UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF WASHINGTON, et al,<br><br>Defendants. | Civil No. C70-9213 RSM<br><br>Subproceeding No. 89-3-04 (Shellfish)<br><br>DECISION |

This matter is before the court pursuant to the dispute resolution process set forth in the Revised Shellfish Implementation Plan (Plan). Exh. 1. The Quileute Tribe disputes the State of Washington's plan to open the 2005-2006 commercial non-tribal Dungeness Crab fishery on December 20, 2005. The State proposed this plan pursuant to 4.6 of the Revised Shellfish Implementation Plan. The Quileute Tribe timely objected to the State's proposed regulation and this court conducted a full day hearing on December 16, 2005.

Pursuant to 4.7 of the Plan, the Tribe's written objection addressed the proposed opening date of the commercial fishery, which had been scheduled for December 20, 2005.[1] The Quileute Tribe proposes an opening date of January 15, 2006. In its briefing, and during the hearing, the Quileute Tribe also

---

[1] At the hearing, the State advised the Court that the opening date had been adjusted to December 31, 2005.

Decision
Page - 1

objected to the western boundary of the U&A utilized by the State. The Court notes, however, that this was not raised in the 4.7 written objection. The State utilizes an approximate three mile western boundary delineating the Washington State territorial sea whereas the Quileute Tribe proposes the use of a 40 mile boundary, as defined in federal regulations.

The undersigned sustains the Quileute Tribe's objection to the opening date for the commercial non-tribal Dungeness Crab fishery and finds that the opening should be delayed until January 15, 2006. The undersigned further declines to rule with regard to the request to utilize a forty mile western boundary for the U&A as opposed to the three mile boundary.

## OPENING THE CRAB FISHERY

The Quileute Tribe has the right to take fifty percent of the Dungeness Crab found anywhere within the Tribe's usual and accustomed fishing areas. *United States v. State of Washington, 873 F. Supp. 1422, 1431 (9th Cir. 1994)*. This right is recognized in the Plan. The challenge faced by the parties in this sub-proceeding is to fashion management techniques which will result in both tribal and non-treaty fishers harvesting their fair share. While the Court recognizes that it will be difficult to reach an exact fifty-fifty share, the law is clear and the management steps taken by the parties must head in the direction of providing treaty and non-treaty fishers a fair opportunity to catch their fair share.

Based on the exhibits and the testimony presented at the hearing, it is apparent that it is not possible to accurately predict the harvestable surplus of Dungeness Crab from year to year. This makes it extremely difficult to "determine" a fair share without the use of hindsight. Section 2.2 of the Plan allows for this situation and requires the Tribes and State to "develop a cooperative approach to management with the goal of maximizing harvest and equalizing allocation, consistent with conservation of the resource." The parties have, in fact, used different management techniques with the goal of "equalizing allocation." These management techniques include the establishment of Special Management Areas (SMA's), gear restrictions, and a "head start" for the tribal fishermen.

Even though a number of management techniques have been employed by the State of Washington in the past, the goal of equal shares was never reached until the 2004-2005 season when, for the first time, the Quileute Tribe harvested 58% of the Dungeness Crab in Area 59A-1. Exh. 16. According to the figures provided by the Quileute Tribe, this was the first time in eight fishing seasons that the tribe

harvested more crab than non-tribal fishers. In the 2003-2004 season the tribe harvested 32% of the crab and in the 2001-2002 season it harvested 37%. For all of the other fishing seasons, the Quileute Tribe harvested less than 20% of the crab. The Quileute Tribe attributes their success in the 2004-2005 season to the fact that the State had to delay opening of the fishery until January 16th.

The State presented testimony through Philip Anderson, Special Assistant to the Director of the Department of Fish and Wildlife, regarding Exhibit N. This exhibit set forth percentages of catch by the Quileute Tribe that differ from those set forth in Exhibit 16. Exhibit N, however, was not made by, or under the direction of Mr. Anderson, although he assumes it to be accurate. While the figures used to reflect the non-treaty harvest are the same in both exhibits, the Quileute Tribe actually reported a larger catch for the 2002-2003 and the 2003-2004 seasons than is reflected on Exhibit N. Inasmuch as there was no testimony presented to the Court regarding the source of these numbers, the Court chooses to rely on the figures provided in Exhibit 16.

Three new management techniques are proposed by the State of Washington for the 2005-2006 season. One change is the requirement that all commercial crab fishers fishing in waters adjacent to the Washington coast "attach a buoy tag purchased from the Department of Fish and Wildlife to each piece of gear deployed by the fisher." Exh. 5. This new requirement is intended to enhance the enforceability of the State's current pot limit program which was adopted in 2002. The State has also reached an agreement with the Makah Tribe which creates an additional small northern SMA off the coast near Lake Ozette. Finally, the State of Washington and State of Oregon have reached an agreement to place geographic restrictions on vessels that fish in federal waters adjacent to Washington and Oregon. This means that vessels licensed solely by Oregon will be prohibited from fishing off the Washington Coast. Exh. 5.

The results of the last crab season have confirmed the capability of the Quileute to harvest their fair share and the State acknowledges they have this capability. The State, however, believes that the new buoy tag requirement, the creation of a secondary SMA per agreement with the Makah Tribe, the agreement with the State of Oregon, and the increase in experience of the tribal fishers will allow the Quileute to reach the 50% goal while still opening the non-tribal fishery on December 31, 2005. On the other hand, the Quileute Tribe believes that an additional "headstart" is a significant management technique that must be continued in order to allow them their fair opportunity to harvest their fair share.

This Court has a difficult time seeing how the changes proposed by the State will reach the hoped for result. With regard to the agreement with the State of Oregon, testimony at the hearing offered additional specifics which were not included in the State's initial letter to the Quileute Tribe. Even with the agreement, there are approximately 55 fishing vessels which have dual licenses with both states while approximately 40 boats are just licensed in the State of Oregon. There is no information as to how many of these boats actually fished in 59A-1. This restriction, however, is of further limited use regarding this sub-proceeding in that the 2004-2005 reported harvest of Dungeness Crab landed in Oregon and harvested in 59-A1 was only 9,830 pounds. (Catch Area 10, Exhibit O). The tribal and non-treaty fishers in Washington reported a total catch of 2,765,020 pounds for that season. Exh. 16. The Oregon catch represents less than one percentage point of the total pounds of Dungeness Crab harvested in 59A-1. ($9,830 \div 2,774,850 = 0.00354$). Based on all the information provided by the State, it does not appear that the agreement between the two states will significantly impact the fishing opportunity of the Quileute Tribe.

While the State has reached an agreement with the Makah Tribe and created a secondary SMA, the Court has no information as to the expected impact this would have with regard to the crab harvest by the Quileute Tribe.

Finally, with regard to the purchase of buoy tags, the State's witness was unable to give any accurate prediction as to what, if any, impact this will have on non-tribal fishers exceeding the pot limit. This buoy tag requirement creates the inference that the pot limitation is not being followed by non-tribal fishers. If this is in fact the case, there is nothing before the Court which suggests the extent of this violation or the impact the buoy markers will have on encouraging non-tribal fishers to comply with the law.

Section 4.7 of the Plan places the burden of proof on the Quileute Tribe as its objection has to be based:

> on a well-founded assertion that the proposed regulation would result in:
> (1) an overharvest on an allocation or conservation basis in violation of the standards set by the Court in *United States v. Washington*, or other conservation standards agreed to by the State and affected Tribes; or
> (2) otherwise violate this Implementation Plan or other applicable orders of the Court. The objection must state the reasons for the objection, the data on which it is based, and any other pertinent information available to the objecting party.

Decision
Page - 4

The undersigned finds that the Quileute Tribe has met its burden of proof. The court recognizes that the Quileute Tribe added another boat to its fleet and that its tribal fishers have gained experience in fishing for crab. However, the addition of a single boat, which increases the size of the Quileute fleet to seven is a factor that can be assessed only in hindsight, as is the case with the Dungeness Crab fishery. This court also notes that the State estimates that the non-tribal harvest will include 56 vessels with 15,000 crab pots. *See* Notice of Amended Coastal Dungeness Crab Fishery Opening Pursuant § 4.6. While the additional boat will assist the Quileute Tribe it is not sufficient reason to ignore history.

The delay in the opening of the non-tribal fishing season to the January 16, 2005 date is logically a major factor in the Quileute Tribe's success in the 2004-2005 season. The track record created by the start dates shown in Exhibit 16 for the seasons prior to the 2004-2005 season show that opening the fishery to non-tribal fishers in December does not give the Quileute Tribe a fair opportunity to catch its fair share.

The undisputed testimony is that the Quileute Tribe's goal of reaching the 50/50 share was made known to the State by 2001. However, any changes in the fisheries management did not accomplish the fair share goal until the Quileute Tribe was given a greater head start. This Court is very aware of the fact that the Tribe and the non-treaty fishers are each entitled to their fair share and that the State is concerned that a delay to January 15, 2006 will result in the Quileute Tribe harvesting more than its fair share. That is also a concern of this Court. However, the steps taken to date by the State have not provided the Quileute Tribe with its fair opportunity to catch its fair share and in fact have resulted in over-harvesting every year but one by non-treaty fishers. Adjustments will have to be made based on experience. It may be that the Quileute Tribe will harvest more than 50% this season. No one can know until the season is over. If that is in fact the case, then there will have to be another adjustment to the opening date. It appears that experience is the best indicator of the future regarding the crab fishery. Prior to the 2003-2004 season, experience showed that the goal was not being reached. The 2003-2004 season, with the delayed opening of the fishery, added an additional element which cannot be ignored by the Court.

By approving the opening date of January 15, 2006 this Court feels compelled to comment on the testimony of Resource Economist Phil Meyer. Mr. Meyer simply took the opening dates of the state fishery and the percentage harvested by the Quileute Tribe corresponding to each opening date and created a linear relationship between the points which he then used to predict an appropriate opening date for non-

Decision
Page - 5

tribal fishers. He readily admitted that more data points would be helpful in light of the fact that there was only one non-tribal opening date in January and the rest of the opening dates were either in November or December. Mr. Meyer testified that the information was "something I think we can work with." The Court, however, declines to accept this testimony as something to "work with" for purposes of prediction. On cross-examination Mr. Meyers admitted that use of this "predictive model" shows only a 40% Quileute harvest in the 2005-2006 season with an opening date of January 15th. This Court is of the opinion that the model has no real predictive value at this time and gives it no weight.

Another area of concern for this court was the uncontradicted testimony of Mr. Anderson with regard to crab harvested by the Quileute Tribe south of 59A-1. He testified that this catch should be added to the harvest in 59A-1 as it suggests the Tribe is not expending maximum effort in the 59A-1 area. Due to the fact that the testimony was a general statement, the testimony did not impact this Court's decision. This Court also recognizes that the Tribe does not believe that it is a fair comparison to add in that catch. However, for the future, it would be wise to determine whether this is a factor that should be considered. The Tribe is asserting that it needs the additional head start in order to have a fair opportunity to catch its fair share. The Court assumes, from that statement, that maximum effort would be given by the tribe during the head start. If it is not, then it is arguable that the Tribe is not taking advantage of its fair opportunity and that may impact an appropriate opening date for non-tribal fishers.

## WESTERN BOUNDARY OF THE U&A

In its written objection to the State, the Tribe stated as follows: "Because the State has focused all of its regulatory actions in Area 59A-1 alone, we will focus on that area as well, even though it is the Tribe's position that this Area does not represent the Tribe's entire U&A." Exh. 6, pages 1 and 2. The objection further stated, at page 3:

> While the Tribe firmly believes that it is entitled to 50% of the crab in the Tribe's entire U&A as defined by the federal government for other ocean species, at this point the Tribe will only seek restriction in the area that is bounded by northern line drawn west from Sand Point (48°07'36") and a southern line drawn west the coast near Destruction Island (47°40'30").

Based on the statements in the written objection, this Court finds that the Quileute Tribe did not preserve any right to raise the western boundary in this dispute resolution process. In addition, this Court is of the opinion that resolution of the western boundary of the U&A is not an appropriate subject for the

dispute resolution process as set forth in the Revised Shellfish Implementation Plan.

Section 1.3 of the Plan requires all provisions of the Plan and "all management plans that are developed from it" to comply with the Court's December 20, 1994 decision. This decision was referred to in the hearing as the Rafeedie decision and is found at *United States v. State of Washington*, 873 F. Supp. 1422 (9th Cir. 1994). Judge Rafeedie affirmed the U&A determinations made by Judge Boldt in *Washington I*.

> *Washington I* made a series of determinations as to the meaning and import of the phrase "usual and accustomed grounds and stations," in the context of adjudicating where the plaintiff Tribes enjoyed the right to fish for salmon and steelhead. No party to this sub-proceeding has challenged these determinations, and the Court finds, as explained below, that they are the usual and accustomed grounds and stations for shellfishing.

*Id.* at p. 1430.

The terms of the Revised Shellfish Implementation Plan require adherence to Judge Rafeedie's decision which in turn relies on the finding in *Washington I*. The undersigned finds that any other determination as to the western boundary of the U&A for the Quileute Tribe is not subject to the dispute resolution process as established in the Plan. The Court, therefore, declines to make any ruling in that regard other than to affirm that for purposes of this hearing, the only area impacted by this decision as to the opening date for non-tribal fishers is 59A-1.

## CONCLUSION

In summary, this Court orders that the opening of the Dungeness Crab commercial non-tribal fishery be set for January 15, 2006, with allowance for the 64-hour gear-setting period which may precede the season opening. The State is further expected to implement the management techniques which were identified in Exhibit 5 and during the testimony of Mr. Anderson (buoy tags, the agreement with the State of Oregon, and the addition of the small northern SMA off the coast near Lake Ozette).

Finally, this Court is denying the request of the Quileute Tribe to rule that the western boundary of its U&A is other than established in the Rafeedie decision and Boldt decision as that is not a proper subject for the dispute resolution process contained in the Plan.

1
2
3
4
5

DATED this 30th day of December, 2005.

/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28