Dkt #5542
filed Jan. 12, 1979

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA, et al., )
                                   )
                  Plaintiffs,      )      NO. 9213-II
                                   )
        v.                         )
                                   )      PLAINTIFF'S SUPPLEMENTAL
STATE OF WASHINGTON, et al.,       )      MEMORANDUM IN SUPPORT OF
                                   )      MOTION FOR PARTIAL
                  Defendants.      )      SUMMARY JUDGMENT
_____)

Plaintiff, United States of America, hereby submits its Supplemental Memorandum in Support of Motion For Partial Summary Judgment.

I

INTRODUCTION

In our initial memorandum we contend that the Federal treaty fishing right involved in this litigation reserves to treaty tribes a right to have the fishery resource protected from adverse environmental actions or inactions of the State of Washington. In support of that contention we set forth and substantiated several arguments: that the treaty fishing right recognized in Final Decision No. 1 presupposes a measure of environmental protection for the salmon/steelhead resource; that the treaties must be construed to effect the purposes for which they were signed; that

Page 1 - PLAINTIFF'S SUPPLEMENTAL
          MEMORANDUM IN SUPPORT OF
          MOTION FOR PARTIAL
          SUMMARY JUDGMENT

UNITED STATES ATTORNEY
10TH FLOOR - UNITED STATES COURTHOUSE
SEATTLE. WASHINGTON 98104
(206) 442-7970

The Supreme Court held that the treaty provision guaranteeing the right of taking fish "at all usual and accustomed places, in common with citizens of the Territory"[21] "imposed a servitude"[22] in the nature of an easement[23] despite the absence of such a reservation either expressly in the treaty or in the Federal patents:

> They [the Indians] were given "the right of taking fish at all usual and accustomed places," and the right "of erecting temporary buildings for curing them." The contingency of the future ownership of the lands, therefore, was foreseen and provided for -- in other words, the Indians were given a right in the land -- the right of crossing it to the river -- the right to occupy it to the extent and for the purpose mentioned.  No other conclusion would give effect to the treaty.  (Emphasis added.)

198 U.S. at 381.

The effect of _Winans_ on the issue of whether the treaty fishing right is to be protected from adverse environmental actions or inactions of the State is four-fold:  First, _Winans_ stands for the proposition that the treaties must be construed to effectuate the purpose for which they were signed.  Just as the Court in _Winans_ found that a meaningful right to fish included the right to reach the fishing sites, this Court must find that a meaningful right to fish means that the State cannot destroy fish which would otherwise reach those sites.  Second, _Winans_ stands for the notion that direct servitudes which include land-use restrictions can be imposed on non-Indian land in order to fulfill Indian reserved rights.  Third, in _Winans_, an easement-like

---

21/ Treaty with the Yakimas, 12 Stat. 951, Article III.

22/ 198 U.S. at 381.

23/ _Id._, at 384.

Page 14 - PLAINTIFF'S SUPPLEMENTAL
        MEMORANDUM IN SUPPORT OF
        MOTION FOR PARTIAL
        SUMMARY JUDGMENT

1  servitude was placed on non-Indian land so that Indian people
2  could get to and use traditional fishing sites.  In the same
3  manner, we believe that since the right to "take fish" necessarily
4  includes the right to have the fish return to the traditional
5  sites so that they may be taken, the treaties, in a sense, impose
6  an "easement" on all waterways used by salmon and steelhead in
7  their migrations.  The blockage or interference with this
8  easement, either physically or through water pollution, is as
9  direct a violation of the treaty right as was the obstruction in
10  Winans.  Fourth, Winans holds that the State of Washington cannot
11  license activity which would interfere with the treaty fishing
12  right.24/  Likewise, the State cannot authorize activity which
13  would destroy the subject matter of the treaties -- the fish
14  themselves.

15
16       2.   Winters.
17           In Winters v. United States,25/ the Federal Government
18  brought suit on behalf of the Gros Ventre and Assinboine Tribes of
19  the Fort Belknap Reservation in Montana to enjoin diversions of
20  water from the Milk River by settlers located upstream from the
21  reservation.
22          The reservation had been established in 1888 as a result
23  of an agreement between the United States and the Tribes.  The
24  settlers occupied lands that had been ceded by the Indians in 1888.
25          The settlers claimed that their diversions had been
26  initiated in 1898, before any use of the Milk River by the Indians
27  or the United States.  They also claimed that the purpose of the
28

_____

29  24/ See also, Tulee v. Washington, 315 U.S. 681 (1942).
30  25/ 207 U.S. 564 (1908).
31
32  Page 15 - PLAINTIFF'S SUPPLEMENTAL
            MEMORANDUM IN SUPPORT OF
            MOTION FOR PARTIAL
            SUMMARY JUDGMENT

Government in obtaining the 1888 cession from the Indians and opening the lands of their former reservation for entry and settlement under the homestead laws was to encourage the cultivation of those ceded lands by homesteaders and entrymen. The defendants alleged, and the Supreme Court seemed to assume, that if they "are deprived of the waters, their lands cannot be successfully cultivated, and they will become useless and homes cannot be maintained thereon."  207 U.S. at 569.

The 1888 agreement said nothing about water, but it did state that the Indians wanted "to become self-supporting, as a pastoral and agricultural people and to educate their children in the paths of civilization." 25 Stat. at 113.  Noting the "conflict of implications" between the legitimate expectations of the Indians and the settlers, the Supreme Court nevertheless held that the Tribes had reserved sufficient water for the Indians' use as an implied condition of their grant of land to the United States.  Thus, the application of the prior appropriation doctrine to Indian reservations was specifically rejected.  The water rights of the reservation did not depend upon the first actual use that was made of the water, but on the purposes for which the reservation was established.  The priority of the reservation's appurtenant water right was 1888, the date of the establishment of the reservation.[26]

To summarize, in _Winters_, the Supreme Court held that a certain amount of the water of the Milk River was reserved from appropriation under state law despite the absence of any mention of water in the 1888 agreement.  These waters were held to have

---

[26] The Court's reasoning is quoted in our initial memorandum in support of this motion, pp. 14-15.

Page 16 - PLAINTIFF'S SUPPLEMENTAL
          MEMORANDUM IN SUPPORT OF
          MOTION FOR PARTIAL
          SUMMARY JUDGMENT

1   been reserved for one reason -- because they were necessary to the

2   fulfillment of the purposes of the reservation.   In order to

3   effectuate and protect this reservation of water, the defendants

4   were enjoined from any interference with the Indians' water right

5   despite the fact that they had a valid appropriation under state

6   law.

7       The effect of Winters, then, is, in many respects the

8   same as Winans.   It holds that Indian treaties must be construed

9   to contain the elements necessary to achieve their purpose.   In

10  Winters, a reservation of water was necessary to achieve the

11  purpose of the congressionally ratified agreement with the tribes

12  -- the creation of a permanent home for the Indians.   Likewise,

13  the purpose of the six treaties involved in this case can only be

14  achieved by construing them so as to contain the word of the

15  United States that if nature provides the fish -- no one will come

16  between those fish and the treaty fishermen.

17      Winters also reflects Winans in that the case, in a

18  sense, imposes a "servitude" or limitation on the use of

19  non-Indian land in favor of an Indian treaty right.   In Winters,

20  the non-Indian upstream landowners were enjoined from withdrawing

21  water from the Milk River until the senior rights of the Indians

22  were met.   Similarly, this case seeks to limit non-Indian use of

23  salmon and steelhead habitat and transportation routes at least to

24  the extent that the use interferes with the life cycles of those

25  species.

26      In Puget Sound Gillnetters Assn. v. U.S. Dist. Court, 573

27  F.2d 1123 (9th Cir. 1978), the Ninth Circuit recently reaffirmed

28  the view that with regard to the Indian treaty fishing litigation,

29  water law cases are "the most nearly analogous area of the law."

30  573 F.2d at 1132, fn. 15.   The analogy between the holding in

31

32

Page 17 - PLAINTIFF'S SUPPLEMENTAL
          MEMORANDUM IN SUPPORT OF
          MOTION FOR PARTIAL
          SUMMARY JUDGMENT

1  Winters and the relief being sought in this case is most
2  striking.  In Winters, the Supreme Court told the defendant
3  settlers (and, in effect, the State of Montana, since the
4  settlers' water rights were totally based on state law) that they
5  could not interfere with the Indians' senior water rights.  In
6  other words, the Supreme Court did not say that the agreement
7  guaranteed the Indians that they would get their full entitlement
8  of water each year (that would depend entirely on the amount of
9  precipitation which fell).  But the Court did hold that if the
10  water was present in the river, then the agreement guaranteed that
11  no one would interfere with it before it reached the Indians.  A
12  similar ruling must obtain in this case.  We do not contend that
13  the treaties guarantee that salmon and steelhead will always be
14  present at the tribes' usual and accustomed grounds and stations.
15  As a natural resource the fish are, by definition, subject to the
16  vagaries of nature.  We do contend, however, that if nature
17  provides the fish, no one, not the State or any of her non-treaty
18  citizens, can interfere with those fish before they reach the
19  treaty fishermen.  Simply stated, that was the holding in Winters,
20  and it must be applied here.
21
22       3.    Washington.
23            Our reliance on Final Decision No. 1 to support the view
24  that the intent of the treaties was to reserve a perpetual fishery
25  for the treaty tribes, and that the State cannot interfere with
26  that right by destroying the subject matter of the treaties, has
27  been discussed at length in our initial memorandum (pp. 6-12), and
28  will not be repeated here.  We would, however, by way of summary,
29  specifically draw the Court's attention to the following portions
30  of that decision:  384 F. Supp at 333-334, 337-338, 342; C of L
31
32
Page 18 - PLAINTIFF'S SUPPLEMENTAL
         MEMORANDUM IN SUPPORT OF
         MOTION FOR PARTIAL
         SUMMARY JUDGMENT

UNITED STATES ATTORNEY
10TH FLOOR - UNITED STATES COURTHOUSE
SEATTLE, WASHINGTON 98104

1  The tribal watershed reports identified 499 incidents of
2  habitat damage due to channelization.  PE-37 through PE-51.
3  According to those reports, the impact of channelization is being
4  especially felt on the Nooksack River, Squalicum Creek, and
5  Whatcom Creek (PE-37); the Skagit River (PE-38); Montague Creek
6  and French Creek (PE-39); Thornton Creek, McAleer Creek, Lyon
7  Creek, Issaquah Creek, Juanita Creek, and especially the Cedar
8  River (PE-40); the Puyallup River (eighteen miles channelized --
9  PE-42); the Skokomish River (PE-45); and the Hoh River (PE-49).

10

11      4.   <u>Culverts.</u>

12      We use the term "culvert" to refer to any pipe, conduit,
13  tunneled drain, arched passageway, or other waterway constructed
14  to convey water across or beneath a street, highway, railway,
15  parking lot, or similar area.

16      Since culverts convey water and thus become a part of the
17  case area waterways, improper culvert placement, size, or gradient
18  will prevent the upstream migration of salmon and steelhead.

19      Culverts are rarely identified as limiting factors in the
20  Stream Catalog.  <u>See</u> <u>e.g.</u>, PE-2, 19 - Lyre Hoko - 601; 20 -
21  Soleduck Hoh - 05, 401, 1101, 1701.

22      The improper placement of culverts is, however, a chronic
23  problem in streams supporting migratory fish.  The watershed
24  reports list 136 improperly placed culverts which currently exist
25  in the case area.  PE-37 through PE-51.

26

27      5.   <u>Gravel Removal.</u>

28

29      According to the Department of Fisheries Stream Catalog:

30      Removal of riverbed materials, particularly
    gravel, results in reduced spawning areas and
    causes continuous and excessive bed load

31

32

Page 37 - PLAINTIFF'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL
SUMMARY JUDGMENT

V

## CONCLUSION

The Indian people of Western Washington and the salmon/steelhead resource have at least one thing in common: it is remarkable that they have survived the onslaught of "civilization." Whether they continue to survive may be determined to some extent by the outcome of this litigation. These Indian people depend on salmon and steelhead. Salmon and steelhead depend on a clean, fresh aquatic environment. That this environment is being degraded and destroyed is attested to by the 2,110 incidents described above.

We have demonstrated that this treaty fishing right is perpetual in nature. We have further established that the tribes have a right to have this fishery resource, the subject matter of the treaty reservation, protected from adverse environmental actions or inactions of the State. We respectfully request that the motion for partial summary judgment be granted.

DATED this 12th day of January, 1979.

Respectfully submitted,

JOHN C. MERKEL
United States Attorney

MICHAEL R. THORP
Attorney
United States Department of Justice

Attorneys for the United States

Page 55 - PLAINTIFF'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL
SUMMARY JUDGMENT