The Honorable Ricardo S. Martinez

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | NO. C70-9213 |
| Plaintiffs, | Subproceeding 01-1 (Culverts) |
| v. | WASHINGTON'S OPPOSITION TO PLAINTIFF TRIBES' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| STATE OF WASHINGTON, | |
| Defendant. | |

As the Tribes' brief makes clear, this case is not really about culverts. Culverts are simply the vehicle that the Tribes have chosen to get the Court to reinstate a reversed and vacated declaratory judgment that the District Court issued in Phase II of *United States v. Washington* in 1980.[1] A three-judge panel of the Ninth Circuit reversed it in 1982 because it created "a comprehensive environmental servitude with open-ended and unforeseeable consequences,"[2] and in 1985 the Ninth Circuit en banc vacated it for lack of "concrete facts which underlie a dispute in a particular case."[3] Twenty-one years later, the moving Tribes[4]

---

[1] *United States v. Washington*, 506 F. Supp. 187 (W.D. Wash. 1980) (Doc. No. 7240); *see* Am. J. ¶¶ 3, 4 (Jan. 12, 1981) (Doc. No. 7390).

[2] *United States v. Washington*, 694 F.2d 1374, 1381 (9th Cir. 1982), *vacated*, 759 F.2d 1353 (9th Cir. 1985) (en banc).

[3] *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985) (en banc).

[4] It appears that only 18 of the 21 plaintiff-intervenor Tribes have joined in the Tribes' Motion For Partial Summary Judgment at this time. The non-signing Tribes appear to be Nooksack, Quinault, and Upper Skagit. The position of the plaintiff United States is also unknown at this time.

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO. C70-9213

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  offer nothing new to make their claim any more persuasive or justiciable, and they ignore

2  intervening court decisions that have gone against them.

3     There is no genuine issue of material fact.  But the State, not the Tribes, is entitled to

4  a judgment as a matter of law.  The Court should deny the Tribes' motion, and should

5  dismiss the Request For Determination and the United States' Response to it.[5]

6                                **FACTS**

7     This case does have a factual context, but not the one the Tribes describe.  In their

8  brief, the Tribes make many factual assertions for which there is no evidence.

9     First, the Tribes assert that "Tribal harvests have fallen back to near their 1974

10  levels." Tribes' Memo p. 8.  Their own evidence shows otherwise.  As shown in the tables

11  and graphs attached to the Declaration of Keith Lutz (Doc. No. 18564/299),[6] tribal salmon

12  harvests have consistently exceeded 1974 levels since this subproceeding was filed,

13  sometimes substantially.  During that time, there have been some record high runs of wild

14  chum salmon, for example.[7]  In 2003, North Puget Sound had "one of the largest pink salmon

15  runs ever."[8]  Tribal harvests could have been even higher, but the Tribes chose not to harvest

16  their full share of some runs because of poor markets for their catch.[9]

17     The Tribes' brief says state culverts "limit" or "thwart" tribal harvest.  Tribes' Memo

18  p. 12, 17.  But in their depositions, the Tribes' biologists had trouble making *any* connection

19

20  [5] The State incorporates herein the arguments and supporting evidence filed in connection with
Washington's Motion For Summary Judgment, Doc. Nos. 18552/287 – 18557/292.  Copies of additional
21  discovery materials cited herein are attached to the Third Declaration of Mary E. Jones filed herewith.

22  [6] The Tribes did not identify Mr. Lutz as a witness in their pretrial disclosures.  The State does not object
to the Court's consideration of his declaration on this motion, however.

23  [7] *See* Tribes' Memo p. 100; Decl. of Keith Lutz (Doc. No. 18564/299) at 6, 21; Rawson Dep. 94:23-24
(May 22, 2006).  *See also* 63 Fed. Reg. 11774, 11778 (March 10, 1998) ("chum salmon are abundant and have
24  been increasing in abundance in recent years within this [Puget Sound/Strait of Georgia] ESU").

[8] Rawson Dep. 99:22-25.  *See also* 60 Fed. Reg. 51928, 51932 (Oct. 4, 1995) ("Most populations in the
25  odd-year pink salmon ESU appear to be healthy, and overall abundance appears to be close to historic levels").

26  [9] Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 196-97, 231-32, 250, 252, 270; Rawson Dep.
106:14-107:6.

1   between culverts and tribal salmon harvests.[10]   In some cases, as described above, market

2   conditions limit tribal harvest.  In other cases, politics limit tribal harvest.  Nine of the Tribes

3   rely on sockeye salmon from the Fraser River in Canada.[11]   Allocation of the Fraser River

4   sockeye harvest between the United States and Canada is governed by an international

5   treaty.[12]   In recent years, the Tribes' Fraser River sockeye fisheries have been constrained to

6   protect Canadian stocks, whose abundance has no connection with Washington culverts.[13]

7   Canadian fisheries also intercept salmon bound for Washington rivers.   At this time,

8   Canadian catches of some Puget Sound Chinook stocks far exceed those in Washington.[14]

9        Nor do the Tribes have evidence of any causal connection between state culverts and

10   tribal harvest fluctuations over the past 30 years.  Most major highways were constructed

11   before then.  The total centerline mileage in the state highway system has increased by less

12   than two percent since 1974.[15]  In recent years, the State has removed some forest roads.[16]

13        The State agrees that it has some fish-blocking culverts, and that those culverts have

14   *some* effect on salmon abundance, primarily wild coho, but the Tribes cannot prove that a

15   decision in their favor would make any difference in their fisheries.  Culverts do not take fish

16

17   [10]   Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 52, 151; Rawson Dep. 27:13-29:23, 32:14-
33:6, 37:21-42:16, 60:11-61:9, 71:1-10, 98:23-99:4, 100:19-101:4, 144:14-18; Wasserman Dep. 91:3-6, 92:23-
18   93:2 (April 11, 2006); *see* Decl. of Keith Lutz (Doc. No. 18564/299) ¶ 5.  The United States denied that its own
culverts reduce the fish available for tribal harvest because "information that such federal culverts are the cause of
reduced fish runs is inconclusive and it is impossible to generalize."  Decl. of Mary E. Jones Disc. Pg. 124.

19   [11]   *See* Decl. of Keith Lutz (Doc. No. 18564/299) at 25; *United States v. Washington*, 384 F. Supp. 312,
360 (W.D. Wash. 1974) (Lummi Tribe's "single most valuable fish resource was undoubtedly the sockeye, which
20   the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the
Fraser River"); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690-91
21   (1979) (international agreement had no effect on Tribes' rights to take Fraser River sockeye and pink salmon).

22   [12]   Pacific Salmon Treaty, U.S.-Can., Jan. 28, 1985, T.I.A.S. No. 11091; *see United States v. Washington*,
Civil No. 9213, Stipulation and Order Re: Fraser River Sockeye Salmon (W.D. Wash. Feb. 11, 2000) (Doc. No.
23   16905).

     [13]   Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 164, 167-70, 242-45, 271.
24
     [14]   *See 2006 Management Framework Plan and Salmon Runs' Status For the Strait of Juan de Fuca
Region* at 5 (Doc. No. 18611).
25
     [15]   *See* Decl. of Lou Baker ¶ 4.

26   [16]   *See* 2d Decl. of Alex Nagygyor ¶ 10 (Doc. No. 18554/289).

1  in the sense that fishing gear does.  There is no evidence that the State's culverts intercept

2  adult salmon that would otherwise pass through the Tribes' usual and accustomed fishing

3  places.  The Tribes acknowledge that "[c]ulverts do not generally result in fish kills."[17]

4  Many factors affect salmon abundance, and the Tribes' biologists recognize that blocking

5  culverts are not the primary factor limiting salmon production in the *United States v.*

6  *Washington* case area.[18]  In their depositions, taken over five years after this matter was filed,

7  the Tribes' biologists could identify only a handful of state culverts that caused them any

8  particular concern, in only a few of the *United States v. Washington* case area watersheds.[19]

9        The Tribes have no evidence that the State is "constructing culverts that diminish

10  needed fish populations" or "using" culverts "to divert salmon," or that it has ever done so.

11  Tribes' Memo p. 19, 22.  The Tribes' evidence shows that most of the State's culverts do not

12  block fish passage.[20]  Since 1991, the State has spent millions of dollars to find and fix fish-

13  blocking culverts, many of them designed according to standards recommended by the

14  plaintiff United States.[21]  During that time, the State has opened up hundreds of miles of

15

16  [17] Tribes' Answer to Interrog. 109 (Lower Elwha Klallam response).

17  [18] Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 198-200, 212, 263-64, 266-67, 272-74; *see* Fox Dep. 53:3-22 (June 29, 2006); Ladley Dep. 46:1-10 (April 25, 2006); Rawson Dep. 54:18-55:1; Decl. of Keith Lutz (Doc. No. 18564/299 ¶ 5; *see* Decl. of Mary E. Jones Disc. Pg. 4.  The plaintiff United States has described factors affecting wild salmon and steelhead abundance in the *United States v. Washington* case area in several Federal Register notices. *E.g.*, 60 Fed. Reg. 38011, 38022-24 (July 25, 1995) (coho); 61 Fed. Reg. 41541, 41549-50 (Aug. 8, 1996) (steelhead); 63 Fed. Reg. 11482, 11494-95 (March 9, 1998) (Chinook); 63 Fed. Reg. 11750, 11759-61 (March 10, 1998) (sockeye); 63 Fed. Reg. 11774, 11777-80 (March 10, 1998) (chum); 69 Fed. Reg. 33102, 33141-42, 33157, 33159 (June 14, 2004) (Ozette Lake sockeye & Puget Sound Chinook); 71 Fed. Reg. 15666, 15672-75 (March 29, 2006) (Puget Sound steelhead).  *See also Joint Statement Regarding the Biology, Status, Management, & Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsular Drainage Areas of Western Washington* (Joint Exhibit 2a, admitted Aug. 24, 1973) § 1.5.

22  [19] Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 52, 190, 210, 265; Fox Dep 11:14-12:4; Klochak Dep. 74:5–76:5 (July 21, 2006); Ladley Dep. 27:2-28:10, 59:17-60:8; McHenry Dep. 19:1-12, 23:9-25:5 (May 8, 2006); Rawson Dep. 60:11-61:9, 76:21-77:13, 86:15-91:21, 93:20-94:1, 97:3-10, 114:3-13, 120:5-23, 139:18-23, 141:25-142:7, 144:14-18; Wasserman Dep. 28:23-30:5, 114:21-115:19, 117:15-118:8; Wasserman Dep. 155:23-156:20 (June 23, 2006); Zischke Dep. 14:25-15:11, 16:17-20, 20:20-21:20, 30:23-31:6, 32:24-33:16, 50:24-51:15 (April 17, 2006).

25  [20] Decl. of Ronald McFarlane ¶¶ 8-10 (Doc. No. 18565/300).

26  [21] Decl. of Matthew J. Witecki (Doc. No. 18553/288); 2d Decl. of Alex Nagygyor ¶¶ 7, 10 (Doc. No. 18554/289); Decl. of Paul J. Wagner (Aug. 2006) ¶¶ 8, 10 (Doc. No. 18558/293).

1   stream habitat by fixing or removing culverts at high priority sites.[22]   The State's published

2   reports about those efforts are what provided the Tribes with the material for this lawsuit.[23]

3   What the State is doing has the potential to *increase* fish populations, not diminish them.[24]

4   But the State cannot do this alone.  Many of the remaining fish-blocking culverts in the state

5   highway system, perhaps half, lie upstream of other blocking culverts, some owned by

6   entities who are not parties to this case.[25]   Salmon can thrive in these streams only if other

7   problems in the watershed are fixed, too.

8          Finally, the Tribes say there is no "dispute that the Tribes are currently unable to earn

9   even a moderate living by fishing."  Tribes' Memo p. 5.  That misstates the State's position.

10   The State does not know whether the Tribes are earning "a moderate living by fishing," for

11   the Tribes themselves are unable to define what that means.[26]   The State does not argue on

12   this motion, however, that there is a genuine issue of material fact as to whether the Tribes

13   are earning "a moderate living from fishing," whatever that means.

14

15   _____

16   [22]   2d Decl. of Alex Nagygyor ¶¶ 9, 10 (Doc. No. 18554/289); Decl. of Paul J. Wagner (Aug. 2006) ¶¶ 9-11 (Doc. No. 18558/293).  Paragraph 9 of the Declaration of Ronald McFarlane (Doc. No. 18565/300) says that only 152 culverts owned by the Washington Department of Natural Resources have been "repaired."  Mr. McFarlane evidently did not include in his analysis the hundreds of culverts that DNR has simply removed.  *See* 2d Decl. of Alex Nagygyor ¶ 10.  Because the Tribes did not identify Mr. McFarlane as a witness in their pretrial disclosures, the State did not have an opportunity to take Mr. McFarlane's deposition to explore the basis for his opinions.   The State does not contend that the discrepancies between Mr. McFarlane's declaration and Mr. Nagygyor's create a genuine issue for trial, however.

[23]   *See* Tribes' Req. For Determination ¶¶ 3.6, 3.7 (Doc. No. 17033); 2d Decl. of Mary E. Jones at 7-8 (Doc. No. 18559/294).

[24]   *See* Tribes' Memo p. 11 & evidence cited therein; Decl. of Matthew J. Witecki (Doc. No. 18553/288); 2d Decl. of Alex Nagygyor ¶¶ 5-7, 9-10 (Doc. No. 18554/289); Decl. of Michael J. Allen ¶¶ 4, 6 (Doc. No. 18555/290); Decl. of Donald Haring ¶¶ 3-5; 10 (Doc. No. 18556/291); Decl. of Paul J. Wagner (Aug. 2006) ¶¶ 3, 6-12 (Doc. No. 18558/293); Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 47, 59.

[25]   Decl. of Paul J. Wagner (Aug. 2006) ¶ 5 (Doc. No. 18558/293).  The Plaintiffs themselves have fish-blocking culverts in the *United States v. Washington* case area. Pl. Tribes' Answer to Wash. State's Counter Req. Determination ¶ 13 (Doc. No. 17139); Decl. of James Doyle (Nov. 1, 2004) (Doc. No. 17798/165); Decl. of Robert Metzger (Nov. 1, 2004) (Doc. No. 17799/166); Decl. of Richard W. Sowa (Oct. 29, 2004) (Doc. Nos. 17800/167, 17802/168, 17802/169, 17803/170); Decl. of Paul J. Wagner (Aug. 2006) ¶ 4 (Doc. No. 18558/293); Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pgs. 123-24, 183-85, 275-76.

[26]   *See* Washington's Mot. Summ. J. (Doc. No. 18552/287) at 16-17 & evidence cited therein.

1

## ARGUMENT

2     **A.**     ***Winans* and *Puyallup* Do Not Support The Tribes.**

3          According to the Tribes, the legal rule they advocate flows inevitably from the United

4     States Supreme Court's decisions in *United States v. Winans*, 198 U.S. 371 (1905), and the

5     *Puyallup* trilogy of the 1960s and 1970s.[27]  They say the Court "recognized" a treaty-based

6     "State's obligation to preserve the runs."  Tribes' Memo p. 14.  The Court did not do that.

7          The Winans brothers owned land along the Columbia River across from The Dalles,

8     at a usual and accustomed fishing place of the Yakama Nation.  They installed four fish

9     wheels in the river to take salmon for a cannery.  They erected fences to keep the Indians

10    out.[28]  The United States sued the Winans brothers to secure the Indians' access to the fish.

11         The Winans brothers argued that their federal land patents, state shoreland grants, and

12    state fish wheel licenses gave them a right to exclude the Indians from the site.  The Supreme

13    Court disagreed.  It held that, when the Yakamas ceded the land to the United States in the

14    Yakama Treaty, under Article III of the Treaty[29] they expressly retained "a right in the

15    land—the right of crossing it to the river—the right to occupy it to the extent and for the

16    purpose mentioned."[30]  The Court said this easement ran with the land even though it was not

17    expressly mentioned in the Winans' patents.  The Court also rejected the Winans' reading of

18    _____

19         [27] *Puyallup Tribe v. Dep't of Game*, 391 U.S. 392 (1968) (*Puyallup I*); *Dep't of Game v. Puyallup Tribe*,
      414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165 (1977) (*Puyallup III*).

20         [28] *See generally* JOSEPH C. DUPRIS, KATHLEEN S. HILL & WILLIAM H. RODGERS, JR., THE SI'LAILO WAY
21    71-89 (2006).

           [29] Article III, Paragraph 2 of the Yakama Treaty provides:

22              The exclusive right of taking fish in all the streams, where running through or bordering said
                reservation, is further secured to said confederated tribes and bands of Indians, as also the right
23              of taking fish at all usual and accustomed places, in common with citizens of the Territory, and
                of erecting temporary buildings for curing them . . . .
24
      Treaty With the Yakamas, Art. III ¶ 2, 12 Stat. 951, 953 (June 9, 1855).  The Yakama Treaty is one of the treaties
25    at issue in this case.

           [30] *Winans*, 198 U.S. at 381-82.  The Washington Territorial Supreme Court had previously reached the
26    same conclusion in *United States v. Taylor*, 3 Wash. Terr. 88, 13 P. 333 (1887).

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO. C70-9213

6

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1   the state fish license law.  The Court said the law merely authorized the Winans brothers to

2   use fish wheels, and gave them no power to exclude others from the fish wheel sites.[31]

3       The only legal issue in *Winans* was whether the Winans brothers had a right to

4   exclude Indians from treaty-secured usual and accustomed fishing places.  The Supreme

5   Court said no.  The State of Washington was not a party in the case, and the Court said

6   nothing about any treaty-based state "obligation."

7       The issue in *Puyallup I* was whether and to what extent the Medicine Creek Treaty

8   preempted state regulation of fishing by Puyallup Indians at off-reservation usual and

9   accustomed places, a question that had vexed state-tribal relations for decades.[32]  The Tribe

10  and its allies argued that the Treaty preempted all state regulation of fishing by tribal

11  members.[33]  The Supreme Court rejected that argument.  It held that the Treaty does not

12  preempt state regulation "in the interest of conservation, provided the regulation meets

13  appropriate standards and does not discriminate against the Indians."[34]

14      In *Puyallup II*, the Supreme Court held that a state fishing regulation that banned the

15  nets used by Indians but allowed the hook-and-line gear used by non-Indian sportsmen was

16  discriminatory and therefore preempted.[35]  The Court remanded for a fair apportionment of

17

18

19      [31]  *Winans*, 198 U.S. at 384.  The United States Supreme Court's reading was consistent with the
20  Washington Supreme Court's prior construction of the same law.  *See State ex rel. Curry v. Crawford*, 14 Wash.
    373, 44 P. 876 (1896); *Morris v. Graham*, 16 Wash. 343, 47 P. 752 (1897).

21      [32]  *See generally Who's In Charge of Fishing?*, 106 OREGON HISTORICAL QUARTERLY 412 (Fall 2005),
    http://www.historycooperative.org/journals/ohq/106.3/.

22      [33]  *See Puyallup Tribe v. Dep't of Game*, 20 L.Ed.2d 1588 (1968) (briefs of counsel); Ralph W. Johnson,
    *The States Versus Indian Off-Reservation Fishing:  A United States Supreme Court Error*, 47 WASH. L. REV. 207
23  (1972).

24      [34]  *Puyallup I*, 391 U.S. at 398.  The Supreme Court has adopted the "nondiscriminatory" preemption
    standard of *Puyallup* in other cases involving state laws applied off-reservation that affect the exercise of tribal
25  rights secured by federal law.  *Wagnon v. Prairie Band Potawatomi Nation*, 126 S. Ct. 676, 688-89 (2005);
    *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

26      [35]  *Puyallup II*, 414 U.S. at 48.

WASHINGTON'S OPPOSITION TO                  7                ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF TRIBES' MOTION FOR                                        1125 Washington Street SE
PARTIAL SUMMARY JUDGMENT --                                              PO Box 40100
NO.  C70-9213                                                     Olympia, WA  98504-0100
                                                                      (360) 753-6200

1    the available fish between the two groups.  In *Puyallup III*, the Court upheld a 45/55

2    Indian/non-Indian apportionment of the fish available for harvest.[36]

3         The Court in the *Puyallup* trilogy recognized the State's inherent sovereign police

4    power to conserve fish by regulating fishing.  It held that the nondiscriminatory exercise of

5    that power does not conflict with the treaties.[37]  The Supreme Court did not hold that any

6    treaty imposes on the State an affirmative "obligation to preserve the runs" for tribal harvest,

7    as the Tribes now claim.  Tribes' Memo p. 14; *see id.* p. 17.[38]

8    **B.    No Case Holds That The Treaties Guarantee Any Particular Quantity Of Fish.**

9         The Tribes say the legal rule they seek follows from case law establishing "that the

10   Treaties reserved sufficient fish for the Tribes to continue their fishing way of life."  Tribes'

11   Memo p. 17; *see id.* p. 19.  That is not what the courts have said.

12         **1.    In *Fishing Vessel*, The Supreme Court Did Not Hold That The Tribes Are
             Entitled To A "Moderate Living" From Fishing.**

13         In Phase I of *United States v. Washington*, the Tribes contended, as they do here,

14   "that the treaties had reserved a pre-existing right to as many fish as their commercial and

15   subsistence needs dictated."[39]  But the Supreme Court did not adopt that argument.  In

16   *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443

17   U.S. 658 (1979), the Court held instead that the treaties secure to the Tribes only a right "to

18   take a fair share of the available fish."[40]  The *dissenting* opinion in *Fishing Vessel* said "I

19

---

20   [36] *Puyallup III*, 433 U.S. at 177.

[37] *Puyallup I*, 391 U.S. at 398-99; *Puyallup II*, 414 U.S. at 48-49; *see Washington v. Wash. State*

21   *Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 682-84 (1979) (describing *Puyallup* decisions);
     *Antoine v. Washington*, 420 U.S. 194, 207 (1975) (describing *Puyallup I* and *II*); *United States v. Washington*, 520
     F.2d 676, 684 (9th Cir. 1975).

22   [38] Such a holding would have posed serious constitutional problems regarding the relationship between

23   states and the Federal Government under the Tenth Amendment and other provisions of the United States
     Constitution. *See New York v. United States*, 505 U.S. 144 (1992).

24   [39] *Fishing Vessel*, 443 U.S. at 670; *see United States v. Washington*, Civil No. 9213, Final Pretrial Order
     § 6-14 (W.D. Wash. Aug. 24, 1973) (Doc. No. 353) (Tribes contend that the treaties entitle them to take

25   "sufficient fish to satisfy their present and future needs for a subsistence and livelihood").

     [40] *Fishing Vessel*, 443 U.S. at 685-86; *see United States v. Washington*, 157 F.3d 630, 651-52 (9th Cir.

26   1998) (applying "fair share" concept to shellfish allocation).

1   would hold" that the Indians "are guaranteed enough fish to satisfy their ceremonial and

2   subsistence needs."[41]   But the majority did not say that the Tribes are entitled to any

3   minimum quantity of fish, for a "fishing way of life" or any other purpose.[42]

4          The Tribes interpret a sentence from the remedy section of *Fishing Vessel* as a

5   declaration that they have a treaty right to as many fish as they need for a "moderate living."

6   Tribes' Memo p. 16 n.9, *id.* p. 19.  The Tribes have taken that sentence out of context and are

7   confusing rights and remedies.  In Part IV of its opinion in *Fishing Vessel*, 443 U.S. at 674-85,

8   the Supreme Court set forth its legal analysis of the treaties.  The Court said the treaty language

9   securing a "right of taking fish . . . in common with all citizens" means treaty and nontreaty

10  fishermen have a common right "to take a fair share of the available fish."[43]   In Part V of its

11  opinion, 443 U.S. at 685-92, the Supreme Court examined Judge Boldt's equitable remedy to

12  implement that right.  The Court began by saying that "an *equitable* measure of the common

13  right should initially divide the harvestable portion of each run that passes through a 'usual and

14  accustomed' place into approximately equal treaty and non-treaty shares, and should then

15  reduce the treaty share if tribal needs may be satisfied by a lesser amount."[44]   The Court went

16  on to explain why equal shares were equitable.  Finally, the Court recognized that, like any

17  equitable remedy, Judge Boldt's 50/50 apportionment between treaty and non-treaty fishermen

18  could be modified in the future to accommodate changing circumstances.[45]   In particular, a

19

20      [41] *Fishing Vessel*, 443 U.S. at 707 (Powell, J., dissenting).

21      [42] The majority left open the question of whether "priority for [ceremonial and subsistence] uses would be required in a period of short supply in order to carry out the purposes of the treaty."  *Fishing Vessel*, 443 U.S. at 688.  Current tribal/state management of Chinook salmon fisheries does accord priority for tribal ceremonial and subsistence uses.  *See* Puget Sound Indian Tribes & Washington Dep't of Fish & Wildlife, *Comprehensive Management Plan for Puget Sound Chinook: Harvest Management Component* (March 1, 2004) at 15, 21, 32, 33 (available at Northwest Indian Fisheries Commission web site, http://www.nwifc.org/fishmgmt/downloads.asp).

22

23      [43] *Fishing Vessel*, 443 U.S. at 684-85.

24      [44] *Id.* at 685 (emphasis added).

25      [45] *Id.* at 685-87; *see* Fed. R. Civ. P. 60(b)(5); *United States v. Washington*, 394 F.3d 1152, 1162 (9th Cir. 2005) ("the allocation of natural resources between treaty tribes and others cannot help but be an ongoing venture"), *cert. denied*, 126 S. Ct. 1025 (2006); *United States v. Washington*, Subproceedings 83-6/90-1, Order

26

1  Tribe's economic circumstances might change.  The Court said that, if in the future a Tribe

2  does not need 50% of the harvestable fish for a "livelihood," or "moderate living," such a large

3  allocation might be unreasonable, and the State may ask the court for an adjustment.[46]

4        The Supreme Court did not declare that the treaties secure to the Tribes a substantive

5  treaty right to a "moderate living from the fishery."  Substantive rights, and the remedies to

6  protect them, are two different things.[47]  The "moderate living" concept was part of the Court's

7  *remedy* analysis.  Indeed, it was a limitation on Judge Boldt's equitable remedy.  This Court

8  should reject the Tribes' attempt to transform "moderate living" into a substantive legal right.

9        In advocating a legal right based on "moderate living," the Tribes ask this Court to

10 repeat Judge Orrick's misreading of *Fishing Vessel* in *United States v. Washington*, 506

11 F. Supp. 187, 208 (W.D. Wash. 1980).  Tribes' Memo p. 3, 20.  They fail to mention, however,

12 that a three-judge panel of the Ninth Circuit rejected that reading on appeal.[48]  The majority

13 emphasized that *Fishing Vessel* did not "say that the treaty guarantees [the Tribes] a means by

14 which their moderate living needs can be met by fishing in perpetuity."[49]  This Court should

15 not accept the Tribes' invitation to make the same mistake again.

16      **2.    The *Winters* Doctrine Does Not Support The Tribes.**

17      The Tribes say that several water rights cases, beginning with *Winters v. United States*,

18 207 U.S. 564 (1908), lead to the conclusion that the treaties include the right to "sufficient fish

19 to sustain the Tribes by fishing."  Tribes' Memo p. 19, 21.  The Tribes misread those cases.

---

20  Re: Status Conference (W.D. Wash. May 2, 1996) (Doc. No. 15727/167) ("trial in this matter will be limited to
21  determining whether the petitioning tribes can demonstrate the existence of changed circumstances under Fed. R.
    Civ. P. 60(b) sufficient to warrant altering the way in which equitable allocation is made").

22      [46]  *Fishing Vessel*, 443 U.S. at 685-87.  In Subproceeding 89-3, the State urged that a remedy allocating
    50% of the harvestable shellfish to the Tribes would be unfair, in part because the Tribes were already enjoying a
23  "moderate living."  The court concluded that the State failed to meet its burden of proof to show that a 50/50
    remedy would be inequitable.  *United States v. Washington*, 157 F.3d 630, 651-52 (9th Cir. 1998).

24      [47]  *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 213 (2005).

25      [48]  *United States v. Washington*, 694 F.2d 1374 (9th Cir. 1982), *vacated*, 759 F.2d 1353 (9th Cir. 1985) (en
    banc).

26      [49]  *U.S. v. Washington*, 694 F.2d at 1377.

---

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO. C70-9213

10

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1   The *Winters* doctrine, which holds that a federal reservation of land includes an

2   appurtenant right to sufficient water to fulfill the reservation's purpose, is about allocation of

3   water that is *available* in any given year.[50]   Under the *Winters* doctrine, water for Indian lands

4   usually takes first priority when available water is allocated, potentially depriving other people

5   of water in times of scarcity.[51]

6   The method of allocating available fish under the Stevens Treaties is different.   In

7   *Fishing Vessel*, the Supreme Court rejected the *Winters* approach.   The Tribes advocated the

8   *Winters* rule, arguing that tribal needs should be satisfied first, and that other fishermen should

9   be allowed to take only what is left over.[52]   But the Court held that, because the treaties secure

10   to the Tribes a right of taking fish "in common with" others, treaty Indians must fairly share

11   the available fish with others.[53]   Tribal harvest is capped at 50% so that other fishermen will

12   not be deprived of a fair share.[54]

13   In this case, the Tribes are trying to increase the total supply of fish, not allocate the

14   available fish.   The Tribes are asking the Court to impose on the State a duty to manage its

---

16   [50]   *See Arizona v. California*, 460 U.S. 605, 609-10 (1983); *Joint Bd. of Control v. United States*, 832 F.2d 1127 (9th Cir. 1987).

17   [51]   *See, e.g., Joint Bd. of Control v. United States*, 832 F.2d 1127 (9th Cir. 1987); *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 327 (9th Cir. 1956) (Yakama Reservation).   The courts have, however, cabined tribal water allocations through the "practicably irrigable acreage" standard.   *Arizona v. California*, 373 U.S. 546, 600-01 (1963); *United States v. Washington*, 375 F. Supp.2d 1050, 1066-67 (W.D. Wash. 2005) (Lummi Reservation).

20   [52]   *Fishing Vessel*, 443 U.S. at 670 ("tribes themselves contended that the treaties had reserved a pre-existing right to as many fish as their commercial and subsistence needs dictated").   The Tribes urged the *Winters* approach at the 1973 trial in Phase I of *United States v. Washington*. *See* Plfs.' Post-Trial Br. at 27-28 (Nov. 5, 1973) (Doc. No. 387) ("Just as in the case of water, the amount of the Indians' [fish] entitlement is determined not by the amount of use at the time of the treaty, not by the demands placed upon the resource by other users, but by the quantity necessary to meet the needs of the Indians at any particular time."); Post-Trial Br. of Lummi, Makah & Quileute Indian Tribes at 2 (Nov. 6, 1973) (Doc. No. 389) ("Under the doctrine of *Winters*," Indian "fishing rights must be given priority").

24   [53]   *Fishing Vessel*, 443 U.S. at 684-85.

25   [54]   *Fishing Vessel*, 443 U.S. at 686.   The Court did, however, leave open the question of whether the Tribes could be allocated more than 50% if needed for ceremonial and subsistence uses.   *Id.* at 688.   Sometimes, the parties have agreed to allocate more than 50% to the Tribes. *See, e.g., United States v. Washington*, Civil No. 9213, Stipulation and Order Re: Fraser River Sockeye Salmon (W.D. Wash. Feb. 11, 2000) (Doc. No. 16905).

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO. C70-9213

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1    lands so that the overall number of salmon available for harvest will be enough for the Tribes

2    to "earn a moderate living" from their 50% share.  *See* Tribes' Proposed Order (Doc. No.

3    18560/295) p. 2.  The *Winters* doctrine says nothing about the overall amount of water that will

4    be available from year to year.  It does not, for example, impose duties on landowners to

5    capture stormwater run-off so that some total amount of water will be available for allocation.

6    *Fishing Vessel* controls allocation in this case, and the *Winters* doctrine does not apply here.

### 3. *Alaska Pacific Fisheries* Does Not Help The Tribes.

8        At page 18 of their brief, the Tribes say *Alaska Pacific Fisheries Co. v. United States*,

9    248 U.S. 78 (1918), helps their case.  It does not.

10       In *Alaska Pacific Fisheries*, a federal law setting aside the Annette Islands as an Indian

11   reservation in Southeast Alaska was ambiguous regarding the boundary.  After looking at the

12   circumstances surrounding the creation of the reservation and applying the canon that

13   ambiguities in federal laws enacted for Indians' benefit are to be construed in the Indians'

14   favor, the Court held that the reservation included the waters surrounding the islands as well as

15   the uplands.  The Court did not hold that the Indians were entitled to "the natural supply of

16   fish," unaffected by non-Indian activity, as the Tribes seem to suggest.  In fact, fishing within

17   the Annette Islands Reserve is managed today so as to provide for "fair and equitable sharing"

18   between the Indians and other people,[55] the same rule that governs the Tribes' fisheries.

19       The Tribes also fail to mention that *Alaska Pacific Fisheries* has been applied to

20   boundary disputes involving their own reservations, and not always in their favor.  Sometimes,

21   the courts have concluded that the Tribes' reservations include tidelands or the beds of

22   navigable waters.[56]  Sometimes, they have not.[57]  Each case has depended on its own peculiar

23   facts.  The *Alaska Pacific Fisheries* line of cases provides no guidance here.

---

[55] 25 C.F.R. § 241.3(c)(3), (e)(3).

[56] *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983) (Puyallup Reservation includes bed of Puyallup River); *Muckleshoot Indian Tribe v. Trans-Canada Enters., Ltd.*, 713 F.2d 455 (9th Cir.

**C.    No Other Decision Supports The Tribes' Position.**

According to the Tribes, "the rule for which the Tribes advocate in the present sub-proceeding is well-accepted in the District Court." Tribes' Memo p. 20-21.  In making that claim, the Tribes overlook a recent and significant case from this district.  In *Skokomish Indian Tribe v. United States*, No. C99-5606FDB, the Skokomish Tribe sought damages for destruction of fisheries and habitat allegedly caused by the City of Tacoma's Cushman Hydroelectric Project on the North Fork Skokomish River.  The Tribe made many of the same arguments it makes here.   The court rejected them and granted summary judgment to Tacoma.[58]   A three-judge panel of the Ninth Circuit affirmed.[59]   Finally, the Ninth Circuit affirmed en banc on other grounds, and the United States Supreme Court denied review.[60]

The Tribes also fail to mention that, in 1982, a three-judge panel of the Ninth Circuit specifically rejected the rule they advocate in this case when Phase II of *United States v. Washington* was first litigated.  The Ninth Circuit en banc vacated that decision in 1985, but it did not repudiate the three-judge panel's reasoning that the treaties establish "no absolute right to any particular level of fish supply."[61]

---

1983) (per curiam) (Muckleshoot Reservation includes bed of White River); *Moore v. United States*, 157 F.2d 760 (9th Cir. 1946) (Quileute Reservation includes Quillayute River).

[57]   *United States v. Aam*, 887 F.2d 190 (9th Cir. 1990) (Suquamish Reservation does not include tidelands); *Skokomish Indian Tribe v. France*, 320 F.2d 205 (9th Cir. 1963) (Skokomish Reservation does not include tidelands); *United States v. Washington*, No. 9213, Subproceeding 86-7, Decision & Order Re Eastern Boundary of Lummi Indian Reservation (W.D. Wash. May 26, 1990) (Doc. No. 11822) (Lummi Reservation does not include Bellingham Bay), *aff'd*, 969 F.2d 752 (9th Cir. 1992).

[58]   *Skokomish Indian Tribe v. United States*, No. C99-5606FDB, Order Granting City of Tacoma's Mot. Partial Summ. J. (June 5, 2001) (Doc. No. 127).

[59]   *Skokomish Indian Tribe v. United States*, 332 F.3d 551 (9th Cir. 2003), *reh'g en banc granted*, 358 F.3d 1180 (9th Cir. 2004).

[60]   *Skokomish Indian Tribe v. United States*, 410 F.3d 506 (9th Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1025 (2006).

[61]   *United States v. Washington*, 694 F.2d 1374, 1380 (9th Cir. 1982); *see id.* at 1382 ("Only the extension of the servitude to ban even non-discriminatory development occurring both within and without treaty fishing areas could assure against any decline in the amount of fish taken.  The treaty does not grant such assurance."), *vacated*, 759 F.2d 1353 (9th Cir. 1985) (en banc).

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO.  C70-9213

13

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1     That reasoning has since been found persuasive in another case that the Tribes ignore.

2     In *Nez Perce Tribe v. Idaho Power Company*, 847 F. Supp. 791 (D. Idaho 1994), the Tribe

3     sued Idaho Power Company for damage to fish runs allegedly caused by the Company's dams

4     on the Snake River. Relying on the 1982 Ninth Circuit three-judge panel opinion in Phase II of

5     *United States v. Washington*, the Court rejected the claim, saying "the Stevens treaties do not

6     protect the Indians from degradation of the fish runs caused by development which is not part

7     of a pattern of discrimination against Indian treaty fish runs."[62]

8     The other treaty cases cited by the Tribes do not apply. In *No Oilport! v. Carter*, 520

9     F. Supp. 334 (W.D. Wash. 1981), the court relied on Judge Orrick's 1980 decision in Phase II

10    of *United States v. Washington* before it was reversed and ultimately vacated by the Ninth

11    Circuit, and that case is not precedent. The other three cases the Tribes cite all had to do with

12    interference with the treaty-secured easement at usual and accustomed fishing places, which

13    was recognized in *Winans*.[63] Those cases are not about any duty to protect fish habitat.

14    At page 22 of their brief, the Tribes cite an Oregon nuisance case[64] in support of their

15    proposed legal rule. In that case, commercial gillnet fishermen alleged that pollution from a

16    sewer discharge was rotting their gear and killing their prey. The court said the gillnetters had

17    stated a claim upon which equitable relief could be granted under the law of private nuisance.

18    Nuisance law does not help the Tribes. In an action for private nuisance, the

19    complainant must allege a harm that is different in kind from that suffered by the general

20    public.[65] In this case, the Tribes have no evidence that culverts have any particular effect on

21

22    _____

23    [62] *Idaho Power*, 847 F. Supp. at 809.

      [63] *Confederated Tribes of the Umatilla Indian Reservation v. Alexander*, 440 F. Supp. 553 (D. Or. 1977);
24    *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wash. 1988); *NW. Sea Farms, Inc. v. U.S. Army
      Corps of Eng'rs*, 931 F. Supp. 1515 (W.D. Wash. 1996).

25    [64] *Columbia River Fishermen's Protective Union v. City of St. Helens*, 160 Or. 654, 87 P.2d 195 (1939).

      [65] *Columbia River Fishermen's Protective Union*, 160 Or. at 659-60, 87 P.2d at 197; *Bales v. City of
26    Tacoma*, 172 Wash. 494, 503, 20 P.2d 860, 864 (1933); *see* Wash. Rev. Code § 7.48.210.

1  their fisheries, or that any such effect differs from effects on the State's fisheries.[66]   Their

2  vague and general claim falls far short of the specificity required for a private nuisance action.

3      The Tribes also cite four cases in which commercial fishermen were allowed to sue for

4  damages when pollution injured their businesses.[67]   Those cases do not help the Tribes either.

5  The Ninth Circuit has already ruled en banc that the Stevens Treaties cannot support a cause of

6  action for damages, except perhaps against the United States, for injury to tribal fisheries.[68]

7  **D.     The Tribes Have Failed To Meet The Ninth Circuit's Directive In Phase II Of**
   **_United States v. Washington_.**

8      When it vacated the judgment in Phase II of _United States v. Washington_ in 1985, the

9  Ninth Circuit en banc instructed that any legal rules governing the State's obligations under the

10  treaties should be announced only "when their consequences are known and understood in the

11  case before the court, not when the subject parties and the court giving judgment are left to

12  guess at their meaning."[69]   Here, the Tribes say that whether their treaties are violated depends

13  on their "ability to earn a moderate living from their fisheries." Tribes' Memo p. 1.  But they

14  do not explain what they mean by that.  They suggest that their fisheries at one time met "the

15  moderate living needs of the Tribes," Tribes' Memo p. 9, but when asked in discovery whether

16  any Tribe or Tribes had ever earned a moderate living from the fishery, the Tribes answered

17  "We do not have enough information to answer this Interrogatory."[70]   Because the Tribes do

18

19      [66] _See supra_ note 10.

20      [67] _Union Oil Co. v. Oppen_, 501 F.2d 558 (9th Cir. 1974); _Louisiana ex rel. Guste v. M/V Testbank_, 524 F. Supp. 1170 (E.D. La. 1981); _Pruitt v. Allied Chem. Corp._, 523 F. Supp. 975 (E.D. Va. 1981); _Burgess v. M/V Tamano_, 370 F. Supp. 247 (D. Me. 1973).

21
22      [68] _Skokomish Indian Tribe v. United States_, 410 F.3d 506 (9th Cir. 2005) (en banc), _cert. denied_, 126 S. Ct. 1025 (2006).

      [69] _United States v. Washington_, 759 F.2d 1353, 1357 (9th Cir. 1985) (en banc).

23      [70] Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pg. 63.  When asked if the Tribes would currently
24  be able to earn a moderate living from the fishery if no state-owned culvert had ever blocked fish passage, the Tribes objected, stating "Any response to this Interrogatory would require speculation and assumption on a variety of issues regarding the indirect impacts of such an extreme hypothetical situation." Decl. of Mary E. Jones
25  Disc. Pg. 62.  The Tribes could not even say whether they would be able to achieve a moderate living from the fishery if the court were to grant all the relief they ask for in their Request for Determination.  Decl. of Mary E.
26  Jones Disc. Pg. 63.

WASHINGTON'S OPPOSITION TO           15           ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF TRIBES' MOTION FOR                         1125 Washington Street SE
PARTIAL SUMMARY JUDGMENT --                         PO Box 40100
NO. C70-9213                                   Olympia, WA  98504-0100
                                            (360) 753-6200

1    not explain what it means to "earn a moderate living from their fisheries," they provide the

2    Court no way to understand the consequences of declaring a duty that depends on their ability

3    to do so.  The Tribes request exactly what the Ninth Circuit discouraged—a legal rule that is

4    "imprecise in definition and uncertain in dimension."[71]

5         The Tribes have placed the cart before the horse.  The Ninth Circuit was not inviting

6    the Tribes to return to court to ask for a specific *injunction* based on "concrete facts which

7    underlie a dispute in a particular case," as the Tribes suggest at page 23 of their brief.  It was

8    not inviting the Court to reinstate Judge Orrick's 1980 open-ended legal declaration merely by

9    "apply[ing] that declaration to [a] particular activity."  Tribes' Memo p. 3.  Rather, the Ninth

10   Circuit said any *legal standards* would "depend for their definition and articulation upon

11   concrete facts."[72]  The Court directed that any future decisions about the *legal* relationship

12   between the treaty "right of taking fish," fish habitat, and state law would be precise, narrow

13   rulings limited to and informed by the specific factual circumstances at issue.[73]

14        Here, much like the reversed and vacated 1980 declaration in Phase II, the Tribes offer

15   a legal rule completely untethered to the facts.  They offer no facts showing how the State's

16   culverts relate to "a moderate living from their fisheries," or even any way to describe such a

17   relationship.  They identify no concrete or particularized injury to any Tribe.  They do not

18   explain how a decision in their favor would make any difference in their fisheries.  The Tribes

19   do not even seem to know what they want with respect to culverts, or whether they would

20   change what the State is already doing.  They simply want a vague rule of law.  The Court

21   should decline to issue a "general admonition," just as the Ninth Circuit did 21 years ago.[74]

22

---

23      [71]  *U.S. v. Washington*, 759 F.2d at 1357.  *See id.* at 1361 (Ferguson, J., concurring) ("it is impossible to

24   perceive what is meant by . . . 'moderate living needs'").

     [72]  *U.S. v. Washington*, 759 F.2d at 1357.

25      [73]  *Id.*

26      [74]  *Id.*  The standards that the Ninth Circuit laid out are similar to the constitutional requirements for

  standing.  *Compare U.S. v. Washington*, 759 F.2d at 1356-57, *with Lujan v. Defenders of Wildlife*, 504 U.S. 555,

WASHINGTON'S OPPOSITION TO        16        ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF TRIBES' MOTION FOR                      1125 Washington Street SE
PARTIAL SUMMARY JUDGMENT --                       PO Box 40100
NO. C70-9213                                  Olympia, WA  98504-0100
                                        (360) 753-6200

**E.      The Treaties Do Not Guarantee To The Tribes An Inexhaustible Supply Of Fish.**

The Tribes' brief does suggest a standard other than "moderate living" for the "duty" they allege.  The Tribes apparently argue that, because the treaty makers assumed in 1854-55 that the fisheries would be inexhaustible, the treaties promised them inexhaustible fisheries. Tribes' Memo p. 7-8.  Events proved the treaty makers wrong, and today we know that fish populations are not limitless.[75]  But the Tribes seem to argue that the treaties promised them fish runs as the treaty makers knew them in 1855, unaffected by human activity except perhaps their own.  Tribes' Memo p. 15 n.8; *id.* p. 16 n.10; Tribes' Proposed Order p. 2.

The Tribes' argument fails as a matter of law.  The treaties are contracts between the United States and the Tribes.[76]  The law of contracts—including treaties—provides no remedy to parties who fail to contemplate or inaccurately speculate about future conditions.[77]  The treaty makers' assumptions of inexhaustible fisheries, unsupported by treaty language, do not create a contractual promise of inexhaustible fish.  Those assumptions are not part of the treaties.[78]

This is not the first time that the Tribes have tried to turn assumptions into rights.  For decades, tribal advocates argued that, because the treaty makers did not foresee the need for future regulation of fishing, the treaties guaranteed the Tribes a "right of taking fish" free of all

---

560-61 (1992). *See also U.S. v. Washington*, 759 F.2d at 1360-62 (Ferguson, J., concurring) (constitutional case-or-controversy requirements).

[75] *See Fishing Vessel*, 443 U.S. at 669 ("Unfortunately, that resource has now become scarce").

[76] *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 510-11 (9th Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1025 (2006); *see Fishing Vessel*, 443 U.S. at 675.

[77] RESTATEMENT (SECOND) OF CONTRACTS § 151 & cmt. a (1981); 27 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 70:3 – 70:5 (4th ed. 2003).

[78] *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 466-67 (1995) (rejecting treaty interpretation that treaty makers "likely gave no thought to"); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943) ("Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice"); *United States v. White Plume*, 447 F.3d 1067, 1074 (8th Cir. 2006) (because treaty reference to farming said nothing about any particular crop, treaty did not reserve a right to grow hemp free of federal regulation).

state regulation.[79]  The Supreme Court ultimately rejected that argument in *Puyallup I*. The treaty makers' assumptions that people would continue to take fish how and whenever they pleased created no treaty promise of unregulated fisheries.[80]  They create no treaty promise of inexhaustible fisheries, either. "[T]he Treaty is silent."[81]

The Tribes' claim, carried to its logical conclusion, would give them a right to demand restoration of 1855 conditions and to control all future land management decisions in the *United States v. Washington* case area.[82]  That would be contrary to the purpose of the treaties. The treaties were forward-looking documents designed to promote economic development and to accommodate change.[83]  Judges Ryan and Boyle in Idaho have already ruled that the Nez

---

[79]  *See U.S. v. Washington*, 384 F. Supp. at 334; *Makah Indian Tribe v. McCauly*, 39 F. Supp. 75, 78 (W.D. Wash. 1941) (enjoining state fishing regulation because no "proof here that the Indians knew of or appreciated the present or possible future existence of any state sovereignty which might attempt to limit the fishing rights of either Indians or other citizens"), *rev'd*, 128 F.2d 867 (9th Cir. 1942); *State v. McCoy*, 63 Wash.2d 421, 439-56, 387 P.2d 942, 953-64 (1963) (Donworth, J., dissenting); *State v. Tulee*, 7 Wash.2d 124, 147, 109 P.2d 280, 289 (1941) (Simpson, J., dissenting) ("Without any doubt whatever, Governor Stevens and the Indians signed the treaty with the definite understanding that the Indians should be forever allowed to catch salmon from the Columbia River without any restrictions whatsoever.  We should so construe the treaty."), *rev'd on other grounds*, 315 U.S. 681 (1942); *State v. Towessnute*, 89 Wash. 478, 489, 154 P. 805, 810 (1916) (Holcomb, J., dissenting) ("At the time of the treaty it was not known, possibly not even surmised, that the future state would rigidly regulate and partially  prohibit the fishing in its streams").  *See also* Ralph W. Johnson, *The States Versus Indian Off-Reservation Fishing:  A United States Supreme Court Error*, 47 WASH. L. REV. 208, 213-15 (1972).

[80]  *Puyallup I*, 391 U.S. at 399 (because "the Treaty is silent as to the mode or modes of fishing," Treaty does not preempt nondiscriminatory state conservation regulations); *see Fishing Vessel*, 443 U.S. at 668, 682 (treaty makers "did not see the need and did not intend to regulate the taking of fish by either Indians or non-Indians, nor was future regulation foreseen," but under *Puyallup I* State may regulate treaty fishermen if "required for conservation"); *Tulee v. Washington*, 315 U.S. 681, 684 (1942) (Tulee's construction of Yakama Treaty as securing "an unrestricted right to fish in the 'usual and accustomed places,' free from state regulation of any kind" is "too broad"); *U.S. v. Washington*, 384 F. Supp. at 339 (Court is bound by *Puyallup I and II*), *aff'd*, 520 F.2d at 682 n.2.

[81]  *Puyallup I*, 391 U.S. at 399.

[82]  *See United States v. Washington*, 694 F.2d 1374, 1381 (9th Cir. 1982) (rule Tribes advocate would create "a comprehensive environmental servitude with open-ended and unforeseeable consequences"), *vacated*, 759 F.2d 1353 (9th Cir. 1985) (en banc); O. Yale Lewis III, *Treaty Fishing Rights: A Habitat Right as Part of the Trinity of Rights Implied by the Fishing Clause of the Stevens Treaties*, 27 AM. INDIAN L. REV. 281, 284-86 (2003) (recommendations for how Tribes may use favorable decision in culvert case).

[83]  *Tulee v. Washington*, 315 U.S. 681, 682-83 (1942) (treaties "furthered the national program of transforming wilderness into populous, productive territory"); *Seufert Bros. Co. v. United States*, 249 U.S. 194, 197 (1919) ("treaties were negotiated in a group for the purpose of freeing a great territory from Indian claims, preparatory to opening it to settlers"); *Winans*, 198 U.S. at 384 ("extinguishment of the Indian title, opening the land for settlement and preparing the way for future States, were appropriate to the objects for which the United States held the Territory"); *see id.* at 381 ("New conditions came into existence, to which those [tribal] rights had

---

WASHINGTON'S OPPOSITION TO
PLAINTIFF TRIBES' MOTION FOR
PARTIAL SUMMARY JUDGMENT --
NO.  C70-9213                              18                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1   Perce Treaty does not entitle the Nez Perce Tribe to preservation of fish runs in their 1855

2   condition.[84]  This Court should reach the same conclusion.

3       The potential scope of the right sought by the Tribes cannot be underestimated.  The

4   Tribes characterize the issue in this case as "whether the treaties permit non-Indians to degrade

5   salmon habitat and reduce the runs."  Tribes' Memo p. 12.  If, as they apparently contend, their

6   treaties are violated by any habitat degradation that reduces the number of available fish, the

7   right would allow them to prevent or eliminate any fish habitat degradation in the *United States*

8   *v. Washington* case area and beyond.  Nearly all past, present, and future human activities in

9   Western Washington affect anadromous fish habitat and thus could be targeted by the Tribes.

10       The State, the Tribes, and many other groups and individuals have made great efforts in

11   recent years to promote salmon recovery in all sectors of human activity that affect salmon in

12   Western Washington.[85]  They have worked together to develop a salmon recovery plan now

13   under review by the Federal Government under the Endangered Species Act.[86]  The right

14   sought by the Tribes has the potential to trump all other environmental laws, nullify

15   collaborative regional salmon recovery efforts, and put the Tribes and the courts in charge of

16   deciding the future of Western Washington.

17

18

---

19   to be accommodated"); *Duwamish Tribe v. United States*, 79 Ct. Cl. 530, 537 (1934) ("The Government
20   contemplated a change of conditions in the future, established by the article of the treaties, and the treaties were
    concluded with that purpose in view.  The Indians so understood."); *United States v. Washington*, 873 F. Supp.
21   1422, 1438 (W.D. Wash. 1994) ("United States negotiators anticipated industrial and urban development"); *Idaho
    Power*, 847 F. Supp. at 814 (treaty rights are subject to changing circumstances).

22      [84] *Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791, 808 (D. Idaho 1994) ("Indian tribes do not
    have an absolute right to the preservation of the fish runs in their original 1855 condition").  The fishing clause in
23   the Nez Perce Treaty is virtually identical to the one in the Yakama Treaty.  Treaty With the Nez Percés, Art. III
    ¶ 2, 12 Stat. 957, 958 (June 11, 1855).

24      [85] *See generally* Wash. Rev. Code ch. 77.85 ("Salmon Recovery"); 69 Fed. Reg. 33102, 33152-55 (June
    14, 2004) (describing protective efforts in Washington).

25      [86] 70 Fed. Reg. 76445 (Dec. 27, 2005); *see* 71 Fed. Reg. 15666, 15675-77 (March 29, 2006).  The
26   National Marine Fisheries Service describes some of these collaborative efforts on its web site,
    http://www.nwr.noaa.gov/Salmon-Recovery-Planning/Recovery-Domains/Puget-Sound/Index.cfm.

WASHINGTON'S OPPOSITION TO        19         ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF TRIBES' MOTION FOR                    1125 Washington Street SE
PARTIAL SUMMARY JUDGMENT --                     PO Box 40100
NO. C70-9213                                 Olympia, WA  98504-0100
                                         (360) 753-6200

1    Such a treaty-based "wilderness servitude"[87] would disrupt 150 years of settled private

2    and public land ownership and governmental authority.   Henceforth, any land management

3    decision could require the consent of up to 18 Tribes, possibly affecting even the Tribes' own

4    economic development projects.[88]   If that is indeed the Tribes' claim, it is barred by the

5    doctrine of laches, as described in the Washington Association of Counties' Memorandum in

6    Support of the State's Motion for Summary Judgment (Doc. No. 18559/294).[89]

7    **F.    If The United States Is Not Supporting The Tribes' Motion, The Court Should Deny It Under The Eleventh Amendment To The United States Constitution.**

8

9    The United States, the lead plaintiff in this case, did not join in the Tribes' motion, and

10   its position is unknown at this time.   If the United States is not supporting the Tribes' claims,

11   those claims are barred under the Eleventh Amendment to the United States Constitution.

12   The Eleventh Amendment precludes federal courts from hearing a suit against a

13   nonconsenting state unless some exception applies.[90]   The Eleventh Amendment applies to

14   suits by Indian tribes.[91]   It does not bar suits by the United States, however.[92]

15   The United States may sue a state in federal court on behalf of an Indian tribe.[93]   The

16   Tribe may assert the same claims as the United States without running afoul of the Eleventh

17      [87]  The Tribes recognize that their claim "could be characterized as a negative easement or negative servitude." Decl. of Mary E. Jones (Doc. No. 18559/294) Disc. Pg. 53.

18      [88]  The Tribes' economic development projects sometimes require state or local land use permits.  *See Habitat Watch v. Skagit County*, 155 Wash.2d 397, 120 P.3d 56 (2005) (upholding permit for Upper Skagit Tribe's golf course project); *Citizens For Safety & Env't v. Wash. State Dep't of Transp.*, 2004 WL 2651499 (Wash. App. 2004) (upholding state highway access permit for Muckleshoot Tribe's White River Amphitheatre). 56 Fed. Reg. 22068 (May 13, 1991) (notice of environmental review under federal and state law for Tulalip Tribe's proposal to construct I-5 interchange "to provide crucial access to the Tulalip Reservation for a major tribal economic development project").

19

20

21

22      [89]  *See City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005); *Cayuga Indian Nation v. Pataki*, 413 F.3d 266 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 2021 (2006); *Seneca-Cayuga Tribe v. Aurelius*, 233 F.R.D. 278, 281-82 (N.D.N.Y. 2006); *Cayuga Indian Nation v. Village of Union Springs*, 390 F. Supp.2d 203 (N.D.N.Y. 2005).

23

24      [90]  *E.g., Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-69 (1997); *Yakama Indian Nation v. Wash. Dep't of Revenue*, 176 F.3d 1241, 1254 (9th Cir. 1999).

25      [91]  *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991).

26      [92]  *United States v. Mississippi*, 380 U.S. 128, 140-41 (1965).

1   Amendment.[94]   That is how *United States v. Washington* Final Decision #I was litigated in the

2   1970s, and how Phase II proceeded when it was first litigated a generation ago.  But the State

3   retains its Eleventh Amendment immunity to the extent that a plaintiff tribe raises claims or issues

4   not identical to those made by the United States.[95]

5       The Court recognized soon after this subproceeding was filed that the State was free to

6   assert "its 11[th] Amendment rights should there be a change in the status of the United States in this

7   case."[96]  If the United States no longer supports the Tribes' claims, those claims are barred by the

8   Eleventh Amendment, and the Court should deny the Tribes' motion on that basis.

9                                     **CONCLUSION**

10      In their treaties, the Tribes expressly ceded all their right, title, and interest to their

11  aboriginal lands except for what they expressly reserved.[97]  Despite that, the Tribes ask this

12  Court to imply into the Treaties "a comprehensive environmental servitude with open-ended

13  and unforeseeable consequences."[98]  The Tribes want this Court simply to reinstate Judge

14  Orrick's environmental declaration in *United States v. Washington*, 506 F. Supp. 187 (W.D.

15  Wash. 1980), and apply it to culverts.  They offer the same erroneous arguments that led the

16  Ninth Circuit to reverse that declaration in 1982.[99]  Later, the Ninth Circuit en banc vacated

17

18      [93]  *United States v. Minnesota*, 270 U.S. 181, 195 (1926).

19      [94]  *Arizona v. California*, 460 U.S. 605, 614 (1983); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124
    F.3d 904, 913 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999).

20      [95]  *Seneca Nation of Indians v. New York*, 178 F.3d 95, 96 (2d Cir. 1999); *see United States v. Idaho*, 95 F.
    Supp.2d 1094, 1097 n.3 (D. Idaho 1998), *aff'd*, 210 F.3d 1067, 1072, 1079-81 (9th Cir. 2000), *aff'd*, 533 U.S. 262,
21  271 n.4 (2001).

        [96]  Order Regarding Status Conference at 3 n.1 (July 12, 2001) (Doc. No. 17177/55).
22
        [97]  Treaty With Nisquallys (Medicine Creek Treaty), Art. I, 10 Stat. 1132 (Dec. 26, 1854); Treaty With
23  the Dwámish Indians (Treaty of Point Elliott), Art. I, 12 Stat. 927 (Jan. 22, 1855); Treaty With the S'Klallams
    (Treaty of Point No Point), Art. I, 12 Stat. 933 (Jan. 26, 1855); Treaty With the Makah Tribe, Art. I, 12 Stat. 939
24  (Jan. 31, 1855); Treaty With the Yakamas, Art. I, 12 Stat. 951 (June 9, 1855); Treaty With the Qui-Nai-Elts, Art.
    I, 12 Stat. 971 (July 1, 1855).

25      [98]  *United States v. Washington*, 694 F.2d 1374, 1381 (9th Cir. 1982), *vacated*, 759 F.2d 1353 (9th Cir.
    1985) (en banc).
26
        [99]  *United States v. Washington*, 694 F.2d 1374 (9th Cir. 1982).

1    both rulings, finding that justiciability depended upon the presence of concrete facts.  The en

2    banc court directed that future decisions about the relationship between the treaties and state

3    law would be "precise legal formulation[s]" informed by "all of the facts presented by a

4    particular dispute."[100]

5         The Tribes have proposed only a broad, open-ended and imprecise rule of law that is

6    unrelated to the facts of this case.  They have failed to establish a legal basis for such a rule,

7    and have not identified concrete facts connecting their proposed legal rule with the State's

8    culverts or the Tribes' fisheries.

9         The law does not entitle the Tribes to the judgment they request.  The State of

10    Washington respectfully requests that the Court deny the Tribes' motion for partial summary

11    judgment under Fed. R. Civ. P. 56(c).

12         DATED this _27th_ day of September, 2006.

13

14    ROB MCKENNA
      Attorney General of Washington

15

16    _Fronda Woods_

17    FRONDA WOODS, WSBA #18728
      Assistant Attorney General

18

19

20    STEVE E. DIETRICH, WSBA #21897
      Assistant Attorney General

21

22

23    PHILIP M. FERESTER, WSBA #21699
      Assistant Attorney General

24

25

26    _____
      [100] *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985) (en banc).

WASHINGTON'S OPPOSITION TO        22        ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF TRIBES' MOTION FOR                       1125 Washington Street SE
PARTIAL SUMMARY JUDGMENT --                        PO Box 40100
NO. C70-9213                                   Olympia, WA  98504-0100
                                             (360) 753-6200