```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

 UNITED STATES OF AMERICA, et al.,)
                                  ) NO. C70-9213 RSM
                 Plaintiff,       ) (SP01-1)
                                  )
 v.                               ) SEATTLE, WASHINGTON
                                  )
 STATE OF WASHINGTON, et al.,     ) October 26, 2009
                                  )
                 Defendant.       ) Trial
                                  )
_____

                 VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE RICARDO S. MARTINEZ
                 UNITED STATES DISTRICT JUDGE
_____


 APPEARANCES:

  For the Plaintiff:    JOHN SLEDD      JOHN HOLLOWED
                        PETER MONSON    LAUREN RASMUSSEN
                        HARRY JOHNSEN   ALAN STAY
                        MASON MORRISET  ALIX FOSTER
                        TIM WEAVER      JOHN HOLLOWED


  For the Defendant:    RENE TOMISSER
                        PHIL FERESTER
                        DOUG SHAFTEL
                        FRONDA WODDS


  Reported by:          NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        700 Stewart Street
                        Seattle, WA 98101
                        (206) 370-8506
                        nancy_bauer@wawd.uscourts.gov
```

## EXAMINATION INDEX

| WITNESS | DIRECT/REDIRECT | CROSS/RECROSS |
|---|---|---|
| VICTOR MOORE | | |
| BY MR. TOMISSER | 3, 73 | |
| BY MR. SLEDD | | 27 |
| JEFF CARPENTER | | |
| BY MR. TOMISSER | 75 | |
| BY MR. JOHNSEN | | 106 |
| PHIL RONI | | |
| BY MR. MONSON | 143, 195 | |
| BY MR. FERESTER | | 171 |

* * * * * *

## EXHIBITS

| Exhibit No. | Page admitted |
|---|---|
| W-162A | 139 |
| W-163A | 139 |
| W-163B | 139 |
| W-166C | 139 |
| W-175A | 139 |
| W-175C | 139 |
| W-188 | 89 |
| W-090D | 13, 100 |
| W-090B | 19 |
| W-190C | 73 |
| W-190F | 73 |
| W-091 | 80 |
| W-200 | 178 |

```
1    October 26, 2009                                    9:15 a.m.
                              PROCEEDINGS
2    _____
3         THE COURT:  Good morning.  You may all be seated.  Is
4    it the weather, or are people just losing interest?  I'm
5    actually amazed all of you made it here on time today.
6    Welcome back.  We're ready to begin.
7       Do we have any matters we need to take up prior to calling
8    our next witness?
9         MR. TOMISSER:  Yes, Your Honor.  The state would call
10   Victor Moore.
11        THE COURT:  Good morning.  May I have you raise your
12   right hand to be sworn.
13   VICTOR MOORE,                  HAVING BEEN FIRST DULY SWORN,
                                    TESTIFIED AS FOLLOWS:
14
15        THE CLERK:  Please state your name for the record and
16   spell it for our court reporter.
17        THE WITNESS:  Victor Moore, V-i-c-t-o-r, M-o-o-r-e.
18        THE COURT:  You may inquire.
19                        DIRECT EXAMINATION
20   BY MR. TOMISSER:
21   Q   Good morning, Mr. Moore.
22   A   Good morning.
23   Q   Mr. Moore, could you start off this morning and just tell
24   the court a little bit about yourself?
25   A   My current position, I'm the director of the Office of
```

1    Financial Management with the State of Washington.  I'm the

2    state budget director.  I've worked for the state for 29

3    years.  I started -- how far do you want me to go?

4    Q   Well, before we get into all of your experience with that,

5    do you live down in Olympia?

6    A   Yes, I do.  Married; three daughters.

7    Q   It's always nice to know that state employees have a

8    family life as well.

9    A   Not always.

10   Q   Why don't we back up just a little bit, Victor, and if you

11   could describe for the court what your formal educational

12   history has been since high school.

13   A   Okay.  I got a bachelor's degree in business

14   administration from California State University at

15   Sacramento; graduated in 1979; moved to Olympia later that

16   year, and began service with the state in 1980.

17   Q   And when you began that service with the state in 1980,

18   what were you doing at that time?

19   A   I worked for The Evergreen State College in the accounting

20   division, and after about a year moved into the budget office

21   and, through a series of jobs, pretty much have stayed in the

22   budget field my whole career.

23   Q   So when you say "the budget field your whole career," can

24   you describe for the court in more detail what you've done in

25   terms of government budgets and finance?

A    In 1983, I went to the work for the Senate Ways and Means Committee.  I was a budget analyst specializing in higher education budget.  After a short stint with Senate Ways and Means, I went to work for the Commission for Voc Ed, which is a state agency dealing with federal vocational funds.  I was their business manager, which dealt with budget and accounting, facilities, and contracts responsibilities.

In 1986, I went to the Office of Financial Management in the budget division and worked on capital budget and transportation-related issues.

In 1991, I went to the House Appropriations Committee.  My first assignment there was on criminal justice budgets.  I then through -- in a couple of years was the staff coordinator for the committee; served in that capacity until 2000.

Went to work for the courts, the Administrative Office of the Courts for two years; did their legislative liaison work; handled all their budget, their accounting, their facilities, their contract responsibilities.

And then in 2003, I returned to my previous position with House Appropriation as the staff coordinator, and in 2005 was appointed by Governor Gregoire to be the director of the Office of Financial Management.

Q    What is the Office of Financial Management?

A    The office is the administrative arm for the governor.  We

1   also cover a wide variety of other responsibilities.  The

2   labor relations office, which negotiates employee contracts,

3   is in that division.  We manage the risk management

4   responsibilities, the statewide financial systems.  We do a

5   fair amount of forecasting for demographic and case load work

6   in the budget division, which develops the governor's budget

7   proposal and monitors all budget-related activities

8   throughout the biennium.

9   Q   When you say you work in assisting the proposed governor's

10  budget, what does that entail?

11  A   Well, the budget process starts pretty much through OFM.

12  We talk to agencies, give agencies instructions on how to

13  develop their budget proposals.  They are then submitted to

14  the Office of Financial Management.  We analyze those budget

15  requests.

16      We ultimately put together a proposal that we take to the

17  governor for the governor's approval, and which is then

18  submitted to the legislature.

19  Q   Can you also describe for the court, specifically what are

20  your duties as the director of the Office of Financial

21  Management?

22  A   As director, all the various divisions report directly to

23  me, including the budget division.  I make sure that we're

24  fulfilling our statutory requirements.  And as far as the

25  budget's concerned, I'm pretty much responsible for what we

1 take across the street to the governor in terms of

2 recommendations and proposals for her.

3 Q    And once the governor decides on a proposed budget, do you

4 have additional responsibility once the legislative session

5 begins, with budget development in the legislative process?

6 A    Yes.  I represent the governor.  In many instances, I will

7 testify in front of legislative committees.  I'll have

8 conversations with budget writers in legislative leadership

9 about budget issues and budget proposals.

10    I think then throughout -- in the later stages of the

11 session, I'm making sure that the governor's priorities are

12 at least being considered by the legislature.  And then once

13 the bill -- the budget bill and all related legislation is

14 passed by the legislature, I'm part of the review process of

15 that legislation in terms of the governor's signature, veto,

16 partial veto recommendations.

17    After the budget's been signed, OFM has responsibility for

18 develop -- working with the agencies to develop their

19 spending plans, and we monitor their expenditures throughout

20 the biennium to make sure that they're complying with the law

21 and that they're meeting their spending targets.

22 Q    Once the budget is enacted and signed by the governor,

23 does that set the priorities of spending for state agencies?

24 A    Pretty much, yes.

25 Q    And is the Department of Transportation now a cabinet

1  agency within the executive branch?

2  A   Yes, it is.

3  Q   In this case, Victor, do you recall --

4       MR. TOMISSER:  Actually, Madame Clerk, if you'll hand

5  Mr. Moore the binder with Exhibit W-090.

6  Q   (By Mr. Tomisser)  Mr. Moore, do you recall in this case

7  filling out a Declaration in Lieu of Direct Testimony?

8  A   Yes.

9  Q   And do you have that document in front of you at this

10 time?

11 A   Yes.

12 Q   And it's identified as W-090; is that correct?

13 A   Yes.

14 Q   And do you adopt that declaration as your direct testimony

15 in this case?

16 A   Yes.

17 Q   And before we get into any more detail in your

18 declaration, I want to save Mr. Sledd a few questions in this

19 case and ask what -- that you are not holding yourself out as

20 an engineer; is that correct?

21 A   That's correct.

22 Q   Not a biologist?

23 A   Not yet.

24 Q   And you don't fill culverts, correct?

25 A   No, I do not.

1  Q   Mr. Moore, do you recall back in June having your

2  deposition taken by Mr. Sledd in this case?

3  A   Yes.

4  Q   And do you recall telling him at that time that you had

5  been deposed on one previous occasion?

6  A   Yes.

7  Q   And had not had an opportunity to testify in court?

8  A   That's correct.

9  Q   And since the time of that deposition, do you have an

10 update in terms of your opportunities to testify as the

11 director of OFM?

12 A   I had the opportunity to be deposed on the K-12 finance

13 case, and testified, I think about three weeks ago, maybe a

14 month ago, in the trial phase.

15 Q   And what was the nature of that case?

16 A   The state's being sued for not fulfilling its basic

17 education requirements under the constitution.

18 Q   And what's your understanding of the magnitude of that

19 litigation?

20 A   I would think, in my opinion, this is billions of dollars

21 in magnitude for the state.

22 Q   Let me return for a moment to the state budget.  And if

23 you could, describe in general terms how the state budget is

24 organized in terms of what the governor proposes to the

25 legislature.

A    There are actually three appropriations bills that are

proposed by the governor and passed by the legislature.

There is an appropriations bill from what we call the

operating budget, which are the day-to-day operations of

government to the exclusion of transportation.  I'll get to

that in a moment.

So we have three bills:  An operating budget appropriation

bill, a capital construction appropriation bill, and a

separate transportation appropriations bill, which on the

transportation side includes both operating costs and capital

construction costs.

Q    And how is it that the -- that your office and the

legislature is able to determine how much revenue is going to

be available?

A    There are two different revenue forecasting mechanisms.

The State Revenue Forecast Council makes a forecast for the

general fund and some related funds, which are primarily

expended through the operating budget.

There is a transportation revenue work group which makes a

formal forecast for the transportation-related funds.

Q    And taking you back to the most recent biennial cycle,

which was the 09-11 budget; do you recall that?

A    Yes, I do.

Q    Can you describe for the court the extent of the revenue

shortfall that the state was faced with as that budget cycle

1    was beginning?

2    A    During the summer, I think we were estimating that the

3    shortfall -- this is the summer of 2008.  We were thinking

4    that the revenue shortfall was going to be around a little

5    over $3 billion.

6        In the November forecast -- and they're done quarterly.

7    In the November forecast, which is about six weeks -- no,

8    about a month before we went to print for the governor's

9    budget proposal, the revenue forecast for the operating

10   budget went down another $1.9 billion.  And our case loads

11   for K-12, prisons, Medicaid, et cetera, also went up.  So

12   when the governor's budget was proposed, we identified our

13   shortfall at about $5.7 billion.

14       When the legislature came to town, they were working

15   through the budget.  They had a March forecast which lowered

16   the forecast by an additional $2.9 billion and also some

17   changes in case loads.  So the legislature was faced with

18   solving about a $9 billion shortfall for both the 09-11

19   budget and the rest of the 07-09 biennium.

20   Q    All right.  And in view of that shortfall, did the

21   governor have some areas where she proposed budget cuts?

22   A    Yes.  We used a combination of strategies to balance the

23   budget.  There were -- we were able to use some federal money

24   from the -- we anticipated some of the Recovery Act money

25   that was going to come from the federal government.  We used

1    some capital funds to move over into the operating budget.

2    We also took a whole variety of reductions in K-12, in human

3    services, in higher education, in natural resources, in

4    general government.  Really, all areas of the budget were

5    included in the budget reduction strategies.

6    Q    And Attachment D to your declaration was a document titled

7    "Examples of Savings in the Governor's '09 through '11

8    Budget."  I have that on the monitor.  Do you recognize that?

9    A    Is there another copy?  That's pretty fuzzy.

10   Q    It would be Attachment D to your declaration.

11   A    Thank you.  Oh, the print was just too small.

12        I can see it.

13   Q    In looking at that list of examples of savings, do you

14   recall that list at this time?

15   A    It looks familiar, yes.

16   Q    And at the time the governor was proposing her budget in

17   09-11, was that an accurate list of some of the examples that

18   the governor --

19   A    Yes.

20        MR. TOMISSER:  Your Honor, the state would move for

21   the admission of 090-D.

22        THE COURT:  Any objection, Mr. Sledd?

23        MR. SLEDD:  No objection.

24        THE COURT:  All right.

25        You said "D" as in "dog," right?

1          MR. TOMISSER:  Yes.

2          THE COURT:  That will be admitted.  090D.

3                  (Exhibit W-090D admitted.)

4   Q  (By Mr. Tomisser)  And then as the session came to an end,

5   did it turn out that program cuts, in fact, did have to be

6   made in the enacted budget?

7   A   Yes.

8   Q   And have you prepared a slide that exemplifies some of the

9   cuts that actually had to be made in the 09-11 budget?

10  A   Yes.  As we go into this next round of preparing for the

11  2010 session, we thought it would be helpful to display where

12  we've been in terms of budget reductions before we have to go

13  through the next round of budget reductions.

14  Q   Let me show you.  Do you recognize the document on the

15  screen before you now?

16  A   Yes.

17          MR. SLEDD:  Your Honor, plaintiffs would object to

18  inquiry regarding this document which we have not previously

19  been provided and it's not a portion of Mr. Moore's direct

20  testimony.

21          MR. TOMISSER:  It's offered for illustrative purposes

22  here, Your Honor, examples of savings.

23          THE COURT:  The objection will be overruled.

24  Q  (By Mr. Tomisser)  Mr. Moore, can you describe for the

25  court some of the examples of the program cuts that, in fact,

1   had to be made during the 09-11 biennial budget cycle?

2   A   The first one there, which has to do with Initiative 728,

3   which is an allocation out to the schools for class size

4   reduction and other program enhancements, was reduced by $600

5   million.

6        There was a little over a half billion dollar cuts to the

7   various higher education institutions, including the

8   community colleges.  Legislature imposed a series of

9   across-the-board reductions to agencies, a little under $400

10  million.  About 40 percent of the funding for the Basic

11  Health plan, which is a subsidized low-income health plan

12  offered by the state, was reduced.

13  Q   When you say that program was reduced, what did that mean

14  in practical terms for the people who participate in that

15  program?

16  A   Well, there are a variety of strategies to try to

17  implement the cut.  One is to make sure that people who had

18  double coverage, for instance, were moved to the appropriate

19  coverage outside the Basic Health plan.  For instance,

20  someone may be eligible for Medicaid and was on the Basic

21  Health plan, so we moved them, made sure that they were

22  funded through Medicaid.

23       We also made sure that if they had dual coverage with

24  other insurance policies, we made sure that they got moved

25  onto the other insurance policies.  We also implemented a

1  series of increases in co-pays, which creates -- some people

2  will fall off the case load as well because of the higher

3  cost.  So it means fewer spots funded by fewer people

4  enrolled in the Basic Health plan, ultimately.

5  Q    What was done with the higher education budget?

6  A    There were, as you can see, a $557 million cut to higher

7  education.  There's also a policy to increase tuition in each

8  year, I think it's by 7 percent in each year and -- which

9  created more income for the higher ed institutions; however,

10 still in the end, I think it was about a 12 percent

11 reduction, maybe a little less in net terms, for higher

12 education.

13     But it meant that they -- I think if I look at my records

14 correctly, I think they eliminated 3,300 full-time equivalent

15 staff through those reductions.

16 Q    And you also mentioned the transportation budget.  Can you

17 describe for the court what happened with the revenue

18 projections for the transportation budget in the last budget

19 cycle?

20 A    Consumption has gone down for fuel.  The revenues continue

21 to have moderate declines, though not as deep as the general

22 fund was seeing, but we still saw declines in revenue

23 collections for the motor vehicle fuel tax, which creates --

24 again, we needed to rewrite the long -- you know, the 16-year

25 plan for transportation and look at the mix of projects

1    there.

2        There was some relief through the Federal Recovery Act.

3    But from the state's portion of the revenue stream, we're

4    seeing a continued decline as well.

5    Q    So with that decline, is the legislature able to fund the

6    transportation budget fully enough to cover all of its

7    anticipated obligations?

8    A    Well, I think what it had to do was, because it has much

9    more of a long-range view of their program, we're talking

10   about road construction here, that they would reschedule

11   projects.  And maybe if they were originally going to be in

12   the 09-11 biennium, maybe we move those projects out to

13   another time frame.  So there was a lot of shuffling of

14   projects in the 16-year plan.

15   Q    Do you know whether any safety projects had to be

16   deferred?

17   A    I think we try to -- we try to preserve as much as we can

18   of safety projects, but I wouldn't be certain that they were

19   all safe.

20   Q    The legislature -- does the legislature form a list of

21   construction projects for the Department of Transportation to

22   work on?

23   A    Yes.

24   Q    And how does that project list get funded?

25   A    I think it originally probably starts with a proposal from

1   the Department of Transportation, which would build on

2   previous lists that were provided through the budget process.

3   And by that, I mean the legislature would propose a 16 --

4   would assume the 16-year construction plan in their previous

5   budgets.  And as revenue forecast became clear and project

6   costs became clear -- that's kind of a work in progress,

7   where they're always trying to fit the projects into the

8   available revenue.  Also whether or not there are permitting

9   issues which may slow it down or speed it up, maybe other

10  developments that might happen which would change the

11  scheduling of the project.  But it's always kind of a work in

12  progress.

13  Q   Once legislature sets a list of projects to be done by

14  DOT, does DOT have the authority to unilaterally change the

15  legislative priority?

16  A   I say no.  They have very limited authority to transfer

17  money between projects.  If they have a cost underrun on a

18  project, they can match that up with a project cost over --

19  under -- well, you know what I mean.

20      If they save some money on one project, they can move it

21  to another project that costs more.  But they have very

22  limited authority, and it's expressly provided in the budget

23  bill.

24  Q   And so what do they do if a project ends up costing more

25  than was budgeted for?  What is their flexibility in that

1    situation, if any?

2    A    Well, as I said, if they can find some cost underruns that

3    match up with the fund source of the overrun, then they can

4    do that without legislative action.  But if the cost is too

5    high, then they'll have to go back to the legislature and get

6    additional authority for the project.

7    Q    And if the department were able to realize some savings

8    from the project, can they do whatever they want with that

9    savings, or does it come to whatever is next on the list?

10   A    It -- if they have an underrun and they don't have any

11   overruns that they need to cover, then it just goes to what's

12   next on the list.  There's no authority there to give them

13   discretion on cost underrun savings.

14   Q    I'm going to ask you a little bit about the difference

15   between discretionary and mandatory items in the budget.  And

16   in your exhibit book as well as on your monitor, Mr. Moore,

17   is what was identified as Attachment B to your declaration,

18   which was just a worksheet for flexible versus inflexible

19   funding in the budget.

20        Do you see that?

21   A    Yes.

22   Q    And can you describe for the court, what is this document

23   that we're looking at here?

24   A    We were in the -- in putting together the budget, there

25   are a whole host of programs where we feel, either through

1    constitutional or federal law or some statutory requirements,

2    that we had really no authority to change the funding, and so

3    we wanted to display how much of the budget we felt was

4    basically already set and required mandatory funding levels

5    versus where we saw there was discretion.  So this is just an

6    itemization of how they fall on either side of this argument.

7    Q    And do you recognize this document as a compilation of

8    information from official sources?

9    A    Yes.  This was put together by OFM.

10        MR. TOMISSER:  Your Honor, I would move for the

11   admission of W-090B.

12        THE COURT.  Any objections?

13        MR. SLEDD:  No objection.

14        THE COURT:  090B will be admitted.

15                 (Exhibit No. W-090B admitted.)

16   Q    (By Ms. Tomisser)  And when we look at this particular

17   document, and we look at the items over on the

18   "discretionary" side of the ledger.

19   A    Yes.

20   Q    Is it correct -- or let me ask it this way:  Within those

21   various items, does the legislature still set priorities for

22   how discretionary funds have to be spent by whichever agency

23   is receiving the funding?

24   A    Yes.

25   Q    Does the amount of funding, in your experience, even

1    within the "Mandatory" category, get disputed during the

2    budgeting process in terms of the amounts to be spent within

3    those categories?

4              MR. SLEDD:  Objection to the form, Your Honor.

5              THE COURT:  Do you understand the question,

6    Mr. Moore?

7              THE WITNESS:  Try it again.

8    Q   (By Mr. Tomisser)  When we look at the categories where

9    the item's identified as a mandatory item in this exhibit,

10   when it comes to the actual budget process in the

11   legislature, are there disputes amongst the various

12   stakeholders as to how much any of those particular line

13   items in the "Mandatory" category might receive?

14   A   I think I mentioned there's a lawsuit right now on what is

15   basic education in the state.  You can see a little over $900

16   million in the discretionary side.  I think one of the

17   debates now, and I think part of what the suit is trying to

18   figure out, is whether or not the state really has discretion

19   over some of those items.

20       I think on the medical assistance payments, there are

21   always disputes about the various services that are provided

22   under medical assistance.  You know, I think in terms of

23   mental health developmental disabilities, I think there's

24   also a debate about the level of service and certainly the

25   cost of the service.

1   Q    And have you had experience being involved in the

2   negotiation compromises that go into coming up with an

3   enacted budget?

4   A    Yes.

5   Q    Have you seen instances where something happened that

6   undermined the basis for agreements that were being

7   negotiated amongst the stakeholders?

8   A    I'm not sure I understand the question.

9   Q    Have you seen developments -- well, let me ask you this a

10  little more broadly, then.  You mentioned the governor's

11  office and then the House and the Senate, kind of three

12  parties who ultimately put together the final budget; is that

13  correct?

14  A    Yes.

15  Q    And so I assume that for the various issues that come

16  before the legislature in terms of what budget needs to be

17  put together, there are different stakeholders with different

18  interests in what ought to happen in terms of producing a

19  budget; is that correct?

20  A    That's correct.

21  Q    And so are there negotiations, then, that occur with

22  compromises reached on various points?

23  A    Yes.

24  Q    And have you seen instances where agreements appeared to

25  have been reached and then something happens that undoes the

1    agreement?

2    A    Yes.

3    Q    And what does that do to the process?

4    A    Well, you think you're on a path for agreement and

5    adjournment, and either you find maybe there aren't enough

6    votes to support a position or new information is brought to

7    the table or simply they find they can't agree.  Where they

8    thought they were in agreement, they simply find they're no

9    longer in agreement.  Sometimes you can't quite figure out

10   why that happens.

11   Q    All right.  In light of resources that are available to

12   the state, is it correct that the resources have to be

13   prioritized in terms of spending?

14   A    Yes.

15   Q    Does the final enacted budget and the priorities that are

16   in the budget, then, in your view, represent the collective

17   will of the people of the state of Washington?

18   A    I think it represents the decisions by the legislature and

19   ultimately the governor by her signature.  And so I think

20   it's the best indicator we have of what the intent is of how

21   we distribute the resources.

22   Q    Let me ask you a little bit broadly about the I-4 budget,

23   without much detail on that, and ask you if you recognize

24   that the I-4 budget contains a line item for fish barrier?

25   A    I understand that.

1  Q   So with that understanding, let me ask you a hypothetical,

2  Mr. Moore.  If we look at the I-4 budget, and the line item

3  for fish passage in particular, if there was a court order

4  that overrode the appropriated budget as adopted by the state

5  and required an increase in that line item of the budget, is

6  it correct that the state would have to find a way to comply

7  with the order of the court?

8  A   I think what you described that the court order said, we'd

9  have to spend more on I-4, then we usually try and comply.

10 But we'd have to find another place, you know, for the

11 resources.  We'd have to move money around in the budget in

12 order to comply.

13 Q   And so with that consideration of having to -- let me ask

14 you this.  So something else would have to give; is that

15 correct?

16 A   Yes.

17 Q   So with that in mind, can you describe for the court what

18 is the current revenue and expenditures situation looking

19 like as now we approach the 2010 supplemental budget?

20         MR. SLEDD:  Your Honor, I object to this question.

21 We had a stipulation with regard to content of Mr. Moore's

22 direct testimony, and none of this with regard to the

23 upcoming biennium was covered.

24         MR. TOMISSER:  Actually, in his testimony, Your

25 Honor, he mentioned that he was having to sign his

1    declaration before budgets were adopted.  This is an update

2    consistent with that.

3            THE COURT:  Overruled.

4    A   We estimate that the shortfall that we're going to deal

5    with in the 2010 budget for the operating budget is in excess

6    of $1.7 billion.

7    Q   (By Mr. Tomisser)  And that is just for the 2010 budget

8    cycle?

9    A   Right.  That's through several revenue forecasts which

10   were down, case load increases that were up, lawsuits that

11   have been filed or determined by the court, and a series of

12   other reductions that we find we can't really achieve the

13   savings that were assumed in the budget.

14       Through all those items, we figure that we have about $1.7

15   billion to solve, and that's just through the rest of this

16   biennium.  So we have a lot less time in order to achieve

17   those savings.

18   Q   If you'll turn in your exhibit book next, Mr. Moore, to

19   Exhibit G.

20   A   Yes.

21   Q   Can you describe for the court what this exhibit is that

22   we're looking at on the monitor now?

23   A   In the capital construction budget, we have a series of

24   programs for a variety of natural resource programs.  One of

25   those is through the Recreation Conservation Office, who give

1    out grants for a variety of habitat restoration, fish passage

2    programs, and this is an itemization of the last ten years of

3    funding for specifically fish passage projects through both

4    state and federally funded sources.

5    Q    Is this in addition to funding for salmon recovery efforts

6    done through the Department of Transportation budget?

7    A    Yes, it is.

8    Q    And since the time that you signed your declaration and

9    included this exhibit, have you researched to see if there

10   were any updated figures for this particular budget item?

11   A    Yes, I have.

12   Q    Let me show you -- on your monitor, Mr. Moore, can you

13   identify what I'm showing you at this time?

14   A    Yeah.   This is the Exhibit G updated for more recent

15   information from the Recreation Conservation Office database.

16   They show that more contracts have been signed, more

17   obligations have been entered into for fish passage projects.

18   Q    And similar to Exhibit G, does the data supporting this

19   chart come from official government sources?

20   A    Yes, it does.

21   Q    Do you believe this to be an accurate representation of an

22   up-to-date exhibit?

23   A    Yes, I do.

24        MR. TOMISSER:   Your Honor, I would move to amend

25   Exhibit G and substitute this particular document as the

1    updated data for this particular slide and refer to it as G

2    amended.

3           THE COURT:  Any objections?

4           MR. SLEDD:  I could make the same objection, but it's

5    been ruled on twice, Your Honor, so no.

6           THE COURT:  Mr. Tomisser, I just want to make sure.

7    We're substituting this one for the prior G; is that correct?

8           MR. TOMISSER:  Yes.

9           THE COURT:  So W-090G is admitted.

10          MR. TOMISSER:  Thank you, Mr. Moore.

11          THE COURT:  Cross-examination for this witness?

12          MR. TOMISSER:  Your Honor, I'm sorry, kind of a large

13   oversight.  I didn't think I actually moved to admit the

14   declaration, the 090 itself.

15          MR. SLEDD:  Too late.

16          MR. TOMISSER:  Are we still touching it?

17          THE COURT:  Mr. Sledd, any objection to the

18   declaration?

19          MR. SLEDD:  No objection.

20          THE COURT:  W-090, the declaration, is admitted

21   without objection.

22               (Amended Exhibit No. W-090G admitted.)

23          MR. SLEDD:  I would ask a favor of Counsel, if I

24   could have that copy of the amended 090G.

25

<u>CROSS-EXAMINATION</u>

BY MR. SLEDD:

Q    Good morning, Mr. Moore.  Mr. Tomisser reminded you of
when we met, which was June 22nd, I believe, at your
deposition?

A    Yes.

Q    I want to start out by going a little bit through your
qualifications in the preparation of your declaration.  I
will not ask about your biological background.

     Before you went to work for OFM in 1986, you did not
have any experience working with state transportation
budgets, did you?

A    No.

Q    And you worked as a budget analyst with transportation
budgets for a few years, but that ended in 1991, I believe
you said?

A    Correct.  Four years.

Q    About 20 years ago?

A    Correct.

Q    When you were a budget analyst for Senate Ways and Means
in 1983 and 1984, you did not work with the transportation
budget?

A    No.

Q    And when you were with the House Appropriations Committee
from 1991 to 2000, you did not work with the transportation

1    budget?

2    A    No.

3    Q    Paragraph 2 of your Declaration in Lieu of Direct

4    Testimony notes that you served on certain governmental

5    committees, advisory groups, and steering committees.

6         None of those deal with state highways, do they?

7    A    No.

8    Q    And none deal with fisheries or natural resources?

9    A    No.

10   Q    Your declaration was initially drafted for you by OFM

11   staff, I believe?

12   A    The initial draft was, yes.

13   Q    And the person who decided what subjects you should talk

14   about was an OFM staff attorney?

15   A    Yes.

16   Q    You did not prepare the Exhibits A through G to your

17   declaration?

18   A    I did not prepare them directly, no.

19   Q    And you didn't instruct anyone to select those particular

20   documents as exhibits?

21   A    I'm sorry?

22   Q    You did not instruct anyone to select those particular

23   documents as exhibits?

24   A    No.

25   Q    And you don't in fact know who chose to have those

1    exhibits attached to your declaration?

2    A    No.

3    Q    And you do not know what process was followed to select

4    those documents as exhibits?

5    A    I would think that the process was that, following the

6    declaration, that exhibits would be produced to reenforce the

7    points made in the declaration.

8    Q    You assume that, but you don't have any facts on which

9    that assumption is based on?

10   A    Well, I think when we were looking at the exhibits, we

11   were able to match up the declaration with the exhibits.

12   Q    Well, they do support points made in your exhibits.  I'll

13   grant you that.  But you don't actually know that they were

14   selected to do so?

15   A    I'm assuming.

16   Q    And prior to your deposition on the 22nd of June, you had

17   not seen some of those exhibits?

18   A    That's true.

19   Q    But they were in your declaration as --

20   A    Well, I saw them before the declaration was -- I think I

21   saw the exhibits before the declaration was submitted.

22   Q    Mr. Moore, there's -- perhaps you could look at 090F.

23            MR. SLEDD:  Madame Clerk, could you provide the

24   binder?  Does he already have 090F?

25            THE CLERK:  Yes.

Q   (By Mr. Sledd)   This is a -- the graph of DOT construction
spending?

A   Yes.

Q   Had you seen that prior to your deposition?

A   I've seen this graph many times.

Q   Now, you're aware of the existence of DOT's I-4 program.
You were just asked a couple of questions about that.

A   Yes.

Q   I guess technically it's like a subprogram within the
improvement, or I, program of the transportation department,
correct?

A   Yes.

Q   But you don't have any personal involvement in preparing
budgets for the I-4 program, do you?

A   No, I don't.

Q   And you do not know whether the I-4 program is mentioned
in the biennial appropriation statutes?

A   I've looked at the appropriation for the I program.  I
can't tell you whether I-4 is specifically called out.

Q   I believe Mr. Tomisser asked you whether there was a line
item for fish passage barrier removal in the I-4 budget.  But
if I understand what you just testified, you have not seen an
I-4 line in the appropriations budget.

A   I don't believe there is a line specifically for fish
passage.

Q   You talked a little bit about revenue forecasting with
Mr. Tomisser.  You sit on the State Economic and Revenue
Forecast Council, I believe?

A   Yes.

Q   And that council does forecasting for the state's
operating budget and general fund; is that right?

A   Yes.

Q   Your declaration noted that the revenue forecasts at the
time that you did your declaration were declining?

A   Yes.

Q   And that was what you just testified about a moment ago?

A   Yes.

Q   Those forecasts that the revenue council does, the
forecast council you sit on, they only look ahead about,
what, about a year and a half?

A   Typically it's about a year and a half, though at some
point in the process, they then make a revenue forecast for
the next biennium as well.

Q   And that's -- in contrast, there's a separate forecast
council for transportation, as I understand it, the
Transportation Revenue Forecast Council?

A   Yes.

Q   And when they do their forecast, they look considerably
further ahead?

A   Yes.

1    Q    Ten years, I think?

2    A    I'm not sure.

3    Q    When you're doing forecasting that far ahead, your

4    accuracy is not nearly as great as, say, an 18-month

5    forecast, is it?

6    A    I agree.

7    Q    I just asked you about the general fund.  Could you

8    describe briefly what that is?

9    A    The general fund is a series of revenue streams that are

10   collected by the state and placed into a statutorily created

11   fund, the general fund.  I would say virtually all of it is

12   discretionary for legislative appropriation, at least in

13   terms of its broad uses.

14        I don't want to confuse it with mandatory, like K-12

15   spending.  But the fund itself is not a dedicated -- what we

16   call a dedicated fund; that is, it does not have specific

17   purposes laid out in statute.  So we call it the general

18   checkbook for the state.

19   Q    So you could contrast, for example, the general fund with

20   the fund in which the gas tax is paid which is restricted by

21   the constitution for highway purposes, correct?

22   A    Yes.

23   Q    The operating budget you spoke about, that's separate from

24   the transportation budget?

25   A    Separate appropriations bill.

```
 1   Q    If we could look at W-090C?

 2   A    C?

 3   Q    C, yes, like "cat."

 4   A    Okay.

 5   Q    Now, this shows the -- if you'll look down on the bottom

 6   right corner, it's the March 2009 state general fund

 7   forecast, correct, 27 billion 945 million?  Do you see that?

 8   A    Yes.

 9   Q    That's for the 09-11 biennium.  If you could go over two

10   columns to the 05-07 biennium, the last forecast there was

11   about $27.7, .8 billion; is that correct?

12   A    Yes.

13   Q    So basically based on this forecast what was being

14   predicted was that the revenues for the 09-11 for the general

15   fund, state general fund, would be in the same neighborhood

16   as what they were two bienniums previously?

17   A    Yes.

18   Q    So basically back where we were four years ago?

19   A    Yes.

20   Q    Now, there's been a more recent forecast that's been shown

21   here.  There's been two of them, has there not, June and

22   September of '09?

23   A    Yes.

24   Q    And those were forecast from your Revenue Forecast Council

25   you sit on?
```

1    A    Yes.

2    Q    And in the most recent forecast, the September forecast,

3    do you know, is the prediction forecast for the state general

4    fund collection in 2009 to '11 more than the amount that was

5    collected in 07-09?  Is the forecast that we're going to get

6    more in 09-11 than we did previously?

7    A    We're getting less in 09-11 than we received in 07-09.

8    Q    Can you tell me how much less?

9    A    You know, when I'm looking at this document, one of the

10   things I notice is that it does not, as far as I can tell,

11   assert that the nongeneral fund, what we call near general

12   fund, funds sources which have -- in the last session were

13   actually folded into the general fund forecast are not

14   included in this comparison.

15       But I think we are below the 07-09 forecast for combined

16   -- this new combined fund, and I'm comparing apples to

17   apples, we're under it by probably less than $100 million.

18   Q    Out of $28 billion, ballpark?

19   A    Right.  It's actually over -- I think it's close to 30

20   when you combine in those other funds that have been folded

21   into the general fund.

22   Q    Now, in your 25 years or so dealing with state budget

23   issues, revenue to the state general fund goes up some

24   bienniums and it goes down some bienniums?

25   A    I don't know -- in my experience, I've not seen it go down

1    to the extent it's gone down and actually fallen below the

2    previous biennium.

3        I may be wrong, but while I see almost flat and maybe

4    slightly up forecasts, I'm not really familiar with where we

5    see a significant drop from previous year collections.

6    Q   So this last biennium is, knock on wood, a one-off?

7    A   Yeah, I hope so.

8    Q   The record can reflect that both the witness and counsel

9    are knocking on wood.

10       In fact, there have been bienniums where the revenues

11   have gone up fairly dramatically in the general fund from

12   biennium to biennium?

13   A   Yes.

14   Q   On the spending side, is it also the norm that

15   expenditures each biennium go up more often than they go

16   down, in your 25 years?

17   A   Yes.

18   Q   And there were, if I recall, increases in expenditure in

19   the 07-09 biennium compared to what would have been needed

20   just to keep the 05-07 program level the same?

21   A   Yes.

22   Q   And those increases from 05-07 to 07-09 actually

23   contributed some to the deficit that we experienced in 09-11;

24   is that correct?

25   A   Yes.

Q    Compared to the situation when you wrote your declaration,
the economy is now recovering.  Would you agree?

A    Actually, when I -- since I wrote my declaration, we've
lost almost a billion dollars in revenue from the level that
we're at.  The June and September forecasts took the forecast
down an additional $900 million.

Q    But those forecasts also state, though, that the economy
is now recovering.

A    I think the economy -- yes.  And they make the distinction
between what the economy is doing and what the revenues are
doing.

Q    Are you quite certain of that?

A    Yes.

Q    Well, I was going to ask you to look at that revenue
forecast, but I don't have the appropriate page, so...

     You don't expect the factors that resulted in the 09-11
deficit to continue forever, do you?

A    No.  We expect that the economy will recover sometime
perhaps in the first quarter of the next biennium, even
though unemployment will continue to stay at current levels
for much of 2010, though we expect that revenue will start to
climb, so that in 2010 we'll actually be slightly above 2009,
and then 2011 we'll see additional growth in collections.

Q    So it may be like the last business cycle of a jobless
recovery, but the recovery will come, you're saying, in about

1   2011?

2   A   That's what we're seeing in the data.

3   Q   If we could -- we've still got, I believe, 090C up on the

4   monitor here.  And if you look again over in the 09-11

5   biennium, the far right column, it has a -- on the very

6   bottom right, two numbers.  One of them is total change in

7   dollar amounts between the first forecast in February of '08

8   and then the last forecast in March '09.

9        Do you see that?

10  A   Yes.

11  Q   That's about a 3.9, almost a $4 billion difference?

12  A   Yes.

13  Q   And then below that, it indicates that that $4 billion

14  translates into a 12 percent drop in the forecasted revenue

15  for that period?

16  A   Yes.

17  Q   I believe this exhibit has a second page, which is a motor

18  vehicle tax forecast.  And if you look on the far right

19  column of this one, which is the 2009-11 biennium, and you

20  look again comparing the February of '08 to March '09

21  numbers, again you see a drop in forecasted revenue for the

22  motor vehicle tax?

23  A   Yes, if you go down horizontally there on that last

24  column.

25  Q   Right.  And the February '08 forecast for the 09-11

1   biennium was 2.791 billion?

2   A    Yes.

3   Q    And March '09 it was down to 2.65?

4   A    Yes.

5   Q    So if my math is right, which it occasionally is, that's

6   about 135, $140 million difference?

7   A    Yes.

8   Q    And that's out of a total forecast of around 2.7 billion?

9   A    Yes.

10  Q    So bear with me.  If 5 percent is 1/20th of a number and

11  20 times 138 million comes out to 2.76 billion -- is that

12  right?

13  A    Okay.

14  Q    So basically we're looking at about a 5 percent drop in

15  the forecast for motor vehicle tax, is that correct, between

16  the February '08 forecast and the March '09 forecast?

17  A    Okay, yes.  I'm feeling a little naked without my

18  calculator.

19  Q    I meant to bring you one.  I'll get you a scratch pad if

20  you want.

21       So that's a 5 percent drop in the motor vehicle

22  forecast over the same period we just talked about where

23  there's a 12 percent drop in the general fund state money?

24  A    Yes.

25  Q    And then similarly, the general fund in the transportation

1   budgets for '09 to '11 last spring both face deficits.  But

2   percentage-wise, the general fund deficit was larger than the

3   deficit in the transportation funds?

4   A   Yes.

5   Q   And if we could look at Exhibit 090, your declaration, and

6   go to Paragraph 18, please.

7       If I read that second sentence in Paragraph 18

8   correctly, it says, "The March 2009 revenue forecast for

9   transportation projects forecast a shortfall of 151 million

10  for the biennium."

11  A   Yes.

12  Q   And then the last sentence there says, "The budget that

13  passed the Senate was 4.4 billion on DOD capital projects."

14  A   Yes.

15  Q   So tell me if I'm wrong.  151 million out of 4.4 billion

16  was a deficit for the budget.  And ballpark, 1/30th was 3

17  percent?

18  A   Three percent.

19  Q   Paragraph 17, if we could go up to that.  Lines 2 through

20  10 there say, "There is an unprecedented lowering of the

21  general fund state revenue forecast."  And then it says,

22  "It's the largest one-period revenue drop since the state

23  start doing forecasts.  It represents over 25 percent of the

24  state general fund operating budget."

25      So again, a 25 percent drop in the state general fund

1    budget and about 3 percent on the transportation capital?

2    A   I think you're talking about the amount that the budget

3    went down versus the amount that the revenue went down.

4    Q   Oh, okay.  But the general conclusion was that the general

5    fund budget has been worse off than the state transportation

6    budget?

7    A   In terms of percentages, yes.

8    Q   In terms of percentages of revenue and in terms of

9    percentages of the expenditures that had to be cut as well?

10   A   Right.

11   Q   They go hand-in-hand?

12   A   Correct.

13   Q   I'd like to talk a little bit more with you about the

14   general fund budget as compared to the transportation budget.

15   If you're talking about funding for the Department of

16   Transportation highway construction spending, it's the

17   transportation budget that you're talking about, right, not

18   the general fund budget?

19   A   Correct.

20   Q   The state general fund budget actually isn't that relevant

21   to the DOT highway construction budget?

22   A   No.

23   Q   Because they're two separate budgets, two separate

24   appropriation bills, and they have separate revenue sources?

25   A   Correct.

Q    The general fund is basically you've got sales taxes, B&O,

property tax.  And on the transportation side, you've got

license fees, fuel tax, correct?

A    Correct.

Q    So really, the only way the general fund budget would be

relevant to highway construction program is if somebody

wanted to take money from the general fund budget and use it

to augment transportation spending, correct?

A    For transportation-related uses, yes.

Q    And are you aware of that ever having been done, where

general fund money was taken and put into highway

construction spending in the state of Washington?

A    I'm not aware on the highway construction side.  I think

it happened for the ferry system at one point.

Q    Once or twice in the 1990s?

A    Yeah.  In the mid 90s, yeah.

Q    What I call the natural resource agencies and the

landowning natural resource agencies, the DFW, Department of

Fish and Wildlife, state parks, and the Department of Natural

Resources, are they funded through the transportation budget?

A    I think some of them receive a small amount of

transportation funding if they have -- I think there's some

road programs where Fish and Wildlife might receive some

money.  I'm not certain of others, but I think there is some

limited transportation-related money to deal with roads

```
 1    within those -- within their boundaries.
 2    Q    Pretty small portion of their budgets?
 3    A    Yes, yes.
 4    Q    And you have a slide, we don't have to put it up, but a
 5    slide about salmon recovery expenditures, where you had as
 6    far as the fish program and the SRF Board?
 7    A    Yes.
 8    Q    Does transportation money go into any of the programs in
 9    that slide?
10    A    No.  Those are primarily general fund-backed bonds and
11    federal money.
12    Q    Substantial federal money?
13    A    Yes.
14    Q    And in fact, much of the transportation revenue couldn't
15    be transferred over to those other programs, salmon recovery,
16    DNR, parks, because, as we talked earlier, it's gas tax
17    money, motor vehicle fuel tax money, that's dedicated by the
18    constitution to the highway fund?
19    A    That's correct.
20    Q    But there is some effect that the transportation budget
21    has on the general fund budget because when the state goes
22    out and does a contract for highway construction, there's
23    actually sales tax charged on that construction contract,
24    correct?
25    A    Yes.
```

Q    So there's -- I'm terrible with what the taxes are, but it's 8 cents, ballpark, on every dollar of a highway construction bid?

A    That's correct.

Q    -- for sales tax.  And then that gets chased back largely into the general fund, right?

A    Yes.

Q    So construction spending is good for the general fund?

A    In a lot of ways, particularly on the jobs it creates.

Q    I want to talk briefly a little bit more about the gas tax.  Your declaration talks about the scheme for disbursement of the gas tax.  I think the tax is, what, 37 1/2 cents now?

A    Yes.

Q    And it's broken up.  There's 11 cents that is a local share.  If you want to look, it's Paragraph 22 to 24 in your declaration.

        The legislature can change those allocations.  For example, if it wants to say, I don't want 11 cents to go to the local share, I want 14 cents, or I want 8 cents?

A    I believe so, yes.

Q    And it can take away some of that gas tax money from the locals and instead they could pass legislation authorizing to impose a local sales tax or a local motor vehicle license fee to pay for transportation?

1   A    I suppose they could.

2   Q    And the legislature could direct that some part of the gas

3   tax be spent on Department of Transportation's -- on

4   correction of the Department of Transportation's fish passage

5   barriers that are part of its highways?

6   A    I think as long as they don't impair existing contracts,

7   then yes, they could.

8   Q    They're the legislature.  And subject to their

9   constitutional limitations, they can add money -- they're the

10  legislature.  They can raise revenue; they can lower

11  spending; they can raise spending at will.

12  A    As long as they meet their constitutional requirements and

13  the contractual obligations to bond holders and the contract

14  holders.

15  Q    And they get the governor to sign off, right?  The

16  governor's got to sign the legislation as well?

17  A    That's correct.

18  Q    Your declaration says that 8 cents a gallon of the current

19  tax is not restricted for specific uses.  Do you have

20  Paragraph 22 of the 090, W-090?

21  A    Yes.

22  Q    Paragraph 22, "Only 8 cents per gallon is not restricted

23  for specific uses?"

24       And then in next paragraph, Paragraph 24, you note that

25  "Proposals for disbursing the remaining 8 cents per gallon

1    exceed the projected revenue by 168 million."

2    A    Yes.

3    Q    Mr. Tomisser asked you, I believe, about proposals for

4    spending state money being in excess of revenue?

5    A    Yes.

6    Q    You've been in government a long time.  Have you ever run

7    into a situation where the proposals for spending money are

8    less than the money you have to spend?

9    A    Ever?

10    Q    Uh-huh.

11    A    I'd have to think pretty hard.

12    Q    It's pretty uncommon.  Wouldn't you say?

13    A    It would be uncommon.

14    Q    The nickel tax that you refer to in your declaration,

15    that's an additional 5 cents per gallon that was imposed in

16    the 2003 legislation.  Is that right?

17    A    Yes.

18    Q    And that particular tax, it sunsets when the projects that

19    that tax funds are completed and the bonds that are backed by

20    that tax are paid off, correct?

21    A    That's the way the law is written.

22    Q    And it could be written differently.  The legislature

23    could amend it and keep those taxes going after the bonds are

24    paid off, correct?

25    A    Yes, they could.

1  Q   Mr. Tomisser asked you briefly in Paragraph 22, if you

2  scroll over a little bit, actually talks about the list of

3  projects that accompanied adoption of the nickel tax.  And

4  then it also mentions that similarly there's a list of

5  projects in the Transportation Partnership Act, or the 9.5

6  percent phase-in gas tax was adopted in 2005, right?

7  A   Yes.

8  Q   Each biennium in the transportation appropriations bill,

9  there is a section of the bill, is there not, that mentions

10 the project lists that are to be funded by that bill?

11 A   I believe so.

12 Q   And actually, the legislation refers to a specific list

13 that's prepared by the Legislative Evaluation and

14 Accountability Program?

15 A   Yes.

16 Q   And that's -- the acronym, it's the LEAP program?

17 A   Correct.

18 Q   And that's the LEAP list.

19      And that list shows, for the biennium for which the

20 appropriation is being passed, what the appropriation is for

21 those projects for that biennium, correct?

22 A   Yes.

23 Q   And it also has future years.  It goes beyond the current

24 biennium into future biennium.  There's -- on that list,

25 there's specific projects that have dollar amounts assigned

1    to them as well, correct?

2    A    Yes.

3    Q    Those aren't actually being appropriated now because the

4    appropriation was just for two years in the constitution?

5    A    Yes.

6    Q    So those are the projected expenditures for those projects

7    in the future, or planned?

8    A    Planned.

9    Q    That LEAP project list that's referred to in the

10   legislation can also be changed by the legislature, correct?

11   A    Yes.

12   Q    They can add a project?

13   A    Yes.

14   Q    They can take a project off?

15   A    Yes.

16   Q    Delay a project, as you mentioned in your testimony?

17   A    Yes.

18   Q    Change the scope of the project?

19   A    Yes.

20   Q    Do you know whether there are any fish passage projects

21   that are funded using the nickel tax or the 9 from the gas

22   for the Transportation Partnership Act?

23   A    Not specifically, though I would assume that in some of

24   these projects there are fish passage issues that need to be

25   dealt with in the course of completing the project.  But they

1    aren't called out specifically by looking at a project.  It's

2    really not possible to tell which projects have fish passage

3    components.

4    Q    So you're not aware of there being any projects listed on

5    that LEAP list that actually say "fish passage barrier"?

6    A    Not that I'm aware of.

7    Q    Okay.  That's good for current revenue.

8         How about the past revenue source that you spoke about

9    in your declaration, motor vehicle excise tax?

10   A    Yes.

11   Q    That was -- you mentioned that was the subject of

12   Initiative 695 about ten years ago, which eliminated that

13   tax?

14   A    Yes.

15   Q    But then -- and that was a large source of revenue for the

16   Department of Transportation?

17   A    Yes, and local governments.

18   Q    And local governments as well?

19   A    Yes.

20   Q    Funded many transportation projects?

21   A    Yes, and ferry projects as well.

22   Q    You said "and ferry projects as well"?

23   A    Yes.

24   Q    That initiative was actually held unconstitutional after

25   the election, was it not?

1    A    Yes.

2    Q    But the legislature chose to pass its own statute

3    eliminating the motor vehicle excise tax?

4    A    Yes.

5    Q    So the legislature chose to do without that revenue?

6    A    In light of the vote, I think they decided it was --

7    that's what they chose to do.

8    Q    You spoke about the federal stimulus funding last fall.

9    And Paragraph 32 of your declaration, this is Exhibit W-090,

10   discusses that.  It's got an acronym, like everything else in

11   the government, AARA, I believe; is that right?

12   A    Yes.

13   Q    American Recovery and Reinvestment Act or something?

14   A    Probably.  I call -- we call it Federal Recovery Funds.

15   Q    Okay.  Call it federal Recovery Fund.  So the Federal

16   Recovery Fund last fall required that for a highway project

17   to get funding from those funds, it had to be what you call

18   "shovel ready"?

19   A    Yes.

20   Q    And that meant that the state had to be able to actually

21   obligate those funds within twelve months after the funding

22   was received from the federal government?

23   A    I'm thinking 12 months sounds about right.

24   Q    So to be eligible for that federal stimulus funding, the

25   projects basically had to be already in the pipeline and

1   almost ready to go?

2   A    For the most part, yes.

3   Q    And there were some highway projects at the state that

4   were at that stage and got federal stimulus funding?

5   A    Yes.

6   Q    But there were no Department of Transportation fish

7   passage projects that were far enough along in the pipeline

8   to get stimulus money?

9   A    Other than those that were a component, again, of a road

10  construction project that was ready to go.

11  Q    And I think you said a moment ago, you think those are

12  there, you assume there's some, but you don't know?

13  A    Right.

14  Q    So that opportunity to get federal stimulus funding for

15  fish passage projects, stand-alone fish passage projects was

16  lost; there weren't any far enough in the pipeline?

17  A    Well, I can't say that for certain because I'm not sure we

18  funded every project that was ready to go, but I assume that

19  they were weren't ready to go.

20  Q    I'm going to shift over from the revenue side of it to the

21  spending side.  Your declaration has a section, I believe, on

22  spending limits, and one of the things you talk about is

23  Initiative 601?

24  A    Yes.

25  Q    And Paragraph 13, if you go up there under your

1    declaration, that says that "Initiative 601 placed a limit on

2    the growth of general fund expenditures in the operating

3    budget."

4    A    Yes.

5    Q    So again, that's general fund, not transportation revenue?

6    A    Correct.

7    Q    Operating budget, not transportation budget?

8    A    Correct.

9    Q    I-601, I don't know that you mentioned it, but it also

10   imposed, did it not, a requirement of two-thirds vote of the

11   legislature for increases in taxes?

12   A    I believe so.

13   Q    That was just for general fund tax increases?

14   A    Right.

15   Q    Now, that two-thirds requirement, though, could be

16   repealed by a simple majority vote of the legislature,

17   correct?

18   A    If it was beyond two years of the enactment of the bill,

19   yes.

20   Q    And it was 16 years, so we're past two years.

21   A    Though there's been other restrictions placed on the

22   legislature for the passage of revenue bills since.

23   Q    I'm was asking about 601, the one you talked about in your

24   declaration.  In fact, the legislature has, as least in one

25   session, suspended the two-thirds vote requirement for a tax

1   increase, suspended the two-thirds vote requirement about

2   601?

3   A   Yes.

4   Q   You also discuss the constitutional debt limit, 9 percent

5   debt limit, in your declaration.  And in a footnote, Footnote

6   3, you talk about the statutory debt limit, which is 7

7   percent.

8        My understanding is that the 7 percent limit was

9   effectively eliminated this last session; that it was -- the

10  legislation was rewritten so the statutory limit basically

11  conforms to the terms of the constitutional limits; is that

12  right?

13  A   That's right.

14  Q   The constitutional 9 percent debt limit, it doesn't apply

15  to revenue bonds, does it?

16  A   No.

17  Q   So for example, a bond where the payment obligation is

18  secured by the gas tax is not subject to the 9 percent?

19  A   That's correct.

20  Q   And bonds backed by or secured by the gas tax are used by

21  the state to fund highway construction?

22  A   Yes.

23  Q   So that's what the nickel and 9.5 percent taxes are used

24  for, and the nickel sunsets when those bonds are paid off?

25  A   That's correct.

1    Q    Given that the 9 percent debt limit doesn't apply to gas

2    tax bonds that are used for highway construction funding,

3    that debt limit is not that relevant to state highway

4    construction funding?

5    A    As long as you don't fund highway construction from the

6    general fund.

7    Q    Which you said earlier is something you're not aware of

8    ever having happened?

9    A    Not yet.

10   Q    You also talk about spending mandate in your testimony,

11   and you went through WZ-090B.  Before we put that up, can we

12   go up to the Paragraph 9 in the declaration?

13        It says, "In broad terms, 58 percent of the general

14   fund operating budget is required to meet constitutional and

15   statutory mandates."

16   A    Yes.

17   Q    Let me see WZ-090B.  And this is the worksheet that

18   Mr. Tomisser showed you earlier that shows some of what is

19   mandatory and some of what is discretionary, correct?

20   A    Yes.

21   Q    And again, this is the general fund operating budget, so

22   it's not really relevant to the Department of

23   Transportation's highway budget?

24   A    This is the general fund budget.

25   Q    In the "Mandatory" column here, you included "public

1    schools" about two-thirds of the way down, roughly $13

2    billion, correct?

3    A    Yes.

4    Q    And that's in the "Mandatory" column because of the

5    constitutional mandate that the state shall maintain a

6    general and uniform system of public education?

7    A    Yes.

8    Q    And it's called "basic education" in school funding lingo?

9    A    Right.

10   Q    Does the constitution actually say that the state must

11   spend $13 billion per biennium to provide basic education?

12   A    No, it doesn't.

13   Q    The constitution requires the educational system and the

14   legislature, with some input from the courts, as you

15   described, to determine how much has to be spent?

16   A    I think in the suit in the late 70s, the court ruled that

17   the state must fund basic education and the legislature shall

18   define it.

19       From where I sit, we look to the statutes which tell us

20   which parts of K-12 funding is basic ed and which parts

21   aren't.

22   Q    So the court said -- you're not doing it, but you get to

23   say what it is?

24   A    Yes.

25   Q    Medicaid, I think you also mentioned with Mr. Tomisser, I

1    believe there's some Medicaid items in the "Mandatory" column

2    here on Exhibit 090B; is that right?

3    A    Yes.

4    Q    And that's in the "Mandatory" column because federal law

5    says that if the state chooses to have a Medicaid program and

6    accepts state Medicaid funding, its program has to have

7    certain activities and components?

8    A    That's correct.

9    Q    And because of that requirement of federal law, the state

10   has had, on some occasions, to give Medicaid spending

11   precedence at times over other priorities?

12   A    Yes.

13   Q    But not withstanding that, the legislature has cut back

14   Medicaid spending sometimes?

15   A    Yes.

16   Q    And in fact, it made many millions of dollars of cuts in

17   Medicaid spending in the last legislative session?

18   A    Yes.  And we're in court on a series of those strategies.

19   Q    "Contributions to the retirement sytem" down -- the third

20   line up from the bottom of Exhibit 090B is also a "Mandatory"

21   item in your chart, correct?

22   A    Yes.

23   Q    And how much has to actually be contributed to the pension

24   system by the legislature each biennium is based in part on a

25   series of actuarial assumptions about how many people will be

1    retiring and how long they'll be retired; is that correct?

2    A    Yes, and the earnings that the retirement funds have made

3    in their investments.

4    Q    And last session, the legislature changed the actuarial

5    assumptions about how much will be needed for the pension,

6    and it shaves more than $400 million off the pension

7    contribution fund?

8    A    Yes, it did.

9    Q    With those mandatory activities we just talked about, the

10   state basically -- it's got to do the activity.  There's a

11   law that says you have to do it, but there are varying

12   degrees of flexibility in terms of how many dollars have to

13   be spent to do it, correct?

14   A    I think in some portions of the program, yes, and Medicaid

15   in particular.

16   Q    And we talked about pension and we talked about basic ed?

17   A    Yes.

18   Q    And it's also your experience that sometimes the

19   legislature has had to make changes in the budget because the

20   courts say you have to do something?

21   A    Yes.

22   Q    If we could flip back to 090, the declaration, and go to

23   Paragraph 11.  The top of Page 5 there, about Line 3, you

24   state that 16 percent of DOT's 09-11 budget will come from

25   federal funds and nearly all of that from the SAFETEA-LU

1  Trust Fund, which I will spell for the court reporter.

2  S-A-F-E-T-E-A, dash, L-U.

3          Do you see that?

4  A   Yes.

5  Q   And you go on to say that those SAFETEA-LU funds, quote,

6  "must be spent on roadway safety for the traveling public and

7  cannot be diverted for other uses such as culvert

8  remediation."

9  A   Yes.

10 Q   When you signed this declaration, you didn't actually know

11 whether SAFETEA-LU funds could or could not be used to fix

12 barrier culverts, did you?

13 A   I'm not sure when I -- I'm not sure.

14 Q   If you were to look at your deposition, would that help

15 you recall?

16 A   I'm sorry?

17 Q   If you were to look at your deposition transcript, might

18 that help you remember?

19 A   Sure.

20 Q   I'll put up the deposition from June 22nd, 2009, Page 68,

21 Line 25.

22          Mr. Moore, why don't you read to yourself Line 25 there

23 down to Line 10 on Page 69, and then look up when you're

24 done.

25          Does that help you remember whether when you signed the

1   declaration you knew for a fact that those SAFETEA-LU funds

2   could not be used for culvert --

3   A   I think I wasn't sure.  I didn't know for sure.

4   Q   Do you know now?

5   A   No.

6   Q   Let's go back to the declaration, please, Paragraph 26.

7   It's talking, I believe, about the spending mandates for

8   transportation.  Paragraph 26 states that the transportation

9   capital budget consists of funds that are dedicated to

10   specific projects that would be available to fund culvert

11   remediation only when the legislature specifically

12   appropriates funds for that purpose.

13        Do you see that?

14   A   Yes.

15   Q   All you're really saying there is that to spend money on a

16   culvert fix, DOT needs the legislative appropriation,

17   correct?

18   A   That's correct and -- and specific -- and the intent of

19   the appropriation is known.

20   Q   That's no different than any other highway capital

21   project, is it?

22   A   That's correct.

23   Q   Turning to the future of our transportation department

24   budget, Paragraph 31, which was the declaration.

25        You say that the ability of the state to fund

1   construction projects is projected to decrease significantly

2   from prior levels, and then you refer to Exhibit F, which I

3   believe is W-090F.

4        Do you see that reference?

5   A   Yes.

6   Q   We talked about the transportation forecast and how

7   they're long-term, and those forecasts, as you get further

8   out, have lower accuracy?

9   A   Yes.

10  Q   W-090F shows that -- that shows a drop in spending from

11  where we are now into the future, correct?

12  A   Significant, yes.

13  Q   Now, that graph assumes that there's no change in state

14  revenue; is that correct?

15  A   That's correct.

16  Q   No change in gas tax; no new tolling, for example?

17  A   That's correct.

18  Q   And the biennium where this graph starts is 07-09?

19  A   Yes.

20  Q   If we could put up and Ms. Madame Clerk can hand to the

21  witness the binder containing AT-226, which was the

22  stipulated exhibit and has already been admitted.

23        Do you have AT-226 in front of you, Mr. Moore?

24  A   Yes.

25  Q   Now, this one, this is a graph of highway construction

1    program spending, too, isn't it, like your Exhibit F?

2    A    Yes.

3    Q    But this one starts earlier.  It starts back in 1991 to

4    '01.

5    A    That's correct.

6    Q    And it shows the same decline in spending in the future,

7    from the '07 or '09 biennium into the future that your

8    Exhibit F does?

9    A    Yes.

10   Q    But it also shows what happened before that decline,

11   correct?

12   A    Yes.

13   Q    It shows that in fact, your Exhibit F starts pretty much

14   at the peak of this big mountain of spending, correct?

15   A    Yes.

16   Q    So your exhibit just shows the future down side, and it

17   doesn't show the big increase that preceded it?

18   A    Was that a question?

19   Q    That was a question.

20   A    Yes.

21   Q    Right now we're up near the peak of this mountain,

22   correct?

23   A    Yes.

24   Q    And DOT is actually in the midst of the largest highway

25   construction program in this state since the building of the

1    interstate highway system?

2    A    Yes.

3    Q    And that's a program that began really in earnest with the

4    passage of the nickel tax in 2003?

5    A    Yes.

6    Q    So it was after this lawsuit was filed in 2001?  Can you

7    verbalize an answer, please?

8    A    Yes.

9    Q    Yes.  Thank you.

10        You spoke briefly with Mr. Tomisser about some of the

11   budget cuts in the last session, and you spoke of it in your

12   written testimony.  Paragraph 19 of your declaration makes

13   reference to Exhibit D, which is 090D.  Perhaps we can put

14   090D up on the screen again now.

15        This lists the examples of savings in the governor's

16   09-11 budget.  Those were cuts in the governor's proposed

17   operating budget, correct?

18   A    Correct.

19   Q    They were not cuts to the transportation budget?

20   A    That's correct.

21   Q    And again, operating budget is really not that relevant to

22   highway construction?

23   A    There are two different appropriation bills.

24   Q    If we could go back to the declaration briefly, Paragraph

25   20.

1    Now, you talk about the transportation budget in

2 Paragraph 20 and point out that a number of transportation

3 projects have been deferred due to revenue issues; is that

4 right?

5 A    Yes.

6 Q    But you don't actually know the number of either nickel or

7 TPA projects that were deferred in the last budget, do you?

8 A    None specifically, no.

9 Q    And you don't know what the dollar value of those deferred

10 projects were?

11 A    Not the life of the project, no.

12 Q    If you could go down to Paragraph 27 of the declaration.

13 This is where you talk about the five policy goals for DOT.

14    Do you remember that?

15 A    Yes.

16 Q    Can you say what those are?

17 A    Sure.  Preservation, safety, mobility, environment, and

18 stewardship.

19 Q    And that's reading them off of your declaration?

20 A    Yes.

21 Q    Those goals in and of themselves don't dictate the amount

22 of funding that's needed to achieve each of them.

23 A    That's correct.

24 Q    So you're not -- and are you suggesting -- you talked

25 about how switching money between them can have some

1   deleterious consequences potentially.  But you're not

2   suggesting that any change in the mix of funding between

3   those five goals is going to have bad consequences?

4   A   Any change?

5   Q   Uh-huh.

6   A   I think the debate is over the order of magnitude of the

7   changes between the various goals.

8   Q   So basically you're saying if you put an extra dollar

9   towards mobility, that's a dollar you can't put towards the

10  environment, and vice versa?

11  A   That's correct.

12  Q   And the question of how much is too much to move from one

13  to the other is a question for the legislature, correct?

14  A   Yes.

15  Q   So it's up to the legislature to decide how much should be

16  put towards the environmental bills?

17  A   Yes.

18  Q   And you spoke of the legislature as kind of the collective

19  will of the people of the state, right?

20  A   Collective will of the legislature.

21  Q   I think Mr. Tomisser asked if it was the collective will

22  of the people of the state.

23  A   I think I hedged my answer then, too.

24  Q   You've worked with them for a long time, haven't you?  All

25  right.

1           But it's up to the legislature then to determine how

2    much money is needed for the goal of providing fish passage,

3    the Department of Transportation culverts?

4    A    Yes.

5               THE COURT:  Counsel, let's take our morning recess.

6                         (A RECESS WAS TAKEN.)

7               THE COURT:  Mr. Sledd, your cross-examination.

8               MR. SLEDD:  Thank you, Your Honor.

9    Q    (By Mr. Sledd)  Mr. Moore, I'd like to ask a couple of

10   questions about some of the maintenance issues at Department

11   of Transportation that you described in your declaration in

12   Paragraph 33.  I'll put that up for Mr. Moore to see.

13          You said in Paragraph 33 that the erosion of

14   transportation revenue has created an $85 million backlog of

15   important maintenance projects that have been deferred.

16   A    Yes.

17   Q    Where did you get that figure?

18   A    Probably either through my transportation staff or through

19   the Department of Transportation.

20   Q    Do you know what the dollar value is of -- do you know

21   whether there's a backlog of unfunded environmental work at

22   DOT?

23   A    I'm not aware.

24   Q    So you don't know the amount of that or whether there is

25   one?

1   A    No.

2   Q    Paragraph 33 also talks about the cost of snow removal

3   last winter on state highways being almost 13 million more

4   than the recent average.

5        You don't know what the recent average was, though, do

6   you?

7   A    No.

8   Q    You're not suggesting that a big snow last winter will

9   keep DOT from fixing its barrier culverts, are you?

10  A    No.

11  Q    If you could go up to Paragraph 30, please.  You mention

12  the state's rail system in this paragraph and say that -- you

13  say that the plan for the state's rail system will require an

14  additional $141 to $821 million over the next eight years.

15  That's quite a range of costs, is it not?

16  A    Yes.

17  Q    You can't explain why that range is so large, can you?

18  A    Not specifically, no.

19  Q    In fact, you have not looked at the state's rail plan,

20  have you?

21  A    Not in detail, no.

22  Q    The next paragraph down, please.  Paragraph 31 states that

23  the cost of highway construction materials have risen more

24  than 50 percent since 2004.

25        That's also based on what someone else told you,

1   correct?

2   A   Yes.

3   Q   Someone, you think, from DOT but you don't know who?

4   A   Correct.

5   Q   Could you be wrong about that cost increase?

6   A   Could I be wrong?

7   Q   Yes.

8   A   Yes.

9   Q   Would it surprise you if I were to tell you that DOT's

10  costs have gone down recently?

11  A   No.

12  Q   In fact, the legislature in the last session cut back the

13  budgets of a number of DOT projects, did it not, because the

14  bids were coming in at lower levels than had been projected?

15          MR. TOMISSER:   Your Honor, the reference in 31 is to

16  the cost of construction materials, not to the cost of the

17  project.   Those are different concepts.

18  Q   (By Mr. Sledd)   I understand that there are two different

19  costs, as Mr. Tomisser stated, Mr. Moore.

20      Did the legislature in the last session cut back the total

21  budgets for a number of DOT construction projects because the

22  bids were coming in lower than anticipated?

23  A   I'm not specifically aware of the number of projects that

24  they cut.   I have anecdotal evidence that some of the bids

25  for the projects are coming in lower primarily because of the

1    recession and lower bids received in the competitive market.

2    Q    Paragraphs 35 and 36 of Exhibit W-090 of your declaration

3    noted that the government's budget proposal for I-4 fish

4    passage budget for the 09-11 biennium was an increase over

5    the previous biennium, correct?

6    A    Yes.

7    Q    And you refer to that as showing the executive branch's

8    commitment to fish passage?

9    A    Yes.

10   Q    But you don't actually know how much of an increase that

11   budget was compared to what was in the previous biennium's

12   budget, do you?

13   A    No.

14   Q    And you don't know whether it was a significant increase

15   relative to the total cost of correcting DOT culverts, do

16   you?

17   A    No.

18   Q    Paragraph 39, please.  The second sentence, I think this

19   was something you spoke with Mr. Tomisser about.  That

20   sentence says that "Within the transportation budget,

21   rearranging the priorities negotiated during the legislative

22   process would quickly unravel the basis for negotiated

23   agreements."

24        Do you see that?

25   A    Yes.

1  Q    That statement was referring to what could happen if the

2  Department of Transportation spent money in ways differently

3  than what the legislature had been lead to believe would

4  happen?

5  A    Yes.

6  Q    So it wasn't referring to what would happen if the

7  legislature changed the priorities within the DOT budget?

8  A    No.

9  Q    That paragraph also says that "Absent new revenue, any

10 increase in culvert correction spending would be at the

11 expense of other programs."

12 A    Yes.

13 Q    We talked about the legislature does have the power to

14 raise new revenue?

15 A    Yes.

16 Q    But you didn't consider, when you did this declaration,

17 the possibility of such revenue increases because it would

18 have been too speculative to say what the legislature might

19 do.

20 A    Absolutely.

21 Q    But you did speculate in Paragraph 39 that the legislature

22 might take money for culvert correction from other

23 environmental spending, so that it would be

24 counterproductive?

25 A    I think -- well, let me read this.

1    Q    Go ahead and look.

2    A    I think I say it could be taken from other environmental

3    projects.  But the larger point is absent new revenue, any

4    increases in culvert work would come at the expense of other

5    programs.

6    Q    I guess I was just asking, you spoke in this paragraph

7    about the possibility of the legislature raiding

8    environmental programs to pay for culverts, but you didn't

9    speak about the possibility of them adding new revenue?

10   A    No.

11   Q    This Paragraph 39 also says that "Increase in funding for

12   correction of fish passage barriers at the expense of other

13   areas of the transportation budget," quote, "leads to

14   compromises of safety or mobility for millions of drivers."

15        In fact, the effect on safety and mobility and whether

16   it affects millions or less than millions depends on how much

17   money is taken, correct, and for how long?

18   A    That's correct.

19   Q    And without knowing how much money might be taken for fish

20   passage barriers or how long, you can't truthfully say that

21   millions of people will be affected.

22   A    Not knowing how much is redirected, that's correct.

23   Q    Going through your whole declaration, you speak a fair

24   amount about the Department of Transportation.  But you

25   discuss only DOT barrier culverts; is that right?

1    A    Okay.  I suppose -- I'm looking if I mention -- we talked

2    earlier about general fund fish barrier projects.

3    Q    Okay.  You focus heavily on DOT.

4    A    Okay.

5    Q    Do you know whether any agency other than DOT has fish

6    passage barriers?

7    A    I'm assuming that when money is appropriated to some of

8    the other natural resource agencies, be it Parks or Fish and

9    Wildlife or Department of Natural Resources, who have

10   significant property holdings and transportation systems that

11   cross over streams, I'm assuming that those projects deal

12   with fish passage issues on those properties.

13   Q    But you don't know?

14   A    Not for sure, no.

15   Q    And you don't know how many fish passage barriers the

16   Department of Transportation has in its road system, do you?

17   A    No.

18   Q    Or how many any other agency has in its road system?

19   A    No.

20   Q    And you don't know how many fish passage barriers any

21   state agency has corrected, do you?

22   A    No.  Not specifically, no.

23   Q    And you don't know what it costs to fix a fish passage

24   barrier culvert?

25   A    A fish?  I assume the costs are significantly different

1   among the different projects.

2   Q    But for example for the Department of Transportation, you

3   don't know how much an -- average cost of corrections for

4   DOT, do you?

5   A    No.

6   Q    Nor for DNR?

7   A    No.

8   Q    Fisheries?

9   A    No.

10  Q    Parks?

11  A    No.

12  Q    And you don't know how many culverts the plaintiffs are

13  asking be corrected in this case, do you?

14  A    No.

15  Q    And you don't know how fast the plaintiffs are asking that

16  those culverts be corrected, do you?

17  A    No.

18  Q    But you do know that whatever the scope of the correction

19  that's being sought, and whatever the timeline, it will have

20  negative budget consequences?

21  A    Yeah.  The point is that if you're going to move money

22  from one purpose to another, given fixed resources, that

23  you're going to affect the program where the money came from.

24  Q    So that's the one-sentence summary of your entire

25  declaration?

1          MR. TOMISSER:  Objection.

2          THE COURT:  Objection sustained.

3          MR. SLEDD:  I have no further questions.

4     Wait.  I do.  I take that back.  And I was still touching

5     it, too.

6     Q   (By Mr. Sledd) I wanted to ask you one question about --

7     this is, I think, 090G amended.

8     A   Yes.

9     Q   I may have misheard your testimony, Mr. Moore, but I

10    thought I heard you say that this depicted spending on fish

11    passage barrier corrections?

12    A   Well, it displays more.  But I think the bottom line

13    there, it displays a variety of grant programs, and then it

14    specifically itemizes it, on the last line, of all those

15    grant programs how many were specifically for fish passage

16    projects.

17    Q   So it's the 43 million and some change out of the 360

18    million for the fish passage versus the total?

19    A   That's right.

20          MR. SLEDD:  At this time, Your Honor, absent

21    objection from the state, I would like to move for admission

22    of a couple of the Exhibits in Mr. Moore's declaration, 090C

23    and 090F, and I believe that they've all been discussed.

24          THE COURT:  Any objection, Mr. Tomisser?

25          MR. TOMISSER:  No objection.

| | |
|---|---|
| 1 | THE COURT:  C?  O90C and O90F are admitted. |
| 2 | (Exhibits No. O90C and O90F admitted.) |
| 3 | THE COURT:  All right.  Redirect for Mr. Moore? |
| 4 | REDIRECT EXAMINATION |
| 5 | BY MR. TOMISSER: |
| 6 | Q   A couple of points, Mr. Moore.  Counsel asked you about |
| 7 | the ability for the legislature to add revenue.  Can you |
| 8 | describe for the court what restrictions have come into |
| 9 | place, if any, after I-601? |
| 10 | A   Yes.  Initiative 906 was passed a little over two years |
| 11 | ago - I think about two years ago in November - which |
| 12 | required that any revenue, any tax increase, regardless of |
| 13 | the fund source, would require a two-thirds vote of the |
| 14 | legislature and also be placed on the ballot, at least as an |
| 15 | advisory measure, before the people, which is broader than |
| 16 | Initiative 601 which dealt primarily with general fund taxes. |
| 17 | Q   Would this cover fuel tax revenue? |
| 18 | A   Yes, it would. |
| 19 | Q   Mr. Sledd also asked you about what we currently see with |
| 20 | the bids from some projects coming in below the estimate. |
| 21 | Do you recall that? |
| 22 | A   Yes. |
| 23 | Q   Is it your expectation in planning future budgets that we |
| 24 | will continue to see lower bids? |
| 25 | A   Well, if the bids have any relation to the economic cycle, |

1    I think that we'll see -- we see a lot of prices being held

2    flat, or actually deflated in some instances, when business

3    is tough, and I think the competition gets harder.

4        So I haven't seen -- I would be speculative, but in my

5    experience, as the economy recovers, that you'll see prices

6    move back up.

7    Q   I'd also ask you to refer once again to Exhibit 090C.

8    A   Yes.

9    Q   In looking at this exhibit, Mr. Sledd asked you to look

10   at, I believe it was the '08 revenue and the -- or I'm sorry,

11   the '09 revenue compared to 2005, and noticed that

12   essentially we were back to -- we're back to where we were in

13   2005 in terms of revenue.  Is that correct?

14   A   Yeah.  I think that in our analysis now when you combine

15   all the funds, that we think 2011 will be about the level of

16   2008 in revenue collections.

17   Q   And with that reduction in revenue, relatively speaking,

18   did we also get a reduction in the state's case load?

19   A   That didn't happen.

20   Q   So our expenses increased while our revenue decreased; is

21   that correct?

22   A   We see it in -- yes.  We see an increase in Medicaid costs

23   and Medicaid case load.  We see an increase in prison

24   population.  We see an increase in K-12 enrollment and the

25   attendant inflation with all those programs.

```
 1          MR. TOMISSER:  Thank you.  Nothing further, Your
 2   Honor.
 3          THE COURT:  Mr. Moore, thank you very much.  You may
 4   step down, sir.
 5          THE WITNESS:  Thank you.
 6          THE COURT:  Nobody asked him what he thought of Tim
 7   Eynman while he was on the stand.
 8       You may call your next witness.
 9          MR. TOMISSER:  Before I do that, Your Honor, if I
10   might approach and hand the clerk the amended G before we
11   lose track.
12          THE COURT:  Thank you.
13          MR. TOMISSER:  The state calls Mr. Jeff Carpenter.
14          THE COURT:  Good morning, Mr. Carpenter.  Raise your
15   right hand to be sworn:
16   JEFF CARPENTER,            HAVING BEEN FIRST DULY SWORN,
                                TESTIFIED AS FOLLOWS:
17
18          THE CLERK:  Could you please state your name for the
19   record and spell your last name for our court reporter.
20          THE WITNESS:  Jeff Carpenter, C-a-r-p-e-n-t-e-r.
21          THE COURT:  You may inquire.
22                      DIRECT EXAMINATION
23   BY MR. TOMISSER:
24   Q   Good morning, Mr. Carpenter.  Thanks for coming back.  To
25   get started here, could you describe for the court briefly
```

1    what your educational background is.

2    A    Classically trained in engineering from Washington State

3    University; bachelor of science degree.

4    Q    How long have you worked for the Department of

5    Transportation?

6    A    Coming up on 18 years.

7    Q    And can you give the court an overview of the various

8    positions and responsibilities that you've held with the

9    Department of Transportation?

10   A    All right.  I came into the department as a designer.  I

11   worked in design and construction inspection the first few

12   years.  Specialized in hydraulic design.

13        From there, I went to be design team leader in the Port

14   Orchard field office; elevated to assistant project engineer;

15   from there to a project engineer at the Tacoma project

16   office.  Went to headquarters as the state construction

17   engineer for design build.

18   Q    What does that mean, "the state construction engineer for

19   design build"?

20   A    We were given a pilot project by the legislature to look

21   into the design builds as a delivery option.  So they brought

22   me in to work on the contract language and work with the

23   pilot project down in Vancouver, the SR 500 project.  And

24   from there, working with the 405 team and the Everett team on

25   the Everett HOV and 405 corridor.

1    Q    And when you say "design build," what does that mean?

2    A    Design build is in a contract, which brings into a

3    contracting entity with a contractor and designer as a legal

4    team, to where in this case the designer of record, the

5    professional, is with the contractor.

6    Q    So please continue.

7    A    All right.  From there, after a brief stint in the Navy on

8    a recall, I came back and went to the Tacoma Narrows Bridge

9    as the chief engineer.  I went into project director toward

10   the end of it.

11        From there, transitioned over to the Hood Canal Bridge as

12   project director; was given an opportunity to come back to

13   headquarters as the director of project control and

14   reporting.  And just recently, I've moved over to be a state

15   construction engineer.

16   Q    Describe for court, if you would, a little more fully,

17   what were your responsibilities as a project engineer?

18   A    Okay.  Project engineers in DOT are responsible for a

19   specific project area.  They deliver a series of projects,

20   usually in a geographic area, dealing with highway

21   construction and capital improvements.

22        So in the Port Orchard office and Tacoma office, two

23   geographic areas, we delivered projects within the

24   preservation overlays, concrete replacement, the 509

25   corridor, the cable-stay bridge, and the 705 project, Tacoma

1    Narrows Bridge overlay in the Tacoma office.  So you're

2    responsible for delivery, design estimating of projects

3    within a specific area.

4    Q    In the variety of positions that you've held within the

5    Department of Transportation, have you been required to gain

6    a knowledge of the Department of Transportation budget?

7    A    Yes.  Initially, it's through projects.  You have a

8    project budget that you're relating to.  You're also dealing

9    with a scoping effort coming from scoping estimates which go

10   into the budget.

11       If they make the short list and come back as projects,

12   you're responsible to deliver them within the scope section

13   of the budget.  And if there's a change, you have to report

14   it and get it vetted to ensure that there's still funding

15   available to proceed forward with the project.

16       From there, you do project control reporting.  I have a

17   statewide responsibility to make sure -- twofold.  One,

18   projects, once they were vetted be the legislature, were

19   delivered on time and budget, and tracking the changes.  On

20   top of that, providing feedback on the program building.  The

21   various specialty groups brought their needs forward in

22   helping to vet to make sure that the projects proposed were

23   realistic in terms of cost and schedule.

24   Q    Did your responsibilities require you to report to

25   legislative members and legislative staff on DOT projects?

1    A    Yes.

2    Q    Can you give the court some examples of the sorts of

3    reporting that you would do to the legislature on DOT

4    projects?

5    A    All right.  On all nickel and TPA jobs we had to submit

6    quarterly reports, as well as documenting any changes to the

7    projects.  From 2003 to 2007, we saw excessive inflation.

8    And as projects increased in costs, we had to document the

9    costs, share it with not only OFM but also legislative staff

10   to ensure they understand what changed on the project,

11   whether or not there was a scope change or if this was simply

12   a change in the cost.

13        From there to the legislature Joint Transportation

14   Committee, we had to present on the IMP programs as well as

15   what we refer to as other modes: the rail, the ferry

16   programs.

17   Q    When you say "IMP programs," what are you talking about

18   there?

19   A    The improvement and preservation programs.

20   Q    Are those budget items, categories within the DOT budget

21   as well?

22   A    They are categories within our capital improvement budget,

23   yes.

24            MR. TOMISSER:  Madame Clerk, if we could hand the

25   witness the binder containing W-091, please.

1  Q   (By Mr. Tomisser)  Mr. Carpenter, were you asked in this

2  case to prepare a written declaration in lieu of direct

3  testimony for this proceeding?

4  A   Yes, I was.

5  Q   And do you have that declaration in front of you now?

6  A   Yes.

7  Q   And that is the exhibit marked W-091; is that correct?

8  A   Yes.

9  Q   And do you adopt that written declaration as your

10 testimony in this case?

11 A   Yes.

12       MR. TOMISSER:  Your Honor, I would move for the

13 admission of Exhibit W-091.

14       MR. JOHNSEN:  No objection.

15       THE COURT:  Thank you, Counsel.  W-091 is admitted.

16            (Exhibit No. W-091 admitted.)

17 Q   (By Mr. Tomisser)  I'd like to turn your attention to a

18 discussion about the DOT budget, starting with kind of

19 agency-wide rather than more specific that we'll get to in a

20 moment.

21     Can you describe the DOT budget, starting with the revenue

22 side of the equation?  Essentially, where does DOT get its

23 money?

24 A   Obviously the primary source for our revenue is from gas

25 tax.  And then we have motor vehicle excise tax, licensing

1   and fees.  Any truck coming down the road requires a specific

2   license or overweight trucks require licenses.  Those are the

3   primary areas of our funding that we receive.

4       And on top of that, we have the federal gas tax as well.

5   Q   All right.  And I want to talk then also a little bit on

6   the expenditure side of the equation.  And if you would turn

7   in your exhibit binder to Exhibit 091-A.  Do you recognize

8   that?

9   A   Yes.

10  Q   And what are we looking at here with Exhibit A?

11  A   Well, this is our operating budget for transportation from

12  the governor's proposed budget 2009 and '11.  It's broke out

13  from operating and capital.  The capital improvement programs

14  are improvements for -- at least our capital improvement

15  projects for improvement.

16      The Narrows Bridge is pretty small.  Preservation makes up

17  the bulk of it.  The building facilities are kept.  There are

18  state ferries improvements.  Rail gets a small portion.

19  Local programs, which goes down to the local agencies.

20      On the operating budget on top, we have our maintenance

21  budget is broke out by the various functions within our

22  agency on how we operate and how we're funded to deliver our

23  program.

24  Q   And for the fiscal '09 through '11 biennium, was there

25  sufficient revenue to cover the obligations of the

1    department; do you know?

2    A    To cover this budget?

3    Q    Yes.

4    A    Yes.

5    Q    And for the anticipated -- or the maintenance obligations

6    for the Department of Transportation, was there a shortfall

7    in funding?

8    A    Yes.

9    Q    And what was the magnitude of that?

10   A    I don't have that in front of me.

11   Q    It's actually in your declaration.  In terms of the

12   revenue generated by the nickel and TPA taxes, was there a

13   decrease in anticipated revenue coming from those two

14   sources?

15   A    Yes.

16   Q    And do you know what that amount of shortfall was?

17   A    Not off the top of my head.

18   Q    Let me return you, then, to a broader question in terms of

19   how the Department of Transportation organizes its work that

20   is done.

21       How does the department know what order it should do

22   various projects in?

23   A    The order of the projects themselves?  Our priorities are

24   set by the legislature and signed off by the governor.  So we

25   have a proposed budget which the governor creates that is

1   vetted through the legislature, and that ultimately becomes

2   the adopted budget and priorities for our agency.

3   Q    Are some of the revenues collected by the Department of

4   Transportation mandated to be spent only on specific

5   projects?

6   A    The revenue received through the legislature?

7   Q    When the state receives revenue, for example the nickel

8   and TPA, are those mandated for specific projects?

9   A    Yeah.  The nickel and TPA are actually mandated by line

10  item.  Each project that we have on the nickel and TPA, we're

11  required to deliver within that budget and within the

12  timeline set forth by the legislature.

13  Q    And how about for funds the department receives that are

14  not targeted to specific projects like the nickel and TPA; is

15  that money also prioritized by the legislature?

16  A    That is prioritized by the legislature.

17      And along with the funding that comes over, we get through

18  our transportation executive information a list of projects,

19  and each project has a specific budget allocated to it.  We

20  have some flexibility within the projects, if we have a

21  savings, on when to shift it without getting formal

22  legislative approval, but we have a list of projects from the

23  legislature too.

24  Q    Is the way that it works that you have a list of projects,

25  an amount of funding, and you work down the list as deeply as

1    the funding allows?

2    A    Yes.

3    Q    If you'll return to the maintenance budget.  And I'll show

4    you, if you'll turn in your book, and you can also look on

5    the monitor at -- well, before you turn to that.

6          On the maintenance program itself, can you describe for

7    the court, what are the sorts of maintenance activities that

8    the Department of Transportation engages in on a regular

9    basis?

10   A    Well, the maintenance program itself has to deal with

11   continued or keeping the entire highway system up to date and

12   running.  So that's from snow removal, sand and ice, culvert

13   cleaning, guardrail repair, accident control, traffic control

14   as we incur it, striping, raised pavement markers.  So

15   they're effectively responsible to perform all maintenance

16   activities to keep our highway system moving and running.

17   Q    And the money that comes to pay to do these maintenance

18   activities, what part of the budget does that come from?

19   A    That's within the operating budget.

20   Q    Okay.  Let me show you Attachment B, I believe, to your

21   declaration.  And this has been admitted into evidence as

22   well.

23          Can you describe for the court, what is the MAP

24   program?

25   A    I will do my best here.  This is the Maintenance

1  Accountability Program set forth by the legislature to DOT.

2      The legislature acknowledges they're not giving DOT enough

3  funding to meet -- to keep everything pristine within our

4  program, so they set forth targets within our maintenance

5  program and they give us the funding.

6      And on the right on this sheet, you see the word "targets"

7  going down.

8  Q   That's in the first column going down?

9  A   The first column; the second column going down.

10 Q   Okay.

11 A   Those are effectively grades.  Each one of those grades

12 that you see has performance measures attached to it.  And

13 those are the targets.  They're saying this is where we'd

14 like you to be, given the funding that we're giving you,

15 assuming nothing else goes wrong within your system.

16     So if we don't have any unforeseen storms outside, like

17 normal winter conditions, if we don't have any landslides,

18 this is where they'd like to see us end up.

19 Q   All right.  And so when we look at this particular sheet -

20 and this is just for 2008 - what exactly is being measured

21 here?

22 A   Each one of these has a different measurement criteria.

23 For instance, two-thirds of the way down, one of the last, I

24 guess on the screen, light blue, 282 culvert.  The culverts

25 there is measuring all culvert crossings across our highway,

1   both stream and anything carrying water across our highway.

2       And some of the measurement criteria is keeping it free of

3   debris, routine inspection and cleaning, removal of beaver

4   dams, should they be an issue for us.  So on this, those are

5   the criteria.  And to get a C, we need 5 to 10 percent of our

6   culverts, effectively, having issues.  Anything more than

7   that, we would be less than C; anything better, we'd be

8   better than that particular grade.  So each one of these

9   elements has a similar measurement set.

10  Q   So this broad category 282 for culvert, is that more

11  culverts than just fish-bearing culverts?

12  A   Yes.  It's all culverts across the highway.

13  Q   And so then when we look over the headings across the top

14  of the sheet, do those refer to the various regional areas

15  within the Department of Transportation around the state?

16  A   Yes.  Those are the regions that we designate in terms of

17  our core response and how we manage our agency.

18  Q   And so if we look at the northwest region and then read

19  the grades, go down, what does that tell us?  How do we read

20  those grades in comparison to the target set by the

21  legislature?

22  A   Okay.  So the northwest received an F-plus on culverts.

23  And I had to ask because I didn't know what the plus was

24  either.  The plus -- effectively, anything over 20 percent

25  blockage receives a grade of F.  So if it's 21 percent or 81

1   percent blocked, it would still be an F.  So it was a way to

2   communicate, hey, we're on the upper end of this category,

3   and that's where the plusses come from.  So in this case,

4   they're not passing but they're just slightly past it.

5   Q    And this reporting system is dealing only with

6   maintenance; is that correct?  It's not construction or new

7   building or anything like that?

8   A    No.

9   Q    I'll refer you to your declaration as well as one of the

10  previous slides.

11       About how many lane miles does the Department of

12  Transportation maintain?

13  A    Lane miles?

14  Q    Lane miles.

15  A    About 20,000.

16  Q    That's also in your declaration; is that correct?

17  A    Yes.

18  Q    And does the Department of Transportation maintain data on

19  how many lane miles are maintained?  Is that a regular piece

20  of information kept in the ordinary course of department

21  business?

22  A    Are maintained or that are in our system, or both?

23  Q    Maintained by the system so we know how many lane miles

24  are maintained.

25  A    Yes, we do.

Q    And what is the relationship, if any, between a lane mile
and a center line mile?

A    Well, a center line mile is just on any designated
highway, going down the center line of the highway is a
center line mile.  Whether it's a two-lane highway or
Interstate 5, it would have one center line mile per mile.

     So a two-lane -- or a four-lane highway would have four
lane miles per center line mile.  A two-lane highway would
have just the two miles.

     So there's a relationship when you look at lane miles, you
have to factor in the number of lanes we have in the system
versus center line miles.

Q    Does the Department of Transportation also maintain
official public records on how many center line miles are
maintained by the Department of Transportation?

A    Yes.

Q    At my request, did you go and refer to those official
sources to determine how many center line miles are currently
being maintained by the Department of Transportation?

A    Yes.

Q    And how many miles are we currently maintaining, center
line miles?

A    Just under 8,000, is my recollection from the sheet in
front of me.

Q    And did you go to the data office to determine on a

1  historical basis how many center line miles have been

2  maintained by the department over the last several decades?

3  A   Yes.

4  Q   And did you prepare a chart that shows that information?

5  A   Did I prepare the chart?

6  Q   Have you seen the chart that demonstrates that?

7  A   Yes.

8  Q   Do you recognize that chart?

9  A   I do.  If I can correct, it was 7,000 miles.

10 Q   And in generating these numbers -- or by looking at these

11 numbers, did you go and obtain confirmation of this data from

12 the traffic data office?

13 A   Yes.

14 Q   And so are these an accurate representation of the center

15 line miles maintained by the Department of Transportation

16 from 1968 through 2009?

17 A   Yes.

18        MR. TOMISSER:  I'll offer this as Exhibit W-188, and

19 I would move for the admission of that document at this time.

20        MR. JOHNSEN:  No objection, Your Honor.

21        THE COURT:  Thank you, Counsel.  W-188 is admitted.

22             (Exhibit No. W-188 admitted.)

23 Q   (By Mr. Tomisser)  Mr. Carpenter, let's move over, if we

24 could, into the area of construction.  And can you describe

25 for the court over the last five years or so, whether or not

1   there's been an increase in prices for construction

2   materials.

3   A    Yes.  We did notice a significant increase in the prices

4   of our materials.

5   Q    And in terms of what percentage are we talking about over

6   five years?

7   A    In the percentage of the cost increase?

8   Q    Yes.

9   A    Anywhere from 30 to 50, depending on which system we were

10  dealing with.

11  Q    Do you know whether any of that was attributable to the

12  increased cost of oil-based products?

13  A    We believe it was.

14  Q    In what ways does the department consume oil-based

15  products?

16  A    Well, we consume oil-based products -- well, number one,

17  we have the gas required or diesel fuel required to deliver.

18  And within the agency, we have it broke out.

19       For instance, a diesel plant placing hot-mix asphalt would

20  be 2.9 diesel gallons per ton that we place.  So we've got

21  that factored in into our calculations.  Reenforcing steel

22  would be .02 gallons per ton -- on per pound, excuse me.  So

23  we've got that.

24       We also use excessive oil and oil-based products within

25  our hot-mix asphalt itself.

Q   And Mr. Carpenter, switching back for just a moment to maintenance, have you selected some photographs that would help illustrate your testimony that demonstrates the sorts of kind of emergency maintenance repairs that the department is faced with on a regular basis?

A   For maintenance?

Q   Yes.

A   Yeah.

Q   All right.  And would reviewing those photographs help illustrate your testimony regarding those maintenance challenges?

A   I believe so.

Q   I will flip them through them for you one by one.  And if you can just describe what we're looking at and what that means in terms of the maintenance challenge.

A   This is US 101 up by Kalaloch.  This is high winds.  As you can see, the roadway actually was closed due to some falling timber in this vicinity.  To the right, you can see a cone.

    The first order of business is to get the highway back open.  So as you see, there's still some light debris on the roadway.  To the right, we have damaged guardrail that we have to come back later and repair.  And you can see a fairly, from my perspective, large tree damage to the guardrail.

1    So maintenance had to come through here in the first

2    flight.  They had to make this repair, and then they'll

3    follow up in the days to come once this particular storm

4    crisis is over, and they'll effect more permanent repairs.

5    Q    What are we looking at here with the next slide?

6    A    This could have been anywhere in Western Washington, I

7    think at that time.  But this is just an accident that

8    occurred during our snow removal.

9         DOT has a responsibility, one, to communicate the accident

10   with the traveling public and the freight system to

11   understand that Interstate 5 is blocked at this time.  This

12   impacts our snow and ice removal.  We can't get ourselves

13   through this blockage either.  On top of that, we have

14   responsibility for traffic control and to potentially alter

15   routes, depending on how long the clearance is going to be.

16        Once the tow trucks are gone, we have to get crews out

17   there to remove any remaining debris off the highway to make

18   is safe for the traveling public.

19   Q    What is this?

20   A    That's a really big rock in the middle of Interstate 5 up

21   by Bellingham.  There was a series of slides going into

22   Bellingham on Interstate 5.  This particular boulder actually

23   is about the size of -- well, it's quite a bit larger than my

24   car.  And it ended up on the right shoulder of the -- or

25   excuse me, the left shoulder of the road going across.

1    So we had to shut down Interstate 5 for this, actually

2    break it apart into pieces that we could lift and move it

3    out.  On top of this, we had damage to guardrail, and quite a

4    bit of debris on the side that we had to get cleaned out

5    before we could open the highway back up.

6    So when we have this happen, we not only have the

7    maintenance crews in the field, we have communications,

8    traffic control, coordination of state patrol that we're

9    responsible for to keep the system running.

10   Q   And in this shot?

11   A   This is Mount Baker Highway going up to Mount Baker, on SR

12   542.

13   What happened is not infrequent.  With the heavy snowfall

14   in Western Washington being wet, it actually will plug some

15   of the drainage routes.  The water builds up.  And when it

16   comes down, it comes down in a hurry.

17   On this one, you can see some light debris.  And you look

18   at the equipment, that's not a normal snow plow.  When we get

19   this much, we can't run a snow plow through it.  And in this

20   area, they didn't have the snow blowers.  So we actually had

21   to get an excavator to side-cast to the side.  So on this

22   one, we got fairly lucky in the fact that we're predominantly

23   dealing with just snow on this one.  We had to get crews

24   mobilized out there.  Globally obviously in our mindset, we

25   don't think excavators when we're doing snow removal, but we

1  had to get someone in and get the crews and equipment located

2  and get the highway cleaned out before we could open it back

3  up.

4  Q    What are we looking at here with this aerial view?

5  A    Well, this is spot flooding.  This is not Chehalis.  This

6  is actually Fife in Tacoma.  Through backwater flooding,

7  through high tide, we had two southbound lanes and one

8  northbound lane that went under water.  Fortunately in this

9  location, we don't have a lot of movement in terms of cubic

10  feet per second going through causing erosion.

11      We had maintenance forces out there, one, providing

12  traffic control to ensure the public is safe.  We've got

13  communication with the traveling public, our website.  Quite

14  a few commuters rely heavily on us.

15      At this point in time, we were actually fairly confident

16  that the flooding had stopped, so we weren't looking to

17  actually shut the freeway down.  Once it does recede, we have

18  to clean up any debris that's left by the water and to ensure

19  there's no permanent damage to the roadway before we can open

20  it back up.

21      So on this, we had quite a few crews committed just

22  monitoring the situation to make sure it was safe for the

23  public.

24      This is up on I-90.  It's a similar type of slide that

25  came down.  It was a wet snow, and rain hit.  And when this

1    came down, you can see quite a bit of debris.  This is much

2    more problematic for us to deal with.  In this case, not only

3    do we have to truck the snow away.  There's no -- because we

4    have ongoing snow in this area, there's no easy way to side-

5    cast it.  We had to actually load this into trucks and haul

6    it away, just as we would if it was a normal landslide.

7         So on this, if you look in there, you can see some pretty

8    good-sized trees that were in the middle of it.  We had to

9    get this cleaned up.  And this is a major freight corridor,

10   as well as recreational skiers want to go to up the pass, so

11   keeping the pass open is a priority for us.

12   Q   Here's a little more substantial example of the things

13   that can go wrong.  What are we looking at here?

14   A   We didn't do it.  This is SR 410, and this could be today.

15   It's sunny, so it's not...

16        This just happened in the last couple of weeks on SR 410.

17   There's an -- it's an older slide.  About 20 percent of it is

18   what you're looking at here.  So the entire hillside going

19   down the valley, any of it can go at any time.

20        In this case, it obliterated our highway.  And to make it

21   more challenging, it's actually flooded into the river

22   itself.  So the river is being diverted onto private property

23   there.  We had to go in -- this isn't a shock.  We had to

24   shut the roadway down.

25        1,500 people live up this pass, and this is their only way

1    in or out.  As you may or may not know, Chinook Pass is

2    closed in the winter.  So as we were proceeding through, we

3    had to relocate the traveling public onto that county road.

4    We're fortunate in this case that there's actually a bridge a

5    mile up and down stream.  We built a temporary connection.

6    There's a lot of dirt out there right now.  But the vehicles

7    are able to get through between the two structures.

8        And ultimately, we're going to have to potentially

9    relocate the road to the far side.  A lot of that determines

10   on what they decide to do with the Wenatchee River itself.

11   But our plan right now is to relocate this highway to the

12   other side of the valley.

13       This last shot just kind of shows the magnitude.  That is

14   a picture of our roadway as far as center line miles.  If you

15   look, you don't see any of the crushed rock underneath.  It's

16   actually, as part of the roiling and the power that went

17   through here, it shoved our pavement away from the subgrade.

18       And this last photo or slide is just to show you some of

19   the devastation we're having to deal with.  We don't have a

20   permanent fix for this right now.  We think -- we have the

21   road open.  We'll have it open for the winter.  And we think

22   we've got a six-month plan forward.  The ultimate fix for

23   this repair is beyond maintenance.  This would fall into the

24   engineering capital improvement program.  But right now this

25   is all maintenance for us.  This is maintenance emergency

1    contracts that are addressing this issue.

2    Q    And so the various examples that we've reviewed here, does

3    that money have to come out of funds appropriated for

4    maintenance that are not directed to specific projects?

5    A    Portions.  Depending on the severity of the accident and

6    the timing.  If it's anything under 50,000, so most of the

7    maintenance activities I showed you are on the borderline or

8    under it, those we have to, basically, as part of our course

9    of doing business, is to maintain our highways.

10       If it's over that amount and then we can effect a repair

11   within 180 days, we get federal funding.  That's provided the

12   federal bucket is big enough to fully fund that repair.

13   Depending on what happens throughout the nation, there may or

14   may not be enough funds there.

15       If not, they take it from their normal federal funds,

16   which is ultimately our bucket of capital improvement

17   programs.  So as these things occur, they do impact our --

18   not just our ability financially, but our resources.  I mean,

19   our maintenance, we don't get extra maintenance workers for

20   these thing.  So if they're pulled here, they can't do

21   something else.

22   Q    Let me bring your attention to the DOT improvement budget,

23   the I budget.

24       Can you describe for the court, what are the various

25   elements that reside inside the I budget?

A    All right.  There are -- there's four areas.  The
improvements are effectively anything that we do to improve
our system, as opposed to the preservation, which is
preserving their current investment.

So the improvements, the mobility, which is big for
visibility, is adding capacity, whether that be focussing on
single interchange, adding a ramp or adding a lane to a ramp
to potentially corridor-wide repairs, such as 405.  That's
the mobility.

The safety program is addressing safety deficiencies.  A
lot of our highway was built in the 40s and 30s.  So it was
safe back then with the vehicles that were operating on it.
With the numbers, it is no longer, so we're continuously
having to address safety deficiencies in our system as more
and more people continue to use our highways.  So that falls
under the safety category.

The I-3 right now is effectively a dormant category, which
is economic initiatives.  It is possible for transportation
in a localized improvement in a depressed area to make it
easier access to potentially attract business into an area.
That funding is significantly dropped for the near future.

And last is the I-4, which is the environmental program.
Q    And when you look at the I-4 program, what are the various
line items that exist within the I-4 portion of the budget?
A    Some of the key ones are storm water retrofits, chronic

1    environmental deficiencies, the noise wall, noise barrier

2    program, and then the fish passage barrier.

3    Q    All right.  And I believe -- if you would turn to Exhibit

4    D in your binder.  Exhibit D has been admitted.  Do you see

5    that history of I-4 spending?

6    A    Yes.

7    Q    And since you've signed your declaration in this case, do

8    we have an update on what the actual appropriation was for

9    the I-4 fish passage?

10   A    Yes.

11   Q    And can you tell the court what that amount of

12   appropriation was?

13   A    20.3 million.

14   Q    And have you prepared a chart that updates those amounts?

15   A    Yes.

16   Q    Do you recognize the chart that I have up on the monitor

17   for you now as showing the updated figures for the I-4 budget

18   to include the 09-11 actual appropriation and expenditure

19   plan?

20   A    Yes.

21   Q    All right.

22        MR. TOMISSER:  Your Honor, at this time I would move

23   to amend 090D with this exhibit for the updated expenditure

24   amounts.

25        MR. JOHNSEN:  This is another document that we've

```
 1   never seen.  But consistent with prior rulings, I assume it
 2   will be in.  I'd like to get a copy at some point.
 3              THE COURT:  Can you get copies?
 4              MR. TOMISSER:  Yes.
 5              THE COURT:  All right.  It's already in evidence.
 6   We'll go ahead and amend it.
 7                   (Amended Exhibit 090D admitted.)
 8   Q   (By Mr. Tomisser)  Okay.  And have you had an opportunity
 9   to go back and review the I-4 budget over time since it was
10   originally enacted?
11   A   Yes.
12   Q   And when was the I-4 -- when did the I-4 budget first
13   begin to appear as a regular line item in the DOT budget?  Do
14   you recall that?
15   A   As a regular line item?
16   Q   Yes.
17   A   Earliest I've seen is the '91.
18   Q   Is that -- was that for fish passage?  Is that a line item
19   within the I-4 budget?
20   A   For fish passage?
21   Q   Yes.
22   A   Yes.
23   Q   Have you looked to see the percentage --
24   A   Can I clarify a moment?
25   Q   Yes.
```

A    I don't want to say if it was specifically for I-4 or if the I-4 was -- when the I-4 was created.  But the funds for the fish passage were created at that time.

Q    As you look historically through the I-4 budget, over time as a percentage of the I-4 budget, has fish passage and barrier remediation increased or decreased as a percentage of the I-4 budget?

A    It has increased.

Q    I want to return back to some of your earlier testimony on interaction with the legislature and ask a question.

     Mr. Carpenter, if you were asked by the court or by anyone to -- to look for what document would be the best document to review if you had to figure out what is the average cost barrier on a going-forward basis, where would you look for that?

A    From this point, for barriers that are under design?

Q    Yes, on a going-forward basis.

A    The scoping reports.

Q    What is that?

A    The scoping report starts out fairly rough and requires site visitation.  A lot of the factors going into repair of a culvert are very site specific.  So they'll factor that into the cost estimate, and that's what we use to go forward to the legislature to come up with a plan for delivery within the schedule and are our estimated cost.

Q    Okay.  And up on your monitor now is an Exhibit W-113.  I

don't think it's in your book.  It's on your monitor.

Do you see that?

A    Yes.

Q    Do you recognize that as a scoping report that's produced?

A    Yes.

Q    When DOT is presenting budgets, proposed budgets to the

legislature, does DOT take the historic average cost, past

cost, the historic average, and use that as a basis for

calculating the future cost?

A    No, we do not.

Q    And why not?

A    Well, again, site-specific -- culverts in particular are

very site specific: the depth of the culvert, the planned

repair for the culvert streams in as new technology, which we

may not have in the past.

On top of that, you've got to look at your traffic.  I

mean, what are the requirements for the highway itself?  For

instance, SR 410 that I showed you earlier is a mountain pass

with -- in this case where the slide was, we were fortunate

enough to have an alternate route.  We could factor that into

the cost.

In other cases, we might actually have to construct design

of a temporary route, which would have had tremendous impacts

on cost.  So you have to factor all that in, and it's very

1    site-specific.

2         THE COURT:  Counsel, let's go ahead and take our

3    lunch break at this time.  We're in recess for lunch.

4                    (A RECESS WAS TAKEN.)

5         THE COURT:  Counsel, we're back in session for the

6    afternoon.  Mr. Carpenter, you're still under oath.

7    Q   (Mr. Tomisser)  Good afternoon, Mr. Carpenter.

8         I'd like to bring your attention to an exhibit that was

9    admitted through another witness in this case and ask if you

10   recognize this document that is identified as AT-336.

11   A   Yes.

12   Q   And what is AT-336?

13   A   It's what we commonly refer to as a bid sheet.

14   Q   And do you recognize the project that this bid sheet is

15   associated with?

16   A   Yes, I do.

17   Q   What project is that?

18   A   That's the SR 104, 1.2 mile Hood Canal Bridge fish

19   passage.

20   Q   Do you have any experience with that particular project?

21   A   I do.

22         MR. JOHNSEN:  Your Honor, this whole area of inquiry

23   is beyond anything that's in Mr. Carpenter's declaration.

24   It's an entirely new area that he was not designated to

25   testify about, and we object to any further testimony

1   regarding this project through this witness.

2         MR. TOMISSER:  Your Honor, our reason for doing this

3   is that this exhibit was introduced when Paul Wagner was on

4   the stand.  And in our view, much confusion was generated

5   about what this is and what happened with that project.

6   Mr. Carpenter is -- in response to what happened during that

7   testimony, I think it's easier to do it now than to dismiss

8   him and have him come back to address that.

9         THE COURT:  The objection is overruled.  You may

10  continue.

11  Q   (By Mr. Tomisser)  If you could briefly describe, what is

12  your experience with the Hood Canal project?

13  A   At the time this project was being designed, I was the

14  project director on the Hood Canal Bridge, so the Port

15  Angeles project office approached us with the notion of

16  combining this project's timing in with our float-in of the

17  Hood Canal Bridge.

18  Q   So Exhibit AT-336 you were describing as a bid sheet.

19  What is a bid sheet?

20  A   Well, the bid sheet is simply comparing the successful low

21  bidder against the engineer's estimate.

22      In this case, Seton Construction submitted a bid of

23  $517,409, which was the low bid, and that's what we awarded

24  the contractor.  As of the time this was printed out, DOT had

25  paid $507,543.81 to this contract.

1   Q   Does an engineer's bid sheet capture the total cost of the

2   project?

3   A   No.  This is simply the amount that the contractor's

4   receiving directly.  On top of this, you'd have any design

5   cost, right-of-way costs.  On this project, because it was

6   timed with the Hood Canal Bridge float-in, washed up, went

7   ahead and procured the pipes separately.  That cost is not

8   included here.

9        On top of that, you have the sales tax we're required to

10  pay on construction projects.  And the construction

11  engineering contingencies associated with this project would

12  not be on this sheet.

13  Q   What was the cost of the pipe for this project?

14  A   About $236,000.

15  Q   And if you wanted to find out what is the current amount

16  appropriated for this particular fish passage project, where

17  would you look to find that number?

18  A   I would look in the TEIS, the Transportation Executive

19  Information System program and the latest version which they

20  have in there, which would be the 2009 conference version.

21  Q   And have you looked at that amount?

22  A   I have.

23  Q   And what is that amount?

24  A   That amount is approximately 1.7 million.

25          MR. TOMISSER:  Thank you, very much, Mr. Carpenter.

1    No, more questions, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. JOHNSEN:

4    Q   Good afternoon, Mr. Carpenter.  You may recall my name is

5    Harry Johnsen.  We met at your deposition in May of this

6    year, as I recall.  Is that correct?

7    A   Yes.

8    Q   In fact, May of this year is when that project that

9    Mr. Tomisser just referred to was actually being constructed,

10   isn't it?

11   A   Yes.

12   Q   You'll have to bear with me for a moment here because some

13   of this information is information that I just learned here.

14       You said that there was a $236,000 charge on that

15   project that represented the cost of pipe?

16   A   Yes.

17   Q   Okay.  And that's not included in what that contractor

18   provided?

19   A   No.  This was a unique contract because of the timing of

20   the float-in.  We procured the pipe separately.

21   Q   There isn't any pipe in this project, is there?

22   A   I believe there is.

23   Q   Just a second here.  Perhaps the difference is -- are you

24   referring to the culvert structure itself?

25   A   Yes.

1    Q    Okay.  I don't recall the exhibit numbers at the moment,

2    but I'll come back to those later.  So this was a three-sided

3    concrete structure?

4    A    I'm sorry.  You're correct.  For clarification, that would

5    be a culvert.

6    Q    And you're saying that you know, although none of the

7    documents reflect it, that the cost of that structure was not

8    included in the bid that was submitted by Seton Construction

9    for constructing this project?

10   A    Correct.

11   Q    Now, that project was on State Route 104; is that correct?

12   A    Yes.

13   Q    And that route is located between Hood Canal Bridge and

14   State Route 101 -- or excuse me, US 101?

15   A    Yes.

16   Q    On the west side of the bridge; is that correct?

17   A    Correct.

18   Q    Mr. Tomisser gave me some exhibits regarding this last

19   week.

20        MR. JOHNSEN:  Excuse me a minute, Your Honor.  I'm

21   just trying to identify the exhibit numbers.  They don't seem

22   to have the same number.

23   Q    (By Mr. Johnsen)  All right.  I'm going to put up on the

24   document camera some things for you to look at that might

25   help.

1          Do you recognize the area that's depicted on the

2    document camera?

3    A    Yes.

4    Q    I'm going to represent to you that this is one of the

5    documents that Mr. Tomisser provided to me with regard to

6    this project.

7          That orange dot represents the location of the project;

8    is that correct?

9    A    Yes.

10   Q    Are you familiar with this map?

11   A    I'm familiar with the area.

12   Q    You're familiar with the area.  This project caused State

13   Route 104 to be closed, did it not?

14   A    It did.

15   Q    And there was a detour that was in effect during the time

16   the project was being built?

17   A    There was.

18   Q    So that traffic control expenses were incurred as part of

19   this project, just as there would be in most projects?

20   A    No, because the Hood Canal Bridge itself was closed during

21   it.  Like -- I might have misunderstood your question.

22   Q    Well, there was less traffic, but there was still traffic.

23   A    There was still local traffic, and it was routed down the

24   county road, which you can see to -- I've got it sideways for

25   me.

1   Q    Which way do you want me to turn it?

2   A    That works.  Now I'm looking at the county road on the

3   bottom below the -- is where it was routed.

4   Q    Okay.  Was Beaver Valley Road, Oak Bay Road, and Paradise

5   Road also used?

6   A    For the detour?

7   Q    For the detour.

8   A    Well, 104 was closed.  101 was the principal detour for

9   the route.  Getting transit vehicles to the passenger-only

10  ferry, getting a drop-off point away from the passenger-only

11  ferry, and routing local traffic were part of the Hood Canal

12  Bridge float-in plan.

13      If this project had to go independently, you're correct,

14  there still would have been traffic control associated with

15  it.  It would have just been a much more robust traffic

16  control effort to get --

17  Q    Okay.  So there was a detour around the project?

18  A    Oh, yes.

19  Q    Okay.  And there was a passenger ferry that provided

20  transit across Hood Canal during the time the bridge itself

21  was out of commission?

22  A    Yes.

23  Q    And people still had to get to the passenger ferry?

24  A    Yes.

25  Q    Thank you.

1      All right.  Let's go back to the beginning.  I think,

2  first of all, you owe a debt of gratitude to Mr. Moore, who

3  testified this morning, because he answered many of the

4  questions that I had planned to ask you, so you don't get to

5  deal with those this afternoon.  Your declaration indicates

6  that your job title, at least when you signed the

7  declaration, was project control and reporting director for

8  the state Department of Transportation?

9  A   Yes.

10 Q   Is that correct?  Is that still your position?

11 A   No.

12 Q   When you were in that position, which is when your

13 testimony in this case was prepared, that position was not in

14 any way limited to culvert-type projects, was it?

15 A   No.

16 Q   In fact, that was pretty much all the projects that

17 Department of Transportation deals with?

18 A   Yes.

19 Q   Now, you have attached to your declaration several

20 exhibits.  And I want to ask you about C, E, F, and G.  My

21 question about each of them is going to be the same, which is

22 whether you have personal knowledge of the information that's

23 shown in those exhibits.

24      The first one, C, this is a picture of a bridge that

25 you reference in your declaration as needing maintenance; is

1    that correct?

2    A    Correct.

3    Q    At the time of your deposition, you did not know -- you

4    had not taken the photograph; is that correct?

5    A    That's correct.

6    Q    And you did not know where that bridge was located?

7    A    That is correct.

8    Q    And you did not know whether in fact the damage to the

9    bridge that's shown in the photograph had been repaired; is

10   that correct?

11   A    Correct.

12   Q    And you didn't know what had caused the damage; is that

13   also correct?

14   A    Yeah.

15   Q    Although it appeared to you that it might have been caused

16   by the impact from a vehicle?

17   A    Yes.

18   Q    Is that correct?  And you testified at your deposition

19   that if that were the case, then whatever entity that

20   collided with the bridge would be responsible for paying for

21   the damage that collision cost; is that also correct?

22   A    Yes.

23   Q    Let's now go to Exhibit D to your declaration, which is a

24   chart that actually, I believe, has been part of testimony

25   from another witness in this case.

1    A    Do you mean E?

2    Q    Excuse me, is this E?  It is E.  Let me make sure I've got

3    the right version here.  This is the amended version, I

4    believe.

5         You did not prepare this chart?

6    A    No.

7    Q    It was prepared for you for purposes of presentation in

8    this case?

9    A    I can't answer if it was prepared for me.

10   Q    Excuse me?

11   A    I can't answer if it was prepared for me.

12   Q    You cannot --

13   A    I cannot answer that.

14   Q    As far as you know, it was not prepared for you?

15   A    It was not prepared for me, to my understanding.

16   Q    And you don't have any direct, personal knowledge of any

17   of the information contained in that chart; is that correct?

18   A    No.  I'd have to ask Paul Wagner.

19   Q    And is the same true of the next exhibit?  Which also, I

20   believe, was part of earlier testimony.  This, I believe, is

21   F, Exhibit F to your declaration.

22   A    Yes.

23   Q    You don't have any personal knowledge of the information

24   behind that chart either; is that correct?

25   A    No.

1    Q    That's not correct?

2    A    That is correct.

3    Q    All right.  At the time you did your declaration, you

4    stated that the governor had proposed $17.9 million for

5    culvert remediation in the I-4 program in the 2009-2011

6    biennium.  And I believe at the time of your deposition, you

7    testified that you felt that amount had, in fact, been

8    approved by the legislature.

9         Do you recall that?

10   A    Yes.

11   Q    Is that the same as your testimony today about what was

12   actually approved by the legislature?

13   A    No.  It was actually approved as the 20.3.

14   Q    So the legislature appropriated more than the governor

15   asked for; is that correct?

16   A    Yes.

17   Q    And more than the Department of Transportation asked for?

18   A    We don't ask for the funds.

19   Q    At the time of your declaration -- this is doing strange

20   color things on my monitor here.

21        This is Exhibit A to your declaration.  It's the

22   proposed budget for 2009-2011 for both operating and capital

23   expense for the Department of Transportation; is that

24   correct?

25   A    Yes.

1    Q    Was the budget approved exactly as shown in this exhibit?

2    A    No.

3    Q    What changes were made?

4    A    There were slight project adjustments.  The legislature

5    also put an assumption in for savings on our projects.  We

6    knew we were getting better bids, so they made an assumption

7    globally we're going to have a savings.  They didn't tie it

8    to any one specific project.  They just put it at the end.

9         There were some other minor adjustments to maintenance

10   operations and traffic operations.

11   Q    I was looking at the Department of Transportation website

12   the other night, and it said that the budget for the

13   transportation department was 5.8 billion rather than the

14   5.271 billion that's shown here.

15        MR. TOMISSER:  Object to the form of the question.

16   Counsel's representation of the website has -- he doesn't

17   have the screen shot here to show the witness.

18        THE COURT:  Let me have you rephrase the question.

19   Q    (By Mr. Johnsen)  Does the Department of Transportation

20   maintain a website for public information purposes with

21   regard to its budget?

22   A    Yes.

23   Q    Is the address for that site www.wsdot.wa.gov?

24   A    Yes.

25   Q    Let me show you a document that I found online.  At the

1   bottom of the document, if I can get there, is the website

2   address.

3          Is that the address that I just recited to you?

4   A    The first portion, yes.

5   Q    And the rest of it appears to relate to the budget for the

6   Department of Transportation?

7   A    Uh-huh.

8          THE COURT:  Is that a yes?

9   A    Yes.  I'm sorry.  Yes, sir.

10  Q    (By Mr. Johnsen)  This appears to show a total budget of

11  $5.8 billion:  $4.4 billion in the capital expenditure side

12  and $1.4 billion in the operating side of the Department of

13  Transportation budget.

14     My question for you is:  Are you aware of the difference

15  between these figures and the figures in your declaration?

16  A    How specific do you need?

17  Q    Well, the order of magnitude, we're talking about a half

18  billion dollars.

19  A    On the project adjustments?

20  Q    Well, let me switch back to your exhibit which shows

21  $5.271 billion as the total.  And then if we go back to what

22  was on the website, it's 4.8 billion.  Now, that's about half

23  a billion dollars difference.

24     My question is:  Are you aware of that discrepancy or

25  any reason for the discrepancy between those two apparent

1   representations of the department's budget?

2   A   Right.  A good portion of it is the ARRA funds.  The

3   legislature also chose to pull back in from future bienniums

4   into the current biennium projects the governor had proposed

5   to delay.

6   Q   The which funds?

7   A   Sorry.  ARRA funds, A-R-R-A funds.

8   Q   That's the federal stimulus money?

9   A   Correct.

10  Q   Okay.  Is it then correct that the budget for the current

11  biennium for the Department of Transportation, including the

12  stimulus funds, is $5.8 billion?

13  A   It appears that way, yes.

14  Q   Now, I'm going to use your exhibit, even though the

15  numbers are different, just to talk about the categories in

16  the budget.

17       It appears that it's divided into two portions.

18  There's an operating budget and there's a capital budget; is

19  that correct?

20  A   Yes.

21  Q   The numbers that we're seeing here are in billions of

22  dollars; is that right?

23  A   Yes.

24  Q   So even though they're expressed as a thousand, a thousand

25  million is one billion?

1   A   Yes.

2   Q   Is that correct?

3       Now, the term "operating budget" came up in Mr. Moore's

4   testimony this morning.  But I believe he was talking about a

5   different creature when he talked about the operating budget;

6   namely, the state general fund operating budget.

7       Is my impression on that correct?

8   A   I wasn't here for his full testimony, but I can assume,

9   yes.

10  Q   Okay.  So this operating budget, this is all part of the

11  Department of Transportation budget; it's not part of the

12  state general fund budget.  Correct?

13  A   Correct.

14  Q   Both halves of this.

15      And in the operating portion of this budget, there is

16  highway maintenance.  Is that also correct?

17  A   Yes.

18  Q   The first line there.  And it's about $360 million,

19  correct?

20  A   Yes.

21  Q   And that's the fund from which the department deals with

22  that snowstorm and those other things that we saw in your

23  direct testimony this morning?

24  A   Yes.

25  Q   And you plan for those kinds of activities each year?  You

1   don't know exactly what's going to happen, but you plan that

2   something will happen?

3   A   We do our best, yes.

4   Q   The capital part of the budget, on here it's about $4

5   billion, is where things like building culverts land; isn't

6   it?

7   A   Yes.

8   Q   Okay.  So those are -- I think in your deposition, you

9   distinguish between maintenance and preservation as two

10  different, at least budget topics.

11      Do you recall that?

12  A   Yes.

13  Q   And I believe you said that fixing a pothole would be an

14  example of a maintenance project, but repaving the road would

15  be an example of a preservation project?

16  A   Yes.

17  Q   Then I take it building a new road or substantially

18  replacing a road would be an improvement project?

19  A   Correct.

20  Q   Those are the categories?  Okay.

21      So in the culvert world, then, cleaning the debris out

22  of a culvert might be maintenance.  Is that a correct

23  statement?

24  A   Yes.

25  Q   But replacing it or retrofitting it or making it fish

1   passable would either be an improvement or a preservation

2   project; is that correct?

3   A   Correct.

4   Q   So those would come out of the bottom half, the capital

5   half of this budget?

6   A   Uh-huh.  Yes.

7   Q   All right.  Well, back to these budget numbers.  The $20.3

8   million that the legislature apparently has appropriated for

9   the culverts for this biennium, that's the highest amount

10  that's ever been appropriated for that purpose, isn't it?

11  A   I believe so.

12  Q   And compared to the overall budget of the department, that

13  -- well, let's see.  How would we do that math?  One percent

14  of a billion dollars is ten million dollars; is that correct?

15  A   Yes.

16  Q   So maybe the simplest way to --

17        THE COURT:  This is why I became a lawyer.

18        MR. JOHNSEN:  This is exactly why I became a lawyer.

19  I was planning on dealing with billions all the time.

20  Q   (By Mr. Johnsen)  Basically what we're going to do here is

21  figure out what percentage of the overall budget the culvert

22  appropriation consists of.  You would take 20.3 million, or

23  figure 20.3, and divide it by whatever the total budget is,

24  either 5.271 -- or excuse me, 5,271 or 5,800; is that

25  correct?

1  A   Yes.

2  Q   And that's -- when we do that math, it's going to come out

3  to about 35/100 of 1 percent of the budget.

4      Does that seem right?  This is you why you became an

5  engineer?

6      All right.  Anyone can do that math.  That's fine.

7      Looking back at the budget again, W-091A, you've got a

8  category on your presentation here "possible flexibility."

9  And it looks to me like the highway improvements and the

10 highway preservation categories make up over a billion

11 dollars of the "possible flexibility" category.

12     Am I correct there?

13 A   Yes.

14 Q   And that might even be higher when the stimulus funds are

15 included in, is that also correct, for that $5.8 billion

16 total?

17 A   For flexibility for which purpose?

18 Q   I don't know.  This is your -- this is your exhibit.

19 A   Then I would be concerned to say there's flexibility with

20 the ARRA funds.

21 Q   Okay.  So -- and your answer indicates that there may not

22 be flexibility.

23 A   Flexibility.

24 Q   But those funds still went into highway improvements and

25 highway preservation projects, didn't they?

1   A   They did.

2   Q   In fact, largely they've been spent on what we talked

3   about a few moments ago, repaving of roads and things like

4   that?

5   A   Yes.

6   Q   And those categories "highway improvement" and "highway

7   preservation," those are the categories where the culvert

8   correction costs would be found in the Department of

9   Transportation capital budget; isn't that correct?

10  A   Yes.

11  Q   Now, in your declaration, you say, and this is at Page 5,

12  I think you probably have it in front of you, Paragraph 12:

13  16 percent of the revenue that the Department of

14  Transportation receives is from the federal government.

15      Can you find your way in the declaration there?

16  A   Almost.  Page 5?

17  Q   Page 5, Paragraph 12.

18  A   Right.

19  Q   16 percent of the revenue the department receives.  Now

20  that wouldn't include those stimulus funds, the half billion

21  or so that's been added this biennium?

22  A   340 million, yes.

23  Q   Whatever it is.  340?  Okay.

24      So the percentage would go up, then, if those funds

25  were included, at least for this biennium?

1    A    In this biennium, yes.

2    Q    Now, you go on to say in that paragraph that 60 percent of

3    those funds are restricted and cannot be used for culvert

4    remediation.

5         Do you see that?

6    A    Uh-huh.

7    Q    But isn't it true that if a project -- or road improvement

8    project that's otherwise eligible for federal funding -- and

9    this is funding from the Federal Highway Administration; is

10   that correct?

11   A    Yes.

12   Q    If otherwise -- if the project is otherwise eligible for

13   funding from the federal funds and there is a defective fish

14   passage culvert within the project, that the federal funds

15   can be spent on fixing that culvert; is that correct?

16   A    Yes.

17   Q    So what you're really saying about those 60 percent is

18   that they can't be used for a program that's dedicated, like

19   the I-4 program, specifically and only to fix fish passage

20   barriers; is that correct?

21   A    That would be a little bit broad.  We have certain funding

22   from the federal government which is earmarked specifically

23   for projects or it's earmarked for safety, which allows us

24   flexibility with the remainder of our programs. So there are

25   certain funds that wouldn't be utilized on culvert

1   remediation.

2   Q    Okay.  Now, with regard to the remaining 40 percent of the

3   federal funds, that same restriction does not apply then; is

4   that correct?

5   A    Correct.

6   Q    And the 16 percent represents -- well, it's 16 percent of

7   the current budget, which is greatly affected by the presence

8   of two special gas taxes that we're going to talk about in a

9   minute: the nickel tax and the TPA?

10  A    Yes.

11  Q    Is that correct?

12       So without those specialized taxes, the federal

13  contribution to the state transportation budget would be a

14  much higher percentage.  Is that also correct?

15  A    For the capital improvement programs?

16  Q    Yes.

17  A    It's almost 100 percent.

18  Q    They get there because of the federal funding, is what

19  you're saying?

20  A    Yes, the federal funding.

21  Q    Now, you also refer in your declaration to a portion of

22  the transportation department funding that might be

23  restricted by the state legislature.  And this is where you

24  talk about both the nickel tax and the TPA, or Transportation

25  Partnership Tax; is that correct?

A    Yes.

Q    And those particular taxes have a set of projects that --
were you here when Mr. Moore testified about those projects
this morning?

A    On the cross?

Q    No.  I believe it was part of -- well, I'm not sure.  It
may have been part of his cross-examination.

A    I was here for the cross-examination.

Q    All right.  He indicated that those -- that that list is
restructured, or can be restructured, by the legislature
periodically.

     Do you agree with that?

A    The list is created and owned by the legislature.

Q    And it's up to the legislature to decide in any given
biennium what's in and what's out in those particular
projects?

A    Yes.

Q    And, in fact, some of the nickel tax funds have been spent
on culvert remediation in the past, right?

A    Yes.

Q    Now, do you agree with Mr. Moore that the money that is
raised from the gas tax can only be spent for highway
purposes?

A    Yes.

Q    And that's because of the provision in the state

1  constitution that even the legislature cannot change; is that

2  correct?

3  A    Yes.

4  Q    Are you aware of any plan by the state Department of

5  Transportation to spend any funds under its control for the

6  purpose of fish hatchery reform?

7  A    I'm not aware of that.

8  Q    Are you aware of any plans by the state Department of

9  Transportation to spend any funds under its control for fish

10  harvest management?

11  A    I'm not aware of that.

12  Q    Are you aware of any plan by the state Department of

13  Transportation to spend any funds under its control for the

14  purpose of mitigating the adverse effects of hydropower on

15  salmon runs in the state of Washington?

16  A    I'm not aware of that.

17  Q    In fact, it sounds like those things would violate the

18  rules under which the department operates for the expenditure

19  of gas tax funds; is that correct?

20        MR. TOMISSER:  I object, Your Honor, to foundation.

21  There's no evidence those funds were ever targeted for any of

22  those three subjects.

23        THE COURT:  The objection will be sustained.

24  Q    (By Mr. Johnsen)  By the same token, the Department of

25  Transportation is not in competition with other state

1  agencies for general fund funding for the construction

2  activities of the Department of Transportation; isn't that

3  correct?

4  A   Yes.

5  Q   In your declaration, you talk about the legislature

6  appropriating money for the Department of Transportation.

7  Isn't it true that when a legislature does that, essentially

8  it's telling you where it wants the gas tax funds and the

9  other funds that are dedicated to transportation purposes

10  spent?

11  A   Yes.

12  Q   That's the legislature's way of telling you how to spend

13  the money that can only be spent for transportation; is that

14  correct?

15  A   Yes.

16  Q   And those federal highway funds that you refer to, they

17  are also limited to transportation purposes, aren't they?

18  A   I'm not a federal funding expert to answer that.

19  Q   You mentioned on that Highway 104 project that you thought

20  the sales tax was not included in the amount that the

21  construction contract covered.

22      Is that your testimony?

23  A   The construction contract or the form in question covered?

24  Q   Could you look at Exhibit AT-336, please.  It's the

25  exhibit that Mr. Tomisser had in front of you when you were

1    being asked about that project.

2    A    Okay.

3    Q    It's now on the screen.  Ordinarily when the department

4    awards a contract, the department does pay sales tax as part

5    of the contract price; is that correct?

6    A    When we make payments to the contractor, the contractor

7    collects the sales tax from the state funds.

8    Q    So the sales tax money comes out of your pocket because

9    it's something that you reimburse the contractor for?

10   A    Above and beyond the price of the contract, yes.

11   Q    So it's not included in the contract price?

12   A    No.

13   Q    But it's still an expense from the department's point of

14   view?

15   A    It is.

16   Q    And it's still a benefit to the general fund from the

17   overall state's point of view; is that correct?

18   A    Yes.

19   Q    You were also asked some questions by Mr. Tomisser about

20   estimates done for the legislature which were called scoping

21   reports.

22        Do you recall that?

23   A    For the legislature?

24   Q    Yes.

25   A    Yes.

1   Q    The way I understood the question -- and I may have

2   misunderstood it.  He asked you about a particular exhibit

3   that listed a number of projects, and it was referred to as a

4   scoping or a prescoping summary.

5        Do you recall that?

6   A    Yes.

7   Q    And those are used by the department for the purpose of

8   informing the legislature what the department thinks it might

9   need to construct those projects?

10  A    Yes.  Well, to clarify: to design build and obtain

11  right-of-way and permits, yes.

12  Q    So that's what the full budget's for?

13  A    Yes.

14  Q    And those are, for the purpose of obtaining an

15  appropriation of those transportation funds, set aside for

16  that project; isn't that correct?

17  A    Yes.

18  Q    They are not in any way an indication of what you actually

19  spend on a project.  Is that also correct?

20  A    No.  This is for the future.

21  Q    So you want to make sure when you talk to the legislature

22  that you tell them a high enough figure so that when a

23  project actually comes in you'll have enough money to do the

24  project; is that correct?

25  A    We'd like to, but that's not the way we do it.  You end up

1    bidding against yourself, you put in too much money, you end

2    up not having enough projects to build, and you have an

3    excess at the end.  So if you overbid yourself, you'll end up

4    with less projects coming back from the legislature, and you

5    don't get to build as many projects in the time period as the

6    legislature wants you to.

7    Q    So they'll give you the money, but it will be too much

8    money?

9    A    Right.

10   Q    So you can't do as many projects as you'd like to; is that

11   correct?

12   A    That's correct.

13   Q    But you're pretty much guaranteed that you won't have an

14   overrun and have to go back to the legislature and ask for

15   more.  Is that also correct?

16   A    If we went with that theory, that would be correct.

17   Q    Now, you said that each of the projects on that scoping

18   list was unique and had to be looked at in terms of its own

19   characteristics; is that correct?

20   A    Yes.

21   Q    That list is in no way representative of the 750 or so

22   remaining Department of Transportation culverts that need to

23   be repaired, is it?

24   A    That would be the best document I can think of to get

25   there.

1  Q   But it's not -- well, let me ask this question.  Have you

2  compared the characteristics of the projects on that list,

3  the scoping list, with the list of 800 projects that remain

4  to be done in the case area for the washed out fish passage

5  culverts?

6  A   No.

7  Q   So you don't know whether the scoping list is in any way

8  representative of the number of projects that remain to be

9  done?

10 A   No, not with what certainty.

11 Q   Well, you have no basis for making a comparison because

12 you haven't done a comparison; is that correct?

13 A   All estimating we do is based on risk.  And if we were

14 asked by the legislature to give us a price, we would use the

15 scoping list as the best available document to extrapolate

16 from there, acknowledging that there could be variations in

17 the estimates, and this is the best we have at that time.

18 Q   But you've not been asked by the legislature to give an

19 estimate of the -- no, that's okay.  Never mind.

20      The center line miles graph, or whatever that was that

21 was shown, the exhibit that was admitted earlier today, I

22 take it that the center line on Interstate 5 is actually not

23 a line on the road at all; it's just a length of the road

24 from Vancouver to Blaine.  Is that correct?

25 A   There's no line in the road, no, sir.  It's theoretic.

Q    Okay.  I wasn't asking about the line.  I was asking about

the lane.

        When I get off the freeway at my house in Bellingham,

it's about Exit 250, another 25 miles or so you're at Canada,

about Mile Post 275.  Does I-5 have 275 center line miles,

then?

A    Roughly, yes.

Q    Okay.  Regardless of how wide it is in any given spot?

A    Correct.

Q    And then the lane miles would indicate something entirely

different?

A    Yes.

Q    Isn't that correct?

A    Yes.

Q    So back in the day when the highway from Vancouver to

Blaine was a two-lane road, it would have the same

approximate center line that I-5 has today; is that correct?

A    Yes.

Q    But in terms of lane miles, there's quite a few more now

than there was back then; is that also correct?

A    Define "quite a few."

Q    More than two.

A    More than two, yes.

Q    Okay.  And the same would apply to like 405 and the other

freeway miles that we have around the urban corridor, central

1  Puget Sound; is that correct?

2  A   Which would apply?

3  Q   That we're only talking about the length of them, not the

4  number of lanes that are involved.

5  A   Yes.

6  Q   Now, isn't it true that the vast majority of the center

7  line mileage in the state is outside of the four- or six- or

8  eight-lane freeway system?

9  A   I would say the majority is.

10  Q   Okay.  As an example, Highway 101 goes all the way around

11  the Olympic Peninsula.  Even though it's US highway under the

12  Department of Transportation's responsibility, it's basically

13  a two-lane road for most of its length, isn't it?

14  A   Yes.

15  Q   Just a couple more points.  You mentioned in your

16  declaration concerns about traffic safety projects.  In

17  fulfilling its responsibilities to the people of the state,

18  the state Department of Transportation does not compromise

19  public safety in making any of its expenditure decisions,

20  does it?

21  A   Compromise public safety?

22  Q   Right.  You don't trade off public safety because it's too

23  expensive or something?

24  A   Well, we have to.

25  Q   You do?  Okay.

1          Do you defer improving or undertaking an improvement or

2   a preservation or a maintenance project and perhaps using a

3   less expensive alternative as a way of not compromising

4   safety programs?

5   A   Safety programs?

6   Q   Yes.

7   A   We're trying to mitigate them to extend out as far as

8   possible the dollars we have.

9   Q   Maybe I'm making it too hard.  If you have -- you never

10  have enough money to do everything you want to do; isn't that

11  correct?

12  A   That is correct.

13  Q   And the legislature, you said in your testimony,

14  understands they don't provide the department with enough

15  money to get everything done that even the legislature wants

16  to do.

17          Is that also correct?

18  A   Yes.

19  Q   So you have to make choices, correct?

20  A   The legislature has to make choices.

21  Q   All right.  You make recommendations to the legislature

22  about how those choices should be made?

23  A   Yes.

24  Q   The department does.  I'm not talking about you

25  personally.  Some make it, but not you.

1        Okay.  So in making those choices, there may be two or

2   three different ways to extend the life of a roadway, for

3   example; is that correct?

4   A    The life of a roadway?  Yes.

5   Q    Okay.  And that's a preservation project?

6   A    Yes.

7   Q    I think in your deposition you said that you were now --

8   or the department was now using, I think it was chipped

9   sealing instead of a full overlay as a way of saving money on

10  roadway preservation projects; is that correct?

11  A    Yes.

12  Q    So that's an example of having to choose between a more

13  expensive alternative and a less expensive alternative in

14  order to balance out the need to spend money on some other

15  aspect of the system; is that correct?

16  A    Yes.

17        MR. JOHNSEN:  Thank you.  I have no further

18  questions.

19        THE COURT:  Counsel, before you go back to redirect

20  for Mr. Carpenter, I have a question for him.

21     Do you remember the Exhibit AT-336, the Seton bid?

22        THE WITNESS:  Yes.

23        THE COURT:  You mentioned that the cost of the

24  culvert itself was in addition to the construction costs on

25  there.

1          THE WITNESS:  Yes.

2          THE COURT:  Who prepares that form that that was

3    presented in?

4          THE WITNESS:  Which form would that be, sir?

5          THE COURT:  The AT-336.

6          THE WITNESS:  That comes from my office, the

7    construction office, and reports on construction projects.

8    So the construction project is basically our relationship

9    contractually with that contractor.

10          THE COURT:  And so every one of those forms that

11    looks like that does not include the cost of the materials?

12          THE WITNESS:  Most of them do.  It's very unusual

13    that we would procure material as an agency separate from the

14    contract.

15      On this case, because of the timing, we didn't want to run

16    the risk the contractor ran into a delay in ordering.  We

17    weren't going to stop the Hood Canal Bridge float-in, so we

18    had an opportunity to save traffic control costs by

19    effectively piggybacking out of that contract.

20          THE COURT:  Thank you.

21      Redirect.

22                    REDIRECT EXAMINATION

23    BY MR. TOMISSER:

24    Q   Mr. Carpenter, the exhibit that the court was asking you

25    about is up on your monitor now.

1        Do you see that?

2   A    Yes.

3   Q    So what were the project costs that are not captured by

4   this sort of document?

5   A    Well, the design effort, any right-of-way or construction

6   easement procurements, any permitting efforts.  You'd have

7   sales tax that we have to pay the contractor wouldn't reflect

8   on this sheet.  Construction engineering and any

9   contingencies we need to address changes they haven't put on

10  the contract.

11       In this case, there's 11 days remaining on a 33-day job,

12  so I know we still have plans established and other things to

13  do.

14  Q    Right.  And in general, what percentage of these sorts of

15  projects would be attributable to preliminary engineering

16  right-of-way and that sort of thing?  Is there a general rule

17  on that?

18  A    Culverts tend to run considerably higher just because of

19  the uniqueness of each project.  There really is no starting

20  point except for going out in the field and starting from

21  scratch, so it can run as high as 20, 25 percent.

22  Q    Mr. Johnsen also asked you a little bit about the American

23  Recovery Act funding from the federal government.  Were there

24  rules attached to that spending in terms of if the state was

25  planning to spend a certain amount of money on a construction

1   projects and have federal stimulus moneys available, could we

2   take the money that we had planned to spend and just do

3   something else with it and only spend the federal dollars on

4   the project?

5   A   No.   That was referred to as a maintenance of effort.

6   Q   What does that mean?

7   A   Effectively, the budget that we have and the plan we have

8   in place to receive the ARRA funds, we had to continue with

9   that plan.   And at the time, we could have taken the fund we

10  had for fish passage for those projects and put them into the

11  ARAA pocket, but we had to expend those funds within the time

12  period, 50 percent of the funds being obligated within 180

13  days and 100 percent obligated in 365.

14      So if we had taken the existing projects in the pipeline

15  and made them ARRA, we would not have been able to roll those

16  funds and get them expended in time to meet the maintenance

17  of effort expectations.   Because of the 50 percent and

18  anything you didn't get obligated for that got taken from the

19  state and distributed to other states, most of the states

20  went with very low-risk preservation projects that they felt

21  they had a high degree of confidence they could deliver.

22          MR. TOMISSER:   Thank you.   Nothing else, Your Honor.

23                    RECROSS-EXAMINATION

24  BY MR. JOHNSEN:

25  Q   I have just one follow-up question, and it has to do with

1    something you just mentioned about preliminary engineering.

2          That's an expense that is incurred within the

3    Department of Transportation, is it not, the engineering

4    costs?

5    A    Either internal or through a consultant, yes.

6    Q    Generally speaking on culvert projects, they're designed

7    in-house; are they not?

8    A    Yes.

9    Q    And they're done by an employee, like yourself in a former

10   lifetime; is that correct?

11   A    Yes.

12   Q    So there's a project engineer who bills his time against

13   that project?  Is that how that's accounted for?

14   A    There would be a project engineer on a project like this.

15   Most assuredly you'd have hydraulics office engaged, a state

16   biologist, and potentially a marine biologist, depending on

17   the region.  You'd have whatever expertise you needed working

18   on that project.

19   Q    And the engineer's time is going to be billed through this

20   project or some other project; isn't that correct?  If he's

21   not doing a culvert project, that engineer will be assigned

22   to a different project and he'd be billing his time to that

23   project?

24   A    Yes, delivering a different project.

25   Q    Delivering a different project.

1          MR. JOHNSEN:  Thank you.  That's all.

2          THE COURT:  Thank you.  You may step down.

3      You may call your next witness, Counsel.

4          MR. TOMISSER:  Your Honor, I think that we may not

5   have a next witness, although Mr. Shaftel and Mr. Johnsen

6   have worked out agreements on some of the state's exhibits to

7   be put into the record before we rest our case.

8          MR. SHAFTEL:  Your Honor, the following are just

9   photographs that were part of Mr. Wagner's testimony that did

10  not get offered into the record before Mr. Wagner rested, and

11  I just wanted to correct the record.  And I ran this by

12  Mr. Johnson.  The numbers are 162A -- these are all defense

13  exhibits.  W-162A, W-163A, W-163B, W-166C, W-175A, and

14  W-175C, so I'd like to offer those into the record.

15          THE COURT:  And Mr. Johnsen, any objection to those?

16          MR. JOHNSEN:  No.  These are all photographs that

17  were also included in the annual progress reports.  The

18  reports are in evidence.  In that sense, they're duplicates,

19  but we have no objection to the introduction of these.

20          THE COURT:  Then those will be admitted.

21              (Exhibits No. W-162A, W-163A, W-163B,
               W-166C, W-175A and W-175C admitted.)
22

23          THE COURT:  Mr. Tomisser, do we have another witness?

24          MR. TOMISSER:  Your Honor, the state will rest its

25  case.

1        THE COURT:  Any other anticipated witnesses on behalf

2   of the plaintiffs?

3        MR. MONSON:  Yes, Your Honor.  We have one witness,

4   Dr. Philip Roni.

5        THE COURT:  Are you ready to call that witness?

6        MR. MONSON:  We are.

7        MR. TOMISSER:  Your Honor, before we get there, we

8   have an objection to this proposed rebuttal that's being

9   presented that will take a moment to explain to the court.  I

10  would like to do that now before the afternoon break.

11       THE COURT:  And what would the objection be,

12  Mr. Tomisser?

13       MR. TOMISSER:  The objection is that plaintiffs have

14  identified, in addition to Mr. Roni, essentially almost all

15  of their witnesses from their direct case.  I don't believe

16  that any of these witnesses are truly offering rebuttal

17  testimony in this case.

18     When you look at the claim for relief presented by the

19  plaintiff, essentially it was a request for the state to

20  accelerate the pace of barrier corrections in this case.

21  Biologists testified; engineers testified.  Mr. Fox testified

22  on the type of structure that ought to be used.  All of those

23  claims were properly part of the plaintiff's case in chief.

24     What we've seen from the limited disclosures we have in

25  the plaintiff's purported rebuttal case is simply a redo of

1  what they had in their case in chief.  And there are a number

2  of Ninth Circuit cases, any number, that have clarified that

3  it is not a proper use of rebuttal to simply bolster your

4  case in chief.

5      Mr. Roni's testimony in this particular case is presented

6  to make the case that barriers ought to be given some primacy

7  in the arena of habitat restoration above other things.

8  That's the plaintiff's case in chief, Your Honor.  The

9  plaintiffs presented their case in chief.  The state

10 responded with biologists and engineers of our own.

11     The only new element that was presented by the state into

12 the defense of this case was the testimony presented this

13 morning by Mr. Moore and Mr. Carpenter, essentially on the

14 government financing and budgeting side of the equation.

15 That is new material that was not presented -- or was not

16 directly responsive to what the plaintiffs presented.  The

17 plaintiffs presented biologists and engineers on their

18 behalf, not government budgeting type people that.  That

19 would be the only area that is proper rebuttal testimony in

20 this case.

21     The plaintiffs intend to present witnesses who will

22 disagree to some extent with Dr. Koenings, but their

23 disagreement is from the case in chief in terms of that

24 primacy to barriers ought to be given.

25     They have exhibits that they would like to talk about,

1   exhibits that were properly part of the case in chief or

2   potentially an impeachment of Dr. Koenings when he was up on

3   the stand.

4        That time has now passed.  And I think that without some

5   sort of an offer of proof as to why these witnesses were not

6   called in the plaintiff's case in chief to establish those

7   elements, should not be allowed in this case.  If they don't

8   have someone who is in rebuttal to Mr. Moore or

9   Mr. Carpenter, we should be at the end of evidence in this

10  case.

11       THE COURT:  All right.  Thank you, Counsel.

12  Mr. Monson, what is this witness going to testify to and what

13  is he going to rebut?

14       MR. MONSON:  Thank you, Your Honor.  Dr. Roni will

15  testify in direct response to Dr. Koenings' testimony earlier

16  this week - I guess it was last week - and he's going to

17  speak in particular about the importance of restoring

18  habitat.  It's true that it was a part of the discussion

19  earlier in the plaintiffs case.

20       He's also going to talk about his views as to

21  Dr. Koenings' testimony regarding the current salmon recovery

22  efforts and whether they're being successfully implemented or

23  not, the rule of limiting factors analyses.  He's going to

24  discuss the testimony of Dr. Koenings regarding the effect of

25  hatchery fish and global warming, which came up at trial

1   during Dr. Koenings' testimony last week.  He's going to

2   discuss the effect of other -- whether other culverts should

3   be a justification for not accelerating the repair of

4   state-owned fish-blocking culverts.

5       So I think in sum, his testimony is in direct rebuttal.

6   And if allowed to testify, he would discuss the differences

7   of his opinions with Dr. Koenings on those matters.

8           THE COURT:  All right.  Thank you, Counsel.

9       Mr. Tomisser correctly cites the law that rebuttal

10  testimony is not to be used to simply bolster the plaintiff's

11  case in chief but needs to be proper rebuttal.  Given that we

12  don't have a jury, the court's willing to listen to the

13  testimony.  If it does not appear to be proper rebuttal, it

14  will be disregarded.

15      Let's go ahead and take our break now, and we'll put him

16  on right after the break.

17                  (RECESS WAS TAKEN.)

18          THE COURT:  Mr. Tomisser, are you ready for our

19  witness?

20          MR. MONSON:  Yes, we are.  On behalf of plaintiffs,

21  the plaintiffs call Dr. Philip Roni to the stand.

22          THE COURT:  Good afternoon.  I'll have you raise your

23  right hand and be sworn.

24  PHILIP RONI,                    HAVING BEEN FIRST DULY SWORN,
                                    TESTIFIED AS FOLLOWS:
25

 1          THE CLERK:  Would you please state your name for the

 2   record and spell your last name.

 3          THE WITNESS:  My name is Philip Roni.  Last name is

 4   spelled R-o-n-i.

 5                       DIRECT EXAMINATION

 6   BY MR. MONSON:

 7   Q    Good afternoon, Dr. Roni.  Where are you employed?

 8   A    I'm employed at the Northwest Fisheries Science Center of

 9   NOAA Fisheries in Seattle, Washington.

10   Q    What's your position there?

11   A    I'm a research scientist and the watershed program

12   manager.

13   Q    What are your duties, first as a research scientist?

14   A    Developing proposals, overseeing research, analyzing data,

15   and publishing results of those studies.

16   Q    What are your duties, generally speaking, as the watershed

17   program manager?

18   A    I lead up a program of about 25 research scientists.  We

19   do research on primarily freshwater and stream habitat for

20   salmon.  And so my duties there are I directly supervise

21   about four people, and then there's three research teams, one

22   that focuses on restoration effectiveness, one that focuses

23   on ecosystem processes, and one that focuses on landscape

24   ecology and recovery science.  I'm also responsible for the

25   budgeting for the entire program.

Q    When did you first begin working for the National Oceanic
and Atmospheric Administration, which I'll often call NOAA?

A    I began working for them in 1995.

Q    And what position have you held at NOAA since you began in
1995?

A    In 1995, I was hired as a research scientist to start up a
freshwater habitat research team.  And so initially -- to
lead up a research team.  And also I served as the
representative on the research and monitoring committee for
the Northwest Forest Plan.

     Then I was the team leader for the Instream Restoration
Effectiveness Team, and then we became the watershed program
in the year -- well, I became the manager of the watershed
program about the year 2000.

Q    Have you ever worked for the Washington Department of
Fisheries or its successor, Department of Fish and Wildlife?

A    Yes.  In graduate school in 1990, I was actually -- part
of my research was funded by the Department of Fisheries, and
I did some work for them to fund my research.  I am a
biologist too.  But I was stationed at the University of
Washington.

     In 19- -- I guess I can look at my CV.  I think in '93 or
'94, I worked for the Department of Fisheries, which then
became the Department of Fish and Wildlife, at the Brennon
Shellfish Lab on the Hood Canal.

Q    And your CV is on the screen, and it's already been
admitted as USA Exhibit 191.

Do you have any teaching experience, Dr. Roni?

A    Yes.  As a master student, I was a teaching assistant for
both Salmon Life History and Behavior and Fish Genetics and
what was commonly called the hatchery course at the
University of Washington.  So I gave some lectures and then
prepared -- graded and prepared the students' exams.

More recently, I taught a graduate seminar, I think in
2003, on monitoring effectiveness of salmon restoration
recovery actions.  And then starting last year, I began
teaching a course, along with two of my colleagues, at the
Northwest Fisheries Science Center at the University of
Washington called Stream and Watershed Restoration, which is
covering all the aspects of restoration.  We teach that this
year and this coming year and then every other year after
that.

Q    Is the -- Exhibit 191, which is your curriculum vitae, is
that current and complete?

A    I believe so.  I think I prepared this version three or
four months ago.

Q    Have you received any awards for your work, Dr. Roni?

A    Yes.  Probably -- well, yes.  And did you -- sorry.

Q    Let me start again.  On the last page of your resume,
there's a listing of the some of the awards you've received;

1   is that correct?

2   A    That's correct.

3   Q    I'm not going to ask you to go through each and every one

4   of them, but I did notice the first one listed there.

5        Could you describe what that is about?

6   A    That's the Presidential Early Career Award, which I

7   received for -- I received in 2005, but it was a 2004 award.

8   It's a fairly prestigious award given to scientists or

9   engineers within -- by the President within the first -- they

10  have to be within three or four years of getting their Ph.D.

11       I think initially I don't think I realized how prestigious

12  of an award it was.  But along with the award, you go to the

13  White House and possibly have the opportunity to meet with

14  the President.  Most of the other people who receive the

15  award are physicists, engineers.  I was the only fisheries

16  person, which was a big honor.

17  Q    Did you get a chance to meet the President?

18  A    Yes.  After taking a photo, he invited us into the Oval

19  Office to talk for about 20, 30 minutes.

20  Q    How many years experience have you had as a fisheries

21  biologist, all told?

22  A    Not quite 20.  About 19 1/2 or something like that.

23  Q    Is there a particular branch of the field of fisheries

24  biology in which you specialized?

25  A    Well, most of my research in the last -- since I've got to

1   know fisheries since 1995 has focused on salmon habitat, and

2   primarily habitat restoration, the effectiveness of

3   restoration, and how to prioritize and implement those type

4   of actions; basically providing guidance to know the

5   regulatory side of NOAA and other agencies on habitat

6   restoration.

7   Q   Could we go back to Page 1 of Exhibit 191?  Exhibit 191

8   lists a number of publications that you were an author or

9   coauthor of; is that correct?

10  A   Yes.

11  Q   Is this a complete list, as far as you know?

12  A   This is a complete list of the ones that are published.  I

13  have a few others that have been submitted for publication

14  and some others that are in preparation.

15  Q   And have these been published in peer-reviewed journals?

16  A   Yes.  The list here, as the title indicates, is in

17  professional journals, or book chapters, which also would be

18  refereed or reviewed by multiple independent reviewers.

19  Q   How have your papers been received in the community of

20  fisheries biologists?

21  A   Like I said, that's a little hard to judge, though I would

22  say that particularly the 2002 paper, which was on a

23  technique for prioritizing restoration actions, and the 2001

24  paper by myself and Dr. Quinn, which was probably one of the

25  largest evaluations of the effectiveness of wood placement,

1   or success of that in increasing salmon numbers, had been

2   referenced a lot.

3       I noticed that for a while the 2002 paper was one of the

4   -- even a year or so ago was still one of the most downloaded

5   AFS publications.  So I'm assuming they've been fairly well

6   received and cited quite a bit.

7   Q   Dr. Roni, I'm putting on the document camera a copy of an

8   article from the *North American Journal of Fisheries*

9   *Management*, entitled "A Review of Stream Restoration

10  Techniques and a Hierarchical Strategy for Prioritization

11  Restoration for Pacific Northwest Watersheds."

12          Do you see that on the monitor?

13  A   Yeah, sure.

14  Q   Is that the article that you're referring to when --

15  A   Yes, it is.

16  Q   -- you talk about the one in 2002?

17          And that's one that has received a good deal of

18  citation, at least, in the scientific literature?

19  A   Yes.  In fact, I think I saw the other day that it was the

20  most cited AFS paper on the website.

21  Q   And that was published in the *North American Journal of*

22  *American Fisheries Management* of the American Fisheries

23  Society.

24          Is that a prestigious journal?

25  A   Yes.  I think that the three -- sort of the three top

1  fisheries journals are *Canadian Journal of Fisheries and*

2  *Aquatic Sciences*, *Transactions of the American Fisheries*

3  *Society*, and the *North American Journal of Fisheries*

4  *Management*.  Those are probably the three most prestigious

5  fisheries journals, and they have fairly rigorous peer-review

6  processes.

7  Q   Do you continue to publish and write and research in the

8  area of habitat restoration?

9  A   Yeah.  I mean, I have ongoing research projects, and I'm

10  also -- as I said, I direct a program of other Ph.D.s, or

11  heard other Ph.D.s that are doing research on salmon habitat.

12  Q   Are you familiar with salmon restoration efforts that are

13  underway in Western Washington?

14  A   Yes.

15  Q   Is that part of the subject matter of the 2002 paper?

16  A   Yeah.  Well, we focused on the Pacific Northwest in the

17  2002 paper.  I think those are the studies that were reviewed

18  in there.  And the approach that we discuss was really for

19  Northwest watersheds.

20  Q   Are you familiar with the case area as it's been defined

21  by the courts in this case?

22  A   Yes.  If I understand correctly, it's basically from Grays

23  Harbor north and all of Puget Sound.

24  Q   And you're familiar with the whole salmon life cycle?

25  A   Yes.

Q    Are you familiar with, at least generally speaking, with
the role of hatcheries in salmon restoration in the
Northwest?

A    I'm familiar with it as it relates to habitat restoration
projects and some of the effects it has on the fitness of
fish that you might confine them to.

Q    Have you had occasion to be involved in any committees or
organizations that study or try to effect positively salmon
habitat restoration?

A    Yes.  I've been on a number of different committees.
Probably the two that I'm on -- serve on right now that would
be most relevant would be the recovery implementation
technical team, which is a technical team that's tasked with
trying to assist the lead entities, provide technical
assistance to the lead entities, NOAA fisheries and the
partnership, in implementing the recovery plans for Puget
Sound.

     The other technical team I'm on is the intensively
monitored watersheds program, which is funded by the
Department of Ecology, to evaluate watershed wide evaluation
of nine small watersheds in Western Washington.

Q    You mentioned a number of different entities, and I would
like to perhaps have you explain what those are for the
court.  For example, what is -- lead entities, where does
that fit into the process of salmon restoration?

1    A    The lead entities, in each of the -- well, there's usually

2    one for each watershed.   Sometimes there's multiple

3    watersheds or arroyos that they cover.   And they coordinate

4    the restoration activities of the different groups that are

5    proposing the restoration actions in those areas.

6    Q    And what about the intensely monitored watersheds, can you

7    explain about that a little more?

8    A    Yeah.   That is a project that was funded by the Department

9    of Ecology, although I think the funds actually come from the

10   SRF Board, Sound Recovery Funding Board.   And that was one of

11   the approaches for trying to evaluate the success of

12   different restoration actions.

13        And it was decided what we should do is have a number of

14   small watersheds that we restore and others that we didn't

15   restore, and we monitor the whole response of fish at the

16   watershed scale and population level, the reason being that

17   most restoration activities or evaluations are those that

18   occur on short stream reaches.

19        So this was an approach to try to get a number of

20   different organizations together to cooperate on doing that.

21   So it's the Department of Fish and Wildlife, Department of

22   Ecology, Weyerhaeuser Corporation, EPA, NOAA fisheries, and

23   there's a couple of the tribes that I think are involved in

24   it as well.

25   Q    Dr. Roni, based on your experience and your education and

1    your participation in these various groups, as well as your

2    publications, would you consider yourself to be an expert in

3    salmon habitat restoration and salmon recovery?

4    A   Yes.  Sorry, it feels a little odd to say that.

5         MR. MONSON:  Your Honor, I move to qualify Dr. Roni

6    as an expert under Rule 702.

7         THE COURT:  Any objection?

8         MR. FERESTER:  No objection, Your Honor.

9    Q   (By Mr. Monson)  Dr. Roni, were you present in the

10   courtroom and did you hear Dr. Koenings' testimony regarding

11   the four Hs?

12   A   Yes, I did.

13   Q   And those are habitat, hatchery, harvest and hydropower,

14   right?

15   A   Yes.

16   Q   Do you have an opinion as to which of the four H's is the

17   most important to salmon recovery in Western Washington in

18   the case area?

19   A   Yes.  I mean, I think obviously in this case it starts

20   with the habitat.  I mean, that's really where a lot of

21   the -- that's where the fish production comes from, and

22   that's where a lot of effort is going to try to protect and

23   restore those habitats, so I think that's the most important

24   one.

25   Q   Is there a difference between protecting habitat and

1  restoring the habitat?  Could you explain what that is?

2  A   Sure.  Well, protection -- first I should step back and

3  say that often when we use the term "restoration," it's used

4  in a very general sense to include things that include

5  mitigation, habitat protection, as well as improvement of

6  habitat.

7     Specifically protection, we usually -- while we lump that

8  in with restoration activities, it usually involves either

9  buying up habitat to protect it or getting conservation

10 easements to protect it or in taking regulatory action or

11 changing existing laws to further protect habitat.

12 Q   I'm going to show you a page from that 2002 paper.

13    Do you recognize this diagram?

14 A   Yes, I do.

15 Q   Do you know who prepared it?

16 A   Yes.  I did, along with some input from the coauthors of

17 the paper.

18 Q   Dr. Roni, I'm going to focus a little bit on the upper

19 left quadrant.

20    Do you see that area?

21 A   Yes.

22 Q   Can you explain generally what this flowchart diagram

23 shows?

24 A   So basically this flowchart is a combination of what we

25 know about the effectiveness of different habitat restoration

1    techniques and what we know about how they restore watershed

2    processes, and it describes an initial way of prioritizing

3    restoration projects in the absence of very detailed limiting

4    factors analyses.  So it's a basic starting point for how to

5    prioritize actions when you have some basic watershed

6    assessment information.

7    Q    Could you describe what the limiting factors analyses is?

8    A    Sure.  I think the little testimony that I've heard in

9    this case, it seems like it's actually being misused from the

10   standpoint of the way we tend to use it, at least the

11   research scientists that I work with would use it.

12       A true limiting factors analyses is basically an analyses

13   of the types of -- the habitat loss in the watershed, the

14   different types of habitat, the fish production for each life

15   stage of a particular species, to figure out exactly which

16   life stage and which types of habitat are limiting the

17   production of fish.

18       The classic paper on this is Beechie, et al, 1994, which

19   was done for coho salmon in the Skagit River system.  Often

20   people refer to limiting -- we throw that term around,

21   "limiting factor analyses" for things that are really just an

22   assessment or a list of problems in the watershed.

23       But in my view, a true limiting factors analyses is trying

24   to get at which -- as a detailed analysis trying to get at

25   which life stage and which habitats are limiting that life

1  stage for a particular salmon species.

2  Q   Are true limiting factors analyses, in your judgment,

3  available for all watersheds in the case area?

4  A   No.  To my knowledge, they've been done in Skagit for

5  coho.  I think they've done it for Chinook as well.  It's

6  been done on the Stillaguamish for coho.  Most of the other

7  watersheds, to my knowledge, have not done a limiting factors

8  analyses.

9      The documents that are referred to as limiting factors

10 analyses, I know that there was the -- I think it was Smith

11 2000 or 1999.  Carol Smith had put together these limiting

12 factors analyses for the different watersheds throughout the

13 state.  Those are really what we would consider just a

14 synthesis of available information and a list of the key

15 problems in the watershed.  They're not necessarily

16 identifying which of those habitat types or problems are

17 limiting the production of salmon.  So we have those for all

18 the watersheds, but they're not what I would refer to as a

19 limiting factors analyses.

20 Q   Are limiting factors analyses specific to a particular

21 species of salmon?

22 A   Yes.  They've been done most commonly for coho because we

23 probably have the best information for that species, but it's

24 species specific.  So if you wanted to look at doing

25 restoration actions for multiple species, you need to do one

1    for each and then try to weigh those, because obviously the

2    actions you might have meant for one species would differ

3    from another.

4    Q    Would the habitat needs for Chinook salmon be the same as

5    for coho, for example?

6    A    No.  There would be a little bit of overlap, but they're

7    quite different.  So that's why the limiting factors analyses

8    that have been done for the coho in the Skagit or the

9    Stillaguamish are quite a bit different from those for, I

10   think chinook they've done them for.

11   Q    If you don't have a detailed true limiting factors

12   analysis, as you've described it, you mentioned earlier that

13   that reconnecting habitat is important.

14        Why is that?

15   A    So what -- well, basically we came up with a system for

16   prioritizing restoration actions based on if you didn't have

17   a true limiting factors analysis, this was sort of an

18   internal approach, this figure that you have up on the

19   screen.

20        And so one of the first things that we -- that I and my

21   coauthors would recommend that we do is that we focus on

22   protecting high-quality habitat, and then the next thing

23   would be reconnecting isolated habitats.  So that would be

24   pretty -- obviously this figure is a bit high.

25   Q    Is there a pretty high probability of success through

1   reconnecting habitat?

2   A   Well, I think -- yeah.  I mean, from the different

3   restoration actions, it's one of the most successful for a

4   couple of reasons.  One is because it relies on existing

5   habitat instead of trying to improve marginal or improve okay

6   habitat.

7       Also what we see is that the fish colonize these areas

8   very quickly, so it's one of the most successful from getting

9   -- the response time is very quick, where some of the other

10  techniques might take decades before we see response, or they

11  might only last -- some of the other habitat improvement

12  techniques might only last a few decades before we have to

13  repeat.

14  Q   When you say the response times is quick, what time period

15  are you thinking of?

16  A   Well, the studies that we've done and that others have

17  done, I don't know that they've got it down to the day, but

18  it's pretty clear that the fish would colonize the watersheds

19  -- the area fairly quickly.

20      So there's -- we have one study that we've done on a

21  stream down in Oregon where they removed small barriers, a

22  dam of about 20 feet high, on a relatively small stream.  And

23  within a week of removing that dam, there were salmon that

24  had moved up there, both juveniles and some adults.  It's

25  more akin to -- I think that one of the problems we have is

1  we tend to think that it might take years for fish to

2  colonize an area.

3      But I would say it's more akin to having a fenced backyard

4  with a couple of dogs in it.  And if you remove the fence,

5  the dogs don't wait around a year to decide if they're going

6  to go into the neighborhoods' yard.  They go over there

7  pretty quickly.  So we really see fish moving into those

8  areas pretty quickly.

9  Q   Thank you.  I'd like to have you turn your attention to

10 Dr. Koenings' testimony, both his written testimony and his

11 testimony in court that you heard earlier during this trial.

12     I believe Dr. Koenings, and I'm just going to summarize

13 his testimony, explained that the best way to recover salmon

14 was to do -- address all of the Hs, so to speak, concurrently

15 and do a little bit in all the sectors at the same time and

16 work from the bottom up.

17     Is that a fair characterization of his testimony, as

18 you recall it?

19 A   I think that's what I heard, yes.

20 Q   Do you agree with that approach?

21 A   Not entirely.

22 Q   Why not?

23 A   I think that it's pretty clear that the habitat, the

24 rest -- also implied in his answer is that with habitat

25 restoration, we're going to address all the different factors

1    at the same time.  Starting with the four Hs, I think we need

2    to start by focusing on habitat because that's where it all

3    started and that's what it really depends on.

4        The other thing that made me uncomfortable about that was

5    that again, it sounded like he was talking about we should do

6    this sort of bottom up or, I should say, attack all -- try to

7    address all the habitat problems at the same time.  And

8    that's largely, I think, what has been the failure of most

9    previous salmon restoration or habitat restoration efforts,

10   is doing a lot of little things across the landscape and not

11   really trying to address some of the key factors first.

12   Q    Dr. Koenings also testified about the current efforts

13   underway to restore salmon, and I think he mentioned the

14   local -- the bottom-up approach, the local watershed councils

15   and that sort of thing.

16        Are there -- do you have any disagreement with the

17   notions of the bottom-up approach?

18   A    Well, again, I think that what this has led to is lots of

19   -- and this is partly from my experience on the recovery

20   implementation technical team and partly my experience in

21   working with different practitioners on evaluating

22   restoration projects.

23       The bottom-up approach or the current approach we have

24   leads to the different groups that are doing restoration

25   actions proposing whatever they can get done, whatever they

1  -- in essence, some of the easiest projects and not

2  necessarily the projects that are most important.

3      So without some stronger leverage or guidance from above,

4  I think we're largely going to continue to get a lot of

5  little efforts spread across the landscape, and probably not

6  the right ones.

7  Q    Do these small-scale efforts, the watershed councils and

8  so forth, do those rely on voluntary actions by local groups

9  and private landowners?

10  A    Sorry.  Are you talking -- can you repeat the question?

11  Q    I was asking you, generally speaking, whether these local

12  efforts rely on the voluntary efforts of, for example,

13  private land owners or other private entities.

14  A    Well, I think I would respond to that in two ways.  One, a

15  lot of the different groups that are proposing doing these

16  actions, while they're nonprofits, not all of them are

17  volunteers.  So a lot of people getting money from SRF Board

18  are -- some of the them are paid and not all volunteers.

19      But in terms of getting the action on the landscape,

20  certainly they're -- the big issue that we hear on the

21  recovery implementation technical team when we work with the

22  lead entities and some of their enhancement groups is that

23  they can't get access to the lands where the high priority

24  projects are.  So they're basically -- you know, they're

25  relying on landowners volunteering or being willing to sell

1    to get some of these areas.

2    Q    Do you know if that approach has been criticized by other

3    groups?

4    A    Well, I think it's been -- I mean, it's been criticized.

5    I mean, this is a topic of discussion in the recovery

6    implementation technical team in Puget Sound and the other

7    recovery implementation technical teams that NOAA has set up

8    in different parts of the Northwest here.  It also was -- I

9    mean, I think back when the state prepared their "Extinction

10   is Not an Option" report, the independent science review

11   panel reviewed that and basically criticized it very heavily

12   because it relied on voluntary efforts and that those type of

13   efforts have not been successful.

14       So I think there's a history of the scientific community

15   criticizing the recovery plans for relying on voluntary

16   efforts.

17   Q    Turning your attention, Dr. Roni, to restoring the

18   connectivity to isolated habitats, does it matter if the

19   upstream habitat that has opened up is a very high quality or

20   a moderate quality?  Does that play a role in deciding

21   whether to open up that area?

22   A    Well, I think historically, you know, that was one of the

23   factors that was considered most important.  In our more

24   recent research where we've evaluated barrier removals, we

25   see that really the amount of habitat is probably -- assuming

1    the habitat is okay or even marginal, the amount seems to be

2    more important than the actual quality.  And the example I

3    would give there is the Cedar River Watershed where we've

4    been monitoring the Landsburg Diversion Dam.  City of Seattle

5    water supply has blocked fish access there for about a

6    hundred years.  And about five or six years ago, they put a

7    fish ladder on that, and we've been monitoring the

8    recolonization of the fish in that watershed.

9         And while it's in a protected area, the whole watershed

10   was probably logged probably 50 years ago, and it's not

11   particularly high quality habitat, it's okay, but we've seen

12   fish colonize it fairly rapidly, both juveniles and adults.

13   So that and a few other studies are really suggesting that if

14   you give them the access and the habitat is even marginal or

15   okay quality, they'll colonize it fairly quickly.

16        Again, I would use the dogs in the backyard example, where

17   I think the salmon are -- they move around a lot.  And so

18   it's not like -- again, you know, if you remove the fence,

19   your dog's not going to wonder whether the yard next door is

20   suitable.  He's going to go over there.  And it seems to be

21   the same for both juvenile and adult salmon.  They move

22   around a lot at certain times of the year and explore

23   different habitats.

24   Q   Dr. Koenings in his testimony talked about the

25   interrelationship between hatchery fish and wild fish.

1          Do you recall that testimony?

2     A    Yeah.

3     Q    Does the presence of hatchery fish in a particular

4     watershed play a role in the decision as to whether to open

5     that -- open up barriers in that watershed?

6     A    It hasn't historically.  I mean, we've relied -- the Cedar

7     River is a good example, where those fish, the Lake

8     Washington watershed is really a mixed stock of primarily

9     hatchery and just a little bit of wild production.  And the

10    fish that have colonized the Cedar River watershed -- they

11    handle each fish that goes over the ladder, and they know

12    whether they're hatchery or wild fish, and about a third of

13    those have been hatchery fish.

14         In the areas where we've -- historically when we put

15    passage on larger barriers, such as Sunset Falls in Skykomish

16    River, we relied on hatchery fish by outplanting them in

17    those areas to try to jump start it.

18         And in fact on the Elwha River, where we're going to

19    remove the two Elwha River dams, one of the plans is to

20    outplant hatchery fish into the upper watershed.  One of the

21    plans is to outplant fish in the upper watershed once those

22    dams are removed to sort of jump start the recovery.  But

23    that's -- even if there is an outplanting of fish, it's

24    largely hatchery production of chinook and coho and a little

25    bit of steelhead, so we're going to be relying on hatchery

1    fish to recolonize those areas.

2        So I think in many of the watersheds where we have mixed

3    production, you know, that's what we're -- I guess I don't

4    see the hatchery fish as a problem.  We're already relying on

5    them for some of the recolonization and recovery.

6    Q   Some have argued that if there are other culverts, for

7    example, on a stream that are partial barriers or even full

8    barriers to salmon, that it would be perhaps not the best use

9    of funds to spend money to correct an upstream state-owned

10   culvert, for example.

11       Do you agree with that?

12   A   I think the -- well, many times these culverts are partial

13   barriers.  So my concern would be that if we didn't replace a

14   state-owned culvert because there was a downstream fish

15   passage barrier or a partial barrier, then we would be

16   foregoing habitat that is used sometimes already.

17       Also from just experience in working with some of the

18   restoration practitioners, in particularly I worked a lot

19   with the Bureau of Land Management down in Oregon, they -- to

20   get private landowners to agree to restoration actions or the

21   removal of culverts on their land, they basically demonstrate

22   -- they get the landowners to go along by taking care of

23   their culverts and their restoration first and then work with

24   the landowners to try and get them to get theirs as well.

25       So I think it would be -- that's not necessarily a

1   technical issue, but it's sort of from a leverage standpoint

2   of trying to get those restoration actions, it's sort of

3   important for the feds and the states to demonstrate.

4   Q   To act as role models, then, in effect?

5   A   I would think so.

6   Q   Okay.  Dr. Koenings also discussed the effect of climate

7   change.  And I believe he discussed that in relationship to

8   state-owned culverts, for example.

9         What is your view on whether the climate change should

10  be a basis for accelerating the repair of culverts or not

11  accelerating the repair of culverts?

12  A   So I think that the predictions for climate change are

13  obviously that we're going to see changes in stream flows and

14  changes in stream temperature.  And in terms of restoration

15  actions -- and actually, myself and Dr. Beechie have been

16  working on a paper to talk about how to address restoration

17  under climate change, which types of actions you might do.

18       And obviously, the critical thing is if we're going to see

19  changes in water temperature, we need to have -- we need to

20  make sure that the fish have access to all these different

21  habitats that they might use; that they have access to some

22  of the upstream habitats where usually the water temperature

23  is lower.  So one of the best things under a climate change

24  scenario is to make sure that we're -- all the habitats are

25  connected and the fish have access.  Because otherwise, if

1    the temperature's going up, they're not going to be able to

2    move into the cool water refuges.

3    Q    So they need more habitat rather than less?

4    A    Yeah.  Well, more, and access to those habitats.

5    Q    In his testimony, both his written testimony and I believe

6    on the stand, Dr. Koenings discussed the entire four H

7    process, and we need to address all of the Hs and so forth.

8         I was left at least with the implication that there's

9    necessarily a tradeoff between, say, correcting state-owned

10   culverts on Department of Transportation roads and correcting

11   hatchery management actions or habitat management actions?

12        Do you see any kind of tradeoff in that regard?

13   A    Between -- the tradeoff --

14   Q    Between restoring connectivity by fixing culverts on

15   state-owned roads and that necessarily reduce the amount of

16   effort that would be devoted to corrections in the other Hs?

17   A    I don't think so.  I mean, it seems that the discussion is

18   mainly over what types of habitat restoration would be

19   funded, as the funds are -- the funds that are being used for

20   habitat restoration are not coming from the same sources.

21   And most of these other activities that we've been discussing

22   are already being addressed through other processes.

23   Q    Okay.  Thank you.

24        Earlier in this trial, the court has asked prior

25   witnesses what they would do if there was a new bushel of

1    money that dropped out of the sky, I believe, and what would

2    they do differently, what would they do the same with respect

3    to habitat restoration.

4        Would your approach to habitat restoration activities,

5    your suggested approach focus in on, for example, restoring

6    connectivity, would that change if more money was available?

7    A    Well, yes and no.  I think that we would -- initially

8    because it's going to take some time to do kinds of proper

9    assessments and limiting factors analyses in each watershed,

10   that we would go with our interim approach that we've

11   proposed and focus on, you know, protecting the high-quality

12   habitats, reconnecting the isolated habitats, because that's

13   -- again, we know the response time is quick, and it's been

14   shown to be critical for a number of listed salmon species,

15   if that's what we've lost, habitat.  And then focus on some

16   of these other restoration of other watershed processes, like

17   the delivery of wood, water and sediment.  And then once we

18   had -- so that would be the initial approach.

19       And then as we complete the limiting factors analyses, we

20   can refine that, change that, and focus in on things that

21   would be most important for the particular species of

22   interest.

23   Q    Now, as we heard this morning in testimony from the

24   Department of Transportation, this funding isn't

25   inexhaustible.  There are some limitations to funding.  We

1   all know that from our personal lives as well as the current

2   economy.

3        If money is limited, would your priorities be as you

4   suggested?

5   A   Yeah.  I think we're in the same situation, because I

6   don't think we can -- we can't necessarily stop to spend all

7   our money doing limiting factors analyses.  So we would

8   follow the same approach until we get some other information

9   that suggests otherwise.

10  Q   And so that would involve still correcting the barriers to

11  fish passage, reconnecting habitats, for example?

12  A   Yeah.  So I think the starting points are obviously

13  protecting habitat, and that's been borne out in the

14  literature and conservation biology for years, that we have

15  to protect the good stuff and stem the tide of habitat loss,

16  and then focus on reconnecting isolated habitats.  Some of

17  that would be culverts and those types of barriers.  Some of

18  that might be removing levies or dikes to isolated areas for

19  habitats is important for different species.

20        MR. MONSON:  Thank you.

21     Your Honor, may I have a moment to consult with counsel?

22  I believe I might be through.  Your Honor, I have no further

23  questions of this witness on direct.  Thank you.

24        THE COURT:  Cross-examination, Mr. Ferester?

25        MR. FERESTER:  Your Honor, first I'd like to address

1    a procedural matter.  There was a motion to strike rebuttal

2    testimony earlier made by my colleague, Mr. Tomisser.  And

3    we'd like to renew our objection and move to strike the

4    testimony of Dr. Roni.  The testimony has not been rebuttal

5    testimony.  This easily could have been prepared in the case

6    in chief in response to Dr. Koenings.

7        Alternatively, any of this information could have been

8    used to impeach Dr. Koenings at the time that he was on the

9    stand.  I would further note that the papers that have been

10   referred to in Dr. Roni's direct examine, his 2002 paper as

11   well as the Beechie, et al., paper from 1994, were both

12   portions of testimony of direct witnesses in the tribes' case

13   in chief.

14       Specifically, the 2002 paper was addressed by the

15   testimony of Mike McHenry.  That's on Page 7 of his written

16   statement.  And the testimony of Mr. Wasserman.  The 2002

17   paper was discussed there on Page 28 of his direct statement.

18   The Beechie, et al., paper from 1994, that was cited in

19   Mr. Wasserman's paper on Pages 20 and 29.

20       So in summary, these -- this is really just an extension

21   of the direct case put on by the plaintiffs, and thus, this

22   is not proper material for rebuttal, and we renew our

23   objection and move to strike.

24            THE COURT:  Thank you, Counsel.  Note for the record,

25   it will be denied.

CROSS-EXAMINATION

BY MR. FERESTER:

Q    Good afternoon, Dr. Roni.

A    Good afternoon.

Q    I'm sure you remember me from our two-part deposition this summer separated by both your vacation and mine.  For the record, my name is Phil Ferester with the Washington State attorney general's office.

       Just to clarify a few things about your expertise.  Dr. Roni, you are not an engineer; is that correct?

A    Two brothers and two sisters are engineers.  My father's an engineer.  I am not an engineer.

Q    And thus, you've never designed culverts for fish passage; is that correct?

A    No, I have not.

Q    You've also never reviewed the WDFW's culvert design manual called "Design of Road Culverts for Fish Passage"?

A    No, I've not.

Q    You're not familiar with WDFW's culvert design standards, correct?

A    That's correct.

Q    You're also not familiar with WDFW's barrier assessment manual called "Fish Passage Barrier and Surface Water Diversion Screening Assessment and Prioritization Manual," right?

A    Only from what I've seen in the testimony that I've

watched.

Q    And you have been here throughout trial; is that correct?

A    I was here a few days last week and then -- I guess today

is Monday, so today.

Q    So you have no familiarity with the barrier assessment

manual other than what you've observed in this courtroom?

A    Yes.  I think they sent me a copy of it many years ago,

but I did not look at it in detail.

Q    And other than sitting in this courtroom, you have no

familiarity with the state's priority index, or PI, which the

state uses to compare the value of different barrier removal

projects in different watersheds?

        MR. MONSON:  I object to these questions.  They're

going way beyond the scope of direct.

        MR. FERESTER:  This is creditability, Your Honor.

        THE COURT:  Overruled.  Answer his question.

Q    (By Mr. Ferester)  Do you remember the question?

A    I don't.

Q    Okay.  You have no familiarity with the state's priority

index, or PI, which the state uses to compare the value of

different barrier removal projects in different watersheds?

A    That's true.

Q    With respect to the WDFW's hydraulic project approval or

HP program, you've heard of that, correct?

1    A    Yes.

2    Q    And you've applied for and received such a permit for

3    research purposes; is that right?

4    A    That's correct.

5    Q    But other than that one permit that you've received, you

6    have no additional familiarity with that program, right?

7    A    Additional familiarity?  I'm not trying to be difficult.

8    I'm just -- I don't know what you mean.

9    Q    That's not a program that you're familiar with or work

10   with on a daily basis?

11   A    I don't work with it on a daily basis.  I'm familiar with

12   it and what's necessary to do any instream work.

13   Q    It would be accurate to say that you've had no experience

14   with the cost of culvert replacements under state highways,

15   wouldn't it?

16   A    The cost of culverts under state highways?

17   Q    Yes.

18   A    No, though I'm familiar with the cost under other

19   scenarios.

20   Q    Like forest roads?

21   A    Yes.

22   Q    Another witness in this case has described the issue of

23   barrier culverts as a ubiquitous problem.

24        You would agree with that observation, correct?

25   A    Yes.

1  Q   Culverts are a problem throughout most watersheds in the

2  region?

3  A   Yes.  And I think there's a number of references that

4  demonstrate that.

5  Q   I know you have no direct knowledge about who owns which

6  particular culverts or where they exist on the landscape with

7  respect to other culverts, right?

8  A   Uh-huh.  Yes.

9  Q   But you do know that there are some barrier culverts that

10  are privately owned?

11  A   That's correct.

12  Q   Some barrier culverts are owned by cities or local

13  governments?

14  A   Yes.

15  Q   And some barrier culverts are owned by the federal

16  government, too; is that right?

17  A   I would assume so.

18  Q   So while you may not know who owns which culvert, you

19  certainly know of the -- that the existence of barrier

20  culverts is not a problem limited to state ownership, right?

21  A   Yes.

22  Q   Dr. Roni, I've just flashed up on the screen a PowerPoint

23  presentation that I believe you gave this year entitled

24  "Estimating Salmon and Steelhead Response to Watershed

25  Restoration:  How much restoration is enough?"

1          MR. FERESTER:  May I please ask the court clerk to

2     provide the witness Exhibit W-200.

3     Q    (By Mr. Ferester)  Can you please take a moment to look

4     through that?  I hope the exhibit that you've looked through

5     looks familiar to you.

6     A    Yes, it does.

7     Q    This is a document that you coauthored with Messrs. Pess,

8     Morley, and Beechie?

9     A    Yes.  I guess it's a presentation I coauthored.  I don't

10    think of it as a document.

11    Q    And you gave this presentation twice this spring?

12    A    At least twice.  I've been asked to give it three or four

13    times in the last year.

14    Q    So far as I know, once you presented it in February of

15    2009 at the River Restoration Northwest symposium; is that

16    correct?

17    A    Yeah, that's correct.

18    Q    And again in April 2009 at the Salmon Recovery Conference?

19    A    Yes.

20    Q    Before we look at and start discussing a few of your

21    slides, I understand that your presentation had three broad

22    themes.  I just want to confirm those.

23         The first is you wanted to demonstrate that lots of

24    restoration activities are needed in order to produce

25    measurable gains in terms of smolt production.

1         Am I correct so far?

2   A    I think so.

3   Q    Second, you wanted to question whether restoration

4   activities that are dispersed across the landscape in many

5   watersheds, I think your words were "a little here and a

6   little there," is not as good an approach as concentrating

7   restoration activities in particular watersheds.

8         Did I get that right?

9   A    Yes.  But that would have been the third point, because

10  it's -- it would be -- there were two major points to it, and

11  that was sort of a third point, to question how much

12  restoration we're doing in each watershed.

13  Q    But that was one of your points?

14  A    Yes.

15  Q    So your last point was to advocate that the estimates of

16  smolt production can be made with respect to restoration

17  activities, even though they aren't perfect and even though

18  your presentation makes no assumptions about returning adult

19  fish.  Is that right?

20  A    That's probably not exactly how I would state it.

21        I think that basically we're trying to demonstrate that

22  after many years of the scientific community saying that we

23  can't estimate how many more fish we're getting for different

24  types restoration actions, we want to demonstrate that, yes,

25  you could.  We have some estimates, and they're not perfect.

1  Q    I'll accept that clarification without pulling up your

2  deposition.   I was using your own words to draft those

3  questions.

4       But let me clarify that you didn't look at adult

5  returns because of the extreme variability in ocean survival;

6  is that right?

7  A    I wouldn't say that it was the extreme variability in

8  ocean survival that prevented us from looking at it.   The

9  variability in ocean survival was one reason.   Part of it was

10 because we thought we'd made enough -- there were already a

11 few assumptions in here.   And if we tried to calculate

12 adults, we'd need good estimates of smolt to adult survival

13 as well as harvest rates.   And we didn't have the time to do

14 that and didn't think that the analysis was quite appropriate

15 for this particular presentation.

16 Q    Would you also say that the adult survival issue would

17 have created some speculation on your part, your work?

18 A    It would have created speculation if we didn't get a range

19 of estimates over, say, a period of ten years.

20 Q    And this presentation models habitat recovery by type of

21 restoration activity, including barrier removals?

22 A    Yes.

23 Q    And the presentation goes on to assess model contribution

24 to potential increases in smolt production by restoration

25 activity, including barrier removals, right?

1   A   I'm sorry.  Can you read that again?

2   Q   The presentation goes on to assess modeled contribution to

3   potential increases in smolt production by restoration

4   activity, including barrier removals, right?

5   A   I think so.  If that's a statement I made, it's a little

6   bit -- it's a mouthful, but I believe so.

7          MR. FERESTER:  At this time, Your Honor, we'd like to

8   offer Exhibit W-200 into evidence.

9          THE COURT:  Any objection?

10          MR. MONSON:  No objection.

11          THE COURT:  W-200 will be admitted.

12              (Exhibit No. W-200 admitted.)

13   Q   (By Mr. Ferester)  I'd like to just go through a few of

14   these slides with you if we can.

15   A   Sure.

16   Q   Just for your information, W-200 has every slide in your

17   original presentation.  I've taken only some of the slides,

18   in interest of brevity in this proceeding today.  So my

19   second slide is actually numbered Slide No. 9.

20   A   I see that.

21   Q   So that we can follow along and know where we are in your

22   presentation.  So this slide is entitled "Project Goals," and

23   the first point was to estimate the response of coho and

24   steelhead to various restoration techniques, right?

25   A   Yes.  I should say that that's really to use our

1  existing -- I don't remember this next slide, but it's

2  basically using our existing data on evaluations of different

3  effectiveness of different restoration techniques to come up

4  with some estimates of response of coho and steelhead to

5  those different actions.

6  Q   And the second bullet talks about restoration scenarios,

7  and there were two of those; is that correct?

8  A   That's correct.

9  Q   And as far as the third bullet, "How much restoration is

10 needed to detect a change in fish numbers," as we'll see

11 later, I believe you indicated that you need to achieve more

12 than 25 percent of an increase in smolt production over the

13 prerestoration smolt production amount in order to detect a

14 change.

15 A   Yes.  That's basically -- from a smolt monitoring program,

16 usually we can't detect less than about a 25 percent increase

17 or decrease, so that's where that came from.  But that was

18 the goal.

19 Q   So this is due to the fact that there are annual

20 variations in smolt productions from year to year?

21 A   It's due to both the variation, the natural variation, but

22 it's also due to our ability to measure that accurately, so

23 some of it's measurement.

24 Q   And just switch the slide to Slide No. 10 from your

25 presentation, which talks about methods.  And this slide and

1    the one that follows tells us how you conducted your studies;

2    is that right?

3    A    Yes.  I should say that all of these slides are really

4    just bullets for talking points for the presentation, so not

5    all the detail's there, but those are sort of key parts of

6    the methods that, when giving a presentation, I would use as

7    a starting point for the discussion.

8    Q    As far as the first bullet goes, the existing studies that

9    you looked at, those were all connected by NOAA; is that

10   correct?

11   A    They were all connected by myself or one of my coauthors.

12   Q    And you did that because you felt that data would be more

13   trustworthy?

14   A    Yes.  Partly that it's -- I don't know if "trustworthy" is

15   the word we would use.

16       It's just that it's compatible data; we have access to it.

17   And in some of the studies that we use, there's some more

18   thorough studies or evaluations of those techniques.  It's

19   difficult to get some of the other data in the scientific

20   literature, and it's as typically not compatible.

21   Q    In the lower part of the slide, these are the two

22   scenarios that we mentioned just a moment ago.  The typical

23   Puget Sound watershed, and I believe you indicated that this

24   was put together from GIS information at the Northwest

25   Fisheries Science Center based on habitat estimates in 19

1    Puget Sound water resource inventory areas?

2    A    Yes.

3    Q    And the second scenario was based on actual projects and

4    areas of restoration activity conducted by the Pacific

5    Coastal Salmon Recovery Fund, or PCSRF, in Puget Sound.

6            What is the PCSRF?

7    A    The Pacific Coastal Salmon Recovery Fund, which is a fund,

8    a federal fund that NOAA administers that goes to the states

9    of Alaska, Washington, Oregon, California and, more recently,

10   Idaho, to fund recovery and restoration activities for

11   salmon.

12       So a lot of the funds for the SRF Board and in Oregon for

13   the Oregon Watershed Enhancement Board come from this fund.

14   Q    So it's a federally administered fund?

15   A    Yes.

16   Q    By NOAA?

17   A    Yes.

18   Q    So my Slide No. 4, your Slide No. 11 from Exhibit W-200

19   continues in the discussion of methods and applying a mean

20   fish response to the different restoration strategies.

21           This is a smolt production number based on NOAA's

22   existing studies?

23   A    Yes.  Basically it's for the different restoration

24   techniques that we have.  It's an estimation of the increase

25   in smolts for those different restoration techniques.  Some

1    of them were -- we had data that they were reconnection of

2    isolated habitats, barrier removal or reconnection of

3    floodplain habitats.  And some of them were monitoring before

4    and after.

5        I think there is a little bit of -- what I should clarify

6    is that we used both the mean and the variability from those

7    estimates to do this Monte Carlo simulation, which is the

8    next bullet.

9    Q   Right.  And when we talked about the Monte Carlo

10   simulation, you assured me that this exercise involved no

11   international travel on federal budgets; rather, this was a

12   statistical approach to sample data thousands of times to

13   provide a more robust answer?

14   A   Yes.  It's a way of estimating -- creating a confidence or

15   a precision estimate around that mean.  It's basically

16   resampling the data many times.  It can actually be done in

17   Excell with a random number generator, and the mean and an

18   estimate of the standard error.

19   Q   I believe you indicated that you had sampled the range of

20   possible responses to each habitat restoration technique

21   10,000 times?

22   A   Yes.  We did -- we had -- yeah.  Basically we did the

23   simulation 10,000 times.

24   Q   I've just switched slides again.  The title of this slide

25   is called "Restoration Examined."  And this documents the

1    different restoration techniques about which NOAA had data?

2    A    Yes, that's correct.

3    Q    And it also provides the number of samples for each

4    restoration technique; is that correct?

5    A    Yes.  I should clarify that it -- these are the studies

6    that we've done.  So when you say it's the data that we -- I

7    think somehow you said it's data we have or whatnot.

8         I mean, this is -- these are the data that we've

9    personally collected.  And we have access to some other data,

10   of course.

11   Q    But this was the data that you used for purposes of this

12   presentation?

13   A    Yes.

14   Q    And I've switched slides again to the slide titled "Mean

15   increase from smolts."  This is the mean increase in smolts

16   observed in the NOAA studies listed on the prior slide?

17   A    Yes.  This is a mean increase in coho or steelhead smolts.

18   Q    Coho being the blue bars and the steelhead being the red?

19   A    Yes.

20   Q    And the thin bars superimposed on those bars represent the

21   variability observed in the production?

22   A    Yes.  That should be two standard errors of the mean.  And

23   one of the major reasons that we see such a difference in

24   some of the bars has to do with the sample size for some of

25   those.

Q    Okay.  And in taking two standard errors of the mean, I believe you indicated that that has a goal of obtaining a 95 percent confidence interval?

A    Yes.

Q    And I think you just said that the bigger error bars correspond to places where you might have had less data; is that right?

A    Generally.  If you look at two with the largest error bars, logjams and barrier removal, I think the sample size for the data that we actually -- the cites that we actually sampled, there were six other barrier removal projects.  And then the logjams, I think that was a number of sites in one river.

Q    But that could also indicate that the results were more variable as well; isn't that right?

A    They could.  Though in this instance, if you look at the sample size from the other studies that are -- you know, we sampled 30 large debris projects, 13 boulder weir projects, 30 floodplain habitats, 15 groundwater channels, I think.  So part of that is our limited sample size, I think.

Q    And these numbers were multiplied by the habitat areas treated under the two scenarios; i.e., the hypothetical typical Puget Sound watershed, and then those projects performed by the Pacific Coastal Salmon Recovery Fund?

A    So, yeah.  We took the means and the standard errors and

1  multiplied those by -- well, we did the Monte Carlo

2  simulation, which is basically saying that on this 10,000

3  times, it created a distribution of potential responses, and

4  then we multiplied that by the amount of habitat area in our

5  two examples that we did, the two different watersheds that

6  had different amounts, as you'll see if we get to the next

7  slides, of types of habitats.

8  Q   And again, we're just dealing with smolts.  This is an

9  adult survival, right?

10 A   This is just smolts, correct, smolts or presmolts.  Some

11 of these were not smolt trapping but actually counts just

12 before the fish outlet.

13 Q   The next slide indicates the typical Puget Sound

14 watershed, and I believe this is where the GIS data from 19

15 water source inventory areas come.  And I believe the map on

16 the right shows the wires that were used?

17 A   The map isn't totally accurate.  I didn't have a good map

18 for the -- I think it covers most of the wires, but I think

19 there's one or two missing.

20    I just took this figure from another presentation because

21 it was just to demonstrate that that was the area that we

22 were talking about.  Yeah.

23 Q   And average values were used for the various habitats on

24 those?

25 A   Yeah.  We had data on those 19 different arroyos, and we

1  broke the streams down by size, and so we -- yeah, this is

2  just an average estimate of each of those different ones.

3      We didn't want to use a specific watershed because we were

4  concerned that -- well, it's easier for an example like this

5  to use something that's not somebody's specific watershed

6  because they might argue with us about specific things, and

7  this is really for demonstration purposes.

8  Q   So I've switched slides again.  This is more elaboration

9  on the typical Puget Sound watershed.  And this shows the

10 restoration technique associated with each type of salmon

11 habitat in the watershed?

12 A   Yes.  What we did is we matched -- I mean, these are the

13 most likely techniques that would occur in those size of

14 streams.  You could use some of these techniques in other

15 ones, but that's how we broke it out.

16 Q   And I see that barriers are associated with these small

17 inaccessible streams.  It's the small inaccessible streams

18 where barrier/culvert removal might have the best chance of

19 benefitting steelhead and coho; is that right?

20 A   Yes.  Though also the under the floodplain habitat, the

21 floodplain reconnection, that also would include fixing.  It

22 may also include culvert replacement or opening -- if that

23 was required to open up wetlands or other areas on the

24 floodplain.

25 Q   Or floodplain issues could also involve dikes?

1  A    Yes.  The data we have from those projects is from a

2  combination of opening up dikes and putting culverts through

3  roads and other areas to reconnect what we were calling

4  floodplain habitat, which are short of wetlands, slews,

5  oxbows, and those type of habitats.

6  Q    Okay.  Switching to the next slide, this is the product

7  following your completion of the Monte Carlo data sampling

8  run; is that correct?

9  A    That's correct.

10  Q    And I skipped the slide that was sort of the bell-shaped

11  distribution.

12  A    Yeah.

13  Q    Maybe we didn't need that.

14  A    I'm not offended.

15  Q    Okay.  As I understand it, this slide summarizes the

16  contribution of each restoration type by percentage for the

17  mean Monte Carlo response; is that correct?

18  A    More or less.  I think that what -- this is the percentage

19  of that mean response that was on the other graph that we

20  didn't look at for the different types of -- it's their

21  contribution to that total.  So I don't remember the number.

22  But on the previous slides, it was like, I don't know, 20,000

23  or something.  And this is the percentage that was made up by

24  these different type restoration techniques.

25  Q    Okay.  And "LWD" stands for "large woody debris," "boulder

1    weir," self-explanatory.  "ELJ," I'd have to go back and look

2    that up.  That's an "engineered logjam."  And "floodplain" is

3    pretty straightforward.  "CGW" was "groundwater channel

4    rehabilitation work"?

5    A   Yes.  "Constructed groundwater channel."

6    Q   And then the blue bar is "barrier removal."  And that's

7    the very thin band at the top; is that correct?

8    A   Yes, which is largely the reflection of the amount of

9    habitat that we said was isolated in our hypothetical

10   scenario.

11   Q   But the result that this slide speaks to is that barrier

12   removal had approximately 3 percent of the overall recovery

13   that was observed when you ran the Monte Carlo simulation on

14   the typical Puget Sound watershed, right?

15   A   Can you state that again?

16   Q   I said this chart shows that there's about 3 percent

17   contribution from barrier removals to the overall mean smolt

18   gain that was achieved when you ran the Monte Carlo

19   simulation on the typical Puget Sound watersheds?

20   A   Yes.  And it's largely a reflection of the amount of

21   habitat that was reconnected.

22   Q   So I've switched to Slide No. 20, which is entitled

23   "monitoring how much restoration is enough to detect an

24   increase."  And I think we've covered the main point here,

25   which is smolt production increases of less than, I think you

1   said, 25 to 30 percent of the prerestoration smolt production

2   will not be detectable, right?

3   A   Yeah.  Generally if you look at the literature on that, I

4   suggest that a change of 20 -- 25 or 30 percent, it's hard

5   for us to detect with our current monitoring programs, so we

6   use that as a cutoff.

7           MR. FERESTER:  Your Honor, I notice you're looking at

8   me and looking at the clock.

9           THE COURT:  How much more time do you have?

10          MR. FERESTER:  I'm thinking less than 15 minutes.

11          THE COURT:  And then?

12          MR. MONSON:  It depends on what he asks.  I don't

13  have too much now.

14          THE COURT:  All right.  You may continue.

15          MR. FERESTER:  Thank you.

16  Q   (By Mr. Ferester)  So I I've switched to Slide 21, which

17  is entitled "Before restoration smolt production and minimum

18  detectable difference."

19      This indicates the annual mean smolt production of this

20  typical Puget Sound watershed and that 25 percent of that

21  would be in the neighborhood of 58,000 smolts or coho, 6,000

22  steelhead, right?

23  A   Correct.

24  Q   We've already talked a little bit about the Pacific

25  Coastal Salmon Recovery Fund and its function.  It's a NOAA

1  program.  I believe you mentioned when we talked earlier that

2  the hundred million dollar figure is not quite accurate.  I

3  think you said you would cast that more in the 50 to 100

4  annual amount?

5  A   Yes.  I think I was corrected on that shortly before we

6  did the deposition that it should be something like 50 to 80

7  million a year.

8  Q   But more importantly, this slide sort of transitions from

9  the fist few slides that we were looking at, focusing on the

10 typical Puget Sound watershed, and now focussing on those

11 projects that the Pacific Coastal Salmon Recovery Fund has

12 actually funded, right?

13 A   Yes.  This slide is just to demonstrate that there are a

14 lot of projects across the region funded by this program.

15 Q   And this is sort of another graphic display of some of the

16 projects that have been funded by the Pacific Coastal Salmon

17 Recovery Fund over the last ten years.

18      I believe the point of this slide is to indicate the

19 areas used in the middle column for your second Monte Carlo

20 simulation; is that correct?

21 A   No.  Actually, the areas in the middle are the amount of

22 those types of habitat that were -- well, I should say

23 they're in all of Puget Sound basin for all 19 of those

24 arroyos.  And it's just for those -- there's another seven or

25 eight kind of restoration actions that have been implemented

1   that we didn't have numbers for.  These are the middle

2   columns for all of Puget Sound.

3   Q    But you used actual numbers from Puget Sound Pacific

4   Coastal Salmon Recovery Fund in this second aspect of your

5   study running against the Monte Carlo simulation of the smolt

6   production?

7   A    Yes.  So what we did is we took -- I have access to this

8   database through NOAA.  I asked them to query the amount of

9   projects that had been implemented or reported as being

10  implemented under this program that are in their database,

11  because not all the projects are reported from 2000 to 2009.

12      We came up with estimates for throughout Puget Sound, and

13  we divided that by the 19 arroyos.

14  Q    To get an average?

15  A    To get an average to use in the simulation.  So the last

16  column is what we used for watershed.

17  Q    Okay.  So then we have a parallel slide to one that we've

18  seen earlier, contribution of restoration type.  Once again,

19  I've omitted the slides, the bell curves that the Monte Carlo

20  simulation produced.  But this is again a rollup following

21  the Monte Carlo simulation, the mean that was generated from

22  that against the acres treated for each restoration type?

23  A    It's kilometers or acres, depending on the technique.

24  Q    And on the left side was the contribution of restoration

25  type that we looked at previously for the typical Puget Sound

1   watershed, right?

2   A   That's correct.

3   Q   And on the right side, that's from the projects that have

4   been averaged for the -- that were actually performed in the

5   -- as a result of funding from the Pacific Coastal Salmon

6   Recovery Fund?

7   A   Yes.

8       I should clarify on the first two bars where it says "coho

9   all" and "steelhead all."  It says "all" because we restored

10  all the habitat in that hypothetical watershed.  So all of it

11  that was listed as potentially being restored, we did

12  everything.

13      The one on the right from the Pacific Coastal Salmon

14  Recovery Fund is just those three actions that we had numbers

15  for.

16  Q   Okay.  And the barrier removals are again indicated in

17  blue, just like they were before?

18  A   Yes.

19  Q   And this indicates that the -- at least the data that you

20  had for the Pacific Coastal Salmon Recovery Fund has focused

21  much more on barrier removals than the typical Puget Sound

22  watershed, even though you were looking at all restoration

23  activities in that scenario, right?

24  A   I'm not sure.  Could you repeat that, please?

25  Q   Okay.  The bars on the right have more blue, don't they?

1    A    Yes.  On this screen, it looks like it.  Yes, they do.

2    Q    So essentially this is a reflection of the fact that

3    either your data or, in actuality, more culvert repairs were

4    being performed in the Pacific Coastal Salmon Recovery Fund

5    scenario than in the previous typical watershed scenario?

6    A    Not necessarily, because if you look at the total amount

7    of habitat that was restored under these two different

8    scenarios, one of them was a -- it would be back a couple

9    slides.  But it's just really a reflection of the amount of

10   habitat that was restored under those different scenarios,

11   because they're really -- some of the differences in smolt

12   production for the different techniques are not that large.

13   Q    Okay.  So this says 17.  Is that acres? 17 meters?

14   A    That's 17 kilometers.

15   Q    17 kilometers?

16   A    And I believe if you look at the typical Puget Sound

17   watershed, it was 13 kilometers.  But if you look at some of

18   the others, here we have three miles of instream habitat --

19   or three kilometers of instream habitat, three hectares of

20   floodplain habitat.  If you look at the other example, you

21   see that those numbers are quite a bit larger, so it's just a

22   relative proportion.

23   Q    Okay.  I've now switched to the summary chart, which

24   indicates that we're bringing this portion of your

25   presentation to an end.

1          And first of all, the Pacific Coastal Salmon Recovery

2    Fund strategy line indicates that 17,270 coho smolts were

3    produced from the restoration activities that you modeled.

4          Is that right?

5    A    Yeah.  So basically what that tells us is that that would

6    be -- under those actions that we had data for, because there

7    are a number of other actions under that program, your

8    average increase of smolts would be 17,000, roughly, for

9    coho.

10   Q    And about 1,448 --

11   A    Yes.

12   Q    -- reflected the additional steelhead smolts?

13   A    Yes.

14   Q    And those smolt increases were less than one-third of the

15   minimum detectable level, correct?

16   A    Yes.  The minimum, yes.

17   Q    So I think there are a few areas, if I'm not mistaken,

18   where you would actually agree with the testimony of

19   Dr. Koenings.  And I'd like to explore that a little bit.

20         You've obviously heard the four Hs of salmon recovery,

21   because you talked about them in your direct.

22   A    Yes.

23   Q    And you'd agree that the other Hs are also important for

24   the recovery of depressed salmon species, don't you?

25   A    Yes.

1    Q    And you also agree that the importance of each H will vary

2    by the unique circumstances of each watershed, right?

3    A    It could.

4    Q    So a one-size-fits-all approach to salmon recovery that

5    treats every watershed the same really isn't the right

6    approach, is it?

7    A    I didn't disagree with that portion of Dr. Koenings'

8    testimony.

9            MR. FERESTER:  Thank you, Dr. Roni.  Nothing further.

10           THE COURT:  Any redirect?

11           MR. MONSON:  Briefly, Your Honor.

12                          REDIRECT-EXAMINATION

13   BY MR. MONSON:

14   Q    Dr. Roni, I just want to ask you a couple questions about

15   your slide show.  You were asked a lot of questions by

16   Mr. Ferester.  What was the purpose of preparing this

17   presentation?

18   A    So the purpose was to demonstrate that we could actually

19   put some numbers into estimating how many more fish we're

20   getting for different types of restoration activities.

21   They're not perfect estimates, but it would give us an -- we

22   could make some attempts at it.  And largely, the scientific

23   community has been saying we can't.

24   Q    But as I understand your testimony earlier, this was not

25   an actual watershed.  This was more a hypothetical --

```
1    A    No.  These were hypothetical scenarios.

2    Q    Do you think the contribution of barrier corrections in

3    Slide No. 18 -- that was the one with the thin blue line.  Do

4    you think that thin blue line is reflective of Puget Sound as

5    a whole in terms of contribution of barrier removal?

6    A    No.  I think that the thing that became clear with this is

7    that Dr. Pess and I came up with that number by just taking

8    10 percent of the amount of accessible small streams.  And

9    clearly, that was a fairly large -- it's a large

10   underestimation based on some of the testimony I heard last

11   week from Mr. Tyson as well as what we know about some other

12   smaller watersheds.  So it's probably a gross

13   misunderestimation [sic], and we need to correct that.

14   Q    Do you still agree with what your testimony was earlier

15   today that the correction of barrier culverts is an important

16   factor in salmon recovery?

17   A    Yes.

18        MR. FERESTER:  I have no further questions.  Thank

19   you.

20        THE COURT:  You may step down.  Thank you.  Any

21   rebuttal witnesses proposed by the plaintiff?

22        MR. MORSON:  No, Your Honor.

23        THE COURT:  We're done in terms of testimony?  Done

24   done ?

25        MR. SLEDD:  That was it.
```

1    THE COURT:  All right.  Counsel, here's what I

2    propose:  I have to review the memo -- the memos that were

3    given to the court regarding the additional exhibits that the

4    plaintiffs want admitted.  The state submitted their answers

5    and their position -- or at least let me ask.

6        Mr. Tomisser, did the material that you submitted today,

7    does that deal with their request to admit those other

8    exhibits?

9        MR. TOMISSER:  I don't think so, Your Honor.  I'm not

10   sure what material you're referring to.  I don't believe we

11   submitted anything today.

12       THE COURT:  All right.

13       Do you remember the -- when Ms. Foster wanted to admit

14   certain other exhibits based on the interrogatories in the

15   request for production?

16       MR. TOMISSER:  We have our lengthy list of things

17   outlined in the bench memo.  We have that list and also the

18   list of exhibits that she wanted to withdraw from evidence.

19   There were two separate tracks, some being withdrawn and

20   others being added, Your Honor.

21       THE COURT:  Well, I guess what I wanted to know is

22   did you have any objections to the exhibits that she had

23   proposed in that memo?

24       MR. TOMISSER:  Yes, we do.  It will take awhile to

25   work through that.  Our position on the one that they wanted

1    to withdraw is pretty simple, and we can probably deal with

2    that expeditiously today if the court is interested in making

3    that much progress on the exhibits.

4           THE COURT:  All right.  Let me tell you what I'm

5    thinking.  It's kind of late in the day today.  Here's what

6    I'm proposing.  I'm proposing that both sides think about how

7    long you need to prepare proposed findings of fact, and more

8    importantly, when you do that, tell me what testimony or

9    exhibits support the court making that particular finding,

10   and then tell me what conclusions of law you want me to

11   reach.

12     So I need to know the time frames for you to be able to

13   come up with those, because I propose that once you do that

14   and give me time to absorb those and review this material, we

15   can then schedule closing arguments at that point in time,

16   which would make more sense to me, once I've had a chance to

17   review all the declarations.

18     So what I need is what kind of time frame would you need

19   to prepare proposed findings and conclusions, and then we can

20   give you a time frame for closings.

21           MR. SLEDD:  We'll confer.

22           MR. TOMISSER:  Three weeks, Your Honor.

23           THE COURT:  That would be fine.  That would be fine

24   with me.

25           MR. TOMISSER:  And along with that, we would produce

1   responsive memo to the bench memo on the exhibits to the

2   court - is that what the court wanted - sometime prior to

3   that three-week period so the court can make decisions on

4   what evidence is in and what is out before closing?

5          THE COURT:  Exactly.  That's what I need.

6          MR. MORISSET:  Your Honor, Mason Morisset.  I think

7   that we can work in a number of possible errors on earlier

8   admissions of mine into this process, just so I understand

9   the record is still open to clarify exhibit numbers that seem

10  to have gotten a little mixed up.  I understand the record

11  will stay open so we can roll that into this process.

12         THE COURT:  I don't have a problem with that.  In

13  fact, what I want you to do is get copies from our clerk

14  about what has formally been admitted so that you can compare

15  and contrast to what you have and what your records show.

16  And we'll leave that whole thing open until we can balance

17  them one way or the other.  And if it comes down to an actual

18  ruling, I can make a ruling on a particular exhibit.

19         MR. MORISSET:  I think my part of the confusion with

20  the lawyers -- and we'll take the blame, I don't think you

21  need to rule on anything.  We'll straighten it out.

22         THE COURT:  Ms. Foster?

23         MS. FOSTER:  Yes, Your Honor.  I've spoken with

24  counsel for the state, and if I correctly understood what

25  I've been told, they have no objection to any of the exhibits

 1   that the plaintiffs are seeking to withdraw at this time.

 2          THE COURT:  All right.  Tell me which ones those are.

 3          MR. FOSTER:  I may not have accurately...

 4          MR. TOMISSER:  It was the entire list read to the

 5   court by Ms. Foster on the exhibits that they were going to

 6   withdraw, but there were dozens of them, but we're fine with

 7   all of those withdrawals, Your Honor.

 8      The only point to clarify is with AT-329.  That was an

 9   exhibit that referenced some interrogatory answers.  And as

10   part of those -- and also some documents.  Those documents

11   have already come into evidence, so we're fine with a

12   withdrawal of 329 as long as the exhibits that were referred

13   to remain in evidence and Ms. Foster is -- I believe we're on

14   the same page.

15          MS. FOSTER:  That's correct, Your Honor.  We're not

16   withdrawing the underlying documents that are already in

17   evidence.

18          THE COURT:  And was that AT-329?

19          MS. FOSTER:  AT-329.  They do not object to our

20   withdrawing that.  They just want to make certain that the

21   documents that are referred to in that interrogatory are

22   still in evidence.

23          THE COURT:  AT-329 will be withdrawn.

24          MS. FOSTER:  Your Honor, just to be clear, what we

25   are withdrawing is that entire list that I read the other

1    day.

2          THE COURT:  Yes, yes.

3          MS. FOSTER:  Okay.  Thank you.

4          MR. SLEDD:  Your Honor, if I might, just to clarify,

5    at least on plaintiff's side, we have assumed that there

6    would be post-trial briefing, and I wanted to clarify whether

7    what Your Honor's proposing in terms of Proposed Findings of

8    Fact and Conclusions would then be followed by closing

9    argument and then a post-trial briefing period or had you

10   intended the process described to be in lieu of post-trial

11   briefs?

12         THE COURT:  I would combine those two.  That would

13   make the most sense for me, which is why I wanted to make

14   sure that you have enough time to do it.

15         MR. SLEDD:  In that case, I would ask for more than

16   three weeks.  Fellow counsel are nodding their heads.

17         MR. TOMISSER:  That's fine, Your Honor.

18         MR. SLEDD:  Your Honor, I'm just trying to get this

19   procedure as clear and as useful for the court and everyone

20   as possible.  If we combine post-trial briefing with the

21   drafting of Findings of Fact and Conclusions of Law, while we

22   have these evidentiary issues hanging, it makes it a little

23   difficult.  So I'm wondering if perhaps we could have like an

24   interim period where we first will get responses on the bench

25   memos to deal with those evidentiary issues together, get

1   that clarified, and then we'll be able to do the Findings of

2   Fact combined with a post-trial brief.

3       Does that make sense to state's counsel?

4           MR. TOMISSER:  I think I understand the proposal,

5   Your Honor.  I'm flexible on how we pursue this.  We can do a

6   separate memo back to the court responding to the bench memo

7   on the outstanding evidence first, get rulings, and then do

8   the Findings of Fact and Conclusions of Law from there.

9       I think that will extend us out a little further than four

10  weeks if we go that way, which is fine with me, but I'm not

11  sure what the court is looking at in terms of the schedule to

12  get this done.

13      It may make some sense to get all those rulings in place

14  first and then do the Findings of Fact once we know what the

15  court is going to rule on in terms of the outstanding

16  exhibits.

17          THE COURT:  All right, gentlemen.  I think that makes

18  a lot of sense.  Let's deal with the evidentiary issues

19  first.

20      All right.  So first things first.  Get an exhibit list

21  from our clerk.  Make sure it jibes with what you've got.  We

22  can deal with those things fairly quickly.  Secondly, let's

23  deal with all the outstanding evidentiary issues.

24      And Mr. Tomisser, how much time?

25          MR. TOMISSER:  Two weeks, Your Honor.

1          THE COURT:  Will that work for the plaintiffs?

2          MR. SLEDD:  Yes, Your Honor.

3          THE COURT:  All right.  Two weeks.  So Madam Clerk,

4   that would be...?

5          THE CLERK:  Monday, November 8.

6          THE COURT:  So that's by Monday, November the 8th.

7   If we can do a fairly quick wrap-up of the rulings on that,

8   how much time would you need, then, for the Findings and

9   Conclusions?

10          MR. SLEDD:  I think, Your Honor, once we resolve the

11   evidentiary issues, the two-week period that we talked

12   about -- a month.

13          THE COURT:  All right, Counsel.  What if we set a

14   prospective date for December 10th; does that give you plenty

15   of time?

16          MR. TOMISSER:  That's for the Findings of Fact?

17          THE COURT:  Findings of Fact and Conclusions of Law.

18          MR. TOMISSER:  Yes, Your Honor.

19          MR. SLEDD:  Yes.

20          THE COURT:  And then once I take a look at that, I

21   can make a determination as to how much time before we do the

22   actual closing argument.

23       Does that make sense?  Because that will give me time to

24   absorb all of that, tell me exactly what it is that both

25   sides want me to do, base it on the testimony and the

1  evidence that's been presented, take a look at some of the

2  law in the area, listen to arguments, and try to distill it

3  all that way.  Okay?

4         MR. SLEDD:  Makes sense, Your Honor.

5         THE COURT:  Anything else we can do today?

6         MR. MONSON:  Your Honor, just a correction.  I

7  believe that the two weeks from today would the 9th.  The 8th

8  would be a Sunday.

9         THE COURT:  All right.  So we'll set it for November

10  9th and we'll still leave December 10th as the other date.

11     All right.  Other than that, I want to thank all of you

12  for wonderful presentations from both sides.  I know it's a

13  very complex issue.  And thanks to all of you, you dropped it

14  in my lap.  But what I did appreciate was the professionalism

15  of counsel on all sides, the way you handled yourself

16  throughout the trial.  You made it so much easier for me.

17     So at least from that aspect, I'm quite grateful.  I was

18  going to say it's been fun, but I can't really say that.

19  Thank you all.  We'll be at recess.

20

21

22         (THE PROCEEDINGS CONCLUDED.)

23

24

25

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 30th day of October 2009.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter