```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
 2                         IN SEATTLE

 3    ----------------------------------------------------------------

 4    UNITED STATES OF AMERICA, et al.,)
                                      )
 5                    Plaintiffs,     )  No. C70-9213
                                      ) Subproceeding 01-1
 6          v.                        ) Subproceeding 91-1
                                      )
 7    STATE Of WASHINGTON, et al.,    )
                                      )
 8              Defendants.           )
                                      )
 9    ----------------------------------------------------------------

10                       CLOSING ARGUMENTS

11    ----------------------------------------------------------------

12            BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                       June 7, 2010

14

      APPEARANCES:
15
                              Mr. Peter C. Monson
16                            U.S. Department of Justice
                              Environment & Natural Resources Division
17                            Rogers Federal Building
                              1961 Stout Street - 8th Floor
18                            Denver, CO 80294

19                            Rene David Tomisser
                              Fronda C. Woods
20                            Douglas D. Shaftel
                              Philip M. Ferester
21                            Attorney General's Office
                              P.O. Box 40100
22                            Olympia, WA 98504

23                            John C. Sledd
                              KANJI & KATZEN
24                            100 South King Street, Suite 560
                              Seattle, WA 98104
25
```

1

2                    Alan C. Stay
                     Richard Reich
3                    Muckleshoot Indian Tribe
                     39015 172nd Avenue S.E.
4                    Auburn, WA 98092

5                    Tim R. Weaver
                     COCKRILL & WEAVER PS
6                    316 North Third
                     Yakima, WA 98907

7
                     Daniel A. Raas
8                    Kevin Lyon
                     Regina Hovet
9                    Mary Neil
                     RAAS JOHNSEN & STUEN PS
10                   P.O. Box 5746
                     Bellingham, WA 98227

11
                     Mason D. Morisset
12                   MORISSET SCHLOSSER AYER & JOZWIAK
                     801 Second Avenue
13                   11115 Norton Building
                     Seattle, WA 98104

14
                     Alix Foster
15                   Swinomish Indian Tribe
                     11404 Moorage Way
16                   La Conner, WA 98527

17                   Harold Chesnin
                     Confederated Tribes of Chehalis
18                   1810 43rd Ave. E. Suite 203
                     Seattle, WA 98112

19
                     Lauren Rasmussen
20                   Port Gamble S'Klallam and Jamestown
                     S'Klallam Tribes
21                   1904 Third Avenue
                     Securities Building, Suite 1030
22                   Seattle, WA 98227

23                   John Hollowed
                     Northwest Indian Fisheries Commission
24                   6730 Martin Way East
                     Olympia, WA 98506

25

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

Richard Gruber
Brian C. Berley
Makah Tribe
ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM

Yale Lewis
Law Offices of O. Yale Lewis III

Katherine Kruger
Quileute Tribe

Howard Arnett
KARNOPP PETERSEN
Warm Springs Tribe

Craig Dorsay
DORSAY & EASTON
Hoh Tribe

```
 1              THE CLERK:  This is the matter of the United States,

 2   et al versus the State of Washington, case number C70-9213,

 3   assigned to this Court.  Will counsel please make their

 4   appearances for the record.

 5              THE COURT:  Who is going to start?  Mr. Sledd.

 6              MR. SLEDD:  May it please the Court.  John Sledd for the

 7   Sauk-Suiattle, Stillaguamish, Nisqually, Squaxin Island,

 8   Skokomish, Suquamish, Port Gamble S'Klallam, Jamestown S'Klallam,

 9   Lower Elwha Clallam and Hoh Tribes.

10              MR. MONSON:  Good afternoon, your Honor.  Peter Monson

11   for the United States.

12              MR. STAY:  Good afternoon, your Honor.  Alan Stay for

13   just the Muckleshoot Indian Tribe.

14              THE COURT:  Thank you.

15              MS. FOSTER:  Good afternoon, your Honor.  Alix Foster

16   for the Swinomish Indian Tribal Community.

17              MR. RAAS:  Good afternoon, your Honor.  Dan Raas for the

18   Lummi Nation.

19              MS. RASMUSSEN:  Good afternoon.  Lauren Rasmussen,

20   co-counsel for the Port Gamble S'Klallam and the Jamestown

21   S'Klallam Tribes.

22              MR. MORISSET:  May it please the Court, Mason Morisset

23   for the Tulalip Tribes.

24              MR. HOLLOWED:  May it please the Court, my name is John

25   Hollowed with the Northwest Indian Fisheries Commission.
```

```
 1              MR. STILTNER:  Your Honor, I am Sam Stiltner, attorney

 2    for the Puyallup Tribe.

 3              MR. ZEILMAN:  Tom Zeilman, attorney for the Yakima

 4    Nation.

 5              MR. ARNETT:  Howard Arnett for the Warm Springs Tribe of

 6    Oregon.

 7              MR. REICH:  Richard Reich for the Muckleshoot Tribe.

 8              MR. LEWIS:  Good afternoon.  Yale Lewis, co-counsel for

 9    the Quileute Tribe.

10              MS. KRUEGER:  Katherine Krueger, co-counsel for the

11    Quileute Tribe.

12              MS. HANSEN:  Michelle Hansen for the Suquamish Tribe.

13              MS. NEIL:  Mary Neil, attorney for the Lummi Nation.

14              MR. GRUBER:  Brian Gruber for the Makah Tribe.

15              MR. LYON:  Kevin Lyon for the Squaxin Island Tribe.

16              MS. MARTIN:  Connie Sue Martin for the Nooksack Tribe.

17              MR. SUUGEE:  Steve Suugee, Lower Elwha Clallam Tribe.

18              MS. HOVET:  Regina Hovet, Squaxin Island Tribe.

19              THE COURT:  Anyone else from the tribes?

20              MR. TOBIN:  Bill Tobin for the Nisqually Tribe.

21              MR. CUSHMAN:  Chris Cushman for the Nisqually Tribe.

22              MS. WILLIAMS:  Sheri Williams for the Lummi Nation.

23              THE COURT:  All right.

24              MR. TOMISSER:  Rene Tomisser on behalf of the State of

25    Washington.
```

```
 1              MS. WOODS:  Good afternoon, your Honor.  I'm Fronda
 2      Woods for the State of Washington.
 3              MR. SHAFTEL:  Doug Shaftel with the State of Washington.
 4              MR. FERESTER:  Phil Ferester, Assistant Attorney General
 5      for the State of Washington.
 6              THE COURT:  Thank you, all.  The Court has had an
 7      opportunity to fully review the materials submitted, the
 8      post-trial briefing, the proposed Findings of Fact and
 9      Conclusions of Law, and has set aside this afternoon to allow the
10      parties an opportunity to try to convince me in oral argument as
11      to why I should adopt those proposed Findings of Fact and
12      Conclusions of Law.
13          Mr. Sledd, I understand you will be arguing on the tribes'
14      behalf; is that correct?
15              MR. SLEDD:  I will.
16              UNIDENTIFIED ATTORNEY:  Your Honor, before the argument
17      starts, I wanted to announce that our good friend and colleague
18      and officer of the court, Timothy Roy Weaver, died March 22nd,
19      2010, at the age of 65, after a long, 18-year battle with cancer.
20      He was one of the few among us who remembers, almost from the
21      very beginning, the early years of this case.  And he will be
22      missed by everybody.
23              THE COURT:  I'm sure he will.  Thank you.
24              MR. SLEDD:  May it please the Court, John Sledd on
25      behalf of the ten tribes I named earlier.  I will be arguing on
```

1    behalf of all the plaintiff tribes, your Honor.

2        I understand the Court has set aside an hour for each side.

3    I am hoping in some prepared remarks and response to questions,

4    if the Court has any, to go for about a half hour.  Mr. Monson,

5    for the United States, would like to have about five to ten

6    minutes, and then the plaintiffs would like to reserve the

7    remainder of their time for rebuttal, if they may.

8        Your Honor, I want to take this opportunity to address four

9    critical points that were established in the trial that show the

10   need for and the propriety of the injunction that the plaintiffs

11   have presented to the Court.

12       First is that fixing state culverts and keeping them fixed

13   will significantly improve THE tribal salmon harvest.

14       Second, that accelerating correction of state barrier

15   culverts is essential to vindicate treaty rights and to recover

16   salmon rights.

17       Third, the injunction the plaintiffs have proposed will

18   trigger no state budget crisis.

19       And, fourth, that the injunction, by providing some basic

20   ground rules for the correction of culverts, will avoid future

21   disputes between the parties, while preserving the state's

22   discretion on how to fix those culverts.

23       There are, given the time limits, a number of issues I do not

24   intend to address.  One of those is the state's motion for

25   reconsideration of your Honor's summary judgment decision.  The

1   issues that were raised at summary judgment of what the treaty

2   imposes by way of duties and whether the state has violated those

3   was thoroughly briefed, it was thoroughly argued, it was decided.

4   The purpose of the recent trial was to go beyond that and decide

5   a remedy.  And that is what I want to address.

6        The first point I want to make from the evidence at trial,

7   your Honor, is the proof of irreparable harm to tribal fisheries

8   which the proposed injunction will resolve.

9        The Court's summary judgment decision found that culverts

10  contribute significantly to a substantial diminishment of tribal

11  harvest.  And the evidence at trial confirmed that.  It showed an

12  unrelenting decline in salmon populations and harvests since the

13  beginning of the 20th century.  It showed that tribal harvest

14  which started to grow after the Boldt decision reached a peak and

15  is now also in unrelenting decline.  It has fallen back to the

16  abysmal levels that prompted the filing of U.S. v. Washington in

17  the first place.

18       The affects of the shortage of salmon on the tribes was made

19  clear in the testimony of four tribal members, and an additional

20  tribal biologist, from throughout the case area, who testified

21  that their fisheries have been circumscribed in time and in

22  place, that they are no longer able to make a livelihood from

23  their fishing, and that they are compelled to celebrate their

24  first salmon ceremony by drawing fish from a freezer rather than

25  from the streams in their own homelands.

1    The contribution of state barrier culverts to this situation

2    is clear.  This fall, as nine years ago when this case was filed,

3    and as three years ago when your Honor issued a summary judgment

4    decision --  There we go.  This is what salmon will find this

5    fall, your Honor, when they return to the waters of the case

6    area, over 1100 state barrier culverts in every basin throughout

7    the base area that block their passage to the habitat they need

8    to reproduce.

9        The Department of Fish and Wildlife's biologist, Brian

10   Benson, testified upstream of just 800 of those barrier culverts

11   there lie almost five million square meters of habitat, and

12   almost a thousand miles of stream.

13       Tyson Waldo, a biologist with the Northwest Fisheries

14   Commission, who testified for the plaintiffs, said that there is

15   an additional 200 miles blocked by DNR culverts.

16       The consequences of losing 1200 miles of salmon stream are

17   not speculative, they are not hypothetical.  They follow from a

18   very simple principle that was set out by Mr. Wasserman, the

19   biologist for the Swinomish Tribe, in his testimony.  He said,

20   "The number of fish available for harvest and spawning is, in

21   large measure, dependent upon having access to sufficient fresh

22   water habitat to maximize the number of smolts."  Whereas your

23   Honor put it in a question he asked to another witness, Dr. Jeff

24   Koenings:  "It all starts with the habitat, doesn't it?"

25       No testimony from any practicing biologist at trial was to

1   the contrary, and the entire state culvert correction program is

2   predicated on the truth of that principle.

3       The state, in the face of this evidence, nevertheless,

4   contends that plaintiffs have not proven any irreparable harm.

5   The state would demand a precise tribe by tribe, culvert by

6   culvert accounting of loss.  But that is impossible.  The state's

7   witness, Mr. Barber, another biologist, testified it is not

8   possible to tell how many fish are cost by one culvert because

9   the biology is too complicated.  Just because the harm cannot be

10  specifically quantified does not mean that no irreparable harm

11  exists.  Mr. Barber continued and said, "It is not necessary to

12  know the actual number of fish increase to know what you are

13  doing has benefit to fish."

14      And, moreover, as Mr. Rawson, the biologist for the Tulalip

15  Tribe, testified, "It is possible to determine not just the

16  existence, but the magnitude of harm to the fisheries, and the

17  benefit from correcting culverts by looking at the amount of

18  habitat."

19      Dr. Sekulich, the state witness and former WDFW employee,

20  went a step further.  He said he could think of no better way to

21  quantify the potential production that is lost to these culverts

22  than to multiply the habitat area times the production value per

23  meter squared.  That is why he used that methodology in his

24  priority index; it's why he used it in his effort in Exhibit

25  AT-104, where he calculated that every linear meter of habitat

1    loss cost half a salmon, which translate to about 750 a mile.

2    And that's why he used that habitat surrogate times a production

3    value in the 1997 Fish Passage Inventory Final Report where he

4    told the legislature that the potential production upstream of

5    DOT barrier culverts was 200,000 adult salmonids a year.

6        Using habitat area as a surrogate for the numbers of lost

7    fish is not a novelty.  It has been approved in the ESA

8    incidental take context, if the biology makes it impossible to

9    calculate the precise numbers of fish taken.  For that

10   proposition, your Honor, there is a case, Northwest Environmental

11   Defense Center versus National Marine Fisheries Service from the

12   District of Oregon, decided about six or eight weeks before trial

13   began in this case.

14       And the state did something similar in the Gillette case,

15   which we cited in our motion in limine papers prior to trial,

16   where the state proved the loss of adult salmon from illegal

17   stream bulldozing by multiplying an estimated number of reds in a

18   given length of stream and calculating an estimated number of

19   adults that could come back from that.  And when that methodology

20   in Gillette was challenged as too speculative, the State Court of

21   Appeals said, "The court should not immunize a defendant once

22   damage has been shown merely because the extent or amount thereof

23   cannot be ascertained with mathematical precision."

24       The state goes on to argue that proof should be made of

25   tribe-by-tribe harm before we can obtain an injunction case

1    area-wide.  That raises the wrong question, your Honor.  The

2    relevant question is not whether every tribe is harmed, but

3    whether barriers in all parts of the case areas harm at least one

4    of the plaintiffs' tribes.  If they do, then they are subject to

5    injunction.  As Mr. Waldo's map and his table of lost habitat

6    showed at trial, every basin in the case area has barrier

7    culverts and every one has habitat blocked by state barrier

8    culverts.

9        The decisions of this Court in U.S. v. Washington makes

10    equally clear that there is a tribal fishing area in every single

11    part of the case area.

12        And, moreover, the fish that originate from one barrier

13    culvert don't just impair harvest in that particular basin.

14    Wherever those fish go -- would go, there are fewer of them to be

15    caught, affecting the harvest of tribes throughout the case area.

16    They can even affect the harvest from completely unrelated basins

17    by forcing tribes to ratchet down their catch in so-called mixed

18    stock fisheries.  Case area-wide relief is thus completely

19    justified.

20        In addition to demanding a biologically impossible

21    specificity in the proof of harm, the state suggests that fixing

22    its barriers will not help salmon or tribal harvest because there

23    are other barriers on the same streams.  But the state offers no

24    legal support for the notion that equity should condone their

25    violations because there are other barriers out there which

1   violate state law and which the state has chosen to allow to

2   remain.  Nor does the evidence show that those non-state barriers

3   would make an injunction against the state barriers ineffective.

4   The key evidence for that proposition, your Honor, is a series of

5   tables that were done by Mr. Benson and were worked on by

6   Mr. Waldo, that analyzed 315 WSDOT culverts where there has been

7   a complete enough habitat survey to actually locate the barriers

8   upstream and downstream.

9        I would refer the Court to Exhibits AG-285, AG-288 and W-133.

10  What those exhibits show is that for those 315 culverts, more

11  than half of them have no downstream barriers, and 80 percent of

12  them have at most one downstream barrier.

13       Moreover, those barriers are highly concentrated in certain

14  basins.  Fully ten percent of the barriers upstream of those 315

15  DOT culverts are on a single drainage, Little Bear Creek, near

16  Bothell.  Not coincidentally, that is the Little Bear Creek which

17  state counsel directed Mr. Benson to testify about.  It is an

18  outlier.

19       Many of these non-state barriers are also only partial

20  barriers.  Again, Mr. Benson looked at this, he found that

21  70 percent of the barriers below those 315 DOT culverts are only

22  partial.  In those, 70 percent of the time, that means that there

23  are fish still getting past -- some fish who would still benefit

24  by removal of that DOT culvert upstream.

25       The evidence also shows those non-state barriers are coming

1    out.  The state's tenth anniversary report on the Salmon Recovery

2    Act, which is Exhibit 085(e), the state exhibit, shows that more

3    than 3,500 barriers have been removed statewide since 1999.  If

4    you subtract out the number of fixes by the state, which is in

5    the record, you are left with a conclusion that 2,500 of these

6    other barriers have come out in the past ten years.  They are

7    coming out.

8         If the state is, nonetheless, concerned about how non-state

9    barriers will affect its corrections in the future, it is free

10   under the proposed injunction to prioritize correction in basins

11   that have fewer of those non-state barriers.  The state could

12   even choose under the injunction to completely defer correction

13   of some DOT barriers that have a lot of non-state barriers

14   associated to the end of the DOT culverts' useful life, as long

15   as by doing that they don't go over ten percent of the total

16   amount of habitat that is deferred.

17        In summary, regarding proof of irreparable harm, your Honor,

18   the plaintiffs clearly proved it, and they proved an injunction

19   would effectively remedy it, and would restore the fish that

20   these culverts have been taking out of these streams for decades.

21        Turning to my second point, your Honor.  The evidence showed

22   that an injunction accelerating DOT culvert corrections would

23   vindicate the treaties, it is essential to do so, and it is

24   essential to recovering the salmon.

25        As the Department of Fish and Wildlife and the Department of

1    Transportation stated in a pair of reports to the legislature in

2    1997, "The rate of barrier correction must be accelerated if

3    Washington's wild salmon and trout stocks are to recover."

4    Mr. Benson testified at trial that is still true.  The rate still

5    needs to be accelerated.  And it is easy to see why.  The state's

6    correction rate, if it continues, will perpetuate harms to the

7    fish and the fisheries for decades.

8         Let's put aside the Parks and Recreation Commission, which

9    hasn't even finished its inventory and has fixed just one

10   culvert.  Put aside the handful of culverts fixed and the

11   relatively small number that DFW has.  Put aside even DNR,

12   despite the fact that Mr. Nagygyor testified for them that they

13   will have trouble meeting their 2016 goal statewide, because they

14   have a $50 million shortfall in their access road fund they use

15   to pay for these corrections.  Focus just on DOT, and focus just

16   on the 800 culverts that have more than 200 meters of habitat.

17        The Department of Transportation in their annual reports

18   tells us how many they have fixed.  If you look at the most

19   recent one that was in evidence, it will show you that there have

20   been 176 successful DOT culvert corrections statewide since 1991.

21   176.  Two-thirds of those have been in the case area.  And that

22   translates to about six and a half corrections per year.  And if

23   you do the math on 800 DOT pipes, at six and a half a year, it

24   will take 123 years just to fix those 800.

25        This Court in another subproceeding in U.S. v. Washington

1    many years ago said that the presumption is that the tribes are

2    entitled to enforcement of their treaty rights without delay.

3    And the plaintiffs submit, your Honor, 123 years of further delay

4    is completely inconsistent with that presumption, and with their

5    treaty rights.

6        I would point out, your Honor, if the state is correct in its

7    own cost estimates, in its own funding predictions of about

8    $15 million a year, that situation is actually worse.  You do the

9    math there.  They are only going to be able to fix about four or

10   four and a half culverts a year.  And we are looking at close to

11   two centuries to solve this problem.

12       Now, despite the evidence of the abysmal pace of correction

13   currently, at trial and in its post-trial briefing, the state has

14   argued that accelerating culvert corrections will actually hurt

15   salmon recovery.  The only support for their claims is the former

16   biologist, Dr. Jeffrey Koenings.  He has claimed that the state

17   has comprehensive, bottom up, integrated, federally approved,

18   holistic plans, prioritized by fingerprinting the limiting

19   factors in each of the watersheds.  And he claims that fixing the

20   culverts any faster will upset the apple cart of salmon recovery

21   by taking money from higher priority efforts.  Well, that

22   testimony is real long on buzz words, but it is short on

23   substance.  The state didn't put any of the salmon recovery plans

24   into evidence so your Honor could see what they do.  In fact,

25   there are only two.  As Dr. Roni, the United States' witness,

Mr. Wasserman for Swinomish, Mr. Rawson, the Tulalip biologist,
all testified, those are Endangered Species Act plans Puget Sound
Chinook and Hood Canal summer trout.  They are based on ESA
recovery standards.  Don't put this fish into extinction.  They
are not based on tribal needs for harvest that were promised at
treaty time.

There are no plans for other species in other parts of the
case area.

In response to the Court's question, Dr. Koenings actually
admitted that his view of -- his vision of integrated, holistic,
et cetera, plans, that tie all the four Hs together has not been
done on a systematic basis.  And not only have the plans that
would integrate all these things not been done, but the basic
scientific analysis that would be needed to underlie such
integrated, prioritized plans has not been done.

Again, Dr. Roni and Mr. Wasserman and Mr. McHenry, the Elwha
biologist, testified that in order to prioritize preservation
efforts, in the way that Dr. Koenings described as desirable, you
have to have detailed watersheds assessments.  So look at each
species in each basin and identify what is the limiting factor
for each species there.

The tribal biologist testified that such assessments exist
for only a few basins and a few stocks.  The tribal biologists
agreed that the limiting factors analysis that the state has done
and touted as adequate to this purpose are not.  The LSAs, there

is one in evidence, the statewide summary, W-087(h), and it
confirms this.  It is merely a list of things affecting salmon.
It doesn't compare them by species.  It doesn't give you a
prescription for action by watershed.  It characterizes the
habitat conditions as good, fair and poor, but it does nothing to
(inaudible).

Absent those kinds of integrated plans that would allow you
to do that sort of prioritization, what Dr. Roni said, and the
other tribal witnesses agreed with, the first thing to do in
repairing habitat is to reconnect the broken pieces by pulling
out anthropogenic barriers such as culverts.  That recommendation
was not contradicted by any of the practicing biologists who
testified, and it is consistent with multiple exhibits and
multiple state reports over the years that agree that barrier
culverts must be corrected if wild salmon are to recover.

Somewhat incredibly, Dr. Koenings disagreed with all that
evidence and testified that fixing barrier culverts is bad for
salmon.  And the only thing he based that on was his statement
that opening up additional habitat will let wild fish in to
interbreed -- hatchery fish in to interbreed with wild fish.

But in response to that concern, your Honor, let me ask a
simple question:  Where were the wild fish and the hatchery fish
before you fixed the barrier?  They were all jammed in the
remaining habitat downstream, where the competition between them
was even more severe.  Opening up additional habitat will help

1    solve that problem.

2        Dr. Koenings' other argument was not biological, it was

3    financial, that accelerating DOT culvert corrections will take

4    funds away from higher priority efforts.  But his analysis is

5    simply wrong.  The reason is simple.  If you remember the

6    testimony from Victor Moore, the director of the Office of

7    Financial Management who testified on behalf of the state, he

8    made it clear that the cost the Department of Transportation will

9    incur, which is the vast majority of the costs involved in fixing

10   barrier culverts, come out of a separate budget, a transportation

11   budget, that has a separate funding source in the gasoline tax.

12   The costs that pay for salmon recovery are in the general fund

13   budget.  That's where the SRF Board is, the Salmon Recovery

14   Board, that's where the Department of Fish and Wildlife is.  And

15   ne'er the twain shall meet according to Mr. Moore.

16   Constitutionally, that gas tax revenue cannot be diverted to

17   anything but highway purposes.  And as a historic matter, the SRF

18   Board has never made a grant to the DOT to fix a barrier.  As far

19   as Mr. Moore's testimony showed, there has never been use of

20   general fund money for Department of Transportation highway

21   construction projects.  It simply has not happened and there is

22   no reason to expect it would.

23       In summary of my second point, your Honor, the evidence at

24   trial was clear, in the absence of an injunction, state barrier

25   culverts will remain on these streams for decades, if not

1   centuries, they will frustrate both tribal efforts to obtain

2   livelihood and the public interest in salmon recovery.

3       The third point I want to address, your Honor, is this:  The

4   evidence at trial proved that an injunction to correct state

5   barrier culverts will trigger no state budget crisis.  The state

6   has argued that spending money to remedy the treaty violation in

7   a timely fashion is a hardship that tips the balance of hardships

8   in its favor and away from the grant of injunctive relief.  But

9   the state's costs and budget arguments are simply not logical.

10  Because culverts wear out, and because under state law and

11  existing agreements between agencies like DFW and the Department

12  of Transportation, when they wear out and get replaced they must

13  be made fish passable.  The only costs that can properly be

14  attributed to the injunction that the plaintiffs have asked for

15  is the incremental difference between fixing the culverts faster

16  or fixing them more slowly, because they are going to get fixed

17  no matter what.

18      The state finally admitted in its post-trial brief that it is

19  this incremental or marginal cost that counts.  But the analysis

20  the state did of that cost in the post-trial brief is

21  nonsensical.  It did not address the relevant margin or the

22  relevant increment, which is the difference in cost between

23  fixing 800 DOT barriers in 20 years or fixing 800 DOT barriers a

24  century or more over the current rate.  Instead, the state

25  compared the cost of all 800 barriers in 20 years versus

1    correcting some small fraction of that by using their current

2    correction rate in that same 20-year period.  In other words, at

3    the end of the 20 years the state's analysis stops the clock,

4    completely ignore the fact that there would be costs for another

5    80 or 100 under the state's proposal.

6        The state's calculation of the incremental cost is further

7    inflated because, in fact, the plaintiffs are not asking that the

8    state must correct all 800 of those barriers.  We have given the

9    state a very substantial out, by proposing if the state will

10   simply finish its ongoing habitat survey, so it actually knows

11   how much habitat is there with a reasonable degree of certainty,

12   that it would only have to open up 90 percent of the habitat, fix

13   enough DOT culverts to open 90 percent.  Mr. Benson's testimony,

14   AT-323, shows that should be about 577 culverts.  So that is the

15   incremental cost question, your Honor.  577 in 20 years or over a

16   much longer time period.

17       After you take out that 577, the remainder of the 800 could

18   be fixed at the remainder of their useful life, which is what

19   current state law provides.

20       There is another problem with the state's cost arguments,

21   your Honor.  The evidence does not support their claimed cost for

22   fix of $2.3 million.  The state's approach to that average cost

23   has been misleading from the first day of trial.

24       In the state's opening statement there were two culverts that

25   were addressed in particular.  One was Mill Creek, which we were

1    told was a $1.6 million fix, and, quote, was on the medium to

2    smaller side of the fixes.  But if you actually look at

3    Mr. Wagner's testimony, he testified that the Mill Creek fix was

4    a 37-foot wide stream simulation structure.  It was one of the

5    widest stream simulation structures the state has ever built.  It

6    was not on the medium to smaller side.

7         Another example used in opening was Terrell Creek up in the

8    Lummi country.  We were told that the cost of that project for

9    the culvert fix was $2.3 million.  If you look at the evidence,

10   that project was a highway project.  If you look at the documents

11   in the record, it is a highway project, not an I-4 project.  And

12   Mr. Wagner testified it is not possible in a highway project like

13   that to tell what part of that $2.3 million total cost was

14   because of the culvert fix and what was because of the other

15   highway work being done.

16        So that misleading approach has been compounded by the

17   state's use of a nonrepresentative list of only 38 culverts to

18   come up with its $2.3 million average cost.  On

19   cross-examination, both Mr. Wagner and Mr. Carpenter from the

20   Department of Transportation, admitted they had made no effort to

21   determine whether those 38 culverts on that list were

22   representative of the full sweep of 800 to be corrected.

23        But the plaintiffs did make that comparison, your Honor.  And

24   the Court can as well.  If you look at AT-323, it lists stream

25   widths for all 800 of the remaining DOT barriers.  It shows the

1    38 culverts on that scoping list are significantly larger streams

2    than the norm, and thus will have higher costs.

3        Finally, that $2.3 million estimate is inconsistent, and

4    inexplicably inconsistent with the 2007 estimate which the state

5    also prepared in a proposed exhibit back when trial was meant to

6    be in 2007.  And that 2007 exhibit shows that future DOT

7    corrections could be expected to cost $850,000 on average.

8        Now, according to the State Department of Transportation's

9    construction cost index, which is in the record at AT-217,

10   inflation from 2007, when the cost was meant to be $850,000, to

11   2009, when we did trial, was 12 percent.  You add that 12 percent

12   to $850,000, it should have brought the cost up to $952,000.  It

13   does not bring it up to $2.3 million, your Honor.

14       The misleading nature of the state's testimony and argument

15   regarding the average cost continued when the state's witness

16   turned to address the budget as a whole.  Mr. Moore stated that

17   culvert spending would threaten programs for the state's most

18   vulnerable citizens.  He said you can't just borrow more money or

19   pull money out of some pot for culvert fixes, because there are

20   debt limits and spending limits under state law.

21       What he didn't say until cross-exam is those social programs

22   for the most vulnerable, like salmon recovery, are general fund

23   programs.  And those debt limits he spoke of apply only to the

24   general fund.  And the spending limit applies to the general

25   fund.  And none of them are relevant to the Department of

1    Transportation corrections that will consume the vast majority of

2    the money needed to vindicate the plaintiffs' treaty rights by

3    fixing various culverts.  Nor will fixing the barrier culverts

4    that DOT has cause a crisis within the Department of

5    Transportation's own budget.

6        Mr. Moore acknowledged that the impact of fixing culverts on

7    the DOT budget depended on how much a culvert would cost to fix

8    and how many of them there were to fix.  He admitted on cross

9    that he didn't know either of those things.  So his statement

10   that fixing barrier culverts is going to remain -- that the

11   safety of millions of Washingtonians is impaired is pure

12   hyperbole, it is baseless.

13       In fact, your Honor, we do not deny accelerating DOT culvert

14   fixes will require some shift in the Department's priorities.

15   But if you look at the total budget for the Department of

16   Transportation, at the time of trial, $5.8 billion, and the

17   highway construction budget of $4.4 billion, whatever the

18   incremental cost of correcting these culverts faster is will be

19   dwarfed by that budget.

20       The final point, your Honor, I want to make regarding the

21   evidence presented at trial is this:  The injunction will not rob

22   the state of its legitimate discretion; it will not mire this

23   Court or the parties in perpetual implementation proceedings.

24   The injunction is, in fact, minimal in relation to the treaty

25   violations.  And the plaintiffs have striven to balance in their

1    injunction terms between very specific language, which would make

2    quite clear the state's obligations, but which the state would

3    surely call too intrusive, and very general language, which the

4    state would say we don't know what it requires, but which is

5    intended to give them full discretion.

6        In numerous places the proposed injunction borrows from the

7    state's own current policy and does no more than insure that

8    current policy becomes actual practice in the future.

9        Provisions that fall under that category include the

10   inventory.  The plaintiffs proposed that the existing DOT and DNR

11   inventories of barrier culverts be the basis for what has to be

12   fixed in 20 years or by 2016.  The plaintiffs proposed that

13   WDFW's current inventory methods can be continued into the

14   future.  The correction schedule is borrowed from state law for

15   the natural resource agencies, that 2016 deadline, and it is

16   borrowed from the Department of Transportation's own 20-year

17   correction deadline, which it had in its own policy documents up

18   until 2004.

19       The design standard, pass all fish at all life stages, is

20   taken from the State Forest Practices Act.  The proposed

21   hierarchy, once you decide to build this -- the proposed

22   hierarchy of design options, where you would look first at, do we

23   need to put something there, do we put a bridge there before you

24   look at a culvert, is straight out of the WAC for stream crossing

25   structures.

1    So the injunction would impose some new requirements.  And it

2    does so in places where the existing state programs are woefully

3    inadequate.  Thus, the injunction would require that the state

4    actually monitor all of its fish passage corrections for

5    effectiveness.

6    The evidence at trial showed that what is currently done for

7    DNR, they go out and look at their culverts, the big ones, after

8    a major storm.  In other words, they do a drive by.  There is no

9    systematic program of reinspection.  For the Department of

10   Transportation, there is a one-year inspection period for a third

11   of the fixes done with I-4 funding.  And that is it.  There is no

12   comprehensive program.  And that is essentially to insure that

13   these fixes are actually effective and stay that way.

14   Maintenance, your Honor, is similarly included in the

15   injunction because the current maintenance programs are

16   inadequate.  The Department of Transportation has no program

17   aimed at maintenance for the purpose of insuring fish passage.

18   What it has is a maintenance program aimed at insuring the

19   structural integrity of the culverts.  And that program, if you

20   will recall, was recently rated the worst of 32 categories of DOT

21   maintenance programs in their management accountability process.

22   One of the regions that comprised the case actually got an F-plus

23   grade for their maintenance program.

24   Finally, your Honor, the injunction would require that the

25   state do something which the evidence shows is essential to

1   prevent ongoing future harm, and that is to develop a program of

2   ongoing inspection and correction of barrier culverts.  No agency

3   currently has such a program, and the evidence is clear it is

4   almost inevitable that there will be additional barriers in the

5   future, and they will continue to deprive the tribes of harvest

6   if there is no program to find and correct them.

7        In those places where the injunction imposes new

8   requirements, your Honor, that are not borrowed straight from

9   state practice, the requirements are deliberately phrased

10  generally.  They are intended to insure that the state not wholly

11  default on aspects of culvert correction that are essential, but

12  to leave the state as free as possible to fill in technical

13  details.

14       Now, the state portrays this injunction as fraught with

15  complications and intrusions.  It is not so.

16       The state contends in its post-trial brief that it will be

17  compelled under the proposed injunction to develop a new adapted

18  management program.  Well, unlike the state, which insists on

19  clinging adamantly to the status quo, the plaintiff actually

20  listens to the concerns of the other side, your Honor.  We

21  revised the proposed injunction from pretrial to post-trial and

22  deleted the reference to adapted management.  What the injunction

23  would now require is simply monitoring of the effectiveness.

24  That is the essential monitoring that could be used for an

25  adaptive management program.  We think that the biologists for

1    the State of Washington will want that, and will do it, and work

2    with their tribal counterparts to develop it, but it will not be

3    required by this Court.

4        Similarly, the state contends that it will have to use

5    whatever design represents best available science.  Again, the

6    best available science language has been stricken from the

7    proposed injunction that was filed post-trial.  What the

8    injunction now does is merely note that the stream simulation

9    design is currently the best science.

10       The state also contends that it may have to prove to the

11   Court in advance that its designs are adequate, but there is

12   nothing in the injunction that would require that, and there

13   never has been.

14       The state argues that an injunction to prevent it from

15   operating barriers in the future, requiring it to correct

16   barriers in the future, will lead to perpetual judicial

17   supervision.  But, your Honor, this is a permanent injunction.

18   That's what permanent injunctions do.  They require that the

19   situation change for a long time.

20       On the remand in the Winans case, the Winans brothers were

21   not ordered that they could have three fish wheels in the river,

22   but after five years they could have more.  It was perpetual.

23   And when this Court enjoined numerous state regulations in Final

24   Decision One, it was not for a short period of time, it was

25   forever.  And should the circumstances change in the future, such

1    that the terms of this injunction become inequitable, the state

2    is free to make a motion to modify under Rule 60, and under the

3    Rufo decision from the U.S. Supreme Court.

4         So, in summary, substantively and procedurally, the

5    injunction the plaintiffs have proposed is limited, and it is as

6    deferential as it can be and still get the job done.

7         We do not deny that there will be some implementation

8    disputes.  Although, we note, as the Ninth Circuit recently noted

9    in an unrelated sub-proceeding, things have changed a lot in 20

10   years, in terms of how the state and the tribal technical people

11   get along.

12        We believe that providing some basic standards in an

13   injunction will actually avoid future disputes, more than giving

14   the state no guidance at all in terms of how it is to comply with

15   the treaty duties of the state that the Court has already

16   declared.

17        And to the extent that some of those disputes are technical

18   ones, the Court can refer them.  There is the Fishery Advisories

19   Board.  The Court can create a culverts advisory board.  You can

20   order alternative dispute resolution.  You can order mediation.

21   There are a lot of ways to solve those kinds of disputes before

22   they get before the court.

23        Finally, your Honor, in addition to overstating the intrusive

24   effects of this injunction, the state would apply a novel legal

25   test to evaluate it.  In their post-trial brief, they appear to

1   argue that every component of the injunction must address a

2   separate irreparable injury.  For example, they argue that the

3   plaintiffs must show that they suffered irreparable harm from the

4   current inadequate system of notice to tribes.  They must show

5   that they suffered irreparable harms from the current inadequate

6   monitoring systems for culvert corrections.  But the state cites

7   no case that requires that every single element of an injunction

8   be supported by a separate irreparable harm.  The plaintiffs have

9   been unable to find them.  Instead, the principle is very

10  straightforward.  A court of equity has broad and flexible

11  powers.  Once irreparable harm has been shown, it can reach out

12  and do what is necessary to prevent that irreparable harm from

13  continuing or recurring.  In this case, both monitoring and

14  notice of implementation activities are fundamental to insuring

15  that the corrections are done properly and to giving plaintiffs

16  their due.

17      So, in summary on my fourth point, your Honor, the evidence

18  shows that the plaintiffs have suffered irreparable harm and

19  their injunction will do no more than provide the minimum

20  elements of an effective correction program.

21      In conclusion, your Honor, the plaintiffs don't want to make

22  light of the burden this injunction will impose.  We understand

23  full well it will require a lot of work.  It will require a lot

24  of money.  But the alternative proposed by the state is to leave

25  the fate of the culverts, the fate of the salmon and the fate of

1    treaty fisheries entirely in the state's discretion with no

2    injunction.  It is to leave the status quo.  And we know what

3    that status quo is.

4        The state's alternative would insure that these barriers,

5    which have been declared for the last three years to be in

6    violation of the treaties, would remain for decades, if not for

7    centuries.  That would shame equity, that would thwart the treaty

8    promise.  The plaintiffs therefore pray, your Honor, that you

9    grant the injunction as they have requested.

10           THE COURT:  Thank you very much.  Mr. Monson.

11           MR. MONSON:  Good afternoon, your Honor.  May it please

12   the Court.  Peter Monson for the United States of America.

13   First, let me just say the United States joins in the remarks

14   Mr. Sledd just made, as we do in the request for the proposed

15   injunction that was filed post-trial with the amendments

16   Mr. Sledd has outlined.

17       That would bring me to the first of three brief points I

18   intend to make.  In our post-trial briefs, we pointed out the

19   fact that the United States has joined in the plaintiff tribes'

20   request for relief militates against any Eleventh Amendment

21   defense the state has argued.  We briefed that quite extensively.

22   We pointed out a case that is very much similar to this one, the

23   Mille Lacs Band versus Minnesota case.  Unless the Court has

24   questions, I don't intend to address that matter any further.  I

25   think we briefed it adequately.

1      Our second point is that the United States places great

2    importance on the correction of culverts in the Pacific

3    Northwest.  And there is two points I would like to make under

4    that.  First, we presented a witness at the end of trial,

5    Dr. Philip Roni, who discussed the importance of correcting

6    culverts.  And I will get into his testimony in just a moment.

7      And the second point is that, although we did not have

8    testifying witnesses to this fact, we did have evidence in the

9    record regarding Forest Service corrections on national forest

10   lands, and the acceleration that they have undertaken.  I will

11   briefly address those points as well.

12     The correction of fish-bearing culverts is of great

13   importance, in part because of the rapid response that they

14   provide.  As Dr. Roni testified in his direct testimony as

15   rebuttal to Dr. Koenings, reopening habitat that has been blocked

16   by -- whether it is blocking culverts or other matters, is akin

17   to opening the back gate and letting the dogs out.  And fish,

18   like dogs, will run free and will go and explore the new

19   territory that they have heretofore been excluded from.  In the

20   context of fish, it happens within a matter of literally days.

21   If they can access previously inaccessible habitat, they will do

22   so as quickly as they possibly can.

23     Fish-blocking culverts are a problem not only in terms of

24   fulfilling the tribe's treaty rights, as Mr. Sledd has so

25   eloquently discussed, but it is also important from the

1    standpoint of meeting the Endangered Species Act requirements and

2    recovering salmon to a non-threatened, non-endangered status.

3        As Dr. Roni indicated, and I think Mr. Sledd alluded to this

4    in his remarks earlier as well, there are two first steps that

5    need to be taken for purposes of salmon recovery, to protect the

6    high quality habitat that exists and then, secondly, to reconnect

7    isolated habitats.  The culverts fit into that secondary

8    category.  Reconnecting isolated habitats is one of the top two

9    most important things that can be done.  Correcting fish-blocking

10   culverts fills that requirement very successfully.

11       Dr. Roni testified that reconnecting habitat is one of the

12   most successful restoration actions because it relies on existing

13   habitat.  You don't have to create new habitat.  Although

14   certainly improvements may be required.  And also, as I

15   mentioned, fish recolonize new habitat very, very quickly.

16       In addition, in rebutting Dr. Koenings' testimony regarding

17   trying to address all of the Hs all at once without any

18   prioritization of one over the other, Dr. Roni described that as

19   doing a lot of things across the landscape, but not really trying

20   to address some of the key factors first.

21       That approach is flawed because you do a little bit here and

22   a little bit there, but you never really get to the most critical

23   items.  And those, in Dr. Roni's view, were, again, protecting

24   existing high quality habitat and reconnecting isolated habitats.

25       He pointed out that, while limiting factors analyses are very

1       important in salmon restoration, they have to be done correctly,

2       and they have to really, truly analyze what those factors are and

3       how they limit restoration and limit salmon production in those

4       habitats.

5            Habitat reconnection is one thing that can be done very

6       quickly with positive results, without a great deal of analysis

7       required.

8            And Dr. Roni, finally, noted that culvert corrections do not

9       necessarily conflict with other salmon restoration activities.

10      In many cases, such as with DOT highways and roads, the funding

11      sources are completely different.  And Mr. Sledd has alluded to

12      that as well.  The state witnesses confirm that fact, that the

13      budgets for salmon recovery are oftentimes much different -- come

14      from a different pot of money, whether it be federal money or

15      money expended through what is called the SRF Board, the Salmon

16      Recovery Funding Act board.  Those funds are different from where

17      the funds would come from, with respect to Washington State

18      Department of Transportation funds.

19           In short, the injunctive relief proposed by the plaintiffs

20      will not cause the state to have to rob Peter in order to pay

21      Paul in terms of salmon recovery.

22           Now, on cross-examination, Dr. Roni was asked about a

23      PowerPoint presentation.  This is the point the state has made in

24      its post-trial brief, to try to paint Dr. Roni's views as

25      suggesting that culvert corrections are not very important and

not very productive in terms of salmon recovery, and maybe money should be spent elsewhere.

The PowerPoint presentation was lacking a couple of things. One, it was lacking the actual underlying presentation.  It was just the bullet points.  Dr. Roni mentioned this, and tried to explain, no, that wasn't in fact what he intended to convey with the PowerPoint presentation.

Secondly, the PowerPoint presentation was not the result of a comprehensive study, it was simply a hypothetical watershed that was being used to provide an example of how scientists and people in the business of salmon recovery might go about prioritizing recovery actions in a given watershed.  It wasn't intended to say, well, these things should be done first because every watershed is different.  All of the witnesses seem to agree on that point.

Sort of the bottom line here is, with respect to that PowerPoint presentation, Washington Exhibit 200, is that it was really based on a hypothetical estimation, and Dr. Roni clearly clarified on redirect that in fact it was a -- it represented a large underestimation, and that the correction of barrier culverts is still a very important factor in salmon recovery.

So this brings me to my third and final point, and that relates to the importance placed on culvert corrections and barrier corrections by the Forest Service.  As I mentioned, we were unable to present witnesses at trial from the Forest Service

1    because both individuals were called away, one for a family

2    emergency, and the other was out of the country.  But we did --

3    There is evidence in the record regarding the culvert corrections

4    efforts that the Forest Service has undertaken.

5        In 2005, the Forest Service culverts were not in very good

6    shape.  The state has pointed that out in prior briefing when

7    they sought to assert a claim against the United States in this

8    very case.  However, since that time, the funding effort and the

9    work the Forest Service has done to correct its own barrier

10   culverts on forest land has increased dramatically.  The base

11   funding has increased by some 67 percent.  I am looking at

12   Exhibit 187, U.S.A.  It talks about there have been increases in

13   recurrent funding from 2005 to 2009, from 4.6 million to

14   7.7 million.  In addition, there was two substantial, one-time

15   appropriations exceeding $25 million the Forest Service is using

16   to correct culverts and decommission roads and do other things in

17   the Pacific Northwest and in the case area.  A summary of these

18   expenditures and the accomplishments that have been made with

19   those monies can be found at U.S.A. 188, U.S.A. 189 and U.S.A.

20   190.

21       It is important also to note that the Forest Service has

22   developed a very extensive methodology for correcting culverts,

23   that being the stream simulation manual that it uses, which is

24   very similar to the one the state uses.  But it uses that on

25   anadromous streams.  It uses that methodology exclusively for

1   correcting culverts that it is trying to correct on its lands in

2   the case area.

3       I would also note that the Forest Service is on track to try

4   to meet the same 2016 deadlines that the Washington Department of

5   Natural Resources agencies are seeking to meet.

6       So, in conclusion, from our perspective, we want to see the

7   DOT culverts fixed because oftentimes they are located downstream

8   from national forests.  In order to make the improvements that

9   are occurring in the upper stream reaches more effective, and

10  increase production of salmon, we want to see the downstream

11  corrections being made as well.  Without those corrections on the

12  state culverts, the federal culvert corrections benefits will not

13  be fully realized.

14      For those reasons, as those stated by Mr. Sledd earlier, the

15  United States urges the Court to enter the plaintiffs' proposed

16  permanent injunction regarding culvert correction.  We thank you,

17  your Honor.  I will stand for any questions if you have any.

18          THE COURT:  Thank you, Mr. Monson.

19          MR. MONSON:  Thank you.

20          THE COURT:  Mr. Tomisser.

21          MR. TOMISSER:  Good afternoon, your Honor.  The remedies

22  requested by the tribes in this case, ranging from the

23  acceleration of the state's barrier program to the federal

24  jurisdiction over culvert design, are ultimately aimed to achieve

25  one goal, the increase in the abundance of salmon available for

harvest.  The abundance theory presented by Mr. Sledd, as he

mentioned today, in which every existing barrier is a breach of

the treaty, is a treaty that requires no more showing of action

under the Steven's treaty than to make a general assertion that

abundance is diminished from some unarticulated, undefined,

unproven level, and that some state action is a depressing factor

upon the number of salmon.  That is all the Court needs to adopt

as a remedy under the treaty.

I think that this is not the correct vehicle for -- it is not

a correct vehicle to increase the abundance of salmon.  And I

think it is important, your Honor, to consider the abundance

theory in the context that this treaty was signed.

Is the Steven's treaty, a document created in the 1850s, a

proper vehicle to solve the challenges posed today by concerns

over the abundance of salmon and the scarcity of the resource?

If we consider what was thought about at the time the treaty was

executed, one of the primary assumptions that has been noted by a

number of commentators and courts over the years is that the

supply of salmon was thought to be inexhaustible, essentially an

unlimited resource.  There is the colorful description that was

offered at the time of the treaties:  Salmon were abundant in

such numbers that a person could cross the river without getting

their feet wet merely by stepping on the backs of salmon.  Such

was the abundance available at that time.

It is, therefore, not surprising, given that fundamental

1  assumption underlying the treaty, that there is no mechanism

2  built into the treaty to assure any particular level of the

3  resource.   There was no reason to think about that at the time,

4  under the assumption that the resource is inexhaustible.

5      The other consideration that was at the center of the treaty

6  at the time it was signed was the knowledge that there was going

7  to be growth, there was going to be settlement, there was going

8  to be an increase in the population.   All of these things, or

9  both of these things, were primary considerations at the time the

10  treaty was signed.

11      Fifty years later, your Honor, on September the 27th, 1908,

12  to be precise, the anticipated growth and development happened in

13  a very quantum way, in a way that changed the world forever, in a

14  way that was unimaginable at the time the treaty was signed.   We

15  look forward today --  Our own corner of the world is almost

16  unrecognizable from the time that the treaty was signed.

17      It is not surprising, therefore, your Honor, then to consider

18  at the time that the treaty was signed, a vehicle was not going

19  to be capable of solving the problems of today.   The problems of

20  today, problems of abundance, problems of scarcity, are modern

21  problems, problems for which new laws have been created to deal

22  with.

23      Although Mr. Sledd takes me to task for mentioning the

24  Endangered Species Act, the state Salmon Recovery Act, the Forest

25  Practices Act, those are modern tools that have been created to

deal with the modern problems.  There is nothing in the treaty
itself that in any way assures any particular level of abundance.
It was not part of what was in the treaty, and should not be
written into the treaty by this Court.

Once the Court begins to consider the abundance theory as a
viable cause of action, there is no logical distinction between
culverts as a factor that diminishes the relative abundance of
salmon and any other limiting factor that the state may possibly
be involved in.

The Court heard testimony about the four Hs, and how all of
them are important factors for salmon recovery, habitat having a
variety of limiting factors.  The state is involved in every
aspect of these four Hs, including multiple impacts potentially
on habitat.  If the abundance theory is correct, your Honor, that
the Court need only identify some state action that creates a
downward pressure upon the salmon, then, according to the
plaintiffs, that action is now subject to remedy by this Court
under the treaty.  That's an extension that would be unthinkable
at the time that the treaty was signed.  It is a right that has
never been recognized by a court.

Having said that the treaty is not the proper vehicle for the
tribes to receive a remedy in this case, that is far from saying
the treaty no longer has a purpose.  The treaty does have a
purpose.  The treaty remains viable and contains important rights
for all parties to it.

1    The courts have identified two broad, substantive rights that

2    flow from the treaty.  The first is the core decision

3    establishing that the tribes are forever to be granted access to

4    their usual and accustomed fishing areas.  That right is not

5    involved in this particular case.

6    The second broad right is involved.  That broad right deals

7    with the entitlement of the tribes to a fair share of the

8    available catch.  If the Court looks at the decision in 1979 from

9    Fishing Vessel, the court describes the second of the two rights,

10   saying, "The purpose of our cases is clear.  Both sides have a

11   right secured by treaties to take a fair share of the available

12   fish."  That, we think, is what the parties to the treaty

13   intended when they secured to the Indians the right of taking

14   fish in common with other citizens.  What the court says there

15   is, it is a right to a fair share of the available fish, not an

16   inherent right to establish a certain level of availability.

17   This distinction is important, your Honor.

18   If you look back a little bit further, we gain more

19   understanding of what Fishing Vessel was talking about when they

20   talked about a fair share, what is a fair share and what did that

21   mean in terms of the treaty.

22   If you go back and look at the Department of Game versus the

23   Puyallup Tribe, you see the analytical roots for how the Court

24   should be applying this particular right to the treaty.

25   What the court established in the Puyallup series of cases

1   was what the treaty was concerned with preventing was future

2   state action, as new territory was developed, that was going to

3   be unfair in its treatment of tribal access to the resource.

4       What the court in that case said was unlawful was any state

5   action that had either the intent or the effect of discriminating

6   against the ability of the tribes to take their fair share of the

7   available fish.

8       And when you look at that ruling in context, it makes sense

9   in historical terms.  The concern was we need to allow the tribes

10  to have access to the resource that they had historically

11  depended on.  What we are not going to allow the state to do, is

12  to come in, and through state action, or state laws, or unfair

13  practices, push the tribes off that resource, so that when the

14  tribes dip their nets into the water, they come up empty, whereas

15  the non-tribal fishermen are able to take the catch.  That is

16  what was prevented.  The idea was to insure the tribes the

17  ability to get a fair share of the catch that was available.

18  That is a very different right than the right Mr. Sledd and the

19  tribes are asserting in this case, which is a right to some

20  undefined quantum of fish in a treaty.  That is what doesn't

21  exist.  But it has become the issue for us today because the

22  fundamental assumption -- one of the fundamental assumptions in

23  the treaty has changed, the assumption that the supply itself is

24  inexhaustible.  The problem of abundance, the problem of scarcity

25  is a modern problem, not one the treaty was designed to resolve.

1    I tried to be careful with my opening remarks here about the

2    treaty not being available to remedy culverts, because even under

3    the Puyallup decision and in Fishing Vessel, it would be

4    theoretically possible under that construct for a culvert to be a

5    breach of the treaty.  I can describe for the Court in those

6    cases what a prima facie culverts case might look like.

7        If we look at the Puyallup decision in Fishing Vessel, a

8    prima facie culverts case, for example, would include perhaps a

9    tribe that was able to come in and identify that historically

10   they were dependent upon a particular run to catch their fish;

11   and that at some point in time the state had come in and built

12   culverts in a way that was impacting that run of fish, but

13   impacting in a way that was denying the tribes their right to a

14   fair share of that run, whereas non-tribal fishermen were still

15   able to exploit the run.  In that situation, you would have

16   evidence of a state culvert that was having a discriminatory

17   impact on the ability of a tribe to take their share of whatever

18   that run would be.  That would at least be a prima facie case of

19   a breach of culvert (sic) that would come under the treaty.  That

20   isn't to say that the Court would automatically issue an

21   injunction, but at least you would have a prima facie case to

22   review.

23       I want to turn to general considerations for the Court in

24   looking at the remedy that has been requested by the tribes.

25   There are several considerations that the Court needs to take

1    into account when looking particularly at granting an injunction

2    against the state government.  The first and most basic rule is,

3    of course, the plaintiffs have the burden of proof in presenting

4    their case to the Court and satisfying the Court on a more

5    probable than not basis that they are entitled to the equitable

6    remedy they are requesting.

7        The second broad principle the Court can see from the case

8    law, is that the remedy must fit the breach, so that we don't get

9    into the problem of the remedy being overbroad.  And overbroad

10   remedies are found when the Court's remedy applies to things that

11   haven't been proven as part of that breach and in need of the

12   remedy.  That is a significant problem for the presentation of

13   evidence in this case by the tribes.  When you look at what we

14   would propose to the Court to be the prima facie case, there is a

15   stunning lack of evidence.  In fact, the tribes have never moved

16   beyond the generalized assertion that fixing barriers is good.

17   We know that fixing barriers is good.  That's why we have spent

18   tens of millions -- hundreds of millions of dollars trying to do

19   that.  The question is, is fixing them -- have they proven that

20   fixing them faster is going to produce any benefit.  That's what

21   they haven't done.

22       They have approached the case in an unusual fashion, your

23   Honor, asking for a case-wide injunction to fix the barriers.

24   And yet there is no evidence presented to the Court that all of

25   the watersheds need an injunction.  In fact, the testimony

1   presented by the witnesses was that every watershed is different

2   and needs different things.

3        The best way to approach that problem then is in the way that

4   has been described in which plans are developed at the watershed

5   level.  More needs to be done.  But then you apply the remedy

6   that is needed for that watershed and for that species.  A

7   one-size-fits-all remedy over the entire case area, in light of

8   the testimony that not every watershed needs that remedy, is

9   inherently overbroad.

10        Another consideration for the Court, and this one is

11   fundamental, is the problem of a federal court getting into the

12   area of institutional reform.  I do believe that the remedy

13   requested by the tribes in this case in some respects does cross

14   the line into institutional reform, and all the federalism

15   concerns that flow from that.

16        This is how I think they do that in two specific ways:  First

17   of all, although they presented it innocuously, plaintiffs asked

18   the Court to take control over the design of culverts.  Currently

19   under state law, the state can fix culverts using stream

20   simulation, the hydraulic method, or no slope, all of which are

21   designed to pass fish at all stages.  That is what is currently

22   allowed under state law.

23        What the plaintiffs have asked the Court to do is to say, no,

24   stream simulation must be the default except in emergency

25   circumstances.  That is an act of institutional reform, because

1    the state court is telling the state, you cannot do something

2    that is currently allowed under state law, you must choose only

3    this option.

4        The much larger concern when we look at the institutional

5    reform is the effect on the state budget.  And I will get into

6    this cost dispute in a little bit.  But regardless of whether you

7    think the state's numbers were accurate, or Mr. Sledd's numbers

8    were more accurate, underneath either analysis, as Mr. Sledd

9    admitted in his closing, the Court is going to be reorganizing

10   the state's budget to some extent.  The Department of

11   Transportation budget, or whatever budget, in order to meet the

12   goal of repairing the culverts within a 20-year period, the

13   plaintiffs in this case acknowledge, the spending priorities are

14   going to have to be reorganized to do that.  Once the Court sets

15   a performance goal that has to be met by the state that requires

16   the reorganization of the budget, you're instituting

17   institutional reform.

18       The reason I mention that, your Honor, is because

19   institutional reform is not a matter to be taken lightly.  And

20   I'm sure the Court doesn't take it lightly.  When you look at the

21   cases in which institutional reform has been ordered, they are

22   generally cases where the Court is facing a recalcitrant

23   defendant, a state actor who is defiant of federal law or simply

24   has no ability to come into compliance with federal law.

25       This is an aspect of the case that I get most discouraged

about when I hear Mr. Sledd disparage the efforts that have been
made.  Far from being a recalcitrant actor, the State of
Washington in this case, by the undisputed evidence, is actually
a leader in the area of salmon restoration and recovery.  The
State of Washington, from scratch, without a threat of federal
court intervention, developed a program for the inventory, the
prioritization and the correction of a barrier system on its own,
and put that system into place.

It has been consistently funded through the years through a
variety of sources.  It has developed a model for deciding how to
spend money to get the most bang for the buck.  That was done
through the development of the priority index.  The state has
been recognized throughout the nation as being a leader, far from
being the recalcitrant defendant that courts generally reserve
institutional reform awards for.

When you look globally at what the state has done, you look
at the SRF Board spending.  The State of Washington over the last
decade spent $143 million on salmon-wide recovery projects.  We
have put programs into place that qualify for federal assistance,
thereby increasing our ability to fund projects.  The federal
government contribution to that is $216 million, for a total of
$360 million in one decade, spent by the Washington State Salmon
Recovery Board, an office whose functions are overseen by the
governor's office, and who make decisions based on the very work
of people that were witnesses in this case, state biologists,

1    tribal biologists, federal experts who develop the plans to get

2    funding, to develop the priorities for how they should be spent.

3        You can see as a subpart of these totals, 21 million on

4    barrier corrections, another 22 million from the federal

5    government.  That money is in addition to the money spent by DOT

6    and DNR to correct their barriers.  All of this work is being

7    done.  None of it places the state in the position of being a

8    recalcitrant defendant unwilling to do what is necessary for

9    salmon.  What the state has done is taken extraordinary

10   leadership and taken the responsible steps within its means to

11   get as much done, and to do it in a scientifically sound way, the

12   product of collaboratively scientific work, not the product of

13   litigation and court decisions on what ought to happen.

14       So what has happened?  Mr. Sledd contends there is no plan.

15   In fact, there are plans.  This comes from an exhibit admitted

16   into evidence.  It is the key excerpts from the Puget Sound

17   Recovery Plan.  It is called the Chinook plan.  But it will

18   benefit every fish that swims in Puget Sound.  It is a plan that,

19   according to the scientists, has a 50-year time horizon, at a

20   cost of $1.24 billion, and more than a thousand associated

21   actions.  That plan is in place, your Honor.  And it is not the

22   only plan.

23       Dr. Koenings testified that more of this work needs to be

24   done, that what we need to do is look more closely at each

25   watershed so we know what each watershed is.  That work is being

1    done and it is in progress.  As Dr. Koenings described, these

2    coordinated plans and trying to get this coordinated is of

3    relatively recent origin.  The plans are working, they are

4    scientifically sound, and ought to be allowed to continue to

5    work.

6        Another example is the Hood Canal Summer Chum plan.  In fact,

7    Kit Rawson also talked about the plan -- the Snohomish ten-year

8    plan in that particular case.

9        As a part of these plans, your Honor, an extensive limiting

10   factor analyses were done.  If we look just at habitat, what the

11   witnesses testified was that every watershed has different

12   problems and needs different solutions.

13       Significantly, the plans do not place barrier corrections at

14   the top.  Barrier correction is certainly a part, and it is more

15   important in some watersheds than others, but estuary restoration

16   actually ranks at three-quarters of watersheds as a top priority.

17       Why should the Court order the shift in this case, as we

18   present to the Court, of $164 million in funds to put barriers at

19   the top of the list, when the analysis that has been done so far

20   shows the Court that actually estuaries is where that effort

21   ought to be directed?

22       When we look at the work that has been done by individual

23   state agencies, in addition to what has been done through the SRF

24   Board and other agencies working on salmon recovery, you look at

25   what DNR has accomplished in this case, the correction of more

1   than 700 barriers within a decade, as Alex Nagygyor testified in

2   this case, although it will be close, they believe they are on

3   track to meeting the goal of fixing the barriers by 2016.  The

4   tribes are fine with that target.  There is no need to federalize

5   that portion of the plan.

6       When we look at DOT, DOT's barrier corrections, through a

7   combination of a couple of different sources, as was described to

8   the Court, first, in the course of simple highway construction

9   projects where a correction can be made within the scope of a

10  highway project, the correction to the barrier would be made at

11  that time, generally also trending now heavily towards using

12  stream simulation as the method of choice.

13      The other source of barrier correction is in a unique

14  standalone program, the I-4 program, which contains a specific

15  budget line just for barrier corrections.  As the Court can see,

16  the program has been funded consistently from its origins in the

17  early '90s up through today, to where we are up to just under

18  $20 million.  That rate of budget increase, your Honor, is a

19  multiple of what Mr. Monson has just testified was done on behalf

20  of the federal government with their 67 percent.  We are closer

21  to a 300 percent increase on the I-4 alone.  And, of course, that

22  doesn't count the other fixes being done by DOT, DNR and through

23  the SRF Board.  So, in fact, the state's efforts at barrier

24  corrections in this case is broad and crosses multiple agencies.

25      As a result of various efforts that have been done, your

Honor, the salmon recovery plans have a slide that puts together

a snapshot essentially of where we are and what remains to be

done.  You can see that over the last decade in this particular

area --  This is just looking at habitat and the limiting factors

relating to habitat.  You can see passage there on the right side

of the pie chart.  Passage, this is barrier correction

essentially, actually affects amongst the fewest of the ESUs, the

evolutionarily significant units.  It actually affects fewer than

most of the other corrections.  And yet this is the area where

most of the work has been done already.  The plaintiffs have

provided no evidence as to what additional gain might be achieved

if that effort were to be accelerated, and accelerated at the

expense necessarily of something else.  Because the shift in

funding, your Honor, has to come from somewhere.  Mr. Sledd has

described the budget.  He has described everything except where

that $164 million per biennium is going to come from.  It has to

come from somewhere.

    I review that evidence with the Court really for the purpose

of talking to the Court about the lack of need for an injunction,

the lack of need for this Court to begin down a course of

institutional reform.  The State of Washington in this case is

not the kind of defendant for whom that sort of remedy is

awarded.

    If we look beyond that, your Honor, to the more specific

elements of what is required in order to impose an injunction,

1    the first major element is whether or not there has been

2    significant and irreparable injury.

3         Well, when we look at the history of tribal harvests in this

4    case, what we see is fluctuation in what the tribal harvests have

5    been.  This evidence goes back to the date of the Boldt decision,

6    and then up through 2007.  And so what we can see is fluctuation.

7         Mr. Sledd has emphasized repeatedly in the brief that this is

8    a case about culverts; it is not a salmon recovery proceeding, he

9    says, it is the culvert proceedings.  Well, presumably we would

10   have had some evidence about what is the impact on culverts in

11   relationship to tribal harvests.  Now, on summary judgment the

12   Court said, I am not going to require mathematical precision in

13   presenting that analysis.  What the Court didn't say, I am going

14   to allow you to proceed and get a remedy with no evidence

15   whatsoever.  That is exactly what this Court has, no evidence on

16   either a watershed basis or a case area wide basis that gives the

17   Court any means at all to measure how much is being done.

18        Mr. Sledd suggests in his argument this kind of mathematical

19   formula.  That is the methodology that was rejected by this Court

20   as unsound.  You cannot take the potential area that might be

21   available and multiply it by some number and come up with

22   production.  That is the methodology that was rejected.  The

23   tribes presented nothing else in this case to satisfy the burden

24   of what that injury would be.

25        The plaintiffs do bear the burden of showing what the degree

1    of that injury is.  If the Court can't have some way of measuring

2    what is the extent of that injury, the Court has no way of

3    knowing whether or not the remedy it's imposing is going to match

4    the breach.  If you can't know, the Court is stuck with

5    speculation as to how much injury was actually caused by the

6    culverts, and what am I going to get if I order the state to

7    accelerate this program.  The Court doesn't have anything to work

8    with in looking at that.

9         Interestingly, your Honor, if you look at this particular

10   chart, and I have superimposed a red line on it --  This is not

11   on the exhibit that is admitted.  This red line marks 1991, which

12   is the beginning of the state's barrier correction program.  And

13   interestingly, it was the plaintiffs' burden in this case to

14   prove that culverts had a deleterious effect on the tribal

15   harvests.  It doesn't look that way, does it?  If you look at the

16   left side of the case, and you look at my next slide, which is

17   the state highway center line chart, what you can see is that

18   from the late '60s, up through today, the miles on the state's

19   center line miles have remained essentially constant since the

20   late '60s.  About 98 percent of the current system has been the

21   same, along with all of the associated culverts and barriers in

22   that system.

23        So if we weren't fixing barriers in any kind of a regular

24   pattern until 1991, then 1990 or so should be the period of time

25   in which the culverts are having a maximum impact on tribal

1    harvests.  That is when they are the worst.  That is before

2    anything is getting fixed.  What do we see when we look at the

3    evidence produced in this case about what tribal harvests were?

4    It is going up at a time the culverts are presumably at their

5    worst in this case.

6       When you look at the other side of the chart, once the state

7    starts repairing barriers in a consistent manner, you can see

8    generally the trendline of tribal harvests is down.  According to

9    this evidence, Mr. Sledd's case would have established that

10   fixing culverts must be bad for salmon.  That is, of course, not

11   the case, as we know.

12      What is significant here, your Honor, is the absolute lack of

13   any correlation between the state highway system and tribal

14   harvests.

15      What we heard from tribal witnesses and state witnesses in

16   this case is the extreme spikes that we see in the mid to late

17   '80s are attributable to overharvest, harvest levels that were

18   irresponsible and not designed for sustainable growth.  That is

19   why those spikes are high.  There is no relation there to

20   culverts.  Fortunately we have a better cooperation now between

21   state and tribal biologists and fisheries management, witnesses

22   like Loraine Loomis, who sit and make decisions about fishing

23   seasons, and insuring that we have responsible harvests going

24   forward in the future.

25      Further problems with the plaintiffs' proof in this case, and

1    to emphasize the generalization they make about how much of a

2    difference fixing culverts is going to make, can be seen on these

3    slides, the slides that both Tyson Waldo and Brian Benson

4    generated that show all of the different culverts, the state and

5    non-state culverts, that block.

6         This evidence is presented to the Court from the state's view

7    not to blame other landowners or, as Mr. Sledd says, to exculpate

8    the state because somebody else is also bad.  That is not the

9    reason this evidence is presented to the Court.  The reason this

10   type of slide gets presented to the Court is to inform the Court

11   about what is going to be the effectiveness of the remedy ordered

12   by the Court.

13        Courts generally will not order injunctive relief and mandate

14   action to be taken without some certainty about what we are going

15   to get in return.  What we know in this particular case from the

16   evidence presented is there are only 42 streams that are not

17   affected by other culverts, and that there are over 200 instances

18   in which non-state-owned barriers are downstream of the state

19   barriers, and that the overwhelming majority of culverts that

20   exist in the state are not state owned.

21        We don't put this out to blame other landowners, but we put

22   it out to raise the concern to the Court of how is the Court to

23   know, based on the evidence produced from the plaintiffs, what am

24   I going to get if I allow this acceleration to happen, to what

25   purpose is that acceleration actually going to accomplish the

1   goal for which has been set forth.  I submit on the evidence that

2   has been presented, the Court has no way to know what, if

3   anything, is actually going to be produced.

4       The plaintiffs have failed to provide the Court with any

5   specificity necessary to show that they do, in fact, suffer

6   irreparable injury due to culverts in this case.

7       The next factor for the Court to consider in weighing the

8   remedy is the balance of hardships to the parties.  When you say

9   a balance of hardship, that necessarily implies that the Court

10  will weigh on one hand against something else on the other.  So

11  presumably in this case we should be weighing what is the injury

12  to the tribes and what are we going to get if we order the remedy

13  that they ask for, and, on the other hand, what is the cost of

14  that remedy going to be, and am I going to actually get it if I

15  order this remedy to be granted.

16      I would remind the Court that the correction of culverts, I

17  think as I have said in opening, you don't send the maintenance

18  crew out there with a shovel and a bag of sand to fix a culvert

19  in a day.  These are months, if not years, in the planning,

20  permitting, processing to get these sorts of projects done.  They

21  are significant endeavors that have to be engaged in by the

22  state.  The state's rate of correction --  I think Mr. Sledd was

23  erroneous.  The DOT rate of correction that you can see is closer

24  to 14 a year.  And that is just the DOT.  That is not the SRF

25  Board corrections or the DNR corrections.

1        So if the Court is going to consider the balance of interests

2   in this case, what does the Court have on the tribal side of the

3   ledger in terms of what is the injury and what is the return?  As

4   I have presented to the Court, the tribes have nothing but the

5   generalized notion that doing something for salmon must be good,

6   fixing barriers must be good, and a good thing to do.  The state

7   doesn't disagree with that.  That's why we do it.

8        The question here is what evidence was produced to the Court

9   to show that acceleration of that program is going to achieve

10  some benefit that the Court can describe, a measure in some real

11  term beyond that generalization.

12       On the other side of the ledger is the cost.  There is a

13  financial cost.  There is also a systemic cost for the Court to

14  go down this path.

15       Let me talk first about the financial cost.  The state, in

16  presenting its cost numbers -- primarily Jeff Carpenter was the

17  one who knew the most about this, presented on behalf of the

18  state, did not present the Court with 38 random projects.  These

19  projects from this particular exhibit are the next 38 projects to

20  be done.  Paul Wagner testified that these 38 projects are

21  typical of the sorts of projects to happen in the future.

22       When you look at the next 38 projects, the average cost of

23  all of them is $3 million.  If you take out the Chico Creek

24  correction, which is uniquely expensive, the average cost comes

25  back down to 2.3.  The reason we say that it is 2.3, your Honor,

1  rather than the other number, is because, if you look at the

2  testimony of Mr. Carpenter, he described the things that go into

3  this estimate.  The things that go into this estimate include

4  items that are not included in the fish passage report, the

5  historical data cited by the tribes.

6       As Mr. Carpenter explained, the data relied upon by the

7  tribes to reach their number doesn't include professional

8  engineering costs or right-of-way or risk.  The State of

9  Washington is required to include those elements when it presents

10 a budget proposal to the legislature.  It is this sort of

11 document that the state uses when it goes to the legislature to

12 request funding for projects that is utilized, not the historic

13 costs.

14      When you look at the total costs, your Honor, there are 800

15 barriers to be corrected, and Mr. Sledd says that each and every

16 one of them is a breach.  He talks about fixing only 90 percent

17 of them.  I don't know where that comes from.  There is no magic

18 to the 90 percent at all.  They insist that all of them be done.

19 For DOT, that is 800, 1.6 or $1.8 million in costs to do that.

20 And it is not set over any years longer than 20 under the

21 plaintiffs' injunction.  The plaintiffs say at least 90 percent

22 of them must be done within 20 years.

23      And so if you look at the 20-year horizon that the plaintiffs

24 set out and have asked this Court to impose on the DOT for the

25 correction of those barriers, and you look at the $2.3 million

1    average per barrier cost, that turns out to be $184 million per

2    biennium to get that done.

3        Currently the I-4 budget, which is the standalone budget to

4    accomplish this, is budgeted at just under $20 million.  That is

5    $164 million per biennium that this Court would be shifting away

6    from other projects in order to make barrier remediation a

7    priority.  That is a substantial amount of money, your Honor,

8    when you look at what can be done with that sort of funding.

9        The Court is being asked to order that shift of funds with no

10   certainty as to how many salmon are actually going to be

11   produced, what effect that is going to have on the tribal

12   harvest.

13       The final element of cost that I want to talk about is the

14   systemic cost of granting this injunction.  Mr. Sledd noted one

15   of the other sub-proceeding cases in which the Ninth Circuit has

16   noted that things have improved, the relations between state and

17   tribal biologists over the last 20 years have gotten better.  The

18   state and the tribes have shown an ability to work together.  The

19   plans that we have talked about, the plans discussed by

20   Mr. Koenings, the plans, excerpts of which were submitted to this

21   Court, the testimony of Kit Rawson, all talked about state and

22   tribal members working together in a collaborative way on a local

23   level to figure out what each watershed needs, what each species

24   needs in this sort of collaborative environment.  I'm sure there

25   are disagreements about what must be done, but they are working

1   it out, and the plans are coming together.

2       Instead of having a collaborative scientific analysis and

3   decisions about what should be done and in what order they should

4   be done, the plaintiffs are asking this Court to step in and sit

5   at the captain's table of that effort.  It will now be for the

6   Court to decide in what order things must be done, the product of

7   litigation rather than the product of scientific collaboration.

8   This is one of the bottlenecks that Dr. Koenings talked about.

9   It would be inevitable.

10      Once the Court goes down the path of deciding that any

11  downward pressure on salmon reduces abundance and is therefore

12  within my grasp to remedy under the treaty, this Court will be

13  presiding over every impact on salmon.  There is no logical

14  distinction between separating the culverts case from any other

15  downward pressure.

16      The Court, contrary to what the Ninth Circuit has recently

17  talked about, should not be in the position of a permanent

18  federal agency managing fishing.

19      The plans, your Honor, are in place.  The state has been

20  active in working on those plans.  More needs to be done.  More

21  is being done.  The state has been a consistent actor in good

22  faith.  The Court, we would ask, should decline the invitation of

23  the plaintiffs to sit now in perpetuity and decide how the

24  resources ought to be spent.

25      It is not a small thing for this Court to simply brush off

1    and say, well, that really won't happen.  Why wouldn't it happen,

2    your Honor?  Once the Court accepts the abundance theory as the

3    entre into regulating impact on salmon, there is nothing that

4    would be beyond the power of this Court to entertain in order to

5    remedy that.

6         The Court I think has to come to grips with the fact that the

7    treaty is a valuable document, a continuing document, but it is

8    not the solution for every problem posed by modern society.  It

9    is not the vehicle to address problems of abundance and scarcity.

10        The Court should reconsider, we believe, the extent to which

11   it may have bought into the abundance theory, without a showing

12   that an abundance and availability of the tribe to access their

13   share was actually being caused in an unfair manner by state

14   action.  Without that, the Court is simply placing itself at the

15   seat of the center of salmon restoration efforts.  We think that

16   is inappropriate, and the Court should decline that invitation.

17   Thank you.

18             THE COURT:  Counsel, before you step down, I realize

19   that the state's post-trial brief was probably a collaborative

20   effort of several people, yet your signature is the first one

21   that appears on there, so I am assuming you had a good hand in

22   putting this together.  On page 30 of your brief you talk about,

23   in paragraph D, that, "The state should have the opportunity to

24   revise its program before any judicial intervention."  What did

25   you mean by that?

1           MR. TOMISSER:  That is a reflection, your Honor, of the

2     cases that talk about the reluctance that a court would have to

3     simply jump into institutional reform without giving a defendant

4     some idea of what it expected, and allowing that defendant to

5     then see if it could come into compliance without actually having

6     an injunction in place.  It was simply a discussion of that as a

7     possibility that courts have sometimes exercised rather than

8     coming right out and taking control and entering an injunction.

9        The court would essentially set forth its view of what

10    federal law requires, and then give the state some time to come

11    into compliance before actually entering the mandate.  That was

12    the point that was being discussed in that section of the brief.

13          THE COURT:  That's what I thought you meant.  How much

14    time would you consider would be appropriate?

15          MR. TOMISSER:  Since I don't think the Court should be

16    considering an injunction at all --

17          THE COURT:  This is all hypothetical, Mr. Tomisser.

18          MR. TOMISSER:  Apart from hypothetical, I really don't

19    think the Court should be entertaining an injunction.

20       In terms of a time frame, I think what would be appropriate,

21    if the Court was concerned about what is the rate of correction

22    and what is actually being done, what is the effect that we can

23    see, if any, on the harvest.  The Court I think would want to set

24    some sort of a benchmark, collect enough evidence so that the

25    Court could determine more specifically, okay, what is the tribal

1   harvest and what is, in those watersheds where barriers are an

2   issue, creating pressure on the salmon, to what extent do those

3   pressures exist, and what is the pace we can see of fixing those,

4   and then to get a result.

5       Now, I think you would have to turn to the scientists

6   involved and ask them, okay, if we have a particular watershed,

7   and we know there are barrier culverts on that watershed, if we

8   fix them, how quickly should we see results and be able to

9   measure what we are getting?  I think then the Court would have

10  an answer to say, well, okay, that gives me some idea as to how

11  long I would want to wait and see if the plans are working.

12      It is hard to pick an arbitrary number --

13          THE COURT:  I understand.

14          MR. TOMISSER:  -- without the scientists here to say --

15          THE COURT:  Most of them are sitting back there.  I

16  understand.  I guess what I am trying to get a grasp on, are we

17  talking two, three years?  Are we talking a decade?

18          MR. TOMISSER:  It would be my hope --  And now I am

19  happy to guess a little bit here.  In terms of what is the

20  available data that we might have today, so that we don't have to

21  start with a benchmark today, but maybe we could look at some

22  historical information to determine, okay, what was the situation

23  in the past, and then how quickly did I see results from fixes

24  that were made.  Hopefully that data already exists, and so the

25  Court could have an answer to that question fairly quickly, and

1    we wouldn't have to start from scratch and having to go out and

2    make a new assessment.  I think the data that has been collected

3    by the state is pretty robust, and we would probably allow that

4    sort of inquiry to be made, but I am reluctant to promise it off

5    the top of my head.

6              THE COURT:  All right.  Thank you.

7              MR. SLEDD:  By my clock, your Honor, the second game of

8    the doubleheader starts within ten minutes.  I will try to stay

9    within that.

10        I would like to address your Honor's questions to

11   Ms. Tomisser.  In the plaintiffs' view, your Honor, we had a

12   summary judgment that laid out some benchmarks, that said that

13   the culverts violated the treaties.  And we waited three years

14   for the trial.  The purpose of the trial was to come in and show

15   how do we fix them.  What the state came in with was saying, we

16   don't want to do anything different.

17        Where courts have gotten in trouble is where a district court

18   has entered an injunction without bothering to ask and have that

19   hearing.  We have had that hearing.  There is abundant evidence

20   to do exactly what Mr. Tomisser suggested, which is to set some

21   basic guidelines.  That is what we have tried to do in the

22   injunction.

23        Now, if the Court looks at this evidence and thinks, you

24   know, there is a piece here that went too far, let's cut it back,

25   fine.  That is your prerogative as a court in equity.  But to

 1    throw out any issue of guidance to the state now, and simply toss

 2    us to the winds to go out and try to come up with some

 3    integrated, complex plan that will figure out everything to do

 4    about salmon, goes well beyond the scope of this case.  And it

 5    would postpone the vindication of treaty rights that the tribes

 6    have been waiting for for a long time.

 7         We would urge the Court not to go that route, but to enter

 8    some injunction.  And then, as the state has said, their

 9    technical people and the tribal technical people can try and

10    flesh out the details.  We need that skeleton in place.

11         I said I wasn't going to go back and talk about summary

12    judgment.  I can't resist a couple of comments.  There is an

13    awful lot that the treaties do not say.  The treaties don't say

14    you can't put in fish wheels that keep the tribes from getting

15    any harvest.  They don't say you can't put in a fence that keeps

16    them from their fishing places.  They don't say you can't have

17    thousands of non-Indian sport fisherman that monopolize the

18    harvest.  The treaties were not intended to be empty documents.

19    They are intended to be effective permanently.

20         And what the tribes bargained for was not, as the state seems

21    to suggest, the graces of future state salmon recovery law.  They

22    did not bargain for a federal statute at some indefinite point in

23    the future that says we will try not to make these fish extinct.

24    They received very definite and specific promises from Isaac

25    Stevens on treaty grounds across this state that their right to

1   fish would be unimpaired, even if they sold their land; they

2   could continue to fish, as they had before, forever.

3       The treaty has others purposes as well.  The fisheries have

4   to be shared with non-Indians.  There is a clear expectation that

5   the state would be opened up to non-Indian settlement.  That's

6   why Stevens was there.  But just because the treaties didn't

7   anticipate every possible complication, does not mean a court has

8   no role and the treaty has no role in trying to reach

9   accomodation and adjustment which the Supreme Court referred to

10  in Winans, the very first of these disputes to get before the

11  Court.

12      There were no black and white rules laid out.  It was a tough

13  job that equity courts get paid to do, try and balance those

14  interests.  And to balance them in light of the purpose of the

15  treaties, and to balance them, as the law says, with a full

16  understanding of the way that the tribes would have understood

17  the treaty promise.

18      And when the state says that the only thing the treaty

19  promised was they will get treated fairly, that if the state

20  destroys all the fish, it will destroy them for everybody, that

21  is not the treaty promise.  That is not what the tribes would

22  have understood on the treaty grounds.

23      This treaty does more than just prevent discrimination.  It

24  does more than just say that the ESA will protect you at some

25  point in the future.  The tribes bargained for one promise.  It

1   is in that treaty.  And they bargained for it to be enforceable.

2       With regard to the state's recalcitrance or reluctance or

3   leadership or bad faith, there is no case the parties have cited

4   that said that bad faith is an element of getting injunctive

5   relief.  There is a four-part test that is familiar to all of us.

6   The tribes and plaintiffs believe we have shown all four parts of

7   those clearly.  If there had been bad faith, I can tell you we

8   would be asking for a lot more in terms of detail on this

9   injunction.

10      Rather than go through again the whole argument of is it bad

11  faith, is it recalcitrance, let deeds speak louder than words.

12  Look at what has actually happened on the ground, at the

13  magnitude of this problem and at how long it will persist.  And

14  that's what demands injunctive relief.

15      Again, with regard to recovery plans, where is the Coho plan?

16  We have a Chinook plan for Puget Sound.  Where is the coastal

17  salmon recovery plan to help Mr. Johnstone, who talked about the

18  loss of the fish that he grew up fishing for?  There aren't any.

19      And, yes, there are some sub-basins that have a slightly more

20  developed plan than others.  Mr. Rawson, I believe, actually

21  testified to the Snohomish sub-basin plan that Mr. Tomisser

22  mentioned.  They need to be everywhere before anyone can actually

23  say, do this before that before the other.

24      In the absence of that, I fall back on that first principle

25  that Mr. Wasserman said, more habitat would help the fish, and

1   the first principle that Dr. Roni said, which is, if we don't

2   have these detailed plans, the first thing to do is open up the

3   habitat.

4        I want to respond briefly to this graph issue.  I will try my

5   freehand here.  We will see what happens.  I think the graph that

6   Mr. Tomisser showed of the tribal harvest was something like

7   that.  He said, well, you know what, the culverts were all in

8   here before, they were over on the left side of this, so how come

9   the harvest is going up when the culverts are already there.

10  Well, you know what, the culverts were there, a lot of them,

11  before.  A lot of them have been wearing out and becoming

12  barriers as time goes on.  But if there were no culverts, doesn't

13  it make sense that that's what we would see?

14       What has happened is that the culverts that have been there

15  forever have lowered the baseline.  And all these other

16  fluctuations, in this case the upward pressure here, because the

17  tribes are gearing up after the Boldt decision, it is

18  superimposed on the ones already at a depressed level of fish.

19       This is a red herring to say, oh, my gosh, we put the

20  culverts in 50 years ago and you're talking about a diminished

21  harvest today.  The point of the diminished harvest today is

22  things are bad, they have been bad a long time and they are

23  getting worse, and it is time to act.

24       The state says, your Honor, there is no evidence that

25  accelerating correction will actually benefit things.  I would

1    direct the Court's attention to one exhibit, AT-095, prepared by

2    the very program of the Department of Fisheries that fixes

3    culverts, the SHEAR program -- that used to fix culverts.  What

4    it says is, "The benefits are directly proportional to the number

5    corrected each year."  That is not rocket science.  And it is in

6    there.

7        I am not going to try to do the math.  I suppose I could, but

8    if your Honor will do the arithmetic, him or herself, with regard

9    to the number of culverts fixed, 225 tried by the state, a number

10   of them that are not successful, 176 left, and that's since 1991.

11   Do the math.  It works out to about six and a half a year.  And

12   we have over a century still to go.

13       So absent questions from the Court, that's all I wanted to

14   say at the moment.

15           THE COURT:  Thank you, Mr. Sledd.  Counsel, I know we

16   have another argument scheduled for this afternoon, another

17   sub-proceeding here, another issue that has come up regarding the

18   halibut fishery.  There is no doubt, I think, that all parties to

19   this case wish for the same end result, more salmon in the

20   future.  The disagreement obviously is how to get there.

21       There is also no doubt this case highlights just how complex

22   the problem is.  And perhaps more accurately stated, how complex

23   the solution may be.  And here we are only talking about culverts

24   and one of the Hs of the four Hs that all of the experts

25   discussed.  And, of course, I am only referring to the factual

1   issues, not the myriad of legal issues that arise when a court is

2   asked to basically impose an extraordinary remedy, which is

3   injunctive relief, ordering the state to take specific actions

4   within a very specific time.

5      I think everyone who ever practices in court understands that

6   litigation always has inherent built-in limitations.  And

7   cooperative collaborative effort by all stakeholders always makes

8   greater sense.  However, sometimes there is no other resort, and

9   that's when courts must step in, albeit reluctantly, when we do

10   so.

11      There has been a lot of evidence produced in this particular

12   case, a lot of material for the Court to consider, and I will

13   take a careful look at it.  I will try to get you a ruling as

14   quickly as we can.  Thank you all very much.  We will be in

15   recess.

16   (At this time a short break was taken.)

17            (Sub-proceeding 91-1)

18        THE CLERK:  We are back on the record in sub-proceeding

19   91-1.  Will counsel please make their appearances for the record?

20        MS. RASMUSSEN:  May it please the Court, my name is

21   Lauren Rasmussen for the Jamestown Clallam Tribe.

22        THE COURT:  Now you are all by yourself over there.

23        MS. RASMUSSEN:  There isn't co-counsel here.

24        MR. BERLEY:  Your Honor, Richard Berley for the Makah

25   Tribe.  With me is Brian Gruber.

1          MR. RAAS:  Good afternoon to the Court.  Dan Raas from

2   the Lummi Nation.  With me is Ms. Mary Neil.

3          MR. MORISSET:  May it please the Court, Mason Morisset

4   for the Tulalip Tribes.

5          MR. LYON:  Good afternoon, your Honor.  Kevin Lyon with

6   the Squaxin Island Tribe.

7          MR. STILTNER:  Sam Stiltner with the Puyallup Tribe.

8          MS. HANSEN:  Good afternoon again, your Honor.  Michelle

9   Hansen for the Suquamish.

10          MR. LEWIS:  Good afternoon, your Honor.  Yale Lewis,

11   co-counsel for the Quileute.

12          MS. KRUEGER:  Good afternoon, your Honor.  Katherine

13   Krueger, co-counsel for the Quileute Tribe.

14          MS. FOSTER:  Good afternoon, your Honor.  Alix Foster

15   for the Swinomish Indian Tribal Community.

16          MR. STAY:  Hello again, your Honor.  Alan Stay for the

17   Muckleshoot Tribe.  We are just here observing today.

18          MR. REICH:  Richard Reich with the Muckleshoot Tribe.

19   As Mr. Stay said, we are just observing.

20          MR. DORSAY:  Craig Dorsay for the Hoh Tribe, your Honor.

21          THE COURT:  Anyone else?  Ms. Rasmussen, it is your

22   motion.

23          MS. RASMUSSEN:  We are here today to ask this Court to

24   hold the Makah in contempt for its violation of the 2010 halibut

25   management plan.  As the Court well knows, this is the third

1    round of motions before the Court this year, starting off with

2    the Makah's motion to clarify which plan was the status quo,

3    which resulted in your Honor's order clarifying that the 2000

4    plan was to be the status quo for the fishery, a motion by myself

5    two days before the fishery starts, trying to clarify what indeed

6    it meant to update the plan to current conditions.  And I filed

7    this motion because this year the plan, for the first time ever,

8    yielded a 14 or 15-day fishery, when the objective of the plan is

9    a 30-day fishery.  And that has never happened before.  And this

10   is the first time we have had a plan in recent years that we knew

11   we could have your Honor's help in enforcing.

12          THE COURT:  Ms. Rasmussen, I have a question.  You said

13   "the objective."  Isn't it just one of the objectives?

14          MS. RASMUSSEN:  Yes, your Honor.  I will turn your

15   attention to the 2010 management plan.  The plan starts with

16   listing the parties, and then it has the statement objective,

17   singular, to fully harvest the 2010 tribal commercial TAC, which

18   is the total allowable catch allotted to the tribes, while

19   providing a 30-day fishery beginning March 6th.

20       The structure of the plan has but one sole objective.  In

21   order to demand -- request contempt, we must show that both the

22   Makah violated a clear order of the Court and that they failed to

23   take all reasonable steps to comply with the order.

24       As I said before, the fishery resulted in a 14 or 15-day

25   fishery for the first time ever.  And the reason for this is the

1   Makah opened a second unrestricted fishery on March 20th, 15 days

2   in advance.

3       Under the provisions for the restricted fishery, which are in

4   front of your Honor, a party can only open a second unrestricted

5   fishery if the catch is radically less.  And it says

6   75,000 pounds.  Then the unrestricted fishery may be open for a

7   modest additional period of time.

8       This year the first 48-hour period of the unrestricted

9   fishery caught 119,000 pounds.  It was not radically less than

10  100,000 -- than 75,000 pounds, and, therefore, the second

11  unrestricted fishery was a violation of the plan.

12      Now, the Makah, in attempting to avoid this particular

13  provision, tries to characterize the second unrestricted opening

14  as a mop up.  They argue that the mop up is a third required

15  sub-fishery of this plan.

16      But, again, if we go to the plan's provisions, we have a

17  structure.  I think of the structure of the plan as -- the

18  objective is the table top and the legs are how the table is

19  going to stay standing.  And here we have the mop up fishery,

20  which is allotted essentially whatever is remaining after the

21  unrestricted fishery.  The amount allotted to the mop up fishery

22  is 84,000 pounds.  It is a management buffer.  It is what they

23  use repeatedly in management plans to protect the fishery

24  structure from going over the total allowable catch.  They did

25  not allocate all the fish.  The unrestricted fishery and the

1    restricted fishery amounts add up to less than 250,000 pounds.

2    There is 84,000 pounds of protective mechanism in case either of

3    the two fisheries go over.

4         THE COURT:  Counsel, let me ask you a much more basic

5    question.  I want to make sure I understand this.  What is more

6    important, to harvest the total allowable catch or to fish for 30

7    days?

8         MS. RASMUSSEN:  In some ways I don't understand your

9    question, because the point of the plan was to fish for 30 days

10   and make the TAC last that long.  It is both.  If we go back to

11   the reason the S'Klallam brought the sub-proceeding, it is

12   providing a minimum amount of time which would allow parties to

13   get out, gear up for the fishery, find the fish and bring them

14   home.  And that's why we negotiated to have this provision be the

15   objective of the plan, which is to provide that minimum

16   opportunity for the small fleets of the S'Klallams to get out

17   there, not be barred by two days of bad weather, actually get out

18   there and get a chance to go fishing.

19        The reason it is spoken of in terms of opportunity is because

20   my clients firmly believe you have the right to go out and try,

21   but if you don't catch --  You are not guaranteed --  There is no

22   entitlement.

23        One of the differences of opinion we often have with the

24   Makah is because they have been fishing this fishery for a really

25   long time.  It has been going well for them for a really long

1    time.   It has been hard for them to make room for other folks.

2    We don't want to take their share, we just want a chance to fish

3    alongside them.   And so we negotiated this plan with this sole

4    objective.

5        One of the things that gets lost in this interpretation that

6    you see in front of the Court, starting in 2000, what is the

7    status quo, what does status quo mean, so on and so forth, I

8    think its loss is the good faith requirement in the Court's

9    order, the faithfulness to the agreed-upon common purpose and the

10   consistency with the justified expectations of the party.

11       So when you see the provisions of the plan, and you see that

12   there is one objective, and it is the 30-day fishery, and you see

13   that, okay, you could probably if you had a good lawyer find a

14   way to wiggle out from under this or excuse what you did and open

15   the fishery early.   You are not allowed to do that under the

16   restatement second comment A, "Faithfulness to the agreed-upon

17   purpose and consistency with the justified expectations of the

18   parties."

19       I ask you --  When I look at the plan, and I ask myself the

20   question, what is the common purpose of the 2010 halibut plan, I

21   see one objective.   Paragraph 2 of the agreement says, "To fully

22   harvest the TAC while providing the 30-day fishery."   And the

23   rest of it is the structure for how we are going to protect the

24   restricted fishery from getting eaten up by the unrestricted

25   fishery, because the unrestricted fishery is fast, hard to

1   control, everybody goes out and harvests as much as they can in a

2   short period of time.  And so all these management limits are

3   intended to protect the restricted fishery from getting eaten up

4   from the competing demands of the unrestricted fishery and

5   provide this important opportunity for the smaller fleet.

6        This case was not brought by Makah to protect their

7   unrestricted fishery.  This case was brought by the S'Klallam to

8   protect their opportunity to get out there and not be cut off, or

9   preempted, or have the fishery closed before their single boat

10  gets out on the water.

11       I come back to that because, in the discussions that occurred

12  this year, there was this movement to try to manipulate the plan,

13  but there was nobody who said, you know what --  Actually there

14  was one person.  There was one person that said -- when there was

15  an argument about the plan and how it should be interpreted,

16  somebody said, you know, I shouldn't have to look to a

17  declaration to know what the plan means.  I should be able to

18  look at the plan and know what I'm supposed to do and what I am

19  not supposed to do.  And when I look at the plan, it is very

20  clear to me that you cannot -- that April 5th is not March 20th.

21       And when you were faced with that problem, that you reached

22  the range of the restricted fishing early --  In fact, the

23  evidence before you is that all the parties went over the range

24  of the restricted fishery by 16,000 pounds before anybody closed.

25  You couldn't just do your own thing.  You couldn't just go out

1   there and open the second unrestricted early without the

2   consensus of everybody else.

3        And this is the same problem that has happened for years in

4   this fishery.  I think it comes from a feeling of entitlement.  I

5   am not here to psychoanalyze everybody, but when you come into

6   the fishery and you think you can manage it without everybody's

7   consensus --  You see the 2009 objection that the S'Klallam made

8   to the Makah.  We said, hey, you can't do that.  The 2000 plan

9   was really the last one that was adopted by consensus.  You see

10  the letter back from Brian Gruber, no, we have seven of the 13

11  participating tribes; we can go forward without you; you are

12  de minimus.  That is the attitude that permeated last year.  It

13  is permeating the interpretations this year, which is, if we can

14  get a few people to go along with us, people that find this

15  fishery beneficial to them, or for whatever reason adhere to this

16  particular interpretation of the plan, then that's okay.  And it

17  is not okay.

18       When I come back to the plan itself, even under the Makah's

19  interpretation, where it tries to characterize this opening as a

20  mop up, you will see the provision I underlined.  It says the mop

21  up cannot even be discussed until April 5th, which is the end of

22  the 30-day restricted.  At that point, you are supposed to

23  discuss management options and agree to a management plan for the

24  remaining portion of the tribal commercial TAC.  So even when you

25  open a mop up, you have to have agreement.  You can't just go do

1    your own thing.

2        This language also further counters Makah's argument that the

3    mop up is a required third sub-fishery that should be allowed to

4    frustrate the objective of the plan, that protecting this

5    84,000 pounds should be equal to protecting the 30 days.

6        If you read the plan consistent with the common purpose, you

7    really have to let -- you would be letting the whole plan be

8    frustrated by your interpretation.  And I believe under the law

9    you are not allowed to do that.  You are not allowed to do that.

10   And when they opened the fishery on March 20th, it was a

11   violation of the plan.

12       Now, there is a couple of reasons they have given for why

13   they had to open the unrestricted fishery.  They don't deny they

14   opened the unrestricted fishery on March 20th.  They don't deny

15   at that point we had been way into the restricted catch.  They

16   say the reason they had to open this fishery early --  These are

17   their reasonable steps they took to comply.  One was the issue

18   that we have addressed already, that the mop up is a required

19   third sub-fishery.  You see they tried to get away from the

20   terminology mop up and called it a sub-fishery, because mop up is

21   the management buffer.  It is harvesting whatever remains.

22       They say that we elevated the restricted fishery to the

23   objective.  We didn't elevate it, the plan elevates it.  It is

24   the 30 days.  Everything turns around that 30 days in trying to

25   hold it up.

1      They say they had to open the unrestricted fishery because we

2   continued on March 17th to fish on March 18th and March 19th, and

3   then they all reopened again an unrestricted fishery on

4   March 20th.

5      So, again, we were fishing with management limits.

6      This is the do-as-I-say-not-as-I-do defense.  They harvested

7   themselves way into that expected range.  We were 16,000 pounds

8   over when they said, well, now we don't want to do that anymore;

9   we want to do the unrestricted fishery, and we want to take

10  whatever is left and just go fishing.  That is not proper.  That

11  is not a correct interpretation of the plan.  Again, consistent

12  with the agreed-upon common purpose and the justified

13  expectations of the party.

14     The S'Klallam and the S'Klallam fishermen, whose declarations

15  I put before you, had justified expectations that 30 days meant

16  30 days.  If there is some way this plan can be interpreted so 30

17  days doesn't mean 30 days, then we have a problem.  To me and to

18  the fishermen, that doesn't seem right.

19     Now, the last thing that they come forward with, and they may

20  have something else to say after I sit down, is, look, your

21  Honor, we made this proposal, we made this 250-pound per fisher

22  with two landings per week proposal.  The S'Klallam, they ignored

23  us.  They weren't really willing to manage this restricted

24  fishery.

25     I want it to be crystal clear, that a 250-pound limit with

1   two landings per week is a two-weekday per week fishery.  A

2   landing is when the boat comes into the dock.  And the small

3   boats come into the dock every day.

4       It is like giving somebody a job for a month and having them

5   come in for two days.  And you say, well, I am not in breach of

6   your contract because I gave you work on the first day of the

7   month and I gave you work on the last day of the month, and,

8   therefore, I employed you for a month.  Well, that is not -- that

9   wouldn't be 30 days of employment, and this is not 30 days of

10  fishing that their proposal was meant to achieve.  Their proposal

11  was meant to reduce the fishery to essentially two days.  And it

12  wasn't a reasonable proposal and attempt to achieve the common

13  purpose.

14      I respectfully request that, although it is an extraordinary

15  measure, this Court hold the Makah accountable.  Any other lack

16  of clear response to a violation of an order, even if it is just

17  for one more year, is a win.  If anything less than saying, you

18  know, it is not okay to do this, this is a wrong on the

19  S'Klallam, and the S'Klallam came before this Court and we asked,

20  please don't let this plan be breached, please protect us.

21  Perhaps it wasn't right, perhaps it hadn't happened yet, perhaps

22  it was convincing that our claims were hypothetical and there was

23  a lack of support.  But we tried.  We tried to stop it.  And

24  nobody wanted to do anything.

25      We ask this Court to take clear guidance, to enforce the

1    plan, and really get back to what the court said in

2    sub-proceeding 80-1, which is, between sovereigns it is

3    especially important to enforce their obligations.

4        As the Suquamish just filed in their joint status report,

5    there is 360-day, by their count, and I haven't counted myself,

6    types of agreements filed with the Court.  And if you don't

7    require parties to adhere to the plans and fulfill the justified

8    expectations of the parties, then a wrong is committed.  Thank

9    you.

10           THE COURT:  Counsel, before you step down, let me ask

11   you a couple of questions.  I am having a little bit of a problem

12   understanding this.  You have X amount of fish, you have Y amount

13   of fishermen, in terms of your plan and your proposal.  And I

14   understand fully well from reading your materials how important

15   it is to your clients to have that 30-day period of time to go

16   out there and fish.  Is there no room for adjustment if the

17   amount allocated to the fishery is reached sooner than the 30

18   days?  What if there is one halibut out there?

19           MS. RASMUSSEN:  If there is one halibut out there, then

20   obviously we can't fish for 30 days.  We don't have one halibut,

21   we have 251,000 halibut.  In 2000, when this plan was adopted,

22   there was 300,000 halibut.  And we got 60 days out of the

23   fishery, from just the restricted fishery alone.

24       I don't know if we are at the point yet where we can surmise

25   what we would do if the catch dwindled to a small fraction of

1    what it is today.  But right now, there is a way to get 30 days

2    out of the 250,000 pounds.  And we didn't get it because of the

3    illegal, unrestricted, free-for-all fishery that was opened

4    instead.

5            THE COURT:  But if everybody has scaled down their catch

6    limit per day, wouldn't that give you your 30 days?

7            MS. RASMUSSEN:  I guess I am not understanding what you

8    are proposing.

9            THE COURT:  Again, we get back to this so many fish, so

10   many fishermen, right?

11           MS. RASMUSSEN:  Yes.

12           THE COURT:  So once you determine how many fish there

13   are, then you can figure out how many can be caught per day by

14   fishermen.

15           MS. RASMUSSEN:  Yes.

16           THE COURT:  So if you scaled down the amount of fish you

17   are allowed to catch per day in an agreement, that would give you

18   your 30 days to fish, correct?

19           MS. RASMUSSEN:  Yes.  Where the difference of opinion

20   lies is how many fish we have to work with.  Under the Makah

21   interpretation of the plan, the expected catch range is a hard

22   cap at 48,000 pounds.  Therefore, the management buffer, in their

23   view, is only to be used to buffer the unrestricted fishery, it

24   is not to be used to buffer the restricted fishery.  That is

25   where the rubber hits the pavement.  That's where their

1   interpretation of the plan is being used to destroy the common

2   purpose.

3             THE COURT:  All right.  What about the Makah's assertion

4   that the S'Klallam Tribes had their best catch ever?  Jamestown

5   S'Klallam, best catch in 20 years for Port Gamble.

6             MS. RASMUSSEN:  It is a nice fact, but it is not

7   relevant to the question of whether the Makah violated the plan.

8   They would have had an even better year if they had gotten their

9   30 days that was promised to them.  When you and I have a

10  contract, just because I happen to make a lot of money somewhere

11  else or do well, that is not the relevant point.  The point is

12  the promise.  The promise would have gotten my clients a whole

13  lot more than they did get.

14      And the 30-day opportunity is interesting to folks in the

15  fishery --  I provided some declarations of fishermen that

16  said --  The Port Gamble fishermen are actually going to get out

17  there for the first time in a long time.  The thing that has been

18  holding them back is just knowing that they can get out there.

19  And also, you know, being squeezed in other fisheries.  Not to

20  argue the culvert case while folks are gone, but being squeezed

21  in the other fisheries puts more pressure between tribes.

22      A lot of folks don't like to have intertribal disputes.  And

23  I don't like them either.  But when you are squeezed on all

24  levels, and then you are sharing the 250,000 pounds, there is

25  going to be tensions.  And we would love to be able to resolve

1    these tensions, but the culture of this fishery has been this era

2    of entitlement and tyranny of the majority.

3            THE COURT:  Thanks, Ms. Rasmussen.

4            MR. BERLEY:  Good afternoon, your Honor.  I am Richard

5    Berley for the Makah.  We do have the chairman of the tribe here,

6    Michael Lawrence.  We have several elected officials of the tribe

7    here, councilmen.  We have the fisheries director of the Makah

8    Tribe here.  There are a lot of people that are interested.

9        As you have heard, your Honor, we have a tremendous

10   difference of opinion with the S'Klallams about the meaning of

11   the 2000 plan.  It is not just Makah.  Most of the halibut tribes

12   have a tremendous difference of opinion about the interpretation

13   of the plan.

14       We have a court opinion in this case from 2001 which

15   interprets this plan.  And it is at odds with the S'Klallam's

16   interpretation of the case.  It is the law of the case, and the

17   S'Klallam don't even mention it.

18       The 2000 plan itself calls for three sub-fisheries.  It is

19   very clear on this point.  It doesn't emphasize one over the

20   other.  Each sub-fishery has an associated sub-quota.  All three

21   are important in different ways to different tribes.  All three

22   must be protected.

23       The Court's 2001 order by Judge Rothstein provides the

24   clearest explanation of the purposes and administration of the

25   plan.  And it is inconsistent with the S'Klallam's position.

1    The S'Klallams look at one term of one sub-fishery and say it

2    trumps everything else.  They ignore the other two sub-fisheries.

3    And even as to the restricted sub-fishery, the one they care

4    about, they ignore all other terms, as you have heard just now,

5    except for the 30-day time period within which the restricted

6    fishery is supposed to be managed.  But the restricted

7    sub-fishery does have a sub-quota, and it has to be managed for

8    it.  The only way to manage for it is through cooperation among

9    the tribes.  And the plan explicitly calls for that.

10    The S'Klallams have tried to change the restricted fishery

11    sub-quota in their last motion to clarify.  They failed to do

12    that.  The restricted fishery sub-quota remains at 15 to

13    20 percent -- 15 to 19 percent, in that range.  That sub-quota

14    was taken.  The restricted sub-fishery took its full sub-quota in

15    less than 30 days this year.  It took it in 15 days.

16    For the restricted fishery to last 30 days, you have to

17    manage for it.  You have to take management measures.  The main

18    one that is set forth in the plan is to reduce the daily vessel

19    trip limits.  500 pounds per vessel per day just won't work with

20    a low TAC year.  The tribes can, they did, and they predictably

21    will take 11- to 12,000 pounds per day in the restricted fishery

22    in good weather.

23    The Makah and others pointed out in intertribal meetings,

24    both before and during the fishery, if the restricted sub-fishery

25    would be maintained within its quota, there would have to be

1  management measures, and there would have to be reductions to the

2  trip limits in this fishery.  The S'Klallams rejected any

3  reductions whatsoever, until the restricted sub-quota was

4  overtaken.  The high end of the restricted sub-quota range was

5  48,000, and they rejected any reduction in the daily vessel trip

6  limit until the catch was at least 61,000, and probably more,

7  because fish came in, and were reported several days later.

8      In the Makah's view, the S'Klallams violated the plan.  They

9  violated the plan by continuing to fish after the restricted

10  sub-quota was taken, and they violated the plan by refusing to

11  agree to vessel trip limits as required by the plan to protect

12  the 30-day sub-fishery.  They failed to cooperate, in other

13  words.  Cooperation is necessary -- is a necessary element to

14  this plan.

15      The S'Klallams argument that the 30-day term trumps

16  everything else in the plan, including that fishery's own

17  sub-quota, has no basis in the plan itself.  It has no basis in

18  how the fishery was managed between 2000 and 2003, when the 2000

19  plan was in effect, or in any court order interpreting the plan.

20  Their position was rejected.

21      Once the Court's minute order came out on March 5th, it was

22  clear that the only adjustments to the 2000 plan were in the

23  international opening date and in the total quota for the entire

24  fishery.  The 2000 plan's sub-quota formulas were maintained and

25  the 2000 plan's requirement of continued cooperation so the

 1    restricted sub-fishery could be open for 30 days was also

 2    maintained.

 3        Now, this tyranny of the majority, that is an interesting way

 4    to put it.  Unlike the S'Klallams, the Makahs actually tried to

 5    work with other tribes.  Unlike the S'Klallams, the Makahs did

 6    not work alone.  They worked diligently with other tribes.  It

 7    tried to forge a consensus.  It tried to make something work.  It

 8    proposed management reductions to protect the 30 days.  The

 9    S'Klallams would not move an inch.  They wouldn't close their

10    restricted fishery when it was taken, they just kept fishing,

11    even after the sub-quota was taken.  They wouldn't even stop

12    fishing so the tribes could come to court.

13        The Makah didn't act unilaterally.  The other tribes can

14    speak for themselves, but they viewed the S'Klallam position at

15    the time as outrageous as well.  Seven tribes viewed it that way

16    and decided to open a 12-hour unrestricted opening as part of the

17    third fishery.

18        In hindsight, the Makah was most successful, so now the

19    S'Klallam are trying as a tactic to isolate the late Makah.  But

20    the Makahs actually worked with other tribes, and the S'Kallams

21    did not.  It is mandatory under the plan to work with the other

22    tribes.

23        The S'Klallams characterize themselves as having a small

24    fishery.  They had an all-time success this year by any measure.

25    They have never pointed it out.  It was the coastal tribes that

1   were hurt this year.  The Makah was hurt.  The Quinault were

2   hurt.  The Quileute were hurt.

3       In our view, the S'Klallams have had some success distorting

4   the fishery.  They succeeded in getting out of their 2004 and

5   2006 agreements.  They persuaded the Court that the 2000 plan was

6   the status quo.  But the 2000 plan, when it was in effect,

7   between 2000 and 2003, wasn't particularly good for the

8   S'Klallams.  They didn't do well under it.  So immediately after

9   getting the 2000 plan adopted as the status quo, they tried to

10  change it.  They tried to change the sub-quotas under the plan.

11  The Court rejected this, this bootstrapping, in its March 5th

12  minute order, but the S'Klallam continue to reject those

13  sub-quotas, and they reject them today.  They continue to ignore

14  or reject every feature of the plan that isn't convenient for

15  them.

16      We think that the S'Klallam have misinterpreted and violated

17  the plan.  At a minimum, it is obvious from the lengthy

18  declarations that there was a serious disagreement about

19  interpreting the 2000 plan, even after the Court's minute order.

20      At most, giving the S'Klallams' argument more credit than we

21  think they deserve, it can be argued that the plan doesn't

22  explicitly address what happens if the full restricted sub-quota

23  is taken in less than 30 days.

24      This ambiguity in the plan, if that's what it is, was not

25  resolved by the Court's minute order.  And the S'Klallam

1    explicitly acknowledge this in their briefing in footnote 3 of

2    their reply.  And this fact alone is enough to defeat their

3    motion.

4        The legal standard for contempt is very high.  We haven't

5    really heard that standard from the S'Klallam.  It is a drastic

6    remedy.  It has never been imposed in this case in any

7    intertribal disputes.  And we have been having intertribal

8    disputes for almost the 40-year history of this case.  The

9    S'Klallam barely articulate that standard.  They must show by

10   clear and convincing evidence that the Makah clearly,

11   specifically, unequivocally violated a court order.  There is

12   nothing remotely like that here.

13       Unfortunately, we don't have a particularly specific decree

14   here.  Specificity is required if the punishment of contempt is

15   going to be imposed.  A disagreement about the meaning of a

16   decree is not contempt.  There can't be contempt if there is a

17   good faith effort to comply with the Court's decree, which the

18   Makah tried to do in this case.

19       There were some other incorrect statements made by the

20   S'Klallams.  First, there was no way this fishery was going to

21   last another 15 days if the people did what the S'Klallams wanted

22   to do.  The numbers they put out are based on them fishing by

23   themselves.

24       If they went out to fish, and if --  No one else was going to

25   remain in port.  Everyone was going to come out.  And if the

1    reduction from 500 pounds to 350, after the full sub-quota of the

2    restricted fishery was already taken, it would have done nothing

3    to protect the TAC.  The average take per vessel per day in the

4    landings in the restricted fishery -- in the landing zone

5    restricted fishery were approximately 250 to 300 pounds a day.

6    So it was meaningless.  Other tribes would have gone out and

7    fished out the rest of the quota in a few days anyway.

8         The majority of the tribes, after consultation, including

9    consultation with the S'Klallam, after the S'Klallam refused to

10   close their fishery, scheduled a 12-hour unrestricted opening,

11   because the continuation of the restricted fishery after their

12   sub-quota was taken threatened to preempt the rest of the

13   fishery.  The tribes were concerned that continuing to allow

14   fishing along that line would preempt the third sub-fishery

15   completely.

16        The 2010 TAC was slow.  That made for a rough year, a

17   difficult year for the halibut tribes to manage.  But difficulty

18   managing a fishery isn't contempt.

19        We have a minute order here that obviously doesn't answer all

20   the questions about how to interpret the 2000 plan.  The tribes

21   may need additional guidance.  The tribes may have to try to

22   renegotiate a management plan that is easier to manage with the

23   help of a settlement judge, as your Honor suggested in your last

24   order.  But these issues should be addressed in a proceeding

25   where all the tribes can participate fully and not in a contempt

1    proceeding like this.

2        We respectfully ask that the motion be denied.

3            THE COURT:  Thank you.  Ms. Rasmussen, anything further?

4            MS. RASMUSSEN:  There is always wiggle room.  There is

5    always going to be the opportunity to come to this Court and say,

6    well, gee whiz, your Honor, I couldn't figure out how to comply,

7    we were stuck, we did what we thought was reasonable.  March 20th

8    is not April 5th, 15 days is not 30.  The good faith

9    interpretation of the plan required the parties to sit down

10   before the start of the fishery, as the S'Klallam urged in their

11   letter and their e-mail, and try to figure out how to make it

12   work.  Coming in 14 days into the fishery and saying, oh, too

13   bad, so sad, you can't get your 30 days, is not compliance with

14   the plan.

15       If you look at all the years that the plan was in place, you

16   will see that never was the plan ever this short.  Never did it

17   close prior to the 30 days.  Never was it interpreted the

18   expected catch range for the restricted fishery as a hard cap

19   could be used to frustrate the purposes of the plan.

20       And all the other things that the Makah argues have to do

21   with that difference of opinion:  Are you allowed to do that?

22   Are you allowed to say that the unrestricted fishery can fully

23   and freely use the management buffer, but the restricted fishery

24   is not allowed to do so, even though it is the unrestricted

25   fishery that has the language that says it shall be managed to

1  not exceed this amount?  Again, interpretation with the goal --

2  the common purpose of the plan would require no more attempts to

3  game the system.

4      It is really hard to sit here and hear about how the Makah

5  tried to achieve consensus, when on a repeated basis -- in 2009,

6  you see it in black and white, seven out of 13 tribes is good

7  enough, has been the permeating attitude in this fishery based on

8  the entitlement.

9      Normally I would say a good faith proposal to enter into

10  settlement discussions would be a wonderful thing.  But often

11  what has been happening is it is the party that wants to continue

12  to do what it is doing, that wants to propose further settlement

13  discussion as a way to avoiding the repercussions of their

14  actions.  And any wiggle room or equivocation on enforcing the

15  terms of the plan, even if you were to choose to enforce it

16  against us, your Honor, would be unacceptable.  The parties need

17  to get the clear message that just because a bunch of people

18  agree with you does not relieve you of your obligations.

19      We ask this Court to hold the Makah in contempt and to

20  enforce the provisions of the plan.

21      THE COURT:  Thank you, counsel.  The motion before the

22  Court is a request the Court hold the Makah in contempt, order

23  them to pay reasonable attorney fees necessary to bring this

24  action and any other just and equitable relief.

25      After reading through all of this, there is no doubt in my

1    mind there is a serious disagreement with the interpretation and

2    implementation of this plan.  Whether it does have built-in

3    ambiguity or not, it is obvious that nobody agrees exactly what

4    it means.

5         There are only so many fish out there, there are so many

6    fishermen.  There are different parts to the agreement, the

7    restricted fishery, the unrestricted fishery, the mop up, the

8    30-day plan.  All of those parts are important, in my opinion.

9    But I do agree that the only way to manage this is through the

10   cooperation of all the tribes.  That is why the Court has set up

11   a process for everyone to get together and, if necessary, with

12   the help of a judge, and iron out all of these issues.

13        In terms of the actual motion before the Court today, the

14   legal standard for contempt has not been met here.  Procedurally

15   there are severe hurdles in the way, as pointed out by Mr. Raas's

16   brief.  On the merits, there are issues that prohibit the Court

17   from reaching that conclusion as well.

18        It is obvious that everyone is frustrated, and I urge all of

19   you to think about how we handle this before the next season

20   comes up.

21        For now, the motion holding the Makah in contempt will be

22   denied.  All parties will bear their own costs.  Thank you.  We

23   will be at recess.

24                        (Adjourned.)

25

1                              CERTIFICATE

2

3

4

5

6

7

8

         I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25