UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATE OF AMERICA, et. al.,

      Plaintiffs,

      v.

STATE OF WASHINGTON, ET AL.,

      Defendants.

CASE NO. C70-9213 RSM

SUBPROCEEDING 89-3-07

ORDER REGARDING DISPUTE
RESOLUTION

      The State of Washington filed a request for dispute resolution under section 9 of the Shellfish Implementation Plan (SIP) to resolve a dispute between the State and the Squaxin Island Tribe regarding proposed leases of state land for private aquaculture activity.

      In response to the State's request for dispute resolution, United States District Judge Ricardo Martinez referred this subproceeding to the undersigned magistrate judge to hear and determine the dispute pursuant to Paragraphs 9.1.1 and 9.2 of the Shellfish Implementation Plan.

      The parties were given an opportunity to brief the issues and a hearing was conducted on October 14, 2011 before the undersigned judge.

1                              **FACTS LEADING TO THE DISPUTE**

2              The parties before the Court include the State of Washington, the Squaxin Island Tribe

3    and three commercial shellfish companies, Arcadia Point Seafood, Seattle Shellfish LLC and

4    Taylor Shellfish Company, Inc. (collectively, the "Growers").

5              The Growers cultivate geoduck clams on three farm sites in Mason County, which farms

6    are located on leased private tidelands and within the Squaxin Island Tribe's exclusive Usual and

7    Accustomed Grounds and Stations (U & A).  The Growers provided notice, pursuant to Section

8    6.3 of the SIP regarding their plans to create artificial shellfish beds on the tideland parcels.

9    These notices were sent to the Squaxin Island Tribe in 1998 (La Chine property with notice from

10   Seattle Shellfish), 1999 (Rauschert property with notice from Taylor Shellfish Company), 2003

11   (Broehl property with notice from Arcadia Point Seafood) and 2004 (Myers property with notice

12   from Arcadia Point Seafood)   The Court notes that the Broehl and Myers property are side by

13   side and are considered one site for purposes of this decision.

14             The State asserts in its Opening Brief that sometime in 2009 the Department of Natural

15   Resources (DNR) became aware that the Growers had, without permission from the State,

16   planted shellfish, primarily goeduck clams, across the boundaries of the respective private

17   tidelands on state-owned aquatic lands.  The DNR and the Growers subsequently negotiated an

18   "agreement in principle to resolve these three trespasses."   As part of the proposed agreement,

19   "DNR would issue use authorizations, similar to a lease, allowing the Growers to tend their

20   cultivated shellfish to maturity and then harvest them.  No further planting would be allowed.

21   Once all cultivated shellfish have matured and been harvested, the Growers' rights to use the

22   sites would terminate."  (ECF No. 14, p. 5, Washington's Opening Brief).

23             Pursuant to 8.2.1 of the SIP, the State then gave notice to the Squaxin Island Tribe of the

24   proposed aquaculture leases.  The DNR subsequently advised the Squaxin Island Tribe of the

ORDER REGARDING DISPUTE
RESOLUTION            - 2

1    results of the survey required of them under 8.1.2 of the SIP.   The Squaxin Island Tribe

2    responded by asserting that § 8.2 of the SIP was not applicable as it was "not intended to cover

3    situations where a Grower has been intentionally or unintentionally trespassing on public lands."

4    (ECF No. 15-1, p. 15, Letter from Andy Whitener).  The Squaxin Island Tribe then asserted that

5    it has the right to take 50% of the shellfish from public intertidal lands located within its U&A,

6    including the geoduck that were planted on State owned aquatic lands by the Growers.

7          Due to the different positions taken by the State and the Squaxin Island Tribe, the State

8    requested dispute resolution, pursuant to §8.2.4 of the SIP.  This section directs the Magistrate

9    Judge to:

10         determine whether or not the leased activity authorizes the taking of shellfish
           subject to Treaty harvest.  If the lease does not, then the lease may be issued.
11         If the land to be leased contains shellfish subject to the Treaty harvest, then
           the Magistrate Judge shall determine the tribal harvest of a Treaty share of
12         such shellfish consistent with the sharing principles within paragraph 6.1.3,
           or allow the State and Tribe to reconsider agreement regarding tribal harvest.

13

14         The sharing principles of § 6.1.3 of the SIP reflect the case law which was developed in

15   the State v. Washington cases.  In particular, this section of the SIP authorizes tribal harvest

16   "from each enhanced natural bed" of "fifty percent of the sustainable shellfish production (yield)

17   from such beds that would exist absent the Grower's and prior Grower's current and historic

18   enhancement/cultivation activities."

19                          **ISSUE PRESENTED FOR RESOLUTION**

20         The State of Washington and the Growers take the position that § 8.2 of the SIP governs

21   resolution of this dispute which, by its terms, applies to all "new or renewal leases for shellfish

22   harvest or cultivation."   In particular, the State proposes to settle the trespass dispute it has with

23   the Growers by issuing a use authorization, similar to a lease, to permit the Growers to continue

24   to cultivate and subsequently harvest the goeduck they planted on public lands.  The State asserts

ORDER REGARDING DISPUTE
RESOLUTION          - 3

1    that determination of the Treaty right to harvest shellfish is dependent on a determination of

2    whether the sites in question contained natural beds of shellfish prior to the Growers planting the

3    shellfish.  If there was no natural bed, then there is no Treaty right to fish.  On the other hand, if

4    there was a natural bed, then the Tribe retains Treaty harvest rights as determined in *Shellfish III*.

5    That is, the Tribes "shall be entitled to fifty percent of the pre-enhanced sustainable shellfish

6    production from those beds."  *Id.* at p. 653.  The State asserts this approach is consistent with the

7    determination of Treaty fishing rights pursuant to the Stevens Treaties and that such approach

8    must be followed in this case in which trespass on State owned lands is asserted.

9         The Growers support the State's position but also emphasize that they have invested

10   resources, time and effort into the cultivation of the goeduck that were planted on public lands.

11   They assert this requires consideration when the Court determines who should have the right to

12   harvest the planted goeduck.

13        The Squaxin Island Tribe relies heavily on one State property law, and, in particular, the

14   case of  *Wiegardt v. State,* 27 Wash. 2d 1, 175 P. 2d 969 (1947), to support its position that it is

15   entitled to harvest 50% of the goeduck planted by the Growers on public land.  It is the Squaxin

16   Island Tribe's position that because the Growers trespassed on public property that they do not

17   own or have any legal interest in the planted geoduck.  Rather, the State owns the goeduck

18   because the clams were planted on public land.  Since the goeduck were planted on public land

19   and because they are owned by the State, the Tribe therefore has a right to harvest 50% of the

20   goeduck found on the public lands at these sites, the State owns the other 50% and the Growers

21   have no ownership interest whatsoever in the goeduck they planted.

22        For the reasons set forth below, the undersigned finds that the Squaxin Island Tribe's

23   right to harvest goeduck in the areas under dispute is governed by their Treaty rights and is not

24   dependent, connected or related in any way to State property law.

1    **Motions to Strike:**  Pursuant to Federal Rule of Evidence 408, the Squaxin Island Tribe

2    moved to strike Exhibit A to the Kisielius Declaration (ECF No. 21), which was submitted on

3    behalf of the Growers.  This motion to strike was not addressed by the Growers in their Reply.

4    (ECF No. 35).  The motion is GRANTED as it arguably was intended to prove the validity of a

5    disputed claim between the parties.

6         The Squaxin Island Tribe also moved to strike sections of the State's and Growers' briefs

7    which "contain discussions of proposed settlement terms in this case.  State's Brief at 5, 7-8;

8    Growers' Brief at 2, 5."  This motion to strike is DENIED.  The Court considers it appropriate to

9    understand the general terms of the proposed resolution between the State and Growers in this

10   case.  However, as discussed below, the Court did not consider the terms of the proposed

11   agreement between the State and the Growers in its determination regarding the Squaxin Island

12   Tribe's Treaty fishing rights.

13                      **TRIBAL TREATY FISHING RIGHTS**

14        In *Shellfish I*[1] , Judge Rafeedie determined the nature and extent of tribal off-reservation

15   shellfishing rights and the affect the Shellfish Proviso had on those rights.  In reaching his

16   conclusions, he recognized a number of specific canons of construction which apply when

17   interpreting the meaning of Indian treaties.  One such canon required treaties with the Indians "to

18   be construed, so far as possible, in the sense in which the Indians understood them, and 'in a

19   spirit which generously recognizes the full obligation of this nation to protect the interests of a

20   dependent people.'" *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S. Ct.

21   672, 678, 87 L.Ed. 877 (1943)(quoting *Tulee v. Washington,* 315 U.S. 681, 684, 62 S. Ct. 862,

22   864, 86 L.Ed. 1115 (1942).

23   _____

24        [1] United States v. Washington, 873 F.Supp. 1422 (1994)

1    Judge Rafeedie concluded that the Shellfish Proviso "does not apply to natural or native

2  beds and that, under the Shellfish Proviso, artificial beds may be staked or cultivated,

3  notwithstanding their location on private tidal lands." *Shellfish I* at p. 1429.  There is no dispute

4  that at the time the various Stevens Treaties were signed "that private ownership of a parcel of

5  tideland did not include private rights to the shellfish on that parcel." *Id.* at p. 1439.  The

6  converse was also true - an artificial bed placed on public tidelands did not divest ownership of

7  the planted shellfish from the citizen who planted such shellfish.  Tribal treaty fishing rights were

8  dependent on the type of bed involved.  If it was natural – it was open to Indian fishing.  If the

9  shellfish beds were "staked or cultivated by citizens" (artificial beds) then such beds were not

10  open to Indian fishing.

11    It is also important to note that Judge Rafeede's interpretation of the Shellfish Proviso

12  was consistent with the Tribes' interpretation of the Proviso.  The Tribes clearly opposed

13  defining fishing rights based on any notion of private property ownership.

14    The Court is of the opinion that the present dispute between the State of Washington and

15  the Squaxin Island Tribe must be analyzed pursuant to the definitions developed in interpreting

16  the Stevens Treaties.  That is, Treaty fishing rights are dependent on the type of shellfish bed that

17  is at issue.  If a shellfish bed at issue is artificial, then the Squaxin Island Indian Tribe has no

18  Treaty fishing rights.  On the other hand, if a shellfish bed is a natural bed, the Squaxin Island

19  Tribe has a "fair share" fishing right, as that term has been interpreted in *Shellfish* III.  This "fair

20  share" is based on the Court's determination "that allocating fifty percent of the commercial

21  Growers' shellfish harvest to the Tribes would unjustly enrich them." *Shellfish III* at p. 650.

22    Section 8.2.1 of the SIP prohibits the State of Washington from issuing a lease of

23  tidelands and bedlands for shellfish harvest without first providing notice to an affected Tribe.

24  The State is required to determine whether a natural bed is present in the location proposed to be

ORDER REGARDING DISPUTE
RESOLUTION          - 6

covered by the lease and it must address circumstances where there has been enhancement of a natural bed.  This includes those cases "where no enhancement activity has occurred recently enough to affect the density of shellfish beds" as well as when "past or present enhancement activity has affected the current density of shellfish beds."  The language of the Shellfish Implementation Plan clearly covers a factual situation such as this one presented by the Growers trespass on publicly owned lands.  It was suggested at oral argument that the "past or present" phrase somehow refers back to what existed at the time the SIP was initially developed.  There is nothing, however, in the language of the Shellfish Implementation Plan that supports such an inference.  If the Court had intended to limit the application of this section, the word "present" would not have been used.

It is the conclusion of the undersigned judge that the Squaxin Island Tribe's Treaty fishing rights derive solely from the Stevens Treaties and not, in any fashion, on State law private property concepts.  Further, the Squaxin Island Tribe's Treaty fishing rights at the locations in dispute are dependent on whether there is a natural bed of shellfish at the particular location.  If there is a natural bed which has been enhanced, the Tribe's Treaty fishing right is limited to fifty percent of the pre-enhanced sustainable shellfish production from those beds. State property law plays no role in that analysis.

The approach endorsed by this Court is consistent with § 8.2 and § 6.1.3 of the SIP.  In particular, the Court notes that § 8.2.4 requires a determination of a Treaty share of such shellfish consistent with the sharing principles within paragraph 6.1.3.  Paragraph 6.1.3 places the burden of proof regarding an artificial bed or the amount of sustainable shellfish production that would exist absent enhancement on the Growers.  The Court is of the opinion that this burden also applies under the circumstances of this case.

## TRIBE'S RELIANCE ON STATE PROPERTY LAW

While the Court does not accept the Squaxin Island Tribe position that State property law governs its right to fish, it is appropriate for the Court to address the issues they raise.

As noted earlier, the Squaxin Island Tribe asserts the right to harvest 50% of the shellfish planted by the Growers as they are of the view that the State of Washington now owns the shellfish due to the fact they were planted on public lands.

In their pleadings, the Squaxin Island Tribe asserts the following:

> In summary, the Tribe's treaty right to take fish includes all shellfish except those in "staked or cultivated" beds. By this Court's definition of those treaty terms, staked or cultivated beds are limited to shellfish planted by a Grower on lands owned or controlled by the Grower. Because the Growers in this case planted shellfish on State owned tidelands without authorization, the State is the owner of the planted shellfish. The Ninth Circuit has held that State owned shellfish beds cannot be staked or cultivated so the Tribe's treaty right to 50% of all shellfish outside staked or cultivated beds applies to those planted beds. The State may not authorize the Growers to take more than 50% of those shellfish.

ECF No. 30, p. 2.

In support of its assertion that the Court's definition of "staked or cultivated beds" are only those beds planted by Growers **on lands the own or control**, the Tribe cites to *Shellfish* I at p. 1441 and *Shellfish* III at p. 647-48. ECF No. 30, p. 3. The undersigned has reviewed those three pages several times and there is nothing in those sections of the Court's opinions to support the conclusion that a legal claim to "staked or cultivated beds by citizens" can only exist on lands owned or controlled by the citizen who planted the shellfish. In fact, the Court is clear that "when the signatory parties used those terms in the Proviso, 'they intended only to exclude Indians from artificial, or planted, shellfish beds; they neither contemplated nor desired that the Indians would be excluded from natural shellfish beds.' *Id.* 'Therefore, the words 'any beds

1    staked or cultivated by citizens,' describe artificial shellfish beds created by private citizens.' *Id.*"

2    *Shellfish III* at p. 648.    The words "own or control" are nowhere to be found in this definition.

3            The Tribe also relies on language contained in *Shellfish II*[2] to support its assertion that the

4    Shellfish Proviso, in order to be applicable to the Growers, requires that they "owned or

5    controlled" the land on which they planted the shellfish.  The purpose of *Shellfish II* was "to

6    provide a framework for the implementation of the Tribes' fishing rights under the Shellfish

7    Proviso." *Id.*  at p. 1457.  The Court noted that "effectuating the Treaty shellfishing right

8    presents a particularly difficult problem with respect to property owned or leased by commercial

9    Shellfish Growers and Private Property Owners, as compared to that owned by the State of

10   Washington."  *Id.* at p. 1457.  The Court acknowledged this particular difficulty as the "Shellfish

11   Growers and Private Property Owners are, effectively, innocent purchasers who had no notice of

12   the Tribes' Treaty fishing right when they acquired their property. . . . Consequently, it is

13   incumbent upon this Court to use its equitable powers to effect a balance between the Tribes'

14   Treaty shellfishing right and the Growers' and Owners' interest in the peaceful enjoyment and/or

15   commercial development of their property." *Id.* at p. 1457.

16          It is clear that reference by Judge Rafeedie to property "owned or leased by Growers

17   licensed by the State of Washington" was done not to change or affect the definition of "staked

18   or cultivated by citizens."  Rather, it was in acknowledgment of the particular circumstances

19   presented to the Court in that the Court was faced with the question of what should be decided

20   regarding the private cultivation efforts of the Growers and the impact their efforts should, or

21   should not have, on Tribal Treaty fishing rights.

22

23   _____

24          [2] United States v. Washington, 898 F.Supp. 1453 (1995).

ORDER REGARDING DISPUTE
RESOLUTION          - 9

1    Further, the reference in the Shellfish Implementation Plan in "6. Commercial Shellfish

2    Growers" to property ownership or control makes it clear that this section only applies when the

3    Grower have such rights.  The reference does not operate to expand or change the treaty

4    definitions of "staked or cultivated by citizens."  Section 6 is not, however, applicable to the

5    proceeding before the Court as it is undisputed that the Growers trespassed on State property.

6    The fact of trespass, while not admitted by the Growers, is also not denied – therefore there is no

7    factual dispute regarding the occurrence of a trespass.  In addition, it is because of this trespass

8    that the State and the Growers wished to resolve their dispute by entering into the settlement

9    generally described above.

10    The Court concludes that reference in Section 6 of the SIP is not applicable to the facts of

11    this case.  And for that additional reason, the Tribe's assertion that the Growers must own or

12    control the land on which they plant the shellfish has no relevance to the issue to be decided by

13    the Court.

14    The Squaxin Tribe also asserts that, by operation of state law, planting shellfish on the

15    public lands results in the State having ownership of the shellfish with the Tribe having a 50%

16    Treaty fishing right and the Growers having no interest whatsoever in the shellfish they planted.

17    This argument is not based on the assertion of a Treaty right but solely on the Tribe's

18    interpretation of State property law and the domino affect they say follows as a consequence of

19    that interpretation.

20    In *Fishing Vessel*[3] the Supreme Court of the United States stated "that neither party to the

21    treaties may rely on the State's regulatory powers or on property law concepts to defeat the

22    other's right to a 'fairly apportioned' share of each covered run of harvestable anadromous fish."

23

24
_____

[3] 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)

ORDER REGARDING DISPUTE
RESOLUTION         - 10

1   *Id.* at p. 682.  The Tribe's position ignores this limitation.  They assert that pursuant to *Wiegardt*

2   *v. State*, 27 Wash.2d 1, 175 P.2d 969 (1947) that ownership of the shellfish, once planted on

3   State land, is automatically vested in the State and, in this case, that also means that the Growers

4   no longer have any cognizable interest in the planted shellfish.

5          In *Wiegardt* the trial court dismissed the amended complaint on the grounds that it did

6   not state facts sufficient to constitute a cause of action.  The plaintiffs appealed.  The complaint

7   asserted that the Wiegardts were engaged in the business of cultivating and marketing oysters in

8   Pacific County.  They owned a "large and substantial oyster bed abutting upon tide lands of the

9   state of Washington, known as the Long Island Oyster Reserve."  *Id.* at p. 970.  Through

10  inadvertence and for a period 12 years the plaintiffs planted oysters on the State Reserve, which

11  contained no natural bed of oysters.  The State advertized for sale the oysters located on the Long

12  Island Oyster Reserve.  The Plaintiffs sought to enjoin the sale of the oysters they planted on the

13  Reserve, asserting that the oysters are their personal property and not the property of the State of

14  Washington.

15         The Plaintiffs relied on §109 of chapter 31, Laws of 1915, p. 113, Rem.Rev. Stat. § 5763

16  which provided as follows:

17         When any person has, acting in good faith, planted oysters on tide or shore
           lands not containing any bed of natural oysters belong to the State of
18         Washington, and not otherwise occupied for purposes of trade or
           commerce, *such oysters shall, pending the sale, lease or reservation of such*
19         *lands by the state, be considered as personal property*, and the unauthorized
           taking of the same shall subject the offender to civil and criminal prosecution
20         . . .

21  *Weigardt* at p. 971 – 972.  The Court acknowledged that the oysters would be considered

22  personal property, "until the sale, lease or reservation by the state."  The problem with the

23  Plaintiffs' position was that the land on which they planted the oysters, the Long Island Oyster

24  Reserve, had been "forever reserved from sale or lease" by Laws of 1915, chapter 31, § 102, p.

1   110. Thus by law they could not claim the oysters as their personal property.  The Court

2   concluded that the oysters were, therefore, the property of the State of Washington.

3          That, however, was in 1947, and the law was specifically concerned with the

4   maintenance of State oyster preserves.  The undersigned believes that *Weigardt* is not applicable

5   to this dispute resolution for several reasons.  First, Weigardt dealt specifically with oysters, a

6   State resource that had special protection under the law, and oyster reserve land which the State

7   reserved, forever, for public benefit.  There is no such restriction in this case regarding the

8   shellfish at issue – goeduck – or the location in which the Growers planted the goeduck.

9          Second, the Growers point out that R.C.W. 79.135.300 authorizes the department "to

10  lease first or second-class tidelands which have been or that are set aside as state oyster reserves

11  in the same manner as provided elsewhere in this chapter for the lease of those lands."  It is not

12  at all clear that if faced with the same facts today that the State Court would reach the same

13  conclusion that it did in 1947.

14         Finally, Washington statutes permit and encourage the leasing of State tidelands for

15  aquaculture use.  *See* R.C.W. 79.105.

16         The difficulty the Court has with regard to the Tribe's analysis is that it relies solely on

17  State law for its claim to Treaty fishing rights.  In this particular portion of their argument there

18  is absolutely no reliance on the applicable Treaty language or the cases that interpret the Treaties.

19  Any issue regarding ownership pursuant to State law is an issue only between the State and the

20  Growers.  The undersigned does not believe that the Tribe can utilize State property law, as they

21  interpret it, to give them greater fishing rights than they would have under the Treaty.  This is

22  exactly what they are attempting to do as under the Treaty the right to fish is determined by the

23  type of shellfish bed they wish to fish.  If it is artificial they have no fishing rights.  If it is

24

1   natural, they have their right to a "fair share."  The Treaty right does not give them the right to

2   anything more – but that is what they are attempting to accomplish in this case.

3       The Tribe also relies on the determination in *Shellfish* III that the State is not a "citizen"

4   and it cannot therefore come under the protection of the Shellfish Proviso – which only excludes

5   artificial beds from a Tribal fishery.  Because the Shellfish Proviso does not apply to the State

6   the Tribe then asserts that any planted shellfish bed on public property is,  therefore,  not

7   artificial.  If not artificial, then it is natural and the Tribe is entitled to harvest 50% of what was

8   planted.  The facts are clear that the shellfish were planted by the Growers and not the State and

9   that the Growers planted the shellfish for their benefit and not on behalf of the State.  The

10  interpretation asserted by the Squaxin Island Tribe completely ignores the Treaty definitions of

11  shellfish beds.  By excluding the State from the definition of "citizen" under the Shellfish

12  Proviso, the Court only made available for Treaty fishing those shellfish planted by the State.  It

13  did not change the definitions of artificial or natural beds.  It is also clear that the Treaty

14  definitions of those terms are not dependent or connected in any fashion with State property law.

15  The Tribe cannot use State property law to enlarge their fishing rights beyond what is provided

16  under the Treaty.

17      The Tribe then concludes that the rule in Washington is one who owns tidelands also

18  owns the shellfish located in or upon those tidelands.  ECF No. 30, p. 10.  The Court notes,

19  however, that this was not the case prior to Washington becoming a State and was also not the

20  case at the time of the Stevens Treaties.  This argument fails.

21                                        **CONCLUSION**

22      The Court therefore concludes that the Treaty right to fish governs this dispute and not

23  the State property law interpretation urged by the Squaxin Island Tribe.  This means that the

24  Tribe has no right to fish an artificial bed and that the Tribe has a right to a "fair share" of an

1    enhanced natural bed.  Based on this Court's ruling, it will allow the State and Squaxin Island

2    Tribe to reconsider agreement regarding tribal harvest, if any.

3          DATED this 18th day of October, 2011.

4

5                                  _____
                                   Karen L. Strombom
6                                  United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24