```
 1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 2                          IN SEATTLE

 3     --------------------------------------------------------

 4     UNITED STATES OF AMERICA, et al, )
                                        )
 5                      Plaintiffs,     )  No. C70-9213RSM
                                        ) Subproceeding 11-2
 6          v.                          )
                                        )
 7     STATE OF WASHINGTON, et al.,     )
                                        )
 8               Defendants.            )
                                        )
 9     --------------------------------------------------------

10                        MOTION HEARING

11     --------------------------------------------------------

12            BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                     September, 27, 2012

14
       APPEARANCES:
15
       S'KALLAMS:                    Lauren Rasmussen
16
       LUMMI NATION:                 Mary Neil
17                                   Daniel Raas
                                     Harry J. Johnsen
18
       LOWER ELWHA KLALLAM TRIBE:    Trent Crable
19                                   Stephen H. Saugee

20

21

22

23

24

25
```

1          THE CLERK:  This is the scheduled oral argument on

2    the petitioner's motion for summary judgment, Docket

3    Number 40, cause number C70-9213, subproceeding 11-2, in

4    regards to the Lower Elwha Klallam Indian Tribe, et al.

5    versus the Lummi Nation.  Would counsel rise and make

6    their appearances for the court?

7          MS. RASMUSSEN:  If it please the court, my name is

8    Lauren Rasmussen for the Port Gamble S'Klallam and

9    Jamestown S'Klallam Tribes.

10         THE COURT:  Ms. Rasmussen.

11         MR. CRABLE:  May it please the court, my name is

12   Trent Crable, for the Lower Elwha Klallam Tribe.

13         THE COURT:  Mr. Crable, I understand you and

14   Ms. Rasmussen will be splitting the argument?

15         MR. CRABLE:  That's correct.

16         MR. SAUGEE:  Good morning, your Honor.  Steve

17   Saugee for Lower Elwha Klallam.

18         THE COURT:  Good morning.

19         MS. NEIL:  Good morning, your Honor.  Mary Neil

20   for the Lummi Nation.

21         THE COURT:  Ms. Neil.

22         MR. RAAS:  Good morning, your Honor.  Daniel Raas

23   for the Lummi Nation.

24         THE COURT:  Mr. Raas, nice to see you.  How are

25   you doing?

```
 1            MR. RAAS:  I'm doing well.  Thank you.

 2            THE COURT:  Good.  Counsel, our typical time that

 3   we offer for oral argument on these is 30 minutes, but in

 4   view of the fact that I think counsel have requested a

 5   little bit longer time, we will go ahead and give you an

 6   extra ten minutes a side, if necessary.

 7        As is my usual practice, I have looked at all the

 8   materials you have submitted, read all of the

 9   declarations, even went back and looked at some of the

10   older cases as well.  There are motions to strike by the

11   Lummi here at the very beginning.  Let me address two of

12   them.

13        The U.S.G.S. evidence in the 1989 declaration of

14   Barbara Lane, that was in effect ruled out by the line of

15   Muckleshoot cases, the court will grant the motions to

16   strike, will not consider that evidence specifically.

17        As to the other items, for purposes of this argument,

18   the court will deny the motions to strike.  I may very

19   well look at it differently once I start trying to put the

20   order together.  But for purposes of the argument,

21   everything else is in play.

22        Who is going to start?

23        Ms. Rasmussen, one of the things I need to have you

24   address as we go through this, is tell me exactly what

25   areas are at issue.  I have looked at many of the
```

 1    different maps.  I am a little bit confused.  I understand

 2    that the catchment areas, the numbers that are designated

 3    now are different than what they were of course way back

 4    before Judge Boldt.  But I am a little confused as to

 5    exactly what areas are at issue.

 6         MS. RASMUSSEN:  Good morning, your Honor.  Before

 7    I start with what my clients like to call the legal part

 8    of the argument, I am going to tell you the background of

 9    some of the U&A cases in this subproceeding and the other

10    sub-proceedings.

11      Back in the old days, a Suquamish fisherman told me,

12    "We fished where Dr. Lane said that we had our homes, and

13    in front of those homes.  Back in the old days we

14    respected what Dr. Lane had said, because she knew about

15    where we had been at treaty time sometimes better than we

16    had."  And then, he likes to say:  "Ha, ha, ha, we

17    lawyered up.  And after that point we started to get savvy

18    about the language that was used, and how it could be

19    turned and twisted to expand different U&As in a way at

20    the very beginning was never done.  At the very beginning

21    there was honor in what your Lane report said, and there

22    was honor in how and where you fished."

23      This area, under the Lane report, for the Klallams,

24    was covered all along the coastline with Klallam villages

25    on the Strait of Juan de Fuca.  They had village sites on

the west coast of Whidbey Island.  There was specific

findings in the Lane declaration they used these areas

frequently and continuously for the purposes of fishing.

Now, the Lane declaration, with respect to the Lummi,

has one phrase that speaks of fishing from the straits and

bays from the northern -- the Fraser River to the present

environs of Seattle.

Now, Mr. Crable will focus in more detail, but the

district court found that although that path was spoken

of, when you looked underneath the surface, there was no

evidence of treaty time homes or villages along those

routes.

And so the district court had said, twice, that this

was not an area that showed the more than frequent -- more

than for the purposes of travel kind of place.

THE COURT:  Counsel, let me ask you to do one

thing for me.  Can you differentiate between Judge

Rothstein and Judge Coyle?

MS. RASMUSSEN:  I will do that.  Both district

courts agreed with each other on this area, Judge

Rothstein and Judge Coyle.

We are here today because we think that this area that

they have claimed, and they have issued -- the Lummi have

issued, fishing regulations is inside the Strait of

Juan de Fuca.  And we believe the Ninth Circuit order at

1   235 F.3d says that the Lummi may not fish in the Strait of

2   Juan de Fuca.  And we believe it is wrong.

3      And we believe it is wrong because, if you wish -- if

4   you do something, and you are sued for fishing in specific

5   fishing areas, and regulations are cited, saying, this was

6   the action that was not in conformity with the first

7   decision, this is the stuff that we don't want you to do,

8   and you lose once in front of Judge Coyle, and you lose

9   once in front of Judge Rothstein, and you get to the Ninth

10   Circuit and you make the same argument, and Judge Beezer,

11   who authored the opinion says, you also cannot fish in the

12   Strait of Juan de Fuca, and he uses the same exact

13   geographic terminology that Lummi uses, and he denies

14   their request, we don't believe it is credible that you

15   can tell this court you didn't understand the geographical

16   boundaries of what you asked for.

17      Yes, it is possible that every district court and all

18   three Ninth Circuit judges were completely upside down

19   with respect to the geography of this area.  It is

20   possible.  But when we look at the record, it is very

21   unlikely.

22      So this court asked us --  When we filed a motion to

23   show cause, asking to hold Lummi in contempt for fishing

24   in this area, this court said we want you to show -- I

25   want you to show me the record.  I want you to show me

1  where Lummi described these areas.  I want to know the

2  questions that were presented to the court.  And I'm going

3  to do that today.

4      First, I'm going to start --  First, I'm going to tell

5  you the components of the order that we are dealing with

6  today.  I know this court is familiar with it.  But the

7  ruling starts with the conclusion that Admiralty Inlet is

8  in and the Strait of Juan de Fuca and Hood Canal is out.

9  That is on the first page of the order.

10     Then the court goes on to explain its reasoning with

11  respect to the Strait of Juan de Fuca.  It says I find the

12  strait is to the west of the sound.  This court was

13  concerned about that.  It said wait a minute, if the

14  strait is to the west of the sound, could it be that there

15  is some unnamed body of water that the court was talking

16  about?

17     But if you look at this map, your Honor --  May I

18  approach?  You can see that the only correct explanation

19  is that the strait is to the west of the sound.  It can't

20  be north of the sound.  North would have been incorrect.

21  East would have been incorrect.  South would have been

22  incorrect.  In subproceeding 89-2, Admiralty Inlet was

23  found to be part of the Puget Sound.  In subproceeding

24  05-3, Saratoga Passage was found to be part of Puget

25  Sound.

1  Under any explanation, other than a cartographer who

2  would have a specific amount of degrees that is west of

3  the sound, this is a correct layman's explanation.  And

4  you see this explanation repeatedly over and over again in

5  even the fishermen's declarations from the original Boldt

6  testimony, where the fishermen said we went there, up into

7  the Strait of Juan de Fuca, from the San Juan Islands up

8  east into the Strait of Juan de Fuca.  Everybody sort of

9  describes it generally.

10  To clarify, and it is a little bit of a side note, but

11  this court was concerned that the strait to the west of

12  the Sound caused a problem.  I don't think that it does.

13  And then the court says, how do you intend to include

14  the Strait of Juan de Fuca?  He would have used that

15  specific term, as he did in other areas.  And one of those

16  other areas is the Klallam U&A determination.  It

17  specifically says the Strait of Juan de Fuca.

18  The court goes on to deny Hood Canal.

19  And then the court struggles a bit with respect to

20  Admiralty Inlet.  This is the ball of wax.  This is why we

21  are here today.  The court says, "Geographically,

22  Admiralty Inlet was intended to be included."  Okay.  And

23  then he says -- Judge Beezer says, "It is also just as

24  likely it was intended to be excluded as it was not."

25  And then it says, "Admiralty Inlet consists of the

1    waters west of Whidbey Island, separating that island from

2    the Olympic Peninsula."  Now, if we were confused as to

3    what the court was saying, the court clearly has

4    denominated the geographical boundaries of the areas here.

5    Okay?  They are saying it is the area separating the

6    island from the Olympic Peninsula.  That is where

7    everybody knows Admiralty Inlet is.  Mr. Hillaire in his

8    declaration also says that's where Admiralty Inlet is, at

9    the Point Wilson line.

10       So this is the ball of wax.  If one starts at the

11   mouth of the Fraser River and travels past Orcas and

12   San Juan Islands, it is natural to proceed through the

13   Admiralty Inlet to reach the environs of Seattle.  Well,

14   there is a problem, right?  They don't connect.

15       This court says, well, don't I need to connect them?

16   The question we have today is, is it okay for this court

17   to fill in the blanks where that court specifically said

18   Admiralty Inlet ends here?  Admiralty Inlet ends here.

19       And so the one portion of the decision that Lummi is

20   relying on is internally inconsistent, in that it speaks

21   of a passageway, and then it contradicts itself by saying

22   that Admiralty Inlet ends here.  So both of those things

23   can't be true.

24       But even more so, in the hierarchy of interpreting

25   judicial opinions, is it reasonable to take the

1    explanation for Admiralty Inlet and bootstrap it to the

2    Strait of Juan de Fuca, and grant yourself 311 square

3    miles that were not granted by the decision?  Is that an

4    okay thing to do?  Or are you bound by the same

5    considerations a judge would be bound by?  You can't alter

6    or amend or enlarge upon the decision.  You are not

7    allowed to fill in the blanks.

8        The decision --  I hate to say this.  The decision was

9    not ideally written.  It doesn't make sense.  But if the

10   court was confused, it was Lummi who confused them.

11       So I am going to turn to the statements in the Ninth

12   Circuit brief, where I am going to tell you that seven

13   times in their opening brief the Lummi has asked for the

14   right to pass from Admiralty Inlet to Haro Strait.

15           THE COURT:  Counsel, let me ask you a question

16   before you get into that.  I am trying to still frame

17   exactly what it is that I am supposed to do.  You just

18   indicated that you don't believe that the Ninth Circuit

19   opinion is ideally written, that maybe it doesn't make

20   sense.  Are you asking me to find what those other judges

21   meant by the Strait of Juan de Fuca, the eastern end?  Is

22   that what I am being asked to do?

23           MS. RASMUSSEN:  I am saying there is absolutely no

24   question as to what the definition was in this case of the

25   eastern Strait of Juan de Fuca.  You don't need to find

```
 1    that.  Lummi has said seven times in their opening brief,
 2    and again in their closing brief, where the eastern Strait
 3    of Juan de Fuca is located.  The Ninth Circuit necessarily
 4    answered the question that was presented to it.  And it
 5    denied their full passageway.
 6        If this is a harsh result, think of the harsh result
 7    that they had in front of the district court.  The
 8    district court said we don't care if you had a path from
 9    the Fraser River to the environs of Seattle, we are going
10    to give you no components of that path.
11            THE COURT:  The district court didn't give them
12    Admiralty Inlet --
13            MS. RASMUSSEN:  The district court gave them
14    nothing, despite the language that still says from the
15    Fraser River to the present environs of Seattle.
16        The district court said, just like you did in 05-3,
17    when I look at the evidence, I found your claim was naked,
18    there wasn't anything behind it.
19        You know, there is a lot of strange U&A determinations
20    out there.  The Klallam themselves have a line that goes
21    all the way across from Edmonds that of course didn't
22    exist at treaty times.  This is just the way this case is.
23    But as a legal procedure, the court understood the
24    question that was presented it.
25        Can I guess what the court did?  Well, the court split
```

1   the baby.  But did the court say that's what it was doing?

2   No.   The court is not going to say when it sort of says I

3   am going to give you both something, and go home with your

4   lumps and be happy.

5       The first reference in the Ninth Circuit decision --

6   in the Ninth Circuit brief, the Lummi says, "Specifically

7   based on the record before him, did Judge Boldt intend to

8   exclude from the broad language of his ruling the marine

9   waters of Admiralty Inlet and the open marine waters in

10  the Strait of Juan de Fuca between Admiralty Inlet and

11  Haro Strait on the western edge of the San Juan Islands?"

12      That is the question.  They are saying the marine

13  waters are between Admiralty Inlet and Haro Strait.  The

14  court has been told that once, the court is going to be

15  told that again.

16      This is what Lummi is looking for:  "This finding

17  plainly includes all the marine areas between the Fraser

18  River in the north and the vicinity of Seattle in the

19  south.  The waters at issue, Admiralty Inlet and the

20  eastern portion of Strait of Juan de Fuca, are

21  unquestionably located between these end points."

22      Here they recognize, "There may be some ambiguity

23  about the western limits of the eastern portion of the

24  Strait of Juan de Fuca."  But the district court did not

25  rule on this because it held Lummi had no rights whatever

1  in the strait.

2      This portion is important.  This is what I was trying

3  to tell the court in the motion for reconsideration.  You

4  didn't have to have a western boundary when you didn't

5  have the Strait of Juan de Fuca, because that necessarily

6  determines the issue.

7      This is Lummi's recognition of that:  They go on to

8  say, "The best resolution is to follow the literal wording

9  and draw the line south from the mouth of the Fraser River

10  to the southern shore of the strait on the Olympic

11  Peninsula, and then proceed to Seattle."

12      Reference Number 3.  "If one begins at the mouth of

13  the Fraser and follows Dr. Lane's description through the

14  straits and bays, south to the present environs of

15  Seattle, one passes through Georgia Strait, Haro Strait

16  and the eastern end of the Strait of Juan de Fuca,

17  Admiralty Inlet, and then arrives at the waters off

18  Seattle."

19      The next reference.  Here the Lummi recognize that

20  Admiralty Inlet is not an inlet in the usual sense of the

21  term.  "It too is a strait and narrow body of water

22  connecting two larger bodies of water."  So the Lummi's

23  definition of the Admiralty Inlet corresponds with the

24  court.  Nobody is off on la-la land with respect to the

25  geography.

1    "Admiralty Inlet in the eastern portion of the Strait

2    of Juan de Fuca, located between Admiralty Inlet and Haro

3    Strait, are marine waters between Fraser and the south."

4        Reference Number 5.  "The waters west of Whidbey

5    Island comprise Admiralty Inlet.  Those to the east are

6    Saratoga Passage and Possession Sound.  Admiralty Inlet

7    opens into the Strait of Juan de Fuca."  And that is

8    important, because this "opens into" is defining the area

9    as ending at that point.

10       "North of this strait lie the waters of the San Juan

11   Archipelago, including both Haro and Rosario Straits."

12   Again, we are talking about the exact body of water that

13   is inside of Lummi's regulations.

14       And then References 5 and 6 just refer again to the

15   Strait of Juan de Fuca and Admiralty Inlet.

16       Another thing, before I do the last reference that I

17   want to point out, is that every time they refer to this

18   question they refer this court to maps at Appendix C.  If

19   you go to maps at Appendix C, you find this map.

20       Now, today they are going to make ado about U.S.A. 62.

21   U.S.A. 62 was found at Page 101 of 362 items in their

22   appendix.  It was not cited once by them in any of their

23   briefs.  These are the maps they were referring the court

24   to.  So if they try to convince this court that somehow

25   the Ninth Circuit relied on U.S.A. 62, I think that falls

1    flat.

2       Here is the map they were looking at.  They refer to

3    this as an illustrative map.  Here we have Admiralty

4    Inlet.  And then we get to the last reference --  You have

5    to imagine that Judges Beezer and Hawkins are sitting

6    there late at night looking at this map.  Judge Beezer is

7    from Seattle.  He probably has some knowledge of the area.

8       And then we have the last reference on Page 14 of

9    their reply brief.  "If one starts at the mouth of the

10   Fraser River and proceeds south, one passes Point Roberts,

11   bisects Haro Strait west of the San Juan Islands, and

12   crosses the eastern portion of the Strait of

13   Juan de Fuca."  Undoubtably this is the exact path that

14   they have granted themselves in their regulations, as if

15   they won the entire Ninth Circuit case.

16      This is what they were asking for:  "Following the

17   marine waters from there one necessarily passes through

18   Admiralty Inlet and across Hood Canal.  See illustrative

19   maps at Appendix C, Lummi opening brief and Dr. Lane's map

20   at Page 88."

21      This is the only map that they are going to refer to.

22   This is the reef net map.  This is the reef net map that

23   Dr. Lane testified about.  This has the reef nets on the

24   shores of the San Juan Islands.  This is what was in front

25   of the court when it issued its decision.

1    The one thing I would like the court to think about is

2  the strange fact that the Ninth Circuit begins to adopt

3  Lummi's phraseology on Page 14 of their reply brief.  It

4  starts with the same language.  The language we are

5  struggling with from the Ninth Circuit says, "If one

6  starts at the Fraser River."

7    At that point it would have been easy for the law

8  clerk to cut and paste, if that's what they wanted to do.

9  If they wanted to adopt Lummi's path they would have

10  continued and said, "and crosses the eastern portion of

11  the Strait of Juan de Fuca."

12    Instead, the Ninth Circuit veers, and says, "Instead

13  of going through, bisecting Haro," he says, "Travels past

14  Orcas and the San Juans," which is in the middle.  And he

15  says, "Then we get to Admiralty Inlet."

16    Under an analysis that tries to find that the whole

17  decision makes sense, I would say we are not going to get

18  there.  But if we want to know what the court considered

19  and rejected, it would be the very path that Lummi is

20  fishing in now, and the path that they asked for in the

21  brief, and the path that was necessarily not granted.

22    Now, when Lummi sat down and drew their line from Haro

23  to Admiralty Inlet, giving themselves that passageway, we

24  believe they are violating the plain language of the

25  decision, where it says, not once, not twice, but three

1    times, pretty clearly, the Strait of Juan de Fuca is not

2    included.  It doesn't say part of the Strait of

3    Juan de Fuca.  And the court was clearly aware that this

4    was the eastern Strait of Juan de Fuca.

5        So what does the court -- what should the court do

6    when they are looking at a judicial opinion?  Well,

7    interestingly enough -- or it is interesting to me, the

8    court the same day issued another judicial opinion in

9    Muckleshoot versus Lummi.  In that decision the court --

10   the same panel -- it is almost like they were telling a

11   joke, says judicial decisions are not like statutes.  We

12   don't want you to look at them like that.  This is at 235

13   F.3d 429.  "Opinions, unlike statutes, are not usually

14   written with the knowledge or expectation each and every

15   word may be the subject of searching analysis.  This is

16   why we look at the record that is in front of the court."

17       So, ironically, it was as if the judges knew that they

18   had just written a decision that they didn't want to be

19   viewed with searching analysis as to every term.

20       But, you know, I am hearing you, that you are

21   concerned about this passageway.  But Lummi's view is even

22   more absurd.  They say "the general" in the description

23   and the ruling should govern over the specific reversal --

24   the specific grounds of affirmance in the Strait of

25   Juan de Fuca.  That doesn't make sense or seem right.

1    In addition, there is only one area of law where the

2  court has ever said:  Okay, we understand this is a harsh

3  result, and we are going to save you from the harsh

4  impacts of the law.  And that's where you have an implied

5  easement.

6    I'm sure your Honor has dealt with implied easements.

7  You have two parcels of property, and you are not paying

8  attention, and you sell one of them, but you don't reserve

9  yourself the right to cross and get out to the street.

10  And there the court will say, we are going to save you

11  from the harsh impacts of this, and we are going to apply

12  an easement across the other property.

13    But here, the Lummi has done far more than imply

14  themselves an easement.  They don't want the right of

15  passage, which is what they said repeatedly to the Ninth

16  Circuit, we just want a passageway.  This isn't about a

17  passageway.  They want the right to pick their neighbors'

18  fruit and fish in their pond, and take all of the natural

19  resources along the way.  And that's where they go beyond

20  what the court can do for them here.

21    The court can't do more than potentially imply a right

22  of passage without the right to harvest.  The court can't

23  rewrite or expand or enlarge the judicial decision.

24    In closing, I would like to say what we have here, in

25  response to our claim that they are fishing in the Strait

1    of Juan de Fuca, is several competing and contradictory

2    explanations.  Not one of their explanations in their

3    brief tracks the line that they have drawn across the

4    Strait of Juan de Fuca, or is supported by it.  Not one of

5    the explanations in their brief corresponds with the

6    other.  All of them require that the Ninth Circuit, and

7    two judges in this district, had no idea about the

8    boundaries of the waters that they were talking about.

9    This strains credibility and sounds a lot like

10   metaphysical doubt.

11       I would say if a party comes to this court with six

12   explanations for their behavior, it reminds me of what

13   happens when I hear a scream in the other room.  I run in

14   and I say, what happened?  The older child says it could

15   have been this, it could have been that, she fell, she

16   bumped her head, she did this, she did that.  Somewhere

17   towards the middle of the third explanation you think, did

18   you hit your sister?  Because when someone doesn't have

19   just one explanation for their behavior that they in fact

20   relied on, it strains credibility and sounds like an

21   attempt to muddy the waters.

22       What we have here is an unfortunately imperfect

23   decision.  But it wouldn't be right here to fill in the

24   blanks and grant Lummi 311 square miles of water that were

25   not granted by the plain language of the decision.

1   I am going to request that you grant our motion, but

2   first Mr. Crable would like to go through the district

3   court's orders and assure this court that there was

4   nothing anywhere in the district court order that would

5   support the Lummi's line or their claims that these areas

6   were ambiguous, or the judges didn't understand what they

7   were ruling, or your Honor's concern that there might be

8   some sort of unnamed, yet undiscovered body of water that

9   the Lummi can now cross because it has not yet been

10  adjudicated.

11  I am hoping in Mr. Crable's recitation he will focus

12  on the specific catchment area question, because he is

13  going to go over all the times that we mentioned which

14  areas we were suing them for.

15          THE COURT:  Thank you, counsel.  Mr. Crable.

16          MR. CRABLE:  Thank you, your Honor.  Good morning.

17  Before I begin my prepared argument, I would like to

18  address what I understood to be your Honor's questions

19  that you began with.  You asked what area was at issue

20  here, if I recall correctly.  The area is the hatched --

21  east of this line, north of Admiralty Inlet.  It might be

22  kind of hard to see.  It is also on this map.  It is the

23  cross-hatched area.  That is what is at issue.

24  Your Honor's other question about what we expected you

25  to do, do we expect you to say what the Ninth Circuit

1   meant by "the strait"?  I would say no.  What we would

2   like this court to do is say that when the court said

3   "Admiralty Inlet," it meant Admiralty Inlet, which was

4   clearly defined.  It was explained by the court what that

5   was.  In the papers before the court, and in the record,

6   it was very clear what that body of water was, and it did

7   not include this cross-hatched area that we believe is the

8   eastern Strait of Juan de Fuca.

9       Now, my first prepared argument is, what is the

10  operative period here?  That is, what should the court be

11  looking at in making this decision?

12      There is a fundamental disagreement between the

13  parties on this question.  The Lummi argues we should be

14  looking at the evidence before Judge Boldt, and his

15  determinations.  The requesting tribes' position is that

16  we should be looking at the record and the decisions in

17  89-2.  And we believe this position is supported by this

18  court's order on motions for reconsideration, dated

19  July 14th, 2009, the last time this same dispute was

20  before your Honor.

21      In Muckleshoot v. Lummi, found at 141 F.3d 1355, the

22  Ninth Circuit held, "The reviewing court should construe a

23  judgment so as to give effect to the intentions of the

24  issuing court.  If there is any ambiguity, it should look

25  to the entire record before that court."

1    Here, the courts of 89-2 are the issuing courts whose

2    decisions should be interpreted.  The two-step process for

3    determining Judge Boldt's intent as to Lummi U&A has

4    already been performed.  This dispute is now 23 years old,

5    subproceeding 89-2 was actively litigated for eleven

6    years.

7    In the Americana Fabrics case, found at 754 F.2d 1524,

8    the Ninth Circuit held that collateral estoppel bars the

9    re-litigation of issues of fact or law that were actively

10   litigated and necessarily decided.

11   Contrary to what Lummi argues, the fact that the

12   rulings of this court in 89-2 were appealed and partially

13   reversed does not mean that the nine years of litigation

14   before this court has no effect.

15   The question of Judge Boldt's intent, and the evidence

16   before him as to Lummi's U&A was effectively litigated for

17   eleven years and necessarily decided.  Therefore, the

18   records and decisions to be reviewed here are those of the

19   courts of 89-2.

20   I was going to address the Board on Geographic Names

21   definitions, but it is my understanding that you struck

22   that.  So I will move on.

23   Next, is, what was actively litigated and necessarily

24   decided in 89-2?  The request for determination in 89-2, a

25   page of which I placed on the screen, asked the court to

1    determine whether Lummi had a treaty right to fish in the

2    Strait of Juan de Fuca, Admiralty Inlet and the mouth of

3    Hood Canal.   Judge Coyle heard arguments in that case.   He

4    reviewed evidence.   Both parties put on evidence.   He held

5    that the Lummi did not have the right to fish in any of

6    those waters.

7         In Lummi's cross-request, filed about a year later, a

8    page of which is now on the screen, Lummi asked the court

9    to determine if they had a treaty right to fish in the

10   Strait of Juan de Fuca, east from the Hoko River to the

11   mouth of Puget Sound, the waters west of Whidbey Island,

12   and Admiralty Inlet.   And then there were some other

13   waters that are no longer relevant to this dispute.

14        Judge Rothstein heard arguments from the parties,

15   reviewed the evidence, and determined that the waters

16   covered by Lummi's cross-request were the same as those

17   covered by the RFD -- that is an important point, which we

18   discuss in our briefing, and then held that the Lummi did

19   not have a treaty right to fish in any of those waters.

20        The Lummi now argues that there is no identity of

21   causes of action here, between this subproceeding and

22   89-2, because -- they argue there is water at issue here

23   that was not at issue in 89-2.   This map is their

24   depiction of what that water is.   This claim is not

25   supported by the evidence.

1        One of the actions of the Lummi that compelled the

2    bringing of subproceeding 89-2 was the issuance of Lummi

3    regulation 89-08.  This is a page from the RFD that

4    discusses it.  It lays out how this is part of the reason

5    why they are bringing the case.

6        This is the first page of that regulation, which as

7    you can see, lays out quite a few fin fish catch-reporting

8    areas -- or shellfish catch-reporting areas that they have

9    opened for fishing.

10        With this regulation --  The Lummi has provided a map

11    of all those catch areas, which I think makes it a lot

12    easier to understand.  This is Lummi's map.  There is a

13    little identifier down at the bottom.  This is Lummi's map

14    of all the areas opened by that regulation.  In their

15    motion for --  Except those circles, I added.  Those were

16    not on there.

17        In their TRO motion filed at the very start of the

18    subproceeding, right after the subproceeding started, the

19    requesting tribes noted that they were seeking to have

20    Lummi barred from fishing areas in catch areas 23A through

21    D, 25A through E, and 26A, all those which I have circled.

22    That was the area of dispute.  That clearly covers the

23    area Lummi now claims was not at issue.

24        The description of the challenged areas was not a

25    one-time thing.  The requesting tribes used this same

1   description many times throughout the case, including in

2   1990 and in 1994.  It was relatively consistent.

3        There were times when the requesting tribes used both

4   these shellfish catch-reporting areas, these 20s numbers,

5   and the salmon catch-reporting areas, which are the

6   numbers in the single digits.  There were times when they

7   used both, there were times when they only used one.  But

8   throughout the course of the litigation these were the

9   areas in dispute.

10       So from the beginning, the requesting tribe's

11  description of the waters at issue, using catch areas,

12  clearly, without question, included the waters Lummi now

13  claims is not at issue.

14       The courts of 89-2, generally, did not refer to catch

15  areas in their determinations.  In the Ninth Circuit, in

16  particular, there is no evidence at all that they paid any

17  mind to the catch areas at all.

18       So looking at the verbal descriptions of the areas at

19  issue in 89-2, also clearly show that the areas at issue

20  there included what Lummi now claims was not part of that

21  subproceeding.

22       This on the screen now is from Lummi's memo in support

23  of its 1993 cross-motion for summary judgment.  It is

24  Document Number 13828 in this case.  The statement of the

25  case could not be clearer.  I view this as particularly

1    powerful evidence in support of our case, because, one, it

2    shows that the court -- that in Lummi's view the primary

3    purpose of this subproceeding was to bar Lummi from

4    fishing in the eastern Strait of Juan de Fuca, which they

5    defined in a way that clearly indicates we are talking

6    about the waters they now claim weren't at issue.

7         Second, it also shows that Lummi knows --  And this

8    goes somewhat to Ms. Rasmussen's argument.  The court was

9    told exactly where Admiralty Inlet is, and that Lummi did

10   not consider it to expand west and north, clear up to Haro

11   Strait.

12        Next on the screen, this is from a 1998 Lummi reply

13   brief, Document 16497 in the case.  Again, the Lummi's

14   summary of what the subproceeding was about is

15   instructive.  This too shows the court that in the Lummi's

16   view the primary question of the subproceeding was the

17   Lummi fishing in the eastern Strait of Juan de Fuca,

18   defined in such a way as to clearly include the waters

19   that Lummi now claims is not at issue.

20        Second, it also shows that Lummi did not consider

21   Admiralty Inlet to extend clear up to Haro Strait.

22        Also note the map that was attached with that brief.

23   This was Lummi's map they submitted.  It has these little

24   flag identifiers, which I don't know, but I presume were

25   placed by Lummi, that clearly indicates that Admiralty

1    Inlet is where Admiralty Inlet is.

2        Lastly, and I will try not to belabor these, because

3    Ms. Rasmussen went over some of them, we have Lummi's

4    statements from the Ninth Circuit brief, which shows --  I

5    am going to talk about four statements that I believe show

6    clearly that the dispute and the subject of Lummi's

7    appeal, that the Lummi felt it was appealing from the

8    district court's determination, were the waters from the

9    San Juan Islands to the vicinity of Seattle.  Next, the

10   marine waters of Admiralty Inlet, and the open marine

11   waters in the Strait of Juan de Fuca between Admiralty

12   Inlet and the Haro Strait.  Next, going from the Fraser

13   River up to Seattle, one would pass through Georgia

14   Strait, Haro Strait, the eastern end of the Strait of

15   Juan de Fuca, Admiralty Inlet, and then arrives at the

16   waters off of Seattle.

17       Note also here that the Lummi description of Admiralty

18   Inlet is a narrow body of water connecting two larger

19   bodies of water.

20       Lastly --  And Ms. Rasmussen touched on this.  I also

21   think this is a very important piece of evidence.  "The

22   waters" --  Lummi's statement to the Court of Appeals.

23   This is in their opening brief.  This is their appeal.

24   "The waters to the west of Whidbey Island comprise

25   Admiralty Inlet."  There is some dispute about what the

1    waters west of Whidbey Island means, whether that means --

2    when they say that, regarding Admiralty Inlet, that means

3    the whole thing, up the entire coast of Whidbey.

4        Here, Lummi says, "The waters to the west of Whidbey

5    Island comprise Admiralty Inlet."  Admiralty Inlet opens

6    into the Strait of Juan de Fuca.  North of this strait --

7    You can see here on the map.  North of this strait is the

8    San Juan Islands Archipelago, including both Haro and

9    Rosario Straits.

10        Lummi's argument that there is a portion of water in

11    the eastern Strait of Juan de Fuca at issue in this

12    subproceeding that was not at issue in 89-2 is false.

13        To conclude, your Honor, the only way the court can

14    rule, I believe, in Lummi's favor here, is if you conclude

15    that the Ninth Circuit -- when the Ninth Circuit said

16    "Admiralty Inlet," it meant Admiralty Inlet and the Strait

17    of Juan de Fuca.

18        Such a finding would require the court to find that

19    the Ninth Circuit badly misunderstood the geography, and,

20    importantly, as I just went through, and Ms. Rasmussen

21    went through as well, that the Ninth Circuit totally

22    disregarded Lummi's own descriptions of the water at issue

23    in the case, provided in their own briefing.

24        Lastly, and Ms. Rasmussen touched on this as well,

25    after the case was over, this is what they said they did:

1   They concluded that the opinion included Haro Strait and

2   Admiralty Inlet and the waters between the two.  But

3   that's not what the case said.  The case said Admiralty

4   Inlet.  And that's it.

5       Lummi's post hoc rationalizations and explanations,

6   that now, for the first time ever, Admiralty Inlet has

7   grown four times its recognized size, should fail.

8       Thank you, your Honor.

9           THE COURT:  Thank you, Mr. Crable.

10          MS. NEIL:  Good morning, your Honor.

11          THE COURT:  Ms. Neil.

12          MS. NEIL:  Mr. Johnsen is going to assist me with

13  some of these exhibits.

14      May it please the court, my name is Mary Neil.  I

15  represent the Lummi Nation.  Present today in the

16  courtroom are numerous representatives from the Lummi

17  Nation that I would like to draw the court's attention to.

18      The United States Supreme Court has described the

19  right to resort to usual and customary fishing places as

20  part of the larger rights of the Indians, upon the

21  exercise of which there was not a shadow of impediment,

22  and which were not much less necessary to the existence of

23  the Indians than the atmosphere they breathe.

24      This is as true today for the Lummi Nation as it was

25  in 1904 when Justice McKenna wrote that statement.  The

1   members of the Lummi Nation and their ancestors have

2   fished the disputed waters since time immemorial, and for

3   the last 38 years have done so under the authority of

4   Judge Boldt's ruling.

5        This subproceeding marks the third attempt by the

6   Klallams to alter and diminish that ruling.

7        Before turning to specific responses, I would like to

8   discuss an overarching matter, and Mr. Crable spoke about

9   the fundamental differences, the disagreement between --

10  the nature of these proceedings.  The Lummi Nation asserts

11  that this court is bound to look at the language of Judge

12  Boldt in Final Decision 1, at the language of the Ninth

13  Circuit, and the evidence before Judge Boldt, because that

14  is what the Ninth Circuit looked at.

15       The Klallams assert that you should ignore this,

16  ignore the language of the court, ignore the evidence

17  before Boldt, and look only to the statements of the

18  parties and extraneous definitions.

19       They encourage this court to engage in analysis that

20  is analogous to the game of telephone.  As the court

21  undoubtedly knows, this schoolhouse game is a metaphor for

22  the distortion process of acquiring first, second and

23  third-hand information.  The more filtered the

24  information, the more corrupt the message becomes, and

25  increased are the opportunities for the message to be

1  shaped by those passing it on.  The information inevitably

2  becomes distorted.

3      The Klallam seek to distort Final Decision 1 with

4  manipulated maps, extraneous definitions and statements

5  made by the parties.  This sort of review is contrary to

6  the concepts of finalities of judgments, and results in

7  the diminishment of the reserved treaty rights.

8      The Ninth Circuit explained the court's continuing

9  jurisdiction under Paragraph 25 does not allow the court

10  to clarify the meaning of terms used in the decrees, or to

11  resolve ambiguities with supplemental findings which

12  alter, amend, or enlarge upon the descriptions in the

13  decrees.

14      The Klallams attempt to distort Judge Boldt's language

15  in Final Decision 1 from the marine waters of northern

16  Puget Sound, from the Fraser River south to the present

17  environs of Seattle, to something more like the marine

18  waters of northern Puget Sound, from the Fraser River to

19  the southern shorelines of the San Juan Islands, and east

20  to the environs of Seattle.

21      Judge Boldt knew full well how to craft descriptions

22  with directional and land mass cues.  For example, a

23  portion of the Makah's U&A is described as the waters of

24  the Strait of Juan de Fuca to Port Crescent near

25  Port Angeles, extending out into the ocean to an area

1   known as Swiftsure, and then south along the Pacific Coast

2   to an area intermediate to Ozette Village.  There is more

3   to it.  For the purposes of today I will stop there.

4      Judge Boldt could have mirrored this language.  He

5   could have said the marine waters of northern Puget Sound

6   from the Fraser River, south to the San Juan Islands and

7   east to the environs of Seattle.  That is not what Judge

8   Boldt wrote.  That is not what Judge Boldt intended.  And

9   this court is prohibited from altering or diminishing

10   Judge Boldt's determination.

11      The Nation implores this court to adhere to the proper

12   process and reject the Klallams' attempt to distort Judge

13   Boldt's final judgment.

14      The Klallams' motion should be denied for three

15   reasons:  They cannot meet their burden of presenting

16   evidence that disputed waters are not within Lummi's U&A.

17   More plainly stated, all of the evidence, and the Ninth

18   Circuit's interpretation, support the conclusion that the

19   disputed waters are within Lummi's U&A.

20      Two, the Klallams have not and cannot produce any

21   evidence the disputed waters are excluded from Lummi's

22   U&A.

23      Finally, Lummi has not adjudicated its right to the

24   Strait of Juan de Fuca.  What was litigated in 89-2 was

25   whether Judge Boldt intended to include the Strait of

Juan de Fuca within Lummi's U&A.  As such, res judicata

would not bar Lummi if it chose at a later date to seek to

expand U&A to the Strait of Juan de Fuca.

Now, let's turn to Final Decision 1.  Judge Boldt

intended to give broad general descriptions of some of the

areas the tribes fished at treaty times.  Here, he said,

and I quote, "Although no complete inventories of all the

tribes' usual and accustomed fishing sites can be compiled

today, the areas identified in Finding of Fact 3 herein

for each of the plaintiffs tribes, in general, describes

some of the fresh water systems and marine areas within

which the respected tribes fished at the time of the

treaties, and wherein those tribes, as determined above,

are entitled to exercise their treaty rights today."

Judge Boldt intentionally wrote broad descriptions

because he recognized that it would be impossible to

compile a complete inventory of any tribe's usual and

accustomed fishing grounds.  He concluded, "Designation of

fresh water systems in marine areas as the only method to

provide a fair and comprehensive account of the usual and

accustomed fishing places."

So, first, in interpreting Judge Boldt, or any judge,

the determination must be construed to give effect to the

intent of the issuing court.  Judge Boldt said what he

intended to do, and he did just that.  He issued broad

1    general descriptions.

2        Specifically for Lummi he provided the following broad

3    description:  "The single most valuable resource" --

4    "valuable fish resource for the Lummis was undoubtedly the

5    Sockeye, which the Lummi were able to intercept in the

6    straits on the annual migration of the Sockeye from the

7    ocean to the Fraser River.  The Lummis had reef net sites

8    on Orcas Island, San Juan Island, Lummi Island and Fidalgo

9    Island, and near Point Roberts and Sandy Point.  These

10   Indians also took salmon and steelhead near the mouth of

11   the Nooksack River, and steelhead in Whatcom Creek.  They

12   trolled the waters of the San Juan Island for various

13   species of salmon.  In addition to the reef net locations

14   listed above, the usual and accustomed fishing places of

15   the Lummi Indians at treaty time included the marine areas

16   of northern Puget Sound, from the Fraser River south to

17   the present environs of Seattle, and particularly

18   Bellingham Bay.  Fresh water fisheries included the river

19   drainage systems emptying into the bays, from Boundary Bay

20   south to Fidalgo Bay."

21       Secondly, we have Judge Boldt describing the Lummi's

22   U&A, adhered to the method he announced.  He identified

23   specific areas --  He didn't include them all.  For

24   example, Barbara Lane's testimony included places such as

25   Cherry Point.  Then he added, in addition to the specific

```
 1    sites, the marine areas of what he termed northern Puget

 2    Sound, from the Fraser River south to the present environs

 3    of Seattle.

 4        Judge Boldt cited to a portion of the record to

 5    support that broad general description.  One of those is

 6    U.S.A. 62.  What we have over here on the podium is a copy

 7    of U.S.A. 62.  The original is in the courtroom.  However,

 8    it is not -- it is rolled up, so we are going to use that

 9    one.  What Mr. Johnsen has identified is the blue, which

10    would be the Strait of Juan de Fuca, the approximate areas

11    labeled on the map.

12        The green overlay shows the U&A described, up until

13    the point where Judge Boldt says, "In addition."  So after

14    that he adds the Fraser River up in the north, Orcas

15    Island, San Juan Island and all of those there.

16        May I approach the exhibit?

17            THE COURT:  You may.

18            MS. NEIL:  So the Fraser River is right here, the

19    mouth coming down.  Orcas Island, San Juan Island.  Here

20    is the Lummi Reservation.  The Nooksack River and Whatcom

21    Creek is here.  This is Fidalgo, Lopez.  After he has

22    identified those areas and the reef net sites there, he

23    then said, "In addition, you get the marine areas from the

24    Fraser River south to the environs of Seattle."  The

25    environs of Seattle is not listed on this map, is not
```

1  identified, but it would be down here a little bit past

2  Mukilteo.  So that would be the area there.

3          THE COURT:  Judge Boldt never used the term

4  "Strait of Juan de Fuca," did he, for this specific area?

5          MS. NEIL:  He did not use that term for that

6  specific area.  I did not locate a definition in Final

7  Decision 1.  He didn't use it in Lummi's U&A.  He did talk

8  about it in Makah.

9      He also didn't define Puget Sound or northern Puget

10  Sound, and used it differently, as this court has already

11  noted.  So he gave us the definition of northern Puget

12  Sound.

13      So 24 years later Judge Rothstein interpreted Judge

14  Boldt's finding and concluded that he did not include --

15  intend to include the Strait of Juan de Fuca, Admiralty

16  Inlet and the mouth of Hood Canal.

17      The Ninth Circuit reversed Judge Rothstein as to

18  Admiralty Inlet, reasoning that Judge Boldt's

19  intentionally broad finding naturally included in its

20  sweep the waters between Haro Strait and the environs of

21  Seattle.  They reasoned that ascertaining Judge Boldt's

22  intent as to Admiralty Inlet was more difficult because it

23  was not used in Final Decision 1.  Since there were no

24  linguistic clues, as there were for the "Strait" or for

25  "mouth of the Hood Canal," they concluded that it was just

1  as likely that Judge Boldt included -- intended to include

2  it as not include it.

3      So to tip the scales the court turned to geography.

4  They said, and I quote, "Geographically, however,

5  Admiralty Inlet was intended to be included within the

6  marine areas of northern Puget Sound from the Fraser River

7  south to the present environs of Seattle.  Admiralty Inlet

8  consists of the water to the west of Whidbey Island,

9  separating that island from the Olympic Peninsula.

10  Admiralty Inlet would likely be a passage through which

11  the Lummis would have traveled through the San Juan

12  Islands in the north to the present environs of Seattle.

13  If one starts at the mouth of Fraser River and travels

14  past Orcas and San Juan islands, it is natural to proceed

15  through Admiralty Inlet to reach the environs of Seattle."

16      The Ninth Circuit gave us definitions and a reasoning

17  to figure out how to apply that.  Admiralty Inlet is the

18  waters west of Whidbey Island that separate that island

19  from the Olympic Peninsula.  That definition fits with

20  their logic and their description, from here to there.

21      The definition asserted by the Klallams locates the

22  Strait of Juan de Fuca --  I'm sorry.

23      They also said, "It is clear Judge Boldt viewed Puget

24  Sound and the Strait of Juan de Fuca as two separate

25  regions, with the strait lying to the west of the Sound."

1    In his definition, "Northern Puget Sound, from here to

2    there," the Strait of Juan de Fuca would be to the west.

3    That fits with that definition.

4        The definition asserted by the Klallams interrupts

5    northern Puget Sound, instead of winding to the west of

6    it.

7        As I said, there is no reason to look to other

8    definitions.  Judge Boldt defined northern Puget Sound as

9    including Fraser River, Haro and Rosario straits and the

10   waters around the San Juan Islands.

11       The disputed water is between Haro Strait and the

12   environs of Seattle.

13       The Ninth Circuit defined Admiralty Inlet for us.  It

14   said it is the body of water west of Whidbey Island that

15   separates that island from the Olympic Peninsula.  And

16   they said it was in northern Puget Sound.

17       They could have been more limiting.  They could have

18   said the southern portion of Whidbey Island, but they

19   didn't.  They said the water west of Whidbey Island,

20   separating that island from the Olympic Peninsula.

21       It is entirely possible that the Ninth Circuit adopted

22   the Klallams' own definition from their request for

23   determination, which said, "Admiralty Inlet," comma,

24   "which is the body of water west of Whidbey Island."

25       The Ninth Circuit also concluded, "The Strait of

 1   Juan de Fuca lies to the west, not as interrupting."  So

 2   from the plain language of Judge Boldt and the Ninth

 3   Circuit, "The disputed waters are within northern Puget

 4   Sound, in between Haro Strait and the environs of

 5   Seattle."

 6       Instead of focusing on the language of the Court, the

 7   Klallams would like you to focus on statements of the

 8   parties, and inadmissible, irrelevant, manipulated maps.

 9       The Klallams have placed significant support on

10   statements made by the parties, specifically Lummi.  Their

11   reliance is misplaced.  For example, the Klallams seek

12   support from their request for determination in 89-2.  As

13   I have already described to you, it described Admiralty

14   Inlet as a body of water west of Whidbey Island.

15       Once they did that, they then requested relief only as

16   to three areas, the Strait of Juan de Fuca, Admiralty

17   Inlet, and the mouth of Hood Canal.

18       Perhaps this is because the Klallams' own expert in

19   89-2 admitted that Lummi fished in the eastern Strait of

20   Juan de Fuca as far south as Smith Island.

21       They also rely upon the listing of catch recording

22   areas lumped together in a manner that makes it impossible

23   to assign a catch-reporting area to either the Strait of

24   Juan de Fuca, Admiralty Inlet or the mouth of the Hood

25   Canal.

1      They continue to look for support and statements in

2   the record that are described as convenient descriptions.

3   The parties repeatedly acknowledged throughout 89-2 that

4   the names of the areas varied, and often Puget Sound

5   included the Strait of Juan de Fuca.

6      Other language the Klallam point to mirrors the

7   language of the Ninth Circuit.  Specifically --  May I

8   approach the exhibit again?  Specifically, they point to

9   language in which we said if you start at the mouth of the

10  Fraser River and you go south to about above -- I believe

11  this is Dungeness Bay, and then proceed through the

12  environs of Seattle through Admiralty Inlet, that somehow

13  supports them.

14     It would be correct that we pass through the eastern

15  strait under the line that we have drawn, down this way,

16  this way.  That's what the briefing said.  It didn't say

17  come down this way, hug the shorelines, and then follow

18  down.  We said south to here, follow the shoreline of the

19  Olympic Peninsula in through Admiralty Inlet.

20     The Klallams also ignore many of their own statements.

21  For example, in Docket 13986 the Klallams admit that the

22  Lummis fished -- the Klallams admitted the Lummis fishing

23  off the coast of Whidbey Island in the easternmost

24  portions of the Strait of Juan de Fuca are not raised in

25  89-2.  They admitted at 6A and area -- I'm sorry, areas 6A

1    and 7.  Those are the -- I get these mixed up.  Let me

2    double-check.  Commercial salmon management and

3    catch-reporting areas 6A and 7.  They admit that those

4    waters were not an issue in 89-2.  And now throughout

5    their briefing they have made those admissions in their

6    motion for summary judgment and brief in support of that.

7        And then in their reply they say all of the waters at

8    issue -- all of the water was excluded.  So either it

9    wasn't at issue -- is at issue now or is not at issue.

10        Numerous other examples are identified in Exhibit 27

11    to my declaration.  And also in Exhibit 20, which is the

12    transcript of the hearing on the TRO that the Klallams

13    referenced earlier.

14        So, your Honor, if you need to look at any map, I

15    recommend that you look at the maps that were cited to by

16    Judge Boldt.  Those are U.S.A. 60 through 64.  U.S.A. 62

17    was identified by the Klallams in subproceeding 89-2 as

18    clearly marking the location of the Strait of

19    Juan de Fuca.

20        In conclusion, your Honor, the Klallams have failed to

21    meet their burden.  They attempt to distract this court by

22    arguing that the Lummi traveled through this area.  It is

23    not enough to establish U&A.

24        They are 38 years too late to challenge the

25    sufficiency of the evidence.  Judge Boldt found sufficient

1    evidence to support his determination, and cited that

2    evidence.

3        The inquiry here is not one that increases distortion,

4    but should be a review of the evidence before Judge Boldt

5    and the Ninth Circuit and the language of those two

6    courts.

7        The Klallams' reliance on inadmissible -- their

8    reliance on their manipulated maps and the parties'

9    statements in subproceeding 89-2 is misplaced, and are not

10   relevant.  If they are, the Klallams made just as many

11   statements, many of which are contradictory to their

12   position today.  The disputed water is within northern

13   Puget Sound, and within Lummi's U&A.  Klallams' motion

14   should be denied.

15           THE COURT:  Ms. Neil, thank you very much.  I'm

16   not sure if your legal arguments will win out in the end

17   or not, but you get extra credit from me for not using all

18   of your allotted time.

19       Ms. Rasmussen, I need a specific answer to one of the

20   questions raised by Ms. Neil.  This is the declaration of

21   Sarah Burlingame.  I am simply looking at the maps that

22   are attached to that, Exhibit D, this one.

23           MS. RASMUSSEN:  May I approach?

24           THE COURT:  The reason I marked that, and the

25   reason I need an answer, is Ms. Neil just raised it, the

1    areas designated as 6A and 6B are not part of the

2    cross-hatched area that you indicate in your map.  Are

3    they in dispute or not in dispute?  Are they at issue

4    here?

5            MS. RASMUSSEN:  Area 6A was the subject of a

6    stipulation by Lummi, that it was not going to claim area

7    6A in this subproceeding, even though the plain language

8    of the description --  You don't stipulate unless you need

9    to.  The plain language of the description plainly

10   included 6A.  So they stipulated it out of the case.  We

11   did not sue them for 6A, because they were not opening 6A.

12   Since you have to file actions that are not in conformity

13   with Final Decision No. 1, it represented our recognition

14   that they weren't exactly opening that.

15       In addition, with respect to Area 7, a footnote on

16   Page 29 in our brief, after twelve years of litigation we

17   failed to include the shellfish catch areas, which were

18   part of the dispute, and which everybody knew.  It is

19   clear that --  The Lummi now pounce on that as some sort

20   of great admission.  But at the time in their reply brief,

21   they didn't even notice it, because it was a mistake, and

22   it was based on twelve years of litigation and everybody

23   knowing what they are talking about.

24       I think that is something the court has to recognize

25   here, that due to the length of the subproceeding the

1    parties did tend to get somewhat imprecise in their

2    descriptions of the area.  For example, her explanation

3    that once we said Admiralty Inlet was the waters west of

4    Whidbey Island.  You know, it is.  We didn't say it is

5    only the waters north.  We didn't use the terminology that

6    the Ninth Circuit did.  But it is the waters west of

7    Whidbey Island.  It just stops at the Point Wilson line.

8    I don't think that can be used as an admission, especially

9    not one that the Ninth Circuit relied on, to say that we

10   thought Admiralty Inlet somehow went all the way north.

11       There is one fundamental difference that appears in

12   this case, which is, the Lummi is here arguing that

13   northern Puget Sound includes the Strait of Juan de Fuca,

14   this portion of it.  That ship has sailed.  We are in

15   totally uncharted waters here.  We are talking about an

16   ambiguity within a decision that was issued to resolve the

17   ambiguity.  We are talking about that one paragraph in the

18   Ninth Circuit decision.

19       As good as those arguments were the first time around,

20   it neglects the history of the case, which is Judge Coyle

21   ruled on northern Puget Sound as not including these

22   waters.

23       Trent Crable went over all of the catch-reporting

24   areas that were at issue.  They argued that path -- much

25   like Suquamish did in subproceeding 05-3, that path

1    necessarily includes everything.  We said no.  Wait a

2    minute.  If you don't have evidence, it doesn't.

3        It also neglects that there are other paths to get up

4    to the San Juan Islands.  When I was a child we used to

5    take the inside passage, because it was safer, and my

6    mother hated to be seasick.  It is neglecting that there

7    are other realities at play here.

8        So when they reargue that the term "straits" includes

9    the Strait of Juan de Fuca, that argument is in their

10   lower court briefs and was rejected.

11       When they argued that this body of water between

12   Admiralty Inlet and Haro Strait is part of northern Puget

13   Sound, that argument was necessarily rejected when the

14   court said this is two separate regions, with a strait

15   lying to the west of the Sound.

16       But I would like to talk about something that hits

17   home.  Lummi's own expert, when they filed their

18   cross-request for determination, said the territory of the

19   Lummi includes a few miles of mainland shoreline and about

20   half of the San Juan Islands.  The islands it included

21   included the northeastern shores of San Juan Island.  This

22   was their map.

23       This was the evidence that Lummi keeps on ignoring,

24   that they did their cross-request for determination in

25   1990, and affirmatively reclaimed these waters.  So they

1   recognized that Judge Coyle said Judge Boldt did not

2   intend these waters to be included.  So they use

3   Paragraph 25, I think it is subsection 6, to declare

4   waters that were not specifically determined.

5        And they brought in their expert, Wayne Suttles, and

6   he described the area as the eastern Strait of

7   Juan de Fuca, that they were claiming, that partially

8   enclosed water of the northern San Juan Islands and the

9   Olympic Peninsula.  And then their own expert was told by

10  Judge Rothstein, you have not been specific as to the

11  geographical areas that you are claiming.  You need to go

12  back.  And the Lummi never did that.  And now they stand

13  here today and say, oh, the geographical areas are

14  unclear.

15       There is a principle at play here.  When you set up

16  the very error that you are going to claim on appeal, you

17  are not allowed to make hay of it.

18       If the Ninth Circuit misunderstood that Admiralty

19  Inlet did not connect up to the San Juan Islands, then it

20  was Lummi that misled them.  The only party that ever once

21  said that Admiralty Inlet could get you all the way to the

22  San Juan Islands was in their Ninth Circuit brief on

23  Page 16.  They said Admiralty Inlet is a passageway to the

24  San Juan Islands.  And they forgot, like everybody else is

25  doing sometimes, to be exact.  But nine other times they

1   were very exact.  To claim the Ninth Circuit somehow got

2   it wrong is misleading.

3       But the operative period is at the Ninth Circuit.

4   That is the decision we are struggling with.  Everybody

5   understood what Judge Coyle and Rothstein had ordered.

6   Even Lummi said, we don't have to worry about the western

7   boundary because the whole strait was excluded.  There is

8   no ambiguity there.  The ambiguity is in the Ninth Circuit

9   decision, which contradicts itself, and doesn't create a

10  pathway.

11      Now, had Lummi availed themselves to the motion for

12  clarification, a process that they are very able to use

13  today --  Every time your Honor issues a decision, it

14  seems like if there is the slightest thing wrong about it,

15  we make sure you know about it right away.

16      There is a standard:  Manifest error.  I don't know

17  what the standard was in 2000 when they issued their

18  decision, but it seems to me they would have had to make a

19  showing saying, hey, this doesn't make sense, there is no

20  connectivity, are you really denying us all of the Strait

21  of Juan de Fuca, or do you mean to give us 310 square

22  miles back?  And then the Ninth Circuit could have ruled.

23  The judges would have still been there.  And Judge Beezer

24  could have said, hey, you know what, maybe I didn't

25  understand what was at issue here.  But the point to know

1    that is now over.

2        This is the map that they asked the court to look at.

3    When I first saw this map, I thought, well, the Ninth

4    Circuit just misunderstood these county lines.  And maybe

5    they thought that that county line was the boundary of

6    Admiralty Inlet.  As long as we are guessing, if we are

7    going out on a limb, we might as well go out all the way,

8    right?  As long as I am guessing what Judge Beezer

9    thought, maybe that is what he thought.

10       For this reason, when Lummi tried to use this map at

11   the Ninth Circuit in our appeal of your previous decision,

12   we said that map is misleading, because that isn't the

13   boundary of the Admiralty Inlet.  It is a mistake.  We

14   moved to strike.  The Court agreed and struck the map.

15       If the Court had been mislead, or was confused about

16   this line, it clarified that fact and said Admiralty Inlet

17   consists of the waters separating that island from the

18   Olympic Peninsula.  That was my only potential way to make

19   this decision make sense.

20       I think what we are left with is a decision that

21   doesn't entirely fit together like the perfect puzzle

22   piece that we had.  And we have the same panel telling us,

23   at the same time, please don't look at our decisions as if

24   they were these perfect works of statutes, where each and

25   every word was debated and analyzed.  That's not what you

do.   You look at what --   The question the Lummi asked

this court, the Ninth Circuit, the one that issued the

decision at play here was for the right to cross from Haro

to Admiralty Inlet, and to cross the eastern Strait of

Juan de Fuca.   And the answer was no.

    We ask this court to enforce that portion of the

decision.

            THE COURT:   Thank you very much, Ms. Rasmussen.

            MR. CRABLE:   Do we have any remaining time, your

Honor?   A couple of quick points.

            THE COURT:   No, Mr. Crable.   Thank you.

Mr. Crable, thank you very much for your argument as well,

and Ms. Neil.

    Ms. Rasmussen, you said something at the very

beginning that kind of resonated with me a little bit,

talking about Judge Beezer sitting with the other members

of the panel, I believe it was Judge Schroeder and Judge

Hawkins, late at night.   Judge Beezer was much more of a

morning guy, so it was probably breakfast.   But Hawkins,

Schroeder, not from here.   Judge Beezer was a native, and

if I remember correctly, an avid boater as well, who loved

to be around the San Juan Islands.

    Thank you all.   I will go back and look at it very

carefully.   As usual, I will try to get a decision to you

as quickly as we can.   We will be at recess.

1                        **(Adjourned.)**

2                     **CERTIFICATE**

10       I, Barry L. Fanning, Official Court Reporter, do hereby certify that the foregoing transcript is true and correct.

13                       **S/Barry L. Fanning**

14                       **Barry L. Fanning**