```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3   ----------------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al.,)
                                      )
 5                   Plaintiffs,      )  No. C70-9213
                                      ) Subproceeding 05-4
 6           v.                       )
                                      )
 7   STATE OF WASHINGTON, et al.,     )
                                      )
 8               Defendants.          )
                                      )
 9   ----------------------------------------------------------------
                     TRANSCRIPT OF PROCEEDINGS
10   ----------------------------------------------------------------

11            BEFORE THE HONORABLE RICARDO S. MARTINEZ

12                      April 24, 2013

13
     APPEARANCES:          Daniel A. Raas
14                         RAAS JOHNSEN & STUEN PS
                           P.O. Box 5746
15                         Bellingham, WA 98227

16                         Mason D. Morisset
                           Rob Roy Smith
17                         MORISSET SCHLOSSER AYER & JOZWIAK
                           801 Second Avenue
18                         11115 Norton Building
                           Seattle, WA 98104
19
                           Lauren Rasmussen
20                         1904 Third Avenue
                           Securities Building, Suite 1030
21                         Seattle, WA 98227

22                         Michelle Hansen
                           OFFICE OF TRIBAL ATTORNEY
23                         SUQUAMISH TRIBE

24                         James Jannetta
                           OFFICE OF TRIBAL ATTORNEY
25                         SWINOMISH TRIBE
```

1          THE CLERK:  This is the oral argument on the

2   pending motions for summary judgment, Docket Numbers 193,

3   195 and 199, in the case of the United States, et al.

4   versus the State of Washington, et al., cause number

5   C70-9213, sub-proceeding 05-4.

6      Will counsel please rise and make their appearances

7   for the record?

8          MS. HANSEN:  Good morning, your Honor.  Michelle

9   Hansen for the Suquamish Tribe.

10          THE COURT:  Ms. Hansen, good morning.

11          MR. MORISSET:  Good morning, your Honor.  Mason

12   Morisset for the Tulalip.  With me at counsel table is Tim

13   Brewer, the on-reservation attorney.

14          MR. JANNETTA:  Good morning, your Honor.  Jim

15   Jannetta for the Swinomish Indian Tribal Community.

16          THE COURT:  Mr. Jannetta, thank you.

17          MS. RASMUSSEN:  Good morning.  My name is Lauren

18   Rasmussen for the Port Gamble S'Klallam and Jamestown

19   S'Klallam Tribes.

20          THE COURT:  Ms. Rasmussen.

21          MR. RAAS:  Good morning, your Honor.  Dan Raas for

22   the Lummi Nation.  I am here sitting at the end of counsel

23   table just to take advantage of the writing surface.

24          THE COURT:  You are more than welcome to sit

25   there, Mr. Raas.  Thank you.  I know we have other

1  attorneys present in the courtroom.  And I realize that

2  these are the groups that are going to be arguing the

3  case, but just let me have all of the attorneys that are

4  here at least stand up and be recognized for our record.

5          MR. TOBIN:  Good morning, your Honor.  Bill Tobin

6  from the Nisqually Indian Tribe.

7          MR. LYON:  Good morning, your Honor.  Levin Lyon

8  for the Squaxin Island Tribe.

9          MR. SLONIM:  Good morning, your Honor.  Mark

10  Slonim for the Makah Tribe.

11          MS. HALEY:  Good morning, your Honor.  Emily

12  Hutchinson-Haley for the Swinomish Tribe.

13          MR. REICH:  Good morning, your Honor.  Richard

14  Reich for the Muckleshoot Tribe.

15          MS. KING:  Good morning, your Honor.  Lauren King

16  for the Quileute Tribe.

17          MR. NIELSEN:  Good morning, your Honor.  Eric

18  Nielsen for the Quinault Tribe.

19          MR. SMITH:  Good morning, your Honor.  Rob Roy

20  Smith for the Stillaguamish Tribe.

21          MR. MANNAKEE:  Good morning, your Honor.  Scott

22  Mannakee for the Stillaguamish Tribe as well.

23          MR. BELLIS:  Good morning, your Honor.  Rick

24  Bellis for the Suquamish Tribe.

25          MS. ALLEN:  Good morning, your Honor.  My name is

```
 1   Melody Allen, Suquamish Tribe.

 2            MS. NEIL:  Mary Neil for the Lummi Nation as well.

 3            THE COURT:  Thank you all.  Welcome to the oral

 4   argument of sub-proceeding 05-04, or the meeting of Puget

 5   Sound Part II.  I have read the materials that have been

 6   submitted.

 7      Mr. Morisset, I suggest we do the following:  Why

 8   don't we have you do the argument, have Mr. Jannetta join

 9   in afterwards for the Swinomish perspective on -- more of

10   a partial motion for summary judgment, and then we will

11   have Ms. Hansen actually reply.

12      Twenty minutes a side?  That sounds good?

13            MR. MORISSET:  Yes, your Honor.  I would like to

14   be sure to save some rebuttal to reply to Ms. Hansen, and

15   she may want to do the same.

16            THE COURT:  Perfectly fine.  Mr. Morisset, are you

17   ready?

18            MR. MORISSET:  We are ready, your Honor.

19      May it please the court, Mason Morisset for the

20   Tulalip Tribes.  I thought this was the meeting of Puget

21   Sound No. 47.  Kind of like the Super Bowl, it keeps

22   getting larger.

23      As your Honor has indicated, we are here again trying

24   to understand in greater detail the meaning of some words

25   that were used by the court some time ago.  This
```

1  particular controversy involves the findings of the court

2  in 1975 as to the usual and accustomed fishing places of

3  the Suquamish.

4      As reported at 459 F. Supp. 1020 at Page 10 to 49,

5  those include, quote, "The marine waters of Puget Sound

6  from the northern tip of Vashon Island to the Fraser

7  River, including Haro and Rosario Straits, the streams

8  draining into the western side of this portion of Puget

9  Sound, and also Hood Canal."

10     And I have put on the projector here a map that is

11  Exhibit A, I think, to our motion for summary judgment,

12  primarily to assist us in knowing what we are talking

13  about when we are talking about the areas that I have

14  marked in yellow, basically, Possession Sound there,

15  Port Susan there, Port Gardner, the small area there,

16  Holmes Harbor, running southerly off Saratoga Passage,

17  which is indicated there, and also Mutiny Bay, Useless

18  Bay and --  There is one other.  Anyway, those are the

19  three areas.  Cultus Bay.  These are areas that are

20  essentially in dispute in this sub-proceeding.

21     All of these areas are within the Tulalip usual and

22  accustomed grounds and stations as finally determined by

23  the court after numerous negotiations, agreements, court

24  proceedings and finally a full trial on the matter by

25  Judge Craig in 1985, as reported at 626 F. Supp. 1405,

1    Pages 15 through 27.

2        Now, in our motion for summary judgment, pursuant to

3    the court's scheduling orders, we argue that this case

4    follows previous cases, which I know your Honor is all too

5    familiar with, arguments over where is the Strait of

6    Juan de Fuca, where are these other areas, and what is the

7    meaning of these phrases.

8        And, of course, we have 05-3 that you spent

9    considerable time on, went up to the circuit, which gives

10   us some guidance as to the need to review these matters in

11   light of the findings of the court and the rules that the

12   circuit has given us, and the district court has followed

13   through these many, many years.

14       In 1975 Judge Boldt certainly had before him Exhibit

15   U.S.A. 73, which is also attached as Exhibit C to my

16   motion for summary judgment, in which Dr. Barbara Lane

17   explained that, quote, "The Suquamish held the west side

18   of Puget Sound, from near the mouth of Hood Canal, south

19   to Vashon Island."

20       The additional material that she placed in that

21   report, and we have repeated it in the record for this

22   case, show Suquamish fishing places, as recorded by

23   Waterman, solely on the west side of Puget Sound, and

24   place names solely on the west side of Puget Sound.

25       Now, I have marked on this map, which is

1    Document 200-3 in this case, but, as I say, originally

2    Exhibit U.S.A. 73, Bainbridge Island, to give us some

3    direction of where we are.  While it is too small to read

4    on the screen, there are numbers throughout the east side

5    and west side of Bainbridge, and then back into these

6    small bays and areas, and going on down to Vashon Island.

7    This is accompanied with a listing of what all these

8    numbers means, which is the Waterman fishing places.

9        The second map, chart technically, shows the existence

10   of place names, again based on --  I'm sorry.  This is

11   fishing.  The symbol shows on the map, at the upper right

12   up here, what kind of fish were taken where.  And, again,

13   the places are essentially around Bainbridge, the nearby

14   waters and so on.

15       So at the time, Judge Boldt certainly didn't have

16   anything before him, in terms of the location of Suquamish

17   fishing areas, or Suquamish villages, or Suquamish place

18   names that would place them on the east side of the marine

19   waters.

20       Waterman was a combination ethnographer and

21   geographer.  His manuscript was published in 1864, which

22   means he did the work not long after the treaties, and we

23   therefore assume it was pretty accurate as to treaty

24   times.  So from that 1864 report on which Dr. Lane and

25   others have relied, there is certainly no indication of

1    Suquamish fishing beyond that area.

2        Further, we note that Judge Boldt knew how to use

3    geographic descriptors, to include other waters when that

4    was his intent.  He did so in great detail in the Tulalip

5    determination, which is not finalized, which originally

6    was done in 1975, and then was finalized by Judge Craig in

7    1985, where specific areas -- or names of specific bodies

8    of water, specific place names for the areas where people

9    fished.

10       The Tulalips had numerous place names in these areas

11   that we are talking about.  If we have an hour or two I

12   will get it straight which way I have to turn this, your

13   Honor.  We have numerous place names for these areas

14   marked in yellow.  There are 127 place names around

15   Whidbey Island that belong permanently to the Snohomish,

16   the predecessor to Tulalip.  There were a large number of

17   fishing places also around the same area.  Many of them

18   referred to such names as Sabidaba (phonetic), as it was

19   in Waterman's list, and another place named The Place For

20   Using a Dip Net, and so on.  127 place names, including

21   the port village sites and settlements in the area.

22       The indication that this was clearly Snohomish home

23   territory also leads to the conclusion that it is not

24   likely that a tribe from the other side of the Sound and

25   the waters came over freely to attempt to fish in front of

```
 1   villages, fishing sites and so on.

 2      This court noted that Suquamish claims they maintained

 3   close relations with some people in the area who had

 4   fishing sites on Whidbey and Camano would be speculative

 5   for you to conclude this meant that the Suquamish

 6   necessarily camped and fished there as well.  It is in the

 7   order of January 3, 2007, Docket Number 18724.

 8      The Ninth Circuit, in looking at various claims that

 9   the Suquamish have made over the years, noted in its 1990

10   decision that Suquamish hold usual and accustomed places

11   at several areas on the west side of Puget Sound.  They

12   have that -- As to a claim by Suquamish that they fished

13   on the east side, they have at Page 1020 -- that decision,

14   590 F.3d 1020, at the time of the treaty, pointed out they

15   did not fish in those areas.

16      So we have pretty clear discussion of the fact that

17   there is no indicators that Suquamish ever fished in these

18   areas.

19      Judge Boldt had these facts before him, and I think

20   very similar to what this court and the circuit held in

21   05-3, the absence of naming these specific areas, evince

22   an intent not to include them.  He certainly knew how to

23   name specific place names when he needed to.  He knew how

24   to anchor fishing rights with reference to certain place

25   names, and he did not do so in this case.
```

1

2          THE COURT:  Mr. Morisset, let me ask you a

3   question while you have this exhibit up on the ELMO there.

4   Do you see where Catch Area 9 there, you have Useless Bay

5   and Mutiny Bay highlighted.  Catch Area 9, is that at

6   issue in any way, or is it just a little highlighted area

7   that you've got?

8          MR. MORISSET:  The amended --  You recall we went

9   up to the circuit a couple of times.  The amended request

10  for determination states that there is no evidence of

11  fishing on the east side of Admiralty Inlet, which is this

12  whole area.  And then I named including those specific

13  bays, which I think is probably the only place at this

14  point that there would be active fishing, if any.

15      There is an indeterminant, obviously, middle ground

16  there somewhere, which we would think would be the

17  demarcation point between the east side and the west side.

18  Honestly, I don't know where that is.

19      Once again, we get to lay the muddy bag on the court's

20  lap to try to figure out whether there should be a

21  boundary there.

22      But the remarks as to these specific bays is the same

23  as it is for all of the other areas, that there was no

24  mention of those areas as being a fishing area, but there

25  were for Tulalip.  They were specifically called out as

```
 1    being Tulalip fishing areas.
 2            THE COURT:  You only have a few minutes left if
 3    you want to save some time for rebuttal.
 4            MR. MORISSET:  I was going to say, I am going to
 5    stand down.
 6            THE COURT:  Let me ask you a question before you
 7    step down.  Part of your motion is to dismiss the
 8    counterclaim here for failure to state a claim.  It
 9    involves the violation of the prior agreement between the
10    three tribes.  You don't believe that your request at this
11    point in time violates that agreement in any way, shape or
12    form?
13            MR. MORISSET:  No.  I was going to save that
14    argument, but I will jump right into it.  I don't see how
15    filing a case to clarify Judge Boldt's intent as to these
16    northern areas is affected in any way by that agreement,
17    which dealt with fishing in Central Puget Sound only, did
18    not deal with Suquamish fishing at all, other than to try
19    to work with and was worked out an allocation of the Chum
20    runs to southern Puget Sound.  There had to be an
21    agreement about how many of those to intercept and
22    harvest.  But I see nothing in that agreement or the
23    court's order approving it that in any way indicates that
24    Tulalips couldn't challenge Suquamish if they chose to
25    step out and try to fish somewhere else, which is what we
```

1   think they are doing.

2          THE COURT:  Thank you, counsel.

3          MR. MORISSET:  Thank you, your Honor.

4          THE COURT:  Mr. Jannetta.

5          MR. JANNETTA:  Thank you, your Honor.  I stand

6   before you today, just as I did about seven years ago in

7   05-3, arguing about Suquamish U&A, and it seems like the

8   same waters.

9       Swinomish has filed a motion for partial summary

10  judgment to champion the decision that we in Upper Skagit

11  won in 05-3, and raise the banner of finality in this

12  case.

13      Now, I have to say that raising finality issues in a

14  case that is in its 50th year and spans two centuries is a

15  bit of a daunting task.  But I think in fact finality

16  issues are more important in a case like this that is

17  ongoing and evolving, because decided matters should be

18  put behind and we should be dealing with new issues.

19      And when I saw that apparently the bodies of water,

20  Penn Cove and Saratoga Passage, are included in this case,

21  and that Holmes Harbor is also included, we felt it

22  incumbent upon us to file a motion to protect the

23  preclusive effect of -- what we believe is the preclusive

24  effect of 05-3.

25          THE COURT:  Mr. Jannetta, I certainly agree with

1    your arguments on finality.  From my perspective, in fact,

2    one of the circuit judges advised me to put the entire

3    case aside.  That is another matter.

4        MR. JANNETTA:  I know that.  That circuit judge I

5    believe was in the minority on the appeal in 05-3.  First

6    the majority and then the minority.  And he raised that

7    issue also when we argued the Samish case en banc.  I have

8    heard him on that issue before.  And I urge you not to do

9    that.

10    I should go into 05-3, I think in some detail, because

11    it was decided a while ago, and it does cast a long shadow

12    on these proceedings today.  In 05-3, it involved a

13    challenge to Suquamish U&As in Skagit Bay and Saratoga

14    Passage, or Shellfish Areas 24(a) and 25(c), these waters

15    that are east of Whidbey Island.

16    As the Tulalip carefully laid out in its motion, 05-3,

17    like 05-4, arose from a sudden Suquamish incursion into

18    waters that they had not previously fished.  The differing

19    procedural histories of 05-3 and 05-4, which were filed

20    very close together in time, led to 05-3 being decided

21    well before 05-4 got to this stage.  Your decision in 05-3

22    was in early 2007.

23    In 05-3, this court examined the record before Judge

24    Boldt at the time he made the Suquamish U&A determination

25    in 1975.  The court concluded that Judge Boldt did not

1  intend to include Skagit Bay and Saratoga Passage in

2  Suquamish U&As.  This court's decision was based on the

3  finding that there was no evidence before Judge Boldt that

4  Suquamish fished or even traveled in the waters on the

5  east side of Whidbey Island.

6      Here is how the court framed the issue in its order on

7  motions for summary judgment in early 2007:  "In this

8  inquiry the burden is on Upper Skagit and Swinomish to

9  demonstrate that there was no evidence before Judge Boldt

10  that the Suquamish fished on the east side of Whidbey

11  Island, or traveled through there on their way up to the

12  San Juans and the Fraser River area."

13      And this is what the court concluded on the issue a

14  few pages later in that same order, Page 12, beginning at

15  Line 15:  "This absence of evidence regarding Suquamish

16  fishing or travel through to Saratoga Passage and Skagit

17  Bay leads the court to conclude that the Upper Skagit and

18  Swinomish have met their burden of demonstrating that

19  Judge Boldt did not intend to include these areas in the

20  Suquamish U&A."

21      Now, in 05-3, as well as in this case, the universe of

22  evidence is the same in the two cases.  The evidence

23  before Judge Boldt specifically regarding Suquamish U&As

24  consisted of the reported testimony of Dr. Barbara Lane.

25      Of particular importance to that testimony, and also

1    importance to this case, was the map that Dr. Lane used to

2    demonstrate the Suquamish travel route north.  And this is

3    the infamous map, which was actually attached to a

4    Suquamish herring regulation, and was used during the

5    testimony of Dr. Lane when the state raised questions

6    about the travel area north.  Dr. Lane testified that that

7    travel area north extended from their home waters north

8    through Areas 1 and 2 to the Fraser River.  As you can

9    see, all of the waters inside of Whidbey Island, including

10   Skagit Bay and Saratoga Passage, are in Area 4.

11       And the map was important for two reasons in the case.

12   The first was, as I just said, Dr. Lane laid out the

13   travel routes, but the second reason was Judge Boldt made

14   an oral decision on Suquamish U&A from the bench at the

15   conclusion of the hearing.  And Judge Boldt himself

16   referred to those areas, 1 and 2, as the travel area north

17   that was included in Suquamish U&A.

18       And, by the way, Swinomish U&A, too, there was a

19   me-too for Swinomish right after that.

20       So our U&As in that area, as well as Suquamish's, stem

21   from that map -- or partially from that map.

22       Now, when the case went to the Ninth Circuit, the

23   Ninth Circuit essentially affirmed this court in all

24   particulars in its decisions.  And that's Upper Skagit

25   Indian Tribe versus Washington, 590 F.3d 1020, which was

1    decided in 2010.

2        In particular, with regard to this case, the Ninth

3    Circuit said on Page 1025, "There is no evidence in the

4    record before Judge Boldt that the Suquamish fished or

5    traveled in the waters east of Whidbey Island,

6    particularly in Saratoga Passage or Skagit Bay."  The

7    Ninth Circuit also relied on this map, both with regard to

8    Dr. Lane's testimony and with regard to Judge Boldt's

9    ruling from the bench.

10        So that brings us back to this case, 05-4.  There

11   should be no question but that Penn Cove and Saratoga

12   Passage were included in the claim area in 05-3.  And the

13   claim preclusion applies to prevent re-litigation of that

14   in this case.

15             THE COURT:  Tell me why I should include Holmes

16   Harbor in that.

17             MR. JANNETTA:  The Holmes Harbor situation is

18   different.  Issue preclusion precludes that in Holmes

19   Harbor.  Holmes Harbor is a separate shellfish management

20   area, 24(d).

21        It wasn't included in 05-3, because at the time,

22   Suquamish wasn't fishing there, and so there was no case

23   or controversy, and no basis for the court's jurisdiction

24   at that time.  In fact, Suquamish didn't begin fishing in

25   Holmes Harbor until after your decision in 05-3.

1      So claim preclusion doesn't apply, but issue

2   preclusion does, because in this case, where there is a

3   finding in 05-3 that Suquamish never traveled or fished in

4   Saratoga Passage --  If you look at a map --  This is a

5   map of the County of Island that includes -- is better

6   than some of the other maps that we have used illustrating

7   this.  There is no way to get to Holmes Harbor without

8   traveling through Saratoga Passage.  So if you made a

9   finding that the Suquamish didn't travel in Saratoga

10   Passage, that necessarily determines whether Suquamish

11   traveled in Holmes Harbor, and therefore whether Suquamish

12   has U&A there, even though it wasn't technically part of

13   the case.

14      The two cases are very similar.  I mean, this is not a

15   case where you've got a decision in some case involving

16   different issues and facts, and you have to figure --

17   This case involves exactly the same law and facts.  The

18   universe of facts -- it is more like a star cluster maybe,

19   because it is only Dr. Lane's report, essentially, and

20   testimony, is the same in both cases, and the inquiries

21   are the same in both cases.

22      If you are looking in this case for -- if you are

23   looking in 05-4 --  Let's start with 05-3.  If you are

24   looking in 05-3 for evidence that the Suquamish did travel

25   in Saratoga Passage, you would look for evidence in that

1   record of whether they were in Holmes Harbor, because if

2   they were in Holmes Harbor, they would have been in

3   Saratoga Passage as well.  They could not have been in

4   Holmes Harbor without traveling through Saratoga Passage.

5   So the evidence of presence in Saratoga Passage is just as

6   relevant to 05-3 as it is to 05-4, and there wo no such

7   evidence, there was no such evidence presented.

8       Contrarily, once you have decided that there was no

9   Suquamish presence in fishing or travel in Saratoga

10  Passage, you have by that fact alone excluded them from

11  traveling in Holmes Harbor, just because of the

12  impossibility of going anywhere, the north or the south,

13  without going through Saratoga Passage.

14      So that is a matter that was already decided in 05-3,

15  it was litigated with Suquamish participation, the record

16  was combed and evidence was educed regarding the lack of

17  evidence.

18      Another point I guess that should be made is, of

19  course, if you look at the map of Areas 1 and 2, which

20  denote the travel area, of course, Holmes Harbor is as

21  much outside the travel area as Skagit Bay and Saratoga

22  Passage.  Holmes Harbor is just a small appendage to

23  Saratoga Passage.  It was an accident of the history of

24  the Suquamish fishing pattern that it was not part of the

25  case at the time.

1       Because there was no evidence in the record before

2   Judge Boldt, based on 05-3, that Suquamish traveled in

3   Saratoga Passage, and because you can't get to Saratoga

4   Passage by boat -- to Holmes Harbor by boat except through

5   Saratoga Passage, the finding in 05-3 compels the

6   conclusion that the Suquamish does not have U&A in Holmes

7   Harbor.

8       Your Honor, we believe that the Swinomish is entitled

9   to partial summary judgment, that the Suquamish has no U&A

10  in Penn Cove, Saratoga Passage and Holmes Harbor because

11  of the preclusive effect of the decision in 05-3, claim

12  preclusion in the case of Penn Cove and Saratoga Passage,

13  issue preclusion in the case of Holmes Harbor.

14          THE COURT:  Thank you very much, counsel.

15      Ms. Rasmussen.

16          MS. RASMUSSEN:  My client would like to make a

17  statement, but we would like to ask if we could wait until

18  the end, since nobody has raised the issue we would like

19  make a statement on.  Or, if you would like, we could make

20  the statement now?

21          THE COURT:  Let me have you make a statement now,

22  and that way Ms. Hansen may be able to respond to it if

23  she feels it is necessary.

24          MS. RASMUSSEN:  May it please the court.  I am

25  here to represent the Port Gamble S'Klallam and Jamestown

S'Klallam Tribes.  We filed an answer in this case, and also filed a response to the motion for summary judgment. We are here on three discreet issues.  The first and most important is the Suquamish in this case filed an affirmative defense, found on Page 15 of their answer, in Docket Number 139, that they should be -- if they lose this particular motion, they should be allowed to, under Paragraph 25(a)(6), affirmatively claim these areas in the sub-proceeding.  And we believe that is not a properly pled request for determination, and it should be done as a cross-request for determination.

As laid out in Paragraph 25, you said -- this court said that one may assert a counter-request for determination in the sub-proceeding.  We believe that in (a)(6) -- the (a)(6) request should have been a counter-request for determination, as was done by the Lummi in sub-proceeding 89-2.  And that's the proper procedure.  As such, we would ask this court to not allow this to be determined, at least without filing an amended cross -- amended answer and cross-request for determination.

Number two, the Suquamish have asserted in this sub-proceeding that at this juncture, and also in the past, that laches should be used against Tulalip.

We do not weigh in on the merits of that particular

1   request, but to say that this court has held, by Judge

2   Coyle in particular, that laches is not to be used in this

3   case to defeat treaty rights.  And it has been applied to

4   tribe versus tribe cases, so it is not just tribe versus

5   the state or tribe versus an outside party.

6       Judge Coyle ruled very clearly, quote, "Allowing Lummi

7   or any other tribe to assert such claims or defenses in

8   the sub-proceedings of this type," which was a U&A case,

9   "would, as a practical matter, encourage disregard for

10  this court's prior decisions."  That is found at 459 F.

11  Supp. 1068 and 1069.

12      So we would just ask this court to be cognizant of the

13  law of the case.  And that particular matter has been

14  decided, that for whatever defenses they may raise, laches

15  cannot be used, even in a tribe versus tribe case, and

16  therefore it shouldn't be used here.

17      The last is just a question that we were concerned

18  about, raised in Swinomish's brief, about whether this is

19  the law of the case, or whether we have a final decision

20  on the merits with respect to sub-proceeding 05-3.

21      We are concerned, of course, because we have an issue

22  in sub-proceeding 11-2 with respect to whether -- when

23  something is adjudicated, and it has been appealed to the

24  Ninth Circuit, do we have a final determination on the

25  merits, or is it the law of the case which can constantly

```
 1    be challenged?

 2        And we would like this court also to be very clear on

 3    how that is determined so that we do have finality in

 4    these sub-proceedings, that once something has been

 5    brought up to the Ninth Circuit and affirmed, that that is

 6    actually decided.  And that just because of this procedure

 7    that the court has recently expanded on, that you have to

 8    file a request for determination every time you have any

 9    issue, including a contempt proceeding, that that can

10    create this second right to appeal something, because it

11    goes up again on review.  There should be some finality

12    that is clear about things that have already been

13    reviewed, and it is not just a constant re-bite at the

14    apple.  Swinomish refer to it as kicking the cat.  I refer

15    to it as re-biting the apple.

16        To conclude, we are here for those three particular

17    purposes.  We don't weigh in on the merits, but we would

18    weigh in if this Paragraph 25(a)96), cross-requests for

19    determination, were adjudicated.  We would definitely want

20    the opportunity to weigh in fully on that, and would

21    request that be done in the proper process.  Thank you.

22            THE COURT:  Thank you, Ms. Rasmussen.  I also

23    understand you want to be heard on a completely separate

24    matter at the end.  We will do that after.

25        Ms. Hansen.
```

1          MS. HANSEN:  Good morning, your Honor.  Michelle

2    Hansen for the Suquamish Tribe.

3      Before I begin, I do have a question.  Suquamish filed

4    its own motion for summary judgment with three bases.  Did

5    you want this to be part of the 20 minutes, as well as

6    responding to what they were doing?

7          THE COURT:  Why don't you take a minute?  I have

8    read everything.  Take a minute to respond to them, and

9    then you can argue as to your motion as well.

10         MS. HANSEN:  Appreciate that.  Thank you.

11      I think what is important, and the court addressed

12   this in its first motion for dismissal, and that's the

13   question of judicial estoppel.  I think it is very

14   important here.

15      Especially --  I am going to start with the Swinomish

16   motion for partial summary judgment.  It was clear in

17   sub-proceeding 05-3 that the court limited its discussion

18   of the treaty rights to Saratoga Passage and to Skagit

19   Bay.  And, in fact, on several occasions there were

20   parties, including Suquamish, who asked for it to be

21   expanded.  And the court said, no, I am just going to deal

22   with those two issues.

23      In light of that, I think that it would be imprudent

24   to now allow Swinomish, or any other tribe, to come in and

25   say, well, Holmes Harbor, for instance, wasn't ripe,

1    because Suquamish wasn't fishing there, Penn Cove wasn't

2    ripe because Suquamish wasn't fishing there, and so we are

3    not going to deal with that, or ask to have it dealt with,

4    and then now come in in this sub-proceeding and say there

5    is issue preclusion.

6        My understanding from the 05-3 proceeding was that you

7    were going to take areas at a time as they came up instead

8    of trying to deal with them all at one time.

9        So in light of that, I would ask the court to deny

10   that motion for summary judgment -- partial summary

11   judgment on Holmes Harbor, Penn Cove -- I have separate

12   issues related to Saratoga Passage, as far as those.

13            THE COURT:  You do agree there is no way to get

14   into Holmes Harbor other than through Saratoga Passage?

15            MS. HANSEN:  I don't mean to be flippant, but in

16   treaty times people did portage.  And we have in fact done

17   historical research, and we have the ability today, if we

18   went to trial, to prove that Suquamish pre-treaty, and at

19   treaty, was at Holmes Harbor, and had traveled there from

20   the area that is called Edie's Prairie where they had a

21   settlement.  In fact, it is possible to go there.

22       Of course, generally, if you are going to travel, by

23   canoe or even today by any motor -- marine vehicle you are

24   going to pass through Saratoga Passage.

25       But as the court noted, even in the recent Lummi case,

1   even though they don't have fishing rights in a certain

2   area, they certainly can pass through it to get from one

3   treaty area to another treaty area.

4       The fact of the matter is, if we went to trial,

5   Suquamish would in fact show and prove that they were in

6   Holmes Harbor.  So I wouldn't rule it out for that reason.

7       In answer to some of Tulalip's points in its motion

8   for summary judgment, I think the most important point is

9   the fact that Suquamish and Tulalip and Muckleshoot

10  entered into a settlement agreement.  They did not go to

11  trial.  And Judge Craig made it clear in his ruling that,

12  as to his ruling on U&A for Tulalip, it only applied

13  against the Lummi, it did not apply against anybody else,

14  any other tribe who had settled with Tulalip prior to.

15      So when you get --

16          THE COURT:  Ms. Hansen, I have that right here in

17  my hand.  If you have a copy of it, show me in what

18  portion of it the Tulalip are in violation by asking the

19  court to make the rulings that they have asked in this

20  particular summary judgment motion.

21          MS. HANSEN:  The thing about the stipulation

22  between the Muckleshoot, Tulalip and Suquamish was that it

23  was so that the parties would not go to trial, and that

24  they would in fact resolve these overlapping U&A claims.

25      In fact, during the weeks before it was to go to

1    trial, Allen Stay, who is representing Suquamish, was in

2    heavy negotiations and wrote letters.   Those letters were

3    presented to the court, submitted late, that made it clear

4    that, as far as Suquamish was concerned, they didn't think

5    the Tulalip could prove all of these points they were

6    making, and said so.   And yet, they agreed, like people

7    do, like tribes do, to enter into a settlement agreement

8    in order to do several things.   One, to avoid the cost of

9    trial.   And also, in order so there would not be hard

10   feelings, and that they could try to figure out how to

11   move ahead --

12          THE COURT:   Ms. Hansen, I am a huge fan of that.

13   I have been trying to get everybody in this case to do

14   that as often as possible.   But I need you to show me --

15   You are arguing in your countermotion here that they

16   violated that agreement.   I would love to find that they

17   violated the agreement.   It would make it a lot easier for

18   me.   Show me where.

19          MS. HANSEN:   On Page 2 of the agreement it really

20   is the fundamental point, and it is at Line 6 through

21   Line 10, and it says, "This settlement is intended to

22   protect the existing fisheries of the Muckleshoot and

23   Suquamish Tribes in Central Puget Sound, while at the same

24   time recognizing the right of all tribes taking a portion

25   of fish passing through each other's usual and accustomed

1    fishing places.

2       It is the fundamental principle, and the reason why

3    the Suquamish entered into this agreement, is the Tulalip

4    said we will not contest your U&A.  We will not argue that

5    it is insufficient.

6       In fact, in one of the other letters that was

7    submitted late, it was a letter from Chairman Stan Jones

8    on May 5th, 1983, he says specifically we do not contest

9    the sufficiency of evidence of any other tribe, we just

10   want to be treated fairly in this sub-proceeding, which is

11   the 1983 sub-proceeding.

12            THE COURT:  Hang on a second.  I have read this

13   several times now.  I really am trying to --

14            MS. HANSEN:  You are trying to find where that is?

15            THE COURT:  I have it.  I actually had that same

16   passage marked.  That's the introduction portion.  And

17   then you slide into Page 3, Section 2, at the very top,

18   which talks about very specifically the usual and

19   accustomed fishing places.  Any violation anywhere in that

20   area?

21            MS. HANSEN:  The Suquamish Tribe right now has

22   ongoing a sub-proceeding that started in 2008.  2008-01 is

23   what it is called.  And that is where the Suquamish Tribe

24   is actually bringing its action for breaches to this

25   agreement.  And there are breaches --  I don't know if the

1  court recalls, we were working on the Fall Chum Fishery,

2  there were disputes about that, and we were actually able

3  to mediate that and come to some resolution.  But we still

4  have crab issues, we have shrimp issues, a number of

5  issues that are ongoing, and that we, the two governments,

6  are still talking about.

7      In terms of specific violations of the agreement, that

8  is being handled in a separate sub-proceeding, 08-01.

9      This counterclaim has to do with the general concept

10  of the Suquamish Tribe having entered into this settlement

11  on several promises.  There are actually three promises.

12  The first one was, we will -- we do not -- their

13  representation that we do not contest the sufficiency of

14  evidence for any tribe, and that means Suquamish's U&A.

15  Second, that they will protect Suquamish's current

16  fisheries as they exist.  And third, I don't know which

17  page it is on, but they agreed -- Tulalip agreed to be

18  bound to fish under the regulations that are put forth by

19  Muckleshoot and Suquamish together in Central Sound.

20  Those were the three things that were the basic tenets of

21  the agreement and the settlement, the reason why Suquamish

22  didn't go to court.

23      Today, for the purposes of this counterclaim, we are

24  saying that Tulalip had violated that basic tenet that

25  they would not go after and try and reduce or do anything

1   to the Suquamish.

2          THE COURT:  I guess the problem I have with that,

3   Ms. Hansen, is --  I have the agreement here in my hand.

4   And unless you can show me where the violation occurs, it

5   is difficult for me to respond to whatever may have been

6   the motivation that drove the parties together, or

7   whatever their thought process was.  I've got the document

8   that was drafted by all the parties here and signed off on

9   by all of the parties.  This is the controlling document.

10          MS. HANSEN:  Yes.  I understand.  I guess I see

11   the second page as not just a recital, but that it is a

12   fundamental part of the agreement itself.  And that's the

13   difference.

14          THE COURT:  All right.

15          MS. HANSEN:  In any case, Judge Craig made it

16   clear when he wrote his decision, as to Tulalip's U&A,

17   that it only applied against Lummi, and that everybody

18   else, in terms of where they could fish, where Tulalip

19   could fish, where Suquamish could fish, all of those, that

20   judgment and that order was not applicable and could not

21   be used in any proceeding, not even this one, by Tulalip.

22   And they are trying to do that here.  And I would ask that

23   the court not allow Tulalip to do so.

24      Mr. Morisset talked about Mr. Waterman.

25   Mr. Waterman's report is unpublished, and it is

 1    incomplete.

 2        While it does talk about his conversations with

 3    Suquamish informants about the homeland, there is nothing

 4    in there, because he didn't ask the question of Suquamish

 5    informants what is your place name for, say, Edmonds or

 6    Mukilteo.  He never asked that question.  I don't think

 7    you can infer from his report, or whatever Dr. Lane is

 8    saying about his report, that because there is no place

 9    name that Waterman came up with, that Suquamish did not

10    actually fish there, or did not have a place name there.

11        Tulalip is trying to argue that if there is no place

12    name given by Waterman, Suquamish couldn't have been

13    there, and couldn't have been fishing.  And yet, the court

14    has already ruled in -- specifically in 05-3, that

15    Suquamish had traveled from Fort Madison up through

16    Admiralty Inlet.

17        If I may approach the board?  This is JX-4.  JX-4 was

18    used in 1975 to talk about the herring.  These red marks

19    are where the herring fisheries were.  This is Port

20    Madison, and this is Whidbey Island.  Here is all the

21    different parts.

22        Your Honor, in 05-3 you had stated, looking at what

23    Barbara Lane had said about the travels to Fraser River,

24    that the Suquamish left Port Madison and then went up

25    through Admiralty, and then went into Haro, Rosario

1      Straits, and that way.

2         So to argue that because there are no place names from

3      Waterman here on this site, that Suquamish didn't take

4      this route, this court has already said it has, and it has

5      done so.  That then gets to Admiralty Bay, Mutiny Bay,

6      Useless Bay, Cultus Bay, all of those points that are in

7      the case study -- or the case area for Tulalip, are all on

8      that west side, and so is Admiralty Inlet itself.

9         So in terms of using Waterman, I don't think it is

10     appropriate for this.

11        Tulalip argues that Suquamish didn't have any fishing

12     or never came to the east side of Whidbey Island.  And I

13     want to go back to the map, if I may.  What happened, in

14     fact, was that Barbara Lane did say in her report that

15     during the fall and winter, and it is documented by ^

16     George Paige, who is the Indian agent --  Because the year

17     after the treaty the Suquamish were starving because they

18     couldn't go to their regular east side fishing grounds,

19     and they fished in the fall and winter at the Duwamish

20     River and at the Snohomish River.  The Ninth Circuit, and

21     this court, has said that is true.

22        So the point with this is, they had to have gotten

23     from their homeland, which is here --  As noted, this is

24     about three and a half miles.  And fall and winter

25     fisheries, as Judge Boldt said, are the usual fresh water,

in the wintertime, when-you-are-staying-in-one-place
fishery.  It means that this fishery was a homeland
fishery for the Suquamish.

   Now, the point that is important is that Tulalip in
its own 1975 request for determination for this U&A had
Barbara Lane testify.

   The attorney, Lewis Bell, asked her, well, where were
the Snohomish, the Skykomish and the Snoqualmie?  And she
said they are on these rivers and in adjacent marine
areas.  She used those words.  And Mr. Bell said, well,
where is that?  And he said, is that Holmes Harbor?
Port Susan?  Saratoga Passage?  Is it Possession Sound and
Port Gardner?  Is it the west side of Whidbey Island, at
least halfway up?  And Barbara Lane said, yes, yes, it is.
I agree.  But I have to tell you, Judge, that --  She also
said she didn't have any documents to prove it.  Okay?

   My point for judicial estoppel, and I will say it
here, is that the Tulalip can't use that testimony and
say, well, the marine waters that are adjacent to the
Snohomish River include all of these areas for Tulalip,
but they don't for Suquamish.  When Barbara Lane --  The
same expert, same location, same words, "adjacent marine
areas."

   So in addition to the earlier comments that the court
had made back in 2005 about the use of Puget Sound, and

1    this reasonable expectation that Puget Sound would be for

2    Tulalip, include these areas, well, necessarily for

3    Suquamish, too.  You can't have it go inconsistently, one

4    for one tribe and one for the other.

5        Mr. Morisset also talked about laches, and said the

6    1990 decision by the Ninth Circuit precluded Suquamish,

7    and said they were only on the west side.

8        The court has already, in its previous ruling in

9    October of 2005, said that laches applies.  Not because

10   this is a treaty rights case --  And I think the court

11   agreed that laches does not apply when treaty rights are

12   involved, but that Tulalip's case regarding this east of

13   Puget Sound is really an interpretation of its Ninth

14   Circuit case, it is not a treaty rights case.  The court

15   held that before, and the Suquamish asks the court to hold

16   that again.

17       It is important to note that treaty rights vested at

18   treaty time.  So when opposing counsel talk about

19   Suquamish not having fished there, and I think the words

20   are "incursion into this area" in 2003, it is not an

21   incursion.  Judge Boldt made it clear that the treaty

22   rights vested at treaty time, which meant that you could

23   or could not use it at any time.

24       And we have to say, for Suquamish, it has about 15

25   fishermen, and it has a very large U&A.  So to expect that

1  Suquamish every year has to go through every area in order

2  to protect its right, I think is not what Judge Boldt

3  expected, and I don't think that is what the treaties

4  expected either.

5      Although Mr. Jannetta said the evidence is the same

6  between 05-3 and 05-4, I think that it is significantly

7  different.  And I think the court noted that.  Tulalip is

8  in a different position than these other tribes that are

9  also defendants in this case -- plaintiffs in this case.

10  The fact of the matter is that there is not only the

11  relationship of the MST, the settlement agreement, but

12  there is also the language that is the same between

13  Barbara Lane's testimony regarding Tulalip and Suquamish.

14      So the court noted before that there is a difference.

15  And I think, if you may, Suquamish asks the court to again

16  see that distinction and treat 05-4 differently.

17      The most important part, and it perhaps is a closer

18  look at what happened in April 1975 --  What happened is

19  this:  That map that Mr. Jannetta showed you was attached

20  to a regulation.  And if you took a look at that, the

21  writing in the regulation talked about Area 1, Area 2,

22  Area 3 and Area 4, all areas.  And that was submitted by

23  Mr. Morisset on behalf of Suquamish at the time he was

24  representing them.  That was the Suquamish Tribe's

25  assertion of where it had a treaty right to fish.

1    Another thing, no tribe objected to that regulation.

2  And Judge Boldt noted that.  He thought --  In an exchange

3  with Mr. Salomon, who was the AG, said, essentially, what

4  is it to you?  The tribes aren't complaining.  They are

5  the ones that would be sure to keep somebody out if they

6  didn't qualify, because that tribe trying to get in would

7  be taking part of the share.  He found that alone was

8  enough, at least sufficient, to show a prima facie case.

9    The other things that were important about that 1975

10  hearing is that Lummi representative Forrest Kinley

11  presented a joint Indian regulation.  And he said that

12  every tribe was involved.

13    And following that, Mr. Morisset is talking to the

14  judge about what happened, and he said:  Boy, since that

15  order of -- I think it was March 28th, we have been

16  meeting; the attorneys and Indians are meeting, the

17  Indians are meeting with the state, everybody is meeting

18  with everybody else, and we are really trying to do what

19  we can for you, Judge.  And we just can't do it, and that

20  is why we are here today.  That was April 10th.

21    In addition, I think it is important that Dr. Whitney,

22  who was the FAB, the Fish Advisory Board expert, got on

23  the stand and said we have agreed, Indians and

24  non-Indians, to have a joint fishery.  And we are going to

25  have the same regulations.

```
1        In 05-3 the court noted that there is this June 1975
2   regulation that was put out by Suquamish and said, well,
3   that is evidence of what Suquamish thought was its U&A.
4   In fact, if you take a closer look at that, it turns out
5   that that is a revision of the regulation in order to
6   match what the state was doing by agreement of all the
7   parties.  Also, on the face of that June regulation it
8   says we are doing this because we had made an agreement
9   for the state and the U.S. Fish and Wildlife to be able to
10  do biological monitoring.  In order to do that, we all
11  need to be fishing at the same time in the same places.
12       And I think it is important --  I am going to look at
13  another map here.  This is JX-3 --
14            THE COURT:  Did you say JX-3?
15            MS. HANSEN:  JX-3.  Joint Exhibit 3.  It goes
16  together with JX-4.  They were used in 1975.
17       These areas here, this is Northern Puget Sound, and as
18  you can see, spawning areas, purse, gill net, different
19  types of fisheries.  And this is Central Sound and South
20  Sound.  In the testimony before Judge Boldt they are
21  talking about what the fishery is going to be.  All of the
22  fishery for herring roe was going to occur here.  It was a
23  five-week fishery starting in April.
24       Judge Boldt was under a timeline.  I'm sure that you
25  have been in that situation yourself.  The fact is,
```

 1    Mr. Millikan testified that this was a million-dollar

 2    fishery over 14 days, and the state had created a limited

 3    entry fishery, which meant that 17 fishermen, non-Indian

 4    fishermen, were on there for 14 days to catch a million

 5    dollars' worth of fish.  It was a lucrative fish, and

 6    that's why there was a big fight.  And the tribes were

 7    trying to get into that fishery, and the state was

 8    resisting.  So there was a lot of talk about putting it

 9    together.

10       The state didn't care about Area 3 and 4.  And they

11    didn't object to it.  Neither did the tribes.  They were

12    objecting, and all of the testimony you saw was about

13    Areas 1 and 2, because that's where the fisheries were

14    occurring, here, and I think parts of here, that they

15    would have to go through.

16       That's why the evidence before Judge Boldt was only

17    about 1 and 2.  It wasn't because the tribe was limiting

18    it to that, it was because the court already understood

19    that nobody objected.  It is like a judgment on the

20    pleadings.  Nobody objected to the submission, and,

21    therefore, they were only going to deal with the matters

22    that were in dispute.

23       And I think that is important to note when you say

24    there is an absence of evidence about fishing here in this

25    area that is the case area here, because, look --  If you

```
1    look at JX-4, there is no herring fishery here.  There is
2    no reason to talk about it.  And that's why they didn't.
3         So, ultimately, when you get back to the question of
4    whether or not in sub-proceeding 05-3 Judge Boldt made an
5    affirmative decision not to include Saratoga Passage or
6    Skagit Bay, the answer is no.
7         The only thing we have here is the court -- this court
8    and the Ninth Circuit saying we have to infer from the
9    fact that there is no evidence present that he didn't
10   intend to include it.
11        Well, it has got to be one of two ways.  You can't
12   come in after the fact and say now we are going to have
13   issue preclusion.
14        But the fact of the matter is, the Suquamish should be
15   allowed --  If there was no evidence before Judge Boldt,
16   then under paragraph 25(a)(6), which says if I haven't
17   decided it, you can bring it before me, we should be given
18   that initial opportunity to make a presentation of
19   evidence to get an affirmative ruling on whether we were
20   there or not, and not to be foreclosed by an inference
21   just because it was not part of the dispute that was going
22   on in April of 1975.
23        There was some conversation about Holmes Harbor being
24   limited and all of that, but I think it is also important
25   to note, if you look at the map again, that these are
```

```
 1    places that are safe havens.  Any person who is in a canoe
 2    or a kayak at treaty time, and even today, you are going
 3    to go into these areas.  You might camp there.  You might
 4    take refuge for a day.  You might take refuge for a couple
 5    of hours.  It is important.  And the court can take
 6    judicial notice of the fact that the Strait of
 7    Juan de Fuca has strong winds all year around.  And so at
 8    treaty time, and now, people use all of the waterways in
 9    order to take the best and safest route.  That's no
10    different in 1855 than it is today.
11         All in all, your Honor, I think that it is important
12    that you look at what was happening in April of 1975, and
13    find -- if you read the words Judge Boldt says:  I don't
14    see the Indians objecting at all.  And so, state, what is
15    it to you?  Why are you objecting?  Mr. Salomon says,
16    well, it just isn't sufficient, I want to go through this.
17    Judge Boldt says, okay, we will go through the testimony.
18    That's why there is some cross-examination really of
19    Dr. Lane about what was going on in Areas 1 and 2.
20         And she was clear, it is big, Suquamish went to Fraser
21    regularly --  She didn't have a whole lot of detail about
22    it because it was just a fairly broad-based understanding
23    that she could see from the documents that she reviewed,
24    the letters that were at Fort Langley that said the
25    Suquamish were here again, "The Suquams were here."  If we
```

1   go to trial, your Honor, we have evidence that shows that

2   they were there on a regular basis, especially in the

3   early 1800s.

4       All in all, we request that the court look at

5   Suquamish's motion for summary judgment on res judicata,

6   on laches, and on judicial estoppel, and grant Suquamish

7   its motion.

8       Also, in looking at what the Tulalips have produced,

9   in terms of their motion, and the facts as they are that

10  are not controverted because they are already in the

11  record, that Suquamish is entitled to summary judgment on

12  the grounds of the fact that they were also there.

13  Barbara Lane said they were there.  The Ninth Circuit has

14  already said, as to this area that is the case area, the

15  Suquamish have already been there.

16      Thank you.

17          THE COURT:  Thank you, Ms. Hansen.  Mr. Morisset.

18          MR. MORISSET:  May it please the court.  I kind of

19  lost track of time.  Are we doing okay?

20          THE COURT:  It is fine.  You just have a few

21  minutes left.  I want to hear what your definition of

22  "marine waters adjacent to the river fisheries" means.

23          MR. MORISSET:  I think the context of that is

24  important.  And when that phrase was used by Dr. Lane, and

25  Mr. Bell asked her what she meant, would it include

1    specific named waters, she said yes.  Beyond that, we

2    don't know what "adjacent marine waters" means unless

3    there is some context to look at it, and some indication

4    from Dr. Lane or other witnesses or informants as to what

5    it meant.  In that case she named it specifically.

6        That original finding in 1975 by Judge Boldt named

7    those specific places only.  That was one of the reasons

8    that it was necessary for the Tulalips to bring a request

9    for a final determination, to explore the more open marine

10   waters.

11       There is a clear pattern, your Honor, in the case of

12   all of the tribes alleging wide areas based on what we all

13   know to be the facts of treaty times, of travel to the

14   major trading areas and fish-buying areas, a lot of travel

15   to the Fraser River, for example.  And there are no place

16   names or specific waters to go, it was all open.  It was

17   in that famous open area known as eastern Strait of

18   Juan de Fuca.  We won't go there.  Don't worry.  But there

19   were open marine waters.

20       But when we came to constricted waters, the court made

21   a finding in the Tulalip case that there were possibly

22   different rules about constricted waters.  You didn't say

23   what they would be, except that they might be under the

24   control of the resident tribes.  And we know that is a

25   different inquiry than the inquiry we are dealing with

1    here as to specificity.

2       I will quickly run through a few comments.  Ms. Hansen

3    says that no one objected to Suquamish in 1975.  I briefed

4    this extensively.  I would just point out that, among the

5    reasons there was no objection is they did not then, and

6    did not for 30 years thereafter, attempt to fish in those

7    areas.

8       We have the uncontroverted declaration of Mr. Rawson

9    that they didn't attempt salmon fishing until about 2007,

10   and the uncontroverted testimony of Mr. McHugh that they

11   didn't attempt shell fishing until about 2003.

12      Ms. Hansen has a whole number of ideas about the

13   Waterman manuscripts, none of which are in the record.  I

14   don't know where these statements come from, that his

15   materials are suspect because he didn't ask the right

16   question.  That has never appeared before.  Waterman's

17   manuscripts have been relied on by the courts and the

18   tribes for over 30 years.

19      We have to remember that it was Waterman's manuscripts

20   that were in front of Judge Boldt.  He had the reports

21   that had them.  They were not controverted at that time.

22   I don't know that they could be.  He was the only person

23   to make a fairly thorough attempt to note place names and

24   fishing names -- fishing villages around the home areas of

25   the tribes.  He didn't try to go out into the eastern

 1    Strait of Juan de Fuca to find places.  He looked around

 2    the villages and home territory and noted, as I pointed

 3    out, hundreds of places for Tulalip predecessors, and none

 4    for Suquamish.

 5        I will just jump over a couple of things.  I really

 6    have to differ with counsel.  She said don't worry about

 7    the number of claims that were involved in the MST

 8    agreement, those are being handled in 08-1.  Those were

 9    her words.  I don't know what she is talking about.

10        We settled 08-1 as to the allocation of Chum.  You may

11    recall --  We didn't get to trial on them, but you may

12    recall from the papers, originally there were five tribes

13    that fished in Central Puget Sound, now there is two, and

14    that led to difficulties in how to allocate the fish,

15    which was eventually done.

16        I thought 08-1 was dismissed.  I would have to look at

17    the record on that.  But there is certainly nothing going

18    on.  I don't know what she is talking about being handled.

19    She mentioned all kinds of things, shrimp and so on, none

20    of which have anything to do with the MST agreement as I

21    can see it.

22        She constantly misstates the agreement.  She read what

23    it said accurately on Page 2, and then misstated.  She

24    said, and I quote, "The one purpose of the agreement was

25    to," quote, "protect current fisheries as they exist,"

1    unquote.  That is not what it says.

2        The context of the agreement was all about Tulalip

3    fishing, where their U&A was, and could they fish in

4    Area 10.  The agreement says on Page 2, quote, "This

5    settlement is intended to protect the existing fisheries

6    of the Muckleshoot and Suquamish Tribes in Central Puget

7    Sound," end quote.  That is all anyone was talking about.

8    It didn't involve where did the Suquamish fish.  There was

9    no question about that at the time, they fished in Central

10   Puget Sound.

11       The argument was how to allocate the fish if Tulalip

12   was to come in.  And there were elaborate mechanisms

13   worked out to guarantee everyone got a fair share of their

14   home region of production, which was the fish that would

15   end up in their home regions, and to insure that the South

16   Sound tribes got the lion's share of that fishery, because

17   those fish were headed to that area.

18       There was no discussion, no mention and no intent in

19   the document to protect Suquamish fisheries generally.

20   Which even if there were, it wouldn't mean anything

21   because nobody assumed they were going to try to fish in

22   Possession Sound.  They hadn't, they didn't, and they

23   didn't for decades after that agreement.  It is only

24   recently that we have had these issues.

25       Thank you, your Honor.

1          THE COURT:  Thank you, counsel.  Mr. Jannetta, do

2    you want to make any final comments?

3          MR. JANNETTA:  I do, your Honor.  I would like to

4    start out by agreeing with something that counsel for

5    Suquamish said, if I remember it correctly.  Counsel for

6    Suquamish said, this herring map, and the herring

7    regulations prior to Judge Boldt's ruling on the U&A,

8    indicated the area they thought was their U&A.  I submit

9    that is true.

10         But what she didn't tell the court, and the court may

11   not remember, is that in this paragraph of the order on

12   motions for summary judgment in 05-3, this court noted

13   that after Judge Boldt's ruling on U&A, Suquamish amended

14   its regulations to delete those waters that are in dispute

15   in this case.  You said it is not improper to use this

16   evidence as Suquamish's understanding of their own U&A at

17   that time.

18         Suquamish's understanding of its U&A after Judge Boldt

19   had made the ruling is consistent with Barbara Lane's

20   testimony, it is consistent with Judge Boldt's use of the

21   map, it is consistent with our position in 05-3, it is

22   consistent with the position of Mr. Morisset with regard

23   to 05-4.  And for decades after that, until 2003, they

24   fished consistently with that understanding that you found

25   in 1975.  And I believe that that fully justifies the use

1    of the term "incursion" with regard to these waters.

2        Now, I have a little bit of deja vu, because I think I

3    heard 05-3 being reargued before you here, and I want to

4    remind you that this is -- that that case is decided.  I

5    want to remind you that evidence of portaging is not in

6    the case.  I don't think I need to remind you that you

7    concentrate on what was before Judge Boldt at the time,

8    and no amount of reaching forward for evidence or

9    rearguing 05-3 is going to change what is there.  There is

10   nothing there about Holmes Harbor, and there is nothing

11   there to suggest portaging or any other fanciful theory

12   that one might come up with now.

13       I submit that we are still entitled to our partial

14   summary judgment.

15           THE COURT:  Thank you, Mr. Jannetta.

16       Ms. Hansen, anything that you finally would like to

17   say?  It was kind of weird procedurally the way we did

18   this here.  Is there anything else you would like to say

19   in response to what has been brought up?  You don't have

20   to.

21           MS. HANSEN:  I did put stars over comments, so I

22   did have two points.  I think it is important that -- it

23   is what Mr. Morisset said, even Barbara Lane said all of

24   the areas -- that map that Mr. Morisset showed us with the

25   little markings on the west side, she said that has to do

1    with home territory.  If you look at her report, she says

2    it has nothing to do with off-reservation.  And it is

3    clear, she says, that Suquamish went off-reservation to go

4    fishing, and they were widespread in where they went.  So

5    you can't use that map and those words to say that that is

6    the only place that Suquamish fished.

7         Also, the MST agreement was about Central Sound, but

8    it was also about all of these areas.  If you have taken a

9    look, and I think you have, it talks about 8(a), it talks

10   about 9, it talks about all of these areas, and it talks

11   about who -- which tribe is going to be the primary

12   manager for it or issue the regulations for it.  So it is

13   not just an agreement about allocation, or I think

14   Mr. Morisset used another word.  It was allocation and

15   something else.

16        The fact is, it is a U&A dispute settlement agreement.

17   It is not just an allocation agreement.

18        I want to note that in 1990 Tulalip, and Mr. Morisset

19   was representing Tulalip at that time, made that same

20   argument when Swinomish tried to come forward and get an

21   injunction against Tulalip for some overfishing that it

22   was doing.

23        And there, Magistrate Weinberg didn't buy that

24   allocation agreement argument.  And neither did Judge

25   Craig, who said, an agreement is an agreement.  It is

1    clear.   There is nothing in here -- it is --  He found it

2    to be a U&A dispute agreement.   And he said there is

3    nothing that prevents Tulalip from -- excuses Tulalip from

4    not performing this agreement.   And Judge Craig said --

5    Judge Boldt, a long time ago, early in the case, said a

6    deal is a deal.

7        Well, your Honor, a deal is a deal here, too.   And we

8    hope that you find that the MST agreement is in fact an

9    agreement and a settlement of U&A claims that are

10   overlapping, and that this applies to any situation that

11   comes up between Tulalip and Suquamish.   Thank you.

12          THE COURT:   Thank you.  Ms. Rasmussen, you wanted

13   to address the court on a different matter entirely?

14          MS. RASMUSSEN:   Yes, your Honor, I did.

15       I did also want to respond to one thing that the

16   Tulalip said, which I don't think the court needs to reach

17   here, which is about this constrained waters being more

18   specific than open waters, and raising sort of this

19   eastern Strait of Juan de Fuca issue, which you know we

20   hold quite near and dear.   Just to remind the court, of

21   course, travel had to be for the purpose of fishing, not

22   for trading, that this court does not need to reach the

23   question of whether the Suquamish traveled or whether they

24   had U&A all the way up.

25       In addition, with respect to the Strait of

1   Juan de Fuca, the Ninth Circuit has held that it is a

2   geographical marker which Judge Boldt used with the

3   Clallam's U&A determinations specifically.  In addition,

4   the Clallam had village sites all the way along the coast

5   of Juan de Fuca, which nobody else had.

6       So I just wanted to make sure that we don't sort of

7   divert --  We are all kind of pushing each other in

8   different directions.  Don't send them our way so that we

9   have to jump in again on that, or at least save that one

10  issue for yet another day.

11      With respect to the second issue, which has nothing to

12  do with the sub-proceeding, counsel over the last couple

13  of years has been having different responses from the

14  Ninth Circuit with respect to how to participate in

15  appeals.

16      So it used to be with paper filing all the parties,

17  the gigantic service list, would receive copies of the

18  appeal documents, that we would all be able to respond to

19  those documents as either, you know, respondents or --

20  But we were all treated as parties.  And then, of course,

21  electronic filing came and they created categories for

22  your participation, so you are either a respondent or an

23  appellant or an amici.

24      And the Ninth Circuit has sort of been flip-flopping

25  in terms of how to treat us.  In some proceedings --

1    several years ago, for example, my client was told that

2    they had filed an answer in the case, they had filed

3    responses to summary judgment motions similar to here, and

4    the Ninth Circuit suddenly said, just as we were filing,

5    no, I'm sorry, you have to file an amicus brief or you

6    have to intervene, you can't file a response.

7              THE COURT:  Who told you that?  Was it the clerk

8    of the --

9              MS. RASMUSSEN:  It was various clerks.  We get

10   like the clerk of the day.  And so I did that.  And then

11   the next clerk came along and said, no, no, no, here is

12   your green brief back, I want a red brief, you are a

13   respondent.  So that happened to us.  And then we said,

14   okay, fine, that's great, because we felt like we were

15   respondents from the get-go.

16       And we were working with Kathy also on the local Ninth

17   Circuit issue, because she always has problems with the

18   docket and who is the parties.  And then it happened

19   again.  And I said, well, you know, last time I did this I

20   had to file a green brief, and then I was told to file a

21   red brief, and now of course everything is just a white

22   brief and we file electronically, and this is somewhat

23   inconsistent.  And they said, I'm sorry, you are not a

24   party, and you have to file a motion to intervene.

25       And so I have consulted with counsel and I think been

 1    involuntarily nominated with Joe Panesko to try to raise

 2    this issue with this court and try to come up with some

 3    sort of solution for how we are treated on appeal.

 4        Of course, we have the Lummi case on appeal.  There is

 5    parties that want to know, you know, are they going to

 6    have to appear as amici, sort of follow this motion to

 7    intervene procedure, which is the latest from them, is

 8    that we have to intervene, and then they will allow us to

 9    be added as a party.  And then once we are a party, they

10    don't know what to call us, because it isn't a respondent

11    or an appellant.

12        And so they proposed to me at one time that we could

13    create another category of participants called interested

14    parties, which this court has, where you can participate,

15    you know, I am partially on this person's side and

16    partially on this person's side, but that we had to follow

17    some sort of procedure, and it would be difficult.

18        And so Mr. Panesko and I think it would be helpful to

19    have the court help us in creating this category of

20    interested parties, because we don't believe, correctly,

21    that we should have to intervene in a case where we are

22    all bound by the decision, and that we have participated

23    in the lower court pleadings, and should be considered

24    parties.

25            THE COURT:  Ms. Rasmussen, thank you for bringing

1    that to my attention.  I know that when we switched over

2    to electronic filing it would create those kinds of

3    issues, especially in a case like this.  And you know that

4    I love to tell the Ninth Circuit what to do, but --  While

5    I may have developed a reputation for having tried that in

6    the past, I think they pretty much tell me what my place

7    is.

8        I think if all the parties agree --  If you can come

9    up maybe with sort of a specific plan, I like this

10   creating a new category, then I will do whatever I can to

11   work with the clerk of the Ninth Circuit to make sure that

12   it is put into their system so that any new clerks coming

13   on for any of the new appellate judges recognize that this

14   is a different sort of case, and that there is this

15   category of interested parties that may be partially here,

16   partially there.

17           MS. RASMUSSEN:  I would appreciate that, your

18   Honor, and any guidance you can give us on how we should

19   get that in front of the Ninth Circuit.  That is what

20   Mr. Panesko and I have been struggling with.  That's why I

21   am addressing it here.  We didn't just want to call your

22   Honor.  We didn't know if we should write a letter and

23   file it, and thereby you could respond and we could send

24   that all up to the Ninth Circuit.  We just weren't sure

25   how to get the right people involved.

1          THE COURT:  Let me ask you to do this:  In the

2    form of a letter would be fine, something to me in

3    writing, that I could then pass on at the circuit level.

4    What I will do is, I will follow up with the clerk of the

5    Ninth Circuit.  Every now and then they need people to

6    help, and I volunteer, as many other district judges do,

7    to sit up there by designation.  What I will do is, I will

8    follow up informally and see what it is they need, either

9    from me or from the parties in this case, to create that

10   kind of category.  But what I would like from all of you

11   is to have something where all of you agree.  And it would

12   give more strength to what I am requesting of them if they

13   understand that this is sort of a unique case.

14          MS. RASMUSSEN:  Thank you, your Honor.

15          THE COURT:  All right.  Counsel, my standard

16   practice is to go back, take a look at your moving

17   documents again in view of the oral arguments that were

18   made.  I thank all of you for your presence.

19       Let me also read from the MST the stipulation that was

20   handled by Special Master Robert Cooper when the

21   Muckleshoot, Suquamish and Tulalip Tribes came to an

22   agreement.  I like this language.  It says, "In an effort

23   to foster closer ties between the parties, promote tribal

24   unity and cooperation, and to support the development of a

25   comprehensive management plan, the Tulalip, Suquamish,

```
 1   Muckleshoot tribes have agreed as set out in this

 2   settlement agreement."

 3       I said this during the culvert case as well, there are

 4   some cases that just don't lend themselves very well to

 5   judicial disposition.  This case, unfortunately, is one of

 6   those.  And I remind all of you that it is always so much

 7   better to cooperate amongst yourselves in terms of

 8   reaching agreements that are beneficial to all.

 9       I also understand that we are talking about limited

10   resources, and they may be getting more limited as time

11   goes on, and that creates these kind of issues.  It is

12   always better if you decide for yourselves than leaving it

13   in my hands.  I will do the best that I can.

14       Thank you all.  We will be at recess.

15                    (Adjourned.)

16

17

18

19

20

21

22

23

24

25
```

1                          **CERTIFICATE**

2

3

4

5

6

7

8

9          I, Barry L. Fanning, Official Court Reporter, do hereby
certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25