0

```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                           IN SEATTLE

 3   ------------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al, )
                                      )
 5                   Plaintiffs,      )  No. C70-9213
                                      ) Subproceeding 01-1
 6            v.                      )
                                      )
 7   STATE OF WASHINGTON, et al.,     )
                                      )
 8                Defendants.         )
                                      )
 9   ------------------------------------------------------------

10                    TRANSCRIPT OF PROCEEDINGS

11   ------------------------------------------------------------

12           BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                       October 13, 2009

14
     APPEARANCES:
15
                            Mr. Peter C. Monson
16                          U.S. Department of Justice
                            Environment & Natural Resources Division
17                          Rogers Federal Building
                            1961 Stout Street - 8th Floor
18                          Denver, CO 80294

19                          Rene David Tomisser
                            Fronda C. Woods
20                          Douglas D. Shaftel
                            Philip M. Ferester
21                          Attorney General's Office
                            P.O. Box 40100
22                          Olympia, WA 98504

23                          John C. Sledd
                            Laura Sagolla
24                          KANJI & KATZEN
                            100 South King Street, Suite 560
25                          Seattle, WA 98104
```

Alan C. Stay
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Tim R. Weaver
COCKRILL & WEAVER PS
316 North Third
Yakima, WA 98907

Daniel A. Raas
Harold Johnsen
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
Rob Roy Smith
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmussen
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
Northwest Indian Fisheries Commission
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

INDEX OF WITNESSES

**CHARLENE KRIS**                                     **PAGE**

    **Direct by Ms. Foster**                  **42**
    **Cross by Mr. Tomisser**                 **56**

**LORRAINE LOOMIS**

    **Direct by Ms. Foster**                  **61**
    **Cross by Mr. Tomisser**                 **84**
    **Redirect by Ms. Foster**               **98**

**LAURENCE WASSERMAN**

    **Direct by Ms. Foster**                 **100**
    **Cross by Mr. Tomisser**                **126**
    **Redirect by Ms. Foster**              **132**

**MICHAEL McHENRY**

    **Direct by Ms. Foster**                 **134**
    **Cross by Mr. Shaftel**                 **140**

| | |
|---|---|
| 1 | THE CLERK:  This is the matter of the United States of |
| 2 | America, et al, versus the State of Washington, Case |
| 3 | No. C70-9213, sub-proceeding 01-1. |
| 4 | Will counsel please make their appearances for the record? |
| 5 | MR. SLEDD:  Your Honor, John Sledd representing the |
| 6 | Sauk-Suiattle, the Stillaguamish, the Nisqually, Squaxin Island, |
| 7 | Skokomish, Suquamish, Port Gamble S'Klallam, Jamestown S'Klallam, |
| 8 | Lower Elwha Klallam and Hoh Tribes. |
| 9 | THE COURT:  Good morning, Mr. Sledd. |
| 10 | MR. STAY:  Good morning, your Honor.  My name is Alan |
| 11 | Stay.  I represent just one tribe, the Muckleshoot Tribe. |
| 12 | THE COURT:  Mr. Stay. |
| 13 | MS. FOSTER:  Good morning, your Honor.  Alix Foster for |
| 14 | the Swinomish Indian Tribal Community. |
| 15 | THE COURT:  Ms. Foster. |
| 16 | MR. WEAVER:  Good morning, your Honor.  Tim Weaver, |
| 17 | co-counsel for the Yakima Nation. |
| 18 | THE COURT:  Mr. Weaver. |
| 19 | MR. MORISSET:  May it please the Court, Mason Morisset |
| 20 | for the Tulalip Tribes. |
| 21 | THE COURT:  Mr. Morisset. |
| 22 | MS. RASMUSSEN:  May it please the Court, I'm Lauren |
| 23 | Rasmussen, for the Port Gamble S'Klallam and the Jamestown |
| 24 | S'Klallam. |
| 25 | THE COURT:  Thank you, Ms. Rasmussen. |

             MR. HOLLOWED:  Good morning, your Honor.  May it please

1    the court, my name is John Hollowed.  I'm with the Northwest

2

3    Indian Fisheries Commission.

4             THE COURT:  Mr. Hollowed, good morning.

5             MR. MONSON:  Good morning, your Honor.  Peter Monson for

6    the United States of America.

7             THE COURT:  Mr. Monson, thank you.

8             MR. RAAS:  Good morning, your Honor.  Daniel Raas for

9    the Lummi Nation.

10             THE COURT:  Good morning, Mr. Raas.

11             MR. JOHNSEN:  Harry Johnsen, co-counsel for the Lummi

12   Nation.

13             MR. STILTNER:  Good morning, your Honor.  Sam Stiltner

14   for the Puyallup Tribe.

15             THE COURT:  Good morning.

16             MR. CHESNIN:  Good morning, your Honor.  Harold Chesnin

17   representing the Upper Skagit Indian Tribe.

18             THE COURT:  Mr. Chesnin.

19             MR. GRUBER:  Good morning, your Honor.  Brian Gruber

20   representing the Makah Tribe.

21             THE COURT:  Good morning.

22             MR. DAVIES:  Good morning, your Honor.  Bruce Davies

23   representing the Squaxin Island Tribe.

24             THE COURT:  Mr. Davies.  Thank you.

25             MS. SAGOLLA:  Good morning, your Honor.  Laura Sagolla

```
 1    representing the tribes that Mr. Sledd has named.

 2              THE COURT:  Good morning.

 3              MS. KRUEGER:  Good morning, your Honor.  Catherine

 4    Krueger, co-counsel for the Quileute Tribe.

 5              THE COURT:  Thank you.

 6              MR. LEWIS:  Good morning, your Honor.  Yale Lewis, also

 7    co-counsel for Quileute.

 8              THE COURT:  Good morning as well.

 9              MR. NIELSEN:  Good morning, your Honor.  Eric Nielsen

10    for the Quinault Indian Nation.

11              THE COURT:  Thank you.

12              MR. ZIELER:  Good morning, your Honor.  Tom Zieler,

13    co-counsel for the Yakima Nation.

14              THE COURT:  Good morning.

15        Does that take care of everybody on that side of the room?

16              MR. TOMISSER:  Good morning, your Honor.  Rene Tomisser

17    with the State Office of the Attorney General, representing the

18    State of Washington in this matter.

19              THE COURT:  Good morning.

20              MS. WOODS:  Your Honor, good morning.  I'm Fronda Woods

21    for the State of Washington.

22              THE COURT:  Ms. Woods, thank you.

23              MR. SHAFTEL:  Good morning, your Honor.  Doug Shaftel

24    for the State of Washington.

25              THE COURT:  Mr. Shaftel.
```

MR. FERESTER:  Good morning, your Honor.  I'm Phil
Ferester, also for the State of Washington.

THE COURT:  Mr. Ferester.

That takes care of everybody there.  All right.  At our
pretrial conference -- just before we entered our pretrial
conference, there was a request for a few minutes, as we started,
to go ahead and do opening statements.  The Court's quite aware
of the background and what got us to this particular point, but
you certainly have a right to make an opening.

Mr. Sledd?

MR. SLEDD:  Your Honor, two years ago in August, this
Court entered its summary judgment in this matter, declaring that
state-owned culverts beneath state roads that impede the passage
of salmon to and from the tribes' usual and accustomed fishing
areas and diminish the number of fish available for tribal
harvest are in violation of the State's duties under the treaty.

The sole question to be resolved at this trial is whether, in
light of that summary judgment decision, anything must be done
differently in the state of Washington's culvert program.

If the plaintiffs were allowed to present but one piece of
evidence in this case, your Honor, I would offer up a document
prepared by the State.  It's called the "Fish Passage Program
Progress Performance Report for 2009," which will be offered into
evidence along with a number of similar reports prepared in prior
years.  And I would direct your Honor's attention to Tables 4 and

5 in that report and the text accompanying it which indicates that the State of Washington, the Department of Transportation, owns over 2,000 barrier culverts statewide.

The Department of Transportation, which owns more barrier culverts than any other state agency, in the year immediately following your summary judgment decision fixed the least number of its barrier culverts that it has fixed in any year since 2000. That evidence, your Honor, together with the fact that in that same year, 2008, the Department of Transportation, which has a dedicated funding source and program for the correction of culverts, fixed with that funding source the least culverts it has fixed since 1991, precisely zero, demonstrate that the plaintiffs are entitled to an injunction to compel the State to do a better job to fix the culverts more properly, more correctly, and to make it last.

The Court, I'm sure, is familiar with the four-part test for grant of an injunction.  The plaintiffs intend to focus their evidence on the latter two parts of that test, the balance of harms and the public interest.

With regard to the harm to the plaintiffs, your Honor, perhaps the easiest thing would be just to look at numbers.  The admitted facts indicate that there are nearly 2,000 fish barriers just in the case area between the four state agencies that will be in front of you.  A minimum of 1,100 of those are blocking salmon passage.  Three-quarters of those are owned by the

1    Department of Transportation.  Statewide, those DOT culverts

2    alone block 3,500 miles of salmon habitat, according to the

3    agreed facts.

4        And those are only numbers, though, your Honor.  To really

5    understand the harm that the state's treaty violation has

6    inflicted on the plaintiff tribes, it is necessary to try to

7    understand the relationship between the tribes and their members

8    and the salmon.  The only way I think that we as nonIndians can

9    do that is to talk with the tribal members themselves.  And

10   that's the reason why the first two witnesses the Court will hear

11   from today are members of the tribes:  Loraine Loomis from the

12   Swinomish Tribe and Charlene Krise from the Squaxin Island Tribe.

13       Ms. Loomis is a fisheries manager.  Ms. Krise is the museum

14   manager.  Both have fished commercially and for subsistence.

15   Both have grown up in the community and will testify about the

16   deep roles that the salmon and salmon fishing played holding

17   those communities together and the deep harm that they suffer

18   when their harvests are depleted because of declining salmon runs

19   caused by habitat damage such as the state barrier culverts.

20       In addition to trying to offer your Honor some perspective on

21   harm from the tribal members, we will, in a manner of speaking,

22   offer a view of harm from the fish's view.  There will be a

23   number of tribal biologists who will provide a primer, so to

24   speak, on salmon biology, without which you can't really

25   understand the effects of these culverts.

1    They will talk about the life history of these fish and how,

2  particularly with regard to Coho and Steelhead and Chinook, they

3  have long freshwater residences in their juvenile years, which

4  means that these culverts not only block the adults coming back

5  to spawn, but the juveniles as well.  The tribal biological

6  witnesses will testify that habitat is a crucial determinant of

7  production of salmon; that habitat decline, degradation, and loss

8  is the driver of the depleted salmon runs that we are

9  experiencing in the case area, and that will be shown in the

10  evidence.

11    The effects of that lost production on tribal harvest will be

12  explained by the biologists in terms of lost numbers, lost days

13  fishing, and lost opportunity to use all the usual and accustomed

14  places that were reserved for their use in the treaties.

15    Following that background, your Honor, Dr. Martin Fox, who is

16  a tribal fisheries biologist from the Muckleshoot Tribe as well

17  as a forest engineer, will testify regarding the precise

18  mechanisms by which these culverts affect fish passage and fish

19  habitat.  And he will, in a nutshell, indicate that there is a

20  basic rule:  The narrower the culvert in relation to stream

21  width, the greater the risk to fish passage and to the fish

22  habitat.

23    Dr. Fox will describe three primary types of culverts that

24  are used to provide fish passage: hydraulic, no slope, and stream

25  simulation.  The first two are narrower, and Dr. Fox will testify

about their adverse effects on fish passage and habitat.  The

third methodology, known as stream simulation, produces a wider

culvert, and Dr. Fox will describe the results of those culverts

both in terms of literature search and his own observations in

the case area of culverts corrected by the State, in order to

come to a recommendation that that design is the one that should

be used as a default to correct the state barriers.

I think if you asked any of the biologists, whether the

plaintiffs' witnesses or the State's in this case, they will tell

you culverts are not the only habitat problem out there.  And

Mike McHenry, a habitat biologist from the Lower Elwha Tribe who

will testify early in the trial, today I hope, will describe how

culverts relate to the other habitat problems and how a

correction of culverts relates to the other habitat problems in a

given watershed.  And he will testify based on his extensive

experience in stream restoration that in the absence of a very

detailed watershed assessment, something which is expensive and

difficult to come up with, that gives you a detailed list of

priorities, there is a general principle you can follow.  It

gives you a hierarchical ranking of how to go about restoring

fish habitat in the watershed.

The first thing that Mr. McHenry will say you do is to

protect good habitat that's functional.  And the next thing you

do is to reconnect the pieces; to take down barriers within the

watershed so that the fish can move and so the stream processes

1    of sediment transport, wood, etcetera, can function.  It is only

2    after those first two that you get to actually looking at the

3    degraded habitat and restoring it, the types of activities that

4    actually occupy a lot of what goes on for salmon restoration for

5    the state.

6         These habitat biologists will also point out the practical

7    advantages of culvert correction as a restoration tool, including

8    the fact that the science behind it is well-known; it is easy to

9    monitor the projects and their results; when there is state

10   culverts involved, they involve principally state-owned land, so

11   there's no impact on private landowners; and they are highly cost

12   effective.

13        The last witness, if you will, who won't actually be on the

14   stand but will be in all those fat binders up next to the Court,

15   is the State of Washington speaking through numerous exhibits,

16   numerous reports by the State, including reports authored by

17   their witnesses.

18        The earliest of those state documents that will be presented

19   in evidence is a 1949 pamphlet by the Department of Fisheries and

20   Wildlife called "The Salmon Crisis."  And even at that early

21   date, the Department of Fisheries indicated that the prime cause

22   of depleted salmon runs in the case area was loss of access to

23   habitat.  And that report, that pamphlet, described what it

24   called an immense lost frontier of inaccessible habitat through

25   culverts and other barriers to fish passage.

1          There are a few other key documents that I'm sure your Honor

2     will have a chance to look at but will be mentioned repeatedly.

3     I also mentioned those fish passage performance reports done more

4     or less annually by DOT and DFW.  They describe the DOT's culvert

5     correction programs.  They describe their projects, their costs.

6     And prior to this litigation being filed, they described in

7     candid terms the harm that state culverts inflict on salmon and

8     salmon passage, calling those barrier culverts critical

9     components in the effort to restore wild salmon and a very cost-

10    effective means for habitat restoration.

11          The last two documents that will be offered in evidence, and

12    I want to particularly point out, are also Department of

13    Fisheries and Wildlife documents.  The 2000 document entitled

14    "Fish Passage Barrier and Surface Water Diversion Screening

15    Assessment and Prioritization Manual" - which if I were a Navy

16    man I would turn that into an unpronounceable acronym, but I'm

17    simply going to call it the assessment manual, I think that's how

18    most of the witnesses will refer to it - indicates how the State

19    of Washington and the Department of Fisheries goes about

20    determining whether a culvert is a barrier and determining what

21    habitat is available.

22          The second DFW document, in 2003, is entitled "Design of Road

23    Culverts for Fish Passages," which describes the methods widely

24    used by the State to correct fish passage barriers, and it

25    critiques those methods, again, in candid terms.

1        In summary, your Honor, the evidence will show that state

2   fish passage barriers are a major problem for fish, their

3   habitat, and treaty fisheries.  And the question will become what

4   to do about it.  As I mentioned, the Department of

5   Transportation's pace to correct its barriers is slow.  At

6   current rates, the evidence will show it is on pace to fix its

7   barriers in the case area in 50 to 80 years.  Budget plans for

8   the department will be in evidence to show no sign of a great

9   increase in correction rate.  The Department of Transportation

10  continues to use hydraulic designs that are not adequate for

11  juvenile are passage, high maintenance, and easily break down.

12       The Department of Natural Resources, according to the

13  evidence, is facing funding shortages for its culvert

14  corrections.  And in the admitted facts, you will find state

15  parks has fixed one of its barrier culverts.

16       The State contends in its contentions of fact that its

17  current programs are sufficient to provide for treaty fisheries

18  into the future.  The evidence will show State practices are

19  insufficient and that they will likely continue in the absence of

20  an injunction.  Plaintiffs therefore will be proposing that the

21  Court adopt a five-step injunction to require correction of the

22  state's culverts.  Each step in this five-step injunction, your

23  Honor, reflects the application of the principles of equity that

24  govern the grant of extraordinary relief of injunction.

25       The first step is to determine what culverts to fix.  The

1    evidence will show that the State has assessed its barriers

2    within the case area; that it knows with fairly good accuracy

3    what those barriers are.  And although that assessment relies on

4    methodology that plaintiffs' witnesses will tell you does not

5    adequately account for juvenile passage, the plaintiffs are not

6    asking the State to redo its assessment.  They are asking that

7    the injunction rely on the existing documentation of what is a

8    barrier; that, and what we can prove at trial with regard to the

9    specific culvert.

10       Plaintiffs propose that the State be required in the

11   injunction to fix all of its barrier culverts because that is

12   most consistent with treaty understanding and intent and with the

13   law regarding reserved treaty rights to natural resources.

14       And in regard to fixing all of the culverts, your Honor, the

15   plaintiffs expect evidence from the State regarding the numbers

16   of non-state-owned barrier culverts, the same streams where state

17   culverts are located.  And we anticipate some argument that the

18   fact that there are other barriers there should reduce the

19   State's obligations.

20       Plaintiffs will therefore offer evidence to show why the

21   presence of those non-state barriers should not insulate the

22   State from relief, including the fact that a large number of

23   those non-state barriers are in fact partial barriers.  They pass

24   fish some of the time, some species, not all the time.  Thus,

25   when a state barrier upstream is corrected, the fish can still,

some of them, get through that downstream barrier and benefit

from the correction.

Secondly, many of the Department of Transportation's barriers

in these basins are at the bottom of the basin for the simple

reason, as Mr. McHenry will testify, when you're building a big

road, you put it where it's easy, right down the river bottom,

where it truncates, crosses every tributary stream to the lowest

on the system.

The State reports will indicate a third reason why these

non-state barriers are not important, which is a great many of

them are being corrected now.  And finally, as a matter of

equity, the fact that someone else may have done wrong does not

relieve the State of its own obligations under the treaty.

The second step in the five-step injunction, your Honor, is

to set a firm schedule for direction on the state's barriers.

For the Department of Transportation, the plaintiffs propose that

they be fixed, along with those of the Department of Fish and

Wildlife and the Parks Commission, by 2016, a date that is

already in state forest practice law with regard to forest lands

and which the admitted facts show has been adopted by the

Department of Fish and Wildlife and the Parks Commission as a

goal for correcting their culverts.

With regard to the Department of Transportation, the

plaintiffs propose that all their barriers be corrected within 20

years from judgment, again, a deadline that has been borrowed

1    from state practices, because the evidence will show that the

2    Department of Transportation through the 1990s, and at least

3    until 2002, itself had a stated goal of correcting all its

4    barrier culverts within 20 years.

5        The 20-year delay in correction of DOT culverts, the evidence

6    will show, will permit other habitat efforts to occur in these

7    basins, so that when the state culverts are corrected and the

8    fish arrive, the habitat can have already been worked on.

9    Conversely, by not extending DOT corrections beyond 20 years,

10   when other habitat work is done, it will not be frustrated in its

11   effect by the presence of the remaining DOT barriers.

12       Plaintiffs propose two equitable exceptions to that 20-year

13   deadline.  The first, again borrowed from current state practice,

14   is that the State can defer correction of what it calls no

15   significant gain or limited gain barriers, those that block less

16   than 200 meters of habitat, until the end of that culvert's

17   useful life; in other words, when it's fixed for some reason

18   besides fish passage.

19       And the second equitable deferral of the State's correction

20   obligation would be the Department of Transportation could defer

21   to the end of the useful life of the culverts, correction of

22   culverts that affect up to ten percent of the total habitat

23   blocked by DOT culverts.  And because, as the evidence will show,

24   there are a large number of DOT barriers, each with a fairly

25   small amount of habitat, deferring correction of up to ten

1    percent of the habitat means deferring correction of more than

2    ten percent of the barriers and deferring the costs associated

3    with it.

4        On the subject of costs, which of course will be a

5    significant issue, the costs of actual corrections that have been

6    done by the State will be in evidence.  And even with the

7    substantial number of barriers that are present that would have

8    to be fixed under the injunction, those costs will add up to a

9    very small fraction of the state's roads and budgets which, for

10   the Department of Transportation alone, are approximately $3

11   billion in the current biennium.

12       In considering costs, the plaintiffs would ask that the Court

13   also consider the part of the cost of correction that is fairly

14   attributable to the proposed injunction.  What I mean is this:

15   Culverts fail anyway.  The evidence will show they have a

16   hydraulic life, 50 to 80 years.  And at the end of that, they

17   must be replaced or repaired.  And under current state law and

18   policy, when they are replaced or repaired, they must be made

19   fish passable.

20       So the effect of the injunction, your Honor, is not to

21   require a new correction, but to advance a correction that will

22   have to happen anyway.  And the cost that's fairly attributable

23   to the injunction is only that advancement in time and perhaps

24   the fact that it would be done better under the tribe's -- the

25   plaintiffs' proposed correction standards.

1    And if, as the evidence promises, state agencies are in fact

2    fixing increasing numbers of their culverts using this stream

3    simulation method, the difference between correcting under the

4    injunction and correcting under state law may be solely the

5    difference in timing.

6    The third step in the plaintiffs' proposed injunction is to

7    require that the State fix its culverts properly.  Plaintiffs

8    proposed a performance-based standard for what is proper, which

9    is that the culverts be made to pass all salmon at all life

10   stages.  Again, that is a standard drawn from existing state law,

11   from the Forest Practice Act and regulations.  The means to

12   achieve that standard would be to require use of best fish

13   passage design science, except in emergencies or when the use of

14   the best science is infeasible.  Again, there are a number of

15   elements built into this proposal to allow flexibility and to be

16   cognizant of the different equities involved to fix the culverts.

17   Fixing the current backlog of culverts will not fully remedy

18   the violation of the plaintiffs' rights.  The processes that

19   created those barriers are still at work in those streams.  And

20   the evidence will show that additional barriers are very likely

21   to form in the future.

22   In order to avoid that happening, the plaintiffs request that

23   the State be enjoined to perform maintenance on its culverts,

24   that it be enjoined to inspect those culverts, and that it be

25   required to periodically reassess the status of those culverts

1    that it has already looked at and found not to be barriers so

2    that it will in the future be able to determine which have become

3    barriers, and that the State then be required to correct those

4    within a reasonable time.

5         Finally, the fifth element, your Honor, in the proposed

6    injunction is that the State be required to actually monitor its

7    corrections, and that when it finds a correction has not been

8    built according to a design or not been built in accordance with

9    the injunction, it take action to correct that and, should it

10   find that the correction is not functioning as it should, it take

11   steps to correct that.

12        In conclusion, your Honor, this trial that we're about to

13   begin is not going to be short.  Almost all the testimony is

14   expert testimony.  There will be a large number of exhibits

15   offered.  But beneath all that pile of complex evidence, there

16   are four simple themes we would like the Court to keep in mind.

17        First, broken state culverts cause significant harm to the

18   fish, their habitat, and to the tribes who depend on those

19   fisheries.  Second, rendering those culverts passable is a vital

20   part of overall salmon restoration.

21        Third, the science and technology to fix those culverts is

22   known.  And fourth, the State's efforts to date to reopen the

23   lost frontier it described in its 1949 pamphlet have been too

24   little and too late.

25        In short, the answer to the question I posed at the

beginning, should the State be required to do something

differently in response to the summary judgment decision in this

case, is yes, the State should be made to do something different.

That summary judgment decision declared the tribes' treaty

rights.  Now is the time to enforce them.

I believe Mr. Monson would like to say a few words.

THE COURT:  Thank you.

MR. MONSON:  Good morning, your Honor.  I will be very

brief.  When the tribes filed their request for determination in

this case, the United States filed its response and largely

supported the tribes, both in terms of seeking declaratory relief

and also in creating the terms of an injunction that would

effectuate the tribes' treaty rights, and we still stand by that

support.

We believe -- in our opening request -- response to the

request for a determination, we sought both declaratory relief,

similar to what the tribes had sought, as well as injunctive

relief enjoining the State to correct its fish-blocking culverts.

And we believe this Court has fulfilled the request with respect

to the declaratory relief through its order on summary --

cross-motion for summary -- partial summary judgment.  Excuse me.

And we also believe that the tribes' requested injunctive relief

fulfills the relief that the United States sought in its response

for the request for determination that was filed in 2001 in this

case.

1     We also believe that the request that the tribes are seeking,

2   the injunctive relief that they're seeking is reasonable and is

3   within the power of the State to accomplish and is also

4   consistent with salmon recovery principles that the Northwest is

5   currently undergoing.

6     We believe that the tribes -- the elements of the injunction

7   that Mr. Sledd went through just a few moments ago are very much

8   consistent with overall salmon policy, and we believe, as

9   Mr. Sledd alluded to, that the correction of fish-blocking

10   culverts and the opening of fish habitat is a very important

11   element and one of the first priorities to be accomplished in

12   salmon recovery.  We believe that 2016 date that the state

13   agencies, the non-DOT state agencies, such as DNR and parks

14   agencies, is one that's consistent.  It's also one the U.S.

15   Forest Service has agreed to abide by, and it believes that it

16   will be able to meet that deadline as well with respect to its

17   inadequate fish-blocking culverts.

18     We believe that the 20-year period for the correction of DOT

19   is also reasonable and that is something that will not unduly tax

20   the state's budget, and we believe the evidence will show that.

21   As Mr. Sledd indicated, what's really being sought is not so much

22   new money being spent on culverts, but just money that would have

23   to be spent at some point in the future being spent sooner than

24   perhaps otherwise the State would prefer to spend it.

25     The United States is not going to be proposing -- is not

1   going to be presenting its own independent case-in-chief.  We

2   would join with the tribes in their case-in-chief, and we will be

3   presenting perhaps a couple of rebuttal witnesses, one from the

4   Forest Service to discuss their efforts and their funding status,

5   and one from the National Marine Fisheries Service, the

6   scientists who will discuss the correction of culverts and the

7   opening of those linkages between habitats for fish and where

8   they fit in the overall scheme of salmon restoration.

9        With that, I think I will sit down.  I think the Court will

10  hear plenty of testimony and argument.  And I would just like to

11  thank the Court for its time and letting me speak.

12           THE COURT:  Thank you, Mr. Monson.

13       The State's opening.

14           MR. TOMISSER:  Good morning, your Honor.  Once again, I

15  am Rene Tomisser on behalf of the State of Washington in this

16  case.

17       Mr. Sledd talks about the volume of material that's been

18  presented to this Court.  The record that's before the Court

19  documents the history of salmon recovery and restoration in

20  Washington.  Where Mr. Sledd sees failure, I see hope, progress,

21  and overwhelming evidence that substantial efforts have been made

22  and are still underway.  It is, in fact, I believe, one of the

23  finest examples of different agencies, different people,

24  diverging interests, all coming together and realizing that the

25  way to recover this resource that is so important to all is to

1   work together through a coordinated plan, a coordinated plan that

2   in fact has become the law, both federal law and state law.

3       It is a shame when litigation itself has become a barrier and

4   an ongoing distraction to the progress that we are all working so

5   hard to make.  It is disappointing to hear from our federal and

6   tribal partners the disparagement of the efforts that have been

7   made.  So before we get into examinations, cross-examinations,

8   and argument on this point, your Honor, I think it is worth

9   pausing briefly on behalf of the State to say thank you to our

10  federal and tribal partners for the efforts that they make, to my

11  clients on this side of the room, the state biologists, all of

12  the people in this room who have dedicated their careers to

13  making progress in this area.

14      And so it is disappointing to hear the request for an

15  injunction in this case, an injunction that would have the effect

16  and risk the undermining of the scientifically-based

17  comprehensive plans that have been agreed to by the parties and

18  are at the foundation of the progress that we made; an injunction

19  that would undermine -- that would give primacy to barrier

20  remediation that is out of step with the plans that are in place,

21  the plans that have been agreed to by our tribal partners.

22      The Court having found -- made a ruling on partial summary

23  judgment in this case is not required in some sort of a rigid,

24  lockstep fashion to order an injunction.  The Court is sitting in

25  equity, and it is entitled to balance all the factors that come

to bear on whether or not an injunction in this case is warranted

and, what we believe the evidence in this case will show, that an

injunction in this case would be improper in placing a primacy on

barriers as requested by the tribes, and that the Court should

consider four primary factors in exercising its discretion not to

grant an injunction in this case.

First, there are comprehensive and scientifically-based plans

for salmon restoration that are in place, that are a matter of

law, and have been approved by state, federal, and tribal

authorities.  The reallocation of funding that would be required

in order to meet the pace of correction sought by the tribes

would certainly undermine those plans, with other parts of the

plans being unable to be funded if we were to focus our efforts

as greatly on barrier corrections as the tribes would have us do

through these injunctions.  These plans are in place.  They're

required by law.  They've been backed up by the commitment of

hundreds of millions of dollars.

Hopefully to the pleasure of this Court, the Court will see

that it is not faced with a recalcitrant state agency who is

simply unwilling to do what should be required.  But in fact, the

story of the State's effort on this case mark working in

cooperation with our partners in good faith, in fact beginning

our own project for the remediation of culvert barriers in 1991,

a decade before anyone filed suit, all done without the threat of

federal court intervention, all done without the requirement of

1    federal oversight.

2        The third factor, your Honor, is the simple review of the

3    papers for the last year.  We are not going faster because we

4    don't want to, but the budget is a constraint that the Court has

5    to take into account.  There simply is not the money to

6    reallocate to culverts in the disproportionate way sought by the

7    plaintiffs in this case.

8        We're existing at a point in time that the Court will hear

9    from Victor Moore, the director of OFM, which is essentially the

10   budget arm of the governors's office, will describe what the

11   situation is economically for the state and will describe to the

12   Court the fact that incredibly difficult decisions, policy-based

13   decisions, are having to be made on what can we fund, what can we

14   do for our citizens.

15       We're at a period of time where the most vulnerable members

16   of our society - the elderly, the young, the sick - are being

17   told that their programs that they depend on are either going to

18   have to be reduced or go away entirely.  And in spite of the

19   budget challenges that we face, the evidence in this case will

20   show that the State's commitment to salmon restoration has

21   maintained and that, even as other programs have been forced to

22   cut back and be reduced, the State's efforts for salmon

23   restoration have remained constant if not slightly increasing

24   over time.

25       Finally, your Honor, another very practical point here is the

1   reallocation of resources sought by the tribes in this case to

2   fix the culverts within a 20-year period would be a $2 billion

3   reallocation of salmon restoration resources, a reallocation of

4   funding for which the tribes back up with no evidence that it

5   would make any significant difference whatsoever in the actual

6   production of salmon.

7       If we look carefully at what's happening, your Honor,

8   beginning at the watershed level within the case area that we

9   have here, if you look at each water resource area, each

10  watershed, there are comprehensive plans that are in place based

11  on what is needed by each individual watershed.  Every watershed

12  is different.  There are different species.  They have different

13  needs.  A one-size-fits-all injunction to speed up the culvert

14  barriers is going to be out of step with what those plans are

15  calling for.  The watersheds develop plans based on technical

16  input from fisheries experts that you will hear from in this

17  case, along with community members, tribal and state members who

18  step in to review these plans.

19      These plans are then passed up to regional groups, fisheries

20  management groups, who coordinate and prioritize the plans coming

21  from specific watersheds, and then further up the chain to state

22  and federal officials who then approve the plans, prioritize

23  them, and fund them to the greatest extent possible.  One such

24  organization that we will hear about, your Honor, in this case is

25  the state SRF Board, Salmon Recovery Funding Board.  It has

1    placed all -- approving plans that recognize that culverts are

2    only one aspect of salmon restoration challenges in this state,

3    and fund them and prioritize them in accordance with the way the

4    scientists have suggested that they be done, none of which call

5    for the sort of primacies that the tribes urge this Court to

6    achieve.

7         There's an extensive plan that is in place for Puget Sound,

8    the Puget Sound recovery region.  You can see that these plans do

9    not happen overnight.  It is estimated that it will be about 50

10   years to achieve as much progress as can be made at a cost of

11   $142 billion -- $1.42 billion over the first ten years, excuse

12   me.

13        These plans are in place and have been approved by NOAA's

14   fisheries and are funded accordingly.  There are major limiting

15   factors, as you can see in these plans.  All of these need to be

16   addressed, and to be addressed in the way that the scientists

17   have indicated, barriers being only one of those factors and not

18   the primary factor.

19        When we look at the efforts that have been made, these

20   efforts have all been made, your Honor, without the need for

21   court intervention, without a court presiding over how these

22   resources need to be allocated in order to do the best for

23   salmon.  That is a job for the scientists, federal, tribal, and

24   state experts working collaboratively to develop a plan and then

25   executing it in order to get the best bang for the buck to help

1    save this resource.

2        When we look at some of the scope of some of these efforts

3    that have been made, you look at the state -- just the example of

4    the state salmon funding board in this case, this does not

5    include money spent separately through the Department of

6    Transportation and other agencies, but you can see already in the

7    history of this program, a quarter of a billion dollars has been

8    expended through grants, consistent with the plans for the

9    recovery of these species, and that barrier passage is one of

10   those elements; tens of millions of dollars devoted to barrier

11   passage out of that, and devoting it in a way that's consistent

12   with the planning that has gone into Puget Sound recovery for all

13   populations of salmon.

14       The tribes in this case take the position implicitly asking

15   this Court to assume that prior to the existence of any state

16   barriers, that they are entitled to some certain abundance of

17   salmon that existed at that time.  We think that that proposition

18   is not only legally dubious, but factually unproven in this case.

19       Thirty-five years ago, this Court set out its view of the

20   Stevens Treaty, a view that has been affirmed in large part by

21   the United States Supreme Court, setting out the rights of the

22   tribes in this situation and ensuring to the tribes a fair share

23   of the harvest.  In this case, the tribes are asking the Court to

24   essentially restore this abundance to whatever existed without

25   state barriers, to have those barriers taken out of the case, is

1    something that the tribes simply have no evidence of.  Nobody

2    does.

3        We don't know how many salmon existed prior to the

4    construction of state barriers.  We don't know what the

5    diminution of the harvest or the abundance of salmon were due to

6    barriers, let alone state-caused barriers, and no idea how much

7    additional production is going to be necessary in order to

8    achieve this mythical pre-barrier level.  The plaintiffs' case

9    ultimately fails simply for the speculation that would be

10   required in a court's order to attain something that no one is

11   going to be able to measure.  The effectiveness of the Court's

12   order is a consideration that militates [sic] against --

13   mitigates against the issuance of an injunction in this case.

14       Given when all the state barriers have been repaired, and the

15   evidence in this case will show that the State owns actually only

16   a small percentage of the blocking culverts in the state and in

17   the case area, we don't know how many fish are going to be

18   produced as a result of that area.  That doesn't mean that it

19   shouldn't have been done, and we are certainly doing it, but

20   there is no fish emergency that justifies the undue primacy to

21   that project out of step with the plan that has been agreed to.

22       On a more positive side of the equation, your Honor, the

23   harvest numbers -- and we will hear a lot of information about

24   the harvest in this case.  These harvest numbers have been agreed

25   to by the parties, although with different views essentially on

1    what they mean.  I think that for the Court's benefit here, I

2    have highlighted some portions of it, essentially looking at the

3    harvest numbers over the last decades, the harvest numbers that

4    are essentially stable over that period of time.  And if the

5    Court looks at the top of the very busy chart, it's also very

6    relatively stable compared to the time immediately after the

7    Boldt decision jin this case.  When we look at these numbers

8    graphically, your Honor, what we see are a couple of things.  We

9    see some extreme spikes in harvest in the late 80s and early 90s,

10   but overall what we see is rising harvest numbers from the late

11   90s and rough stability over the last decade in these harvest

12   numbers.

13       When you go back and you look at the plaintiffs -- I think in

14   this case if you look at this chart, you can see that it's a

15   decrease from those higher spikes.  That's certainly true, your

16   Honor, but it is also deceptive.  When you go back and look at

17   those spikes and you look at the harvest numbers, what you'll see

18   is in the late 80s to early 90s, we had extraordinary numbers of

19   Sockeye salmon being harvested, as well as extremely high numbers

20   of Pink salmon.  The parties and biologists have agreed that

21   those Sockeye harvests are consistently at least 90 percent of

22   Canadian origin.  That has nothing to do with barriers in the

23   State of Washington.

24       And when you look at those numbers and the spikes that we

25   see, you will see a very strong correlation, in fact a direct

1   correlation, or very close to, between those spikes in the late

2   80s and the very high peaks of Pink and Sockeye salmon during the

3   same period of time.

4       Fixing the state barriers in this case is going to make no

5   difference, your Honor, in what the Canadian origin fisheries do,

6   or such an extremely small difference that I don't believe anyone

7   thinks that they can actually measure it.

8       The harvests that are going on now are agreed to in a process

9   by the parties in which the scientists determine harvest levels

10  that can be maintained at a sustainable rate, not at a rate that

11  is going to stress any of the species through overharvesting.

12      The other interesting thing to note on this graphical

13  representation here of harvests, your Honor, is implicitly the

14  tribes argue that it is the state barriers that have caused

15  diminution of harvest numbers.  But when you look at the state

16  road system and all of the barriers that came along with the

17  construction of the state road system, you go back to 1974 --

18  actually, 1978.  Let's see if I can draw a straight line.

19      The point I'm trying to make, your Honor, is that in 1968

20  [sic], the State maintained about 20,000 lane miles of road,

21  which works out to about 7,000 center-line miles, with all of the

22  culvert barriers that came along with it.  Today we have about

23  7,000 center-line miles.

24      The road system and its barriers have been constant within

25  96 percent of its capacity now for 40 years, and yet we see these

1    extreme fluctuations, suggesting that in fact there is no

2    relationship, or a minimal relationship, between barriers and

3    harvest rates.  So when we turn to barriers in this case, we need

4    to look at what has been done, what remains to do.

5         I want to first talk about the four Hs, your Honor.  This is

6    an approach to salmon restoration that you will hear from several

7    experts.  We'll talk about each of these four elements in the

8    case, each needing attention in order to recover salmon

9    restoration.  What the plaintiffs suggest in this case is that we

10   focus on habitat and give a primacy to habitat, and not just

11   habitat, but to passage within the habitat rather than following

12   a comprehensive approach to salmon restoration.

13        If we look just at the habitat numbers -- and this is from

14   the salmon recovery plan, your Honor.  This chart and graph shows

15   the habitat portion of this problem, along with the major

16   limiting factors within the habitat.  And you can see those going

17   around the outside of the dial, with nearshore at the top,

18   riparian habitat and working around.  Those are all pressures on

19   the habitat portion of the equation.  And what you can see from

20   looking at this depiction, your Honor, is that in terms of the

21   environmentally significant units, barriers affect far fewer than

22   most of the other habitat pressures, but in fact, it's the area

23   where we have made the most progress, suggesting this is not an

24   appropriate candidate for the sort of undue primacy sought to be

25   given it by the tribes.

1    When we look at the barriers that have been done, the state

2    of Washington began its program in 1991, extensive surveying was

3    done, scientific analysis was done to determine how barriers

4    should be fixed, and it has evolved over time.  An extensive

5    inventory was conducted.  And in fact, the state of Washington's

6    program was amongst the earliest in the nation and is

7    consistently looked to as in fact a model of how to approach

8    salmon restoration with a dedicated barrier correction program.

9    Since this program was started, the Department of

10   Transportation has corrected about 225 barriers.  This is in

11   addition to barriers corrected through other programs.  These are

12   simply the DOT-owned corrections.  And what you can see is steady

13   progress being made with corrections being done.

14   Similarly, although at a much faster rate, the Department of

15   Natural Resources is dealing essentially with forest roads,

16   correcting barriers at even a much faster rate, nearly a thousand

17   barriers corrected by the Department of Natural Resources.  This

18   is substantial effort, your Honor, and substantial progress that

19   has been made in a dedicated way.

20   So what remains to be done?  Your Honor, the parties agree

21   that for the Department of Transportation, there are about 807

22   barriers that remain to be fixed that have significant habitat

23   associated with them.  The 200 linear meters mentioned by

24   Mr. Sledd is the figure that's most commonly used.  807 of them

25   to fix.  They cost about $2.3 million apiece to fix.  That does

1    not include inflation.  This number is based on projects that we

2    know that are upcoming and the engineering costs that have been

3    associated with them.  That's a big number.

4        And the Court may wonder, well, why is it so expensive to fix

5    these culverts?  I have just a couple of quick examples to show

6    the Court what is involved.  The design, the permitting, the

7    scope of excavation in order to do the job right, as Mr. Sledd

8    suggests we should, and as we agree that we should, is extensive.

9        So the first example to put before the Court is for Mill

10   Creek up on Highway 2.  This is an 11-foot culvert that was

11   replaced.  It is kind of on the medium to smaller side of the

12   fixes, at a cost of $1.6 million.  This is what it looked like

13   before.  There's a shot that shows kind of the midpoint of

14   construction.  You can see the dramatic amount of work that goes

15   into getting to this part, to finally complete the project.  It

16   is a lot of work.

17       One additional example from Terrell Creek, a slightly larger

18   project, a 12-foot steel culvert was replaced.  I selected this

19   one, simply because it came out right on the average of

20   2.3 million, for the Court to see.  Once again, you can see the

21   extensive work that goes into fixing this kind of problem.  This

22   is what Terrell Creek looked like before the State performed its

23   remediation.  There's a shot partway through construction.  For

24   more of a view of what's involved in this, your Honor, as you can

25   see, you just don't send a maintenance crew out with a couple of

1    shovels and a bag of cement to fix culverts in one afternoon.

2    There's what we have at the end of the process.

3        So if we look at the scale of work to be done, 807 culverts

4    at $2.3 million apiece, roughly, that works out to about

5    $1.8 billion.  And that is just for the Department of

6    Transportation, your Honor.  It's a number that doesn't include

7    inflation that would have to be factored into those figures.

8        So how does all this get paid for?  And this is not counting

9    the SRF Board or grants coming from other places.  How does DOT

10   pay to get these things done?  There are two primary funding

11   mechanisms and then a smaller program as well.  The two primary

12   funding mechanisms come through what is known as the I-4 budget.

13   That is a specific section within the Department of

14   Transportation budget that exists every year.

15       Within that budget, there is a specific line item that the

16   legislature has dedicated to the funding of barrier corrections.

17   That budget is important to watch as a milestone, your Honor,

18   because that budget follows the priority index fairly closely,

19   not precisely, but essentially is worked in that order so that we

20   are getting the most gain we can for the fixes that are done.

21       And the other funding mechanism that we use is simply that

22   culverts get fixed in the course of highway improvement projects.

23   Most of the time when we're going to be fixing a section of

24   highway, if there's a culvert within the boundaries of the

25   project, then generally those get fixed as well.

1          The problem with looking at that, your Honor, as kind of an

2    apples to apples is, when the highway improvement projects get

3    fixed, those are just random, just kind of wherever the road

4    happens to be.  They're not done in the order that the priority

5    index would suggest, but we generally try to do them anyway even

6    if they aren't in the ideal order in the index.  The I-4 budget

7    looks much more closely to the index that has been established.

8          You can see historically back to 1991, the corrections that

9    are done on an annual basis in this case.  The blue bars in this

10   case are culverts that were repaired through the I-4 budget.  The

11   red bars are the fixes done through the highway improvement

12   project.  And then an average -- a combined average with the

13   green.  Once again, this doesn't include fixes coming from other

14   sources.

15         The interesting thing to know about this chart, as your Honor

16   will learn, is even though there are fewer fixes on average in

17   the I-4 budget, we actually get more lineal gain out of them

18   because they are being done -- tied more closely to what the

19   priority index would suggest.

20         The other important point to be brought out, your Honor, in

21   terms of asking the State to accelerate, is a problem of

22   diminishing returns.  With 807 culverts, once you get out into

23   the final few hundreds of these, you end up getting very little

24   gain, relatively speaking.  So we're getting the most we can now

25   through the I-4 budget, picking off the better projects and then

1    working down the list so that we get the most bang for our buck.

2        Historically -- and I should also remind the Court that all

3    of this has been done, budgeted, funded and completed without

4    court intervention and federal oversight.  So in order to fix the

5    807 barriers that remain in 20 years, the simple math on that

6    suggests that we need to do about 40 barriers per year.

7        Every year, going back to the mid '90s, the Court can see

8    that the legislature has devoted money just to the I-4 portion of

9    this budget.  This is in addition to all of the other fixes that

10   are being done.  Every year the State's commitment to that

11   program has gone up at least a little bit, in spite of the budget

12   difficulties that we're facing.  We expect to have about

13   $17 million for the upcoming biennium, and essentially

14   stabilizing, we would think.  Although predicting future budgets,

15   your Honor, is difficult to do, we would expect about $15 million

16   or so per biennium for the I-4 budget.

17        In order to do the corrections suggested by the plaintiffs,

18   for the cost of these culverts, it would require about

19   $92 million a year, or $185 million for every biennium.  That is

20   an order of magnitude greater than what the legislative process

21   has determined is the appropriate level for funding of these

22   barriers.  It would be a reallocation of resources forced by the

23   Court on the State of Washington to the tune of about

24   $170 million per biennium, and it would need to come through a

25   program similar to this I-4 budget, your Honor, in order to

ensure that the culvert repairs were being fixed in the order
suggested by the index.  It is this budget that gives us our best
key to how that should be done.

      The parties in this case, as you can note already, will
dispute what the costs of fixing the culverts is in this case.
No matter where the Court lands, in terms of what its thought is
about future costs of culverts, it's going to be more,
substantially more, than the legislature budgets through the I-4
program to get these done.  And it would be in fact a step of
institutional reform of the state's budget and salmon restoration
funding plans in order to accomplish that.  Again, there's no
certainty of return in terms of additional salmon being produced.

      I mentioned briefly at the outset, your Honor, Victor Moore
from OFM will be here to explain what the State is doing to try
and overcome what was a $9 billion deficit last year, and the
fact that if money has to be reallocated to the I-4 budget or
some other program at a rate of $195 million a biennium, it's got
to come from somewhere.  Something is not going to be done if we
have to put a primacy on culverts due to an injunction, an
injunction that is not based on science.

      The final consideration for the Court in this case simply has
to do with whether or not an injunction by the Court will
actually be effective, effective at producing fish in a way that
is relevant to the treaty rights of the tribes.  What we know in
this case, your Honor, is that the State owns a very small

1    percentage of the culverts at issue.  Most of the culverts are

2    owned by other landowners.

3        I have an example here from Little Bear Creek.  I will zoom

4    in just a little bit.  In this area, we can see nine state

5    barriers, 131 non-state barriers, and they're color coded.  I

6    hope the monitor is clear enough to see that.  This is a problem

7    with accelerating the pace of the state's barriers when there are

8    going to be numerous barriers that still exist in the case that

9    complicates any kind of calculation as to how much production is

10   actually going to be gained, and we would think, as a caution to

11   the Court, that ordering acceleration out of step with existing

12   plans when the Court can't be certain what the return on that

13   reallocation -- forced reallocation would be.

14       There is one other example.  This is from Steilacoom and

15   Baker Creeks up in WRIA.  Number 1, 80 non-state barriers, with

16   six partial barriers by the state.  We have partial barriers,

17   like the non-state landowners as well, your Honor, and only two

18   partial barriers.

19       So the situation that we end up in, your Honor, is the

20   certainty on the one hand that the Court is being asked to make a

21   major reallocation of salmon resource funding, and on the other

22   hand being presented with the fact that there is no evidence as

23   to what benefit we're actually going to get if we make that

24   reallocation; no evidence as to how many additional fish we are

25   going to actually obtain, and how that would be relevant to any

1   treaty right that's actually held by the tribes.

2       The uncertainty of that reallocation of resources, combined

3   with the speculative benefits, I would caution the Court against

4   issuing an injunction.  A federal injunction in this case and the

5   decades of court oversight that would come along with it are not

6   necessary, and the Court should exercise its discretion to not

7   grant an injunction in this case.

8           THE COURT:  All right.  Counsel, thank you very much.

9       Are the plaintiffs ready to call their first witness?

10          MR. SLEDD:  Your Honor, we have a procedural question

11  from counsel, which is whether you would wish us to call

12  witnesses now or proceed to read into the record the exhibits

13  that we have stipulated to.

14          THE COURT:  Yes.  We wanted to keep track of that, as we

15  talked about in the pretrial conference.  So let's go ahead and

16  read into the record the exhibits that are either stipulated to

17  or agreed can come in without any objection.

18          MR. SLEDD:  Your Honor, before I start reading in the

19  exhibits that have been stipulated to, I did want to mention the

20  stipulation that the Court approved just before our final

21  pretrial conference with regard to these exhibits indicating the

22  parties would use their best efforts to come up with joint

23  exhibits where they had both listed them.

24      The parties were using their best efforts quite late last

25  night, continuing to --  And while we suggested we wanted to get

 1   those read in today, those joint exhibits, with the Court's

 2   permission, I would like an additional day to work with the

 3   State, and hopefully we can come up with something by tomorrow's

 4   session to read in the joint exhibits.  But we are prepared to

 5   proceed on reading on the individual parties' exhibits that have

 6   been stipulated.

 7            THE COURT:  You may proceed.

 8            MR. SLEDD:  Thank you, your Honor.

 9        We would like to enter, without objection, the following

10   plaintiffs', all tribes', exhibits into evidence.  AT-001-1,

11   AT-002-1, AT-004-1, AT-004-2, AT-004-3, 004-6, 004-8, 004-9,

12   004-10, 004-11, 004-12.  AT-007-1, 008-1, 008-2, 008-3, 008-5,

13   008-7, 008-8, 008-9, 008-10.  AT-009-1, AT-010-2, AT-010-4.

14   AT-011, AT-014, AT-015, 016, 017, 020, 022, 024, 025, 031.

15   AT-037, 041, 042, 046, 047, 048, 050, 052, 053, 054, 055, 056,

16   057, 058, 059, 060, 061, 062, 063, 064, 065, 066, 067, 068, 069,

17   070.  AT-071, 072, 081, 082, 083.  AT-101, 102, 108, 109, 110,

18   111, 112, 113, 118, 125, 129, 130, 131, 132, 133.  AT-143, 144,

19   145, 146, 147, 148, 149, 150, 153, 155, 158, 161, 162, 163, 164,

20   165, 166, 181, 182, 186, 187, 196, 206, 210, 212, 214, 225, 226,

21   229, 230, 231, 232, 233, 237, 239, 243, 247, 248, 249, 254, 255,

22   257, 258, 259, 260, 262, 263, 281, 282.

23       AT-282, 285, 286, 287, 288 and 289.  AT-290, 291, 292, 302,

24   306, 309, 310, 311, 312, 313, 315 and AT-317.

25       Mr. Monson, would you like me to read the USA exhibits, or do

1   you want to do that?

2            MR. MONSON:  Please go ahead.

3            MR. SLEDD:  Is that good with everybody?

4            MR. TOMISSER:  Before your Honor bangs the gavel down on

5   these, we will have to check a couple of these earlier ones on

6   the break.  Our list started later.

7            THE COURT:  All right.  How about the U.S. ones?

8            MR. SLEDD:  Again, without objection, the plaintiffs

9   would offer into evidence the following exhibits for the United

10  States of America:  U.S. 182, 183, 184, 185, 186, 187, 188, 189,

11  190, and 191.

12           MR. MONSON:  We think that is correct for the U.S.

13  exhibits, your Honor.

14           THE COURT:  Mr. Tomisser, what about the defense

15  exhibits?

16           MR. TOMISSER:  Defense exhibits that we believe are

17  stipulated to, your Honor, W 085 A, W 085 S, W 087 A, W 087 B.

18           THE COURT:  Hang on a second.  087 A and B.

19           MR. TOMISSER:  Yes.  And C and D and E.

20       087 G, W 087-I, dash J, K.  W 088-A, B, D, E, F, G, H, I, J.

21       W 089 A, B, F and G.  W 090 A, W 091 A.  W 091 B, D, H, W.  W

22  092 A, D, E, F, G, H, I, M and O.  W 093 A, B, C, D, F, G, J, L,

23  R, S and T.

24       W 094 A, C, D and E.  W 136, W 144, 146, 147, 148, 149, 152,

25  155, 185 and 187.

```
 1              THE COURT:  No objection?

 2              MR. SLEDD:  No objection from the plaintiffs, your

 3   Honor.

 4              THE COURT:  All of the defense exhibits as listed will

 5   be admitted.  All of the United States exhibits as listed will

 6   also be admitted, and you can double-check -- in fact, we'll just

 7   go ahead and take our break at this point before we call our

 8   first witness.  Let me have you double-check the plaintiffs

 9   exhibits, and then the first thing we'll do when we get back is

10   deal with that and probably admit those as well and we'll get

11   started.  All right.

12   (Recess)

13              THE COURT:  Mr. Tomisser, did you get a chance to review

14   the proposed trial exhibits?

15              MR. TOMISSER:  We did, your Honor, and we are fine with

16   the list as read.

17              THE COURT:  All those listed, all the tribes' exhibits,

18   will be admitted.

19              MR. SLEDD:  Your Honor, if I may?  John Sledd.  There

20   were two exhibits stipulated to late yesterday I would like to

21   read in now, if I may?

22              THE COURT:  Please.

23              MR. SLEDD:  I would ask, without objection, these

24   exhibits be admitted:  AT-330 and 331.

25              THE COURT:  330 and 331 will also be admitted.
```

```
 1              And the plaintiffs may call their first witness.

 2              MR. DAVIES:  Your Honor, we'd like to call Charlene

 3    Krise.

 4              THE COURT:  Good morning.  We'll have you come forward

 5    and be sworn, please.

 6         And the plaintiffs may call their first witness.

 7    Whereupon,

 8                           CHARLENE KRISE

 9    Called as a witness, having been first duly sworn, was examined

10    and testified as follows:

11              THE CLERK:  Please state your full name for the record

12    and spell it for the court reporter.

13              THE WITNESS:  My name is Charlene Krise, C-H-A-R-L-E-N-E

14    K-R-I-S-E.

15              THE COURT:  As you can tell, the microphone does amplify

16    a little bit.  You need to keep your voice up so everybody in the

17    courtroom can hear you.

18         You may inquire.

19              MR. DAVIES:  Thank you.

20                        DIRECT EXAMINATION

21    By Mr. Davies:

22    Q    Thank you.  Could you say where you live?

23    A    I live in Shelton, Washington, in an area called Kamilche.

24    Q    Are you currently an enrolled member of the Squaxin Island

25    Tribe?
```

```
 1   A    I am.

 2   Q    Do you have family members who are also tribal members?

 3   A    Yes, I do.

 4   Q    Could you describe your family?

 5   A    Within the Squaxin Island Tribe, I have numerous family

 6   members.  The Krises, Whitners and -- quite a few.  I don't know

 7   the total number.

 8   Q    Are you employed?

 9   A    Yes, I am.

10   Q    And where do you work?

11   A    I work in the Squaxin Island Museum Library, Research Center.

12   Q    And could you describe your work at the museum?

13   A    I work as an executive director, and I make sure that our

14   culture and the teachings of our ancestors are preserved and

15   taught to our younger generation.  We have a cultural educational

16   outreach to people that come through the doors.  These could be

17   people from K through 12, colleges, universities from all over

18   the world.  We've had college exchange students from China, from

19   different countries.  And we will share with them about who we

20   are as people of the water.

21        We have shared our history with some people on the east coast

22   of Africa.  We try to be very hospitable and share who we are.

23   Q    And what prepared you for your work with the museum?

24   A    Years ago, when I was fishing out in the south Puget Sound

25   region -- it was after the Judge Boldt decision, and our tribal
```

1    people started to return back to our area, Kamilche but also in

2    Thurston, Mason and Kitsap counties.   And many of us had not

3    known much about our history.   But when we started to come

4    together out on the water, we would hook our boats together.   It

5    would be just like hanging on to the next boat and the next boat.

6    And we'd share with one another our point of history, what our

7    grandmothers or grandfathers had taught us and what we knew about

8    the different inlets where we were fishing, and who we knew as

9    far as who were still smoking the salmon.

10        So part of my teaching ground had to do with the return back

11   to the south Puget Sound area and learning about our history

12   through my relatives, many of them were elders.   And that was

13   after the Boldt decision.

14   Q    Do you hold any elected positions with the tribe?

15   A    Currently I'm on the tribal council.

16   Q    And how long have you been a member of the tribal council?

17   A    Ten years.

18   Q    Are there any subject areas that you concentrate in as a

19   tribal council member?

20   A    Some of the areas that hold my interest are healthcare,

21   education, cultural education, and also the natural resources.

22   Q    Have you been involved with the environmental policy issues

23   on the council?

24   A    Yes, I have.

25   Q    And what have you done in that area?

A    **Years ago when I was fishing, during the time that fishing**
**was my main livelihood, it was what I did every year, and even**
**off-season I would be working on my gear, hanging nets.  Our**
**fishing fluctuated.  It had good years and bad years.**

**One year it became extremely terrible, and it was during this**
**time that I got into my rig, my Volkswagen, and I would drive**
**around the res, the reservation, where our community is, our**
**tribal community.  And I had this area that I liked to visit.**
**And the road that I would travel down was canopied.  It was**
**beautiful.  Well, as I made the corner and came out of the**
**canopy, I wasn't prepared for what was before me.  The forest**
**that I loved so much was gone.  They had taken all the trees.**

**I was so astounded.  I got out of my car and stood on the**
**ridge and looked around.  And it was like coming across someone**
**who had died.  And it really bothered me a lot, so much that it**
**impacted my daily life.  And my husband at that time said, What**
**is wrong with you?  And I told him that I was really bothered by**
**this.  And he said, Well, what are you going to do about it?  And**
**at that time, I thought, Well, there's nothing I can do about**
**this.  But then as I started to think about it, yes, I am one**
**voice, so I went down to our natural resources.  And at that time**
**there was a lady there who brought out these maps, and she showed**
**me what was going on and how that already this particular area**
**had been replanted.  And I was glad to see that it was replanted.**

**And she said, Charlene, I notice that you're really concerned**

1    about what's going on in the land use.  And I said, I am.  And

2    she said, Would you be interested in volunteering?  I said, I

3    will.

4        So what happened is I started volunteering on these watershed

5    committees and commissions, and I utilized my years of knowledge

6    of being out on the water, being in close contact with the

7    environment and paying attention to the changes of the season,

8    watching what was going on on the mainlands of the areas that we

9    fished, and utilizing the cultural knowledge that I had gained

10   from my ancestors about how important it is that we as people

11   coexist on the land.

12       I used these principles in the environmental policy-making

13   that I would be involved in with the tribe.  And the

14   environmental policy-making would be with the local government,

15   state, and also some of the federal.

16   Q    Could you describe what a rememberer is?

17   A    In our tribal society, through the generations, the ancestors

18   would watch in the community those that had a good memory for

19   retaining history.  So we know them as accountants that can look

20   at long numbers, and they have those numbers.

21       In our culture, our people would know that there are ones

22   that have that memory and that cared to pay attention to details

23   of the ways of the people.  And when I was younger, I remember

24   hearing a lot of the teachings from my granddad and from my

25   grandmother about who we are as people of the water, and then

1    from my father.  And I would take time in busy days to sit with

2    tribal elders and listen to them and make sure that -- at times I

3    didn't like it, but I had to.  Sometimes I would take notes on

4    paper, table settings and napkins, fish tickets, clam tickets,

5    and I stored all this information.  I have some boxes of just my

6    own personal gathering of being a rememberer and making sure that

7    our history is held for the future.

8    Q    Are you familiar with stories about salmon that would have

9    been told within your family?

10   A    Yes.

11   Q    Could you describe some of those stories?

12   A    The first time, I think it was back in 1978, I attended a

13   first salmon ceremony, and I listened to some of the teachings

14   from the elders of how the salmon would return.  When they would

15   return, our people would have this ceremony to honor the return

16   of the salmon because they provided so much in our daily lives.

17        To our tribal people, the salmon would be like, to many

18   non-tribal societies, their daily bread.  Our salmon was an

19   important part of -- and so -- of our daily life, our daily

20   bread.  So part of the ceremonies our people would have would be

21   a way to honor, not just the salmon, but to honor the creator

22   that we have these salmon for today, but also for the future.

23   Q    Are you involved with the Shaker Church?

24   A    I'm not a full-fledged member, but I am one that, as a child,

25   it was a church that I went to.  When I was sick, I went there a

lot, and they would pray over me, and I remember that.

I remember that we would go to tribal Shaker functions at different churches.  And some of the people that I see today, I remember as a child that they also were at these functions.  The Shaker Church was an important aspect of my childhood.  And even today, it's still an important part of who I am.

Q    Could you describe what the Shaker Church is?

A    The Shaker Church -- in the late 1800s, a lot of the ways of my tribal people were outlawed.  The ways that our people would worship and pray were considered very pagan, very heathen, and so there are many laws that prohibited tribal people from practicing their expression of religion, their belief.

My ancestor, John Slocum, he had a life/death experience, and part of the teaching that he brought back was to take back what we call Gwud-sah-dod in our language means body, mind, soul, spirit, infant, child, adult, elder, spring, summer, fall, winter.  He took these teachings, and he knew about Protestant teachings, the Baptists and the Methodists, and then he took the teachings of Catholicism, and he combined them together, and he incorporated what is known as the Indian Shaker Church.  And that was incorporated in 1910.

This church helped to preserve a lot of our sacred songs that we held very dear, and it also helped preserve a lot of our principles and ways that we believe how we should treat each other.

Q    Do salmon play a role in the Shaker Church activities and functions?

A    Normally when we have a Shaker Church gathering, there's always salmon dinners.  There's probably salmon stew, there's probably fish eggs, smoked salmon, smoked fish heads.  There's a lot of salmon around the -- well, salmon is one of our first foods.  And so when we have these Shaker gatherings, often there will be the salmon.

Q    Have you ever testified in court on the tribe's behalf?

A    Yes.

Q    And when was that?

A    That was for the shellfish case.

Q    And what did you -- what did you testify in that case about?

A    I am a fisher person, but I also consume a lot of shellfish. Because of that knowledge of the ways of the ancestors, what I testified on was that knowing how the shellfish was used and is still currently used for our people.

Q    Now, are there other ceremonies besides the Shaker Church that tribal members currently perform that involve salmon?

A    Yes.  Salmon is our first food, one of the main foods for our people.  And during naming ceremonies, the time celebrating the birth of a child, or maybe it's letting go of a loved one that has passed on, it might be a time where a marriage has happened, we will have salmon.  It's usually there.

Q    What about the first salmon ceremony; could you describe

that?

A    Our tribe every year has a salmon ceremony.  It is in August,
July, around that time.  It depends on when it's determined.  And
we take the first salmon, and we prepare it, and we serve it to
people.  We invite non-tribal people to also join us.  It is to
be like a ceremony to thank the creator for this gift of the
salmon.

     We also utilize it as a time to help people -- to remind
people that we coexist.  Whatever happens to that salmon will
happen to us as humans.

Q    Now, at the museum, are there artifacts that you've collected
that reflect the historic role of salmon in Squaxin culture?

A    Yes.

Q    Could you describe some of those?

A    I sure can.  Just recently some of our projectile points,
which would be items that could have been used for salmon use,
have been dated several thousands of years old.  We have a whale
bone club that's in the museum that is called a salmon club.  And
that's dated 2,500 years old.  We have a gill net that was
brought out of our archeological site, and that is dated close to
500 years old.

     We have fish rearers.  They're like -- I would say kind of
like fish pens that help guide the salmon, so our ancestors would
gather the salmon and prepare them for the winter.  We have
remnants of fish rearers.  We have legends on our seven-panels

1  that is the length of the museum.  And we cover the stories of

2  salmon and how it's important for us to be very mindful that we

3  coexist on the land, as part of our teachings.

4  Q    Now, could you describe in more detail those panels you

5  mentioned and their meaning at the museum?

6  A    Our seven panels represent the seven inlets from where our

7  tribal people come from, the ancestral inlets.  And on each of

8  the panels, we have portions of the legend.  It's called the

9  Do-kwee-buhth.  It's the Legend of the Changer.  On each panel

10  there is stories that tell about us as people of the water.  And

11  they're important stories to Squaxins but also to tribes in the

12  Northwest.

13      And on these panels, I would say the second one tells about

14  how there was a great earthquake on the Deschutes River and how

15  Changer came and caused the ground to rumble and shake, and it

16  changed the course of that river so that now there were falls,

17  and how that the salmon at one time had been able to go up

18  those -- this river no longer could go up that river, so they had

19  to go to different streams and creeks.

20      In our teaching of Gwud-sah-dod, it teaches us that the

21  reason this happened is because some of the protocol that was

22  important for this world had not been followed, and so in that

23  particular panel, we're telling about the importance of -- that

24  we should always pay attention to what we are doing to the land

25  and always be careful, that we as humans, we're just a small part

of what is happening with the land.

The second one was on the -- it's a story about Changer, and it tells a little bit more about how the salmon is one of the first foods that was given to the people as the foods.

Q   Let me ask another question.  Are salmon parts used in contemporary art?

A   Yes.  I forgot to mention something, and this is tied to the art question.  In our museum, we have a petroglyph.  A petroglyph is a rock with carvings into the rock.  Some of these rocks that we have in our museum are several thousands of years old.

In a couple of the rocks, there are depictions of salmon. And a lot -- so it shows the antiquity of how important salmon is to our people.  In the modern artwork, it's still a depiction of that our people are very much tied to the salmon.  Many of our people believe that salmon are like spirit helpers.  If you ever watch salmon, you can see why, because they go through a lot, and they still make their destination.  They have that determination to make that destination.

Q   I think you testified earlier that you used to fish yourself quite a bit?

A   Yes.

Q   Could you describe your fishing experience?

A   I've been fishing since 1976, I think it is.  '75 or '76. And I love the water.  I love the good weather and the bad weather and the cold weather and the warm weather.  It's very

1   exhilarating to be out there on the water, to be -- it's like

2   being alive to sometimes get so wet from fishing.  It's a good

3   place to connect with your tribal people, I think.  Because it

4   is, for our tribe, almost like a family affair.  Even though we

5   may not be related to maybe the Peters clan by blood, we're still

6   family because we are all out there fishing.

7       There's a great importance to us as tribal people to be able

8   to be out there in the areas where we know that our ancestors

9   have been and to know that we're doing the same things that our

10  people have been doing for thousands of years: catching those

11  salmon and feeding our people.

12      So my experience on the water covered many years.  I also

13  almost gave birth to my first daughter.  She's 29 this year.

14  Shows you how much I was out there on the water.  I also noticed

15  a lot of changes all these years of what's been happening out on

16  the water.  I fished different species of salmon using different

17  gears.

18  Q   I'm going to show you a photograph here just for illustrative

19  purposes, if I can figure out how to make the equipment work.

20      Do you recognize this photograph?

21  A   Yes.

22  Q   Can you describe it?

23  A   This is a photograph of my grandfather, Michael Krise.  And

24  my grandfather has lived in Kamilche all his life.  And this was

25  taken by Little Skookum.  And this area is Kamilche.  My

1    grandfather was an avid fisher person.  He was always smoking

2    salmon.

3        When we stayed at our grandfather's house, it would be salmon

4    eggs for breakfast, it would be salmon sandwiches for lunch, it

5    would be smoked salmon with potatoes for dinner.  So whenever I

6    see a photo of my grandfather, I always think of salmon.

7    Q    Could you tell us when this photograph was taken?

8    A    In the 1960s.

9    Q    Was he concerned about the abundance of salmon?

10   A    He was.  In the 1960s, my brothers would have to go down to

11   the creek with him, and he would have them egg salmon -- milk the

12   salmon.  And my brothers would tell about how he was so concerned

13   that the salmon were not returning like they used to.  In his

14   time, the streams and creeks were full of salmon, and now it

15   seemed like they were diminishing rapidly.

16   Q    Now, did your fishing effort ever change over time?  I think

17   you indicated earlier you used to be out on the water a lot.  But

18   at some point in time, did that shift?

19   A    As I became older, yes, it did shift considerably.  Fishing

20   is not an easy way of life.  I would be jumping off the bow of

21   skiffs and jumping on rocks and pulling anchors, throwing

22   anchors, and pulling on beach seines.  I know what it's like to

23   tear tendons, and I know what it's like to get backaches,

24   shoulder aches, muscle aches.  And plus being a mother of four,

25   it was -- you know, it was kind of rough at times because I would

1    take my children out there too, and then juggling, making sure

2    that my children were in school.

3        But I think the biggest factor was -- that totally changed my

4    world was those bad years and not being able to make it through

5    the year, and the struggle, and almost like a shame not being

6    able to put the food on the table when I wanted to or not being

7    able to buy the school clothes, you know, because I depended on

8    fishing.

9        So, yes, after a while when it became so bad, I became the

10   environmental policy representative.  And I still fish off and

11   on, but not as much as I used to because I could not make it in

12   that area.

13   Q    Now, in the bad years, how were other people in your family

14   impacted by the lack of salmon?

15   A    I've watched where there were times when I would see the

16   children at the bus stop, and some of them would just have their

17   heads down, and I'd look and see, this was a bad year, because

18   the kids did not have brand-new shoes, they did not have the

19   school clothes.  So that was probably one of the bigger areas

20   that, as a mother, I would see in the children.

21       But one year it was so bad that I watched as cars were being

22   repossessed, and people would talk about their eviction notices

23   or losing electricity.  And it was because we all depended on

24   that salmon to return.  And we'd get the paper numbers, like, oh,

25   you're supposed to get this amount.  But then when it came to

1   actualities, sometimes those salmon would not be there.  And it

2   wasn't because we lacked the effort.  We were putting everything

3   into it to try to get our share, but it was not there.

4   Q    Now, the changes in abundance, does that affect the cultural

5   practices in any way?

6   A    There were times when we needed salmon for certain

7   ceremonies, and we were worried because we could not get the

8   salmon for those ceremonies.  What we would do to -- when we

9   couldn't get the fresh salmon, is we would bring out our smoked

10  salmon and our canned salmon and utilize that salmon.

11          MR. DAVIES:  I don't have any other questions.

12          THE COURT:  Thank you.

13      Cross-examination.

14                        CROSS-EXAMINATION

15  By Mr. Tomisser:

16  Q    Good morning.

17  A    Good morning.

18  Q    We had an opportunity to meet a few months ago, if you

19  recall, when I had a chance to ask you some questions at that

20  time.

21      Do you remember that?

22  A    Yes, I do.

23  Q    I will start and ask you a little bit more about the work

24  that you do as a council member.  Is it correct with the Squaxin

25  Tribe, it is the council that makes policy decisions for the

```
 1   tribe based on the income that the council gets from its members?
 2   A    We have a general council.  The general council is our tribal
 3   people who are 19-year-olds and on up.  And we take their
 4   directive, their ideas, what they would like to see for the
 5   future, and we follow many -- and often what they have stated as
 6   the needs, and then we also follow our Constitution.
 7   Q    And specifically on the council, what is your position?
 8   A    I would be considered a council member at large.
 9   Q    And you have been on the council for about ten years; is that
10   right?
11   A    Yes.
12   Q    And the council every year formulates the budget for the
13   tribe; is that correct?
14   A    Actually, we have a budget commission that will put together
15   and gather all the information regarding what is going on within
16   the tribe.
17   Q    And how does that commission interact with the council?
18   A    They will give a report towards the end.
19   Q    And so when the council is looking at all the things that
20   need to be done on behalf of the tribe, can you give the Court a
21   list of the various services that the tribe provides to its
22   members?
23   A    I will do my best.  I don't know if I could cover them all,
24   because it is quite large.
25        Some of the major ones would be, of course, our healthcare,
```

1    natural resources, education, law enforcement, cultural

2    education, our elders program, our social service program.

3    Q   It sounds like you have a number of programs that are devoted

4    to the health and wellbeing of the tribal members from very young

5    all the way through to the elder members of the tribe.  Would

6    that be true?

7    A   Yes.

8    Q   And every year when these services are being provided, you

9    have to have a budget to pay for them; is that right?

10   A   Yes.

11   Q   And is it true that there is not enough budget to pay for all

12   the things the tribe would like to do for its members?

13   A   There is not enough.  There really isn't.  And we do actively

14   seek grants, and we go after grants to try to help offset those

15   costs.

16   Q   Sure.  And when the tribe is looking at doing what it can,

17   the tribe is then required to prioritize the budget; is that

18   correct?

19   A   Yes.

20   Q   I want to ask you a little bit also about fishing and your

21   experience with fishing.  If I recall correctly from what you

22   told me before, fishing over your time has fluctuated up and

23   down, some years better than others; is that true?

24   A   Yes.

25   Q   But to the best of your memory, the effort of the Squaxin

Tribe to fish has always been good; is that right?

A    It has been good.   There have been times when the fishing has been extremely bad, and we'll see a diminution in effort.

Q    Is it your impression, though, that over the years, the number of fishermen has remained relatively constant?

A    In the past years, it has been larger, the effort.

Q    Is it also correct, Ms. Krise, that personally, though, you are unaware of any culvert barriers in the Squaxin Tribe; is that correct?

A    Well, are you -- the Squaxin Tribe reservation?

Q    Yes.  Do you know of any, is the question.

A    On our reservation?

Q    Yes.

A    No.

Q    One final question.   The picture here of your grandfather, I was just curious if there was perhaps a misdating on the photograph.   It looks like it says August of 1966.

     Do you see that?

A    Yes, I do see that.

Q    But there is snow on the ground?

A    It might be a misdating, huh?  Not unless -- no.   This is just me, because I'm from a tribal reservation.   We have dogs. You know, I have a wild -- not a wild dog, but a dog that likes to tear up everything.

     I don't know.  But I'm looking at the trees, too.   In August,

1   you would think that there would be leaves on those trees, so it

2   looks misdated.

3   Q   But at any rate, it is your grandfather?

4   A   It is my grandfather.

5   Q   There with the fish that he caught?

6   A   Yeah.

7       This is what could have happened, is that the photo could

8   have been taken earlier in the year, and then it was probably

9   printed about that time.

10          MR. TOMISSER:  Thank you.

11          THE WITNESS:  You're welcome.

12          THE COURT:  Any redirect, Mr. Davies?

13          MR. DAVIES:  None, your Honor.

14          THE COURT:  You may step down.

15          THE WITNESS:  Thank you.

16          THE COURT:  The plaintiffs may call their next witness.

17          MS. FOSTER:  Your Honor, at this time the plaintiffs

18   would call Lorraine Loomis to the stand.

19          THE COURT:  Ms. Loomis, good morning.  If I could have

20   you stand and raise your right hand to be sworn in.

21   Whereupon,

22                      LORRAINE LOOMIS

23   Called as a witness, having been first duly sworn, was examined

24   and testified as follows:

25          THE CLERK:  Could you please state your name for the

1    record and spell it for our court reporter.

2            THE WITNESS:  My English name is Lorraine Loomis.

3    L-O-R-R-A-I-N-E, Loomis, L-O-O-M-I-S.  And my Indian name is

4    Itakbix, and Alix will give you that spelling.

5            MS. FOSTER:  Your Honor, I have provided a copy of the

6    spelling to the court reporter.

7            THE COURT:  Thank you very much.  You may inquire.

8                        DIRECT EXAMINATION

9    By Ms. Foster:

10   Q    Ms. Loomis, where do you reside?

11   A    On the Swinomish reservation.

12   Q    Are you an enrolled member of the Swinomish Indian tribal

13   community?

14   A    Yes, I am.

15   Q    Were you born and raised on the reservation?

16   A    Yes, I was born and raised on the Swinomish reservation.

17   Q    And have you lived there most of your life?

18   A    I lived there -- I was gone for a period of about ten years,

19   and then I came back.

20   Q    Are you descended from anyone who has signed the Treaty of

21   Point Elliott?

22   A    Yes, I am.  On my mother's side, her great grandfather, his

23   name is Kwallattum.  He is also known as General Pierce, and he

24   is the subchief of the Skagit Tribe, which signed the treaty.

25        And on my father's side, his great grandmother is a

1    granddaughter of Chief Goliah, who is also a Skagit Tribe chief,

2    and he signed the treaty.  And on still my dad's side, on his

3    mother's side is a descendent of Chief Galilahi from Suquamish.

4    Q   Was that Chief Galilahi from Suquamish?

5    A   No.  Chief Seattle, Chief Sealth.

6    Q   Are you familiar with the history and traditions of the

7    Swinomish Tribe?

8    A   Yes, I am.

9    Q   And how did you gain this familiarity?

10   A   It was handed down.  It was taught from generation to

11   generation, and we lived it.  We lived the culture of the

12   reservation.

13   Q   What role did your family and tribal elders have in passing

14   down traditions to you, if any?

15   A   It was always very important for tribal members to listen to

16   elders, and listen -- and they always spoke with teachings in all

17   of the doings which we attended.  And they were always teaching

18   something about the tribal culture, what to do and not to do.

19   You were always taught to listen.

20   Q   And can you share with us one of those traditions, please?

21   A   One of the traditions, I guess, since we are talking about

22   salmon and wildlife -- or not talking about wildlife.  One of our

23   traditions is that when fishermen go out on their first day of

24   fishing, they come home, and they share their salmon with elders

25   of the reservation, always with elders of the reservation, and it

1   could be their family elders or it could be other elders.

2      And when a young youth, when they go out hunting and they

3   catch their first deer or their first elk or they shoot their

4   first deer, they give it all away.  They don't keep any of it.

5   They give it all away.

6   Q   Were you taught the importance of community by your elders?

7   A   Yes.  Yes, I was.  Community gatherings, it was important for

8   everybody to attend community gatherings, to be there to -- just

9   to be there at the community gatherings.

10   Q   Are you currently employed, Ms. Loomis?

11   A   Yes, I am.

12   Q   And where are you employed?

13   A   I am employed at the Swinomish Tribe.

14   Q   And what is your position there?

15   A   Fisheries manager.

16   Q   And how long have you held that position?

17   A   Since 1975.

18   Q   And what are your major responsibilities as a fisheries

19   manager?

20   A   We do a lot of negotiations.  I represent the tribe in policy

21   matters with other tribes, the state, feds, and anything that has

22   to do with salmon.

23      I do preseason management plans for all of the species that

24   we fish in.  I open and close fisheries and meet with our

25   governing body and our fish and wildlife commission on all of

1    these.

2    Q    When you have to make decisions in your job as a fisheries

3    manager, what kinds of issues do you take into account?

4    A    Well, I always make sure that what is this decision going to

5    harm in the future, that this decision is not going to take away

6    fish that is to come back in the future or anything else.  We

7    always have to look forward.  We always got to make decisions to

8    protect the fishing rights of the tribe and keep the culture

9    going for the tribe.

10   Q    Overall, do you find that your job is a rewarding job?

11   A    Yes, it is rewarding.  It is hard to say right now why it

12   would be rewarding.  But you know, to work for the tribe and work

13   for fishermen is -- and to see fishermen on the first day that we

14   have an opening of any kind, and they're scurrying around the

15   docks, they're getting ready.  My office, by the way, faces the

16   docks, so I can see them all going.

17        And to see them getting ready and how excited they are to be

18   out, to be able to go out fishing is a rewarding experience.  To

19   see them happy after a season that -- they have had a good

20   season, it's -- fishermen in general, you know, if they're happy,

21   I'm happy.

22   Q    Have you held any elected positions with the Swinomish Tribe?

23   A    Yes, I have.

24   Q    What position is that?

25   A    I served on the senate, our governing body, for about 15

1    years.  I am not on it now.

2    Q    Do you represent the tribe on any fisheries boards or fish

3    commissions?

4    A    I am on the board of the Skagit System Cooperative Board.

5    The Skagit System River -- Cooperative, SRSC.  That's a

6    consortium that manages the fisheries for the two tribes, the

7    Sauk-Suiattle Tribe and Swinomish Tribe.  We have a staff of

8    probably about 20 scientists and maybe a technician -- counting

9    the technicians, it would be about 27.

10        I also serve on the commission for the Northwest Indian

11   Fisheries Commission, which is a coordinating body for the 20

12   tribes in Puget Sound and the coast.  I serve as vice chair in

13   that position.  And I also serve on the Fraser Panel for the

14   Pacific Salmon Commission.

15   Q    And do you hold a particular position on the Fraser panel?

16   A    I am presently this year currently the chair for the U.S.

17   Q    Is that the U.S. section?

18   A    Yes.

19   Q    Do you hold any positions with regard to a fisheries

20   management process known as North of Falcon?

21   A    As the vice chair of the Northwest Indian Fishing Commission,

22   I serve as co-chair with WDFW in that process.

23   Q    And would you explain briefly to the Court what North of

24   Falcon is, please?

25   A    It is a process that takes about three months or longer, to

```
 1    put it in very few words.
 2              THE COURT:  The explanation doesn't take three months,
 3    right?
 4              THE WITNESS:  No.
 5       It's a co-managers body that we put preseason plans together
 6    from the ocean to all of the river systems.  So all of the tribes
 7    are involved and Washington Department of Fisheries.  And we put
 8    harvest management plans together.
 9    By Ms. Foster:
10    Q    Thank you.  Did you serve on the board of directors for
11    Shared Strategy for Puget Sound?
12    A    I did.
13    Q    Growing up, Ms. Loomis, did you or anyone else in your family
14    fish for salmon?
15    A    All of my family fished.  My mother, who was born in 1903,
16    and she was 93 when she died, or 94, she used to tell us about
17    going out on a family canoe with her uncle, as a child, to the --
18    going through Deception Pass and going to the San Juans to fish.
19         On my birth certificate, on my father's occupation, it says
20    "fisherman."  Fishing was just handed down from generation to
21    generation and still continues today.
22    Q    So do you have family members that today are fishing for
23    salmon?
24    A    I do.  I have -- just about all of my family fishes.
25    Q    How old were you when you began to fish for salmon?
```

1    A    Well, I was a helper in the beach, seining as a little girl.

2    I did anything and everything to stay at the beach, seining,

3    fishing.

4    Q    Would you describe for the Court what beach seining is?

5    A    Beach seining is on our reservation.  It takes about 10, 12

6    people that fish a net that is -- it's stationary on the beach

7    side, and then the net is pulled around the water and held for

8    anywhere from 17 to 20 minutes, and then it's brought in.  The

9    other side is brought in to shore, and then it's pulled in by

10   hand.  And it's always families, families that run a beach seine.

11        And so the community, everybody, you know, comes down to

12   visit.  So it's like an everyday community affair.  It's just a

13   wonderful time to be out.  In fact, I spent -- every day after

14   work, I went down this summer to my grandson, who's still beach

15   seining today.

16   Q    Do you currently fish for salmon yourself?

17   A    No.  I have a boat.  It doesn't fish for salmon.  It fishes

18   for shellfish right now.  But yeah, I've had a boat since 1978.

19   Q    And why is it that you don't fish for salmon now?

20   A    It takes a lot more money to fish for salmon, especially in

21   the marine waters.  And the salmon are not plentiful enough to

22   pay for your gear and your -- you know, to really -- even to

23   really break even.  So we have quit.  We don't fish salmon

24   anymore.

25   Q    If salmon were more plentiful, would you fish?

1    A    Oh, yes.  Yes.

2    Q    Where do the members of the Swinomish Tribe currently fish

3    for salmon?

4    A    Mostly in the Skagit River and the Skagit Bay area.

5    Q    Approximately how many tribal members does the Swinomish

6    Tribe have at the present time?

7    A    About 800.

8    Q    And in recent years, approximately how many tribal members

9    fish commercially for salmon?

10   A    About 100.

11   Q    And do other tribal members fish for other species?

12   A    Yes.

13   Q    And what species would those be?

14   A    Shellfish.  And we have about -- between 5- and 600 people

15   that fish.

16   Q    And when you first became fisheries manager, did tribal

17   members harvest more salmon or more shellfish?

18   A    More salmon.

19   Q    And do you know why so many tribal members now harvest

20   shellfish?

21   A    They can't make it in salmon anymore.  They can't -- there

22   isn't enough salmon to go around, to sustain them in a

23   livelihood.

24   Q    Do you believe that if there was more salmon to be harvested,

25   that those members would, once again, return and fish for salmon,

1    those who are not currently fishing for salmon?

2            MR. TOMISSER:  I would object, your Honor, to

3    speculation for this witness.

4            THE COURT:  The objection to speculation would be

5    overruled.

6    By Ms. Foster:

7    Q    You may answer.

8    A    Thank you.

9            Yes, I do believe that.  In fact, I know it would be -- it

10   would happen.  I will give you an example of what happens in the

11   rivers.  When we have a run that is forecasted -- it's not

12   forecasted for very much, and we have maybe six to ten boats that

13   will go out, but the forecast is really -- was really more than

14   what it forecast, the abundance is more than what it was

15   forecasted, then you will see anywhere from -- that number

16   increase to anywhere from 25 to 30 boats, that everybody will go

17   out and they will fish.  They absolutely look for that

18   opportunity to go out there.

19   Q    Approximately how many tribal members currently fish for

20   salmon on a subsistence basis?

21   A    All my boats that fish for -- that fish salmon will fish

22   subsistence.  Number one, as our culture is, is that they bring

23   in -- their first catch, they will give away.  They will give it

24   to seniors.  And always -- you know, part of what happens with

25   our culture is that Indian fishermen will -- Indians are very

1  giving.  They will give -- provide fish for their aunts and

2  uncles, grandparents, grandpas and to -- so that they will have

3  fish to freeze, fish to can, fish to be able to save for the

4  wintertime.  And so everybody that does subsistence -- everybody

5  that fishes will bring fish home.

6  Q   Are there members of the Swinomish Tribe now who don't fish

7  commercially for salmon, but fish on a subsistence basis?

8  A   I know of a couple.  You know, maybe they're too old, they

9  can't go out and commercially fish anymore, but they just want to

10  get out on the water, so they will go out and they'll fish for a

11  few fish and bring it home.  Or maybe they have another job and

12  they want to get out on the water, so they'll go out on weekends.

13  If it's open on a weekend, they will go out.

14  Q   Does the tribe also have ceremonial fisheries?

15  A   Yes, we do.

16  Q   And on which species does the tribe conduct ceremonial

17  fisheries?

18  A   We do probably on Baker River Sockeye.  Sometimes there's

19  just not enough coming in, and the Fish Commission, the governing

20  body, will say -- you know, rather than have a commercial

21  harvest, they will save that fish for ceremonial.

22      And sometimes on Fraser Sockeye -- at least always on Fraser

23  Sockeye, where the tribes are allowed to go out and do

24  ceremonials.  It's important, and it's sacred to the tribes and

25  recognized by the State.

Q    Would you describe for the Court how the tribe conducts its
ceremonial fisheries?

A    Usually it's volunteer.  You know, a fisherman will
volunteer, and the tribe will pay for the fuel.  But sometimes we
have to pay somebody to go out there.  But most of the time, it's
volunteer.

Q    Does salmon play a role in any tribal ceremonies?

A    We do -- we have our first salmon ceremony that it's
traditional to have fresh salmon on that day.  And that first
salmon ceremony is conducted before we start fishing.  It's to
bless fishermen, to bless the boats and their gear, and to -- for
a safe and a good season.

     And it's also to return the Skagit Chinook back to the waters
in the four directions.  And it's taken out by boats to return it
back to the waters.

Q    And have you had occasion in years past or presently where
the tribe has not had enough salmon to provide for this ceremony?

A    For the last several years, we have not had enough salmon for
the ceremony, so we've had to go out and buy it from a fishery
that was open, like Columbia River.  But the salmon that we
return to the waters was always from the Skagit.

Q    And it always had to be fresh?

A    Yeah.

Q    What other ceremonies does salmon play a role in?

A    You know, all of our tribal gatherings, it's always been

1    known for the table to have salmon, and it would be for the main

2    meal.

3         We haven't -- there's been years when -- we usually put

4    salmon away to have for these different gatherings and to provide

5    fish for everybody for all year, for the different namings,

6    birthdays, weddings.  It could be religious.  It could be --

7    anytime it's a gathering of people, when it's a community

8    gathering, we provide them fish.

9         There are some years we haven't been able to do that.  When I

10   sit around the table with other members of the tribe, and we're

11   sitting there, I can hear people say when they start putting the

12   food on the table -- it's always served family style.  And when

13   they start putting the food on the table and then they see fish

14   coming in, they said, Oh, we get fish.  You know, they're all

15   excited.  They're all excited.  Because that's what used to

16   happen.  We never had to save fish.  When we had a gathering, we

17   could go out, we could fish, we could bring it in, we could serve

18   it.

19        That doesn't happen anymore.  We now have to put our fish

20   away in the cold storage to save for the various community

21   dinners, and sometimes we can't provide for all.  It's sad when

22   we have to say no, we don't have any fish left.

23   Q    Why is it so important to have salmon at these ceremonies?

24   A    It's always been.  It's just -- I've never known community

25   dinners without salmon when I was growing up, and so it's been

```
1    handed down, you know, from generation to generation again.
2         And I guess when you look at, you know, how important it was
3    for our ancestors who signed the treaty, you know, how important
4    it was for them to protect and save salmon.  And that's how it
5    is.  It's just handed down from generation to generation that,
6    you know, salmon and wild game is on the table.
7    Q   Does salmon have a significance other than food at these
8    ceremonies?
9    A   I'm not understanding that question.  I'm sorry.
10   Q   I understand from what you're saying that salmon is important
11   to serve as food at the various tribal ceremonies.  But what I'm
12   wondering about is whether or not -- why it is so essential that
13   it be salmon as opposed to some other.
14   A   It's -- I think it's seafood.  You know, it isn't a matter
15   of -- all seafood and wild and -- I guess because, you know, the
16   one thing that the reservation wanted when the Indian people were
17   put on reservations, the one thing they wanted, they wanted to be
18   put in the mouths of the rivers, on the rivers, by bodies of
19   water because salmon was so important.
20        I can't express to you any other way, you know, to put into
21   words why or how.  But that's the way it was handed down from way
22   back.  That's what we were taught.
23   Q   Now, you made reference earlier to SRSC, which as I
24   understand your testimony, is a consortium of two tribes, the
25   Sauk-Suiattle and the Swinomish Tribe.
```

1    Are both of those tribes located on the Skagit River -- the

2    tributaries to the Skagit River?

3    A    The Swinomish is located on the mouth of the river, and the

4    Sauk-Suiattle is quite a ways up the river.

5    Q    And when was the cooperative formed?

6    A    1975.

7    Q    And where is it located?

8    A    It is on the Swinomish Tribe.

9    Q    On the reservation?

10   A    On the reservation.

11   Q    You mentioned earlier that you thought there were about 20

12   scientists employed by the cooperative.  What is the focus of

13   those scientists?

14   A    We do restoration, research, environment, harvest.  We study

15   all of those and restore salmon.

16   Q    And what species of fish do they -- and when I say "fish," I

17   guess what I'm trying to find out, do they work on salmon issues

18   or do they work on salmon and shellfish issues, or do they work

19   on shellfish issues?

20   A    They work only on salmon.

21   Q    Are the scientists that are on -- that are employed by the

22   cooperative, are they members of any technical committees or

23   commissions that you are aware of?

24   A    Yes.  They serve on quite a few, actually.  We have a harvest

25   biologist that serves on the Pacific Salmon Commission, Coho

1    Technical Committee.  We have two of them that serve on TRT,

2    technical review team, for NOAA, for ESA, for -- one on

3    Steelhead, one on research.  And I am not sure about the others.

4    I know there's others.

5    Q    Now, you have mentioned the cooperative, but what I would now

6    like to know is whether or not the tribe has staff itself that

7    address reservation fisheries and natural resource issues.

8    A    In the tribe's planning department, they have some

9    scientists.  They do reservation, forest -- forest and fish,

10   water quality surveys.  They do some construction, some

11   restoration work.

12   Q    Does the tribe operate a fish plant on the reservation?

13   A    Yes, they do.

14   Q    And would you tell us when that was established?

15   A    It was actually established back in 1969, I believe.  And

16   we -- but in 1975, we got out of the fish processing, and we

17   leased our plant out, but we just got it back this year.

18   Q    Does the tribe support salmon recovery and restoration?

19   A    Yes, it does.

20   Q    Does the tribe participate in WDFW to address harvest issues?

21   A    Yes.

22   Q    Could you explain that, please?

23   A    Well, in our North of Falcon process, with our preseason

24   planning -- I am not sure what you are getting at.  You asked

25   about harvest, right?

```
 1   Q    Yes.
 2   A    In our North of Falcon process, we work towards protecting
 3   the resource and development plans that we both agree on.
 4   Q    Has the tribe completed any projects on the reservation to
 5   protect or restore salmon?
 6   A    Yes.
 7   Q    Would you describe for the Court some of those projects,
 8   please?
 9   A    We have one tide gate.  We put in a self-regulating tide gate
10   on Fornsby Creek and a culvert further up.  And we put in a
11   bridge and a culvert, I believe, on Lone Tree.  I'm not sure of
12   the name of the creek, but it is on Lone Tree.  I'm not sure of
13   the name of the creek.
14   Q    And when you say that the tribe has installed a culvert, was
15   that to ensure fish passage because there had not previously been
16   fish passage?
17   A    Yes.
18   Q    Has the tribe participated in or completed off-reservation
19   projects to protect or restore salmon?
20   A    Yes, we have.
21   Q    Would you describe for the Court some of those?  I know you
22   may not be able to remember many of them, but if you could
23   describe some of them for the Court, that would be helpful.
24   A    I don't remember the names of the creeks, but I know there
25   have been culverts that we worked with the County and with the
```

1   State.   We've always worked with the State.   And to fix culverts

2   that -- I guess I better not say exactly, but they were culverts.

3        We worked with the Forest Service board to either

4   decommission roads or fix them.   As many people as we could work

5   with, we worked with.   And it's important to work with others to

6   fix the problems with habitat.

7   Q    And has the tribe participated or sponsored or, I should say,

8   been involved with any projects in the Skagit estuary?

9   A    Yes.

10  Q    And what are those projects?

11  A    We opened up dikes and made estuaries and flooded it with

12  water.   I don't know.   I don't know the names of them.   I can't

13  remember.

14  Q    Does the tribe receive any income from fishing?

15  A    Yes.

16  Q    And would you describe for the Court how that occurs?

17  A    For each fisherman that fishes commercially, they are charged

18  with a five percent tax, and the tribe -- the fisheries office

19  collects all that.   And on December 15th, a two percent tax is

20  returned back to the fisherman.   It is for them to use for

21  Christmas; for them to use for groceries or whatever their needs

22  might be.   It is returned back to them.

23        And this year, in 2009, because the seasons have been so bad

24  that we had to -- we returned the three percent to them in May

25  this year.   We returned the two percent in December, and then in

1    May we returned the -- for them to use to get started for

2    fishing.

3    Q    Was that unusual, that you would have returned the three

4    percent?

5    A    This was the first time.

6    Q    Now, I'd like to just talk a little bit about how fishing has

7    changed since you've been a fisheries manager.

8                THE COURT:  Counsel, if we're going to get into a

9    different area, let's go ahead and break for lunch.  Let's try to

10   start up at 1:20.  Will that work for everybody?  Okay.  Twenty

11   minutes after one.  We'll be at recess.

12   (At this time a lunch break was taken.)

13                THE COURT:  All right.  Counsel, we're ready to start

14   our afternoon session.

15                Ms. Foster, I believe you were still on direct with Ms.

16   Loomis.

17                MS. FOSTER:  Yes, I was.  Thank you, your Honor.

18   By Ms. Foster:

19   Q    Ms. Loomis, before we went to lunch, I believe you mentioned

20   one of the ceremonies that I think might behoove us to just talk

21   about a little more.  You mentioned a naming ceremony.

22        Would you describe for the Court what a naming ceremony is,

23   please?

24   A    A naming ceremony is a -- it's a tradition, of course.  And

25   it's a big doings, a big gathering.  It's where a person will

1   receive an Indian name that is handed down from generation to

2   generation.  Like my name, Itakbix, is my grandmother's name.

3   And it's a -- the people come there to learn your name and call

4   you that name.  And for most cases, instead of calling you by

5   your English name, they will call you by your Indian name.

6       Some people believe that the youth are able to receive names.

7   And that's their tradition.  That's their family way of doing

8   things.  My mother felt that you have to earn your Indian name.

9   You have to have proven yourself in your Indian culture to be

10  able to have an Indian name.  And if you proceed on in life and

11  you don't honor that name and you're somehow doing something that

12  is not -- that the elders do not like, then they can take that

13  name away from you.

14      And, again, that's a big ceremony as well, taking the name

15  away, and so that people will know that that name no longer

16  belongs to you.

17  Q   Thank you very much.

18      Turning your attention now to the fisheries of the Swinomish

19  Tribe.  What wild salmon runs return to the Skagit River?

20  A   We have spring Chinook, Mt. Baker Sockeye, summer, fall

21  Chinook, Coho, Pinks, Chum, Steelhead.

22  Q   Historically, did the Swinomish Tribe fish each of those

23  runs, or were there some runs that the tribe did not fish?

24  A   No.  Historically we fished all those runs, yes.

25  Q   Does the tribe currently fish each of those runs every year?

A     No.  It depends on the abundance of the run coming in,

whether it is depressed or not depressed.

Q     Are any of the stocks, to your knowledge, that return to the

Skagit River listed under the federal Endangered Species Act?

A     The Chinook and Steelhead are.

Q     How do the fisheries on the Skagit, how are they managed?

A     Well, we manage for wild stocks.  If, for instance, the

Chinook is coming in below escapement or coming in with few

harvestable amounts, they have to be taking a count.  When you're

fishing Cohos or Pinks, they're the next two runs coming in and

-- so you'll take Chinook incidentally to one or both of those

fisheries.  And so they have to be taken in a count.

      So if you catch too much of the Chinook, you have a projected

amount preseason, that's what you do in North of Falcon, with the

co-managers, you project how many fish are going to be taken into

your fishery.  If you take too many, then it will close your

fishery down.

Q     And when you say "it will close your fishery down," which

fisheries will it close down?

A     Depending on which one you're fishing, if you're fishing

Cohos or you're fishing Pinks.  You -- when you're fishing a

directed fishery of any one and your incidental catch is high,

then it can close you down.

Q     Other than closing your fishery down, are there other ways in

which the tribe has shaped its fisheries to avoid the taking of

1    listed species?

2    A    Yes.   In the rivers, you can use mesh size, a minimum or

3    maximum mass size.   Like for Chinook, you would use a six and a

4    quarter or six inch, so you don't catch so much Chinook.   It

5    lowers the catch of Chinook.

6         Some areas, you have to close.   Like 6A West Beach is one of

7    our usual and accustomed fishing areas that we haven't fished

8    since the early '80s because of Chinook and Steelhead.   So, yeah.

9    So there's area closures as well.

10   Q    Does it affect the number of days that the tribe might be

11   fishing?

12   A    Most definitely.

13   Q    Could you describe that, please?

14   A    If you -- you can -- you need to limit the number of days to

15   the number of incidental catch you catch of other species.   So

16   maybe you want to spread out your fleet or your fishing days from

17   week to week, and maybe you want to keep your fleet fishing for

18   three weeks, say.   But in order to keep it three weeks, instead

19   of fishing three days, you maybe fish only one day.   It will

20   limit the number of days you fish.

21   Q    So, in other words, I think I heard you say that you fish one

22   day every week for three weeks or three days in one week?

23   A    Yes.

24   Q    Could you please describe for the Court the general trend

25   that you've seen in terms of the Swinomish Tribe's fisheries

1   since the Boldt decision --

2   A    In the...

3   Q    -- with regard to salmon fisheries?

4   A    The trend has gone down.  It was up in the late '70s and the

5   early '80s.  And for some stocks, it's gone way down.  And

6   lately, they're all pretty much going down.

7        Chinook was good last year -- or this year, I'm sorry.

8   Q    Do you have any idea why that might be?

9   A    It could be a number of reasons.  It could be the work that

10  we're doing in restoration.  It could be the U.S./Canada new

11  Chinook agreement.  It could be -- it is definitely not where we

12  need it to be.  I think we have to -- we have to --

13       No, forget that.  Thanks.  That's all.

14  Q    You have described that the fisheries of the Swinomish Tribe

15  have decreased over time.  Can you tell us how that impacted the

16  community, the tribal members?

17  A    It's decreased both in marine water fisheries, which is

18  the -- where our bigger boats fish, and it has also decreased in

19  the river fisheries as well.  What happens in that time, we can

20  no longer just fish.  We can no longer -- most of the time, the

21  fishers will have to get a winter job, for instance.  It is no

22  longer just -- fishing is no longer what we can sustain ourselves

23  with.

24  Q    And has the tribe sought to help the fishermen out in any

25  way?

1   A   We have an employment policy -- a new employment policy

2   within recent years.  It is that they can -- a person employed

3   with the tribe can take a leave of absence to go fishing, and

4   they won't lose their job, and they can later come back and work.

5   That's a new policy developed.

6   Q   Does the tribe purchase any fish from its fishermen?

7   A   It's the reason why we took our fish plant over this year.

8   It is very hard at times to sell fish.  And the tribe decided in

9   order to help our fishermen out, because we were expecting a very

10   large Pink run this year, and it did come in, and it could have

11   turned out to be very hard not being able to sell the fish, and

12   so the tribe took it over to provide a place for the fishermen to

13   sell.

14   Q   Is it your experience as a fisheries manager that tribal

15   members who have gone on, let's say, to get a higher education,

16   will still come back and fish for the tribe, or is that not your

17   experience?

18   A   It is definitely the way of the Indian people.  I know

19   several fishermen that have college degrees.  They will still

20   come back and they will fish.  They may get second jobs, but

21   they -- fishing is in the Indians' blood.  No matter what else

22   they do, where they go, they will always come back and they will

23   always fish.

24   Q   And do you have family members for whom that is true?

25   A   I have quite a few that have degrees and still continue to

1    fish, yes.

2    Q    Is it for salmon -- are the individuals that you are

3    referring to, in terms of the tribe, tribal members coming back

4    and fishing after they receive a college education, is it salmon

5    that they are fishing for or is it some other species?

6    A    Both.  There are some that -- there are some that fish marine

7    waters, and they will probably only fish marine waters.  There

8    are some that fish just in a river itself, and they don't go out

9    in marine waters.  It is our custom -- it is the way they were

10   brought up.  It is the way they were taught.  If they were taught

11   to fish in marine waters, that's where they fish.

12            MS. FOSTER:  Thank you.  I have no further questions at

13   this time.

14            THE COURT:  Cross-examination.

15                        CROSS-EXAMINATION

16   By Mr. Tomisser:

17   Q    Good afternoon, Ms. Loomis.

18   A    Good afternoon.

19   Q    We had an opportunity to meet once before.  Do you recall

20   that?

21   A    Yes.

22   Q    I want to turn your attention back to the North of Falcon

23   process for just a moment.  You state that you are one of the

24   co-chairs for that process; is that right?

25   A    Yes.

1    Q    And you have been the co-chair since 1983; is that right?

2    A    Since it started, yes.  Since we started the North of Falcon

3    process.

4    Q    1983 about right?

5    A    25 years.  25 years back.  Because we just celebrated 25 last

6    year.

7    Q    When you are sitting as co-chair for the North of Falcon

8    process, do you sit in that capacity as a representative of the

9    Swinomish Tribe or as Indian Northwest Fisheries?

10   A    I sit in there as both, Swinomish Tribe -- I represent my

11   tribe in the Skagit River, and I do negotiate preseason.  What

12   the co-chair does is it kind of coordinates the issues with the

13   WDFW so that we make sure that all the tribes and all non-treaty

14   issues are taken care of.

15   Q    So you get input from other tribes as part of that process;

16   is that right?

17   A    They're part of the process.

18   Q    And the overall goal of this process is to set harvest rates

19   for the upcoming season for each species; is that right?

20   A    For each river system for all the species, right, except for

21   Steelhead.

22   Q    And that management is from the ocean all the way into the

23   terminals; is that right?

24   A    Yes, it is.

25   Q    So during these meetings, are there also experts in fisheries

1    management from the federal government that attend?

2    A    Yes, there are.  They don't always attend our meetings, the

3    co-managers meetings, but they are there at the Pacific Fisheries

4    Management Council.  And we do meet with NOAA representatives to

5    give them periodic updates.

6    Q    And there are also then tribal experts in fisheries that

7    would assist in this process; is that right?

8    A    Every tribe has a fisheries manager and scientist to be there

9    that represent their tribe.

10   Q    And how about from the state of Washington, also fisheries

11   experts from the state of Washington that participate; is that

12   right?

13   A    Yes.

14   Q    And so all of you together then will come up with the plan

15   for the upcoming season; is that right?

16   A    Yes.

17   Q    And when there are issues to be decided and decisions that

18   have to be made, are you one of the voices that speaks there on

19   behalf of the tribe?

20   A    Only if it's in my area.  Every tribe is a manager, and they

21   will meet with WDFW, and they will make that decision within that

22   area in the WDFW and tribe.

23   Q    So for an issue that might affect the Skagit which -- that

24   would affect your tribe then, right?

25   A    Pardon?

Q    The runs that return to the Skagit River would be one of the examples that might affect your tribe; is that right?

A    Yes.   The State and tribes would -- the State and tribes from each of the watersheds would get together and decide their objectives, and those objectives would be agreed upon with the WDFW and the State and the tribes.   And then those objectives would be used to determine and negotiate the rest of their plan.

Q    And are the plans based, with the help of the scientists, to try to ensure that we have a sustainable, healthy harvest?

A    Those would be the objectives, the escapement and harvest rate for each of the watersheds.

Q    And this is done every year?

A    Yes.

Q    And about how many people attend the North of Falcon process?

A    Probably 100, 150 people.

Q    Now, you also mentioned the Fraser River Panel; is that right?

A    Yes.

Q    And this year you're going to be a chair of that panel?

A    No.   I was the chair last year, in 2009.   I won't be the chair in 2010, which takes over next week.   I won't be chair.

Q    You have served well for a year.

Can you tell the Court, on the Fraser River Panel, what is the issue that that panel deals with?

A    We manage the Fraser Sockeye and Pinks coming in through our

1    waters, through panel waters, which is both Canadian and

2    American, and so we manage and develop our fishing plan for both

3    those areas.   It is agreed upon with openings and closures, both

4    in Canada panel waters and U.S. panel waters.

5    Q    So the people that might participate in that, would that

6    include tribal, state, federal, and Canadian officials?

7    A    That would -- for the United States, we have state, tribal,

8    industry and federal.   And for the -- and we have only eight

9    members.

10        For Canada, they have something like 12 members.   They have

11   many more than we do.   They have quite a few industries.   They

12   have recreation.   They have gill net, purse seine, troll.   So

13   it's a little bit different than ours.

14   Q    And what is the goal that the Fraser River Panel is trying to

15   achieve?

16   A    To follow the management plan that we developed before

17   preseason.

18   Q    So it's similar in that sense to the North Falcon process; is

19   that right?

20   A    Similar.

21   Q    I want to ask you a little bit about the Swinomish Tribe and

22   the organization of the tribe.

23        The tribe is organized around the senate; is that correct?

24   A    Yes, we have a senate.

25   Q    And then under the senate, there are a number of departments

1   and programs, of which fisheries is one; is that correct?

2   A    Yes.  All the programs are under the salmon.

3   Q    If I showed you a summary of the tribal departments from the

4   Swinomish Tribe, do you think you might recognize that?

5   A    If I --

6   Q    If I showed you a summary of the different departments within

7   the Swinomish Tribe, do you think you might recognize that?

8   A    Sure.

9   Q    Does that look familiar?

10  A    That is just one area.  Can you move it up?

11  Q    Let's slide it up just a little bit.

12  A    Yeah.  That is all the various departments.  But a lot of

13  these are under the -- a lot of these are under a director.

14  Social services, you've got like medical, health clinic, Indian

15  child welfare, daycare.  That's all under social service.  You

16  just have a whole lot of different programs, but they're run

17  under separate directors.

18  Q    And there's also a tribal court.  That would be a department

19  too; is that right?

20  A    Yes.

21  Q    And so, just looking at this list of various departments, is

22  it correct that the tribe does put a lot of emphasis on the care

23  for its members from the very young members, infant care,

24  daycare, up through services for the senior citizens?  Would that

25  be true?

1    A    Yes.

2    Q    You also provide or have a program for housing to assist the

3    members; is that correct?

4    A    Yes.  It's a separate entity within the tribe, though.  It's

5    run under -- like SRSC.  I don't know if you even have that under

6    there.  But SRSC is separate.

7    Q    And do you have also a medical clinic?

8    A    Yes.

9    Q    And how is that run through the tribe?

10   A    It's run under social services.

11   Q    Is it fair to say, Ms. Loomis, that in running these

12   departments, in doing the things that the tribe wants to do for

13   its people, that there is not enough money to do everything that

14   the tribe would like to do for its people?

15   A    Well, always you can say there's never enough money.  I mean,

16   that goes without saying, I think.  But yeah, we do a very good

17   job on what we have, yes.

18   Q    And so you have to be careful with the budget and prioritize

19   the spending; is that right?

20   A    Well, yeah.  In any budget process, I think that's what you

21   do.

22   Q    I'd like to turn back for a moment to the children of the

23   tribe.  If I understood you correctly, one of the important

24   traditions with the tribe is to find ways to pass along the

25   culture and the practices of the tribe to the next generation; is

1    that correct?

2    A    Yes.

3    Q    And can you describe for the Court, how do you do that?  How

4    do you ensure that the children become aware and are taught the

5    ways of the tribe?

6    A    It's through community gatherings.  It's through teachings

7    from the elders.  It's like -- it's taught within.  It's also

8    within yourself.  You know, you learn it without learning it,

9    without even being told.  You know, this is going on around you,

10   and you're part of it, you know, so it's instilled in you.

11   Q    Do you think that that is one of the ways -- an important way

12   for keeping the tribal culture strong and vibrant?

13   A    Yes.

14   Q    Let me ask you a little bit about these fisheries.  You are

15   the department head for fisheries, is that correct, for the

16   tribe?

17   A    I'm the fisheries manager.

18   Q    When you first began as fisheries manager, how many people

19   worked in your department?

20   A    Four.

21   Q    And how many work there today?

22   A    Four.

23        That's not fair.  It's five.

24   Q    And so the fisheries department, I wanted to talk a little

25   bit about some of the things that the fisheries department does

```
 1    in Swinomish.
 2        Are you familiar with the tribe's participation in a program
 3    for the comprehensive Chinook?
 4    A    Yes.
 5    Q    And that's done through the CRSC and the tribe --
 6    A    SRSC.
 7    Q    SRSC?
 8    A    SRSC.   Skagit River System Cooperative.
 9    Q    And that's done in conjunction with the state of Washington
10    to develop a Chinook harvest management plan; is that right?
11    A    It was written by WDFW and the two tribes and its staffs.
12    Q    The Swinomish Tribe also participate in Pacific Fisheries
13    Management Council; is that right?
14    A    Yes.
15    Q    And what is the purpose of that council?
16    A    That's the North of Falcon process.
17    Q    There's also the Skagit Memorandum of Understanding; is that
18    right?  Are you familiar with that?
19    A    Is there more to it?
20    Q    This is an annual meeting with the State and three Skagit
21    tribes that regulate the Washington fisheries that affect Skagit
22    salmon.
23        Are you familiar with that?
24    A    I don't know what that is, and it should be me that's there.
25    Is there another title?
```

1   Q    That's the only title I have for it.

2   A    I don't know.

3   Q    That doesn't ring a bell as you're sitting here?

4   A    No.

5   Q    Okay.  Do you participate in the Hatchery Science Review

6   Group?

7   A    I do not.  I do on occasion, but I don't all the time.

8   SRSC's harvest management biologist does.

9   Q    Is that one of the people in your department?

10  A    It's in SRSC.

11  Q    And that evaluates hatchery programs, along with state and

12  federal biologists; is that right?

13  A    Yes, it does.

14  Q    Do you participate in the Technical Review Team?

15  A    I don't.  My biologist -- I have two biologists that are

16  both -- one on the Steelhead and one on the research.

17  Q    And so your biologists then provide input to state and

18  federal biologists looking at the recovery plans for ESA-listed

19  salmon?

20  A    Yes, they do.

21  Q    When we look at the salmon recovery for the Skagit River

22  area, the Samish River area, is it correct that the estuary

23  recovery and habitat is considered the primary goal for salmon

24  recovery for the Skagit and Samish Rivers?

25  A    I don't think that we have prioritized anything in the

1    recovery plan yet.  I think that's in the making.

2    Q    The Swinomish Tribe does create a tribal management plan; is

3    that right?

4    A    Oh, is that the Samish you're talking about?

5    Q    Yes.  A tribal management plan?

6    A    Yes.

7    Q    And in that plan, the estuary habitat is identified as a

8    primary limiting factor for salmon; is that right?

9    A    I'm not sure about that.

10   Q    If I showed you a copy of the plan, do you think it might

11   refresh your memory about that?

12   A    No.  I think it would be best if you ask the biologist that

13   is coming up after this.

14   Q    Have you reviewed, as the head of the fisheries department

15   for the tribe, the fisheries management --

16   A    I have reviewed it, but I don't get into the technical.  We

17   have done a lot of -- particularly spent a lot of time in the

18   protection area and -- because that was where we didn't have

19   agreement on.  And so I did work on that one, but I don't get

20   into the technical, scientific details.  I am not a scientist.

21   Q    I wasn't asking you for the details, just if you were

22   familiar with the report at this point.

23   A    I am, but I don't live it everyday, you know, so I -- I'm not

24   one that can give you details.

25   Q    Okay.  I wasn't really pressing you for the details.  I

1  thought if I showed you a copy of it, it might refresh your

2  recollection as to what it said since you had reviewed it at some

3  point.

4  A    You could if you want, but I don't think it would help you --

5  help me.

6  Q    Well, let's see if it might.   Let me show you the cover page

7  here and ask you if you recognize it.

8  A    (Witness peruses document.)

9  Q    Have you had a chance to look at that for a moment?

10  A    I see it, but that is not the Chinook Comprehensive

11  Management Plan.

12  Q    Is it the Swinomish plan?

13  A    Well, it could be planning.   And planning on the reservation,

14  they do some work on it.   But the comprehensive Chinook plan is

15  the one I would look at.

16  Q    Have you seen reference, Ms. Loomis, to the conclusion that

17  fish passage barriers are not deemed essential for salmon

18  recovery on the Skagit and Samish Rivers?

19  A    Would you repeat that?

20  Q    Sure.   Have you seen the report's conclusion that fish

21  passage barriers are not deemed essential for the Skagit and

22  Samish Rivers; that it is the estuary that is primary?

23  A    I wouldn't --

24        MS. FOSTER:   I'm going to object, your Honor.   I don't

25  believe that counsel has laid the foundation for this.

1          MR. TOMISSER:  She's the head of the fisheries

2    department, your Honor.  I'm just asking if she knows.

3          THE WITNESS:  I did not see that.

4          THE COURT:  Ms. Loomis, hang on a second.

5      The objection on foundation grounds will be overruled.  She

6    has to answer the question.

7          THE WITNESS:  I have not seen that.

8    By Mr. Tomisser:

9    Q    Let me ask you another question, then, on the fisheries side

10   of the equation.  I understand that the budget for the Swinomish

11   Tribe and fisheries department is about 500,000 a year; is that

12   correct?

13   A    Just for Swinomish?  Is that just for Swinomish?

14   Q    Yes.

15   A    I think it's lower than that.

16   Q    What do you think it is?

17   A    I think it's around 3- or 400.

18   Q    3- or 400,000?

19   A    Yeah.

20   Q    And is it correct that the annual revenue generated by the

21   fishing with the Swinomish Tribe is about $3 million a year?

22   A    That's not salmon.

23   Q    That's everything; is that right?

24   A    That's everything.

25   Q    Shellfish, everything?

1    A    Yeah.  Most of it is shellfish.

2    Q    All right.  And from that budget and the revenue that is

3    generated, it is correct, is it not, that the tribe does not

4    spend any of that revenue on barrier correction?

5    A    I guess I'm not understanding your -- you said revenue for --

6    is not for the tribe.

7    Q    Of the tribe's own revenue --

8    A    No.  I do not know what you're talking about, then, because I

9    thought you were talking about fishers' income, which would not

10   go to the tribe.  You're talking about --

11   Q    The tribal revenue.  Money that comes to the tribe from

12   fishing.

13   A    No.  Then the answer would be no, because they don't get that

14   much money from fishing.

15           MR. TOMISSER:  Thank you, Ms. Loomis.

16           THE COURT:  Any redirect?

17           MS. FOSTER:  Yes, your Honor.

18                      REDIRECT EXAMINATION

19   By Ms. Foster:

20   Q    Ms. Loomis, I believe you testified on cross-examination that

21   the fisheries department has four employees -- or five employees,

22   I guess now?

23   A    Yes.

24   Q    And that previously it had four employees.  But in the years

25   since you've been fisheries manager, have you seen a growth in

1    the tribe's staff with regard to -- well, actually, strike that.

2        Is the fisheries department -- is the fisheries department

3    involved with fisheries management as well as habitat issues, or

4    is it just one of them?

5    A    The Swinomish fisheries department is only involved with

6    shellfish management and harvest management and data collection.

7    Q    And are there employees at the tribe in a different

8    department that address habitat issues?

9    A    SRSC does, which is part of Swinomish.

10   Q    And since you've been a fisheries manager, what has the

11   growth been in the Skagit River System Cooperative in terms of

12   number of employees?

13   A    Okay.  That's grown from like about five employees to 27

14   employees.

15   Q    And in the planning department, I believe you testified on

16   direct that there were staff in the planning department that also

17   address on-reservation fish habitat issues?

18   A    Yes.

19   Q    Do you know how many people are employed currently in the

20   planning department who address fish habitat issues or fish -- or

21   at least issues related to fish habitat?

22   A    I want to say about six, maybe more.

23   Q    And since you first became a fisheries manager back in the

24   late 70s, have you seen a growth in that particular department

25   with regard to staff that address fish habitat issues?

A    Yes.   They didn't have any money when they started out.   They

didn't do any fish habitat stuff.

Q    Do you know what percentage of the tribe's budget is directed

towards fisheries and natural resource issues?

A    How much of the tribe's resources?

Q    Yeah.   What percentage of their budget is directed towards

fisheries and natural resource protection issues.

A    I don't know that I can answer.   There's quite a bit that

goes into the SRSC department, more so than mine, because mine

only does harvest.   And although I do policy with SRSC, I

don't -- their direction comes with the board, not with just

individuals.

Q    Do you know what the budget of the Skagit River System

Cooperative was last year?

A    6 million.

          MS. FOSTER:   Thank you.   I have no further questions at

this time.

          THE COURT:   Ms. Loomis, thank you.   You may step down.

The plaintiffs' next witness.

          MS. FOSTER:   The plaintiffs would call Lawrence

Wasserman to the stand.

Whereupon,

                         LAWRENCE WASSERMAN

Called as a witness, having been first duly sworn, was examined

and testified as follows:

1       THE CLERK:  Will you please state your name and spell

2   your last name for the court reporter.

3       THE WITNESS:  Lawrence J. Wasserman, L-A-W-R-E-N-C-E,

4   W-A-S-S-E-R-M-A-N.

5       THE COURT:  You may inquire.

6                       DIRECT EXAMINATION

7   By Ms. Foster:

8   Q    Mr. Wasserman, where are you employed?

9   A    I am employed by the Swinomish Indian Tribal Community in

10  LaConnor.

11  Q    And what is your position with the tribe?

12  A    Environmental policy manager.

13  Q    And since when -- when did you start with the tribe?

14  A    2007.

15  Q    And what are your responsibilities with the tribe?

16  A    My responsibilities are to oversee environmental protection

17  issues, predominantly but not exclusively off the reservation.  I

18  deal with SRSC staff and others, overseeing permits and providing

19  advice to the tribe with regard to mechanisms to protect tribal

20  resources.  In fulfilling that job, I need to stay current with

21  fisheries literature to make sure that I understand what the best

22  ways are to carry out those tasks.

23  Q    And where were you employed prior to working for the

24  Swinomish Tribe?

25  A    The Skagit River System Cooperative.

1    Q    And how long were you employed by SRSC?

2    A    Approximately 15 years.

3    Q    And would you tell the Court, please, what your educational

4    background is?

5    A    I have an undergraduate degree in biology from the State

6    University of New York at Buffalo and a graduate degree in

7    fisheries from the University of Washington, Seattle.

8    Q    And are the honors that you have received and your

9    publications listed in the declaration that you have prepared for

10   this case?

11   A    Yes, they are.

12   Q    And how many years all together would you say you have spent

13   on salmon biological issues and habitat management issues?

14   A    This will be my 30th year.

15   Q    Mr. Wasserman, did you prepare a Declaration in Lieu of

16   Direct Testimony for this sub-proceeding?

17   A    I did.

18        MS. FOSTER:  Madam Clerk, would you hand to the witness

19   Exhibit AT-0-10, please?

20   By Ms. Foster:

21   Q    Mr. Wasserman, would you turn to the last page of the

22   declaration, please?

23   A    Yes.

24   Q    And is that your signature?

25   A    Yes, it is.

1  Q    And what is the date of the declaration?

2  A    30th day of March, 2009.

3       Sorry for my voice.  I am losing it.

4  Q    Is there a report attached to your declaration?

5  A    Yes, there is.

6  Q    Does your declaration contain your background information; in

7  other words, your resume?

8  A    It does.

9  Q    Did you prepare that report for this proceeding?

10 A    I did.

11 Q    Are there exhibits both embedded in that report as well as

12 attached to that report?

13 A    Yes, there are.

14 Q    And did you recently make any corrections to your report at

15 my request to address certain evidentiary challenges by the

16 State?

17 A    Yes, I did.

18 Q    And those changes now appear in AT-010?

19 A    Yes.

20 Q    And do you adopt the declaration of Lawrence J. Wasserman

21 dated March 30, 2009, and the report identified as AT-010, and

22 the exhibits attached thereto as your direct testimony here

23 today?

24 A    I do.

25 Q    Mr. Wasserman, could you turn, please, to AT-010-14, which is

1    Attachment M to your report?

2            MS. FOSTER:  Your Honor, I have provided to

3    Mr. Wasserman a copy of his report, which I have shared with the

4    State -- the State's attorneys.  And Mr. Wasserman will be using

5    his report, because he has tabbed a number of pages to help the

6    testimony of this -- his testimony go more smoothly, if that

7    would be okay with the Court.  It is an exact replica of AT-010.

8            THE COURT:  I don't have any problem with him looking at

9    his report during his testimony.

10       The State had objections to the original AT-010 in the

11   beginning.  Does the State still continue to have those

12   objections?

13           MR. TOMISSER:  We maintain an objection to Exhibit M,

14   Your Honor, which is the exhibit you just listed.

15           THE COURT:  Counsel, as we go through this, then, the

16   Court -- because I've not read through his testimony either, but

17   I'll be cognizant of the State's objections that are set out in

18   the pretrial report.

19           MS. FOSTER:  Okay.  Your Honor, I do have a few

20   questions of Mr. Wasserman with regard to Attachment M.

21   By Ms. Foster:

22   Q   Mr. Wasserman, are you familiar with an individual by the

23   name of Curt Buchanan?

24   A   Yes, I am.

25   Q   And is Attachment M, otherwise known as AT-010-14, an e-mail

1    that purports to be from a Curt Buchanan?

2    A    Yes.

3    Q    And what is the date of that e-mail?

4    A    December 6th, 2004.

5    Q    And at the time the e-mail was generated, do you know where

6    Mr. Buchanan was employed?

7    A    He was employed by the Washington Department of Fish and

8    Wildlife in LaConnor, Washington.

9    Q    And what was his position there?

10   A    Area habitat biologist, I think is his title.

11   Q    Do you know whether or not he was responsible for issuing

12   hydraulic project approvals for the Skagit watershed?

13   A    Yes.

14   Q    As well as compliance with those permits?

15   A    Yes.

16   Q    And are the individuals to whom the e-mail was sent, the

17   e-mail in AT-010-14, that that particular e-mail was either sent

18   to or copied to, are also WDFW employees?

19   A    Yes, they are.

20   Q    And in the course of your dealings with Mr. Buchanan, did

21   Mr. Buchanan provide a copy of the e-mail in AT-010-14 to SRSC?

22   A    Yes, he did.

23          MS. FOSTER:  At this time, I would move to admit AT-010

24   and the exhibits attached to AT-010.  That is AT-010-2 through

25   18.

1              THE COURT:  Any other objections from the State, other

2      than the ones that are still listed?

3              MR. TOMISSER:  Only the ones that are listed in the

4      pretrial order, your Honor, which is hearsay to the content of

5      the substance of the e-mails.

6              MS. FOSTER:  Your Honor, if you wish, I can address that

7      issue in terms of a legal argument.  I believe that the e-mail

8      and the attachments are admissions of a party opponent and are

9      admissible, therefore, under Federal Rule 801(d)(2)(d).  The

10     e-mail and the attachment were made by an employee of WDFW during

11     the course of his employment and concern a matter within the

12     scope of his employment.

13          The case law in the Ninth Circuit is clear on this issue, and

14     I have -- there are several cases from the Ninth Circuit.

15     Sea-Land Service, Incorporated v. Lozen International at 285 F.3d

16     808, at Page 821, 2002, in that case the Court ruled that the

17     text -- because the text of the e-mail indicated that it was

18     authored by a person identified in another trial exhibit as a

19     company employee and the subject matter of the internal company

20     e-mail appeared to concern a matter within the scope of his

21     employment, it was admissible.

22          In this particular case, I believe that the e-mail here

23     presents essentially the same scenario.  Mr. Buchanan was an

24     employee of WDFW at the time he sent the e-mail.  The contents of

25     his e-mail were within the scope of his employment.  The contents

of the e-mail itself demonstrate this, as well as the testimony
of Mr. Wasserman.

The field notes that were attached to the e-mail indicate
that they were prepared by Mr. Buchanan during his employment and
within the scope of his employment.  As such, I believe that the
e-mail, the field notes, and the meeting notes that are attached
thereto are all admissible admissions under 801(d)(2)(d).

Additionally, Mr. Buchanan references some photographs that
were taken by a Mr. Keith Wyman in the body of his field notes,
which Mr. Wyman is identified as an SRSC employee.  I believe
that Mr. Buchanan's inclusion of them within the field notes
indicate that the photographs were in fact adopted by him, and
thus admissible under FRE 801 -- excuse me, 801(d)(2)(b), because
they are an adoptive admission because he included them within
his notes as well as commented on them.

THE COURT:  All right.  Counsel, I have no problem with
admitting AT-010 and AT-010-2 through 18.  Those are all specific
attachments.  The Court will overrule the objections as made for
purposes of getting them into the record.

Ms. Foster, in the future, as I review the materials with
greater care, if the Court should agree with any of the
objections that are made in the pretrial order, then the Court
will make that known at the time in its opinion.  All right?

MS. FOSTER:  That would be fine, as long as I might be
able to reserve an opportunity to present some legal argument

1   with regard to any of those issues.

2            THE COURT:   Thank you.   For now they will be admitted.

3            MS. FOSTER:   Thank you.

4   By Ms. Foster:

5   Q    Mr. Wasserman, would you briefly describe for the Court what

6   the life history characteristics common to anadromous salmonids

7   are?

8   A    Yes.   There's general characteristics of all anadromous

9   salmonids.   They all spawn in fresh water, lay their eggs in the

10  gravel.   The eggs emerge from the gravel and spend from a few

11  days to a few years in fresh water.   Those fish, upon reaching

12  the appropriate level of maturity in fresh water, convert their

13  body condition to be able to sustain themselves in saltwater,

14  become what's called smolts, travel out to sea, and while at sea

15  become large, start to create -- undergo circumstances in their

16  body to start to produce sexual products, so that when they

17  return to fresh water, the smolts turn into adults, the adults

18  return to fresh water, usually to their native streams, where

19  they spawn.   And other than Steelhead, all salmon die.   Many of

20  the Steelhead die after spawning, but not all of them.

21       So the general characteristics of returning to their native

22  stream, fresh water residence, out to the ocean, and then return.

23  Q    And what are the habitat components that are essential for

24  salmon?

25  A    There are five components that are essential for salmon.   One

1    is access to the sea, access to and from the sea; adequate

2    shelter; good clean spawning gravel; adequate food; abundant

3    supply of clean water.

4    Q    And would you explain to the Court why access is important to

5    salmon?

6    A    As I said, when salmon return from the sea, they have a

7    homing instinct to go back to their home stream.  And because

8    they don't feed, they have a limited time to get to that home

9    stream, at which point they spread throughout a watershed looking

10   for appropriate substrates, gravels to spawn in.  And their

11   ability to get there in a timely fashion and in a geographically

12   dispersed fashion is critical both to be able to spread fish

13   around the watershed and keep the densities, the number of fish

14   in a particular area, low enough so their survival is high, but

15   also in case of any kind of environmental disasters, fish spread

16   throughout a watershed can sustain themselves.  So if one

17   tributary is damaged by a mud flow or a forest fire, throughout

18   the watershed you have a robustness for that entire population.

19        So for adult salmon, they need to get back to their streams.

20   For juvenile salmon, shortly after they emerge from the gravel,

21   they look for preferred depths and velocities and substrates in

22   the stream environment that allows them to avoid predators and

23   feed in an energetically efficient way.  So immediately upon

24   emerging from the gravel, they move both upstream and downstream

25   to find those preferred habitats.

 1    And most specifically for some species in the fall, with the

 2    onset of fall rains, they will actually move as juvenile fish

 3    upstream into the tributaries, where they can find areas of lower

 4    velocities rather than encountering very high flows in a mainstem

 5    river.  So we see in some instances quite large upstream

 6    movements.  So both adult and juvenile salmon move upstream, as

 7    well as juvenile salmon moving downstream.

 8  Q    Showing you a photograph on Page 4 of your report, can you

 9    please tell us what that photo depicts in relation to the other

10    four essential habitat components?

11  A    The purpose of this photograph is to illustrate the kind of

12    good habitats that salmon require.  So just a few things to point

13    out in this photograph.  This is a creek that is good habitat -

14    not pristine habitat, good habitat - but I wanted to point out

15    some of the attributes that fish are looking for and they need in

16    order to thrive and reproduce in a sustainable way.

17        A few things to point out.  We have some habitat here in this

18    area.  The velocities on the inside of this area are slow.  The

19    gravel is small.  It might be a place that juvenile fish would

20    live.  Also you can see small gravel there.  Cobbled in the

21    bottom of the stream is small -- and fish may spawn in those

22    areas.  They look for clean gravel that doesn't have a lot of

23    sediment and that has water flowing through it.

24        On the right side of the screen, over here for example, as

25    the water comes around that bend, the water is deeper.  Different

1   age classes of salmon, older juvenile fish might be there.  Adult

2   fish may want to hold there during the summer months to wait for

3   them to be able to spawn.  Riparian vegetation in this area

4   provides a number of things.  Insects fall off that riparian

5   vegetation and provide a food supply for the salmon.  I should

6   point out that good, clean gravels provide food as well for the

7   juvenile salmon as well.  They eat insects.

8       The last point I think I would make is that if we take a look

9   at this piece of wood in the stream here that I pointed out,

10  these trees along the stream side need to fall into the stream.

11  And when they do, they create critical habitats for salmon as

12  well.  If you can imagine a log that falls in the stream,

13  sediment will pile up behind it, that may form gravel for salmon

14  to be spawning in.

15      Downstream of it, as the water flows over that log, it

16  creates a deep pool for fish to be hiding in.  So this wood

17  structure here allows the fish to be hiding, escaping from

18  predators, provides a food supply, and creates those kind of

19  diversities and channels that are important to be able to sustain

20  a wide sweep of salmon species, as well as diverse life history

21  strategies.  Life histories being spawning, juvenile rearing,

22  time for emergence, smolt, and out to sea.

23  Q   Mr. Wasserman, in the fourth section of your report,

24  beginning on Page 9, you address factors influencing survival and

25  mortality of salmon.  One of those concepts that you discuss is

1  called density-dependent mortality.

2      So now showing you Figure 5.1 on Page 11, could you tell the

3  Court what this figure portrays, please?

4  A   This is a hypothetical figure that portrays the relationship

5  between the number of female spawning fish and the number of

6  smolts, which is the number of fish that will go out to sea.  It

7  is that relationship.

8  Q   Could you then explain what -- interpret this figure for us,

9  please?

10  A   The purpose of this figure is to explain the idea of

11  density-dependent mortality habitat limitations.  And so if I

12  could just try to explain what the curve demonstrates.

13      If you take a look at Curve A, to start with, and we use that

14  as a baseline.  If you notice the shape of that curve, it bends

15  over.  You might think that, as the number of female spawners

16  increases, you would have a direct relationship and the number of

17  smolts would increase in direct relationship as if it were a

18  straight line.  But that doesn't happen.  As you see, that curve

19  bends over, Curve A.

20      The reason that curve bends over is that, except at very,

21  very low numbers of spawners, the numbers of juvenile fish,

22  either the amount of spawning habitat or the number of juvenile

23  fish produced, start to compete with each other.  And because of

24  that competition, their survival is less, their ability to

25  withstand the rigors of summer and wintertime is less.  And so

```
 1     the more competition they have, while you still see that curve
 2     increasing, and there's a total number of smolts increasing, the
 3     efficiency, if you will, the ratio between spawners and smolts,
 4     isn't rising so fast.  And so the purpose of this curve in Curve
 5     A is to show this idea of density-dependent mortality.  As the
 6     densities come up because we have more spawners, the mortality
 7     goes up as well.  And so the number of smolts, the number of eggs
 8     that survive to be a smolt goes down.  So Curve A is a stream
 9     with a certain amount of habitat, and we have that relationship.
10         Curve B would be another stream where the amount of habitat
11     -- the same stream, we've opened up a lot of habitat.  If you
12     take a look, for example, and compare Curve A to Curve B, and
13     take a look at, for example, the number of 200 female spawners,
14     approximately, let's say, for 200 female spawners in Curve A, you
15     have, let's say, 7,000 smolts.
16         With Curve B, where you have more habitat, the same number of
17     spawners produces 11- or 12,000 smolts.  There's less
18     competition.  They're able to thrive more.  There's less
19     competition for food and space.  So the advantage of having more
20     habitat is, as you get more spawners, you get an increased number
21     of smolts per spawner.
22         So the purpose of this curve is really to demonstrate, and
23     these are curves that are routinely used in fisheries management
24     in trying to describe the relationship between spawners and
25     smolts.  The number of smolts is a very, very good measure of the
```

1    number of adults available to come back for harvest by anybody or

2    for escapement.  So the purpose of this curve is to graphically

3    demonstrate the importance of increasing the amount of habitat

4    with regard to efficacy of the number of females spawning and the

5    number of smolts produced.

6    Q   You have used the term "escapement."  Would you just define

7    that?

8    A   Escapement is the number of fish that make it back to the

9    spawning grounds to spawn.

10   Q   Mr. Wasserman, generally speaking, what impacts do improperly

11   designed culverts have upon salmon and salmon habitat?

12   A   There are a variety of impacts, both with adults and with

13   juveniles.  I will start with the adults.  As I said before,

14   adults have only a limited amount of time.

15       There are two major factors.  One is culverts have impacts

16   both --  access problems, but the culverts themselves may

17   adversely affect the amount of habitat as well, those ecosystem

18   functions that I talked about in the photograph with Day Creek,

19   having appropriate sediment, the amount of wood, proper flows.

20   So those are the two major factors that culverts affect, in broad

21   strokes.

22   Q   Why don't you go on, if you would, please, and describe more

23   specifically how fish passage barrier culverts impact adult

24   salmon.

25   A   How they affect adult salmon?

Q     Yes.

A     They affect adult salmon in a number of ways.  As I said before, these fish, when coming back from the sea, have a limited amount of time to spawn.  They stop feeding, so they only have so much energy to get to their spawning grounds.

If they get to the culverts, they are waiting for flows to be adequate to get through the culvert or they can't get through the culvert.  They wait and wait and wait, and in some instances they die unspawned because they can't get back to where they want to go.  Or they can die by jumping out of a culvert that's inadequate, and they bang into the sides of the culvert and can have direct mortality that way.

The other thing that can occur with passage barriers is, if they can't spawn upstream of the culvert, they may be forced to spawn downstream of the culvert in and among fish that are already spawning.  So if they can't get through the culvert and spawn upstream, and they're forced to spawn downstream and they choose to do that, and there are other fish spawning in that area, two things can happen.  They can spawn on top of fish that have already spawned there.  Superimposition of redds, they call it.  The eggs that are already in the gravel get dug up and disturbed.  Those eggs don't survive.

Or if they spawn successfully downstream, there's a higher concentration of fish spawning in that limited amount of habitat downstream.  So as I pointed to the curve before, that

1  competition is greater, and the survival is less, and the number

2  of smolts produced go down.

3      And the final factor is that we know that these fish coming

4  back into these watersheds where you have low production - in

5  other words, they can be relatively pristine - these salmon

6  carcasses when the fish die, there are these bags of nutrients

7  that are dying that are then used.  They then act to drive that

8  system, where the insects are eating them, the insects grow

9  better, and then the juvenile fish eat better.

10     So you have this nutrient reserve, basically marine-borne

11  nutrients in the form of these carcasses coming upriver, being

12  deposited in the stream to be used, to be eaten by insects, by

13  the fish.  And in fact, all sorts of wildlife utilize these.

14  Those are the implications associated with impassable adult

15  barriers.

16  Q  And so would you now describe for the Court, please, what the

17  impacts of impassable barriers are on juvenile salmon?

18  A  Well, as I said before, the requirements of these juvenile

19  fish is to move both upstream and downstream.  By and large,

20  they're moving to try to increase their growth as fast as they

21  can so that the bigger they are when they go out to sea, the

22  greater survival they have.  So they're trying not to get eaten,

23  and they're trying to grow.  Energetically, the most advantageous

24  stream positions.

25     And so they tend to be trying to disperse themselves in ways

1    that create the most favorable conditions, which are essentially

2    low velocities, or the appropriate velocities that they like, but

3    also, as I said, to sustain themselves against flooding events.

4    Fish can only swim in streams in water that's moving so fast.  If

5    it's moving just so fast, they get swept downstream.  By being

6    able to find these preferred habitats, in moving upstream and

7    downstream direction, they're able to increase their survival as

8    well.

9    Q    Mr. Wasserman, would you now relate these impacts, if you

10   would, back to Figure 5.1, this curve that's on the screen?

11   A    Sure.  So if you go back to 5.1 that's on your screen, again,

12   I'd just ask to compare Curve A and B.  The difference between

13   Curve A and Curve B is really -- it can be the same stream.

14   You've opened up the amount of habitat.  So you're really

15   shifting that relationship on the number of female spawners to

16   smolts, that you're getting more smolts for a particular number

17   of females because there's more space, less competition, they can

18   find more refuge.  Those good habitat characteristics that I

19   showed you from Day Creek are available over a larger area.

20        So that's the advantage of opening up culverts.  It allows an

21   increase in habitat, just in terms of density-dependent

22   mortality.  There are other advantages of having appropriately

23   designed culverts as well.

24   Q    And could you please describe for the Court now how

25   improperly designed culverts impact that habitat of the salmon?

A    Sure.  So culverts are designed initially to pass water

underneath a road.  But fish are traveling in that same waterway,

and so they need to be designed, obviously, for the

characteristics to pass fish.

But moving down that stream, in addition to the water and the

fish are sediment and wood.  And if a culvert is improperly

designed and can't carry the amount of water, for example, that

it needs to carry, then water spills over the road with dire

consequences for fish.  They may get swept over the road, down

ditches.  And in one of the documents that we've talked about,

there's a reference to that, in that the fish being swept into

ditches and dying.  So we have a fish passage problem if they

can't carry the capacity of the water.

Important as well is that if sediment or logs get backed up

behind a culvert because it's too small, it forms a dam behind

that culvert.  And if that dam gets large enough and the flows

get too high, that culvert can blow out, the road can blow out

and wipe out all the salmon and salmon habitat downstream.

And finally, because of sediment accumulating behind

culverts, there's a requirement -- in order to not have this dam

form, or to at least let the fish travel, then there's

maintenance required if these culverts are inadequately designed.

That has consequences as well.

Q    Mr. Wasserman, to your knowledge, have the activities of the

State in maintaining its culverts adversely impacted salmon or

1    salmon habitat?

2    A    Yes, they have.

3    Q    Would you please explain how?

4    A    Maybe I can explain with some photographs.

5    Q    Tell us which photograph, please.

6    A    Attachment K.

7    Q    That would be AT-010-12.

8    A    This is a culvert -- no, that's not right, I don't believe.

9    Excuse me.  Let me just make sure I've got the right one.

10        It would be H, Alix, excuse me.

11            MS. FOSTER:  I'm sorry, your Honor.

12   By Ms. Foster:

13   Q    Okay, Mr. Wasserman.

14   A    Well, let's start with this one.  We can find the other one.

15        There's a culvert under this road.  This is Red Cabin Creek.

16   And you can see that this sediment is right up to the top of the

17   road.  There isn't a place for the water or the fish to go.

18        We just need to find the right photographs so this makes some

19   sense.  There is a photograph dated --

20   Q    Tell us, if you would, Mr. Wasserman, which attachment it is

21   that you'd like to address that's in your report.

22   A    I believe it's J.

23        Okay.  Thank you.  Sorry about that.

24        This is the photograph.  This is the culvert that we were

25   just looking at.  This is called a box culvert.  It's made out of

cement.  You can see the two holes where the water is able to go

underneath the road and through that culvert.  But you can see

from the previous photograph, that culvert was completely filled

up with gravel, right up to the top.

So routinely what happens is these culverts have to be

dredged.  And in dredging that culvert -- what this stream looks

like, even though there's no water in it -- the lack of water

isn't necessarily a result of the maintenance.  But if you

compare this stream to the Day Creek stream, very little

vegetation, there's not pools and ripples.  It's just a straight

gouged-out channel with a limited amount of habitat.

If we show Photograph K -- so this is the same culvert in

2002.  And what happened was the State, when they dredged this

stream out, created a hole to let some of the sediment fill up in

that hole and to allow for water and fish to pass through.  And

they attracted these adult salmon and juvenile salmon into this

hole, flows came, the fish got attracted in there, the flows went

away, and the salmon were trapped here.  So now we have all these

dead salmon that have not spawned as a result of these dredging

activities.

So what we see from the dredging activities are a number of

things.  This is all maintenance associated with culverts.  We

see the loss of habitat associated with that.  We see that when

fish have spawned in these kind of sediments, which are similar

in some sense to the sediments I showed you before, when they

1    dredge out these streams, they're actually dredging out the

2    redds.

3        And because streams want to maintain a certain gradient, even

4    beyond the area where they dredged there can be what's called

5    down-cutting or head-cutting where, as a stream tries to

6    re-establish a gradient, it starts to eat away at these upstream

7    substrates in the stream where there also may be salmon redds.

8    So there are very dire consequences not only if fish can't get

9    past during the flood, but from the maintenance itself.

10   Q    Mr. Wasserman, in 1994, did you and your colleagues at SRSC

11   conduct a study into the factors limiting the production of

12   Skagit Coho?

13   A    We did.

14   Q    And what -- were the results of that study published in a

15   scientific journal?

16   A    Were they published?

17   Q    Yes.

18   A    Yes, they were.

19   Q    And what is the name of that article?

20   A    I need to look for the title.  Excuse me.

21   Q    I'd turn your attention to the references in the back of your

22   report, Mr. Wasserman.

23   A    There we go.  Thank you.

24       The title was "Estimating Coho Salmon Rearing Habitat and

25   Smolt Production Losses in a Large River Basin and Implications

1    for Habitat Restoration."

2    Q    And did you receive an award for that publication?

3    A    We did.

4    Q    From whom did you receive that award, please?

5    A    That was from the American Fisheries Society.

6    Q    And what was that award?

7    A    The best paper of the year in the *North American Journal of*

8    *Fisheries Management*.

9    Q    And please explain what you were investigating in that study.

10   A    We were trying to look at what were the greatest limitations

11   for Coho production in the Skagit River.  And we looked at it in

12   terms of where habitat had been lost, and again, what were the

13   biggest factors and what kind of land uses were associated with

14   that.

15   Q    And what did you conclude at the end of your investigation?

16   A    What we concluded is that hydro modifications, which are

17   diking and dredging streams, had the largest impact.  But the

18   second largest impact in the Skagit River for Coho was from

19   blocking culverts.

20   Q    Mr. Wasserman, would you please summarize the key points in

21   your report for the Court?

22   A    The number of returning adults is in large measure a function

23   of how many smolts can be produced.  The number of smolts that

24   are produced in most watersheds are directly related to the

25   amount of habitat they have available to them, and the culverts

1    adversely impact the number of smolts being produced, either by

2    density-dependent mortality or by these adverse environmental

3    circumstances.

4    Q    And do you have an opinion, Mr. Wasserman, concerning the

5    correction of culverts as a method of habitat protection and

6    restoration?

7    A    I do.

8    Q    And what is that opinion?

9    A    That culverts are one of the most effective and well-

10   documented ways to restore salmon throughout Puget Sound and the

11   State of Washington.

12   Q    And what is the basis for that opinion, please?

13   A    It's based on my opinion of 25 or 30 years working out in the

14   field, written opinions by my colleagues and others, and the

15   actions of others in establishing that as being a high priority

16   throughout the watersheds.

17   Q    Is it also based upon your own investigation in the Skagit?

18   A    Certainly.  My investigations and other literature as well.

19   Q    And you say that your opinion is supported by the findings

20   that are reported in some scientific literature.  Are those

21   studies cited in your report?

22   A    Yes, they are.

23   Q    And have those studies been published?

24   A    Some of them have been.  Most of them have been.

25   Q    And were they peer reviewed?

1    A    Some of them have been.

2    Q    Do the scientists rely upon -- do scientists routinely rely

3    on the published studies of other scientists in their work?

4    A    Certainly they do.

5    Q    And do those studies rely upon generally accepted

6    methodologies?

7    A    For it to be a peer-reviewed article and to pass muster in

8    peer-review publications, they certainly do.

9    Q    In your professional opinion, do the studies reasonably and

10   reliably support your opinion that culverts are one of the most

11   cost-effective proven methods of habitat protection and

12   restoration?

13   A    Yes, they do.

14   Q    Would you please describe for the Court, Mr. Wasserman, some

15   of the benefits from correcting improperly designed road

16   culverts, and in doing so please contrast these benefits, if you

17   will, with the benefits that may result from other habitat

18   protection or restoration measures.

19   A    Sure.

20        THE COURT:  Ms. Foster, maybe before we get to that,

21   let's go ahead and take our afternoon break at this point in

22   time, give our reporter a little bit of a break.

23   (At this time a short break was taken.)

24   By Ms. Foster:

25   Q    Mr. Wasserman, would you please describe for the Court some

1  of the benefits from correcting improperly designed road

2  culverts.  And in doing so, please contrast those benefits, if

3  you will, with benefits that may result from other habitat

4  protection and restoration measures.

5  A    Certainly.  It's been documented in my report.  I'll try to

6  be succinct.  There's an immediate access and immediate benefit

7  to additional habitat when we replace a culvert.  When the fish

8  couldn't get there, you fix the culvert, they immediately get the

9  benefit of the new habitat.

10    If you compare that to having to plant trees, shade, it can

11  take 10, 20, 50 years to get trees large enough.  Or if it's

12  moving and damming, it will take 10 or 20 years to get the

13  sediments behind the dam.

14    So we get immediate benefits for fixing a culvert.  We have a

15  high confidence in design.  By and large, we know how to fix

16  culverts.  We don't always do it the right way, but we know what

17  it takes to get fish through culverts.  So we have a high

18  confidence compared to many other more experimental restoration

19  activities.

20    It's fairly easy to monitor.  If there were no fish there

21  before, and we open a culvert and we can count fish, we can tell.

22  Sometimes it's more difficult in fisheries management to see the

23  benefits of a restoration project because it may be making better

24  habitat in a particular area, and it's really hard to discern the

25  benefits.

1        A critical factor is that there's minimal impacts on adjacent

2    land use or landowners.   The culverts we're talking about in this

3    case are under state roads, and so it's relatively infrequent

4    where there needs to be a condemnation of other people's land or

5    asking people to sell their land.   And this really contrasts with

6    so many other areas of salmon restoration where we're asking on a

7    voluntary basis for landowners to do something different on their

8    property.   And we've had quite a bit of resistance across at

9    least Skagit County in the watershed for people not wanting to

10   change their underlying land uses.

11        For roads, it's pretty straightforward, for culverts.   It's

12   mostly under a right-of-way.   It can be fixed in a very isolated

13   place and yet the benefits can be quite far-reaching.   It's cost

14   effective.   There have been some studies that have shown that,

15   really, compared to other kinds of restoration activities, the

16   cost per smolt produced is relatively low, and that cost factor

17   is also influenced by the fact that there's a high confidence

18   that these things are going to work.

19        And finally, we get benefits with a broad sweep of culvert

20   repairs.   We get a very broad geographic distribution of

21   benefits, and the cumulative effects can accrue across a variety

22   of watersheds.

23             MS. FOSTER:   Thank you.   I have no further questions at

24   this time.

25             THE COURT:   Cross-examination.

**CROSS-EXAMINATION**

By Mr. Tomisser:

Q    Good afternoon, Mr. Wasserman.  I'd like to start by asking you about the curve you testified to.  Is it correct, though, that when you see that kind of curve, the amount of actual production that you will get is going to be dependent on what the quality of the habitat is above the barrier that gets corrected?

A    That's true.

Q    And the quality -- habitat quality issues is one other aspect of salmon restoration, in a general matter; is that correct?

A    That's true.  However, quality of habitat upstream is in many cases better than the habitat downstream, habitat quality.

Q    But that's going to be case by case?

A    Certainly it will be.

Q    All right.  When we look at issues of salmon recovery and restoration in general, do you agree with me that a comprehensive approach -- scientifically-based comprehensive approach is the best way to achieve good results on salmon recovery and restoration?

A    If it's a well-documented and well-implemented comprehensive approach, certainly.

Q    And it should be based on best available science; is that correct?

A    It should be based on best available science.  However, there are species-specific priorities that are policy matters.

1  Q    And when we look at species-specific priorities in salmon

2  restoration, is it also true that as we look at the case area in

3  this case, that different species have different needs in terms

4  of improving their habitat?

5  A    That's true.  They have different habitat requirements.

6  Q    And so -- and also in terms of areas in watersheds, there are

7  some watershed areas where one aspect of salmon restoration,

8  whether it's barriers, hydro, estuaries, may be different for

9  different watersheds; is that right?

10  A    Right.  All watersheds are different, and there would be

11  different variables at play.

12  Q    And the lead entities who are working on those particular

13  watersheds are charged then with developing what is the best plan

14  for this particular watershed and the species that might use

15  that?

16  A    That's not correct.

17  Q    Plans do get developed on a watershed basis for salmon

18  restoration and recovery; is that correct?

19  A    Well, the only plans that I am aware of is the Chinook

20  recovery plans for listed species.  In the Skagit, for example,

21  there's no Coho plan or Steelhead plan or Sockeye plan.  So when

22  you say watersheds get developed for different species in

23  different watersheds, I think it depends -- I'm not sure of the

24  correct answer, because I'm only familiar that there are a

25  limited number of comprehensive plans.

1  Q   And so if we look at the Skagit Chinook plan, would that

2  cover the Skagit and Samish Rivers?

3  A   No.

4  Q   Just the Skagit?

5  A   Correct.

6  Q   Is it correct that for Skagit Chinook, that estuary

7  conditions are the primary limiting factor?

8  A   Not necessarily true.

9  Q   Is -- I'm sorry.  Go ahead.

10  A   The plan talks about a number of factors that need to be

11  addressed.  Two significant factors for Chinook, in the Skagit

12  specifically, are both estuarine habitat and the lack of access

13  to the estuary, and impacts associated with high flows, in the

14  fact that when we have years of high flows, redds get scoured

15  out, the eggs get scoured out.

16  Q   Have you seen the Swinomish Tribe management plan?

17  A   I have seen the plan.  I think it was written quite some time

18  ago.  I haven't seen it since it was probably first written.

19  Q   Do you recall that that plan did identify estuary recovery as

20  the primary limiting factor, with barriers secondary?

21  A   Without reading the plan again -- again, it's been, I think

22  2004 that was written, so I can't recall.  I haven't reviewed it

23  since that time.

24  Q   In looking at the -- are you familiar with the Skagit Basin

25  three-year program?

1   A    Could you please repeat the question?

2   Q    Are you familiar with the Skagit Basin three-year work plan

3   for 2008?

4   A    I am generally familiar with the 2008 plan.  I can't speak to

5   each detail of the plan.

6   Q    Do you recall that there are roughly 30 projects planned over

7   that time period?

8   A    Now -- I'm sorry.  Is this the plan -- I couldn't attest to

9   whether there are 30 projects there.

10  Q    Does that number sound about right for a three-year plan?

11  A    You know, I don't know.  There's been a number of three-year

12  plans.  The three-year plans, I think, are directed directly

13  towards Chinook.  And so if that's the plan, I just don't know

14  the number of projects.  I'm also not sure of the difference

15  between the three-year plan and the plan -- the Puget Sound

16  Partnership's action agenda.  They're two different things.

17  Without having seen the plan in front of me, I can't really --

18  Q    Okay.  If I showed you a copy of the plan, do you think you'd

19  recognize it?

20  A    Probably.

21  Q    Let's take a look.

22       MS. FOSTER:  Your Honor, I'm going to object at this

23  point.  I believe that Counsel is using a document that

24  apparently has not been marked or identified.  And it's improper

25  to ask the witness questions about the substance of the document

1    since it has not been admitted.

2            MR. TOMISSER:  I'm trying to see if I can refresh his

3    recollection of the plan, your Honor, by showing it to him.

4            THE COURT:  The objection will be overruled.  We will

5    see if Mr. Wasserman can recognize it when it's shown to him.

6    By Mr. Tomisser:

7    Q    This is the cover page of a draft of the 2008 three-year

8    program.  Does that look familiar?

9    A    I have to say it looks generally familiar, but I'm not sure

10   what version this might be.  I just don't know if this was a

11   watershed council product or a product that was written by the

12   regional recovery office.  I think it's the watershed council,

13   but I'm not certain.

14   Q    Do you recall previously telling me that estuaries for the

15   Skagit Chinook are the biggest limiting factor?

16           MS. FOSTER:  Objection, your Honor.  Asked and answered.

17           THE COURT:  Overruled.  You may respond.

18           THE WITNESS:  Counsel, your question, do I recall or

19   remember saying that to you?

20   By Mr. Tomisser:

21   Q    Let me ask you this:  Is the statement true that for recovery

22   plans for the Skagit Chinook that the estuary problem is the

23   biggest limiting factor?

24   A    Well, as I said before, it's both -- the plan really talks

25   about two major areas: flows -- you know, storm flows; flooding

1   that impacts Chinook production, as well as the lack of estuarine

2   habitat.

3   Q    Mr. Wasserman, do you recognize this as the title page of the

4   article that you mentioned on your direct testimony for

5   estimating Coho salmon and limiting factors?

6   A    Yes, I recognize it.

7   Q    In this report, isn't it correct that in terms of the

8   watershed, that you identified the primary limiting factor as

9   hydro morphology, not barrier culverts?

10  A    Hydro modification.  I don't think we used the word "hydro

11  morphology."  Hydro modification.

12  Q    Hydro modification as the primary limiting factor?

13  A    For Coho production in this paper, yes.

14  Q    In fact, you developed a pie chart that illustrated that

15  point; is that correct?

16  A    That's correct.

17  Q    What I am showing you on the screen now, this is from Page 10

18  of that report, a depiction of that limiting factor's impact was

19  hydro modification?

20  A    That's correct.

21  Q    Mr. Wasserman, in terms of Red Cabin Creek, is it your

22  understanding that Red Cabin Creek is on schedule to be

23  remediated next year?

24  A    I know it is on a schedule.  I can't attest as to whether it

25  is on a schedule for next year.  I just don't know if it is on

1    for next year.

2    Q    Are you aware that the cost of the project is roughly $5

3    million?

4    A    No, I wasn't aware of that.

5            MS. FOSTER:  Objection, your Honor.  I don't believe

6    that that's in evidence.

7            THE COURT:  The objection is sustained.

8            MS. FOSTER:  I'd move to strike.

9            THE COURT:  It will be stricken.

10       You may ask another question.

11           MR. TOMISSER:  Nothing further, your Honor.

12           THE COURT:  Any redirect for this witness?

13           MS. FOSTER:  Yes, your Honor.  I just have a couple of

14   questions.

15                      REDIRECT EXAMINATION

16   By Ms. Foster:

17   Q    Mr. Wasserman, in the 1994 paper that you wrote with regard

18   to the factors that limited Coho production in the Skagit, you've

19   testified that hydro modification is -- was the primary factor

20   and that culverts, blocking culverts, was the next largest factor

21   limiting Coho production.

22       Can you please tell us the success that the tribe or Skagit

23   River Systems Cooperative has had in addressing the hydro

24   modification issues in the Skagit Basin, please?

25   A    Sure.  These issues have been quite difficult to address, in

1    that hydro modification is the diking along the river that

2    prevents flooding of the adjacent farm lands and the cities.  And

3    in building those dikes, those off-channel areas that

4    historically were important to salmon have been blocked off.  And

5    the ability to remove those dikes and still deal with public

6    safety and ongoing farming has been very, very problematic.

7         And so it's been very hard to try to deal with the hydro

8    modification issues.  We've been able to do it in a few places,

9    but the magnitude of the problem and the resistance to make those

10   kind of changes has resulted in only limited successes.

11        MS. FOSTER:  Thank you.  I have no further questions at

12   this time.

13        THE COURT:  You may step down.  Thank you.

14      Can we have the plaintiffs' next witness, please.

15        MS. FOSTER:  I would call Mike McHenry to the stand,

16   please.

17   Whereupon,

18                        MICHAEL McHENRY

19   Called as a witness, having been first duly sworn, was examined

20   and testified as follows:

21        THE CLERK:  Please state your name for the record and

22   spell your last name.

23        THE WITNESS:  My name is Michael McHenry, M-I-C-H-A-E-L,

24   capital M, small C, capital H-E-N-R-Y.

25        THE COURT:  You may inquire.

1          MS. FOSTER:  Thank you, your Honor.

2                    DIRECT EXAMINATION

3    By Ms. Foster:

4    Q    Mr. McHenry, are you currently employed?

5    A    Yes, I am.

6    Q    And where are you employed?

7    A    I am employed at the Lower Elwha Klallam Tribe.

8    Q    What is your position at the Lower Elwha Klallam Tribe?

9    A    I am the fisheries habitat manager for the tribe.

10   Q    And for how long have you held that position?

11   A    I have been employed with the tribe since 1991.

12   Q    And what are your responsibilities in that position?

13   A    I report directly to the fisheries manager.  I manage the

14   habitat portions of the tribe's usual and accustomed areas; that

15   is the watersheds that the tribe relies on for its fish and

16   shellfish and wildlife resources.

17        I manage a program that involves habitat protection of those

18   resources, assessment -- that is, assessment of their condition,

19   restoration.

20   Q    And do you conduct any fieldwork?

21   A    I conduct a lot of fieldwork.

22   Q    And would you please advise the Court of your educational

23   background, please?

24   A    Yes.  I have a Bachelor of Science degree from Humboldt State

25   University in fisheries and a Master's of Science from New Mexico

1    State University in wildlife science.

2    Q   Are the honors that you have received and the publications

3    that you have written listed in your resume?

4    A   Yes, they are.

5              MS. FOSTER:  Madam Clerk, would you please show the

6    witness Exhibit AT-004-1, please.

7    By Ms. Foster:

8    Q   Mr. McHenry, showing you what has been marked as AT-004-1, is

9    that your resume?

10   A   Yes, it is.

11             MS. FOSTER:  Your Honor, I would move to admit AT-004-1

12   at this time.

13             THE COURT:  I believe it's already in evidence, Counsel.

14             MS. FOSTER:  Thank you.

15   By Ms. Foster:

16   Q   Mr. McHenry, could you please advise the Court as to the

17   number of years that you have spent in salmon biology and habitat

18   restoration?

19   A   25 years.

20   Q   Are you familiar with the relevant literature in salmon

21   ecology and watershed restoration?

22   A   Yes, I am.

23   Q   Did you prepare a Declaration in Lieu of Direct Testimony for

24   this sub-proceeding in U.S. v. Washington?

25   A   Yes, I did.

Q    If you would, please, turn to AT-004 in the book that the clerk has just handed you.

Is that your declaration?

A    Yes, it is.

Q    And would you turn, please, to the -- would you please tell us whether or not that's your signature on the declaration?

A    Yes, that's my signature.

Q    And what is the date of that declaration?

A    The 10th day of October, 2009.

Q    Was there a report attached to your declaration?

A    Yes, there is.

Q    And did you prepare that report for this sub-proceeding?

A    Yes, I did.

Q    When did you initially prepare that report?

A    March 27th, 2009.

Q    And have you subsequently amended the report?

A    Amended October 10, 2009.

Q    And is the report that is attached to your declaration the amended report?

A    Yes, it is.

Q    And are there any exhibits attached to that report?

A    There are exhibits.

Q    Were those exhibits attached to your initial report?

A    Yes.

Q    Do you adopt the Declaration of Mike McHenry regarding

1  **Prefiled Written Direct Testimony dated October 10, 2009, in the**

2  **report, and exhibits attached thereto as your direct testimony**

3  **today?**

4  A   I do.

5  Q   If you could you please turn your attention to AT-004-7.

6  A   Okay.

7  Q   Could you please tell us what this photograph purports to

8  represent?

9  A   This is a photograph of a box culvert under Highway 101 that

10  drains Chicken Coop Creek.

11  Q   And are you familiar with that particular culvert?

12  A   Yes, I am.

13  Q   And did you take that photograph?

14  A   I did not take this particular photograph.

15  Q   And who took that photograph?

16  A   The photograph was taken by Byron Rote.

17  Q   And who is Mr. Rote?

18  A   He is the habitat manager for the Jamestown S'Klallam Tribe.

19  Q   Do you know approximately when that photograph was taken?

20  A   I believe it was the summer of 2006.

21  Q   And does that photo -- does AT-004-7 accurately represent the

22  state-owned barrier culvert on Chicken Coop Creek?

23  A   I was there a couple of weeks ago.  It has not changed.

24         MS. FOSTER:  Your Honor, I would move to admit AT-004

25  and AT-004-2 through AT-004-11 at this time.

```
 1            MR. SHAFTEL:  Your Honor, the State only has an

 2   objection to, I believe, to one exhibit, and that would be -- I'm

 3   sorry, I guess you haven't offered that.  I will wait.

 4            THE COURT:  No objection to those exhibits she just

 5   requested?

 6            MR. SHAFTEL:  No objections, your Honor.

 7            THE COURT:  Those will be admitted.

 8       I'm sorry.  Ms. Foster, can you go through that with me

 9   again?

10            MS. FOSTER:  I would be happy to, your Honor.  That

11   would be AT-004 and then AT-004-02 through 004-11.

12            THE CLERK:  Through 11?

13            MS. FOSTER:  Through 11.

14            MR. SHAFTEL:  I'm sorry.  I misspoke.  I do have one

15   outstanding objection on the declaration, if I may.  On the last

16   page, there's a reference to a data set.  And the implications of

17   the data set is to increase smolt production.  I believe that the

18   data set is not the type of data upon which experts should be

19   relying, under Federal Rules of Evidence 702.

20            THE COURT:  Tell me again what page that was.

21            MR. SHAFTEL:  It will be on the very last page.  I

22   believe it's Page 12 to 13 of the declaration.  He makes

23   reference to the data set.  The reason for my confusion is

24   because the actual chart has not been offered into evidence yet.

25   The chart is Figure 12, AT-004-13.
```

1      In his deposition, Mr. McHenry testified that it was too

2   early to tell what this data meant.

3           THE COURT:  All right.  All of the other exhibits will

4   be admitted.  We'll reserve on that portion of it, Ms. Foster,

5   until you get some questions and answers going through it with

6   Mr. McHenry.

7      Do you understand the objection being made by the State about

8   that?

9           MS. FOSTER:  Yes, I do, your Honor.

10           THE COURT:  All right.  Thank you.

11           MS. FOSTER:  I will get to that later.

12   By Ms. Foster:

13   Q   Mr. McHenry, generally speaking, what is the current status

14   of wild salmon species in the watershed native to the Olympic

15   Peninsula?

16   A   The Olympic Peninsula contains a variety of watersheds -

17   large, small, medium, glacier fed, rainfall fed - that support

18   many different stocks.  In general, on the north Olympic

19   Peninsula, the status of salmon is depressed.  There are at least

20   33 stocks that are in a depressed state.  There are several that

21   are listed under the Endangered Species Act.

22      As you move to the outer coast, the situation is a little

23   better.  There are healthier situations there, but there are some

24   that are not meeting their escapement goals.

25   Q   What has been the effect of the decline on the fisheries at

1    the Lower Elwha Tribe?

2    A    The tribe has greatly reduced its fishing effort over the

3    past two to three decades.  And in fact, in watersheds that it

4    historically fished along the Strait of Juan de Fuca, it no

5    longer fishes many of them.  It voluntarily ceased fishing as

6    part of a conservation closure in the mid-1980s.  So places like

7    the Pysht and the Hoko River no longer have salmon fisheries in

8    them.

9    Q    Does the tribe harvest any hatchery stocks?

10   A    Yes.  The tribe's terminal salmon fisheries have switched

11   primarily to hatchery-produced stocks in a couple of rivers, the

12   Elwha and Dungeness mainly.

13   Q    As a result of these changes in stocks of salmon and the

14   impacts to the tribe's fisheries, has the tribe formulated a

15   particular approach to habitat protection and restoration?

16   A    Yes.  We're trying to recover our salmon populations at the

17   watershed scale, and we use a hierarchical approach that involves

18   protecting first best available habitats for salmon.

19        Second, correcting artificial barriers, be they culverts from

20   roads or dikes or other sorts of structures that affect access to

21   habitat.  And then we get into restoring the processes of formed

22   habitat in the watershed, so the flow of wood, sediment, and

23   water.

24        And then finally we have a monitoring component so that we

25   can learn from what we're doing and adapt our programs

1    accordingly.

2    Q    Do you have an opinion as to whether or not that particular

3    approach is scientifically based?

4    A    Yes.  It's been published in the scientific literature, that

5    particular approach.

6    Q    And have you cited those studies in your report?

7    A    I have.

8    Q    And is this approach unique to the Lower Klallam Tribe or is

9    it used by others, to your knowledge?

10   A    I think it is being used more frequently in other places, but

11   it is hard for me to say how widely it is being applied.

12   Q    Have you conducted watershed assessments for any portions of

13   the Olympic Peninsula?

14   A    Yes, we have.

15   Q    And would you please describe for the Court what you mean by

16   a watershed assessment?

17   A    Yes.  A watershed assessment is -- I look at it as a toolbox

18   that we apply on our watersheds.  It's a series of analyses that

19   we do to actually quantify how the watersheds have changed from

20   their historic condition.  And we use that data to then plan and

21   prioritize our restoration efforts.

22   Q    Are you familiar with the limiting factors analyses that have

23   been prepared by the state of Washington?

24   A    I am.  I participated in the WRIA 18 and WRIA 19 Elwha phase.

25   Q    When you say "WRIA," what does WRIA refer to?

A    WRIA is a planning unit the State has.  It is a Watershed

Resource Inventory Area.  And it includes, in the case of where I

work, multiple watersheds.  So it is a much broader planning

scale of watershed assessment which occurs at a true watershed

scale.

Q    Other than the scale of the -- a difference in scale between

a watershed assessment and a limiting factors analysis, is there

any other difference between the two analyses?

A    Yeah.  In my opinion, there are huge differences.  The

watershed assessment technique is a much finer instrument than

the LFA.  The limiting factors analyses that I have participated

in were done under pretty rushed timelines with very busy people,

coming into a room and sitting around the table and kind of

taking their best crack as to what they thought the limiting

factors were.

     The watershed assessment is much different, and you actually

have time to go out in the field to get the photos you need to do

the analysis, to get out, to find the barriers, to do your

historic reconstruction of the fish populations.  It is a much,

much more quantitative tool.

Q    So generally speaking, what information does a watershed

assessment provide that a limiting factors analysis does not

provide?

A    Well, depending on your objective, it can produce a lot of

things.  It has been used in forest practices to modify forest

1    practice regulations.  We use it for restoration planning, to

2    prioritize and identify projects.  You can use it to figure out

3    your landslide rates on the landscape, condition your riparian

4    zones, how hydrology has changed.

5    Q    Can you provide us with any examples of a watershed

6    assessment that provided an additional quantitative analysis?

7    A    Yes.  We have done watershed assessments on two watersheds of

8    note.  One is Salt Creek, an independent tributary to the Strait

9    of Juan de Fuca.  And in that assessment, one of the first things

10   that we found was that the stream layer was wrong.  The data

11   layer that people use to manage the streams was wrong.

12       We corrected the stream layer using a watershed assessment,

13   some new remote sensing techniques, and we doubled the amount of

14   water that we found in that watershed.  It went from 25 miles to

15   50 miles of habitat.  And on that habitat, we also found many

16   more barriers than anyone ever knew existed.  And these are

17   culvert barriers.  We found a total of 31 culvert barriers in

18   this watershed.  That was not known from the LFA.

19   Q    As a result of your assessment in watershed -- watershed

20   assessment in Salt Creek, did you make any recommendations to the

21   Lower Elwha Klallam Tribe regarding habitat restoration and

22   protection?

23   A    Yes.  Salt Creek, because of the amount of low gradient

24   stream habitat it has in it, it has a high potential for Coho

25   salmon production.  And we recommended and have begun to

implement a systematic barrier correction program in the

watershed.  The tribe has taken the lead on that.  And as of this

summer, we have corrected 17 of those barriers.

Q    And how many barriers total did you find?

A    31.

Q    And were some of those barriers that you corrected

state-owned barriers?

A    Yes.  They were on state, county, and private lands.

Q    The ones that were on state lands, why did you fix those

barrier culverts?

A    Well, we weren't able to fix any DOT-owned barriers.  We

focused on DNR lands.  These are forest lands and logging roads.

And this particular block of land had quite a bit of road length

in it that was going to be abandoned, or needed to be abandoned.

And so we had a combination of culvert replacements, actual

culvert removals and culvert for -- bridge replacements.  We

chose to do those to accelerate the recovery of salmon in that

watershed.  We did not want to wait for the forest and fish

deadline.

Q    And for completing the -- I believe you testified you also

completed a watershed assessment on the Pysht River; is that

correct?

A    Yes.

Q    After completing that watershed assessment, what information

did you learn that was different from the limiting factors

```
1    analysis that included the same area?

2    A    Again, we found a lot of stream habitats that were unknown

3    and unmapped and not on any water type map.  On those habitats,

4    we found blocking culverts on various ownerships, and we found

5    that those culverts blocked about eight miles of the total

6    floodplain habitat in that analysis.  We were looking

7    specifically at the Pysht River floodplain and its associated

8    habitats.

9    Q    And how many miles actually was covered by that particular

10   analysis?

11   A    We covered the lower ten miles of the river and all its

12   floodplain.

13   Q    Are you saying that eight of the ten miles was what was

14   blocked?

15   A    Well, there's ten linear miles of the lower river.  When you

16   add all the little wetlands and sinuous channels, there was eight

17   miles of habitat blocked that drained into the river.  About

18   half.

19   Q    Half of what?

20   A    Half of the historically accessible habitat.

21   Q    As a result of that assessment, did you again make

22   recommendations to the Lower Elwha Klallam Tribe?

23   A    Yes.  We looked at a number of restoration options in the

24   Pysht.  Barrier correction is one of them that is high on the

25   list, but we are also looking at large-scale projects in the
```

1  mainstem of the river and in the estuary.

2  Q    And has the Lower Elwha Klallam Tribe acted upon your

3  recommendations?

4  A    We have.   We have corrected one barrier in 2007, and we have

5  another barrier/culvert scheduled for correction next summer.

6  Q    In addition to the barrier corrections in the Salt and the

7  Pysht watersheds, has the tribe corrected blocking culverts in

8  other watersheds?

9  A    We have.

10  Q    And what watersheds are they?

11  A    The Hoko, Deep Creek, East Twin River, Lyre River, Whiskey

12  Creek.

13  Q    Has the Lower Elwha Tribe monitored any sites where culverts

14  have been corrected and habitat opened up to fish passage?

15  A    We have done some monitoring at some sites.

16  Q    Would you please explain to the Court the nature of your

17  monitoring?

18  A    Yeah.   It is fairly simple.   When we do culvert monitoring,

19  we're really looking at who gets there fish-wise; who's there

20  before the culvert is removed and who gets there afterwards.

21      So we use a combination of either adult surveys, which are

22  typically done on foot, or we walk up the channel and count and

23  identify fish, or we'll actually go in and collect juvenile fish.

24  And we use electrofishing or smolt trapping for those

25  enumerations.

1    Q    When conducting the monitoring that you have, does the tribe

2    follow established scientific methods?

3    A    We do.

4    Q    And what has your monitoring shown, if anything?

5    A    Well, I have qualitative results that include standing at a

6    culvert site the first storm after it was removed and seeing Coho

7    salmon pass.  And I also have fish presence data that show

8    juvenile, Coho usually, in these sites that we've been

9    monitoring, accessing above.  And we also have some smolt

10   trapping data from one site in particular on the south fork of

11   the Pysht River.

12   Q    If I could show you AT-004-13.

13   A    Yes.

14   Q    Who prepared this chart?

15   A    I did.

16   Q    And was this -- when did you prepare this chart?

17   A    This is the site on the south fork of the Pysht where we do

18   smolt trapping.  And I update this graph every year.  I think the

19   first year I prepared this was 2005.  Basically we're monitoring

20   the site to see how the tributary responds to the opening of

21   barriers and other restoration in terms of how many smolts it

22   produces.

23        And this data is a compilation of that data we have collected

24   every year, basically the number of Coho smolts out of the

25   tributary system.

1   Q    Was this chart prepared for litigation?

2   A    No.  It was routine monitoring.

3   Q    Was it, then, prepared at or near the time when you obtained

4   the monitoring data shown in the chart?

5   A    Yes.

6   Q    And was it prepared in the regular course of the tribe's

7   monitoring study?

8   A    Yes.

9   Q    Was it your regular practice to prepare such a chart?

10  A    Yes.  As I said, we are trying to monitor our restoration

11  efforts.  This is part of that effort.

12          MS. FOSTER:  Your Honor, I would move for the admission

13  of AT-004-13 as a business record -- excuse me, as the business

14  record exception to the hearsay rule under Federal Rule 803(6).

15          THE COURT:  Any objections, Counsel?

16          MR. SHAFTEL:  Yes, your Honor, on relevance under ER

17  702 -- I'm sorry, Federal Rule of Evidence 702.  Just the data is

18  insufficient to make any sort of expert opinion on it, and

19  therefore it's also irrelevant in this case based upon its

20  limited information.

21          THE COURT:  All right.  Thank you.  Those objections

22  will be overruled.  004-13 will be admitted.  There was no data

23  for 2001?

24          THE WITNESS:  We had some funding issues that year.  We

25  don't get paid to monitor.  We have to come up with funds for our

1    monitoring mostly.

2            MS. FOSTER:  Your Honor, I neglected to offer AT-004-12,

3    which is --

4            THE COURT:  That's already admitted, Counsel.

5            MS. FOSTER:  Thank you.  I have no further questions at

6    this time.

7            THE COURT:  Cross-examination, Mr. Shaftel.

8                        CROSS-EXAMINATION

9    By Mr. Shaftel:

10   Q    Good afternoon, Mr. McHenry.

11   A    How are you?

12   Q    You had the good fortune of being deposed not once but twice

13   in this case; is that right?

14   A    That's correct.

15   Q    Once in 2006, by Mr. Steve Dietrich, and then again by myself

16   in 2009; is that right?

17   A    Yes.

18   Q    Mr. McHenry, you are familiar generally with the habitat in

19   WRIA 18 and 19, which are generally associated with the usual and

20   accustomed fishing places of the LEKT; is that correct?

21   A    Yes, that's correct.

22   Q    Outside of those two WRIAs, you don't have any personal

23   knowledge of habitat conditions; is that correct?

24   A    That would be incorrect.  I worked in WRIA 20 for two years,

25   so I have direct knowledge of WRIA 20 as well.

```
 1   Q    Any other WRIAs other than those three?

 2   A    WRIA 17 as well.  I've done a little work in WRIA 17.

 3   Q    Any other than those four?

 4   A    No.

 5   Q    And you've also -- the studies that you mentioned, those were

 6   in WRIAs 19, is that correct, the two watershed assessments that

 7   you performed?

 8   A    There were others, but, yes, the two I mentioned were in 19.

 9   Q    And have you performed any outside of 18 and 19?

10   A    Yes.  I was involved with a whole watershed analysis, which

11   is in WRIA 20.

12   Q    Any others?

13   A    No.

14   Q    And the testimony that you provided in your declaration, is

15   that purely limited to those WRIAs with which you're familiar?

16   A    Could you rephrase the question?

17   Q    You make a lot of representations about conditions of

18   habitat, and I'm wondering whether or not that is limited to

19   WRIAs 18, 19.  Is that correct?

20   A    I think if I understand your question, that's correct.  But I

21   also used other literature to reach some of my conclusions.

22   Q    And those conclusions were based upon your experiences in

23   WRIAs 18 and 19?

24   A    Yes.

25   Q    You mentioned in your deposition in 2006 -- I don't know if
```

1  you recall this, and tell me if you don't, but you were shown a

2  stock status report from 1996 by Steve Dietrich.

3      Do you remember that?

4  A   Yes.

5  Q   And he asked you some questions about the condition of stocks

6  with which the LEKT generally harvest, and he asked you whether

7  or not -- what those changes had been between 1996 and 2006.

8  A   Um-hum.

9  Q   Do you remember that line of questioning?

10 A   I do, yes.

11 Q   And he asked you about the Strait of Juan de Fuca Chum being

12 down.  I guess he asked you what species you remember being down,

13 and one of the species you remembered was the Strait of

14 Juan de Fuca Chum --

15         MS. FOSTER:  Your Honor, I'm going to object.  I believe

16 that the witness has not yet -- if Mr. Shaftel is trying to

17 impeach the witness, I don't believe he's laying the proper

18 foundation.

19         THE COURT:  The objection is overruled.  I don't know

20 what the question is going to be yet.

21     Mr. Shaftel, go ahead.

22         MR. SHAFTEL:  Thank you.

23 By Mr. Shaftel:

24 Q   The question is whether or not you remember the line of

25 questioning about the Strait of Juan de Fuca Chum being down

1    between the years 1996 and 2006.

2        Do you remember being asked about that?

3    A    I believe I do.

4    Q    In fact, what you said at that time was that the Strait of

5    Juan de Fuca Chum was down because of degradation of mainstem

6    habitat; is that right?

7    A    I did say that, yes.

8    Q    Is that still your testimony?

9    A    Yes.

10   Q    And mainstem habitat issues are unrelated to state barrier

11   culverts; isn't that correct?

12   A    Mostly, yes.

13   Q    And are you also familiar with the lifecycles of Pink salmon?

14   A    Yes.  I'm quite aware of their life history.

15   Q    Okay.  And are they also mainstem spawners, similar to Chum?

16   A    We don't have populations of Pink Salmon in the Strait of

17   Juan de Fuca, except for the Elwha and Dungeness River.

18   Q    Is that consistent with your understanding, that Pinks are

19   mainstem spawners?

20   A    Mainstem and large tributary.

21   Q    By and large, Pinks, in fact, are a species that are less

22   impacted by barrier culverts than Coho; is that correct?

23   A    In my watersheds that I work in, yes, I would say that's

24   probably true.

25   Q    Is that also consistent with your understanding outside of

1   your watersheds?

2   A    I don't know.   That is an honest answer.

3   Q    And those are the ones I'm looking for.

4        Steve Dietrich also asked you some questions about the

5   condition of Coho between 1996 and 2006, and you said that Coho

6   were slightly up during that period?  Do you remember that?

7   A    Yes, I do.

8   Q    Is that still consistent with your understanding?

9   A    No.   They have since declined.  We had a little blip of high

10  survival around 2000, 2001, but they have since declined again.

11  Q    So there have been fluctuations of Coho?

12  A    Yes.   However, last year was the lowest return ever in the

13  Strait of Juan de Fuca.

14  Q    You said between 1996 and 2006, Chinooks had flatlined; is

15  that correct?

16  A    I was referring to the Hoko River stock, which is sort of a

17  depressed flatline life-support state.

18  Q    Would you agree -- I'm sorry.  I will start over.

19       Harvest reform is an important step in establishing salmon

20  recovery; isn't that correct?

21  A    If has been an important step, and the co-managers have

22  committed to it.

23  Q    In fact, there was overharvest by all groups occurring in the

24  late 1880s -- sorry, 1980s?

25  A    I'm not a harvest manager.  I don't know.

Q    Isn't that what you testified to in your deposition this last

summer?

A    There were high rates of harvest, but that would be a better

question for a harvest manager.

Q    And those high rates of harvest had occurred in the late

1980s; is that right?

A    My understanding is that our rates of harvest were very high

on some stocks in the 1980s and early 1990s.

Q    And that was true for both the tribes and the non-tribal

fishermen?

A    Again, that would be a better question for the harvest

managers.  My understanding of a lot of Washington coastal stocks

is they were heavily impacted by Alaska and British Columbia

fisheries, actually.

Q    I am just asking for your understanding.  I will move on.

     There has been a lot of progress made in reducing overharvest

in the last 15 years; is that right?

A    I believe so.

Q    But there is still some overharvest occurring today; is that

correct?

A    There could be on some stocks.

Q    And that's indeed your opinion; isn't that true?

A    There could be on some stocks, yes.

Q    Another aspect of salmon recovery that is very important is

hatchery reform?

1  A   (Witness nodding in the affirmative.)

2  Q   Could you verbalize your answers, please?

3  A   Yes, hatchery reform.

4  Q   And hatchery reform is in fact caused -- I'm sorry, prior to

5  some of the hatchery reform occurring, the problems with

6  hatcheries have caused degradation of certain stocks; is that

7  correct?

8  A   Well, hatcheries have caused a number of problems.  One is

9  that they've supported artificially high fisheries, which led to

10  some of our overharvesting rates.  They've also caused problems

11  with dilution of genetics, swamping of native gene sources from

12  different watersheds, reducing survival of those wild fish.

13  Q   So it's very important in order to address salmon recovery to

14  address the hatchery reform issue?

15  A   Yes.

16  Q   And that's a very expensive proposition, in your experience;

17  is that correct?

18  A   Did you say "expensive" or "inexpensive"?

19  Q   I'm sorry.  Expensive to perform hatchery reform?

20  A   I think in some cases there's substantial savings, because

21  you're talking about reducing the number of hatchery fish that

22  you're growing and the costs associated with growing them, so I

23  don't necessarily agree with that.

24  Q   But you do agree that it's important to continue efforts on

25  hatchery reform?

1 A Yes.

2 Q And hydropower is actually a pretty big deal to the LEKT.

3 And I apologize for using the acronym.  Just for expediency, if I

4 may.

5 A I know what you mean.

6 Q Okay.  Should I ask the question again?

7  Hydropower is a very important issue to the LEKT due to the

8 fact that there's two dams on the Elwha River that block fish

9 passage?

10 A That's correct.

11 Q And in fact, habitat -- the habitat component of salmon

12 recovery includes a lot of different aspects, including things

13 like logging, water diversions, urban development, floodplain

14 connectivity, channel conditions, water quality, hydrology,

15 nutrient levels, sedimentation, and riparian conditions.

16  Would you agree with that?

17 A Yes.  There's a lot of complexity to restoring salmon

18 populations, and you've touched on many of those.

19 Q And in fact, there are -- in fact, while there are barriers

20 in the U&A, many of those barriers -- I'm sorry, in the usual and

21 accustomed fishing places of the LEKT, many of those barriers are

22 in fact owned by non-state entities; is that correct?

23 A That's correct.

24 Q They're owned by private individuals or logging companies,

25 cities, counties, and the U.S. Forest Service; is that correct?

1    A    To name a few.

2    Q    Now, you talked a little bit about limiting factors analysis

3    in your direct testimony.  I don't know that it was ever

4    explained what a limiting factor analysis is.

5        In case it is not self-evident, would you agree that limiting

6    factors analyses are studies that examine the sources of

7    mortality that affect fish populations?

8    A    Yeah.  It is a synopsis of people's opinions and available

9    information.

10   Q    And the limiting factors analyses that you participated in

11   were performed in 1990 and 2000; is that correct?

12   A    Yes.

13   Q    And those limiting factors analyses were performed by getting

14   a large -- a wide array of different interest groups together to

15   talk about all the different impacts they believed were happening

16   in these watersheds; is that correct?

17   A    Yes, that's correct.

18   Q    And the tribes were -- the LEKT were involved?

19   A    Yes.  I participated in those processes.

20   Q    As well as other local groups?

21   A    Yeah.  The Department of Fish and Wildlife, DNR folks,

22   others.

23   Q    Any county folks or city folks?

24   A    Yeah, I believe county.  There was county staff.

25   Q    And most of these people were scientists?

1   A    Yes.

2   Q    Experts in their field?

3   A    Yes.

4   Q    The limiting factors analysis for WRIA 18 was drafted by a

5   WDFW employee named Donald Herring.

6       Does that ring a bell?

7   A    Yes.  I know Don well.

8   Q    In fact, you respect his opinion?

9   A    I do.

10   Q    According to that limiting factors analysis, in many of the

11   watersheds in WRIA 18, barrier culverts are not in fact a

12   limiting factor; is that correct?

13   A    That is correct.

14   Q    In fact, for the vast majority of them, the barrier culvert

15   component of the habitat was described as either in good or fair

16   condition; is that correct?

17   A    Could you repeat that?

18   Q    Sure.  Do you recall that there was an effort made to

19   describe the different components of the habitat in each

20   watershed?

21   A    Yes.

22   Q    And for each component, there was a descriptor given to it,

23   whether it be fair, good or poor?

24   A    Yes.  Yes.

25   Q    And do you remember that, in fact, the majority of the

1    watersheds in WRIA 18, barrier culverts, or I guess it was

2    described as access, were in fair or good condition; is that

3    correct?

4    A    I don't actually remember that.  It's been ten years since

5    I've participated in that.

6    Q    Sure.  Would it help if I were to show you the document?

7    A    Sure.

8          MR. SHAFTEL:  Your Honor, I'm about halfway through.  I

9    don't know what your ending time was today.

10          THE COURT:  You're about halfway through?

11          MR. SHAFTEL:  Yeah.

12          THE COURT:  Let's go ahead and recess until tomorrow.

13    We'll start tomorrow morning.

14          MR. SHAFTEL:  Sounds good.

15          THE COURT:  All right, Mr. McHenry.  We'll see you back

16    here tomorrow morning at nine o'clock.

17                    (Adjourned for the day.)

18

19

20

21

22

23

24

25

**CERTIFICATE**

       I, Barry L. Fanning, Official Court Reporter, do hereby certify that the foregoing transcript is true and correct.


                  S/Barry L. Fanning


                  _____
                  Barry L. Fanning