```
 1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3   ----------------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al, )
                                      )
 5                 Plaintiffs,        )  No. C70-9213
                                      ) Subproceeding 01-1
 6        v.                          )
                                      )          FINAL
 7   STATE OF WASHINGTON, et al.,     )
                                      )
 8            Defendants.             )
                                      )
 9   ----------------------------------------------------------------

10                     TRANSCRIPT OF PROCEEDINGS

11   ----------------------------------------------------------------

12           BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                      October 15, 2009

14
     APPEARANCES:
15
                         Mr. Peter C. Monson
16                       U.S. Department of Justice
                         Environment & Natural Resources Division
17                       Rogers Federal Building
                         1961 Stout Street - 8th Floor
18                       Denver, CO 80294

19                       Rene David Tomisser
                         Fronda C. Woods
20                       Douglas D. Shaftel
                         Philip M. Ferester
21                       Attorney General's Office
                         P.O. Box 40100
22                       Olympia, WA 98504

23                       John C. Sledd
                         Laura Sagolla
24                       KANJI & KATZEN
                         100 South King Street, Suite 560
25                       Seattle, WA 98104
```

Alan C. Stay
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Tim R. Weaver
COCKRILL & WEAVER PS
316 North Third
Yakima, WA 98907

Daniel A. Raas
Harold Johnsen
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
Rob Roy Smith
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmusen
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

2

1                     INDEX OF WITNESSES

2

    PAUL SEKULICH                      PAGE

3
        Direct by By Mr. Tomisser        4

4
    TYSON WALDO

5
        Direct by Mr. Morisset          14
6       Cross by Mr. Tomisser           22
        Redirect by Mr. Morisset        27
7       Recross by Mr. Tomisser         33

8   PHILIP MEYER

9       Direct by Mr. Morisset          36
        Cross by Mr. Tomisser           39
10      Redirect by Mr. Morisset        48

11  RANDOLPH KINLEY

12      Direct by Mr. Raas              52
        Cross by Mr. Tomisser           73
13      Redirect by Mr. Raas            83

14  EDWARD JOHNSTONE

15      Direct by Mr. Nielsen           86
        Cross by Mr. Shaftel            99
16
    PAUL SEKULICH

17
        Direct by Ms. Woods            105
18      Cross by Mr. Sledd             119
        Redirect by Ms. Woods          136

19

20

21

22

23

24

25

1          THE COURT:  Counsel, we had left off yesterday,

2   concluded the testimony of Ms. Walter.  So are we ready from

3   another witness from the plaintiff?

4          MR. TOMISSER:  What we would like to do, if we can, your

5   Honor, is we are prepared to offer the State's response to the

6   plaintiffs offer of proof yesterday regarding Section 5 of

7   Mr. Rawson.

8          THE COURT:  Mr. Tomisser, if I could have you step to

9   the podium?

10          MR. TOMISSER:  Your Honor, yesterday afternoon the

11   plaintiffs were allowed to make an offer of proof regarding a new

12   theory of calculating what will lead to an estimate of lost fish

13   through Mr. Rawson in this case, testimony we have objected to on

14   a couple of bases.  The Court allowed the offer of proof to go

15   forward in this particular case, and last night when we had an

16   opportunity to try and sit down and read the new material, and

17   understand it, it quickly became apparent that our ability to

18   respond to that was going to require the biologist herself to

19   explain to the Court what had happened between what was excluded

20   by the Court in limine and now what is being done in response to

21   that order.  And so in order to respond to the plaintiffs' offer

22   of proof the State would like to call Dr. Paul Sekulich to the

23   stand and make an explanation to the Court, as our response to

24   this case, to that evidence.

25          THE COURT:  How long will it take, Counsel?

```
 1              MR. TOMISSER:  It will probably take about 15 minutes to

 2   run through that offer.  We would call Dr. Paul Sekulich.

 3              THE COURT:  All right.  Good morning.

 4   Whereupon,

 5                          PAUL SEKULICH

 6   Called as a witness, having been first duly sworn, was examined

 7   and testified as follows:

 8              THE CLERK:  Please state your full name and spell your

 9   last name for the record.

10              THE WITNESS:  My name is Paul Thomas Sekulich, last name

11   spelled S-E-K-U-L-I-C-H.

12              THE COURT:  You may inquire, Counsel.

13                       DIRECT EXAMINATION

14   By Mr. Tomisser:

15   Q    Good morning, Dr. Sekulich.

16   A    Good morning.

17   Q    Would you please provide the Court with a brief summary of

18   your educational qualifications?

19   A    Education wise, I received a Bachelor of Science degree in

20   fisheries from Colorado State University, a Master of Science

21   degree in fish biology from Colorado State University, a Ph.D. in

22   forest science and fisheries from the University of Idaho in

23   1980.

24   Q    And can you also give the Court a summary of your

25   professional experience?
```

A    Subsequent to the advanced degrees I gained employment with

the Department of Fisheries and the Department of Fish and

Wildlife, a 12-year stint in harvest management, successively

more difficult responsibilities, ending with a division manager,

the head of Puget Sound Harvest Management, in what was called

the PSHM program.  The last ten years was spent as a division

manager in the restoration division in the habitat program with

the Department of Fish and Wildlife.

Q    And have you had involvement with what is referred to as the

priority index?

A    Yes.  The priority index is a methodology that I compiled

with the help of my staff in the early 1990s.

Q    And can you describe to the Court what you were trying to do

in the development of the priority index?

A    The priority index methodology was first envisioned

subsequent to a memorandum of understanding between the

Department of Transportation and Fisheries and Wildlife that

called for an inventory of fish passage barriers on state roads.

Subsequent to that the legislature allocated money for inventory

and prioritization.  So what we did in the Department of

Fisheries was compile this methodology to prioritize those

barriers on state roads.

Q    And then with the assistance of your staff, is it accurate to

say, you were the creator of that methodology?

A    Yes.

1  Q    Do you have an expertise in the subject matter of fish

2  passage and barrier issues?

3  A    Yes.

4  Q    And can you describe your experience in that area?

5  A    Well, the expertise, basic salmon biology, in the conduct of

6  securing the Ph.D. degree in forest science and fisheries, but

7  also the experience of 12 years in habitat management,

8  specifically the environmental restoration division that

9  concerned itself with fish passage, fish screening and habitat

10  restoration.

11  Q    In preparing and assisting in this case, Dr. Sekulich, have

12  you had an opportunity to review the depositions and direct

13  testimony provided by the tribal witnesses in this case?

14  A    Yes.

15  Q    And have you also had an opportunity now to review the

16  revised declarations provided by tribal witnesses in this case?

17  A    Yes, last night I was able to review them briefly.

18  Q    And that would be revised testimony by Mr. Rawson, Mr. Waldo

19  and Mr. Meyers; is that correct?

20  A    That's correct.

21  Q    I would like to ask you about the revised declaration

22  provided by Mr. Rawson to start with.  And can you describe for

23  the Court what change was made, in terms of the use of ranges, as

24  compared to what was done the first time?

25  A    The first time there was a table in Section 5 that took

1    estimates that were used in priority index methodology that was

2    compiled by the Department of Fish and Wildlife.  There was a

3    table that expressed those as point estimates.  The revision

4    showed results of a literature search and expressed those

5    production values, which were adult equivalents in a square meter

6    of habitat, and expressed those as a range.

7    Q   And are the authorities that were relied upon by Mr. Rawson

8    in presenting those ranges to the Court authorities that are

9    generally accepted by fish passage experts for the purpose

10   intended here by Mr. Rawson?

11   A   No, not to my knowledge.  There was no one in Fish and

12   Wildlife that had reviewed those values.  I don't know if they

13   are reviewed by any fish passage experts.

14   Q   I would also like to ask you about the H factor, which if I

15   understand correctly, is part of the priority index; is that

16   correct?

17   A   That's correct.

18   Q   And with the intent of the priority index, how is the

19   H factor used in that formula?

20   A   Well, to maybe expand on that a little bit, the priority

21   index that is calculated for an individual barrier yields a

22   relatively priority for that barrier for correction, numbers

23   ranging from 1 to 100.  The higher the number the higher priority

24   for correction.  The components of the priority index of an

25   individual facility is a product of what is called BPH and MDC,

1  with some mathematical manipulation of those factors.  The BPH

2  portion of that model expresses the adult equivalent salmonids

3  that could potentially be produced with the correction of that

4  barrier.  It is important to note that BPH portion is a relative

5  tool.  It is merely meant to be a priority tool and not to yield

6  an absolute number of adult equivalents.

7  Q   So is it still a misuse of the H factor in the way that it

8  has been set up in the new sequence from Mr. Waldo, Mr. Rawson

9  and others?

10 A   In my opinion it is, because it doesn't parse out the habitat

11 for an individual project, that then is inserted into a priority

12 index for prioritization.  In this case it is an aggregate number

13 that lends itself to, again, inappropriate use of the H value.

14 Q   And when you say "inappropriate use," do you mean that it is

15 a use other than what the PI was designed and intended to do?

16 A   That's correct.

17            MR. TOMISSER:  Thank you, Dr. Sekulich.

18            THE COURT:  Mr. Tomisser, that concludes the offer of

19 proof on behalf of the State?

20            MR. TOMISSER:  Other than argument.  I don't know if the

21 Court wants argument now on this or not in order to make a ruling

22 on what we are going to do with the scope of the testimony on

23 behalf of Mr. Rawson and how that impacts other witnesses

24 potentially.

25            THE COURT:  Let me have our witness go ahead and step

1    down.   Thank you.

2         MR. MORISSET:   We might want some opportunity to

3    cross-examine their witness at some point, your Honor, depending

4    on your views on how to proceed.

5         THE COURT:   Here is what I think is going on now and why

6    I don't think we need cross-examination.   The testimony that was

7    proffered yesterday, Mr. Morisset, by Mr. Rawson, and I assume

8    will be followed up with other witnesses potentially today, to me

9    it is really no different than you have differences of opinion

10   from different experts that are putting that forth, just like any

11   other case, in terms of how it is these figures are arrived at.

12   The Court, in its motion in limine, already indicated that it is

13   skeptical about many of these figures.   And I am looking at them

14   in that way.   However, I believe that both sides certainly have

15   the opportunity to put all that evidence in, all that testimony

16   in, and the Court can weigh and balance what it thinks really has

17   weight and what doesn't have weight.   So the offer of proof, as I

18   see it, from the government is simply this is the rebuttal to the

19   argument of why we should have allowed Mr. Rawson's testimony and

20   these other witnesses.   I don't really think cross-examination is

21   necessary.   It is simply his explanation of this methodology that

22   developed, that in his opinion it is incorrect to be used in the

23   way Mr. Rawson, and maybe some of these other experts, have used

24   it, for whatever good that does.   All right.

25         MR. MORISSET:   Certainly.   We would point out that we

1    believe Mr. Sekulich has misrepresented what we said we were

2    doing.  We did not say we were producing absolute numbers of

3    fish, was the phrase he used.  We would --  I guess we can argue

4    that, your Honor.

5              THE COURT:  I think so.  Thank you.  Mr. Tomisser, does

6    that answer your question about what we are doing and how we are

7    doing it?

8              MR. TOMISSER:  Yes.

9              THE COURT:  Next witness.  Mr. Stay, good morning.

10             MR. STAY:  Good morning, your Honor.  I am not the next

11   witness, nor am I going to present it.  There was one detail of

12   yesterday that we were going to try to clear up with Mr. Shaftel.

13   There was a reserved objection to a sentence or two on page 11.

14   Mr. Shaftel, I believe, is going to withdraw his objection based

15   upon my representation that section was not being submitted for

16   the truth or falsity of that but as an example.  Am I correct?

17             MR. SHAFTEL:  Let me just clarify, that the objection

18   was just to the representation of the numbers that she used with

19   regard to the State budget, and whether or not those numbers in

20   fact were accurate.  And to the degree the Court is not looking

21   at those numbers for the matter asserted, the State doesn't have

22   an objection for that particular part of her testimony being

23   allowed in, merely for the purpose of showing that she was

24   looking for a plan and in fact found one on line.

25             THE COURT:  Thank you, Mr. Shaftel.  We are discussing

1    AT-009, a sub-portion of that.  Thank you for reminding me,

2    Mr. Stay.  We went a little late yesterday, so I was kind of

3    anxious to get all my staff out of here, but we should have taken

4    care of that yesterday.

5              MR. STAY:  That was my last question.  I should have

6    asked it yesterday.

7              THE COURT:  I love the jacket/bow tie combination.

8              MR. STAY:  I didn't expect to be up today.

9              MR. MORISSET:  May it please the Court, Mason Morisset,

10   attorney for the Tulalip tribes.  For the record, I already

11   remonstrated Mr. Stay on his dress.

12      Our next witness will be Mr. Tyson Waldo.  And we have

13   similar procedures we need to cover as we did with Mr. Rawson,

14   your Honor.  We need to offer the original AT-008 as an offer of

15   proof to preserve it for the record.  We need to offer his

16   revised declaration, which was redacted in conformance, we

17   believe, with the Court's order.  And then we have some exhibits

18   which I am either a little confused on, as to whether they got in

19   or not, or there may be continuing objections from the Attorney

20   General.  So that's kind of the three things we need to do.  And

21   I will presume that the Attorney General will pop up at

22   appropriate points.

23             MR. TOMISSER:  That would probably be now, your Honor.

24   In terms of the exhibits, in the flurry this morning Mr. Morisset

25   was asking me about some of the remaining exhibits, maps

generated by Mr. Waldo.  In the two minutes that I had to look at

them I have had a chance to review them, and we will be

withdrawing our objections to the maps you were asking about.

THE COURT:  Let's take it one step at a time.  I want to

keep our record absolutely clear.  We are talking about AT-008.

MR. MORISSET:  I have renumbered that as A, to make it

clear.  That is the original, portions of which were excluded by

your Honor.

THE COURT:  I understand.

MR. MORISSET:  I have handed up a revised version and

labeled it 008-B.

THE COURT:  Thank you.  So A is the original declaration

of Mr. Waldo.  And, again, to preserve the appeal for the

plaintiffs, that will be put into the record.  B is now the

redacted version?

MR. MORISSET:  That's correct.

THE COURT:  Mr. Tomisser, any other objections, other

than ones already made discussing the methodology issues?

MR. TOMISSER:  No, your Honor.

THE COURT:  AT-008-B will be admitted.  We have already

got his resume in.  That is 008-1.  We have already got the maps,

map one, map two, which is 8-2 and 8-3, in.  Are we discussing

8-4 now, Mr. Morisset?

MR. MORISSET:  That's why I brought this up, is that I

am not clear where we are.  I am not sure what Mr. Tomisser is

1   saying on 4, 6 and 11 through 18, which I didn't have listed as

2   admitted or not.  And we just need to proceed cautiously here and

3   make sure we are all on the same page.  And I can put Mr. Waldo

4   on the stand to explain those, if need be.

5          THE COURT:  Hang on a second.  Let me ask the State.

6   The 008-2, the case area scale map one, and 008-3, are both in.

7   No objection.  There was an objection to 4, an objection to 6.

8   5, 7, 8, 9 and 10 are all in.  So, as Mr. Morisset says, we are

9   looking at 8-11 through 8-18.  17 and 18 are tables.  The rest of

10   them are from the description in the pretrial order.  It appears

11   they are all maps.

12      Mr. Tomisser, does the State have any continuing objection?

13   Let's take them one at a time.

14          MR. TOMISSER:  Your Honor, I think it will take us a

15   moment to look at these.  Not all of them were attached to the

16   new declaration.  We think that 11 was an attachment that was

17   part of the original testimony from Mr. Waldo that remains

18   excluded in this case.  I think it will take us a while to sort

19   this out exactly.

20          THE COURT:  How long is a while?  Ten minutes?

21          MR. MORISSET:  A little colloquy with the counsel and

22   the witness off the record might help.

23          THE COURT:  Why don't we take a short, 10-minute recess?

24   (Break)

25          THE COURT:  All right, gentlemen, we're back on the

```
1   record.  Mr. Morisset or Mr. Tomisser, where are we in terms of

2   the proposed exhibits?

3                MR. MORISSET:  May it please the Court, I think we have

4   beat each other to an impasse.  No.  I think we've come to an

5   agreement.  I would like to call the witness to the stand to

6   explain on the record what we've done and make sure that we've

7   adequately explained it to both Counsel and Court.

8                THE COURT:  That's fine.

9                MR. MORISSET:  I call Tyson Waldo.

10               THE COURT:  Mr. Waldo, good morning.  If we could have

11  you stand and raise your right hand, please, to be sworn in.

12  Whereupon,

13                            TYSON WALDO

14  Called as a witness, having been first duly sworn, was examined

15  and testified as follows:

16               THE CLERK:  Will you please state your full name and

17  spell your last name for the court reporter.

18               THE WITNESS:  Tyson Zane Waldo, W-A-L-D-O.

19               THE COURT:  Mr. Waldo, there's water on your left if you

20  need it.

21       You may inquire, Counsel.

22                        DIRECT EXAMINATION

23  By Mr. Morisset:

24  Q   Mr. Waldo, where are you currently employed?

25  A   I'm employed at the Northwest Indian Fisheries Commission as
```

1    the Puget Sound SSHIAP program habitat biologist.  I'm also

2    employed at Western Washington University as a GIS instructor.

3    Q    And have you prepared a declaration for this case, which I

4    believe you have before you, marked AT-008-B?

5    A    Yes.

6    Q    And is that -- would that be your testimony today if you were

7    to give it live as opposed to in writing?

8    A    Yes.

9    Q    And attached to that, there's a map entitled, "State- Owned

10   Barrier Culverts Used by Plaintiff Tribes to Estimate the

11   Potential Habitat Upstream," which I believe I have up on the

12   screen.  Is that correct?

13   A    Correct.

14   Q    Is my understanding that this was revised in connection with

15   the Court's order on redacting certain information and would be

16   considered a new version of the original AT-008-11?

17   A    Correct.

18   Q    And what does this show briefly, in summary?

19   A    This shows the State-owned barrier culverts used by plaintiff

20   tribes to estimate the potential habitat upstream.

21        In my revised declaration, I redacted -- I redacted the

22   production numbers that we had been providing.  And in so doing,

23   the maps showing the sites that were used for those production

24   numbers also changed.  I kept habitat -- potential habitat

25   upstream in my revised declaration.  And this map represents the

```
1    sites that we used for estimating potential habitat upstream as
2    opposed to the sites we were using for estimating potential
3    production.
4    Q    And what are the little black dots all over the map?  What
5    does that represent?
6    A    There's two -- I guess it's black to us.  It's actually red
7    dots and black dots.  The red dots represent --
8    Q    Excuse me.  Are the red dots what would be smaller on this
9    map?
10   A    Yeah.  Those are the sites that were used in the calculation.
11   And now there are 668 sites that we used to look at potential
12   habitat upstream.  What that refers to is -- lineal gain is one
13   of the measures of potential habitat.  There are 487 sites from
14   FPDSI, and then there are 181 sites from DNR that we were able to
15   use for our potential lineal gain estimation.
16        And then the other 829 sites are sites that didn't have --
17   either didn't have lineal gain data associated with them or any
18   habitat data associated with them or that were a barrier upstream
19   of a downstream barrier.  Any barriers upstream had to be removed
20   as well so as not to double, triple, or quadruple count habitat.
21            THE COURT:  Counsel, I just need to clarify.  Are these
22   culverts you're talking about, then?
23            THE WITNESS:  Yes.
24            THE COURT:  Each of these little dots?
25            THE WITNESS:  Yes.
```

By Mr. Morisset:

Q    To follow up on the Court's question, and to make sure we're clear, are these sites which mean there may be more than one culvert at some of these sites?

A    In the case of this map, they're the actual -- the culverts that may be -- so one site may have multiple culverts, in the case of these maps where I'm showing the culverts.  And so there could potentially be two culverts at a site.

Q    Then also attached to your revised declaration is something labeled Table 1.  Does that look like the table?

A    Yes.

Q    Do you have a copy of it with your declaration?  And would you briefly describe what this is?

A    It's a summary table by WRIA and by state ownership.  The WRIA -- it's the case area -- or the table represents the case area, and the case area, starting with WRIAs 1 through 23, which are the case area WRIAs.

     And then the state ownership is broken into basically DOT and DNR.  And that break also represents the FPDSI data base from the DNR data sets.  And then there's habitat summaries in length and in miles, spawning habitat in meters squared, and rearing habitat area in meters squared.  So both the spawning and rearing are area numbers, and then the length is a linear length number.

Q    Now, WRIA stands for the first column, W-R-I-A?

A    Um-hum.

1  Q    And just explain what that acronym is, please.

2  A    Water Resource Inventory Area.

3  Q    Does that coincide with what we might say are the major river

4  systems in the western part of the State?

5  A    Yes.

6         MR. MORISSET:  Now, your Honor, I think that I will --

7  well, maybe I won't make a multipart motion, which is difficult.

8  I'll make one motion at a time.

9      I would like to identify Table 1 as -- after discussing this

10  with defense counsel, I think we have agreement that we should

11  label it a new exhibit number, AT-008-19, and move for its

12  admission as an exhibit.

13        THE COURT:  Is that the one we have on the screen,

14  Counsel?

15        MR. MORISSET:  That's the one the screen, your Honor.

16        THE COURT:  Mr. Waldo --

17        MR. MORISSET:  Your Honor, may I explain that we had two

18  earlier tables which are now simply part of the original offer of

19  proof.  In effect, it's a little bit of a misstatement.  We're

20  replacing those with this and giving it a new number to keep

21  clarity here.

22        THE COURT:  That's my understanding.  I assume for

23  Table 2, then, we'll use 008-20?

24        MR. MORISSET:  No.  We're just doing one table now.

25        THE COURT:  Just one?

1          MR. MORISSET:  19.  And there will be no 20.

2          THE COURT:  All right.  Before we do that, can you just

3    run through this with me and look at WRIA 1, Department of

4    Fisheries and Wildlife/DOT.

5      Length, you're talking about the length of the stream.

6          THE WITNESS:  Yeah.  So for however many pipes in

7    WRIA 1, or however many culverts that had habitat surveys

8    associated with them, as part of the habitat survey they measured

9    length upstream, and they measured it in meters.  I converted it

10   from meters into miles just because it's a more meaningful number

11   to communicate at this scale.

12      And then I summarized for a particular WRIA all those

13   culverts with associated habitat survey data.  And from that

14   summary, I came up with this length measurement which happens to

15   be, for WRIA 1, 58 miles.

16          THE COURT:  And then the spawn?

17          THE WITNESS:  The spawning habitat is an area, so it's

18   in meters squared, and it's the same -- the summary process was

19   the same.  For sites where there was a habitat record associated

20   for a culvert in a particular WRIA, if there was spawning habitat

21   measured, that site would then be used -- it would then aggregate

22   all the sites that had spawning habitat measured.  And from that

23   aggregation, I would get this number, this 41,992 square meters

24   of spawning habitat.

25          THE COURT:  That's your calculation?

```
 1              THE WITNESS:  That's my summary.  The measurement of
 2   spawning habitat actually comes from a field measurement using
 3   the habitat survey data.  So the measurement is from field data.
 4   My summary of spawning habitat -- yeah, the summary is mine.
 5              THE COURT:  All right.  And then rearing?
 6              THE WITNESS:  Rearing, the same as both spawning and
 7   length.  I got that from the actual habitat record as it's
 8   associated with culverts, and then I summarized those habitat
 9   records of rearing area on a WRIA by WRIA.
10              THE COURT:  All right.  Thank you.
11        So you're asking to admit 008-19?
12              MR. MORISSET:  Correct, your Honor.
13              THE COURT:  Any other objections from the State?
14              MR. TOMISSER:  No other objections, your Honor.
15              THE COURT:  Then that will be admitted.
16              MR. MORISSET:  Defense counsel has been very cooperative
17   in trying to help me clear where we are on the rest of the maps.
18   If I misstate things, I'm sure I'll get a response.  But I think
19   we also have agreement now to admit the rest of the exhibits
20   which were not admitted before.  And that would be AT-008-4, -6,
21   and -11(b), which is the new version of -11, -12, -13, -14, -15
22   and -16, as well as the new -19.  I would move for admission of
23   those.  And I apologize in advance for the fact there still may
24   be some confusion.
25              THE COURT:  Any objection from the State?
```

1              MR. TOMISSER:  No.

2              THE COURT:  All right.

3              MR. MORISSET:  Counsel was asking about AT-008-17, which

4    at one time we had new versions but were not -- in effect, we've

5    replaced those with the new -19.

6              THE COURT:  That was my understanding.  So -17 is gone?

7              MR. MORISSET:  Well, -17 and -18, in their original

8    versions are in the original offer of proof.

9              THE COURT:  Yes.

10             MR. MORISSET:  They are not part of the new declaration.

11             THE COURT:  Thank you.

12             MR. TOMISSER:  That's our understanding as well, your

13   Honor.

14             THE COURT:  All right.  Then the remainder of those

15   exhibits dealing with the declaration of Tyson Waldo are now

16   admitted.  You may continue, Mr. Morisset.

17             MR. MORISSET:  Then I guess all that's left is a need to

18   move the admission of the revised declaration of Tyson Waldo,

19   which I have labeled AT-008-B.

20             THE COURT:  We've done that already.

21             MR. MORISSET:  We have done that?  Then thank you, your

22   Honor.

23       I believe that is all.  I think we're completed.  Nothing

24   further on direct.

25             THE COURT:  Cross-examination for Mr. Waldo.

```
1                        CROSS-EXAMINATION
2    By Mr. Tomisser:
3    Q    Good morning, Mr. Waldo.
4    A    Good morning.
5    Q    For the record, we want to congratulate you on the most
6    frequently deposed person.
7    A    Thank you.
8    Q    Mr. Waldo, I want to ask you about some of your terminology
9    in this particular case.  The various maps and charts that you
10   have generated in this case are all carefully labeled as
11   estimates of potential gains made; is that correct?
12   A    Correct.
13   Q    And the reason that they are labeled as potential gain is
14   because of the presence of non-state barriers along the river and
15   stream systems; is that correct?
16   A    The reason that they're -- not specifically.  I mean,
17   generally I think that's part of why they are called potential,
18   yes.
19   Q    Because if there is a stream system that has a state barrier,
20   and then either above or below that, that would effect the amount
21   of gain that you could actually achieve, because there would
22   still be blockages even if the state barrier was removed; is that
23   true?
24   A    That would affect the amount of gain that you could actually
25   achieve at the time that I did this assessment.
```

1  Q    That was my question.

2  A    Okay.

3  Q    And also in terms of -- I think you also were going to

4  explain a moment ago, in terms of why this is referred to as

5  potential, is that your numbers, in terms of making these counts,

6  also don't take into account what the quality of the habitat

7  might be that's being gained; is that correct?

8  A    I don't think that is a correct statement.

9  Q    Do your numbers take into account the quality of the habitat?

10 A    When the habitat is surveyed through the WDFW methodology,

11 there are multiple ways that the quality of the habitat is

12 ascertained, the quality from the perspective of hydrology, so

13 we're looking at a 60-day low flow.

14     And then in terms of the habitat quality modifiers, the

15 surveyors are looking at water temperature; they're looking at

16 stream condition; they're looking at riparian condition; they're

17 looking at morphology; they're looking at substrate.  When you

18 take all of those things together and you take into account that

19 they're being assessed in the field, I would argue that habitat

20 quality is very much a part of this habitat number that we're

21 looking at.

22 Q    My question, Mr. Waldo -- and I don't disagree with any of

23 that.  I understand that those measurements are there.  I'm

24 simply trying to understand, from what you have presented here,

25 in terms of when we come up with a number, I think the example

1    was 50 something miles in WRIA 1 as potential gain.

2        Simply looking at that number doesn't tell us anything about

3    what the quality of the habitat along that 50 miles might be.

4    We'd have to look at other data to find out what the quality of

5    the 50 miles is.

6    A    I guess the way that I see it is that when you look at that

7    58, for example, if you took it at 100 percent and you hadn't

8    already applied those quality modifiers, that 58 might be

9    something like 137.  So you've already factored in the quality of

10   the habitat.  And the way that you've factored it in is you've

11   actually minimized the amount of gain that you're going to have.

12   You're taking that into account.

13       So I would say even in summary, the habitat quality modifier

14   is still a part of that value.  That's the way I see it.

15   Q    In looking at the surveys that have been done, in terms of

16   people trying to go out and inventory how many culverts there are

17   and where they are and who owns them, you've had a chance to

18   review that data, haven't you?

19   A    Could you be more specific?

20   Q    Have you had a chance to review inventory data that lists the

21   identification and location of culverts?

22   A    Like the actual habitat survey files?

23   Q    Yes.

24   A    Yes.

25   Q    And in reviewing those files, is it true that we can tell

1   that the database, in terms of non-state-owned barriers is

2   incomplete?

3   A    From reviewing the habitat survey files, I don't think that I

4   can make the conclusion from those particular files, no.

5   Q    Is it true, based on any of the material that you've

6   reviewed, that you can tell that the inventory data that we have

7   on non-state-owned barriers is incomplete?

8   A    The FPDSI database, data continues to be collected and put

9   into the FPDSI database.

10  Q    I guess maybe a simpler way of getting to this point,

11  Mr. Waldo, is, is it your belief that there are probably

12  additional non-state-owned barriers within the case area that

13  simply haven't been identified and put into the data base yet?

14  Do you think that's probably true?

15  A    I think that's potentially true.  And I also -- it's

16  potentially true that there are additional state-owned barriers

17  that haven't been put into the database yet.

18  Q    There may be more?

19  A    Yeah.

20  Q    Have you had a chance in this case, Mr. Waldo, to review some

21  of the work and mapping that was done by Brian Benson?

22  A    Yes.

23  Q    And let me show you an example of one of his maps that was

24  similar to what you did in terms of putting dots on a map.

25       Do you recognize this as typical of the sorts of maps that

1    you reviewed that were generated by Mr. Benson?

2    A    I recognize this as typical of the maps that were generated

3    by Mr. Benson.   This particular situation, I don't recognize that

4    as typical of most situations with regard to how many non-state

5    barriers there are in relation to state barriers.

6    Q    The situation for Little Bear Creek is what's represented

7    here, correct?

8    A    Correct.

9    Q    And so in other situations, the proportion of how many

10   state-owned barriers there are and how many non-state-owned

11   barriers there are is different in different areas, correct?

12   A    Correct.   I found in most cases, there were -- it's

13   different, yeah.

14   Q    And so as part of the analysis here, Mr. Waldo, in looking at

15   a stream system, is you would need to look at state-owned

16   barriers in relationship to non-state-owned barriers that might

17   be either upstream or downstream of the state-owned barriers; is

18   that correct?

19   A    As part of the survey, upstream and downstream barriers are

20   sort of noted -- when they're doing habitat survey?   Yeah, that

21   is correct.

22   Q    And in doing your review, Mr. Waldo, on how many instances

23   were you able to determine that a non-state-owned barrier was

24   downstream of a state-owned barrier?

25   A    I don't recall.

```
 1   Q    It's in your tables, though, correct?  Those numbers were
 2   presented in a table that you generated?
 3   A    Correct.
 4   Q    So we can review those later?
 5   A    Yes.
 6        MR. TOMISSER:  I think those are all the questions I
 7   have for you, Mr. Waldo.  Thank you.
 8        THE COURT:  Any redirect?
 9        MR. MORISSET:  Yes, your Honor.
10                    REDIRECT EXAMINATION
11   By Mr. Morisset:
12   Q    Mr. Waldo, I've placed the new AT-008-11(b) on the screen.
13   This indicates in the legend that the culvert data sources are on
14   the left bottom; is that correct?
15   A    Correct.
16   Q    I assume that is the source, then, of the information that
17   made up the map?
18   A    Correct.
19   Q    Could you explain what the first data source is there?  The
20   acronyms, can explain what those are?
21   A    The first data source is the WDFW WSDOT FPDSI database.  I
22   fear if I try to spell out what FPDSI stands for, I might get it
23   wrong.  But it is the DFW compiled and managed database for road
24   crossings, for both state-owned and non-state-owned road
25   crossings.
```

1    And then the DNR R008653 culvert shape file, that's the shape

2    file that is provided to show the current state, or at least at

3    that point, November of '08, I think, the current state of DNR

4    culverts that had been surveyed and put into the GIS.

5    And then the PI-221, all fish barrier costs.  7-03 XLS table,

6    that's where DNR was storing the old habitat in their version of

7    the PI data.  And then the barrier XLS is another part of the

8    DNR's barrier survey, or data system barriers, as is the

9    DNR-repaired barriers November 2008, also part the DNR's data

10   system for barrier data.

11   Q    And DNR is the Department of Natural Resources?

12   A    The Washington Department of Natural Resources.

13   Q    These are all state agencies?

14   A    Yes.

15   Q    All state-generated data?

16   A    Yes.

17   Q    Now, still referring to AT-008-11(b), in response to

18   questions by defense counsel as to the nature of what potential

19   habitat meant, is it -- I guess, once again explain what the 829

20   large dots are that were not used and why they were not used in

21   your calculation of estimated potential habitat.

22   A    They either did not have a habitat survey associated with

23   them or they were a culvert that had a habitat survey associated

24   but that were upstream of a downstream culvert.  In these

25   databases, from each culvert they do a full -- they count habitat

1    completely to the upstream natural barrier.  So if you have

2    multiple culverts upstream of a bottom one, you potentially will

3    overcount that habitat.  So you have to pull those out to make

4    sure you're counting from the bottom and then going up.

5    Q    So is it fair to say your map accounts for those state

6    blocking culverts which, however, may be above some other

7    blocking culvert or for some other reason have habitat that you

8    didn't use in your calculations?

9    A    The habitat is accounted for, yes.

10   Q    But not twice?

11   A    Not twice.

12   Q    Does Exhibit AT-8-11(b) show whether the non-state culverts

13   are partial or total blocking?

14   A    No.

15   Q    In the example that Counsel showed you of Little Bear Creek,

16   would you label that a typical example or an exception to the

17   culverts that show on your map?

18   A    I would label that as an exception.

19         MR. MORISSET:  Nothing further, your Honor.  Thank you,

20   Mr. Waldo.

21         THE COURT:  Mr. Waldo, before you step down, I just need

22   some clarification on your Table 1, the one we went over with the

23   WRIAs and your estimation of habitats in terms of miles and

24   spawning and rearing.

25       You, in response to Mr. Tomisser's questions about habitat

quality, used a term -- you said, "quality modifiers of habitat."

Tell me again how you came up with first column figure in terms

of the number of miles.

THE WITNESS:  The number of miles doesn't -- the way

that I came up with the figure was to take the habitat survey

data that the State had generated and had made part of their

FPDSI database, and then I located the culverts that had those

surveys associated with them within their particular WRIAs, so I

was able to then, by WRIA, anything within that boundary could

get summarized into that WRIA.

THE COURT:  Now, how does the State come up with that

particular number versus measuring and saying this stream is --

or all these tributaries would be 127 miles?  When you said

"quality modifiers of habitat," are there other factors that the

State takes into account when they come up with that final

number?

THE WITNESS:  With regards to area, yeah.  The number

we're talking about right now that you're asking about is the

length number.  The way the State comes up with the length number

is during the habitat survey, they actually have a string box,

right, if it's a field survey?  And as they're walking up the

stream to do that, I think to the tenth of a meter, they're

measuring that habitat.  So by the time they're done going to

each particular anadromous barrier, because it would natural

barrier of anadromy, they can then take that -- they'll take all

habitat they've measured and summarize it for that particular

culvert.  And then I just simply took those culvert summaries and

summarized them for a particular WRIA.  So that's how you get the

length number.

In terms of the spawning and rearing number, the State

measures habitat area.  So, again, in the field, they'll have

what's called a stadia rod, and they can measure lengths of a

particular habitat unit, widths of a particular habitat unit, to

get an area.  And then upon that, they apply a 60-day low-flow

factor which minimizes it to just say that -- to make sure that

we're talking about a summer low flow, the minimum habitat.

And also while the State -- or while a particular survey is

in the field, they're taking into account substrate quality,

riparian quality, shading, in-stream cover, the actual morphology

of a particular habitat, other things that might be going on

environmentally.  And those are factored into basically a system

of weights that can sort of say from excellent to poor.  And

they'll apply that particular factor to the area that they've

measured to further minimize it, including -- I mean by the

quality of its habitat.

THE COURT:  And aren't those necessarily subjective to a

certain degree?

THE WITNESS:  I believe there's such a thing as limited

subjectivity.  And I think that when you take an experienced

surveyor and you put them in the field, and they're engaging all

five of their senses while they're also measuring something, then
I think you very much have limited their subjectivity, and it's a
relatively objective measurement at that point.

   Also, the fact that -- you're not saying, Tell me if it's
good or bad.  You're actually giving them some criteria as to
what is good and what is bad, and you're splitting it into three
or four categories, so that person really can fit their
subjectivity into a smaller box.

          THE COURT:  And can that change over time?

          THE WITNESS:  The condition of the habitat could change
over time.  I think that that process -- the actual way that it's
measured and the way they're looking at it, yes.  But I think
that process happens rather slowly.

          THE COURT:  Thank you.

          THE WITNESS:  Yeah.

          THE COURT:  Any other questions based on that?

          MR. MORISSET:  One followup in response to the Court.

By Mr. Morisset:

Q   As to these modifiers that are used to give what I would say
is a conservative view of habitat for spawning and rearing area,
you use the words "area morphology."

   Would you explain what that means?

A   I use the word "morphology," as in habitat unit, so that
you're looking at pools -- sort of literally the shape of the
streambed and how that affects the type of habitat you have,

1    looking at a pool as opposed to a ripple as opposed to a glide as

2    opposed to a pond.   Those breaks happen because of morphological

3    breaks in the stream.

4    Q   And those are all considered by the surveyors that are

5    preparing this?

6    A   The surveyors are breaking out habitat units based on those

7    breaks.

8            MR. MORISSET:  Nothing further, your Honor.

9            MR. TOMISSER:   I have one question based on the Court's

10   questioning, your Honor.

11                          RECROSS-EXAMINATION

12   By Mr. Tomisser:

13   Q   Mr. Waldo, in calculating the length numbers that you have

14   here, you mentioned that you filtered out state barriers so that

15   you would not double count; is that correct?

16   A   Right.

17   Q   But you did not filter out the non-state barriers; is that

18   correct?

19   A   I did not include non-state barriers.

20           MR. TOMISSER:  Thank you.

21           THE COURT:  Thank you, Mr. Waldo.

22      The plaintiffs may call the next witness.

23           MR. MORISSET:  I am also responsible for the next

24   witness.  May I have a few minutes to gather my papers?

25           THE COURT:  Certainly.

1           MR. MORISSET:  May it please the Court, Mason Morisset

2     in the for the Tulalip Tribes.  Our next witness will be

3     economist Phil Meyer.  We have the same situation here in terms

4     of an original declaration, which we've labeled...

5           THE COURT:  AT-005?

6           MR. MORISSET:  I think that's correct, your Honor, yes.

7     And now A and B also.  A for the original and B for the revised

8     version.

9        And we'd like to offer -- make an offer of proof for the

10    first version, 005(a), for purposes of perpetuating that record

11    at this time.

12          THE COURT:  All right.

13          MR. TOMISSER:  No objection for that purpose, your

14    Honor.

15          THE COURT:  Thank you.

16          MR. MORISSET:  And then if the Attorney General has

17    anything to discuss as to the redacted version, we'll put

18    Mr. Meyer on the stand to explain that.

19          THE COURT:  Mr. Meyer, let me have you step forward to

20    be sworn in.

21    Whereupon,

22                          PHILIP MEYER

23    Called as a witness, having been first duly sworn, was examined

24    and testified as follows:

25          THE CLERK:  Will you please state your full name and

1    spell your last name for the record.

2              THE WITNESS:  Philip A. Meyer, M-E-Y-E-R.

3              THE COURT:  Mr. Meyer, good morning.  There's water on

4    your left if you should need it.  All right?

5        Mr. Morisset, for our record, the only exhibit that's in at

6    this point in time is his resume.  That's 005-1.  All of the

7    other ones, my records show, are not admitted at this point in

8    time.

9              MR. MORISSET:  That's what I understand.  Now I'm not

10   sure, before we start, if I cut off defense counsel who might

11   want to say something about where we are before we start.

12             THE COURT:  Right.  Let me check with the State to see

13   if they still maintain objections to any or all of -- let me know

14   if you maintain objections or are withdrawing your objections to

15   anything.

16             MR. TOMISSER:  With regard to the original declaration

17   of Mr. Meyer, your Honor, the State would stand on its objection

18   that it's been excluded in its entirety on the order in limine.

19   With that caveat, we don't have an objection to what is now

20   offered as the revised declaration of Mr. Meyer.

21             THE COURT:  So 005-B?

22             MR. TOMISSER:  Yes.

23             THE COURT:  All right.  That will be admitted.

24                          DIRECT EXAMINATION

25   By Mr. Morisset:

1  Q    All right.  In that case, I will just briefly run through it.

2      Mr. Meyer, do you have 005-B in front of you?

3  A    Yes, I do.

4  Q    And do you have the pleading paper attached to it with your

5  signature and a date of October 13th?

6  A    No, I don't.

7  Q    Well, is the report you have in front of you the final report

8  that you approved on approximately the 13th?

9  A    Yes.

10  Q    And would -- if you were giving live testimony today, would

11  that be your direct testimony?

12  A    Yes.

13  Q    Now, would you explain just briefly that after the Court's

14  ruling as to what portions of your testimony needed to be --

15  original testimony needed to be excluded, will you just briefly

16  indicate what you did on this revised report?

17  A    Basically I removed any of the calculations and conclusions

18  associated with production numbers of adult salmon and their

19  distribution to various fisheries that had been earlier supplied

20  to me.

21  Q    And then that left what as to the remainder of your report?

22  A    Well, I should have said that I also removed a section that

23  has to do with what is described as existence or non-use values.

24  Because what I was asked to do in the remainder of this report

25  was simply deal with the value of a salmon or a Steelhead, not go

1    beyond a single adult fish.

2         At that marginal scale, talking about existing values,

3    existence values doesn't make any sense, so I removed that

4    section completely.  And so what I did, in essence, was I reduced

5    summary tables that talked about the commercial -- the value for

6    commercial catchers and processors of a single salmon, or in the

7    tribal case, Steelhead, and the value for recreational fishermen

8    of a catch of a single salmon or Steelhead.

9    Q    If you would, please, turn to Table 1 in your revised report.

10   A    I have it.

11   Q    And what's the label on that, please?

12   A    It says, "Net Economic Value Coefficients for Commercial

13   Fisheries and Processing, Added Harvest of Salmon and Steelhead."

14   Q    And, briefly, what does that indicate and how did you arrive

15   at those numbers?

16   A    Basically it is simply a factor table which identifies the

17   percent of value that is described as net economic value as

18   opposed to gross value received by fishermen, and then similarly

19   by persons who were processing that fish.

20        And by "net economic value," I simply mean gross value minus

21   the costs of fishing and/or processing.

22   Q    And would you go to the next table, please, and indicate what

23   table that is on?

24   A    Table 2 on Page 4.

25   Q    And what is that table?

A    That table basically takes the average harvest price for each
-- commercial harvest price for each species of commercial salmon
and Steelhead and then applies the factors developed in Table 3
to it to obtain a net economic value per salmonid for fishing and
processing.

In essence, that's the final result of my calculation with
respect to commercial fishing and processing activity.

Q    All right.  And would you proceed to the next table and page
number, please?

A    That's Table 3 on Page 6.

Q    And explain what that is and how you derived those numbers.

A    That table presents the net economic value per salmonid for
salmon and for Steelhead -- for a salmon or a Steelhead caught in
sport fisheries.  And the way I obtained that was to first
develop a value of, I believe it was $58 per recreational fishing
day.  And then I needed to get from a recreational -- the value
per recreational fishing day to the value per recreational fish.
And to do that, I took data from the U.S. Fish and Wildlife
Service and from the Washington Department of Fish and Wildlife.

And what I did in that data was divide the total number of
fishing days -- sport fishing days reported by the total number
of sport fish caught reported, and that gave me the number of
days per salmon caught.  And I multiplied that by the $58 to get
the numbers that are presented in Table 3.

Q    And what was the source of the data you used to get that

1    per-fish value?

2    A    The $58 per angler day came from a study by TCW Economics

3    published in 2008 for the Washington Department of Fish and

4    Wildlife.   That TCW Economics report also provided in its table

5    recreation salmon and Steelhead harvest figures for Washington,

6    and it is Table 6.   The -- pardon me.   I misspoke.

7         The TCW report in its Table 8 provided aggregate net economic

8    value figures for salmon and Steelhead in the state of

9    Washington.   Table 6 provided recreational Steelhead and salmon

10   harvest figures for the state of Washington.   That was the

11   division that I described.

12            MR. MORISSET:   I have no further direct, your Honor.

13            THE COURT:   Thank you.   Cross-examination.

14                       CROSS-EXAMINATION

15   By Mr. Tomisser:

16   Q    Good morning, Mr. Meyer.

17   A    Good morning.

18   Q    In your report, I want to be clear, when you refer to net

19   economic value to Washington, as it's phrased in your report,

20   that is a reflection of net economic value -- or economic

21   activity in the state, not a revenue stream to the Department of

22   Revenue of the state of Washington, correct?

23   A    That is correct.

24   Q    In the table that you have there, it represents the price of

25   various fish in the state.   Is it correct that those prices

1    fluctuate over time?

2    A    Yes, they do.

3    Q    And Table 3 in your chart -- in your report, I'm sorry, on

4    Page 6, you say, "This is an effort on a daily basis," is how

5    that is calculated; is that right?

6        Explain what you mean.  You said it's based on effort to

7    catch a fish.  As I understand it, the way that works out is how

8    many days essentially to catch one fish; is that right?

9    A    No.

10   Q    Okay.  Please explain how that calculation works.

11   A    I started with a value for a recreational day of fishing.

12   And I needed to get from a value per day to a value per fish.  To

13   make that calculation, I needed to know how many days it takes to

14   catch a fish.  And so I went to data in Wegge, TCW Economics - if

15   I said Wegge, that's what I mean - which gave me aggregate net

16   economic value and the number of days to get there.  And by

17   dividing the one to the other --  pardon me.  Aggregate harvest

18   and the number of days to get there.  And that gave me data on

19   how many days it takes to catch a fish.  And when I do that, then

20   I could multiply it by the value per day to the value per fish.

21   Q    And when we look at the value involved in a day's effort to

22   catch a fish, does that include all the cost that it takes to do

23   that; in other words, the gear that you're going to use, the

24   fuel, the transportation, maybe lodging, all of those things, is

25   that what you are talking about when you talk about aggregate

1   value, are those sorts of items?

2   A    No.

3   Q    What are you talking about?

4   A    Typically net economic value, the term subtracts out

5   associated costs and refers to what economists describe as the

6   consumer surplus, which is the surplus in benefit or value left

7   after you've spent whatever you need to spend to go catching the

8   fish.

9   Q    The numbers presented in both -- well, in Table 3, for

10  example, this is based on a statewide amount, correct?

11  A    Statewide average.

12  Q    Do you happen to know what the percentage is for contribution

13  to that from Columbia River fishing?

14  A    No.

15  Q    Do you know what the percentage attributable to fishing in

16  eastern Washington might be?

17  A    I would have to go and look at the data.  I seem to recall

18  that eastern Washington may -- I believe the term of art that was

19  used was -- well, they were talking about salmon, so basically

20  the first qualifier would be that they weren't talking about

21  other species of fish other than salmon and Steelhead.  But I

22  would have to go back and look at the tables to answer that

23  accurately.

24  Q    And if we look at fishing activity within the case area, is

25  it also your understanding from looking at the data that is

1  collected that the Lake Washington Sockeye fisheries, when it is

2  open, has a much lower number, in terms of the days of effort to

3  catch a fish on that fishery?

4  A    That's being argued by a state witness.  I don't have any

5  direct knowledge that that is correct.

6  Q    You also mentioned in your direct testimony, I believe,

7  Mr. Meyer, that you had removed your previous analysis on the

8  contingent value methodology, correct?

9  A    I removed my previous analysis on existence or non-use

10 values.

11 Q    Although you still reference some of that material in your

12 direct report on -- for example, on Page 1 and again on Page 5

13 with your reference to the Loomis study, correct?

14 A    Just bear with me for a second.  My Page 5 reference to

15 Loomis has to do with benefit transfer methodology, not with

16 contingent valuation.  You are correct that I make a kind of

17 baseline statement in Section 1 on Page 1 before I go into my

18 marginal analysis.

19 Q    When we talk about contingent value studies and benefit

20 transfer analysis, this is an economic practice where we look at

21 ways to measure things that people value, such as the value of

22 having cleaner water or cleaner air, an improved natural

23 resource, preserving the scenic vista, are all things that might

24 be the subject of a contingent value study or a benefit transfer

25 analysis; is that right?

A    That's two questions.  And the answer to both is yes.

Q    Thank you.  In conducting these sorts of studies, I understand that they are based around carefully designed surveys in order to elicit responses from the public in terms of what they might be willing to pay to either improve a resource or to preserve a resource?

A    Are you talking about contingent valuation now?

Q    Yes.

A    Many such studies are.

Q    And then the distinction that we're making here between a contingent value study and a benefit transfer analysis study is that the benefit transfer analysis, what that does is it reviews contingent value surveys that have already been done, takes those values, when appropriate, and transfers them to a new case study situation, correct?

A    Contingent valuation studies would be some of the studies that would be reviewed if one were looking to use a transfer -- a benefit transfer methodology.

Q    And in this particular case that we have here, this sub-proceeding, there was no study done in order to do a contingent value study, correct?

A    No study done by me?

Q    There was no study done by you?

A    That's correct.

Q    In your report, I believe on Page 5, you state that given the

1    time and resources available that a benefit transfer analysis was

2    employed here.  And I assume that that is as opposed to having

3    done a contingent value study, correct?

4    A   That's almost correct.  You continue to use the term

5    "contingent valuation" as if that's the only way to do that kind

6    of a study.  There are other methods.  But taking that as -- with

7    that qualification, my answer is yes.

8    Q   And, in fact, you have assisted in performing contingent

9    value studies on previous occasions in other situations, is that

10   right, at least on one occasion that I'm aware of?

11   A   I've done them and I've assisted.  "Assisted" might be a word

12   that we need to discuss.  I'm not quite sure how that applies.

13   Q   There can be varying levels of assistance on a project, I

14   assume?

15   A   I'm still not sure.

16   Q   Well, you provided enough assistance to Mr. Loomis to have

17   him thank you when the final report came out on the --

18   A   Yes.  I was the chair of a human effects working group

19   established by the National Park Service, the U.S. Bureau of

20   Reclamation, the Washington Department of Fish and Wildlife, and

21   the Lower Elwha S'Klallam, at that time, Tribe, as I remember.

22       And as chair of that committee, there were various studies,

23   economic, anthropologic costs, as I remember them, that were

24   under the general direction of my committee.  And Dr. Loomis's

25   study on the Lower Elwha, short term, I can call it existent

1    values, was one of those studies.

2    Q    That particular study that you mentioned there by Dr. Loomis,

3    about how long did it take to do the study; in other words,

4    generate the questions, send out the survey, get the data back,

5    and then come to conclusions?

6    A    If I said about a year, I think that would be close.

7    Q    So about a year to conduct that particular survey.  And that

8    was one that involved salmon -- recovery of salmon, correct?

9    A    Yes.

10   Q    And so you're aware, Mr. Meyer, that this sub-proceeding has

11   now been in existence for about eight years?

12   A    I'll accept that.  I don't know.

13   Q    So I'm wondering, then, Mr. Meyer, about your statement in

14   your report that there was not enough time to do a contingent

15   value study in this case.  Eight years would be plenty of time to

16   do a contingent value study if somebody wanted to do one, isn't

17   it?

18   A    It certainly would if the economist was contacted and

19   retained at a sufficient period, yes.

20   Q    In fact, the practice of doing contingent value studies has

21   been around since at least the early to mid '90s, correct?

22   A    Well before that.

23   Q    And when you do a contingent value survey, and you do one

24   honestly, you don't know the answer to the survey before you send

25   it out, do you?

1    A    No.

2    Q    So to do a contingent value survey in the course of

3    litigation would be risky, wouldn't it, because you don't know

4    what the answer's going to be?

5    A    I think the social scientist is going to simply -- would

6    simply respond:  The answer's going to be what the answer is.  I

7    don't know that risk comes into it, or I don't know how you're

8    defining "risk."

9    Q    Well, one of the ways that you could control for risk,

10   Mr. Meyer, is rather than doing the contingent value study and

11   asking the questions directly about the case, would be to do a

12   benefit transfer analysis, perform a review of the literature

13   that has been done, and then find one that worked for you,

14   correct?

15   A    If that's a hypothetical, I don't believe that any competent

16   economist would do that.

17   Q    Well, in this particular case, Mr. Meyer, let me ask you

18   about the benefit transfer analysis that you have proposed to the

19   Court.  And before we get into the specifics of that, I'd like to

20   talk about a couple of general points when you're considering

21   doing the benefits transfer analysis.

22        Is it correct that as you're approaching the benefits

23   transfer analysis, one of the things that you would be concerned

24   about is the quality of the underlying contingent value study

25   that you may be using?

1            THE WITNESS:  Could I ask for a clarification?

2            THE COURT:  You may.

3            THE WITNESS:  Are you cross-examining me on my original

4    report or are you cross-examining me on the report that's been

5    accepted today?

6        The Loomis work was in the original report and was not in

7    this report.

8    By Mr. Tomisser:

9    Q   And it's also referenced in the report that you filed

10   yesterday.  In fact, it's still recommended for the Court to

11   review it.

12           MR. MORISSET:  May we have a minute to have a colloquy

13   here?

14           THE COURT:  Actually, this is probably a perfect time

15   for our morning break.

16   (At this time, a short break was taken.)

17           THE COURT:  Counsel, we are back in session.  Were we

18   able to resolve what's going on with these two versions of the

19   declaration, Mr. Tomisser?

20           MR. TOMISSER:  We have not only resolved that, your

21   Honor, we have gone further and resolved any need for me to

22   continue my cross.

23           THE COURT:  Maybe we should take more breaks, then.

24   Thank you.

25       Any redirect?

1           MR. TOMISSER:  Well, wait a minute, but let me tell you

2     what we did.  A newly admitted exhibit from Mr. Meyer, your

3     Honor, during the break, Counsel -- Mr. Morisset and I have

4     agreed that the second paragraph on the first page that has the

5     reference to the Loomis study, that that paragraph can be

6     stricken from the report.

7        Once that is stricken, then I don't need to go any further

8     with that portion of the cross.  And what we will do to assist

9     the clerk, I hope, is that we will, sometime today, get a

10    redacted version that takes that paragraph out and then give this

11    a new exhibit number, and that will hopefully be the final

12    exhibit for Mr. Meyer.

13          THE COURT:  That will help us a lot.  Thank you.

14       All right.  Mr. Morisset, any redirect?

15          MR. MORISSET:  Just briefly, your Honor.

16       I just want to confirm or ask whether we did admit AT-005-1,

17    which is the resume.

18          THE COURT:  Yes.

19          MR. MORISSET:  We did do that.  All right.

20                     REDIRECT EXAMINATION

21    By Mr. Morisset:

22    Q   And if I may ask a question, do you have that in front of

23    you, Mr. Meyer?

24    A   No, I don't.

25    Q   You do recall it generally?

A    Yes.

Q    Is it up-to-date, as far as your current activities as an economist?

A    Yes.

MR. MORISSET:  And I'm sorry, but I think Mr. Tomisser indicated we will be submitting a revised exhibit, your Honor. So we agree on that.

Well, I guess that completes my examination of Mr. Meyer.  I have a couple of other housekeeping things I want to discuss.

THE COURT:  Thank you.

Mr. Meyer, thank you.  You may step down.

MR. MORISSET:  Your Honor, before it gets lost in the fog of trial, as we say, plaintiffs want to be clear that we still have a number of exhibits that we need to deal with before we rest our case.  And we will continue our discussions with defense counsel and try to have those lined up for discussion as soon as possible.

There's still a number of exhibits that may not have been alluded to with witnesses that we need to discuss with defense counsel.

Second, I do want to be clear, I will move now to introduce as an offer of proof Exhibits AT-006, AT-006-1 through 11.  Those are things that deal with Mr. Rankis, who has been withdrawn pursuant to your Honor's order, but they relate to information -- or work done by Mr. Waldo and will be kind of free floating as to

1    the original presentations, if not included in the offer of

2    proof, not for evidence before the Court.

3        And then also AT-211, which falls into the same category.

4    And, again, these are just for the offer of proof.  AT-211 is a

5    spreadsheet which was also subject to the Daubert Motion on which

6    you ruled that it should be excluded.  So those should, in

7    effect, go along with the offer of proof of Mr. Waldo's original

8    testimony, and I would so move.

9            MR. TOMISSER:  On the limited basis this is being

10   offered here, your Honor, there's no objection for them being

11   offered as an offer of proof.

12           THE COURT:  It is understood that the Court's ruling

13   basically kept these out.  So AT-006 through AT-006-11 are part

14   of that offer of proof, as well as AT-211, which is a spreadsheet

15   labeled "Lake Washington Sockeye Data.  Sockeye Harvest

16   Calculations for Directed Fishery Years and Non-Directed Fishery

17   Years," and it is dated 7/31/2009.

18      Mr. Morisset, regarding the exhibits, that's of course not

19   final.  I understand that, giving the timing of the preparation

20   of the numerous exhibits and the Court's ruling on the motions

21   in limine, that that makes it a little difficult to sort all this

22   out.  So, yes, you will also have the opportunity to go ahead and

23   make sure that whatever exhibits you are proposing have been

24   dealt with, and don't worry about the timing of it so much.

25           MR. MORISSET:  Thank you, your Honor.  That completes my

1   examination of Mr. Meyer.

2          THE COURT:  Any other witnesses, then, on behalf of the

3   plaintiffs?

4          MR. MORISSET:  Yes.  I believe they've arrived.  We

5   apologize for sometimes being a little slow, because we've got

6   people travelling from all over.  I'll let Mr. Raas make excuses

7   if he has to.

8          MR. RAAS:  Thank you, your Honor.  I'm Daniel Raas.  I

9   am co-counsel for the Lummi Nation.

10      The plaintiffs would next call Mr. Randy Kinley to the stand.

11         THE COURT:  Good morning.  Let me have you raise your

12   right hand and be sworn, please.

13   Whereupon,

14                       RANDOLPH KINLEY

15    Called as a witness, having been first duly sworn, was examined

16   and testified as follows:

17         THE CLERK:  Will you please state your full name and

18   spell your last name for the record?

19         THE WITNESS:  My indian name is Paquasut,

20   P-A-Q-U-A-S-U-T.  My Christian name is Randolph James Kinley,

21   Senior.

22         THE COURT:  Can you spell your last name for us?

23         THE WITNESS:  K-I-N-L-E-Y.

24         THE COURT:  Thank you, Mr. Kinley.

25         MR. RAAS:  Your Honor, I'd like to beg the Court's

1    indulgence if we run a little late for the noon break.

2    Mr. Kinley has responsibilities back at the reservation to cook

3    some fish for a visiting delegation from the Obama

4    administration.

5              THE COURT:  We'll try to get him done.

6                      DIRECT EXAMINATION

7    By Mr. Raas:

8    Q    Could you state your age, please, Randy?

9    A    I'm 58.

10   Q    And where do you live?

11   A    I live on the Lummi Nation Reservation.

12   Q    And where did you grow up?

13   A    On the reservation.

14   Q    Have you been away from the reservation for any length of

15   time?

16   A    No.

17   Q    And what tribe are you a member of?

18   A    I'm an enrolled member of the Lummi Nation, but I am a

19   descendent of some other tribes.

20   Q    We'll get to that.  And do you count among your ancestors

21   individuals who signed the treaty?

22   A    Can I count them up?

23   Q    Are there such?

24   A    Yes, there is.

25   Q    And you've mentioned that you are also descending from people

```
 1    who were members of other tribes or belong to other groups.

 2        Which groups are those?

 3    A    On my grandfather's side, I'm descendent of the S'Klallams,

 4    the Duwamish.  On my grandfather's side, I'm part of the Cowichan

 5    and Samish.  I'm also part of the Semiahmoo band.

 6    Q    And the Semiahmoo band is located?

 7    A    Just north of the U.S. border.

 8    Q    And have you testified in the United States versus Washington

 9    before?

10    A    No.  I was in the Rafeedie Decision.

11        Okay, they're both the same.  Yeah.  Sorry, your Honor.

12    Q    You testified in the shellfish case?

13    A    Yes.

14    Q    And have you had relatives testify in the United States

15    versus Washington?

16    A    Yes.  My uncle was very paramount in the decision.

17    Q    The original decision with Boldt?

18    A    Yes.

19    Q    And that uncle was?

20    A    Forrest Kinley; Dutch.

21    Q    Now, how long have you been fishing?

22    A    Since I was about four years old.

23    Q    So that's 54 years?

24    A    54 years.

25    Q    And how did you learn how to fish?
```

1  A     In the river, my mom taught me.   In the marine water, my

2  father taught me.

3  Q     How extensive has your fishing career been?

4  A     When it was sustainable, I used to make my livelihood out of

5  fishing year round.

6  Q     You said you started in the river.   Which river is that?

7  A     The Nooksack.

8  Q     What kind of fishing did you do there?

9  A     We would start in the spring and fish clear until February,

10 March.

11 Q     What species were there?

12 A     All species except for Sockeye.

13 Q     Now, we're talking about all species of salmon, right?

14 A     Yes.

15 Q     Including Steelhead?

16 A     Yes.

17 Q     And then when you moved out of the river, where did you fish?

18 A     I fished from the Canadian borders -- well, it started before

19 U.S. versus Washington.   I fished in southeast Alaska, I fished

20 in California, and I fished in Oregon.   That was before Boldt.

21     And then after Boldt, we fished from the Canadian border to

22 the waters of Seattle.

23 Q     And what species did you fish for?

24 A     I fished for salmon within -- shellfish.   And then I traveled

25 to Alaska.   I fished halibut and crab.   And I fished herring in

San Francisco, and I fished crab on the Columbia River.

Q    Excluding shellfish, did you fish other species other than salmon in the case area?

A    Yes.

Q    And what were those?

A    They were all Coho, Chinook, Chums.

Q    Did you fish halibut?

A    Yes.

Q    Would you say that the way you learned how to fish is typical of how Lummis and other Indians learned how to fish?

A    Yes, I would agree with that.

Q    Well, first of all, do you earn your living by fishing today?

A    No.

Q    And why don't you?

A    Because of the diminished resources, and the opportunity on the water is not there like it used to be.

Q    So fewer fish?

A    Yes.

Q    So there are fewer fish than, say, the 1980s?

A    Definitely.

Q    1990s?

A    Definitely.

Q    And what effect has this had on the Lummi fleet?

A    I don't know how you put it into terminology other than it's been so devastating to our people culturally.  And then you have

```
 1    to put the quantifier, like I heard the gentleman talking before,

 2    economically, that there's no value that you can put to our

 3    social impacts to our people because of our traditions, the way

 4    we do our businesses and stuff.

 5    Q    Is there fishing knowledge being lost?

 6    A    Definitely, because of the time and the lack on the water.

 7    Q    What do you mean by "time and lack on the water"?

 8    A    Because our knowledge is not written and scripted by books

 9    like the Caucasians.  Ours is traditionally oral.  And because

10    we're not on the water, the way I was taught through my dad,

11    sitting there watching and listening, I can't pass that on, my

12    teachings that I've learned to my siblings, because I'm not on

13    the water as much as I used to be.

14    Q    Do you have children?

15    A    Oh, yes, I do.  I got four beautiful daughters, two sons, and

16    I got 28 grandkids and one great granddaughter.

17    Q    And you're young yet.

18    A    I know.  That's why my hair's like this.

19    Q    Are any of your sons or daughters fishers?

20    A    Yes.  I got two sons that are commercial.  One's a diver,

21    crabs.  And my daughters, they dig clams.  It's something I

22    wouldn't do, though.

23    Q    Why not?

24    A    It's too hard on the back.

25    Q    When you're fishing, you fished Sockeye salmon?
```

1    A    Yes, I have.

2    Q    And where did you do that?

3    A    In Alaska in '73, I fished in our usual and accustomed areas,

4    from Point Roberts down to the Salmon Banks.

5    Q    And that's in the San Juans?

6    A    Yes.

7    Q    Where are those Sockeyes from, what river system?

8    A    The biggest portion are coming from the Fraser.

9    Q    Is there a few from other places?

10   A    Yeah.  There's a minute.  But the way the management is

11   structured is that we don't want to have impacts on Lake

12   Washington and Baker Lake because of the status of those stocks.

13   Q    And Baker Lake is part of the Skagit system?

14   A    Yes.

15   Q    And are there any other species that impact your ability to

16   fish the Fraser River?

17   A    Yes, there is.  There's Chinook and Coho.

18   Q    And where did the Chinook come from?

19   A    From the Fraser.

20        And we have Washington State listed species that have the big

21   impact on our fisheries.

22   Q    And how do they impact your fishery?

23   A    Based upon the timing and migration and the process that's

24   developed cooperatively with the State, there's X amount of

25   Chinook that are indirectly taken during incidental fisheries.

1    The Lummis never had a directed fishery since 1978, which we took

2    upon ourselves to close our fishery down because of the status of

3    the Chinook.

4        But we go through this process, as you heard the other

5    witnesses talk about, the North of Falcon process, that divides

6    literally, sorry to say, the last fish, so somebody has the

7    ability to go out and practice their way of -- quality of life,

8    which is the tribes.

9    Q   So as not to take the last fish, your fishing of the Sockeye

10    are limited?

11    A   You bet.

12    Q   Then you also used to fish Pink salmon?

13    A   On an odd year.

14    Q   Because that's when they run, is --

15    A   Yes.

16    Q   And where are the majority of the fish from?

17    A   Fraser.

18    Q   And there are other domestic runs?

19    A   Yes.  Back when I was growing up, the Nooksack had a heck of

20    a run.  We've had some problems of escapement and stuff, and

21    survival.

22    Q   And is the Pink salmon fishery impacted by other species?

23    A   Yes.

24    Q   Which species?

25    A   Coho, and Chinook also.

1   Q    And where are the Coho from?

2   A    Fraser.

3        And I apologize, too.  There's another one being listed too

4   that's impacting our fisheries, too, and it's the Steelhead now.

5   Q    And those are -- where are the Steelhead from?

6   A    It doesn't make no difference.  They're listed through the

7   whole state of Washington.

8   Q    They're Washington run Steelhead?

9   A    Yeah.

10  Q    And the Coho are in the Fraser and where else?  Are there

11  domestic runs?

12  A    They're more in the Fraser than anyplace.

13  Q    And speaking of Coho, you used to fish Coho?

14  A    Yes.  Our neck of the woods was one of the largest terminal

15  area fisheries that we had, that we managed with the State of

16  Washington, which is 7B and C.

17  Q    And where are 7B and C?

18  A    Bellingham Bay and Samish Bay.

19  Q    So that's close to home?

20  A    Yes.

21  Q    And those fish are all from which rivers?

22  A    The Nooksack and the Samish.

23  Q    Are there as many of those there as there used to be?

24  A    No.

25  Q    And Chinook, you used to harvest?

1   A   Yes.

2   Q   And where did you harvest those?

3   A   We had directed Chinook fisheries in the same areas.  And

4   sometimes we had opportunities outside in 7A and 7 because the

5   Fraser stocks were okay.

6   Q   And 7A is --

7   A   Point Roberts.

8   Q   And 7?

9   A   Down towards the islands.

10  Q   The San Juan Islands?

11  A   Yes.

12  Q   And there obviously aren't as many Chinook as there used to

13  be?

14  A   Definitely.

15  Q   Now, you do have a Chinook fishery in 7C, do you not?

16  A   Yes.  That's a terminal fishery.

17  Q   And where are those fish from?

18  A   Samish and Kendall and Lummi hatcheries.

19  Q   So those are all hatchery fish?

20  A   Yes, the majority of them, 95 percent of them.

21  Q   Are the hatchery fish influenced by -- your ability to catch

22  hatchery fish influenced by the wild fish?

23  A   You bet.

24  Q   And how is that?

25  A   Because of the listing and -- I'm not an expert, because the

```
 1    way I understand things, hatchery fish is being treated, I
 2    believe, biologically as important as a wild fish.  That hampers
 3    our ability to take as much as we used to.
 4    Q    Is that because you can't differentiate in your nets
 5    between --
 6    A    Yes.  We don't have a selected methodology to fish, to
 7    harvest.
 8    Q    Throughout your life, how did you learn about the place of
 9    fish in the Lummi culture?
10    A    By sitting down and listening, talking to our people.  Lummi
11    is so unique.  We are probably the largest fishing tribe.  That's
12    nothing to brag about.  All the tribes are great fishing.  They
13    tried to make us farmers, but we're farmers of the sea.  That's
14    from the bottom of the south to the north where we're at.
15         I mean, it's something that -- I hate to say bred into us,
16    but because of our -- where the federal government put us, we had
17    to learn to live off.  And like I says, we're not a potato or a
18    corn planter.  We're fishermen.  And it's our elders and it's
19    oral tradition that's passed down to us how we learn to do what
20    we do.
21    Q    Now, the tribe celebrates first salmon ceremony?
22    A    Yes, we do.
23    Q    And when is that?
24    A    We have turn around.  In western civilization's language, we
25    annualize it to May 17th every year.
```

1   Q    And where has that been celebrated recently?

2   A    When we first started, we started it on the beach, and then

3   it grew.  We moved it up to our community building.  And because

4   of the way we've been taught, we moved it into our school now.

5   And so the last year -- which was so great that the school held

6   it.  Because of the way we were taught, it's through oral.  And

7   we bring our kids into the festivities to make sure that they

8   understand all that stuff and why we do it.

9   Q    And who else is invited to that ceremony?

10  A    We reach out to all the communities.  Our friends that are

11  sitting at the table, we invite them; we invite the federals; we

12  invite different municipalities; we invite the county.  You name

13  it.  We invite everybody, because this is the beginning of our

14  harvest season for us, and we want to share it with as many

15  people that will sit down with us and break bread.

16  Q    And salmon are served, right?

17  A    It's the number one.

18  Q    And what species are we talking about?

19  A    Chinook.

20  Q    So these are spring Chinook?

21  A    Yes.

22  Q    Are spring Chinook plentiful?

23  A    No.

24  Q    These are fresh caught?

25  A    Yes.

1  Q    And do you have enough fish all the time to feed the people?

2  A    No.

3  Q    And what happens when you don't have enough locally caught

4  fish?

5  A    We have to go ask some of our friends above the border, below

6  the border, and we'll sit down and we'll trade shellfish with

7  them to acquire salmon.  And if it comes to the seriousness of

8  the situation, we'll send our guys out to buy fish from our

9  people in the straits, because they have a fishery going on out

10  there.

11  Q    Is that the way it used to be?

12  A    Never.

13  Q    Now, since you're not a full-time fisher anymore --  You do

14  still fish, right?

15  A    Yes, I do, when I have the ability, the time.

16  Q    So you're employed?

17  A    Yes.

18  Q    And what's your current position?

19  A    I work for the Lummi Natural Resources Division.  I am an ESA

20  policy representative.

21  Q    And what does an ESA policy representative do?  What do you

22  do as the ESA policy representative?  I don't want to generalize

23  here.

24  A    On the non-tribal side, I work with the state, federal, local

25  entities on salmon recovery.  On the tribal side, I work with the

1    tribes trying to promote our salmon recovery plans.

2    Q    And do you also work on the harvest side?

3    A    Yes.

4    Q    Now, there are a number of various groups that we've heard

5    about over the last couple of days.  Let's talk about -- oh, I'm

6    sorry.

7         You said you worked with the state agencies as part of your

8    job?

9    A    Yes.

10   Q    And -- have you worked with state agencies for a while?

11   A    Since I've been involved with this stuff for the last 30-some

12   years.

13   Q    And has the interaction -- the quality of the interaction

14   with the state agencies changed?

15   A    Dramatically changed.

16   Q    How?

17   A    Because of the situation of the resources, we came to the

18   point of fighting over the last fish instead of trying to

19   create -- support each other to create more fish.  That causes

20   animosity between the user group, the non-tribal, commercial and

21   recreation versus us people, us Indian people.

22   Q    And that's changed?

23   A    Yes.  It's kind of -- sorry to say it, once -- the mentality

24   is dang near close to the 70s.

25   Q    It's back to close to the 70s?

1    A    Yes.

2    Q    And how would you describe the 70s?

3    A    That's something I'd like to forget.  We went through the

4    same things on the commercial side that Billy went through,

5    except for I wasn't in jail, but we were shot at, we were

6    threatened, with our boats blown up.  But we were young and we

7    wouldn't take nothing, and so we had lots of confrontations.

8        We were even in federal court here, and we had to send

9    somebody to prison, sorry to say.

10   Q    And what has changed the reaction of the state agencies?

11   A    The political climate and the legal.  I think the political

12   has caused so much controversy, because everybody is trying to

13   survive.  And they're not sitting down and working in a

14   cooperative manner anymore.  That's my belief.

15   Q    What do you mean by the legal climate?

16   A    The tribes have always been willing to sit and talk and try

17   to -- based upon our experience.  And because of the financial

18   situation that we're in right now, spend our money wisely.  We

19   would rather sit at the table and try to come up with a solution.

20       But that's not -- withstanding that, if we can't come to a

21   solution, that we're not scared of court, even though our

22   druthers would be to sit and resolve.

23   Q    Let's talk about some of those forums, or fora, if that would

24   be proper, where that discussion takes place.

25       Firstly, there's the Northwest Indian Fisheries Comission.

```
 1    A    Yes.

 2    Q    You're familiar with that?

 3    A    Yes.

 4    Q    Do you hold an official position?

 5    A    I sit with my partners Elden Hillaire and Harlan James.  The

 6    three of us are tribal representatives.

 7    Q    For the Lummi Nation?

 8    A    Yes.

 9    Q    What is the Northwest Indian Fisheries Commission?

10    A    There's a consortium that was created back in the '70s by

11    some very wise individuals at the time that laid out some ground

12    rules by the U.S. versus Washington that some of the smaller

13    tribes weren't organized.

14    Q    And this is a tribal organization?

15    A    Yes, it is.

16    Q    And it meets to -- how often does it meet?

17    A    Monthly.

18    Q    And does it have a staff?

19    A    Yes, it does.

20    Q    Does it do any actual allocation of fish?

21    A    No.

22    Q    Or perform any salmon restoration activities?

23    A    No.

24    Q    In terms of dividing up the fish and perhaps doing some

25    restoration activities, there is the Pacific Salmon Commission.
```

1      Are you familiar with that?

2  A   Yes, I am.

3  Q   Have you had or do you have any official positions on that

4  commission?

5  A   No, I don't have an official.  But because of our status as

6  Lummi Nation and the largest fishing tribe, we're always

7  attending these meetings.

8  Q   And what's the role of the commission overall?

9  A   They go through the process of allocation, meeting the

10  objectives of the treaty language which states that the U.S.

11  share 16.5.  Out of that 16.5, 11.5 of that is treaty share,

12  which means that the tribes have the largest vested interest in

13  this.

14  Q   Let me back up a second.  The first treaty, the Pacific

15  Salmon Treaty?

16  A   Yes.

17  Q   And that's between the U.S. and Canada?

18  A   Yes.

19  Q   When you were talking about percentages, you're talking about

20  a portion of the Pacific Salmon Treaty annex that --

21  A   Fraser.

22  Q   Fraser River.  Sockeyes and Pinks?

23  A   Yes.

24  Q   And 11 and a half percent of the Fraser run is allocated to

25  the indian treaty share?

1    A    Yes.

2    Q    And you're involved in those discussions?

3    A    Yes.

4    Q    And there are other tribal members, not necessarily Lummi,

5    who are involved in other parts of the Pacific salmon --

6    A    Yes, there is.

7    Q    Now, were you here when Lorraine Loomis testified?

8    A    Yes, I was.

9    Q    And you heard her discussion about the North of Falcon

10   process?

11   A    Yes, and I sympathize for her.

12   Q    Do you have any similar position in the North of Falcon?

13   A    Yes.  We're there to promote Lummi's objectives.

14   Q    So you are the Lummi Nation representative?

15   A    Yes.

16   Q    And did she more or less accurately describe what happens

17   there?

18   A    Yes.

19   Q    There are a number of state-created groups.  I want to talk

20   about a couple.  One is the -- I think I've got it right.  The

21   Salmon Recovery Funding Board?

22   A    SRF Board.

23   Q    SRF Board.  Do you hold any position on the SRF Board?

24   A    No, I don't.

25   Q    Is there an official tribal representative of the SRF Board?

1   A    Yes, there is.

2   Q    How many tribal representatives?

3   A    One.

4   Q    Out of how many?

5   A    I don't know precisely.  There's more of a majority of non

6   than there is tribal.

7   Q    So it's at least three?

8   A    Yes.

9   Q    What does the SRF Board do?

10  A    They allocate funds for projects, restoration, and

11  acquisition and other things, too.  Salmon recovery.  Fund salmon

12  recovery projects.

13  Q    And have you attended their meetings?

14  A    No, I haven't.

15  Q    The other one is the Puget Sound Partnership.  Can you tell

16  us what the Puget Sound Partnership is?

17  A    It's a state agency that the governor created, I can't

18  remember how many years ago, to solve the problems in Puget

19  Sound, or clean up Puget Sound by 2020.  And there was a law

20  created that established this new entity.

21  Q    Called the partnership?

22  A    Yes.

23  Q    And do you have a role in that partnership?

24  A    Yes.  I'm not at the level as the partnership per se, but I

25  sit on the ECO board.

1    Q    And what does the ECO board do?

2    A    The ECO board sits down and discusses issues and projects and

3    tries to get into the weeds and make recommendations to the

4    partnership.

5        But I also have a responsibility to meet with our tribes in

6    the Northwest, because there's only three indian seats on that

7    table, which is comprised of, I think, about 25.

8    Q    So you're one of three, and there's 25 members?

9    A    Yes.

10   Q    On the ECO board?

11   A    Yes.

12   Q    And what kinds of things does the ECO board recommend?

13   A    It depends on what chair you're filling, because the builders

14   make requests to solve their problems, the enviros solve their

15   problems, the municipalities try to solve their problems, and

16   we're looking at trying to figure out, at least from the tribal

17   perspective, how do we turn around and prioritize out of all

18   these problems, because there's not enough funding to go around

19   to solve, you know, if everybody wants their pet project solved.

20   Q    And where does the money come from?

21   A    Part of it is funded from the feds.  The partnership

22   evidently just got the status of a national sanctuary now, which

23   is going to give them a lot of resources coming in.

24   Q    And the ECO board makes recommendations to the partnership as

25   a whole?

```
 1    A    Yes.
 2    Q    Now, the 25 members on the ECO board, do they all understand
 3    the indian treaties?
 4    A    No.
 5    Q    What do you mean when you say "no"?
 6         MR. TOMISSER:  Your Honor, I'm going to object to lack
 7    of foundation for him to testify on that.
 8         THE COURT:  The objection is sustained.
 9    By Mr. Raas:
10    Q    Does their lack of understanding of the indian treaties, as
11    you put it, cause difficulties for you?
12    A    Yes.
13         MR. TOMISSER:  I will object, your Honor, and move to
14    strike the answer.
15         THE COURT:  The objection's sustained.
16       We don't know yet how he knows that they don't understand the
17    indian treaties.
18         MR. RAAS:  Very well.  Thank you, your Honor.
19    By Mr. Raas:
20    Q    Why do you think that some of the individuals on the ECO
21    board don't understand the indian treaties?
22    A    As you know, Ron Simms, who's the executive director of King
23    County, who is now back in DC, always tried to refresh the ECO
24    board members' mind that they should pay attention to what we're
25    saying.
```

1   Q    When you say "we," who do you mean?

2   A    The tribes.  Because you look at the history of this stuff

3   where we're at today, the State hasn't had very many chalked-up

4   wins on their side to do the right thing.  And when I say that,

5   we look at the history of the decisions, the tribes have more

6   favorable decisions in their favor on the environment, fish, and

7   stuff like that, and cleaning up, and doing the right thing.

8        And Ron kept trying to promote that, because we are very

9   adamant that getting into a state process does not belittle our

10  treaty right or the trust responsibility to the federal agencies.

11  We are willing to work within that arena, but make it very clear,

12  if they're not going to do what's right, we'll take it to the

13  next level to accomplish the task or the objectives of the

14  tribes.

15  Q    So can you give me an example of that kind of problem that

16  you've seen?

17  A    Last year -- I'm going to give you one specific to the

18  Nooksack.  Last year we had a water quality problem, a

19  temperature.  And we just about had to threaten somebody to --

20  and this was Ecology, so my good friend Jay Manning, to do the

21  right thing on water temperature in order to meet in-stream flows

22  at the time that the fish needed it, from what I understand,

23  since I'm not a technical expertise, but I know the principle of

24  the argument.

25       And we had to force -- literally threaten to just about get

1      to the front doors of the court before they would do the right

2      thing, protect the resources.

3      Q    And the ECO board, if I understood your testimony, makes

4      recommendations to the partnership?

5      A    Yes, it does.

6      Q    And the partnership does what with those recommendations?

7      A    They'll try to implement them as best way seen into what they

8      call the action agenda that has been passed.

9      Q    And does that action agenda always work out?

10     A    No.

11     Q    And why not?

12     A    Because it's such a political process.

13     Q    And who's the final arbiter of that?  Who makes the call?

14     A    It ultimately comes down to who controls the checkbook.

15     Q    And that is?

16     A    I couldn't rightly tell you who that is at that level.

17     Q    And the tribal interests, how are they treated by the ECO

18     board and eventually by the partnership?

19     A    They treat us just like a stakeholder, which really upsets

20     us.

21            MR. RAAS:  Thank you very much.  I have no further

22     questions at this time.

23            THE COURT:  Cross-examination of Mr. Kinley?

24                        CROSS-EXAMINATION

25     By Mr. Tomisser:

```
 1   Q    Good morning, Mr. Kinley.

 2   A    Good morning, sir.

 3   Q    I wanted to ask you a little bit about the ECO board and your

 4   testimony here that there are a variety of stakeholders that

 5   participate on that board, correct?

 6   A    Yes.

 7   Q    And a lot of them have -- I think you phrased it as pet

 8   issues, but issues that different members are concerned about

 9   that they try to bring to the floor; is that correct?

10   A    Yes.

11   Q    And the board is then tasked with trying to prioritize those

12   and decide which ones should be done and in what order, correct?

13   A    Yes.   Make recommendations to the partnership.

14   Q    But there's not enough funding to do everything that everyone

15   wants; is that correct?

16   A    Yes.

17   Q    And that kind of prioritization exists not just at the ECO

18   board but also within the Lummi Nation as well in terms of having

19   to prioritize limited dollars; is that correct?

20           MR. RAAS:  Objection, your Honor.  That's beyond the

21   scope of direct.  And furthermore, there's no foundation that

22   Mr. Kinley knows what the process of the Lummi is.

23           THE COURT:  The objection will be sustained.

24   By Mr. Tomisser:

25   Q    Mr. Kinley, have you participated as a member of the Lummi
```

1    Tribal Council?

2              MR. RAAS:  Objection.  Beyond the scope.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes.

5    By Mr. Tomisser:

6    Q    And what has been your activity in that capacity?

7    A    My first tenure, I was just a junior councilman, and then I

8    got to the point where I was vice chairman of our tribe.

9    Q    What did you do as vice chairman of the tribe?

10   A    I tried to get our people to develop policy and protect our

11   treaty rights at the state, local, and then the chairman took on

12   the federal level.

13   Q    As a council member and also then as a vice chair, as you

14   phrase it, did you also have to deal with issues of tribal

15   budget?

16   A    As an officer, all I did is oversee the meetings, unless

17   there was something that had to be voted on, because we have

18   processes set up that deals with it.  We have a Title 29, we have

19   a treasurer, we have budget officers, just like any other

20   government.

21   Q    And you would oversee those other departments?

22   A    No.  We had a GM.

23   Q    Is that general manager?

24   A    Yeah.

25   Q    And would the general manager then report to the council?

1    A    Yes.

2    Q    And when decisions would have to be made, would the general

3    manager make recommendations to the council?

4    A    We have what we call commissions, boards, and committees that

5    would also go through the process and scrub and make sure that

6    they have the input and make recommendations to the GM to the

7    LIBC.

8    Q    I'm sorry, that last acronym?

9    A    Lummi Indian Business Council.  Sorry.

10   Q    And have you served on the Lummi Indian Business Council?

11   A    You bet.

12   Q    How long?

13   A    I think I served three terms.  Twelve years, nine years,

14   whatever it was.

15   Q    What time period are we talking about?

16   A    From the 80s until early '90s.

17   Q    And what does the Lummi Indian Business Council do?

18   A    They do whatever the people -- the majority of the time what

19   the people tell them to do.

20   Q    And what are the sort of things that the people tell them to

21   do?

22   A    Take care of our elders; take care of our school; take care

23   of our kids; our health; try to create economic development; and

24   fund basic our services: housing, health, and enforcement.

25   Q    So providing social services, has that consistently been a

```
1    priority of the Lummi people, to the best of your memory?
2    A    We have literally took some serious steps because we're in
3    what they call a -- there's a status of health.  It's a limit on
4    death, or whatever you want to call it, because of the health
5    situation on the funding.
6    Q    The problem is there's not enough funding to provide all the
7    social services to help --
8    A    The status of healthcare.
9    Q    There's not enough funding --
10   A    Yeah.
11   Q    -- to fund all the healthcare programs --
12   A    Yes.
13   Q    -- that the tribe would like to put in place; is that
14   correct?
15   A    Yeah.
16   Q    So those decisions have to then be prioritized, correct?
17   A    They are self priority, I believe.
18   Q    "Self priority" meaning those come first?
19   A    No.  If you get sick and you're just about dead, you go to
20   the emergency room, and they have to pay for it.
21   Q    I also wanted to ask you about the --
22            THE COURT:  Good thing we don't have that as a problem
23   nationally, right?
24            THE WITNESS:  We can't be buried on Friday.
25            THE COURT:  I'm sorry, Counsel.
```

```
 1            MR. TOMISSER:  Easier for you to make that point than
 2    me.
 3    By Mr. Tomisser:
 4    Q   In terms of tribal revenues, is it correct that the casino is
 5    now the largest single source of revenue?
 6            MR. RAAS:  Objection.  Both beyond the scope, and more
 7    importantly there's no foundation that Mr. Kinley knows about the
 8    operation of the casino or the present day funding since he's
 9    been off the council since the early 90s.
10            MR. TOMISSER:  He was a member of the Lummi Indian
11    Business Council, your Honor, which is the financial arm of the
12    tribe.
13            THE COURT:  I guess the question I have is how is this
14    relevant to the issues we're looking at here?
15            MR. TOMISSER:  I'm trying to establish, your Honor,
16    broadly, that the tribal organization operates with priorities in
17    much the same way that the State does.  They have different
18    revenue sources, and then what they do with them.
19            THE COURT:  I understand that.
20    By Mr. Tomisser:
21    Q   Mr. Kinley, let me ask you about some of the fishery points
22    that you had talked about earlier with Mr. Raas.  I think you
23    mentioned that in earlier years, the Lummi Nation would fish
24    Sockeye salmon; is that correct?
25    A   Yes.  His name is Raas.
```

```
 1   Q    Raas.
 2        The Sockeye salmon are affected by a phenomenon known as the
 3   northern diversion; is that correct?
 4   A    Yes.
 5   Q    And the northern diversion is a situation -- a marine
 6   condition which forces the Sockeye run up the western side of the
 7   island and away from the Lummi Nation; is that correct?
 8   A    No, because they still end up in the same place, which is in
 9   the Point Roberts area, which is ours.
10   Q    Do you recall telling me, Mr. Kinley, in your deposition,
11   that the northern diversion forces Sockeye away from the Lummi
12   Nation?
13   A    No.
14   Q    Let me see if I can refresh you on that.
15   A    I think the definition you're looking at, too, it used to be
16   El Nino.  The mouth of the Fraser is still right at Point
17   Roberts.
18            MR. RAAS:  Your Honor, without a reference to the
19   deposition page and line number, I would move that question and
20   answer be stricken.
21            MR. TOMISSER:  Well, I'm getting there, your Honor.  I'm
22   just trying to find it on my note.
23        It is Page 33 of the deposition.
24   By Mr. Tomisser:
25   Q    On Page 33, Line 3.  Towards the very bottom of that page,
```

1    Line 21 and then 23?

2    A    Yes.

3    Q    You were asked in that situation whether or not the northern

4    diversion turned the salmon up the west side of the island; is

5    that correct?

6              MR. RAAS:   Your Honor, if he's going to impeach him, may

7    we have the question and answers, please?

8              THE COURT:   Yes.

9    By Mr. Tomisser:

10   Q    Mr. Kinley, you were asked, were you not, at Line 21:   "From

11   your view, how does the northern diversion affect the Lummi

12   Tribe's harvest?"

13        You answered:   "Because they come up the northern end, we

14   don't get an opportunity because the late stocks nowadays are

15   stocks of concern.   So when they come that way, the only time we

16   would ever get to harvest them is when they back off the Fraser

17   flats."

18        Did I read that correctly?

19   A    Yeah.

20   Q    The Lummi Indian Nation --

21   A    It's Lummi.

22   Q    I'm sorry.   My pronunciations are not good with anyone.

23        The Lummi Tribe performed an assessment of the factors that

24   are impacting the decline of salmon for the tribe.   Do you recall

25   that?

1    A    I couldn't recall that.

2    Q    Do you know a Mr. Kurt Russo?

3    A    Oh, yeah.

4    Q    And who is Mr. Russo?

5    A    He was a consultant that was hired by the tribe in the latter

6    years.  I think he works for the Kluckhohn Group in Bellingham.

7    Before that, he used to be -- this was back in the '70s.  He used

8    to be an employee of the Nation.

9    Q    And do you recall him producing a report called "The Lummi

10   Indian Tribe and the Life With Salmon"?

11   A    No, I don't.

12   Q    Do you think that if I showed you a copy of that report that

13   it might refresh your recollection?

14   A    Probably.

15   Q    That's the first page of a two-page summary.

16        Does that look familiar?

17   A    Well, you can see how long ago it was, because the enrollment

18   was only 3,500.  Now our tribe is dang near 5,000.

19   Q    So the tribe has grown?

20   A    Yeah.

21   Q    My question for you, Mr. Kinley, though, was now that you've

22   had a chance to look at that, does that refresh your recollection

23   about this report from Mr. Russo?

24   A    In the detail, I couldn't say yes or no.

25   Q    Do you recall, Mr. Kinley, any analysis on behalf of the

1    Lummi Tribe talking about the decline of salmon available to the

2    tribe, attributing the decline to accelerated logging in the

3    headwaters of the Nooksack basin?

4    A    Can you rephrase that again, please?

5             THE COURT:  Hang on.  There's actually two questions

6    that are combined, Counsel.  Let's break them down.  The first

7    question is:  Do you recall any analysis on behalf of the Lummi

8    Tribe talking about the decline of salmon?

9             THE WITNESS:  Not to my recollection.

10   By Mr. Tomisser:

11   Q    Do you recall a report attributing the decline to accelerated

12   logging in the headwaters of the Nooksack Basin?

13   A    I couldn't say yes or no.  Because I never read one, that

14   doesn't mean it doesn't exist.

15   Q    Aside from any report that somebody may have done, do you

16   believe that accelerated logging in the headwaters of the

17   Nooksack basin would be one of the reasons for declining salmon

18   available to the tribe?

19            MR. RAAS:  Objection, your Honor.  Lack of foundation

20   and beyond the scope.

21            MR. TOMISSER:  The witness testified on direct that

22   there had --

23            THE COURT:  Objection.  The objection will be overruled.

24       He's asking for your opinion.  Do you have an opinion?

25            THE WITNESS:  I'm not an expert in habitat, but a layman

1   would say it's part of the problem, I guess I would say.  But

2   like I says, I'm not an expert, our biologist or geomorphologist,

3   or whatever you call it.  I'm just a fisherman.

4          MR. TOMISSER:  Thank you, Mr. Kinley.  We will let you

5   go cook your fish.

6          THE WITNESS:  I appreciate that, sir.

7          THE COURT:  Any redirect, Mr. Raas?

8          MR. RAAS:  Yes, your Honor.

9                     REDIRECT EXAMINATION

10  By Mr. Raas:

11  Q    Now, Randy, when you were on the council, and to the best of

12  your knowledge since then, where do the treaty rights stand on

13  the LIBC priorities?

14  A    When I was on the council, there was eight of us that were

15  fishermen -- nine of us that were fisherman of the 11.  And that

16  was the priority.  We were the ones that took on the IRS case.

17  We took on the reservation case.  We took on Boldt 2 and 3 and

18  all them other treaty right impact cases.  We took on the effect

19  of water into the treaty rights.

20      It was the highest principle that was taught to us, and we

21  would do whatever it took to solve the problem, which was

22  litigation if we couldn't work it out cooperatively.

23  Q    And a question of geography.  You said that, in answer to

24  Mr. Tomisser, Point Roberts was a place -- the mouth of the

25  Fraser.  Is Point Roberts in the United States?

1   A   Yes, it is.

2   Q   And is that part of the usual and accustomed fishing areas of

3   the Lummi Nation?

4   A   Yes, it is.  We have camp sites up there.

5   Q   Is that where a major reef net fishery was?

6   A   Yes, at Chaltoneth, is the indian term.  They assigned it

7   over, with the assistance of the State, to make it an exclusive

8   area so it wouldn't be disturbed up there.

9   Q   And that happened recently, right?

10   A   Yes, it has.  The governor was there and everybody else was

11   up there within the last two years.

12   Q   And that's preserved as an historical and cultural site?

13   A   Yes, it has.

14   Q   Now, Mr. Tomisser spent some time talking about stakeholders.

15       Is there a difference in your mind between treaty rights and

16   stakeholder status?

17   A   Yes, there is, definitely.

18   Q   Would you tell us what that is?

19   A   The problem with the stakeholders and -- and that's no -- how

20   would you say it?  I am trying to figure out the terminology,

21   where the treaty right is with the federal government.  A

22   stakeholder might be a person from the county or a municipality

23   or Joe Blow off the street.

24       A treaty right is something that's guaranteed to us versus a

25   right that actually a state citizen holds.  And that's what

1   irritates us as tribal people, that the people that were in

2   charge turned around and could have solved some of the

3   problems --

4           MR. TOMISSER:  Your Honor, I will object as

5   nonresponsive.

6           THE COURT:  Ask another question.

7           MR. RAAS:  I think he's actually answered the question.

8     Thank you very much.  I don't have anything further.

9           THE COURT:  Mr. Kinley, thank you.  You may step down.

10     Counsel, we're a couple of minutes before noon, but we will

11   go ahead and take our break here and start up, and try to have

12   everyone back by 1:20 again.  Have a good lunch.

13   (At this time, a lunch break was taken.)

14           THE COURT:  Are we ready for our next witness?

15           MR. NIELSEN:  May it please the Court, Eric Nielsen for

16   the Quinault Indian Nation.

17     The plaintiffs would like to call Ed Johnstone.

18           THE COURT:  Mr. Johnstone, good afternoon.  If I could

19   have you raise your right hand, we will get you sworn in.

20   Whereupon,

21                       EDWARD JOHNSTONE

22   Called as a witness, having been first duly sworn, was examined

23   and testified as follows:

24           THE CLERK:  Please state your full name and spell your

25   last name for the record.

```
 1              THE WITNESS:  Edward Johnstone, J-O-H-N-S-T-O-N-E.

 2              THE COURT:  You may inquire, Counsel.

 3                          DIRECT EXAMINATION

 4    By Mr. Nielsen:

 5    Q    Mr. Johnstone, where do you live?

 6    A    I live at Tahola, Washington, on the Quinault Indian

 7    Reservation.

 8    Q    Where is the Quinault Indian Reservation located?

 9    A    It is just north of Grays Harbor in the mid Washington coast.

10    Q    Are you an enrolled member of the Quinault?

11    A    I am an enrolled member.

12    Q    How old are you?

13    A    I'm 56.

14    Q    Are you a descendent of any of the signers of the treaties?

15    A    Yes.  My grandmother was from Hoh River, and our family on

16    the Hoh River side were the treaty signers.

17    Q    And Mr. Johnstone, what do you do for a living?

18    A    I'm a fisheries policy spokesperson for the Quinault Indian

19    Nation.

20    Q    And can you briefly describe in general terms what that

21    means.  What is your job?  What do you do?

22    A    Well, it generally means that anything that has to do with

23    policy in the fisheries arena, that's what I do.  I work directly

24    with the fisheries division and handle any of the policy issues.

25    Q    When you say you work directly with the fisheries division,
```

1    what is the fisheries division?

2    A    It's the division for the Quinault Tribe that handles all the

3    activities surrounding compliance under U.S. v. Washington to

4    uphold our self-regulatory status.  It's one of the true tribes

5    that came out of the Boldt Decision that's self-regulating.

6    There are criterion under the Boldt Decision that we adhere to.

7        So in order to have the harvest, you have to do certain

8    technical things.  To be able to do that, you have to have law

9    enforcement, you have to have officers, Quinault tribal members

10   to enforce our fisheries regulations.  Those are the areas that

11   we cover.  We do other things because we have hatcheries, but

12   those are not specific requirements of the Boldt Decision.

13   Q    Now, are you a member of any other tribal fishery

14   organization?

15   A    I'm a member of the Northwest Indian Fish Commission.  And

16   currently I am the treasurer.

17   Q    Have you ever held any elected offices with the Quinault

18   Indian Nation?

19   A    Yes, I have.  I was a tribal councilman.  I served two terms,

20   '95 to 2001.

21   Q    Based on your position with the Quinault Indian Nation and as

22   an elected officer in the past, are you familiar with how many

23   people the tribe employs in its -- dealing with its salmon

24   fishery?

25   A    Well, fishermen or -- we happen to have a seafood enterprise

1    that employs folks also.

2    Q    Okay.  And this division, this fisheries division, do you

3    know how many people --

4    A    In the fisheries division, we have 30 full-time staff and 30

5    to 50 seasonal workers.

6    Q    And what kinds of things do they do?

7    A    Well, they collect data.  In order to have a fishery, you

8    have to know about the particular stock that you're trying to

9    manage.  So when you're talking about -- you would have to do

10   spawning ground surveys.  And so that data gets collected and

11   compiled and works through our operational technical section.

12   And then that stuff moves up and goes to our lead biologist who

13   would then work and do the forecasting for that particular year

14   that goes into the management cycle year that would you use that

15   data in -- for instance, in the North of Falcon process, when

16   you're negotiating, you know, the season that is going to come

17   upon you.  That's one area.

18        There are several areas in the cyclical nature of managing

19   these resources.  It's the same, if you will, every year.  You

20   have preseason forecasts.  You go into the process where all of

21   that is compiled.  It's compiled for Pacific Fisheries Management

22   Council area.  It's compiled for the Pacific Salmon Treaty uses.

23   Those are used in model runs that assist us in looking at how

24   that stock gets back to its home stream.

25        Then you go into this negotiated process where you talk about

1    how is the co-managers of the State of Washington and the tribe

2    going to harvest that resource if there are harvestable fish.

3    And then you go into actual -- you know, you may have a treaty

4    troll fishery.  And then later on in the fall, you'd have your

5    in-season fishery.  So then you're actively managing the fishery.

6    And then you're doing post-season analysis.  And the thing just

7    rolls.  It's continual.

8    Q    Now, as the policy representative, are you required to know

9    how many tribal members are engaged in the treaty fishery?

10   A    I do know, because this is my life's work.

11   Q    Okay.  And do you know how many -- the kinds of species of

12   salmon that the Quinault treaty --

13   A    Well, we do harvest -- or we do fish on your fall stocks of

14   Coho, Chinook, we get Chum salmon, and then later on, Steelhead,

15   spring Chinook, Sockeye, Quinault Sockeye, summer Steelhead, some

16   summer Coho.  We do not have any Pink salmon.

17   Q    Do you participate in the Quinault Tribal Treaty Fisheries --

18   A    I certainly do.  And if I weren't here, I'd be there doing my

19   one -- you know, my only opportunity, or the major opportunity,

20   is in the fall and it's in October.  And for this week, I had to

21   forego my fishing opportunity.  This is the time period that I

22   fish.

23   Q    And how do you work that with your job?

24   A    Well, under our governance, my tribal member hired fishermen

25   can fish for me while I'm at this kind of a meeting.  Otherwise I

1    would be just be out of the fishing.

2    Q    Now, are you familiar with the tribe's usual and accustomed

3    fishing areas?

4    A    Yes, I am.

5    Q    And can you briefly name the river systems that make up those

6    areas?

7    A    From north to south, it's the Queets, the Raft, the Quinault,

8    the Moclips, the Kapallas.

9         Inside of Grays Harbor Bay, because they both flow into the

10   Grays Harbor Bay, is the Humptulips and the Chehalis.  To the

11   south farther, it would be the Elk and the Johns.  And inside the

12   tributaries of the Chehalis are the Satsup and the Wynoochee.

13   Q    And do some Quinault members also fish in the ocean as well

14   for salmon?

15   A    Yes.  We have a treaty troll fishery.

16   Q    And do some of the Quinault fishers fish the river systems

17   and the ocean commercially?

18   A    Yes.

19   Q    And do you know where those fishermen sell the salmon that

20   they harvest?

21   A    Quinault Pride Seafood.

22   Q    And is that owned by the Quinault Indian Nation?

23   A    It's a wholly owned -- a company owned by the Quinault Indian

24   Nation.

25   Q    Do you know how many employees it employees?

A    Approximately twelve full-time.  And seasonally they can
swell to probably 50, 60, at least in the processing plant in
Tahola.

Q    And, Ed, when did you start salmon fishing?

A    It goes back a long time, in a different time, in a very
beautiful place.

Q    Can you describe what that experience was like?

A    Well, as I mentioned earlier, my grandmother was from Hoh
River.  About the turn of the last century, my grandmother and
her husband were asked to come to Tahola.  And my great
grandmother was a midwife, and my great grandfather was a
blacksmith.  So they moved to Tahola at the request of the tribe,
but that left deep roots in Hoh River.  And I'm talking about a
time when I started to fish, it was pre-Boldt.  And I was seven
years old when my sister married my brother-in-law, Howard
Hudson.

     At that time in the village of Hoh River, it was very small,
six or eight homes, three or four families.  There was not the
population in the state of Washington that there is now.  My
sister kind of took care of the three of us, so I spent a lot of
time there.  My brother-in-law would say, Do you want to go
fishing?  And I'd say, Yeah.

     So in the morning, he would -- my sister would get us ready.
She would feed us and then make a sack lunch and would normally
pack two thermoses of coffee, and we'd go down to the river, and

1    we fished out of dugout cedar canoes.

2        I never saw a skiff until I was about 14 or 15 years old on

3    the Hoh River.  Everybody fished out of dugout canoes.  And he

4    would get us ready, and he'd tuck me in the bow of the canoe, and

5    up the Hoh River we'd go.  It was motorized.  It had a 20 horse

6    Mercury motor on there.  We'd often go near the 101 -- the 101

7    bridge, 14 miles or so up the river.

8        I can't even tell you how great it was.  I'd look back at my

9    brother-in-law.  The water would spray from the motor, you know,

10   and he'd just -- it was just such a -- you know, in today's

11   world, you would call him an icon, but he was a teacher to me.

12   Now he was going to teach me something.  And we'd get up to where

13   we were going and he'd pull to shore and he'd have a cup of

14   coffee, and he'd tell me about how it was when he was a little

15   boy on the Hoh.

16       And when he was little, he pointed to a little building, as

17   we were going up, and then he told me, he says, Do you see the

18   house way over there?  I said, Yeah.  He said, Well, that's where

19   I went to school, in a one-room schoolhouse.  And it's on Missy

20   Barlow's ranch.

21       So we'd have our coffee and then he would -- the first time

22   he told me, he says, This is what I'm going to do.  We're going

23   to get out here a little bit with our poles, and then I am going

24   to throw the net out, and then we're going to be near shore.  We

25   were drift fishing.  So later on, when he was kind of having a

```
 1    tough time, he would tell me, Grab the pole.  It was about 16,
 2    maybe 12-foot long poles.  And that was to pull you along with
 3    the canoe.  And he'd bring in the fish, and we'd go ashore.  And
 4    he'd take the net out, and he'd take the fish out, and he'd wrap
 5    the net the way it's supposed to be, and we'd sit down and he'd
 6    have a cup of coffee, and he'd teach me about what we're doing
 7    here.  You know, I would say, How come we're doing it right here?
 8    And he'd say, Well, you see how the river runs?  You see where
 9    the channel is, and you see the big rocks?  He was teaching me
10    about where salmon travel and where they go to rest and where
11    it's easier to swim, not in the current.
12        That was a -- I learned every time.  Eventually he gave me
13    more and more responsibility, including how to hang a net, how to
14    mend a net, what knots -- you know, how we tie things, how we use
15    the resources that are around us while we're fishing for salmon
16    in the river.
17    Q    So he essentially taught you how to fish?
18    A    Yes, he did.
19    Q    And at some point, did you start fishing by yourself?
20    A    Yes, I did, I guess in kind of two different ways.  Along
21    about the time that we started to have our first skiff was also
22    about the time that it was time for me to take over the
23    operations while my brother and brother-in-law went hunting.
24    They'd go up the river and go elk hunting.  The very first time,
25    I was scared, and I was reluctant.  They basically pushed me
```

offshore, and down the stream I went. And they said, you know,
If you're scared of the ripple, wait until the tide starts to
come in and the ripple goes away, and then you can come back to
the landing.

   And what I would do was tend a stationary net at the mouth of
the Hoh River. I wasn't challenged with going up the river. But
as I stayed and fished in the Hoh area for many, many years, I
would fish with my brother-in-law, sometimes with his older
brothers, never independently, always as a helper for them in
their fisheries, way into the '80s, way past the Boldt Decision.

   And we did so because we had agreements because we had
intertribal -- we were Quinault treaty area, and the Quinaults
and the Hohs and Quileutes often went to different rivers and
fished with family and moved around a lot.

   But in later times, those agreements went away. But after
the Boldt Decision, I was one of the first to fish in the
Chehalis system on the Chehalis River, and I've been there ever
since. And that is my own -- under my own gear and my own
grounds and my own opportunity.

Q   So you fish the Chehalis River now?

A   Yes, I do.

Q   And do you fish that river commercially?

A   Yes, I do.

Q   And when you were talking about your family learning how to
fish, did your family rely on salmon, both economically and for

1  subsistence purposes?

2  A    Yes.   When I talk about my Hoh River family, it's exclusive,

3  the only income that my brother-in-law has ever known, and he's

4  73 years old.   It was his entire life.

5  Q    Are there tribal members now who rely on salmon fishing to

6  support themselves economically?

7  A    In the Quinault Tribe, there are several.

8  Q    And does your family still rely on salmon as a source of

9  economics?

10  A    Very much so.   I have nephews that fish full-time and work, I

11  guess seasonal work when it's available.

12  Q    Now, in Quinault practices -- well, first off, are you

13  familiar with the role salmon has played in the Quinault culture

14  and tradition?

15  A    Well, in our language, the word for "salmon" is the equal

16  word for "food."   It's very much a part of us as Indian people.

17  The salmon were the buffalo of the great plains when there were

18  60 billion.   You know, salmon are our buffalo.   It is intertwined

19  within our culture.   Our songs, our ceremonies, our subsistence

20  coincide with the salmon.   When salmon are not plentiful, we

21  suffer.   When salmon are plentiful, we basically are rejoicing,

22  we're happier, but we're also mindful of what that means to us.

23  It means that when they're plentiful, that you take care of your

24  harvest, you take care of your needs, your smoke and your can and

25  your freezing, all of those things.

```
 1        And always, we take care of our elders.  We take care of
 2   those that can't provide for their selves first and foremost: our
 3   babies, our grandmothers, our grandfathers and our children, and
 4   our elders.  That's just the way Indian people are.
 5   Q    And salmon is an important part of taking care of the
 6   children and the elders?
 7   A    Yes, it is.
 8   Q    And you mentioned ceremonies.  How in Quinault culture is
 9   salmon used ceremonially?  Can you give us a brief description of
10   that?
11   A    Well, salmon are used in all events as well as all of our
12   foods.  Salmon is the center pin, for instance, of our culture.
13   If you look at Quinaults, we have a particular stock of salmon
14   called the Quinault Blue Back, or the Sockeye.  It's a Sockeye
15   salmon.  It is known actually throughout the world.
16        It is basically the foundation of who we are.  We're talking
17   about a run of fish that once numbered into a million.  In the
18   last century, there were runs of a million fish.  In the last
19   seven years, we had the lowest run ever recorded, at like 7,200
20   fish.  So our connection is deep.  The relationship to the salmon
21   is ever present.
22        And we use salmon for name givings.  We use salmon for
23   deaths, for burials, for recognitions, for birthdays.  Ceremonial
24   events, we would use particularly the Quinault Sockeye.
25   Q    When you testified that -- I think you said Blue Back; is
```

1    that correct?

2    A    That's correct.

3    Q    When you said the Blue Back is who we are, can you tell me

4    what that means to you?  What does that mean, "who we are"?

5    A    Well, you know, I guess it's the run of fish that the

6    Quinaults really identify with.  It's probably the strength of

7    that fish that drove our economies.  If you had, you know, back

8    in 1923, 700,000 dimes, you were doing pretty well, because

9    that's what they went for, about a dime a fish.

10        It's not only that part of it that it provides, but it

11   provides the income and the opportunity to provide for your

12   families.  And we have a lot of folks that still fish.  When you

13   look at the Village Queets that's out on the Olympic Peninsula,

14   it's a hundred miles from Aberdeen and Hoquiam, which is the

15   nearest population center, and a hundred miles from Port Angeles.

16   It is a small village at the mouth of the Queets River where we

17   have 70 percent unemployment, when you talk about job access.

18   But when there's fishing opportunity, all the fishermen are

19   fishing.  That's how they derive most of their income.

20   Q    Now, you talked a little bit about the diminished runs of the

21   Blue Back salmon.  Have there been any other Quinault fishing

22   areas that have been recently closed because of diminished salmon

23   runs?

24   A    We're like a lot of areas in the fact that our spring Chinook

25   are in trouble on the Queets, in Grays Harbor, Humptulips -- both

1    on the Humptulips and the Chehalis side.  Those are stocks that

2    are very troubling to us.

3    Q    And how have these -- I guess for lack of a better word, how

4    have these diminished salmon runs affected you or your family?

5    A    Well, not unlike most places that deal with tribes that deal

6    with abundance, when you can't provide for your families, it's

7    not good.  You have to look to other sources of income.  And out

8    on the Washington coast, there aren't many places to do that.

9    Q    And based on your knowledge and experience, what is your

10   opinion, do you think more Quinaults would fish if there were

11   more fish, if the runs were as great as in the past?

12   A    Yes.  And I base that on the fact that we have fisheries that

13   are open for folks to come and fish when there are openings, but

14   they simply look at whether or not they think they can prevail

15   all the costs in order to do so, then it gets pretty tough for

16   some of them to make that decision.

17   Q    You testified that you were taught how to fish by your

18   brother-in-law.  Is that how most Quinault members are taught how

19   to fish, by a family member or somebody that's a fisherman?

20   A    That is the way that I understand it, that it's generational.

21   Q    So it's passed down?

22   A    It's passed down, yes.

23           MR. NIELSEN:  I have no further questions.

24           THE COURT:  Cross-examination for Mr. Johnstone?

25                      CROSS-EXAMINATION

By Mr. Shaftel:

Q   Good afternoon.  My name is Doug Shaftel.  We met once

before.  Do you remember when I took your deposition?

A   I do remember.

Q   Mr. Johnstone, the Quinaults, they have control over the land

management -- the land use decisions within the Quinault

Reservation; is that correct?

A   We have jurisdiction, yes.

Q   And do you agree that there are land uses that are impacting

the rivers that run through the Quinault, the Quinault's have the

regulatory power to influence those land uses; is that correct?

A   That's correct.

Q   And the Quinaults in fact -- quite a large part of the

Quinault Reservation is logged, is that correct, contract logged?

A   It is.  It has been logged, and it continues to have logging

activities on the reservation.

Q   It provides quite a bit of income for the Quinault

Reservation; isn't that correct?

A   I wouldn't say that at all.

Q   It has historically, though?

A   There have been times when the timber market has been

conducive to making money, yes.

Q   And the Quinaults continue to -- well, strike that.

     You mentioned earlier the Quinault Blue Black salmon run?

A   Yes.

Q    That's a salmon run that runs through the Quinault River; is
that correct?

A    It goes the 25 miles of lower Quinault into Lake Quinault and
then up to the upper Quinault.

Q    And quite a bit of the Quinault River runs through the
reservation?

A    All of it runs through.

Q    Similarly, the Queets, you mentioned that there's been some
issues with the Queets.

     Does part of the Queets in fact run through the reservation?

A    Part of it.  Most of it's state and federal.

Q    You mentioned that you grew up fishing on the Hoh; is that
right?

A    Yes.

Q    But you don't have any personal knowledge of how the run
sizes have changed since you last fished it, do you?

A    Not involved with management of the Hoh.

Q    And on the Humptulips River, when I deposed you -- I'm sorry.
Let me phrase my question better.

     I guess this would have been the season before this season,
the Chinook on the Humptulips were at harvestable levels; is that
correct?

A    Without double-checking, that could be true.

Q    And you don't know whether or not the Chinook levels have
changed from the year prior to that, do you?

A    Not without checking.

Q    And similarly, the Coho on the Humptulips were harvestable
the year prior to this year?

A    Well, the only correction I would make to where you are with
this is Grays Harbor is managed on the aggregate.  The whole
system is managed by the total run of Coho for both the Chehalis
and the Humptulips for Chinook and for Coho.  So it's an
aggregate picture that you look at.  They're not managed river by
river like other systems under Hoh v. Baldridge.  Although we
have agreed to escapement goals, they're managed on the
aggregate.

Q    Was there something about my question that made it difficult
for you to answer as to whether or not Coho was harvestable on
the Humptulips --

A    Because you may -- if you have ten fish, you may take and --
and five of them are harvestable, you may take six.  So as long
as you have ten fish on the Chehalis, and you need to have six
over there, but you leave seven.  So the combined numbers are
what you are managing for in order to meet your escapement.

Q    Do you remember at my deposition -- I'm sorry.  When I took
your deposition, I asked you:  "What's your understanding of the
run sizes for the various stocks that run through the Humptulips
and how they compare to previous years?"  This is on Line 6 of
Page 43.

    And you said:  "I think they were harvestable, Chinook and

1    Coho."

2    A    Okay.

3    Q    And you don't know anything about how the Coho runs on the

4    Humptulips compared to the year before, do you?

5    A    So I'm trying to understand.  Are you referring to that

6    question or a new question?

7    Q    This is a new question.  I'm asking, as you sit here today,

8    you don't know anything about how the Coho runs on the Humptulips

9    have changed -- I'm sorry, as far as harvestable levels have

10   changed between 2008 and 2007?

11   A    I think generally they're up.

12   Q    Now, as far as the run sizes for salmon that the Quin harvest

13   in their U&A, they haven't changed much in the last five to ten

14   years; is that correct?

15   A    What was the question again?

16   Q    The harvestable runs of salmon in the Quinault usual and

17   accustomed fishing places have not changed much in the last five

18   to ten years; is that correct?

19   A    I know there's been fluctuation.  I don't know that I could

20   say that it hasn't changed much.

21   Q    But that's what you said in your deposition; isn't that

22   right?  Do you recall?

23   A    I don't recall.  You know, I manage these fisheries and --

24   when I do them, I do them real time, so they're actually managed

25   on what the particular instance is in that particular year.  For

1    me to sit here and say I remember every management plan that I

2    ever negotiated or we fished on would be ridiculous.  I just

3    don't recall.

4    Q    You also don't recall whether or not the run sizes have

5    changed for salmon much in the last 20 years?

6    A    They've changed.  I believe they've changed.  You know, I

7    just don't know what the particular numbers are.

8    Q    You don't know whether or not they've gone up or they've gone

9    down?

10   A    Well, I can tell you that Grays Harbor's been a limiting

11   factor for Coho in the Pacific Council process more than once in

12   the last 20 years.

13   Q    Mr. Johnstone, you have a pretty positive relationship with

14   the Department of Fish and Wildlife; isn't that correct?

15   A    I do have a good relationship with the Fish and Wildlife.

16   Q    And in fact, it's your opinion that they do a pretty good job

17   co-managing the -- working with you --

18   A    In the case of the Quinaults --

19   Q    Can I finish my question?

20   A    Go ahead.

21   Q    Okay.  Thank you.

22        They do a pretty good job working with you in managing

23   harvests; is that correct?

24   A    I have a good relationship with now the director of the

25   Department of Fish and Wildlife.

```
 1              MR. SHAFTEL:  Thank you.

 2              THE COURT:  Mr. Nielsen, any redirect?

 3              MR. NIELSEN:  I have no redirect, your Honor.

 4              THE COURT:  Mr. Johnstone, thank you.  You may step

 5      down.

 6          The plaintiffs may call their next witness.

 7              MR. SLEDD:  Your Honor, the plaintiffs have no further

 8      witnesses in their case-in-chief.  We may have rebuttal

 9      witnesses.  As I believe was discussed this morning, we may have

10      some additional exhibits we may have later.  So we are not

11      resting, but we are done with our case-in-chief.

12              THE COURT:  Thank you, Mr. Sledd.

13          Are the defendants ready to call their first witness?

14              MS. WOODS:  Your Honor, the State would like to call

15      Dr. Paul Sekulich.

16              THE COURT:  Good afternoon.  If I could have you raise

17      your right hand to be sworn in.

18          I'm sorry.  We swore you in this morning.

19              THE CLERK:  Would you state your name for the record,

20      please?

21              THE WITNESS:  Paul Sekulich.

22              THE COURT:  We swore you in this morning.  You remain

23      under oath.

24          You may inquire, please.

25              MS. WOODS:  Thank you, your Honor.
```

1               **DIRECT EXAMINATION**

2     **By Ms. Woods:**

3     Q    Good afternoon, Dr. Sekulich.

4     A    Good afternoon.

5     Q    I believe you described your educational background for the

6     Court this morning.  Has your educational background changed

7     since this morning?

8     A    Well, I've learned more.

9     Q    Dr. Sekulich, are you currently employed?

10    A    No, I'm not.  I'm retired.

11    Q    Where did you work before you retired?

12    A    I worked for the Department of Fish and Wildlife in the

13    habitat program.  I retired in January of '03.

14    Q    How long did you work for the Washington Department of Fish

15    and Wildlife?

16    A    It was about 25 and a half years.

17    Q    Are you a fisheries biologist?

18    A    Yes.

19    Q    How many years of professional experience do you have as a

20    fisheries biologist?

21    A    I would say 35-plus.

22    Q    Dr. Sekulich, did you prepare a Declaration in Lieu of Direct

23    Testimony for this sub-proceeding?

24    A    Yes, I did.

25               MS. WOODS:  I would ask the courtroom deputy please to

1    hand Dr. Sekulich Exhibit W-087.

2    By Ms. Woods:

3    Q    Do you have it?

4    A    Yes.  That's my declaration.

5    Q    Would you please turn to Page 20.

6    A    Okay.

7    Q    Is that your signature?

8    A    Yes, it is.

9    Q    What's the date of your signature?

10   A    March 19th, 2009.

11   Q    Dr. Sekulich, do you adopt Exhibit W-087, the Declaration in

12   Lieu of Direct Testimony of Paul Sekulich, dated March 19th,

13   2009, as your direct testimony today?

14   A    Yes, I do.

15           MS. WOODS:  I would move for the admission of W-087.

16           MR. SLEDD:  Your Honor, the plaintiffs do have an

17   objection.  We had an objection in the pretrial order to one

18   paragraph of this declaration which we are withdrawing.

19       However, due to the -- there are ten paragraphs in the

20   declaration.  Paragraphs 29 and 39 that are captioned "Response

21   to Tribal Use of the Fish Passage Priority Index."  And based on

22   your Honor's ruling in the motion in limine matters, we believe

23   those are basically anticipatory rebuttal of evidence that has

24   now been excluded.  We would ask that those paragraphs also be

25   excluded as irrelevant.

1          THE COURT:  First steps first.  You withdraw your

2    objection to Paragraph 46.

3          MR. SLEDD:  That's correct.

4          THE COURT:  Thank you.

5       Ms. Woods, what is the State's position regarding Paragraphs

6    29 through 39?

7          MS. WOODS:  Mr. Sledd is correct that the heading for

8    that section is "Response to Tribal Use of the Fish Passage

9    Priority Index," and there are some sentences and sections in

10   those ten paragraphs that do refer to the Fish Passage Priority

11   Index, but there are also other sections in there that are

12   responsive to the evidence that was admitted this morning with

13   Mr. Rawson and Mr. Waldo regarding the use of habitat as a way to

14   estimate losses of fish production, and so it's our position that

15   those are still in the case the way it's now framed.

16         THE COURT:  All right.  I'll tell you what I'll do.  I

17   won't exclude them, but I understand what the objection is from

18   the other side.  And the Court certainly understands its own

19   ruling.  And when reviewing 29 through 39, I will review it

20   carefully to see if it is in fact responsive.

21      Exhibit W-087 will be admitted at this point in time.

22         MS. WOODS:  Thank you, your Honor.

23      There are also Exhibits W-087-A through L that are associated

24   with Dr. Sekulich's declaration.  I believe that all but one of

25   them have previously been admitted.  The one that I believe has

1    not been previously admitted is W-087-L.

2              THE COURT:  No.  I actually show W-087-H is not admitted

3    as well, but we can double-check with our clerk.

4              MS. WOODS:  That is correct.  It is W-087-H that has not

5    been admitted.

6              THE CLERK:  That's what I show.

7              MS. WOODS:  I would like to move for the admission of

8    that exhibit at this time as well.

9              MR. SLEDD:  No objection from plaintiffs.  We withdraw

10   our objection.

11             THE COURT:  Thank you, Mr. Sledd.

12        087-H is admitted.

13             MS. WOODS:  Thank you, your Honor.

14   By Ms. Woods:

15   Q    Dr. Sekulich, during the 25 and a half years or so that you

16   worked for the Washington Department of Fish and Wildlife, what

17   kind of work did you do?

18   A    Well, during the first twelve or so years, I was employed in

19   the harvest management division of the PRRHM program, the

20   Planning, Resource, Research and Harvest Management Program.  I

21   started out there as a fish biologist at the lower level.  I had

22   progressively more difficult challenges as I advanced in my

23   career there and ended up assistant chief of the Puget Sound

24   harvest division that was responsible for sport and commercial

25   fishing in the Puget Sound.

1    Q    What did you do after that?

2    A    After that, I became employed with the habitat program,

3    environmental restoration division manager.  In that capacity, we

4    were involved with fish passage, screening, water diversions,

5    inventorying those facilities, correcting problems involved with

6    habitat restoration projects, and also the technical assistance

7    to outside groups in those same issues.

8    Q    When did you first become involved in fish passage work?

9    A    Actually, it was upon my employment in the habitat program,

10   which was in early 1991.

11   Q    Did you have a role in getting the State's Fish Passage

12   Barrier Correction Program started?

13   A    Yes, I did.  When I took that job, there was a recently

14   signed MOA between the Department of Fisheries, the Department of

15   Wildlife and the Department of Transportation.  And that

16   particular Memorandum of Agreement kind of set the stage for fish

17   passage.

18       What the agreement did is it addressed facilitating the HPA

19   process for work on DOT roadways, and we tied that with fish

20   passage.  So the specific section in the MOA concerning fish

21   passage.  We also addressed tying it to HPAs and inventorying of

22   fish passage barriers on DOT roadways.

23   Q    The MOA that you referred to, is that Exhibit W-087-B?

24   A    Yes, it is.

25   Q    Was it your job to implement that MOA for the Washington

1   Department of Fish and Wildlife, Fisheries at that time?

2   A   Yes, it was.

3   Q   How did you go about doing that?

4   A   Well, the first thing we did is pursued at the legislature

5   funding to start the implementation of the MOA after the

6   legislature cooperated and appropriated some funds for some

7   barrier correction projects.  And to be in the inventory, we

8   secured an agreement with the Department of Transportation that

9   formalized that inventory and then also specified six projects

10  that would be corrected on DOT roadways.

11  Q   And why six projects?

12  A   Well, it's a little tough to answer, because when I stepped

13  into the job, it was -- I didn't know much about the magnitude of

14  the problem.  So at that time, that was six projects that I knew

15  about, and that was it.

16  Q   That interagency agreement that you mentioned, is that

17  Exhibit W-087-D?

18  A   Yes, it is.

19  Q   We will come back to that in a bit.  You mentioned inventory.

20  What's inventory?

21  A   Well, inventory is basically going out on all the DOT

22  roadways and looking at the facilities, the road crossings, and

23  inventorying those to see if there were fish passage barriers.

24  And in addition to that, we included a provision for

25  prioritization of those facilities for correction.

1    Q    How do you figure out if something is a fish passage barrier?

2    A    In the early years we relied on the expertise of people in my

3    staff involved with fish passage.  It was kind of a judgment

4    call, outfall drop, slope of the culvert, velocities in the

5    culvert.

6        As we refined our technology through the years, we ended up

7    regimenting that approach and consummating all the methodology in

8    a manual, the first edition was 1998, and later added to in 2000.

9    Q    Is that 2000 manual Exhibit W-087-E?

10   A    Yes, it is.

11   Q    What was your role in developing that manual?

12   A    Well, my primary role was directing my staff to flesh out the

13   details of the inventory process.  I provided a frame for

14   prioritization by originating the priority index methodology.

15   The specific methodology for the habitat assessment revolved

16   around that priority index methodology.

17   Q    Did your staff continue to do inventories while you were at

18   the Washington Department of Fish and Wildlife?

19   A    Yes, we did.  At the time of my tenure through 2002, we had

20   increasing involvement with the Department of Transportation to

21   continue the inventory.  Also during my tenure, we realized there

22   was additional benefit for starting to work with smaller

23   jurisdictions.

24       So we did outreach to several counties, as kind of a pilot

25   project, where we would volunteer to inventory the barriers on

1  county roadways, with the idea that we would end up cost sharing

2  arrangements for correcting some of those barriers.  That was

3  kind of a jump start for the counties.

4      Later, in about 1997, we decided to also concentrate on our

5  own problems in the Department of Fish and Wildlife lands, so we

6  secured funding to also prosecute inventories of our own lands.

7      And in addition to that, using the manual, we thought it was

8  beneficial to also train outside groups for inventories, so we

9  did that.  We had a technical assistance component where we used

10 staff that were adept at inventories, and their supervisors, and

11 actually did outreach to other groups to do inventories.

12 Q   As these inventories progressed over time, were you surprised

13 in any way by the results?

14 A   Surprised in what way?

15 Q   Did things turn out the way you thought when you started

16 doing the inventories?

17 A   Well, that is interesting.  When I first took the job in

18 habitat management, as I indicated, my first exposure to fish

19 passage were these six DOT projects that we knew about.  And as

20 we started conducting the inventory, it became I guess

21 progressively obvious that the magnitude of the problem was much

22 larger than we had originally anticipated.

23 Q   I'd like to focus on those six projects for just a moment.

24      MS. WOODS:  I am about to show Dr. Sekulich the second

25 page of 087-D.

By Ms. Woods:

Q   Dr. Sekulich, do you see a list of projects near the top of that page?

A   Yes, I do.

Q   Are those the six projects that you mentioned earlier?

A   Yes.

Q   Have these six been fixed?

A   Yes, they have.

Q   I am noticing that under the column heading "Project District," it says, "baffles, fishway, log controls."

    Would those be characterized as retrofits?

A   Yes, they would.

Q   What is a retrofit?

A   Well, a retrofit is basically taking an existing crossing and retrofitting it with either downstream/upstream controls, baffles within the culvert, fishways, that type of thing, to afford fish passage.  We weren't really replacing the culvert.

Q   Did the types of fish passage projects change as time went on, in your experience?

A   Yes, they did.  These were relatively easy projects as a whole, although I'd qualified that on Bulson Creek.  That became a much larger magnitude project, and it didn't get completed for several years after this agreement.

    But, yes, subsequent to that time, as project magnitudes become larger and larger, costs have gone up.  What's interesting

1   about this, if you look at the amount that was appropriated for

2   these projects, about $280,000, that's certainly an order of

3   magnitude below what these DOT projects are costing today.

4   Q   You mentioned prioritization and the development of the

5   prioritization process and the manual.

6       Why is it important to prioritize culverts for correction?

7   A   Well, we felt it was important so that -- front load

8   benefits.  We knew that some projects, you would gain more fish

9   or access for more fish, so that would be one aspect of

10   prioritization.

11       There are other aspects of how much it would cost to correct

12   a project, the status of the stocks that were affected, the

13   mobility of those stocks when you were dealing with anadromous

14   fish or only resident fish.  So these are all factors that we

15   felt needed to be in the prioritization process.

16       It basically was a surrogate for a cost benefit, but we felt

17   it did a better job of prioritization than a formal cost benefit

18   analysis.

19   Q   You testified a bit this morning about the Fish Passage

20   Priority Index, and you described a little bit about your role in

21   developing that.  I would like to go into a little bit more

22   detail.

23       What is the Fish Passage Priority Index?

24   A   Well, it is a unique number that is calculated for each

25   barrier culvert.  And what that lends itself to is a comparison

1   of numbers from other barriers.  The range that is expected with

2   utilization of priority index is 1 to 100.  The higher the

3   number, the higher the priority.  There are six factors within

4   the priority index.  I think I alluded to some of those in

5   general terms.

6       Basically there are three modifiers within the priority index

7   for each species.  That is the cost stratification of the

8   project, to correct it; the status of the stocks, whether they

9   are depressed or not; again, whether they are anadromous or not.

10      And then critical pieces of the priority index are the first

11  three factors.  I used the BPH.  The BPH represents B, being the

12  passability of the culvert, a rough approximation of that; P, the

13  productivity capability of the species that is being calculated,

14  those being different for each species; and then the habitat that

15  a species would utilize after the correction is made.

16      Those factors are multiplied together.  There's a quadratic

17  root calculated for those factors for each species.  And then

18  once those are calculated for each species within a drainage,

19  then those are added together to give you the final PI number for

20  that crossing.

21  Q   How does the Washington Department of Fish and Wildlife

22  collect the information necessary to collect to compute a

23  priority index number for a culvert?

24  A   Well, we've had inventory crews.  And those that were

25  inventorying DOT roadways, we receive money from the Department

1    of Transportation to do that work.  And basically what starts out

2    as a driving roads, looking where those crossings are, looking at

3    the site, taking measurements, assessing whether the facility is

4    a barrier or not.

5        If it's determined that it's a barrier, secondly, then

6    determine if there's a significant amount of habitat that the

7    barrier's affecting that is 200 meters upstream and downstream.

8        Once that threshold is met, then an in-depth habitat survey

9    is done where various measurements are made of the habitat to

10   determine the habitat that is unique to each species being

11   affected.

12   Q   Once you've assembled all that information, what do you do

13   with it?

14   A   Well, through the help of my staff, we developed a database

15   to compile all that information and do the calculations of the

16   priority index.  It resides in what is called the Fish Passage

17   and Diversion Screening Inventory Database.  That's undergone

18   several names.  At one time, it was called SHEAR base.

19       But all the data for the inventory crews in Fish and Wildlife

20   are compiled there.  All of the inventories that we did for

21   counties, the data resides there.  And also if we provide

22   technical assistance to grant groups that secure money through

23   the SRF Board, those data also reside there.

24   Q   When you calculate a priority index number for a culvert, do

25   you account for the presence of other fish passage barriers in a

1    watershed?

2    A    We account for it only insofar as it's recorded as reach

3    breaks in our habitat surveys.  When the priority index is

4    calculated, it treats those other barriers as transparent.  The

5    reason we do that, we don't know when those other barriers are

6    being corrected.  So by treating them as transparent, you do a

7    priority index that looks at potential habitat gain as if all

8    those barriers would be corrected at some point in time.

9    Q    And by "transparent," what do you mean?

10   A    What that means is if you're walking the watershed, and

11   perhaps there may be ten barriers, to look at the total

12   potential, you walk the whole stream past every one of those

13   barriers measuring the habitat, and those become an integral part

14   of the priority index.  If you didn't do that, you would only

15   calculate a priority index up to the next barrier, and then you

16   would stop your survey.  That wasn't our intent, because that's

17   drawing a conclusion that that next barrier and the eight after

18   that would never be fixed.

19   Q    Optimistic way of looking at things.

20        If we fix a fish passage barrier culvert in a watershed that

21   has other barriers upstream, will the potential benefit of fixing

22   that barrier be immediately realized?

23   A    Generally no.

24   Q    Why not?

25   A    Well, if you open the habitat and the fish start utilizing or

1  passing the previous barrier, they're going to butt up against,

2  in some magnitude, to the next barrier.  And of course the amount

3  of that decline in potential production depends on the degree of

4  passability of subsequent facilities.

5  Q   I think you testified you worked for the Washington

6  Department of Fish and Wildlife a little over 25 years?

7  A   That's correct.

8  Q   Why did you stay so long?

9  A   I knew you were going to ask that.  I guess the short answer

10  is I just really enjoyed working with people and supervising

11  people that were extremely dedicated to protecting and enhancing

12  the resources of the state.  It would have been a very difficult

13  job had you not had good staff working for you to implement good

14  ideas, I guess act as you in your own ideas.  It made it real

15  easy.

16  Q   Are some of your staff in the courtroom today?

17  A   Yes, they are.

18       MS. WOODS:  Thank you.

19       THE COURT:  Counsel, before you start, let me ask him

20  one question that may help you also in your cross-examination.

21       Dr. Sekulich, I haven't read your direct testimony as of yet.

22  But in all the years and all the work that you did, in looking at

23  how to address this very complex problem that everybody wants to

24  fix, if Mr. Monson's client over there came up with a pot of

25  stimulus money, a big pot, would you do anything different than

1     the way you've set it out?

2             THE WITNESS:  In terms of the prioritization?

3             THE COURT:  I don't want to make you nervous over there.

4        Yes.

5             THE WITNESS:  No, not in terms of the prioritization

6     method.

7             THE COURT:  Thank you.

8        You may cross-examine.

9             MR. SLEDD:  Thank you, your Honor.

10                          CROSS-EXAMINATION

11    By Mr. Sledd:

12    Q    Good afternoon, Dr. Sekulich.

13    A    Good afternoon.

14    Q    I'm John Sledd.  You'll probably remember we first met

15    underneath the conference table during the earthquake at your

16    first deposition?

17    A    I think Mr. Hollowed was taking pictures.

18    Q    The infamous cellphone pictures.

19        When you were employed at WDFW, you supervised a unit that

20    goes by the acronym of SHEAR; is that correct?

21    A    Yes.  That was a name I coined when I first took the job in

22    habitat management.

23    Q    Can you spell it and tell us what it stands for?

24    A    It started as S-H-E-A-R, which was Salmon Habitat Enhancement

25    and Restoration.  That's when we were then the Department of

1    Fisheries and our responsibility was only for salmon.

2    Q    And then in your last year or two with the State, there was

3    some reorganization of the SHEAR program.  It sort of morphed

4    into the habitat and passage project section of the technical

5    applications division; is that correct?

6    A    It did.  There were some intermediate steps before then.

7    Q    And the SHEAR program, when you were directing it, you

8    produced an annual report, did you not, to describe the

9    activities of the program?

10   A    We didn't start the annual reports until probably the mid

11   '90s, but there were other reports that we jointly did with the

12   Department of Transportation.

13   Q    But there those annual SHEAR reports, for example, in 1997 to

14   2001 or so --

15   A    That sounds right.

16   Q    And then after the name change, when that became part of the

17   technical applications division, the habitat and passage project

18   section, did that annual reporting continue until you left the

19   department?

20   A    Yes.

21   Q    And you supervised the preparation and did a good bit of work

22   on each of those annual reports?

23   A    Yes.  Most of the work was outlined, directing staff to

24   complete portions of the report.  That's correct.

25   Q    Now, you started doing habitat work at DFW, I believe you

1    testified, in 1990?

2    A    Actually, it was 1991.

3    Q    And it's your opinion, is it not, that prior to your starting

4    your tenure with the DFW, or the Department of Fisheries, a

5    significant portion or most of the culvert structures that were

6    installed in the state were barriers from the minute they were

7    installed; is that not correct?

8    A    I believe there was a significant number that were.

9    Q    And that opinion's based on your personal observation of

10   culverts as well as input from your staff while you were with

11   DFW?

12   A    That's correct.

13   Q    The 1990 MOU, Exhibit W-087-B that you were asked about, that

14   didn't enable DFW to do anything that it couldn't have done

15   before, did it?

16   A    No, it didn't.

17   Q    Because, as I believe you say in your declaration, there have

18   been fish passage laws on the books in the state of Washington

19   since the late 1800s.

20   A    That's correct.

21   Q    The 1990 MOU just profiled the need and raised people's

22   awareness of those laws; is that correct?

23   A    That's correct.

24   Q    If you could take a look at Exhibit 87-B.  If you could look

25   down at the bottom of the first page.  You should see there about

1  four or five lines below the word "purpose," it says, "In order

2  to accomplish this purpose, the respective participating agencies

3  hereby agree as follows:"

4      And then after that for several pages there's descriptions of

5  responsibilities.  And to the left of each, there's an agency

6  acronym; is that correct?

7  A    That's correct.

8  Q    And if we turn to the eighth page, in the lower right, there

9  is a long number, T10 etcetera 40.  It is the eighth page in.

10      There's a heading you should see in the middle of the page

11  that says "Fish Passage Barrier Removal and Maintenance Program."

12  A    I see it.

13  Q    The first item under that heading states, "The Department of

14  Transportation was to be responsible to," quote, "maintain

15  culverts and fish passage facilities in a manner which provides

16  continued fish passage for the life of the installation."

17      Do you see that?

18  A    I do.

19  Q    The Department of Transportation did not in fact maintain all

20  its culverts and fish passage facilities to provide continued

21  passage after this MOU, did it?

22  A    Despite its best efforts, no.

23  Q    As I understand the testimony -- you've been in the courtroom

24  pretty much the whole trial, haven't you?

25  A    I have.

1 Q There's been some discussions about DOT funding for

2 corrections in reference to the I-4 program?

3 A Yes.

4 Q That's funding that is appropriated by the state legislature

5 to the Department of Transportation specifically for fish passage

6 barrier corrections, right?

7 A That's correct.

8 Q Now, the PI, or prioritization process that you just spoke

9 about a moment ago, is used for prioritizing DOT corrections that

10 are going to be funded with that I-4 funding, correct?

11 A That's correct.

12 Q It is not used for prioritizing corrections that are going to

13 be done as part of a road project that happens to have a barrier

14 in the project area?

15 A That's generally true, yes.

16 Q In that prioritization process for the I-4 funded

17 corrections, is a culvert with less than 200 meters of upstream

18 habitat treated differently than one that has more than

19 200 meters?

20 A In the inventory process?

21 Q In the prioritization process.

22 A Yes.

23 Q And the culvert with less than 200 is assessed, the data's

24 kept in the data base, but it's not prioritized for

25 correction with those I-4 funds?

1    A    In general, that's true.

2    Q    But do you just write off that barrier and say, we're not

3    going to fix it?

4    A    No, we do not.  It's kept on the databases of barriers with

5    the presumption that when there is road work safety mobility

6    projects, for example, that the fish passage barrier will be

7    corrected concurrent with that work.

8    Q    And the reason you do that is because biologically, even

9    though it's a short amount, there's still going to be benefit

10   from correcting that?

11   A    That's correct.

12   Q    In your declaration -- you've still got it up there with you,

13   don't you?

14   A    Yes.

15   Q    Can we look at Paragraph 48?  I'm sorry.  You probably don't

16   have it.

17        You state in Paragraph 48 that when DFW formulated its

18   current fish passage regulations for culverts back in the 1990s,

19   there was not much information available on the swimming

20   abilities of juvenile salmon?

21   A    I think I'm in the wrong place there.  Is it 48?

22   Q    Excuse me for a second.  Sorry about that.

23        It states, "As of '94, little information was available about

24   the swimming abilities of juvenile salmon, so we used a six-inch

25   trout as the closest surrogate," correct?

1   A   That's correct.

2   Q   It's your opinion now that the six-inch trout standard is too

3   liberal in that it will not pass all juveniles?

4   A   It will not pass all juveniles.

5   Q   And it's too liberal in that regard?

6   A   Yes.

7   Q   The next paragraph, 49 in your declaration, describes some

8   juvenile fish passage research that was done by Pat Powers of DFW

9   about 15 years ago and then some by Battelle Labs more recently?

10  A   That's correct.

11  Q   The Battelle research was done for the same state contract,

12  was it not?

13  A   Yes, the Department of Transportation.

14  Q   But the results of that research have not been incorporated

15  into the DFW barrier assessment process, have they?

16  A   Not directly, no.

17  Q   You speak in Paragraph 47 about the process known as adaptive

18  management which resource managers use -- where they use research

19  to improve the way they do things?

20  A   Yes, I see it.

21  Q   Juvenile salmon passage.  And in particular that six-inch

22  trout surrogate, is an area that would benefit from adapted

23  management, would it not?

24  A   Yes, it would.

25  Q   And of course in doing adaptive management, it would be

1    beneficial to have your tribal partners and their biologists

2    participate, along with state biologists?

3    A    Yes.

4    Q    Paragraph 48 states that the -- it describes the WAC when you

5    shifted from, as you described it -- you said best professional

6    judgment.  That was the effects of its actually having defined

7    standards and they were put in regulations?

8    A    That's correct.

9    Q    You state in Paragraph 48 that was based on state-of-the-art

10   research when it was adopted in 1994?

11   A    Yes.

12   Q    But by the time you retired in 2002, you believed that more

13   work could be done in addressing juvenile fish passage?

14   A    That's correct.

15   Q    Is it your opinion that the barriers to Sockeye migration in

16   the Lake Washington system should be made passable whenever

17   that's possible?

18   A    Yes.

19   Q    And in the declaration, I believe Ms. Woods also asked you a

20   little bit about inventory work that was done early on in the

21   development of DFW's Fish Passage Program.  And you mentioned

22   some county inventories?

23   A    Yes.

24   Q    And one of those that's mentioned in your declaration is with

25   Skagit County, correct?

1   A   Yes.

2   Q   And that inventory was done with the participation of the

3   Skagit River Tribes?

4   A   Yes, it was.

5   Q   And you spoke also in summarizing your declaration about a

6   cost-sharing program that DFW had in the mid to late '90s that

7   had fixed some county barrier culverts?

8   A   That's correct.

9   Q   Cost share means the State pays part of the cost of the

10   correction?

11   A   It was a little more in-depth than that.  What we did is we

12   volunteered to do the work, a cost-share arrangement, where the

13   county typically paid 50 percent, and we elected to do that to

14   kind of train the county in how that work should be done, in

15   addition to providing that additional resource.

16   Q   In about the same term during the development of the DFW's

17   passage program, you also tried to include correction of nearby

18   private barrier culverts when you were fixing the state and

19   county culverts?

20   A   Yes, we did.

21   Q   So the State would also have ended up paying some of the

22   costs for that correction process?

23   A   It wasn't exactly the arrangement that we had with counties.

24   We realized that the private barrier owners didn't have the

25   resources that the counties or cities would have.  So we tried to

1    come up with an arrangement where the private barrier owner would

2    put forth any resources they had available.

3    Q    And then the State would put forth its resources to help fix

4    the private owners' barrier?

5    A    Which was normally over 50 percent of the cost.

6    Q    Did the Department -- did you, when you were working on that

7    program, supervise it?

8    A    Yes.

9    Q    Did you ever consider using an enforcement mechanism to

10   compel those private parties to correct their barriers?

11   A    I didn't personally, no.

12   Q    You mention in Paragraph 43 of your declaration that the

13   State legislature in 1997 passed a law to create a fish passage

14   task force and then chartered the task force to come up with a

15   report to the legislature on how to create a fish passage barrier

16   program, correct?

17   A    Would you say that again?  I was kind of reading it.

18   Q    Take a minute to read it.

19   A    I've only seen the top four lines there.

20        Okay.  Yes.

21   Q    So the legislature created a task force with this '97

22   legislation and said, Go out and come back to us with a report on

23   how to create a passage barrier correction program?

24   A    That's correct.

25   Q    And you were a co-chair of that task force?

A    I was, with Paul Wagner from Department of Transportation.

Q    And Mr. Wagner was also a witness in this case?

A    Yes.

Q    And the two of you were the co-authors of the report that ultimately was submitted to the legislature in accordance with that statute, correct?

A    Yes, we were.

Q    And the work that was done by the task force, with the members of the task force, investigated the facts surrounding the creation of such a fish passage barrier correction program and then reported your conclusions back to the legislature?

A    Yes, we did.

        THE COURT:  Counsel, why don't we pause here and go ahead and take our recess for the afternoon.

(At this time, a short break was taken.)

        THE COURT:  Mr. Sledd, we were on cross-examination of Dr. Sekulich.

        MR. SLEDD:  Thank you.

By Mr. Sledd:

Q    Dr. Sekulich, a culvert that is passable to fish in the present can become a barrier over time due to changes in the hydrology of the stream, correct?

A    Yes, it can.

Q    So if you fix a barrier and you want to make sure that it stays passable in the future, you need a monitoring program to go

1    out and determine that that passable structure has not become a

2    barrier again, correct?

3    A    Yes.  You would want a monitoring program.

4         I might add to that, though, that the type of correction that

5    you make would determine the, I guess, frequency that you would

6    have to reinspect those facilities to see if they were still

7    passing fish.

8    Q    So if you used correction designs that minimize the chance

9    for hydraulic changes to create an impassable condition, it could

10   lower your monitoring burden?

11   A    That's correct.

12   Q    When I was asking you about the 1997 legislative task force

13   report - or it may have been when I was asking you about the

14   SHEAR reports - you mentioned a number of other reports done

15   jointly with DOT.  I want to ask you about one of those.

16        MR. SLEDD:  Madam Clerk, if you could hand the witness

17   Exhibit AT-54, please.

18        THE WITNESS:  What was the number again?

19   By Mr. Sledd:

20   Q    This is AT-54.  It's a Fish Passage Program Department of

21   Transportation Inventory Final Report.

22   A    Can I just look at the screen?

23   Q    That's absolutely fine.  Whatever is easier for you.

24        Did your fish passage program work with DOT and prepare a

25   series of not quite annual, but as time went on became more close

1    to annual progress performance reports regarding the joint work

2    between DFW and DOT regarding DOT culverts?

3    A    Yes, we did.

4    Q    And this is one in that series of reports?

5    A    Yes.

6    Q    And if I am correct, it has already been admitted in

7    evidence.

8         You approved the content of these reports when these were

9    prepared by staff under your supervision?

10   A    That's correct.

11   Q    If we could turn to Page 3 in the final report, the first

12   paragraph.  Four lines down there, it states, "One

13   habitat-related cause for weakening of salmonid production, which

14   can be easily resolved, is human-made barriers to fish migrations

15   caused by improper placement of road culverts."

16        Do you see that?

17   A    Yes, I do.

18   Q    By that statement that it is easily resolved, what you and

19   your staff meant was that fish passage barriers were easier to

20   fix than those habitat problems described in the previous

21   paragraphs, such as hydropower, habitat degradation, easier to

22   deal with than oceanic events; is that correct?

23   A    That's correct.

24   Q    If we could look to Page 2, please, in Exhibit AT-54.  In the

25   third paragraph on that page, the next-to-the-last sentence --

1    are you with me?

2    A    I think so.  On my screen here -- is it the last full

3    paragraph?

4    Q    Yes, it is.

5    A    Okay.

6    Q    The next-to-last sentence in that last full paragraph on your

7    screen states, "A total potential spawning and rearing area of

8    1.6 million meters squared," and some change, "is currently

9    blocked by WSDOT culverts on the 177 surveyed streams requiring

10   barrier resolution.  This is enough wetted stream area to produce

11   200,000 adult salmonids annually."

12       Now, you were the major player in preparing that statement

13   and doing those calculations, were you not?

14   A    Yes, I was.

15   Q    And those calculations are based on the percent passability,

16   or B factor, the P or production factors, and production

17   coefficients, and the H, or habitat values, that are described in

18   the priority index?

19   A    With the understanding it is all under the umbrella of

20   potential production.

21   Q    Correct.  So that is the potential annual adult equivalent

22   salmonid production?

23   A    That's correct.

24   Q    An adult equivalent means that's a fish that actually would

25   end up in either harvest or escapement as an adult?

A     That's correct.

Q     So that it's after ocean mortality and other mortality factors?

A     Yes.

Q     You included that statement about the 200,000 fish in this final report in order to convey to the state legislature that there was a real benefit to the money the legislature was appropriating for culvert corrections, was it not?

A     That's correct.

Q     And I believe your declaration describes these factors in the PI and the BPH combination as being properly used only in a relativistic sense, to compare the benefits between one project and another?

A     For that purpose, and also to compare correction schedules, where it's still a relative comparison.

Q     This 200,000 additional salmon statement was not comparing the relative benefits of two projects, though?

A     It was not, but it was a result of a cost benefit analysis that I did at that time.

Q     But it was not comparing two different projects?

A     No, it was not.

Q     And it was not comparing two different schedules?

A     No.  It was a result of such analysis.

Q     But it's not stated in the report?

A     That's correct.

1 Q You said this is an outgrowth, I believe, of a cost benefit

2 analysis?

3 A That's correct.

4 Q And you did that analysis?

5 A Yes.

6 Q But in your opinion, it's impossible to do a cost benefit

7 analysis on a single culvert and determine what the benefit of

8 the fish coming back to a single correction is?

9 A I don't think it's impossible, but it's very difficult.

10 Q Dr. Sekulich, I'm going to read to you the question and

11 response from your deposition of April 22nd of 2009, Page 69 at

12 Lines 3 to 9.

13  Question:  "So the legislature, you think, wanted a

14 project-by-project cost benefit?"

15  Answer:  "Yes."

16  Question:  "And you didn't think that was possible?"

17  Now, if you wanted to do a cost benefit on the overall

18 programatic level, not individual culverts but the whole

19 correction program, you believe you could do that?

20 A I believe it's much easier and it makes more sense.

21 Q And if you wanted to do that, you don't know of any better

22 method to do than the BPH method, the percent passability, the

23 cost of production coefficient times the habitat areas, do you?

24 A In my opinion, on an individual project, the priority index

25 methodology is the best.

Q    And if you want to prepare an estimate for the entire

program, you don't know of a better methodology than that?

A    Than the priority index methodology or the cost benefit

analysis?

Q    Than the BPH methodology that's a portion of the priority --

A    It's a portion.  I think it's a good methodology, yes.

Q    And you don't know of a better one to come up with a cost

benefit for the entire --

A    Not without thinking about it more, no.

          MR. SLEDD:  If we could have on the screen, please -- if

I could have the clerk deliver to Dr. Sekulich Exhibit AT-154?

     I'm sorry, your Honor.  It's not admitted yet, so perhaps I

should have it on the screen and not publish it to the witness.

By Mr. Sledd:

Q    I'll botch this, but it's my last question.

A    Are you hoping it's a good one?

Q    It's a doozy.

     Do you recognize that document, Dr. Sekulich?

A    I do.

Q    And it has your name on it underneath the title, correct?

A    Yes.

Q    And is that a document that -- the date down there,

November 9th, 1999, do you see that?

A    Yes, I do.

Q    And that was during your tenure with the Department of Fish

1   and Wildlife?

2   A   Yes.

3   Q   And this document has your name on it?

4   A   Yes, it does.

5   Q   It indicates that you're a fellow author?

6   A   I was primary author.

7   Q   It says, Dr. Paul Sekulich, Washington Department of Fish and

8   Wildlife."  That's to indicate that you did this as part of your

9   employment with WDFW?

10  A   That's correct.

11  Q   And it's describing some of your work that was done in the

12  course of your employment?

13  A   I don't know if it was describing my work.  It was positing

14  inventory process to be funded by the SRF Board.

15  Q   But it was part of your work to posit that inventory process?

16  A   Yes, it was.

17          MR. SLEDD:  I have no further questions, your Honor.

18      Thank you, Dr. Sekulich.

19          THE WITNESS:  Thank you.

20          THE COURT:  Redirect.

21                      REDIRECT EXAMINATION

22  By Ms. Woods:

23  Q   Dr. Sekulich, the Court asked you a question about if Peter

24  Monson's client sent you a pile of money, would you do anything

25  different, and I believe you responded with respect to

1    prioritization.

2        I'd like to phrase a similar question a little bit

3    differently.  If you had a big pot of money, regardless of the

4    source, what would you do with it in a culvert program?

5    A    I guess I would take the existing methodology and the

6    comprehensive plan for prioritizing bigger culverts, take that

7    list and accelerate the correction schedule with the increased

8    money.

9    Q    I'd also like to clarify, we've been talking about the Fish

10   Passage Priority Index and how that's used for prioritization.

11       It's used for prioritization of culvert corrections; is that

12   right?

13   A    That's correct.

14   Q    Is it used for prioritization of anything else?

15   A    No, it's not.

16   Q    Mr. Sledd asked you some questions about the swimming

17   abilities of six-inch trout and inventory methodologies based on

18   that.

19       If a culvert is designed to pass a six-inch trout, will it

20   also pass juvenile salmon some of the time?

21   A    Yes.

22   Q    Mr. Sledd also asked you some questions about a culvert

23   inventory that was done in the Skagit Basin, and he mentioned the

24   participation of the indian tribes in that area.

25       Did you have a court order in place requiring you to

1   collaborate with the tribes to do that inventory?

2   A   No, we did not.

3   Q   Mr. Sledd also asked you some questions about enforcement of

4   fish passage laws in the state of Washington, and he asked

5   whether you would consider an enforcement mechanism.

6       Do you remember that?

7   A   Yes, I do.

8   Q   I believe the two of you also went through some examples of

9   collaborative projects that involved counties and other entities?

10  A   Yes.

11  Q   Was there some conscious decision in the Department of Fish

12  and Wildlife to choose collaboration over enforcement as a way to

13  fix fish passage barriers?

14  A   Well, that's a good question.  I guess I took it upon myself

15  to use a collaborative approach, and I was never told to do

16  otherwise; felt that would not have cost any more money or

17  resources to use a collaborative approach to correct fish passage

18  barriers as using a strict enforcement approach.

19  Q   Do you have an opinion about whether it works better to use

20  one approach or the other?

21  A   Well, personally, I thought it would be better to use a

22  collaborative approach.  One thing you get out of such approach

23  is people tend to listen to your ideas more and realize their

24  responsibility for maintaining a barrier that's been corrected

25  subsequent to the correction.

Q    Were you in the courtroom when Mr. McHenry talked about a

project in the Salt Creek watershed?

A    I recall him mentioning several corrections in the Salt Creek

watershed.

Q    Would that be an example of the kind of collaborative project

that you were talking about?

A    I wasn't involved with it, but it sure sounded like it.  It

sounded like there were various ownerships involved, including

state agency, DNR, so that's an example of a collaborative

approach, yes.

Q    Mr. Sledd asked you about the 200,000 fish number that is in

the 1997 progress report for DOT barrier correction, Exhibit

AT-054?

A    Yes, he did.

Q    That 200,000 fish number, was that a statewide number?

A    Yes.

Q    In your opinion, can the BPH and the priority index be used

to predict the number of fish that will be produced from fixing a

particular culvert?

A    No, I do not.

Q    Do you have an opinion about whether the current approach to

salmon recovery is a good one?

A    Well, not having been directly involved with it for several

years, at the time my tenure ended with the Department of Fish

and Wildlife, there were --

1          MR. SLEDD:  Objection, your Honor.  He testified he

2     hasn't been involved with it for several years.  It's speculative

3     about the time frame.

4          THE COURT:  The objection is sustained without further

5     foundation, Ms. Wood.

6     By Ms. Woods:

7     Q   Dr. Sekulich, have you been involved in salmon activity since

8     you retired?

9     A   Yes, I have.

10    Q   What kinds of activities?

11    A   I've been on contract with the Department of Transportation,

12    Department of Fish and Wildlife on fish passage and related

13    environmental issues.

14    Q   Is that part of an overall salmon recovery strategy, as far

15    as you know?

16    A   In terms of my involvement, it was fish passage and chronic

17    environmental deficiencies, which would be part of a

18    comprehensive package.

19    Q   Do you believe that comprehensive package is a good one?

20         MR. SLEDD:  Your Honor, I'm going to object.  We have a

21    stipulation that the direct testimony would be limited to what

22    was in the testimony.  We summarized for half an hour.  This is

23    going beyond the scope of what was in the report.

24         THE COURT:  It is beyond the scope.

25         But, Dr. Sekulich, I want to hear your answer.

1          THE WITNESS:  What I was waiting to say is a followup.

2    During my tenure with Fish and Wildlife, even in my own unit, we

3    were not just involved with fish passage.  It was also with

4    habitat restoration projects and also screening unscreened water

5    diversions, so it was a comprehensive approach that involved

6    those perturbations of the habitat.

7        Also in terms of involvement with the SRF Board and giving

8    advice to the SRF Board, there were habitat integrity issues that

9    I think are very important, not just passage issues; habitat

10   integrity being the actual restoration of the habitat, riparian

11   rebuilding, creating off-channel rearing areas, that type of

12   thing.

13       So in that context, the comprehensive approach, I think, was

14   appropriate.  I don't think you can address just fish passage or

15   preventing fish access into unscreened water divisions or

16   diversions, but also the integrity of the habitat.

17   By Ms. Woods:

18   Q   Dr. Sekulich, would it be a good idea, in your opinion, to

19   spend all of our money on fixing culverts without taking into

20   consideration other elements of a comprehensive plan for salmon

21   recovery?

22   A   No, I do not.

23   Q   And why not?

24   A   Well, I think you need the comprehensive approach that

25   addresses various limiting factors in specific watersheds.  And I

```
 1    think you have to address those all to really have a good success

 2    rate in your efforts.

 3              MS. WOODS:  Thank you.

 4              THE COURT:  Thank you, Doctor.  You may step down.

 5        The State's next witness?

 6              MR. SHAFTEL:  Your Honor, if it's all the same to the

 7    Court, both parties have talked and would be happy to call the

 8    next State's witness on Monday so the cross-examination could

 9    take place directly after the direct.

10              THE COURT:  So you want to quit half an hour early?  How

11    are we doing in terms of time, in terms of the estimation of how

12    much time it would take?

13              MR. TOMISSER:  I think we're probably ahead of schedule,

14    your Honor.  At the current pace, I think that we will conclude

15    probably before the 29th, I would think.  At this point, I'm not

16    concerned that we're going to run out of time.

17              MR. SLEDD:  We are ahead of where we expected to be,

18    your Honor.

19              THE COURT:  Boy, how rarely do I hear that?  That's

20    great.

21        Tomorrow, of course, you don't -- we have a criminal

22    calendar, so we will not be in session tomorrow.  We will be in

23    session then Monday, Tuesday.  Wednesday and Thursday, the Court

24    will be shut down, and I'm not in town.  And then we're back in

25    court on Friday.  All right?
```

1          MR. MONSON:  I have a question, your Honor.  We have one

2    rebuttal witness who will be coming from out of state, and I'm

3    just trying to understand the best time to call him to ask him to

4    be here.  Would Friday -- do you think Friday the State will be

5    finishing its case, and that would be appropriate for rebuttal

6    testimony to be heard?

7          THE COURT:  And even if they're not done, we can always

8    take that person out of order.  Okay?

9          MR. MONSON:  All right.  I'll try to have him here on

10   Friday.

11         THE COURT:  Other than that, have a great three-day

12   weekend.  I like the collaborative effort testimony given by

13   Dr. Sekulich up here.

14      So if you should happen to meet anywhere during the weekend

15   and decide that you've got a solution, I would not be unhappy.

16   Have a great weekend.  We'll be at recess.

17                         (Adjourned)

18

19

20

21

22

23

24

25

1                                **CERTIFICATE**

2

3

4

5

6

7

8

            I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                      S/Barry L. Fanning

12                                      _____

13                                      Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25