```
 1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 2                          IN SEATTLE

 3    -----------------------------------------------------------

 4    UNITED STATES OF AMERICA, et al, )
                                       )
 5                    Plaintiffs,      )  No. C70-9213
                                       ) Subproceeding 01-1
 6         v.                          )
                                       )          FINAL
 7    STATE OF WASHINGTON, et al.,     )
                                       )
 8              Defendants.            )
                                       )
 9    -----------------------------------------------------------

10                  TRANSCRIPT OF PROCEEDINGS

11    -----------------------------------------------------------

12            BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                      October 19, 2009

14
      APPEARANCES:
15
                            Mr. Peter C. Monson
16                          U.S. Department of Justice
                            Environment & Natural Resources Division
17                          Rogers Federal Building
                            1961 Stout Street - 8th Floor
18                          Denver, CO 80294

19                          Rene David Tomisser
                            Fronda C. Woods
20                          Douglas D. Shaftel
                            Philip M. Ferester
21                          Attorney General's Office
                            P.O. Box 40100
22                          Olympia, WA 98504

23                          John C. Sledd
                            Laura Sagolla
24                          KANJI & KATZEN
                            100 South King Street, Suite 560
25                          Seattle, WA 98104
```

Alan C. Stay
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Tim R. Weaver
COCKRILL & WEAVER PS
316 North Third
Yakima, WA 98907

Daniel A. Raas
Harold Johnsen
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
Rob Roy Smith
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmussen
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

1

1       INDEX OF WITNESSES

2

3       PAUL WAGNER                    PAGE

        Direct by Mr. Shaftel          4
4       Cross by Mr. Johnsen           34
        Redirect by Mr. Shaftel        93
5       Recross by Mr. Johnsen        115
        Recross by Mr. Monson         124

6

7       MICHAEL BARBER

        Direct by Ms. Woods           126
8       Cross by Ms. Rasmussen        139
        Redirect by Ms. Woods         166

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning and welcome back.  I hope you

2    all had a good weekend.  I think we had left off with the State

3    preparing to call their next witness.

4          MR. SHAFTEL:  Do we have any preliminaries?

5       The State calls Paul Wagner to the stand.

6          THE COURT:  Good morning, Mr. Wagner.  I will have you

7    step in front of our clerk to be sworn prior to testifying.

8    Whereupon,

9                          PAUL WAGNER

10   Called as a witness, having been first duly sworn, was examined

11   and testified as follows:

12         THE CLERK:  Please state your full name and spell your

13   last name for the record.

14         THE WITNESS:  Paul Wagner, last name spelled

15   W-A-G-N-E-R.

16         THE COURT:  You may inquire, Mr. Shaftel.

17         MR. SHAFTEL:  Your Honor, I believe we have stipulations

18   on all the exhibits associated with Mr. Wagner except for one,

19   W-092-J.

20      In addition, I have a list of additional exhibits that will

21   be used during the course of Mr. Wagner's testimony that have

22   been stipulated to, and I'll provide that list, which includes

23   W-161-D, W-161-A, W-162-D, 164-A, 164-B, 165-B, 166-A, 166-B,

24   168-A, 168-E, 189.  I believe that's it.

25      The State would like to substitute W-113 for W-092-J, but I

1    believe that the tribes have an objection to that document.

2            MR. JOHNSEN:   189 was not on the list that you gave me

3    Thursday.  Is that the graph that you showed me this morning from

4    Mr. Carpenter's declaration?

5            MR. SHAFTEL:   It is.

6            MR. JOHNSEN:   Okay.  Thank you.

7            THE COURT:   Counsel, before you start, let me catch up

8    on your exhibits here.  So 161-B, 161-A, 162-D, 164-A, 164-B,

9    165-B, 166-A, 166-B, 168-A, as in apple, 168-E, W-189.

10       Now, W-092-J is the Wagner declaration, correct, the

11   original?

12           MR. SHAFTEL:   I'm sorry, your Honor.  The Wagner

13   declaration is W-092, which has been stipulated to.  The W-092-J

14   is a scoping report, and the State would like to substitute a

15   more recent copy of that scoping report, W-113, to give the Court

16   the most updated information on that topic.

17           THE COURT:   All right.  092-J is an exhibit.  Exhibit J,

18   Fish Passage Pre-Scoping List?

19           MR. SHAFTEL:   That's correct.

20           THE COURT:   All right.  And that one's being withdrawn?

21           MR. SHAFTEL:   And substituted with W-113.

22           THE COURT:   I understand.

23       Do the plaintiffs have any objection to 113?

24           MR. JOHNSEN:   We do, your Honor.  113 is not referenced,

25   but its predecessor, the one that's being substituted for, is

1    referenced in Mr. Wagner's declaration in Paragraph 42 only as a

2    list of stream simulation projects that are planned.

3        The exhibit actually contains other information.  As a list

4    of projects that are planned, we have no objection to.  It's the

5    additional that's in the exhibit that he doesn't make reference

6    to at all in his declaration which should not be either included

7    in the exhibit or, if it is included, not considered by the

8    Court.

9            THE COURT:  All right.  Mr. Shaftel, let's do this.

10   Let's get going on the testimony of Mr. Wagner here.  I

11   understand what the issue is on 113.  And then we can deal with

12   that after we get some of the testimony out.

13       The others are admitted.  You may inquire.

14                        DIRECT EXAMINATION

15   By Mr. Shaftel:

16   Q   Mr. Wagner, would you state your full name for the record.

17   A   Paul Joseph Wagner.

18           MR. SHAFTEL:  Madam Clerk, would you please hand

19   Mr. Wagner a copy of his declaration, which is W-092?

20   By Mr. Shaftel:

21   Q   Mr. Wagner, I would like you to take a look at Exhibit W-092,

22   if you would, please.

23   A   Yes.

24   Q   And did you prepare a written declaration in this case?

25   A   Yes, I did.

```
 1   Q    And is W-092 that declaration?

 2   A    It is.

 3   Q    And do you adopt that declaration as your testimony here

 4   today?

 5   A    Yes.

 6         MR. SHAFTEL:  I would like to offer Exhibit 092, as well

 7   as every other exhibit that has so far been stipulated to, into

 8   the record.

 9         THE COURT:  Yes.  The others ones that were stipulated

10   to have been admitted.

11      Any objection to W-092, the declaration?

12         MR. JOHNSEN:  No, your Honor.

13         THE COURT:  That will be admitted.  Thank you.

14         MR. SHAFTEL:  Your Honor, just to be clear, I'd like to

15   make sure that I've also offered all the exhibits attached to the

16   declaration, which would be Exhibits A through O, 092, except for

17   I understand there is still an outstanding issue on J.  So I

18   would like to offer those exhibits into the record as well.

19         THE COURT:  Let me check with the plaintiffs.  Any

20   objection to all of those exhibits through O, 092, with the

21   withdrawal of 92-J, being admitted?

22         MR. JOHNSEN:  No.

23         THE COURT:  Thank you.

24      Madam Clerk, I think we are caught up on the exhibits,

25   correct?
```

1          THE CLERK:  Correct.

2          THE COURT:  Thank you.  You may inquire.

3          MR. SHAFTEL:  Your Honor, I apologize.  One last

4  clarification.  The State is not withdrawing 092-J unless

5  W-113 is substituted.

6          THE COURT:  I understand.

7  By Mr. Shaftel:

8  Q    Mr. Wagner, what's your title?

9  A    Biology branch manager at the Department of Transportation

10  and Environmental Services office.

11  Q    Could you give a brief overview of your education?

12  A    I have a Bachelor of Science in natural history, which is a

13  double major, geology and biology.  And I've done graduate

14  fieldwork in salmon ecology at Evergreen State College.

15  Q    And how did you come to work for the Department of

16  Transportation?

17  A    I began in late 1989.  I hired on to conduct wildlife

18  studies.

19  Q    And how long have you held your current position?

20  A    Beginning in 1993, I was promoted to a management position in

21  the unit, and I have been in basically those same duties since

22  then.

23  Q    And what do your responsibilities include?

24  A    I manage the biology branch in our headquarters office, which

25  is responsible for statewide functions for the department,

1    providing technical support, policy guidance and direction on

2    biological resource issues as they affect the department.   So

3    that includes fish passage and stream restoration projects as

4    well as wetlands, wetland delineation, Endangered Species Act

5    coordination, as well as mitigation design, mitigation

6    monitoring, those types of activities.

7    Q    How many people do you oversee?

8    A    I have 25 staff that are state employees, and then we hire on

9    up to another 16 or so summer seasonals.

10   Q    As part of your job, do you participate in any organizations

11   on transportation and the environment?

12   A    I do.   I have the opportunity to work in a number of

13   different forums that are national and international.   I work

14   with several panels that are part of the National Academy of

15   Sciences Transportation Research Board, evaluating and consulting

16   on research projects that are looking at the effects of

17   transportation infrastructure on the national environment.

18        I also work with an organization called the International

19   Conference on Ecology and Transportation.   I chair that committee

20   and am involved in organizing and coordinating international

21   conferences on that topic.

22   Q    And do you also work with counterparts from other states?

23   A    I do.   In those different committees and forums, I have an

24   opportunity to interact with my counterparts in DOTs and people

25   working with transportation and ecology issues around the country

1    and in other countries.

2    Q    When did the DOT's fish passage correction program start?

3    A    The program started in an organized way in 1991.

4    Q    And why was it created?

5    A    It was created as a followup from the Memorandum of

6    Understanding that was signed between the Department of

7    Transportation and the Department of Fisheries, at that time,

8    recognizing that there are numerous barriers to fish passage in

9    the highway system and setting forth a program to identify and

10   correct those.

11   Q    And was it a unique program when it began in 1991?

12   A    Yes.  That's one of the things that I've learned from

13   coordinating with other states and from our history is that we

14   were the first state to develop a comprehensive approach to

15   identifying and evaluating fish passage barriers on a highway

16   system.

17   Q    Was it also unique within the Department of Transportation?

18   A    Yes.  This is set up as a specific funding -- specific

19   program that's funded in the department separate from other

20   transportation activities.

21   Q    Could you turn to your monitor there and explain to the Court

22   what this exhibit shows?

23   A    This chart just shows the different programs that are part of

24   the Washington State DOT highway construction program.  And the

25   grouping at the top under "Preservation," or what we call P,

1    projects or preservation: typical work on transportation

2    projects, paving, working on structures, rest areas.

3        The section below that is "Improvement," the I categories.

4    And these are where we identify different deficiencies in the

5    transportation system and correct those through the specific

6    programs.

7        The point in showing this slide is just to illustrate that

8    Washington DOT has a category of improvement called

9    "Environmental Retrofit" where we identify and execute projects

10   based on an environmental need where the need there is to correct

11   an environmental problem.  In particular, the ones that I work

12   with are fish passage barriers, wildlife habitat connectivity,

13   chronic environmental deficiency, and management of environmental

14   mitigation sites.

15   Q    In addition to the fish passage barrier retrofit program, do

16   any of the other programs that you oversee have a fish habitat

17   component to them?

18   A    Well, in Washington, as in most states, these other

19   activities -- I don't oversee them.  But roadway work, some

20   safety projects, mobility projects where work is planned that

21   encounters fish barriers, they also may be correcting fish

22   passage barriers as well as their maintenance activities.

23        I refer to that as an opportunistic way of correcting fish

24   barriers.  That's the main technique that's used in most states.

25   Q    I notice that under the "I-4 program" box, it says "chronic

1    environmental deficiency."

2    A    Um-hum.

3    Q    Can you describe what that program is?

4    A    This is a program where we've recognized the need to address

5    certain problems where we have repeated occurrences of usually

6    washouts along highways or rivers running parallel to the roads,

7    and the roads have been built very close.  We have repeated

8    maintenance activities at those areas where there may be impacts

9    to habitat as a result of that.  And we set up a special program

10   to identify some of those problem areas and develop proactive

11   solutions that help get us out of repetitive problems rather than

12   just treating those as a band-aid on a regular basis.

13       I should mention that those solutions are done in ways that

14   not only reduce the need for repetitive maintenance but also

15   provide a substantial benefit to habitat, using bioengineered

16   slopes, using careful attention to habitat restoration as part of

17   those projects.

18   Q    And do culverts that may have issues with sedimentation

19   problems also get addressed in that program?

20   A    Yes.  There is an overlap, because both this project and fish

21   barrier -- this program and the fish barrier program both relate

22   to aquatic systems.  Sometimes we may have a culvert that has --

23   may have fish passage issues related to it but fits more clearly

24   into the chronic environmental deficiency program, so we do

25   correct fish barrier projects -- fish barriers as part of the I-4

1    chronic environmental deficiency program.  We also refer to that

2    as CED, and I'd like to use that acronym as we talk today.

3    Q    That's fine.

4         What does this next slide show?

5    A    This slide shows an overview of fish barrier corrections that

6    we have records for.  The blue lines are fish barrier corrections

7    that have been done through that I-4 standalone program under the

8    environmental retrofit.

9         The red bars are for corrections that have been accomplished

10   through other types of projects such as safety and mobility

11   projects.

12        And the green bar is just a cumulation of the other two bars.

13   Q    I notice it says before 1991, ten were done, in the red bars.

14   How does the DOT know that only ten were done before 1991?

15   A    Well, our program of tracking with the Department of Fish and

16   Wildlife really started in 1991.  But at that time, there were

17   some that were on the records at the Department of Fish and

18   Wildlife, although there hadn't been a comprehensive inventory.

19   Those have been included just as a part of recordkeeping, but

20   they don't really represent any directed effort at inventorying

21   those.  It's not a comprehensive list.  It's just some entries

22   that were in the database before the program started in earnest.

23   Q    And I notice that on 2008, it says zero for the I-4.  Why

24   were zero corrected in 2008 under the I-4 program?

25   A    Under the I-4 program.  We were originally planning to

1    construct three projects that year.  We had some difficulties as

2    we moved ahead with those and decided to make some changes in

3    those projects.  Two of them were intended to provide correction

4    to a retrofit project by -- the intent was to provide an improved

5    fishway.

6        As we got into those designs, we realized that those

7    approaches were very expensive and that we would be better off

8    looking at doing a full replacement on those projects, and so we

9    elected to wait on those designs to do a full replacement instead

10   of a fishway, and that required moving those projects out into a

11   future biennium.

12       The third project on Chicken Coop Creek was planned for

13   construction.  But as we began to develop our designs, we became

14   aware of the plans via the Jamestown S'Klallam Tribe to improve

15   an interchange that would affect that project.  And we didn't

16   want to be building a corrected -- a fish passage correction that

17   then was going to be affected by a future interchange project, so

18   we decided to hold on that until we know what that design is.

19       We also recognize that at that location there are two

20   downstream barriers that are County owned that may also be

21   corrected as part of that interchange project.  So we felt it was

22   prudent to wait until we know what that full design is.

23   Q    Is the Chicken Coop Creek, is that in WRIA 19?

24   A    I believe so.

25   Q    And were you here for the McHenry testimony?

1  A    Yes, I was.

2  Q    And is that the same Chicken Coop Creek as he mentioned in

3  his testimony?

4  A    It is.

5  Q    Despite the fact that DOT wasn't able to actually complete

6  any corrections in 2008 in the I-4 program, did it spend money?

7  A    We did.  When we realized that we were not going to have

8  projects ready for execution that construction season, as I said,

9  we moved the planned projects into the future biennium and we

10 redirected money to design of other projects.  And our effort in

11 the last few years has really been to work on having more

12 projects in a more advanced state of readiness through expanding

13 our scoping efforts and expanding our design efforts, so we have

14 more projects ready to go.  And that's what we've done that

15 biennium, so we've actually made progress.

16 Q    So what's the cumulative total of corrections that DOT has

17 records for?

18 A    This table shows 225 corrections; however, this doesn't show

19 this construction season.  This construction season, 2009, we

20 corrected another 11 fish passage barrier projects, so that would

21 bring this total to 236.

22 Q    And what does this next slide show?

23 A    This is using the same information but just showing kind of a

24 running total of our corrections.  And, again, it doesn't include

25 the corrections from 2009.  Our purpose in showing this is just

1    to indicate that we've had a steady rate of corrections and we

2    haven't had a year where we've made no corrections.

3    Q    And what is this next slide?

4    A    This slide shows the funding/expenditures for the I-4

5    program, the stand-alone program.  So it doesn't include other

6    methods by which fish passage would be corrected.

7         This shows the funding in the light blue bars, the

8    expenditures for those corresponding biennium, 1995 through 2009.

9    And the purple bars are just a conversion of those years to their

10   equivalent in 2009 dollars.

11        So this shows a total expenditure of almost $53 million,

12   which would be equivalent to $73 million in today's money.

13   Q    Now, going back to, if I could, the first exhibit.  I'll just

14   flash back here.  Which of these programs is being shown in that

15   funding slide?

16   A    Only that program.  That's the fish passage barrier

17   standalone program.

18   Q    And so things like barriers -- or culverts that are worked on

19   through the CED program are not included in that total?

20   A    That's correct.

21   Q    Do you know what other funding for fish passage barrier

22   corrections might be excluded from the numbers that are reflected

23   here?

24   A    Well, these numbers wouldn't show barriers that are corrected

25   as a part of regular safety mobility projects.

1    Q    What about funding for fish passage barrier corrections

2    performed through the preservation program, are those reflected

3    in this slide?

4    A    No, they are not.

5    Q    And why are we not able to obtain that information to show

6    how much resources we are committing to fish passage barrier

7    corrections from these other programs?

8    A    It just has to do with how our funding is tracked in the

9    department.  If we fix a fish barrier as part of a larger safety

10   project, the cost of that correction is just embedded in the

11   overall project cost.  It doesn't really discriminate between,

12   for example, excavation that's done for the project overall

13   versus the portion of excavation that would be done for that

14   culvert or that project.  It's actually rather difficult for us

15   to separate out those costs that are embedded in other project

16   costs.

17   Q    And what's included within these numbers?

18   A    This includes the inventory work that we fund at Department

19   of Fish and Wildlife as well as the barrier correction work

20   that's done through the I-4 standalone program.

21   Q    Does this also include any contract you have with WDFW for

22   monitoring the corrections?

23   A    It does.  We fund staff at the Department of Fish and

24   Wildlife to monitor fishways and to monitor our construction

25   projects.  And that's included as part of that contract.

1  Q    And do you know how much the legislature appropriated for

2  DOT's fish passage barrier program for the current biennium?

3  A    It's about $19 million.

4  Q    Could you explain how the DOT's inventory of its barriers has

5  evolved over time?

6  A    Yes.  When we started the program, we really didn't know how

7  many barriers were out there.  Some were known, but we didn't

8  know the scale of the problem.  And so starting in 1991, we

9  worked with the Department of Fish and Wildlife to inventory

10  streams, looking for barriers and streams with gradients up to

11  seven percent.  That work was done, and actually that inventory

12  was brought to completion in 1994.  And initially we thought that

13  that was the scope of the problem.  About 350 barriers were known

14  at that time.

15      Over time, the criteria's changed and we've had to expand the

16  inventory to include streams up to -- first to 12 percent

17  gradient and then to a 20 percent gradient, which very

18  significantly expanded the geographic area that was required for

19  analysis as well as the total number of barriers that were

20  investigated and determined that needed to be fixed.

21  Q    What was DOT's understanding of how -- of what it believed to

22  be the universe in 1994?

23  A    In 1994, we had completed the initial barrier inventory up to

24  seven percent gradient streams.  And total barriers that we were

25  aware of at that point was 350.

1  Q    And then how did it change when you got through 199 -- or how

2  was it different as of 1997?

3  A    As I mentioned, the criteria continued to change, which meant

4  we needed to look much farther afield for barriers.  In 1997, we

5  had records for 509 barriers, I believe it was.  About half of

6  those were considered barriers to fix.  The remainder had less

7  than 200 meters of habitat or other unknowns about them.

8       But we were still involved in completing the inventory, even

9  past 1997.  It actually took until 2007 to complete the

10  state-wide inventory.

11  Q    And the 509 barriers that you mentioned, what geographic area

12  did that encompass?

13  A    That's statewide.

14  Q    And what species did that encompass?

15  A    Anadromous salmon.

16  Q    And how many is DOT aware of in that category today

17  statewide?

18  A    Statewide, we had records for about 1,800 barriers.

19  Q    So how did the change in the understanding of the scope of

20  barriers change how you felt about DOT's ability to address the

21  problem?

22  A    Well, the scale of the problem is certainly different than

23  what it was understood to be even when the first inventory was

24  done, and certainly very different from the numbers that people

25  even thought it might be when it started.  So the scale of the

1    problem has become much larger over time as we've learned more

2    about it.

3    Q    How does the Department of Transportation use the priority

4    index?

5    A    We receive information on the priority index for the projects

6    that we've identified from the Department of Fish and Wildlife,

7    and we use that to help identify the priority culverts for us to

8    focus our scoping and design and correction efforts on.

9    Q    And why does it use the priority index?

10   A    Well, we want to make sure that we're getting the best

11   benefit by correcting the highest priority culverts as early as

12   we can in the program.  We want to front load the benefits of the

13   program by doing that.

14   Q    You mentioned an evolution -- or a change in your

15   understanding of the scope of the number of barriers.  Has there

16   also been a change in the understanding of the design methods

17   that should be used?

18   A    Yes, there has.  A lot of things have changed over the years

19   as we've been doing this program.

20       In the early years, the designs were really based on best

21   professional judgment and coordination between our agencies.  It

22   wasn't until the late 1990s, 1999, when there was a manual for

23   fish passage correction.  And in the early years, there was a

24   large focus on retrofits, constructing fishways at existing

25   culverts to provide fish passage at those sites.

1    Over time, we've used, more and more frequently, the other

2    techniques of no-slope culvert design and stream simulation

3    culvert design.  And the projects that we've constructed in this

4    construction season, all those projects meet the stream

5    simulation stance.

6    Q   So as the different methodologies have come out over time,

7    how has DOT responded to those changes?

8    A   We've started to use those different approaches as they

9    become available.  There's always concern about increased costs

10   from these.  Replacement projects are generally much more

11   expensive that retrofits, but we've seen the benefits of those

12   and are using that approach of complete replacement with no-slope

13   or steam simulation more and more frequently, and bridges as

14   well.  We're having many more projects where we're using a bridge

15   to replace a culvert.

16   Q   How have the changes in the design methods affected the costs

17   of correction?

18   A   Very significantly.  It's relatively inexpensive to put in a

19   fishway.  A lot of that work can be done off the roadway.  It

20   doesn't require excavation or replacement of the structure.  It

21   doesn't require very much traffic control.  The costs are

22   relatively low.  So those are much more lower cost projects.

23       Replacement projects require, obviously, the removal of the

24   old structure.  Very often some type of traffic control is needed

25   for that, maybe a detour or some other work to maintain the

1    availability of the road for the public to use.  Those are much

2    more complex and expensive projects.

3    Q    And are there other reasons why projects have gotten more

4    expensive over time?

5    A    There's been a number of factors.  Material costs have gone

6    up over time.  The environmental permitting process has become

7    more complex.  Salmon have been listed as endangered species

8    since the program started.  So ESA consultation is required for

9    those projects.  There are a number of reasons that the costs

10   have escalated.

11   Q    Has the DOT -- how has the difficulty of projects that the

12   DOT is engaged in changed over time?

13   A    Well, in the early years, we were able to collect a lot of

14   the low-hanging fruit, frankly, finding projects where a

15   relatively small-scale fix could open up a significant amount of

16   habitat, a very significant amount of habitat.

17        And a lot of the projects that presented themselves as

18   relatively straightforward with little complications, not a lot

19   of other barriers in the system, not a lot of difficulty with

20   right-of-way or other land ownership issues next to the culverts,

21   a lot of those have been done in the early years of the program.

22        So as we move deeper and deeper into our list, we tend to

23   encounter projects that have a lot more complexity, especially in

24   the developed environment.

25   Q    Are you familiar with the term "scoping" as it's used in the

1   development of a project for a fish passage barrier correction?

2   A    Yes.

3   Q    What does that term mean to you?

4   A    "Scoping" refers to basically developing a concept of what

5   the correction will be as well as an estimate of what the

6   correction would cost.

7   Q    And what does DOT -- well, how does DOT use the scoping that

8   it does when it tries to develop a long-term plan for correcting

9   barriers?

10  A    We use scoping to help us identify what projects we would be

11  doing in the future.  We use that to help put together budget

12  proposals to the legislature for funding.  That's the main reason

13  we use that.  It's the first step in developing the concept of

14  what the correction would be.

15  Q    And who prepares the estimates when you perform scoping?

16  A    We have a process of coordination on our scoping projects

17  between our department and the Department of Fish and Wildlife.

18  And we have a team assembled of fish passage experts from the

19  Department of Fish and Wildlife and design engineers that are

20  involved with scoping transportation projects.  So it's a

21  coordinated approach where the scope of the project is developed

22  by biological input and the costs are developed with engineering

23  input.

24  Q    And has the Department of Transportation performed any

25  scoping for the upcoming -- for upcoming projects?

1    A    We have.

2    Q    And do you have a list of that?

3    A    I do.

4    Q    Could you turn to your screen and tell me, is that the list

5    of scoped projects within the case area?

6    A    That's correct.

7         MR. JOHNSEN:  Your Honor, this is the exhibit that the

8    admissibility is questioned.

9    By Mr. Shaftel:

10   Q    And what does the column under "Proposed Solution" stand for?

11   A    This is kind of a shorthand in this table to help us kind of

12   generally remember what the concepts were.  This solution talks

13   about basically what the approach would be in these cases.  And

14   you can see the second one simply says "30-foot span bridge."

15   That would be the proposed -- the proposal to replace a barrier

16   culvert with a bridge of that dimension.  This information on

17   these proposed solutions is just a quick summary of a more

18   developed solution that is part of our project documentation.

19       We have a scoping concurrence form that lays out the concept

20   in more detail and provides information on the rationale for

21   that, as well as the estimated cost.

22   Q    And where do these estimated cost numbers come from?

23   A    These are provided by DOT engineers that are part of the

24   scoping team.

25   Q    And do you work with this document in the normal course of

1    your business?

2    A    I do.   My staff works with it more directly, but I am

3    regularly looking at this and have overview of the status of our

4    program.

5    Q    And when was the last time you worked with this document?

6    A    A couple of weeks ago.

7    Q    And how does this document compare to the document in your --

8    attached to your declaration, that is W-092-J?

9         MR. SHAFTEL:   If I could ask the Court clerk to show him

10   a copy?

11        THE CLERK:   092-J?

12        MR. SHAFTEL:   092-J.

13        THE WITNESS:   The scoping list I am looking at here,

14   092-J, is an earlier version of the document that I am looking at

15   on the monitor.   So these ones on the monitor are more updated

16   costs.

17   By Mr. Shaftel:

18   Q    And do you know what the date is of the updated document?

19   A    It is from, I believe, July of this year.

20   Q    Do you know what geographic -- do you notice that -- what

21   geographic region the 092-J document encompasses as compared to

22   the geographic region in the document?

23   A    Yes.   The region -- this table on the monitor includes just

24   WRIAs that are in the case area.   And the document that I have

25   here, 092-J, includes some areas that are outside the case area.

1          MR. SHAFTEL:  Your Honor, I'd like to offer W-113 into

2     evidence.

3          THE COURT:  What is the plaintiffs' objection to 113?

4          MR. JOHNSON:  The objection, your Honor, is that in his

5     declaration, which constitutes his actual testimony, he refers to

6     it only in Paragraph 42 and only for this proposition.  Of the 20

7     dedicated projects currently planned for design or construction

8     in the 2009/2011 biennium, 17 are for stream simulation or bridge

9     corrections.  "See Exhibit J."  That's the only reference in his

10    testimony to that exhibit.

11         Again, a list of -- there are more than 17 projects listed

12    here, obviously.  For the purpose of identifying 17 stream

13    simulation projects, that's fine.  For inclusion of other

14    projects, inclusion of estimated costs from this scoping process,

15    that's beyond the scope of his testimony.

16         MR. SHAFTEL:  Your Honor, this document was unavailable

17    to the witness at the time that he drafted his declaration.  In

18    addition, on the scoping page, on Page 11, he mentions both the

19    fact that scoping is used to develop an agreed design concept to

20    fix the culvert with an estimated cost.  He then references it

21    again on Page 12.  Cost estimates are developed for corrections

22    and options.

23         He's clearly referred to the scoping process and this scoping

24    exhibit as being the outcome of that process as a process results

25    in estimates for projects, and that's why the State is offering

1  it, in addition to the information about the designs of these

2  projects.

3            THE COURT:  Thank you, Mr. Shaftel.

4      Let me ask a couple of questions, Mr. Wagner.  Looking at

5  092.  Not the one on the screen, 113, but 092, this is the

6  earlier version you've indicated?

7            THE WITNESS:  That's correct.

8            THE COURT:  Mr. Shaftel says that 113, the one on the

9  screen, was not available to you at the time your declaration was

10  put together.

11           THE WITNESS:  That's right.  This is an update to those

12  cost estimates.

13           THE COURT:  Who creates this document?

14           THE WITNESS:  This table itself is created as a summary

15  by my staff.

16           THE COURT:  Your staff?

17           THE WITNESS:  Yes.

18           THE COURT:  All right, gentlemen.  The Court will

19  overrule the objections, and 113 will be admitted.

20  By Mr. Shaftel:

21  Q    Now, Mr. Wagner, I'd like to ask you a couple questions about

22  the scoping that's reflected on this particular document.

23      Why did we do all this scoping?

24  A    Scoping is very important to get a handle on what the costs

25  would be as well as to get agreement on the type of fix.  Our

1 intent here is -- as I mentioned, the fish passage program has

2 evolved as we've worked to improve it over the years.  One of the

3 things that we're working on is to really emphasize scoping so

4 that we have more projects that can move on to design and more

5 projects that are ready for construction ultimately.

6 Q   And do you know how many projects -- I'm sorry.  Is this a

7 comprehensive list of everything in the scoping process?

8 A   No, it's not.  We have scoping -- projects that are in the

9 scoping process that haven't been brought to the completion that

10 these have, and we also have projects that have been scoped in

11 other geographic areas.

12 Q   And do you know how many projects were listed on this

13 particular scoping list?

14 A   It says 38 projects.

15 Q   Have you calculated what the average cost reflected in the

16 "Estimated Cost" column is?

17 A   Yes.  The average cost of all those 38 is about $3 million.

18 Q   And I notice there's one project on here that seems quite a

19 bit higher than the rest.  It's SR 3 Chico Creek at $29 million.

20 Have you also done a calculation that would remove that

21 extremely higher cost?

22 A   It is a very high-cost project.  If we took that out and

23 averaged the remaining 37, it would be an average of $2.3 million

24 apiece.

25 Q   And how do you think this sample of approaching projects

1  compares to other remaining projects that have yet to be scoped

2  but would still need to be corrected by the Department of

3  Transportation, in terms of the size of the projects?

4          MR. JOHNSEN:  Objection, your Honor.  This is beyond the

5  scope of anything in his declaration.  His declaration is his

6  testimony.  It is not a summary.

7          MR. SHAFTEL:  Your Honor, I believe he talks about costs

8  and how they've changed over time.  He talks about the number of

9  barriers that are remaining.  He's just merely -- trying to

10  provide context for this particular document and the costs

11  reflected.

12          THE COURT:  Overruled.

13      You may respond.  Do you do you remember the question?

14          THE WITNESS:  Could you repeat that, please?

15          MR. SHAFTEL:  Yes.

16  By Mr. Shaftel:

17  Q   How does the averages that you just mentioned -- or, I'm

18  sorry, how does the list that you see here and the size of the

19  projects reflected here compare to the size of the projects that

20  have yet to be scoped or corrected but still need to be corrected

21  by the Department of Transportation?

22  A   I think these are pretty typical of projects that we are

23  scoping now and have not concluded the scoping to.  We are

24  definitely finding as we go into our list we are adding more and

25  more complex projects, and there may be a number of very high

1    costs besides Chico Creek out there, too, that we haven't fully

2    scoped yet.

3    Q    What's this document?

4    A    This is a flow chart that outlines our process for

5    implementing fish passage projects and the I-4 program.  It

6    starts with our scoping process and goes through ultimately to

7    completion of the job.

8    Q    And how long does it take to get from the beginning stages to

9    the final completion, in your experience?

10   A    Well, if a project was scoped and moved directly into funding

11   and construction, this process could take as little as four

12   years.  But we may have projects, and we often do have projects,

13   that are scoped and may wait for some period of time before

14   they're funded for further design and construction.  So it can

15   take longer than that as well.

16   Q    How would having more money increase the ability to get

17   through this process?

18   A    We would be able to do more projects at the same time.  But

19   we've found that it's very important to be coordinating all the

20   designs of these projects so that we have all the information we

21   need to do an effective design to begin with and we have a good

22   understanding between the players, between the Department of Fish

23   and Wildlife, DOT and other stakeholders about what the design is

24   and what we're proceeding with.

25        So this coordination process, these steps of further design

1   development and refinement, still would need to take place even

2   if there were more money available.

3   Q    Are there opportunities for tribal involvement in these

4   different stages of project -- on the project?

5   A    Yes.  There are several places where groups outside of DOT

6   and WDFW are involved.  The first is --

7   Q    You are supposed to use your finger if you can, or

8   fingernail.

9   A    Very quickly, at the initial identification of the problem --

10  well, the block that's just above that arrow.

11      At the initial identification, the problem we identified that

12  we're looking for input, this would be identifying barriers.

13  Most of this has been done through the inventory, but we're also

14  open to learning more about other barriers, or in this case we

15  refer to deficiencies in the system.  Also at this notification

16  point here where parties outside DOT are notified about projects

17  advancing, this is still where we just have a rough scope.

18      When we do a field review of the people involved in the

19  scoping, we have participation of tribes as part of that process.

20  And then in our development of the design, there's a -- it's kind

21  of hard for me to read this.  There's an environmental permitting

22  process, SEPA review, and a notification of outside parties and

23  stakeholder groups that the project is proceeding.  So those are

24  the different points in the process where we're -- involving

25  input from outside parties.

Q    What does this slide tend to show?

A    This is a pie chart that shows basically the division of our

effort in the fish passage program.  I-4 program is a statewide

program.  We're looking at prioritized projects throughout the

state.  And this just simply indicates we, through the history of

the program, spent about two-thirds of our effort in the case

area and a third of our effort outside the case area.

Q    And how does the Department of Transportation's program rank

compared to other states, in your experience?

A    Well, we were the first to develop this type of approach of a

standalone comprehensive inventory.  We were the first to develop

the approach of having a standalone retrofit program where we

weren't just relying on encountering fish barriers as part of

transportation projects.

     We have a very collaborative approach with the Department of

Fish and Wildlife, cooperating on developing these designs and

these strategies.  We have been recognized as a leader in this

area nationally.

Q    And what is this next document?

A    This is an overview of salmon habitat and restoration-

related activities.  The document was written in January 2008 by

the Pacific Salmon Commission.

Q    And what are you trying to show through this paragraph?

A    This is an excerpt from that document that indicates that the

Pacific Salmon Commission, which is a group of -- international

```
 1    group coordinating between the U.S. and Canada, was ranking the

 2    progress of states and provinces on fish passage correction.

 3         And this shows that Washington is in the lead -- is a leader

 4    in this area, both in the number of corrections and the amount of

 5    potential habitat made available through those corrections.

 6    Q    And this next slide, what does this show?

 7    A    This is one of our corrections at Jim Creek on Highway 112.

 8    Q    And this slide?

 9    A    This is a correction on a tributary to the Pysht River.

10    Q    And here, what is this?

11    A    This is Little Boulder Creek.  This is the before condition,

12    before the project was corrected.  You can see how these drop

13    there.  This is the culvert that replaced the preceding.

14    Q    And this is what?

15    A    This is Mill Creek before.  You see a small corrugated pipe

16    there?

17    Q    This?

18    A    Replaced with this large arched culvert.

19    Q    And what is shown in this picture?

20    A    This is Catherine Creek.  This was a before photo showing the

21    box culvert with a shallow flow at high velocity, which would be

22    a barrier to fish.

23    Q    And what are you showing here?

24    A    This is a view standing on top of the culvert looking

25    downstream, showing weirs that were constructed to provide fish
```

```
 1   passage at that site.
 2   Q    Is this one of the corrections you mentioned in your
 3   declaration?
 4   A    Yes.
 5   Q    What does this show?
 6   A    Skobob Creek.  This is the before condition of the box
 7   culvert that was a barrier to fish passage.
 8   Q    And this?
 9   A    This is the correction that replaced -- we replaced that
10   culvert with a large bridge.
11   Q    And here?
12   A    This is Jimmycomelately Creek, which has a set of parallel
13   box culverts.  You can see the fairly shallow water depth there.
14   That's the before condition.
15        This is after.  These culverts were replaced with this bridge
16   as part of a large partnership project for estuary restoration.
17   Q    And finally, what is this?
18   A    This is Tibbetts Creek.  It's a little hard to see, but there
19   are several small metal pipes that conducted that flow in the
20   before condition.  Those were replaced with a large bridge.  This
21   is under I-90.
22        MR. SHAFTEL:  All right.  Thank you, Mr. Wagner.
23        THE COURT:  Before we get to cross-examination, let me
24   ask Mr. Wagner just a couple of clarifying questions.
25        Mr. Wagner, of the $73 million that you testified would have
```

1    been today's dollars, in terms of the prior efforts at fixing

2    some of these barriers, does that include maintenance money?

3              THE WITNESS:  That includes money that was spent to

4    inventory, prioritize, and correct barriers in the I-4 program.

5    It doesn't include maintenance activities per se.  It does

6    include some followup monitoring and evaluation of projects in

7    coordination with our maintenance people.  The maintenance

8    activities themselves would be funded through a different

9    category.

10             THE COURT:  And is it your department that determines

11   when a barrier is corrected; in other words, what criteria is

12   necessary to say that's corrected?

13             THE WITNESS:  We actually work with the Department of

14   Fish and Wildlife on that.  We coordinate in the development of

15   those designs.  And then after the project's been built, we ask

16   the Department of Fish and Wildlife to go out and do a followup

17   check on that and confirm for us whether it's working or not.

18             THE COURT:  And maybe I am missing something, but

19   doesn't it seem to be cheaper to build bridges over most of these

20   streams?

21             THE WITNESS:  Bridges are usually more expensive than

22   culvert corrections.

23             THE COURT:  And the reason for that is, do you know?

24             THE WITNESS:  It's more involved to design a bridge

25   usually.  Often -- it depends a lot on how much fill depth there

1   is.  If there's an adequate amount of fill, you can get the

2   structure in there.  If not, you may have to raise the elevation

3   of the road, and that can change the vertical alignment of the

4   road for some distance.  That can result in fill and other

5   environmental impacts as well.

6           THE COURT:  Thank you.  You may inquire, Counsel.

7                       CROSS-EXAMINATION

8   By Mr. Johnsen:

9   Q    Mr. Wagner, your position is biology branch manager; is that

10  correct?

11  A    Yes.

12  Q    You are not a fisheries biologist, are you?

13  A    I'm not.

14  Q    And you're not an engineer; is that correct?

15  A    No.

16  Q    You're not a culvert designer?

17  A    I don't design culverts.

18  Q    In fact, during the course of your employment with the

19  Department of Transportation since 1993, your duties have been

20  primarily managerial rather than technical; isn't that correct?

21  A    That's correct.

22  Q    And you are the manager of what is called the I-4 program?

23  A    I am the manager of portions of that, the ones that I

24  indicated earlier on the chart.

25  Q    And that includes the barrier correction program?

1    A    Yes.

2    Q    And that barrier correction program is one of the primary

3    components of the I-4 program, is it not?

4    A    That's correct.

5    Q    Now, each year the Department of Fish and Wildlife produces a

6    report on the progress that the Department of Transportation is

7    making on fish passage barrier removal, and that report is called

8    a performance progress report; is that correct?

9    A    Yes.

10   Q    Do you agree with me that one of the major problems facing

11   salmon populations in Washington State is an inability to utilize

12   their historic rearing and spawning grounds due to fish passage

13   barriers that block access to upstream habitat?

14   A    It can be in some cases.

15   Q    It can be in some cases?

16   A    Yes.

17   Q    Can you -- attached to your declaration, as originally filed,

18   was a copy of the 2008 Fish Passage Progress Report.  It is

19   Exhibit E.

20        Do you have that in front of you?

21   A    Yes.

22   Q    Could you turn to Page 4?

23   A    Yes.

24   Q    In the section marked "Introduction" there, would you read

25   the second sentence aloud please?

1  A    "One of the major problems facing salmon and trout

2  populations is the inability to utilize their historic rearing

3  and spawning grounds due to fish passage barriers that block

4  access to upstream habitat."

5  Q    You agree with that statement?

6  A    Yes.

7  Q    Do you agree with me that the goal of the I-4 culverts

8  program is to correct the State Department of Transportation's

9  fish passage barriers?  Is that the goal of the I-4 project?

10 A    The fish passage part of the I-4 program, yes.

11 Q    And isn't it true that the purpose for correcting those

12 barriers is to increase salmon production by making available

13 significant salmon habitat that is currently blocked by the

14 Department of Transportation culverts?

15 A    Our goal is to correct priority barriers.  We hope that that

16 contributes to salmon production.  We don't have a specific way

17 of assigning what that contribution would be.

18 Q    You are doing it to increase salmon production; isn't that

19 correct?

20 A    We are doing it to benefit fish habitat.

21 Q    Do you agree the Department of Transportation's approach to

22 fish passage barrier correction does not assume the habitat will

23 be immediately fully utilized by the salmon and that many years

24 may be required before the newly opened habitat is fully utilized

25 by the fish?

1      MR. SHAFTEL:  Your Honor, I'm going to object as outside

2  the scope of his declaration.  I don't believe any of this line

3  of questioning reflects any sort of representations that were

4  made in the declaration.

5      THE COURT:  The objection is overruled.

6   Do you understand the question?

7      THE WITNESS:  I believe so.

8   You were asking if I agreed with that statement.

9  By Mr. Johnsen:

10 Q   Yes.

11 A   Yes.

12 Q   Well, isn't it true, then, that the Department of

13 Transportation's barrier culverts present two potential delays to

14 salmon recovery; first in the time it takes to correct the

15 barrier, and then second in the time it takes for the fish to

16 actually utilize the reopened habitat?

17 A   I'm not sure I understand your question.

18 Q   Let me back up and ask you the previous question again.  Do

19 you agree that the habitat -- the Department of Transportation

20 does not assume that the habitat will be immediately fully used

21 by the salmon and that many years may be required before the

22 newly opened habitat is fully utilized by the fish?

23   You said you agreed with that statement?

24 A   Yes.  That is a statement that is in our annual report.

25 Q   And you agree with it?

1  A   I do.

2  Q   So isn't it true, then, that the barrier culverts that the

3  department maintains present two different delays in increasing

4  salmon production, the first in the time that it takes to repair

5  the culvert and the second in the time that it takes the fish to

6  fully utilize the production -- excuse me, the habitat?

7  A   I'm not sure I follow you on that.  I think the statement

8  that you read is meant to indicate the reproduction of salmon in

9  streams is dependent upon other factors and may take time for it

10 to occur, indicating that the barrier is not the only factor that

11 might affect that.

12 Q   Isn't it true that a culvert is a barrier to salmon passage

13 when it fails to meet the current fish passage standards?

14 A   Yes.

15 Q   Now, when the department corrects a barrier culvert, it does

16 that in order to meet the current fish passage standards; is that

17 also correct?

18 A   Yes.

19 Q   Now, you have testified that there are two different ways in

20 which the department approaches fish passage barrier correction,

21 one through the I-4 program that you manage and the other through

22 what I think you might call the department's highway improvement

23 program; is that correct?

24 A   Yes.  And we also correct barriers as part of maintenance

25 activities.

Q    Maintenance activities, is that considered part of the

highway improvement program or is that a different category?

A    It is a different category.

Q    All right.  In the highway improvement program or in the

maintenance program, when a barrier culvert is encountered in the

course of work on a highway, then the culvert may be corrected as

part of that project?

A    It may.

Q    And when a culvert on a fish-bearing stream is replaced, it

must be replaced with a structure that meets current fish passage

standards; isn't that also correct?

A    That's correct.

Q    Now, in your declaration at Page 4, Line 21, you state that

many of the Department of Transportation culverts currently in

existence were installed many decades ago.

     Do you agree that for those culverts, many decades of their

useful life has already passed?

A    If they were installed many decades ago?

Q    That's pretty obvious, isn't it?

A    I think so, yes.

Q    Now, in this case the parties have agreed that the life of a

culvert, purely as a water conveyance device, the hydraulic life

of a culvert is about 80 years.

     Isn't it true, then, that the Department of Transportation

will be replacing aging culverts in the future under a standard

```
 1   that will require fish passage?
 2            MR. SHAFTEL:  Objection to foundation.  He has no --
 3   he's not testified that he has any knowledge for the lifespan of
 4   culverts.
 5            MR. JOHNSEN:  It's an admitted fact in the case.
 6            THE COURT:  It is.  So you're asking him to assume that?
 7            MR. JOHNSEN:  I'm asking him to assume that admitted
 8   fact, yes.
 9            THE COURT:  All right.  Objection overruled.
10       Do you understand that?
11            THE WITNESS:  I think I need to --
12   By Mr. Johnsen:
13   Q   I'll start over again.  That's fine.
14       Assuming that the admitted fact in the case is true, that the
15   hydraulic life of the Department of Transportation culverts is
16   about 80 years, isn't it true that -- and many of them are many
17   decades old already, isn't it true that the Department of
18   Transportation will be replacing those culverts in the relatively
19   near future under a standard that will require fish passage, just
20   in the course of normal maintenance of the department's
21   facilities?
22            MR. SHAFTEL:  Your Honor, I will voice the same
23   objection.  It calls for speculation.
24            THE COURT:  Overruled.
25       If he knows.
```

```
 1              THE WITNESS:  I'm not sure how to answer that.
 2   By Mr. Johnsen:
 3   Q    Let's see if I can help.  Let's go backwards.  You have some
 4   charts and graphs in this case and some counts of culverts that
 5   have been removed.  I believe those show that approximately 72 of
 6   the corrections that the department has attempted have been
 7   attempted under your program.  And about twice that many, about
 8   140, 150 or so, have been undertaken under the highway
 9   improvement program; is that correct?
10   A    Yes, excluding the culverts that were corrected this past
11   construction season.
12   Q    So the count for the last construction season is not
13   reflected in those last numbers I gave you?
14   A    That's what I am saying, yes.
15   Q    Okay.  So it's about a 2 to 1 ratio, isn't it, over time?
16   A    Yes.
17   Q    Twice as many have been corrected under the normal roads
18   wearing out, we have to fix it, let's-fix-the-culvert-
19   while-we-are-at-it program?
20   A    Yes.
21   Q    In your planning as a manager for the I-4 program, do you
22   anticipate that that trend will continue in the future?
23              MR. SHAFTEL:  Objection.  Calls for speculation.
24              THE COURT:  Overruled.
25              THE WITNESS:  I guess where I am not quite following you
```

1    is the equation of the culvert lifespan triggering replacement

2    versus the correction of barriers as part of those planned safety

3    mobility projects.  They aren't necessarily the same.

4        Those projects, the safety mobility projects, for example,

5    may be -- they may be correcting a barrier because they need to

6    work on the culvert to extend it or to do some type of work on

7    the roadway that then triggers needing to work on the culvert.

8    The culvert may still be technically within its useful life and

9    not triggering replacement from a hydraulic standard.

10       So some of those corrections that we're talking about through

11   the non I-4 funding wouldn't be triggered by something related to

12   the lifespan of the culvert.  Some would, but probably many

13   wouldn't.  They'd be triggered by the nature of the

14   transportation project that's planned at that site.

15   By Mr. Johnsen:

16   Q   All right.  So the culvert may be working just fine for

17   getting water through the roadway; there may be some other reason

18   to deal with the roadway; the culvert may have an extended

19   lifespan; it may be good for another 40, 50 years.  But it's

20   going to get replaced when the Department of Transportation

21   addresses that road project even though the useful life of the

22   culvert has not been expended yet.

23       But if none of that occurs, that culvert is going to have to

24   be replaced at the end of its useful life even if the road is

25   fine, isn't it?

1           MR. SHAFTEL:  Same objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  It would eventually need to be replaced.

4     I think the part of the question about what is done and how

5     it's done depends on the funding that's available in that

6     situation.  We get to that point in a number of different ways.

7     It may be a slow progression to that point or it may be

8     catastrophic failure.  The response and the funding available

9     could be different in those situations.  That's my answer.

10    By Mr. Johnsen:

11    Q   All right.  Now, with that background, my question to you

12    earlier was:  In your planning for the dedicated culvert

13    replacement program, do you anticipate that a certain number or

14    an approximate number of the barrier culverts are going to be

15    replaced in the course of those highway projects, in addition to

16    the ones that you're going to work on under the I-4 program?

17    A   Well, that's part of the benefit of the scoping process that

18    we have where we are looking at those projects in advance, and

19    that gives us ample time to coordinate with regions, with

20    maintenance, and with another program that we have in the

21    department called major drainage, to see are these -- are these

22    culverts likely to be picked up by some other project, do we have

23    a mobility project coming through or planned in the future or a

24    major drainage project.  That may be the program you're really

25    asking me about.

1    In our major drainage program, which is part of the

2    preservation, we have an inventory looking at the span of the

3    function of the culverts and replacing those when that's

4    triggered by structural needs.

5    Q    Okay.  So the answer is yes, you do anticipate that some will

6    be replaced under the highway program?

7    A    Yes.

8    Q    Thank you.  Do you anticipate that the ratio that has existed

9    in the past, approximately twice as many under the regular

10   highway program as under the I-4 program, will continue in the

11   future?

12            MR. SHAFTEL:  Objection.  Calls for speculation.

13            THE COURT:  Overruled.

14            THE WITNESS:  I really don't know the answer to that.

15   By Mr. Johnsen:

16   Q    Okay.  So when we look at these graphs that shows what you

17   have accomplished so far, they don't necessarily depict the trend

18   in the future; is that correct?

19   A    We are not presenting them for that purpose, no.

20   Q    They only show what has happened in the past?

21   A    Yes.

22   Q    Let's look at Exhibit M to your declaration.  I believe you

23   testified during Mr. Shaftel's examination that this represents

24   the actual corrections that had taken place up to this year; is

25   that correct?

A     That's correct, through construction season 2008.

Q     And these are put forth as -- well, strike that.  So in 2008,

there were ten under the highway improvement program and none

under the I-4 program, as you previously testified; is that

correct?

A     Yes.

Q     And in 2007 there were nine under the highway improvement

program and only three under the I-4 program?

A     That's correct.

Q     Am I reading that correctly?  In fact, in no year since 1994

has the number of fixes in the I-4 program exceeded the number in

the highway improvement program, has it?

A     That's correct.

Q     All right.  Now turn to Exhibit N to your declaration.

A     Yes.

Q     If I am reading this correctly, each bar in this graph

includes the previous bar; is that correct?

A     That is correct.

Q     So this graph is always going to have an upward trend unless

it is flat, unless you do absolutely nothing in a given year; is

that correct?

A     Correct.

Q     So all this shows is another way of saying you've done 225;

is that correct?

A     Well, it shows more than that.  It shows the contribution

1    each year to that total and that the progress has been steady.

2    Q    And when I say "you," I mean the Department of

3    Transportation, not your program, because your program has not

4    done 225 corrections; is that correct?

5    A    The I-4 program has just done a portion of those.

6    Q    Now, isn't it also true that of the 225 sites that you show

7    as being corrected in this graph, 49 in fact are not corrected

8    because they failed to meet fish passage standards?

9    A    Some of these projects are not satisfactorily meeting those

10   standards.

11   Q    So they are not corrected?

12   A    They are not fully corrected.  In many cases what's happened

13   is that a project that was a complete barrier at the outset -- or

14   a site, a culvert that was a complete barrier at the outset has

15   been replaced with another structure, either -- whatever

16   technique, and it is now partially passable.

17   Q    "Partially passable" means that it goes on the list as an

18   existing fish passage barrier, not a corrected barrier?

19   A    That's correct.  And we note that in the report.

20   Q    Yes, you do.  Would you turn to Exhibit AT-72?

21        MR. JOHNSEN:  Can the clerk hand AT-72 to the witness?

22   By Mr. Johnsen:

23   Q    I would ask you to go to Page 5 of the report when you get

24   it.

25        If you look at Footnote 2 at the bottom of Page 5, which

1    should be displayed on the monitor in front of you, you noted

2    that the fish passage reports do indicate where the correction

3    failures have occurred; is that correct?

4    A    That's correct.

5    Q    So there are 49 of them.  And it makes a reference to Tables

6    4 and 5?

7    A    Yes.

8    Q    Those are tabs in the report?

9    A    Correct.

10   Q    And those tabs show not only the failed corrections but the

11   habitat gain that is associated with those failures?

12   A    They show the potential habitat.

13   Q    So when you're looking at your reports which state the total

14   number of miles of habitat that have been made available through

15   the 225 so-called corrections, there is a mileage total and a

16   barrier total.  And they relate to each other, don't they?

17   A    Yes.

18   Q    So would it be possible to go to those tables and to reduce

19   the 225 by 49 and also to reduce the number of miles of habitat

20   made available by whatever numbers those tables show, so that the

21   total would not be the -- I think it's 699 that you're currently

22   claiming, total miles; is that correct?

23   A    There are a couple of questions there.

24   Q    Do you understand the question?

25        I'll rephrase it.  It would be possible from those tables to

1  determine the number of miles of habitat associated with the

2  corrections that aren't actually corrections; isn't that true?

3  A    You could do that math, yes.

4  Q    And those miles, then, could be subtracted from the total

5  mileage that your declaration claims the department has achieved

6  by correcting the 225 barriers.  Isn't that also correct?

7  A    That math could be done, yes.

8  Q    Now, I believe when your declaration was originally served on

9  us in this case, it had higher numbers for the number of

10  corrections and the number of miles compared to your final

11  declaration; is that correct?

12  A    That is correct.  We realized after we sent that out that

13  there were a couple of errors in the calculation, and we quickly

14  moved to correct those.

15  Q    So the original calculation was 232 barriers corrected and

16  754 miles of habitat made available?

17  A    I believe that's what we said.

18  Q    And you corrected that by saying, no, no, it is actually 225

19  barriers and 699 miles of habitat.  Is that also correct?

20  A    Yes.

21  Q    But you did not correct your declaration to remove from the

22  225 the 49 sites that are in fact not corrected?  Is that also

23  correct?

24  A    That's true.

25  Q    And likewise, you did not correct your declaration to remove

1   from the 699 miles of habitat the number of miles associated with

2   those 49 failed corrections.  Isn't that also true?

3   A   That's true.

4   Q   Turning to Page 5 of your declaration.  You state at

5   Paragraph 8 -- do you have it in front of you?  It is on the

6   screen.

7   A   You said the report.  Go ahead.

8   Q   There you are making reference to certain photographs that

9   are attached to your declaration as Exhibit B.  And you state in

10  your professional opinion these culverts would not have been

11  considered to be fish passage barriers when they were originally

12  permitted and built.

13      Do you see that?

14  A   Yes.

15  Q   Showing you now Exhibit B, that's W-92 B.  Do you have that

16  in front of you?

17  A   Yes.

18  Q   The paper version may be clearer than the version we have on

19  the screen.

20      Can you describe what we are seeing there in that picture?

21  A   These are two steel pipes at Moose Creek.  This is a before

22  picture of a fish passage barrier that has since been corrected.

23  Q   And those two pipes are some distance from the stream below

24  them; is that correct?

25  A   Yes.

```
 1   Q    So when you say on Page 5 that that culvert would not have
 2   been considered a fish passage barrier when it was constructed,
 3   are you saying that if it were constructed exactly as it is shown
 4   in that photograph, it would not, in your opinion, have been a
 5   barrier to fish passage?
 6   A    With what we know today?  I'm not sure what timeframe you're
 7   asking about.
 8   Q    I'm asking whether fish could get through it, not about what
 9   we know about fish.
10   A    I think that fish would have difficulty getting through that
11   with the flows.
12   Q    If it were constructed that way.  Okay.
13        So in your declaration when you say it would not have been
14   considered a fish passage barrier, what do you mean?
15   A    What I'm referring to there is the growth in awareness about
16   what constitutes a barrier over time, and that my intent in that
17   part of the declaration is to say we didn't -- DOT didn't
18   knowingly build culverts that they knew were barriers to fish.
19   Q    Were you present in court when Dr. Sekulich testified last
20   week?
21   A    Yes.
22   Q    Do you recall him testifying that in his opinion, almost all
23   of the culverts in the case area were fish passage barriers when
24   they were installed?
25             MR. SHAFTEL:  Objection.  I believe that
```

1  mischaracterizes Dr. Sekulich's testimony.  I believe he said

2  some of them may have been.  I don't believe he said almost all

3  of them.

4       THE COURT:  The objection to the form of the question is

5  sustained.

6  By Mr. Johnsen:

7  Q   Do you recall Dr. Sekulich testifying about fish passage

8  barriers in the case area last week?

9  A   I do.

10 Q   Do you disagree with any part of Dr. Sekulich's testimony

11 regarding the passability of Department of Transportation

12 culverts in the case area in the last week?

13      MR. SHAFTEL:  Objection.  Overbroad.

14      THE COURT:  Overruled.

15      THE WITNESS:  Not that I can recall.

16 By Mr. Johnsen:

17 Q   Going back to Page 5 of your declaration, Paragraph 9.  This,

18 I think, is just a clarification point.  You make reference in

19 that paragraph to the industry -- it is right at the bottom,

20 Line 26, the industry standard for the design of road culverts

21 for hydraulic purposes.

22     Do you see that?

23 A   Yes.

24 Q   In making that statement, are you using the word "hydraulic"

25 there in the sense -- the ordinary sense of conveying liquid

1    through a pipe, rather than referring to the hydraulic method of

2    designing culverts?

3    A    That's correct.

4    Q    So you are not saying that the manual that you are referring

5    to in Paragraph 9 contained any direction on how to construct a

6    hydraulic fish passage culvert; is that correct?

7    A    That is correct, I am not saying that.

8    Q    And isn't it also true that the standards for fish passage

9    that the Department of Transportation uses are set by the State

10   of Washington Department of Fisheries and not by the Federal

11   Highway Administration?

12   A    That is correct.

13   Q    Turning to Page 9.  On Page 9, you are talking about the

14   inventory of the Department of Transportation culvert sites.  And

15   you testified about that some this morning as well.

16        You state there that the inventory is now complete; is that

17   correct?

18   A    That's correct.

19   Q    Although the inventory is complete, habitat assessments still

20   must be completed on a majority of the department's fish passage

21   barrier culverts; isn't that also correct?

22   A    That's correct.

23   Q    Is it true that about two-thirds of the culverts remain to

24   have habitat assessments on them?

25   A    I believe that is about the number, yes.

1   Q   Now, you testified earlier this morning about the scoping

2   process.  Do you recall that?

3   A   Yes.

4   Q   And you said that a portion of that process involves coming

5   up with estimates of possible project costs.  Is that also

6   correct?

7   A   Yes.

8   Q   And isn't it true that those estimates are not done with the

9   same rigor that would be done if the project was being put out to

10   bids, for example?

11   A   I'm not sure about the word "rigor" in that.  They're for

12   different purposes.  The scoping estimate is a rough estimate.

13   It's based on engineering principles, but it doesn't involve the

14   detailed analysis that would --

15   Q   Right.  So it's a rough estimate compared to the actual

16   estimate that an engineer prepares when a project is going to be

17   put out to bid by the State Department of Transportation?

18   A   Yes.

19   Q   And in fact, in the scoping process, those estimates are used

20   primarily for comparison purposes when you're comparing the

21   different possible solutions to the problem that's presented?

22   Isn't that also correct?

23   A   They can be used that way.

24   Q   So if you are considering a retrofit, what's the rough cost

25   of that compared to a rough estimate of the cost of a bridge or a

1    stream simulation culvert, people come up with numbers for that;

2    is that correct?

3    A    Through the scoping process.

4    Q    Right.

5        Now, I think you testified that there are some 32 projects in

6    the Scoping Summary Report that's Exhibit 113.

7            MR. JOHNSEN:  Could you put up W-113, please?  Did I get

8    the number wrong?  It's the one we substituted for 92-J.

9            THE COURT:  Counsel, this might be a good time for our

10   morning recess.

11           MR. JOHNSEN:  Thank you.

12           THE COURT:  We will take our morning recess.

13   (At this time, a short break was taken.)

14   By Mr. Johnsen:

15   Q    Mr. Wagner, in front of you on the screen is the second page,

16   the exhibit that we were talking about prior to the break.  And

17   this is the page where I believe you testified sets out the

18   barrier culverts that have been scoped for correction in the case

19   area; is that correct?

20   A    Yes.  These are projects in the case area where we've

21   completed the scoping process.  I can't see the whole document

22   here.

23   Q    That's so we can read the part that is here.

24   A    Okay.

25   Q    You have, I believe, access to a paper copy, if you prefer

1    it.  Would you rather have the paper copy?

2    A    Ask me the questions and I'll see if I need something

3    different.

4    Q    I counted these up during the break, and I didn't come up

5    with 32.  I came up with 40.

6         Can you explain the reason for that?  It may be that I can't

7    count.

8    A    I believe this is 38.

9    Q    38?

10   A    I don't think I said it was 32.

11   Q    I may not have heard you correctly.

12        There are 807 -- or there were before this construction

13   season, I guess, 807 barrier culverts blocking more than

14   200 meters of salmon habitat in the case area that belonged to

15   the Department of Transportation, correct?

16   A    According to the -- at the time of my declaration, yeah.

17   We've corrected a few of those this past construction season, but

18   that was the number at the time I did declaration.

19   Q    And I believe you testified that 11 sites had been addressed

20   during this construction season; is that correct?

21   A    Yes.

22   Q    Not all of those are sites that block more than 200 meters of

23   habitat, are they?

24   A    I believe most of those are ones that block more than

25   200 meters of habitat.

```
 1   Q    So the answer to my question is "correct."  Not all of them
 2   block more than 200 meters; most of them do.
 3   A    Of the list of 11?
 4   Q    Yes.
 5   A    I believe they all do.
 6   Q    You believe they all do.  Okay.
 7        Can you give us the list?
 8   A    I provided a list to my attorneys.
 9   Q    I do have the list.  Do you know the list?
10   A    I know some of them.  I don't have the list memorized
11   completely.
12   Q    Let me read you what I've been provided.  There were five
13   that were listed under the I-4 program, the program that you
14   administered.  One on a tributary to the Skokomish River.
15        Do you recall that one?
16   A    Yes.
17   Q    One on Highway 104 west of the Hood Canal Bridge?
18   A    Yes.
19   Q    Do you recall that?  And those two are in the case area, are
20   they not?
21   A    Correct.
22   Q    One is on Mosquito Creek in WRIA 24?
23   A    That's correct.
24   Q    And WRIA 24 is not in the case area, is it?
25   A    That's correct.
```

1   Q    There was one that was described as near Mayfield Lake.   Do

2   you recall that one?

3   A    Yes.

4   Q    Is that one in the case area?

5   A    It is not.

6   Q    There's two out of the 11 that wouldn't reduce the 807?

7   A    Correct.

8   Q    So far.   The next one is actually, I think, two, funded under

9   one contract but under two different programs, Baptist Camp and

10  Bruce Creek?

11  A    Those are two different creeks.

12  Q    They're two different creeks, but they were addressed under

13  one contract; is that correct?

14  A    That's correct.

15  Q    And those are both in the case area; is that correct?

16  A    Yes.

17  Q    And then there are four that were done under -- excuse me.

18  There was another one, Cougar Creek?

19  A    Yes.

20  Q    That was not under the I-4 program, was it?

21  A    That's correct.

22  Q    That was under the P-3 program?

23  A    Yes.

24  Q    What is that?

25  A    That's the major drainage program that I spoke about earlier.

1    Q    And then the remaining four were done under the so-called

2    Nickel Project; is that correct?

3    A    Yes.

4    Q    What's the Nickel?

5    A    Nickel is a group of safety mobility projects that were

6    funded by a nickel increase in the gas tax.

7    Q    Two of those were on tributaries of Tibbetts Creek?

8    A    That's correct.

9    Q    And two were on Burly Creek?

10   A    Yes.

11   Q    And at least one of the ones on Burly Creek blocked only

12   about 60 meters of habitat; isn't that correct?

13   A    I believe that connects to larger wetland system.  That's my

14   understanding.

15   Q    So we don't have an exact count, but it doesn't reduce the

16   807 in the case area by 11; it reduces by some other number?

17   A    That's correct.

18   Q    Would you be comfortable for today's discussion if we just

19   referred to the number that is left as 800?  Is that a close

20   enough approximation?

21   A    For purposes of discussion?

22   Q    Yes.  We'll call it testimony, since that's what you're

23   doing.  Can we agree on 800 as a round figure for the number of

24   culverts that remain to be corrected by the Department of

25   Transportation as of today in the case area?

```
 1    A    Okay.

 2    Q    So 38 of those are shown on the exhibit that's on the screen

 3    in front of you; isn't that correct?  That's your count?

 4    A    Yes.

 5    Q    You testified that you felt these 38 were a representative

 6    sample of the 800 that remained to be corrected.  Do you recall

 7    saying that?

 8    A    Yes.

 9    Q    What did you base that testimony on?

10    A    On my general awareness of these projects and on the

11    discussions we have had about the scoping effort with my staff

12    and with the Department of Fish and Wildlife staff.

13    Q    You have available to you in the course of your work access

14    to the Fish Passage Diversion Screening Inventory Database, do

15    you not?

16    A    We use that database.  I don't personally run analyses on

17    that.

18    Q    That's a data base maintained by the State Department of

19    Fisheries that includes all of the Department of Transportation

20    barrier culverts as well as information on other culverts; isn't

21    that correct?

22    A    Yes.  Department of Fish and Wildlife, yes.

23    Q    So when you reached your conclusion that you testified to

24    here in court today in this case, did you consult that database

25    to determine whether in fact these 38 projects are representative
```

1   of the remaining 800, as reflected by the data in that database?

2   A    If I'm understanding your question, you're asking me if we

3   looked at that larger database to see if these are reflective of

4   that?

5   Q    Yes.

6   A    I don't believe we've done that analysis.

7   Q    Why not?

8   A    We have been busy with other tasks.

9   Q    Really?  Okay.

10      Well, so you have a general feeling that this is consistent

11  with those 800, but you haven't undertaken any kind of analysis

12  of the data to support your opinion; is that correct?

13  A    These projects represent a range of the stream conditions,

14  streams of different sizes, different locations in the case area,

15  different watersheds reflecting different levels of development,

16  and so this list -- these are the kinds of projects that we're

17  scoping, that are in the process of scoping now that haven't

18  reached completion, and my sense is that these are fairly typical

19  of the types of projects we see.

20  Q    Could you please answer the question that I asked?

21  A    I'm sorry.  I guess I need to have that question again.

22          MR. JOHNSEN:  Can the reporter read back the question.

23          THE COURT:  Actually, Counsel, I think he did answer it.

24  Ask him another question.

25  By Mr. Johnsen:

Q    How many of the projects on the list here involve bridges?

A    I don't know the number off the top of my head.  We've indicated bridge corrections in the description of the proposed solution.

Q    Scanning down through it, I see a 200-foot bridge, an 80-foot bridge, a 30-foot bridge.

Is it your opinion that the number of bridges that are reflected in this exhibit is representative of the number of bridges that will be required to address the 800 culverts that remain to be corrected in the case area?

A    I'm not sure how to answer that question.

Q    Isn't it true that the reason you can't answer it is that you haven't undertaken the analysis that would allow you to answer it?

A    Well, a bridge is a method of correction that could be chosen at a number of different locations.  A bridge is a specific kind of structure that could be used at a number of spans.  And so some of these projects where we say replace culverts with stream sim design, those may in fact be bridge projects as well.  We could -- you know, it would be replaced with a bridge structure.

THE COURT:  Mr. Wagner, I think the question was a lot simpler than that.  There are bridges on this list of 38, right?

THE WITNESS:  Yes.

THE COURT:  And you said earlier that you thought this list was representative of the 800 that need to be corrected?

1              THE WITNESS:  Yes.

2              THE COURT:  Do you think the numbers of bridges are also

3     representative of that 800, the 38 on here, three bridges,

4     roughly ten percent?

5              THE WITNESS:  It's very possible, yes.

6     By Mr. Johnsen:

7     Q    You have available to you through the database stream width

8     measurements, do you not?

9     A    Yes.

10    Q    And those stream width measurements are a major factor in

11    deciding the size of a culvert, or a bridge for that matter, that

12    will be used to solve the barrier problem; isn't that also

13    correct?

14    A    Yes.

15    Q    Isn't it true that the database indicates that approximately

16    80 percent of the current barrier culverts could be addressed

17    with a stream simulation culvert that is no larger than 16 feet

18    in width?

19             MR. SHAFTEL:  Objection.  Foundation.

20             THE COURT:  Are you referring to the Fish Passage

21    Diversion Screening Database?

22             MR. JOHNSEN:  Yes.

23             THE COURT:  All right.  Overruled.

24             THE WITNESS:  I'm not sure about that.  I would need to

25    look at the database.

By Mr. Johnsen:

Q   And you have not done that in support of your opinion regarding these culverts; is that correct?

A   No, sir.

Q   If that is true, if 80 percent of the barrier culverts could be addressed with a stream simulation culvert 16 feet in width or less, is that fact reflected in this exhibit?

A   I don't believe so.

Q   And in fact, there is a much greater proportion in this exhibit of much larger crossings, is there not?

A   Because we are working down the priority index, streams that are larger sizes are going to tend to have a higher priority.

Q   And that makes this not representative of the future problem, doesn't it?

A   Well, very often it may take a large structure to cross even a small stream, depending on the terrain, the roadway, the depth of roadway fill and other factors that are the realities of the situation on the ground.

Q   The projects that were done this past construction season, are they in fact all complete at this point?

A   Some are complete.  Some are still in their final stages with vegetation work and some other kind of final steps happening to them this fall.

Q   Have they passed final inspection?

A   They have passed the inspection from our construction

1    standpoint.  And we have had personnel from my office and from

2    the Department of Fish and Wildlife out to almost all of those.

3    I'm not sure if they have been to each one of those.

4    Q   And they inspect for compliance with the fish passage

5    standard; is that correct?

6    A   That's right.

7    Q   The fisheries folks.

8    A   Actually, I would correct that.  We have had field visits by

9    personnel from the Department of Fish and Wildlife to each of

10   those.

11   Q   Okay.  So at this point, it is your conclusion that they meet

12   fish passage standards?

13   A   Yes.

14   Q   And the work is basically done on them.  Is that also

15   correct?

16   A   Yes.  The construction work is largely done.

17   Q   Now, I believe your testimony was that this year's projects

18   all met stream simulation standards, is that correct, the 11?

19   A   Stream simulation spans, yes.

20   Q   They were all done with that design in mind?

21   A   Yes.

22   Q   We talked about, earlier, Bruce Creek and Baptist Camp.  Are

23   you familiar with that project?

24   A   Yes.

25   Q   Wasn't that in fact a realignment of the roadway to avoid

```
 1   culverts rather than installing new culverts?

 2   A    There was a culvert that was removed as part of work on the

 3   highway in that area.  But the two -- there were two new

 4   crossings that were installed, one at Bruce Creek and one at

 5   Baptist Camp Creek.

 6   Q    And that was done under one contract?

 7   A    That's correct.

 8   Q    Do you know the sizes of those culverts?

 9   A    They are relatively small.  I think they are both -- I think

10   Baptist Camp Creek is around ten feet span.  I'm just trying to

11   remember from having seen them on the ground.  And Bruce Creek is

12   a little bit larger, I think, maybe 14 to 16 feet.

13   Q    And those two were accomplished with a construction contract

14   in the amount of $969,075.12?

15   A    I'm not sure about that number.

16   Q    You're not sure about that?  Okay.  Would you look at Exhibit

17   AT-332, please?  It is one of the new ones we brought in this

18   morning.

19        You have seen this document before?

20   A    I saw it last night.

21   Q    It comes from the State Department of Transportation website;

22   is that correct?

23   A    I don't know for a fact where it came from.

24   Q    Does it refresh your recollection regarding the contract that

25   you administered for the construction of this project?
```

A    This shows a line for engineers estimate and a line for prime
contractor bid.

Q    Yes, it does.  Does it refresh your recollection regarding
the contract amount?

MR. SHAFTEL:  Object to foundation.  I don't believe
this witness ever testified that he had a previous recollection
as to what the cost was for this project.

THE COURT:  The objection is sustained.

By Mr. Johnsen:

Q    Do you know what the contract was for the correction of the
Bruce Creek/Baptist Camp culverts?

A    I don't off the top of my head.  I would really refer to our
documents and reports to keep track of those numbers.

Q    Does $969,075.12 sound like the right ballpark?

MR. SHAFTEL:  Same objection.

THE COURT:  Objection overruled.  I think he answered
the question.  The answer will stand.

By Mr. Johnsen:

Q    That is two culverts, right --

A    Yes.

Q    -- for that project?  Another of this year's projects was the
Cougar Creek culvert replacement; is that correct?

A    Yes.

Q    And that was done under the P-3 program?

A    Yes.

1    Q    Are you familiar with that culvert?

2    A    A little bit.  I haven't been to the site.  Since it is not

3    an I-4 project, I wasn't very involved with that.

4    Q    Was it prioritized for correction?

5    A    I believe it has a PI, yes.

6    Q    And is it true that the contract amount for correction of

7    that culvert in this construction season was $546,628?

8    A    I don't know that for a fact.

9    Q    Would you look at Exhibit AT-333, please?  Do you recognize

10   this document?

11   A    I believe I saw this for the first time last night.

12   Q    Right.  Probably shown to you by Mr. Shaftel, correct?

13   A    Yes.

14   Q    I will represent to you this is a document that I found

15   yesterday on the Department of Transportation's website and

16   provided to Mr. Shaftel, indicating that it's a construction

17   contract report for the Cougar Creek culvert replacement project

18   that you referred to as being completed this year.

19        This document also shows an engineer's estimate, does it not?

20   A    It does.

21   Q    About $400,000 higher than the actual contract amount?

22   A    That's right.

23   Q    And you testified earlier that the sort of rough estimates

24   that are involved in the scoping reports aren't done with the

25   same level of rigor and analysis as an actual engineer's estimate

1    when a project goes out to bid.

2        Do you recall that?

3    A    Yes.

4    Q    The Mosquito Creek project outside the case area but still a

5    culvert that was repaired this season, are you familiar with that

6    one?

7    A    To some degree.

8    Q    That was done under your program?

9    A    Yes.

10   Q    You are not familiar with the actual project?

11   A    I am familiar with the project in general.  I haven't been to

12   the site, if that's what you're asking.

13   Q    That's on US 101; is that correct?  And construction of that

14   project required closure of US 101 while it was being built; is

15   that correct?

16   A    I am not specifically familiar with that.

17   Q    Where on 101 is it located?

18   A    In Aberdeen.

19   Q    Does the culvert run entirely under US 101?

20   A    I am not specifically familiar with that.

21   Q    The contract for that project was $728,34- -- excuse me,

22   $728,349.25, wasn't it?

23   A    Again, I'm not familiar with those -- with that particular

24   number.

25   Q    This is done under the program you manage; is that correct?

1    A    Yes.

2    Q    Did that contract that you administered seem to be about

3    $730,000?

4         MR. SHAFTEL:  Objection, lack of foundation.

5         THE COURT:  I think he has answered the question,

6    Counsel.  He is not particularly familiar with it.

7    By Mr. Johnsen:

8    Q    Would you look at Exhibit AT-334?  This appears to be the

9    construction report for the Mosquito Creek project that we have

10   just been discussing?

11   A    It appears to be.

12   Q    Do you recall that the contract amount when it was actually

13   awarded was substantially lower than the engineer's estimate in

14   this project as well?

15        MR. SHAFTEL:  Objection.  Lack of foundation.  This

16   witness has not testified that he had any previous knowledge on

17   that issue.

18        THE COURT:  Overruled.

19        THE WITNESS:  I know from talking with my staff that we

20   had a number of projects that came in this season under budget --

21   or under estimates.

22   By Mr. Johnsen:

23   Q    Under estimates.  In fact, every one of them did?

24   A    Yes.

25   Q    The estimates were uniformly high?

```
1    A    It was a very unusual year.
2              THE COURT:  Everyone was looking for work.
3              THE WITNESS:  Yes.
4    By Mr. Johnsen:
5    Q    The project on a tributary of the Skokomish River was done
6    this year under the I-4 program; is that correct?
7    A    Yes.
8    Q    Do you recall the dimensions of that project?
9    A    I don't know off the top of my head.
10   Q    Do you know approximately?
11   A    I look at project files to recall information.
12   Q    Did you visit the site of this project?
13   A    I personally have not visited that site.  Members of my staff
14   and our colleagues at Department of Fish and Wildlife have
15   visited several times.
16   Q    Is it true that the contract award for that project was for
17   $557,083.50?
18   A    I don't know that number off the top of my head.
19   Q    Does that appear to be in the general ballpark of the
20   contract that your office awarded for the construction of this
21   particular culvert correction?
22   A    That sounds about right.
23   Q    Do you recall that the engineer's estimate for that project
24   was nearly $400,000 higher than the final bid award?
25   A    As I mentioned, it was an unusual year, unusual bidding
```

environment, and we did have a number of projects in fish passage

and in the department in general that came in under the

estimates.

Q    Would you look at Exhibits AT-335, please.  It's on the

screen in front of you.  And that exhibit indicates an engineer's

estimate of about $913,000 for that project, doesn't it?

A    Yes, it does.

MR. SHAFTEL:  Your Honor, I'm going to object.  We keep

reading these numbers into the record on documents that have not

been admitted into the record.

THE COURT:  You're right.  Objection's sustained.

MR. JOHNSEN:  Mr. Shaftel informed me this morning there

would be no objection to the admission of these construction

reports that were obtained over the weekend if their use was

limited to the comparison of the engineer's estimate to the

contract bid amounts.

MR. SHAFTEL:  Your Honor, that's correct.  I did in fact

say that I would not object to them to the degree that these

documents are being used for the specific purpose of showing

there's been lower bid amounts than the engineer's estimates on

these particular segments of these projects, whatever they may

include.

I would object to these to the degree that they purport to

show the total costs of these projects because there's been no

foundation laid as to whether this witness has any idea as to

```
 1    what goes into these numbers.
 2            THE COURT:  All right.  Which ones are you asking to
 3    admit for that limited purpose?
 4            MR. JOHNSEN:  332 through 336.
 5            THE COURT:  Is 337 one of these as well?
 6            MR. JOHNSEN:  It is.
 7            THE COURT:  So through 337?
 8            MR. HOLLOWED:  Yes.
 9            THE COURT:  For that limited purpose, no objection?
10            MR. SHAFTEL:  Just for the limited purpose of showing
11    the difference between the bid amounts.
12            THE COURT:  I understand.
13        332 through 337 will be admitted.
14    By Mr. Johnsen:
15    Q   Mr. Wagner, another of the projects was on State Route 122.
16    Would you look at Exhibit 337, please?
17        Does the title -- the contract title there refer to the
18    project that you were referencing when you said that a Mayfield
19    Lake project was done this year?
20    A   Yes.
21    Q   That is the same project?
22    A   That's correct.
23    Q   Now, for the four projects that were done under the Nickel
24    Program, the two on Tibbetts Creek and the two on Burly Creek,
25    those would fall into the category of we really don't know how
```

1  much the culvert aspect of those cost because it was to know as

2  part of the larger project; is that correct?

3  A    That's my understanding, yes.

4  Q    So we have in these Exhibits 332 through 337 both the

5  contract amounts for construction for the projects for this

6  season, where data's available on the cost, and the engineer's

7  estimates for each of those projects; is that correct?

8  A    That appears to be so.

9  Q    I will move on to a different subject.  Back to your

10  declaration.  On Page 12, as it happened, when you were doing the

11  declaration you said that you received a call on a project -- I

12  think it's actually two projects, that you had planned for this

13  year's construction season that caused a delay, and they were

14  located in Poulsbo.

15      Do you recall that?

16  A    I do.

17  Q    Now, the objection that the City of Poulsbo had was that they

18  didn't want the department to be closing a state highway through

19  Poulsbo for construction and requiring traffic to go on other

20  city streets to get around the construction; isn't that correct?

21  A    Yes, that is my understanding.

22  Q    And they were going to actually deny you the use of those

23  other streets for this construction season; isn't that also

24  correct?

25  A    Yes.

1   Q    That's not the end of the story, is it, with regard to those

2   projects?

3   A    No, I don't think so.

4   Q    Something else happened later after your declaration that had

5   a different effect on the project; isn't that correct?

6   A    I'm not sure I follow you.

7   Q    Let's back up.  These were projects that were scoped; isn't

8   that correct?

9   A    Yes.

10  Q    They were actually designed; an engineer had determined the

11  design that was going to be used?

12  A    Yes.

13  Q    They'd gone through that whole chart process that you

14  referred to in your earlier testimony, that multicolored chart

15  that got us to a project; is that correct?

16  A    They had gone through a process.  I believe they actually

17  went through the process before that specific step- wise process

18  and flow chart was developed.

19  Q    Okay.  A similar process.  They were ready to go, basically?

20  A    Yes.

21  Q    And the department had done all the things that it needed to

22  do to put them out to bids?

23  A    To that point.  I don't believe they had been put out to bid,

24  but we were on track to do that.

25  Q    You were ready to go.  They were going to be done during that

1    construction season.

2    A    Right.

3    Q    Okay.  And then in addition to the call from Poulsbo, the

4    state legislature specifically directed you not to do those

5    projects in the way that the experts had designed them; isn't

6    that correct?

7    A    The state legislature directed us to investigate a different

8    technique for constructing those projects than what was planned.

9    Q    And that technique was tunneling underneath the road rather

10   than digging it up?

11   A    That's correct.

12   Q    And that had absolutely nothing to do with the viability of

13   the project as a fish passage barrier; isn't that also correct?

14   A    I'm not sure I follow the question.  The project was for the

15   purpose of fish passage correction.

16   Q    Yes.  The reason the legislature asked you to investigate

17   tunneling rather than digging up the road had nothing to do with

18   the merits of the planned project in terms of fish passage, did

19   it?

20        MR. SHAFTEL:  I will object that it calls for

21   speculation as to the intent of the legislature.

22        THE COURT:  The objection to the form of the question is

23   sustained.

24   By Mr. Johnsen:

25   Q    What was the direction you received from the legislature

1    regarding that project?

2    A    Paraphrasing, I believe it was directing the Department of

3    Transportation to evaluate tunneling as a method for correcting

4    those culverts.

5    Q    And the advantage of tunneling would be that the street would

6    not have to be closed; is that correct?

7    A    I believe so, yes.

8    Q    Was anything communicated to the department regarding

9    tunneling from the legislature that indicated the legislature's

10   concern was that the design you were considering or going to use

11   was inadequate or inappropriate for fish passage purposes?

12   A    No.  I don't think there was a criticism of the adequacy of

13   the design for fish passage.

14   Q    Could you turn to Page 15 of your declaration?  At Line 10

15   you are referring to -- actually starting at Line 8, you are

16   referring to recent examples of stream simulation installations;

17   the first one at Stevens Creek $634,000, and then a pair on

18   Frazer Creek and Beaver Creek, $1,401,830.  In fact, that

19   $1,401,000 figure is for both of those culverts, not each of

20   those culverts; isn't that correct?

21   A    Yes.

22   Q    And in fact, all of the costs that have been incurred for

23   stream simulation culverts under the I-4 program are shown in a

24   table in the annual progress reports, are they not?  Do you

25   recall?

1    A    All of the costs for those projects?

2    Q    Yes.

3    A    That's our intent, yes.

4         MR. JOHNSEN:   Could the clerk hand the witness Exhibit

5    AT-101?

6    By Mr. Johnsen:

7    Q    First of all, do you recognize AT-101?

8    A    Yes, I do.

9    Q    And that is in fact the table taken out of the 2008 progress

10   report, with one addition, isn't that correct, and the addition

11   is that column on the right that identifies the type of design

12   that was involved in the project?

13   A    That's correct.

14   Q    Displayed on the screen in front of you, I think it's on the

15   third page of the exhibit, is the Frazer Creek and Beaver Creek

16   projects that you testified about.   They're involved in your

17   declaration; is that correct?

18   A    Yes.

19   Q    And it looks like you've just taken the total costs of the

20   two projects and split it between the two; is that correct?

21   A    Yes.   They were constructed together under one contract.

22   Q    Would you turn back to the top of the exhibit?   There's a

23   note at the top, and that note indicates that the costs that are

24   reflected in this table are the actual costs of the projects,

25   including all of the costs that the department might incur beyond

1    the construction costs; isn't that correct?

2    A    In preliminary engineering, yes.

3    Q    The intent here was to show the entire cost of each project?

4    A    As best we could.

5    Q    Could you turn to -- I don't think you have this exhibit yet.

6    It is AT-70, which is one of the progress reports.

7         Do you have that in front of you?

8    A    Yes.

9    Q    This is the Frazer Creek project, isn't it?

10   A    Yes.

11   Q    And at the bottom of the page it indicates that the structure

12   that we're looking at there is 4.57 meters wide.

13        Do you see that?

14   A    Yes, I do.

15   Q    Is that approximately 15 feet?

16   A    Sounds like it.

17   Q    I'm going to test your math knowledge here slightly.   To

18   convert meters to feet, do you multiply meters by 3.28?

19   A    Yes.

20   Q    Most of this data is in meters in these reports, is it not?

21   A    There's a mix, but yeah.

22   Q    Okay.   We have a 15-foot culvert there.   If you go back a

23   page, we're looking at the Beaver Creek project; is that correct?

24   A    Yes.

25   Q    And it's described at the bottom as being 7.93 meters wide.

1    It's about 26 feet; is that correct?

2    A    Sounds about right.

3    Q    In the counting, though, you've listed both of these as

4    costing exactly the same amount.  Is that a reasonable assumption

5    based on the difference in size?

6            MR. SHAFTEL:  Object as to form.  Reasonable in what

7    context?

8            THE COURT:  Do you understand the question?

9            THE WITNESS:  Not fully.

10            THE COURT:  Let me have you rephrase.

11    By Mr. Johnsen:

12    Q    I'll rephrase it.

13        One of these projects is about 12 feet wider -- bigger than

14    the other.  In your opinion, is it reasonable to assume they

15    would both cost the same amount of money?

16    A    No.  The larger culvert would probably cost more than the

17    smaller one.

18    Q    Right.  I have been waiting the whole trial to say this:

19    Size matters, doesn't it, Mr. Wagner?  It matters to cost; isn't

20    that correct?

21    A    It does.

22    Q    All right.  Well, let's look at a few more examples.  Do you

23    have AT-68 available to you there?  This is the Stevens Creek

24    project that was referenced in your declaration?

25    A    Yes.

1  Q    And that's located, according to the map here, just north of

2  Lake Stevens in the area north of Seattle; is that correct?

3  A    Yes.

4  Q    Generally an urbanized area, also correct?

5  A    Varying densities, yeah.

6  Q    And this particular culvert is about 12 feet in length, is

7  that right, 3.74 meters?

8  A    I believe that's right.

9  Q    In the slide show that you went through, the different

10  photographs that Mr. Shaftel showed you, I believe -- I'm not

11  sure about the order, but I believe one of them was of a

12  correction on the Pysht River, Pysht Creek, on the Olympic

13  Peninsula.

14      Do you recall that?

15  A    That's a tributary to the Pysht, yes.

16  Q    Well, that one actually is illustrated in AT-70 at Page 35.

17  It may be easier just to look at these on the screen rather than

18  to go through all the manuals, but whichever you prefer.

19      Is that the same project that was in the slide show?

20  A    Yes.

21  Q    Here we have a 4.6 meter width; is that correct?

22  A    Yes.

23  Q    And that's about 15 feet; is that right?

24  A    Yes.

25  Q    Now, this one is listed in the table as AT-101 as a no- slope

1    culvert rather than a stream simulation culvert; isn't that

2    correct?  If you don't know, you can certainly look at the

3    exhibit.

4    A    The exhibit number?

5    Q    AT-101.  That's Table 3.  It's the last one in the Olympic

6    region.

7    A    Yes.

8    Q    Now, the next one that I recall from the presentation was the

9    Mill Creek culvert.

10        Do you know where that one is located?

11   A    Mill Creek is in our north central region.

12   Q    That's over on the east side of Stevens Pass?

13   A    Yes.

14   Q    That's not the town Mill Creek?  The town of Mill Creek is

15   located north of Seattle?

16   A    Correct.

17   Q    That one is a stream simulation culvert, is it not?

18   A    That's how it's listed here, yes.

19   Q    In fact, there's a photograph of the Mill Creek project

20   that's attached to your declaration, isn't there?  If we look at

21   W-92-H, is that the Mill Creek culvert?

22   A    Yes.

23   Q    And that is in fact, I think you said in your testimony, a

24   concrete arch culvert, and it's 37 feet in width; is that

25   correct?

A    That's my understanding, yes.

Q    It's also what the caption to the photo in your declaration says?

A    Yes.

Q    Now, when we're talking about the width of the culvert, we're talking about the span of the stream, basically?

A    The span of the culvert is the dimension across the stream.

Q    It is not the dimension across the road.  That would be the length of the culvert; is that correct?

A    Yes.  It's confusing.  Depending on which direction you look at it from, but...

Q    One little minor point here.  The caption on the photo says it's on US 21.  It's actually on US 2, isn't it?  Just a typo?

A    Yes.

Q    And that's a major east/west highway between Everett and Spokane, is it not?

A    Yes.

Q    Now, in your declaration you say that above 20 feet, the department uses a bridge.  This culvert is 37 feet.  You've also said that bridges tend to be more expensive than culverts.  This is an example of when in fact a culvert was used in a location where your declaration indicates a bridge would normally be used; is that correct?

A    I didn't mean in that statement to indicate that that was a blanket approach that in every case of a crossing over 20 feet we

1    would use a bridge.  But we run into a little bit of sort of

2    complexity about what classifications structures receive.

3        This structure is a culvert.  But for structures that span

4    more than 20 feet in DOT, they are listed as bridges in our

5    system and involve a different design process.

6    Q    If we had, say, an average cost for bridges, we shouldn't

7    necessarily then attribute that cost to any culvert replacement

8    that is larger than 20 feet, should we?

9            MR. SHAFTEL:  Objection.  Lack of foundation.  This

10   witness -- there hasn't been a foundation laid for his ability to

11   testify on this topic.

12           THE COURT:  Overruled.

13   By Mr. Johnsen:

14   Q    Can you answer the question?

15   A    I'm sorry.  Can you repeat it?

16   Q    If we had an average cost for a structure called a bridge, we

17   should not necessarily apply that cost to any culvert replacement

18   project that was larger than 20 feet, should we?

19           MR. SHAFTEL:  I'm going to also object in that it's an

20   incomplete hypothetical.  He doesn't have all the facts before

21   him in what context he's being asked to answer this question.

22           THE COURT:  Do you understand what he's asking you?

23           THE WITNESS:  I'm really not sure, sir.

24           THE COURT:  You testified that generally above 20 feet

25   the Department of Transportation uses a bridge.  That's not

always the case.  That's one example right here.  It's 37 feet

wide.  So what he's saying is, so you can't look at anything over

20 feet and necessarily assume that a bridge will be put in that

spot; isn't that true?

       THE WITNESS:  That's true.

       THE COURT:  That will take us to lunch, Counsel.  Thank

you.  Try to have everyone gathered back at 20 minutes after one

o'clock.  Thank you.

(At this time, a lunch break was taken.)

       THE COURT:  All right, Mr. Johnsen.  I think we were

still on cross-examination.

By Mr. Johnsen:

Q   Mr. Wagner, at lunchtime, a couple of the attorneys mentioned

to me that they thought some of your responses were simply

nodding your head or shaking your head.  The court reporter is

sitting in front of you, and he can't see it when you do that.

    So if possible, could you make your responses oral?

A   Yes, I will.

Q   Thanks.

    I've got a couple of things we talked about earlier this

morning before we moved ahead with the picture show here.

    Is one of the people who works in your office John Peterson?

A   Yes.

Q   What is his position with the department?

A   He works in my stream restoration program as the fish passage

1    coordinator.

2    Q    Is he involved with the culverts, the barrier correction

3    project?

4    A    Yes, he is.

5    Q    Do you know how long he has worked there?

6    A    Approximately eight years or so.

7    Q    The past eight years?

8    A    I'm not positive, but something in that range.  I just don't

9    recall.

10   Q    Mr. Shaftel reminded me during the break that there are

11   actually photographs of one of the projects that was completed

12   this year in the State's exhibit list.  And I don't know if

13   you're familiar with them or not, but there's no harm in asking.

14       Can you pull up the Exhibit W-173?  Can you see that

15   photograph?

16   A    Yes.

17   Q    On the State's exhibit list, that is described as being part

18   of the project on Highway 104 west of the Hood Canal Bridge.

19       Do you recognize it as such?

20   A    That looks right.  I think the photo's kind of distorted.

21   Q    In the way it's displayed on the screen?

22   A    My view of it, it looks like it's kind of squeezed from side

23   to side.  But that does look like the project.

24   Q    Those people may not be quite as tall as they appear to be.

25       How about 173-C?

1    A    Yes.

2    Q    Is that a picture of the same project?

3    A    Yes.

4    Q    And that's the project that is described in Exhibit AT-336.

5    It's not exactly described but referenced in AT-336; is that

6    correct?

7    A    I am just wanting to make sure what AT-336 is.  Okay.

8            MR. JOHNSEN:  I would move for the admission of W-173-C

9    and D.

10           THE COURT:  Any objection, Mr. Shaftel?

11           MR. SHAFTEL:  I have no objection.

12           THE COURT:  173-C and 173-D are admitted.

13   By Mr. Johnsen:

14   Q    Have you visited that site?

15   A    I have.

16   Q    This is W-173-C.  That looks to be a sizable excavation.

17       Am I correct in that assumption?

18   A    Yes.

19   Q    Do you know how deep that particular excavation was?

20   A    I think it was 20 or 30 feet from the original road surface

21   to the top of that culvert.

22   Q    Would that be considered a large excavation in the scope of

23   the culverts projects?

24   A    Yes.

25   Q    Do you recall the length of this particular culvert?

1    A    I believe this culvert is about 200 feet long.

2    Q    And would that be considered a long culvert in the list?

3    A    There are certainly ones that are longer.  But that is a

4    significant size, yeah.

5    Q    If you could look at Exhibit AT-68, that is one of the annual

6    progress reports, Page 32.  This is the next picture in your

7    slide show from this morning.  It's Little Boulder Creek?

8    A    Yes.

9    Q    Do you recognize that?

10        MR. JOHNSEN:  I'm not sure why it's distorted.  Can you

11   scroll down to the bottom a little bit, and the caption

12   underneath it so the whole caption shows on screen?

13        Thank you.

14   By Mr. Johnsen:

15   Q    Now, this is an eight-meter or 26-foot culvert; is that

16   correct?

17   A    Yes.

18   Q    And this was done to the stream simulation standards, to your

19   knowledge?

20   A    Yes.

21   Q    And the end of the caption there indicates that there's an

22   additional benefit in terms of -- or in addition to the fish

23   passage for this -- that's illustrated by this particular

24   culvert, and that's that maintenance issues associated with

25   cleaning debris are decreased with this design.

1    Is that your understanding as well?

2  A   I think that's generally true, yes.

3  Q   And this photo also illustrates a culvert that has the

4  capacity to accommodate 100-year flood flows, as Dr. Fox talked

5  about in his testimony the other day?

6  A   That's what this caption says, yes.

7  Q   The next exhibit is AT-67, another progress report, Page 28.

8  This is the Jim Creek culvert that you talked about.  Oops.

9  That's Jimmycomelately Creek.

10    128.  Do you recognize this as the Jim Creek culvert you

11  discussed briefly in your testimony this morning?

12  A   Yes.

13  Q   Now, this one indicates that it had eight meters of road

14  fill.  That would be about 26 feet or so?

15  A   Yes.

16  Q   And that's the distance from the top of the culvert to the

17  road; is that correct?

18  A   Yes.

19  Q   Now, in this particular one, the caption indicates that there

20  were two privately-owned barriers upstream of this transportation

21  department culvert and one barrier downstream, and the department

22  went ahead and corrected this culvert in spite of this fact.

23    Is that consistent with your knowledge of this particular

24  culvert?

25  A   That is my understanding.

Q    The next exhibit is the next page of the same exhibit, which
is the Jimmycomelately project, which was also in your slide show
this morning.

     Now, this is actually a bridge, isn't it?

A    The correction is a bridge, yes.

Q    Yes.  By any definition, that's a bridge.  And it's about a
hundred feet long; is that also correct?

A    Yes, 100-foot span.

Q    And you indicated in your testimony, and the caption
reaffirms that, that this is a multi-entity project?

A    That's correct.

Q    Correct.  One of those entities was the Jamestown S'Klallam
Tribe?

A    Yes.

Q    And that's also on Highway 101, the Olympic Peninsula?

A    Yes.

Q    And the last photo is the Tibbetts Creek.  Let's start at the
top of the page here.  The bottom picture is the same picture
that was in your slide show?

A    It appears to be.

Q    This is the culvert after it was reconstructed?

A    Yes.

Q    And those are fish in the foreground?

A    They are.

Q    And they are headed underneath that culvert up to where

1    they're going to spawn, if you know?

2        That's okay.  They're fish.  Let's scroll back up to the top

3    of the page.  Now, we can tell from that picture at the bottom of

4    the page that this thing goes under Interstate 90 for a

5    considerable distance; is that correct?

6    A    Yes.

7    Q    And the project map shows us where it is.  It appears to be

8    right at the east boundary of Bellevue just before one gets to

9    Issaquah on Interstate 90?

10   A    Yes.

11   Q    That is certainly an urbanized area, isn't it?

12   A    Yes.

13   Q    This is one of the more complicated and large projects that

14   the I-4 program has ever undertaken, is it not?

15   A    One of the larger projects, yes.

16   Q    Actually, I think I just misspoke.  This isn't an I-4

17   project, is it?  It was done under another program?

18   A    It was a project that was funded basically earmarked for this

19   project -- for this barrier.

20   Q    Was it administered through your office from the I-4 program?

21   A    My office did work with that, yes.

22   Q    It is not on the list of I-4 projects in Exhibit 101, AT-101.

23   That's why I asked.

24        It was associated with your office, I take it?

25   A    Yes.

Q    Isn't it true that in addition to the fish passage problems

that the prior culvert presented that it also presented a problem

with clogging and upstream flooding?

A    I'm not specifically familiar with that.

Q    So you don't know whether that was one of the motivations for

replacing it, in addition to the beneficial benefits?

A    Well, there are many times where there's multiple issues that

are associated with the culvert.  Flooding can be one of those.

Q    So reasons to repair them in addition to the fish passage; is

that correct?

A    There can be, yes.

Q    Briefly during your testimony this morning there was

displayed a pie chart that showed about two-thirds of the culvert

corrections that have been undertaken statewide under the I-4

program in the case area.

     Do you remember that exhibit?

A    Yes.

Q    I'm not sure I remember the exhibit number.

     Isn't it true that about two-thirds of the culverts in the

state are located in the case area?

A    That is probably about true, yes.

Q    Your testimony, I believe, was there's about 1,200 statewide

and about 800 of them in the case area, the ones that are rated

as significant?

A    The 800 number doesn't exactly correspond to the 1,200

1   number, because for the purposes of the case we have taken out

2   some barriers that were for resident-only fish.

3   Q    But the proportion -- the two-thirds proportion that fixes

4   problems is about the same, if I didn't butcher that question so

5   badly that you couldn't understand it?

6        Let me try again.  About two-thirds of the barrier culverts

7   are located in the case area and about two-thirds of the fixes

8   are in the case area; is that correct?

9   A    Roughly, yes.

10  Q    Now, in terms of the future, based on your testimony today,

11  is it true that you can't -- you're not able to tell the Court by

12  what year the Department of Transportation plans or intends to

13  have corrected the 800 fish passage barriers that exist in the

14  case area?

15  A    That's correct.

16  Q    And you're not even able to tell the Court the rate at which

17  the Department of Transportation plans or intends to correct

18  those barriers.  Is that also correct?

19  A    Well, we put together our ten-year plan to show what our

20  intent is and what we would be prepared to do if funding were

21  available.  But ultimately our rate is determined by funding from

22  the legislature, which we don't control.

23  Q    And the ten-year plan is also based on funding that you know

24  or anticipate at this point; isn't that correct?

25  A    Well, our ten-year plan is identifying corrections that we

1    think could be accomplished in that timeframe, ones that we think

2    would be appropriate to be working on and are staged to be ready

3    for delivery on the schedule that we're laying out there.

4    Q    And those ten-year plans appear in the annual progress

5    reports each year, don't they?

6    A    They appear -- in 2006, we were still using a six-year plan.

7    And subsequent to that, we expanded the program to a ten-year

8    plan.

9    Q    But the current ones have a ten-year plan in them?

10   A    Yes.

11   Q    Beyond that, you don't know what the rate would be; is that

12   correct?

13   A    Depends on funding.

14   Q    And even within the ten years, it still depends on funding,

15   doesn't it?

16   A    Yes.

17           MR. JOHNSEN:  Thank you, Mr. Wagner.

18           THE COURT:  Redirect for Mr. Wagner?

19                        REDIRECT EXAMINATION

20   By Mr. Shaftel:

21   Q    Mr. Wagner, we've done quite a bit of talking about the

22   ten-year plan, but I don't believe you've actually shown the

23   Court what we're talking about.

24       Can you look at the monitor there and tell me what is this on

25   the monitor?

1    A    This is a page -- the first page from our ten-year plan, and

2    this shows projects that are in our Northwest region and our

3    planned activities costs estimated for that for the barriers in

4    that region.

5    Q    And we can find this ten-year plan where?

6    A    This is on Page 11 of our 2009 annual report -- progress

7    report.

8    Q    And that's from Exhibit No. W-092-0; is that correct?

9    A    I'm going to trust you on that.  I can't keep straight the

10   exhibit numbers.

11   Q    You might want to just flip through your exhibits in that

12   binder there just to make sure that we're all referring to the

13   same document.

14   A    Can you give me that number again?

15   Q    W-092-0.

16   A    That is correct.

17   Q    W-092-0 is the 2009 Fish Passage Inventory Report for July of

18   that year?

19   A    Yes.

20   Q    And can you explain what goes into the ten-year plan with

21   regard to the numbers that you see in the columns for each

22   biennium?

23   A    What goes into those numbers; is that what you're asking?

24   Q    Where did those numbers come from?

25   A    These numbers are from our scoping process that I described

1    earlier that involve the coordination between experts with fish

2    passage experience and engineers in this to develop the scoping

3    estimate for those projects.

4    Q    Are DOT cost estimators involved?

5    A    Yes.

6    Q    Do you know what components of the projects that are listed

7    are included within these numbers?

8    A    These include PE, which is preliminary engineering,

9    right-of-way costs, as well as estimate construction costs.

10   Q    And how does the Department of Transportation use the

11   ten-year plan and the numbers found within it when it prepares a

12   budget to go to the legislature?

13   A    We use this plan to lay out our planned work for future

14   biennium, and so this is used to build a budget for the next

15   biennium and to help us forecast where we can go with this

16   program.

17   Q    And so when you need to understand how much money you want to

18   get for a particular project, would you use the numbers that are

19   reflected in the ten-year plan?

20   A    Yes.  This is the simplest place to access those.

21   Q    Is that in fact how DOT does it when it prepares a budget?

22   A    We use the scoping estimates that are summarized in this

23   ten-year plan, yes.  We also do an update of those figures prior

24   to composing a budget.

25   Q    We talked about a number of projects that DOT has in fact

1   performed in 2009 on cross-examination, and one of those was

2   Cougar Creek.

3       Do you remember that?

4   A   Yes.

5   Q   Could you look at the ten-year plan on the top of the page

6   there and tell me what is the total amount that the ten-year plan

7   reflects that the Cougar Creek project will be funded at?

8   A   The ten-year plan shows 831,000 expenditure in the 07/09

9   biennium and $1,597,000 planned for the 09/11 biennium.

10  Q   So to get the total amount that on Cougar Creek the

11  Department of Transportation planned to spend, would you add

12  those two numbers up?

13  A   Yes.

14  Q   If you will turn your attention to the screen again, I am

15  showing you AT-333, an exhibit that Mr. Johnson asked you some

16  questions about.  Do you see there where the engineer's estimate

17  is at $965,000 for that particular project?

18  A   Yes.

19  Q   Is that the same project we were just referring to in the

20  ten-year plan?

21  A   That's right.

22  Q   Do you have a feeling for why the numbers are so different in

23  the ten-year plan as opposed to the engineer's estimate?

24  A   Part of the difference is that the ten-year plan includes

25  preliminary engineering and right-of-way, and those would not be

1    included in the engineer's estimate for a contractor bid.

2    Q    Are there other things that may have been excluded from the

3    engineer's estimate?

4    A    There may be project contingency amounts that are not in

5    there.

6    Q    When building a budget for the legislature, to go and ask the

7    legislature for funding for future projects, do you know whether

8    or not DOT utilizes the engineer's estimate number that's

9    reflected in this document?

10   A    No.  We use the numbers that we have in the ten-year plan.

11   Q    You were asked about another project called, I think it was

12   X TRIB to Skokomish.

13        Do you remember being asked a question about this document,

14   and it is AT-335?

15   A    Yes.

16   Q    And there the engineer's estimate says $912,000?

17   A    Yes.

18        MR. SHAFTEL:  Your Honor, if I may approach to get

19   another document marked?

20        THE COURT:  You may.

21   By Mr. Shaftel:

22   Q    Mr. Wagner, you've been handed what's been marked --

23        MR. SHAFTEL:  And for the record, I have provided a copy

24   of W-196 to opposing counsel.

25   By Mr. Shaftel:

1    Q    W-196, do you recognize this document?

2    A    Yes.

3    Q    What does it appear to be to you?

4    A    This is a printout from our TEIS database on the project

5    costs associated with the SR 106 X TRIB Skokomish fish barrier

6    project.

7    Q    What is the TEIS database?

8    A    Transportation Executive Information System.

9    Q    And how do you use the TEIS database?

10   A    Primarily my staff use this to track project costs and to

11   enter into the system estimated project costs for these fish

12   passage projects.

13        MR. SHAFTEL:  Your Honor, I would like to move to admit

14   W-196 into the record.

15        THE COURT:  Any objection, Mr. Johnsen?

16        MR. JOHNSEN:  Yes, your Honor.  We were provided with

17   this document about 20 minutes ago, half an hour ago, during the

18   lunch break.  We've never seen it before.

19        It relates to a project that we were told would be the

20   subject of testimony today on Saturday.  We scrambled around to

21   get the information that we did get to respond to it.  We've

22   never had a chance to conduct any kind of discovery or other

23   inquiry about this document.  It is completely hearsay, and so

24   on.

25        It's just prejudicial to us to have this delivered to us at

1    the last minute.  It's not even clear that the witness could

2    actually recognize it.

3              MR. SHAFTEL:  Your Honor, I wasn't aware that we were

4    going to be offering documents on this particular project or any

5    other projects related to cost until Saturday either, and I just

6    obtained this one recently.  And it gets around the hearsay rule

7    under the public records exception.

8              THE COURT:  All right, gentlemen, I'll tell you what I'm

9    going to do for now.  I will admit it temporarily.

10       Mr. Johnsen, if you have a chance to check it out and it's

11   not coming off their website like that, then we can discuss it

12   later.  And I certainly understand, we don't know how the numbers

13   got on there, who puts the numbers on there, all that stuff.

14             MR. JOHNSEN:  I would like to reserve some time to

15   conduct recross examination today on this and the other testimony

16   that we just heard on redirect.

17             THE COURT:  All right.

18       You may continue, Mr. Shaftel.

19   By Mr. Shaftel:

20   Q   If you will turn to your monitor again, I have published the

21   document W-196, Mr. Wagner.  On this document it says on the

22   bottom right-hand corner, the total number for this particular

23   project is $2,288,890.

24       Do you see where it says that?

25   A   Yes.

1   Q    Is this the same X TRIB as we were talking about on AT-335?

2   A    Yes.

3   Q    Do you know why the number on the TEIS database is different

4   from the one for the engineer's estimate on AT-335?

5   A    I'm not sure specifically where the information on the

6   engineer's estimate is derived.  I do know in our budgeting for

7   our program and our work with DOT program management for tracking

8   project costs and current expenditures that we use the TEIS

9   system as the main source of information.

10  Q    Mr. Wagner, during the course of cross-examination, you were

11  asked about language that is in the fish passage task force

12  report.

13      I misspoke.  I meant the Fish Passage Progress Report from

14  2009.  Again, we're at W-092-0, which is that progress report,

15  correct?

16  A    That's correct.

17  Q    You were asked some questions about the first sentence there,

18  "Fish passage barrier correction at any given site does not

19  assume that the upstream habitat will immediately be used by

20  salmonids," or something to that decree.  It may have been a

21  different one.

22      I think the question that was posed to you was that in fact

23  you may not see immediate use of the upstream habitat.

24      Do you remember that question?

25  A    Yes, I do.

Q    And your answer on that question, if I recall it correctly,
was that there are other factors which can contribute to using --
or effectively using the upstream habitat other than just the
state barriers; is that correct?

A    Yes.

Q    What other factors are you referring to?

A    Well, the statement goes on to list a number of those.  The
presence of other fish barriers on the system, the condition of
the habitat, and the condition of the fish stock itself would
probably be some of the main ones.

Q    Do you have a feeling for what the known other barriers are
on the system other than the Department of Transportation's?

A    Are you talking about a specific --

Q    Do you have a feeling for how many other known barriers there
are in Washington State other than the state barriers?

A    Many thousands of barriers.

Q    And do you have a feeling for whether or not the inventory of
non-state barriers is complete?

A    My understanding is it is not complete.

Q    Mr. Wagner, you were asked a question during
cross-examination where I believe you were asked that if the
State has a barrier, that that in fact means that it blocks all
fish passage upstream for that upstream habitat.  And I believe I
heard you say "yes," and I want to clarify that.

     Does the DOT in fact have barriers that are partial barriers

1    as opposed to complete barriers?

2    A    Yes.

3    Q    And what does "partial barrier" mean to you?

4    A    A partial barrier is one that does provide some passage to

5    fish at some flows.

6    Q    And do you know what percentage of DOT's ownership are in

7    partial barriers?

8    A    Approximately half the barriers that we know of in the system

9    are partial barriers.

10   Q    You were asked a question about whether or not DOT in fact

11   corrects a certain number of barriers historically every year

12   through its highway improvement program.

13       Do you remember that question?

14   A    Yes.

15   Q    What I want to clarify is whether or not the costs of fixing

16   the barriers within the corridor, the highway improvement

17   project, are actually -- add to the overall project costs or

18   whether or not those are just costs that would already have been

19   absorbed within the project?

20       MR. JOHNSEN:   Objection.   He testified on direct that he

21   doesn't know how the costs are broken up.

22       MR. SHAFTEL:   I don't believe that was the question I

23   asked.   I could ask it again if it was poorly phrased.

24       THE COURT:   Let me have you rephrase.

25   By Mr. Shaftel:

1  Q   Do you know whether or not when you actually have to fix a

2  fish passage barrier project because you're doing work on a

3  waterway within a highway improvement project whether or not

4  including the costs of the fish passage barrier project actually

5  adds to the cost of the overall highway improvement project?

6  A   Yes.

7  Q   And can that be a significant increase in the cost of the

8  highway improvement project?

9  A   It can be, depending on the scale of the correction and the

10 size of the project, yes.

11 Q   Another question I want to ask you about, these projects that

12 are performed during highway improvement projects, do you have a

13 feeling for whether or not the I-4 program, the corrections that

14 are performed during the I-4 program actually provide greater

15 benefit to the fish than the corrections provided -- that have

16 historically been provided under the highway improvement project?

17 A   The corrections that we achieve through the fish passage

18 standalone program provide significantly more habitat --

19 potential habitat per correction than those through the safety

20 and mobility projects.  Of the estimated 700 miles of habitat

21 potentially upstream of these barriers, about 300 miles of that

22 is associated with safety mobility projects and about 400 miles

23 of that is associated with the I-4 projects, even though the I-4

24 projects is a much smaller number.

25 Q   Mr. Wagner, I'd like to ask you some questions about the 49

1    projects that you were asked about where they -- although a

2    correction was performed, the Department of Transportation, or

3    the WDFW rather, has decided that they still don't yet meet the

4    fish passage criteria.

5        Do you remember the questions from the cross-examination?

6    A    Yes.

7    Q    For these projects, have they provided any improvement for

8    fish passage over the original situation?

9    A    In almost all cases, they're partially passable, and so they

10   have provided some additional passage, although they still have

11   work to be done to be fully functional as a fish passage

12   structure.

13   Q    Can you be a little more clear for the Court for what kinds

14   of work might be typical that you would need to do and go back

15   out to fix these types of barriers?

16   A    Sure.  It ranges from something relatively small, like

17   adjusting one piece of wood in a weir or a fishway to get the

18   elevation correct.  In other cases, we may need to go back in

19   with a larger construction project and adjust several structures.

20   In some cases, we find that we're really not getting function

21   from those projects, and we ultimately are looking at replacing

22   those as well.  But we do track those and monitor those.

23       We work with the Department of Fish and Wildlife to develop

24   proposed solutions, and I actually know several that are on the

25   project list where we're working on corrections and have achieved

1   corrections since that last report was published.

2   Q   So 49 may not even be correct as of today?

3   A   That's correct.

4   Q   And how does DOT catch the fact that these in fact are not

5   meeting the fish passage criteria?

6   A   Well, it is part of our communication with the crew at Fish

7   and Wildlife.  We are meeting with them regularly, but we also

8   have this report with the notation that some of these projects

9   still need work.  So it is a way for us to keep track of what we

10  still need to do.

11  Q   And has the success rate of these corrections changed over

12  time?

13  A   Yes.  With our approach of using more frequent use of

14  complete replacements, using no-slope and stream simulation

15  design, we've had a higher rate of performance.

16  Q   In fact, are you aware of any no-slope corrections that have

17  later on been found to not meet the fish passage criteria?

18  A   No, I'm not.

19  Q   Similarly, are you aware of any stream sim corrections that

20  later on have been found to meet the fish passage criteria?

21  A   To not meet the fish passage criteria?

22  Q   Sorry.  Are you aware of any stream sim corrections that have

23  later been found not to meet the fish passage criteria?

24  A   No.  We don't have that.

25  Q   Does DOT have a system for monitoring fishways?

1    A    **We do.**

2    Q    **What is that system?**

3    A    **We contract with the Department of Fish and Wildlife to do**

4    **annual fishway inspections, and those are reported on as part of**

5    **our annual report.**

6    Q    **And why does it have that system in place?**

7    A    **It's important to keep after those, because they do require**

8    **maintenance, they do require ongoing monitoring.**

9    Q    **In fact, of the 49 mentioned, aren't a number of those, or a**

10   **great deal of those, the fishways that you're monitoring over**

11   **time?**

12   A    **Yes.**

13   Q    **I would like to turn your attention to Page 5 of your**

14   **declaration, Paragraph 9.  I believe you were asked a question**

15   **about what you meant in this paragraph here relating to the**

16   **Federal Highway Administration HEC 10 document and whether or not**

17   **the DOT in fact looks to the Federal Highway Administration to**

18   **provide fish passage standards or whether or not it looks to**

19   **state guidelines.**

20   **Do you remember that question?**

21   A    **I do.**

22   Q    **What was your intent by making a mention of HEC 10 in this**

23   **paragraph?**

24   A    **In terms of engineering guidance, Washington State DOT and**

25   **other DOTs do look to the federal highways for basic guidance for**

1   engineering design.  And my point in bringing this up was that

2   this is really, to date, the only manual or direction that's been

3   provided for how to design culverts from the Federal Highway

4   Administration.

5        The focus has been on design for hydraulic capacity not just

6   to kind of carry water.  And in my declaration, I mention that

7   just in the last couple of years, the Federal Highway

8   Administration has issued a synthesis document that's sort of an

9   analysis of the state of the art for fish passage but has yet to

10  put out a manual or a direction on how to incorporate that into

11  hydraulic design.

12  Q   And so did the Department of Transportation historically rely

13  on the HEC 10 document?

14  A   Yes.

15  Q   And that document didn't mention anything on whether or not

16  those culverts that were being installed by the Department of

17  Transportation, consistent with those guidelines, in fact met

18  fish passage standards; is that correct?

19            MR. JOHNSEN:  Object to the form of the question.  It's

20  leading.

21            MR. SHAFTEL:  It's redirect.

22            THE COURT:  The objection is sustained.

23  By Mr. Shaftel:

24  Q   Did the department -- I'm sorry.  Did the Federal Highway

25  Administration ever inform the Department of Transportation that

1    HEC 10 standards did not, in some cases, allow for fish passage,

2    to your knowledge?

3    A    Not to my knowledge.

4    Q    You were asked a number of questions about projects that are

5    16 feet or less in width size and projects that have yet to be

6    performed that are still on the list.

7         Do you remember that set of questions?

8    A    Yes.

9    Q    There was a representation made to you that assumed that

10   80 percent of the culverts in fact could be addressed with a

11   16-foot width or less number.

12        Do you remember that question?

13   A    I remember that question.

14   Q    My question to follow up on that is whether or not the width

15   of a culvert is the only driver of costs.

16   A    It's definitely not the only driver of costs.  There are

17   similarly significant cost factors related to the depth of fill

18   that's over the culvert, to the length of the culvert itself, to

19   the traffic on the roadway, real estate, right-of-way issues,

20   access issues, all can be significant cost factors.

21   Q    Can risk be a cost factor?  Do you know what I mean by

22   "risk"?

23   A    Yes.

24   Q    What do you understand me to mean?

25   A    The chance of something in the project not going as planned,

1    resulting in higher costs.

2    Q    And when the Department of Transportation performs the

3    estimates that go into the ten-year plan, are all those elements

4    included in those estimates?

5    A    The elements that I described are included, yes, to the best

6    of our ability.

7    Q    I would like to show you a picture of that 104 project that

8    we talked about before.  I believe this is a picture of W-173-G.

9         Do you recognize that picture there?

10   A    Yes.  That is the downstream end of the culvert on the

11   unnamed trib to Suquamish.

12   Q    How do you recognize it?

13   A    I've been on site.  I remember that configuration.

14        MR. SHAFTEL:  Your Honor, I'd like to offer W-173-G into

15   evidence at this time.

16        MR. JOHNSEN:  No objection.

17        THE COURT:  That is admitted, 173-G.

18   By Mr. Shaftel:

19   Q    Mr. Wagner, do you have a feeling for how wide that

20   particular culvert is?

21   A    I believe that is 12 feet wide.

22   Q    And do you know what the costs of building this culvert is to

23   date?

24   A    Yes.  I just a couple of days ago had checked with our

25   program management office to check on the costs of that.  They

1    used the TEIS system, and the expenditures so far are

2    $1.4 million.

3    Q    Do you know whether or not traffic control was an issue on

4    this particular site?

5    A    This project is on Highway 104 and was constructed this

6    summer in conjunction with the closure of the Hood Canal Bridge.

7    And that provided an opportunity to cut open the large amount of

8    fill that was over this without needing to handle traffic or

9    detour and to quickly correct this barrier.

10   Q    And how did the lack of traffic control as an issue affect

11   DOT's ability to keep costs down on this particular project?

12   A    My understanding, it would have been a very significant

13   factor, probably several hundred thousand dollars.

14   Q    And was that a somewhat unique situation due to the fact that

15   DOT had some flexibility about when to in fact install this

16   particular barrier?

17   A    We definitely saw an opportunity.  Since the bridge was

18   closed, the road was really not used at that point.  It allowed

19   us to do a more cost-effective project than we would have if we

20   had done this on its own.

21   Q    You were asked a number of questions about historic costs

22   that are found in the Fish Passage Progress Report.

23        Do you remember being asked some questions about that topic?

24   A    Yes.

25   Q    Does the Department of Transportation look for or rely upon

1    the historic costs of these I-4 projects when it is building a

2    budget to go to the legislature for future projects?

3    A    Yes.

4    Q    How so?

5    A    The historic costs?

6    Q    Yes.

7    A    The historic costs are really not used for building a budget

8    for the legislature.  Sorry.  I misspoke.

9    Q    And do you know whether or not the historic costs that are

10   found within the fish passage reports include escalation --

11   amounts for escalation?

12   A    In the annual report, we just show those costs in the year of

13   expenditure.  They don't equate to today's dollars.  That is

14   something we really need to be careful with in looking at older

15   project costs.

16   Q    You were asked some questions about bridges, specifically --

17   or showed a picture of Mill Creek and asked whether or not that

18   in fact was a culvert or a bridge.

19        Do you remember that question and answer?

20   A    Something like that, yes.

21   Q    And you were somewhat taken to task for the fact that you

22   called it a bridge -- I'm sorry, that you had mentioned that

23   anything over 20 feet was a bridge but in fact this was described

24   in the passage report as a culvert.

25        Would you like to explain what is the significance of calling

1  something a bridge over 20 feet versus under 20 feet?

2  A    Yes.  When we are constructing a structure with more than a

3  20-foot span or more, we are involving our bridge office in the

4  design and followup inspections, and it is a more complicated

5  process and more costly process to do structures that are over

6  that span, whether they are built like a culvert or built like a

7  bridge.

8  Q   And so the significance is there is different costs that may

9  be associated with those additional design specifications?

10  A    Yeah.  More engineering is required just to make sure that

11  the road is built in the correct way.

12  Q   You were asked some questions about Little Boulder Creek,

13  which was on AT-68.  The question I remember was whether or not

14  maintenance issues are decreased by using stream simulation

15  design.

16     Do you remember that question and answer?

17  A    Yes.

18  Q   Are there advantages, in your mind, to having the flexibility

19  to be able to use the hydraulic method or the no- slope method in

20  addition to the stream simulation design?

21  A    Yes.  Although we see some advantages to the stream

22  simulation and the no-slope design, we feel it is important to

23  have a range of options to use because of the variety of

24  different circumstances that we encounter in the field.

25  Q   And what kind of circumstances are you referring to?

A    I am thinking especially of projects where there is

difficulty from the terrain or from very great fill depths that

-- to remove a culvert and to replace it with another could be

very expensive, many millions of dollars.  And depending on what

the potential benefit of that may be, we think it is important to

have the option to do cost-effective fixes.

Q    Are there also situations where you just can't do a

cut-and-fill project as opposed to -- or cut-and-cover -- do you

know what I mean by "cut-and-cover"?

A    Yes.

Q    What do I mean by "cut-and-cover"?

A    That's where the roadway is removed, cut through the roadway,

remove the structure, the old culvert's taken out, and then a new

structure is placed on top -- a new roadway is placed on top.

Q    Are there situations in which a cut-and-cover project is

feasible as opposed to using a hydraulic retrofit?

        MR. JOHNSEN:  Objection, your Honor.  He's already

testified that he's not an engineer, he's never designed a

culvert, and he has no expertise in this area.

        MR. SHAFTEL:  I believe he has expertise with regard to

the situations in which they've used different design methods

historically over the years.

        THE COURT:  You're not asking him about the design of

the -- the advantages of the different designs as they relate to

fish passage?

1         MR. SHAFTEL:  No.  I'm merely asking whether there are

2    site feasibility issues which might require going with an option

3    other than a cut-and-cover.

4         THE COURT:  Isn't that kind of far afield from his

5    expertise?

6         MR. SHAFTEL:  I don't believe so.  I believe he's

7    frequently working with trying to determine what's the best

8    methodology at every site.  I can certainly ask him some

9    questions to lay a foundation.

10        THE COURT:  All right.  I'll let him answer.

11   By Mr. Shaftel:

12   Q    Do you understand the question?

13   A    Could you repeat it, please?

14   Q    Are there situations in which a cut-and-cover -- certain site

15   circumstances require that a cut-and-cover would not work,

16   whereas another method might work?

17   A    Well, certainly situations where there's very deep fill.

18   That's one of our biggest challenges.

19        The issue with the projects in the Poulsbo area would be an

20   example where the cut-and-cover approach would necessitate road

21   closure of some duration.  And in that situation, that was not

22   acceptable to the local agency.

23   Q    You've been asked a lot of questions about different types of

24   data with regard to projects -- with regard to sites that the DFW

25   has compiled information on.  You have been asked questions about

1    width of culverts, length of culverts, fill of culverts.

2        Do you remember those questions?

3    A    I believe so.

4    Q    What do you think would be more reliable, going and looking

5    at the scoping reports or the ten-year plan to come up with a

6    feeling for the Department of Transportation's anticipated costs

7    for future projects, or using some sort of calculation using that

8    data which I just mentioned, trying to find averages based upon

9    those different dimensions?  Do you understand my question?

10   A    I'm not entirely sure.

11           THE COURT:  I was reading it, Mr. Shaftel, and I

12   couldn't tell what you were asking.

13           MR. SHAFTEL:  Well, then it's definitely not a good

14   question.

15       All right.  Thank you.

16           THE COURT:  Mr. Johnsen, you wanted some ability to

17   recross.

18                         RECROSS-EXAMINATION

19   By Mr. Johnsen:

20   Q    Mr. Wagner, on the document camera is Exhibit W-196 that was

21   introduced during your recent testimony.  It is a series of

22   figures on this particular exhibit.  Now, this is the Skokomish

23   River tributary correction that you testified in

24   cross-examination was completed and the project closed out this

25   year; is that correct?

1    A    That's correct.

2    Q    So we know what the actual construction costs for this

3    project was.  And that is illustrated or set out in Exhibit 335;

4    is that also correct?

5         MR. SHAFTEL:  Objection.  I believe that misstates his

6    prior testimony.

7         THE COURT:  I'm not sure what you're asking him,

8    Counsel.

9         MR. JOHNSEN:  I'm looking for the document.

10   By Mr. Johnsen:

11   Q    This is the same project that's addressed in W-196; is that

12   correct?

13   A    It is the same named project, yes.

14   Q    Do you have any reason to believe it's not the same project

15   that's addressed in W-196?

16   A    I think this is talking about the same project.

17   Q    Your testimony in answer to my questions earlier was that

18   this project is done, completed, the contract has been inspected.

19   This is one of the projects that was done this year; is that

20   correct?

21   A    I think I said that there were still some finishing up on the

22   project to occur.  As I understood your question, I thought you

23   were asking me about whether these culverts had been placed so

24   that we could see what they looked like after construction.  I

25   wasn't meaning to say that the contract was completed or that

1    there was no remaining work going on on site.

2    Q    Were you aware of any amendments or additions to the contract

3    for the construction of the project that is illustrated in

4    Exhibit AT-336?  Excuse me.  That is the wrong one.  335, that is

5    the one that is in front of you.

6    A    Could you say that again?

7    Q    Are you aware of any additions, amendments, changes to the

8    contract that would add cost to the construction contract for the

9    project that's illustrated in AT-335?

10   A    I am not aware of any changes that have happened in the

11   project that would add cost.

12   Q    The contract was awarded for $557,000; isn't that correct?

13   A    That's what this document says.  But as I indicated, our

14   project tracking for our program uses this TEIS system, and I am

15   not exactly sure what the origin of these other forms are.

16   Q    And you need to understand I am not exactly sure what the

17   TEIS system is at this point either.  What it says is that the

18   totals -- now we are back at W-196.  The totals that we are

19   seeing on 196 are based on the 2007 legislative final project

20   list, last updated Thursday, April 19th, 2007; is that correct?

21   A    Yes.

22   Q    So these are the amounts that the department anticipated it

23   would need to do the project, AT-335, that was in fact done for

24   $557,000; isn't that correct?

25            MR. SHAFTEL:  Objection.  He's testified that he has no

1   foundation for whether or not the numbers on that estimate bid in

2   fact amount for everything that was within the scope of the

3   project.

4          THE COURT:  The objection is overruled.

5      Do you understand the question being asked, Mr. Wagner?

6          THE WITNESS:  I'm not sure I do.

7          THE COURT:  I think he's asking you to compare and

8   contrast one exhibit against the other exhibit.  The one exhibit

9   sets out an expenditure that was based on the 2007 for an

10  anticipated cost.  I guess what he's trying to find out is, if

11  the project is almost complete, how much does it cost?

12     Right?

13         MR. JOHNSEN:  That is exactly what I'm trying to find

14  out.

15         THE WITNESS:  I don't know that number off the top of my

16  head.  I would be looking to our program management to answer

17  that, and I know that the system they would use to answer that is

18  the TEIS system.

19  By Mr. Johnsen:

20  Q   Isn't this the TEIS system?

21  A   Yes.

22  Q   This is the best available information from that system about

23  this project?

24  A   I think this is a query from it that shows the anticipated

25  expenses.  But that same system is a tracking system that tracks

1    project expenditures as they go, and it is considered the source

2    of information for current project expenditures.  That's the

3    source of information that I use to track the costs on the SR 104

4    project near Hood Canal Bridge.

5    Q    Understanding -- well, this is beginning to sound like a

6    deposition because I don't know exactly what we're doing here.

7    But if I'm understanding this exhibit correctly, there was an

8    anticipation in 2007 that you would need, for construction only,

9    because that's the line item on here, $1,578,000 between May of

10   '08 and September of '09.  And that's where we are now.

11       Am I reading that correctly?  That's just construction; is

12   that correct?

13   A    That's correct.

14   Q    And as far as you know, the only amount that has been spent

15   is the amount that is in the contract summary that was on the

16   screen earlier, which is 336.  Is that also correct?

17            MR. SHAFTEL:  Again, he's speculating as to what he --

18   he hasn't laid a foundation as to what he knows and doesn't know

19   about this document.  I believe he said he does not know what

20   goes into this document and what's included in this document.

21            MR. JOHNSEN:  Your Honor, I believe the testimony --

22            THE COURT:  Hang on.  I'll overrule the objection.

23       Do you understand the question?  You may not know the answer,

24   but do you understand the question?

25            THE WITNESS:  I think I need that repeated.

By Mr. Johnsen:

Q   As far as you know, has there been any other construction
expenditure other than the expenditure of $557,000 that appears
in Exhibit AT-336 -- excuse me, 335?

MR. SHAFTEL:  Same objection.  He doesn't know that this
in fact is what it's based on.  He keeps saying, do you know
anything else other than the $557, which assumes that he in facts
knows that $557,000 has been expended.  He says he doesn't know
that.

MR. JOHNSEN:  I think he says he doesn't know anything
about the project.

THE COURT:  I think he says he doesn't know, Counsel.

MR. JOHNSEN:  Okay.

By Mr. Johnsen:

Q   Okay.  And that includes not knowing whether any of the
anticipated expenditures in W-196 have ever come about.  You do
not know that, do you?

A   As discussed, the project is just finishing up and the
billing is just happening on these projects, so I don't know the
status of this particular project.  I did check on the 104
project because that was completed early in the spring.  And the
documentation -- the contract is complete, and the billing is
almost completely in on that.

These other projects that have been constructed in the summer
and the fall, we don't have full information on.  So I don't have

1    a basis to judge that.

2    Q    You mentioned that there are non-state barriers on the same

3    stream system where state barriers exist, in the course of

4    redirect examination.

5         Do you remember that?

6    A    Yes, I do.

7    Q    Those non-state barriers are all there with the permission of

8    the State Department of Fisheries; are they not?

9    A    I don't know that they have permission to be there.

10   Q    They are required to get an HPA in the same manner that the

11   Department of Transportation is required to get an HPA for its

12   culverts; isn't that correct?

13   A    HPAs are required with in-water work.  There could be other

14   barriers created without the benefit of an HPA.

15   Q    One of the other projects that you testified about in

16   redirect was the Cougar Creek project.

17        Do you recall that?

18   A    Yes.

19   Q    Like the Skokomish project, that project is complete; is it

20   not?

21   A    The construction work is complete on that, to my knowledge.

22        Well, when I say "complete," what I understood you to be

23   asking was is that culvert constructed on the ground.  And as I

24   mentioned earlier, there may still be some ongoing finish-up

25   construction activity, re-vegetation, striping, other kinds of

1  things happening on some of these projects right at this time.

2  Q   On the screen is AT-333, which is the Cougar Creek

3  construction report.  Now, when you testified on redirect, you

4  indicated that the department had planned to spend $2.3 million

5  on this project.  And this indicates that the construction

6  contract that was actually awarded was about $550,000.

7       I take it, then, that you have available to you, or the

8  program that did this particular project has available to it the

9  difference between the actual construction contract cost and the

10  amount that had been planned for when the project was being

11  anticipated in the past; is that correct?

12          MR. SHAFTEL:  I'm going to object to the form of the

13  question.  It's also talking about -- and it's not in the record.

14  He's never testified that there is in fact an excess amount

15  between those two amounts or whether or not it just hasn't been

16  accounted for within this particular document.

17          THE COURT:  The foundational objection is sustained.

18  By Mr. Johnsen:

19  Q   Do you know whether the $2.3 million that was planned for the

20  Cougar Creek project has ever been spent?

21  A   I know the project has undergone construction this summer.  I

22  know that it is completed or nearing completion.  I don't know

23  the current balance on that project.

24  Q   So the only thing we do know is what the construction

25  contract award was for, and that was $550,000?

1          MR. SHAFTEL:  That also misstates his prior testimony,

2    which is that --

3          THE COURT:  The objection to the form is sustained.

4       How much more do you have, by the way?

5          MR. JOHNSEN:  I think I have one more question.

6    By Mr. Johnsen:

7    Q    You mentioned that in a road project, not the type that you

8    are involved in, but in the highway improvement projects, the

9    costs of correcting a culvert in the course of that project might

10   add to the overall costs of the project.

11      Do you recall that?

12   A    I do.

13   Q    Isn't it true that the cost of any element of the project is

14   going to add to the overall cost?

15   A    If it was in addition to what was planned.

16   Q    And the requirement to correct the culvert in the course of

17   that project is a requirement of state law; is it not?

18   A    If there is work on that culvert.

19   Q    So it would be part of the overall budget then, if it is a

20   requirement of state law, would it not be?

21   A    I think the question was about a slightly different scenario.

22   I think what you are asking me about, if work is planned that

23   involves work on a culvert that would lengthen it or modify it in

24   some way, then that work would require us to provide fish passage

25   at that site.

1    I think the earlier question was about the general concept of

2    fish passage corrections being added to safety and mobility

3    projects as a means of efficiently correcting barriers.

4    Q    So in your mind, it is added if it is required by state law

5    but not something the department would otherwise do; is that

6    correct?

7    A    Added to the scope of the project.

8         MR. JOHNSEN:  Thank you.

9         THE COURT:  Do you feel a little bit Matt Hasselbeck up

10   there?

11       Mr. Wagner, you may step down.

12        MR. MONSON:  Your Honor, Peter Monson.  I think I have

13   just a couple questions.

14        THE COURT:  Oh, great.  All right.  Are you ready now?

15        MR. MONSON:  I will be brief.  Yes.

16                     RECROSS-EXAMINATION

17   By Mr. Monson:

18   Q    Good afternoon, Mr. Wagner.  I'm Peter Monson.  I represent

19   the United States in this case.

20       There was a couple of questions that you were asked on

21   redirect regarding the HEC 10 standards, or a guidance document.

22   Do you recall those --

23   A    I do.

24   Q    -- that your counsel asked you?

25       The HEC 10 manual is a hydraulic manual, is it not?

1   A   Yes.  "Hydraulic engineering circular" is the acronym.

2   Q   Thank you.  Does it have any statements in there regarding

3   the design criteria for fish passage?

4   A   Not to my knowledge.

5   Q   You indicated both on redirect and in your written testimony

6   that "At no time has FHWA notified WSDOT that the federal design

7   standards failed to provide fish passage or that culverts

8   designed pursuant to the standards might violate treaty fishing

9   rights."

10      Do you recall writing that statement?

11  A   I do.

12  Q   Has the FHWA ever notified WSDOT that the federal design

13  standards were sufficient to meet the fish passage?

14  A   Not to my knowledge.

15  Q   Is there anything in the HEC 10 circular that precludes the

16  State from modifying the design standards to accommodate local

17  conditions, such as fish passage?

18  A   Not that I'm aware of.

19          MR. MONSON:  No further questions.  Thank you.

20          THE WITNESS:  Thank you.

21          THE COURT:  Mr. Shaftel, anything else from the State

22  based on the questions from the government?

23          MR. SHAFTEL:  No questions.

24          THE COURT:  Mr. Wagner, you may step down.  Thank you.

25      Counsel, let's take our break.

1   (At this time, a short break was taken.)

2        THE COURT:  Do we have another witness on behalf of the

3   State?

4        MS. WOODS:  Yes, your Honor.  The State will call

5   Michael Barber.

6        THE COURT:  Mr. Barber, could we have you step forward.

7   Raise your right hand to be sworn, please.

8   Whereupon,

9                      MICHAEL BARBER

10  Called as a witness, having been first duly sworn, was examined

11  and testified as follows:

12        THE CLERK:  Would you please state your full name for

13  the record and spell your last name for the court reporter?

14        THE WITNESS:  Michael Barber, B-A-R-B-E-R.

15        THE COURT:  You may inquire.

16        MS. WOODS:  Thank you, your Honor.

17                    DIRECT EXAMINATION

18  By Ms. Woods:

19  Q   Good afternoon, Mr. Barber.  I'd like you to begin, please,

20  by describing your educational background.

21  A   Yes.  I have a bachelor's and a Master of Science degree in

22  biology from Eastern Washington University.

23  Q   Was there any fisheries training associated with that?

24  A   Yes.  My master's degree was looking at the relationship

25  between fish habitat and stream flow on Chamokane Creek on the

1    Spokane Indian Reservation using in-stream flow incremental

2    methodology.

3    Q    Did you get a job after receiving your master's degree?

4    A    Yes, I did, with the Upper Columbia United Tribes Fisheries

5    Center at Eastern Washington University.

6    Q    What is the Upper Columbia United Tribes?

7    A    It was an intertribal organization that dealt with the

8    fisheries issues for the Spokane, Coeur d'Alene, Kalispel and

9    Kootenai Tribes.

10   Q    How long did you work for that organization?

11   A    About five years.

12   Q    What did you do after that?

13   A    I got a job with the Department of Fisheries in Olympia.

14   Q    What year was that?

15   A    1990.

16   Q    Are you currently employed?

17   A    Yes, I am.

18   Q    Who do you work for now?

19   A    The Washington Department of Fish and Wildlife.

20   Q    Is that a successor agency to the Washington Department of

21   Fisheries?

22   A    Yes, it is.

23   Q    How long have you been with WDFW or its predecessor?

24   A    A little over 19 years.

25   Q    Are you involved in fish passage work?

1  A    Yes, I am.

2  Q    When did you first become involved in fish passage work?

3  A    When I was first hired with the Department of Fisheries, I

4  was what was then called the regional habitat manager, so I was

5  involved in writing HPAs, so I had some involvement in the

6  approval and compliance inspections of fish passage projects.

7        In 1995, I was hired by Dr. Paul Sekulich and Larry Cowan

8  into the SHEAR section, where I became more involved with fish

9  passage.

10  Q    What is your current title?

11  A    I am the section manager for the environmental restoration

12  technical assistance section within the technical applications

13  division.

14  Q    What are your responsibilities?

15  A    I supervise the unit that -- well, within my section is the

16  unit that conducts the inventory and assessment of WSDOT fish

17  passage barriers as well as the crew that conducts inventories on

18  WDFW lands.

19        I also supervise the biologists that do the scoping for the

20  Washington State Department of Transportation barrier corrections

21  as well as the WDFW barrier corrections.  And some of those

22  biologists also provide training and technical assistance to

23  groups or individuals wishing to do fish passage barrier

24  assessments.  And we also provide technical assistance to

25  individuals or groups that are interested in doing habitat

1    enhancement or restoration projects.

2    Q    Mr. Barber, did you prepare a Declaration in Lieu of Direct

3    Testimony for this sub-proceeding?

4    A    Yes, I did.

5            MS. WOODS:   If Madam Clerk would please hand Mr. Barber

6    the binder with W-088, please?

7    By Ms. Woods:

8    Q    Mr. Barber, do you have Exhibit W-088 with you?

9    A    Yes, I do.

10   Q    Do you recognize it?

11   A    Yes, I do.

12   Q    What is it?

13   A    It is the Declaration of Michael Barber in Lieu of Direct

14   Testimony.

15   Q    Would you please turn to Page 15?  That's your signature on

16   Page 15?

17   A    Yes, it is.

18   Q    What is the date of your signature?

19   A    March 27th, 2009.

20   Q    After that date, did you prepare an addendum to your

21   declaration?

22   A    Yes, I did.

23   Q    If you would please flip forward a couple of pages to page --

24   exhibit Page No. 00017.

25        Do you have it?

1    A    Yes, I do.

2    Q    Do you recognize that page?

3    A    Yes, I do.

4    Q    What is that?

5    A    The Addendum to the Declaration of Michael R. Barber in Lieu

6    of Direct Testimony.

7    Q    Would you please flip forward a couple more pages?

8    A    Okay.

9    Q    Do you see your signature?

10   A    Yes, I do.

11   Q    What is the date of your signature there?

12   A    July 6th, 2009.

13   Q    Mr. Barber, do you adopt the Declaration of Michael R. Barber

14   in Lieu of Direct Testimony, dated March 27th, 2009, and addendum

15   dated July 6th, 2009, as your direct testimony today?

16   A    Yes, I do.

17             MS. WOODS:   Your Honor, I would like to move for the

18   admission of Exhibit W-088.

19             MS. RASMUSSEN:   We had some objections to Paragraph 6, 7

20   and 5.   We agreed beforehand that these objections would go more

21   to weight rather than admissibility, so we will argue it on

22   cross.

23             THE COURT:   I think that will work just fine.

24             MS. WOODS:   Your Honor, there are some exhibits

25   associated with Mr. Barber's declaration as well.   I believe that

1    W-088-A and B as well as W-008-D through J have already been

2    admitted.   We will be offering W-088-C through another witness.

3             THE COURT:   Thank you.   Yes.   All the exhibits have been

4    admitted other than C.

5             MS. WOODS:   All right.   Thank you.

6    By Ms. Woods:

7    Q    Mr. Barber, were you in the courtroom last week when

8    Dr. Sekulich testified about the culvert inventory methodology

9    that WDFW developed?

10   A    Yes, I was.

11   Q    Did you have a role in developing that methodology?

12   A    Yes, I did.   I was responsible for compiling the information

13   from various sources within the division to put together the 1998

14   and 2000 manuals.

15   Q    Do you currently have a role in conducting culvert

16   inventories?

17   A    Yes, I do.

18   Q    What is that role?

19   A    I supervise the unit that conducts the inventory.

20   Q    Are there inventories being conducted now?

21   A    Yes, there are.

22   Q    What kind of inventories?

23   A    We have three crews -- three two-person crews working on

24   conducting habitat assessments on Washington State Department of

25   Transportation barriers, and we have one crew that is working on

1    inventorying fish passage barriers and unscreened or inadequately

2    screened water diversions on WDFW land in eastern Washington.

3    Q    Are there people out in the field today conducting

4    inventories?

5    A    Yes, there are.

6    Q    I believe you said three two-person crews?

7    A    That's right.

8    Q    Is that it?

9    A    There is three two-person crews working on Washington State

10   Department of Transportation barriers and one crew working on

11   WDFW lands.

12   Q    Once those folks who are out there today finish what they're

13   doing, how do you decide to send them next?  And I'm speaking

14   specifically of the folks that are out there assessing -- doing

15   habitat assessment for WSDOT barriers.

16   A    We calculate what is called a surrogate PI for all of the DOT

17   barriers.  And what that is, we use a stream length, and then we

18   take -- we estimate the stream length using GIS, and then we use

19   that information to calculate what we call a surrogate PI.

20        We use that surrogate PI to kind of direct where we spend our

21   efforts or how we order our work.  So we will go -- we will send

22   the crew, when they complete the survey they're on now, they will

23   go to the next higher surrogate PI and do the habitat assessment

24   at that site.

25   Q    Are you trying to focus habitat assessments in the areas

1    where you think you're likely going to find the most habitat?

2    A    That's the purpose, yes.

3    Q    When do you expect to complete the habitat surveys that your

4    staff is doing for the WSDOT culverts?

5    A    In the case area, we think we -- or the best estimate that I

6    have is 2013.  Statewide, probably 2017.

7    Q    Once those field crews collect their information, what do you

8    do with that information?

9    A    They enter the information into the Fish Passage Diversion

10   Screening Inventory Database.

11   Q    Does WDFW calculate priority index values for the culverts it

12   has inventoried?

13   A    Yes, we do.

14   Q    About how many WSDOT culverts have stream restoration

15   priority index values at this time?

16   A    Probably just under 500 statewide, and probably just over 350

17   in the case area.

18   Q    Once you have calculated a priority index value for a

19   culvert, then what happens?

20   A    Right now we're working on a threshold of 13.  If the PI is

21   over 13, then I assign a biologist to scope the project.

22   Q    I believe Mr. Wagner described something about the scoping

23   process earlier today.  Mr. Barber, would you please describe

24   WDFW's role in the scoping process for WSDOT culverts?

25   A    Yes, I will.  First the biologist will look at the

1    information collected by the inventory crew.  They'll do a site

2    visit, verify the information, make sure nothing's changed.

3        If something's changed, they'll update the record.  If there

4    was data missing, they'll fill the data gaps.  They will do

5    something of an evaluation of the upstream habitat, look at the

6    quality of the habitat.  They'll look at the presence of upstream

7    or downstream barriers.  They'll look at issues like is there

8    other habitat restoration efforts going on in the watershed,

9    things like that.  And then they'll make a recommendation to me

10   that either the project -- they'll also verify the information in

11   the PI, excuse me, and make sure the correct species are

12   accounted for in the PI.

13       If the PI -- if there's something wrong with the PI, they'll

14   recalculate it.  If it drops below the 13 threshold, then the

15   project's deferred.  If there are issues that they feel -- that

16   they feel make the project unworthy of moving forward, they may

17   recommend that it be put on hold until conditions change, or

18   they'll recommend that the project move forward.

19       If they recommend that the project moves forward, I request

20   that an engineer be assigned to do further engineering scoping

21   and develop conceptual designs.  Once the engineer has completed

22   their process and developed the conceptual report, we will

23   forward that to DOT and request that they schedule what we call a

24   pre-scoping meeting.

25       Once that's scheduled, we will have the scoping engineer,

1  scoping biologist and the area habitat biologist, at a minimum,

2  from WDFW.  From DOT you'll have the regional scoping

3  engineering.  You'll have regional environmental staff and

4  representatives from the fish passage program from Olympia.

5  They'll meet and discuss the options for correcting that

6  particular site.  Hopefully at the completion of that meeting,

7  they will have come to a consensus on what design option will be

8  pursued.

9      A concurrence form is drafted that captures the design option

10  that was selected, and then all of the individuals at that

11  meeting will sign off on that concurrence form.  And at that

12  point, DOT is committed to designing, permitting and building

13  that project, using that design option, and WDFW is committed to

14  permitting that project.

15  Q  Are the steps you've described some of the steps that were in

16  a very colorful flow chart that we saw with Mr. Wagner earlier

17  today?

18  A  Yes, they are.

19  Q  Once a fish passage project has been constructed on the state

20  highway system, does WDFW have a role after that?

21  A  We do -- upon completion of construction, we do a compliance

22  inspection on all fish passage projects.

23  Q  What is a compliance inspection?

24  A  We would visit the site and make sure that the completed

25  project complies with our fish passage standards.

1  Q    So is the Washington State Department of Fish and Wildlife

2  the agency that determines whether a corrected culvert is in fact

3  fish passable?

4  A    Yes, it is.

5  Q    Do you do any monitoring after projects have been

6  constructed?

7  A    All of the I-4 dedicated-funding projects, we will do a

8  followup visit the following year and do spawner surveys to

9  evaluate whether in fact fish are actually passing through and

10 using the habitat above the culvert.

11     On all projects that are considered fishways or fishway

12 retrofits, regardless of how they were constructed or what the

13 funding source of that construction is, we will do an annual

14 inspection of those every year for as long as that project is in

15 place.

16 Q    Do you have any responsibility with respect to the annual

17 progress reports for the WSDOT fish passage program?

18 A    Yes.  I oversee the production of that report.

19 Q    Have you seen any changes over the years in the types of

20 barrier correction projects that WSDOT has performed?

21 A    Yes, I have.  In the early years of the program, and in the

22 '90s particularly, the dominant type of project was a fishway

23 retrofit project, predominantly.

24     In early 2000, that began to change, where those projects

25 became less frequent, more culvert replacement projects were

1    done.  And as we progressed into the current times, the

2    structures have become larger and more similar to stream

3    simulation culverts.

4    Q    In your opinion, would the 2005 WSDOT Fish Passage Inventory

5    Progress Performance Report provide a representative sample of

6    the types of corrections that DOT is doing today?

7    A    No, because many of those projects would have been

8    constructed in the 1990s and would be heavily weighted towards

9    fishway retrofits and hydraulic design culverts.

10   Q    Does the Washington Department of Fish and Wildlife own any

11   culverts?

12   A    Yes, we do.

13   Q    Where are they?  What types of lands are they on?

14   A    Most of them are on what we call wildlife areas, lands that

15   we own and manage for wildlife habitat and for hunting.  There

16   are a number of them on fish hatcheries as well.

17   Q    What is WDFW doing about those culverts?

18   A    We have developed a -- I have developed a ten-year plan to

19   address all of those that we have identified so far.

20   Q    Have you done an inventory of the WDFW culverts?

21   A    We're complete in the case area.  We have a few new

22   acquisitions in eastern Washington that we're finishing up now.

23   Q    You said that your ten-year plan addresses your culverts.

24   What is in the ten-year plan?  Are you planning to correct those

25   culverts?

1    A    Yes, we are.

2    Q    Do you get involved in capital budget planning for WDFW?

3    A    Part of the ten-year plan is putting together the biennial

4    budget for each subsequent biennium, so yes, that goes forward to

5    the agency MP and forwarded to the legislature with the capital

6    budget request.

7    Q    Are you familiar with the capital budget request for the

8    department as a whole?

9    A    Yes, I am.

10   Q    Besides culverts, what other capital infrastructure does WDFW

11   have?

12   A    We have office buildings throughout the state.  We have a

13   large number of fish hatcheries throughout the state.  We have,

14   as I mentioned, wildlife lands and the roads that come with

15   those, and we have a number of access areas as well.

16   Q    Is WDFW renovating its salmon hatcheries, to your knowledge?

17   A    Yes, we are.

18   Q    Is hatchery reform part of salmon recovery?

19   A    Yes, it is.

20   Q    Is renovating hatcheries part of hatchery reform?

21   A    Yes, it is.

22   Q    Is there enough money in WDFW's budget for all of its

23   infrastructure needs?

24   A    No, there is not.

25           MS. WOODS:  That concludes the direct examination.

1    Thank you.

2                          CROSS-EXAMINATION

3    By Ms. Rasmussen:

4    Q   Good afternoon, Mr. Barber.  My name is Lauren Rasmussen.  I

5    represent two of the plaintiff tribes: the Port Gamble S'Klallam

6    and Jamestown S'Klallam Tribes.

7        I believe we've met a couple of times on this case.  You were

8    deposed under oath on, let me get this right, July 18th, 2006,

9    May 12th, 2009, and October 6th, 2009; is that correct?

10   A   I'll have to take your word for it.

11   Q   Okay.  Well, I did try to look it up.

12       And you still agree with what you said at those times was

13   accurate and correct?

14   A   I believe so.

15   Q   And I'm only telling you this not as a threat, just as a sort

16   of a warning that I might be plowing some of the same kind of

17   ground.  So I'm just bringing that up.

18       You have a background in biology, as you testified; is that

19   correct?

20   A   That's correct.

21   Q   So you know the science behind fish passage?

22   A   Yes, I do.

23   Q   And what fish need to get through a fish passage barrier?

24   A   Yes, I do.

25   Q   And you also work on the progress reports that Fronda

1  mentioned?

2  A    Yes.

3  Q    And the reports say how far you have come in dealing with the

4  major issue in this case, right, the progress in fixing the

5  fish-blocking culverts in Washington State, in particular in the

6  case area; is that correct?

7  A    That's correct.

8  Q    And a lot of your declaration covers those

9  how-far-you've-come numbers; is that correct?

10  A    That's correct.

11  Q    And what are your current job responsibilities?

12  A    I currently -- I am the section manager of the environmental

13  restoration technical assistance section.  I supervise the units

14  that -- the unit that does the DOT inventory and habitat

15  assessments.

16      As I said, I supervise the biologists that do the scoping

17  work.  I do the coordination with the engineers for the

18  engineering scoping.  My people in my unit also provide training

19  to other groups that want to do inventories or want to do fish

20  passage projects or other types of habitat restoration projects.

21  We also manage a number of large fishways in the state: the

22  Sunset Falls and Granite Falls fishways.  In the north sound, we

23  are responsible for the Mitchell Act facilities on the Columbia

24  River -- or Columbia River tributary.  I am responsible for

25  putting together the WDFW habitat program ten-year plan.  I work

1   with DOT in putting together their ten-year plan.

2   Q    Sounds like a lot of work.  Do you also get involved in

3   issues that certain specific -- site-specific agreements?  One

4   that comes to mind is the Barnes Creek agreement.

5   A    Yes, I was involved with that.

6   Q    And what -- the general activities of WDFW, one of the

7   disclosures of your testimony here is you talk about the mission

8   and function of WDFW.  It seems like it covers -- the Department

9   of Fish and Wildlife covers a lot of issues, like issuing HPAs,

10  enforcement of HPAs, writing progress reports, researching

11  methods for providing fish passage, and contracting with DOT to

12  do some -- you talked about maintenance on I-4 projects -- or

13  monitoring of I-4 projects.

14       Is that sort of a good general statement of the overview of

15  some of the things that WDFW does?

16  A    Yeah, I think so.

17  Q    If you know -- and this is going to seem like a weird

18  question to you, but I ask you to be sympathetic to the attorneys

19  in the case that have a lot of exhibits to get in.

20       If you know, would you say that if a document has a WDFW seal

21  on it, it would be fair to assume that somebody at WDFW wrote it

22  and did it as part of their job duties?

23  A    If it has a WDFW letterhead on it?

24  Q    Yeah.  If it says "Department of Wish and Wildlife" and it

25  will say, you know, like the annual report, and then it will

1    say -- and then you'll have a research report that also has the

2    seal.

3         Would it be a fair assumption that people don't just put

4    seals on anything; it's usually something they did as part of

5    their job duties?

6    A    That would seem reasonable, yes.

7    Q    Now I'm going to ask you to turn your attention to your

8    declaration, which is -- go ahead and pull up 88.

9         Are there portions of this declaration that you would say

10   other witnesses might have more knowledge about the specific

11   issues than you would?

12   A    I think that would be -- well, I would have to flip through

13   it.

14   Q    For example, I'm thinking of the paragraphs - and I believe

15   you and I discussed this before - sort of when you refer to

16   Paragraphs 4 through 8, you refer back to the declaration of

17   Sekulich, and Paragraphs 28 and 29 refer to Barnard's

18   declaration, and I believe one of your exhibits was generated by

19   Benson.

20   A    That's correct.  Yes, I think the table that was generated by

21   Brian Benson, that he would be able to better explain how he

22   generated that table.

23        Some of the other stuff about the early workings of the SHEAR

24   program and the involvement with the DOT that predates my

25   employment with the section, that is referred back to

1    Dr. Sekulich.  That's pretty common knowledge and well

2    documented, so I don't feel that it's terribly inappropriate to

3    be in my declaration.

4    Q    But I am thinking sort of, for example -- let me try to give

5    you specific examples.  For example, the whole chart about the

6    new manual, the new updated 2009 fish passage manual, where you

7    refer to the differences between the 2000 and the 2009.  The meat

8    of that, I would need to ask Mr. Barnard, wouldn't I?

9    A    No.  No.  He really didn't have a lot of involvement with

10   that.  The fish passage -- are you talking about the Fish Passage

11   Barrier Assessment Manual or the Culvert Design Manual?

12   Q    The Culvert Design Manual.

13   A    The Culvert Design Manual would be, yes, Bob Barnard.

14   Q    So I'm coming back to Exhibit C.  And I understand from

15   Counsel that Mr. Benson is going to testify about this a little

16   bit later.  But in Paragraph 11 -- uh-oh, we shouldn't be using

17   my copy.  I have sticky notes on it.  Well, ignore the sticky

18   notes.

19        Could you use a different copy?  I'm afraid of what I might

20   have said.  It wouldn't have been bad.  I mean, it would have

21   been notes to myself?

22            THE COURT:  Remind you to pick up milk, bread, you know,

23   things like that?

24            MS. RASMUSSEN:  I don't think that's quite as

25   embarrassing as a sticky note.

By Ms. Rasmussen:

Q    At the bottom of Paragraph 11, I believe this is sort of the

text that goes with Exhibit C, and it says -- within that group,

you're referring to -- you're speaking of the FPDSI.  I think

Fronda mentioned this.  That is the database that contains the

records of the fish blocking culverts; is that correct?

A    That's correct.

Q    And you mention that there are 375 records of DOT, WDFW and

state parks that show barrier culverts in the United States

Washington case area, but only 393 of them have habitat

assessments conducted.

A    That's correct.

Q    And you said 350 earlier today.  Is that in the ballpark?

A    This is a composite Fish and Wildlife/DOT and state parks.

     I think the question that was asked of me by Fronda Woods was

the number of DOT habitat assessments.

Q    Okay.  That helps.  Thank you.

     And you say within that group of 393, the FPDSI shows 42

anadromous fish passage barriers in the case area that block more

than 200 meters of habitat in streams with no other known

anadromous barriers.  The list is attached as Exhibit C.

     I understand Mr. Benson is going to explain how he generated

the list.  I would like to ask you a little bit about what that's

supposed to mean.  I just want it to be absolutely clear that it

is, for the record, that this 42 is of not the total 375 but it's

1    of the quarter of the data for which you have habitat

2    assessments; is that correct?

3    A    That is correct.  The only way we can do an assessment of are

4    there any upstream or downstream barriers is if we've done a

5    habitat assessment.  It would only include those -- it's a subset

6    of the 393, which we have done habitat assessments.

7    Q    Okay.  And were you the one that asked Mr. Benson to create

8    Exhibit C?

9    A    Yes, I did.

10   Q    Did you ask him how many of the 393 with other barriers had

11   partially passable downstream barriers?

12   A    No, I did not.

13   Q    But we've been talking a lot about how we sort of separate

14   the partially passable barriers from the fully passable barriers,

15   because fish can get through them, right?

16   A    In some cases, yes.

17   Q    And there's three measures of passability: 66 percent and

18   33 percent and then fully blocked; is that correct?

19   A    Right.

20   Q    And in your annual report, you separate the two, is that

21   correct?  The 2009 version, you state how many fish are

22   blocked -- okay.  Would seeing that report refresh your

23   recollection?

24   A    Yeah.

25   Q    I believe that it is Exhibit 72.  This is already admitted.

1    Scroll down to Page 6.

2        Here's what I think is the data on total fish-blocking

3    culverts in the case area.  And you've set it out between

4    partially passable and fully blocked; is that correct?

5    A    Okay.  That's correct.  Yes.  I'd forgotten about this.  This

6    is a change in this report.

7    Q    Yeah, because before, you just listed them all as blocking;

8    is that correct?

9    A    Yes.

10   Q    But for your particular example, you pull out only the fully

11   blocked culverts with more than 200 meters of habitat; is that

12   correct?

13   A    Say that again.

14   Q    For the purpose of your declaration - you can go back to

15   Paragraph 11 in 88 - you pull out only the 42 totally blocked

16   sites; is that correct?

17   A    No.  I don't believe those are sites that are total

18   blockages, no.  I think it's all -- it's 42 barriers.  Some of

19   them may be partial barriers.

20   Q    I will move on to Paragraph 12.  The last line of

21   Paragraph 12, Lines 10 through 13, you say, "As of early 2009,

22   most DOT barriers with a PI greater than 20 and no other barrier

23   in the watershed have been fixed"; is that correct?

24   A    That's correct.

25   Q    How many barriers was that?

1    A    How many barriers?

2    Q    That were fixed.

3    A    I don't know the number, not off the top of my head.

4    Q    Who gave you this number?

5    A    That's me.  I am just going off of the scoping list and the

6    barriers -- the projects we are scoping now.  There aren't that

7    many with a PI greater than 20 that don't have any other barriers

8    associated.

9    Q    Does 20 have any sort of significance or is it just a number?

10   A    It's just a number.

11   Q    And you have SPIs that you've generated based on GIS data, as

12   you testified earlier, for the rest of the 1,375 culverts; is

13   that correct?  And SPI, in my understanding, means surrogate PI,

14   because you have measured it based on essentially a proxy for

15   actual habitat measures, and you use GIS to measure the lineal

16   gain that you've achieved in fixing the culvert; is that correct?

17   A    That's correct.  The 1,375 number you used, that includes, I

18   believe -- the sites with limited habitat gain, we don't do a

19   surrogate PI for those.  So those that have a significant

20   habitat, you know, more than 200 meters of habitat, we would have

21   calculated a surrogate PI for virtually all of them.

22   Q    Okay.  So this would be kind of the 800 ballpark that

23   Mr. Johnsen was talking about before?

24   A    That's correct.

25   Q    For the 800 who have PIs or surrogate PIs to sort of

1   prioritize the culverts based on amount of habitat gain?

2   A    That's correct.

3   Q    In your deposition, you talk about fixing culverts, you talk

4   about the manuals, you talk about examples, but there's one sort

5   of gap that I'm sort of curious about that seems pretty

6   significant.

7        You don't mention the idea of mitigation in lieu of

8   correcting the enforcement anywhere, do you?

9   A    That really goes beyond my role in this program.

10  Q    But I believe you testified earlier that you had some role in

11  the Barns Creek agreement which, as I understand it, is an

12  agreement to accept mitigation in lieu of enforcement for --

13  instead of correcting the culvert correction, you accept

14  mitigation for the duration of the life of the culvert?

15          MS. WOODS:  Objection.  I don't think that document is

16  in evidence.  There has been no foundation for this testimony.

17          MS. RASMUSSEN:  I believe I asked him if he was familiar

18  with it.  And from the depositions, we know that he had an active

19  role.  I can ask him some more questions about his role in the --

20          THE COURT:  Yes.  Let me have you do that.

21  By Ms. Rasmussen:

22  Q    Are you familiar with the Barns Creek agreement?  I believe

23  you already said you're familiar with the Barns Creek agreement?

24  A    Yes, I am.

25  Q    The Barns Creek agreement is essentially one of those

1    situations, as I understand it -- I'm sorry.

2        What was your role in the Barns Creek agreement?

3    A    I was asked to participate in a meeting between our assistant

4    director for the habitat program and representatives of DOT to

5    try to resolve the dispute regarding the Barns Creek project.

6    Q    And what was the dispute?

7    A    There was a culvert failure on Barns Creek on Interstate 5

8    where DOT had to do an emergency project to replace the culverts.

9    Our area habitat bio issued the Department of Transportation an

10   emergency HPA with the stipulation -- or with the provision that

11   they replace the culvert with a fish passable culvert.

12       DOT could not secure a culvert that was adequate size to

13   provide for fish passage in time to respond to the emergency, so

14   they put in a fish passage barrier.  They replaced the fish

15   passage barrier with another fish passage barrier.  They then

16   subsequently appealed the HPA.

17   Q    And you testified in the past that you worked on issuing the

18   HPAs.  And when you issue HPAs, one of the issues that comes up

19   in permitting is mitigation sometimes; is that correct?

20   A    That's correct.

21   Q    So you're familiar with the concept of mitigation?

22   A    Yes, I am.

23   Q    And in this agreement, didn't the parties negotiate

24   mitigation in lieu of enforcement against DOT for installing the

25   fish passage barrier?

1    A    That's correct.

2    Q    And do you know the specifics of what that mitigation was?

3    A    It was a habitat restoration project on a stream that was

4    just to the south of the Barns Creek site.  It was doing -- I

5    think it involved removing a small fish passage barrier that was

6    owned by the landowner, which I believe was Whatcom County, and

7    doing some other enhancement work there.

8    Q    Wasn't one of the principles of the mitigation is that for

9    the culvert, if it was going to be there for 40 years, it would

10   require 40 years of mitigation?

11   A    That's usually the requirement, yes.

12   Q    Do you have an idea -- you list a lot of the totals for fish

13   blocking culverts.  You list for DOT, 807.  Is that culverts or

14   sites?  And this is not a trick question.  I know we went back

15   and forth.

16   A    That would be sites.  There could be more than one culvert at

17   a site.  It's one barrier.

18   Q    The Department of Fish and Wildlife has how many?

19   A    We have about 71.

20   Q    About how much time, if you know, do you think it will take

21   to fix the culverts at the current rate?

22   A    For the Department of Transportation?

23   Q    Yes.

24   A    I have been asked that question before, and when I answered

25   it before, I was only considering the correction of culverts

1    using the I-4 program.  But in considering the rate of correction

2    with both the I-4 program and other projects constructed,

3    transportation projects, safety mobility, major drainage

4    projects, I think it would probably be in the neighborhood of 50

5    years.

6    Q    But you're referring to your prior testimony which stated it

7    was going to be 100 years at a rate of seven to eight per year;

8    isn't that correct?

9    A    That's correct, yes.

10   Q    And what rate are you using now?

11   A    Ten to 12 per year.

12   Q    And in your calculations, are you counting all 1,375

13   culverts?

14   A    No, just the 800.

15   Q    So it's 50 years for the 800 culverts blocking a significant

16   reach of habitat; is that correct?  That's your estimate?

17   A    That's correct, yes.

18   Q    And you say that average cost -- here you talk about the cost

19   of fixing DFW culverts, and you said that the average cost is

20   $230,000; is that correct?

21   A    That's correct.

22   Q    So this is different from the average cost that we're hearing

23   from DOT; is that correct?

24   A    Yes.  Our projects are considerably easier than state highway

25   culverts.

Q    But some of the culverts in the 807 must be just as easy as
your culverts; isn't that correct?

A    That may be correct, but it would be very rare.

MS. RASMUSSEN:  I am going to ask the clerk right now to
hand the witness Exhibit AT-156.

By Ms. Rasmussen:

Q    Do you recognize this document?

A    Yes.  I saw this yesterday.

Q    Are you testifying that is the first time you saw it?

A    I did not remember seeing this document prior to yesterday.

Q    You don't remember testifying earlier in your deposition you
recognized the document?

A    I do not remember that, no.  I do know in my 2006 deposition
I did recognize this document.

Q    You are admitting that you recognized it in 2006; is that
correct?

A    I testified that I recognized it in 2006, so I must have
recognized it in 2006.

Q    I'm not sure where that leaves me, I'm afraid.

Who wrote it?

A    I can't say for sure, but having read it, I suspect that
Dr. Paul Sekulich wrote it.  I can't say that for sure.

Q    Would seeing your testimony from 2006 refresh your
recollection?

A    I have read that.  I know what I said.  At the time, that's

1   what I believed.

2   Q   Are you saying that you no longer think that is true, or you

3   just don't remember?

4   A   I really don't remember.

5   Q   But you worked for Mr. Sekulich -- what's the date on this

6   document?

7   A   This is April 8th, 1997.

8   Q   And this is during the time period that you worked with

9   Mr. Sekulich?

10  A   That's correct.

11  Q   Is it the kind of topic that Mr. Sekulich would have been

12  responsible for during the scope of his employment, fish passage?

13  A   Yes, it is.

14  Q   We heard him testifying, and he seems to be the fish passage

15  person that was working for WDFW in 1997?

16  A   That's correct.

17  Q   Am I understanding correct, you are unable to say today for

18  sure that Mr. Sekulich wrote it?

19  A   Yes.  I guess I am three years older than I was in 1996 --

20  2006.  When I picked it up yesterday, I didn't recall ever seeing

21  it before.  Having looked back at my declaration, at that time I

22  believed that it was probably written by Dr. Sekulich.

23  Q   Would your memory have been better in 2006 when it was closer

24  in time to when it has been written?

25  A   That could be, or I may have encountered the document

1    sometime in the recent past before my 2006 deposition.

2         MS. RASMUSSEN:  I'm going to move to have this admitted.

3    An objection has been raised that it's a hearsay statement.  I'm

4    going to ask it be moved as an admission made by an agent during

5    employment concerning matters in the scope of his employment.

6         THE COURT:  The pretrial order lists an objection based

7    on 802.  Any further objection?

8         MS. WOODS:  We continue to maintain the objection that

9    it's a hearsay document.  There's been no indication that it

10   indeed was done within the scope of anybody's employment.  Even

11   if it was prepared by Dr. Sekulich, there's no indication in the

12   document why it was prepared or that it was done within the scope

13   of Dr. Sekulich's employment.

14        THE COURT:  All right.  Understood.

15      AT-156 will be admitted by the Court.

16   By Ms. Rasmussen:

17   Q   I am going to change gears a little bit.  Back to the

18   question of culverts and the problem they create for fish

19   passage.

20      You testified earlier that you worked with the progress

21   reports; is that correct?

22   A   That's correct.

23   Q   And do you still agree with the statement - it was found in

24   the 2006 project reports - that one of the major problems facing

25   salmon and trout populations is an inability to utilize their

1    historic rearing and spawning grounds due to fish passage

2    barriers that block access to upstream habitat?

3    A    I agree with that.

4    Q    Are you familiar with the WDFW -- well, those outside of WDFW

5    call it their mantra of protection of fish life being one of

6    their duties?

7    A    Ask that again.

8    Q    One of the only grounds for denying an HPA is that it fails

9    to protect fish life; isn't that correct?

10   A    That's correct.

11   Q    And fish -- the definition of "fish" includes juvenile

12   salmon; is that correct?

13   A    That's correct.

14   Q    And are you familiar with the literature that supports the

15   proposition that juvenile salmon have difficulties swimming

16   upriver when a culvert makes the water too fast?

17   A    That's correct.

18   Q    And I believe we heard Mr. Fox testify about that particular

19   issue with juvenile salmon and their swimming abilities; is that

20   correct?

21   A    That's correct.

22   Q    Do you agree that -- do you have any problem with Mr. Fox's

23   declaration on that in this case?

24   A    I don't think I've read all of Dr. Fox's declarations.  I

25   can't say.

Q    You don't remember saying that you were -- that you had no
problem, no critique of his declaration?

A    I think I said that I skimmed his declaration, and from my
skimming, I didn't have a problem with it.  I can't say that I've
thoroughly read it.

Q    Did you say that Mr. McHenry did a good job of characterizing
the issues in this particular area?

A    Yes.

Q    Do you still agree with that?

A    Oh, yes.  Yes.  I think Mike is a fine biologist.

Q    In your declaration, you talk about the changes between the
update of the new Washington Department of Fish and Wildlife Fish
Passage Assessment and Prioritization Manual; is that correct?

A    That's correct.

Q    Did the new update in 2009 take into consideration the
juvenile passage?

A    No, it does not.

Q    And from a biological standpoint, wouldn't it be necessary to
modify the manual to allow for the passage of juvenile salmonids?

A    Yes.  That would be something that I could see us doing in
the future.

Q    Would that be -- would it be necessary to modify the manual;
is that correct?

A    It would be.

Q    You testified earlier about working with HPAs, I believe when

1    you started at the department, issuing and probably also denying

2    them sometimes; is that correct?

3    A    I can't recall having had to deny an HPA, but I did issue

4    HPAs, yes.

5    Q    HPAs are the hydraulic approvals that allows someone to build

6    in water, essentially.   If someone wants to build a dock or put

7    in a culvert, they need an HPA; is that correct?

8    A    That's correct.

9    Q    And so all of the culverts put in by DOT require HPAs; is

10   that correct?

11   A    That's correct.

12   Q    So from WDFW's standpoint, aren't all the fish-blocking

13   culverts in violation of their hydraulic approvals?

14   A    If in fact there was a hydraulic project approval written and

15   that hydraulic project approval required fish passage, then that

16   would be the case, yes.

17   Q    Some culverts don't even have an HPA; is that right?

18   A    I think that is true in some cases, yes.

19   Q    So they are also not compliant with the hydraulic code if

20   they don't have one?

21   A    That would be true too.

22   Q    In fact, that might even be worse?

23   A    Yes, it would be.

24   Q    So to your knowledge, does WDFW have any power to require

25   someone to remove a culvert if it doesn't have a permit or is not

1   in compliance with its permit?

2   A   I believe the only -- the department's only power would be to

3   actually go in and actually remove or replace the culvert and

4   then bill the landowner.

5   Q   Do you have any idea what the failure rate for culverts is?

6   A   No, I don't.

7   Q   Did you at one time propose a monitoring scheme that wasn't

8   adopted that would look at the failure rate and find out the

9   answer to that question?

10  A   No.   No.   I've had discussions periodically with DOT about

11  the need to update the inventory once we complete the habitat

12  assessments, and we've actually included in our contract this

13  biennium with DOT to do some spot checks on some of the DOT

14  culverts that have already been assessed as passable.   So we're

15  going to start that probably after the first of the year, where

16  we'll do some spot checks to verify that those culverts are still

17  passing fish.

18  Q   What's your definition of "some"?

19  A   I don't know yet.   We're going to be doing a query of the

20  database and looking at sites that we feel are most likely to

21  have problems in the future.   We'll probably look at culvert size

22  relative to stream size, look at some relationship there and then

23  determine how we can fit those into our other activities when

24  we're in the area, and we can have somebody stop by and do an

25  assessment of those sites.

1   Q   I'm going to turn now to the topic of the benefit to fish of

2   removing the culverts.  Is it your opinion that you have to know

3   the actual number of fish increase to know what you're doing has

4   a benefit to fish?

5   A   No, I don't think you do.

6   Q   Has parks completed their inventory of culverts?

7   A   No, I don't believe they have.

8   Q   Did they used to have a contract with WDFW and it terminated?

9   A   Yes.

10  Q   Do you know anything about the costs of different culvert

11  designs, say between hydraulic and stream simulation?

12  A   Only in a general sense.

13  Q   In terms of a culvert project, I have been told often the

14  highest cost involved manpower, the diversion of the roads, and

15  other types of costs would essentially be constant between two

16  types of culvert fixes.

17      Is that your understanding?

18  A   If you are getting to the size of the culvert, it is not the

19  largest influence in the cost of the project, that can be true,

20  yes.

21  Q   In fact, you testified earlier if you're doing an open cut,

22  there really isn't much difference between stream simulation and

23  the cost of a hydraulic culvert; is that correct?

24  A   I don't believe so, no.

25  Q   Because the idea is if you're digging up the road anyway and

1  you're diverting the traffic anyway, that this is just a

2  difference in size of the culvert; is that correct?

3  A   There's a small monetary difference, but I think relative to

4  the overall project cost, it would be small.

5  Q   I believe you heard Mr. Wagner testify earlier about WDFW

6  monitoring fish passage barriers; is that correct?

7  A   That's correct.

8  Q   Isn't it just I-4 projects that are monitored currently?

9  A   That is correct.  We only do a compliance inspection on those

10  projects that were constructed using other funding sources.  We

11  do not do any followup monitoring other than those that fall

12  within the category of a fishway retrofit.  Those, we will

13  inspect annually.

14  Q   Because fishways have lots of problems, right?

15  A   That's correct.

16  Q   So you can't just walk away from a fishway?

17  A   No, you can't.

18  Q   But for the rest of the culverts, nobody's going out to look

19  at them to see if they're currently complying with fish passage?

20  A   No.  Nobody from WDFW.

21  Q   Are you familiar with the scoping work for the Highway 3

22  crossing at the mouth of Chico Creek in Kitsap?

23  A   A little bit.

24  Q   Are you aware that this is a pretty expensive project, around

25  the range of $31 million?

1    A    Yes.

2    Q    Is it a good project?

3    A    Yes, it is.

4    Q    And why is it a good project?

5    A    There's a significant amount of habitat upstream, and Chico

6    Creek also is a significant Chum Salmon producer in that area.

7    Q    So from your perspective, it is high cost but well worth it?

8    A    It's a good project, yes.

9    Q    Are you responsible for the collection of data regarding DOT

10   culverts in the case area?

11   A    Ultimately, yes.

12   Q    Basically it's done by field crews?

13   A    Yes.

14   Q    And one of the elements that the field crews measure is

15   lineal salmon habitat upstream?

16   A    Lineal gain upstream.

17   Q    And they measure spawning area?

18   A    Yes.

19   Q    And rearing area?

20   A    Yes.

21   Q    And they put this all into a database called the FPDSI; is

22   that correct?

23   A    That's correct.

24   Q    And you testified that WDFW calculated PI values for some of

25   the culvert sites in the case area?

1    A    Yes.

2    Q    And those are entered into the database; is that correct?

3    A    That's correct.

4    Q    And for the rest of the culverts, it does what's called an

5    SPI, which you talked about earlier, which is the surrogate for

6    the PI done by GIS mapping; is that correct?

7    A    That's correct.

8    Q    And they're not as accurate as field measurements?

9    A    No.

10   Q    But WDFW has elected to not include the SPI in the FPDSI?

11   A    That's correct.

12   Q    But it represents the best available data concerning the gain

13   of the other culverts; is that correct?

14   A    That would be correct.

15   Q    And is Brian Benson the WDFW employee who's currently

16   responsible for maintaining the FPDSI?

17   A    Yes.

18   Q    He would be considered the custodian of it?

19   A    That would be accurate.

20   Q    So when in the course of your work you desire a compilation

21   of data regarding the given set of culverts, you ask Mr. Benson

22   to produce a data like you did for your declaration?

23   A    Yes.

24   Q    And he gets it from the FPDSI and he reports it back to you?

25   A    Correct.

Q   Have you requested from Mr. Benson a compilation of DOT barriers in the case area which block at least 200 meters of salmon habitat in a form that includes both measured lineal gain, measured and estimated spawning area, and measured and estimated rearing areas and PIs and SPIs?

A   No.  He couldn't query the data base and get all that information.  That's not how we --

Q   He could get everything but the SPI, right?

A   He could get the SPI -- he can get the PI, he can get the actual spawning area, rearing area, and lineal gain for those sites which we have surveys.  There is some other information in there called ETDPIs, which are kind of a hybrid of where there's actually data measured -- data collected for the first 200 meters, and then it's expanded using a GIS.

     That information is also in the database.  That data is more along the lines of the SPI data.  The SPI data is not stored in the database, so that would have to be extracted from those individual spreadsheets that I gave you at my last declaration.

Q   But you never asked him to compile that all together on one spreadsheet for you?

A   No.  That request came from the Department of Transportation.

Q   But the lineal gain measure, you can get from another source, right?

A   That's correct.

        MS. RASMUSSEN:  I knew this was going to happen to me.

1   It's the end of the day, and I have to lay foundation for a bunch

2   of hearsay objections.  I'm going to ask first for some patience

3   from the Court and the witness.  I really wouldn't do it if I

4   didn't have to, I promise.

5          Can you give the witness AT-216, please?

6   By Ms. Rasmussen:

7   Q    Do you recognize this document?

8   A    Yes, I do.

9   Q    What is it?

10  A    It is the 2002 annual report.

11  Q    Do you know who drafted it?

12  A    It would have been drafted by a number of staff within the --

13  what was current at that time called the habitat and passage

14  project section.  There's multiple authors.

15  Q    Is the annual report done pursuant to a duty of WDFW to

16  report its activities annually?

17  A    I don't think there was any specific requirement for us to

18  produce this report.  It was just something we wanted to do to

19  get the information out of what we were doing in the division.

20  Q    But it concerns a matter within the scope of the people who

21  worked on it during their employment with the department?

22  A    Oh, correct.

23  Q    I would ask you to look at 319.

24       Do you recognize this document?

25  A    Yes, I do.

Q    What is it?

A    It's "Culvert Hydraulics Related to Upstream Juvenile Salmon

Passage," produced by Pat Powers.

Q    And was Mr. Powers working for the department when he wrote

this?

A    Yes, he was.

Q    And the other people, Ken Bates, Tom Burns, Bob Gowen and Ron

Whitney, were also employees of WDFW?

A    Yes.

Q    On the date of the publication?

A    Yes.

Q    And did the report concern matters within the scope of their

employment?

A    Yes, it did.

Q    The last one is 236.

Do you recognize this?

A    Yes, I do.

Q    And what is it?

A    It's titled "The Summary of Client Agency Fish Passage

Inventory and Correction Status."

Q    And who wrote it?

A    I'm not sure who compiled it.  I know that I provided some of

the numbers for WDFW.

Q    And did you do that as a part of your employment with WDFW

within the scope of your employment to provide those numbers?

```
 1    A    Yes.
 2              MS. RASMUSSEN:  If I can have a second to inquire with
 3    co-counsel if she minds if I ask for admission, with the
 4    stipulation that I have to tell her beforehand?  I may wait until
 5    tomorrow.
 6        We have a stipulation that we're supposed to tell them a day
 7    in advance, so I will wait until tomorrow to move for the
 8    admission.
 9              THE COURT:  No problem.
10              MS. RASMUSSEN:  I believe that's all I have.  No further
11    questions.
12        Thank you, Mr. Barber.
13              THE COURT:  Ms. Woods, anything further for Mr. Barber?
14              MS. WOODS:  Your Honor, I would like to ask some
15    questions of Mr. Barber now.  As for the three exhibits that
16    Ms. Rasmussen referred to just now, I will be asking Mr. Barber
17    about the last one.
18        We'd like to have the opportunity to look at the other two
19    and potentially ask additional questions tomorrow.
20              THE COURT:  All right.
21                        REDIRECT EXAMINATION
22    By Ms. Woods:
23    Q    Mr. Barber, that last document that you were asked to look
24    at, Exhibit AT-236, is there a little number down in the lower
25    right corner?
```

1  A    Yes, there is.

2  Q    And what is that number?

3  A    W-220.

4  Q    Were you asked to prepare some numbers for this document as

5  part of the preparation for trial in 2007?

6  A    I can't say for sure when it was.

7  Q    Who asked you to do it?

8  A    I believe you did.

9  Q    Ms. Rasmussen asked you some questions about hydraulic

10  project approvals?

11  A    Yes.

12  Q    What is a hydraulic project approval?

13  A    A hydraulic project approval is a permit to perform a

14  hydraulic project, which is a project within the -- within waters

15  of the state.  It has the potential to impact fish life or fish

16  habitat.

17  Q    Are those what we call HPAs sometimes?

18  A    Yes.

19  Q    Could you characterize a hydraulic project approval as a

20  construction permit?

21  A    Yes.

22  Q    Is it a permit to just allow something to exist in the water?

23  A    No.  I think it is more of a permit to construct something in

24  the water.

25  Q    Does WDFW issue hydraulic project approvals to allow culverts

1    to exist?

2    A    No.

3    Q    Does WDFW issue hydraulic project approvals to construct

4    culverts?

5    A    Yes.

6    Q    How long do HPAs last?

7    A    An HPA cannot -- a hydraulic project approval cannot exceed

8    five years, I believe.

9    Q    Ms. Rasmussen asked you some questions about surrogate PIs.

10   Do you use surrogate PIs to prioritize culverts for correction?

11   A    No.

12   Q    How do you use them?

13   A    Only for planning which sites to do habitat assessments on

14   next.

15   Q    Ms. Rasmussen also showed you a table in Exhibit AT-072, 2009

16   WSDOT progress report.  That table had some numbers for culverts

17   that were partially passable.

18        Do you remember that?

19   A    Yes.

20   Q    And she asked you some questions about culverts that were

21   33 percent or 66 percent passable.

22        Do you remember that?

23   A    Yes.

24   Q    Those numbers, 33 percent or 66 percent passable, are they

25   precise numbers?

1    A    No.   Those are estimates based on the professional judgment

2    of the observer.

3    Q    So for a culvert that is estimated to be 33 percent passable,

4    what does that really mean?

5    A    It means its probably -- that the observer felt that it was a

6    barrier but -- not a total barrier, but worse than a barrier that

7    they would have called a 67 passage.   It was a judgment call

8    based on the degree of passability.

9    Q    Would you characterize it as a qualitative assessment?

10   A    That's correct.   It would be qualitative rather than

11   quantitative.

12   Q    Would it be a subjective assessment?

13   A    Yes, it is.

14        MS. WOODS:   All right.   Thank you.

15        THE COURT:   Mr. Barber, I have one question.   I wrote a

16   note to myself during your testimony.

17        When WDFW talks about failure for a culvert.   Is there a

18   definition that your agency has?

19        THE WITNESS:   For failure?

20        THE COURT:   What does that mean?

21        THE WITNESS:   I think what it would mean is it does not

22   meet our fish passage protocol.   If it doesn't meet the fish

23   passage protocol, we would call it a barrier.

24        THE COURT:   Ms. Rasmussen, while I'm thinking about it,

25   W-088, the exhibit, his declaration, do you still maintain

1    objections to the admissibility, Paragraphs 5, 6 and 7?

2              MS. RASMUSSEN:  No, your Honor.  I believe that I just

3    wanted to cross about his personal knowledge and to the extent

4    which that was his own knowledge or if he was just referring to

5    somebody else who had more knowledge.  That was the only point I

6    wanted to make.  I don't believe that it requires that you don't

7    admit it.

8              THE COURT:  All right.  We will admit W-088.

9         All right.  We will recess for the day.  Thank you.

10                       (Adjourned for the day.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8

           I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                                    _____

13                                    Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25