```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3   -----------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al, )
                                      )
 5                   Plaintiffs,      )  No. C70-9213
                                      ) Subproceeding 01-1
 6          v.                        )
                                      )           FINAL
 7   STATE OF WASHINGTON, et al.,     )
                                      )
 8              Defendants.           )
                                      )
 9   -----------------------------------------------------------

10                    TRANSCRIPT OF PROCEEDINGS

11   -----------------------------------------------------------

12           BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                      October 20, 2009

14
     APPEARANCES:
15
                         Mr. Peter C. Monson
16                       U.S. Department of Justice
                         Environment & Natural Resources Division
17                       Rogers Federal Building
                         1961 Stout Street - 8th Floor
18                       Denver, CO 80294

19                       Rene David Tomisser
                         Fronda C. Woods
20                       Douglas D. Shaftel
                         Philip M. Ferester
21                       Attorney General's Office
                         P.O. Box 40100
22                       Olympia, WA 98504

23                       John C. Sledd
                         Laura Sagolla
24                       KANJI & KATZEN
                         100 South King Street, Suite 560
25                       Seattle, WA 98104
```

Alan C. Stay
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Daniel A. Raas
Harold Johnsen
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
Rob Roy Smith
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmussen
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

1

1                    INDEX OF WITNESSES

2

  MICHAEL BARBER                    PAGE
3   (Continued)

4       Redirect by Ms. Woods          4
        Recross by Ms. Rasmussen       9
5
  ALEX NAGYGYOR
6
        Direct by Mr. Ferester        13
7       Cross by Mr. Monson           58
        Redirect by Mr. Ferester      64
8
  ROBERT BARNARD
9
        Direct by Ms. Woods           68
10      Cross by Mr. Stay             96

11  ALLISON HANSON

12      Direct by Mr. Shaftel        132

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Counsel, welcome back to our session.  Had

2     we finished with this witness?

3          MS. WOODS:  Your Honor, we have a few more questions for

4     Mr. Barber.  We've also reached agreement on a few exhibits, and

5     we can take care of that right away.

6          THE COURT:  Great.

7          MR. MONSON:  Good morning, your Honor.  Peter Monson for

8     the United States.

9          The United States has proposed Exhibit USA 197 for admission,

10    and the State had objected to that.  We have, I believe, resolved

11    that objection by adding several pages to the document, Pages 7

12    through 42.  And we have provided Madam Clerk with two copies of

13    the substitute exhibit to just incorporate and replace the one

14    that's in the Court's binders.

15         THE COURT:  My understanding, Ms. Woods, as substituted

16    now, the State has no objection to what is now USA 197?

17         MS. WOODS:  That is correct, your Honor.

18         THE COURT:  Then 197 will be admitted.

19         MR. MONSON:  Thank you, your Honor.

20         THE COURT:  Madam Clerk, you have a copy of this?

21         THE CLERK:  I do.

22         MS. WOODS:  There are also several tribal exhibits that

23    we've reached agreement on.

24         THE COURT:  All right.  Thank you.

25         MS. WOODS:  The first one is AT-194.  I believe the

```
1    situation there is similar to the one that Mr. Monson described
2    with USA 197.  Some material has been added that has enabled the
3    State to withdraw its objection.
4            THE COURT:  All right.  So as presently constituted,
5    then the State has no objection to AT-194?
6            MS. WOODS:  That is correct.
7            THE COURT:  AT-194 will be admitted.
8            MS. WOODS:  The next one is AT-216.  That's one of the
9    exhibits that Ms. Rasmussen introduced yesterday, and we waited
10   until today to decide what to do about it.  The State has no
11   objection to AT-216.
12           THE COURT:  AT-216 will also be admitted.
13           MS. WOODS:  The next one is AT-250.  The State has no
14   objection to AT-250.
15           THE COURT:  That's the deposition?  It's a spreadsheet.
16           MR. FERESTER:  It's a spreadsheet.
17           THE COURT:  Spreadsheet, okay.  AT-250 will be admitted.
18           MS. WOODS:  Finally, AT-319.  AT-319 is one of the
19   exhibits that Ms. Rasmussen displayed yesterday.  The State has
20   no objection to AT-319.
21           THE COURT:  That is the one that is authored by Pat
22   Powers.
23           MS. WOODS:  That's correct.
24           THE COURT:  All right.  AT-319 will be admitted.  Thank
25   you, Ms. Woods.
```

1           MS. WOODS:  Thank you.

2       And I'm ready to continue the redirect examination of

3   Mr. Barber.

4           THE COURT:  All right.  Give me one moment.  I have a

5   question about an exhibit that was brought up by Ms. Rasmussen

6   yesterday in her questioning I think of this witness, and that's

7   AT-236.  That's the summary of the passage -- Fish Passage

8   Inventory and Correction Status.

9       Ms. Rasmussen, have you decided not to offer that or have you

10  reached an agreement on that one?

11          MS. RASMUSSEN:  No, we've not reached agreement.  It is

12  my understanding Ms. Woods will be asking additional questions

13  and then we will be dealing with that particular issue.

14          THE COURT:  Thank you.  All right.

15      Ms. Woods, you may inquire.

16  (Continued Redirect Examination)

17  By Ms. Woods:

18  Q   Mr. Barber, yesterday the Court asked you a question about

19  whether the Washington Department of Fish and Wildlife had a

20  definition of "culvert failure," and I believe you answered that

21  question in terms of whether a culvert could pass fish; is that

22  right?

23  A   That's correct.

24  Q   Are there any other ways that the term "culvert failure" is

25  used?

A     Yes.  And I realized after court yesterday that we discussed

Barns Creek, and I think we referred to Barns Creek as a failure.

In that case, it was a physical or structural failure of the

culvert.  And in that case what was happening is the culvert near

the downstream end of the culvert was collapsing, causing the

road shoulder to slump into the creek.  The shoulder was gone up

to the right-hand lane of southbound I-5, causing the Washington

Department of Transportation to close the right lane for public

safety.

    If they hadn't addressed the issue to replace the culvert or

somehow remediate the failure, they could have lost the entire

southbound lanes of I-5.  So that's another way culverts can

fail, more catastrophically.

Q     Mr. Barber, yesterday Ms. Rasmussen asked you some questions

about what has now been admitted as Exhibit AT-156.  I would like

to ask a few more questions about it.  I have displayed the first

page of AT-156 on the screen.

    What is the date on AT-156?

A     April 8th, 1997.

Q     As of that time, how many WSDOT fish passage barrier culverts

had been identified, as far as you know?

A     In the 1997 progress report, there was 509 total known fish

passage barriers identified.

Q     What did that number include?

A     It included 268 culverts that had a significant habitat gain,

1    at least 200 meters of upstream and downstream habitat.  That

2    inventory only went up to the 7 percent stream gradient because

3    the original DOT inventory only took into account fish passage

4    for salmon.

5        After the merger, it was recognized that we needed to account

6    for barriers for Steelhead as well -- with the merger of the

7    Department of Fisheries and the Department of Fish and Wildlife.

8    I should clarify.

9        So what happened then was the Department of Fish and Wildlife

10   sent crews back to several WRIAs throughout the state to try to

11   come up with an estimate of how many additional barriers there

12   were in the state in that 7 to 12 percent stream gradient that

13   would account for barriers to Steelhead.

14       Through that process, it was estimated that there would be an

15   additional 95 barriers statewide.  So the total known in 1997

16   with a significant habitat gain would have been 363.

17   Q    What type of fish passage barrier corrections was WSDOT

18   performing in the mid 1990s?

19   A    Primarily fishway retrofits.

20   Q    In your opinion, is it reasonable to rely on Exhibit AT-156

21   to determine the scope of the fish passage barrier problem today?

22            MS. RASMUSSEN:  Objection.  That calls for a legal

23   conclusion.

24            THE COURT:  Overruled.

25       You may answer.

 1            THE WITNESS:  No, I don't.

 2   By Ms. Woods:

 3   Q    In your opinion, is it reasonable to rely on Exhibit AT-156

 4   to determine the types of fish passage barrier correction

 5   projects that are being conducted today?

 6   A    No, I don't.

 7   Q    In your opinion, is it reasonable to rely on Exhibit AT-156

 8   to determine the cost of fish passage barrier correction projects

 9   today?

10   A    No, I do not.

11   Q    In your opinion, is it reasonable to rely on Exhibit AT-156

12   to determine the pace at which fish passage barrier correction

13   projects should be conducted today?

14   A    No, I don't.

15   Q    When we began this inquiry this morning, the Court had asked

16   some questions about Exhibit AT-236.  I would also like to ask a

17   few questions about that.  I have it here displayed on the

18   screen.

19        Mr. Barber, I believe you testified yesterday that you

20   prepared some of the information that went into Exhibit AT-236?

21   A    Yes, I did.

22   Q    Why did you do that?

23   A    It was an e-mail request from you to do so.

24   Q    Do you know why I was asking for it?

25   A    In preparation for this case.

1    Q    Did you create the information that went into Exhibit AT-236

2    as part of your normal job duties?

3    A    Yes, I did.

4    Q    Would you have created the information for an exhibit like

5    this if I had not asked?

6    A    Probably not.

7    Q    Do you know who prepared Exhibit AT-236?

8    A    Since you were the one that requested the information, I

9    assume that you did.

10           MS. WOODS:  Thank you.  That's all my questions.

11           MS. RASMUSSEN:  Your Honor, I would like to recross on

12    Exhibit AT-156, please.

13           THE COURT:  Are you done, Ms. Woods?  I'm not sure.  Do

14    you have other questions?

15           MS. WOODS:  I am done.  Thank you, your Honor.

16           THE COURT:  All right.  Ms. Rasmussen, regarding AT-236.

17           MS. RASMUSSEN:  156.

18           THE COURT:  Don't say it unless you mean it, Counsel.

19    One question.

20           THE CLERK:  156.

21           MS. RASMUSSEN:  I really mean 156.

22           THE COURT:  Oh, I'm sorry.  I thought you said --

23           MS. RASMUSSEN:  To recross on the briefing document fish

24    passage because yesterday I didn't ask any questions other than

25    to identify the document.  And Ms. Woods has gone through and

1    asked if it's reasonable to rely on certain parts of the

2    document.  I'd like to know what he thinks about the -- if he

3    thinks the document is acceptable.

4        Can you go ahead and put up 156?

5            THE COURT:  You may proceed, Ms. Rasmussen.

6                      RECROSS-EXAMINATION

7    By Ms. Rasmussen:

8    Q    Mr. Barber, Ms. Woods asked you about numerous portions,

9    including the cost estimate that was done in 1997 and the number

10   of culverts and a couple of other items that she asked you if it

11   was reasonable to rely on, and you said no.

12       Is that the extent of the parts of the document which are not

13   reasonable to rely on?

14   A    I think there are other components of it that could be

15   questionable.

16   Q    Is it questionable, the statement in the first paragraph,

17   that "Fish need habitat, but if they cannot reach spawning and

18   rearing areas, then the full potential of the habitat is not

19   achieved and depressed, and even healthy fish stocks decline to

20   levels that cannot support utilization objectives and even levels

21   of extinction"?

22   A    I think that statement's correct.

23   Q    And No. 2, that state law requires fish passage, is that no

24   longer correct?

25   A    No, that is still correct.

```
 1   Q    And you didn't state any opinion about the miles of road

 2   crossings that were estimated, did you?

 3   A    No, I didn't.

 4   Q    Is it still true there is a need to accelerate fish passage

 5   corrections?

 6   A    I believe so.

 7            MS. RASMUSSEN:  No further questions.  Thank you.

 8            THE COURT:  I believe you may step down.  Thank you.

 9            THE WITNESS:  Thank you.

10            THE COURT:  Do we have a new witness?

11            MS. RASMUSSEN:  Your Honor, I believe we have to deal

12   with the rest of the objection back-and-forth of Ms. Woods and I

13   on AT-236.

14            THE COURT:  Let's deal with AT-236.  That's the Fish

15   Passage Inventory and Corrections Status Summary.

16            MS. WOODS:  Your Honor, we maintain the objection to

17   that document.  As indicated in Mr. Barber's answer, that

18   document was prepared for litigation.  It was not prepared by an

19   agency employee within the scope of his normal duties.  It was

20   prepared for litigation.

21            THE COURT:  Ms. Rasmussen?

22            MS. RASMUSSEN:  Yes, your Honor.  This is essentially

23   the quintessential admission.  They created something and now

24   they no longer like what they created, and so they want to take

25   it back.  But under the -- it's not hearsay under 802 (d)(2)(b)
```

1    if a party has manifested an adoption or belief in its truth.

2        And this document we asked about in recent discovery

3    requests, which, again, under Rule 11, by signing a discovery

4    response, the attorney certifies that to the best of a person's

5    knowledge that the factual contentions have evidentiary support.

6        And I'm going to actually ask to approach, because I'd like

7    to put up the request.

8            THE COURT:  Please.

9            MS. RASMUSSEN:  For the record, the interrogatory

10   response is AT-308.  In Interrogatory No. 13, it says, "Does the

11   State contend that any of the amounts of spending per barrier

12   culvert correction in Exhibit W-220" - and I will assert that it

13   used to be W-220 and it's now AT-236 - "or the methodology used

14   to prepare any of those figures are in any way inaccurate,

15   unreliable, misleading, or not reflective of the complete costs

16   of correction?  Please state the reasons for your contention and

17   what the correct figures are."

18       It says, "No.  Proposed Exhibit W-220 was prepared two years

19   ago in the spring of 2007, and the figures are out of date.  But

20   with respect to the particular agencies, the WDFW corrected their

21   amount to 230," which is the amount depicted in Mr. Barber's

22   current declaration.  The Department of Fish and Wildlife noted

23   the answer was prepared two years ago by John Peterson.  And so

24   for the very minimum as evidence of what the cost -- the

25   assertion of the costs were two years ago, historically this

1    document can be used.

2        In addition, there's numerous case law in support that when

3    offered against the parties answers, answers to interrogatories

4    are admissions of a party opponent admissible for any purpose

5    under 801(d)(2).  The case that supports that is Victory

6    Carriers, Inc., versus Stockton Stevedoring Co., 388 F.2d 955,

7    Ninth Circuit, 1968.

8            THE COURT:  That's fine, Ms. Rasmussen.  I'm satisfied

9    that there's sufficient legal basis to admit AT-236.  The

10   objection by the State will be overruled.  Obviously what weight

11   to give it is a different matter.

12       Does that take care of all the exhibits that you brought up

13   yesterday?

14           MS. RASMUSSEN:  Yes, it does.

15           THE COURT:  All right.  Thank you.

16       Now, do we have another witness?

17           MR. FERESTER:  We do, your Honor.  Before we get going,

18   your Honor, my name is Phil Ferester for the State of Washington.

19       We're going to be working with Exhibit 094 and the

20   attachments to that.  I think we've resolved with the United

21   States objections to two of the attachments, and I'd just like to

22   clarify that at this time.  Those would be attached as 094-B and

23   094-F.

24           MR. MONSON:  That's correct, your Honor.  The United

25   States is withdrawing its objections to those two exhibits.

1          THE COURT:  Mr. Ferester, what I show right now is that

2    094 -- W-094-B and F, as in Frank, have not been admitted.  The

3    rest of those exhibits have.  Of course we have still not

4    admitted W-094, the actual declaration.

5          MR. FERESTER:  Right.  We'll get to that in just a

6    second.

7          THE COURT:  All right.  094-B and W-094-F are now

8    admitted.

9          MR. FERESTER:  Thank you, your Honor.  And the State

10   will call Alex Nagygyor to the stand.

11         THE COURT:  Good morning.  I'll ask you to raise your

12   right hand and be sworn.

13   Whereupon,

14                          ALEX NAGYGYOR

15   Called as a witness, having been first duly sworn, was examined

16   and testified as follows:

17         THE CLERK:  Please state your full name and spell your

18   last name for the court reporter.

19         THE WITNESS:  Alex Nagygyor, N-A-G-Y-G-Y-O-R.

20                        DIRECT EXAMINATION

21   By Mr. Ferester:

22   Q    Good morning, Mr. Nagygyor.  Where do you work?

23   A    I work in Olympia, Washington, for the Department of Natural

24   Resources.

25   Q    And what position do you hold there?

A    I am the assistant division manager in the engineering

division, and I manage the forest roads program.

Q    And what are your responsibilities in that position?

A    As assistant division manager, I am responsible for our

culvert design team.  I supervise that team.  I also provide

standards for our agency in forest road management and

maintenance.  I allocate out our budget to our regions and also

supervise our forest roads public works.

Q    How many people do you supervise?

A    I supervise four people directly, and then there are 83

people in the forest road program within the Department of

Natural Resources.

Q    And are the rest of those people in regional DNR offices?

A    Yes, they are.

Q    How many road miles is the DNR responsible for?

A    12,000.

Q    How long have you worked for the Department of Natural

Resources?

A    For 23 years.

Q    Can you discuss what prior positions you've held as an

engineer?

A    Yes.  I started in the Olympic region on the Olympic

Peninsula designing roads, doing road construction contracts,

cost estimates.  I did a similar job in our Chehalis office.  I

designed my first fish passage culvert while in the Chehalis

1    office.

2         Then I was promoted to regional engineer, where I supervised

3    a team of engineers and put together construction contracts and

4    designs.  I also supervised our road maintenance crew, our lands

5    surveyor for the region, and the landscape planner.

6    Q    And what is your educational background?

7    A    I graduated from Oregon State University with a Bachelor of

8    Science in School of Forestry, the Department of Forest

9    Engineering.

10   Q    And what year was that?

11   A    That was 1985.

12   Q    Are you a licensed engineer?

13   A    Yes, I am.

14   Q    What does it take to become a licensed engineer?

15   A    A typical licensed engineer goes to college for four years.

16   After they graduate, they sit for a fundamentals exam that lasts

17   all day.  Once they pass that exam, they are an engineer in

18   training.  They then work for a licensed engineer who reviews

19   their work for four years, certifies that their work is

20   satisfactory, and then they will sit for their PE, or

21   Professional Engineering, exam.  Once they have passed that exam,

22   they become a professional engineer.

23   Q    What does being licensed enable you to do?

24   A    It enables me to bring a special set of skills to engineering

25   problems, where I can design structures, design roads, do cost

```
 1   estimates, put together specifications for contracts, and
 2   construction.
 3   Q    I think you have already mentioned that you have designed
 4   culverts for forest roads.  Have you designed culverts using the
 5   stream simulation design method?
 6   A    Yes, I have.
 7   Q    How about culverts using the no-slope design method?
 8   A    Yes, I have.
 9   Q    Have you designed bridges as stream crossings?
10   A    Yes.
11   Q    Have you reviewed the culvert or bridge designs of other
12   engineers that have worked for you?
13   A    Yes.
14   Q    How long have you been designing culverts for forest roads?
15   A    I've been designing culverts for 21 years.
16   Q    And during that time when you have designed culverts for
17   forest roads, are those designs accomplished with the intent of
18   forestry operations, in connection with forestry operations?
19   A    Yes.  They are designed for a forest road, typically a
20   single-lane gravel surface.
21   Q    Are you familiar with the State Forest Practices Act?
22   A    Yes, I am.
23   Q    How are you familiar with that?
24   A    I have worked with the State Forest Practices Act since I
25   started working with the agency 23 years ago.
```

1   Q   And are you familiar with the 2001 amendments to the Forest

2   Practices Act called the Forests and Fish Law?

3   A   Yes, I'm aware of that.  That law has put additional

4   requirements on our forest roads.

5          MR. FERESTER:  May I ask the clerk to please provide

6   this witness Exhibit W-094, the amended declaration of Alex

7   Nagygyor?

8   By Mr. Ferester:

9   Q   Can you please turn to Page 22 of your amended declaration?

10   A   Yes.

11   Q   Is that your signature?

12   A   Yes.

13   Q   And what is the date by your signature?

14   A   29th of September 2009.

15   Q   Did you prepare this declaration and the accompanying

16   exhibits for this case?

17   A   Yes.

18   Q   Is this the written direct testimony that you intend to offer

19   in this case?

20   A   Yes, it is.

21   Q   Do you adopt Exhibit W-094 and the accompanying Exhibits A

22   through F as your direct testimony today?

23   A   Yes.

24          MR. FERESTER:  The State offers Exhibit 094 and asks the

25   Court to admit that, along with the accompanying exhibits.

1    I do note that there will be one objection from the tribes as

2  to one specific portion of that declaration.

3          MR. GRUBER:  Good morning, your Honor.  We're playing a

4  little musical chairs here.  My name is Brian Gruber, and I'm an

5  attorney for the Makah Tribe.

6    We listed in the pretrial order several objections to the

7  various parts of the declaration.  Our intent is to withdraw all

8  of those with one exception, and that exception is to

9  Paragraph 13, the first sentence, where Mr. Nagygyor offers an

10  opinion regarding the degree of protection for fish that the

11  Forest Practices Act offers.

12    And as he's testified here, his training and experience is

13  entirely in forest engineering, not in habitat biology or

14  fisheries biology.  And as a result, we don't believe he's

15  qualified as an expert to render an opinion on that subject.

16          THE COURT:  I believe the sentence you object to says,

17  "For reasons as follows, the regulatory standards in the State

18  Forest Practices Act provide considerable protection for fish,

19  particularly in the area of forest road management."

20          MR. GRUBER:  That's correct.

21          MR. FERESTER:  Your Honor, I believe we've already laid

22  an appropriate foundation for this testimony.  We didn't

23  anticipate spending a lot of time on it this morning.  But if

24  you'd like additional background from this witness, we can

25  certainly do that.

```
 1              THE COURT:  No, Counsel.  I'm going to overrule the
 2     objection and admit the declaration in its entirety.  I think the
 3     Court itself can determine for itself what exactly the Forest
 4     Practices Act provides.  Thank you.
 5     By Mr. Ferester:
 6     Q   Mr. Nagygyor, you mentioned that the Department of Natural
 7     Resources has 12,000 miles of forest roads.
 8         Why do they have those roads?
 9     A   DNR constructs and maintains forest roads for the management
10     of forest lands, specifically for the extraction of wood
11     products.
12     Q   And why do they -- why do they extract wood products?
13     A   We extract wood products on state trust lands to provide a
14     revenue to the trusts.
15     Q   What are the trusts?
16     A   The trusts are institutional organizations, such as the state
17     universities, Washington State, University of Washington, penal
18     institutions, and the county lands.
19     Q   Does that include K through 12 schools, common schools?
20     A   Yes, it does include common schools, K through 12.
21     Q   Let's talk a little bit about DNR's barrier removal program.
22     We will start with the inventory.
23         When did DNR start to inventory the culverts on its forest
24     roads?
25     A   We started our field inventory in 1999.
```

1   Q    And how was that inventory performed?

2   A    It was performed as a road-based inventory where we collected

3   information on maps, where roads were located, where streams were

4   located.  We then drove all of these roads and looked at those

5   crossings and any other stream crossings for fish barrier

6   culverts.

7   Q    When was that inventory concluded?

8   A    In April of 2001.

9   Q    And was a report prepared at that time?

10  A    Yes, there was.

11  Q    With respect to the habitat associated with DNR's barrier

12  culverts, how did DNR obtain habitat information to assist it

13  with the prioritization process?

14  A    Some habitat information was collected while they were at the

15  specific streams.  Other habitat information, such as habitat

16  length, was generated from maps such as GIS data.  And the

17  information about fish species that might be in those streams was

18  determined from other data sources.

19  Q    Why did DNR use a different approach to obtaining habitat

20  information when compared to WDFW or DOT?

21  A    We determined early on that we had a lot of stream miles out

22  there, and it would be too costly for us to do a stream-based

23  habitat assessment, so we did a map-based habitat assessment.

24       We also knew that we had a short timeframe to fix all these

25  culverts.  We thought it was prudent that we accomplish it in a

1    prompt manner.

2    Q    What do you mean by "a short timeframe"?

3    A    The fact that we were under a deadline of completing all our

4    barriers by 2016.

5    Q    Was that deadline part of the forests and fish amendments to

6    the Forest Practices Act?

7    A    Yes, it was.

8    Q    As DNR has implemented its road maintenance and barrier

9    removal programs, has it adjusted its inventory?

10   A    Yes, we have.

11   Q    Under what circumstances does DNR adjust the numbers in its

12   inventory?

13   A    Two different circumstances.  We will remove barriers from

14   our list when we determine that they are on lands that we no

15   longer own.  We also will remove barriers when we determine that

16   we are not the agency responsible for the maintenance of those

17   roads, such as county roads.

18        We will add barriers to our list when we trade in to or

19   purchase new lands.  And there has been situations where we added

20   barriers to a list because we missed them during the field

21   assessment, because they're typically in the brush, and we

22   weren't able to find them with our first barrier assessment.

23   Q    Have some barriers been removed from DNRs list because the

24   stream was later determined not to contain fish?

25   A    That's true.

Q     And do you adjust the inventory numbers after each repair season?

A     Yes.  Every winter we typically will maintain our database and add and subtract to that database.

Q     And I mentioned repair season.  Is there a particular repair season for fixing culverts?

A     Our culverts are repaired in what we call the HPA window, which is typically July 1 to the end of September, during that construction season.

Q     Have you prepared a short slideshow to provide an overview of DNR's road maintenance and barrier removal programs?

A     Yes, I have.

Q     Let's start with this.  This first slide has a lot of words on it.  Why don't you tell us what this demonstrates?

A     This demonstrates the typical forest road that DNR manages here.  And we are at a stream crossing where the road has -- is across a fish stream.  And where the arrow is pointing, we have a culvert in that location that provides fish passage.  We have also got some other structures out here that are minimizing the delivery of sediment to these waters.  We have an inline sediment trap just above that arrow that catches the ditch-related sediment.  We've also got a ditch relief culvert that catches the ditch water and allows that ditch water to be routed and then filtered through the forest floor.

Q     And just to be clear, a ditch relief culvert is not one that

1  is designed to pass fish that's not on a stream, is it?

2  A   No.  It's in a ditch.

3  Q   This next slide discusses road abandonment.  Can you describe

4  what that is?

5  A   Well, the DNR has the opportunity that when we assess our

6  lands and our road maintenance strategies that we will evaluate

7  some roads to be abandoned.  And when we abandon a road with a

8  fish barrier in it, we will remove the fill, we will remove the

9  culvert and stabilize any of the associated other materials on

10  that road.  And it provides us another tool set that's fairly

11  cost effective for us to remove fish barrier culverts.

12  Q   In what circumstances are you able to abandon a forest road?

13  A   We typically abandon forest roads when we determine that we

14  no longer need them for management access, or they could be a

15  redundant road or there could be a significant environmental

16  impact associated with that road.

17  Q   Turning now to the next slide, what does this show?

18  A   This is a -- demonstrates a barrier on the upper left- hand

19  picture.

20      And then on the lower right we have shown that we have

21  corrected this barrier with a 15-foot metal arch that is sitting

22  on concrete footings with a natural streambed designed and built

23  underneath it.

24  Q   I have just switched the slide again.  What does this one

25  show?

1   A   This shows the fact that we've taken an existing barrier, you

2   can see it's pretty dramatic, with a couple foot outfall drop,

3   and we replaced this with a concrete bridge.

4   Q   When would a bridge type of replacement be used by DNR?

5   A   We typically consider bridges on our larger streams that are

6   bigger than 15 feet, also on streams that have steeper gradient

7   and are larger than eight feet.  We also need to consider what

8   the alignment is associated with the road to make sure that we're

9   not installing a very wide bridge.

10  Q   And I have switched the slide again.  What does this show?

11  A   This shows that we are -- on the upper left, we are in the

12  process of installing a stream simulation culvert.  That is a

13  picture of me doing some construction compliance inspection.  And

14  the contractor is in the process of installing the stream

15  simulation rock within that culvert.  They've got a person in

16  there doing some manual labor, along with a bobcat loader that

17  drives into the culvert and delivers rock into that structure.

18      The picture on the lower right shows that structure that is

19  half full with the rock and four years later still functioning

20  fine.

21  Q   When DNR entertains one of these culvert repairs, does it

22  need flaggers or other traffic detours on its road system?

23  A   No, we don't.  Forest roads are typically one lane, like I

24  mentioned before.  We will traditionally specify in the contract

25  that our roads are allowed to be closed for two or three weeks.

1    If needed, there is detours for recreation use that is provided.

2    Or if we have some sort of hauling going on, they just schedule

3    their hauling around our construction project.

4    Q    I notice that this slide is a stream simulation culvert, and

5    this next one here has some of the characteristics of that.

6        Do you want to briefly mention that?

7    A    Yes.  When you look at a stream simulation culvert, and it

8    has been -- it is in the stream for a while, it has a couple of

9    characteristics you can readily identify with the stream

10   simulation culvert.  It is going to have a low-flow channel that

11   is outlined in red here.  It is going to have some banks that you

12   can see -- it has a small bank and a depositional area on the

13   right side there.  It has some riffle development.  There's

14   typically little pool development unless we've actually built in

15   pools during the construction of that streambed material.

16   Q    How long has DNR been using stream simulation designed

17   culverts?

18   A    We have been using them approximately since 2001.

19   Q    How often does DNR use this design method?

20   A    In the past previous years, it has exclusively been the

21   design choice for the agency.  We still use no-slope culverts out

22   there.  Those tend to be on contracts that we have had under

23   contract for a number of years.

24   Q    And as long as you mention no-slope culverts, let's look at

25   the next slide.

1        What are we looking at here?

2   A    This is a culvert that has been laid flat.  It is installed

3   in streams that are very small, typically small streams with flat

4   gradients.  The major characteristics when you can look at this

5   culvert, right away you see there is water that is standing

6   inside this culvert.  There is not a bunch of riffles in the

7   structure.  It still allows sediment and water and fish to pass

8   through this culvert.  It is typically a little smaller culvert,

9   and therefore for us a lower installation cost than stream

10  simulation costs.

11  Q    In your experience, how do these culverts handle storm events

12  or flood flows?

13  A    They handle the 100-year flood flows very well, just as well

14  as the stream simulation culvert does.

15  Q    In your experience, how do these culverts pass fish?

16  A    They pass fish very well.  You can physically look at the

17  fact that there's standing water there, and the fish will migrate

18  through that culvert.

19  Q    I would like to turn now to some issues related to funding.

20  How does DNR fund its culvert repair work?

21  A    DNR funds its repair work through two primary methods:

22  Through a contractual obligation associated with timber sales and

23  through the Access Road Revolving Fund, abbreviated with the

24  acronym ARRF.

25  Q    We will talk about ARRF in a second.  Let's talk about timber

1    sales.   How does that process work?

2    A    That contract obligation is put onto the purchaser of our

3    sales, and they are obligated to do a certain amount of

4    construction, reconstruction, and also fish barrier repairs.

5    Q    How do timber purchasers account for those contractual

6    burdens?

7    A    Those burdens are taken off of their bid.   They're going to

8    determine what they want to bid for a sale, they're going to

9    subtract out hauling costs, logging costs, any of their overhead

10   in any of the construction or barrier replacement work, and that

11   will be a reduction in funds to the trusts and to the agency's

12   management account.

13   Q    Approximately what percentage of DNR's barrier remediation

14   projects have been accomplished through the timber sale process?

15   A    In the past previous years, approximately 20 percent have

16   been accomplished through timber sales.

17   Q    And then let's turn to the other method DNR typically uses,

18   the Access Road Revolving Fund, or ARRF.   What is this, and for

19   what purposes does DNR use the Access Road Revolving Fund?

20   A    Access Road Revolving Fund is a fund specifically designated

21   for road maintenance repairs.   The funds for that account are

22   associated with the selling of valuable forest products.   A fee

23   is calculated and collected during the date of sale, and then a

24   fee is also collected when the timber is removed.

25   Q    How long has DNR had the Access Road Revolving Fund account?

1  A   Since 1961.

2  Q   And I think you mentioned that the source of funds come from

3  timber sales?

4  A   That's correct.

5  Q   Are there any other fees that get added to the account as

6  well for road use?

7  A   There can be other associated minor fees collected for

8  communication sites, for cost-share agreements, easements, that

9  sort of thing.

10 Q   Does the Washington State legislature need to appropriate

11 funds from that account before DNR uses them?

12 A   The ARRF account is a non-appropriated, budgeted account.

13 Q   Whose responsibility is it to manage the account?

14 A   Myself and the division of finance.

15 Q   Mr. Nagygyor, has the ARRF account been running short of

16 money in recent years?

17 A   Back in 2001 we had a funding balance issue that resulted in

18 us going below our minimum fund balance.

19 Q   And how about in more recent years?

20 A   In more recent years we have maintained the fund balance at

21 the $3 million level or a little bit less.  Most recently in the

22 past couple of months, we have been able to get above that

23 minimum fund balance.

24 Q   In the last year, has the ARRF account been encountering

25 shortages of money?

1  A    Twelve months ago, that would have been true.

2  Q    Is the level of ARRF account a concern from a road

3  maintenance standpoint?

4  A    Yes, it is.  We determined that we had a short fund in the

5  ARRF account.  That short fund was a result of the fact that we

6  weren't getting the amount of revenue into that account that

7  we've seen in previous years.  We had to adjust where we spent

8  our money in that account and prioritize our projects.

9  Q    Did you prepare a document regarding your concerns with the

10 Access Road Revolving Fund balance?

11 A    Yes, I have.

12        MR. FERESTER:  May I ask the clerk to please provide the

13 witness Exhibit AT-131, entitled "ARRF Fee Increase Proposal."

14 By Mr. Ferester:

15 Q    Is this the memo that you wrote?

16 A    Yes, it is.

17 Q    And why did you write that memo?

18 A    I wrote this memo because we determined that we were short in

19 our Access Road Revolving Fund to meet our road maintenance and

20 abandonment planning requirements by 2016 and identified that we

21 had a funding issue, in that we needed to increase the ARRF fee

22 to fund that gap.

23 Q    Were you particularly candid in your memo?

24 A    I tried to be.

25 Q    Did any followup action occur on your memo?

A    My supervisor and myself discussed the memo, and we -- he

decided that it wasn't the appropriate time to forward this memo

up to executive management.

Q    And why is that?

A    At that time in December, the agency was aware of the fact

that it had a significant budget shortfall.  We knew that we had

to go through layoffs.  We knew that if we were going to get an

ARRF fee increase, that would be less money going to the trusts,

that would be less money coming into our forest management

accounts and would have the potential to increase the number of

layoffs within the agency.

Q    Was there discussion of some of the broader economic

conditions at this time?

A    Yeah.  At that time we were not selling the typical amount of

timber that we do on a monthly basis.  Nobody was interested in

our forest products because the amount of home construction was

severely down, and we really had no idea when that market was

going to turn around.

Q    And is the home construction market, is that linked to demand

for DNR timber?

A    It is linked directly.  Home construction requires lumber,

and that lumber market really drives the price of our logs that

we get at auction.

Q    Let's talk about the numbers of culverts.  Your declaration

contains a lot of detailed information about DNR's inventory and

1    how those numbers have changed across the years.  Your testimony

2    has covered some of this already.

3        On Page 18, did you include a summary chart in your

4    declaration to help track those changes?

5    A    Yes, I did.

6    Q    Do the culvert numbers in your declaration pertain only to

7    anadromous fish?

8    A    They apply to both anadromous and resident fish, and they

9    apply within the case area and then also within the entire state

10   of Washington.

11   Q    And why does DNR track its information that way?

12   A    We track our information that way because we are required by

13   WAC to replace all our resident and anadromous fish barriers

14   within the state by 2016.

15   Q    And when you say WAC, that is a state rule?

16   A    Washington Administrative Code.

17   Q    Is that under the Forest Practices Act?

18   A    Yes, it is.

19   Q    Has DNR determined how many anadromous barriers exist within

20   the case area as of April 2009 when the rest of the culvert

21   numbers in your declaration were created?

22   A    Yes.  We determined that we had 228 anadromous barriers

23   within the case area.

24   Q    And that's remaining?

25   A    That's correct.

1  Q    How many barriers to resident or anadromous fish has DNR

2  repaired since its inventory was completed on a statewide basis?

3  A    We have removed, on a statewide basis, 744 fish barrier

4  culverts.

5  Q    And how about in the case area?

6  A    Within the case area, there were 405 resident and anadromous

7  fish barriers.

8  Q    Given your experience with the DNRs funding problems with the

9  Access Road Revolving Fund, the current market conditions for

10  timber, and DNR's status on its barrier remediation program, do

11  you think that you need an order from this Court to continue

12  making progress towards fixing DNR's case area anadromous

13  barriers?

14  A    No.

15  Q    Based on your experience, do you think DNR will be able to

16  finish remediating all 228 of its anadromous case area barriers

17  by July 2016?

18  A    I believe that DNR has quite the task in front of it to get

19  all the resident and anadromous fish barriers done by 2016.  I

20  believe that we can take our resources that we have identified

21  for some of these resident barriers, some of these barriers

22  outside the case area, and definitely fix all the anadromous

23  barriers within the case area by 2016.

24       MR. FERESTER:  Thank you.  I have no further questions

25  at this time.

1      THE COURT:  Mr. Gruber, before we get into

2  cross-examination, let me ask him a clarifying question.

3      On the slideshow, we saw the stream simulation culvert and

4  then we also saw the no-slope.  How does your department make a

5  determination, what process does it go through when it looks at a

6  stream, small or not, and it says, we will go with no-slope here

7  versus stream simulation?

8      THE WITNESS:  It is really dependent upon the site

9  conditions.  The no-slope culverts work very well on low-gradient

10  streams that are lower down in the watershed.  Typically

11  gradients around -- stream gradients are 1 to 2 percent.  If you

12  get 3 or 4 percent, you are immediately going to say no slopes

13  aren't going to function very well.

14      We also use those on smaller streams because we don't want to

15  install huge metal pipes in the ground.  That can come with

16  problems too.  So no-slopes are traditionally low-gradient

17  streams, lower in the water shed, they are smaller in nature.

18      They are at a lower cost, too.  And that has been some of the

19  driving force out there with folks.  We are an agency that is

20  supposed to make money for the trusts, so we are not supposed to

21  be putting in structures that we don't think are above a certain

22  level of threshold out there.  No-slope culverts seem to be

23  functioning very well in the situations that I have described.

24      THE COURT:  And as part of this, is there a monitoring

25  process that is ongoing?

| | |
|---|---|
| 1 | THE WITNESS:  We do not -- the agency does not have a |
| 2 | defined monitoring program right now.  We have worked with the |
| 3 | Department of Fish and Wildlife, and me personally with Bob |
| 4 | Barnard, to do a short-term, at this time, one-time monitoring |
| 5 | program where we went out and monitored.  And Bob Barnard went |
| 6 | out there and evaluated a number of culverts to see how they were |
| 7 | performing.  So it provided us a monitoring service and then |
| 8 | provided Bob the ability to generate some data for us that he was |
| 9 | interested in completing. |
| 10 | THE COURT:  Thank you. |
| 11 | You may inquire. |
| 12 | CROSS-EXAMINATION |
| 13 | By Mr. Gruber: |
| 14 | Q    Good morning, Mr. Nagygyor.  How are you? |
| 15 | A    Good, Brian. |
| 16 | Q    You've been deposed in this case three times previously.  Do |
| 17 | you remember that? |
| 18 | A    Yes. |
| 19 | Q    I took your deposition twice earlier this year; is that |
| 20 | right? |
| 21 | A    Okay. |
| 22 | Q    And by training, you are a forest engineer.  Did I hear that |
| 23 | correctly? |
| 24 | A    That's correct. |
| 25 | Q    And you earned a Bachelor of Science in forestry engineering? |

1    A    Yes.

2    Q    And that degree involved no courses in fishery biology; is

3    that correct?

4    A    Correct.

5    Q    And the only training you have had in culvert design and fish

6    passage has been through short courses that you attended as a DNR

7    employee; is that right?

8    A    The culvert design, I got at university.  The fish passage,

9    design passage I received while as an employee of the Department

10   of Natural Resources.

11   Q    So you studied culvert design when you were in school in the

12   early 1980s.  Is that what you just said?

13   A    That's correct.

14   Q    And would it be fair to say that the science of culvert

15   design has changed significantly since that time?

16   A    It has changed in the fact that at university we were doing

17   hydraulic design passage primarily of water, and after that we

18   started to implement a passage of fish, the passage of wood, and

19   the passage of sediment.

20   Q    Those other considerations have been included since you

21   earned your degree?

22   A    That's correct.

23   Q    And the short courses that you took regarding fish passage,

24   were those courses taught by Bob Barnard and Ken Bates of WDFW?

25   A    Yes.

Q    And is it true that since 2006 you haven't taken any
additional short courses on the subject of fish passage?

A    That sounds right.

Q    Just to go over the culvert numbers a little bit more.  Your
testimony is that DNR's repaired 405 case area barriers as of
April 2009?

A    Yes.

Q    And in the case area, it has 455 more barriers to repair?

A    Yes.

Q    And of those 455 barriers, your testimony is that 228 are
barriers to anadromous salmon?

A    Yes.

Q    Could you please take a look at Exhibit C to your amended
declaration, which is Exhibit W-094-C?

A    Okay.

Q    Now, in this pie chart, 46 percent "no habitat" section,
which was the biggest segment to the pie, represents culverts
removed from the inventory because the stream was reclassified as
non fish bearing; is that correct?

A    That's correct.

Q    And for these culverts, DNR will not be taking any corrective
action?

A    The only corrective action that we took is the fact that we
evaluated the stream for fish and for fish habitat and found that
those two were not present.

1  Q    But you -- DNR is not planning to repair or remove that

2  culvert as a result of this determination on fish-bearing status

3  in the stream?

4  A    That's correct.  There is no on-the-ground activities that

5  are going to occur.

6  Q    It is true that DNR has made a significant effort in the past

7  few years to survey certain barrier culverts on its inventory in

8  an effort to reclassify them as non fish bearing; is that right?

9  A    We have made a survey of our marginal habitat, and our

10  marginal habitat is habitat in the upper and the headwater

11  streams, so the vast majority of those surveys have occurred on

12  resident streams.  They're going to be trout streams or sculpin

13  streams.

14  Q    Now, this effort you made to do these stream surveys, that

15  has been more intense in the past few years; isn't that right?

16  A    Yeah.

17  Q    And to accomplish that goal, you hired a consulting firm

18  called Forest & Channel Metrics?

19  A    They were one part of that effort to look at those marginal

20  streams, yes.

21  Q    There were other stream surveys conducted by other parties to

22  evaluate this issue?

23  A    Yes.

24  Q    And is it correct -- does it sound right that Forest &

25  Channel Metrics conducted approximately 97 stream surveys in the

1    2007 year?

2    A    I don't have that number with me at this time.

3              MR. GRUBER:   Would the clerk please hand the witness

4    Exhibit AT-130.

5    By Mr. Gruber:

6    Q    Mr. Nagygyor, if you could look at the top right-hand corner

7    of this document.   Is that your name?

8    A    Yes.

9    Q    And that indicates you prepared this document; is that right?

10   A    That's correct.

11   Q    Would you please turn to Page 7.   It has at the top of it a

12   table, Table 3.   On the left-hand column of that table, the

13   heading is F&CM.   That's Forest & Channel Metrics?

14   A    Yes, it is.

15   Q    Does this table refresh your recollection that in the survey

16   year 2007 Forest & Channel Metrics was expected to conduct

17   approximately 97 surveys for the DNR?

18   A    Yes, it does.

19   Q    Could you turn to the previous page and look at the bottom?

20   There is an indication about your expectation for the 2008 season

21   and the stream surveys that would be conducted then; is that

22   right?

23   A    Yes.   I read that.

24   Q    When you wrote this document, your anticipation was that

25   approximately 44 Northwest region stream survey projects would be

1  undertaken in 2008; is that right?

2  A    That's correct.

3  Q    Now, as a result of this recent effort to reclassify streams,

4  you anticipate that going forward, the percent of no-habitat

5  culverts among the remaining 455 case area barriers will decrease

6  substantially to 46 percent; isn't that right?

7  A    I expect there will be a decrease and a change in that pie

8  chart there, yes.

9  Q    Let me ask you this.  How many more of the 455 case area

10  barriers does DNR intend to conduct stream surveys for?

11  A    I can't give you that exact number.  I don't have that

12  number.  I would have to inquire of the regions.  I can tell you

13  that it's going to be substantially less than what we did in

14  2007.

15  Q    How about in 2008, when you expected 44?

16  A    It's going to be less than -- it should be less than 44 that

17  we expected in 2008.

18  Q    So isn't it true that going forward, DNR will actually have

19  to remove or repair a greater percentage of barriers from 2010

20  through 2016 than it did in 2008 in order to meet the 2016

21  deadline?

22  A    It's true the fact that there's going to be less barriers

23  taken off the list because there's no fish and no fish habitat.

24  That's true.

25  Q    But to remove the remaining culverts, you will actually have

1    to do some work at those culverts, correct?

2    A    Yeah.   Those barrier fixes are going to cost us additional

3    money on the average barrier cost than what we saw in 2007 and

4    2008.

5    Q    Now, isn't it true that since 2001 when DNR's inventory

6    report was completed that DNR has prioritized its low-cost

7    barrier repairs?

8    A    I'm not sure what you mean by "prioritized low-cost barrier

9    repairs."

10    Q    Haven't you done the less expensive barrier repairs first,

11    including reclassifying a stream, thereby removing the culvert

12    from your list without doing any actual work on the culvert?

13             MR. FERESTER:  Objection.  Compound question.

14             THE COURT:  Let me have you break it down.

15    By Mr. Gruber:

16    Q    Maybe I could have you look at an exhibit that might help

17    refresh your recollection.  If you could look at that same

18    exhibit, AT-130, and turn to Page 5, please.  If you could look

19    at the text above the first full paragraph and read the last two

20    sentences of that.

21    A    Which paragraph?

22    Q    The middle paragraph, the one that starts with, "Since we

23    have begun."

24    A    Okay.

25    Q    Does this refresh your recollection that when you prepared

1  this document you observed that DNR's trend was to fix the

2  low-cost barriers and that trend has held true between 2001 and

3  2007?

4  A    Yeah.   It refreshes my mind that we've gone in and done quite

5  a bit of work to correct our fish inventory to make sure that we

6  are spending our money on streams that actually have fish habitat

7  and fish presence.

8  Q    Now, DNR -- you testified earlier about the ARRF account; is

9  that right?

10  A    Yes.

11  Q    And the ARRF account is the primary means by which DNR

12  accomplishes its culvert repairs; is that right?

13  A    That's correct.

14  Q    And you also talked about Exhibit AT-131, which is a document

15  you prepared in December of 2008 addressing the ARRF account; is

16  that right?

17  A    That's right.

18  Q    Is it your opinion that, based on the assumptions of future

19  volumes of timber sales and estimated engineer and project costs,

20  the ARRF account is underfunded by approximately $50 million

21  needed to complete DNR's culvert repairs by the 2016 deadline?

22  A    Yes.

23  Q    To address this funding problem, you recommended an increase

24  in the ARRF fees applied to timber sales; did you not?

25  A    I did.

1  Q    In fact, you recommended that this fee increase be

2  implemented as soon as possible?

3  A    I did.

4  Q    Isn't it true that the recommendation contained in that

5  document has not been advanced to DNR management?

6  A    DNR management is aware of our funding shortfall and they are

7  aware of that document.

8  Q    I thought I heard you testify earlier you had discussed this

9  document with your supervisor but had not passed it on to higher

10  levels of DNR?

11  A    That was in December of 2008.  I discussed it with my manager

12  at that time.  And at that time, he decided not to bring it up

13  the chain of command.

14      Since then, we've had a new commissioner, a different

15  executive in the agency, and I believe they've actually seen that

16  document now.

17  Q    DNR has not taken any action to approve your recommendations

18  to the State, have they?

19  A    There's been no increase in the ARRF fee, that's correct.

20  Q    I would also like to ask about an earlier recommendation you

21  made.  Do you recall that the forest roads program requested a

22  fee increase in fiscal year 2008?

23  A    Could you be more specific in fiscal year 2008 what calendar

24  months those are?

25  Q    Well, perhaps you could look at the Exhibit AT-131 at Page 2.

1  I believe you address it.  If you look at the paragraph below the

2  table, towards the bottom of that.

3  A    Page 2?

4  Q    Page 2.  The paragraph below the table, it's the

5  second-to-last sentence.

6  A    Yes.

7  Q    So the recommendation for a fee increase of the ARRF account

8  that is referred to here occurred prior to the recommendation

9  made in this document; is that right?

10  A    That's true.

11  Q    And that recommendation was also declined by DNR's

12  management?

13  A    It was declined by my supervisor.  I'm not sure to what level

14  he took it.

15  Q    One of the issues that you address in this document is what

16  you call very high-cost repairs; isn't that right?

17  A    That's true.

18  Q    And isn't it true that DNR does not know the number of

19  high-cost culvert repairs that remain?

20  A    I don't have that number with me today.

21  Q    And is it also true that DNR hasn't specifically determined

22  the costs of these very high cost of culvert repairs?

23  A    Not every one has been determined.

24  Q    Could you please take a look at amended Exhibit E to your

25  amended declaration, that's Exhibit W-094-E.  Now, in this graph,

1   the yellow line indicates the proposal of DNR's regional offices

2   to repair the remaining barrier culverts statewide; is that

3   correct?

4   A    Yes.

5   Q    And the blue line indicates the number of barrier culverts

6   that were actually removed from DNR's inventory?

7   A    Correct.

8   Q    And that's -- I believe it's through the 2008 construction

9   year; is that correct?

10  A    That's correct.

11  Q    Does this chart demonstrate that in some years the regions

12  projected more removals than actually happened?

13  A    That's true.

14  Q    Now, the region's proposals from 2009 through 2016 doesn't

15  consider the $50 million funding shortfall in the ARRF account

16  that you have predicted, does it?

17  A    It does not, no.

18  Q    Now, you testified earlier you were familiar with the three

19  primary culvert design methods used -- or referred to in the WDFW

20  Design Manual?

21  A    Three?

22  Q    Let me ask you this.  Are you familiar with WDFW's manual

23  entitled, "Design of Road Culverts for Fish Passage"?

24  A    Yes.  I am familiar with certain aspects of that manual, yes.

25  Q    And does that manual not discuss the hydraulic, no- slope,

1   stream simulation design methods?

2   A   I am familiar with the stream simulation and the no- slope

3   design.  I'm not familiar with the hydraulic design.

4   Q   You have a general familiarity with that design method?

5   A   I've never designed a hydraulic culvert.  I read through that

6   portion of that manual years ago.

7   Q   You generally understand what that design method entails?

8   A   Very generally, yes.

9   Q   And it is true that you are not aware of any culverts

10  installed by DNR using that hydraulic design method since 1997;

11  is that right?

12  A   That's true.

13  Q   In 2007 you recommended to DNR region engineers that all of

14  the culverts they designed in the future be stream simulation

15  culverts and not no-slope culverts; isn't that right?

16  A   That's correct.

17  Q   Earlier today you testified that it is DNR's practice that

18  essentially all of their culvert repairs will be using the stream

19  simulation design, with maybe a few exceptions that might be

20  no-slope; is that right?

21  A   That's correct.

22  Q   Now, isn't it true that DNR's official guidance to its

23  engineers indicate that stream simulation is the preferred design

24  method for fish passage culvert repairs?

25  A   That's correct.

1   Q    Now, is it also true that DNR's guidance to its regional

2 engineers indicates that no-slope is not preferred as a design

3 method?

4   A    I don't recall it specifically saying "not preferred."

5   Q    Are you familiar with the Fish Passage Design Guidance that

6 DNR keeps for its regional engineers?

7   A    What's the title of this guidance?

8   Q    It's an on-line manual entitled, "Fish Passage Design

9 Guidance."

10   A    Is that that flow chart?

11   Q    I believe it is a flow chart.

12   A    Okay.

13   Q    Are you familiar with it?

14   A    Yes.

15   Q    Could you please take a look at AT-117.

16       Does this look like the Fish Passage Design Guidance flow

17 chart?

18   A    Yes, it does.

19   Q    Now, this is an on-line document, so that each of the boxes

20 on the first page opens up a link to other documents which then

21 may actually be linked to even additional documents?

22   A    That's true.

23   Q    If you could look at the second page, please.  This is one of

24 those links, entitled "Structure Selection."  Let me just ask you

25 a general question about the guidance.

1    Is this the type of document that a regional engineer would

2    look to for guidance when designing a fish passage repair

3    project?

4  A    No.

5  Q    Has it been superseded by additional guidance?

6  A    No.

7  Q    Has it been withdrawn as guidance?

8  A    This little -- I'll make it easy on you.  This document has

9    been specifically written for Engineer IIs and engineers that are

10   new to the agency and new to designing structures.  It's not

11   specifically written for folks that have multiple years of

12   experience that already understand the design process of no-slope

13   and stream simulation and have design experience.

14 Q    So a DNR engineer that's actually designing a culvert repair

15   project would not be a level II engineer?  Is that who you said

16   relies on this manual?

17 A    Natural Resource Engineer II, Natural Resource Engineer I;

18   somebody that's not familiar with that process.  This would be a

19   document they'd use to help them along in designing a structure.

20 Q    So those levels of engineers within DNR who do not design

21   fish passage repair projects; is that what you're saying?

22 A    No.  I'm saying they use this document to assist them in that

23   design process.

24 Q    And so one of those engineers, in looking at this, would take

25   this as guidance for the proper way of designing a fish passage

1   project?

2   A   Yes.

3   Q   If you could look at the second page, please.  In the middle

4   of the page, I believe it addresses the three methods -- three

5   design methods that we have discussed earlier.  And does it not

6   say for the no-slope design method that this is not a preferred

7   method?

8   A   It specifically says, "not preferred method but applicable to

9   stream gradients less than 3 percent and culverts less than 75

10   feet long."

11   Q   Now, it's DNR's practice to monitor its fish passage culverts

12   after a flood or storm event; is that right?

13   A   We typically go out there and inspect culverts after a flood

14   event.

15   Q   And DNR does not have a designated monitoring program where

16   it inspects its fish passage culverts on a periodic basis?

17   A   We don't have a monitoring program that is periodic in

18   nature.  We do have inspections that go on.  And I just -- And I

19   have a distinction between a monitoring program and an inspection

20   program.

21   Q   How do you distinguish those two?

22   A   An inspection program would be where you go out there and

23   visually inspect that culvert to make sure that it's still

24   functioning.  To me, a monitoring program would be you going out

25   there and you're evaluating that culvert to see whether or not

1    the design process that you use, the design practice that you

2    use, the objectives that you wanted to achieve with that

3    structure are still functioning out there.

4    Q    Could you describe the department's, what you describe as an

5    inspection program?

6    A    Okay.  DNR went out and inspected all its structures with the

7    Road Maintenance Abandonment Planning Act associated with the

8    Forest Practices Act starting in 2000 and completed in 2005.

9         At that point we identified all of the work that we need to

10   do on our roads out there, including fish passage structures,

11   including structures that don't meet a 100-year flood event, and

12   a lot of other work that we needed to get done out there on our

13   forest road according to that Forest Practices Act.  So that was

14   in kind of the baseline assessment.

15        Since then, we inspect our culverts after flood events.  We

16   also inspect our culverts on a non-routine basis when we report

17   what our activities are going to be for the next construction

18   season associated with our annual plans.  So every year, we will

19   meet with forest practice and say we're going to do this work in

20   this block of land.  That means we've gone out there, we've

21   looked at all those structures out there and are going to

22   complete some maintenance work on those structures, or

23   replacement work.

24   Q    Now, you mentioned that there have been -- DNR has repaired

25   405 barriers in the case area?

1   A    Yes.

2   Q    How many of those barriers in the last year do you know DNR

3   has inspected under the program you just described?

4   A    I don't have that number at this time.

5   Q    You don't have that number because DNR doesn't keep a

6   centralized record of the inspections?

7   A    That's true.

8              MR. GRUBER:  Would the clerk please hand the witness

9   Exhibit AT-212, please.

10  By Mr. Gruber:

11  Q    Do you recognize this document?

12  A    Yes, I do.

13  Q    And it is a draft of the Forest Roads Guide, Chapter 4; is

14  that correct?

15  A    That's correct.

16  Q    Did you participate in drafting it?

17  A    Yes, I have.

18  Q    And the draft is dated 2009, correct?

19  A    Correct.

20  Q    Do you know if this draft Forest Roads Guide includes a

21  formal maintenance and inspection program?

22  A    It does not include a formal inspection program.

23  Q    Would you please turn to 4-21, which is toward the end of the

24  document.

25       Does Section 4.8 not address inspection and maintenance?

1    A    Yes, it does.  And I thought when you meant "formal

2    inspection program," it would be a program that would require the

3    regions to report to the headquarters office their

4    accomplishments on a yearly basis so that we could do some sort

5    of monitoring of their program, or auditing.

6    Q    Does the inspection and maintenance section here request that

7    people in the field looking at these culverts look for whether

8    there's been a loss of stream function or fish passage function?

9    A    Yes.  Down there in Item 5, sub-item F, it does say that.

10   Q    And isn't it true that this draft, Forest Roads Guide,

11   requires that the DNR database addressing bridges and culverts be

12   updated based on these inspections?  I believe that is addressed

13   on the last page at the bottom.

14   A    Yes, it does.

15   Q    Now, it is true, is it not, that currently no such

16   requirements are in place regarding an inspection and maintenance

17   program or the requirements to update the database based on those

18   inspections?

19   A    There are currently no guides out in this form that requests

20   or mandates this sort of inspection program.

21   Q    So, in other words, this is a change to the current Forest

22   Roads Guide?

23   A    That's true.

24   Q    And has this draft been finalized and approved by the agency?

25   A    It's still in its draft form.

1   Q    You would agree, would you not, that on the whole, DNR has a

2   positive working relationship with the tribes in its culverts

3   removal program?

4   A    Yes.

5   Q    Now, your testimony, and I actually believe it's more in your

6   declaration than in your direct testimony today, includes some

7   analysis of historic culvert repair costs for DNR; isn't that

8   right?

9   A    Yes.

10  Q    Now, DNR has traditionally used historic costs to predict

11  future culvert repair costs after applying an inflation factor;

12  isn't that right?

13  A    Yes.

14  Q    And hasn't DNR found historic costs used in this way to be a

15  reasonable indicator of future DNR culvert repair costs?

16  A    Yes.

17  Q    You also testified earlier about the WAC or the rules?

18  A    Yes.

19  Q    And you are familiar with those rules?

20  A    With some aspects of that rule, specifically dealing with

21  forest roads.

22  Q    And those are the -- those rules are essentially the source

23  of the 2016 deadline that you talked about?

24  A    Yes, they are.

25  Q    Do you know why culverts were included as part of forest and

1    fish rules in the 2016 deadline?

2    A    Culverts, or roads in general, are a significant impact to

3    the natural resources out there when we extract timber.  So it

4    just makes sense that if you're going to put together strategies

5    and BMPs and goals and objectives to minimize the impact to

6    forest roads that you also address culverts.

7    Q    Has the 2016 deadline encouraged DNR to focus its efforts on

8    culvert repair in order to make reasonable progress to meet the

9    deadline?

10   A    Yes.

11         MR. GRUBER:  If I could ask the clerk to please hand the

12   witness AT-152.

13        Your Honor, this is an exhibit that has not yet been

14   admitted.

15   By Mr. Gruber:

16   Q    Have you seen this document before?

17   A    Yes, I have.

18   Q    Was it prepared by DNR staff in the Pacific Cascade region?

19   A    Yes, it was.

20   Q    And they prepared it in the regular course of DNR's

21   activities related to the culvert repair programs, did they not?

22   A    They did.

23   Q    And the Pacific Cascade region of DNR is partially within the

24   case area, isn't it?

25   A    That's correct.

1    Q    And isn't it true that DNR conducts the stream surveys that

2    we've been talking about both inside and outside the case area?

3    A    You're talking about the protocol surveys?

4    Q    Yes.

5    A    Yes.

6           MR. GRUBER:  Your Honor, we move for the admission of

7    AT-152.

8           MR. FERESTER:  Your Honor, we had an objection to AT-152

9    because, although these questions weren't directed to the

10   witness, a large portion of the Pacific Cascade region, perhaps

11   two-thirds of it, are outside the case area.

12      This document, some 12 pages, has information on lots of

13   streams that are not within the case area and thus not subject to

14   this proceeding.

15           THE COURT:  But since there is a portion within it, any

16   other objections, Counsel?

17           MR. FERESTER:  No, your Honor.

18           THE COURT:  All right.  AT-152 will be admitted.

19      Mr. Gruber, how much more do you have on cross?

20           MR. GRUBER:  A couple minutes, your Honor.

21           THE COURT:  Let's go ahead and take our break.

22   (At this time, a short break was taken.)

23           THE COURT:  Mr. Gruber, you may continue.

24   By Mr. Gruber:

25   Q    Mr. Nagygyor, you responded to a question from Judge Martinez

1    regarding monitoring.  I believe you talked about a monitoring

2    study that Bob Barnard was conducting; is that right?

3    A    Yes.  It was a combination of a project that the Department

4    of Natural Resources and Department of Fish and Wildlife did

5    together.

6    Q    And that study is looking at DNR culvert repairs?

7    A    Along with other culverts.

8    Q    By other agencies?

9    A    I believe so.

10   Q    Do you know the number of culverts that are part of that

11   study?

12   A    We've looked at 30 culverts on DNR lands.

13   Q    Do you know if Mr. Barnard has completed the study?

14   A    I believe it is not completely published yet.

15   Q    Do you know if he has sufficient funding to complete or

16   publish the study?

17   A    I don't know.

18   Q    In assisting the State's attorneys in preparing this case,

19   you reviewed the report of tribal witness Tyson Waldo, did you

20   not?

21   A    I read a small portion of that report.

22   Q    And the portion that you read addressed his methodology for

23   estimating the potential fish production from the removal of

24   DNR's barrier culverts?

25            MR. FERESTER:  Objection.  The evidence regarding

1    potential fish production has been excluded by motion and order

2    of your Honor.

3              THE COURT:  I don't know where you're going.

4              MR. GRUBER:  Your Honor, we're moving in this direction

5    because, as the Court is well aware, we offered testimony from

6    Mr. Waldo which the Court excluded as too speculative, and we

7    believe we should be allowed to at least ask state witnesses who

8    have considered Mr. Waldo's methodology whether they are aware of

9    better or different methodologies that could -- the tribes may

10   have been able to use to make a showing that Mr. Waldo attempted

11   to make for the tribes.

12             THE COURT:  All right.  I'll give you a little bit of

13   leeway in this area, but --

14             MR. FERESTER:  I would also say that this material is

15   also beyond the scope of direct.

16             THE COURT:  Overruled.

17      Go ahead.

18   By Mr. Gruber:

19   Q   So is it correct that you did review Mr. Waldo's methodology

20   for estimating potential fish production from removal of DNR's

21   barrier culverts?

22   A   I reviewed a portion of that document.  I didn't review the

23   entire thing.

24   Q   Are you familiar with Mr. Waldo's methodology that involved a

25   measurement of habitat gain?

```
 1   A   I am -- I know the fact that he used some of DNR's
 2   information from our database to come up with habitat.
 3   Q   And as a result, predict fish production gain; is that
 4   correct?
 5   A   That is correct.
 6   Q   And you would agree that estimating changes in fish
 7   production from removing barrier culverts is a difficult task,
 8   would you not?
 9           MR. FERESTER:  Objection, your Honor.  This is beyond
10   the scope of this witness's expertise.
11           THE COURT:  Overruled.  I'll let him answer.
12           THE WITNESS:  Could you repeat that question, please?
13   By Mr. Gruber:
14   Q   You agree that estimating changes in fish production from
15   removing barrier culverts is a difficult task?
16   A   I've never completed that task before.  I'm an engineer.  I'm
17   not a fish biologist.  I've never calculated production numbers.
18   Q   Do you remember when I asked you this question at your
19   July 20th deposition?
20   A   Could you refresh my memory on that?
21   Q   Yes.  If you could look at Page 25, beginning at Line 14.
22   I'm going to read here.
23       Question:  "Would you agree that estimating the potential
24   increase in fish production based on removal of barrier culverts
25   is a difficult task?"
```

1     Answer:  "I would agree with that."

2     Did I read that correctly?

3  A   You did.

4  Q   And I also want to ask you, you are also unaware of a

5  superior method than that employed by Mr. Waldo in estimating

6  potential fish production achieved by removing barrier culverts;

7  is that correct?

8     MR. FERESTER:  Objection, your Honor.  Beyond the scope

9  of direct and beyond the witness's expertise.

10     THE COURT:  It is, Counsel.

11     MR. GRUBER:  That's my last question.

12    Thank you, Mr. Nagygyor.

13     MR. MONSON:  Good Morning, your Honor.  I'm Peter Monson

14  for the United States.

15              CROSS-EXAMINATION

16  By Mr. Monson:

17  Q   Good morning, Mr. Nagygyor.

18  A   Good morning.

19  Q   My name is Peter Monson, and I represent the United States,

20  and I think we had the pleasure of meeting each other at one of

21  your depositions back in June.

22    Do you recall that?

23  A   Yes, I do.

24  Q   I just have a very few questions regarding Paragraphs 36

25  through 49 in your report, which is marked W-094.  In those

1    paragraphs you discuss the funding levels for forest roads owned

2    by the U.S. Forest Service; is that correct?

3    A    That's correct.

4    Q    And you make a comparison -- excuse me.  The entire section

5    is titled "Comparisons to USFS and Other Large Forest

6    Landowners," correct?

7    A    Correct.

8    Q    But the only forest landowner that you discuss in these

9    paragraphs is the U.S. Forest Service; is that correct?

10   A    And DNR.

11   Q    And DNR, right.  Have you ever been employed by the U.S.

12   Forest Service?

13   A    Occasionally in the summertime, I'll be a wild land

14   firefighter, and they will pay my salary.  Never as an engineer.

15   Q    And you haven't had any exposure to the Forest Service

16   budgeting process, have you?

17   A    No, I have not.

18   Q    And the estimates that you give for the Forest Service's

19   annual road maintenance budget, is that solely based on the 2005

20   paper that you cite on Footnote 10?

21   A    Yes, it is.

22   Q    And that would be Exhibit F to your declaration?

23   A    I will take your word for it.

24   Q    And that's what Footnote 10 says, just for the record.

25   That's Exhibit F.

1     Did you look at any other documents or have any other

2  information regarding Forest Service funding levels for road

3  maintenance expenses when you prepared these paragraphs?

4  A   I believe there was a second Forest Service document that was

5  published that I read, but the information that I used to

6  generate these numbers came out of that 2005 document.

7  Q   Okay.  Now, the second document, do you recall when that was

8  prepared?

9  A   I believe it was a more recent document that talked about

10  some of the challenges that the Forest Service had.

11  Q   Do you know whether it also discussed increases in funding

12  levels by the Forest Service?  Do you recall that?

13  A   I don't recall specifically that it talked about funding.  I

14  think it didn't talk about funding to the level of detail or it

15  was a little more of a general document of their program and

16  their accomplishments.

17  Q   Do you have any independent knowledge as to whether Forest

18  Service funding levels have increased since 2005?

19  A   Recently I understand that the Forest Service has obtained

20  some stimulus money that they've used to complete -- or are

21  planning to complete some projects with that stimulus money.

22  Q   Do you know if there have been any other increases?

23  A   I'm unaware of any.

24  Q   And you didn't reference -- in preparing your amended

25  declaration, you didn't make any changes to include the reference

1    to stimulus money or any other increases in funding to the Forest

2    Service road maintenance?

3    A    I did not.

4    Q    You didn't have occasion to call Mr. Erkert, who was the

5    author of that 2005 paper, did you?

6    A    I did not.

7    Q    So any changes that may have occurred between 2005 and 2009

8    are not reflected in the information you present in Paragraphs 36

9    through 49; is that correct?

10   A    That's correct.

11        MR. MONSON:  I have no further questions.  Thank you,

12   Mr. Nagygyor.

13        THE COURT:  Thank you, Mr. Monson.

14        Counsel, before you ask, I have a question.

15        You mentioned the DNR classifies some of these barriers as

16   very high-cost repairs.  How do you define that?

17        THE WITNESS:  Our repairs that we typically do, our

18   average cost is around $60,000 or so.  When we have to do repairs

19   that are on two lanes of paved road or with substantial amounts

20   of fill, then we start getting into repairs that are going to

21   cost us $300,000, somewhere around there.  And that's just

22   approximately.  Our high cost repairs are projects that we don't

23   normally see out there, non-routine in nature for us.

24        THE COURT:  Of the miles that you have under your

25   jurisdiction, how many of them would fall under the two-lane

```
 1   paved road?

 2          THE WITNESS:  For barriers?  And this is just the case

 3   area?

 4          THE COURT:  Yes.

 5          THE WITNESS:  That would be excluded to two sections of

 6   road, one up to Cedar Creek and one up to our correction facility

 7   then on the Olympic Peninsula.  I would say less than 20.

 8          THE COURT:  And one other area.  You talked about the

 9   difference between inspecting and monitoring after a flood event.

10      Do you remember that?

11          THE WITNESS:  Yes.

12          THE COURT:  When your agency inspects and they see that

13   there's a problem with that particular culvert, do you track it?

14   do you fix it? do you prioritize it? how do you deal with it?

15          THE WITNESS:  It depends on what they observed.  What

16   has traditionally happened the last couple of winters, we've had

17   a couple large storm events that come down, a lot of flooding in

18   the low lands, a lot of damage in the uplands, too, up in the

19   forest lands.

20      When we go out there and inspect them, we'll go out there and

21   do a broad-based inventory of that whole block and determine all

22   the work that we need to get done on that block as soon as we

23   can.  Some of that requires us to walk in, because they're

24   blocked and stuff like that.

25      We'll determined whether it's work that we can do in the
```

1    wintertime, whether it's work that we need to do right now

2    because we need access to specific area.  Maybe we need access to

3    a communication tower that has 911 service up there.  That's

4    stuff that we need to do right now.

5        Other work that we might need to get done is we would review

6    when we have a contract out there to harvest wood, we've got a

7    contractual obligation to open that road up.

8        Projects that we would wait on would be projects that were

9    not immediately needed to open that road, and we realize that

10   those sites can wait until the construction season.  We can get

11   an HPA -- routine HPA and complete those projects at our

12   convenience.

13       You talked about the inspection.  You know, it could be as

14   easy as you go look at a culvert -- and these could be small

15   culverts or they could be a larger fish passage culvert.  It

16   could be as easy as a small culvert that has some debris in front

17   of it, you jump out of your pickup, you clean it out, or it could

18   be as much as we have to get a piece of equipment out here right

19   now, we can save this culvert, save this road.

20       The worst case scenarios for us is when we have some sort of

21   mass wasting event: a mix of debris, wood, water, soil comes

22   down, it takes out a whole strip of trees.  Maybe it takes out

23   the road.  Maybe it stops at the road.  Those would be large

24   events that typically require us to do a lot more planning, some

25   design work, clean up that material to ensure that the resources

1    are being protected, the damage is being minimized, and to

2    provide access.

3              THE COURT:  And it's my understanding that the Army Corp

4    of Engineers has indicated a potential problem with the Howard

5    Hanson Dam.

6         Does that affect any of your culverts, or can it affect it?

7              THE WITNESS:  I am unaware of any association with the

8    Howard Hanson Dam and DNR culverts.

9              THE COURT:  Thank you.

10        You may inquire, Counsel.

11                       REDIRECT EXAMINATION

12   By Mr. Ferester:

13   Q   Mr. Nagygyor, since we have just been talking about

14   inspection and maintenance, why don't we start with that subject.

15        How would DNR pay for an inspection and maintenance program?

16   Where would the funds for that come from?

17   A   The funds for that sort of program would come out of the

18   Access Road Revolving Fund.

19   Q   And that's the very account we've been talking about having

20   some shortages of money; is that right?

21   A   Yes, it is.

22   Q   And I believe Counsel mentioned that the account would be

23   underfunded by some $50 million, looking at the variety of

24   projects and obligations that the DNR has under its ARRF account.

25        As far as barrier repairs go and the State's programs, what

1   is the State obligated to fix under state law?

2   A   Under state law, we are obligated to fix all species of fish

3   at all life stages.  We are obligated to fish, resident and

4   anadromous, across the entire state, which is dealing with

5   culverts.  We are also obligated to fix sediment that delivers to

6   streams.  We're obligated to fix unstable roads.  We're obligated

7   to inventory orphaned roads.  We're obligated to improve our

8   roads through best management practices, or BMPs.

9   Q   So when you wrote your memo that is Exhibit AT-131, were you

10  looking at all of those obligations?

11  A   All those obligations, from fixing culverts to road

12  maintenance to road abandonment to road management.

13  Q   I believe Counsel referenced that you had requested an ARRF,

14  Access Road Revolving Fund, fee increase in fiscal year 2008?

15  A   That's true.

16  Q   What was occurring economically in fiscal year 2008?

17  A   That's when we were -- the beginning of the downturn of the

18  timber market.

19  Q   Counsel also talked about significant efforts to reclassify

20  streams.  Is it difficult in the forested environment to

21  determine how far up a stream resident fish may travel?

22  A   It's difficult to just observe a stream and go to a section

23  of stream or segment of stream and determine fish habitat, fish

24  presence.  To do it adequately, you need to follow the protocols

25  described in the manual and follow that process to determine

1    where the last fish is and then the last fish habitat.

2    Q    And why is DNR spending some additional time on determining

3    where those boundaries are?

4    A    It's prudent for us as land managers to spend our funds

5    wisely, and we don't want to be spending our limited resources on

6    improving structures that don't have fish habitat or fish

7    presence there.

8    Q    In terms of the reclassification effort, what types of

9    streams would that apply to?

10   A    For the most part, those are going to apply to resident fish

11   streams.

12   Q    And those are not the subject of this case, right?

13   A    That's correct.

14   Q    Let's talk for just a moment about historic costs.  How do

15   the costs of repairing a barrier culvert on a forest road

16   generally compare to the costs of replacing a barrier on a state

17   highway?

18   A    They are orders of magnitude difference in cost and

19   difference in complexity.

20   Q    Are you able to state whether historic costs would be

21   reasonably related to future costs for a highway culvert repair?

22          MR. GRUBER:  I'm going to object, your Honor.  This

23   witness has not testified that he's familiar with DOT highways or

24   culvert repairs for DOT.

25          THE COURT:  Foundation question.  The objection will be

```
 1   sustained.

 2            MR. FERESTER:  Well, that was the point, your Honor.

 3   Thank you.

 4            THE COURT:  You may step down.  Thank you.

 5       Do we have another witness on behalf of the State?

 6            MS. WOODS:  The State will call Robert Barnard, your

 7   Honor.

 8            THE COURT:  Mr. Barnard, I'm going to have you raise

 9   your right hand to be sworn.

10   Whereupon,

11                         ROBERT BARNARD

12   Called as a witness, having been first duly sworn, was examined

13   and testified as follows:

14            THE CLERK:  Please state your full name and spell your

15   last name for our court reporter.

16            THE WITNESS:  Robert J. Barnard, B-A-R-N-A-R-D.

17            THE COURT:  Ms. Woods, before we start, I believe his

18   declaration is W-089.  Of course, it has not been admitted.

19   89-A, B, C, D, E, F and G have all the been admitted.  I think

20   that leaves only 89-H.

21            MS. WOODS:  That matches our records as well, your

22   Honor.

23            THE COURT:  Thank you.  You may inquire.

24                         DIRECT EXAMINATION

25   By Ms. Woods:
```

1    Q    Good morning, Mr. Barnard.

2    A    Good morning.

3    Q    Mr. Barnard, where do you work?

4    A    I work for the Washington Department of Fish and Wildlife in

5    the habitat program.

6    Q    How long have you worked for the Washington Department of

7    Fish and Wildlife?

8    A    Thirteen years.  Actually, 14 at the end of next month.

9    Q    What are your job responsibilities?

10   A    I represent the agency in technical matters, fish passage and

11   habitat.  I design fish passage projects.  I provide technical

12   assistance on fish and fish habitat-related issues to staff and

13   to outside agencies, and I prepare guidance documents and

14   training materials in these areas.

15   Q    Would you please describe your educational background?

16   A    I have a Bachelor of Science in civil engineering, and I have

17   various professional courses in hydrology, geomorphology.

18   Q    Mr. Barnard, do you have a professional engineer's license?

19   A    I do.  It's currently paid up.

20   Q    Did you prepare a Declaration in Lieu of Direct Testimony for

21   this sub-proceeding?

22   A    I did.

23        MS. WOODS:  And the Court has already alluded to it.  If

24   Madam Clerk would please hand Mr. Barnard a copy of -- or the

25   binder that has Exhibit W-089 in it, please.

1   By Ms. Woods:

2   Q   Do you have it, Mr. Barnard?

3   A   Yes, I do.

4   Q   Do you recognize Exhibit W-089?

5   A   I do.

6   Q   What is it?

7   A   It is the Declaration of Robert Barnard, PE, in Lieu of

8   Direct Testimony.

9   Q   Would you please turn to Page 25?

10  A   Yes.

11  Q   Is that your signature on Page 25?

12  A   It is.

13  Q   What is the date of your signature?

14  A   3/19/09.

15  Q   Mr. Barnard, do you adopt the Declaration of Robert Barnard

16  PE in Lieu of Direct Testimony, dated March 19th of 2009, as your

17  direct testimony today?

18  A   I do.

19  Q   Would you please turn to Exhibit W 089-H.

20        MR. STAY:  Excuse me, your Honor.  Just for Ms. Woods,

21  we're not going to object to H, if you were trying to lay

22  foundation.

23     You may go forward without objection.

24  By Ms. Woods:

25  Q   Do you recognize Exhibit W-089-H?

1    A    I do.

2    Q    What is it?

3    A    It's a slideshow that I prepared for the Court to explain

4    some of the issues that I brought up in my declaration.

5             THE COURT:  You're asking to admit H?

6             MS. WOODS:  I would like to have admitted Exhibits W-089

7    and W-089-H.

8             THE COURT:  And Mr. Stay, you've got objections to 089?

9             MR. STAY:  We do.  But we are going to, under the

10   stipulation, your Honor, reserve those objections, allow the

11   admission subject to those objections which we may raise later on

12   as permitted.

13            THE COURT:  Thank you.

14       You may proceed, Ms. Woods.

15   By Ms. Woods:

16   Q    Mr. Barnard, does your job involve culverts?

17   A    Oh yes.  I would say 70 to 100 percent of my time, depending

18   on the season, is involved in culvert-related issues.

19   Q    Do you design culverts?

20   A    I do.

21   Q    About how many culverts have you designed?

22   A    I don't actually keep track, but probably in the neighborhood

23   of a hundred culverts I have designed that have actually a

24   drawing and a report associated with that.

25       And then when we used to keep track of our technical

1    assistance, I averaged about 100 culvert technical assistances a

2    year, so that's probably in the neighborhood of 12- or 1,400

3    culverts.

4    Q    Have you designed structures for projects that were sponsored

5    by any indian tribe?

6    A    As a matter of fact, Mike McHenry, a witness here earlier, I

7    designed him a bridge several years ago.  I also spent a fair

8    amount of time with his team in the field on his Salt Creek

9    barrier removal project.

10   Q    Do you work with other tribal biologists in your job?

11   A    I do.  Some tribes are very involved in the HPA process.

12   Q    Would you please turn to Exhibit W-089-B?

13   A    Yes.

14   Q    What is that?

15   A    That is "Design of Road Culverts for Fish Passage," dated

16   2003.

17   Q    Is it okay if I call that the WDFW Culvert Design Manual?

18   A    Or culvert manual, sure.

19   Q    Are you one of the authors of the culvert manual?

20   A    I am.  I wrote a number of sections in here, specifically the

21   stream simulation and roughened channels sections and also

22   sections on identifying bankful width.  And I was general editor

23   to the document as well.

24   Q    Have you done any research on culverts?

25   A    I have.  In the last ten years, I've done two research

1    projects on stream simulation culvert effectiveness.

2    Q    Would you please turn to Exhibit W-089-G?

3    A    Yes.

4    Q    What is that?

5    A    It's "Evaluation of Stream Simulation Culvert Design Method

6    in Western Washington," a preliminary study.  And it's a draft

7    document.

8    Q    Is that document one of the studies that you referred to a

9    moment ago?

10   A    Yes, it is.

11   Q    And you mentioned that it says "draft" on it.

12        Have you made that paper publicly available?

13   A    Oh, yes.  It's featured on our website, along with the

14   culvert manual guidance documents.  It's freely available.

15   Q    And you mentioned that you had another study; is that right?

16   A    Yes.  I'm currently engaged in cooperation with the

17   Department of Natural Resources, a study of 50 stream simulation

18   culverts.  It's a continuation of the first study.  The first

19   study involved 19 culverts, and this one currently involves 50.

20   An increase in the number of culverts was to overcome some of the

21   shortcomings of the first study because of the lack of sample

22   size.

23   Q    You thought that 19 was too small of a sample size?

24   A    Yes.

25   Q    In your opinion, would eight culverts be a large enough

1    sample size to give statistically significant results?

2    A    I suppose it depends on what you're trying to say.  Sample

3    size is a function of the variance in the population and the

4    degree of certainty that you want to have in your answers.

5         So, for instance, if you look down at the bed of the stream,

6    the gravel bed stream, and you wanted to know the average

7    particle size, let's say, of that stream, if you -- if all those

8    particles were the same size, you could pick up one and measure

9    it and have an idea of what the average size was.  But there was

10   a variance in the particle size, very small particles to very

11   large ones, and you wanted to have a great deal of certainty in

12   your result, you would have to pick up very many particles and

13   measure them.

14   Q    Are you preparing any papers for publication?

15   A    Yes.  Right now I'm just in the final stages of preparing my

16   50 culvert stream simulation study.

17   Q    Has your 19 culvert study been cited in other publications?

18   A    It has been.  I have given it at various conferences.  I gave

19   it at the AFS conference in Quebec a number of years ago.  I gave

20   it to the Forest Service in Oregon.  I can't remember where the

21   other places that I've given this paper at.

22        It's been cited in one document, the 2007 synthesis report

23   from federal highways for fish passage.

24   Q    Would you turn to Exhibit W-089-E, please?

25   A    Yes.

Q     Is that the federal highways publication that you just

mentioned?

A     Yes, it is.

Q     All right.  An excerpt thereof?

A     Right.

Q     You mentioned that you presented your paper at a variety of

conferences.  Have you given training presentations on culverts?

A     Yes.  Actually, this is a very important, large part of my

duties at Department of Fish and Wildlife.  Just two weeks ago, I

gave a presentation on culvert design to the county road

administration board.

      Biannually we give culvert training as a service to the

State, it's a day-and-a-half training session, of which excerpts

of it are in part of my declaration.  And I gave -- provided

training to the oceans and fisheries Canada senior staff some

years ago in developing a culvert -- involving a stream

simulation design and monitoring program.  I regularly am giving

presentations about culvert design and fish passage.

Q     Have you done any cost estimating for culverts?

A     When an engineer does a formal design, a cost estimate is

usually a part of it.

Q     What is the process for deciding what kind of culvert to

design?

A     What you're seeing right here is part of a flow chart, a much

longer flow chart totally, from the culvert manual.  There's

1  three sections at the top of this here of concern, what you would

2  discuss in any type of a crossing, whether that crossing is

3  necessary or not.

4      Particularly in the forested environment, roads can change

5  locations and we can not have that crossing at all.  Crossing

6  sitings are important, crossing either laterally or

7  longitudinally, to improve the characteristics of the crossing.

8  And then habitat considerations, which I spend a fair amount of

9  time in my declaration outlining.  These are considerations that

10  one would apply to the habitat impacts of choosing a given

11  culvert design method, particularly the concept of ecological

12  connectivity is important in understanding what is the most

13  appropriate structure.  And then we have bifurcate in this

14  process, then, between a bridge and a culvert.

15      The general rule of thumb for whether the crossing should be

16  a bridge or a culvert is a bankful width of 15 feet.  So larger

17  than 15, we generally apply a bridge; smaller than 15 feet, a

18  culvert.  Clearly that's a fairly gray area because we have very

19  large culverts that look pretty much like bridges, and we also

20  have very small streams that are also spanned by a bridge.

21      I'm not going to talk about bridge design at all.  On the

22  culvert side, you have three basic methods, two of them are

23  outlined in our Washington Administrative Code 220.110.070.  We

24  have a no-slope method and the hydraulic design method.  And the

25  third one, which is stream simulation, which is not featured in

1    the WAC, although we include it in our suite and include it in

2    our hydraulic project approvals because it provides at least as

3    good a passage than either of the two designs which are featured

4    in the code.

5    Q    Let's have you give a brief description to the Court of these

6    three design methods, starting with the no-slope method.

7    A    So a no-slope method was developed -- or is included in the

8    WAC to fill a specific purpose.  And the purpose is that culvert

9    designs is a very complex process.  And this method is made

10   available for people who, let's say, would want to replace their

11   driveway culvert and they don't want to hire an engineer.  They

12   want to do this themselves.  They own a backhoe, and they would

13   like to replace the culvert themselves.  So they need a method

14   that they can design a culvert which provides fish passage and

15   functions efficiently in the stream channel.

16        And so the no-slope method has three aspects.  One of them is

17   that the culvert is laid at a flat gradient; hence, the name

18   no-slope.  The second one is that the downstream end of the

19   culvert be countersunk at least 20 percent below the stream

20   channel.  That means that there's a bed inside the culvert with

21   stream material inside of it.  The third one there is that the

22   width of the bed of the culvert must be equal to the channel bed

23   width.  In the manual, we clearly defined that as the bankful

24   width of the stream.

25        As you can see from this drawing, with a round culvert in

1    there, the actual width of the bed is less than the diameter of

2    the culvert.  So let's take, for instance, if the width of the --

3    bankful width of the stream is five feet, then the no-slope

4    culvert, because of the geometry in this particular situation, is

5    going to be 125 percent larger than that, than let's say 6.25

6    feet, which we would probably round up to seven feet.  We were

7    trying to do that the other day.

8         Then we added a fourth aspect to this, which limits the use

9    of the no-slope method to lower gradient streams, the method of

10   the upstream counters, upstream of the inlet can be countersunk

11   no more than 40 percent of the rise.

12        Let's see.  Next slide.

13   Q    Have you designed any no-slope culverts?

14   A    Oh, yes.

15        And so this is an example of a no-slope culvert.  It is Bear

16   Creek.  We talked about the fact that - I just want to mention

17   this - that there is sometimes a difficulty in telling the

18   difference between a bridge and a culvert.  With a headwall like

19   this, this culvert is really just the length of the roadway's

20   width.  And if this was wider, we would have a very difficult

21   time telling the difference between calling this a bridge or

22   calling this a culvert.  But in this particular case, this is a

23   culvert.  And we can see that there's material outside of this,

24   that the water surface is relatively uniform from the adjacent

25   channel through the culvert and that the culvert is approximately

1    the same width as the streambed.

2        Now, there was some discussion the other day about the fact

3    that at flows above bankful, that there would be increased

4    velocity or increased hydraulic conditions, let's say, inside the

5    culvert.  If you turn to the next slide, you can look at a

6    hydrograph of the stream.  So what this is showing is we have a

7    survey cross-section here, the heavy dark line, of a stream.

8    This is Newberry Creek in Grays Harbor County on U.S. Forest

9    Service land.

10       And then there's a horizontal blue line, which indicates the

11   bankful stage of the stream and also the bankful width.  Beneath

12   that is a stage hydrograph.  What this is is a record of the

13   water surface elevation as a function of time.  And so what we

14   see started on the left-hand side and progress through time, it's

15   not raining for a period of time.

16       The period of time for this hydrograph is between October and

17   February in 2007.  And as we proceed through time, it's not

18   raining, and then it rains, we get runoff, and then the water

19   surface elevation increases.

20       And so this happens occasionally -- well, all the time out

21   there on the coast, basically in the rain forest.  So we can see

22   that the vast majority of the time, the water surface elevation

23   is below bankful, so that the condition inside the culvert in

24   terms of, say, its width and hydraulic conditions, is roughly the

25   same as they are inside the culvert, except there is one peak

1    that occurs off towards the left where the water surface

2    elevation for, it looks like some period of hours, was greater

3    than the bankful elevation.

4        And so if you want to, you can -- I can draw on this thing,

5    right?  Should I try that or is that a mistake?

6    Q    Go ahead.

7    A    It's not working very good.  How do I get rid of it?

8            THE COURT:  You can be John Madden here.

9            THE WITNESS:  Who's that?

10       Okay.  One more time.  There we go.  So there's the water

11   surface elevation during that peak event -- and actually, that's

12   December 3rd, 2007, the date of that famous storm.  And so we can

13   see that the width actually at that peak flow, which is just

14   instantaneous, obviously, is only just a couple of feet wider in

15   this particular cross-section than the bankful width.  So we

16   would have a constriction there instantaneously of a couple of

17   feet for a very short period of time.

18       So actually, the hydraulic conditions inside this particular

19   culvert on this particular stream is, you know, largely the same

20   the vast majority of the time.  That doesn't mean that it's never

21   exceeded or that we could have a year in which we had, say, a

22   100-year event, which would probably be twice the bankful depth,

23   which is going to be somewhere in here.

24       There we go.  So it's several feet wider there, so that would

25   also act as a constriction.  But these events don't actually last

1   very long, and the culvert does require -- does recover from

2   them.

3   By Ms. Woods:

4   Q   Going back to the picture of the Bear Creek culvert, does

5   this culvert pass transported wood?

6   A   Yes.  Actually, we have fairly good research on the size of

7   the wood that is transported by a channel.  In Flanagan -- Sam

8   Flanagan's research in northern California, he actually measured

9   all the wood that was transported in the channel during the

10  hundred-year period, and he found that 99 percent of the wood

11  which is transported by the channel is bankful width or less.

12      Intuitively, you could see that if a piece is longer than

13  bankful, it's likely to lodge someplace and not be readily

14  transported.  So he found that the vast majority of the wood

15  transported is bankful length or less.  So if we create a

16  structure which is bankful width, we would tend to pass

17  transported wood.

18  Q   This particular culvert depicted in the photograph that

19  you're looking at, did you take that photograph?

20  A   I did.

21  Q   Is that culvert in the case area?

22  A   Yes.  This is the Bear Creek -- well, there are many Bear

23  Creeks.  This one is in Kitsap County.  It is a county culvert.

24  It's like on Olalla Road, I think.  I can't remember the name of

25  the road that it's on top of it.

Q    Let's talk about the hydraulic method.

A    Ooh, what everyone's been waiting for.

Q    What are the key features depicted on this slide?

A    This is -- as I say up here, this is sort of a WAC concept, because I don't actually design culverts this way.  But this is what the WAC says.  The WAC says that the average velocity inside the culvert must be less than a specific value 90 percent of the time.

It also says that there must be a minimum flow depth, which is also specified, so that there's enough water for fish to swim through.  And then it also says that this culvert must be countersunk at least 20 percent below an elevation that's 25 feet downstream of the culvert outlet.  And this is to ensure that there is a bed inside the culvert under most conditions.

Q    Have you designed any fish passage structures using the hydraulic method?

A    I've used the hydraulic method to design retrofits and also to design roughened channels but not to design a culvert in this sense.

As I said, this is a concept.  It's really not been used.  It hasn't been used for, I don't know, probably 12, 14 years, although that doesn't mean that people don't call me every week and ask me why they can't use this method.

Q    Why is the hydraulic method not being used much today?

A    We recognize -- well, a number of things.  Number one is that

1   we are required to pass all fish.  "All fish" means 35 species of

2   freshwater fish, all the salmonids.  And that -- the hydraulic

3   criteria is really set up for just a very few number of target

4   species.  And also, the target species are all adult fish.  So if

5   we're required to pass all fish, then having a method which only

6   specifically addresses adult fish is something which is

7   inadequate.

8       That doesn't mean that fish that are smaller or fish of other

9   species can't pass at a lesser frequency than the target species.

10  They are not specifically part of the design process.  So we

11  can't say with assurance that they have passage for 90 percent of

12  the time because that's -- they're not part of the design

13  process, which is why we now prefer to use stream simulation.

14  Q   Are there situations when the hydraulic method would be

15  appropriate, in your opinion?

16  A   Yes, actually, there are.  We have said that it is applicable

17  for retrofits, which I think was in a slide earlier on, and also

18  for exceptional circumstances where the -- where either the

19  no-slope method or the stream simulation method do not apply.

20  Q   Is Washington the only jurisdiction that has used the

21  hydraulic method of designing culverts for fish passage?

22  A   No.  It used to be the most common method for using swimming

23  ability to achieve certain hydraulic conditions inside the

24  culvert.  And it's still used in many states.

25      You have to remember also, other places in the country -- you

1   know, we have 35 species of freshwater fish.  You go to the east

2   coast, there's 2- or 300 in there, and they have specific habitat

3   needs.  They also, you know, have different levels of awareness

4   of the requirements for fish passage.  So people in other states

5   do use the hydraulic -- still do use the hydraulic method.

6        So what we see in this table here is, in our Washington

7   Administrative Code 220.110.070, the first four columns and the

8   first four rows or so, those are featured in the WAC.  And so the

9   white numbers are the numbers that are in the WAC.  So we have --

10  on the top labels of the columns, we have the fish species.  And

11  then on the rows, those are the lengths of culverts.

12       So we have -- now believe that there are trout in just about

13  all the streams that we have culverts on, fish- bearing streams.

14  So we don't even think about adult salmon and Steelhead.  We use

15  only the adult trout column, so we have four feet per second for

16  culverts between one and 100 feet and then the velocity

17  requirement.  It goes down for longer culverts.

18       The numbers that are in colors there are -- the yellow ones

19  are for the Oregon Fish and Wildlife Proposed Criteria and also

20  for the National Marine Fisheries fish passage requirement for

21  salmon.  And then in the last row, there is work done by us and

22  others on the velocity requirements for migrating juvenile

23  salmonids.

24  Q   Are those numbers in the juvenile salmonids column in the

25  Washington WAC?

1    A    No, they are not.

2    Q    Can a culvert that's designed to pass a six-inch trout pass

3    juvenile salmon some of the time?

4    A    Well, you could specifically design a culvert to meet

5    juvenile passage requirements for a given period of time, let's

6    say 90 percent of the time.  You could do that.  It is onerous,

7    but you could do that.

8    Q    I'll turn to the next slide.  Would you please explain what

9    this slide depicts?

10   A    So this is one of the ways in which we would use the

11   hydraulic method.  It is for the design of baffles as a retrofit

12   to an existing culvert.  So if for some reason we plan on

13   replacing this culvert in the future, but at this point, for

14   whatever reason, it's not being replaced, we can achieve some

15   level of fish passage inside this culvert by fitting it with

16   these steel plates, which increase the roughness inside the

17   culvert, the resistance to flow, and they also increase the water

18   depth to provide greater depth for the fish to swim through.

19        The reason that we use the hydraulic method, this velocity

20   method here, is because unless we have criteria to design these

21   things to, we're adrift.  We don't know how close to put these

22   together, how tall to make them.  We need to have some criteria

23   to design them to, so we have a velocity or fish swimming ability

24   criteria.

25        There's also a second criteria, which I haven't mentioned up

1   until this point, which is not in WAC.  But in our study of fish

2   passage, we found that as you increase roughness, thereby

3   decreasing velocity, you increase turbulence.  So turbulence is

4   the velocities that are not -- that aren't directly downstream.

5   In other words, they're to the left, they're up and down.  They

6   create turbulent cells with the tumbling of the water.  This is

7   turbulence.

8       So as we increase roughness, we increase turbulence.  And at

9   some point, we create turbulent cells that are large enough that

10  they prevent fish from swimming through them.  They're tumbled

11  back out of the culvert.  So we have these two conflicting

12  values.  One is velocity and the other is turbulence.

13      As we increase roughness, we increase velocity and we

14  increase turbulence.  So we manage the conditions inside the

15  culvert using these two criteria.  And what happens actually is

16  that as you increase slope, which increases the velocity, then we

17  increase roughness, we get more turbulence.  So it effectively

18  limits the slope of a hydraulically designed culvert, let's say

19  in the case of baffles.  For baffles, we don't apply them to any

20  greater slope than three and a half percent.

21  Q   This particular photograph of this west fork Hylebos Creek

22  culvert, did you take that photograph?

23  A   I did.

24          THE COURT:  Counsel, before we leave that, if I could

25  ask him a question about that one.

1          Mr. Barnard, the baffles don't go all the way across the

2    inside of the culvert?

3                THE WITNESS:  They don't.

4                THE COURT:  Does that increase the velocity in the area

5    that is not baffled?  Do you understand me?

6                THE WITNESS:  Yes, I do.

7          In some cases, we actually bring the baffle all the way to

8    the other wall.  It depends on what the low-flow discharge is.

9    So if we have a stream which pretty much dries up during the

10   summer, we run those baffles all the way across so that we can

11   maintain as much depth inside the culvert as possible.

12         As that base flow, we call it, increases, then we provide

13   more of a notch on that side and we're able to keep flow depth

14   deep, but then we have a swim-through condition; whereas if we

15   have the baffles, then we force fish to jump over that.  And at

16   low-flow conditions, that can be difficult for them.  So we have

17   a swim-through condition on that left-hand side there.  So we

18   have enough flow that we can keep that full, right, so there's

19   enough depth for the fish to swim through it, but we also have

20   the roughness created by the baffles to decrease the velocity.

21         There's also the issue of transporting sediment, too, because

22   these streams have transported sediment.  The fact that they're

23   angled downstream this way and they have that notch, the

24   conditions are balanced so that we get a maximum set of transport

25   so the thing doesn't fill up with sediment and reduce the

1    effectiveness of the baffle.

2            THE COURT:   Thank you.

3    By Ms. Woods:

4    Q    Let's move on to stream simulation.

5    A    Ah, it's such a relief to get to stream simulation.

6    Q    And why is that?

7    A    Because it's a preferred method.

8    Q    Did you design the stream simulation method?

9    A    I developed it in Washington State.

10        So the concept behind stream simulation is that if a fish can

11   successfully navigate a natural channel, and if we create

12   conditions inside the culvert which are similar to those in the

13   natural channel, by implication we get fish passage.  This is

14   very important, and we don't take this casually.

15        If we can't recreate conditions that are like the natural

16   channel inside the culvert, it is not stream simulation.  We

17   don't call it stream simulation.  So there's a number of criteria

18   that we have for this method.  One of them I'm just going to get

19   to right away is called slope ratio.  And it is the ratio of the

20   culvert bed slope to the upstream channel slope.  And we say that

21   this ratio can't be any greater than 1.25.  What that means is

22   that the slope of the culvert can't be 25 -- more than 25 percent

23   greater than the upstream channel.

24        Let's say the upstream channel is a 1 percent sandbed channel

25   or a small gravel bed channel, but because of site specific

1   conditions, we need to oversteepen the culvert, let's say to 5

2   percent.  So if conditions inside the culvert are 5 percent, it's

3   going to be a boulder bed stream, and it won't look anything like

4   the upstream channel.  That's not stream simulation, so the

5   method will not apply in that particular case.

6        The other aspects of the stream simulation culvert are that

7   the bed material inside the culvert be similar to that found in

8   the adjacent channel; that the culvert is deeply countersunk, 30

9   to 50 percent.  The reason for this is that we want to have a

10  substantial amount of bed material inside the culvert to allow

11  for vertical variation in the streambed.

12       And the third or last one is that the channel -- the width of

13  the culvert is greater than channel width.  In this particular

14  case for confined channels, the width of the culvert, the width

15  of the bed of the culvert, is 1.2 times the bankful width of the

16  stream plus two feet.

17       And I can explain where that came from if you want to know,

18  but I won't go there.  It's almost lunchtime.

19       This is an end view looking up at the outlet of a stream

20  simulation culvert, one of the first ones.  This was taken a long

21  time ago.  It's in the Chehalis River basin.  I believe it's a

22  Weyerhaeuser culvert.  And there's supposed to be another line in

23  here.  I'm going to try draw again.  This might be a mistake.

24       There needs to be another line in here so we have kind of a

25  defined streambed inside of there that looks something like this,

1    and that this is the bankful width of this stream.  It's like a

2    nine-year-old's drawing this stuff.  You don't preserve this, do

3    you?

4         But that's the bankful width of the stream inside the

5    culvert.  You see we have dry banks inside the culvert and that

6    the culvert sides are substantially wider than the stream.

7    Q    This particular culvert, have you used it in any of your

8    studies?

9    A    No, I did not.

10   Q    How about this one?

11   A    This is Club Creek.  It was originally constructed by

12   Weyerhaeuser.  It's in the White River Tree Farm in, I guess that

13   would be Pierce County.  And this is a stream simulation culvert.

14   The width of this is 1.2 plus 2, so it's exactly what our stream

15   simulation method says.

16        You can see that it has a channel that runs down the middle

17   of the culvert; that there are dry banks at this low-flow

18   condition; that the flow is generally isolated, from a hydraulic

19   standpoint, the majority of the time, except during peak events,

20   and that this culvert is part of my stream simulation -- oh, the

21   part of the first one but not the second one, unfortunately.  And

22   I have looked in depth at this culvert.

23   Q    Are there situations where the stream simulation design

24   method would not work?

25   A    Yeah.  I just mentioned one, which is where the culvert must

1    be oversteepened relative to the upstream channel.  So if we

2    can't create conditions inside the culvert that don't look like

3    the adjacent stream channel, we don't do stream simulation.

4            THE COURT:  Counsel, let's go ahead and take our lunch

5    break at this point in time.

6    (At this time, a lunch break was taken.)

7            THE COURT:  Welcome back from lunch.  Are you ready to

8    start the afternoon session?

9        Counsel, you were on direct.

10           MS. WOODS:  Thank you, your Honor.

11   By Ms. Woods:

12   Q   Mr. Barnard, before lunch, we looked at the three design

13   methods for designing culverts.  Can you tell just by looking at

14   a culvert what design method was used?

15   A   Actually not.

16   Q   Is it possible that if one person designs a culvert using the

17   no-slope method and someone else designs a culvert using the

18   stream simulation method, you could wind up with two culverts

19   that look the same?

20   A   Yes.

21   Q   Is it possible that if one person designs a culvert using the

22   hydraulic method and someone else designs a culvert using the

23   stream simulation method, you could wind up with two culverts

24   that look the same?

25   A   Yes.  And in fact, the roughened channel method, which uses

the hydraulic criteria, actually, it's seeking a similar goal to stream simulation.  The only way you would be able to tell the difference would be to measure the culvert bed slope with respect to the upstream channel slope.

Q   Is it possible that if one person designs a culvert using the no-slope method and someone else designs a culvert using the hydraulic method, you could wind up with two culverts that look the same?

A   Yes.  But you know, you can tell the difference -- no, you couldn't tell the difference.

Q   In the studies that you've conducted, have you included hydraulically designed culverts in the sample?

A   Actually, there is one roughened channel culvert that is included in my current stream simulation study.

Q   In your studies, have you measured water velocity inside a culvert?

A   Well, I both measured velocity at the time of our site visit, and then I also modeled velocity in measured cross-sections.

Q   Can water velocity vary for different cross-sections inside a culvert?

A   Inside the culvert, it can, particularly inside -- or within a stream channel.  In my reference reaches, there are two cross-sections within the reference reach which is approximately the same length as the culvert, and it's not uncommon to have a 20 percent difference in velocity between the two cross-sections.

Q    And by "reference reach," are you referring to the channel
outside the culvert?

A    Yes.

Q    At the outset of your testimony, I believe you said you'd
been with Washington Department of Fish and Wildlife for almost
14 years; is that right?

A    Yes.

Q    During this time, have you observed any changes in the types
of culvert designs that state agencies have installed?

A    Yes.  When I first started working for Fish and Wildlife in
'95, there was no stream simulation method.  There was the
no-slope design method and the hydraulic design method.  These
are the only two ways that a person could design a culvert.

     We realized that neither of these methods applied,
particularly to higher-gradient streams, and so I developed the
stream simulation method to expand our methods so that they
applied to any channel.  So anyway, the progress has been from
these two -- the two methods that were outlined in the Washington
Administrative Code to expand to the use of the stream simulation
culvert.  So we've gone from the no-slope used to be the default
method to now the stream simulation is the default method, or the
method that is used -- looked at first in the alternative
analysis.

Q    We spent quite a bit of time describing the three methods for
designing culverts.  Why do we need multiple methods for

designing culverts?

A    Well, the first engineering code of ethics says that we are

to use our knowledge and skill for the enhancement of human

welfare and the environment.  What this sets up is a balancing

act between human welfare and environment.  A hundred years ago,

that balance looked a little different than it does now, where

the human welfare was quite a bit more important than the

environment, and we created culverts that passed water safely

from one side to the other.

    And then of course as we began to see the fact that culverts

also interfere significantly with our natural resources, we began

to design culverts that had greater environmental benefit,

particularly passing fish, so we're bringing that balance more

into alignment.

    And as we realize that need for ecological connectivity

between the upstream and the downstream section of the stream, we

developed stream simulation which brought that more into

alignment.

    Human welfare just doesn't mean cost.  We don't just do these

methods just because one is cheaper than the other.  There's a

lot of other issues, particularly property rights.  Often

adjacent landowners forbid our access to their land.  So if we

have an inside stream channel where the upstream channel is

discontinuous from the downstream channel and we need to connect

these two and we can't get access to land outside of

1    right-of-way, we need to create a structure which connects those

2    two in order to provide fish passage.

3        So we need a method for us to do that, and it's not stream

4    simulation because we would have to oversteepen.  As I talked

5    about the slope ratio, we have to oversteepen it, so we can't use

6    stream simulation.  We need another method to do that, to get

7    from one side to the other.

8        There's other instances where adjacent landowners refuse to

9    have any access to their land because they don't believe that the

10   State should waste all that money on that big culvert.  And let

11   me tell you, this isn't just some idle observation.  I mean, this

12   is regularly the sort of interaction that we have sometimes with

13   landowners.  It's also a case where -- a recent project in

14   Thurston County, where an undersized culvert in a road at peak

15   events diverts water along a ditch line, where it reconnects with

16   the channel much further downstream.  Well, what this has done is

17   it's caused the downstream channel to narrow as a result of not

18   having these flushing flows.  And then the downstream channel --

19   or downstream landowner has a very insufficiently designed

20   culvert in his driveway.

21       So the County's claim is if we put in a full- sized culvert

22   now, we let all the peak flow go through here, then we're going

23   to flood the downstream neighbor, and we'll have a deleterious

24   effect on that downstream neighbor and clearly going to overwhelm

25   his culvert, which has been serving him for only as much water

1    that makes it through this existing culvert.

2        So here, clearly by changing the culvert in this particular

3    instance, we have an effect on a downstream landowner, you know,

4    which is outside our control.  So we need a method to approach

5    this situation.  And if it's just stream simulation, we're lost.

6    I mean, what do you do there?  You put in a stream simulation

7    culvert, and then the County is sued, or it could easily be a

8    state highway, because this also occurs on state highways.  So

9    now the County's getting sued because they've had a deleterious

10   effect on a downstream landowner.

11       I don't think that this balance is something to take lightly.

12   I work for the Department of Fish and Wildlife.  You know, I'd

13   love to see valley-spanning structures all over the state, but

14   clearly we wouldn't have a modern transportation system if all we

15   did is drive on bridges.  So you know, we have to keep this human

16   welfare and environment in a balance, because we clearly can't do

17   all one or all of another.

18       Does that answer your question?

19   Q    Yes.  Thank you.

20           MS. WOODS:  Your Honor, one of the slides that was in

21   Mr. Barnard's presentation was a slide from AT-128.  In the

22   pretrial order, we had an objection to that exhibit.  We are

23   withdrawing that objection.  In fact, we'd like to offer AT-128

24   for admission into the record.

25           MR. STAY:  We refuse to let her withdraw the objection.

1            THE COURT:  AT-128 will be admitted.

2            MS. WOODS:  Thank you, your Honor.  That concludes the

3  direct examination.

4            THE COURT:  Cross-examination.

5            MR. STAY:  Thank you, your Honor.

6                        CROSS-EXAMINATION

7  By Mr. Stay:

8  Q    Hello, Mr. Barnard.  How are you today?

9  A    Perfect.  I couldn't be better.

10 Q    You could be better, you say?

11 A    Couldn't be better.

12 Q    Great.

13       My cross may be a bit disjointed as I try to put in comment

14 to what you said and also talk about what I've just done.  But I

15 was curious about your last comment.  You're talking about this

16 balance.  And this balance, you do it, the Department of

17 Transportation does it, and they balance all these interests

18 trying to figure out what culvert solution might be better.

19       Is that what you were saying?

20 A    Basically.

21 Q    Okay.  And sometimes the balance would be for a larger

22 culvert that might pass fish and sometimes the balance might be

23 for a smaller one because of other circumstances.

24 A    Yeah.  I'm not talking about the average culvert

25 installation.  I'm talking about fairly rare circumstances, but

1    they still do occur.

2    Q    Okay.   I think I want to start with where you ended, because

3    I really enjoyed that.

4         Mr. Barnard, you would agree with me that the stream

5    simulation culvert design method is the preferred method today in

6    the Department of Transportation in the state of Washington?

7    A    I don't know about the state of Washington -- I mean in the

8    Department of Transportation.   But in terms of our design

9    philosophy, the stream simulation method is preferred.

10   Q    When you say "ours," you're talking about the Department of

11   Fish and Wildlife?

12   A    Yes.

13   Q    Okay.   And you provide guidance to the Department of

14   Transportation as they select their particular culvert designs?

15   A    Insofar as we provide guidance to anyone.

16   Q    So your role with the Department of Transportation is no

17   different than your role would be in providing a guidance to me

18   if I want to ask how I could fix a culvert on my property?

19   A    Actually, I have two relationships with the Department of

20   Transportation.   One is I am what's called a scoping engineer,

21   which I think Mike Barber told you about, so I do provide

22   conceptual-level designs for the Department of Transportation.

23   But I also, of course, review their projects as they come up,

24   some before HPAs.

25   Q    I want to see if I captured your discussion on the stream

1    simulation.  I want to sort of give you a hypothetical which I

2    think is consistent with what your testimony was.

3        Let's assume for the moment that a hydraulic culvert design

4    culvert and a stream simulation design culvert, and no-slope and

5    stream simulation, all three could go into a particular location.

6    It was possible.  Okay?

7        Now, they both would meet their relative standards.  In that

8    case, would you agree with me that the stream simulation culvert

9    would be the preferred culvert for passing fish?

10   A    You said "they both."  You mean three methods?

11   Q    Yes.  I said no-slope, stream simulation, and hydraulic, both

12   -- all three can be installed in a particular location.

13       So my question to you is:  In that situation, would the

14   stream simulation be the culvert design that would be best for

15   passing fish?

16   A    Yeah, depending on what the site-specific circumstances are.

17   Q    No.  They all work.  That's my hypothetical.

18       The stream simulation would pass more life stages than the

19   hydraulic, I assume.  Am I correct?

20   A    Well, what I talked about in the hydraulic design method is

21   we use an adult fish criteria, but that doesn't mean that

22   juvenile fish couldn't pass through that structure.

23   Q    That wasn't quite my question.  Let me see if I can state it

24   again.

25       Would a stream simulation culvert, as compared to a hydraulic

1    design culvert, be able to pass more salmon at more life stages

2    and more flows than would a hydraulic method?

3    A    Yeah, although I'm going to equivocate on this.  Considering

4    that I have a hydraulic culvert in my mind which has many of the

5    characteristics of a stream simulation culvert, so it isn't as

6    clear a line as that.

7    Q    So they're all the same?

8    A    No, they are not all the same, but it's not a -- you know, I

9    don't think I can make any dramatic, earth-rending, you know,

10   distinction.

11   Q    It looks like a culvert with Moses striking the water.  So

12   it's not possible for you to say that a stream simulation

13   culvert, because it's larger, because it exceeds the bankful,

14   would be more likely to pass juvenile salmon than will a

15   hydraulic culvert design?

16   A    Let's make it easy.  Stream simulation, generally speaking,

17   is preferred for location.

18   Q    It's better for passing wood?

19   A    Generally speaking.

20   Q    And debris, other debris?

21   A    Generally speaking.

22   Q    Sediment?

23   A    Generally speaking, yes.

24   Q    That was nice to make it easier, wasn't it?

25   A    Yeah.  We could have gone on all day otherwise.

1  Q    Mr. Barnard, you're not a biologist.  Am I correct?

2  A    That's right.

3  Q    You are an engineer.  Have you taken any classes in biology

4  since you took your degree in engineering?

5  A    No, although my daily interaction is with biologists, and

6  regularly on stream surveys with biologists.

7  Q    So you consult with biologists regularly?

8  A    Yes, every day.

9  Q    But you don't have a degree in biology?

10 A    I don't have a degree in biology.

11 Q    Would it be fair to say that if you had a biological question

12 that came up in the design of a culvert that you would consult

13 with a biologist?

14 A    No.

15 Q    You would make the biological determination yourself?

16 A    Well, generally speaking, we look at physical

17 characteristics.  We don't actually measure fish.  We don't count

18 fish.  We look at physical characteristics.

19 Q    So that it's possible as you're designing culverts to go

20 through the whole process and not even talk to a biologist?

21 A    Right.

22 Q    Okay.

23 A    That's what these design principles are.  They're engineering

24 principles.

25 Q    So using these engineering principles, so not talking about

1    the biologists, you're able to make these designs as you think

2    are appropriate?

3    A    Yes.

4    Q    Do you agree with me that under Washington State requirements

5    that culverts are required to pass free -- or to freely pass

6    fish?  Is that a requirement under state law, as you understand

7    it?

8    A    We could read what it says in the RC -- are you talking about

9    the RCW?

10   Q    Yes.

11   A    It says that every dam or structure must be fitted with a

12   durable and efficient fishway, I believe are the words.

13   Q    To freely pass fish?

14   A    It doesn't say that.

15   Q    Doesn't say that?

16   A    Does it?  I forget now.

17   Q    No.  I don't mean to trap you.  Actually, I'll tell you what

18   you can do.  Why don't you look at Exhibit H, Slide 3.

19   A    Yes.  That's what I was looking for.

20   Q    We have no secrets.

21   A    "Dam or obstruction action cross a stream" -- "A dam or other

22   obstruction across or in a stream shall be provided with a

23   durable and efficient fishway approved by the director and shall

24   be maintained in an effective condition to freely pass fish."

25        You're right.  Sorry.

1    Q    I knew I was.

2         There's also a hydraulic code that you rely on; is that

3    right, Mr. Barnard?

4    A    Yes.

5    Q    And that's in the Washington Administrative Code?

6    A    That's right.

7    Q    And why don't you go to Slide 4.  Is that your sort of

8    guideline in how you're developing culverts?  This is sort of

9    your basic understanding; this is the rules you follow here in

10   the WAC?  This is what controls what you do?

11   A    Well, actually what we do is, these are rules; they're not an

12   engineering design method.  So what we have done is we've

13   interpreted these rules in our guidance, which is what we're now

14   calling the culvert manual.

15        So I don't actually sit and look at the WAC when I'm

16   designing a culvert.  I would look to the culvert manual, since

17   it is an engineering document.

18   Q    Since we have the WAC out, just look at it for just a moment.

19   It says, "Culverts shall be designed so as not to impede fish

20   passage."

21   A    That's right.

22   Q    So that would be something you would follow.  That would be

23   one of the rules you would follow?

24   A    Actually, the name of our culvert manual is "Design of Road

25   Culverts for Fish Passage."

1   Q   So looking at the WAC and looking at the RCW, one says to not

2   impede fish, and the other says to pass fish.

3       Does that, in your mind, as you'd interpret it, only apply to

4   adults, adult fish?

5   A   Well, no.  Actually the RCW has been interpreted to mean all

6   fish.

7   Q   And that would be juveniles?

8   A   Sure.

9   Q   Now, I looked at -- since you have the WAC still up.  Looking

10  at that, I'm looking at there's a no-slope option, a hydraulic

11  option.

12      Are those, as I understand them, are they two culvert design

13  methods?

14  A   Well, as we're looking at the WAC, we see that there are a

15  set of -- there was a rule associated with two methods.  Now,

16  they're actually not called no-slope and hydraulic.

17  Q   It says "no-slope."  That's why I used those words.

18  A   Yeah, I know, but they were in quotation marks.  I mean, that

19  doesn't say that in the WAC.  Right?

20  Q   Oh, I see.  Okay, because this is your slide.  Thank you.

21  A   So in the WAC, it gives a series of criteria for the design

22  of a culvert, right?  No-slope, we call it.

23  Q   Okay.  So you gave me sort of a lay person's view of what

24  those longer words in the WAC would mean?

25  A   It's common parlance.

1   Q   Okay.  I'm a common guy.

2      I see that stream simulation is not listed.

3   A   That's exactly right.

4   Q   So stream simulation, I assume, then, is not listed in the

5   WAC?

6   A   It's not in the WAC.

7   Q   So it's not something that you can require someone to do?

8   A   It is not something we can require someone to do.

9   Q   You can't require the Department of Transportation to do it?

10   A   No, we couldn't.

11      Well, you know, that's not exactly true.

12   Q   I'll just sit down here.

13      Go ahead, Mr. Barnard.  The judge wants to hear your answer.

14   A   Okay.  That's not exactly true because we say in the WAC that

15   we - I forget the exact words for this - that we must mitigate so

16   as to cause a no-net-loss in the productive capacity of the

17   stream.  In that sense, if we can show that using another -- that

18   using stream simulation results in a no-net-loss of productive

19   capacity, then in that sense we could require the use of the

20   stream simulation method.

21   Q   That's different.  Do you remember taking -- I took many

22   depositions of you over the last four or five years, but we took

23   one in --

24   A   Just two.

25   Q   Two.  That's right.

1    A    They were so long.

2    Q    You did not have a rebuttal deposition.  That's true.  In

3    2006, we did that.

4         At that time, do you recall indicating to me that the manual,

5    which were in the stream simulation design method, as set out is

6    advisory?

7    A    It's guideline, yes.

8    Q    It's guidelines.  Okay.

9    A    Was that at odds with what I just said?

10   Q    No.  No, no.  If it was, I --

11   A    I was just wondering why you commented.

12   Q    You did fine.

13        On the no-slope design, do you agree that the no- slope

14   culvert design method was initially designed to help small

15   landowners install culverts without expensive engineering?

16   A    Well, actually, the WAC doesn't tell us what they designed it

17   for.  We have interpreted it as the method which is available to

18   people who do not -- who would want to do this without the

19   assistance of an engineer.

20   Q    Do it by themselves; sort of home project kind of thing?

21   A    DIY, or whatever it is.

22   Q    The no-slope design standard, would you agree with me that it

23   sets up a few basic relationships but it really doesn't talk

24   about fish passage, it doesn't really address the issue fish

25   passage in the design itself?

1  A   No, it doesn't.  It sets up physical and hydraulic

2  relationships which we believe provide fish passage.

3  Q   I think I have some easy questions for you now.  Do you agree

4  that the hydraulic method is no longer the preferred method?

5  A   It's not the preferred method.

6  Q   Do you agree that in many cases, the hydraulic method is not

7  even allowed?

8  A   In many cases, the hydraulic method is not even allowed.  It

9  says that right in the culvert manual.

10 Q   Do you agree that the hydraulic method applies to temporary

11 retrofits within existing culverts?

12 A   That and exceptional circumstances.

13 Q   And the exceptional circumstance is where you have a new

14 culvert built to a hydraulic standard?

15 A   Yes.

16 Q   And that would be rare?

17 A   Rare.

18 Q   So we basically need to have a really good reason for doing

19 that?

20 A   We would have a really good reason for doing that.  We

21 wouldn't do it cavalierly.

22 Q   Now, a hydraulic design, the design itself is based on a

23 velocity.  Am I correct?

24 A   The hydraulic design?

25 Q   Yes.

A    It's based on velocity, minimum depth, and energy dissipation factor.

Q    It has a design flow.  Am I correct on that as well?

A    Yes, 10 percent of exceedance flow.

Q    And that design flow, that's greater than one foot per second.  Am I correct?

A    No.  Design flow would be a discharge.

Q    A discharge.  And what would that be?

A    Well, a discharge would not be exceeded more than 10 percent of the time.

Q    Is there a discharge amount?

A    Well, it would depend on the stream and where you were.

Q    I see.  So a hydraulic method, it's my understanding -- and I could be wrong on this.  It's my understanding that the hydraulic method has a velocity standard of four feet per second in its design.  Am I incorrect on that?

A    Well, for culverts between 10 and 100 feet, the adult trout velocity criteria is four feet per second.

Q    And that's what the hydraulic culvert is designed to, to pass that fish?

A    Yes.

Q    Am I correct -- even though you're not a biologist, I think you may know this.  Am I correct that a juvenile salmon will not be able to migrate through velocities that high?

A    Well, we have data on the swimming ability of juvenile salmon

1    in bare culverts.  That means culverts that have no bed material

2    inside of them, or flume studies that don't have any bed material

3    inside of them.  But culverts which have substrate, in other

4    words, they have gravel, let's say, or streambed material in

5    them, the passage characteristics are probably different than

6    they are in a culvert without.

7    Q    Again, I just don't know this.  I need to ask you.

8        I thought that the juvenile salmonid passage criteria that

9    you've identified in your slideshow is one foot per second and

10   that that was considerably slower than the six-inch trout.

11       Am I reading that incorrectly?

12   A    No.  You're reading that very correctly.  But it also depends

13   on what flow you are measuring that velocity.

14   Q    So it's possible, in your mind, that a juvenile salmon will

15   be able to migrate upstream in flows reaching four feet per

16   second?

17   A    If there's bed material inside the culvert -- because

18   actually we don't know because the studies for swimming ability,

19   at least up to this point, have been done in culverts without any

20   bed material inside of them.

21       We know that in a bare culvert, there's a barrier, it --

22   well, Pat Powers did his - I can't see it on the screen now -

23   1.2, 1.3 feet per second.  He found that in bare culverts.

24       We actually did further studies in the culvert test bed

25   facility looking at the passage of juvenile Coho in baffled

1  culverts.   There were surprisingly strong velocities they were

2  able to swim against.

3  Q   Even though your exhibit that you provided us has swimming

4  abilities or velocities of 1.1, 1.3, 2 and 1, it's your testimony

5  here that indeed juvenile salmon can migrate at speeds -- at

6  flows up to and over -- up to four feet per second?

7  A   Well, no.   What you're seeing here are all values that are

8  related to passage of fish in bare culverts or in flumes, and so

9  they actually are on the same footing.

10     In a bare culvert, four feet per second, I'd very much doubt

11  that a juvenile salmon would be able to migrate through that.

12  But in a culvert which has a bed in it, in the case of a

13  roughened channel culvert, they may be fully able to at least

14  hold at that four feet per second.

15  Q   And that's your biological opinion?

16  A   No.   Speculation.

17  Q   Speculation?

18  A   Speculation.

19  Q   Thank you.

20     Was one of the reasons why you embark on, and this is your

21  method of stream simulation method, embarked on this challenge to

22  create a new method was that the old traditional methods only

23  dealt with one life stage, adults, and did not really adequately

24  deal with juveniles?   Is that one of the reasons you took on

25  that?

A    Well, actually, the main reason was to provide passage for fish in higher-gradient channels.  That's the main reason.  What we really were trying to address was the passage of fish, particularly resident fish in headwater streams.  That was the original impetus.

Q    So you would not agree with the statement that one of the purposes was, with the existing technologies or methods, that upstream adult salmon in traditional methods consider only one life phase, a complex organism, and then in fact, there was a need for additional methods, and this was one of the reasons for the stream simulation?

A    I know that.  I wrote that.

Q    You agree with that?

A    Yes.

        THE COURT:  I've written things I don't agree with.

        MR. STAY:  Your Honor, my goodness.

        THE WITNESS:  But I do agree with it.  But you know, if you ask me why I originally did it, I did it at the request of the biologists working in enforcement.

By Mr. Stay:

Q    Do you recognize this, Mr. Barnard?

A    I do.

Q    It is from your slideshow?

A    Yes.

Q    It is a hydraulic culvert which has baffles in it?

```
 1   A    Yes.

 2   Q    Now, when you use baffles, is one of the problems in using

 3   baffles that it creates increased maintenance issues?

 4   A    That is true, yes.

 5   Q    So you would want to make sure that you had those baffles

 6   maintained regularly?

 7   A    Yeah, particularly the inlet to the culvert, because at least

 8   in this particular case -- in fact, I have a slide in my

 9   slideshow, in case you want to look at it, which shows someone

10   maintaining the inlet to this very culvert.

11        Yeah.  It's -- I don't know what those numbers mean.  It's

12   this one, the same culvert.  This guy is maintaining the inlet to

13   that same culvert in the slide here.

14   Q    Is the use of baffles basically a method of retrofitting?

15   A    Retrofitting.  But the culvert we're looking at right here,

16   this was a new culvert that's had baffles inside it.

17   Q    And it's a hydraulic culvert, so I must assume, then, that

18   there were some exceptional reasons for allowing this particular

19   culvert here?

20   A    Yeah.  This is Dickerson Creek.  It's under the Navy's

21   railroad for the white train, the one that carries the nuclear

22   materials to Bangor.  They said, you're not going to dig up our

23   train track, so we had to jack pipe through.  That's trenchless

24   technology there.

25   Q    So I suspect that one example of exceptional circumstances
```

1   would be a nuclear arsenal and the need to get weapons to it?

2   A    That was it.   It doesn't happen very often.

3   Q    This culvert won't be relative to my next question.   When

4   you're retrofitting -- when you retrofit a culvert, are you

5   intending that culvert will ultimately be corrected?

6   A    Our recommendation for baffles are that they be temporary

7   projects.

8   Q    Is there any guidance in your documents on how -- what

9   "temporary" means?

10  A    Unfortunately, no.

11  Q    Temporary could be permanent, if it's not watched closely, I

12  assume?

13  A    It would be unfortunate, but I guess that's possible.

14  Q    That is certainly not what the State would want, or at least

15  the Department of Fisheries would want?

16  A    We would not want that.

17  Q    Now, you indicate that hydraulic method, in your opinion

18  anyway, needs to be done in rare cases, exceptional

19  circumstances.   Retrofits should be temporary.

20       Am I recalling your testimony correctly?

21  A    Yeah.   So that would be one way that we'd use the hydraulic

22  method.   Another way might be the design of such a thing as a

23  roughened channel.

24  Q    As a roughened channel?

25  A    Which would be a permanent structure.

1    Q    Would that be a retrofit or would that be a new culvert?

2    A    That would be a new culvert.

3    Q    Is it possible under the WAC, as you understand how it's

4    administered, that hydraulic culverts can be used by other

5    parties for new culverts?  Without putting others, you could

6    recommend that they not use it and they could say to you, I'm

7    sorry, we're going to use it anyway?

8    A    It's rare, but there are some times -- you know, I can't

9    think of any -- you know, people call me all the time and say,

10   why can't I do the hydraulic method, because it's available in

11   the WAC.

12       I can't remember a case in which someone actually has

13   designed a -- let's say a more traditional hydraulically designed

14   culvert.  It's truly rare.

15   Q    And with respect to wood, I understand from your slideshow --

16            MR. STAY:  Your Honor, what I'm putting on here are

17   slides from his slideshow, which is exhibit H to his declaration,

18   which has been admitted into evidence.

19   By Mr. Stay:

20   Q    Mr. Barnard, this sort of gives us a feeling for how

21   important wood can be to the, if I might use the word,

22   survivability of a culvert?

23   A    Yes.

24   Q    And it says that wood debris can have a significant impact on

25   a culvert.  In fact, it looks like it is the most dangerous

1    in-stream factor that can be used to effect a culvert?

2    A    And when combined with sediment, accounts for three-quarters

3    of the failures in this particular study.

4    Q    And a failure, I suspect, can have rather serious

5    consequences for the river itself?

6    A    These were road failures.

7    Q    And that would affect the river if there was a road failure,

8    would that move sediment and wood down?

9    A    It potentially could be disastrous.

10   Q    When we look at the three culvert designs we've been talking

11   about, hydraulic, no-slope and stream simulation, of the three,

12   would you agree that stream simulation is most likely not to be

13   affected by wood?

14   A    I want to make this easy, and I'm going to say yes, although

15   there's a bunch of reasons why I could qualify that.

16   Q    I like your easy answer.

17   A    It's two o'clock.

18   Q    I want to understand no-slope and stream simulation.  Let's

19   lay aside for a moment hydraulic.

20        Is it true that if the circumstances in the river would allow

21   the construction of a no-slope culvert, a stream-simulation

22   culvert could also be built there as well?

23   A    Yes.

24   Q    And the difference between a no-slope and a stream

25   simulation, at least in terms of their size -- I understand you

1   want to make that stream simulate the outside of the stream when

2   you're doing the culvert.  But in terms of their size, would it

3   be fair to say that a stream simulation culvert would, in the

4   main, be wider than a no-slope culvert?

5   A   Are you talking about the span or the width of the bed?

6   Q   The width of the culvert.  The culvert would, as I understand

7   the formula, would create a culvert slightly wider than the

8   bankful width with respect to a stream simulation.  Is that true?

9   A   Yes, although that may not be true in terms of the culvert

10  span.  But we will make it simple, and I'll say yes.

11  Q   Good.  I appreciate your help on that.

12      My question goes one more, though.  If I'm going to install

13  both of those and I'm going to have to dig a hole to put it in,

14  and I put a coffer dam up so the water doesn't come through when

15  I'm working on it, and I've got to buy flaggers, and I've got to

16  buy -- whatever I have to buy to make this happen, there really

17  isn't much difference in the cost between a stream simulation and

18  a no-slope when you decide to install one or the other?

19  A   In a public works project like you'd find on a public road,

20  the cost of the culvert is relatively small compared to the

21  overall project costs.  Now, on a forest road, that is not the

22  case any longer.

23  Q   In terms of Department of Transportation, which have public

24  work highway kinds of projects?

25  A   That's exactly right.  The guardrail probably costs more than

1    the culvert does.

2    Q    Thank you.

3    A    I shouldn't have said that.

4    Q    I think I understand.  It's relatively small.

5    A    Yeah.  There are all these other elements into these things

6    which are very costly, and traffic control being one of them.

7    Q    You developed stream simulation when it wasn't there before?

8    A    Right.

9    Q    Is it fair to say that culvert design methodology, science,

10   is evolving?

11   A    Yeah.

12   Q    And you would expect, then, that some day, sooner or later,

13   somebody might have an improvement to stream simulation?

14   A    They might.

15   Q    It may be you?

16   A    It may be me.

17   Q    I understand you're doing some studies right now?

18   A    That's right.

19   Q    So that applying some sort of an adaptive management or

20   continuing to look at the process would make sense from a

21   scientific point of view?

22   A    Well, if my experience with the forest and fish adaptive

23   management program is any example, I would say no.

24   Q    Let's leave forest and fish out for a moment and just look at

25   the concept of continuing to look at the science that exists

1    today to see whether or not we can improve it tomorrow.

2         From a scientific point of view, is that a good thing?

3    A    Yeah.  Yeah.  We should be doing research.  We should be

4    developing -- continuing to develop this as a method.

5    Q    Have I put up a slide of a stream simulation culvert?

6    A    Yes.

7    Q    Good.  It wasn't labeled that way.  I want to make sure I've

8    got it right.

9         What I wanted to bring your attention to was the low velocity

10   margin.  When you're developing a culvert that's slightly larger

11   than the bankful width, this sort of low- margin area, that's

12   designed to assist fish in higher flows?

13   A    No.  This would be for lower flows.

14   Q    Lower flows.  Okay.  So if you have low flows, there's still

15   water for them?

16   A    Well, no.  Low velocity margin is an area of velocity and low

17   turbulence.  It's recognized as a passage pathway not only for

18   small fish but also for amphibians.

19   Q    Now, the stream simulation culvert, which is supposed to -- I

20   don't want you to sort of mimic it or -- I don't know if that's

21   the right word, but sort of simulate the outside culvert, you

22   want the culvert inside to sort of look like the culvert -- I

23   mean the bed inside to look like the bed outside?

24   A    That is the basic principle of stream simulation.

25   Q    And the bed outside has these kind of meanders and these kind

1    of low-flow margins, and you have them here?

2    A    Yes.

3    Q    And that fish sort of adapt to their streams?  I mean, they

4    adapt to how the streams operate.  Am I right on that?

5    A    Well, there are migration strategies to how they're going to

6    utilize the materials.

7    Q    So when you have a stream inside a culvert that looks like a

8    stream outside a culvert, it's going to make it easier for those

9    fish to migrate?

10   A    That's the principle.

11   Q    In your slideshow, you had a number of slides that sort of

12   showed us hypothetically various culvert designs, and I just want

13   to put them on to identify.  This would be a hydraulic -- sort of

14   an example of how a hydraulic culvert design would appear in this

15   stream?

16   A    Actually, if you put the previous slide up, then you can kind

17   of see the sort of perspective that you're going to get through

18   this sequence.

19   Q    I'll try to do that.  I don't have it with me, but Wendy, who

20   is the smartest person in this world --

21           MR. MONSON:  Page 14 of Exhibit H.

22           MR. STAY:  Page 14.  Thank you.

23           THE WITNESS:  I don't know if I should --

24   By Mr. Stay:

25   Q    This shows us the --

1   A    I was actually talking about the ones before this one.

2   Q    We should ask you how far you want us to go back.

3   A    I'm sorry.  I didn't look.  I forgot that there was this one.

4   But there's one before that gives you this sort of whole overview

5   picture and then -- that's it.

6   Q    Okay.  As I look at this, it tells me sort of like -- am I

7   correct that this is sort of like the benefits of the various --

8   A    Ecological benefits are on the vertical scale, and then on

9   the horizontal scale would be the crossing structure with the

10  approximate cost.

11  Q    So if I look at hydraulic, it would be narrower, and it would

12  have less ecological benefits than would stream simulation?

13  A    That's right.

14  Q    Okay.  So let's go to the slide after this.  This is the

15  stream now, right?

16  A    Yes.  If we're going to define the elements here, we show a

17  bankful channel, and then 100-year floodplain.  This is a

18  relatively unconfined channel.  This is actually a pretty big

19  one, too.

20       This would give you a true impression of what the effect is

21  to fill the floodplain and to prevent flow.

22  Q    It's illustrative.  I mean, you know, no one's building this?

23  A    This is actually not in the case area, by the way.

24  Q    That's okay.

25  A    This is in eastern Washington.

1   Q    That's okay.  The river works.

2        So we're back again now to the first example, which is --

3   identifies a hydraulic designed culvert.

4   A    So we're low down in the lower left-hand corner of that

5   benefit cost.

6   Q    And it has -- it passes flood flows and allows passage of

7   certain fish at certain flows and many undesirable -- with many

8   undesirable ecological effects?

9   A    Yes.

10  Q    Moving along the continuum, we have this -- am I correct,

11  this would be a no-slope?

12  A    Or a culvert, which is channel width.

13  Q    Oh, channel width.  Okay.

14       I have a question for you.  One of my colleagues asked this.

15  Channel width, bankful width, ordinary high water, are they, for

16  our purposes, relatively synonymous?

17  A    For your purposes, they are the same.

18  Q    Thank you.

19       Now, this is our no-slope, and we see that the culvert is now

20  slightly larger?

21  A    Um-hum.

22  Q    Passing water underneath.  And we know that this passes flood

23  flows and debris, allows passage of most fish, allows some stream

24  processes.  And the last slides I want to show you --

25  A    Actually, there's two more slides.

1    Q    Did I take it away too soon?

2    A    No.  There are two more slides.  There's this one, which

3    shows stream simulation, and then the final one that shows --

4    Q    So this is our stream simulation culvert.  It passes flood

5    flows and debris.  It allows passage of nearly all fish and

6    aquatic organism and allows many stream processes, including

7    banks?

8    A    Yes.

9            MR. STAY:  Now, I'm not going to show, your Honor, the

10   bridge one, unless you care to see it, because we're not asking

11   for bridges.  But I can do that if you wish.

12           THE COURT:  No.  That's fine.  It looks like a bridge to

13   me.

14           THE WITNESS:  Well, it's not.  I mean, it's still a

15   culvert.  The bridge one, of course, would span the whole

16   100-year floodplain, in which case we would have, as I was

17   talking about earlier, you know, we would maximize ecological

18   benefits with respect to human needs.

19           MR. STAY:  Let me just look a little bit at my notes.

20       I think I'm done.  Thank you very much, sir.

21           THE WITNESS:  Yeah, so that -- you know you were looking

22   at --

23   By Mr. Stay:

24   Q    I guess I'm not done okay.

25   A    -- sort of the extreme case for each one of those design

1    methods.

2    Q    Right.  I put it as more of illustrative.  I didn't --

3    A    Yeah.  What we're showing is this continuum, just on the

4    basis of width, between the smallest, least expensive, but having

5    the greatest ecological effects, to one which has the greatest

6    benefit, showing that continuum.

7            MR. STAY:  And again, a second time, thank you very

8    much.

9        I have nothing further, your Honor.  Mr. Monson has a few

10   questions.

11           MR. MONSON:  Thank you, your Honor.

12                        RECROSS-EXAMINATION

13   By Mr. Monson:

14   Q    Mr. Barnard, I'm Peter Monson.  You last saw me probably on a

15   little black box on a speaker phone at your deposition.  It's a

16   pleasure to meet you in person.

17       I just have a very few questions.  I can't help but comment

18   that your enthusiasm for the stream simulation method is very

19   infectious.

20   A    Well, one of the federal agencies, the Forest Service, has

21   written an absolutely stunning guidance manual on stream

22   simulation.

23   Q    Well, thank you.  You just answered my next question.  I

24   appreciate that.

25   A    I was one of the major reviewers for that guidance manual.

1   Q   Excellent.

2       And the Forest Service has a slightly different technical

3   approach, does it not?

4   A   Oh, that.  Well, we're headed to the same place.  We're

5   headed to simulating natural stream conditions inside the

6   culvert.  We're both going to the same place, but they get there

7   with a level of rigor which is way beyond what we require.

8   Q   That's good to know.  Thank you.

9       Now, the National Marine Fisheries Service has also indicated

10  a preference for the stream simulation methodology, right?

11  A   Yes.

12  Q   And they have an approach that's also ended towards the same

13  goal.  They calculate the --

14  A   It's headed towards the same goal, although they use -- I

15  want to remember this correctly.  They use a simple factor to

16  relate the bankful channel width to the culvert bed width.  I

17  believe it's 1.3.

18  Q   From a fish's perspective, it probably looks about the same?

19  A   Well, actually, one of the problems with it -- do you want to

20  know what the problems with it are?  Do you want me to go into

21  this?

22  Q   I don't really want to get into too much detail.  I wasn't

23  really looking.  I was just wanting to make a point that they

24  have developed similar methodology.

25  A   They have a criteria as well.

1    Q    Thank you.  Now, in your declaration, you have attached a

2    copy of the Anadromous Salmonid Passage Facility Design Manual,

3    which the National Marine Fisheries Service published in 2008.

4    A    Yes.

5    Q    That would be Exhibit W-089-D.  The part you included was

6    just certain excerpts, certain pages excerpted from that

7    document, correct?

8    A    Yes.  I believe it related to that criteria we just spoke

9    about.

10   Q    I'd like to ask you a couple of questions about two pages

11   that you didn't include in your excerpts.

12           MR. MONSON:  So I would ask, Madam Clerk, if you could

13   hand the witness USA Exhibit 198.

14   By Mr. Monson:

15   Q    Do you have that in front of you?

16   A    Yes.

17   Q    And is that the complete document from which you excerpted

18   those pages?

19   A    It looks like it.

20   Q    Would you turn to Page 67, please.

21   A    Yes.

22   Q    Do you have that in front of you?

23   A    Um-hum.

24   Q    That's beginning under 7.1, "Introduction."  It might be

25   easiest if I just read the first three sentences for you, and I'm

1    just going to ask you if agree with those statements.

2  A    Um-hum.

3  Q    It begins, "This section provides criteria and guidelines for

4  the design of stream crossings to aid upstream and downstream

5  movement of anadromous salmonids.  For the purpose of fish

6  passage, the distinction between bridge, culvert, and low-water

7  crossing is not as important as the effect the structure has on

8  the form and function of the stream."

9        Do you agree with that sentence?

10  A    Yes.

11  Q    Continuing on.  "To this end, these criteria conceptually

12  apply to bridges and low water crossings as well as to culverts.

13  In addition to providing fish passage, any road crossing design

14  should include consideration for maintaining the ecological

15  function of the stream, passing woody debris, flood flows,

16  sediments, and other species that may be present at the site."

17        Do you agree with that last sentence?

18  A    Yeah.  Um-hum.

19  Q    Turning to Page 68, do you see the bulleted items there?

20  A    Yes, in the middle of the page.

21  Q    And the sentence reads -- introduces those bullets.  "The

22  following alternatives and structure types are listed in general

23  order of NMFS's reference."  And that would be the National

24  Marine Fisheries Service.

25        And then the first one there is "Road abandonment and

1   reclamation or road realignment to avoid crossing the stream.

2   The second one would be bridge or stream simulation spanning the

3   stream floodplain, and so on.  I won't read all the details.

4       The third alternative type is an embedded pipe culvert,

5   bottomless arch design, or non-floodplain spanning stream

6   simulation.

7       Do you see that?

8   A   Yeah.  I think they mean more of the -- kind of the no-slope

9   idea.

10  Q   The fourth one would be hydraulic design method.

11  A   Um-hum.

12  Q   The fifth one would be constructing an external fishway

13  adjacent to a culvert, I guess?

14  A   Um-hum.

15  Q   And the last one would be a baffle culvert or internal weir.

16      Do you see that?

17  A   I do.

18  Q   Do you agree generally with these priorities?

19  A   Yeah.

20  Q   Okay.  Thank you.

21      Now, the Federal Highway Administration has prepared a

22  synthesis report entitled, "Design for Fish Passage at Roadway

23  Stream Crossings: Synthesis Report," which was published in 2007.

24      Are you familiar with that document?

25  A   I am.  They actually now have a draft design guideline for

1    fish passage and culverts called -- I think it's called HEC 26.

2    I just read a final draft of it a couple of weeks ago.

3    Q    Does the Federal Highway Administration also indicate a

4    preference for stream simulation culverts?

5    A    Well, actually, the draft I read of HEC 26, they recommend a

6    culvert design method based on sediment stability.

7         It was very disappointing.  I read the initial draft of this.

8    They are adamant.  It's sort of an engineering-based design.  It

9    is kind of like -- it's basically kind of a velocity sort of

10   design based on sediment stability.

11   Q    From a fish passage perspective, you still continue to

12   believe that stream simulation is the best?

13   A    Oh, yeah.

14             MR. MONSON:  I have no further questions.  Thank you.

15             THE COURT:  Any redirect, Ms. Woods?

16             MS. WOODS:  No redirect, your Honor.

17             THE COURT:  Mr. Barnard, before you step down.  I

18   appreciate your enthusiasm for all this as well.  Thank you.  I

19   have a question that may not make a lot of sense.  Maybe it's my

20   lack of understanding here.

21             THE WITNESS:  It's a complicated business.

22             THE COURT:  I assume that most of the streams that we're

23   talking about that have these barriers drain into either Puget

24   Sound or the Pacific Ocean, correct?

25             THE WITNESS:  You're talking about the case area?

1          THE COURT:  Yes.

2          THE WITNESS:  Yeah.  I don't know too much about the

3   case area.

4          THE COURT:  All right.

5          THE WITNESS:  I'll take your word for it.

6          THE COURT:  The streams, being dynamic things, other

7   than seasonal variation in terms of flooding, etcetera, lots of

8   rain, do we ever have to worry about the stream actually getting

9   smaller or bigger over time?  I guess what I'm asking is, if you

10  put in a stream simulation culvert, can it become obsolete

11  because the waterway gets bigger?

12         THE WITNESS:  Well, there's a couple of instances where

13  this would be true.  One would be urbanization, so increased

14  surface area and then increased discharge.  So it's possible that

15  the stream would become bigger because of that.

16     There's also stream incision, which means that the bed of the

17  stream actually is going down.  Actually, all of our streams are

18  incising.  We have sort of a young geology.  So I would

19  characterize it as young geology is erosion.  So basically our

20  landscape is going down through the action of water and sediment,

21  and so streams are incising.  They're going down continually.  So

22  we countersink stream simulation culverts deeply so that we have

23  a margin there for that downward variation.

24     But if it goes down far enough, we're going to encounter the

25  bottom of the culvert, and then it's all over.  Then it's

1     obsolete.  Another case, too, would be where a person didn't

2     accurately understand where in its evolution a stream is.  And

3     let's say the stream is incised, so it's rapidly dropped down in

4     vertical elevation.  This ends up with a very narrow, deep

5     channel.  What happens over time is that channel starts to widen

6     out and develop a floodplain.

7          So if you measure channel width at some point within that

8     progress, within that evolution of that channel, you get it

9     wrong, right, if you didn't understand it was getting wider, in

10    which case, then, the culvert would be too small for that stream

11    channel, according to the criteria.

12         So these are some instances.  You know, actually we could

13    probably go into this all day.

14         Am I kind of getting at your question?

15              THE COURT:  Yes.  Thank you.  You may step down.

16         You may call your next witness.

17              MR. SHAFTEL:  The State calls Allison Hanson to the

18    stand.

19              THE COURT:  Ms. Hanson, if I could have you raise your

20    right hand and be sworn, please.

21    Whereupon,

22                        ALLISON HANSON

23    Called as a witness, having been first duly sworn, was examined

24    and testified as follows:

25              THE CLERK:  Please state your full name and spell your

```
1    last name for our court reporter.
2            THE WITNESS:  Allison Hanson, H-A-N-S-O-N.
3            MR. SHAFTEL:  Before we begin, your Honor, I believe we
4    reached an agreement on the majority of the exhibits that the
5    State will be using during the course of Ms. Hanson's testimony.
6        The remaining exhibits that are attached to Ms. Hanson's
7    declaration that have not been admitted are 093-H, 093-I, 093-K,
8    093-O, 093-N.  Sorry.  I went out of order.  093-P, 093-Q.  In
9    addition to the ones that have been attached to our declaration,
10   the State is offering -- will be utilizing the following -- or
11   anticipates offering the following exhibits:  W-145, W-150,
12   W-151, W-157, W-158, W-159, W-160, and W-191.
13       From that list, I'll give the clerk a list of the exhibits
14   that have been stipulated to.  Those would be 093-H, 093-I,
15   093-K, 093-N, 093-O, 093-P, 093-Q, 157, 158.  So I believe we
16   have five remaining exhibits outstanding.
17       Actually, 145, the State will withdraw that exhibit.  And the
18   State will withdraw 160 with the condition that 191 be admitted.
19   So again, it's a conditional withdrawal.
20       And another preliminary point, Ms. Hanson is both a direct
21   testimony witness as well as a rebuttal witness.  We've done our
22   best to try and merge the two into a single presentation, but it
23   probably will run longer than the typical allotted time for a
24   direct testimony witness.  I mentioned that to opposing counsel,
25   and I don't know how much agreement we have.
```

1          MR. STAY:  We have no objection as long as it's within

2     the trial period.

3          THE COURT:  All right.  Mr. Shaftel, give me a minute to

4     catch up on the exhibits that have been stipulated to here.

5       Mr. Stay, the State is requesting -- asking to withdraw one

6     of the exhibits so long as there's no objection to W-191, which

7     is a map of south Lake Washington vicinity.

8       Do the plaintiffs have any objection to 191?

9          MR. STAY:  Yes, your Honor.  The problem is they're both

10     the same map.  The 191 has an overlay of data that I view then as

11     a compilation of data.  We've never seen that.  I don't know

12     where it came from.  I don't know whether it's complete or not.

13       We don't object to the map coming in, although we couldn't

14     find it.  It looks like Lake Washington, so we'll accept that.

15     I'm not trying to be smart, your Honor.  We just didn't find it

16     in our data base.

17       So 160, south Lake Washington, we would not object to that.

18     We don't think it's appropriate to have an exhibit with an

19     overlay of data where the underlying data has not been provided.

20          MR. SHAFTEL:  Your Honor, that particular exhibit is a

21     printout from a GIS workbench, which is something that Mr. Stay

22     actually questioned Ms. Hanson on in her deposition.  She has

23     merely obtained a printout from this particular data source for

24     the Department of Transportation for the purposes of just

25     providing the Court an example of the types of information that

1  can be overlain on a map when the Department of Transportation is

2  assessing the fish passage culverts that are within a highway

3  corridor -- I'm sorry, in a highway improvement project corridor,

4  and that's the sole reason for which it's being offered.

5        MR. STAY:  You Honor, if it's not being offered for the

6  truth or falsity of the data laid on it, I don't have an

7  objection.

8        THE COURT:  So then we'll go ahead and allow them to

9  withdraw 160.  And Madam Clerk, W-191 will be admitted.

10     Thank you, Counsel.  You may inquire.

11                      DIRECT EXAMINATION

12  By Mr. Shaftel:

13  Q    Good afternoon, Ms. Hanson.

14  A    Good afternoon.

15  Q    Could you provide your full name for the record?

16  A    Allison Hanson.

17  Q    What's your current title with the Department of

18  Transportation?

19  A    Director of environmental services for mega projects.

20  Q    And can you provide the Court with a brief overview of your

21  education?

22  A    I have a Bachelor of Arts in environmental studies and have a

23  degree in education, K through 8.

24  Q    And how did you end up coming to work for the Department of

25  Transportation?

A    I had a three-month internship in the hazardous materials

program out of the headquarters office in Olympia.

Q    And when did that begin?

A    That began in 1998.

Q    And have you been working for the department ever since?

A    Yes.

Q    Can you describe the progression of your career, again, in a

broad sense, from that period of time to your current position?

A    I worked in the hazardous materials program for about five

years in our headquarters office, and then I was promoted to be

the project environmental manager for the Alaskan Way Viaduct and

seawall replacement program in Seattle.  And in that role, I was

responsible for ensuring that the project obtained all the

environmental clearances.

I was in that project for a little over a year when I was

promoted to be the project environmental manager for the I-405

corridor over on the east side of Lake Washington.  In that role,

I was responsible for ensuring that the projects - at that time,

we had, I think between ten and 11 active projects on the I-405

corridor - that all of those projects obtained the environmental

clearances that they needed.

I was in that role for about two years when I was promoted to

be the deputy director of environmental services for the urban

corridor's office, which at the time was the region overseeing

the mega projects within Seattle, so the Alaskan Way Viaduct

program, the 520 program, the I-405 program, projects on 167, and

some smaller projects in the Seattle area.  And in that role, I

provided assistance to the project teams to help them with

management and guidance on environmental clearances for their

projects, as well as provided a conduit to our state

environmental management out of the headquarters office.

     And I was in that role for a little over a year when I was

promoted to become the director of environmental services for the

region, which is the position that I'm in today.  In my current

position as a director, I provide environmental management

support to all the project offices and staff that work within my

region on environmental clearance issues.

Q    What do you mean when you say "environmental clearance"?

A    For all of the projects that we have, there are specific

environmental requirements that we need to meet, which include

meeting the requirements of NEPA and SEPA and Section 106, which

relates to protection of archeological and historic resources,

Section 4F, which relates to the protection of public places and

historic structures, Endangered Species Act consultation, as well

as all local, state, and federal permitting requirements.

Q    You also have responsibilities with regard to tribal

outreach?

A    Yes, I do.

Q    And what are those?

A    Currently I'm the tribal coordinator for my region, which

1    entails primarily being the watch dog representative that

2    oversees tribal coordination between the projects and the

3    different tribes that we consult with.

4    Q    And do you also have responsibilities with regard to

5    performing mitigation on highway improvement projects?

6    A    Yes, I do.

7    Q    And can you go into a little bit of those responsibilities?

8    A    Related to mitigation?

9    Q    Yes.

10   A    Related to mitigation, there may be different types of

11   mitigation that we may do for projects, which include stream

12   mitigation, wetland mitigation, other types of mitigation from

13   impacts that occur during construction of projects.

14   Q    How many employees do you supervise?

15   A    I directly supervise six state employees, and I have 19 state

16   employees that work within my team, and then I have consultants

17   that report to me as well.

18   Q    Did you prepare a Declaration in Lieu of Direct Testimony for

19   this case?

20   A    I did.

21            MR. SHAFTEL:  Madam Clerk, could you hand the witness

22   W-093?

23   By Mr. Shaftel:

24   Q    Take a moment to review Exhibit W-093, Ms. Hanson, and tell

25   me whether or not that's the declaration that you prepared for

1   this sub-proceeding.

2   A   It is.

3   Q   And do you adopt that declaration as your testimony in this

4   sub-proceeding?

5   A   Yes.

6        MR. SHAFTEL:  Your Honor, I'd like to offer into

7   evidence Exhibit W-093.

8        THE COURT:  Any objection?

9        MR. STAY:  Yes, your Honor.  We have objection to two

10  parts of that; one part dealing with the Highway 305 project and

11  the other dealing with -- the last section dealing with culvert

12  design.

13      My suggestion would be that during my cross-examination, I

14  intended to ask her questions, and then I'd like to raise the

15  objection then and you can rule at that time.

16       THE COURT:  That makes sense.  We'll reserve.

17  By Mr. Shaftel:

18  Q   Ms. Hanson, what is the first step that the Department of

19  Transportation takes when it is building -- let me just step

20  back.

21      What are some examples of the types of highway improvement

22  projects that you work on and the purposes that they're looking

23  to achieve?

24  A   Typically the projects that I am working on are safety,

25  mobility projects, and they may include projects where we're

1    adding lanes, for example, to I-405 or replacing the Alaska Way

2    Viaduct, doing widening along the SR-520 corridor.  We may also

3    be making safety improvements as well as for other projects.

4    Q   And what's the first step the department takes when it's

5    working on one of these projects to identify potential barriers

6    that may need to be corrected during the course of one of these

7    projects?

8          MR. STAY:  Objection, your Honor.  I don't think this

9    witness is qualified to talk about how you identify barriers,

10   what's involved in it at all.

11       She testified that's she's basically an environmental

12   coordinator for these projects.  A hefty job, but not one that

13   involved the identification of culverts.

14          THE COURT:  Let's have a little more foundation,

15   Mr. Shaftel.

16   By Mr. Shaftel:

17   Q   Ms. Hanson, are you involved, in your work, in helping to

18   identify potential barriers along the corridors that may need to

19   be corrected during highway improvement projects?

20   A   I am.  I've worked on the I-405 corridor, for example,

21   previously, where during the time that I was the project

22   environmental manager, I participated with my team in developing

23   the lists of barriers that were within our project areas.  I've

24   also participated with the 520 team and the 167 team, with

25   technical staff and engineering staff as they're compiling

1    information on existing barriers within our project areas.

2    Q    And are you aware of the data that's available to the

3    Department of Transportation to try and determine whether or not

4    there's barriers within the scope of a highway improvement

5    project?

6    A    I'm aware of some of the types of information technical staff

7    use.

8    Q    And what are some of those types?

9    A    There is information that's available through a GIS workbench

10   that is an agency tool that we have.  That workbench is managed

11   by a GIS team out of our headquarters office in Olympia, and that

12   GIS workbench has multiple GIS layers on it which contains

13   different types of information from other state or public

14   agencies with essentially their latest and greatest most

15   up-to-date information on resources.

16       And those layers can include things such as information on

17   streams as well as built environment, above-ground type of

18   information as well.  That's one example of information.

19   Q    If you'll turn your attention to your monitor there.  Could

20   you describe what you see on this monitor?

21   A    This is an example of a printout looking at our GIS

22   workbench.

23   Q    You are talking about Exhibit W-191; is that correct?

24   A    Yes.

25   Q    There's a number of different colored fish-looking symbols on

1    here; is that correct?

2    A    Correct.

3    Q    And what are those supposed to represent?

4    A    Those fish represent different types of status of barriers

5    within the project corridor -- or sorry, different types of

6    status of culverts within the project corridor.

7    Q    And do you know where the department obtains that information

8    from?

9    A    I believe it comes from the Fish Passage Inventory.

10   Q    On the legend there that explains what the different colors

11   stand for; is that what that is?

12   A    That's correct.

13   Q    What's the other layer that is shown on this particular

14   exhibit?

15   A    The other layer is one that is from DNR that lists the

16   different types of stream typing per WAC 222-166.

17   Q    And what do you mean by "stream typing"?

18   A    Stream typing essentially gives you an indication about

19   characteristics of that stream, so whether it may be fish

20   bearing, non fish bearing, a shoreline of the state.

21   Q    And how does the Department of Transportation use this

22   information?

23   A    Technical staff can pull up these layers, for example, in the

24   GIS workbench, to obtain existing documentation about resources

25   and environmental considerations within the project area.

1   Q    Ms. Hanson, before you, do you have copies of exhibits

2   W-093-D through W-093-G?

3   A    Was the first one B as in "boy"?

4   Q    D as in "dog."

5   A    Yes, I do.

6   Q    Why did you attach those exhibits to your declaration?

7   A    They are copies of past and current MOUs or MOAs between DOT

8   and the Department of Fish and Wildlife, and in some cases other

9   agencies, regarding HPAs and barriers.

10  Q    Can you go through each one of them and just tell the Court

11  which different MOA, MOUs are attached?

12  A    Yes.  W-093-D is an MOU that was created in 1990 between the

13  department and Fish and Wildlife and primarily talked about the

14  process for acquiring an HPA.

15       W-093-E is an MOU between multiple different parties that,

16  again, talks about the HPA process, and related to barrier

17  culverts in particular notes that if there's a barrier culvert

18  within the capital improvement project, that that barrier culvert

19  would be corrected during the time that that capital improvement

20  project went forward.

21       W-093-F is a 2002 MOA between the Department of Fish and

22  Wildlife and Washington State DOT.  It includes also information

23  about the HPA process and applications specifically related to

24  highway improvement projects and fish passage barriers.  It notes

25  that if during the course of a highway improvement project we are

1   altering or modifying a barrier culvert that we are required to

2   replace that culvert with a fish passable structure.

3       And W-093-G is the 2008 MOA between Fish and Wildlife and

4   DOT.  This is the current version of the MOA that projects refer

5   to now.  And in this particular MOA, there is a section that

6   specifically talks about culverts being fixed during the course

7   of safety and mobility projects.

8   Q   You mentioned the term HPA several times.  What is an HPA?

9   A   An HPA is a hydraulic project approval, which is a permit

10  that is issued to DOT construction projects when we have projects

11  that occur within waters of the state.

12  Q   And where do you apply for an HPA from?

13  A   The Department of Fish and Wildlife.

14          THE COURT:  Counsel, let's go ahead and take our

15  afternoon recess.

16  (At this time, a short break was taken.)

17          THE COURT:  And you may inquire.

18  By Mr. Shaftel:

19  Q   I would like you to turn to the monitor, Ms. Hanson.  Do you

20  recognize the page from Exhibit W-093-G on the monitor?

21  A   Yes.

22  Q   And what is this page?

23  A   This is the page from the 2008 MOA between WSDOT and Fish and

24  Wildlife that talks about culvert replacement that occurs through

25  highway mobility projects.

1  Q    The highlighted portion under the fourth bullet, what does

2  that refer to?

3  A    That refers to if a transportation project is doing work on a

4  barrier that requires an HPA from Fish and Wildlife, that DOT is

5  required to replace that barrier with a fish-passable structure.

6  Q    And is that the section of the 2008 MOA that the Department

7  of Transportation looks to when trying to determine whether or

8  not it's required to fix a barrier during the course of a highway

9  improvement project?

10  A    Yes, it is, as well as two other subsections of that same

11  section.

12  Q    Which two subsections are you referring to?

13  A    The two bullets below the highlighted bullet.

14  Q    And can you explain to the Court how you use those two

15  subsections?

16  A    Yeah.  The second bullet up from the bottom talks about that

17  highway improvement projects that may have a culvert barrier

18  within the project but that WSDOT is not doing any actual work on

19  that culvert itself.  So if there's no HPA required for work on

20  that culvert, WSDOT could choose to fix that barrier on a

21  case-by-case basis.

22      The last bullet in that section talks about in rare cases

23  when WSDOT is doing work on a barrier, if there is

24  extraordinarily high cost and minimal gain, WSDOT could choose to

25  do some other type of mitigation in lieu of replacing that

1    structure with a fish-passable crossing.  And if we were to do

2    that, we would be required to provide mitigation to compensate

3    for that.

4    Q    Now, in your declaration, you provide two different project

5    examples for which the Department of Transportation fixed

6    barriers within the scope of the highway improvement project; is

7    that correct?

8    A    Yes.

9    Q    And one of them was SR 900?

10   A    Correct.

11   Q    And do you have -- and the other one was a project in the

12   Olympic region; is that correct?

13   A    Correct.

14   Q    And that is summarized in Paragraphs 20 through 24 of your

15   declaration?

16   A    Correct.

17   Q    Why did you include that Olympic region project in your

18   declaration?

19          MR. STAY:  Object, your Honor.  I believe this witness

20   has no direct experience in the Olympic region.  She's been with

21   the urban corridors, which I do not believe is in the Olympic

22   region.  Therefore what she's testifying to is purely what she

23   has been told.

24          MR. SHAFTEL:  Your Honor --

25          THE COURT:  That's all right.  The objection will be

1    overruled.

2        The question is actually:  Why did you include that Olympic

3    region project in the declaration?

4            THE WITNESS:  The reason that I included it in is

5    because it's an example of how WSDOT replaces fish passage

6    barriers within a highway improvement project.

7    By Mr. Shaftel:

8    Q   And how did you learn about the information that's expressed

9    in Paragraphs 20 through 24?

10   A   I had discussions with Jeff Sawyer, who's the regional

11   environmental manager for Olympic region, so he's essentially my

12   counterpart within that region.  I also reviewed documentation

13   that was provided by Jeff's office, which included environmental

14   assessments for the project, portions of hydraulic reports,

15   written correspondence between WSDOT and the Suquamish Tribe,

16   which included e-mails and letters, and other project

17   documentation, and then I went out on site in Poulsbo to look at

18   the replacement culverts.

19   Q   So let me see if I understand this.  You initially obtained

20   information from Jeff Sawyer, who is who?

21   A   Jeff Sawyer is the regional environmental manager for Olympic

22   region, so essentially my counterpart in that region.

23   Q   So he would have been the person that directly worked on the

24   Poulsbo project?

25   A   Jeff and his team, yes.

1  Q    And then to confirm the information that Mr. Sawyer provided,

2  you also looked at public documents?

3  A    Correct.

4  Q    And these are documents from the project file?

5  A    Correct.

6  Q    And did those documents confirm the substance of the

7  information as reflected in Paragraphs 20 through 24?

8  A    Yes, it did.

9  Q    And when you went out and you visited the sites, did you have

10  anybody accompanying you?

11  A    Yes, I did.

12  Q    Who accompanied you on those visits?

13  A    Paul Wagner from WSDOT, John Peterson from WSDOT, Scott

14  Anderson from WSDOT, and Don Seeberger from WSDOT.

15  Q    And who are those four people?

16  A    Don Seeberger is technical services manager on my team.  Paul

17  Wagner is biology program manager for WSDOT.  Scott Anderson, I'm

18  not -- I probably can't say his specific title, but he oversees

19  retrofit programs out of headquarters.  And John Peterson works

20  on the fish passage program.

21  Q    And what did you see when you went out in your site visits

22  onto the Poulsbo project?

23  A    We looked at the culverts that are in place now underneath

24  Highway 305 and 307 and saw what they look like today in their

25  existing condition.

Q    And what did you see when you were out at these projects?

MR. STAY:  Objection, your Honor.  If the witness is going to testify to the quality of the culverts, the nature of the mitigation, the nature of the design, she's not qualified.

Perhaps I could interject, too, this is an area we had objected to, this section, SR 305, and the paragraphs which follow.  I can raise the -- continue with my objection now.  I was letting Mr. Shaftel go on because I assumed he was trying to lay foundation and the Court would need to know that.  I think the foundation has not been properly laid to have her discuss any of this project.

Mr. Sawyer is the appropriate witness.  The State did not see fit to have an important enough issue to bring Mr. Sawyer here.  This witness went out and talked with him.  She went out and looked at the records.  She's not a biologist.  She's not an engineer.  She can't tell us what she saw in terms of whether the culverts are good or bad, whether they're passing or not passing fish.  We would renew our objection.  This section, SR 305, Part A, should be stricken from the exhibit and not considered by the Court.

MR. SHAFTEL:  Your Honor, this is the State's witness, who's an expert on highway improvement projects.  She's the State's representative on that topic.  She's went out and she's confirmed using public documents, all the information that's reflected in Paragraphs 20 through 24.  She's actually visualized

1    the site.  The only purpose for which we're even offering this

2    testimony is to give the Court an example of a highway

3    improvement project and how the State has worked through that

4    highway improvement project to correct barriers.

5        I think for that purpose, and under Navel Orange, a Ninth

6    Circuit case, that allows the head of an agency to testify on

7    behalf of research that -- or investigations that were performed

8    by people within the same company.  Ms. Hanson's testimony is

9    admissible both as -- the factual testimony is admissible as well

10   as the expert testimony.

11           MR. STAY:  Your Honor, if I might, this witness is not

12   an expert in --

13           THE COURT:  That's all right, Mr. Stay.  She doesn't get

14   to testify as an expert in culverts or culvert designs or how

15   they look, but I don't have any problem with her testifying as a

16   factual witness as to what she saw and how it connects with her

17   department and what she did.  Okay?

18           MR. SHAFTEL:  Do you have a problem with the paragraphs

19   in which she describes how the department made its decisions

20   about how to -- when it should be in fact correcting some of

21   these barriers, which is what these paragraphs also go to, what

22   she's learned from public documents?

23           THE COURT:  Let me take a look at it, and we can deal

24   with that next time.

25   By Mr. Shaftel:

1   Q    So Ms. Hanson, when you went out and you inspected the sites,

2   how many sites did you inspect?

3   A    I believe we looked at nine.

4   Q    And of those nine, do you know how many are DOT -- are

5   culverts under DOT roads?

6   A    Six.

7   Q    And the rest of the culverts, what roads do they fall into?

8   A    They're underneath private driveways.

9   Q    Do you recognize Exhibit No. W-093-L, which is on your

10  screen?

11  A    Yes.

12  Q    What does this exhibit show?

13  A    This is a map out of an environmental assessment for the 305

14  project which shows the locations of the culvert crossings within

15  the project area.

16  Q    So on this map, there's 11 culvert crossings; is that

17  correct?

18  A    Correct.

19  Q    And the culvert crossings that are under state roads would be

20  No. 1, No. 4, No. 5, and No. 10; is that correct?

21          MR. STAY:  Excuse me.  Is Mr. Shaftel testifying?

22          THE COURT:  Are you asking her a question, Counsel?

23  By Mr. Shaftel:

24  Q    Which ones of the Exhibit W-093-O are the ones that were

25  under state highways?

1  A   I'm sorry.  That were under state highways?

2  Q   Yes, state highways.

3  A   No. 1, No. 2, No. 3, No. 4, No. 5, No. 10, No. 11.

4  Q   And did you inspect those sites?

5  A   Yes.

6  Q   What is this a picture of?

7  A   This is a picture of the culvert that is underneath Bond

8  Road.

9  Q   And is that one of the state culverts?

10  A   Yes.

11  Q   Is Bond Road also SR 307?

12  A   Yes, I think so.

13  Q   And is this picture similar to the condition that you saw it

14  when you were out there?

15  A   Essentially, this picture is when the project was still

16  completing construction, so obviously I didn't see it with still

17  the construction elements.  But, yes, the structure itself was

18  the same.

19  Q   And what is this picture of?

20  A   This is a picture of a culvert that was underneath 305.

21  Q   And how do the conditions in this picture compare to the

22  conditions that you saw when you inspected the site?

23  A   The same as with the last one.  Except for the construction

24  aspects of it, the culvert itself looked the same.

25  Q   Ms. Hanson, I'd like to ask you about the second bullet point

1    on the 2008 MOU, which you referred to -- or I guess it's the

2    third bullet point, which you referred to as the exception to the

3    requirement that the Department of Transportation fix a barrier

4    if it obtains an HPA.

5        Is that what you said?

6    A    Yes.  If there is a -- DOT is modifying or altering a barrier

7    which would require an HPA, the MOA does allow for an exception

8    where WSDOT can provide other mitigation in lieu of providing

9    fish-passable structure at that crossing.

10   Q    In your experience, how frequently does the Department of

11   Transportation invoke this exception?

12   A    In my experience, it is truly the exception.  I've seen this

13   on my projects invoke it in one project.

14   Q    And what was that project?

15   A    The triangle project, which is at the intersection of SR 18

16   and I-5.

17   Q    And can you give some explanation for what occurred at that

18   project?

19   A    Yes.  We are doing an improvement project at that

20   intersection.  And at that intersection, a tributary to Hylebos

21   Creek crosses underneath I-5 and SR 18 and then heads north up

22   towards SeaTac.  And we have four fish passage barriers on that

23   tributary.

24       Three of those barriers, we're going to have to alter and

25   modify because of the project.  And when we were looking at

1    replacement of those barriers, the upstream habitat doesn't have

2    a perennial water source, and so it's a very flashy system.  In

3    the wintertime when there's a heavy storm, it's wet.  When

4    there's not a storm, it tends to run dry.  And so what we

5    determined was if we replaced those barriers, we'd essentially be

6    getting fish up to a place where the majority of the time there

7    wouldn't be any water for them to go anywhere.

8        So we worked with the Muckleshoot Tribe initially, and then

9    primarily with the Puyallup Tribe, to talk about invoking the

10   exception and instead of replacing those barriers, doing some

11   other improvements at our mitigation site that would have more

12   benefit to fish.

13   Q    And what types of mitigation were agreed to?

14   A    We have a mitigation site that's located on the west fork of

15   the Hylebos, which at that site, we are going to create

16   off-channel habitat for fish and we're also going to do stream

17   enhancement.

18   Q    Were the tribes involved in that agreement?

19   A    Primarily our involvement was with the Puyallup Tribe on that

20   project.

21   Q    Is this an example of the department working collaboratively

22   with the tribes to reach agreement?

23   A    Yes.  We worked with the technical staff from the Puyallup

24   Tribe, who reviewed our mitigation plan and provided us input on

25   those mitigation plans.  And we recently signed a mitigation

1    agreement with the tribe outlining the process that we're going

2    to follow to implement our proposed mitigation.

3    Q    Do you know of examples where the department utilized its

4    discretion under the bullet point immediately following the

5    highlighted section of W-093-G to fix a culvert where it was not

6    actually going to be performing work on that culvert otherwise

7    within the scope of its highway project?

8    A    Yes, I do.

9    Q    Can you provide an example of that for the Court?

10   A    Yes.  On SR 167, we have a project we call the Stage IV

11   project.  There's two fish passage barriers within that project

12   that we weren't altering or modifying due to the widening

13   project, but we saw an opportunity there to retrofit those two

14   culverts as part of the project, and so we have proposed that,

15   included it in our permitting for the project.  Those two

16   retrofits will go forward when that project goes to construction.

17        We also, on our Kirkland nickel project on I-405, replaced

18   the Forbes Creek culvert, which was not a crossing that we were

19   going to alter or modify due to the widening project.  And the

20   305 project that I talked about earlier, we did a replacement on

21   three barriers that were under private driveways that would not

22   have been otherwise modified or altered by the project.

23   Q    On 167, why did the -- why did you do a retrofit instead of

24   using a full cut-and-cover replacement?

25   A    That project was primarily doing widening into the median.

1   As I noted earlier, the project wasn't going to modify or alter

2   those culverts.  But through the course of doing site work, it

3   was determined that those two barriers could potentially be

4   retrofitted to allow fish passage at those crossings.  And from

5   work that we did with Fish and Wildlife, we determined that the

6   type of retrofits that could be possible there would, for the two

7   crossings, come to about $500,000.  And we were able to assume

8   that cost within our existing project budget, and so we decided

9   to proceed with including those two retrofits in the project.

10  Q   And had you gone with a full cut-and-cover design on those

11  particular projects, would you have been able to do that

12  discretionary work in the scope of this 167 project?

13  A   No, we would not.

14  Q   What are some of the reasons why the Department of

15  Transportation might not fix barriers within the scope of the

16  highway improvement project that it does not otherwise have plans

17  to work on?

18  A   There could be a multitude of reasons that would be taken

19  into consideration.  One of the primary reasons could be fish

20  windows.  There are only certain times -- as noted earlier today

21  in previous testimony, there's only certain times within the year

22  that you can do work within the waters of the state, which is

23  typically July 1st through September 30th.

24       So depending upon the construction timeline that you have, if

25  your overall construction timeline isn't long and therefore is

going over multiple years, you may only have one or two fish

windows in which you can do work in the water.  And so if you

were doing a culvert replacement, depending upon how extensive

that work is, that may take the bulk of the fish window, that

opportunity that you have for that season.

    If in addition to the replacement of the structure you have

mitigation associated with that, that as well would likely have

to be done within that fish window.  So you are limited within

the times that you can actually do barrier replacement work.

That's one factor, just from a timing standpoint.

    Also, taking on barrier replacements in general means that

you are obviously obtaining HPA permits.  And depending upon the

impacts associated with that work, you may have other permits

that you then also have to obtain, such as permits from the Corp

or permits from local agencies.  If you have additional impacts

related to replacement of a structure in addition to additional

permits, you could also have more mitigation requirements, which

could be stream mitigation, wetland mitigation, which would

require that you do either mitigation on site or potentially find

an off-site location.  Depending upon where your project is,

finding suitable mitigation can be tougher in more urban areas

than it may be in some rural areas.  It would also require that

you do more excavation work than what would be needed for the

widening project itself potentially.

    You may also have a need for additional types of construction

1  equipment to be on site other than what you would normally have.

2  Depending upon the type of construction technique that's used for

3  the culvert replacement, if, for example, let's say, a

4  cut-and-cover, and you would need to have a major traffic shift,

5  that in itself could be a major component of timing, especially

6  if you're talking about a major corridor like 520 or 405, for

7  example, where you can have up to eight, nine lanes of traffic.

8  Trying to plan around doing lane closures can be a major factor.

9  Q    And how can -- how does that adding barrier corrections to a

10  highway improvement project, how can that change the overall

11  scope and focus of the project?

12  A    When I related to you, for example, fish windows, typically

13  your construction project gears around your construction schedule

14  of the major roadway elements of the project.  If you had a

15  project that was including multiple barrier replacements, because

16  of the fish window that I talked about earlier, it could be that

17  that work in water starts to drive your overall project in your

18  sequencing, versus the roadway mobility projects driving the

19  overall schedule, could be an example.

20  Q    What are the different mechanisms for tribal involvement in a

21  highway improvement project?

22  A    We have multiple different ways that we work with the tribes

23  on our projects.  One way is through environmental document

24  review.  So for our projects, we do some type of documentation to

25  comply with NEPA or SEPA.  And so at a minimum, the tribes are

1    given the opportunity to comment during formal comment periods on

2    NEPA and SEPA for the environmental documentation that we have.

3        In some cases on projects, particularly for EISs, we're able

4    to provide the tribes with the opportunity to review draft

5    discipline reports and documents prior to those documents being

6    published for the public and a formal comment period.  So there's

7    that opportunity that we can sometimes provide on projects, even

8    sometimes not for EISs, other projects as scheduled are able to

9    accommodate tribes being provided a review of the draft documents

10   before they're published.

11       When tribes do comment formally, in projects that I've worked

12   on previously, we've worked hard to work closely with the tribe

13   to try and resolve comments before we finalized those comments.

14   So, for example, if we get 80 comments on an environmental

15   assessment in the past, one example is I've worked with the

16   Muckleshoot tribal staff members to work on what our comment

17   responses would be to those before we finalize our responses.

18       Another example of tribal involvement is having them

19   participate with us in project meetings, which may be meetings

20   that are focused on specific technical issues, or it may just be

21   regular project update meetings.  Depending upon the project and

22   how fast its schedule is moving, those project meetings may

23   happen once or twice a year.  They may in some cases, like our

24   520 project, happen on a monthly or bimonthly basis.

25       We have had tribes involved with meetings with resource

1    agencies when we're permitting projects where they're at the

2    table with the resource agencies when we're having permitting

3    discussions.  We also consult with tribes on a

4    government-to-government basis, which means we also have meetings

5    which are just with WSDOT and the tribe; in some cases, federal

6    highway administration, where we talk specifically about

7    government-to-government issues or tribal issues that may relate

8    to their usual and accustomed treaty rights.

9        We also do on-site field reviews with tribes, ask them to

10   come out on site with us and review the existing conditions prior

11   to construction when we're determining our effects and our

12   potential impacts.  And then we also have, through the course of

13   projects, the regular type of informal communication with tribes,

14   which may be e-mail or phone or letter correspondence back and

15   forth.  And then we also have involvement with tribes in more the

16   long-term planning for WSDOT as well.

17   Q   I'd like you to take a look at Exhibit No. W-150 and

18   Exhibit 151.  What is Exhibit No. 150?

19   A   It's a letter from Chris Picard at DOT to Chairperson

20   Williams at the Muckleshoot Tribe regarding a feasibility study

21   that we were doing for a bypass route on 164 -- SR 164.

22   Q   And what is Exhibit 151?

23   A   I'm sorry?

24   Q   Exhibit No. 151.

25   A   Exhibit 161 [sic] is a copy of the 164 Route Development Plan

1    Corridor Study, the charter for the corridor working group.

2    Q    Have you seen these documents before?

3    A    Yes.

4    Q    And are these documents that the Department of Transportation

5    prepared?

6    A    Yes.

7              MR. SHAFTEL:  Your Honor, I'd like to offer these two

8    exhibits, and the sole purpose for offering these exhibits is

9    just to provide evidence that the Department of Transportation

10   does provide opportunities for tribes to be involved in long-term

11   planning on highway improvement projects.

12             THE COURT:  Any objections?

13             MR. STAY:  Just a short one, your Honor.  These letters

14   don't have anything to do with culverts.  They have to do with

15   another project entirely.  This witness was neither the author

16   nor the recipient of those letters, and therefore I think they're

17   not admissible.  They're not relevant, as she has no personal

18   knowledge.  They were not under her control, and she was not

19   responsible for the drafting of them.

20             THE COURT:  Mr. Shaftel, given that, I don't see how

21   they'd be very relevant.

22   By Mr. Shaftel:

23   Q    What existing plans or reference documents do you use

24   in the -- do you use to guide you in conducting your tribal

25   outreach?

1   A    There are a couple of different guidance documents that we

2   use.  One is the agency's Centennial Accord Plan.  The Centennial

3   Accord Plan lists out the different divisions, services, and

4   offices of WSDOT and talks about the ways in which those

5   divisions of WSDOT consult with tribes, different ways that we

6   work with them from a planning and funding perspective.

7        Another one is our executive order from the director of

8   transportation, and that outlines how DOT employees consult with

9   tribes.  It also outlines our tribal liaison office out of

10  headquarters and their responsibilities for consultation.

11  Q    Let me back up.  The Centennial Accord Plan, I want you to

12  turn to Exhibit No. 093-H, which I put on the monitor there.  Is

13  that the Centennial Accord Plan that you were referring to?

14  A    It is.  There's an updated version since 2003.

15  Q    When was the updated version drafted?

16  A    Earlier this year.  2009, I believe.

17  Q    And it has a similar goal and purpose?

18  A    Yes, it does.

19  Q    And Exhibit W-093 -I, which is now on your monitor, is that

20  the executive order that you were referring to?

21  A    It is.  And there's also a more recent version of the

22  executive order.

23  Q    And when was that published?

24  A    I am not positive.  I believe it was within the last two

25  years, though.

1    Q    And that has a similar directive to the Department of

2    Transportation?

3    A    Yes, it does.

4    Q    And are there any others that you would refer to?

5    A    Yes.  There is the NEPA consultation handbook, which was

6    created to inform DOT employees about a couple of different

7    aspects about tribal consultation.  One, it outlines the

8    background of how and why we consult with the tribes.  It

9    references things like the Centennial Accord Plan and our

10   executive order.

11       It also walks through, for employees, the different times at

12   which we consult with the tribes and how we consult with tribes.

13   So, for example, if you were on a project, from an environmental

14   perspective, and you were going to publish an environmental

15   assessment, you could turn to the NEPA handbook and it would walk

16   you through the steps of how you would typically consult with the

17   tribe if you were producing an environmental assessment.

18   Q    Was this recently created?

19   A    Yes, it was.

20   Q    Why was it created?

21   A    It was created, I believe, to be a guidance document for DOT

22   employees.  There had been, I think, a lot of questions going to

23   the tribal liaison office about how to consult and when to

24   consult, especially for the different types of environmental

25   documents that DOT may have related to an eco, which may be an

1    EIS or an environmental assessment.

2        And so the handbook was created at that time by our acting

3    tribal liaison for the agency to help inform employees that are

4    doing environmental work about how and when we consult with

5    tribes.  It also has the base premise of doing consultation early

6    and often and really doing a kind of wholesale consultation with

7    the different tribal staff members, which includes both the

8    archeological side, culture resource, as well as the natural

9    resource side.

10   Q    And so is this supposed to encourage DOT employees to provide

11   greater outreach than they would just under the minimum statutory

12   requirements?

13   A    I believe that this does encourage DOT employees to really

14   reach out and make a good effort at consulting with the tribes.

15   It has followup -- frequently asked questions about how to follow

16   up with tribes, and gives ways to follow up and try to gain

17   information.  If you're not receiving direct feedback from the

18   tribes, as an example, it gives some steps to be able to continue

19   conversations.

20   Q    Are you familiar with the term "baseline report" as it's used

21   in the scope of highway improvement projects?

22   A    Yes.

23   Q    And how do baseline reports relate to tribal outreach?

24   A    Baseline reports in the context of culverts are something

25   within my region.  We have used the graphic as an example, the

1   cover page, of one for the 167 project.  At the time that I came

2   on to I-405, which is when I first started working on projects

3   that had barriers on them, one of the requests that we had heard

4   from tribes, Muckleshoot Tribe staff members in particular, who

5   we worked closest with, asking us to provide information on the

6   barriers that were within our project areas.  And so out of that

7   request, through the years, we've created these baseline reports

8   which provide essentially documentation of the existing culverts,

9   both -- all culverts within our project area, so that includes

10  stormwater culverts as well as culverts that have streams, and

11  also provides information on those culverts.

12      Depending upon the project, the format may be a little bit

13  different on the type of information that's included, but it can

14  include such things as the length, the width of the culvert, the

15  stream that's passing through it, the elevation of the inlet, the

16  elevation of the outlet, what type of upstream habitat there is,

17  how much upstream habitat there is, species that may use that

18  stream, etcetera.

19  Q   And how do you use this information once you have it?

20  A   We use this information -- if we are going to alter or modify

21  a project, we'll use that information to help inform how we go

22  about designing a replacement.  We also provide the information

23  that's included within the report in different formats to the

24  tribes, primarily Muckleshoot staff members that we work with

25  closely on our projects, to give them information on the culverts

1   that are within our project area and information that we have

2   about those culverts.

3   Q    When you say "provide information to the Muckleshoots," do

4   you always provide the entire report?

5   A    Previously on projects, I think in most cases, the entire

6   report has not been provided to the staff members.  The

7   information out of the report has been provided in different

8   formats, depending upon the project.

9   Q    And have you always produced these reports when they've been

10  requested from the tribes?

11  A    Yes.

12  Q    Who creates these reports?

13  A    Typically on the projects that I have worked on, it's been

14  consultant staff primarily developing them for us.

15  Q    And how is the scope of work that goes into these reports

16  changed over time?

17  A    In some of the original reports that were from I-405 that

18  were created before I came onto I-405, during the time I was

19  transitioning on, the focus of the baseline report was different.

20  Essentially the focus of that was to look at all the barriers

21  within the project area and for biologists on the team to make

22  recommendations about which of those barrier culverts, from a

23  biological standpoint, would be good candidates for doing

24  replacement.

25       As we've moved through the years, I've asked the team to have

the baseline reports focus more on the existing data that we know

about the culverts and the barriers and provide the type of

information we talked about earlier as far as inlet, outlet,

upstream habitat, etcetera.

Q    Do you know Karen Walter from the Muckleshoot Indian Tribe?

A    Yes, I do.

Q    And how do you know her?

A    I have worked with Karen closely over the last five years on

natural resource issues on the projects within my region.

Q    How frequently do you interact with Ms. Walter?

A    The frequency depends on the projects that we're working on,

the particular month, and what's going on with those projects.

But I would say in any given month, I'm probably corresponding or

in a meeting with Karen probably at least once a month.

Q    How much time do you spend responding to Ms. Walter's

concerns on highway improvement projects that you work on?

A    Can you say it again, sir?  I couldn't hear.

Q    Yes.  Sorry about that.

      How much time do you spend responding to Ms. Walter's

concerns on highway improvement projects that you work on?

A    I think again that depends on the particular projects and

what's going on with that project in a month.  If we're working

on resolving comments on an environmental document, like I talked

about earlier, Karen and I have been known to have eight to

nine-hour meetings working through comments.  In a given month, I

1    may spend two to three hours being in the same meeting with her

2    or working on some type of correspondence back and forth.  So it

3    can be very intensive, depending upon if we're trying to resolve

4    something specific on a project.  In other months, it may be not

5    as intensive, but we're just participating in the meetings.

6    Q    Do you have face-to-face meetings with Ms. Walter?

7    A    Yes, I do.

8    Q    How would you say the level of involvement Ms. Walter desires

9    in DOT projects compares to the level that's requested by other

10   tribes?

11              MR. STAY:  Object, your Honor.  Speculation on the

12   witness's part.

13              MR. SHAFTEL:  I'm just asking for her experience.

14              MR. STAY:  Yeah.  But she's asking her to compare with

15   other tribes.

16              THE COURT:  The objection will be sustained.

17   By Mr. Shaftel:

18   Q    Do you work with other tribes, Ms. Hanson?

19   A    Yes, I do.

20   Q    Which tribes do you work with?

21   A    I work with the Snoqualmie Tribe, the Suquamish Tribe, the

22   Yakama Tribe, the Puyallup Tribe, the Tulalip Tribe, and then we

23   also work with non-federally recognized Duwamish Tribe.

24   Q    How does your experience with the level of involvement

25   Ms. Walter desires in DOT projects compare to the level requested

1  by those tribes?

2  A    Related to culvert and natural resource issues, Karen's

3  involvement is greater than what I've seen on projects related to

4  natural resource issues from other tribal staff.

5  Q    In what way is it greater?

6  A    Typically on my projects related to natural resource issues,

7  Karen likes to review documents when they're issued, and she does

8  provide comments.  Typically they're substantive, and she has a

9  lot of comments, depending upon the specific project.

10     She likes to participate in project meetings, technical

11  working groups that we may have, makes herself available to do

12  that in most cases.  She will go on site reviews with us in the

13  field, participate in meetings with permit agencies.  Those are a

14  couple of the ways that she'll work with us, in addition to

15  regular project meetings, etcetera.

16  Q    When Ms. Walter asked for additional involvement in highway

17  improvement projects, how does the Department of Transportation

18  work to accommodate her?

19  A    Through the years on the projects that I have worked on,

20  there's been lessons learned as we've gone through working with

21  Karen on requests that she's made.  One is the example that I

22  provided earlier.  When I first started on 405, we weren't

23  providing information on all of the barriers and culverts within

24  project areas.

25     So in working with my team, we developed baseline reports for

1   those projects, which include a map that shows all of the

2   culverts within the project area, both stormwater and stream

3   crossings.  As an example, we now typically on our projects

4   provide those maps to Karen to show her where all the culvert

5   crossings are.  We provide spreadsheets that have, for example,

6   the inlet, the outlet, the upstream habitat, the stream, species,

7   etcetera.

8        We also work, for example, to try and resolve comments.  One

9   of the concerns that I'd heard from Karen when I first started

10  working on 405 was that the Muckleshoot Tribe would provide a lot

11  of comments on a project, and they wouldn't see our responses

12  until they were finalized.  And so if they weren't in agreement

13  with our responses at that point they were final, they were on

14  the record, and that kind of left us into a position where we'd

15  have to work to resolve those in the permitting process.  It was

16  beneficial to WSDOT and the tribe to not go through that.  And so

17  that's when I worked closely with Karen to sit down and go over

18  our draft responses on documents, for example, for some of our

19  projects, so that when the documents were finalized.  Karen knew

20  what those comment responses were going to be, which doesn't mean

21  to say that we had 100 percent agreement on every comment

22  response, but it did mean that Karen knew what our responses were

23  before we published them.

24  Q   I'd like you to turn to Exhibit W-155, which is on your

25  screen.

1          Do you recognize this document?

2     A    Yes, I do.

3     Q    What is this document?

4     A    This is a cover letter for comments that Karen provided to

5     the I-405 team, comments on the Tukwila to Renton environmental

6     assessment, which is an I-405 project.

7     Q    And I will represent to you that the next page is the last

8     page from that exhibit, Page 19.

9          Do you recognize this page?

10    A    Yes, I do.

11    Q    What is this page?

12    A    This is a copy of a page from our finding of no significant

13    impacts, which is our decision document for the Tukwila to Renton

14    project.  And this is showing our responses back to the

15    Muckleshoot tribe on this project was another example where

16    myself and Bill Jordan, the project environmental manager from

17    the I-405 team, worked with Karen to go over our responses on the

18    Muckleshoot comments before we published the documentation.

19    Q    And how many comments did Ms. Walter have on this particular

20    project?

21    A    It looks like 92.

22    Q    And did the Department of Transportation respond to all her

23    comments on this particular project?

24    A    We provided comment responses on all 92, yes.

25    Q    And how does the level of coordination on this particular

1   project compare with a typical projects in which you've worked

2   with Ms. Walter?

3   A    On an environmental assessment, it can range on our project.

4   But typically I would say there's probably, on our more

5   substantial projects, anywhere between 80 and 100 comments on

6   average that we would see from Karen.

7   Q    How would you describe the Department of Transportation's

8   efforts to reach out to the Muckleshoot Indian Tribe?

9   A    I think that in the experience that I've had on working on

10  projects that we've come a long way from where we were on my

11  projects over the last five years, continued to have lessons

12  learned and worked with Karen to implement changes; have talked

13  about what some of the examples are from ones that I've

14  instituted with the teams.  I know that Northwest region, which

15  is another region within the case area, has also been work

16  working on some lessons learned with Karen --

17         MR. STAY:  She's speaking from hearsay, not her personal

18  knowledge, when she's talking about the Northwest region.  Unless

19  it is from her own knowledge, there's no foundation for it.

20         THE COURT:  The objection is sustained.

21  By Mr. Shaftel:

22  Q    I would like to show you -- well, why don't you continue your

23  answer, Ms. Hanson -- let me ask you the question again.  How

24  would you describe the department's efforts to reach out to the

25  Muckleshoot Indian Tribe, but this time if you would focus on

1   your own experiences.

2   A    In addition to the ways that we talked about earlier doing

3   document reviews and providing comment responses on some projects

4   before we finalized documents, when we have requests from Karen

5   to provide documents for her review, which sometimes has happened

6   when we put out SEPA documents, there's reference documents that

7   Karen would like to have, we try to provide those to her as

8   quickly as we can when requested.

9        In some projects previously, we've been asked for an

10  extension to extend a comment period for the Muckleshoots to be

11  able to provide us comments after the comment period for the

12  project.  And I think every case where I've been asked to do

13  that.  I have done that and granted the extension.  We have also

14  tried to on previous projects that I have worked on, when there's

15  been a couple of projects within my region that all are having a

16  lot of time demands on Karen's time, worked with Karen to try to

17  make an internal decision within WSDOT which of those two

18  projects needs to be the greatest priority so that we can ask

19  Karen to focus her time on one particular project to get through

20  resolution to help decide for Karen what's the best use of her

21  time on a specific project within my region.

22       I think that in going forward that we'll continue to have

23  lessons learned in ways that we can improve and work with Karen.

24  It is not perfect, but we continue to keep trying to make

25  improvements as we go.

1   Q   Turn to your screen.  And I'm showing you what has been

2  marked as W-157.  It is an admitted document.

3      Do you recognize this document?

4  A   I do.

5   Q   And what is this document?

6  A   This document is an e-mail summary of an update on Northwest

7  region projects in April of this year.

8   Q   And is this a document that is provided Ms. Walter on a

9  monthly basis?

10  A   That's my understanding, that monthly updates started earlier

11  this year.

12   Q   And why were these monthly updates started?

13  A   My understanding was that Karen was wanting to have more

14  regular updates from Northwest region about projects that were

15  occurring within the region, and so the regional environmental

16  manager and staff have implemented providing monthly e-mail

17  updates to Karen.

18   Q   I'd like you to look at your screen again.  I'm showing you

19  W-158.

20      Do you recognize this document?

21  A   Yes, I do.

22   Q   And what is this document?

23  A   This is a tribal transportation survey that was done to

24  support the data of our transportation 20-year plan.

25   Q   Why was this document created?

A    The document was created to gain feedback from tribes about a

myriad of different issues related to transportation that would

help to inform the development of the update to the 20-year plan.

Q    And what is this next slideshow?

A    This is a table of contents of the different types of

categories that the survey asked questions about.

Q    These are all the different topics on which the tribes were

surveyed on?

A    Correct.

Q    And this next page, what does this show under "Participating

Tribes"?

A    I'm sorry?

Q    What is shown under the title "Participating Tribes" about

halfway down the page?

A    My understanding is that that includes the tribes that

provided responses back on the survey.

        MR. STAY:  Objection, your Honor.  She said she's

assuming.  Does she knows it or does she not know?

        MR. SHAFTEL:  That's not what she said.  She said, It's

my understanding.

        THE COURT:  She said, My understanding is.

        MR. STAY:  Is that based upon personal information or --

the document says who participated.  If she's asked more about

what they were doing, she'd have to know what they were doing,

the tribes I mean.

```
 1              THE COURT:  You may clarify.
 2    By Mr. Shaftel:
 3    Q    Do you have an understanding for what -- for the
 4    participating tribes in this survey?
 5    A    The participation tribes were tribes that provided responses
 6    on the survey.
 7    Q    Were the Muckleshoots one of the participating tribes in the
 8    survey, to your knowledge?
 9    A    Yes.
10    Q    Are you familiar with the term "mitigation" as it's used
11    within the scope of highway improvement projects?
12    A    Yes.
13    Q    What does that term mean to you?
14    A    To me.  Mitigation means it is the compensation that is
15    provided after you go through mitigation sequencing on a project.
16    So first you avoid -- look to avoid impacts, and then minimize
17    effects that you're going to have.  And then for those effects
18    that remain, you look at how you're going to mitigate for those.
19    Q    And what types of mitigation are typical in a highway
20    improvement project that you work on?
21              MR. STAY:  Your Honor, again, this witness is not
22    qualified to talk about the nature of mitigation, in terms of its
23    impacts and how it's developed biological aspects to it.  She is
24    an environmental coordinator, not a biologist, is my
25    understanding.
```

1              MR. SHAFTEL:  I believe the question I asked were what

2     types of mitigation are provided.  She's very experienced with

3     the types of mitigation that are required under her projects.

4              THE COURT:  The objection will be overruled.

5        Do you understand the question?

6              THE WITNESS:  Yes.

7              THE COURT:  You may answer.

8              THE WITNESS:  We, typically related to natural

9     resources, will provide stream mitigation when we're having

10    impacts within waters of the state.  And for the streams

11    mitigation, for example, if we were having a culvert put in that

12    would mean that we're going to have less stream habitat, we

13    would, somewhere else within the project area, potentially do

14    enhancements on stream habitat or create new stream habitat or

15    look for mitigation opportunity off site.

16       In-stream habitat could include, like I talked about earlier

17    in the case of the triangle project, creating off-channel habitat

18    for fish.  It could include doing plantings of native vegetation.

19    It could include adding large woody debris to an existing stream

20    system.  We would also typically on projects do wetland

21    mitigation.  And wetland mitigation is for impacts to wetlands,

22    depending upon the category of the wetland.

23       The most pristine wetlands have a higher ratio for

24    mitigation.  So depending upon your category, you have certain

25    ratios that you have to meet.  We would do wetland mitigation

1    either, again, within the project area or at an off-site

2    location, which could include doing enhancements of existing

3    wetlands, creating all new wetlands on a site, for example,

4    that's fill, depending upon what your potential mitigation

5    opportunities are within your project area or off site.  Those

6    are two -- stream and wetland mitigations are two common resource

7    type mitigation that we provide on my projects.

8    By Mr. Shaftel:

9    Q    And what permits triggered the mitigation that you just spoke

10   of?

11   A    Permits that we typically obtain on my projects include

12   hydraulic project approvals that we talked about from Fish and

13   Wildlife.  We obtain either nationwide or individual 404 permits

14   from the Corps of Engineers.  We have 401 permits from the

15   Department of Ecology.  We have NPDS permits also from the

16   Department of Ecology for some construction stormwater runoff.

17   Depending upon the local jurisdiction, we may have critical areas

18   review or some other type of local permit that we obtain.  Those

19   are some of the most common permits that we get on my projects.

20   Q    Have you reviewed the paragraphs of Ms. Walter's declaration

21   which follow the title "Stream Crossing Impacts and Mitigation"?

22   A    Yes.

23   Q    Have you also reviewed Ms. Walter's deposition testimony on

24   this topic?

25   A    Yes.

1   Q    And I understand that you were unavailable to actually sit in

2   person on Ms. Walter's in-court testimony due to a personal

3   matter.

4        Did you also have an opportunity to review the transcript of

5   the testimony that she provided on 10/14?

6   A    Yes.

7   Q    What is your understanding of the extent of mitigation that

8   Ms. Walter would desire during the course of highway improvement

9   project as compared to what is currently required by regulatory

10  agencies?  And I am specifically speaking here about mitigation

11  related to fish-passage barrier improvements.

12          MR. STAY:  Objection, your Honor.  She has no way of

13  knowing what Ms. Walter would think she wants.

14          MR. SHAFTEL:  I'm asking for what's her understanding

15  based upon her review of the testimony that's been provided in

16  this case.

17          THE COURT:  Before we get to that, can you clarify

18  something for me?  How is the appropriate amount of mitigation

19  determined?  You can't do this, so you're going to do this over

20  here.  Who decides how much of this is sufficient?

21          THE WITNESS:  That's usually -- depending upon what the

22  permit is or the resource agency that needs to be involved, if

23  it's wetland mitigation, for example, there are specific ratios

24  that are typically agreed to through regulation.

25        So in that case, for example, if you had one acre of a

1    Category 2, there would typically be known ratios for how much

2    wetland mitigation you would need to provide.  Then the

3    conversation becomes where do you do that mitigation.

4        For stream mitigation, it's a little bit trickier because

5    there aren't those defined ratios.  So coming up for stream

6    mitigation, typically what you are asked to do is, at a minimum,

7    compensate for the quantity and the quality of what has been

8    impacted, and sometimes even beyond that.  And so you'll have

9    discussions with the resource agencies, and in many cases with

10   the tribes who have interest in that area about what appropriate

11   mitigation is for the stream impacts.

12             THE COURT:  The tribe has input into that as well?

13             THE WITNESS:  The tribe can have input into that.

14             THE COURT:  Does it develop into a negotiated process or

15   just more collaborative?

16             THE WITNESS:  I would say it could probably be both of

17   those.  I've seen stream mitigation where there can be general

18   agreement on where it is, and there's also times where there is

19   more discussion, and a negotiation about our proposal may not be

20   adequate.  And in some cases, for example, on our Renton nickel

21   project, we did stream mitigation.  And the proposal that we had,

22   Karen wanted to see some additional plantings and some additional

23   large woody debris added.  And so working with Karen's request

24   and with the agencies granting the permits, we came to a

25   resolution on adding plantings and large woody debris as part of

1    the mitigation.

2              THE COURT:  Thank you.

3        Now, I forgot your question, Counsel.

4              MR. SHAFTEL:  I'll try to answer it again -- or ask it

5    again, and then answer it.

6    By Mr. Shaftel:

7    Q   Ms. Hanson, the question that I attempted to pose earlier is

8    what's your understanding of the extent of mitigation that

9    Ms. Walter would like to see on a highway improvement project,

10   specifically with regard to the fish barrier improvement as

11   compared to what's currently required by regulatory agencies?

12   A   From reviewing the testimony, my understanding is that in

13   addition to the direct construction impacts that we would have

14   during construction of the barrier replacement project, that

15   Karen would also be looking for mitigation for potential future

16   effects that could occur from that culvert or fish replacement

17   structure being in place, or other components, of that work

18   activity.

19       So essentially effects for -- potentially future effects

20   other than the effects that are occurring specifically during

21   construction of that new structure.

22   Q   Can you give an example of how you think that might play out?

23             MR. STAY:  Your Honor, I think it's totally

24   inappropriate for this witness to talk about what Ms. Walter

25   might have been thinking, etcetera.  She's testified that she

thinks this is what she meant.  What Ms. Walter said is what she

said.  And Mr. Shaftel can argue about that, but I don't think

this witness should be able to interpret on the stand.

          MR. SHAFTEL:  Ms. Walter is a rebuttal witness in this

case.  She can come back up and she can clarify what she meant if

Ms. Hanson is mischaracterizing it.  I'm just trying to --

          THE COURT:  That's all right.  The objection will be

overruled.

     Based on her understanding, I understand she reviewed the

testimony of Ms. Walter.

     Go ahead.

By Mr. Shaftel:

Q   So I'm just asking for an example to help make this more

clear, for how you see this playing out in a real-life

circumstance.

A   Okay.  An example that I could think of maybe to illustrate

the concept I'm trying to convey is that if you put -- did a

replacement and you put in a new culvert, in addition to

mitigating for the direct effects that you would have, that

potentially in the future if there was going to be, say a scour

condition created at the end of that concrete culvert, that in

the context of Karen's testimony, you would be asked to -- the

agency would be asked to provide mitigation for that scour

condition that would occur in the future at the culvert crossing.

Q   So you could have a situation where you have a smaller

1  culvert that's having larger impacts on the existing habitat,

2  replace it with a larger culvert that's having less impacts on

3  the overall habitat, and you'd have to mitigate for the impact of

4  the larger culvert?  Is that what I'm hearing you say?

5  A   If there was a future effect from that larger culvert beyond

6  the construction impacts.

7  Q   All right.  How is that different from what's currently

8  required by regulatory jurisdiction that you work with?

9  A   Currently with the agencies that I work with on the projects

10  that I've worked on previously in permitting, the mitigation that

11  we are asked to provide is for those direct effects that happen

12  during construction of the project.

13  Q   And are you aware of any other tribes that you work with that

14  are asking for the type of mitigation that Ms. Walter is asking

15  for?

16  A   No.

17  Q   And has Ms. Walter ever asked for this type of mitigation on

18  a project you're working on?

19  A   I don't believe yet that I have seen Karen ask for that

20  specifically on one of my projects.

21  Q   What concerns do you have about such a mitigation requirement

22  being implemented?

23  A   From a project perspective, and from my experience, the work

24  that we do related to effects of a project is looking at what the

25  direct effects are during construction of a project.

1      And so from an environmental management standpoint in working

2   with the teams, the question that I would have is how would we do

3   analysis to determine what an unknown future effect of that

4   replacement project could be, and so how would we go about doing

5   that analysis.  If there was agreement on how we would do that

6   analysis and it was determined that there would be potentially a

7   future effect, when would the expected requirement for mitigation

8   be expected?  Would that be combined with the direct construction

9   effect or would there be an expectation that some kind of

10  monitoring or maintenance check-in would happen in the future.

11  And if that effect came to fruition, then at that point in time,

12  you would mitigate.  And if that was the case, would you know in

13  advance what you're expected mitigation would be or would you not

14  have that discussion until the effect was known and then be asked

15  to mitigate?  And the concerns that I would have from working on

16  projects is that would potentially leave this outstanding future

17  mitigation concern out related to a project.  And how do we plan

18  for that?  And how do we pay for that?  And whose responsibility,

19  from a WSDOT perspective, does that become if it's a

20  post-construction requirement.

21  Q   Are you familiar with the different design methods available

22  to the Department of Transportation?

23  A   Yes.

24  Q   And what are they, as you understand them to be?

25  A   Stream simulation, hydraulic design, and no-slope.

1   Q    And when you say "hydraulic," what are you referring to?

2   A    Typically my -- the projects that I worked on, hydraulic is

3   related to retrofits.

4   Q    And in your experience, does the Department of Transportation

5   make use of all three methods?

6   A    Yes.

7   Q    Do you feel it's important the Department of Transportation

8   retain discretion regarding design methods during the course of

9   highway improvement projects?

10        MR. STAY:  Object, your Honor.  We've had witnesses

11   today who spoke to this who are experts in the field.  This

12   witness is not qualified to talk about which culvert method

13   should be a used in any particular project.

14        MR. SHAFTEL:  Your Honor, if I may --

15        MR. STAY:  This is also beyond the scope of her

16   declaration.

17        MR. SHAFTEL:  It's actually not.  It's in her

18   declaration.

19        THE COURT:  All right.  The objection will be overruled.

20   By Mr. Shaftel:

21   Q    So Ms. Hanson, the question I asked was whether or not you

22   feel it's important for the Department of Transportation to

23   retain discretion regarding the design method implemented during

24   the course of highway improvement projects?

25   A    Yes, I do.

1    Q    And why is that?

2    A    From projects that I have worked on previously, one example

3    is the Thunder Hills Creek project, we had an emergency project.

4    And as part of that emergency project, we replaced the crossing

5    with a structure that was not fish passable, and so we had a

6    requirement to work with the Muckleshoot Tribe to determine

7    whether we could post- emergency replace that with a

8    fish-passable crossing or look at doing a fish crossing within

9    another location in the project area.

10        And at that particular crossing, it's along I-405, and it's

11   in the S-curves of 405 within Renton, and so the topography

12   between the northbound lanes and the southbound lanes is a pretty

13   steep difference.  Also because of the design, because it's in

14   the S-curves, it has an interesting roadway design consideration.

15   There's also some major overhead and underground utilities that

16   run through the project area.  And then we also had constraints

17   of existing right-of-way as well as an existing downstream

18   culvert and concrete flume.

19        And so when we're looking at the design for a culvert

20   crossing there, we looked at, I think, seven or eight different

21   crossings, which included multiple versions of potential stream

22   sim options.

23        What we found was through all of those options that we had

24   two major issues.  One was in doing a trenchless type of design,

25   the size of the culvert that we would need for the stream

1    simulation was literally larger than the construction equipment

2    that's usually used to do a trenchless type of technique.  So we

3    had a culvert exceeding the typical construction technique

4    capacity.

5        We also looked at doing a cut-and-cover option there for

6    stream simulation.  But because it's on I-405 and because of the

7    roadway design issues, there wasn't a feasible way to do a

8    cut-and-cover without essentially closing all the lanes on I-405

9    and shifting that traffic to I-5 or to I-90 which, from a traffic

10   standpoint, wasn't going to be feasible either.

11       So through that process, we worked with Karen Walter and

12   Martin Fox and kind of walked through all those issues, and we

13   then determined that instead of looking at fish-passable crossing

14   at Thunder Hills, we shifted our attention to a culvert that

15   conveys Panther Creek along 167.

16       And so in that particular example there, after looking at

17   multiple different options for stream simulation, we determined

18   there wasn't a feasible way to do a stream simulation crossing

19   there.  That's one reason why I think that there needs to be,

20   from a project perspective, the ability to at least talk about

21   what other design options are, because there may be specific site

22   constraints that don't allow for stream simulation to work, for

23   whatever the particular reason is at that crossing.

24       That's not to say in every case, but it's to say in some

25   cases there may be site considerations that do come into play.

1   Another reason why I would say yes to that is the case of the 167

2   project where, because of the limited budget that was within the

3   project scope to be able to do those two retrofits, retrofits

4   were really the only option that we had within the money that was

5   available.

6        And so for that project, it was a choice of doing two

7   retrofits to be able to enhance fish passage at those crossings

8   for that project or not doing anything.  And obviously, we chose

9   to do the retrofits to be able to do something versus doing

10  nothing.  So from a project perspective, I think having those

11  options in the cases where it makes sense, and all of the

12  interested parties, including tribes and the resource agencies,

13  thinks it makes sense to do so.  I think it's a good option for

14  projects to be able to have when necessary.

15  Q   Ms. Hanson, how many projects has the Department of

16  Transportation completed during the course of highway improvement

17  projects?

18  A   153.

19  Q   Are you saying -- is that up to the year 2008 construction

20  season?

21  A   Correct.

22  Q   And how many projects does it have planned for correction in

23  the upcoming ECO projects?

24  A   Upcoming planned projects that we have are on our 520

25  Eastside HOV project.  There's 18 crossings in that project that

1    we're going to replace.  We're going to do ten stream simulation

2    structures.  We're also going to be able to just take some

3    culverts out.  They're located underneath ramps, and those ramps

4    are going away, and so we'll be able to not have to put any

5    culverts back and essentially daylight the stream there.

6         For our Tukwila to Renton projects on I-405, we have noted in

7    the EA that there are six culvert crossings that will require

8    in-water work.  And so those, we will address for fish passage

9    per the MOA.  We have the two retrofits coming up on the 167

10   project.

11   Q    Are those the retrofits that you just mentioned earlier?

12   A    Yes.

13   Q    With the cost issue being the driver for the retrofit?

14   A    Correct.

15   Q    What's this a picture of?

16   A    This is a picture of one of the existing 520 culverts that

17   we're going to be replacing.

18   Q    And this?

19   A    The same.  This is the other end of the 520 culvert.

20   Q    This is a different culvert on that same project?

21   A    Yes.

22   Q    Is this the inlet or outlet, do you know?

23   A    I believe that one is the outlet.

24   Q    Have you been on these sites?

25   A    Yes.

1    Q    And what is this picture?

2    A    This is another 520 culvert.

3    Q    And this?

4    A    This is a 520 that we're going to replace.

5    Q    And you're replacing all those culverts with stream

6    simulation design culverts; is that correct?

7    A    Correct.

8    Q    And do you know how much cost will be added to that highway

9    improvement project as a result of the installation of the new

10   stream simulation culverts?

11   A    The estimate for the replacement structures themselves is

12   approximately $27 million.

13   Q    Do you know how much that is per barrier?

14   A    Approximately 2.7 million.

15   Q    And do you know what's included in that amount?

16        MR. STAY:  Objection, your Honor.  I think she's outside

17   her expertise.  It's not part of her understanding.  This is not

18   part of her declaration either.  She has no explanation or

19   foundation that she has any ability to understand or has any

20   knowledge of how those figures were derived.

21        MR. SHAFTEL:  It is part of her declaration, your Honor.

22   I can point to the specific sections and lay a foundation if

23   necessary.

24        THE COURT:  How much longer do you have?

25        MR. SHAFTEL:  I have about five minutes, your Honor,

1    maybe less.

2              THE COURT:  I'll overrule it for now.  Go ahead.

3    By Mr. Shaftel:

4    Q    Do you know what's included in those amounts?

5    A    What's included in the cost is just the structure itself.

6    Q    So would traffic control costs be included in that?

7              MR. STAY:  Objection.  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  Can you ask the question again?

10   By Mr. Shaftel:

11   Q    Would traffic control costs be included in that amount?

12   A    No.

13   Q    You -- during the course of Ms. Walter's testimony, she said

14   she was unaware of any work that was to be done on barrier

15   culverts on Phase II of the Tukwila to Renton project.

16        Do you remember reading that testimony?

17   A    Yes.

18   Q    Is that consistent with your understanding?

19   A    No.

20   Q    What's your understanding of what will be done during the

21   Phase II of the Tukwila to Renton project with regard to culvert

22   barrier replacements?

23   A    We noted in the environmental assessment for that project

24   that we had multiple culverts that would require in-water work,

25   which would then trigger the MOA for fish passage.

```
 1        I think between the time that the environmental assessment
 2   was published and the FONSI, which was a decision document, the
 3   Thunder Hills Creek emergency project occurred.  So I believe if
 4   you compare the environmental assessment with the FONSI, there
 5   would be one less barrier noted, because at that point the
 6   emergency project had happened.  So I believe it's six culverts
 7   that have in-water work associated with that project.  And the
 8   comment responses for that project are the ones that we referred
 9   to earlier that we reviewed with Karen prior to finalizing them.
10   Q   And so what would that mean if you did in-water work on the
11   Tukwila to Renton project with regard to whether or not you would
12   correct those barriers?
13   A   We did in-water work associated with the culverts that were
14   being modified.  And the work triggering HPA, we would be
15   addressing them per the MOA.
16   Q   I'd like to turn your attention to the screen again.  Do you
17   recognize this picture?
18   A   Yes.
19   Q   What is this picture?
20   A   It is the Ashley Creek culvert crossing on SR 9.
21   Q   And is this the after condition?
22   A   Yes.
23   Q   And this picture here, do you recognize this picture?
24   A   Yes.  It's the west fork of Tibbetts Creek earlier this
25   summer.
```

1  Q    This is one of the barriers that was fixed during the highway

2  improvement project on SR 900?

3  A    Right.   That project is in construction right now, yes.

4  Q    And this picture here?

5  A    This is on the same project, SR 900, and it's Clay Creek

6  culvert that was put in this year.

7  Q    Do you recognize this picture here?

8  A    Yes.   This is Taylor Creek Bridge crossing on SR 18.

9  Q    And is this the before or after condition?

10  A    This is after condition.

11  Q    And do you know what this bridge replaced?

12  A    I believe it was two twin culverts.

13  Q    And was this performed during the scope of a highway

14  improvement project?

15  A    Yes.

16       MR. SHAFTEL:  Your Honor, at this time I'd like to admit

17  the declaration of Ms. Hanson, as well as her accompanying

18  exhibits.   That's W-093, and Exhibits A through Q.

19     I believe most of these have already been admitted.   I

20  believe with regard to the remaining exhibits, there are no

21  objections.

22       MR. STAY:  No objection to the exhibits attached to the

23  declaration, your Honor.   We have two outstanding objections.

24  You may have addressed one.   That was the 305 project we talked

25  about earlier.

1        And our other objection was on Page 20 to Section 7, which

2    sets out a series of stream design determination factors, which I

3    would argue are outside her expertise.

4            MR. SHAFTEL:  Again, your Honor, with regard to

5    Paragraphs 20 through 24, she obtained all that information both

6    through meeting with contemporaries on projects as well as

7    referring to public documents to confirm all the information in

8    those paragraphs.  And the paragraphs merely set out the

9    background on the project and set out some information that's

10   actually already been admitted in this case, which is the

11   Department of Transportation fixed its culverts on those highways

12   and that those culverts are still fish passable today.

13       With regard to Paragraphs 46 through 48, which is another

14   outstanding objection, those paragraphs just summarize what

15   you've already heard from the witness about the situations and

16   site-specific circumstances which may trigger a need to use a

17   design other than stream simulation, and flexibility for having

18   that design that's well within her expertise and her experience.

19           THE COURT:  All right.  Mr. Stay, is there any objection

20   to W-093-E?

21           MR. STAY:  That was the memorandum?  No, your Honor.

22           THE COURT:  That will be admitted.  Then the only other

23   declaration remaining that has not been admitted is W- 093-M.

24   Any objection to that one?  Although it's my understanding that's

25   the same exhibit as AT-070.

1              MR. SHAFTEL:  Yes, I believe it is.  Well, it's a page

2       from that document, your Honor.

3          I just wanted to maintain it as an attachment to her

4       declaration for ease of reference for the Court.

5              MR. STAY:  Your Honor, I had suggested to Mr. Shaftel

6       that he may want to use the exhibit that's already in.  I have no

7       objection to using the exhibit.

8              THE COURT:  Then for purposes of keeping it all

9       together, we'll go ahead and admit W-093-M, although it's my

10      understanding that is a portion of AT-070 that's already been

11      admitted.

12         All right.  Regarding her actual declaration, W-093, let me

13      read it, and then we can talk about it next time we get together.

14         And tell me what portions you object to, Mr. Stay.

15             MR. STAY:  Let me get the exact page for you, your

16      Honor.  On Page 10, the provision Part A, SR 305, Poulsbo.

17      Again, we argue that's not part of her project.  She's not

18      responsible for it.  She had nothing do with it.  They should

19      have brought the right witness in to do that.

20         And the next section we object to, the only other one, is on

21      Page 20, Part 7, "Culvert Design Determinations."  Those

22      technical items set out are outside of her expertise, and

23      therefore she does not know them.  Those are the only two

24      objections to that declaration.

25             THE COURT:  All right.  Thank you.

1          Counsel, this is the end of our trial day.  Please remember

2    we will not be in session tomorrow or Thursday.  We will be in

3    session again regular time on Friday.  How are we doing in terms

4    of schedule?

5              MR. SLEDD:  Your Honor, you may have noticed that

6    Mr. Tomisser and I just slipped out and had a brief conversation

7    about this.  We anticipated your question.

8          It looks to us that we will probably be able to wrap up with

9    the final rebuttal witnesses on Monday, to do closing on Tuesday,

10   unless something untoward happens between now and then.

11             THE COURT:  All right.  I thought you guys were

12   discussing a potential settlement.

13             MR. SLEDD:  We were rolling for it.

14             THE COURT:  All right.  We'll be at recess.  Back in

15   session on Friday morning.

16                       (Adjourned for the day)

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8
            I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                      S/Barry L. Fanning

12                                      _____

13                                      Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25