0

```
 1                   UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
 2                          IN SEATTLE

 3   ----------------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al, )
                                     )
 5              Plaintiffs,   )   No. C70-9213
                                     ) Subproceeding 01-1
 6        v.                         )
                                     )
 7   STATE OF WASHINGTON, et al.,    )         FINAL
                                     )
 8           Defendants.            )
                                     )
 9   ----------------------------------------------------------------

10              TRANSCRIPT OF PROCEEDINGS

11   ----------------------------------------------------------------

12         BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                     October 23, 2009

14
     APPEARANCES:
15
                         Mr. Peter C. Monson
16                       U.S. Department of Justice
                         Environment & Natural Resources Division
17                       Rogers Federal Building
                         1961 Stout Street - 8th Floor
18                       Denver, CO 80294

19                       Rene David Tomisser
                         Fronda C. Woods
20                       Douglas D. Shaftel
                         Philip M. Ferester
21                       Attorney General's Office
                         P.O. Box 40100
22                       Olympia, WA 98504

23                       John C. Sledd
                         Laura Sagolla
24                       KANJI & KATZEN
                         100 South King Street, Suite 560
25                       Seattle, WA 98104
```

Alan C. Stay
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Tim R. Weaver
COCKRILL & WEAVER PS
316 North Third
Yakima, WA 98907

Daniel A. Raas
Harold Johnsen
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
Rob Roy Smith
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmussen
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

1

1                      INDEX OF WITNESSES

2

**ALLISON HANSON**                    **PAGE**
3    **(Continued)**

4        Direct by Mr. Shaftel          8
         Cross by Mr. Stay             16
5        Redirect by Mr. Shaftel       46
         Recross by Mr. Stay           50
6
**JEFFREY KOENINGS**
7
         Direct by Ms. Woods           55
8        Cross by Mr. Stay             86
         Cross by Mr. Monson          100
9        Redirect by Ms. Woods        102

10   **BRIAN BENSON**

11       Direct by Ms. Woods          104
         Cross by Ms. Rasmussen       121
12       Redirect by Ms. Woods        148

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Welcome back, everybody.  I hope you had a

2    good two days while we were gone.  I think we have a couple of

3    housekeeping matters we want to take up.

4          MS. FOSTER:  Good morning, your Honor.  This is Alix

5    Foster, for the record.

6       Your Honor, I'd like to withdraw at this time a number of the

7    plaintiffs' proposed exhibits, and I will read them slowly for

8    the court clerk as well as for the court reporter.  The

9    plaintiffs would like to now withdraw AT-13, AT-29, AT-74, AT-77,

10   AT-98, AT-99, AT-106, AT-107, AT-115, AT-116, AT-122, AT-123,

11   AT-124, AT-126, AT-127, AT-134, AT-135, AT-136, AT-139, AT-141,

12   AT-142, AT-173, AT-175, AT-179, AT-185, AT-188, AT-191, AT-195,

13   AT-198, AT-200, AT-201, AT-203, AT-204, AT-205, AT-208, AT-209,

14   AT-215, AT-218, AT-219, AT-220, AT-221, AT-222, AT-223, AT-224,

15   AT-227, AT-228, AT-238, AT-240, AT-241, AT-242, AT-244, AT-245,

16   AT-252, AT-253, AT-256, AT-261, AT-264, AT-265, AT-266, AT-267,

17   AT-268, AT-269, AT-271, AT-274, AT-275, AT-277, AT-280, AT-283,

18   AT-284, AT-293, AT-294, AT-295, AT-296, AT-297, AT-298, AT-299,

19   AT-300, AT-303, AT-305, AT-307, AT-308, AT-316, AT-318, AT-320,

20   AT-321, AT-329.

21      I'd also like to -- apparently the admissibility has been

22   stipulated with regard to AT-327 and AT-328, and I'd like to move

23   to admit those at this time.

24      And then finally, there were two plaintiffs' exhibits that on

25   the first day, in our desire to move quickly in terms of the

```
 1    admissions, we mistakenly admitted two exhibits.  One of them is
 2    AT-125 and the other is AT-317.  And I would like to move to
 3    withdraw them because they were mistakenly admitted.
 4             THE COURT:  All right.  Thank you, Counsel.
 5        Let me hear from Mr. Tomisser.  First of all, let's start
 6    from the last point and go backwards.  Any objection to
 7    withdrawing admitted Exhibits AT-125 and 317?
 8             MR. TOMISSER:  We need to figure out which those are.
 9    We didn't have a notice to withdraw.  I'd like to state, you
10    know, as a general matter here, this extensive list of withdrawn
11    exhibits, which we'll obviously have to look through and see
12    which ones are being referred to, but these pieces of evidence
13    were stipulated by the party and ruled admissible by the court.
14        At that point, the evidence is equally available to everyone,
15    and so I don't know that we're necessarily going to agree to now
16    the denial of that evidence lightly after the witness who would
17    have been here to lay the foundation for it is gone, and we would
18    have no opportunity to then put in a piece of evidence that we
19    had assumed at the time the witness was here was in because it
20    had been ruled admissible by the Court.  But we will certainly
21    review this list, and perhaps we won't care about the
22    withdrawals.
23        But potentially -- we're certainly not going to agree to the
24    withdrawal of evidence with no witness available to put it back
25    in.
```

```
 1            THE COURT:  All right.  Hang on a second.  Let me see if
 2   I can figure out where we are here.
 3       Ms. Foster, my understanding was that the very first list you
 4   read that makes my notes here look like the DaVinci Code, the
 5   very first list that you read, none of those have been admitted
 6   so far.
 7            MS. FOSTER:  That is correct.
 8            THE COURT:  Were any of those that you read in that
 9   entire list stipulated for admission by both sides?
10            MS. FOSTER:  I will have to review my list, your Honor.
11   I think there was a large majority that were not stipulated to,
12   but I will have to verify that.
13            THE COURT:  All right.  So then what we need is a list
14   of the ones that were stipulated by both sides, because the State
15   is correct, they have an absolute right to have relied on the
16   fact that these might have been admitted.  So we can deal with
17   that later.
18       But regarding 125, 317, Mr. Tomisser?
19            MR. TOMISSER:  I'm trying to find what they are, your
20   Honor.
21            MS. FOSTER:  Your Honor, I had advised the State early
22   last week, shortly after they had been admitted, that they were
23   admitted improper -- that we had mistakenly moved to admit them.
24   So the State was on notice for at least a week prior to the
25   beginning of their -- certainly prior to the beginning of their
```

1    own case and before the end of our case that we wished to

2    withdraw those two exhibits, AT-125 and AT-317.

3              MR. TOMISSER:  Your Honor, we were not notified about

4    the 317.  We have no objection to the tribe's request on 317.

5              THE COURT:  So you have no objection to 317?

6              MR. TOMISSER:  Right.

7              THE COURT:  317 will be withdrawn, Madam Clerk.  It is

8    not admitted.

9              MS. FOSTER:  We certainly notified them of AT-125.  They

10   should not have relied upon the fact that they were going to be

11   admitted.  They knew we were going to move to withdraw, or

12   advised the Court that there had been a mistake.

13             THE COURT:  All right.  Hang on.  AT-125 is a risk-based

14   estimate self-modeling, according to my pretrial order, and the

15   admission had been stipulated to by both sides.

16             MR. TOMISSER:  We would like to have that one in.

17             THE COURT:  So you would like that one to remain?

18             MR. TOMISSER:  Yes.

19             THE COURT:  All right.  So 125 will then remain in

20   evidence.

21             MS. FOSTER:  Your Honor, that particular exhibit had

22   everything to do with a State's witness, David Smelser, who the

23   Court then subsequently ordered in the motion in limine that his

24   testimony would not be permitted.  And so the tribes -- because

25   we did not know at the time that we drafted our exhibit list, the

1   tribes included a number of documents that we might have used

2   with regard to that testimony.

3       That testimony is no longer before the Court, and we don't

4   believe that there's a need for that evidence to be in.  Plus we

5   had advised the Court last week that we were -- that it had been

6   mistakenly admitted.  But the tribes really had no choice but to

7   list a number of documents that it might have relied upon had

8   that testimony been before the Court.  But once that testimony

9   was no longer before the Court, I think that the tribes certainly

10  have the right to withdraw that evidence.

11          THE COURT:  I understand the point you're making,

12  Counsel.  At this point in time, we'll leave it in.  Let me take

13  a look at it specifically.  As always, I can sort this out later.

14  It may be easier.

15      All right.  Step two, she asked for admission of AT-327 and

16  328.  Any objection to those two?

17          MR. TOMISSER:  No objection, your Honor.

18          THE COURT:  Madam Clerk, AT-327, AT-328 are now

19  admitted.

20      Mr. Tomisser, we can wait on the first step.  There was a

21  long list of ones she read off.  Let me know sometime later today

22  if you have any specific ones that you wish to discuss.  Since

23  they have not been admitted, I think they do have probably a

24  pretty good right to withdraw them.  We can talk about any

25  specific ones later on.  All right.

 1          MR. TOMISSER:  Very well.  Thank you.

 2          THE COURT:  Counsel, Ms. Hanson was on the stand when we

 3   recessed.  And I believe, Mr. Shaftel, you were still on direct,

 4   I think.

 5          MR. SHAFTEL:  Yes, your Honor.  As long as we're on

 6   exhibits, actually, we've cleared up a number of issues on

 7   exhibits with regard to Ms. Hanson's testimony.  The following

 8   exhibits, we've reached agreement on admission:  W-153, W-156,

 9   178-B, 179-B, 171-B, 193, 192, 170-B, and 152-A.  So I'd like to

10   offer those exhibits into evidence.

11          THE COURT:  Mr. Stay, good morning.

12          MR. STAY:  Good morning.

13          THE COURT:  Any objection to those that Mr. Shaftel read

14   off?

15          MR. STAY:  No.

16          THE COURT:  Madam Clerk, all those will be admitted as

17   well.

18          MR. SHAFTEL:  I believe I neglected to offer into

19   evidence, although we have stipulation, on all the exhibits

20   attached to Ms. Hanson's declaration.  Those would be W-093-A

21   through T.  I'd like to offer those into evidence.

22          MR. STAY:  I think they're in, your Honor.

23          THE COURT:  Every one of those is in.  093-M was denied.

24   The rest of them are in.

25          MR. SHAFTEL:  Okay.  Thank you.

```
1        The outstanding exhibit that remains is Ms. Hanson's

2   declaration.  We had an outstanding objection on two parts of

3   that declaration on Tuesday.  We've reached agreement on one

4   part.  Those are Paragraphs 46 through 48.  There is a previous

5   objection to those, and I believe that objection has been

6   withdrawn.

7             MR. STAY:  That is correct, your Honor.

8             THE COURT:  All right.  Thank you.  46 through 48.

9        That only leaves the 305-A you're still objecting to,

10  Mr. Stay?

11            MR. STAY:  I want to ask Ms. Hanson some questions on

12  that, but -- in fact, no.  I'll withdraw that objection and I'll

13  just ask my questions.

14            THE COURT:  All right.  So W-093 is also admitted.

15       All right, Counsel.  Thank you very much.  I've caught up on

16  the exhibits.

17       Mr. Shaftel, is there anything further on direct for her?

18            MR. SHAFTEL:  Just a couple of questions, your Honor, if

19  I may.

20  (Continued Direct Examination)

21  By Mr. Shaftel:

22  Q   Ms. Hanson, on Ms. Walter's direct testimony, Ms. Walter

23  represented the Department of Transportation did not fix a

24  barrier on the Renton nickel project - I believe it was Barrier

25  66 - despite the fact that she understood that there had been
```

1  work performed on that culvert.

2      Could you explain the circumstances surrounding that issue?

3  A    On the I-405 Renton nickel project, we did have a culvert

4  along the SR 167 portion of the project.  We identified it as

5  Culvert 66.  We did, due to the roadway project, need to extend

6  that culvert, I think by about two feet.  That culvert is one

7  that is parallel to another culvert that is located south on

8  SR 167, which is Culvert 65.

9      Culvert 65 carries the main flow of the tributary to Panther

10 Creek, and Culvert 66 only carries flow when there's an overflow

11 event, essentially, so it's not the main culvert which carries

12 the flow of that tributary.  And so when we extended that culvert

13 because it was not the main culvert carrying the flow of that

14 tributary, we did not implement the exception to provide

15 mitigation in lieu of fixing that barrier.  We did provide

16 mitigation for the direct construction impacts of extending it by

17 two feet.

18     In addition, at that time we knew that the upcoming phase of

19 work on I-405 was going to be looking at a larger watershed

20 concept for mitigation.  And as part of the proposal at that

21 time, we were considering plugging Culvert 66 to direct flow

22 north to a culvert located north along 167, which carried the

23 main Panther Creek underneath 167.  And so we knew that when that

24 future project became funded, the proposal that we would be

25 looking to go forward with would be plugging that culvert, 66, as

```
 1    well as Culvert 65 to direct flow north.

 2        And that proposal -- a portion of that is what we're now

 3    implementing through part of our discussions with the Muckleshoot

 4    Tribe for the mitigation on the work that we're doing in lieu of

 5    doing a fish replacement structure at Thunder Hills Creek.

 6    Q    The names Kerry Ruth and Steve Shipe have come up a couple of

 7    times throughout both Ms. Walter's testimony and your testimony.

 8        Can you identify who are Kerry Ruth and Steve Shipe?

 9    A    Kerry Ruth is the Northwest Region environmental manager, so

10    she is my counterpart at Northwest Region.  Steve Shipe works for

11    Kerry Ruth.  He is the Northwest Region -- I believe his title is

12    tribal coordinator and business manager.

13    Q    So are these the primary contacts for the Muckleshoot Indian

14    Tribe?

15    A    That's my understanding, yes.

16    Q    From the Northwest Region?

17    A    Yes.

18    Q    Sorry?

19    A    Correct.

20    Q    How can the cost of fixing barriers within the scope of a

21    highway improvement project that the DOT would not otherwise be

22    working on impact the ability to obtain funding for that project?

23            MR. STAY:  Object, your Honor.  I don't believe this

24    witness has the expertise to address that question.  No

25    foundation has been laid that she is in fact a budget person who
```

1    addresses costs in their development.

2         THE COURT:  We need more foundation, Mr. Shaftel.

3    By Mr. Shaftel:

4    Q   Ms. Hanson, do you have familiarity with how the budget gets

5    developed for highway improvement projects in your region?

6    A   I participate in the development of the environmental

7    portions of budget as well as over -- and previously in my

8    experience, I've been directly responsible for overseeing the

9    environmental portions of the project budget.

10   Q   And do you sit in on meetings where the creation of the

11   budget for the projects are discussed?

12   A   I participate in meetings where we talk about the overall

13   costs for the projects.  And we have opportunities called cost

14   evaluation -- cost estimate validation process, where we look at

15   the cost on the projects, look at the risk and opportunity to the

16   overall project budget, do updates on the overall project

17   budgets, as well as participating in putting together estimates

18   for the environmental portions of project budgets, which include

19   the environmental documentation for NEPA, SEPA, the permitting

20   work, the mitigation plan, development, as well as participating

21   in the meetings.

22        I still in my role today review scopes of work for the

23   majority of that work that's done by consultants for our

24   projects, as well as in some cases participate in the

25   negotiations on those scopes of work.

Q    And with those items that you just talked about, would they include the costs -- the potential costs of including fish passage barriers within the scope of the overall project?

A    Yes.  In order to implement a fish passage barrier replacement as a portion of a highway improvement project, you would have to do a couple of things up front of actually the construction project.

In your NEPA or SEPA environmental documentation, you would have to clear doing the fish replacement project.  You would have to obtain the permits to do that work.  And in order to obtain the permits for the project, you would have to develop the stream and the wetland mitigation.

For the development of the stream and the wetland mitigation, you develop actual stream and wetland mitigation plans which show where you're going to do your mitigation, how you're going to implement it, what your performance measures are, what your monitoring requirements are, as well as where that mitigation is going to occur.  So for some of our projects, we have been able to mitigate within our own right-of-way.

For some of our other projects, specifically within urban areas, we may not have the ability to do so within the right-of-way, and so we look for opportunities to do so outside of right-of-way.  In some of those cases, we may need to purchase right-of-way.  Other opportunities, we may be able to work with local jurisdictions if they have a need for -- if they have

1   excess property and we have a need.  We've found some good

2   partnerships that way.

3        The development of the permits, the mitigation plans, all of

4   that is up front prior to construction so that when the project

5   goes to construction, the actual culvert replacement can be

6   implemented as part of that project.  Those types of up-front

7   costs are all things that happen before the contract goes out to

8   ad.  And it's a DOT requirement that the permits are obtained,

9   the environmental clearance is in hand before the project goes

10  out to ad.

11  Q   So these are all additional costs in addition to the actual

12  costs of the barrier itself and the work associated with the

13  barrier?

14        MR. STAY:  Your Honor, I object.  I don't think that's a

15  fair characterization of the testimony.  She wasn't talking about

16  those added costs.  Those are things that are involved in the

17  NEPA process.

18        THE COURT:  The objection to the form of the question is

19  sustained.

20  By Mr. Shaftel:

21  Q   How would you describe the -- are there costs associated with

22  all the things, these upfront environmental steps that you just

23  talked about?

24  A   Yes, there are.  And depending upon the project and the other

25  activities that are occurring, if you had a roadway project where

1    the only in-water work that was occurring was related to the

2    culvert replacement, then the stream mitigation that you were

3    developing for that project would be specifically related to that

4    culvert replacement project.

5        Other projects, that cost may not be solely attributed to

6    culvert work, if you're doing widening and you're going into the

7    stream and you're not doing culvert work; the same with a portion

8    of the permits and the mitigation plan development, our costs

9    that are associated with that work prior to the construction

10   cost.

11   Q   And so you mentioned these costs being incurred before the

12   bidding -- the bid goes out.  Are you saying that these are

13   separate costs that wouldn't be included in the bid that goes out

14   on the contract?

15   A   Correct.  Usually these --

16            MR. STAY:  Objection, your Honor.  We don't know that

17   this witness is involved with the bidding of these projects.  I'm

18   getting the impression that she sits in meetings where these

19   things may be discussed, but there's no evidence or foundation

20   that she's responsible for anything involving the budget process.

21            THE COURT:  The objection's sustained.

22   By Mr. Shaftel:

23   Q   Are you familiar with what goes into a bid on the highway

24   improvement projects that you work on?

25   A   How the format of the bid actually looks?  I am not.

Q    Are you familiar with whether or not those costs -- those upfront costs that you just talked about would be the types of things that would go into a bid?

A    I am.

Q    And how so?

A    The work that I described of completing the NEPA/SEPA work, obtaining the permits, the development of the mitigation plans, in most DOT contracts, especially design-bid-build contracts, those activities have to occur before the project can go out to ad.  So the contractor in a construction project for most typical DOT projects under design/bid/builds, for example, doesn't have responsibility for obtaining permits, obtaining the NEPA/SEPA clearance, developing the mitigation plans.  Those are provided to them as part of the contract documents, and they then implement those as part of the construction contracts.  For example, in our typical design/bid/build, we would include those stream and wetland mitigation plans to the contractor as part of that package that they are bidding on.

Q    Ms. Hanson, you mentioned earlier in your testimony about how fish windows can impact timing for the construction project.  Can you give a little bit more clarification about what you mean by "fish window"?

A    The fish window is the time in which you can do work within waters of the state.  And depending upon the watershed and the stream that you're working in, the fish window can be different.

So I think I mentioned the other day that typically our projects
are from fish window and our -- projects within my region are
usually from July through September.  Typically the right start
date for that is usually about June 15th through September 30th,
in general.  So depending upon the stream and the watershed,
those fish windows can vary.  So there's some streams within King
County, for example, where the fish window may only be two weeks
in August, so the fish windows vary.

The purpose of the fish window is to do the work when there's
potentially the least damage to the fish species that may be
within the stream.  A requirement that comes with the HPA when
you are doing work in water, even though you're doing it within
the fish window, HPAs will come with the requirement to ensure
that you're doing fish exclusions, so that if there are fish
within the stream at the time that you're doing that work, that
you move them out of the project area to downstream so that they
can continue to go through the stream without harm.  So we have
provisions in our HPA for those fish that we may encounter during
construction outlining, how we work with those fish to allow them
to safely continue to move through the stream system.

                    MR. SHAFTEL:  Thank you, Ms. Hanson.

                    THE COURT:  Cross-examination for Ms. Hanson?

                    MR. STAY:  Yes, your Honor.

                              CROSS-EXAMINATION

By Mr. Stay:

1   Q   Good morning, Ms. Hanson.  How are you today?

2   A   Good morning.  Good, thank you.

3   Q   What was your bachelor's degree in again?

4   A   Environmental education.

5   Q   Could you relate for us your work experience from the time

6   you got that degree until you went to work for the Department of

7   Transportation?

8   A   After I graduated, I did substitute teaching in various

9   schools, K through 8, from about January until June, and then for

10  about, I think, two to three months, worked for the Department of

11  Social and Health Services down in Vancouver.  And then I had --

12  started my internship with the Department of Transportation.

13  Q   And then you related to Mr. Shaftel that work experience

14  after that.  I won't go into that again.

15      Have you ever worked as a biologist?

16  A   No, I have not.

17  Q   Have you ever worked as an engineer?

18  A   No, I have not.

19  Q   Do you supervise either biologists or engineers?

20  A   Yes.

21  Q   You're a supervisor -- which biologists do you supervise?

22  A   Within my organization, I have Michelle Steinmetz, who's our

23  biology program manager.  For projects within my region working

24  for Michelle, I have Phil Bloch, who's a biologist primarily

25  working on the 520 project, and George Ritchotte, who is a

1  biologist working on various other projects.

2  Q    And you evaluate their work, their biological work?

3  A    I would not say I evaluate their biology work.  I have

4  participation with them on discussions related --

5  Q    But I just asked the question:  Do you evaluate the work?

6  You said "no" or "yes"?

7  A    No.

8  Q    Do you tell them or advise them on biological questions?

9  A    Yes.

10  Q    So you give them biological advice?

11  A    I give them input based on my experience on projects.

12  Q    And that's based upon your education and experience?

13  A    That's primarily based on my experience working on the

14  projects.

15  Q    And you have no degree in biology?

16  A    Correct.

17  Q    You have no degree in fish management?

18  A    Correct.

19  Q    And you have no degree in anything relating to the natural

20  sciences?

21  A    Correct.

22  Q    Is it part of your job to determine that there is a culvert

23  blockage?  Do you go out and say, This culvert blocks fish?  Is

24  that your job?

25  A    Specifically in the field?

1    Q    Yeah.  Do you make the determination that Culvert A is a

2    fish-blocking culvert?  Is that part of your job?

3    A    No.

4    Q    Do you make the determination whether there should be a

5    culvert or a bridge as a replacement?

6    A    No.

7    Q    Do you make the determination what kind of culvert might be

8    used?

9    A    No.

10    Q    Do you make the determination of whether mitigation is

11    needed?

12    A    Can you clarify what you mean by "mitigation"?

13    Q    Sure.  Do you make a determination of what biological

14    improvements need to be made to a culvert site to make up for the

15    culvert installation?  Do you make that determination?

16    A    I provide input.

17    Q    But is it made by someone else, basically, a biologist -- a

18    fish biologist?

19    A    Yes.

20    Q    Do you determine whether or not a culvert is operating

21    correctly, to its design standard?

22    A    No.

23    Q    Do you determine whether or not it was the proper culvert to

24    be installed?

25    A    No.

Q    Do you oversee the budget process for a culvert?  Is that
your responsibility, to be responsible for a budget for -- for a
DOT project?  I-405, are you responsible for developing a budget
for that project?

A    I don't understand your question.

Q    Well, I assume that these projects that you work on are
fairly expensive and they have a large budget that goes into
them.  My question is:  Are you responsible for developing the
budget?

A    For the project budget?

Q    Yeah.

A    No.

Q    Do you have any real direct role in project budgets?  Direct
role.

A    Yes.

Q    And that direct role is to create the budget?

A    Through my role in working on scopes of work and negotiations
that are part of what goes into the overall project budget, yes.

Q    So you'll tell a biologist how much a culvert costs and how
to figure that out?

A    That specific example, no.

Q    This is a culvert case.  I think that's probably what we're
mostly involved in.

        In your declaration, you have a number of cost items where
you relate -- I'm not going to have you go look for them, but

1    there are places where you identified particular costs with

2    particular culverts.

3        And the question I have for you is:  Have you independently

4    verified the accuracy of those numbers?

5    A    No.

6    Q    Can you tell us whether they're high or low in terms of their

7    estimates?

8    A    Compared to what?

9    Q    Anything.  To the actual construction.  Can you tell me

10   whether or not those culvert -- those estimates are exaggerated

11   or overestimates, underestimates?  Do you have any information on

12   that at all?

13   A    No.

14   Q    On Page 3 of your declaration, you say you provide over --

15   excuse me, environmental oversight.  And I take that to mean

16   you're responsible for the NEPA and SEPA compliance; is that

17   correct?

18   A    I am responsible for many other aspects other than NEPA and

19   SEPA.

20   Q    Would you say that environmental oversight and responsibility

21   for NEPA and SEPA is a substantial portion of your responsibility

22   or a minimal?

23   A    I'd say NEPA and SEPA is one of the larger portions.

24   Q    But you don't deal with I-4 projects.  Am I correct?

25   A    That is correct.

1    Q    You mentioned that -- you say in your declaration, in fact

2    you have an exhibit, Exhibit J, you have the WSDOT model

3    Comprehensive Tribal Consultation Process for the NEPA.  That's

4    National Environmental Policy Act, and it's shortened to NEPA.

5         Do you remember that?

6    A    Yes.

7    Q    Are there some projects that the Department of Transportation

8    does that are under the State Environmental Policy Act?

9    A    Yes.

10   Q    And they -- I know some overlap.  But are some exclusively

11   under SEPA rather than under NEPA?

12   A    Yes.

13   Q    The Exhibit J, the WSDOT Model Comprehensive Tribal

14   Consultation Process for the NEPA doesn't apply to SEPA.  Am I

15   correct?

16   A    The handbook as it was written applies to NEPA projects.  On

17   my projects, we've implemented some of those --

18   Q    Well, I'm not talking about that.  My question was -- I'm

19   sorry.  Sometimes I ask bad questions.

20        I thought my question was that that Model Comprehensive

21   Tribal Consultation Process doesn't apply to SEPA; is that

22   correct?  As it's written, it doesn't apply to SEPA?

23   A    As it's written, it applies to projects with NEPA.

24   Q    My question was:  It doesn't apply to SEPA; is that correct?

25   We know it applies to NEPA.  It says so.

1    A    For a SEPA-only project, no, it does not.

2    Q    Thank you.

3         Are you familiar with Bob Barnard?

4    A    Yes.

5    Q    You know he has a slide show?

6    A    Yes.

7    Q    Have you ever seen that slide show?

8    A    Yes.

9    Q    You did.  And you've seen it when?

10   A    I have seen it as part of my involvement in this case.

11   Q    You saw it after June 11th, 2009; is that correct?

12   A    I cannot remember the date in which I first saw it.

13   Q    On that day, you told me in a deposition that you had not

14   seen it.

15   A    I believe what I told you in my deposition was I had not seen

16   Bob do the Power Point verbally but I had seen a hard copy of the

17   presentation.

18   Q    Oh.  You went through the slides, but you didn't go to his

19   presentation?

20   A    Correct.

21   Q    Do you know whether there's a rule, that you know of, that

22   the Department of Transportation employees are required to see

23   that slide show?

24   A    Not that I'm aware of.

25   Q    I want to talk about the rules when DOT fixes culverts on a

project and when they don't.  As I understood your testimony, if

DOT is going to be actually working with a culvert, that there's

an obligation - and there's one exception we will get to - but

generally there's an obligation that you have to correct that

culvert; is that correct?

A    Correct.

Q    If you're not touching the culvert, you don't have to make

the correction?

A    Correct.

Q    You may, but you don't have to; is that right?

A    Correct.

Q    So you've two culverts side by side, both fish-blocking

culverts, and Culvert A is -- you're going to touch, and Culvert

B, you're not.  And you would fix Culvert A but you may or may

not fix Culvert B?

          MR. SHAFTEL:  I'm going to object to the form of the

question.  I believe what she said in her prior testimony was

that if they have to get an HPA for in-water work.  We're using

jingoism about touching, which is not clear what that means.

          MR. STAY:  Jingoism?  I don't know what that means.

          THE COURT:  The objection is overruled.

     Do you remember the question?

          THE WITNESS:  Can you ask it again?  I'm sorry.

By Mr. Stay:

Q    Certainly.  We've had conversations before, Ms. Hanson, and

1    I'm trying to remember that.  If you've got two culverts side by

2    side in a project, and one you're going to be working in,

3    extending it, making it wider, whatever you're doing with that

4    culvert, and one you're not, and they're both fish-blocking

5    culverts, under the Memorandum of Agreement with the Department

6    of Fisheries, you have to address the one that you're actually

7    working in but you don't have to address the one you're not.  Am

8    I correct?

9    A    Correct.

10   Q    Thank you.  Now, we talked about there's a touch/no touch

11   rule when we had our deposition.  Is that a fair sort of a

12   colloquialism of how it works?  If you touch it, you have to fix

13   it; if you don't touch it, you don't have to.

14   A    I don't use that terminology, but, yes, if you alter or

15   modify the culvert.

16   Q    Okay.  On Tuesday you provided us an example, I think

17   Highway 167, where you voluntarily fixed it - you had a long

18   explanation of why you decided to do that - and you indicated

19   that that was a retrofit.

20        Do you remember that?  You didn't take the culvert out.  You

21   retrofitted the culvert that was there?  Am I right?

22   A    That's the proposal, yes.

23   Q    That's what you intend to do?

24   A    Correct.

25   Q    Now, we learned from Mr. Barnard that retrofits are temporary

1   fixes.  And so I want to know, when you're putting this proposal

2   together, when have you scheduled that culvert to be corrected

3   fully?

4   A    We have not scheduled that.

5   Q    Now, we also learned from Mr. Barnard that retrofit -- one

6   other question.

7        The retrofit for 167, am I correct that's going to be with

8   the use of baffles?  Is that part of the solution?

9   A    One culvert is replacing baffles.

10  Q    Now, I understand that when you deal with retrofits,

11  especially with baffles, there is a higher likelihood of having

12  maintenance problems.  So my question to you is:  What

13  maintenance program have you included in this proposal to address

14  that eventuality of having maintenance problems with those

15  culverts?

16  A    The HPA that's been provided for the 167 project specifies

17  that if in the future the two retrofits become barriers, WSDOT is

18  to promptly obtain an HPA and correct that situation.

19  Q    Very good.  So you're on notice from the Department of

20  Fisheries that you have to be taking care of this.  What program

21  have you developed as part of this proposal that's going to deal

22  with the additional maintenance?

23       In your proposal, what is the additional maintenance proposal

24  that you've included, if you have?

25  A    At this time, we have not developed a maintenance proposal.

```
 1   Q    Thank you.  Now, when you testified the other day, you

 2   indicated that even when you're touching -- I'm sorry, jingoism

 3   again.

 4       Even when you are actually working in the culvert and you

 5   have an HPA, there may be certain circumstances where you won't

 6   correct that culvert anyway.  And I think they are, and tell me

 7   if I'm right, where there's extremely minimal gain and the costs

 8   are extraordinarily high; is that correct?

 9   A    Correct.  That's the language in the MOA.

10   Q    Yeah.  But those are the standards that you would use in

11   making a determination not to correct this culvert, even though

12   you're working in it; is that right?

13   A    Correct.

14   Q    I want to know if you can direct me to the document, the

15   Department of Transportation document that defines

16   extraordinarily high costs and extremely minimal gain, those

17   terms.  You must use it all the time.

18   A    I cannot.

19            MR. STAY:  Your Honor, at this time, before I forget, I

20   would like to move the admission of AT-270, 1, 2, 3, 4, 5, 7 and

21   8.  And I believe there's no objection from Mr. Shaftel.

22            MR. SHAFTEL:  No.

23            THE COURT:  So AT-270 through AT-277, with the exception

24   of 6?

25            MR. STAY:  And then plus 8.
```

```
 1              THE COURT:  Like "Jon and Kate Plus Eight."  All right.

 2              MR. STAY:  I'm sorry.  My colleague says I may have

 3   misspoken and confused the Court.  I meant to say AT-270, dash 1,

 4   dash 2, dash 3, dash 4, dash 5, dash 7, dash 8.

 5              THE COURT:  Thank you.

 6              MR. STAY:  I screwed up.

 7              THE COURT:  Any objection, Mr. Shaftel, to those

 8   exhibits?

 9              MR. SHAFTEL:  I don't believe there's any objection,

10   your Honor.

11              THE COURT:  Then those will be admitted, Madam Clerk.

12              MR. STAY:  Madam Clerk, I believe you have them up there

13   close at hand.  Could I have you hand them to the witness,

14   please?

15   By Mr. Stay:

16   Q   Ms. Hanson, if you could just sort of thumb through those.  I

17   just want to make sure you're familiar with them.  I am not going

18   to ask you any questions about them.  I just want to make sure

19   you know what they are.  They should be based on your reports or

20   assessments on various projects.

21   A   Is there one that is missing?

22   Q   I didn't put them all in because, what I did, Ms. Hanson, I

23   tried to provide the ones that you provided me in your rebuttal.

24   A   Well, it seems that there's a number missing.  There's a No.

25   4, and I'm not seeing a No. 5 before it goes to No. 6.  Those are
```

1    not ones --

2    Q    They should be there.  They just may be out of place.  That's

3    okay.  I'll check with the clerk to make sure that that's been

4    taken care of.  Let me go to a question that may help us save a

5    bit of time.  I didn't want you to go -- I didn't want to ask any

6    questions about the substance of those at all, but I wanted to

7    ask a question of whether or not you're familiar with them, you

8    recognize them.

9    A    Yes, I do.

10   Q    Do you know that they were provided to me during the rebuttal

11   file?  Is that when I got them, if you know?  If you don't know,

12   that's fine.  Mr. Shaftel could have done them.

13   A    Yes.

14   Q    Did I get them then?

15   A    I don't remember which part it was that you received them.

16   Q    The question for all this effort is just this:  Do you agree

17   with me that they contain information that would be useful in

18   evaluating a culvert, whether it is or is not a blockage, whether

19   it should or shouldn't be repaired?  I mean, do those documents

20   contain information that you would consider to be useful in

21   examining culverts and whether they should be repaired or

22   otherwise?

23            MR. SHAFTEL:  Object as to form.  It's not clear in what

24   context they should be repaired, what he's referring to, in what

25   context they should be prepared.

1          THE COURT:  Hang on a second.

2      From your perspective, do those documents contain information

3   that you would find useful in evaluating whether these are

4   blocking culverts?

5          THE WITNESS:  Whether or not they're blocking culverts?

6   Yes.

7   By Mr. Stay:

8   Q   Now, would you agree with me that these reports would be

9   useful to a tribe that might be evaluating a culvert?

10          MR. SHAFTEL:  Objection, your Honor.  This witness

11   doesn't have any --

12          THE COURT:  The objection will be sustained.

13   By Mr. Stay:

14   Q   On Tuesday, you mentioned mitigation.  You mentioned it this

15   morning as well.  I just have a couple of questions on that.

16      Are you the person in the Department of Transportation who's

17   responsible for determining what mitigation will be used on a

18   particular stream or river?

19   A   Can you ask that again?

20   Q   Certainly.  Are you the person within the Department of

21   Transportation, or one of the people, I assume it's a big

22   organization, one of the people who's responsible for determining

23   what mitigation, the kind of mitigation that would be applied

24   with respect to a culvert project?

25   A   Am I the sole person?  No.

1    Q    Are you the person that has decision-making authority on

2    that?  Do you decide?

3    A    Am I the sole person?  No.

4    Q    I'm just having trouble asking the question here.  I

5    apologize.  Are you the person that can say yes or no with

6    respect to a particular mitigation proposal?

7             MR. SHAFTEL:  Asked and answered, your Honor.

8             MR. STAY:  It hasn't been answered.  She said she didn't

9    understand it.

10            MR. SHAFTEL:  No.  She said --

11            THE COURT:  Hang on.  You asked her if she was the

12   person who has decision-making authority.  She said, I am not the

13   sole person.

14            MR. STAY:  And I'm asking a question in a little more

15   detail, your Honor, whether or not she has up or down authority;

16   in other words, she is the one that when all is said or done, you

17   decide which mitigation goes forward.

18            THE WITNESS:  I'm not the sole person, no.

19            MR. STAY:  Reminds me of the other day, your Honor, and

20   I think you had a comment on this particular kind of answer.

21   Thank you.

22   By Mr. Stay:

23   Q    On Tuesday, you talked about the consultation process.

24   You're the environmental coordinator for the urban corridors

25   project.  You were; you're not anymore, right?

1    A    I'm the director of environmental services for mega projects.

2    Q    Right.  Is that the same as -- I understand you got promoted.

3    That's all I am asking about.

4         When I first knew you, you were the coordinator for urban

5    corridors projects, and now I believe you have greater

6    responsibilities; is that correct?

7    A    The name of our region has changed.  My position has remained

8    the same.

9    Q    Okay.  Thank you.  I just misunderstood.

10        Now, in the urban corridors area, the projects you've had the

11   most experience with, would you call those to be large projects?

12   A    Some of our projects are considered mega projects; some of

13   the projects I oversee are not.

14   Q    Let's look at some of these.  The I-405, that's a big

15   project?

16   A    Yes.

17   Q    SR 167?

18   A    It's not considered a mega project.

19   Q    But is it big?

20   A    Which project on 167 are you referring to?

21   Q    167 has lots of projects on it?

22   A    Yes, it does.

23   Q    Okay.  I-5, is that a mega project?

24   A    Which I-5 project?

25   Q    So there are lots of I-5 projects?

1    A    There are, but I don't oversee all of those.

2    Q    Okay.  So I'm getting the picture.  You may have a highway,

3    like say SR 520 or I-405, and there may be lots of projects

4    dealing with that particular highway; is that correct?

5    A    That is correct.

6    Q    Are you generally responsible for overseeing all of those?

7    A    I don't know what you mean by "all of those."

8    Q    Let's say SR -- I-405 in the Kirkland to South Center area.

9    A    Previously, as I noted, my previous role was the

10   environmental manager for I-405.  And I previously in my role as

11   a director provided guidance and oversight to that team in my

12   director and deputy role.

13   Q    Are there lots of culverts that you have to deal with on

14   those projects?

15             MR. SHAFTEL:  Object as to form.

16             THE COURT:  The problem, Mr. Stay, is words like "lots,"

17   words like "big," words like "large."

18             MR. STAY:  I understand.  I should know better than

19   that.

20   By Mr. Stay:

21   Q    Do culverts play -- are culverts an issue that are involved

22   in all of those projects?

23   A    In all of which projects?

24   Q    I-405, 520, I-67, I-5, 518, do all of those projects involve

25   culverts?

```
 1    A    I don't know which I-5 projects you're referring to.

 2    Q    Okay.   There's so many of them.

 3         Are there any I-5 problems you've worked on that involve

 4    culverts?

 5    A    The I-5 SR 18 triangle project has.

 6    Q    Now, you consult with many tribes, you've indicated:

 7    Muckleshoot, Puyallup, Tulalip, the Snoqualmie Tribe, and

 8    unrecognized Duwamish, you also indicated.

 9         Where would you put Muckleshoot in that as being the tribe

10    that you consult with the most?  Would that be the Muckleshoot

11    Tribe?

12    A    Can you clarify what you mean by "consult with the most"?

13    Q    Does the Muckleshoot Tribe -- do you and the Muckleshoot

14    Tribe interact on highway projects more than you interact with

15    representatives from other tribes?

16    A    Regarding what type of issues?

17    Q    Culvert issues.

18    A    Yes, typically.

19    Q    Thank you.  Got there.

20         Now, just looking at -- are you involved in the consultation

21    process with the Quinault Tribe?

22    A    I'm sorry?  Can you ask that again?

23    Q    Are you involved with the DOT tribal consultation process

24    with the Quinault Indian Nation?

25    A    To a limited extent, yes.
```

1  Q    They're on the Olympic Peninsula?

2  A    I don't know if the area that they're in is considered the

3  peninsula.  But, yes, they're on the coast.

4  Q    And then you'd also deal with the Hoh Tribe, I suspect,

5  right?

6  A    I have not specifically.

7  Q    You talked about Thunder Hills, and I want to spend just a

8  moment on Thunder Hills.  That seemed to be an issue that was

9  resolved through consultation with the Muckleshoot Tribe, the

10 Corps of Engineers, the Department of Fish and Wildlife and the

11 Department of Transportation.

12      Am I correct on that?

13 A    Correct.

14 Q    And that was a positive consultation process, in your mind?

15 A    We had an outcome with a solution to move forward.

16 Q    And having an outcome with a solution; that's a good thing, I

17 take it?

18 A    Yes.

19 Q    Now, for Thunder Hills, let me see if I can tick down some of

20 the factors that were involved.  You had an emergency; am I

21 correct?

22 A    Correct.

23 Q    And the culvert that was immediately below the Thunder Hills

24 culvert, the culvert going underneath the highway, that would

25 have been smaller than, say, a stream simulation culvert or a

1  fish-passing culvert if that had been built under the highway.

2  Am I correct?

3  A    Can you ask that again, please?

4  Q    When you were looking at that -- first, let's go back.  When

5  you had this emergency, there was a culvert that collapsed.  Am I

6  correct?

7  A    Correct.

8  Q    And that was the problem.  You had to fix that culvert; am I

9  correct?

10  A    Correct.

11  Q    And I assume the Muckleshoot Tribe wanted a culvert that

12  passed fish.  That was their initial position, I take it, right?

13  A    Correct.

14  Q    But there were some problems in being able to do that.  And

15  one of the problems, as I understand it, and I want you to verify

16  this, was that directly below or downstream from the culvert

17  under the 405 roadway was another culvert not owned by the

18  Department of Transportation, which was small; is that correct?

19  A    I'm sorry.  Did you say "small" --

20  Q    I did say "small."

21  A    -- or "smaller"?

22  Q    I did say "small."

23  A    I don't think I can quantify it.  I'm not sure what you mean

24  by "small."

25  Q    If you had put a stream simulation culvert, for example, a

1  larger culvert under the highway, one that would pass fish, would

2  there have been a problem with the existing culvert directly

3  downstream from that new culvert?

4  A   I don't understand what you mean when you say "problem with

5  it."

6  Q   Was the culvert downstream of a new culvert under the roadway

7  sufficiently sized to be able to accommodate the flows that would

8  be anticipated in the new culvert that would be fish bearing

9  under the highway?  If you don't know, that's fine.

10 A   From the work I did with the team, we had stream simulation

11 designs that worked with that downstream culvert without

12 modifying that culvert, I believe.

13 Q   Okay.  Fine.  There were power lines and sewer lines that

14 were a problem in installing a new culvert; is that correct?

15 A   Yes.

16 Q   You indicated the other day there was a problem with the kind

17 of equipment you would need to bore that tunnel, that culvert?

18 You didn't have the equipment that could be used; is that

19 correct?

20 A   I believe what I said was with the trenchless technique, the

21 size of the stream simulation culvert that we looked at exceeded

22 the size of the equipment that's typically used for that work.

23 Q   So the result was -- the result, by the way, it was contained

24 in a Corp of Engineers permit, was it not?

25 A   It was a 404 permit.

Q    Now, that permit included some off-site mitigation, am I correct, that you're working on now?

A    Correct.

Q    So the result of this, if I might see if you agree with me, was the correction of the emergency, the provision of mitigation, all with the consultation of at least one Indian tribe.  Is that a fair summation?

A    Yes.

Q    On Page 10 of your declaration there, we talked about Project 305, which I've already dropped my objection to.  But I just want to ask a couple of questions on it, if I might.

    Were you personally responsible for overseeing that project, SR 305?

A    I was not.

Q    Did you do any work on that project?

A    I did not.

Q    You didn't supervise the project, then?

A    Correct.

Q    You have visited that project, though, have you not?

A    I have.

Q    And you visited that project when?

A    Either in September or this month.

Q    So you visited that project for the first time after at least we had our deposition meeting on July 28th, 2009?

A    Correct.

1  Q   On Page 11 of your declaration, I think we -- we're talking

2  about the 305 project, and on Page 11, the last paragraph, you

3  say, "All the fish-passable structures are successfully providing

4  fish passage today."

5      You're not making that statement from any personal

6  involvement in the project, are you?

7  A   Correct.

8  Q   You're reporting what somebody told you?

9  A   Correct.

10  Q   Just a couple more questions, Ms. Hanson, and then we'll be

11  through.

12      In your declaration, Exhibits M through S, are a series of

13  pictures, diagrams.  And we have some more today.  Mr. Shaftel

14  even added to the record with the additional pictures.  A couple

15  of questions on all that as a group, and if you can't answer it

16  as a group, then we'll have to break it down.

17  A   Can you refer to the ones that we're discussing?  I don't

18  know them by that information.

19  Q   Certainly.  Yes, you can.  They're Exhibits M through S of

20  your declaration.  Just a few simple questions.

21      Did you take those pictures?

22  A   No, I did not.

23  Q   Did you develop the culvert designs that were used in any of

24  those depicted projects?

25  A   No, I did not.

Q    Did you supervise the installation of any of those projects that we see in those pictures?

A    Can you clarify what you mean by "supervise the installation"?

Q    Were you out there telling people how to build them?

A    I was not telling them how to build the culvert.

Q    Did you review each culvert that's depicted there to see whether or not it was installed correctly?

A    No, I did not.

Q    Did you monitor any kind of compliance with respect to that construction, whether or not it complied with design criteria?

          MR. SHAFTEL:  Your Honor, I'm not sure where we're going with this questioning.  I think she's already established that she was not at this project.

          MR. STAY:  Okay.  I don't need to ask the question, your Honor.  We can go forward.

By Mr. Stay:

Q    Can you say from your own personal knowledge any one of those culverts is today properly - not the word "properly" - today is passing salmon and is no longer a barrier to fish passage at all life stages and all salmon species?  Can you tell me that from your own personal knowledge?

          MR. SHAFTEL:  Your Honor, that's not testimony from her declaration.  That's a mischaracterization of testimony.

          MR. STAY:  I'm not --

```
 1              THE COURT:  Hang on.  Overruled.

 2        You may answer.

 3              THE WITNESS:  Can you repeat the question, please?

 4   By Mr. Stay:

 5   Q    Probably not, but I'll try to rephrase it a little better.

 6   Can you tell us from your own personal knowledge whether these

 7   culverts which are depicted in these pictures are today presently

 8   no longer fish barriers and passing fish, salmon, at all life

 9   stages, and all species of salmon?

10   A    From personal knowledge, I can for the Forbes Creek.

11   Q    Forbes Creek.  And that one is which one?

12        Oh, I see it.  That would be O, Q?

13   A    Correct.

14   Q    And so that culvert design and installation there, that's

15   what kind of culvert design?

16   A    That is a fishway.

17   Q    That's a fishway.  And you know that fishway is passing fish

18   at all life stages?  You know from your own personal knowledge

19   and experience that that culvert is passing fish at all life

20   stages?

21   A    From my experience from working with the I-405 team recently

22   on that project, I understand that Fish and Wildlife staff have

23   recently been out to verify --

24   Q    No, no, no, no, no, no.  Excuse me.  I didn't ask that.

25        I asked whether you, from your experience, can independently
```

1  verify for us that that culvert is properly functioning to pass

2  salmon at all life stages.

3  A    Independently verified it?  No, I have not.

4  Q    Thank you.  On Exhibit M, as in "mostly" done, do you have

5  that?

6  A    Yes.

7  Q    On Figure 41, there's a statement, "Four fish passage

8  barriers on South Fork Dog Fish Creek have been replaced to date

9  with 100 percent passable culverts."

10     Do you have any independent knowledge that that statement is

11  correct?

12  A    I do not.

13         MR. STAY:  Thank you.  I appreciate your help.  I'm

14  done.

15         THE COURT:  Ms. Hanson, before we get to redirect from

16  Mr. Shaftel, help me understand mitigation a little bit better.

17  When you determine that as part of a project on a culvert you're

18  not going to be able to correct it, for whatever reason, it

19  doesn't matter what the reason is, mitigation then kicks in; is

20  that correct?

21         THE WITNESS:  Correct.

22         THE COURT:  When that occurs, how do you decide which

23  tribe to consult with?  Is it just the tribe that that culvert is

24  within their jurisdictional area?

25         THE WITNESS:  In the example of the triangle project we

1   talked about where we did that exception, both Puyallup and

2   Muckleshoot have treaty rights.  I believe Muckleshoot, that's

3   one area we typically consult with them on, but we talked with

4   both of the tribes.  And in that case, in working with the

5   fishery staff from Muckleshoot, they told us primarily we should

6   be working with the Puyallup Tribe.

7        And so in any project scenario, we would look at all of the

8   tribes that we would need to consult with.  And then if they

9   chose to consult with us on the project, we would include them in

10  the process.

11           THE COURT:  From your department, who makes that --

12  somehow you come to the process where you say, Okay, we are going

13  to need mitigation in this project.

14       Do you then make a phone call?  Do you send a letter?  How do

15  you notify the tribes?

16           THE WITNESS:  We -- typically when we're starting a

17  process, we will send a letter to a tribe notifying them that we

18  are asking them to consult with us on a project.  We have a

19  requirement to do so under Section 106, which is the

20  archeological component of our project.  And typically on

21  projects, we will also ask for Natural Resource input on

22  projects.  And so that's one way that we will do it.

23       We have -- from the work that the agency's done and in

24  working with tribes, we have an understanding of which tribes

25  have U&A or interest in specific areas.  So for my projects, we

1  have five or six tribes that we consult with on all of our

2  projects, and some of those tribes may have more interest in

3  culverts than in others.

4      But we'll typically know -- at least on my projects and my

5  experience, we know which tribes we need to consult with.

6          THE COURT:  So the consultation process occurs.  There's

7  a give-and-take, whether its negotiated or not, I understand.

8  You come up with a potential resolution of it.  And who then from

9  your department has the final say on this is what is going to

10  happen, in terms of mitigation?

11          THE WITNESS:  On a project team perspective, for example

12  on the triangle project, it was collective, so we have a project

13  engineer from a design site who's overall responsible for the

14  overall design, and I was the environmental lead for the project,

15  so the two of us.  And we would work with staff from Fish and

16  Wildlife, and then we'd work with the staff from the Puyallup

17  Tribe.  We also worked with the staff from Fish and Wildlife,

18  both with the area habitat biologist that's issuing the permit,

19  as well as Mike Barber and staff from the task group that

20  actually oversee the barrier list, as well as Paul Wagner at

21  headquarters.  So usually in the exception process, at least in

22  my experience, it's been --

23          THE COURT:  A group effort.

24          THE WITNESS:  -- a group that's involved collectively

25  deciding that that's going to be how we're going to go forward.

1    In the case of the triangle project, for example, we have the

2  mitigation agreement with the Puyallup that notes that agreement

3  between the State and the tribe.

4    And then when Fish and Wildlife issues us our Hydraulic

5  Project Approval, one of the things that's included in the permit

6  as a standard is that there's a reference to the specific design

7  and the specs that we'll implement in construction.  So the HPA,

8  when it's issued, will reference what that essential agreement

9  is, per say, between the State and DOT about what that design is

10  that will go forward, or in the case of the triangle project,

11  note what the mitigation is that's being provided in lieu of the

12  replacement.

13          THE COURT:  And what happens in a situation where the

14  tribe that you're working with disagrees with your proposed

15  resolution?  Do they have any sort of appeal?  Can they go higher

16  up?

17          THE WITNESS:  They could go higher up.  Do you mean

18  higher up within the agency?

19          THE COURT:  Yes.

20          THE WITNESS:  Yes.  I mean, there could be the potential

21  to go higher up within our agency to the secretary of

22  transportation, and go up from that standpoint.

23    Depending upon the project, there's also the ability to work

24  with the resource agency who oversees that particular permit to

25  seek resolution.  Specifically for those agencies that are

1    issuing a permit that they have requirements of consulting with

2    the tribes and having jurisdiction, they'll typically work with

3    us to have those issues resolved before they'll issue the permit,

4    so there's various ways that the issue can be resolved.

5        If in what I would call a worst-case scenario, if a permit is

6    issued and the tribe does not agree, depending upon the permit,

7    there would also be the potential of appealing or challenging a

8    permit.

9            THE COURT:  Has that ever happened on one of your

10   projects?

11           THE WITNESS:  Not on one of my projects.

12           THE COURT:  All right.  Any redirect?

13           MR. SHAFTEL:  Just a couple of questions.

14                        REDIRECT EXAMINATION

15   By Mr. Shaftel:

16   Q    Ms. Hanson, you were asked a number of questions about the SR

17   305 project and why you made references to the projects -- or to

18   the barriers that were fixed during the course of that highway

19   improvement project being fish passable today.

20       Do you remember those questions just a moment ago?

21   A    Yes.

22   Q    Did you -- are you familiar with the fish passage progress

23   report that the DOT puts out?

24   A    Yes, I am.

25   Q    And have you reviewed those before drafting your declaration?

1    A    Yes.

2    Q    Will you turn to your screen there?  And I'll represent to

3    you this is a page from the 2009 fish passage report.  Do you see

4    the lines on this page that say "SR 305, Dog Fish Creek"?

5    Starting about halfway down the page, there's two of them, and

6    then you get down -- as you go further down the page, there's a

7    third one, there's a fourth, and I believe there's a fifth down

8    at the bottom.

9         Do you see all those?

10   A    Yes, I do.

11   Q    Is that where you got the information from your declaration

12   regarding whether or not these projects continue to be fish

13   passable -- or maybe I should ask it this way.  Have you looked

14   at this to confirm in fact that these are fish passable as of

15   today and that's why you included them in your declaration?

16   A    Did you say this is the 2009?

17   Q    This is the 2009.

18   A    I believe when I wrote -- included that in my declaration, I

19   was looking at the 2008 and then also verified that with Jon

20   Peterson in our headquarters group.

21   Q    Okay.  So you looked at a comparable table from 2008?

22   A    Correct.

23   Q    And so on that 2008 table, what did it say under "fish

24   passage satisfactory, yes or no," for those five projects?

25              MR. STAY:  Objection, your Honor.  The project speaks

 1    for itself.

 2              THE COURT:  It does, Mr. Shaftel.

 3              MR. SHAFTEL:  I'm sorry.  We're looking at a 2009 table.

 4    I am asking her about what she remembers about her 2008.

 5              MR. STAY:  All the tables speak for themselves.

 6              THE COURT:  They're admitted in evidence.  They speak

 7    for themselves.  It's fine.

 8    By Mr. Shaftel:

 9    Q    And there are several barriers that DOT fixed that were not

10    state barriers; is that right?  That's what you testified to

11    earlier?

12    A    Within that project, yes.

13    Q    Right.

14              MR. STAY:  Object, your Honor.  That's outside the scope

15    of cross.  I didn't ask about any barriers except state barriers.

16    Move to strike.

17              THE COURT:  Her answer will stand.  But where are you

18    going with this?

19              MR. SHAFTEL:  Well, I thought he asked a number of

20    questions about pictures that she had attached to her declaration

21    that may or may not be state barriers that reflected that they

22    were in fact continuing to be fish passable.  I just wanted to

23    find out what her foundation was for her identifying them.

24              THE COURT:  I don't think it's necessary, because we

25    stayed in cross-examination only on the state-owned.

1              MR. SHAFTEL:   Okay.

2      By Mr. Shaftel:

3      Q    You mentioned -- you were asked some questions about whether

4      or not the NEPA handbook that you've attached to your declaration

5      applies to SEPA projects.  What's your experience with whether or

6      not DOT in fact follows the guidelines that are put out in that

7      NEPA handbook on SEPA-only projects?

8      A    For many of the projects that I work on, the documents need

9      both NEPA and SEPA clearance.  And so we will typically, if we're

10     doing, for example, an environmental assessment, which is a NEPA

11     requirement, we will adopt that environmental assessment as our

12     SEPA checklist to meet our state requirements as well.

13          And so for the majority of the projects that I work on and

14     oversee, our environmental documentation is for both NEPA and

15     SEPA, and so we follow the procedures within the NEPA handbook

16     for those projects which are meeting both of those requirements.

17          So for my projects, that NEPA handbook really works and is

18     followed for projects that are meeting both the National and the

19     State Environmental Policy Act requirements.

20     Q    You were asked questions about whether or not the DFW has --

21     or I guess whether DOT has the final say on what design to use,

22     whether it be stream sim or hydraulic.

23          How does the DOT work with the Department of Fish and

24     Wildlife on design issues?

25     A    We typically on our projects will work -- our biological

1    staff, engineering staff, will work with the area habitat

2    biologists, who are the ones who essentially permit -- provide us

3    with the HPA permit for the project.  And so depending upon the

4    specific project, that may happen in a couple different ways.

5         One example would be having meetings throughout the

6    development of the design of the replacement structures with the

7    technical staff from DOT and the Fish and Wildlife staff, and

8    tribes may be involved in those conversations as well, to develop

9    the design.

10        As I mentioned earlier, when the Hydraulic Project Approval

11   is issued to DOT for a project, one of the standard terms

12   included in the HPA is a reference to the specific plans and

13   specs that we will implement for construction of that project.

14   So the actual permit itself, when it's issued, notes the specific

15   design requirements that we're going to follow.  It references

16   our plan set, essentially.

17             MR. SHAFTEL:  Thank you.

18             MR. STAY:  One question, if I might?

19                         RECROSS-EXAMINATION

20   By Mr. Stay:

21   Q    I am looking for Exhibit J.  That's the WSDOT comprehensive

22   and NEPA manual we've talked about and Mr. Shaftel asked you

23   about.  I'd like you to thumb through to Page I-5.

24   A    I'm sorry.  Which page did you say?

25   Q    I-5.  Introduction 5, the page right at the beginning.  This

1    is the J, WSDOT Model Comprehensive Tribal Consultation Process

2    for NEPA.

3          Did you find it?

4    A    No.   Which page did you say?

5    Q    I-5.   It is five pages from the beginning.

6    A    Thank you.   I was looking for I-5, not 1-5.

7    Q    I apologize.   I for "Introduction," which is part of J

8    document.

9          Do you see the bold print in the middle?

10   A    Yes.

11   Q    Can you read that for us, please?

12   A    "What's not included in this document."

13   Q    Would you go down to the third bullet?

14   A    Yes.

15   Q    Would you read that?

16   A    "Consultation process for State Environmental Policy Act only

17   projects."

18              MR. STAY:   Thank you.   Now I'll take all my stuff.

19              THE COURT:   Ms. Hanson, you'll be glad to hear you can

20   step down.   Thank you very much.

21        Counsel, let's go ahead and take our morning recess at this

22   time.

23   (At this time, a short break was taken.)

24              MR. GRUBER:   Your Honor, we have a couple more

25   housekeeping matters.   The first relates to the testimony of Alex

1    Nagygyor from Tuesday.

2        Towards the end of my cross-examination, the Court may recall

3    that I referred to the witness's deposition from July 20th of

4    this year for purposes of impeachment.  I would now move to

5    publish the original transcript of that deposition.

6            THE COURT:  Mr. Ferester, any objection?

7            MR. FERESTER:  Your Honor, we would object.  Essentially

8    this was an inquiry into matters that Mr. Nagygyor did not

9    testify to.  He did not offer rebuttal testimony.  You may recall

10   that this involves the lost fish issue that we've had lots of

11   discussion about.

12       Your Honor allowed one question into that matter.  That's the

13   question I believe Mr. Gruber referred to and read from the

14   deposition to refresh the witness's recollection.  There were

15   subsequent questions to which I objected and you sustained.

16       I just believe that this matter is irrelevant and wasn't

17   addressed in the direct testimony.  There's no need to publish

18   the deposition.

19           THE COURT:  Okay.  Mr. Gruber, I think that's correct.

20   I don't think there's any need to publish it, Counsel.  You read

21   the portion that pertained to the issue and the question that was

22   being discussed into the record at the time.  I think that's

23   sufficient.

24           MR. GRUBER:  Okay.  Thank you, your Honor.

25           MS. FOSTER:  Your Honor, I have one other matter.  This

1    morning I filed with the clerk of the court a bench memo with

2    regard to the admissibility of a number of other plaintiffs'

3    exhibits.  I provided a copy electronically to the State

4    yesterday, and I provided a copy also to your law clerk

5    yesterday.

6        It's my understanding from speaking with the counsel for the

7    State that they would like to have an opportunity to respond to

8    that, but I just wanted to place on the record that I am moving

9    for admission of the exhibits that are contained within the bench

10   memo.

11           THE COURT:  And I think the State certainly has the --

12   let me rephrase that.  The Court did receive a copy of this, a

13   courtesy copy, delivered to chambers, and so I was aware of the

14   issue.  It's certainly something we can take up next week, and of

15   course the State has a right to respond.  All right?

16           MS. FOSTER:  Thank you, your Honor.

17           THE COURT:  Counsel, before we call our next witness,

18   while I'm thinking about it, I'm sure that our clerk has already

19   informed you of this, but we moved all of our sentencing to try

20   to maximize our trial day today.  One sentencing, we could not

21   move.  We will be starting at one o'clock.  It normally takes at

22   least 30 minutes.  This one might take perhaps 30 to 40 minutes.

23   So we'll have just a little bit longer lunch break for you,

24   because I'm sure there will be probably ten to 15 people in here

25   for that particular sentencing, so we'll just need to have you

1    wait a little bit before we get started this afternoon.  All

2    right?

3              MR. STAY:  Your Honor, may we leave our materials here?

4              THE COURT:  You're fine.  We just need a space cleared

5    so counsel can sit.  When we break for lunch, our clerk can tell

6    you exactly where.  That would help.

7       All right.  You may call your next witness.

8              MS. WOODS:  Your Honor, the State will call Dr. Jeff

9    Koenings.

10             THE COURT:  Dr. Koenings, if you would approach in front

11   of our clerk to be sworn in, and raise your right hand.

12   Whereupon,

13                        JEFFREY KOENINGS

14   Called as a witness, having been first duly sworn, was examined

15   and testified as follows:

16             THE COURT:  It's nice to see you again.

17             THE WITNESS:  It's nice to see you.  It's a pleasure to

18   be here.

19             THE CLERK:  Please state your full name and spell your

20   last name for the record.

21             THE WITNESS:  My full name is Jeffrey Paul Koenings.

22   The last name is K-O-E-N-I-N-G-S.

23             THE COURT:  Ms. Woods, you may inquire.

24             MS. WOODS:  Your Honor, we did have a motion to use

25   Dr. Koenings' video deposition.  Now that he's here live, that

1   motion is moot and will be withdrawn.

2            THE COURT:   Thank you.

3                          DIRECT EXAMINATION

4   By Ms. Woods:

5   Q    Good morning, Dr. Koenings.

6   A    Good morning.

7   Q    Where do you work?

8   A    I work in Olympia at the Recreation and Conservation Office

9   for the State of Washington.

10  Q    What do you do for that office?

11  A    My primary responsibilities are as a commission

12  representative.   That means I do work relative to salmon

13  commissions, the primary one being the Pacific Salmon Commission,

14  the Pacific Salmon Treaty with Canada.

15  Q    Did you just fly in from Sitka, Alaska, yesterday evening?

16  A    Yes.   Gratefully, I made it.   Yes, I did.

17  Q    Why were you in Sitka?

18  A    There was a meeting of the Pacific Salmon Commission, which

19  is the implementing body for the Pacific Salmon Treaty.   We were

20  there discussing various matters dealing with the conduct of

21  future meetings in January and February.   It was a bilateral

22  meeting with the Canadians.

23  Q    What did you do before you joined the Recreation and

24  Conservation Office?

25  A    I was director of the Washington Department of Fish and

1    Wildlife for ten years.

2    Q    What were your responsibilities as director of Washington

3    Department of Fish and Wildlife?

4    A    Well, the responsibilities were trying to referee five

5    particular programs within the Department of Fish and Wildlife.

6    Basically the program dealing with wildlife, fish, fisheries,

7    habitat section, enforcement, which is always an interesting

8    endeavor, and of course the inter-governmental resource

9    management unit that I basically started.

10        So the duties were trying to conduct budgets and basically

11   program direction -- policy direction for those particular

12   programs.

13   Q    Were you involved in salmon recovery activities during that

14   time?

15   A    Very much so.  Very much heavily involved in those

16   activities.  As you know, we have a co-management relationship

17   with the tribes, and fish and wildlife are basically part of that

18   co-management, so it's a heavy, heavy responsibility with the

19   department to cooperate with the tribes in terms of managing fish

20   and wildlife.

21   Q    What kind of salmon recovery activities were you involved in?

22   A    Many activities.  Fortunately or unfortunately, when I

23   arrived in the state, they were just beginning their response to

24   the various listings of salmon under the Federal Endangered

25   Species Act.  That act, of course, was administered by NOAA

1    Fisheries or the National Marine Fisheries Service.

2        We were in a state of beginning to put together a policy

3    direction in terms of how the State would participate and respond

4    to various listings of salmon in the state of Washington.  We

5    got, as Department of Fish and Wildlife, in the beginning of

6    identifying direction of the State through the natural resource

7    cabinet, where that particular endeavor would go.  It was an

8    attempt by the State to say it would basically be heavily

9    involved in salmon recovery activities.

10       "Extinction is not an option" was one of the documents that

11   was put forward.  And the Department of Fish and Wildlife was

12   heavily involved in those discussions.

13   Q   What did you do before you were appointed director of the

14   Washington Department of Fish and Wildlife?

15   A   I worked for the State of Alaska for the Alaska Department of

16   Fish and Game.  And in that position, I started out as a research

17   scientist.  I worked in that particular capacity as a statewide

18   position dealing with limnology, which is the productivity of

19   lakes and streams towards the production of salmon, principally

20   Sockeye and Coho.

21       Some say I joined the dark side and became a policy maker in

22   Juneau.  In that regard, I ran various divisions in the Alaska

23   Department of Fish and Game Commercial Fisheries division, and

24   the division that was responsible for the hatchery program and

25   the rehabilitation and enhancement of fish in the state of

1    Alaska.

2        From there I moved into what they call the commissioners

3    office, and I was a special assistant to the commissioner dealing

4    with international issues that dealt with Alaska.

5    Q    Maybe by "dark side," they meant the weather in Juneau.

6    A    Yes, true.

7    Q    How long did you work for the State of Alaska?

8    A    I worked there for 21 years.

9    Q    Would you please describe your educational background?

10   A    I will.   It's sort of in my distant past, but I think I can

11   remember.

12       I attained a Bachelor of Science degree in fisheries from the

13   University of Michigan.   And then I had a Master of Science

14   degree, which was a combined program with the School of Natural

15   Resources and ecology engineering and water resources management.

16   And then I have a Ph.D. at the University of Michigan in natural

17   resource management.

18       And after that, I went down to the University of North

19   Carolina, Chapel Hill, and did a two-year post doc at the School

20   of Public Health dealing with nutrient cycling in coastal

21   estuaries.

22   Q    In total, about how many years of professional experience do

23   you have in the areas of salmon biology and management?

24   A    I would say about 30.

25   Q    Dr. Koenings, did you prepare a Declaration in Lieu of Direct

1    Testimony for this sub-proceeding?

2    A    I did.

3    Q    I would like Madam Clerk to please hand Dr. Koenings the

4    binder with Exhibit W-085.

5    A    You build up a lot of muscles dealing with these things.

6         Yes, I have it.

7    Q    Do you recognize Exhibit W-085?

8    A    Yes, I do.

9    Q    What is it?

10   A    It is the Declaration of Jeffrey P. Koenings, Ph.D., in Lieu

11   of Direct Testimony.

12   Q    Would you please turn to Page 27?

13   A    Got it.

14   Q    That's your signature on Page 27?

15   A    Yes, it is.

16   Q    What's the date of your signature?

17   A    31st day of March 2009.

18   Q    Dr. Koenings, do you adopt Exhibit W-085 as your direct

19   testimony today?

20   A    I do.

21        MS. WOODS:  I'd like to offer Exhibit W-085 for

22   admission into evidence.

23        MR. STAY:  We have no objection.  You're not going to

24   the exhibits yet, are you?

25        MS. WOODS:  That's next.

1          THE COURT:  Thank you, Mr. Stay.

2     W-085 is admitted.

3          MS. WOODS:  Your Honor, Mr. Stay just referred to the

4     exhibits that are associated with Dr. Koenings' declaration.  We

5     have 22 of those.  I believe three are already admitted.  Those

6     would be W-085-A, W-085-C, and W-085-S, as in "state."

7          THE COURT:  That jibes with our records, yes.

8          MS. WOODS:  It's my understanding that the plaintiffs -

9     and I appreciate Mr. Stay's cooperation on this - will not be

10    objecting to 13 of the remaining exhibits.  I think that I have

11    this list correct, and so I will read it off, and Mr. Stay will

12    tell us whether I'm wrong on any of these.

13        The list that I believe that is not objected to is W-085-B,

14    as in "boy," W-085-D as in "dog," W-085-E, W-085-F, as in

15    "Friday," W-085-I, W-085-L, W-085-M, W-085-N, W-085-O, W-085-P,

16    W-085-Q, W-085-R, and W-085-V.

17        I'd like to offer those 13 exhibits that I just listed into

18    the record.

19          MR. STAY:  No objection, as long as J and K are not on

20    the list.

21          THE COURT:  J and K were not on that list.  The rest, as

22    indicated by Ms. Woods, will be admitted, Madam Clerk.

23          MS. WOODS:  The plaintiffs have objected to W-085-G.

24    I'd like to withdraw that one and substitute in its place joint

25    Exhibit 25, which I believe has already been admitted.

```
1              THE COURT:  Joint Exhibit 25 has already been admitted.

2     You are withdrawing W-085-G, as in "goat"?

3              MS. WOODS:  Yes.

4              THE COURT:  Thank you.  That will be withdrawn.

5              MS. WOODS:  We're also withdrawing two additional

6     exhibits:  W-085-T and W-085-U.

7              THE COURT:  W-085-T and U will also be withdrawn.

8              MS. WOODS:  I believe that leaves three exhibits.  We

9     will be addressing those during Dr. Koenings' testimony.

10    By Ms. Woods:

11    Q    Dr. Koenings, on the Table of Contents on the first page of

12    your declaration, there's a reference to the four Hs.

13         What are the four Hs?

14    A    The four Hs are a simple way of looking at salmon recovery in

15    terms of those factors that impact salmon, have impacted salmon,

16    and those factors that need to be corrected in order for salmon

17    to be restored, delisted in the state of Washington.  They are:

18    hatcheries, harvest, hydropower, and habitat.

19    Q    Do you have a slide in front of you?

20    A    I do.  That slide depicts those particular four components

21    and how these components are broken out in each one of the

22    watersheds.  Let's say we are dealing with Chinook in the Puget

23    Sound case area.  Each one of these quadrants would be of

24    different sizes, depending on the unique fingerprint of what

25    needs to be corrected in each one of those habitats.
```

1        As you see in the diagram -- and I can use an example, if you

2    will.  For example in the Nooksack, we basically have an area

3    here where harvest is not going to basically be able to be

4    addressed any more than it is, so I would draw a smaller line of

5    the impact of harvest.  It's a great impact, but because of that

6    harvest occurring mostly in Canada, there's not much we can do to

7    correct that.

8        There is some small dams on the Nooksack, so hydropower is

9    not really going to be a major issue on the Nooksack.  There is a

10   hatchery program that we need to deal with on the Nooksack River,

11   so hatcheries will play a larger role, if you will.  And then of

12   course there is a huge habitat component on the Nooksack in terms

13   of getting to salmon recovery.

14       So basically here you have two of the major quadrants that

15   are, I think, the major ingredients of addressing salmon recovery

16   in the Nooksack.

17       Now, if you go to another watershed, for example the Skagit,

18   there isn't a lot of hatchery influence on the Skagit.  There is

19   some, but not an awful lot.  So that impact would be fairly

20   small.

21       The harvest impacts to be corrected, we are putting

22   substantial numbers of fish on the spawning grounds, maybe not

23   for all segments but for a majority of the fish.  Harvest is

24   really not a problem on the Skagit.  There is a small hydropower

25   project, but I think with the FERC relicensing we've addressed

1   most of those issues, so a lot of that will be fairly minor.   But

2   there's a huge habitat component on the Skagit.   And these

3   particular major limiting factors, I think we've identified most

4   of that -- not all, but most of that habitat relies, in terms of

5   being restored, in the estuary portion of that particular system.

6        I'd just like to go through perhaps one more to illustrate my

7   point about diversity.

8             MR. STAY:   Your Honor, may I interrupt and object,

9   please.   I believe this is outside the scope of his declaration.

10  It's supposed to be a summary of what's there.   I don't believe

11  that these examples and discussions are part of it, so therefore

12  it's not an appropriate summary.

13       As interesting as it might be, it's not an appropriate

14  summary, and we would move to strike it.

15            THE COURT:   Ms. Woods?

16            MS. WOODS:   I believe it's correct that those particular

17  examples are not in his declaration, but Dr. Koenings does talk

18  about the four Hs in his declaration.

19            THE COURT:   I think so.   I understand that it's

20  background for setting up to getting to the specific examples

21  that will be at issue here.

22       So you may continue.

23            THE WITNESS:   Thank you.

24  By Ms. Woods:

25  Q   Dr. Koenings, were you about to give an additional example?

1    A    I would just like to, again, give an addition example.  Move

2    to the south Sound, maybe the Nisqually system, if you will.  The

3    tribes have been just really excellent in terms of working with

4    the State and other federal agencies, for example on the

5    Nisqually, the refuge, etcetera, so they have dealt with a lots

6    of habitat issues.  There's some more to be dealt with, but

7    habitat is really being dealt with quite nicely there.

8         There are some dams in the upper part of the Nisqually, so

9    hydropower again is really not that much of an issue.  We do have

10   an issue in terms of the harvest and hatchery component here in

11   the Nisqually that the co-managers have to deal with.

12        The whole idea here is to just to give everybody an

13   understanding that the four Hs are unique in terms of their

14   combination or integration to get the salmon recovery in each one

15   of the watersheds.  That's why it's so complex and difficult in

16   terms of dealing with the individual watersheds, because of this

17   unique fingerprinting that does go on in terms of the four Hs.

18   Q    Where do fish passage barrier culverts fit in the four Hs?

19   A    They fit in the habitat component of these.  On the lower

20   right-hand corner quadrant, along with major limiting factors

21   here, fish passage barriers are very definitely a problem in some

22   of the watersheds that need to be corrected, so they would be

23   part of that fingerprinting process.

24   Q    Do you have an overall vision of salmon recovery?

25   A    I do.

Q    I just put up a slide.  What is that vision?  Would you

describe how it relates to the slide that I've just put up?

A    I would like to, and I'll try to be brief, because it is a

complicated issue and this is a complicated slide, but it does

depict an illustrative viewpoint of what we're dealing with in

terms of past practices and how we got to where we are today.

Past practices, and we have the degraded habitat,

urbanization, forestry practices, agricultural practices.  Just

more and more people coming into the habitats have degraded the

habitat, made them less functional to produce wild fish.  Wild

fish in that production declined until the State of Washington

built one of the biggest hatchery systems, I believe in the

world, in terms of number of facilities.  We have now state

facilities, tribal facilities, and federal facilities producing

hatchery fish to supplant and augment the wild fish population.

And in that process, the hatchery program was run -- or

hatchery fish became the brood stock for the hatchery program, so

those genes became part of those particular production.  The

hatchery production became really large, especially for

Steelhead, Coho, and Chinook.  Pink and Chum, not so much.  Just

those main three species.  So hatchery fish really dominated the

harvest.  That's what they were designed to do, and they did a

very good job of that.

Where the harvest came in, the harvest was focused on total

abundance.  And in some cases, the harvest rate on these fish

1    almost got to be the point of being 80 percent or so.  So in that

2    high harvest, we took an awful lot of the wild fish in that

3    harvest rate, as well as the hatchery fish, which was basically

4    the intent to harvest.

5        So we've got -- in that particular process, the wild fish

6    spawners began to decline, which led to fewer fish on this

7    degraded habitat, and a lot of the habitats in the state of

8    Washington now have a dominance of hatchery fish in their

9    particular systems.  So that's the past.  That's what we've been

10   developing over the last 50 or 60 years.  It's a way of saying

11   that that's got us to where we are now with the listings in Puget

12   Sound and elsewhere.  It's, again, a depiction of where we've

13   come.  And I think it gives you an illustration of why we need to

14   address the four Hs, and this one is depicting why the habitat,

15   the hatchery, and the harvest component of those.

16   Q   How do state-owned fish passage barrier culverts fit into the

17   past that you've just described?

18   A   Well, I believe that they naturally fit into the degraded

19   habitat portion of this.  They basically are responsible for

20   taking out various quantities of functional habitat in the

21   various watersheds.  And it's something that's happened over a

22   period of time.  In some watersheds, it's severe, and in other

23   water sheds it's not severe.  But basically they are a component

24   of the degraded habitat.

25   Q   I just put up a slide called "Future."  Would you please

1  explain what this slide depicts?

2  A    Certainly.   In my particular viewpoint, we need to get to the

3  portion of restoring habitat.   I think everybody agrees that

4  restoring habitat is a key component.   That's one of the four Hs

5  of addressing the restoration of fish in the watersheds.

6      We need to provide room in the habitat for wild fish here to

7  spawn.   And in the future, the wild fish in these particular

8  watersheds would be the primary number of fish dealing with the

9  spawning capacity of that particular watershed.   Hatchery fish

10  will be less important in terms of streaming into those

11  particular spawning grounds, and wild fish would make up the

12  dominating, as they were in the distant past -- the dominating

13  fish type in these particular watersheds.

14      And if we can get to that particular point, we'll always have

15  the wild fish genetics that will help drive the genetics of the

16  hatchery fish, so the hatchery fish will become more akin to what

17  the wild fish genes are all about, because they will dominate the

18  number of eggs and sperm going into those particular programs.

19      The next side of it -- because I think, by the way, that

20  hatchery fish -- and there is some disagreement here -- hatchery

21  fish will always be part of our environment here in the state of

22  Washington simply to provide a lot of the harvest that needs to

23  go on on those particular species, be they Chinook, Coho, or

24  Steelhead.

25      Now, the interesting part of all this is that you have

harvest now focusing more on the hatchery origin fish.  It's my belief that the wild fish, even in a sustained habitat, may be able to withstand something like 30 percent harvest rate, 20 to 40 percent, not nearly what was the harvest rate of nearly 60 to 80 percent in the past.

However, we like to have harvest rates on the hatchery fish closer to 90 percent because we need to make sure that those hatchery fish no longer spawn on the water's edge in Puget Sound streams and rivers.  So harvest would be more directed towards a hatchery-origin fish and less directed towards the wild fish, as we allow more of those wild fish spawners back onto the restored habitat.

So the cycle would continue in terms of a gravel-to-gravel cycle, where wild fish would basically dominate each one of these particular cycles, as they did in the past.  So you have restored habitat, you have hatchery reform, which basically gets at the idea of having hatchery fish, drives the genetics of the programs.  We have harvest reform, more focus on hatchery-origin fish, less on the wild fish, and basically the cycle can continue into the future.

And out of that, you get a wild fish population that is sustainable for the future, a wild fish population that would enable us to say that the populations are restored, we'll have harvest, and these wild fish populations will be able to exist without the hatchery programs.  And that's what's called a

1   restored and, I think, an unlisted fish population.

2   Q   Have you written any newspaper editorials that describe your

3   vision of salmon recovery?

4   A   I have over the years, yes.

5   Q   Would you please turn to Exhibit W-085-J?

6   A   Yes.

7   Q   Is Exhibit 085-J one the editorials that you have written?

8   A   Yes.

9   Q   Do you still agree with it?

10  A   I do.

11  Q   Do you adopt Exhibit W-085-J as part of your testimony today?

12  A   Certainly.

13  Q   Would you please turn to Exhibit W-085-K?

14  A   Okay.

15  Q   Is Exhibit W-085-K one of the editorials you have written?

16  A   Yes, it is.

17  Q   Do you still agree with it?

18  A   Absolutely.

19  Q   Do you adopt Exhibit W-085-K as part of your testimony today?

20  A   I do.

21          MS. WOODS:  Your Honor, I would like to offer Exhibits

22  W-085-J and W-085-K for admission into the record.

23          MR. STAY:  Your Honor, these were the two exhibits that

24  we objected to.  They're obviously hearsay.  But more than that,

25  I believe that they're not even a complete rendition of what

Dr. Koenings submitted to the local paper.  This is what their
editorial board saw fit to put into the press.

If I've misstated, then I know Dr. Koenings will tell me that
I'm wrong, but I believe I'm correct; therefore they're not a
government record, they're not a public document, they're not
complete.  They should not be introduced.  There's no exception
to the hearsay rule.

THE COURT:  Ms. Woods?

MS. WOODS:  Dr. Koenings has just stated that he adopts
the statements in those two editorials as his testimony today, so
they become his sworn testimony today.

MR. STAY:  The testimony was created in April, not in
October, your Honor.  We are here to summarize the testimony, not
to create it.

THE COURT:  All right.  Counsel, here's what I will do.
Let's reserve on J and K until cross-examination.  All right?

By Ms. Woods:

Q   Dr. Koenings, you've just described your vision of the
future.  With respect to the hatchery H, has the State of
Washington been doing anything to make the future a reality?

A   Yes.  In the state of Washington, as I said when I began my
testimony, we've been involved in salmon recovery and addressing
the four Hs.  So one of the Hs that we've had to address is
hatchery and hatchery reform.

And in the state of Washington, we have a congressionally

1   driven hatchery scientific review group that has basically

2   reviewed the hatchery programs throughout the state and has come

3   up with a series of recommendations for us to follow to reform

4   our hatchery systems to more or less comply with the future

5   conditions as I laid it out.

6       In the rough, it's correspondence, not letter to letter, but

7   basically that's the particular focus of the hatchery reform.  So

8   we have been in the process of trying to implement those kinds of

9   recommendations.  There are something like over a thousand

10  recommendations, I believe, in the Puget Sound area, and we've

11  done, as co-managers, maybe 800 of those.  Don't hold me to the

12  exact figure, but a bulk of them.

13      But in a lot of cases what's remaining are the more expensive

14  and more elaborate fixes, if you will.  And we've been seeking

15  funding over the years to get those fixes put in place, and we

16  slowly are getting some funding to do that, but it's not

17  sufficient to make a very big dent in what we need to do in terms

18  of hatchery reform.

19  Q   Dr. Koenings, at the outset of your testimony, you said you'd

20  just gotten back from Sitka from a Pacific Salmon Commission

21  meeting.  The Pacific Salmon Commission, I believe, is set

22  up under a treaty between the United States and Canada; is that

23  right?

24  A   That's correct.

25  Q   Do fisheries in Canada affect salmon that spawn in Washington

1  rivers?

2  A    Yes, they do.

3  Q    I just put on the screen Exhibit W-085-L.  What does this

4  slide depict?

5  A    It depicts basically what the salmon commission is all about

6  in terms of one of the species it manages.  This is the average

7  annual Chinook catch in those various fisheries up and down the

8  coast from southeast Alaska to Washington and Oregon.

9      It represents the stocks of origin in those particular

10 fisheries.  So as you can see, from southeast Alaska, from a

11 catch of about 460,000 Chinook, they are made up primarily of

12 stocks that are not produced in Alaska.  A lot of those are

13 produced in British Columbia and a lot are produced in the state

14 of Washington and Oregon.

15     So the treaty was set up to basically figure out how do we

16 conserve these stocks, given this catch history up and down the

17 coast of different entities catching each other's fish.  So

18 that's a part of the treaty that deals with the conservation,

19 trying to prevent what we call overfishing.

20     The other part is trying to figure out how do we get to

21 optimum production in those particular -- for these particular

22 stocks.  And optimum production basically deals, in our language,

23 with what's called non-fishing factors.  So the commission is

24 increasingly becoming involved in trying to understand and deal

25 with what's going on with habitat and the natural stock

1  production in various watersheds that affect their fisheries.

2      So we are heavily involved of course in the management, but

3  we're also dipping our toe in the lukewarm water of salmon

4  restoration and trying to learn from the different entities how

5  best to do and how we could help in the salmon restoration

6  picture.

7      Now, one of the things I want to point out is that I

8  mentioned earlier for the Nooksack, you see being basically

9  harvest outside the state of Washington.  Most of the harvest on

10  the Nooksack and a lot of the Puget Sound fish occurs in these

11  two fisheries in Canada.

12      And we have an international treaty, but that treaty doesn't

13  reduce -- can't reduce the harvest to a sufficient degree to say

14  that we've got harvest under control in the Nooksack River

15  system.  But the co-managers have been adamant that in our

16  particular fisheries, we've basically cut that impact on those

17  particular fish down to basically nothing.  So it goes back to

18  the fingerprinting in the various watersheds.

19      If you can't reduce the mortality through harvest

20  restrictions and -- because of the international nature of these

21  fisheries, how do you boost the survivorship of those fish in the

22  freshwater or in the portion of the system that we can deal with?

23  So that's how you get off in terms of a trade-off between the

24  various Hs, depending on what factor is affecting which H.

25      Yes.  This is a depiction of how Chinook salmon are caught up

1   and down the coast.

2   Q   Has there been any effort to persuade Canada to reduce its

3   catch of Washington and Oregon Chinook?

4   A   Yes.  We've just completed another ten-year agreement that

5   includes a 30 percent reduction of Canada's catch off the west

6   coast of Vancouver Island here, which basically has a lot to do

7   with Puget Sound stocks of Chinook.

8       And we've also had a 15 percent reduction in basically the

9   Chinook catch in the southeast Alaska system, primarily having to

10  do with their catch of Canadian-origin fish.  That enables

11  Canada, therefore, to turn around and cut their catch on the west

12  coast of Vancouver Island so that we have more fish coming back

13  to the spawning grounds in Washington and Oregon to fulfill our

14  responsibility to basically restore those fish populations under

15  the ESA.

16  Q   When was that ten-year agreement executed?

17  A   It was signed last year, basically in December.

18  Q   Is it currently in effect?

19  A   It is.

20  Q   Did you see any result of it during the fishing seasons in

21  2009?

22  A   Yes.  I think we saw -- it's hard to tease out in one year,

23  but I think we saw the results of some of the harvest

24  restrictions off the west coast of Vancouver Island deliver more

25  fish back to Washington and Oregon.

```
 1            THE COURT:  Counsel, I want to make sure I understand
 2   this slide.  Doctor, the way I understand this particular slide
 3   is that the legend on the left shows where the fish come from.
 4            THE WITNESS:  Yes.
 5            THE COURT:  Where the stock of this Chinook comes from.
 6            THE WITNESS:  Stock of origin, yes.
 7            THE COURT:  And then the circles that are on the main
 8   portion of it show the catch size and how that is composed, where
 9   those fish come from, correct?
10            THE WITNESS:  Yes.
11            THE COURT:  Doesn't differentiate between hatchery fish?
12   wild fish?  It doesn't matter?
13            THE WITNESS:  It does not.
14            THE COURT:  Thank you.
15   By Ms. Woods:
16   Q   All right.  Dr. Koenings, we've been talking about the
17   harvest H and a little bit about the habitat H.
18       What's happening in the state of Washington, and particularly
19   in the case area, with respect to the habitat H?
20   A   Well, the co-managers, as I indicated earlier, took a very
21   proactive step in terms of dealing with recovery plans in the
22   various watersheds, dealing with Chinook in particular.  The
23   co-managers had a very large part to play in developing recovery
24   plans.
25       When we started this endeavor in 1998, 1999, the State set up
```

local watershed groups in these particular watersheds that were to help write recovery plans.  So the watershed groups called "lead entities" have been fully functional through that particular time, helping to write the recovery plans for listed fish and their watersheds.

We've also had other groups, called Regional Fish Enhancement Groups, that are watershed groups that do habitat restoration work and other work dealing with the fish in the watersheds as well.  Now, these are groups that are made up of volunteers that do like boots-in-the-water kind of work, but they're official volunteers for the State of Washington.  And these programs are administered either by the Department of Fish and Wildlife or more recently by the recreation and conservation office.  So they are what the legislature envisioned to be the primary vehicles of doing habitat restoration, the actual work, and proposing projects to get funded.

Now, the project funding part of it was supposed to occur through the Salmon Recovery Funding Board.  The Salmon Recovery Funding Board gets its allocations from the federal budget and a 25 percent match from the state budget.  And the funding board takes projects coming out of the watersheds that are recommended by the watersheds and funds those basically habitat restoration projects, more recently according to the plans that were submitted and approved by NOAA.

So that's sort of a nutshell in terms of how the restoration

1   work is occurring.  And you can see in this particular diagram,

2   which comes out in the State of the Salmon Report, the latest

3   State of the Salmon Report, looking at some of the, again,

4   habitat-related issues that have been addressed in the various

5   ESUs in the watersheds.  So you know, we're making some progress,

6   and the progress is in a variety of different components of the

7   overall habitat.

8        You have to -- again, as NOAA would define it, you have to

9   address the main attributes of the limiting factors in order to

10  recover the fish populations in each one of these particular

11  sectors.  So there are multiple factors that need to be

12  considered.  And what this shows is just basically the progress,

13  and it's a depiction and it's a summary of addressing each one of

14  these components as part of our overall strategy in the state of

15  Washington.

16       So it shows the average progress in terms of addressing the

17  various issues that are responsible for the salmon populations

18  being diminished in each one of these watersheds.  And you can

19  see that they're at varying degrees of basically being addressed,

20  depending on what are some of the factors in the various

21  watersheds that need to be addressed.

22       So we think we've made progress, and the progress is not

23  sufficient to recover the fish at this point in time, but

24  progress is being made.

25  Q    How does climate change factor into all of this?

A     Well, that's a subject that is increasingly on everybody's mind dealing with natural resource issues, be they fish issues or be they wildlife issues, plant issues, whatever.

Climate change is, in my opinion, clearly upon us.  And it's increasingly evident from the fish managers' point of view that it's putting into the picture of fish management a lot of uncertainty relative to fish production and the fish production models that we've used in the past.

An example of that would be the recent discussions on the Fraser River system in Canada, where they had basically this year a total run collapse, despite the fact that they put out near record numbers of Sockeye out of that freshwater habitat.  None of the fish came back.  So instead of a harvest anticipated between 6 and 8 million, there was very little harvest, very little harvest in terms of the tribal and non-tribal fisheries.  Basically, it was a disaster.

But the idea here in terms of people that have looked at that, the uncertainty being introduced by climate change in terms of thermal regimes is going to make forecasting and being -- in terms of accuracy of forecast, problematic for fish managers into the future.  As yet, we don't have tools to incorporate the elements of climate change into our models we use to manage fisheries.  So more and more, we're going to be less certain about how many fish are basically coming back to our systems, just because of the varying degrees of influence of climate

1   change and the thermal regimes out in the ocean.

2   Q    If you would please turn to Exhibit W-085-H in the binder

3   before you.

4   A    Yes.

5   Q    Do you recognize that?

6   A    Yes, I do.

7   Q    What is it?

8   A    It is my testimony to the United States senate conference,

9   Science and Transportation Committee at a field hearing in

10  Seattle, Washington.

11  Q    What's the topic of the testimony?

12  A    I don't really have a topic.  The topic I was dealing with,

13  in terms of a topic sentence, was impacts of climate change in

14  Washington State's marine ecosystem.  And again, I can sum this

15  topic up with one word:  Uncertainty.

16  Q    Do you still agree with the statements that are in Exhibit

17  W-085-H?

18  A    I certainly do.  I think, given what we've learned since

19  putting this together, I would have been more definitive, if you

20  will, in terms of using the one word, "uncertainty."  It's

21  becoming increasingly clear, talking with fish managers up and

22  down the coast, that that is one of the code words they're using

23  now.  It's just less certain in terms of what we're getting out

24  of our fisheries.

25  Q    Do you adopt Exhibit W-085-H as part of your testimony today?

```
 1   A    Yes.

 2             MS. WOODS:  I'd like to move for admission of Exhibit

 3   W-085-H into the record.

 4             MR. STAY:  We have no objection, your Honor.  There's no

 5   need to adopt it as his testimony.  We have no objection to the

 6   exhibit as it stands.

 7             THE COURT:  Exhibit 085-H is admitted.  Thank you,

 8   Mr. Stay.

 9   By Ms. Woods:

10   Q    Dr. Koenings, if the Court were to order the State to make

11   the correction of state-owned fish passage barrier culverts the

12   first priority in all watersheds in the US v. Washington case

13   area, would that upset the apple cart for salmon recovery?

14             MR. STAY:  Objection, your Honor.  Form of the question,

15   "we."

16             THE COURT:  Overruled.

17        You may respond.

18             THE WITNESS:  Thank you.

19        Well, that's a good question, and my answer is related to my

20   testimony, is that in addressing salmon recovery, there's a

21   multitude of different factors that need to be addressed, in my

22   opinion on a concurrent path.  And those concurrent paths deal

23   with the four Hs.  Those concurrent paths deal with how you

24   fingerprint in the various watersheds how those various H's come

25   together to form a recovered salmon population.
```

1        With today's budgetary climate, both in terms of the

2   legislature and otherwise, I think there is a limited amount of

3   money to deal with that over time.  And if those concurrent paths

4   aren't followed in a comprehensive fashion, I think it will delay

5   salmon recovery and make it more costly into the future.

6        So I think fixing the blocking culverts is certainly an

7   important part of overall salmon recovery.  There's no question

8   about that.  But my concern is using what I call inordinate

9   amounts of money to put into that when we haven't really

10  determined what is the best fingerprint for the different

11  watersheds to go by in terms of recovering the fish.

12       So my answer to that is we put together a hugely, I think,

13  successful model of doing salmon recovery in the state of

14  Washington.  It is something that's being copied in other parts

15  of the state -- other parts of the nation, I should say, as a

16  real way of getting things done.  It's a collaborative process

17  that we've set up.

18       So we've got a system in place.  I think it's working, and I

19  think from the documentation today we'll see there are advances

20  being made for the various populations.  I think keeping that in

21  place is extremely important for the future, especially given

22  where climate change is taking us in terms of the increasing

23  uncertainty in dealing with these particular issues.

24  By Ms. Woods:

25  Q    If a big pile of salmon recovery money fell out of the sky

1   today, how would you spend it?

2          MR. STAY:  Your Honor, I object.  There's no foundation

3   for large or small piles of money falling from the sky.

4          THE COURT:  Because I am dying to hear his answer, I'll

5   overrule the objection.

6      And here's my question.  I understand about the four Hs, but

7   doesn't it all start with habitat?  Without the available

8   habitat, don't the other three Hs become less relevant?

9          THE WITNESS:  It certainly is a starting point, but I

10  would answer it in this manner.  You need habitat, certainly

11  functional habitat, for the natural wild fish we're trying to

12  recover.  But at the same time, if in -- I think in -- let's see,

13  there's only four watersheds of the 22 in Puget Sound, as an

14  example, where hatchery fish don't dominate the fish in the

15  spawning grounds, i.e., into the river systems.

16     Now, in some cases, those fish are out-of-basin fish that are

17  not adapted to those particular watersheds.  They are hatchery

18  origin stocks.  So if you open up additional habitat and you have

19  this swamping effect of hatchery fish, which could be

20  out-of-basin fish, you may be doing more harm in the long term in

21  terms of trying to reduce the impacts of those fish to the wild

22  fish than you would be in terms of enhancing the wild fish

23  production by opening that habitat.

24     So my particular point of view is you need to have hatchery

25  reform deal with a number of hatchery fish.  And that would, in

essence, increase or synergize, if you will, the effects of

opening up the habitat.  To get the hatchery fish off the

spawning grounds, you have to reform the harvest so that the

harvest takes most of the hatchery fish out of being able to get

back to the spawning grounds over time.  So there's a cycle here

and a sequence that needs to be maintained so that that habitat

that's being opened up actually is producing the right number of

fish to basically get to where we want to go in terms of our

future condition.  I hope I didn't confuse you more than I want

to.

THE COURT:  Help me maybe with a more basic question.

You have a hatchery fish; you have a wild fish.

THE WITNESS:  Yes.

THE COURT:  Same species.

THE WITNESS:  Yes.

THE COURT:  They can mate, interbreed, whatever, spawn

together.

THE WITNESS:  Exactly.

THE COURT:  They both go out to the ocean, they both

come back to the same spot.  What are their offspring?

THE WITNESS:  Well, they're fish.  We consider a wild

fish a fish that completes the gravel-to-gravel migration.  So if

that fish, that hybrid, if you will, comes back and spawns, their

progeny is considered wild fish because they would complete the

gravel-to-gravel cycle.

1     The problem that we're getting into with hatchery fish,

2  especially fish that come from out of basin, is that the genes

3  and the ability of hatcheries to drive the genetic drift, if you

4  will, away from endemically evolved fish is deemed by NOAA

5  fisheries and other fishery scientists as being detrimental to

6  being able to attain the recovery of the natural fish population.

7     So what we need in terms of these hatchery fish is to have

8  the wild fish over time begin to drive the genetics of the

9  hatchery fish so that you don't get that negative effect of

10  hatchery fish in a restored wild fish population.  So that's why

11  those particular components need to operate concurrently to be

12  able to get the biggest bang for the buck, in my viewpoint.

13         THE COURT:  That brings us back to Ms. Woods' question.

14  If you had that bushel of money, how would you spend it?

15         THE WITNESS:  Well, one thing that I would do,

16  certainly, and the starting point, is we have comprehensive ways

17  of looking at habitat restoration.  We have the recovery plans.

18  We have a comprehensive way of looking at harvest.  And that's

19  the comprehensive harvest plan for Chinook that the co-managers

20  have put together and adopted by NOAA.  We have the

21  recommendations of the hatchery scientific review group in terms

22  of dealing with the hatchery H.  I'm going to leave the

23  hydropower because that doesn't really enter into the equation

24  that much.

25     So we have these comprehensive reviews that have gone on and

have said, We need to do these things.  In my view, the first

thing is to have a comprehensive look of integrating all those Hs

and the processes connected to them into one particular way of

looking at fingerprinting the watersheds.  In other words, how do

those comprehensive uses fit together to give you the best bang

for the buck for salmon recovery.

Integrating into the watersheds would allow you to

fingerprint which part of the H needs to be done at which

particular point in time, and how they all fit together in the

watersheds will become much clearer than they are right now.  In

some cases, you have people competing for funds because they want

to address one H over the other H, and there just isn't that much

money to go around to do that.

In my particular view, and the co-managers in the state of

Washington have been trying to do this, we just haven't had the

money and the personnel to get it done, given all our other

responsibilities, is to begin to form an integrated look to what

needs to be done in each one of the watersheds so we have a

comprehensive plan of moving forward.  That would be the starting

point, and then you could take your bushel of money and begin to

apply it to those particular priority needs.

That would be, if I were ruler of the world for ten minutes,

my view of it.

THE COURT:  In your opinion, that is not occurring right

now?

1          THE WITNESS:  In my opinion, that is not occurring to

2     the degree that it needs to occur.  That's correct.  It has not

3     been done on a systematic basis.

4          THE COURT:  And when we talk about that integrated look,

5     I'm sure you are including the tribes as well?

6          THE WITNESS:  Absolutely.  Oh, absolutely.  Again, we've

7     been trying to do this.  We just haven't been able to get to it.

8          THE COURT:  Ms. Woods?

9          MS. WOODS:  I have no further questions at this time,

10    your Honor.

11         THE COURT:  Cross-examination, Mr. Stay?

12         MR. STAY:  Thank you very much, your Honor.

13                         CROSS-EXAMINATION

14    By Mr. Stay:

15    Q    Nice to see you, Dr. Koenings.

16    A    It's a pleasure to be here.  We've done this before.

17    Q    Haven't we, though?

18         You're not an engineer, are you, Dr. Koenings?

19    A    I am not.

20    Q    Nor are you a hydrologist?

21    A    I am not.

22    Q    So you're not an expert in the design or operation of

23    culverts?

24    A    I am not.

25    Q    As I understand it, there is -- we have limited factor

1    assessments now in all of the watersheds?

2    A    We do.

3    Q    Those LFAs, are they sort of the basis for making priority

4    decisions in these watersheds?

5    A    I think they form one of the bases for making those kinds of

6    decisions.  They were done almost ten years ago.  Circumstances

7    may have changed, but yes, they certainly are a starting point, I

8    think, of making a lot of determinations on habitat restoration

9    efforts in the watersheds.

10   Q    Do we have any other watershed assessments similar to the

11   LFAs in the case area?

12   A    There could be, but they're the most comprehensive dealing

13   with the case area.

14   Q    And we know for a fact that barriers are a limiting factor --

15   a major limiting factor for Chinook recovery, don't we?

16   A    They are one of many.

17   Q    You would not use the word "major"?

18   A    In some watersheds, I would use the word "major."  In other

19   watersheds, I would not use the word "major."

20   Q    If you could look at Exhibit N to your declaration, which is

21   a statewide strategy for salmon recovery.

22   A    Yes.

23   Q    And if you look at Page 13 --

24   A    Where are we now?  I'm sorry.

25   Q    I'm sorry.  We're in Exhibit N, which, your Honor, is

1    entitled "Statewide Strategy to Recover Salmon."

2        And I'm now going to Page 13.

3    A    Hang on.  Page 13.

4    Q    And the left-hand column?

5    A    Yes, sir.

6    Q    It says -- am I reading this correctly when I read it, "Major

7    Factors Limiting Recovery"?  It's in red.

8    A    Yes.

9    Q    And the last one there is "Barriers to Fish Passage"?

10   A    Correct.

11   Q    I'm reading that correctly?

12   A    You are.

13   Q    Thank you.  Am I correct -- I'm not a biologist, and you know

14   that, Dr. Koenings, so if I misstate -- I'll try not to.

15       The salmon species, they have different life histories?

16   A    Correct.

17   Q    And therefore they'll need different kinds of habitat or

18   natural conditions for their survival?

19   A    They have some in common, but, yes, they do differ because

20   they're different species, that's correct.

21   Q    This is an aside.  We talk about fixing blocking culverts to

22   pass fish, but am I right that another reason for doing that,

23   independent of fish passage, would be to facilitate the movement

24   of wooden sediment?

25   A    I would believe so, yes.

1   Q    Now, we have recovery plans in the Puget Sound area for

2   Chinook and Hood Canal Chum.  Am I correct?

3   A    Yes.

4   Q    We do not have recovery plans for Puget Sound Coho.  Am I

5   right?

6   A    That's correct.

7   Q    Nor do we have recovery plans for Pink in Puget Sound?

8   A    True.

9   Q    Now, we do have a recovery plan for Sockeye in Lake Ozette?

10  A    Yes.  That's our favorite subject we talk about, yes.

11  Q    But we don't have a similar one in Puget Sound?

12  A    That's correct.

13  Q    And the species that we have recovery plans for are all

14  listed under the Endangered Species Act, right?

15  A    Yes.  On the other hand -- I just want to be clear.

16  Q    This is your one chance.  Go ahead.

17  A    All right.  Thank you, Alan.

18       Coho in Puget Sound, although they're not listed, they are a

19  stock of concern for NOAA.  I just wanted to make sure to say

20  that.

21  Q    Now, in these recovery plans, there's no requirement that any

22  of these recovery plans be implemented.  Am I correct?

23  A    Yes.

24  Q    Now, recovery plans, they're not intended -- they're intended

25  for a target species, even though they have may ancillary or

1    indirect effects on other species.  Am I correct?

2    A    In my view of it, yes, they are designed for one species.

3    The overall effect is to do the watershed health, which is the

4    indirect effects you mentioned.

5    Q    Now, I know you're not an expert on culvert design, so if I

6    ask you this question and it's outside your expertise, please

7    tell me.

8        In selecting a culvert design method, you would want to use

9    the best methodology that has been developed, the best available

10   science in selecting the culvert design to correct the blocking

11   culvert.  Would you agree with that statement?

12   A    I would agree with it from the point of view that given the

13   circumstances at hand, and those circumstances vary, you would

14   want the best fix possible.

15   Q    Now, you were the director of the Department of Fisheries for

16   ten years?

17   A    Department of Fish and Wildlife for ten years.

18   Q    Pardon me.  Department of Fish and Wildlife.  That's how old

19   I am.

20       The Department of Fish and Wildlife does not fund the

21   correction of the Washington Department of Transportation barrier

22   culverts, does it?

23   A    I don't believe so, no.

24   Q    If a culvert is blocking habitat that is susceptible to being

25   made functional, that culvert would be a candidate for

1    correction, would it not?

2    A    Repeat the question.

3    Q    Certainly.  If we have a culvert that blocks habitat --

4    A    It's blocking currently?

5    Q    It's blocking.

6    A    Okay.

7    Q    And that habitat is susceptible to be made functional, would

8    that culvert be a candidate for correction?  I'm not prioritizing

9    now.  I'm just saying, is it a candidate?

10   A    I would say that if it can be made functional for fish

11   production, yes, it would be suitable for being a candidate for

12   replacement and repair.

13   Q    Now, in your direct testimony with Ms. Woods, you talked

14   about the Salmon Recovery Funding Board.

15        That's called a SRF Board?

16   A    Correct.

17   Q    And you also talked about the Regional Fishery Enhancement

18   Groups?

19   A    RFEGs, correct.

20   Q    RFEGs.  I got from your testimony that you thought that these

21   two mechanisms are central to the recovery, as you see it, in the

22   Puget Sound?

23   A    Yes.  They're one of the main ingredients in terms of the

24   State's vision of how to address salmon recovery.

25   Q    Let's start with the Salmon Recovery Funding Board, the SRF

1    Board.   It's a funding entity, correct?

2    A    Correct.

3    Q    And how it gets projects is that a local watershed group will

4    suggest projects, and then those projects will go forward to the

5    SRF Board, and then they may or may not be funded, as the SRF

6    Board decides?

7    A    That's correct, but there's a number of steps that you left

8    out in terms of the process that are, I think, key to what gets

9    funded.

10        There's scientific scrutiny.   There's the scrutiny of the

11   tribes' and the department's biologists, and they make

12   corrections and recommendations to be able to say that this

13   project will help the fish in the particular watersheds.   And

14   they go up through a citizens' advisory board, and they get

15   looked at in terms of how it fits into the watershed group's

16   vision of moving forward, the lead entity.   And the lead entities

17   advance those projects that meet certain criteria to the SRF

18   Board for funding.

19   Q    Okay.   So we've got a local group down in Nisqually, the lead

20   agency?

21   A    Yes.

22   Q    We have a local group on the Nooksack with a lead agency.

23   And they develop projects which they believe are important for

24   their particular watersheds?

25   A    Particularly in the habitat component.

1   Q   That's what I'm talking about.  I'm leaving the other Hs out.

2   A   Okay.  I just wanted to make sure that we --

3   Q   This is a one-H discussion.  Habitat only.

4   A   Thank you.

5   Q   And then they will go to the SRF Board, and then they will

6   fund them or not fund them?

7   A   That's one path of getting projects funded, that's correct.

8   Q   And the Washington Department of Fisheries, it doesn't have

9   any approval function with respect to what the SRF Board funds;

10  is that correct?

11  A   No.  And we have an advisory seat, if you will, on the SRF

12  Board.

13  Q   But you don't have any approval function?

14  A   No.

15  Q   And you're not a voting member on this board?

16  A   Correct.

17  Q   So as you -- not you, the Department of Fish and Wildlife,

18  sits there managing the fisheries, we have various local groups

19  which are proposing projects to the SRF Board, and there's no

20  coordination.  You don't coordinate because you don't have any

21  role on the SRF Board; is that correct?

22  A   I don't have a role on -- the department's role on the SRF

23  Board is advisory, so we don't make the decision.  But I would

24  back up a bit and say we have scientific input in terms of the

25  projects moving forward at the local level before they get to the

SRF Board.  So they have been scrubbed by a couple of different

groups dealing with are they going to be effective for the fish

in the watersheds.

Q    Effective in that watershed?

A    Exactly.

Q    But not effective with respect to the grand scheme of what

should be going on in Puget Sound?

A    They are following, I believe, the recovery plans that were

developed for those watersheds, yes.

Q    And the recovery plans we have are for Chinook; is that

right?

A    One species, yes.

Q    Well, we have no other recovery plans in Puget Sound except

for Hood Canal Chum.

A    Okay.  Thank you.

Q    I got there.  But for Coho or Pink or Sockeye, these are just

independent bodies putting together, for the sake of argument,

goods plans for their particular watershed, and they're going to

go up, and they get funded or not?

A    That's true.  You recall earlier, Alan, that this is a Salmon

Recovery Funding Board, it's not the listed salmon recovery

funding board, so they fund projects in the areas where there are

not listed fish.

Q    But the only coordinating plan is the recovery plans, and we

don't have recovery plans except for listed fish.

1    A   We have recovery plans for listed fish, but we also have

2    projects that deal with unlisted fish because the SRF Board is

3    designed to preserve the baseline for these fish as well as

4    recovering those fish through restoration projects.

5        So there are projects funded that aren't basically dealing

6    with listed fish, but they have to be stocks that are in trouble.

7    I mean, that's why it's called the recovery board.

8    Q   The regional fisheries enhancement group, they're local

9    volunteer groups too.  Am I right?

10   A   You're right.

11   Q   And they're a basic nonprofit corporation?  I believe that's

12   how they're set up?

13   A   I believe so.

14   Q   And they also can submit funding requests to the SRF Board?

15   A   Yes, through the lead entity process.

16   Q   You would agree with me that the success -- well, would you

17   agree with this statement, "Individual donations and in-kind

18   contributions from local community members" -- excuse me, "and

19   businesses are essential to the success of each RFEG"?

20   A   I think there are some that would rely on those sources of

21   funding, and there are others that don't rely on those sources of

22   funding.  And the reason I say that, there are administrative

23   funds that flow from the state and the federal government to

24   these groups to enable them to function administratively.  So the

25   existence or nonexistence, depending on other sources of funding,

1    it depends.

2    Q    Would you look at Exhibit O to your declaration?

3    A    There it is.  I've got it.

4    Q    Would you look at that first page?

5    A    Yes.

6    Q    Look at the one, two, three, fourth paragraph.

7    A    Okay.  I'm on the second page, then.

8    Q    Excuse me.

9    A    Page 3?

10   Q    It says Page 3, right.

11   A    Okay.

12   Q    And the one, two, three, fourth paragraph?

13   A    Yes.

14   Q    Could you read that first sentence for me?

15   A    Sure.  "Individual donations and in-kind contributions from

16   local community members and businesses are essential to the

17   success of each RFEG."

18   Q    Thank you.  We talked about science a minute ago.  Now, I

19   want you to think on this carefully.  Would you agree with me

20   that science is not the controlling factor on what the citizen

21   advisory groups will do?  Do you agree with me on that?

22   A    Yes.  It informs decisions.  It doesn't make decisions.

23   Q    Thank you.  In your declaration on Page 25 -- I think it's

24   Paragraph 53, but I wrote 534 on my notes.

25   A    Could be.  It seems that long.

Q    It does, doesn't it?  But we're almost done.  We're almost

done.

A    Do you want me to go to it?

Q    No.  I think you'll remember it.  If we need to go to it, we

will.

In there, you say, "We have already fixed the cheapest" --

"the easiest and cheapest fish passage barriers."

Do you remember that?

A    Yes.

Q    Ms. Woods asked you about that this morning.  In making that

statement, you relied upon people in your office.  Am I right?

A    The experts in the field, that's correct.

Q    And you did not go out and do any independent analysis or ask

any independent professionals with respect to the veracity or

truthfulness of that statement; is that correct?

A    I did not.

Q    The Department of Fish and Wildlife enforces a hydraulic

code; am I right?

A    Correct.

Q    And do you recall ever taking an enforcement action against

the Washington Department of Transportation?

A    I don't recall.  And this is where we're dealing with the HPA

program, the hydraulic code and the HPA program, just to make

everybody aware of what we're talking about.  Allison made

several references to the HPA program.

1   Q     That's a program where if you're going to do things within

2   the water of the state of Washington, you need to talk to you and

3   get a permit?

4   A     Talk to the department personnel, that's correct.

5   Q     I keep saying "you," but I use "you" in the global sense.

6   A     I'm not that global.

7   Q     I want to put on a Washington State statute.  Can you see

8   that, Dr. Koenings?  Is that clear to you?

9   A     Not very well.

10  Q     I'll represent this is Paragraph 3 of RCW 77.57.030.

11        Are you familiar with that paragraph I have highlighted?

12  A     Yes.

13  Q     That paragraph was added to the legislature in an effort to

14  reduce the Washington State Department of Fisheries' authority.

15  Am I right?

16  A     Yes.

17  Q     It was a response to an effort by the Department of Fish and

18  Wildlife to address a blocking tide gate in the Skagit drainage?

19  A     Correct.

20  Q     And the legislature acted to take that authority away by

21  amending the law?

22  A     Correct.  I'm getting nervous agreeing with you.

23  Q     I've known you for 12 years, and you've never done it before.

24        I want to ask a question on recovery.

25              MR. STAY:  Just a couple of questions, your Honor.

By Mr. Stay:

Q    Would you agree with me that we would have recovery if we had sustainable runs with some harvest?

A    Yes.

Q    And with respect to co-management, that's where you and I have done most of our interacting, it's been mostly on harvest. Do you see the co-management relationship that exists between tribes and the department on harvest and hatchery issues being the model that you would use for co-management with respect to habitat issues?

A    Not in its entirety, no.

Q    And would the difference be that you would believe that ultimately the State of Washington would have the authority to make the decision with respect to habitat matters?

A    I would make the statement, or characterize it a bit differently, that it would have the responsibility as a sovereign government and the responsibility of the tribes as sovereign governments.  And to maintain that sovereignty, there has to be an entity that makes the decision, but I would characterize it more as an informed decision by having the tribes be part of the process to reach that decision.

But, yes, ultimately the State of Washington, I believe, is the one to make that decision.

MR. STAY:  Thank you, your Honor.

Thank you, Dr. Koenings.  I am done.  But I believe my

```
 1    colleague, Mr. Monson, is not.
 2              THE COURT:  Mr. Monson, how many questions do you have?
 3              MR. MONSON:  Maybe five or ten minutes' worth.
 4         Good morning, Dr. Koenings.  Good morning, your Honor.  Peter
 5    Monson for the United States.
 6              THE WITNESS:  Good morning.
 7                            CROSS-EXAMINATION
 8    By Mr. Monson:
 9    Q    We participated by telephone, so you might recognize me as
10    the black box from your deposition.
11    A    I recognize the voice.
12    Q    Okay.  Very good.
13         I just have a relatively few questions to follow up on the
14    ones Mr. Stay had asked.  In your direct testimony this morning
15    and in your report, you described the four Hs.
16         Do you recall that?
17    A    Correct.
18    Q    And you described both in your declaration and today your
19    past experience as the director of the Washington Department of
20    Fish and Wildlife?
21    A    Correct.
22    Q    And were you there for about nine years?
23    A    Ten years.
24    Q    And you dealt with budgets probably considerably.  So you're
25    familiar with the sources of funding the Washington Department of
```

1    Fish and Wildlife receives?

2    A    Yes.

3    Q    And you're familiar with the places that it goes, where it's

4    spent?

5    A    I'd like to think so.  But over the years, I developed a

6    basic belief that I don't know as much as I should.  But yes, I

7    do know that.

8    Q    Now, in terms of the four Hs, let's turn to hatchery reform,

9    for example.

10   A    Sure.

11   Q    I will ask it this way.  The Washington Department of

12   Transportation doesn't provide funding to the Washington

13   Department of Fish and Wildlife for hatchery reform, does it?

14   A    Not to my knowledge.

15   Q    And what about for harvest management; the same answer?

16   A    Yes.

17   Q    And for hydropower operations, would that be the same answer?

18   A    I would believe so.  I'm not quite sure.

19        At least in the case area.  I'll put it that way.

20   Q    Now, you spoke earlier about the SRF Board and its

21   relationship to the habitat component, the habitat H, if you

22   will.

23        Does the Department of Transportation contribute any funding

24   to the Salmon Recovery Fund Board -- or to the Salmon Recovery

25   Fund, I should say?

1    A    No.   I believe it comes out of separate appropriations from

2    the legislature.

3    Q    Now, does the Department of Fish and Wildlife provide any

4    funds for any of the Hs to the Department of Transportation?

5    A    I don't believe so.   I'm not going to stand on that.   There

6    could be some -- you know, at the staff level, some contracting

7    that goes on that I didn't know about.   But basically, no.

8    Q    To your knowledge, no?

9    A    Yes.

10         MR. MONSON:   Thank you, Dr. Koenings.

11    I have no further questions, your Honor.

12         THE COURT:   Ms. Woods, how much redirect do you have?

13         MS. WOODS:   Very little, your Honor.

14                        REDIRECT EXAMINATION

15   By Ms. Woods:

16   Q    Dr. Koenings, Mr. Stay asked you a few questions about the

17   Salmon Recovery Funding Board.   Do tribes participate in the

18   local watershed groups?

19   A    Oh, absolutely.   Absolutely.   They're a critical element of

20   it.

21   Q    Does the Salmon Recovery Funding Board have a tribal

22   representative?

23   A    A voting member, yes.

24   Q    Mr. Stay also asked you some questions about Regional

25   Fisheries Enhancement Groups.

1        Do the tribes participate in those groups?

2    A    I can't say for sure.  I don't know why not, but I can't say

3    for sure whether they do or not.

4            MS. WOODS:  That's all the questions I have, your Honor.

5            THE COURT:  You are free to step down.  Thank you.

6        All right, counsel, we'll go ahead and take our break for

7    noon.  Please remember we will be starting a little bit later

8    this afternoon.  Ms. Williams can fill you in on exactly what we

9    need to move around to get our other people in here for our

10   sentencing matter.

11       Have a great lunch.

12   (At this time, a lunch break was taken.)

13           THE COURT:  Counsel, a couple of things.  I appreciate

14   your help in allowing us to do that criminal matter.

15   Unfortunately, another criminal matter -- emergency criminal

16   matter has popped up that I'm going need to handle a few minutes

17   after four o'clock.  That's the way my Fridays tend to go.

18       Here is what we'll do.  We'll start our session now, have no

19   break, and go all the way until four o'clock, and we'll excuse

20   you guys at that point in time.  All right?

21       One last thing regarding Dr. Koenings' testimony.  The Court

22   has had a chance to review Exhibits J and K, 085-J and 085-K, and

23   I certainly understand from the plaintiffs' perspective that

24   these are articles, they were published in the newspaper, and

25   it's whatever the newspaper people decided to publish.  But the

1    fact that Dr. Koenings indicated that he would stand behind those

2    statements, at least for whatever that's worth, the Court will

3    admit 85-J and 85-K.

4        And the State may call their next witness.

5            MS. WOODS:  Your Honor, the State will call Brian

6    Benson.

7            THE COURT:  Mr. Benson, I'll have you raise your right

8    hand and be sworn.

9    Whereupon,

10                          BRIAN BENSON

11   Called as a witness, having been first duly sworn, was examined

12   and testified as follows:

13           THE CLERK:  Please state your full name and spell your

14   last name for the record.

15           THE WITNESS:  Brian Benson, B-E-N-S-O-N.

16           THE COURT:  Mr. Benson, there's water on your left if

17   you need it.

18       You may inquire, Ms. Woods.

19                       DIRECT EXAMINATION

20   By Ms. Woods:

21   Q    Good afternoon, Mr. Benson.

22   A    Good afternoon.

23   Q    Mr. Benson, where do you work?

24   A    I work for the Washington Department of Fish and Wildlife.

25   Q    How long have you worked for the Washington Department of

1    Fish and Wildlife?

2    A    Almost 29 years.

3    Q    What are your current job responsibilities?

4    A    Currently I'm an information technology specialist in the

5    science division, which is part of the habitat program.  My job

6    responsibilities, I manage two fairly large natural resource

7    databases.  It involves design, construction, maintenance,

8    updating, modifications.  I'm responsible for creating and

9    maintaining the GIS products that come out of those databases.

10   Q    How long have you been doing that type of work?

11   A    Probably started in the early 90s.

12   Q    Would you please describe your educational background?

13   A    I have a Bachelor of Science in marine resources from Huxley

14   College of Environmental Studies at Western Washington

15   University.

16   Q    Do you have experience as a fish biologist?

17   A    I have held that position, yes.

18   Q    With the Washington Department of Fish and Wildlife?

19   A    That's correct.

20   Q    Is that before you began the database work that you've been

21   doing now for a while?

22   A    Yes, and kind of at the same time as well.

23   Q    Mr. Benson, were you in the courtroom during the testimony of

24   Tyson Waldo?

25   A    Yes, I was.

1  Q    Do you recall him using the acronym FPDSI?

2  A    Yes, I do.

3  Q    What does FPDSI stand for?

4  A    Fish Passage and Diversion Screening Inventory.

5  Q    Is that a database?

6  A    That is a database.

7  Q    Who developed the Fish Passage and Diversion Screening

8  Inventory Database?

9  A    I did.

10  Q   Why did you choose the title "Fish Passage and Diversion

11  Screening Inventory"?

12  A    Well, for one, it's reflective of the contents of the

13  database.  Also, it is hard to pronounce.  Most database

14  developers like to come up with names that have catchy acronyms,

15  and I don't particularly care for that.

16  Q    Is it okay if I use it -- if I call it the FPDSI?

17  A    Yes.

18  Q    Would you please describe the history of the FPDSI?

19  A    Well, the predecessors to the FPDSI probably originated in

20  the late 1980s and early 1990s.  I started with the SHEAR program

21  about 1996, and there were several independent databases being

22  used to keep track of the various fish passage inventories and

23  fishway inspection projects.  There was just an ad hoc kind of

24  table, essentially, that contained barrier information.

25        After I joined the division, we started the Thurston County

1   inventory, which had its own database, and then the Jefferson

2   County inventory, again, had a separate database.  So in about

3   '97, '98 when we started working on the manual, we decided to

4   create a database to support the manual, and as part of that

5   process, we would incorporate all the other independent databases

6   into it.  That database became known as SHEAR base, and it's

7   undergone several iterations over the years and finally ended up

8   being the FPDSI.

9   Q    When you say "the manual," what are you talking about?

10  A    That's the Fish Passage Barrier Assessment Manual.

11  Q    Are you the person who currently maintains the FPDSI?

12  A    Yes, I am.

13  Q    What kinds of data does the FPDSI contain?

14  A    It contains information on fish passage structures.  It

15  contains some information on surface water diversions.  Relative

16  to the fish passage information, it's got locational data.  It's

17  got specific descriptors of the various types of fish passage

18  structures, whether they be culverts, dams, things like that, the

19  habitat information, and the priority index information.

20  Q    Does the data change over time?

21  A    It changes on virtually a daily basis.

22  Q    And why is that?

23  A    Well, it's an active database.  We have a lot of work going

24  on with the DOT inventory crews.  They come in and update and add

25  data weekly.  I add data on a fairly regular basis from inventory

1    information coming in from non WDFW sources.

2    Q    About how many records for fish passage structures does the

3    FPDSI have today?

4    A    It has over 36,000.

5    Q    About how many of those are human-made fish passage barriers?

6    A    Around 11,500.

7    Q    Of those 11,500, about what proportion are state owned?

8    A    I guess it's just under 25 percent.

9    Q    Does the FPDSI have records for every fish passage barrier in

10   the state of Washington?

11   A    It does not.

12   Q    Why not?

13   A    Well, several reasons.  There are a number of large data sets

14   that we don't have.  We don't have DNR's data set incorporated.

15   We don't have the Forest Service data set.  We don't have the

16   large commercial forest landowners information.  There's just a

17   lot of private and local governmental culverts out there that

18   have not been assessed and inventoried.

19   Q    Are the inventories for Washington State Department of

20   Transportation culverts complete?

21   A    I believe they are.

22   Q    Are the inventories for Washington Department of Fish and

23   Wildlife culverts complete in the case area?

24   A    I believe so.

25   Q    Is the inventory for state parks culverts complete?

1   A   Not to my knowledge.

2   Q   Has any complete inventory of non state culverts been done,

3   to your knowledge?

4   A   No.

5   Q   I've just put up on the screen what has been admitted as

6   Exhibit AT-008-19.

7       Mr. Benson, have you had an opportunity to review that

8   exhibit?

9   A   Yes, I have.

10  Q   It appears to me that there are two parts on the exhibit, one

11  showing some numbers for DFW/DOT culverts and the other showing

12  some numbers for DNR culverts.

13      Do you know anything about the DNR numbers?

14  A   I don't work the DNR numbers.

15  Q   Do you work with the DFW/DOT numbers?

16  A   Yes, I do.

17  Q   Let's focus on them.  I believe Mr. Waldo testified that he

18  got those from the FPDSI.

19      Is that true, as far as you know?

20  A   Yes.

21  Q   Have you checked Mr. Waldo's work?

22  A   I have.

23  Q   As far as you can tell, did Mr. Waldo accurately extract the

24  habitat numbers from the FPDSI when he created the DFW/DOT part

25  of Exhibit AT-008-19?

A    Yes.  I believe it's a reasonable summary of the numbers.

Q    Are the habitat numbers that Mr. Waldo extracted all based on field-verified data?

A    No.  Some portion of these are not field verified.

Q    Does it make a difference whether some are field verified and some are not?

A    Well, I would think the field-verified numbers would be more accurate than the non field-verified numbers.

Q    For the habitat length data that is contained in the FPDSI, is there any adjustment made for the quality of the habitat?

A    No.  Those numbers are just direct measurements.

Q    For the habitat area data that is contained in the FPDSI, is there any adjustment made for the quality of the habitat?

A    Yes, there is.

Q    Looking at the exhibit on the screen, and again the DFW/DOT numbers, if you multiplied the habitat areas in Exhibit AT-008-19 times a species-specific fish production coefficient, would you get an accurate prediction of how many fish could be produced from that habitat?

MS. RASMUSSEN:  Objection, your Honor.  This was ruled to be inadmissible by your motion in limine, the question of Mr. Benson, on a previously eliminated portion of Mr. Waldo's testimony that's not admissible.

THE COURT:  How is it relevant, I guess, Ms. Woods?

MS. WOODS:  The Court has admitted a revised portion of

1    Mr. Rawson's declaration that has some ranges for species

2    production coefficients.

3              MS. RASMUSSEN:  Mr. Benson is not a rebuttal testimony

4    designated for Mr. Rawson.  He's designated specifically to deal

5    with Mr. Waldo's Table 1.  And specifically, he can respond to

6    the habitat length.  I believe that's what he said he was going

7    to do at his deposition.  There's nothing here about Mr. Rawson's

8    numbers or any production coefficients.

9              THE COURT:  The objection will be sustained.

10   By Ms. Woods:

11   Q    Mr. Benson, have you reviewed Tyson Waldo's declaration that

12   was submitted in this case?

13   A    Yes, I have.

14   Q    As far as you can recall, did Mr. Waldo testify that he used

15   324 sites from the FPDSI to generate the rearing habitat numbers

16   in Exhibit AT-008-19?

17   A    That was the number I read in his declaration.

18   Q    Were you provided a list of those sites?

19   A    I believe I was.

20   Q    Did you check the FPDSI to see whether there are non state-

21   owned fish passage barriers in the same watersheds as the site

22   that Tyson Waldo used?

23   A    Yes, I did.

24   Q    What did you find?  And I put --

25              MS. RASMUSSEN:  I'm only going to ask that Ms. Woods

1    identify this.  It is not a previously identified exhibit.  She

2    should ask Mr. Benson some questions to lay a foundation.

3              THE COURT:  Does this have an exhibit number?

4              MS. WOODS:  Yes, it does.  It's W-133.  And

5    Ms. Rasmussen is correct that it has not been admitted.

6              THE COURT:  Can you ask some foundational questions?

7    By Ms. Woods:

8    Q    Mr. Benson, did you create Exhibit W-133?

9    A    Yes, I did.

10   Q    How did you do it?

11   A    Using the 324 culvert crossings provided by Mr. Waldo, I used

12   a GIS exercise.  I plotted those points, overlaid over stream

13   layer and some aerial imagery.  I also plotted the fish passage

14   barrier information from the FPDSI database, and then I would, on

15   screen, count the number of barriers upstream of the points

16   provided by Mr. Waldo and the ones downstream as well.

17        And in that process, I created some reference tables

18   referencing Mr. Waldo's points and the upstream barrier points

19   and the downstream barrier points.

20   Q    Does Exhibit W-133 summarize the results of some of that work

21   that you did?

22   A    Yes, it does.

23             MS. WOODS:  I would like to offer Exhibit W-133.

24             THE COURT:  Any objection, Ms. Rasmussen?

25             MS. RASMUSSEN:  I just want to clarify, because my W-133

1    goes on for ten pages.  We've only seen the first page of this.

2    I just want to make sure it's the same as the one I have.

3              THE COURT:  How many pages is the exhibit?

4              MS. WOODS:  I think it is ten pages.

5              MS. RASMUSSEN:  We would have no objection, as long as

6    Ms. Woods clarifies originally Mr. Benson made this for

7    Mr. Waldo's first Table 1, just to clarify and question that it

8    is also a response to his actually admitted Table 1.

9              THE COURT:  Ms. Woods, here's what I'll do.  We'll go

10   ahead and admit W-133, but Ms. Rasmussen is correct, if there's

11   anything in that ten-page exhibit that is not relevant because of

12   the Court's prior rulings and the exclusion of some of

13   Mr. Waldo's testimony, then it will be disregarded.

14             MS. WOODS:  Thank you, your Honor.

15   By Ms. Woods:

16   Q   Mr. Benson, we have the first page of Exhibit W-133 on the

17   screen, and I see a couple of tables on that page.

18       Would you please describe what the first table indicates?

19   A   Well, it's a summary of the upstream and downstream barriers

20   associated with the state-owned barriers used by Mr. Waldo to

21   generate his Table 1, and this is a case area summary.

22   Q   Moving to the second table on the screen, would you please

23   summarize what that depicts?

24   A   Well, this would be a WRIA, Water Resource Inventory Area,

25   summary of the same information.

1    Q    Now, moving to the second page of W-133, another table,

2    Mr. Benson, would you please summarize what this table depicts?

3              THE COURT:  Can you see that entire left-side column?

4              THE WITNESS:  I can.

5         Again, this is a case area summary of the data, and it's

6    broken down.  It's essentially summarizing the pass -- estimated

7    passability of the culverts using the analysis.  The base

8    culverts are those that were provided by Mr. Waldo.

9         Downstream are the state-owned barriers downstream the base

10   culverts, and upstream reflect the barrier culverts -- upstream

11   of the base culverts.

12             MS. WOODS:  I'm going to move on to the next slide, and

13   I would also ask Madam Clerk to please hand Mr. Benson the binder

14   that has Exhibit W-133 in it.

15   By Ms. Woods:

16   Q    Mr. Benson, if you would please turn to Exhibit 133.

17   A    Okay.

18   Q    Page 3 up on the screen, would you please describe what the

19   table on Page 3 depicts?

20   A    This is a -- essentially a site-specific summary of the

21   upstream and downstream barriers.  And they're broken out by

22   their estimated passability.  If you were to follow the columns

23   across the top, DS-0 percent would indicate a total barrier

24   downstream of the base culvert.  A DS-33 would be a 33 percent

25   estimated passability, etcetera, across the thing.

1  Q   I'd like you to, in your notebook, move on and look at the

2  remaining pages in the exhibit and tell me if the remaining pages

3  are all similar to Page 3 displayed on the screen.

4  A   Yes, they are.

5  Q   Do they display a similar type of information?

6  A   Yes, they do.

7  Q   Did you prepare any maps that illustrate non state-owned

8  passage barriers upstream and downstream of the culverts that

9  Tyson Waldo used for his analysis?

10  A   Yes, I did.

11        MS. WOODS:  Your Honor, I will be attempting to lay the

12  foundation for 14 maps.  I hope that we can streamline this a

13  little bit.

14        THE COURT:  Can you tell me what exhibit number they

15  start with, Counsel?

16        MS. WOODS:  119.

17  By Ms. Woods:

18  Q   Mr. Benson, are those maps in the same binder that you've

19  already got, I hope?

20  A   Yes.

21  Q   I have up on the screen Exhibit W-119.  Mr. Benson, did you

22  prepare this exhibit?

23  A   Yes, I did.

24  Q   What is it?

25  A   This is a map of Chico Creek, displaying the upstream and

1    downstream barriers associated with a barrier taken from the list

2    that Mr. Waldo provided.

3    Q    What's the significance of the fact that there are non

4    state-owned barriers in the watershed?

5    A    Well, it just goes to show that in order to achieve --

6            MS. RASMUSSEN:  I'm going to object in that Mr. Benson

7    is here as a FPDSI database expert.  He's not here in his

8    scientific capacity as a biologist.  He's allowed to create the

9    maps, but originally he was a case-in-chief expert.  He was going

10   to be an expert --

11           THE COURT:  That's fine, Counsel.  The objection is

12   sustained.

13       I know what the significance is, Ms. Woods.  Next question.

14   By Ms. Woods:

15   Q    Ms. Benson, how did you prepare Exhibit W-119?

16   A    It's a relatively straightforward GIS exercise.  I selected

17   several data sets.  I used the National Agricultural Imagery

18   Program aerial photos as a backdrop.  I then overlaid the DNR

19   stream layer, followed by the DOT highway layer and then points

20   from the Fish Passage Diversion Screening Inventory Database.

21       Specifically that was associated with the list provided by

22   Mr. Waldo and the list I generated for the upstream and

23   downstream barriers.

24           MS. WOODS:  I would like to offer Exhibit 119 into the

25   record.

1        MS. RASMUSSEN:  Your Honor, for this, and all of the

2   remaining maps, we're willing to stipulate that we believe

3   Mr. Benson made them and that he used a similar methodology to

4   make all the maps.  Our objection will be to, one, relevance with

5   respect to other people are doing something wrong does not excuse

6   you not fixing your own barriers.

7        And two, when we get to the second one of Chico Creek, you'll

8   see that he has elected to separate passability for the State but

9   not for the other owned barriers.  So it just gives sort of a

10   false impression that only -- that the State has passable,

11   partially passable, and totally blocked culverts but that the

12   counties and other owned are all just blocked.

13        And so the second one of each map, we find, have very little

14   probative value in that all the information he had available to

15   him, he did not put onto the map.  And then it's sort of

16   cumulative after the first set of examples.

17        THE COURT:  And Ms. Rasmussen, I take it that's the same

18   set of objections for all the way down to W-132?

19        MS. RASMUSSEN:  Yes, the series of 119 to 132.

20        MS. WOODS:  I believe that's correct.

21        MS. RASMUSSEN:  And for each of the six examples,

22   there's two types of maps.  One is the first one just shows state

23   and non state.  Everybody's treated the same.  And then the

24   second series will show non state and state partial and state

25   total.  We believe that's somewhat misleading not to show the

1      same information for the other owned.

2          And then after the first example, I believe that the point

3      has been made, and it just becomes sort of a cumulative finger

4      pointing that is not relevant to this proceeding.

5              THE COURT:  All right.  I understand.  W-119 will be

6      admitted; in fact, so will all of them down through W-132.

7          Ms. Woods, the arguments being made by the plaintiffs are

8      valid in terms of weight to be given, but they don't deal with

9      admissibility.  Whatever probative value they have, I understand

10     they're all different WRIAs.  They'll be admitted.

11             MS. WOODS:  Thank you, your Honor.  So I can move

12     quickly through these slides.

13     By Ms. Woods:

14     Q   Mr. Benson, have you prepared any analysis of fish passage --

15     state-owned fish passage barrier culverts in the FPDSI that are

16     not affected by additional barriers in the watershed?

17     A   Yes, I have.

18     Q   I have put up on the screen Exhibit W-088-C.  Do you

19     recognize it?

20     A   Yes, I do.

21     Q   What is it?

22     A   It's a table I prepared for Mr. Barber's declaration

23     indicating state-owned barriers that do not have another barrier,

24     either upstream or downstream.

25     Q   How did you prepare it?

1    A    This was based on a query directly from the FPDSI database.

2    Q    Was it accurate at the time you prepared it, as far as you

3    know?

4    A    Yes.

5    Q    I would like to move that Exhibit W-088-C be admitted into

6    the record.

7              MS. RASMUSSEN:  Your Honor, I'd ask only on this one

8    that you wait until I have an opportunity to cross-examine

9    Mr. Benson about its accuracy, because I found some anomalies,

10   and so I just wanted to examine him further and reserve ruling on

11   that.

12             THE COURT:  Fair enough.  We'll reserve on 088-C.

13   By Ms. Woods:

14   Q    Mr. Benson, has the data in the FPDSI changed since you

15   prepared Exhibit W-088-C?

16   A    Yes, it has.

17   Q    And when did you prepare the exhibit?

18   A    I believe this was March 25th, 2009.

19   Q    If you were to prepare an exhibit or list like the one in

20   Exhibit W-088-C today, would it be identical to Exhibit W-088-C?

21   A    I don't believe it would.

22   Q    Why not?

23   A    I think there would probably be 10 to 12 additional culverts

24   added to this list.

25   Q    Why is that?

A    In doing some additional work, GIS work, I found there were

some records in the scoping table upon which I relied to do this

query that had not been updated properly.  Through a GIS

exercise, I found more culverts that did not appear to have

upstream or downstream barriers associated with them.

Q    As far as you know, did any drop off the list?

A    I don't think so.

Q    I've now got on the screen what has been admitted as Exhibit

AT-008-12.

      Mr. Benson, have you had an opportunity to review this

exhibit?

A    Yes, I have.

Q    Is the information displayed on it accurate?

A    I believe the information displayed here is technically

correct; however, the number of barrier culverts here I believe

actually reflects about 1,155 unique stream crossings, so it's

being -- what I believe is being depicted here are the actual

numbers of culverts not the actual number of stream crossings.

Q    And why does that matter?

A    Well, one, I think it overstates the situation.  When I

report barrier numbers, I always report the crossings, not the

number of culverts that comprise the crossings.  In terms of

reporting fixes again, they're reported as fixed crossings, not

as the individual culverts comprising crossings.

            THE COURT:  Ms. Woods, what exhibit is he discussing

1   right now?

2           MS. WOODS:  AT-008-12.

3           THE COURT:  Thank you, Counsel.

4           MS. WOODS:  I have no further questions at this time.

5           THE COURT:  Ms. Rasmussen, cross-examination?

6                   CROSS-EXAMINATION

7   By Ms. Rasmussen:

8   Q   Good afternoon, Mr. Benson.  I believe that we were slotted

9   to do this much earlier, so now we're finally getting it over

10  with.  My name is Ms. Rasmussen.  I believe you recognize me from

11  prior depositions.

12  A   Several.

13  Q   Several.  Well, you didn't win the most depositions award.

14  A   I thought I was close.

15  Q   That was Mr. Waldo, your tribal counterpart.

16      I believe Ms. Woods asked you a question about this

17  particular exhibit, and you stated that he put 1,267 culverts,

18  and he accurately wrote that down on the map, right, that it was

19  culverts not sites?

20  A   That's correct.

21  Q   And that's associated with about how many sites, do you

22  think?

23  A   1,155 I believe is the correct number.

24  Q   1,155 sites, because sometimes there is more than one culvert

25  at a site; is that correct?

A    That's correct.

Q    But visually, if you were to put two dots on top of each other, you wouldn't actually see any visual difference in what these two maps look like; is that correct?

A    That's correct.  But I don't know anyone that's going to count the dots.  They're going to look at the number and see how many there are there.

Q    And are you aware that repeatedly in this proceeding, different state witnesses, including Mr. Wagner in his declaration, Exhibit 92, W-92, refers to culverts and not sites, and in fact people have often not been aware of what they were referring to?

     At least with respect to Mr. Waldo and yourself, you've accurately identified when you used one or the other.  But many state witnesses have in fact used the term "culverts" when they meant "sites," and possibly vice versa; is that correct?

A    That's quite possible.

Q    So it's more important to get it right, isn't it?

A    Yes.

Q    I'm going to go back to W-133.  As much as I love this one, and I'd love to leave it up all day, I'm going to switch.

     This is your response to Mr. Waldo's Table 1; is that correct?

A    Yes, it is.

Q    And your point here is that there's a lot of other people who

1  have blocking culverts; is that correct?

2  A   Yes.

3  Q   But your point isn't that the State doesn't have to fix

4  theirs; it's just that there's a lot of other work that has to be

5  done, right?

6  A   That's correct.

7  Q   And in order to achieve the benefit -- say the counties were

8  to come in and really go out and fix that 1,370 barrier culverts,

9  it wouldn't realize its full benefit, right, unless the State

10  fixed their 315?

11  A   That's correct.

12  Q   And I believe in your Exhibit 88-C, you say there's 42

13  barriers with no other barrier in the watershed.  And when I look

14  at 133 and sort of go through, there's a couple of pages past

15  this.  I went through the columns of the grand total and looked

16  for zeros, and I found about 77 of them.

17     Would that be my mistake or a change in the data set?

18  A   I believe there may have been some qualifiers on the data

19  that were used in the other table.  I think there was a minimum

20  of 200 lineal meters of habitat required upstream that would have

21  to be included on that.  This table here, that filter is not in

22  place, so some of these that you see here may not have that

23  200 meters of habitat associated with them.

24  Q   While we're on this page, I want you to take a look at site

25  102 L 062, where it says there's 140 other culverts in the

1   watershed.

2       That's Little Bear Creek, isn't it, one of the examples that

3   Mr. Tomisser used in opening statements?

4   A   I believe that's correct.

5   Q   It is kind of an outlier, isn't it?

6   A   It's a very high number.

7   Q   In fact, it's the only culvert of the 315 that has 81 more

8   sites associated than any other, is that correct?  In the

9   ballpark.  I'll say I counted.

10  A   Can you repeat that, please?

11  Q   Little Bear Creek, the example used by Mr. Tomisser in his

12  opening to illustrate his problem, is such an outlier, in fact,

13  doesn't it have about 80 more sites associated than any other

14  culvert in the examples?  If you want to verify, you can scroll

15  through -- go ahead and circle that first page where the 140 is.

16  I'll attest to you that I verified that that was in fact the site

17  ID for Little Bear Creek.

18      I don't find anything on the grand total that's anywhere near

19  that particular example that Mr. Tomisser chose to use in his

20  opening.  Do you?

21  A   No, you don't.

22  Q   And in fact, you use this example because Counsel asked you

23  to, right?

24  A   That's correct.

25  Q   Does Little Bear Creek, to your knowledge, have a high PI or

1  a low PI?

2  A   I'm thinking it has a pretty high PI.

3  Q   And that's because it has, I'll attest to say, about 18 miles

4  of habitat that's being blocked; is that correct?

5  A   I don't recall the exact number, no.

6  Q   Okay.  So it has a high PI, which means that the State has

7  determined, based on its priority index, that it's actually a

8  good project; is that correct?

9  A   I don't know that it was determined that it was a good

10  project.  That comes as part of the scoping process.

11  Q   Okay.  Well, I can go to one that Mr. Barber -- from your

12  examples that Mr. Barber testified was a good project, which was

13  Chico Creek, and that's W-119 and 120.  And here you have it as

14  an example of there being other barriers of the watershed.

15      And you heard Mr. Barber testify, correct?

16  A   Yes.

17  Q   And he said that despite this, it is a pretty good project.

18  In fact, it's a great project.

19  A   I did hear him testify to that.

20  Q   Do you disagree with that?

21  A   I have no basis to agree or disagree.

22  Q   But wouldn't looking at the map not tell you that story if

23  you were sitting in your chambers by yourself looking at the map,

24  you wouldn't necessarily know the full story of that project

25  would be that it was a great project with lots of miles and lots

1      of species that could be helped?

2          You're not going to give me anything, are you?  Okay.  I'll

3      take that.  It's okay.  I won't push any further.

4          I will sort of rewind to the beginning a little bit.  Do you

5      work with someone named Eva Wilder?

6      A    Yes.

7      Q    And what does she do?

8      A    Well, she works in the maps section, and she does -- to be

9      honest with you, I don't know what all of her jobs duties are,

10     but she does utilize the database quite a bit, and that's how I

11     interact with her.

12     Q    Okay.  And do you remember there being prior testimony about

13     the SPI from Mr. Barber?

14     A    Here?

15     Q    Yes.

16     A    I don't recall it.

17     Q    Do you know what the SPI is?

18     A    Yes, I do.

19     Q    And what is it?

20     A    It is a surrogate PI.  It's kind of a place holder value for

21     a real PI.

22     Q    It's an analysis done to determine a surrogate priority

23     number for the remainder of the culvert -- blocking culverts for

24     which there's no actual habitat assessment; is that correct?

25     A     Well, I think it was calculated for the purpose of

1    prioritizing how to do their habitat assessment work.

2    Q    But it's used for other purposes, isn't it?

3    A    I believe it has been.

4    Q    In fact, you use it in your annual reports, don't you?

5    A    I do not write or participate in the annual reports.

6    Q    Have you ever participated in the annual reports?

7    A    Maybe back in the late 90s.

8    Q    Go ahead and move to Page 4.  This has been previously

9    admitted as AT-72, for the record.

10        On Page 4 on the right-hand column, there's a little asterisk

11   that goes up to the calculation as the miles restored by opening

12   up fish-blocking culverts.  And what does it say in that corner?

13        MS. WOODS:  Objection, your Honor.  It's beyond the

14   scope of Mr. Benson's direct testimony.

15        MS. RASMUSSEN:  I can respond to that.  Mr. Benson is

16   the FPDSI records custodian.  We have a stipulation in the

17   pretrial order that we can lay the foundation through the State's

18   witnesses if we need to.  And he's testified that he uses GIS and

19   other types of techniques to supplement his information in the

20   SPI, and he's used some examples of that.  And I'm trying to

21   establish that this particular example shows that in their annual

22   report, they use a GIS-based SPI priority index number.

23        And he works with Ms. Wilder, and he has previously had

24   knowledge that this was likely how she did it.

25        THE COURT:  All right.  I'll overrule the objection.

1    I'll let you explore it more.

2              THE WITNESS:   Where were we?

3    By Ms. Rasmussen:

4    Q    Mr. Benson, if the end report says the amount of habitat

5    blocked by barrier was determined by habitat surveys or estimated

6    using Geographic Information System, GIS, which you have referred

7    to today often, software for sites that were lacking habitat

8    surveys, would that mean that this number was derived in part by

9    using the SPI?

10   A    It may be the same work.  Again, I did not participate in it.

11   I'm not the only person that does the GIS work.  It's quite

12   possible that Eva Wilder did the GIS work and that the SPI came

13   out of that.

14   Q    Do you know of any other way that the State would have been

15   able to measure these miles known as restored, given that they

16   don't have a PI for all the culverts that they fixed and don't

17   have a habitat measure?

18   A    Well, I imagine they -- they used the GIS exercise.  It could

19   be multiple GIS exercises going on.

20   Q    So there's something I've never heard of that could have

21   happened, but most likely it was Ms. Wilder using the SPI, wasn't

22   it?

23   A    Most likely.  I can't say for absolute certain.

24   Q    Can you turn to Page 87, please.  The annual report is put

25   together every year.  And used in the annual report is records of

1    the progress that folks are making with respect to fixing barrier

2    culverts, right -- or in particular, DOT is making; is that

3    correct?

4    A    I believe so, yeah.  Again, I don't participate in the

5    writing of the annual report.

6    Q    But are you aware generally the information from the FPDSI is

7    used for this report?

8    A    I'm aware the information is used.

9    Q    Okay.  So if you look at the table on Page 87, are these the

10   kind of site identifiers that you find in the database: site ID,

11   road, mile post, system name, WRIA, percentage fish passable?

12   And at the end, it goes to lineal gain, and sometimes there's a

13   measure and sometimes there's not.

14   A    Yes.  This would all come out of the database.

15   Q    And this lineal gain is measured irrespective of any other

16   owned culvert which might be on the watershed; is that correct?

17   The State doesn't measure from the culvert they opened up to the

18   next blocking culvert; they measure from the culvert to the top

19   watershed, is that correct, in terms of lineal gain?

20   A    When we report potential lineal gain, that is correct.  I'm

21   not sure if in this report they're actually reporting the

22   incremental gain or the potential.

23   Q    Can you pull up AT-071, Page 6?  And in this 2008 annual

24   report, AT-71, it does the same thing.  It refers to 782 linear

25   kilometers, 486 miles, once blocked that have been restored; is

1    that correct?

2    A    I have not read this report.

3    Q    So you have no knowledge about the amount of miles having

4    been calculated as being -- and being treated as restored or

5    opened up in the report by the department?

6    A    I have not participated in the calculations recorded in this

7    report.

8    Q    Have you ever done a calculation that referred to miles that

9    could be potentially opened up?  And, again, without taking into

10   account other owned barriers, just counting the miles.

11   A    If I did, it was many years ago and not related to this

12   litigation.

13   Q    That doesn't bother me if it's not related to the litigation.

14   Would seeing the salmon recovery balance scorecard detail refresh

15   your recollection on whether you'd ever done such an analysis?

16   A    That was the one that was coming to mind.

17   Q    So do you want to change your answer about whether or not you

18   have done it, or would you like to see the document?

19   A    You can put the document up if you like.

20   Q    I'm asking if you need the document to refresh your

21   recollection or not.

22   A    I don't need it.

23   Q    So you have done such an analysis?

24   A    Actually, that document talks about how to do it.  I don't

25   really recall that we ever followed through and did it.  We

1    talked about concepts on how to do it, and that was a long time

2    ago.

3    Q    That's okay.  That's why I brought it.

4         MS. RASMUSSEN:  May I approach, your Honor?

5         THE COURT:  He asked you to put it on the --

6         MS. RASMUSSEN:  Oh, okay.  I don't need to get it marked

7    to use it to refresh his recollection.  Okay.  I'm going to go

8    ahead and put it up here.

9    By Ms. Rasmussen:

10   Q    First of all, do you recognize that?

11   A    Not just as you have it there.  I recall working on this

12   process.

13   Q    I'm going to turn to Page 7 of the document.  I'm trying to

14   get the right part there.  It talks of cumulative miles of high-

15   quality fish habitat opened up.  It has your name on it as the

16   data collector.

17   A    I see that.

18   Q    Does that refresh your recollection about whether you did

19   that kind of analysis?

20   A    Again, I think this was being put forth as processes to how

21   you would do it.  I don't ever really recall doing the analysis

22   or following up with the score card.  It was one of those things

23   that kind of came and went.

24   Q    Did you ever work on a document with Mr. Sekulich where you

25   described road crossings blocking 3,000 miles of spawning and

1    rearing habitat in Washington?  Did you provide that 3,000 miles

2    to Mr. Sekulich?

3    A    That's pretty vague.  I think I need more information here.

4    Q    I'll go ahead and put up AT-156.

5         Did you work with Mr. Sekulich in 1997?

6    A    Yes, I did.

7    Q    I believe we've seen this document before.  Do you recognize

8    it?

9    A    I do not.

10   Q    So you don't recall whether you provided that analysis in

11   Paragraph 3 that says, "In fact, road crossings block about

12   3,000 miles of spawning and rearing areas in Washington"?

13   A    I have no recollection of that.

14   Q    Okay.  Have you ever compiled data and organized it that

15   showed the percentage of culverts that would need to be fixed in

16   order to get a 90 percent habitat benefit?

17   A    Yes.

18   Q    And you created a spreadsheet with this information; is that

19   correct?

20   A    Yes.

21   Q    Can you put up 333 -- 323?

22        Was this information outlined in the spreadsheet called

23   "WSDOT CA Barriers Habitat 311-090HW Update"?

24            MS. WOODS:  Your Honor, this material was prepared in

25   connection with Dave Smelser's testimony, which has been

1    excluded, and we are objecting to questions about these documents

2    that were provided to Mr. Smelser because it relates to testimony

3    that was excluded.  These documents should be excluded as well.

4            MS. RASMUSSEN:  Your Honor, may I respond?

5            THE COURT:  Which exhibit are you looking at?

6            MS. RASMUSSEN:  AT-323.

7            THE COURT:  All right.

8            MS. RASMUSSEN:  So I understand that the State's

9    argument is a little bit that this is fruit of the poisonous tree

10   of Mr. Smelser.  In fact, it's sort of the reverse.  Mr. Benson

11   created this spreadsheet, not Mr. Smelser.  And in the beginning

12   of this year, we promulgated an interrogatory asking for all

13   measurements and information that they had, and this was the

14   cause of our dispute in the motion in limine.  We were

15   complaining about not having obtained timely information.

16       And then the July 20th discovery cutoff came, and we still

17   didn't have the information.  We knew they had compiled habitat

18   gain information using this surrogate PI, but we didn't have it.

19   And we obviously were interested in proposing to the Court a

20   potential solution, where we'd ask for only 90 percent of the

21   habitat to be fixed.  And in order to have some idea of what that

22   was, we needed this surrogate PI measure.

23       And so then on July 21st we sent a letter to counsel asking

24   again -- pointing out that they used the SPI in their 2009, 2008,

25   2007, 2006 progress reports in order to get this potential miles

1    gain because they didn't have PIs for all those culverts they

2    were fixing, so they were obviously using a surrogate.

3         In response, Ms. Woods responds, Well, we're going to provide

4    it with Mr. Smelser on July 21st.  Ms. Woods says, We expect to

5    provide it with Dave Smelser's rebuttal file on the 27th.  And

6    again I asked for it again on the July 22nd deposition of

7    Mr. Benson when I learned that he'd worked on this information.

8         The problem here is that it does not become the fruit of the

9    poisonous tree that's Mr. Smelser's excluded testimony by the

10   fact -- by virtue of the fact that Mr. Benson created it in March

11   and refused to give it to us in response to the discovery

12   response.

13            THE COURT:  All right.  If I understand this correctly,

14   this was created in March of '09, right?

15            MS. RASMUSSEN:  Yes.  And then it was updated.  I don't

16   know the exact date that he updated it.

17            THE COURT:  And it purports to show this witness's

18   efforts at calculating which barriers would need to be fixed in

19   order to gain a 90 percent benefit in habitat?

20            MS. RASMUSSEN:  Yes.

21            THE COURT:  The objection will be overruled.  You may

22   inquire.

23   By Ms. Rasmussen:

24   Q   Do you recognize the spreadsheet?  Is it from the source

25   datasheet?

1    A    I'm afraid it's too small for me to read.

2         MS. RASMUSSEN:  If it would help the witness, we have

3    actually brought the active sheets in anticipation that he might

4    not be able to verify it with the PDF.

5    By Ms. Rasmussen:

6    Q    I should ask you, can you PDF -- or turn into a PDF an Excel

7    spreadsheet?  Is that possible?

8    A    I'm not absolutely sure.  I don't do it.

9         MS. RASMUSSEN:  Well, I'll attest to you that what we

10   did is we obtained this worksheet actually from Ms. Woods, and I

11   have the screen shot of the e-mails which I obtained for the

12   worksheet if I need to produce it.  We turned it into a PDF

13   because we felt that an Excel spreadsheet as an exhibit might be

14   somewhat difficult for the Court.  But we have it with us should

15   the witness need it to verify the information.

16        THE COURT:  If you can show him that.  Because I can't

17   see what's on the screen, and I'm sure he can't see it either.

18        MS. RASMUSSEN:  Would you like me to have the Court's

19   copy marked, your Honor?

20        THE COURT:  No, that's all right.  I just want him to be

21   able to identify it.

22   By Ms. Rasmussen:

23   Q    I will attest to you that this is the document we received

24   from Ms. Woods in response to a subpoena, WS/DOT CA barrier

25   77311090HWF site.  And the anadromous all PI tab is Exhibit 323.

1    And the anadromous formal PI worksheet is 322 -- or tab, I should

2    say, which is to the left of this one.

3         Let's start with 323.  Do you recognize this?

4    A    Yes.

5    Q    Would you like a moment to compare it to the other worksheet

6    so that can you answer whether or not they're the same?

7    A    How would I do that?

8         MS. RASMUSSEN:  Madam Clerk, can you hand the witness

9    Exhibit 323 in its paper form?

10   By Ms. Rasmussen:

11   Q    Did you bring your glasses today?

12   A    I brought both sets, yes.

13   Q    I should have bought some in anticipation that you might tell

14   me that you can't read any of this.

15   A    What number was it again?

16   Q    323.

17   A    I would agree that these are the same.

18        MS. RASMUSSEN:  Your Honor, I would move at this time to

19   admit Exhibits 323 and 324.

20        THE COURT:  Any other objections, Ms. Woods?

21        MS. WOODS:  I don't believe it's been established that

22   Mr. Benson maintains this type of information as part of his

23   ordinary job duties, so I would object on that basis.

24        MS. RASMUSSEN:  Your Honor, my response to this is that

25   --

1          THE COURT:   That's fine, Ms. Rasmussen.

2      I'm going admit AT-323 and AT-324.

3  By Ms. Rasmussen:

4  Q   I guess I'll have to use this one.

5      You created this spreadsheet; is that correct?

6  A   Yes, I did.

7  Q   And if you wanted to know -- I attested to you that the

8  tribes have proposed in the pretrial order a resolution whereby

9  they're asking DOT to fix 90 percent of the habitat.

10      Would there be a way to find out, based on this analysis,

11  what 90 percent of the habitat -- how many culverts that would

12  mean?

13  A   Which habitat metric are you referring to?

14  Q   Well, if I understand correctly, this worksheet has "habitat

15  gain" on it.  It has "lineal gain" in Column M.

16      So you have "lineal gain" in column M, and that lineal gain

17  is associated with fixing certain culverts.  And have you another

18  column that's the cumulative percentage of habitat?  Is that the

19  one in Column 0?

20  A   "Cumulative percentage of lineal gain."

21  Q   "Cumulative percentage of lineal gain."  Well, how would you

22  find out 90 percent?  Since it is your spreadsheet, I won't

23  embarrass myself by doing it for you.

24  A   Well, you would go down the column until you reach the

25  90 percent value.  That would correspond with a line that would

1  give you the number of culverts associated with that value.

2  Q    I believe we've found the line.  Can you scroll over and tell

3  me how many culverts that would be?

4      Sorry, your Honor, it's a little different than the

5  worksheet.

6      Let's go back to 323.  Is there a way to find out what line

7  culvert this is?  When we printed it out, it did a numerical

8  value for which culvert it was.

9  A    I think you're corresponding to a value of 577 there.

10  Q    Okay.  So the sort number is that it would take, according to

11  this worksheet, 577 of the 807 culverts with over 200 meters of

12  habitat to get 90 percent of the habitat gain; is that correct?

13  A    Based on the information that's in here.  Again, you're

14  mixing estimated with real data here, so you can't say for sure

15  that that is exactly what you're going to end up with.

16  Q    And when you say "estimated," you're referring to the SPI,

17  not the EDT analysis which you referred to before as the non

18  field verified?

19  A    EDT is also an estimate.

20  Q    Okay.  And you use EDT frequently, correct?

21  A    We don't use it that often anymore.

22  Q    Does it amount to a large percent of the data or just a small

23  percentage?

24  A    I would say a smaller percent.

25  Q    So your caveat here is that the SPI is based on this GIS

1   exercise, so that it's not absolutely 577 exactly, which would

2   yield 90 percent habitat gain; is that correct?

3   A   That's correct.

4   Q   And in order to know that for sure, you'd probably have to do

5   these habitat assessments that the tribes are interested in

6   having the department complete; is that correct?

7   A   That's correct.

8   Q   All right.  But this would give you at least some sort of

9   idea that the remedy that the tribes are seeking isn't all 807 of

10  the culverts, should the department complete habitat surveys.

11  A   That's correct.

12  Q   And that would impact the total number that would need to be

13  fixed at an accelerated schedule; is that correct?

14  A   I believe so.

15  Q   So unfortunately for me, I have another spreadsheet I'd like

16  to ask you about, 168.

17      Do you know what the anadromous all PI 92 worksheet might be?

18  A   Yes, I do.

19  Q   Do you recognize this?

20  A   I do.

21  Q   And did you do this?

22  A   Yes, I did.

23  Q   And what does it represent?

24  A   It's essentially the same as the previous spreadsheet;

25  however -- well, it's not essentially the same.  It's the same

site, same order.  It doesn't have the calculated fields, the

percentage fields, the cumulative gains, etcetera, but there are

habitat values that have been reinserted in this spreadsheet that

were not included in the other spreadsheet.

If you look at the lines that have been grayed out, those

represent barriers that are upstream of another barrier.  And in

the previous spreadsheet, we zeroed out the potential habitat

gain values so that that habitat was not double counted in the

total.  This spreadsheet was provided with those values put back

in so that Mr. Smelser could run his analysis in an alternative

way.

MS. RASMUSSEN:  I'm going to ask to have AT-168 also

admitted.

THE COURT:  Any objection?

MS. WOODS:  We have the same objections, your Honor, as

to the prior spreadsheets.

THE COURT:  Thank you, Ms. Woods.

AT-168 will be admitted.  Ms. Rasmussen, I'm sorry.

I didn't understand, Mr. Benson, the last thing you said

about this exhibit.  Can you go through that with me one more

time, please, what the difference is between this one and the

other one?

THE WITNESS:  This spreadsheet does not contain the

"cumulative lineal gain," "sum lineal gain," "sum of spawning

area," "cumulative spawning area," "sum of rearing area," and

1    "cumulative rearing area" columns.   The lines that are grayed

2    out, the rows, if you go under the "potential lineal gain,"

3    "potential spawning area," and the "potential rearing area," you

4    will see that there are values in each row.

5        In the previous spreadsheet, many of those values were zeroed

6    out in those gray lines.   In creating this spreadsheet, we were

7    grouping culverts together that are on the same stream.   So when

8    we say "potential," we're talking about all the habitat from the

9    lower most barrier to the upper end of the anadromous fish use.

10       So if there's barriers upstream, we included the habitat for

11   all of those and we totaled it up, and it's in the cumulative

12   columns.   We would double count, triple count the habitat.

13   That's why it was zeroed out in the first spreadsheet.   Those

14   numbers were put back into the spreadsheet so that Mr. Smelser

15   could run an analysis in a different way than what we had

16   originally laid out.

17            THE COURT:   Thank you.   You may inquire.

18            MS. RASMUSSEN:   I believe that I misspoke earlier.

19   Counsel just reminded me.

20       I asked to have 323 and 324 admitted as part of the OHW

21   3/11/09 worksheet.   What I should have said was 322 and 323.

22   Those were the two that were part of the worksheet.   And I have

23   yet to ask Mr. Benson about 324, which is the last worksheet,

24   should anybody be worried.

25            THE COURT:   All right.   So we're referring to AT-323 and

1    AT-322?

2            MS. RASMUSSEN:  Yes.  Those are the two that should have

3    been admitted rather than 323 and 324.  I misspoke.  I got the

4    two next to each other wrong.  And I have yet to ask Mr. Benson

5    about 324.

6            THE COURT:  We'll admit AT-322, and you may inquire

7    about AT-324.

8    By Ms. Rasmussen:

9    Q   Is this the same worksheet as AT-168, Mr. Benson?

10   A   Is AT-168 in this book?

11           MS. RASMUSSEN:  Madam Clerk, could you give him the book

12   with AT-168?

13       The reason I'm asking him to do this, your Honor, is we have

14   different source documents.

15           THE WITNESS:  I think these are the same spreadsheets.

16   By Ms. Rasmussen:

17   Q   Remember when I asked you earlier if one of the examples you

18   used for Mr. Waldo's work was a very high PI number and I pointed

19   to Little Bear Creek?  Is Little Bear Creek on here?

20   A   Yes, it is.

21   Q   What's its PI number?

22   A   52.7.

23   Q   What did you say?  Sorry.

24   A   52.7.

25   Q   Is that a relatively high PI for your priority index?

1    A    I believe that's a pretty high PI.

2    Q    And you don't know why it has such a high PI?

3    A    Well, there are many factors that go into the PI.  It could

4    be the amount of habitat, the potential habitat gain.  It could

5    be the number of species that stand to benefit.

6    Q    If I wanted to know the potential lineal gain from Little

7    Bear Creek, what would I do?

8    A    Potential lineal gain?

9    Q    Yeah.

10   A    Well, I would just follow the spreadsheet over to right there

11   where it says "potential lineal gain."

12   Q    And you don't recall if that's somewhere near 18 miles of

13   habitat?

14   A    I'd have to do the math.  I don't report my stuff in miles

15   typically.

16   Q    But the examples -- suffice it to say that the examples of

17   the maps you used, and I don't mean to beat a dead horse, were

18   not randomly selected; they were selected because they had a high

19   number of barriers, right?  It wasn't a statistically valid

20   sampling technique?

21   A    It was -- yeah.  The sites were not randomly selected.

22   Q    The purpose was to drag out a bunch of examples where a lot

23   of people were shirking; isn't that correct?

24          MS. WOODS:  Objection as to form, your Honor.

25          MS. RASMUSSEN:  Sorry.  I've been reading "Horton Hears

1    a Who."

2    By Ms. Rasmussen:

3    Q    To draw a bunch of examples where a lot of people were also

4    not fixing their culverts; is that correct?  That they were

5    weren't statistically valid samplings; they were specifically

6    chosen for their large number of barrier culverts associated with

7    them.  Your purpose was not to show that they were bad projects

8    but to just show the fact that there were other barriers; is that

9    correct?

10   A    The selection -- you have three criteria.  Number one, that

11   they were spread out over the WRIAs; two, they had high PIs; and

12   three, yes, there were a large number of other barriers in the

13   system.

14   Q    But you wouldn't want to be misleading the Court in implying

15   that these projects were not good projects, right?

16   A    I did not select them based on whether or not they were good

17   projects.

18           MS. RASMUSSEN:  Can you go ahead and put up AT-235,

19   please?

20           THE COURT:  Counsel, before we leave AT-324, he did say

21   it was the same as AT-168?

22           MS. RASMUSSEN:  Yes.  I believe that if it's the same as

23   AT-168, then we do not need it twice.

24           THE COURT:  Madam Clerk, AT-324 is not admitted.  Thank

25   you.

By Ms. Rasmussen:

Q   Do you recognize this, Mr. Benson?  I'm showing you what has

been marked as AT-235.  This has not been admitted.

Do you recognize it?

A   Yeah.  I believe you showed this to me during my last

deposition.

Q   Is this the kind of chart you could make using the

information supplied from the database that we discussed?

A   Can you enlarge it, please?  I can't see it.

If I read this correctly, it says it's a statewide estimate.

That would exceed the data that's available on the spreadsheets.

Q   I'm going to go back to something you said about Mr. Waldo's

table.

MS. RASMUSSEN:  Could you put up his Table 008-19?  Oh,

we don't have it.  That's right.  Just a second.  I have a copy.

By Ms. Rasmussen:

Q   I've put up what's AT-008-19.  I will attest to you that it's

my copy, and it's got handwriting on it.

This is the table that you looked at earlier with Ms. Woods;

is that correct?

A   That's correct.

Q   And you testified that one problem you have with it was that

he had used non field-verified data.  And this is -- you're

referring to the expanded threshold determination analysis; is

that correct?

1   A      That's correct.

2   Q      And do you know whether -- and I just want to be clear.  This

3   portion of the data that you use is only about 6 to 9 percent of

4   the data, or possibly less; is that correct?  It's a very small

5   portion of the data that he used?

6   A      Can you be a little more specific, please?

7   Q      You know, when you made the critique that Mr. Waldo used non

8   field-verified data, do you know how much of the data was non

9   field verified?

10  A      I think it accounts for approximately 10 percent of the

11  measures recorded here.

12  Q      And other than that, Mr. Waldo, you had no critique of the

13  methodology he used?

14  A      No, I did not.

15          MS. RASMUSSEN:  I'm making sure I haven't forgotten any

16  of the documents my colleagues asked me to ask Mr. Benson about.

17  Otherwise, I'll hear about it later.

18      I believe I have no further questions for Mr. Benson.  Thank

19  you.

20          THE COURT:  Counsel, we had reserved on W-088-C until

21  after your cross.  Do you still have any objections to it?

22          MS. RASMUSSEN:  Just that one of the big problems with

23  this particular exhibit, and I explored this with Mr. Barber, is

24  the exhibit itself does not contain the limiting basis of the

25  data.  He used 398 of the total sites, and on the exhibit

1    itself --

2        Can you put up 88-C?  On the top title, it just says, "WSDOT

3    and WDFW barrier culverts unaffected by additional upstream or

4    downstream barriers."  These culverts represent barriers to

5    anadromous salmon that have over 200 meters of potential habitat

6    gain.  It does not contain the limitation that it's only actually

7    a quarter of the data.  It accounts for a quarter of the data,

8    not for all of them.

9        And my concern is that if someone takes this exhibit not in

10   conjunction with Mr. Barber's declaration that contains the

11   limit, it's completely possible that they would be misled.  And

12   sometimes this happens, and they say there's only 54 barriers

13   with no other barriers in the watershed.  And we've seen in the

14   most recent exhibit, W-133, that there's 77 on that list, and

15   Mr. Benson testified it's because the database is a moving thing.

16       So this one is no longer accurate, and he has testified that

17   it isn't, so that would be my objection.

18            THE COURT:  Thank you.

19       That objection will be overruled.  W-088-C is admitted.

20            MS. RASMUSSEN:  So I still have no further questions.

21            THE COURT:  Thank you, Ms. Rasmussen.

22       Ms. Woods, any redirect of this witness?

23            MS. WOODS:  Just a few questions, your Honor.

24       I've asked to have AT-168 put back up on the screen.

25                       REDIRECT EXAMINATION

By Ms. Woods:

Q   All right.  Mr. Benson, you were asked some questions about AT-168.  Do the culverts listed on AT-168 include culverts that block less than 200 meters of habitat?

A   I don't believe so.

Q   You were asked some questions about one of the sites on AT-168 as well as the spreadsheet that appears to be identical to it, and that is - these numbers are teeny, I'm sorry - the fourth site listed on the spreadsheet, Little Bear Creek.  And I believe you testified that it has a high PI and explained how you would find out how much potential lineal gain that culvert would have if it were fixed.

Can you tell from the spreadsheet how much lineal gain you would actually achieve by fixing the culvert?

A   No.  This value represents the potential.  You would need to know what the next upstream barrier is and what the distance between the two is to account for that.

MS. WOODS:  Your Honor, before we dismiss this witness, I would like to make an offer of proof regarding a question where an objection was sustained.

THE COURT:  Go ahead.

MS. WOODS:  I put back up on the screen Exhibit AT-008-19.  And the question that I asked where the objection was sustained was, if you multiply the habitat areas in Exhibit AT-008-19 times a species-specific fish production coefficient,

1    would you get an accurate prediction of how many fish could be

2    produced from that habitat?

3        You may go ahead and answer, please.

4            THE WITNESS:  Oh, I may?  I wasn't aware of that.

5        No, I don't believe you would.  The numbers portrayed here

6    are summary numbers taken from the database.  They essentially

7    reflect the distance -- the potential gain between target barrier

8    and the upstream most extent of anadromous use.  To get into

9    species-specific production values, you would need to know which

10   portion of that habitat is actually used by any given species.

11       Different species of salmon are distributed throughout the

12   streams.  They're essentially partitioned into different gradient

13   reaches.  So if you have a stream that has a whole variety

14   that -- you know, those from low gradient to high gradient, some

15   species are going to be found in the lower end, some in the

16   middle, some in the upper end.  You really need to be able to

17   break out which part of those streams those species are using in

18   order to get you any kind of fish production value.

19            MS. WOODS:  Thank you.  I have no further questions.

20            THE COURT:  Mr. Benson, you may step down.  Thank you.

21       Ms. Woods, we have about a half hour left.  Do you have a

22   little, short witness?

23       Mr. Tomisser?

24            MR. TOMISSER:  We have a big, tall witness who I suspect

25   will not be finished, if the Court has a hard deadline.

1            THE COURT:  Do you want to get started today, though?

2    We have about half an hour left, so --

3            MR. TOMISSER:  Yeah, we can.  He's here.

4            THE COURT:  My clerk has convinced me I need to attend

5    to this other detail.  We will give you a half hour off on our

6    weekend here.  Any problem?

7        Everybody back nine o'clock Monday morning.  Have a great

8    weekend.  We will see you all then.

9                        (Adjourned for the day.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8

          I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25