```
 1                 UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 2                        IN SEATTLE

 3   ----------------------------------------------------------

 4   UNITED STATES OF AMERICA, et al.,)
                                      )
 5                  Plaintiffs,       )  No. C70-9213
                                      ) Subproceeding 01-1
 6          v.                        )
                                      )         FINAL
 7   STATE Of WASHINGTON, et al.,     )
                                      )
 8               Defendants.          )
                                      )
 9   ----------------------------------------------------------

10                      CLOSING ARGUMENTS

11   ----------------------------------------------------------

12         BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                      June 7, 2010

14

     APPEARANCES:
15
                            Mr. Peter C. Monson
16                          U.S. Department of Justice
                            Environment & Natural Resources Division
17                          Rogers Federal Building
                            1961 Stout Street - 8th Floor
18                          Denver, CO 80294

19                          Rene David Tomisser
                            Fronda C. Woods
20                          Douglas D. Shaftel
                            Philip M. Ferester
21                          Attorney General's Office
                            P.O. Box 40100
22                          Olympia, WA 98504

23                          John C. Sledd
                            KANJI & KATZEN
24                          100 South King Street, Suite 560
                            Seattle, WA 98104
25
```

Alan C. Stay
Richard Reich
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98092

Daniel A. Raas
Kevin Lyon
Regina Hovet
Mary Neil
RAAS JOHNSEN & STUEN PS
P.O. Box 5746
Bellingham, WA 98227

Mason D. Morisset
MORISSET SCHLOSSER AYER & JOZWIAK
801 Second Avenue
11115 Norton Building
Seattle, WA 98104

Alix Foster
Swinomish Indian Tribe
11404 Moorage Way
La Conner, WA 98527

Harold Chesnin
Confederated Tribes of Chehalis
1810 43rd Ave. E. Suite 203
Seattle, WA 98112

Lauren Rasmussen
Port Gamble S'Klallam and Jamestown
S'Klallam Tribes
1904 Third Avenue
Securities Building, Suite 1030
Seattle, WA 98227

John Hollowed
Northwest Indian Fisheries Commission
6730 Martin Way East
Olympia, WA 98506

Samuel Stiltner
Puyallup Tribe
3009 Portland Avenue
Tacoma, WA 98404

```
 1                          Richard Gruber
                            Brian C. Berley
 2                          Makah Tribe
                            ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM
 3
                            Yale Lewis
 4                          Law Offices of O. Yale Lewis III

 5                          Katherine Kruger
                            Quileute Tribe
 6
                            Howard Arnett
 7                          KARNOPP PETERSEN
                            Warm Springs Tribe
 8
                            Craig Dorsay
 9                          DORSAY & EASTON
                            Hoh Tribe
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE CLERK:  This is the matter of the United States,
2    et al versus the State of Washington, case number C70-9213,
3    assigned to this Court.  Will counsel please make their
4    appearances for the record.
5    THE COURT:  Who is going to start?  Mr. Sledd.
6    MR. SLEDD:  May it please the Court.  John Sledd for the
7    Sauk-Suiattle, Stillaguamish, Nisqually, Squaxin Island,
8    Skokomish, Suquamish, Port Gamble S'Klallam, Jamestown S'Klallam,
9    Lower Elwha Klallam and Hoh Tribes.
10    MR. MONSON:  Good afternoon, your Honor.  Peter Monson
11    for the United States.
12    MR. STAY:  Good afternoon, your Honor.  Alan Stay for
13    just the Muckleshoot Indian Tribe.
14    THE COURT:  Thank you.
15    MS. FOSTER:  Good afternoon, your Honor.  Alix Foster
16    for the Swinomish Indian Tribal Community.
17    MR. RAAS:  Good afternoon, your Honor.  Dan Raas for the
18    Lummi Nation.
19    MS. RASMUSSEN:  Good afternoon.  Lauren Rasmussen,
20    co-counsel for the Port Gamble S'Klallam and the Jamestown
21    S'Klallam Tribes.
22    MR. MORISSET:  May it please the Court, Mason Morisset
23    for the Tulalip Tribes.
24    MR. HOLLOWED:  May it please the Court, my name is John
25    Hollowed with the Northwest Indian Fisheries Commission.

```
 1              MR. STILTNER:  Your Honor, I am Sam Stiltner, attorney
 2      for the Puyallup Tribe.
 3              MR. ZEILMAN:  Tom Zeilman, attorney for the Yakama
 4      Nation.
 5              MR. ARNETT:  Howard Arnett for the Warm Springs Tribe of
 6      Oregon.
 7              MR. REICH:  Richard Reich for the Muckleshoot Tribe.
 8              MR. LEWIS:  Good afternoon.  Yale Lewis, co-counsel for
 9      the Quileute Tribe.
10              MS. KRUEGER:  Katherine Krueger, co-counsel for the
11      Quileute Tribe.
12              MS. HANSEN:  Michelle Hansen for the Suquamish Tribe.
13              MS. NEIL:  Mary Neil, attorney for the Lummi Nation.
14              MR. GRUBER:  Brian Gruber for the Makah Tribe.
15              MR. LYON:  Kevin Lyon for the Squaxin Island Tribe.
16              MS. MARTIN:  Connie Sue Martin for the Nooksack Tribe.
17              MR. SUAGEE:  Steve Suagee, Lower Elwha Klallam.
18              MS. HOVET:  Regina Hovet, Squaxin Island Tribe.
19              THE COURT:  Anyone else from the tribes?
20              MR. TOBIN:  Bill Tobin for the Nisqually Tribe.
21              MR. CUSHMAN:  Chris Cushman for the Nisqually Tribe.
22              MS. WILLIAMS:  Sheri Williams for the Lummi Nation.
23              THE COURT:  All right.
24              MR. TOMISSER:  Rene Tomisser on behalf of the State of
25      Washington.
```

```
 1              MS. WOODS:  Good afternoon, your Honor.  I'm Fronda
 2   Woods for the State of Washington.
 3              MR. SHAFTEL:  Doug Shaftel with the State of Washington.
 4              MR. FERESTER:  Phil Ferester, Assistant Attorney General
 5   for the State of Washington.
 6              THE COURT:  Thank you, all.  The Court has had an
 7   opportunity to fully review the materials submitted, the
 8   post-trial briefing, the proposed Findings of Fact and
 9   Conclusions of Law, and has set aside this afternoon to allow the
10   parties an opportunity to try to convince me in oral argument as
11   to why I should adopt those proposed Findings of Fact and
12   Conclusions of Law.
13          Mr. Sledd, I understand you will be arguing on the tribes'
14   behalf; is that correct?
15              MR. SLEDD:  I will.
16              MR. ZEILMAN:  Your Honor, before the argument starts, I
17   wanted to announce that our good friend and colleague and officer
18   of the court, Timothy Roy Weaver, died March 22nd, 2010, at the
19   age of 65, after a long, 18-year battle with cancer.  He was one
20   of the few among us who remembers, almost from the very
21   beginning, the early years of this case.  And he will be missed
22   by everybody.
23              THE COURT:  I'm sure he will.  Thank you.
24              MR. SLEDD:  May it please the Court, John Sledd on
25   behalf of the ten tribes I named earlier.  I will be arguing on
```

1    behalf of all the plaintiff tribes, your Honor.

2        I understand the Court has set aside an hour for each side.

3    I am hoping in some prepared remarks and response to questions,

4    if the Court has any, to go for about a half hour.  Mr. Monson,

5    for the United States, would like to have about five to ten

6    minutes, and then the plaintiffs would like to reserve the

7    remainder of their time for rebuttal, if they may.

8        Your Honor, I want to take this opportunity to address four

9    critical points that were established in the trial that show the

10   need for and the propriety of the injunction that the plaintiffs

11   have presented to the Court.

12       First is that fixing state culverts and keeping them fixed

13   will significantly improve THE tribal salmon harvest.

14       Second, that accelerating correction of state barrier

15   culverts is essential to vindicate treaty rights and to recover

16   salmon runs.

17       Third, the injunction the plaintiffs have proposed will

18   trigger no state budget crisis.

19       And, fourth, that the injunction, by providing some basic

20   ground rules for the correction of culverts, will avoid future

21   disputes between the parties, while preserving the state's

22   discretion on how to fix those culverts.

23       There are, given the time limits, a number of issues I do not

24   intend to address.  One of those is the state's motion for

25   reconsideration of your Honor's summary judgment decision.  The

issues that were raised at summary judgment of what the treaty imposes by way of duties and whether the state has violated those was thoroughly briefed, it was thoroughly argued, it was decided. The purpose of the recent trial was to go beyond that and decide a remedy.  And that is what I want to address.

The first point I want to make from the evidence at trial, your Honor, is the proof of irreparable harm to tribal fisheries which the proposed injunction will resolve.

The Court's summary judgment decision found that culverts contribute significantly to a substantial diminishment of tribal harvest.  And the evidence at trial confirmed that.  It showed an unrelenting decline in salmon populations and harvests since the beginning of the 20th century.  It showed that tribal harvest which started to grow after the Boldt decision reached a peak and is now also in unrelenting decline.  It has fallen back to the abysmal levels that prompted the filing of U.S. v. Washington in the first place.

The affects of the shortage of salmon on the tribes was made clear in the testimony of four tribal members, and an additional tribal biologist, from throughout the case area, who testified that their fisheries have been circumscribed in time and in place, that they are no longer able to make a livelihood from their fishing, and that they are compelled to celebrate their first salmon ceremony by drawing fish from a freezer rather than from the streams in their own homelands.

1    The contribution of state barrier culverts to this situation
2    is clear.  This fall, as nine years ago when this case was filed,
3    and as three years ago when your Honor issued a summary judgment
4    decision --  There we go.  This is what salmon will find this
5    fall, your Honor, when they return to the waters of the case
6    area, over 1100 state barrier culverts in every basin throughout
7    the case area that block their passage to the habitat they need
8    to reproduce.
9        The Department of Fish and Wildlife's biologist, Brian
10   Benson, testified upstream of just 800 of those barrier culverts
11   there lie almost five million square meters of habitat, and
12   almost a thousand miles of stream.
13       Tyson Waldo, a biologist with the Northwest Fisheries
14   Commission, who testified for the plaintiffs, said that there is
15   an additional 200 miles blocked by DNR culverts.
16       The consequences of losing 1200 miles of salmon stream are
17   not speculative, they are not hypothetical.  They follow from a
18   very simple principle that was set out by Mr. Wasserman, the
19   biologist for the Swinomish Tribe, in his testimony.  He said,
20   "The number of fish available for harvest and spawning is, in
21   large measure, dependent upon having access to sufficient fresh
22   water habitat to maximize the number of smolts."  Or as your
23   Honor put it in a question he asked to another witness, Dr. Jeff
24   Koenings:  "It all starts with the habitat, doesn't it?"
25       No testimony from any practicing biologist at trial was to

the contrary, and the entire state culvert correction program is predicated on the truth of that principle.

The state, in the face of this evidence, nevertheless, contends that plaintiffs have not proven any irreparable harm. The state would demand a precise tribe by tribe, culvert by culvert accounting of loss.  But that is impossible.  The state's witness, Mr. Barber, another biologist, testified it is not possible to tell how many fish are cost by one culvert because the biology is too complicated.  Just because the harm cannot be specifically quantified does not mean that no irreparable harm exists.  Mr. Barber continued and said, "It is not necessary to know the actual number of fish increase to know what you are doing has benefit to fish."

And, moreover, as Mr. Rawson, the biologist for the Tulalip Tribe, testified, "It is possible to determine not just the existence, but the magnitude of harm to the fisheries, and the benefit from correcting culverts by looking at the amount of habitat."

Dr. Sekulich, the state witness and former WDFW employee, went a step further.  He said he could think of no better way to quantify the potential production that is lost to these culverts than to multiply the habitat area times the production value per meter squared.  That is why he used that methodology in his priority index; it's why he used it in his effort in Exhibit AT-104, where he calculated that every linear meter of habitat

1    loss cost half a salmon, which translate to about 750 a mile.

2    And that's why he used that habitat surrogate times a production

3    value in the 1997 Fish Passage Inventory Final Report where he

4    told the legislature that the potential production upstream of

5    DOT barrier culverts was 200,000 adult salmonids a year.

6        Using habitat area as a surrogate for the numbers of lost

7    fish is not a novelty.  It has been approved in the ESA

8    incidental take context, if the biology makes it impossible to

9    calculate the precise numbers of fish taken.  For that

10   proposition, your Honor, there is a case, Northwest Environmental

11   Defense Center versus National Marine Fisheries Service from the

12   District of Oregon, decided about six or eight weeks before trial

13   began in this case.

14       And the state did something similar in the Gillette case,

15   which we cited in our motion in limine papers prior to trial,

16   where the state proved the loss of adult salmon from illegal

17   stream bulldozing by multiplying an estimated number of redds in

18   a given length of stream and calculating an estimated number of

19   adults that could come back from that.  And when that methodology

20   in Gillette was challenged as too speculative, the State Court of

21   Appeals said, "The court should not immunize a defendant once

22   damage has been shown merely because the extent or amount thereof

23   cannot be ascertained with mathematical precision."

24       The state goes on to argue that proof should be made of

25   tribe-by-tribe harm before we can obtain an injunction case

1    area-wide.  That raises the wrong question, your Honor.  The

2    relevant question is not whether every tribe is harmed, but

3    whether barriers in all parts of the case areas harm at least one

4    of the plaintiffs' tribes.  If they do, then they are subject to

5    injunction.  As Mr. Waldo's map and his table of lost habitat

6    showed at trial, every basin in the case area has barrier

7    culverts and every one has habitat blocked by state barrier

8    culverts.

9        The decisions of this Court in U.S. v. Washington makes

10   equally clear that there is a tribal fishing area in every single

11   part of the case area.

12       And, moreover, the fish that originate from one barrier

13   culvert don't just impair harvest in that particular basin.

14   Wherever those fish go -- would go, there are fewer of them to be

15   caught, affecting the harvest of tribes throughout the case area.

16   They can even affect the harvest from completely unrelated basins

17   by forcing tribes to ratchet down their catch in so-called mixed

18   stock fisheries.  Case area-wide relief is thus completely

19   justified.

20       In addition to demanding a biologically impossible

21   specificity in the proof of harm, the state suggests that fixing

22   its barriers will not help salmon or tribal harvest because there

23   are other barriers on the same streams.  But the state offers no

24   legal support for the notion that equity should condone their

25   violations because there are other barriers out there which

1    violate state law and which the state has chosen to allow to

2    remain.  Nor does the evidence show that those non-state barriers

3    would make an injunction against the state barriers ineffective.

4    The key evidence for that proposition, your Honor, is a series of

5    tables that were done by Mr. Benson and were worked on by

6    Mr. Waldo, that analyzed 315 WSDOT culverts where there has been

7    a complete enough habitat survey to actually locate the barriers

8    upstream and downstream.

9        I would refer the Court to Exhibits AT-285, AG-288 and W-133.

10   What those exhibits show is that for those 315 culverts, more

11   than half of them have no downstream barriers, and 80 percent of

12   them have at most one downstream barrier.

13       Moreover, those barriers are highly concentrated in certain

14   basins.  Fully ten percent of the barriers upstream of those 315

15   DOT culverts are on a single drainage, Little Bear Creek, near

16   Bothell.  Not coincidentally, that is the Little Bear Creek which

17   state counsel directed Mr. Benson to testify about.  It is an

18   outlier.

19       Many of these non-state barriers are also only partial

20   barriers.  Again, Mr. Benson looked at this, he found that

21   70 percent of the barriers below those 315 DOT culverts are only

22   partial.  In those, 70 percent of the time, that means that there

23   are fish still getting past -- some fish who would still benefit

24   by removal of that DOT culvert upstream.

25       The evidence also shows those non-state barriers are coming

out.  The state's tenth anniversary report on the Salmon Recovery Act, which is Exhibit 085(e), the state exhibit, shows that more than 3,500 barriers have been removed statewide since 1999.  If you subtract out the number of fixes by the state, which is in the record, you are left with a conclusion that 2,500 of these other barriers have come out in the past ten years.  They are coming out.

If the state is, nonetheless, concerned about how non-state barriers will affect its corrections in the future, it is free under the proposed injunction to prioritize correction in basins that have fewer of those non-state barriers.  The state could even choose under the injunction to completely defer correction of some DOT barriers that have a lot of non-state barriers associated to the end of the DOT culverts' useful life, as long as by doing that they don't go over ten percent of the total amount of habitat that is deferred.

In summary, regarding proof of irreparable harm, your Honor, the plaintiffs clearly proved it, and they proved an injunction would effectively remedy it, and would restore the fish that these culverts have been taking out of these streams for decades.

Turning to my second point, your Honor.  The evidence showed that an injunction accelerating DOT culvert corrections would vindicate the treaties, it is essential to do so, and it is essential to recovering the salmon.

As the Department of Fish and Wildlife and the Department of

Transportation stated in a pair of reports to the legislature in 1997, "The rate of barrier correction must be accelerated if Washington's wild salmon and trout stocks are to recover." Mr. Benson testified at trial that is still true.  The rate still needs to be accelerated.  And it is easy to see why.  The state's correction rate, if it continues, will perpetuate harms to the fish and the fisheries for decades.

Let's put aside the Parks and Recreation Commission, which hasn't even finished its inventory and has fixed just one culvert.  Put aside the handful of culverts fixed and the relatively small number that DFW has.  Put aside even DNR, despite the fact that Mr. Nagygyor testified for them that they will have trouble meeting their 2016 goal statewide, because they have a $50 million shortfall in their access road fund they use to pay for these corrections.  Focus just on DOT, and focus just on the 800 culverts that have more than 200 meters of habitat.

The Department of Transportation in their annual reports tells us how many they have fixed.  If you look at the most recent one that was in evidence, it will show you that there have been 176 successful DOT culvert corrections statewide since 1991. 176.  Two-thirds of those have been in the case area.  And that translates to about six and a half corrections per year.  And if you do the math on 800 DOT pipes, at six and a half a year, it will take 123 years just to fix those 800.

This Court in another subproceeding in U.S. v. Washington

many years ago said that the presumption is that the tribes are entitled to enforcement of their treaty rights without delay. And the plaintiffs submit, your Honor, 123 years of further delay is completely inconsistent with that presumption, and with their treaty rights.

I would point out, your Honor, if the state is correct in its own cost estimates, in its own funding predictions of about $15 million a year, that situation is actually worse.  You do the math there.  They are only going to be able to fix about four or four and a half culverts a year.  And we are looking at close to two centuries to solve this problem.

Now, despite the evidence of the abysmal pace of correction currently, at trial and in its post-trial briefing, the state has argued that accelerating culvert corrections will actually hurt salmon recovery.  The only support for their claims is the former biologist, Dr. Jeffrey Koenings.  He has claimed that the state has comprehensive, bottom up, integrated, federally approved, holistic plans, prioritized by fingerprinting the limiting factors in each of the watersheds.  And he claims that fixing the culverts any faster will upset the apple cart of salmon recovery by taking money from higher priority efforts.  Well, that testimony is real long on buzz words, but it is short on substance.  The state didn't put any of the salmon recovery plans into evidence so your Honor could see what they do.  In fact, there are only two.  As Dr. Roni, the United States' witness,

Mr. Wasserman for Swinomish, Mr. Rawson, the Tulalip biologist, all testified, those are Endangered Species Act plans Puget Sound Chinook and Hood Canal summer chum.  They are based on ESA recovery standards.  Don't put this fish into extinction.  They are not based on tribal needs for harvest that were promised at treaty time.

There are no plans for other species in other parts of the case area.

In response to the Court's question, Dr. Koenings actually admitted that his view of -- his vision of integrated, holistic, et cetera, plans, that tie all the four Hs together has not been done on a systematic basis.  And not only have the plans that would integrate all these things not been done, but the basic scientific analysis that would be needed to underlie such integrated, prioritized plans has not been done.

Again, Dr. Roni and Mr. Wasserman and Mr. McHenry, the Elwha biologist, testified that in order to prioritize preservation efforts, in the way that Dr. Koenings described as desirable, you have to have detailed watershed assessments.  So look at each species in each basin and identify what is the limiting factor for each species there.

The tribal biologists testified that such assessments exist for only a few basins and a few stocks.  The tribal biologists agreed that the limiting factors analysis that the state has done and touted as adequate to this purpose are not.  The LFAs, there

is one in evidence, the statewide summary, W-087(h), and it
confirms this.  It is merely a list of things affecting salmon.
It doesn't compare them by species.  It doesn't give you a
prescription for action by watershed.  It characterizes the
habitat conditions as good, fair and poor, but it does nothing to
say which is limiting.

Absent those kinds of integrated plans that would allow you
to do that sort of prioritization, what Dr. Roni said, and the
other tribal witnesses agreed with, the first thing to do in
repairing habitat is to reconnect the broken pieces by pulling
out anthropogenic barriers such as culverts.  That recommendation
was not contradicted by any of the practicing biologists who
testified, and it is consistent with multiple exhibits and
multiple state reports over the years that agree that barrier
culverts must be corrected if wild salmon are to recover.

Somewhat incredibly, Dr. Koenings disagreed with all that
evidence and testified that fixing barrier culverts is bad for
salmon.  And the only thing he based that on was his statement
that opening up additional habitat will let wild fish in to
interbreed -- hatchery fish in to interbreed with wild fish.

But in response to that concern, your Honor, let me ask a
simple question:  Where were the wild fish and the hatchery fish
before you fixed the barrier?  They were all jammed in the
remaining habitat downstream, where the competition between them
was even more severe.  Opening up additional habitat will help

1   solve that problem.

2       Dr. Koenings' other argument was not biological, it was

3   financial, that accelerating DOT culvert corrections will take

4   funds away from higher priority efforts.  But his analysis is

5   simply wrong.  The reason is simple.  If you remember the

6   testimony from Victor Moore, the director of the Office of

7   Financial Management who testified on behalf of the state, he

8   made it clear that the cost the Department of Transportation will

9   incur, which is the vast majority of the costs involved in fixing

10  barrier culverts, come out of a separate budget, a transportation

11  budget, that has a separate funding source in the gasoline tax.

12  The costs that pay for salmon recovery are in the general fund

13  budget.  That's where the SRF Board is, the Salmon Recovery

14  Board, that's where the Department of Fish and Wildlife is.  And

15  ne'er the twain shall meet according to Mr. Moore.

16  Constitutionally, that gas tax revenue cannot be diverted to

17  anything but highway purposes.  And as a historic matter, the SRF

18  Board has never made a grant to the DOT to fix a barrier.  As far

19  as Mr. Moore's testimony showed, there has never been use of

20  general fund money for Department of Transportation highway

21  construction projects.  It simply has not happened and there is

22  no reason to expect it would.

23      In summary of my second point, your Honor, the evidence at

24  trial was clear, in the absence of an injunction, state barrier

25  culverts will remain on these streams for decades, if not

1    centuries, they will frustrate both tribal efforts to obtain

2    livelihood and the public interest in salmon recovery.

3         The third point I want to address, your Honor, is this:  The

4    evidence at trial proved that an injunction to correct state

5    barrier culverts will trigger no state budget crisis.  The state

6    has argued that spending money to remedy the treaty violation in

7    a timely fashion is a hardship that tips the balance of hardships

8    in its favor and away from the grant of injunctive relief.  But

9    the state's costs and budget arguments are simply not logical.

10   Because culverts wear out, and because under state law and

11   existing agreements between agencies like DFW and the Department

12   of Transportation, when they wear out and get replaced they must

13   be made fish passable.  The only costs that can properly be

14   attributed to the injunction that the plaintiffs have asked for

15   is the incremental difference between fixing the culverts faster

16   or fixing them more slowly, because they are going to get fixed

17   no matter what.

18        The state finally admitted in its post-trial brief that it is

19   this incremental or marginal cost that counts.  But the analysis

20   the state did of that cost in the post-trial brief is

21   nonsensical.  It did not address the relevant margin or the

22   relevant increment, which is the difference in cost between

23   fixing 800 DOT barriers in 20 years or fixing 800 DOT barriers a

24   century or more over the current rate.  Instead, the state

25   compared the cost of all 800 barriers in 20 years versus

1    correcting some small fraction of that by using their current

2    correction rate in that same 20-year period.  In other words, at

3    the end of the 20 years the state's analysis stops the clock,

4    completely ignoring the fact that there would be costs for

5    another 80 to 100 years under the state's proposal.

6        The state's calculation of the incremental cost is further

7    inflated because, in fact, the plaintiffs are not asking that the

8    state must correct all 800 of those barriers.  We have given the

9    state a very substantial out, by proposing if the state will

10   simply finish its ongoing habitat survey, so it actually knows

11   how much habitat is there with a reasonable degree of certainty,

12   that it would only have to open up 90 percent of the habitat, fix

13   enough DOT culverts to open 90 percent.  Mr. Benson's testimony,

14   AT-323, shows that should be about 577 culverts.  So that is the

15   incremental cost question, your Honor.  577 in 20 years or over a

16   much longer time period.

17       After you take out that 577, the end of the 800 could be

18   fixed at the remainder of their useful life, which is what

19   current state law provides.

20       There is another problem with the state's cost arguments,

21   your Honor.  The evidence does not support their claimed cost for

22   fix of $2.3 million.  The state's approach to that average cost

23   has been misleading from the first day of trial.

24       In the state's opening statement there were two culverts that

25   were addressed in particular.  One was Mill Creek, which we were

1   told was a $1.6 million fix, and, quote, was on the medium to

2   smaller side of the fixes.  But if you actually look at

3   Mr. Wagner's testimony, he testified that the Mill Creek fix was

4   a 37-foot wide stream simulation structure.  It was one of the

5   widest stream simulation structures the state has ever built.  It

6   was not on the medium to smaller side.

7       Another example used in opening was Terrell Creek up in the

8   Lummi country.  We were told that the cost of that project for

9   the culvert fix was $2.3 million.  If you look at the evidence,

10  that project was a highway project.  If you look at the documents

11  in the record, it is a highway project, not an I-4 project.  And

12  Mr. Wagner testified it is not possible in a highway project like

13  that to tell what part of that $2.3 million total cost was

14  because of the culvert fix and what was because of the other

15  highway work being done.

16      So that misleading approach has been compounded by the

17  state's use of a nonrepresentative list of only 38 culverts to

18  come up with its $2.3 million average cost.  On

19  cross-examination, both Mr. Wagner and Mr. Carpenter from the

20  Department of Transportation, admitted they had made no effort to

21  determine whether those 38 culverts on that list were

22  representative of the full sweep of 800 to be corrected.

23      But the plaintiffs did make that comparison, your Honor.  And

24  the Court can as well.  If you look at AT-323, it lists stream

25  widths for all 800 of the remaining DOT barriers.  It shows the

38 culverts on that scoping list are significantly larger streams than the norm, and thus will have higher costs.

Finally, that $2.3 million estimate is inconsistent, and inexplicably inconsistent with the 2007 estimate which the state also prepared in a proposed exhibit back when trial was meant to be in 2007.  And that 2007 exhibit shows that future DOT corrections could be expected to cost $850,000 on average.

Now, according to the State Department of Transportation's construction cost index, which is in the record at AT-217, inflation from 2007, when the cost was meant to be $850,000, to 2009, when we did trial, was 12 percent.  You add that 12 percent to $850,000, it should have brought the cost up to $952,000.  It does not bring it up to $2.3 million, your Honor.

The misleading nature of the state's testimony and argument regarding the average cost continued when the state's witness turned to address the budget as a whole.  Mr. Moore stated that culvert spending would threaten programs for the state's most vulnerable citizens.  He said you can't just borrow more money or pull money out of some pot for culvert fixes, because there are debt limits and spending limits under state law.

What he didn't say until cross-exam is those social programs for the most vulnerable, like salmon recovery, are general fund programs.  And those debt limits he spoke of apply only to the general fund.  And the spending limit applies to the general fund.  And none of them are relevant to the Department of

1    Transportation corrections that will consume the vast majority of

2    the money needed to vindicate the plaintiffs' treaty rights by

3    fixing various culverts.  Nor will fixing the barrier culverts

4    that DOT has cause a crisis within the Department of

5    Transportation's own budget.

6       Mr. Moore acknowledged that the impact of fixing culverts on

7    the DOT budget depended on how much a culvert would cost to fix

8    and how many of them there were to fix.  He admitted on cross

9    that he didn't know either of those things.  So his statement

10    that fixing barrier culverts is going to remain -- that the

11    safety of millions of Washingtonians is impaired is pure

12    hyperbole, it is baseless.

13       In fact, your Honor, we do not deny accelerating DOT culvert

14    fixes will require some shift in the Department's priorities.

15    But if you look at the total budget for the Department of

16    Transportation, at the time of trial, $5.8 billion, and the

17    highway construction budget of $4.4 billion, whatever the

18    incremental cost of correcting these culverts faster is will be

19    dwarfed by that budget.

20       The final point, your Honor, I want to make regarding the

21    evidence presented at trial is this:  The injunction will not rob

22    the state of its legitimate discretion; it will not mire this

23    Court or the parties in perpetual implementation proceedings.

24    The injunction is, in fact, minimal in relation to the treaty

25    violations.  And the plaintiffs have striven to balance in their

1   injunction terms between very specific language, which would make

2   quite clear the state's obligations, but which the state would

3   surely call too intrusive, and very general language, which the

4   state would say we don't know what it requires, but which is

5   intended to give them full discretion.

6       In numerous places the proposed injunction borrows from the

7   state's own current policy and does no more than insure that

8   current policy becomes actual practice in the future.

9       Provisions that fall under that category include the

10  inventory.  The plaintiffs proposed that the existing DOT and DNR

11  inventories of barrier culverts be the basis for what has to be

12  fixed in 20 years or by 2016.  The plaintiffs proposed that

13  WDFW's current inventory methods can be continued into the

14  future.  The correction schedule is borrowed from state law for

15  the natural resource agencies, that 2016 deadline, and it is

16  borrowed from the Department of Transportation's own 20-year

17  correction deadline, which it had in its own policy documents up

18  until 2004.

19      The design standard, pass all fish at all life stages, is

20  taken from the State Forest Practices Act.  The proposed

21  hierarchy, once you decide to build this -- the proposed

22  hierarchy of design options, where you would look first at, do we

23  need to put something there, do we put a bridge there before you

24  look at a culvert, is straight out of the WAC for stream crossing

25  structures.

 1          So the injunction would impose some new requirements.  And it

 2     does so in places where the existing state programs are woefully

 3     inadequate.  Thus, the injunction would require that the state

 4     actually monitor all of its fish passage corrections for

 5     effectiveness.

 6          The evidence at trial showed that what is currently done for

 7     DNR, they go out and look at their culverts, the big ones, after

 8     a major storm.  In other words, they do a drive by.  There is no

 9     systematic program of reinspection.  For the Department of

10     Transportation, there is a one-year inspection period for a third

11     of the fixes done with I-4 funding.  And that is it.  There is no

12     comprehensive program.  And that is essential to insure that

13     these fixes are actually effective and stay that way.

14          Maintenance, your Honor, is similarly included in the

15     injunction because the current maintenance programs are

16     inadequate.  The Department of Transportation has no program

17     aimed at maintenance for the purpose of insuring fish passage.

18     What it has is a maintenance program aimed at insuring the

19     structural integrity of the culverts.  And that program, if you

20     will recall, was recently rated the worst of 32 categories of DOT

21     maintenance programs in their management accountability process.

22     One of the regions that comprised the case actually got an F-plus

23     grade for their maintenance program.

24          Finally, your Honor, the injunction would require that the

25     state do something which the evidence shows is essential to

1  prevent ongoing future harm, and that is to develop a program of

2  ongoing inspection and correction of barrier culverts.  No agency

3  currently has such a program, and the evidence is clear it is

4  almost inevitable that there will be additional barriers in the

5  future, and they will continue to deprive the tribes of harvest

6  if there is no program to find and correct them.

7       In those places where the injunction imposes new

8  requirements, your Honor, that are not borrowed straight from

9  state practice, the requirements are deliberately phrased

10  generally.  They are intended to insure that the state not wholly

11  default on aspects of culvert correction that are essential, but

12  to leave the state as free as possible to fill in technical

13  details.

14       Now, the state portrays this injunction as fraught with

15  complications and intrusions.  It is not so.

16       The state contends in its post-trial brief that it will be

17  compelled under the proposed injunction to develop a new adaptive

18  management program.  Well, unlike the state, which insists on

19  clinging adamantly to the status quo, the plaintiff actually

20  listens to the concerns of the other side, your Honor.  We

21  revised the proposed injunction from pretrial to post-trial and

22  deleted the reference to adapted management.  What the injunction

23  would now require is simply monitoring of the effectiveness.

24  That is the essential monitoring that could be used for an

25  adaptive management program.  We think that the biologists for

1    the State of Washington will want that, and will do it, and work

2    with their tribal counterparts to develop it, but it will not be

3    required by this Court.

4        Similarly, the state contends that it will have to use

5    whatever design represents best available science.  Again, the

6    best available science language has been stricken from the

7    proposed injunction that was filed post-trial.  What the

8    injunction now does is merely note that the stream simulation

9    design is currently the best science.

10       The state also contends that it may have to prove to the

11   Court in advance that its designs are adequate, but there is

12   nothing in the injunction that would require that, and there

13   never has been.

14       The state argues that an injunction to prevent it from

15   operating barriers in the future, requiring it to correct

16   barriers in the future, will lead to perpetual judicial

17   supervision.  But, your Honor, this is a permanent injunction.

18   That's what permanent injunctions do.  They require that the

19   situation change for a long time.

20       On the remand in the Winans case, the Winans brothers were

21   not ordered that they could have three fish wheels in the river,

22   but after five years they could have more.  It was perpetual.

23   And when this Court enjoined numerous state regulations in Final

24   Decision One, it was not for a short period of time, it was

25   forever.  And should the circumstances change in the future, such

1   that the terms of this injunction become inequitable, the state

2   is free to make a motion to modify under Rule 60, and under the

3   Rufo decision from the U.S. Supreme Court.

4         So, in summary, substantively and procedurally, the

5   injunction the plaintiffs have proposed is limited, and it is as

6   deferential as it can be and still get the job done.

7         We do not deny that there will be some implementation

8   disputes.  Although, we note, as the Ninth Circuit recently noted

9   in an unrelated sub-proceeding, things have changed a lot in 20

10  years, in terms of how the state and the tribal technical people

11  get along.

12        We believe that providing some basic standards in an

13  injunction will actually avoid future disputes, more than giving

14  the state no guidance at all in terms of how it is to comply with

15  the treaty duties of the state that the Court has already

16  declared.

17        And to the extent that some of those disputes are technical

18  ones, the Court can refer them.  There is the Fishery Advisories

19  Board.  The Court can create a culverts advisory board.  You can

20  order alternative dispute resolution.  You can order mediation.

21  There are a lot of ways to solve those kinds of disputes before

22  they get before the court.

23        Finally, your Honor, in addition to overstating the intrusive

24  effects of this injunction, the state would apply a novel legal

25  test to evaluate it.  In their post-trial brief, they appear to

argue that every component of the injunction must address a
separate irreparable injury.  For example, they argue that the
plaintiffs must show that they suffered irreparable harm from the
current inadequate system of notice to tribes.  They must show
that they suffered irreparable harms from the current inadequate
monitoring systems for culvert corrections.  But the state cites
no case that requires that every single element of an injunction
be supported by a separate irreparable harm.  The plaintiffs have
been unable to find them.  Instead, the principle is very
straightforward.  A court of equity has broad and flexible
powers.  Once irreparable harm has been shown, it can reach out
and do what is necessary to prevent that irreparable harm from
continuing or recurring.  In this case, both monitoring and
notice of implementation activities are fundamental to insuring
that the corrections are done properly and to giving plaintiffs
their due.

So, in summary on my fourth point, your Honor, the evidence
shows that the plaintiffs have suffered irreparable harm and
their injunction will do no more than provide the minimum
elements of an effective correction program.

In conclusion, your Honor, the plaintiffs don't want to make
light of the burden this injunction will impose.  We understand
full well it will require a lot of work.  It will require a lot
of money.  But the alternative proposed by the state is to leave
the fate of the culverts, the fate of the salmon and the fate of

1    treaty fisheries entirely in the state's discretion with no

2    injunction.  It is to leave the status quo.  And we know what

3    that status quo is.

4        The state's alternative would insure that these barriers,

5    which have been declared for the last three years to be in

6    violation of the treaties, would remain for decades, if not for

7    centuries.  That would shame equity, that would thwart the treaty

8    promise.  The plaintiffs therefore pray, your Honor, that you

9    grant the injunction as they have requested.

10          THE COURT:  Thank you very much.  Mr. Monson.

11          MR. MONSON:  Good afternoon, your Honor.  May it please

12   the Court.  Peter Monson for the United States of America.

13   First, let me just say the United States joins in the remarks

14   Mr. Sledd just made, as we do in the request for the proposed

15   injunction that was filed post-trial with the amendments

16   Mr. Sledd has outlined.

17       That would bring me to the first of three brief points I

18   intend to make.  In our post-trial briefs, we pointed out the

19   fact that the United States has joined in the plaintiff tribes'

20   request for relief militates against any Eleventh Amendment

21   defense the state has argued.  We briefed that quite extensively.

22   We pointed out a case that is very much similar to this one, the

23   Mille Lacs Band versus Minnesota case.  Unless the Court has

24   questions, I don't intend to address that matter any further.  I

25   think we briefed it adequately.

1        Our second point is that the United States places great

2   importance on the correction of culverts in the Pacific

3   Northwest.  And there is two points I would like to make under

4   that.  First, we presented a witness at the end of trial,

5   Dr. Philip Roni, who discussed the importance of correcting

6   culverts.  And I will get into his testimony in just a moment.

7        And the second point is that, although we did not have

8   testifying witnesses to this fact, we did have evidence in the

9   record regarding Forest Service corrections on national forest

10  lands, and the acceleration that they have undertaken.  I will

11  briefly address those points as well.

12       The correction of fish-bearing culverts is of great

13  importance, in part because of the rapid response that they

14  provide.  As Dr. Roni testified in his direct testimony as

15  rebuttal to Dr. Koenings, reopening habitat that has been blocked

16  by -- whether it is blocking culverts or other matters, is akin

17  to opening the back gate and letting the dogs out.  And fish,

18  like dogs, will run free and will go and explore the new

19  territory that they have heretofore been excluded from.  In the

20  context of fish, it happens within a matter of literally days.

21  If they can access previously inaccessible habitat, they will do

22  so as quickly as they possibly can.

23       Fish-blocking culverts are a problem not only in terms of

24  fulfilling the tribe's treaty rights, as Mr. Sledd has so

25  eloquently discussed, but it is also important from the

1    standpoint of meeting the Endangered Species Act requirements and

2    recovering salmon to a non-threatened, non-endangered status.

3        As Dr. Roni indicated, and I think Mr. Sledd alluded to this

4    in his remarks earlier as well, there are two first steps that

5    need to be taken for purposes of salmon recovery, to protect the

6    high quality habitat that exists and then, secondly, to reconnect

7    isolated habitats.  The culverts fit into that secondary

8    category.  Reconnecting isolated habitats is one of the top two

9    most important things that can be done.  Correcting fish-blocking

10   culverts fills that requirement very successfully.

11       Dr. Roni testified that reconnecting habitat is one of the

12   most successful restoration actions because it relies on existing

13   habitat.  You don't have to create new habitat.  Although

14   certainly improvements may be required.  And also, as I

15   mentioned, fish recolonize new habitat very, very quickly.

16       In addition, in rebutting Dr. Koenings' testimony regarding

17   trying to address all of the Hs all at once without any

18   prioritization of one over the other, Dr. Roni described that as

19   doing a lot of things across the landscape, but not really trying

20   to address some of the key factors first.

21       That approach is flawed because you do a little bit here and

22   a little bit there, but you never really get to the most critical

23   items.  And those, in Dr. Roni's view, were, again, protecting

24   existing high quality habitat and reconnecting isolated habitats.

25       He pointed out that, while limiting factors analyses are very

1    important in salmon restoration, they have to be done correctly,

2    and they have to really, truly analyze what those factors are and

3    how they limit restoration and limit salmon production in those

4    habitats.

5         Habitat reconnection is one thing that can be done very

6    quickly with positive results, without a great deal of analysis

7    required.

8         And Dr. Roni, finally, noted that culvert corrections do not

9    necessarily conflict with other salmon restoration activities.

10   In many cases, such as with DOT highways and roads, the funding

11   sources are completely different.  And Mr. Sledd has alluded to

12   that as well.  The state witnesses confirm that fact, that the

13   budgets for salmon recovery are oftentimes much different -- come

14   from a different pot of money, whether it be federal money or

15   money expended through what is called the SRF Board, the Salmon

16   Recovery Funding Act board.  Those funds are different from where

17   the funds would come from, with respect to Washington State

18   Department of Transportation funds.

19        In short, the injunctive relief proposed by the plaintiffs

20   will not cause the state to have to rob Peter in order to pay

21   Paul in terms of salmon recovery.

22        Now, on cross-examination, Dr. Roni was asked about a

23   PowerPoint presentation.  This is the point the state has made in

24   its post-trial brief, to try to paint Dr. Roni's views as

25   suggesting that culvert corrections are not very important and

1    not very productive in terms of salmon recovery, and maybe money

2    should be spent elsewhere.

3        The PowerPoint presentation was lacking a couple of things.

4    One, it was lacking the actual underlying presentation.  It was

5    just the bullet points.  Dr. Roni mentioned this, and tried to

6    explain, no, that wasn't in fact what he intended to convey with

7    the PowerPoint presentation.

8        Secondly, the PowerPoint presentation was not the result of a

9    comprehensive study, it was simply a hypothetical watershed that

10   was being used to provide an example of how scientists and people

11   in the business of salmon recovery might go about prioritizing

12   recovery actions in a given watershed.  It wasn't intended to

13   say, well, these things should be done first because every

14   watershed is different.  All of the witnesses seem to agree on

15   that point.

16       Sort of the bottom line here is, with respect to that

17   PowerPoint presentation, Washington Exhibit 200, is that it was

18   really based on a hypothetical estimation, and Dr. Roni clearly

19   clarified on redirect that in fact it was a -- it represented a

20   large underestimation, and that the correction of barrier

21   culverts is still a very important factor in salmon recovery.

22       So this brings me to my third and final point, and that

23   relates to the importance placed on culvert corrections and

24   barrier corrections by the Forest Service.  As I mentioned, we

25   were unable to present witnesses at trial from the Forest Service

1    because both individuals were called away, one for a family

2    emergency, and the other was out of the country.  But we did --

3    There is evidence in the record regarding the culvert corrections

4    efforts that the Forest Service has undertaken.

5        In 2005, the Forest Service culverts were not in very good

6    shape.  The state has pointed that out in prior briefing when

7    they sought to assert a claim against the United States in this

8    very case.  However, since that time, the funding effort and the

9    work the Forest Service has done to correct its own barrier

10   culverts on forest land has increased dramatically.  The base

11   funding has increased by some 67 percent.  I am looking at

12   Exhibit 187, U.S.A.  It talks about there have been increases in

13   recurrent funding from 2005 to 2009, from 4.6 million to

14   7.7 million.  In addition, there was two substantial, one-time

15   appropriations exceeding $25 million the Forest Service is using

16   to correct culverts and decommission roads and do other things in

17   the Pacific Northwest and in the case area.  A summary of these

18   expenditures and the accomplishments that have been made with

19   those monies can be found at U.S.A. 188, U.S.A. 189 and U.S.A.

20   190.

21       It is important also to note that the Forest Service has

22   developed a very extensive methodology for correcting culverts,

23   that being the stream simulation manual that it uses, which is

24   very similar to the one the state uses.  But it uses that on

25   anadromous streams.  It uses that methodology exclusively for

correcting culverts that it is trying to correct on its lands in the case area.

I would also note that the Forest Service is on track to try to meet the same 2016 deadlines that the Washington Department of Natural Resources agencies are seeking to meet.

So, in conclusion, from our perspective, we want to see the DOT culverts fixed because oftentimes they are located downstream from national forests.  In order to make the improvements that are occurring in the upper stream reaches more effective, and increase production of salmon, we want to see the downstream corrections being made as well.  Without those corrections on the state culverts, the federal culvert corrections benefits will not be fully realized.

For those reasons, as those stated by Mr. Sledd earlier, the United States urges the Court to enter the plaintiffs' proposed permanent injunction regarding culvert correction.  We thank you, your Honor.  I will stand for any questions if you have any.

THE COURT:  Thank you, Mr. Monson.

MR. MONSON:  Thank you.

THE COURT:  Mr. Tomisser.

MR. TOMISSER:  Good afternoon, your Honor.  The remedies requested by the tribes in this case, ranging from the acceleration of the state's barrier program to the federal jurisdiction over culvert design, are ultimately aimed to achieve one goal, the increase in the abundance of salmon available for

1    harvest.  The abundance theory presented by Mr. Sledd, as he

2    mentioned today, in which every existing barrier is a breach of

3    the treaty, is a treaty that requires no more showing of action

4    under the Steven's treaty than to make a general assertion that

5    abundance is diminished from some unarticulated, undefined,

6    unproven level, and that some state action is a depressing factor

7    upon the number of salmon.  That is all the Court needs to adopt

8    as a remedy under the treaty.

9         I think that this is not the correct vehicle for -- it is not

10   a correct vehicle to increase the abundance of salmon.  And I

11   think it is important, your Honor, to consider the abundance

12   theory in the context that this treaty was signed.

13        Is the Steven's treaty, a document created in the 1850s, a

14   proper vehicle to solve the challenges posed today by concerns

15   over the abundance of salmon and the scarcity of the resource?

16   If we consider what was thought about at the time the treaty was

17   executed, one of the primary assumptions that has been noted by a

18   number of commentators and courts over the years is that the

19   supply of salmon was thought to be inexhaustible, essentially an

20   unlimited resource.  There is the colorful description that was

21   offered at the time of the treaties:  Salmon were abundant in

22   such numbers that a person could cross the river without getting

23   their feet wet merely by stepping on the backs of salmon.  Such

24   was the abundance available at that time.

25        It is, therefore, not surprising, given that fundamental

1    assumption underlying the treaty, that there is no mechanism

2    built into the treaty to assure any particular level of the

3    resource.   There was no reason to think about that at the time,

4    under the assumption that the resource is inexhaustible.

5        The other consideration that was at the center of the treaty

6    at the time it was signed was the knowledge that there was going

7    to be growth, there was going to be settlement, there was going

8    to be an increase in the population.  All of these things, or

9    both of these things, were primary considerations at the time the

10   treaty was signed.

11       Fifty years later, your Honor, on September the 27th, 1908,

12   to be precise, the anticipated growth and development happened in

13   a very quantum way, in a way that changed the world forever, in a

14   way that was unimaginable at the time the treaty was signed.  We

15   look forward today --  Our own corner of the world is almost

16   unrecognizable from the time that the treaty was signed.

17       It is not surprising, therefore, your Honor, then to consider

18   at the time that the treaty was signed, a vehicle was not going

19   to be capable of solving the problems of today.  The problems of

20   today, problems of abundance, problems of scarcity, are modern

21   problems, problems for which new laws have been created to deal

22   with.

23       Although Mr. Sledd takes me to task for mentioning the

24   Endangered Species Act, the state Salmon Recovery Act, the Forest

25   Practices Act, those are modern tools that have been created to

deal with the modern problems. There is nothing in the treaty itself that in any way assures any particular level of abundance. It was not part of what was in the treaty, and should not be written into the treaty by this Court.

Once the Court begins to consider the abundance theory as a viable cause of action, there is no logical distinction between culverts as a factor that diminishes the relative abundance of salmon and any other limiting factor that the state may possibly be involved in.

The Court heard testimony about the four Hs, and how all of them are important factors for salmon recovery, habitat having a variety of limiting factors. The state is involved in every aspect of these four Hs, including multiple impacts potentially on habitat. If the abundance theory is correct, your Honor, that the Court need only identify some state action that creates a downward pressure upon the salmon, then, according to the plaintiffs, that action is now subject to remedy by this Court under the treaty. That's an extension that would be unthinkable at the time that the treaty was signed. It is a right that has never been recognized by a court.

Having said that the treaty is not the proper vehicle for the tribes to receive a remedy in this case, that is far from saying the treaty no longer has a purpose. The treaty does have a purpose. The treaty remains viable and contains important rights for all parties to it.

1    The courts have identified two broad, substantive rights that
2    flow from the treaty.  The first is the core decision
3    establishing that the tribes are forever to be granted access to
4    their usual and accustomed fishing areas.  That right is not
5    involved in this particular case.
6        The second broad right is involved.  That broad right deals
7    with the entitlement of the tribes to a fair share of the
8    available catch.  If the Court looks at the decision in 1979 from
9    Fishing Vessel, the court describes the second of the two rights,
10    saying, "The purpose of our cases is clear.  Both sides have a
11    right secured by treaties to take a fair share of the available
12    fish."  That, we think, is what the parties to the treaty
13    intended when they secured to the Indians the right of taking
14    fish in common with other citizens.  What the court says there
15    is, it is a right to a fair share of the available fish, not an
16    inherent right to establish a certain level of availability.
17    This distinction is important, your Honor.
18        If you look back a little bit further, we gain more
19    understanding of what Fishing Vessel was talking about when they
20    talked about a fair share, what is a fair share and what did that
21    mean in terms of the treaty.
22        If you go back and look at the Department of Game versus the
23    Puyallup Tribe, you see the analytical roots for how the Court
24    should be applying this particular right to the treaty.
25        What the court established in the Puyallup series of cases

1    was what the treaty was concerned with preventing was future

2    state action, as new territory was developed, that was going to

3    be unfair in its treatment of tribal access to the resource.

4        What the court in that case said was unlawful was any state

5    action that had either the intent or the effect of discriminating

6    against the ability of the tribes to take their fair share of the

7    available fish.

8        And when you look at that ruling in context, it makes sense

9    in historical terms.  The concern was we need to allow the tribes

10   to have access to the resource that they had historically

11   depended on.  What we are not going to allow the state to do, is

12   to come in, and through state action, or state laws, or unfair

13   practices, push the tribes off that resource, so that when the

14   tribes dip their nets into the water, they come up empty, whereas

15   the non-tribal fishermen are able to take the catch.  That is

16   what was prevented.  The idea was to insure the tribes the

17   ability to get a fair share of the catch that was available.

18   That is a very different right than the right Mr. Sledd and the

19   tribes are asserting in this case, which is a right to some

20   undefined quantum of fish in a treaty.  That is what doesn't

21   exist.  But it has become the issue for us today because the

22   fundamental assumption -- one of the fundamental assumptions in

23   the treaty has changed, the assumption that the supply itself is

24   inexhaustible.  The problem of abundance, the problem of scarcity

25   is a modern problem, not one the treaty was designed to resolve.

1    I tried to be careful with my opening remarks here about the

2    treaty not being available to remedy culverts, because even under

3    the Puyallup decision and in Fishing Vessel, it would be

4    theoretically possible under that construct for a culvert to be a

5    breach of the treaty.  I can describe for the Court in those

6    cases what a prima facie culverts case might look like.

7        If we look at the Puyallup decision in Fishing Vessel, a

8    prima facie culverts case, for example, would include perhaps a

9    tribe that was able to come in and identify that historically

10   they were dependent upon a particular run to catch their fish;

11   and that at some point in time the state had come in and built

12   culverts in a way that was impacting that run of fish, but

13   impacting in a way that was denying the tribes their right to a

14   fair share of that run, whereas non-tribal fishermen were still

15   able to exploit the run.  In that situation, you would have

16   evidence of a state culvert that was having a discriminatory

17   impact on the ability of a tribe to take their share of whatever

18   that run would be.  That would at least be a prima facie case of

19   a breach of culvert (sic) that would come under the treaty.  That

20   isn't to say that the Court would automatically issue an

21   injunction, but at least you would have a prima facie case to

22   review.

23       I want to turn to general considerations for the Court in

24   looking at the remedy that has been requested by the tribes.

25   There are several considerations that the Court needs to take

into account when looking particularly at granting an injunction
against the state government.   The first and most basic rule is,
of course, the plaintiffs have the burden of proof in presenting
their case to the Court and satisfying the Court on a more
probable than not basis that they are entitled to the equitable
remedy they are requesting.

The second broad principle the Court can see from the case
law, is that the remedy must fit the breach, so that we don't get
into the problem of the remedy being overbroad.   And overbroad
remedies are found when the Court's remedy applies to things that
haven't been proven as part of that breach and in need of the
remedy.   That is a significant problem for the presentation of
evidence in this case by the tribes.   When you look at what we
would propose to the Court to be the prima facie case, there is a
stunning lack of evidence.   In fact, the tribes have never moved
beyond the generalized assertion that fixing barriers is good.
We know that fixing barriers is good.   That's why we have spent
tens of millions -- hundreds of millions of dollars trying to do
that.   The question is, is fixing them -- have they proven that
fixing them faster is going to produce any benefit.   That's what
they haven't done.

They have approached the case in an unusual fashion, your
Honor, asking for a case-wide injunction to fix the barriers.
And yet there is no evidence presented to the Court that all of
the watersheds need an injunction.   In fact, the testimony

1    presented by the witnesses was that every watershed is different
2    and needs different things.

3        The best way to approach that problem then is in the way that
4    has been described in which plans are developed at the watershed
5    level.  More needs to be done.  But then you apply the remedy
6    that is needed for that watershed and for that species.  A
7    one-size-fits-all remedy over the entire case area, in light of
8    the testimony that not every watershed needs that remedy, is
9    inherently overbroad.

10       Another consideration for the Court, and this one is
11   fundamental, is the problem of a federal court getting into the
12   area of institutional reform.  I do believe that the remedy
13   requested by the tribes in this case in some respects does cross
14   the line into institutional reform, and all the federalism
15   concerns that flow from that.

16       This is how I think they do that in two specific ways:  First
17   of all, although they presented it innocuously, plaintiffs asked
18   the Court to take control over the design of culverts.  Currently
19   under state law, the state can fix culverts using stream
20   simulation, the hydraulic method, or no slope, all of which are
21   designed to pass fish at all stages.  That is what is currently
22   allowed under state law.

23       What the plaintiffs have asked the Court to do is to say, no,
24   stream simulation must be the default except in emergency
25   circumstances.  That is an act of institutional reform, because

1    the state court is telling the state, you cannot do something

2    that is currently allowed under state law, you must choose only

3    this option.

4        The much larger concern when we look at the institutional

5    reform is the effect on the state budget.  And I will get into

6    this cost dispute in a little bit.  But regardless of whether you

7    think the state's numbers were accurate, or Mr. Sledd's numbers

8    were more accurate, underneath either analysis, as Mr. Sledd

9    admitted in his closing, the Court is going to be reorganizing

10   the state's budget to some extent.  The Department of

11   Transportation budget, or whatever budget, in order to meet the

12   goal of repairing the culverts within a 20-year period, the

13   plaintiffs in this case acknowledge, the spending priorities are

14   going to have to be reorganized to do that.  Once the Court sets

15   a performance goal that has to be met by the state that requires

16   the reorganization of the budget, you're instituting

17   institutional reform.

18       The reason I mention that, your Honor, is because

19   institutional reform is not a matter to be taken lightly.  And

20   I'm sure the Court doesn't take it lightly.  When you look at the

21   cases in which institutional reform has been ordered, they are

22   generally cases where the Court is facing a recalcitrant

23   defendant, a state actor who is defiant of federal law or simply

24   has no ability to come into compliance with federal law.

25       This is an aspect of the case that I get most discouraged

about when I hear Mr. Sledd disparage the efforts that have been
made.  Far from being a recalcitrant actor, the State of
Washington in this case, by the undisputed evidence, is actually
a leader in the area of salmon restoration and recovery.  The
State of Washington, from scratch, without a threat of federal
court intervention, developed a program for the inventory, the
prioritization and the correction of a barrier system on its own,
and put that system into place.

It has been consistently funded through the years through a
variety of sources.  It has developed a model for deciding how to
spend money to get the most bang for the buck.  That was done
through the development of the priority index.  The state has
been recognized throughout the nation as being a leader, far from
being the recalcitrant defendant that courts generally reserve
institutional reform awards for.

When you look globally at what the state has done, you look
at the SRF Board spending.  The State of Washington over the last
decade spent $143 million on salmon-wide recovery projects.  We
have put programs into place that qualify for federal assistance,
thereby increasing our ability to fund projects.  The federal
government contribution to that is $216 million, for a total of
$360 million in one decade, spent by the Washington State Salmon
Recovery Board, an office whose functions are overseen by the
governor's office, and who make decisions based on the very work
of people that were witnesses in this case, state biologists,

1    tribal biologists, federal experts who develop the plans to get

2    funding, to develop the priorities for how they should be spent.

3        You can see as a subpart of these totals, 21 million on

4    barrier corrections, another 22 million from the federal

5    government.  That money is in addition to the money spent by DOT

6    and DNR to correct their barriers.  All of this work is being

7    done.  None of it places the state in the position of being a

8    recalcitrant defendant unwilling to do what is necessary for

9    salmon.  What the state has done is taken extraordinary

10   leadership and taken the responsible steps within its means to

11   get as much done, and to do it in a scientifically sound way, the

12   product of collaboratively scientific work, not the product of

13   litigation and court decisions on what ought to happen.

14       So what has happened?  Mr. Sledd contends there is no plan.

15   In fact, there are plans.  This comes from an exhibit admitted

16   into evidence.  It is the key excerpts from the Puget Sound

17   Recovery Plan.  It is called the Chinook plan.  But it will

18   benefit every fish that swims in Puget Sound.  It is a plan that,

19   according to the scientists, has a 50-year time horizon, at a

20   cost of $1.24 billion, and more than a thousand associated

21   actions.  That plan is in place, your Honor.  And it is not the

22   only plan.

23       Dr. Koenings testified that more of this work needs to be

24   done, that what we need to do is look more closely at each

25   watershed so we know what each watershed is.  That work is being

1    done and it is in progress.  As Dr. Koenings described, these

2    coordinated plans and trying to get this coordinated is of

3    relatively recent origin.  The plans are working, they are

4    scientifically sound, and ought to be allowed to continue to

5    work.

6        Another example is the Hood Canal Summer Chum plan.  In fact,

7    Kit Rawson also talked about the plan -- the Snohomish ten-year

8    plan in that particular case.

9        As a part of these plans, your Honor, an extensive limiting

10   factor analyses were done.  If we look just at habitat, what the

11   witnesses testified was that every watershed has different

12   problems and needs different solutions.

13       Significantly, the plans do not place barrier corrections at

14   the top.  Barrier correction is certainly a part, and it is more

15   important in some watersheds than others, but estuary restoration

16   actually ranks at three-quarters of watersheds as a top priority.

17       Why should the Court order the shift in this case, as we

18   present to the Court, of $164 million in funds to put barriers at

19   the top of the list, when the analysis that has been done so far

20   shows the Court that actually estuaries is where that effort

21   ought to be directed?

22       When we look at the work that has been done by individual

23   state agencies, in addition to what has been done through the SRF

24   Board and other agencies working on salmon recovery, you look at

25   what DNR has accomplished in this case, the correction of more

than 700 barriers within a decade, as Alex Nagygyor testified in this case, although it will be close, they believe they are on track to meeting the goal of fixing the barriers by 2016.  The tribes are fine with that target.  There is no need to federalize that portion of the plan.

When we look at DOT, DOT's barrier corrections, through a combination of a couple of different sources, as was described to the Court, first, in the course of simple highway construction projects where a correction can be made within the scope of a highway project, the correction to the barrier would be made at that time, generally also trending now heavily towards using stream simulation as the method of choice.

The other source of barrier correction is in a unique standalone program, the I-4 program, which contains a specific budget line just for barrier corrections.  As the Court can see, the program has been funded consistently from its origins in the early '90s up through today, to where we are up to just under $20 million.  That rate of budget increase, your Honor, is a multiple of what Mr. Monson has just testified was done on behalf of the federal government with their 67 percent.  We are closer to a 300 percent increase on the I-4 alone.  And, of course, that doesn't count the other fixes being done by DOT, DNR and through the SRF Board.  So, in fact, the state's efforts at barrier corrections in this case is broad and crosses multiple agencies.

As a result of various efforts that have been done, your

Honor, the salmon recovery plans have a slide that puts together
a snapshot essentially of where we are and what remains to be
done.  You can see that over the last decade in this particular
area --  This is just looking at habitat and the limiting factors
relating to habitat.  You can see passage there on the right side
of the pie chart.  Passage, this is barrier correction
essentially, actually affects amongst the fewest of the ESUs, the
evolutionarily significant units.  It actually affects fewer than
most of the other corrections.  And yet this is the area where
most of the work has been done already.  The plaintiffs have
provided no evidence as to what additional gain might be achieved
if that effort were to be accelerated, and accelerated at the
expense necessarily of something else.  Because the shift in
funding, your Honor, has to come from somewhere.  Mr. Sledd has
described the budget.  He has described everything except where
that $164 million per biennium is going to come from.  It has to
come from somewhere.

     I review that evidence with the Court really for the purpose
of talking to the Court about the lack of need for an injunction,
the lack of need for this Court to begin down a course of
institutional reform.  The State of Washington in this case is
not the kind of defendant for whom that sort of remedy is
awarded.

     If we look beyond that, your Honor, to the more specific
elements of what is required in order to impose an injunction,

1    the first major element is whether or not there has been

2    significant and irreparable injury.

3         Well, when we look at the history of tribal harvests in this

4    case, what we see is fluctuation in what the tribal harvests have

5    been.  This evidence goes back to the date of the Boldt decision,

6    and then up through 2007.  And so what we can see is fluctuation.

7         Mr. Sledd has emphasized repeatedly in the brief that this is

8    a case about culverts; it is not a salmon recovery proceeding, he

9    says, it is the culvert proceedings.  Well, presumably we would

10   have had some evidence about what is the impact on culverts in

11   relationship to tribal harvests.  Now, on summary judgment the

12   Court said, I am not going to require mathematical precision in

13   presenting that analysis.  What the Court didn't say, I am going

14   to allow you to proceed and get a remedy with no evidence

15   whatsoever.  That is exactly what this Court has, no evidence on

16   either a watershed basis or a case area wide basis that gives the

17   Court any means at all to measure how much is being done.

18        Mr. Sledd suggests in his argument this kind of mathematical

19   formula.  That is the methodology that was rejected by this Court

20   as unsound.  You cannot take the potential area that might be

21   available and multiply it by some number and come up with

22   production.  That is the methodology that was rejected.  The

23   tribes presented nothing else in this case to satisfy the burden

24   of what that injury would be.

25        The plaintiffs do bear the burden of showing what the degree

1   of that injury is.  If the Court can't have some way of measuring

2   what is the extent of that injury, the Court has no way of

3   knowing whether or not the remedy it's imposing is going to match

4   the breach.  If you can't know, the Court is stuck with

5   speculation as to how much injury was actually caused by the

6   culverts, and what am I going to get if I order the state to

7   accelerate this program.  The Court doesn't have anything to work

8   with in looking at that.

9       Interestingly, your Honor, if you look at this particular

10  chart, and I have superimposed a red line on it --  This is not

11  on the exhibit that is admitted.  This red line marks 1991, which

12  is the beginning of the state's barrier correction program.  And

13  interestingly, it was the plaintiffs' burden in this case to

14  prove that culverts had a deleterious effect on the tribal

15  harvests.  It doesn't look that way, does it?  If you look at the

16  left side of the case, and you look at my next slide, which is

17  the state highway center line chart, what you can see is that

18  from the late '60s, up through today, the miles on the state's

19  center line miles have remained essentially constant since the

20  late '60s.  About 98 percent of the current system has been the

21  same, along with all of the associated culverts and barriers in

22  that system.

23      So if we weren't fixing barriers in any kind of a regular

24  pattern until 1991, then 1990 or so should be the period of time

25  in which the culverts are having a maximum impact on tribal

1   harvests.  That is when they are the worst.  That is before

2   anything is getting fixed.  What do we see when we look at the

3   evidence produced in this case about what tribal harvests were?

4   It is going up at a time the culverts are presumably at their

5   worst in this case.

6        When you look at the other side of the chart, once the state

7   starts repairing barriers in a consistent manner, you can see

8   generally the trendline of tribal harvests is down.  According to

9   this evidence, Mr. Sledd's case would have established that

10  fixing culverts must be bad for salmon.  That is, of course, not

11  the case, as we know.

12       What is significant here, your Honor, is the absolute lack of

13  any correlation between the state highway system and tribal

14  harvests.

15       What we heard from tribal witnesses and state witnesses in

16  this case is the extreme spikes that we see in the mid to late

17  '80s are attributable to overharvest, harvest levels that were

18  irresponsible and not designed for sustainable growth.  That is

19  why those spikes are high.  There is no relation there to

20  culverts.  Fortunately we have a better cooperation now between

21  state and tribal biologists and fisheries management, witnesses

22  like Lorraine Loomis, who sit and make decisions about fishing

23  seasons, and insuring that we have responsible harvests going

24  forward in the future.

25       Further problems with the plaintiffs' proof in this case, and

1      to emphasize the generalization they make about how much of a

2      difference fixing culverts is going to make, can be seen on these

3      slides, the slides that both Tyson Waldo and Brian Benson

4      generated that show all of the different culverts, the state and

5      non-state culverts, that block.

6            This evidence is presented to the Court from the state's view

7      not to blame other landowners or, as Mr. Sledd says, to exculpate

8      the state because somebody else is also bad.  That is not the

9      reason this evidence is presented to the Court.  The reason this

10     type of slide gets presented to the Court is to inform the Court

11     about what is going to be the effectiveness of the remedy ordered

12     by the Court.

13           Courts generally will not order injunctive relief and mandate

14     action to be taken without some certainty about what we are going

15     to get in return.  What we know in this particular case from the

16     evidence presented is there are only 42 streams that are not

17     affected by other culverts, and that there are over 200 instances

18     in which non-state-owned barriers are downstream of the state

19     barriers, and that the overwhelming majority of culverts that

20     exist in the state are not state owned.

21           We don't put this out to blame other landowners, but we put

22     it out to raise the concern to the Court of how is the Court to

23     know, based on the evidence produced from the plaintiffs, what am

24     I going to get if I allow this acceleration to happen, to what

25     purpose is that acceleration actually going to accomplish the

1    goal for which has been set forth.  I submit on the evidence that

2    has been presented, the Court has no way to know what, if

3    anything, is actually going to be produced.

4         The plaintiffs have failed to provide the Court with any

5    specificity necessary to show that they do, in fact, suffer

6    irreparable injury due to culverts in this case.

7         The next factor for the Court to consider in weighing the

8    remedy is the balance of hardships to the parties.  When you say

9    a balance of hardship, that necessarily implies that the Court

10   will weigh on one hand against something else on the other.  So

11   presumably in this case we should be weighing what is the injury

12   to the tribes and what are we going to get if we order the remedy

13   that they ask for, and, on the other hand, what is the cost of

14   that remedy going to be, and am I going to actually get it if I

15   order this remedy to be granted.

16        I would remind the Court that the correction of culverts, I

17   think as I have said in opening, you don't send the maintenance

18   crew out there with a shovel and a bag of sand to fix a culvert

19   in a day.  These are months, if not years, in the planning,

20   permitting, processing to get these sorts of projects done.  They

21   are significant endeavors that have to be engaged in by the

22   state.  The state's rate of correction --  I think Mr. Sledd was

23   erroneous.  The DOT rate of correction that you can see is closer

24   to 14 a year.  And that is just the DOT.  That is not the SRF

25   Board corrections or the DNR corrections.

1        So if the Court is going to consider the balance of interests

2   in this case, what does the Court have on the tribal side of the

3   ledger in terms of what is the injury and what is the return?  As

4   I have presented to the Court, the tribes have nothing but the

5   generalized notion that doing something for salmon must be good,

6   fixing barriers must be good, and a good thing to do.  The state

7   doesn't disagree with that.  That's why we do it.

8        The question here is what evidence was produced to the Court

9   to show that acceleration of that program is going to achieve

10  some benefit that the Court can describe, a measure in some real

11  term beyond that generalization.

12       On the other side of the ledger is the cost.  There is a

13  financial cost.  There is also a systemic cost for the Court to

14  go down this path.

15       Let me talk first about the financial cost.  The state, in

16  presenting its cost numbers -- primarily Jeff Carpenter was the

17  one who knew the most about this, presented on behalf of the

18  state, did not present the Court with 38 random projects.  These

19  projects from this particular exhibit are the next 38 projects to

20  be done.  Paul Wagner testified that these 38 projects are

21  typical of the sorts of projects to happen in the future.

22       When you look at the next 38 projects, the average cost of

23  all of them is $3 million.  If you take out the Chico Creek

24  correction, which is uniquely expensive, the average cost comes

25  back down to 2.3.  The reason we say that it is 2.3, your Honor,

1    rather than the other number, is because, if you look at the

2    testimony of Mr. Carpenter, he described the things that go into

3    this estimate.  The things that go into this estimate include

4    items that are not included in the fish passage report, the

5    historical data cited by the tribes.

6        As Mr. Carpenter explained, the data relied upon by the

7    tribes to reach their number doesn't include professional

8    engineering costs or right-of-way or risk.  The State of

9    Washington is required to include those elements when it presents

10   a budget proposal to the legislature.  It is this sort of

11   document that the state uses when it goes to the legislature to

12   request funding for projects that is utilized, not the historic

13   costs.

14       When you look at the total costs, your Honor, there are 800

15   barriers to be corrected, and Mr. Sledd says that each and every

16   one of them is a breach.  He talks about fixing only 90 percent

17   of them.  I don't know where that comes from.  There is no magic

18   to the 90 percent at all.  They insist that all of them be done.

19   For DOT, that is 800, 1.6 or $1.8 million in costs to do that.

20   And it is not set over any years longer than 20 under the

21   plaintiffs' injunction.  The plaintiffs say at least 90 percent

22   of them must be done within 20 years.

23       And so if you look at the 20-year horizon that the plaintiffs

24   set out and have asked this Court to impose on the DOT for the

25   correction of those barriers, and you look at the $2.3 million

average per barrier cost, that turns out to be $184 million per
biennium to get that done.

Currently the I-4 budget, which is the standalone budget to
accomplish this, is budgeted at just under $20 million.  That is
$164 million per biennium that this Court would be shifting away
from other projects in order to make barrier remediation a
priority.  That is a substantial amount of money, your Honor,
when you look at what can be done with that sort of funding.

The Court is being asked to order that shift of funds with no
certainty as to how many salmon are actually going to be
produced, what effect that is going to have on the tribal
harvest.

The final element of cost that I want to talk about is the
systemic cost of granting this injunction.  Mr. Sledd noted one
of the other sub-proceeding cases in which the Ninth Circuit has
noted that things have improved, the relations between state and
tribal biologists over the last 20 years have gotten better.  The
state and the tribes have shown an ability to work together.  The
plans that we have talked about, the plans discussed by
Mr. Koenings, the plans, excerpts of which were submitted to this
Court, the testimony of Kit Rawson, all talked about state and
tribal members working together in a collaborative way on a local
level to figure out what each watershed needs, what each species
needs in this sort of collaborative environment.  I'm sure there
are disagreements about what must be done, but they are working

1    it out, and the plans are coming together.

2        Instead of having a collaborative scientific analysis and

3    decisions about what should be done and in what order they should

4    be done, the plaintiffs are asking this Court to step in and sit

5    at the captain's table of that effort.  It will now be for the

6    Court to decide in what order things must be done, the product of

7    litigation rather than the product of scientific collaboration.

8    This is one of the bottlenecks that Dr. Koenings talked about.

9    It would be inevitable.

10       Once the Court goes down the path of deciding that any

11   downward pressure on salmon reduces abundance and is therefore

12   within my grasp to remedy under the treaty, this Court will be

13   presiding over every impact on salmon.  There is no logical

14   distinction between separating the culverts case from any other

15   downward pressure.

16       The Court, contrary to what the Ninth Circuit has recently

17   talked about, should not be in the position of a permanent

18   federal agency managing fishing.

19       The plans, your Honor, are in place.  The state has been

20   active in working on those plans.  More needs to be done.  More

21   is being done.  The state has been a consistent actor in good

22   faith.  The Court, we would ask, should decline the invitation of

23   the plaintiffs to sit now in perpetuity and decide how the

24   resources ought to be spent.

25       It is not a small thing for this Court to simply brush off

1    and say, well, that really won't happen.  Why wouldn't it happen,

2    your Honor?  Once the Court accepts the abundance theory as the

3    entre into regulating impact on salmon, there is nothing that

4    would be beyond the power of this Court to entertain in order to

5    remedy that.

6         The Court I think has to come to grips with the fact that the

7    treaty is a valuable document, a continuing document, but it is

8    not the solution for every problem posed by modern society.  It

9    is not the vehicle to address problems of abundance and scarcity.

10        The Court should reconsider, we believe, the extent to which

11   it may have bought into the abundance theory, without a showing

12   that an abundance and availability of the tribe to access their

13   share was actually being caused in an unfair manner by state

14   action.  Without that, the Court is simply placing itself at the

15   seat of the center of salmon restoration efforts.  We think that

16   is inappropriate, and the Court should decline that invitation.

17   Thank you.

18             THE COURT:  Counsel, before you step down, I realize

19   that the state's post-trial brief was probably a collaborative

20   effort of several people, yet your signature is the first one

21   that appears on there, so I am assuming you had a good hand in

22   putting this together.  On page 30 of your brief you talk about,

23   in paragraph D, that, "The state should have the opportunity to

24   revise its program before any judicial intervention."  What did

25   you mean by that?

1     MR. TOMISSER:  That is a reflection, your Honor, of the

2   cases that talk about the reluctance that a court would have to

3   simply jump into institutional reform without giving a defendant

4   some idea of what it expected, and allowing that defendant to

5   then see if it could come into compliance without actually having

6   an injunction in place.  It was simply a discussion of that as a

7   possibility that courts have sometimes exercised rather than

8   coming right out and taking control and entering an injunction.

9     The court would essentially set forth its view of what

10  federal law requires, and then give the state some time to come

11  into compliance before actually entering the mandate.  That was

12  the point that was being discussed in that section of the brief.

13    THE COURT:  That's what I thought you meant.  How much

14  time would you consider would be appropriate?

15    MR. TOMISSER:  Since I don't think the Court should be

16  considering an injunction at all --

17    THE COURT:  This is all hypothetical, Mr. Tomisser.

18    MR. TOMISSER:  Apart from hypothetical, I really don't

19  think the Court should be entertaining an injunction.

20    In terms of a time frame, I think what would be appropriate,

21  if the Court was concerned about what is the rate of correction

22  and what is actually being done, what is the effect that we can

23  see, if any, on the harvest.  The Court I think would want to set

24  some sort of a benchmark, collect enough evidence so that the

25  Court could determine more specifically, okay, what is the tribal

1   harvest and what is, in those watersheds where barriers are an

2   issue, creating pressure on the salmon, to what extent do those

3   pressures exist, and what is the pace we can see of fixing those,

4   and then to get a result.

5       Now, I think you would have to turn to the scientists

6   involved and ask them, okay, if we have a particular watershed,

7   and we know there are barrier culverts on that watershed, if we

8   fix them, how quickly should we see results and be able to

9   measure what we are getting?  I think then the Court would have

10  an answer to say, well, okay, that gives me some idea as to how

11  long I would want to wait and see if the plans are working.

12      It is hard to pick an arbitrary number --

13          THE COURT:  I understand.

14          MR. TOMISSER:  -- without the scientists here to say --

15          THE COURT:  Most of them are sitting back there.  I

16  understand.  I guess what I am trying to get a grasp on, are we

17  talking two, three years?  Are we talking a decade?

18          MR. TOMISSER:  It would be my hope --  And now I am

19  happy to guess a little bit here.  In terms of what is the

20  available data that we might have today, so that we don't have to

21  start with a benchmark today, but maybe we could look at some

22  historical information to determine, okay, what was the situation

23  in the past, and then how quickly did I see results from fixes

24  that were made.  Hopefully that data already exists, and so the

25  Court could have an answer to that question fairly quickly, and

1   we wouldn't have to start from scratch and having to go out and

2   make a new assessment.  I think the data that has been collected

3   by the state is pretty robust, and we would probably allow that

4   sort of inquiry to be made, but I am reluctant to promise it off

5   the top of my head.

6           THE COURT:  All right.  Thank you.

7           MR. SLEDD:  By my clock, your Honor, the second game of

8   the doubleheader starts within ten minutes.  I will try to stay

9   within that.

10      I would like to address your Honor's questions to

11  Ms. Tomisser.  In the plaintiffs' view, your Honor, we had a

12  summary judgment that laid out some benchmarks, that said that

13  the culverts violated the treaties.  And we waited three years

14  for the trial.  The purpose of the trial was to come in and show

15  how do we fix them.  What the state came in with was saying, we

16  don't want to do anything different.

17      Where courts have gotten in trouble is where a district court

18  has entered an injunction without bothering to ask and have that

19  hearing.  We have had that hearing.  There is abundant evidence

20  to do exactly what Mr. Tomisser suggested, which is to set some

21  basic guidelines.  That is what we have tried to do in the

22  injunction.

23      Now, if the Court looks at this evidence and thinks, you

24  know, there is a piece here that went too far, let's cut it back,

25  fine.  That is your prerogative as a court in equity.  But to

throw out any issue of guidance to the state now, and simply toss

us to the winds to go out and try to come up with some

integrated, complex plan that will figure out everything to do

about salmon, goes well beyond the scope of this case.  And it

would postpone the vindication of treaty rights that the tribes

have been waiting for for a long time.

     We would urge the Court not to go that route, but to enter

some injunction.  And then, as the state has said, their

technical people and the tribal technical people can try and

flesh out the details.  We need that skeleton in place.

     I said I wasn't going to go back and talk about summary

judgment.  I can't resist a couple of comments.  There is an

awful lot that the treaties do not say.  The treaties don't say

you can't put in fish wheels that keep the tribes from getting

any harvest.  They don't say you can't put in a fence that keeps

them from their fishing places.  They don't say you can't have

thousands of non-Indian sport fisherman that monopolize the

harvest.  The treaties were not intended to be empty documents.

They are intended to be effective permanently.

     And what the tribes bargained for was not, as the state seems

to suggest, the graces of future state salmon recovery law.  They

did not bargain for a federal statute at some indefinite point in

the future that says we will try not to make these fish extinct.

They received very definite and specific promises from Isaac

Stevens on treaty grounds across this state that their right to

1    fish would be unimpaired, even if they sold their land; they

2    could continue to fish, as they had before, forever.

3        The treaty has others purposes as well.  The fisheries have

4    to be shared with non-Indians.  There is a clear expectation that

5    the state would be opened up to non-Indian settlement.  That's

6    why Stevens was there.  But just because the treaties didn't

7    anticipate every possible complication, does not mean a court has

8    no role and the treaty has no role in trying to reach

9    accomodation and adjustment which the Supreme Court referred to

10   in Winans, the very first of these disputes to get before the

11   Court.

12       There were no black and white rules laid out.  It was a tough

13   job that equity courts get paid to do, try and balance those

14   interests.  And to balance them in light of the purpose of the

15   treaties, and to balance them, as the law says, with a full

16   understanding of the way that the tribes would have understood

17   the treaty promise.

18       And when the state says that the only thing the treaty

19   promised was they will get treated fairly, that if the state

20   destroys all the fish, it will destroy them for everybody, that

21   is not the treaty promise.  That is not what the tribes would

22   have understood on the treaty grounds.

23       This treaty does more than just prevent discrimination.  It

24   does more than just say that the ESA will protect you at some

25   point in the future.  The tribes bargained for one promise.  It

1   is in that treaty.  And they bargained for it to be enforceable.

2        With regard to the state's recalcitrance or reluctance or

3   leadership or bad faith, there is no case the parties have cited

4   that said that bad faith is an element of getting injunctive

5   relief.  There is a four-part test that is familiar to all of us.

6   The tribes and plaintiffs believe we have shown all four parts of

7   those clearly.  If there had been bad faith, I can tell you we

8   would be asking for a lot more in terms of detail on this

9   injunction.

10       Rather than go through again the whole argument of is it bad

11  faith, is it recalcitrance, let deeds speak louder than words.

12  Look at what has actually happened on the ground, at the

13  magnitude of this problem and at how long it will persist.  And

14  that's what demands injunctive relief.

15       Again, with regard to recovery plans, where is the Coho plan?

16  We have a Chinook plan for Puget Sound.  Where is the coastal

17  salmon recovery plan to help Mr. Johnstone, who talked about the

18  loss of the fish that he grew up fishing for?  There aren't any.

19       And, yes, there are some sub-basins that have a slightly more

20  developed plan than others.  Mr. Rawson, I believe, actually

21  testified to the Snohomish sub-basin plan that Mr. Tomisser

22  mentioned.  They need to be everywhere before anyone can actually

23  say, do this before that before the other.

24       In the absence of that, I fall back on that first principle

25  that Mr. Wasserman said, more habitat would help the fish, and

1   the first principle that Dr. Roni said, which is, if we don't

2   have these detailed plans, the first thing to do is open up the

3   habitat.

4       I want to respond briefly to this graph issue.  I will try my

5   freehand here.  We will see what happens.  I think the graph that

6   Mr. Tomisser showed of the tribal harvest was something like

7   that.  He said, well, you know what, the culverts were all in

8   here before, they were over on the left side of this, so how come

9   the harvest is going up when the culverts are already there.

10  Well, you know what, the culverts were there, a lot of them,

11  before.  A lot of them have been wearing out and becoming

12  barriers as time goes on.  But if there were no culverts, doesn't

13  it make sense that that's what we would see?

14      What has happened is that the culverts that have been there

15  forever have lowered the baseline.  And all these other

16  fluctuations, in this case the upward pressure here, because the

17  tribes are gearing up after the Boldt decision, it is

18  superimposed on the ones already at a depressed level of fish.

19      This is a red herring to say, oh, my gosh, we put the

20  culverts in 50 years ago and you're talking about a diminished

21  harvest today.  The point of the diminished harvest today is

22  things are bad, they have been bad a long time and they are

23  getting worse, and it is time to act.

24      The state says, your Honor, there is no evidence that

25  accelerating correction will actually benefit things.  I would

1   direct the Court's attention to one exhibit, AT-095, prepared by

2   the very program of the Department of Fisheries that fixes

3   culverts, the SHEAR program -- that used to fix culverts.  What

4   it says is, "The benefits are directly proportional to the number

5   corrected each year."  That is not rocket science.  And it is in

6   there.

7       I am not going to try to do the math.  I suppose I could, but

8   if your Honor will do the arithmetic, him or herself, with regard

9   to the number of culverts fixed, 225 tried by the state, a number

10  of them that are not successful, 176 left, and that's since 1991.

11  Do the math.  It works out to about six and a half a year.  And

12  we have over a century still to go.

13      So absent questions from the Court, that's all I wanted to

14  say at the moment.

15          THE COURT:  Thank you, Mr. Sledd.  Counsel, I know we

16  have another argument scheduled for this afternoon, another

17  sub-proceeding here, another issue that has come up regarding the

18  halibut fishery.  There is no doubt, I think, that all parties to

19  this case wish for the same end result, more salmon in the

20  future.  The disagreement obviously is how to get there.

21      There is also no doubt this case highlights just how complex

22  the problem is.  And perhaps more accurately stated, how complex

23  the solution may be.  And here we are only talking about culverts

24  and one of the Hs of the four Hs that all of the experts

25  discussed.  And, of course, I am only referring to the factual

1   issues, not the myriad of legal issues that arise when a court is

2   asked to basically impose an extraordinary remedy, which is

3   injunctive relief, ordering the state to take specific actions

4   within a very specific time.

5       I think everyone who ever practices in court understands that

6   litigation always has inherent built-in limitations.  And

7   cooperative collaborative effort by all stakeholders always makes

8   greater sense.  However, sometimes there is no other resort, and

9   that's when courts must step in, albeit reluctantly, when we do

10  so.

11      There has been a lot of evidence produced in this particular

12  case, a lot of material for the Court to consider, and I will

13  take a careful look at it.  I will try to get you a ruling as

14  quickly as we can.  Thank you all very much.  We will be in

15  recess.

16                          (Adjourned.)

17

18

19

20

21

22

23

24

25

1           **CERTIFICATE**

2

3

4

5

6

7

8

        **I, Barry L. Fanning, Official Court Reporter, do hereby**
9   **certify that the foregoing transcript is true and correct.**

10

11                    **S/Barry L. Fanning**

12                    _____

13                    **Barry L. Fanning**

14

15

16

17

18

19

20

21

22

23

24

25