1
2

```
              UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON AT SEATTLE
```

3

4

5

6

7

8

```
UNITED STATES OF AMERICA,    )   NO. C70-9213RSM
et al.,                      )   (SP09-01)
                             )
      Plaintiffs,            )   SEATTLE, WASHINGTON
v.                           )   5/22/2013
                             )
STATE OF WASHINGTON, et      )   ORAL ARGUMENT
al.,                         )
      Defendants.            )
```

9

10

```
            VERBATIM REPORT OF PROCEEDINGS
      BEFORE THE HONORABLE RICARDO S. MARTINEZ
            UNITED STATES DISTRICT JUDGE
```

11

APPEARANCES:

12

| Makah Tribe: | MARC SLONIM |
| | BRIAN C. GRUBER |

13

| | Ziontz Chestnut Varnell Berley & |
| | Slonim |

14

15

16

| Quinault Indian | ERIC J. NIELSEN |
| Nation: | Nielsen Broman & Koch |

17

18

19

| Quileute Tribe: | LAUREN KING |
| | Foster Pepper PLLC |
| | and |
| | JOHN A. TONDINI |
| | Byrnes Keller Cromwell LLP |

20

21

| S'Klallam Tribes: | LAUREN P. RASMUSSEN |
| | Law Offices of Lauren Rasmussen |

22

23

| Hoh Tribe: | CRAIG J. DORSAY |
| | Law Offices of Craig J. Dorsay |

24

25

| Lummi Nation: | DANIEL A. RAAS |
| | Raas Johnsen & Stuen |

```
1    APPEARANCES: (Con't)

2

     Tulalip Tribe:          MASON D. MORISSET
3                            Morisset Schlosser Jozwiak &
                             Somerville
4

5    Skokomish Tribe:        EARLE D. LEES, III
                             Skokomish Tribal Attorney
6

7    Muckleshoot Tribe:      RICHARD REICH
                             Office of the Tribal Attorney
8                            Muckleshoot Indian Tribe

9

     Puyallup Tribe:         SAMUEL J. STILTNER
10                           Puyallup Tribe of Indians

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS
 2    _____

 3            THE COURT:  Good morning to all.  You may be seated.
 4    Thank you.
 5            THE CLERK:  This is the oral argument hearing on the
 6    Makah Indian Tribe's motion for partial summary judgment in
 7    Cause No. C70-9213, Subproceeding 09-01, United States, et
 8    al. versus the State of Washington, et al.
 9        Would counsel please rise and make their appearances for
10    the record.
11            MR. SLONIM:  Good morning, Your Honor.  Marc Slonim
12    for the Makah Tribe, along with Brian Gruber.
13            THE COURT:  Gentlemen, thank you.
14            MR. NIELSEN:  Good morning, Your Honor.  Eric Nielsen
15    on behalf of the Quinault Indian Nation.
16            THE COURT:  Mr. Nielsen.
17            MS. KING:  Good morning, Your Honor.  Lauren King for
18    the Quileute Tribe.
19            THE COURT:  Ms. King.
20            MR. DORSAY:  Good morning, Your Honor.  Craig Dorsay
21    for the Hoh Tribe.
22            THE COURT:  Mr. Dorsay.
23            MR. RAAS:  Good morning, Your Honor.  Daniel Raas for
24    the Lummi Nation.
25            THE COURT:  Mr. Raas, thank you.
```

1          MR. RAAS:  Lummi does not take a position, but with

2     the court's indulgence, I just want to use counsel table to

3     write on.

4          THE COURT:  No problems for us.  Thank you very much.

5       And we have other counsel present as well from some of the

6     other tribes.  If I could have you introduce yourself for our

7     record as well.

8          MR. MORISSET:  May it please the court.  Mason

9     Morisset for Tulalip.  And I think I am with my brother Dan

10    Raas as to the issues, but he got a better chair than I did.

11          MS. RASMUSSEN:  Good morning.  My name is Lauren

12    Rasmussen for the Port Gamble S'Klallam and Jamestown

13    S'Klallam Tribes.  We won't be arguing, but we did take a

14    position, actually needed to.  On 7/15/2010 we filed a

15    response to the motion to dismiss.  And our position is

16    exactly the same today as it was in that response.

17          THE COURT:  Thank you, Ms. Rasmussen.

18          MR. LEES:  My name is Earle Lees.  I'm the attorney

19    for the Skokomish Indian Tribe.  And I won't be making an

20    argument today.

21          THE COURT:  Good morning.

22          MR. TONDINI:  Good morning, Your Honor.  John

23    Tondini.  I'm co-counsel with Ms. King, but she will be doing

24    the argument today.

25          THE COURT:  Thank you.

1          MR. REICH:  Richard Reich for the Muckleshoot Tribe.

2          THE COURT:  Good morning.

3          MR. STILTNER:  Good morning, Your Honor.  Sam

4    Stiltner for the Puyallup Tribe.

5          THE COURT:  I don't see anybody else.  All right.

6    Thank you.

7       All right.  Counsel, let me tell you, I have reviewed all

8    of the material submitted for this motion for partial summary

9    judgment being brought by the Makah.  And why don't we break

10   it up.  Since the Quinault and the Quileute both submitted

11   substantial responses, let's break it up this way --

12   Mr. Slonim, are you going to be arguing?

13          MR. SLONIM:  Yes, Your Honor.

14          THE COURT:  All right.  Why don't we have you take up

15   the 20 minutes.  And you might have a few minutes left for

16   rebuttal.  And then we will have the same with the Quinault

17   and the Quileute.  You will each get up to 20 minutes each.

18       All right.  Are you ready, Mr. Slonim?

19          MR. SLONIM:  I am, Your Honor.  Your Honor, Makah's

20   motion for partial summary judgment presents three issues.

21   First, does Makah have standing to seek a determination of

22   the location of Quileute and Quinault ocean fishing places?

23       The court previously found that the allegations in Makah's

24   Request for Determination were sufficient to demonstrate that

25   Makah has standing.  Makah has now submitted evidence to

1    support its allegations and seeks summary judgment that it

2    has standing on the basis of that evidence.

3            THE COURT:  Didn't we already rule that you had

4    standing?

5            MR. SLONIM:  Well, you ruled on the basis of the

6    allegations in our Request for Determination.  And so at this

7    stage -- and then subsequent to that, Quileute and Quinault,

8    in a status conference, informed us that they intended to

9    continue challenging our standing on the grounds that we

10   wouldn't be able to prove what we alleged.  And so we have

11   now submitted the evidence to support our allegations and are

12   seeking summary judgment that the evidence, the undisputed

13   evidence, establishes our standing.

14       The second issue is the issue the court asked us to

15   address in its prior court orders, which involves the

16   interpretation of Judge Boldt's findings under

17   Paragraph 25(a)(1), and, in particular, whether Judge Boldt

18   specifically determined the location of Quileute and Quinault

19   ocean fishing places and whether he included in those

20   findings any waters more than three miles offshore.

21       Here, it is important to note that Makah, Quileute, and

22   Quinault all agree that Judge Boldt's findings did not

23   include waters more than three miles offshore.  The only

24   dispute we have is regarding waters within three miles of

25   shore.

1    As to those waters, it is Makah's position that, with the

2  exception of certain beaches and river mouths, Judge Boldt

3  did not specifically determine the location of Quileute and

4  Quinault ocean fishing places, but instead left that

5  determination to a future proceeding under what was then

6  Paragraph 25(f) and is now Paragraph 25(a)(6) of the court's

7  permanent injunction.

8    And then the final issue is, what happens next?  If the

9  court agrees with the parties that Judge Boldt's findings did

10  not include waters more than three miles offshore, we believe

11  it should retain jurisdiction to determine the western extent

12  of Quileute and Quinault's ocean fishing places under

13  Paragraph 25(a)(6).

14    Similarly, if the court finds that Judge Boldt did not

15  establish a northern boundary for Quinault's -- or for

16  Quileute's ocean fishing places, we believe it should retain

17  jurisdiction to make that determination under

18  Paragraph 25(a)(6) as well.

19    I would like to just touch initially on the standing

20  issue, recognizing that you have already made a

21  determination, but the issue has been contested based on the

22  evidence we have submitted.

23    There are four undisputed facts that underlie our

24  position:  First, that at the time the Makah filed this

25  Request for Determination, Quileute and Quinault had

1  announced their intent to enter the treaty Pacific whiting

2  fishery and were active participants in the treaty blackcod

3  and halibut fisheries.

4      Second, all of those fisheries take place more than five

5  to ten miles offshore.  And the Quileute blackcod and halibut

6  fisheries take place within Makah's adjudicated usual and

7  accustomed grounds.

8          THE COURT:  Mr. Slonim, am I correct that both the

9  Quileute and Quinault have not entered the whiting fishing?

10          MR. SLONIM:  They have not participated to date in

11  the fishery.  Quileute has requested and received an

12  allocation from the National Marine Fisheries Service.  But

13  so far they have not participated.

14          THE COURT:  Does that affect your issue of standing?

15  So long as they don't, is there any harm being done to the

16  Makah?

17          MR. SLONIM:  Yes, there is.  Well, there is with

18  respect to the other fisheries.  As to the whiting fishery,

19  the standing determination is made as of the date we filed

20  the Request for Determination, which was in 2009.

21      As of that date, they had both announced their intent to

22  enter the fishery.  We had already engaged in co-management

23  discussions with them throughout 2008 and much of 2009 in an

24  unsuccessful attempt to negotiate an intertribal plan.

25      Quileute was planning to enter the fishery that year.

```
1    They had projections of, initially, one boat and three to

2    four boats, with harvest projections up to 24,000 metric

3    tons, which is almost as much as what Makah was taking at the

4    time.  So we had an actual and imminent entry into the

5    fishery, which causes injury to us.  And we think that's

6    sufficient for standing purposes.

7        The reasons -- we don't know why they haven't entered the

8    fishery since then.  They both told us they were planning on

9    entering.  They told the National Marine Fisheries Service.

10   People were engaged, not only us, but the federal government,

11   in accommodating their entry into the fishery.  And we have

12   yet to receive any explanation of why that hasn't happened.

13       With respect to the blackcod and the halibut fisheries,

14   they were already participating, and have continued to

15   participate in those fisheries.  And those fisheries take

16   place well beyond ten miles offshore.

17           THE COURT:  But with respect to those two species,

18   you do have a management plan and an agreement with them,

19   right?

20           MR. SLONIM:  Yes.  And so we engage in -- we devote

21   significant efforts to negotiating those management plans and

22   agreements.  And as a result of those management plans and

23   agreements, less fish is available to the Makah than would be

24   if they weren't participating in the fishery.

25       It's a single stock of fish that we're fishing on.  There
```

 1    is a single overall quota.  So what another tribe takes, we

 2    don't take.  It's not available to us.  So there is a direct

 3    impact on Makah from their participation in each of those

 4    fisheries.

 5        And then the final element with respect to the whiting

 6    fishery is that, as a result of their announced intent to

 7    enter into the fishery, the National Marine Fisheries Service

 8    said, well, we now need to determine an overall treaty share

 9    for this fishery.

10        That issue had been resolved, as long as Makah was the

11    only participant in the fishery.  We spent, you know, many,

12    many years actually working on that, litigating that issue,

13    and had it resolved.

14        And then, with the intent of Quileute and Quinault to

15    enter the fishery, a new process was started, and Makah was

16    required to engage in that process.  We hired consultants.

17    We again devoted significant time and resources to dealing

18    with an issue that arose directly because of their announced

19    intent to participate in the fishery.

20        And for all of those reasons, we think there is clear

21    evidence of injury here, actual injury in the blackcod and

22    halibut fisheries, and imminent injury in the whiting

23    fishery, which is sufficient to support Makah's standing.

24        And it's the evidence that we -- what we have alleged in

25    the Request for Determination that the court found sufficient

1   is now supported by evidence, and we think it's sufficient to

2   grant summary judgment on that issue.

3       And unless the court has more questions about that, I'm

4   going to move on to the interpretation of Judge Boldt's

5   findings, and in particular to the meaning of the term

6   "adjacent" as used in those findings, which is the term that

7   the court focused on in its prior orders.

8       As I mentioned at the outset, Quileute, Quinault, and

9   Makah all agree that the findings did not include any ocean

10  waters more than three miles offshore.  Makah reaches that

11  conclusion and the further conclusion that Judge Boldt did

12  not intend to specifically determine the location of

13  Quileute's and Quinault's ocean fishing places, even within

14  three miles of shore, based on several considerations.

15      First, the ordinary meaning of the term "adjacent" does

16  not connote a specific distance.  It simply means nearby or

17  not far.  The context in which the term is used may provide

18  some indication of the distance involved, or it may confirm

19  that no specific distance was intended.

20      Here, the overall context was provided by Judge Boldt's

21  limitation of the case area as areas within the jurisdiction

22  of the state of Washington which extended only three miles

23  offshore.

24      Although the case area has since been expanded, in light

25  of the limitation on the case area in 1974, it's reasonable

1    to infer that Judge Boldt's findings did not address or

2    include waters more than three miles offshore.

3         Notably, in one instance, Judge Boldt did make a finding

4    about tribal fisheries outside of the case area.  In Finding

5    No. 121, which is at 384 F.Supp, pages 374 and 375, Judge

6    Boldt found that Quinault had, quote, important fisheries

7    which were shared with other tribes to the south and east of

8    the boundaries of the case area, especially Grays Harbor and

9    those streams which empty into Grays Harbor, closed quote.

10        In that instance, Judge Boldt stated expressly that he was

11   referring to an area beyond the case area boundaries.

12   However, there is nothing in his findings regarding

13   Quileute's ocean fishing places or Quinault's ocean fishing

14   places to suggest he was intending to make a finding

15   regarding fishing in areas that were outside the case area.

16        The evidence in the record before Judge Boldt also

17   provides important context for his findings.  And there was

18   no evidence before him to support a finding that either

19   Quileute or Quinault had usual and accustomed fishing grounds

20   more than three miles offshore.

21        We attached to our motion and discussed in some detail all

22   of the evidence cited by Judge Boldt in his findings, as well

23   as other evidence that we were able to locate in the trial

24   record before Judge Boldt bearing on Quileute's and

25   Quinault's ocean fishing places.

1    As to Quileute, Dr. Lane found that they, quote, relied

2  primarily on salmon and steelhead taken in their long and

3  extensive river systems, closed quote.

4    To be sure, there was evidence of at least some ocean

5  fishing, including evidence about the species taken, certain

6  beaches and river mouths where Quileute harvested smelt and

7  cod, and some coastal sites that were used for sea fishing

8  and bottom fishing.  However, there was no evidence of how

9  far offshore Quileute went in pursuing these fisheries,

10  whether one, two, three, or more miles offshore.

11    The specific coastal sites were identified in an exhibit

12  from an Indian Claims Commission case which Dr. Lane attached

13  to her report on Quinault's fishery.  And this is attached to

14  our motion for summary judgment.  And this is the exhibit

15  from the Indian Claims Commission case.

16    And it's a little hard to see here.  But when you look at

17  the hard copy, you will see that these numbered sites are

18  sites that were identified as either village sites or fishing

19  sites where Quileute, Hoh, Queets, and Quinault had engaged

20  in fisheries.

21    And there are some sites you can see.  Lake Ozette is

22  shown on the upper left here.  And there are sites to the

23  south of Lake Ozette, along the coast.  But there was no

24  evidence about where Quileute went from those sites to fish,

25  whether they fished on the beach, whether they fished a mile

1   offshore or two miles offshore.  There was no evidence about

2   how far they went.  And that was the best evidence we had to

3   support the fact that they were fishing in the ocean.

4       Similarly, as to Quinault, there was actually even less

5   evidence of ocean fishing for Quinault.  You will see there

6   are many fewer ocean sites in the Quinault area than in the

7   Quileute area.  But, again, neither the map nor the table

8   that accompanies this map that describes some of these sites

9   provide any evidence of how far offshore they were going from

10  these sites to fish.

11      There was one discussion of offshore distance with respect

12  to Quinault which was in an excerpt from a manuscript by

13  Dr. Ronald Olson.  Dr. Lane attached Olson's manuscript to

14  her report, or excerpts of it, not because of its discussion

15  of their offshore fishing locations, but because it had a

16  very detailed description of the fishing gear they used in

17  the river system, of traps and other in-river fishing gear.

18  But in that excerpt, Olson stated that certain fish could

19  have been taken by Quinault anywhere along the coast within

20  six miles of shore.

21      It's important to note, however, that Judge Boldt did not

22  cite that excerpt in support of his finding regarding

23  Quinault fishing places.  And the statement that fish could

24  have been taken within six miles of shore does not establish

25  that they were taken there on a usual and accustomed basis.

1      In sum, based on Judge Boldt's use of the nonspecific term

2  "adjacent," the case area limitation in 1974, when Judge

3  Boldt made his findings, and the absence of any evidence in

4  the record regarding the distances offshore at which Quileute

5  and Quinault fish, we think the most reasonable construction

6  of Judge Boldt's findings regarding Quileute and Quinault

7  ocean fishing places is that he did not intend to make a

8  specific determination of their location and that he did not

9  intend to include any waters more than three miles offshore.

10      There is nothing particularly surprising about that

11  conclusion.  Judge Boldt acknowledged that he was not

12  specifically determining the usual and accustomed fishing

13  grounds for all tribes and established in what is now

14  Paragraph 25(a)(6) the mechanism for making such

15  determinations in the future.  And we think this is a

16  situation where this is precisely what 25(a)(6) was intended

17  to cover, where there isn't an existing determination of the

18  specific locations of these fishing grounds.

19      Now, although Quileute and Quinault agree that Judge

20  Boldt's findings did not include any water more than three

21  miles offshore, they do contend that he intended to include

22  all waters out to three miles.  There are several problems

23  with their arguments.

24      First, both Quileute and Quinault have discerned the

25  meaning of the term "adjacent" from Judge Boldt's use of that

1  term in another passage in his decision which involved

2  contemporary nontreaty fisheries that were, quote, closely

3  adjacent to but beyond the territorial waters of the state,

4  closed quote.  The problem is that the very different context

5  for that passage doesn't really shed much light on how Judge

6  Boldt used the term "adjacent" in a different passage in a

7  very different context.

8       Second, for its part, in its brief, in its responsive

9  brief, Quileute did not discuss any of the evidence before

10  Judge Boldt.  Instead, it presented to you a variety of

11  materials that were not in the record before Judge Boldt,

12  court cases that were not cited by Judge Boldt, reports that

13  were prepared after 1974, and other materials, testimony that

14  was given later than 1974.

15       Those kinds of materials are not properly submitted in a

16  Paragraph 25(a)(1) proceeding, which is what this is at this

17  point, and shed no light on what Judge Boldt intended.  There

18  is nothing in Quileute's response that points to any evidence

19  in the record before Judge Boldt about the location or how

20  far offshore their fishing grounds went.

21       Quinault does discuss some of the evidence before Judge

22  Boldt.  But it also points to materials that were not in the

23  record before Judge Boldt, a 1977 report by Dr. Lane, which

24  came three years after Judge Boldt's findings and was not

25  submitted to him, and portions of the Olson manuscript that

1    were not provided to Judge Boldt in 1974.

2        The evidence that was before Judge Boldt, such as

3    Quinault's acquisition of canoes from Makah in its travel to

4    the Columbia River to trade, simply does not indicate how far

5    offshore Quinault fished at treaty time.  Indeed, as this

6    court has pointed out on several occasions, fishing incident

7    to travel is not evidence of usual and accustomed fishing

8    grounds at all.

9        Quileute and Quinault also discussed evidence of whaling

10   and sealing.  As we pointed out in the Makah -- there was a

11   proceeding in this case involving Makah's ocean fishing

12   places.  And both this court and the Ninth Circuit held that

13   evidence of whaling and sealing could not be used to

14   establish usual and accustomed fishing grounds.  And we

15   believe strongly that the same rules for determining usual

16   and accustomed grounds should apply to all tribes.

17       But the additional problem here is that, as was the case

18   for fishing, there was no evidence before Judge Boldt

19   regarding how far offshore Quileute or Quinault went in

20   pursuit of whales and seals.

21       In sum, in the absence of any evidence in the record

22   before Judge Boldt regarding how far offshore Quileute and

23   Quinault fish on a usual and accustomed basis at treaty

24   times, it cannot be said that he made a specific

25   determination of the location of their offshore fishing

 1   grounds even within three miles of shore.

 2        Now I want to take just a minute to talk about this

 3   exhibit, which nobody cited in the briefing.  We didn't

 4   address it in the briefing.  This was an illustrative exhibit

 5   prepared by attorneys for the United States during the course

 6   of the trial before Judge Boldt.  It was brought into court

 7   and shown to Dr. Lane while she was testifying.  And she

 8   initially said, "I can't really comment on it, because I've

 9   never seen it before."

10        And then she was given an opportunity to look at it.  And

11   she came back, and she was asked about certain river

12   stretches, where she said, "Well, that's not accurate.

13   That's not what my report said.  And if you want to know what

14   my opinion is, you have to look at my reports.  That's where

15   I provided my opinion."

16        That exhibit was admitted on the basis of that testimony

17   for illustrative purposes only and never cited by Judge

18   Boldt.  And so to rely on it now, to assume that there was

19   evidence that there were usual and accustomed grounds in all

20   of those red areas, even when there was actually no evidence

21   in Dr. Lane's reports or anywhere else in the record to

22   support that, is really a misuse of that exhibit.

23        For that --

24            THE COURT:  Counsel, I know you want to save a little

25   bit of time for rebuttal.  I have a couple of questions.

1      MR. SLONIM:  Okay.

2      THE COURT:  In reading the responses of your

3   opponents here, one of the issues that they bring up is

4   subject matter jurisdiction.  I think everyone agrees that

5   Judge Boldt did not include -- his ruling did not include

6   waters more than three miles offshore.  And, yes, I think

7   there is a dispute as to what "adjacent" means and what he

8   meant by it and within the three-mile range.

9      But aside from what the original case area was, what is

10   the case area now?

11      MR. SLONIM:  There were two limitations in the

12   conclusion of law that put two limitations on the original

13   decision.  One was geographic.  It was limited to waters

14   within the state.  And one was a species limitation.  It was

15   limited to anadromous fish.  And those limitations have both

16   been dropped by the court.

17      The anadromous species limitation was dropped in a

18   proceeding involving herring, where the court said:  As long

19   as the dispute arises under the treaties, it's within my

20   subject matter jurisdiction, and I can consider it.  It makes

21   no sense to start a new case and then have to consolidate it

22   with this case.

23      The geographic limitation was dropped in a series of

24   cases.  First, when Makah sought an adjudication of its usual

25   and accustomed grounds in the ocean, the court held that that

1   adjudication was within its subject matter jurisdiction.

2   Makah was seeking an adjudication out to 100 miles.  The

3   ruling was that its usual and accustomed grounds went to 40

4   miles.  And both this court and the Ninth Circuit said that

5   issue was within the court's subject matter jurisdiction and

6   part of this case.

7       We've had enumerable proceedings involving the halibut

8   fishery, which takes place well beyond the three-mile limit.

9   The bulk of the coastal halibut fishery takes place from 12

10  to 20 miles offshore.

11      We had a subproceeding in this case involving the whiting

12  fishery, which takes place from 12 to 40 miles offshore.

13  That was held to be within the subject matter jurisdiction of

14  this court.

15      We had proceedings in this case initiated not only by

16  Makah but by Quinault and Hoh regarding the blackcod fishery

17  in which Quileute was an adverse party.  That fishery takes

18  place well beyond the three-mile limit.  That was held to be

19  within the subject matter jurisdiction of the court.

20      In the shellfish case, which in part involved species

21  outside three miles, the court said that the subject matter

22  jurisdiction of this court is issues arising under the

23  Stevens Treaties.  And I think there is no geographic

24  limitation anymore as long as the issue arises under the

25  Stevens Treaties.  And nothing is more central to the Stevens

1    Treaties than the determination of usual and accustomed

2    fishing areas.

3        Our request that the court retain jurisdiction under

4    Paragraph 25(a)(6) and make a determination of Quileute and

5    Quinault's ocean fishing areas, we think, lies really at the

6    heart of this case.  And the claim that Quileute and Quinault

7    are making, that they have some type of special immunity so

8    that they can continue to fish in an area where they

9    acknowledge there's never been a determination that they have

10   a treaty right in the first place, makes them the outliers.

11   Every other tribe has had to adjudicate its usual and

12   accustomed fishing grounds, in some cases in multiple

13   proceedings.

14       And to provide an immunity for two tribes to say, we can

15   fish in existing fisheries, we can expand into new fisheries,

16   but you can't decide whether we have a treaty right there in

17   the first place is -- that's the outlier.  And that is not

18   only injurious to Makah, but it's a threat to the integrity

19   of the treaty fishing right and integrity to this entire

20   case.

21           THE COURT:  Mr. Slonim, thank you.  I will give you

22   two minutes for rebuttal.

23       Mr. Nielsen, on behalf of the Quinault.

24           MR. NIELSEN:  Thank you, Your Honor.  May it please

25   the court.  Eric Nielsen on behalf of Quinault Indian Nation.

1    I guess, first off, I would like to say that if you look

2    at the Makah's motion for partial summary judgment, they

3    raise actually two issues.  They are now arguing that they

4    have raised three.  But the issues they do raise are whether

5    they have standing to seek adjudication of the location of

6    the Quinault and Quileute Pacific Ocean U&A and whether Final

7    Decision 1 did not specifically determine the Quinault and

8    Quileute Pacific Ocean locations.

9    They devoted the bulk of their argument to the issue of

10   "adjacent" and what does that mean, what does that not mean,

11   how does that affect the Quinault and Quileute fishing rights

12   within the three-mile limit.

13   We have agreed, the parties agreed, that we were going to

14   stay briefing on the "adjacent" issue until the court rules

15   on this current motion.  That is the real issue in this case,

16   is whether -- the language "adjacent to," what does that mean

17   with respect to Judge Boldt's findings?

18   We believe that Judge Boldt's findings with respect to

19   "adjacent" include all the ocean area within three miles that

20   is adjacent to the Quinault Indian Nation territory.  Those

21   are the words that Judge Boldt used in his finding.  How can

22   it mean anything other than that?

23   I don't know what the Makah is trying to argue, that there

24   is a specific point in the ocean within three miles that

25   Quinault fished, but maybe, you know, three or four or

1     ten yards up they didn't fish; or I don't know if they are

2     arguing that Judge Boldt didn't determine that they fished

3     within that entire three-mile area.

4         But I think that, based on the evidence that was submitted

5     to Judge Boldt, based on what the case was about at the time,

6     I believe that the "adjacent to" language with respect to

7     Judge Boldt's finding means exactly what it says, that the

8     Quinault Indian Nation fished adjacent to its territory, its

9     territory being its land-based fishing areas.  And we know

10    what those land-based fishing areas are, because Judge Boldt

11    identified them in his finding.

12            THE COURT:  You do agree that Judge Boldt's findings

13    did not include waters more than three miles offshore?

14            MR. NIELSEN:  I do, Your Honor.  And that's the crux

15    of the issue, I believe.  I think what Makah is trying to do

16    here is ask this court -- well, they've just admitted they

17    were trying to ask this court to retain jurisdiction so it

18    could determine the Quileute and Quinault ocean fishing

19    places beyond the three-mile limit.  I think that is really

20    the crux of the issue, Your Honor.  That is what this is all

21    about.

22        But there are a number of legal, equitable, and practical

23    reasons why that request should be rejected.

24            THE COURT:  Tell me why you don't believe the court

25    has jurisdiction, as you argue in your material.

1          MR. NIELSEN:  Well, we've argued that the court

2     doesn't have -- well, there's a couple reasons, Your Honor.

3     First, you know, Makah is claiming that, well, gee, you know,

4     Quileute and Quinault are outliers because they have never

5     had their ocean fishing rights outside of three miles

6     adjudicated.

7          But what they failed to tell the court is that that right

8     has already been acknowledged by the federal government.  And

9     the federal government is the treaty partner to both Quinault

10    and Quileute.  The federal government and Quinault and

11    Quileute have entered into an agreement.  They have

12    negotiated an agreement based on evidence that was submitted

13    to the government that Quinault and Quileute have fished in

14    that area which is now determined by an unambiguous line that

15    is set by the federal government in their regulations.

16         Why are Quinault and Quileute outliers?  They are not.

17    They have not been fishing illegally.  They have never fished

18    illegally.  They have been fishing pursuant to an

19    interpretation that they have reached with respect to their

20    treaty rights, with their treaty partner, in waters that are

21    under the exclusive jurisdiction of their treaty partners.

22         THE COURT:  So as long as a dispute arises under the

23    treaty rights, doesn't this court then have jurisdiction to

24    deal with it?

25         MR. NIELSEN:  Well, it depends on what the dispute

 1    is, Your Honor.  But if the dispute is that Quinault and

 2    Quileute are fishing somehow outside of the right to fish

 3    their treaty right in the ocean, and that includes waters

 4    that are under the exclusive jurisdiction of the federal

 5    government, which was not a part of this case, as the court

 6    is well aware -- I mean, this whole case was about fishing

 7    within the territorial waters of the state of Washington.

 8        When Quinault and Quileute intervened in this case, that

 9    is the question that was asked.  That is the reason they

10    intervened in this case, to determine their rights vis-a-vis

11    the state of Washington, vis-a-vis the territory and the

12    jurisdiction of the state of Washington.

13        They have not intervened in this case to determine their

14    treaty fishing rights beyond those territorial waters.  And,

15    in fact, Your Honor, at the time, really, it was unclear who

16    had jurisdiction over those waters.

17        And when you look at the history of this case, when you

18    look at the history of the federal regulations, they started

19    out when, after Judge Boldt had issued his decision, the

20    federal government went and assumed jurisdiction 200 miles

21    out.

22        The first regulations -- and they were the salmon

23    regulations -- they identified a north and south boundary for

24    all the coastal tribes, including the Makah Tribe, with no

25    limitation on a western boundary.  There was no limitation on

1   how far out the coastal tribes could go and fish.

2       When Makah then comes, in the late '70s, and asks this

3   court to determine its treaty rights outside the case area,

4   in that area that we're now discussing, the court did so.

5   Nobody objected.  Nobody raised any issues of sovereign

6   immunity.  Why would they?  The Makah itself was making that

7   request.  So the court didn't have that in front of it.  It

8   wasn't faced with that issue.  It went ahead and adjudicated

9   those rights.

10      Well, Quileute and Quinault took a different route.  We

11  decided to negotiate with the federal government, our treaty

12  partner, the entity that had jurisdiction within that area.

13  And based on that negotiation, we determined -- we and our

14  treaty partners determined what was a reasonable limit to the

15  Quinault and Quileute fishing rights out into that area, into

16  that ocean, beyond the three miles that were already

17  adjudicated by Judge Boldt, out to the 200 miles in which the

18  federal government had asserted jurisdiction.

19      Why does that make us any more of an outlier than anybody

20  else?  Why does that even make us an outlier?  It wasn't as

21  if Quinault and Quileute were deciding on their own, we're

22  just going to go out there and fish wherever we want to fish

23  because there was no adjudication over our rights out in the

24  ocean.

25      Quinault and Quileute did it one way.  Their way is no

1    more or no less valid than the way the Makah did it.  The

2    Makah asked for an adjudication.  But there is absolutely no

3    legal theory that I am aware of, Your Honor, that says that a

4    tribe has to have a court's blessing to fish in an area under

5    the exclusive jurisdiction of its treaty partner.  And, in

6    fact, I think that the cases suggest otherwise.  We know that

7    treaties are self-executing.  We know that treaties are

8    obligatory on the parties to the treaties.  So it makes sense

9    that Quinault and Quileute would take the route that it took.

10        Now --

11            THE COURT:  All right.  Let me -- this is a fairly

12    important part of this.  Let me ask you directly.  Are you

13    asserting a treaty right to fish in the area from three to

14    200 miles?

15            MR. NIELSEN:  No, Your Honor.

16            THE COURT:  You are not?

17            MR. NIELSEN:  No, we're not.

18            THE COURT:  What gives you the right to fish there

19    then?

20            MR. NIELSEN:  We're asserting the treaty right to

21    fish between the areas of three miles out to where we and the

22    federal government have determined is the limit or the extent

23    or the boundary of our treaty fishing right, which is now

24    somewhere approximately 40 to 50 miles off the coast.

25        There is an unambiguous line, Your Honor, that has been

1    drawn.  And it's contained in the framework.  It's contained

2    in the regulations regarding all the fisheries under the

3    jurisdiction of the United States.  And that line is drawn

4    right straight down the ocean.

5        And prior to that, prior to that determination, prior to

6    the regulations being implemented, as I said before, there

7    was no limit on how far, or nobody imposed any limit on how

8    far Quileute and Quinault or even Makah could fish out in the

9    ocean beyond three miles.

10       Now there is.  There is a fine, unambiguous line.  We are

11   not asserting that we can fish beyond that line.  We are

12   asserting that we can fish up to that line, because that is

13   the line that was acknowledged by us and by our treaty

14   partner, the United States, as the area in which we have a

15   right to exercise our treaty right to fish.

16       And, again, Your Honor, I don't understand how that makes

17   us outliers.  We are fishing in that area legally.  We are

18   fishing in that area legally pursuant to federal regulations.

19   There is no illegal fishing going on here.  And to suggest

20   there is is just plain ludicrous.

21       As I stated before, there is no law that I am aware of

22   that requires a tribe that is fishing in the exclusive

23   jurisdiction of its treaty partner, pursuant to an

24   interpretation of that treaty between it and its treaty

25   partner, that it has to come into some court, whether it's

1    this court or some other court, and get the court's blessing

2    to do so.  That just simply isn't the law, Your Honor.  As

3    much as Makah would like to think it is, as much as Makah

4    would like to make that the law, that's not the law.

5        So the question then becomes, if this court does take

6    Makah's invitation and decides, yes, I have jurisdiction, I'm

7    going to determine -- or we are going to have a trial and

8    determine exactly how far out beyond the three-mile limit

9    Quinault and Quileute have a treaty right to fish, then what

10   we are going to end up doing, Your Honor, is we are doing

11   something that has never been done in this proceeding before.

12   We are allowing another tribe, in this case Makah, to use

13   Paragraph 25(a)(6) as an offensive procedural weapon.  I

14   don't think that was the intent behind that.  I don't think

15   that was the intent that Judge Boldt had when he adopted that

16   provision of his decree or his order.

17       It appears that the intent behind (a)(6) was to allow a

18   tribe to come in and argue that their treaty rights were

19   broader than were first determined under Final Decision 1.  I

20   don't think it was intended to allow a tribe -- or a

21   plaintiff tribe to come in and then use it offensively

22   against another plaintiff tribe to say, oh, no, you don't get

23   the right to fish there.

24       I mean, if that was the intent, and this court ruled that,

25   yes, that is the intent and, yes, we can go forward with

1    something like that, then it seems to me that that would open

2    up an opportunity for every other tribe in this proceeding to

3    file a preemptive RFD whether or not the other tribe they are

4    filing against has ever fished in an area, has ever claimed

5    it's going to fish in an area, has ever been intending to

6    fish in that area, just to ensure that that never happens.

7         And it doesn't seem that it would require that tribe who

8    is filing that to say, oh, gee, we're harmed by you fishing

9    in this area, because, as I've said, if it can be used

10   offensively, then they don't have to show any harm.  They

11   wouldn't have to show anything other than, for example,

12   Quinault saying to the Muckleshoot, we're going to file this

13   RFD because we don't believe there is any evidence that

14   there's Muckleshoot fish in the Strait of Juan de Fuca.

15        Well, the Muckleshoot may be in the process -- they may

16   have some evidence.  They may be in the process of gathering

17   some evidence that they did, intending at some point in time

18   to bring an (a)(6) motion to this court to adjudicate their

19   right to fish there.

20        But if a tribe like Quinault can come in and preempt them

21   from doing that, then what is to prevent any other tribe from

22   doing that with respect to any other tribe?  I can't believe

23   that that is what Judge Boldt intended.  I can't believe that

24   that is the intention behind Paragraph 25(a)(6).  And there

25   is nothing to suggest that it is either.

1    THE COURT:  Let me ask you this.  Your clients have

2 been able to agree on a management plan with the Makah

3 involving, I think, cod, halibut, and salmon.  Why have you

4 not been able to come to an agreement on whiting?

5    MR. NIELSEN:  Your Honor --

6    THE COURT:  Do you really want to leave it to this

7 court to make those kinds of determinations?

8    MR. NIELSEN:  Your Honor, my preference would be to

9 not leave it to this court to make any of those kind of

10 determinations.  You know, when I first started practicing

11 law, I was told by a judge that you never want to go to

12 court, you never want to have somebody else make that

13 decision, that the parties should always try to settle

14 whatever disputes they have.

15    And, no, I don't think that we want the court to make that

16 decision.  We do not want the court to make that decision.

17 But the problem, and why we haven't been able to reach an

18 agreement, is that Makah's position is that -- and it's the

19 position it's taken with NMFS, it's the position it's taken

20 with the federal government, that we are entitled to a

21 certain allocation of the whiting.  And they have not moved

22 off of that position.

23    Their position is that, whatever allocation is set aside

24 for the tribe's treaty rights in this whiting fishery, we are

25 entitled to this specific percentage.  And the Quinault and

1  Quileute position has always been, we are willing to work

2  with the Makah, we are willing to work with the federal

3  government to set an allocation, but we are not willing to do

4  so on terms that were submitted to us by Makah without any

5  movement.  That is not the way it's supposed to work.

6       THE COURT:  Well, the federal government does not get

7  into the business of allocating.  They give you the split,

8  the tribes, and then it's up to you to decide.

9       MR. NIELSEN:  And that's what Makah -- that's Makah's

10  problem.  And that is why we have a breach of the settlement

11  in this area, Your Honor, because Makah wants the federal

12  government to do just that, to set allocations for each one

13  of the tribes.

14     And we have balked at that.  We have taken the position,

15  as Your Honor has just described, that when the federal

16  government sets the treaty allocation, it sets an allocation

17  for the entire treaty tribes, and that it is up to the treaty

18  tribes to work out amongst themselves how they are going to

19  allocate that percentage.

20     And we have been more than willing to do that with the

21  Makah.  It's Makah that has been unwilling to do that with

22  us.  And that's why we find ourselves here today.  Now,

23  Makah, I'm sure -- this is a no-win proposition for Makah,

24  because if they can convince this court that it should wade

25  into these uncharted waters and adjudicate the Quinault and

1   Quileute fishing rights outside of three miles -- oh, and by

2   the way, I don't even know how that would work.

3        When a tribe comes in under an (a)(6) to adjudicate its

4   own treaty fishing rights, or an expansion of its own treaty

5   fishing rights, it's pretty clear.  We know what the burdens

6   of proof are.  We know what the sufficiency of the evidence

7   test is.  We know how.  We have a template for doing that.

8   There is no template for doing what Makah is asking this

9   court to do.  Who has the burden of proof?  What is the

10  burden of proof?  What is the sufficiency of the evidence?

11       And then, even if you address those issues, how do you

12  address the issue that we have an acknowledgement by the

13  federal government that we do have a treaty right to fish out

14  to that line that I have just described?  How do we deal with

15  that?  Do we use what Judge Rothstein had indicated was

16  appropriate, whether there is extraordinary evidence that the

17  Quinault and Quileute didn't really fish to that line?  Do we

18  talk about whether or not the Secretary of Commerce's

19  decision or determination that Quinault and Quileute fished

20  out of line was arbitrary and capricious?  Is that the

21  standard that we use, or do we use some other standard, some

22  other standard that I don't even know we have even identified

23  or addressed?

24       There is a host of procedural issues and a host of

25  procedural problems with Makah's request, which is why I

 1    don't believe that that is what Paragraph 25(a)(6) was

 2    intended for.  It wasn't intended as an offensive weapon to

 3    be used by one tribe against another, which is exactly what

 4    Makah is trying to use it for.

 5            THE COURT:  You only have a couple of minutes,

 6    counsel.  I agree with you, first of all, that it opens up a

 7    host of procedural issues that no one has ever considered

 8    before.  And it opens up a lot of possibility for attorney

 9    billing hours as well, rather than putting the resources into

10    what they should be doing.

11            MR. NIELSEN:  Yes.

12            THE COURT:  Exactly.  But, anyway, two minutes.

13            MR. NIELSEN:  Thank you, Your Honor.  I just want to

14    make two -- well, three quick points, that this is all about

15    the whiting fishery.  We all know that.  I mean, Makah admits

16    it in the pleadings, that the reason it didn't join in whole

17    in this action is because they expressed no interest in the

18    whiting.

19        So it's really not about Quinault and Quileute harvesting

20    halibut, harvesting salmon, harvesting blackcod, or any of

21    the other things that they are claiming.  We know exactly

22    what this is about.

23        The Ninth Circuit has questioned whether it is proper for

24    this court to displace the federal government in management

25    of its fisheries.  And that is what Makah is really

1  requesting this court to do.

2      It has also twice stated that we can think of no more

3  complex case than this.  Well, Makah invites the court to add

4  what we believe is another needless layer of complexity to

5  this case.

6      We would ask that the court deny the motion for summary

7  judgment and that it proceed to determine Quinault's and

8  Quileute's ocean fishing boundary outside the three-mile

9  limit.

10          THE COURT:  You know what troubles me the most about

11  this right now in the Makah's request, as you indicated, and

12  this host of unknowns that can happen, is thinking about some

13  fellow federal judge 30 years from now trying to figure out

14  what the heck Judge Martinez meant by this.

15      Thank you, Mr. Nielsen.

16          MR. NIELSEN:  Thank you.

17          THE COURT:  Ms. King.

18          MS. KING:  May it please the court.  Lauren King for

19  the Quileute Tribe.  As Mr. Nielsen mentioned, I will be

20  discussing two topics today: Makah's standing, and a brief

21  commentary on the issues that have been raised on Quileute's

22  northern boundary.

23      As we put in the response, we don't think that this motion

24  gives the court anything to determine.  We ask the court to

25  deny or strike the motion for three main reasons.  First, we

1   view it as an improper and untimely motion for

2   reconsideration.  Second, it asks for relief outside the

3   scope of this subproceeding as defined by the court.  And,

4   third, Makah fails to show standing.  There simply is no harm

5   here.  And what Makah claims is harm won't be redressed by

6   the relief they seek here.

7        So why is this really a motion for reconsideration?  Well,

8   this court has ordered twice now that this subproceeding

9   proceed as an interpretation of what Judge Boldt meant when

10  using the word "adjacent" in 1974.

11       And the most recent ruling on that was in March of 2012.

12  But six months later, six months too late, Makah moves on

13  these two issues here, which are (a)(6) issues, standing to

14  seek an adjudication.  And this court says, we're not doing

15  an adjudication.  Nobody is contesting there is standing

16  under (a)(1).  This is (a)(6).

17       And, number two, in Final Decision 1, the court's finding

18  did not specifically determine the location of Quileute's and

19  Quinault's ocean fishing grounds, which, as Mr. Nielsen said,

20  we don't think is disputed.  But, as you can see here, that's

21  a Paragraph 25(a)(6) inquiry.  And as Mr. Nielsen said, the

22  parties have agreed to stay briefing on (a)(1) until after we

23  get a ruling on this motion.

24       So, yes, Quileute is going to have plenty to say about the

25  meaning of "adjacent" and the evidence before Judge Boldt

1  when that time comes, when and if that time comes.  But for

2  today, this is really a motion to reconsider this court's

3  directive that we continue under (a)(1).  And it should be

4  denied as untimely and improper.

5      Along the same lines, the court can strike the motion in

6  its entirety because it asks for relief simply outside the

7  scope of this subproceeding.  But even if you do entertain

8  Makah's motion, Makah fails to show any harm.

9      So why is there no harm in the fisheries that were

10  actually added: salmon, halibut, and blackcod?  Well, Makah

11  wants to start with the proposition, as Mr. Slonim said, of,

12  if you take one fish out of the total tribal allocation,

13  that's injury.  But that's just not true, because no one

14  tribe, not Makah, not Quileute, is entitled to harvest the

15  entire tribal allocation.  We have to, instead, start from

16  the beginning, in Judge Boldt's mandate that we each get

17  50 percent of what is in our U&As.

18      So without getting too far into the science of the thing,

19  what the regulators do is they look at the tribes' U&As.  And

20  they look at two things: the geographic areas and data

21  regarding the fish in each of those areas.  And then we come

22  to a total tribal allocation of all the U&As of all the

23  treaty tribes for those species.

24      And when we look at that data for the tribes in this case,

25  in a hypothetical 100-fish allocation, the area in green

1    there for Quileute and Quinault makes up about 70 fish.  It

2    contributes 70 fish to the allocation.  And the area in red

3    for Makah contributes only about 30 fish.

4        So what is injury in this scenario?  We would agree that

5    if you contribute 70 percent of the fish to the allocation,

6    but you take out 90 percent, that is injury.  But that is not

7    the case here.  You have seen the numbers.  Quileute and

8    Quinault is contributing 70 percent in halibut and blackcod.

9    But what is it getting?  What are they getting?  30 to

10   40 percent.  Makah is the one that is getting 60 to

11   70 percent of those fisheries, and it only contributes about

12   30 percent when you look at those two factors, geographic

13   area and availability of fish within that area.

14       And then with respect to the salmon troll fishery, they

15   get almost everything.  That is not injury.  That is a

16   windfall.  And it brings up an important point, because if

17   Makah gets what it's asking in this subproceeding, that green

18   area will go away, and they will be left with 30 percent.  In

19   other words, they get more fish and more opportunity because

20   we are in the fishery.

21       So why would Makah do that?  Why would Makah shoot itself

22   in the foot like that?  Well, as Mr. Nielsen said, this is

23   not about those fisheries.  This is about the whiting

24   fishery.  If it were about salmon, we would have heard about

25   it in 1983, when all four coastal tribes litigated the ocean

1    troll fishery.

2        And if it were about halibut, we would have heard about it

3    in 1991, when that was litigated.  And we did hear from Makah

4    in 1991, but only to say specifically that all 12 halibut

5    tribes made factual representations to and obtained

6    recognition out of their treaty rights from the federal

7    regulators.

8        Makah went on to say, this court, the U.S. v. Washington

9    court, told all the parties in that case that if you have a

10   problem with any one of those tribes going out and exercising

11   their treaty rights for halibut, bring a subproceeding now or

12   forever hold your peace.  The court said, I want to get this

13   issue resolved.  As Makah points out, to date, back in 1991,

14   no party had elected to do so.

15       In 1994, Makah, along with the other coastal tribes,

16   encouraged the federal government, when setting the blackcod

17   allocation for the first time, to include all of the U&As in

18   that area, including Quileute and Quinault.  This isn't about

19   blackcod.

20       And in the late '90s and early 2000s, when whiting was

21   litigated, Makah was even okay with our participation.  They

22   didn't join the plaintiffs in that case, who were challenging

23   our right to enter the fishery.  They had the same issue

24   we're hearing today, that we didn't adjudicate our U&As

25   within U.S. v. Washington.

1        Instead, they submitted a joint proposal with Quileute.

2  And that joint proposal gave Quileute 2,500 metric tons of

3  whiting each year.  It was only when we couldn't agree to an

4  allocation that we found ourselves here.

5        And as you just mentioned, the tribes generally don't fish

6  pursuant to allocations.  Normally we have management plans.

7  And if we do fish pursuant to allocations, only the

8  sovereigns themselves are the ones that can impose that.

9        Yet that is the basis for Makah's lawsuit here, that we

10  wouldn't agree to an allocation.  And the ironic thing is, as

11  you recognized earlier, Quileute and Quinault have never even

12  entered the whiting fishery.  But Makah claims that our

13  potential entry is a threat to them, and they have raised

14  three reasons why.

15        First, they say, if we get into the fishery, it's going to

16  threaten their share.  Second, they say, if we don't have an

17  allocation, there is going to be a race for fish.  And,

18  third, they claim that co-management is injury.  So I'll

19  address those one by one.

20        First, our potential entry into the fishery does not

21  threaten Makah.  Why?  Because whiting is managed differently

22  than blackcod, halibut, and salmon.  It's a needs-based

23  fishery, because the tribes are not even close to asking for

24  the full 50-percent entitlement.  In Makah's own words, in

25  its 16-year history, it never sought to harvest the full

1   50-percent entitlement.  Instead, it's only asked for

2   17.5 percent.

3       And when Quileute expressed an interest in participating

4   in whiting in 2009, the federal regulators added onto the

5   allocation an additional 3 percent.  The tribes simply submit

6   what's called a statement of need, and the allocation

7   reflects that.  Makah's share is safe, because what Quileute

8   asks for is simply an add-on.

9       Secondly, Makah claims that without an allocation we'll

10  have a race for fish.  But as I mentioned, in none of these

11  other fisheries that we're talking about today do we have

12  management by allocation.  We don't hear complaints from

13  Makah there regarding the competitive portion of those

14  fisheries that we are going to have a race for fish.  So

15  there is no reason to think that suddenly, magically in the

16  whiting fishery we'll have a race for fish.

17      Moreover, even without an allocation or a management plan,

18  Quileute always has a duty as a co-manager to conserve for

19  the resource.  So if they come up and say, here's our needs

20  for the year, we think we can harvest 8,000 metric tons, they

21  will manage to 8,000.

22      And because it's a needs-based fishery, those do reflect

23  their capacity.  So when we ask for 8,000 metric tons, we are

24  not going to have the capacity really to go over.  If we do,

25  that's an issue for the next year, when we ask for our needs

1     again.

2         In short, there simply is no harm here, no standing.   In

3     the fisheries that we actually participate in, the Makah is

4     receiving a windfall.  And in whiting, we have never even

5     entered.  And even if we did, we wouldn't affect Makah's

6     share.  Makah has not shown standing here.  And at the very

7     least, there are disputed issues of material fact that

8     preclude summary judgment.

9         Now, turning to my single point, Quileute's northern

10    boundary, Makah did not move on this in its motion, but it

11    does complain that we are setting our northern boundary too

12    far north.

13        Here is Sand Point.  Quileute has been setting regulations

14    at Sand Point ever since the Boldt decision.  And it has

15    fished within those boundaries.  As Mr. Nielsen mentioned,

16    those are the federal boundaries as of 1985.  And we have

17    stayed within those.

18        The basis for Makah's complaint is that list of villages

19    that Mr. Slonim talked about in which the northern-most

20    fishing village for Quileute is that bottom area there called

21    Norwegian Memorial now.

22        And Makah says, well, if that is your northern-most

23    fishing village, that also must be the northern-most extent

24    that you're fishing.  As we said in our response, no, common

25    sense would tell you the fishermen probably fish both south

 1   and north of their villages.  And we actually have an

 2   admission from Makah that we did just that.

 3        In 1977, and again in 1981, in Makah's own RFD, it

 4   submitted testimony from one of its elders, Harry McCarthy,

 5   in which Mr. McCarthy says, yes, Quileutes did fish north,

 6   they fished all the way up to Tatoosh Island, that is where

 7   they camped and they fished.  And asked whether Quileutes

 8   would go north of that line, whether they would go north of

 9   Tatoosh Island, Mr. McCarthy said yes.  And Makah submitted

10   this testimony as a truthful account of treaty time fishing.

11   We don't understand how they can be here to contradict that

12   now.

13        Secondly, Decision 1 itself supports our boundary at Sand

14   Point.  In Finding of Fact 108, Judge Boldt found that

15   before, during, and after treaty times, the usual and

16   accustomed fishing places of Quileute included Lake Ozette

17   and the adjacent saltwater areas.

18        Looking at Lake Ozette here, Sand Point falls well within

19   that finding.  If anything, our northern boundary could be

20   much farther north than it is now.  But as it is at Sand

21   Point, it's supported by both Decision 1 and the evidence

22   submitted by Makah.

23        Having discussed that last point, I want to go back to my

24   first statement, that there is simply nothing for the court

25   to consider here.  The bottom line is that we had an order to

1    continue on (a)(1), and Makah disregarded that order.  The

2    time for reconsideration is long past, nor is there any

3    reason to listen to complaints about what is really a

4    windfall to a tribe that already dominates the ocean

5    fisheries and to purely hypothetical sky-is-falling

6    speculation about a fishery that we have never even entered

7    and which is set up by its very nature to give Makah and to

8    continue giving Makah everything that it asks for whether we

9    are in it or not.

10        Now, a point was raised a few weeks ago, in 05-4, which is

11   finality.  And for 30 years, almost 30 years now, Quileute

12   and Quinault have been out fishing in the ocean under

13   unambiguous federal boundaries.  And in the 25 years before

14   Makah filed this lawsuit, we never heard an objection to our

15   right to be out there.  Instead, they signed co-management

16   agreements with us.  They fished alongside us, and they urged

17   the federal regulators to incorporate our U&As in

18   establishing the tribal allocations.

19        Now Makah wants to erase history.  They want to undo the

20   work that we did with our treaty partner in 1985, and they

21   want to make us start all over again.  Should equity have

22   something to say about that?  We think that it should.  And

23   we think that equity should have something to say about the

24   fact that in those 30 years both Quileute and Quinault have

25   been fishing legally, as Mr. Nielsen pointed out.  They have

1   revived their cultures of ocean fishing, and they have

2   invested in the fisheries.  And at some point, the tribes

3   should be allowed to do that.  They should be allowed to

4   invest in the fisheries and plan for the future, have some

5   finality.

6       We ask the court to give us some finality today and deny

7   or strike Makah's motion.  And I would be happy to take any

8   questions.

9           THE COURT:  You talked about the lack of harm here.

10  And I understand that argument.  But there was also an

11  argument made in your written materials about the court --

12  regarding standing in this particular case, about the fact

13  that the original case area, that Judge Boldt really did not

14  go beyond the three miles offshore.  I asked this question of

15  Mr. Nielsen, and I am going to ask it also of you.

16      Isn't your client in this particular case asserting the

17  treaty right to fish in this disputed area, three to

18  200 miles?

19          MS. KING:  Quileute is asserting a right to fish

20  within its federal U&A, which was established in 1985, yes.

21          THE COURT:  Thank you, Ms. King.

22      All right.  Mr. Slonim.

23          MR. SLONIM:  Just a few points, Your Honor.  First of

24  all, you directed us to proceed under Paragraph 25(a)(1).

25  And that's what we did.  We looked at the language of Judge

1   Boldt's finding.  We looked at the evidence in front of Judge

2   Boldt.  And we offered our interpretation of what Judge Boldt

3   meant.  I don't really understand the argument that somehow

4   we ignored the court's order.  We did exactly what the court

5   said.

6       Ms. King stood before you and offered you 1981 testimony

7   from a Makah elder which wasn't about treaty time fishing, it

8   was about fishing that occurred long after treaty time, and

9   wants to introduce that into this proceeding.  But it sheds

10  no light on what Judge Boldt meant.  That testimony wasn't in

11  front of Judge Boldt.

12      We proceeded under 25(a)(1).  And we all agreed that, in

13  looking at Judge Boldt's findings, they don't say anything

14  about fishing more than three miles offshore.  And as you

15  have pointed out repeatedly, we have two tribes that are

16  claiming a right to fish and exercising a right to fish more

17  than three miles offshore where there has been no

18  determination.

19      So that leads to, do you continue with this case and

20  decide whether that is lawful or not, whether they have

21  treaty fishing rights in that area?  I didn't hear

22  Mr. Nielsen's answer to your question about whether the court

23  has subject matter to do that or not, because I think it's

24  clear the court does have subject matter to resolve that

25  question.  It arises under the treaties, and it presents a

1    federal question.  It goes to the heart of this case.

2        Now, with respect to the federal regulations and the

3    federal line, this is really where Quileute and Quinault are

4    engaged in a shell game.  When that line -- first of all,

5    that line is simply an extension of Makah's western boundary.

6    The federal government didn't know where the Quileute and

7    Quinault line was.  And so the federal government just said,

8    well, let's just take the Makah boundary and draw it south.

9        And at the time, Quileute and Quinault objected to that.

10   They said, there's no basis for it, there's no evidence to

11   support it, you can't do that to us.  When it was challenged,

12   when that line was challenged in connection with the whiting

13   quotas, Quileute and Quinault said to this court, and then to

14   the Ninth Circuit:  You can't review the federal line.  What

15   you have to do is wait for the issue to come up in U.S. v.

16   Washington.  That's where U&As are decided.

17       So now that we're in U.S. v. Washington, it's like, you

18   know, go over there.  And when we go over here, they say, no,

19   go over there.  Because what this is all about is avoiding an

20   actual adjudication of their usual and accustomed grounds, an

21   adjudication that has been conducted for every other tribe in

22   this case.

23       Mr. Nielsen says, well, when we got involved in this case,

24   we were only interested in our fishing rights within three

25   miles.  And I think that the implication is that, so we never

1   waived our immunity with respect to our right outside of

2   three miles.

3       But if you look at our response to the motion to dismiss,

4   we detail proceeding after proceeding after proceeding in

5   which Quileute and Quinault have come to this court seeking

6   relief with respect to their fishing rights more than three

7   miles offshore.

8       Quileute, for its part, in a shellfish subproceeding,

9   asked the court to rule that it had usual and accustomed

10  grounds 40 miles offshore.  How they can now say, well, but

11  that's outside your jurisdiction, you can't do that, is

12  beyond me.

13      I want to talk a little bit about the issue of harm and

14  the 70 percent/30 percent argument Ms. King made.  Treaty

15  allocations aren't based on the size of a tribe's usual and

16  accustomed grounds.  They are based on how many fish pass

17  through those grounds.

18      The halibut resource tends to migrate from north to south.

19  And so the same fish that are available in the Quileute and

20  Quinault areas first come through the Makah areas.  We all

21  have an entitlement to all of those fish.  There is no one

22  tribe contributing more than another tribe.

23      As this court pointed out, in denying the Lummi's request

24  for a stay in 11-02, if a tribe is fishing outside of its

25  usual and accustomed grounds, that causes injury to other

1  tribes.  We are fishing on a common stock of fish.  We are

2  under a single allocation.  We are forced to negotiate

3  intertribal agreements.  We are forced to co-manage.  And we

4  lose fishing opportunities as fish are taken.

5      And that's all fine if everybody is playing by the same

6  rules, if everybody is fishing within their usual and

7  accustomed grounds.  But when you have a situation where

8  there is a question of whether a tribe is fishing within its

9  usual and accustomed grounds or not, to just say, well,

10  forget about that, you know, negotiate the co-management

11  plan, and don't worry whether they are fishing lawfully or

12  not, that's a real injury, and that's a real threat to the

13  integrity of this lawsuit and the treaty right.

14      There is no question that this litigation was triggered by

15  the dispute over the whiting fishery.  When Quileute and

16  Quinault announced their intent to participate in the whiting

17  fishery, we said to them, let's work out separate

18  allocations, because that's good for all tribes.

19      There's a lot of things that are unique about the whiting

20  fishery.  You need to find a processor to process the fish.

21  And if you have a fixed amount of fish that you can work

22  with, it's a lot easier to find a processor than if you don't

23  know what you are going to catch.

24      There are enormous bycatch concerns in the whiting fishery

25  for overfished stocks of rockfish and listed species of

1    salmon.  The only way to avoid bycatch is by slowing down the

2    fishery.  When you see high levels of bycatch, you move to

3    another area.  You don't allow fishing at night.  You say

4    we're not going to open the fishing at all.

5        If you have a race for fish in that context, you either

6    sacrifice the concern for bycatch or you lose out on the

7    opportunity to harvest whiting.  And that's different than

8    the halibut fishery, where we can have a 24- or 48-hour

9    opening and say, go out and get as many fish as you can,

10   guys.  We don't have those kind of bycatch concerns.

11       When we originally proposed separate allocations in the

12   whiting fishery, we didn't try to dictate what they were.  We

13   said, let's negotiate them, and then we'll see if we can get

14   a big enough overall allocation to accommodate it.

15       Quileute was adamant that they wouldn't do that, that they

16   would never agree to separate allocations.  Quinault was

17   adamant that they would never agree to separate allocations.

18   And there was no alternative.  There was nothing said:  Well,

19   we can manage this fishery in another way and address your

20   concerns.  There was nothing like that.

21       Instead, what we got was:  You can't do anything about

22   this.  You can't get the federal government to help you.  You

23   can't get the federal court to help you.  We're going to do

24   what we want to do.  That was the response we got over and

25   over and over again.

1    But having triggered the issue, it's clear that there is

2  harm in the other fisheries.  It's clear that Quileute's and

3  Quinault's participation in the blackcod reduces harvest

4  available to Makah.  It's clear that their participation in

5  the halibut fishery reduces harvest available to Makah.  And

6  those are real, concrete injuries that are sufficient for us

7  to have standing, much as you ruled on the motions to

8  dismiss.  There is standing.  This is within the court's

9  subject matter jurisdiction.

10    Will there be some new procedural issues?  Maybe.  They

11  don't seem overwhelmingly complex to me.  The court has

12  addressed usual and accustomed grounds issues on innumerable

13  occasions, and it can do so again.

14    We think the court has jurisdiction.  The court should

15  keep the case and make a determination.

16    THE COURT:  Thank you very much, counsel.

17  Thank you all for the interesting argument.

18  Ms. Rasmussen?

19    MS. RASMUSSEN:  Your Honor, I know I promised I

20  wouldn't say anything, but I heard a couple of things that

21  made me somewhat concerned.  Just very briefly.  There's

22  three things.

23    One, at the end of the presentation, I believe Quileute

24  said that they had federal U&As.  And that causes me to pause

25  for a number of reasons, because the idea that you can

1    establish federal U&A without due process to the other tribes

2    would be very disruptive to the rest of the tribes in the

3    proceeding.

4         And, also, I think they might not have thought through the

5    implication for nontreaty tribes to actually try to establish

6    also federal U&A and therefore disrupt allocations set aside

7    for the treaty tribes.

8         Number two, I believe this shell game type of argument was

9    seen in the *Samish* and *Greene* line of litigation, where it's

10   not a -- it's a similar circumstance in that the court said

11   you can't use the federal recognition process to gain treaty

12   rights.  And that's a little bit similar to using a federal

13   regulation process to try to come in the back door and gain

14   treaty rights.

15        And, lastly, there's this idea that somehow entering into

16   management plans with tribes and respecting them and trying

17   to manage along the way, somehow means that you slept on your

18   rights with respect to your treaty rights plan.

19        And as this court knows, in 89-2, the judge said, no, you

20   don't have to raise it.  If the tribe does not have treaty

21   rights, you never lose your chance of making that claim

22   because they don't have the right in the first place.

23        And so I would urge this court to not use the good faith

24   entering into management plans against the Makah, because my

25   clients enter into management plans all the time with tribes

1    with whom we have great differences of opinions.

2        For years we managed halibut with the Lummi, even though

3    we had a great difference of opinion about whether they

4    belonged there.  But life needed to go on before the

5    adjudication was done.

6        And right now we enter into management plans on shellfish

7    with tribes and the state with whom we do not believe that

8    they have a right to be present in the area.  And we would

9    hate for that to be used against us one day in a proceeding

10   such as this.

11       Thank you.

12           THE COURT:  Thank you, Ms. Rasmussen.

13       And as I think was mentioned in several places throughout

14   the memos that were submitted to the court, fishery

15   management plans is a way of life here.  They are, obviously.

16   And I sound like a broken record every time I have one of

17   these oral arguments.  And that's because I keep trying to

18   get the same message across, and that is that we have limited

19   resources, and you have more and more demand.  And it makes

20   so much more sense to me for you to be able to figure these

21   things out on your own without having the court imposing what

22   I think is the right thing to do and then years of litigation

23   until we figure out whether or not the Ninth Circuit thinks I

24   was right.

25       Thank you for the very interesting argument.  We'll try to

1    get an order out to you fairly quickly.

2         We'll be at recess.

3         (Proceedings adjourned.)

4

5

6

7                     * * * * * * * * *

8

9                     C E R T I F I C A T E

10

11       I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14        Dated this June 10, 2013.

15

16                          /S/  KARI McGRATH

17                          Kari McGrath, CCR, CRR, RMR

18                          Official Court Reporter

19

20

21

22

23

24

25