```
1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
2                            IN SEATTLE

3    -----------------------------------------------------------------

4    UNITED STATES OF AMERICA, et al, )
                                      )
5                     Plaintiffs,     )  No. C70-9213
                                      ) Subproceeding 91-1
6            v.                       )
                                      )
7    STATE OF WASHINGTON, et al.,     )
                                      )
8                 Defendants.         )
                                      )
9    -----------------------------------------------------------------

10                     TRANSCRIPT OF PROCEEDINGS

11   -----------------------------------------------------------------

12            BEFORE THE HONORABLE RICARDO S. MARTINEZ

13                         June 7, 2010

14
     APPEARANCES:              Lauren Rasmusen
15                             Jamestown Klallam Tribe
                               1904 Third Avenue
16                             Securities Building, Suite 1030
                               Seattle, WA 98227
17
                               Richard Berley
18                             Brian Gruber
                               Makah Indian Tribe
19
                               Michelle Hansen
20                             Suquamish Indian Tribe

21                             Alan C. Stay
                               Muckleshoot Indian Tribe
22                             39015 172nd Avenue S.E.
                               Auburn, WA 98092
23
                               Daniel A. Raas
24                             Mary Neil
                               RAAS JOHNSEN & STUEN PS
25                             P.O. Box 5746
                               Bellingham, WA 98227
```

1

2                   **Mason D. Morisset**

**MORISSET SCHLOSSER AYER & JOZWIAK**

3                   **801 Second Avenue**

**11115 Norton Building**

4                   **Seattle, WA 98104**

5                   **O. Yale Lewis**

**Katherine Krueger**

6                   **Quileute Indian Tribe**

7                   **Kevin Lyon**

**Squaxin Island Tribe**

8

9                   **Richard Reich**

**Muckleshoot Indian Tribe**

10                  **Craig Dorsay**

**Hoh Indian Tribe**

11

12                  **Alix Foster**

**Swinomish Indian Tribe**

13                  **11404 Moorage Way**

**La Conner, WA 98527**

14                  **Samuel Stiltner**

**Puyallup Tribe**

15                  **3009 Portland Avenue**

**Tacoma, WA 98404**

16

17

18

19

20

21

22

23

24

25

```
 1   (sub-proceeding 91-1)

 2           THE CLERK:  We are back on the record in

 3   sub-proceeding 91-1.  Will counsel please make their

 4   appearances for the record?

 5           MS. RASMUSSEN:  May it please the Court, my name

 6   is Lauren Rasmussen for the Jamestown Klallam Tribe.

 7           THE COURT:  Now you are all by yourself over

 8   there.

 9           MS. RASMUSSEN:  There isn't co-counsel here.

10           MR. BERLEY:  Your Honor, Richard Berley for the

11   Makah Tribe.  With me is Brian Gruber.

12           MR. RAAS:  Good afternoon to the Court.  Dan Raas

13   from the Lummi Nation.  With me is Ms. Mary Neil.

14           MR. MORISSET:  May it please the Court, Mason

15   Morisset for the Tulalip Tribes.

16           MR. LYON:  Good afternoon, your Honor.  Kevin

17   Lyon with the Squaxin Island Tribe.

18           MR. STILTNER:  Sam Stiltner with the Puyallup

19   Tribe.

20           MS. HANSEN:  Good afternoon again, your Honor.

21   Michelle Hansen for the Suquamish.

22           MR. LEWIS:  Good afternoon, your Honor.  Yale

23   Lewis, co-counsel for the Quileute.

24           MS. KRUEGER:  Good afternoon, your Honor.

25   Katherine Krueger, co-counsel for the Quileute Tribe.
```

4

```
 1            MS. FOSTER:  Good afternoon, your Honor.  Alix
 2    Foster for the Swinomish Indian Tribal Community.
 3            MR. STAY:  Hello again, your Honor.  Alan Stay
 4    for the Muckleshoot Tribe.  We are just here observing
 5    today.
 6            MR. REICH:  Richard Reich with the Muckleshoot
 7    Tribe.  As Mr. Stay said, we are just observing.
 8            MR. DORSAY:  Craig Dorsay for the Hoh Tribe, your
 9    Honor.
10            THE COURT:  Anyone else?  Ms. Rasmussen, it is
11    your motion.
12            MS. RASMUSSEN:  We are here today to ask this
13    Court to hold the Makah in contempt for its violation of
14    the 2010 halibut management plan.  As the Court well
15    knows, this is the third round of motions before the Court
16    this year, starting off with the Makah's motion to clarify
17    which plan was the status quo, which resulted in your
18    Honor's order clarifying that the 2000 plan was to be the
19    status quo for the fishery, a motion by myself two days
20    before the fishery starts, trying to clarify what indeed
21    it meant to update the plan to current conditions.  And I
22    filed this motion because this year the plan, for the
23    first time ever, yielded a 14 or 15-day fishery, when the
24    objective of the plan is a 30-day fishery.  And that has
25    never happened before.  And this is the first time we have
```

1    had a plan in recent years that we knew we could have your

2    Honor's help in enforcing.

3              THE COURT:  Ms. Rasmussen, I have a question.

4    You said "the objective."  Isn't it just one of the

5    objectives?

6              MS. RASMUSSEN:  Yes, your Honor.  I will turn

7    your attention to the 2010 management plan.  The plan

8    starts with listing the parties, and then it has the

9    statement objective, singular, to fully harvest the 2010

10   tribal commercial TAC, which is the total allowable catch

11   allotted to the tribes, while providing a 30-day fishery

12   beginning March 6th.

13             The structure of the plan has but one sole

14   objective.  In order to demand -- request contempt, we

15   must show that both the Makah violated a clear order of

16   the Court and that they failed to take all reasonable

17   steps to comply with the order.

18             As I said before, the fishery resulted in a 14 or

19   15-day fishery for the first time ever.  And the reason

20   for this is the Makah opened a second unrestricted fishery

21   on March 20th, 15 days in advance.

22             Under the provisions for the restricted fishery,

23   which are in front of your Honor, a party can only open a

24   second unrestricted fishery if the catch is radically

25   less.  And it says 75,000 pounds.  Then the unrestricted

1   fishery may be open for a modest additional period of
2   time.
3          This year the first 48-hour period of the
4   unrestricted fishery caught 119,000 pounds.  It was not
5   radically less than 100,000 -- than 75,000 pounds, and,
6   therefore, the second unrestricted fishery was a violation
7   of the plan.
8          Now, the Makah, in attempting to avoid this
9   particular provision, tries to characterize the second
10   unrestricted opening as a mop up.  They argue that the mop
11   up is a third required sub-fishery of this plan.
12          But, again, if we go to the plan's provisions, we
13   have a structure.  I think of the structure of the plan as
14   -- the objective is the table top and the legs are how the
15   table is going to stay standing.  And here we have the mop
16   up fishery, which is allotted essentially whatever is
17   remaining after the unrestricted fishery.  The amount
18   allotted to the mop up fishery is 84,000 pounds.  It is a
19   management buffer.  It is what they use repeatedly in
20   management plans to protect the fishery structure from
21   going over the total allowable catch.  They did not
22   allocate all the fish.  The unrestricted fishery and the
23   restricted fishery amounts add up to less than 250,000
24   pounds.  There is 84,000 pounds of protective mechanism in
25   case either of the two fisheries go over.

1     THE COURT:  Counsel, let me ask you a much more

2  basic question.  I want to make sure I understand this.

3  What is more important, to harvest the total allowable

4  catch or to fish for 30 days?

5     MS. RASMUSSEN:  In some ways I don't understand

6  your question, because the point of the plan was to fish

7  for 30 days and make the TAC last that long.  It is both.

8  If we go back to the reason the S'Klallam brought the

9  sub-proceeding, it is providing a minimum amount of time

10  which would allow parties to get out, gear up for the

11  fishery, find the fish and bring them home.  And that's

12  why we negotiated to have this provision be the objective

13  of the plan, which is to provide that minimum opportunity

14  for the small fleets of the S'Klallams to get out there,

15  not be barred by two days of bad weather, actually get out

16  there and get a chance to go fishing.

17     The reason it is spoken of in terms of

18  opportunity is because my clients firmly believe you have

19  the right to go out and try, but if you don't catch --

20  You are not guaranteed --  There is no entitlement.

21     One of the differences of opinion we often have

22  with the Makah is because they have been fishing this

23  fishery for a really long time.  It has been going well

24  for them for a really long time.  It has been hard for

25  them to make room for other folks.  We don't want to take

1    their share, we just want a chance to fish alongside them.

2    And so we negotiated this plan with this sole objective.

3         One of the things that gets lost in this

4    interpretation that you see in front of the Court,

5    starting in 2000, what is the status quo, what does

6    status quo mean, so on and so forth, I think its loss is

7    the good faith requirement in the Court's order, the

8    faithfulness to the agreed-upon common purpose and the

9    consistency with the justified expectations of the party.

10        So when you see the provisions of the plan, and

11   you see that there is one objective, and it is the 30-day

12   fishery, and you see that, okay, you could probably if you

13   had a good lawyer find a way to wiggle out from under this

14   or excuse what you did and open the fishery early.  You

15   are not allowed to do that under the restatement second

16   comment A, "Faithfulness to the agreed-upon purpose and

17   consistency with the justified expectations of the

18   parties."

19        I ask you --  When I look at the plan, and I ask

20   myself the question, what is the common purpose of the

21   2010 halibut plan, I see one objective.  Paragraph 2 of

22   the agreement says, "To fully harvest the TAC while

23   providing the 30-day fishery."  And the rest of it is the

24   structure for how we are going to protect the restricted

25   fishery from getting eaten up by the unrestricted fishery,

1   because the unrestricted fishery is fast, hard to control,

2   everybody goes out and harvests as much as they can in a

3   short period of time.  And so all these management limits

4   are intended to protect the restricted fishery from

5   getting eaten up from the competing demands of the

6   unrestricted fishery and provide this important

7   opportunity for the smaller fleet.

8            This case was not brought by Makah to protect

9   their unrestricted fishery.  This case was brought by the

10  S'Klallam to protect their opportunity to get out there

11  and not be cut off, or preempted, or have the fishery

12  closed before their single boat gets out on the water.

13           I come back to that because, in the discussions

14  that occurred this year, there was this movement to try to

15  manipulate the plan, but there was nobody who said, you

16  know what --  Actually there was one person.  There was

17  one person that said -- when there was an argument about

18  the plan and how it should be interpreted, somebody said,

19  you know, I shouldn't have to look to a declaration to

20  know what the plan means.  I should be able to look at the

21  plan and know what I'm supposed to do and what I am not

22  supposed to do.  And when I look at the plan, it is very

23  clear to me that you cannot -- that April 5th is not

24  March 20th.

25           And when you were faced with that problem, that

 1    you reached the range of the restricted fishing early --

 2    In fact, the evidence before you is that all the parties

 3    went over the range of the restricted fishery by

 4    16,000 pounds before anybody closed.  You couldn't just do

 5    your own thing.  You couldn't just go out there and open

 6    the second unrestricted early without the consensus of

 7    everybody else.

 8              And this is the same problem that has happened

 9    for years in this fishery.  I think it comes from a

10    feeling of entitlement.  I am not here to psychoanalyze

11    everybody, but when you come into the fishery and you

12    think you can manage it without everybody's consensus --

13    You see the 2009 objection that the S'Klallam made to the

14    Makah.  We said, hey, you can't do that.  The 2000 plan

15    was really the last one that was adopted by consensus.

16    You see the letter back from Brian Gruber, no, we have

17    seven of the 13 participating tribes; we can go forward

18    without you; you are de minimus.  That is the attitude

19    that permeated last year.  It is permeating the

20    interpretations this year, which is, if we can get a few

21    people to go along with us, people that find this fishery

22    beneficial to them, or for whatever reason adhere to this

23    particular interpretation of the plan, then that's okay.

24    And it is not okay.

25              When I come back to the plan itself, even under

1   the Makah's interpretation, where it tries to characterize

2   this opening as a mop up, you will see the provision I

3   underlined.  It says the mop up cannot even be discussed

4   until April 5th, which is the end of the 30-day

5   restricted.  At that point, you are supposed to discuss

6   management options and agree to a management plan for the

7   remaining portion of the tribal commercial TAC.  So even

8   when you open a mop up, you have to have agreement.  You

9   can't just go do your own thing.

10          This language also further counters Makah's

11  argument that the mop up is a required third sub-fishery

12  that should be allowed to frustrate the objective of the

13  plan, that protecting this 84,000 pounds should be equal

14  to protecting the 30 days.

15          If you read the plan consistent with the common

16  purpose, you really have to let -- you would be letting

17  the whole plan be frustrated by your interpretation.  And

18  I believe under the law you are not allowed to do that.

19  You are not allowed to do that.  And when they opened the

20  fishery on March 20th, it was a violation of the plan.

21          Now, there is a couple of reasons they have

22  given for why they had to open the unrestricted fishery.

23  They don't deny they opened the unrestricted fishery on

24  March 20th.  They don't deny at that point we had been way

25  into the restricted catch.  They say the reason they had

1    to open this fishery early --  These are their reasonable

2    steps they took to comply.  One was the issue that we have

3    addressed already, that the mop up is a required third

4    sub-fishery.  You see they tried to get away from the

5    terminology mop up and called it a sub-fishery, because

6    mop up is the management buffer.  It is harvesting

7    whatever remains.

8            They say that we elevated the restricted fishery

9    to the objective.  We didn't elevate it, the plan elevates

10   it.  It is the 30 days.  Everything turns around that 30

11   days in trying to hold it up.

12           They say they had to open the unrestricted

13   fishery because we continued on March 17th to fish on

14   March 18th and March 19th, and then they all reopened

15   again an unrestricted fishery on March 20th.

16           So, again, we were fishing with management

17   limits.

18           This is the do-as-I-say-not-as-I-do defense.

19   They harvested themselves way into that expected range.

20   We were 16,000 pounds over when they said, well, now we

21   don't want to do that anymore; we want to do the

22   unrestricted fishery, and we want to take whatever is left

23   and just go fishing.  That is not proper.  That is not a

24   correct interpretation of the plan.  Again, consistent

25   with the agreed-upon common purpose and the justified

1    expectations of the party.

2            The S'Klallam and the S'Klallam fishermen, whose

3    declarations I put before you, had justified expectations

4    that 30 days meant 30 days.  If there is some way this

5    plan can be interpreted so 30 days doesn't mean 30 days,

6    then we have a problem.  To me and to the fishermen, that

7    doesn't seem right.

8            Now, the last thing that they come forward with,

9    and they may have something else to say after I sit down,

10   is, look, your Honor, we made this proposal, we made this

11   250-pound per fisher with two landings per week proposal.

12   The S'Klallam, they ignored us.  They weren't really

13   willing to manage this restricted fishery.

14           I want it to be crystal clear, that a 250-pound

15   limit with two landings per week is a two-weekday per week

16   fishery.  A landing is when the boat comes into the dock.

17   And the small boats come into the dock every day.

18           It is like giving somebody a job for a month and

19   having them come in for two days.  And you say, well, I am

20   not in breach of your contract because I gave you work on

21   the first day of the month and I gave you work on the last

22   day of the month, and, therefore, I employed you for a

23   month.  Well, that is not -- that wouldn't be 30 days of

24   employment, and this is not 30 days of fishing that their

25   proposal was meant to achieve.  Their proposal was meant

1   to reduce the fishery to essentially two days.  And it

2   wasn't a reasonable proposal and attempt to achieve the

3   common purpose.

4          I respectfully request that, although it is an

5   extraordinary measure, this Court hold the Makah

6   accountable.  Any other lack of clear response to a

7   violation of an order, even if it is just for one more

8   year, is a win.  If anything less than saying, you know,

9   it is not okay to do this, this is a wrong on the

10  S'Klallam, and the S'Klallam came before this Court and we

11  asked, please don't let this plan be breached, please

12  protect us.  Perhaps it wasn't right, perhaps it hadn't

13  happened yet, perhaps it was convincing that our claims

14  were hypothetical and there was a lack of support.  But we

15  tried.  We tried to stop it.  And nobody wanted to do

16  anything.

17         We ask this Court to take clear guidance, to

18  enforce the plan, and really get back to what the

19  court said in sub-proceeding 80-1, which is, between

20  sovereigns it is especially important to enforce their

21  obligations.

22         As the Suquamish just filed in their joint status

23  report, there is 360-day, by their count, and I haven't

24  counted myself, types of agreements filed with the Court.

25  And if you don't require parties to adhere to the plans

1    and fulfill the justified expectations of the parties,

2    then a wrong is committed.  Thank you.

3            THE COURT:  Counsel, before you step down, let me

4    ask you a couple of questions.  I am having a little bit

5    of a problem understanding this.  You have X amount of

6    fish, you have Y amount of fishermen, in terms of your

7    plan and your proposal.  And I understand fully well from

8    reading your materials how important it is to your clients

9    to have that 30-day period of time to go out there and

10   fish.  Is there no room for adjustment if the amount

11   allocated to the fishery is reached sooner than the 30

12   days?  What if there is one halibut out there?

13           MS. RASMUSSEN:  If there is one halibut out

14   there, then obviously we can't fish for 30 days.  We don't

15   have one halibut, we have 251,000 halibut.  In 2000, when

16   this plan was adopted, there was 300,000 halibut.  And we

17   got 60 days out of the fishery, from just the restricted

18   fishery alone.

19           I don't know if we are at the point yet where we

20   can surmise what we would do if the catch dwindled to a

21   small fraction of what it is today.  But right now, there

22   is a way to get 30 days out of the 250,000 pounds.  And we

23   didn't get it because of the illegal, unrestricted,

24   free-for-all fishery that was opened instead.

25           THE COURT:  But if everybody has scaled down

1    their catch limit per day, wouldn't that give you your 30

2    days?

3              MS. RASMUSSEN:  I guess I am not understanding

4    what you are proposing.

5              THE COURT:  Again, we get back to this so many

6    fish, so many fishermen, right?

7              MS. RASMUSSEN:  Yes.

8              THE COURT:  So once you determine how many fish

9    there are, then you can figure out how many can be caught

10   per day by fishermen.

11             MS. RASMUSSEN:  Yes.

12             THE COURT:  So if you scaled down the amount of

13   fish you are allowed to catch per day in an agreement,

14   that would give you your 30 days to fish, correct?

15             MS. RASMUSSEN:  Yes.  Where the difference of

16   opinion lies is how many fish we have to work with.  Under

17   the Makah interpretation of the plan, the expected catch

18   range is a hard cap at 48,000 pounds.  Therefore, the

19   management buffer, in their view, is only to be used to

20   buffer the unrestricted fishery, it is not to be used to

21   buffer the restricted fishery.  That is where the rubber

22   hits the pavement.  That's where their interpretation of

23   the plan is being used to destroy the common purpose.

24             THE COURT:  All right.  What about the Makah's

25   assertion that the S'Klallam Tribes had their best catch

1   ever?  Jamestown S'Klallam, best catch in 20 years for

2   Port Gamble.

3            MS. RASMUSSEN:  It is a nice fact, but it is not

4   relevant to the question of whether the Makah violated the

5   plan.  They would have had an even better year if they had

6   gotten their 30 days that was promised to them.  When you

7   and I have a contract, just because I happen to make a lot

8   of money somewhere else or do well, that is not the

9   relevant point.  The point is the promise.  The promise

10  would have gotten my clients a whole lot more than they

11  did get.

12           And the 30-day opportunity is interesting to

13  folks in the fishery --  I provided some declarations of

14  fishermen that said --  The Port Gamble fishermen are

15  actually going to get out there for the first time in a

16  long time.  The thing that has been holding them back is

17  just knowing that they can get out there.  And also, you

18  know, being squeezed in other fisheries.  Not to argue the

19  culvert case while folks are gone, but being squeezed in

20  the other fisheries puts more pressure between tribes.

21           A lot of folks don't like to have intertribal

22  disputes.  And I don't like them either.  But when you are

23  squeezed on all levels, and then you are sharing the

24  250,000 pounds, there is going to be tensions.  And we

25  would love to be able to resolve these tensions, but the

1    culture of this fishery has been this era of entitlement

2    and tyranny of the majority.

3              THE COURT:  Thanks, Ms. Rasmussen.

4              MR. BERLEY:  Good afternoon, your Honor.  I am

5    Richard Berley for the Makah.  We do have the chairman of

6    the tribe here, Michael Lawrence.  We have several elected

7    officials of the tribe here, councilmen.  We have the

8    fisheries director of the Makah Tribe here.  There are a

9    lot of people that are interested.

10             As you have heard, your Honor, we have a

11   tremendous difference of opinion with the S'Klallams about

12   the meaning of the 2000 plan.  It is not just Makah.  Most

13   of the halibut tribes have a tremendous difference of

14   opinion about the interpretation of the plan.

15             We have a court opinion in this case from 2001

16   which interprets this plan.  And it is at odds with the

17   S'Klallam's interpretation of the case.  It is the law of

18   the case, and the S'Klallam don't even mention it.

19             The 2000 plan itself calls for three

20   sub-fisheries.  It is very clear on this point.  It

21   doesn't emphasize one over the other.  Each sub-fishery

22   has an associated sub-quota.  All three are important in

23   different ways to different tribes.  All three must be

24   protected.

25             The Court's 2001 order by Judge Rothstein

1   provides the clearest explanation of the purposes and

2   administration of the plan.  And it is inconsistent with

3   the S'Klallam's position.

4         The S'Klallams look at one term of one

5   sub-fishery and say it trumps everything else.  They

6   ignore the other two sub-fisheries.  And even as to the

7   restricted sub-fishery, the one they care about, they

8   ignore all other terms, as you have heard just now, except

9   for the 30-day time period within which the restricted

10  fishery is supposed to be managed.  But the restricted

11  sub-fishery does have a sub-quota, and it has to be

12  managed for it.  The only way to manage for it is through

13  cooperation among the tribes.  And the plan explicitly

14  calls for that.

15        The S'Klallams have tried to change the

16  restricted fishery sub-quota in their last motion to

17  clarify.  They failed to do that.  The restricted fishery

18  sub-quota remains at 15 to 20 percent -- 15 to 19 percent,

19  in that range.  That sub-quota was taken.  The restricted

20  sub-fishery took its full sub-quota in less than 30 days

21  this year.  It took it in 15 days.

22        For the restricted fishery to last 30 days, you

23  have to manage for it.  You have to take management

24  measures.  The main one that is set forth in the plan is

25  to reduce the daily vessel trip limits.  500 pounds per

1   vessel per day just won't work with a low TAC year.  The

2   tribes can, they did, and they predictably will take 11-

3   to 12,000 pounds per day in the restricted fishery in good

4   weather.

5            The Makah and others pointed out in intertribal

6   meetings, both before and during the fishery, if the

7   restricted sub-fishery would be maintained within its

8   quota, there would have to be management measures, and

9   there would have to be reductions to the trip limits in

10  this fishery.  The S'Klallams rejected any reductions

11  whatsoever, until the restricted sub-quota was overtaken.

12  The high end of the restricted sub-quota range was 48,000,

13  and they rejected any reduction in the daily vessel trip

14  limit until the catch was at least 61,000, and probably

15  more, because fish came in, and were reported several days

16  later.

17           In the Makah's view, the S'Klallams violated the

18  plan.  They violated the plan by continuing to fish after

19  the restricted sub-quota was taken, and they violated the

20  plan by refusing to agree to vessel trip limits as

21  required by the plan to protect the 30-day sub-fishery.

22  They failed to cooperate, in other words.  Cooperation is

23  necessary -- is a necessary element to this plan.

24           The S'Klallams argument that the 30-day term

25  trumps everything else in the plan, including that

 1   fishery's own sub-quota, has no basis in the plan itself.

 2   It has no basis in how the fishery was managed between

 3   2000 and 2003, when the 2000 plan was in effect, or in any

 4   court order interpreting the plan.   Their position was

 5   rejected.

 6          Once the Court's minute order came out on

 7   March 5th, it was clear that the only adjustments to the

 8   2000 plan were in the international opening date and in

 9   the total quota for the entire fishery.   The 2000 plan's

10   sub-quota formulas were maintained and the 2000 plan's

11   requirement of continued cooperation so the restricted

12   sub-fishery could be open for 30 days was also maintained.

13          Now, this tyranny of the majority, that is an

14   interesting way to put it.   Unlike the S'Klallams, the

15   Makahs actually tried to work with other tribes.   Unlike

16   the S'Klallams, the Makahs did not work alone.   They

17   worked diligently with other tribes.   It tried to forge a

18   consensus.   It tried to make something work.   It proposed

19   management reductions to protect the 30 days.   The

20   S'Klallams would not move an inch.   They wouldn't close

21   their restricted fishery when it was taken, they just kept

22   fishing, even after the sub-quota was taken.   They

23   wouldn't even stop fishing so the tribes could come to

24   court.

25          The Makah didn't act unilaterally.   The other

 1    tribes can speak for themselves, but they viewed the

 2    S'Klallam position at the time as outrageous as well.

 3    Seven tribes viewed it that way and decided to open a

 4    12-hour unrestricted opening as part of the third fishery.

 5          In hindsight, the Makah was most successful, so

 6    now the S'Klallam are trying as a tactic to isolate the

 7    late Makah.  But the Makahs actually worked with other

 8    tribes, and the S'Kallams did not.  It is mandatory under

 9    the plan to work with the other tribes.

10          The S'Klallams characterize themselves as having

11    a small fishery.  They had an all-time success this year

12    by any measure.  They have never pointed it out.  It was

13    the coastal tribes that were hurt this year.  The Makah

14    was hurt.  The Quinault were hurt.  The Quileute were

15    hurt.

16          In our view, the S'Klallams have had some success

17    distorting the fishery.  They succeeded in getting out of

18    their 2004 and 2006 agreements.  They persuaded the Court

19    that the 2000 plan was the status quo.  But the 2000 plan,

20    when it was in effect, between 2000 and 2003, wasn't

21    particularly good for the S'Klallams.  They didn't do well

22    under it.  So immediately after getting the 2000 plan

23    adopted as the status quo, they tried to change it.  They

24    tried to change the sub-quotas under the plan.  The Court

25    rejected this, this bootstrapping, in its March 5th minute

1    order, but the S'Klallam continue to reject those

2    sub-quotas, and they reject them today.  They continue to

3    ignore or reject every feature of the plan that isn't

4    convenient for them.

5           We think that the S'Klallam have misinterpreted

6    and violated the plan.  At a minimum, it is obvious from

7    the lengthy declarations that there was a serious

8    disagreement about interpreting the 2000 plan, even after

9    the Court's minute order.

10          At most, giving the S'Klallams' argument more

11   credit than we think they deserve, it can be argued that

12   the plan doesn't explicitly address what happens if the

13   full restricted sub-quota is taken in less than 30 days.

14          This ambiguity in the plan, if that's what it is,

15   was not resolved by the Court's minute order.  And the

16   S'Klallam explicitly acknowledge this in their briefing in

17   footnote 3 of their reply.  And this fact alone is enough

18   to defeat their motion.

19          The legal standard for contempt is very high.  We

20   haven't really heard that standard from the S'Klallam.  It

21   is a drastic remedy.  It has never been imposed in this

22   case in any intertribal disputes.  And we have been having

23   intertribal disputes for almost the 40-year history of

24   this case.  The S'Klallam barely articulate that standard.

25   They must show by clear and convincing evidence that the

1    Makah clearly, specifically, unequivocally violated a

2    court order.  There is nothing remotely like that here.

3            Unfortunately, we don't have a particularly

4    specific decree here.  Specificity is required if the

5    punishment of contempt is going to be imposed.  A

6    disagreement about the meaning of a decree is not

7    contempt.  There can't be contempt if there is a good

8    faith effort to comply with the Court's decree, which the

9    Makah tried to do in this case.

10           There were some other incorrect statements made

11   by the S'Klallams.  First, there was no way this fishery

12   was going to last another 15 days if the people did what

13   the S'Klallams wanted to do.  The numbers they put out are

14   based on them fishing by themselves.

15           If they went out to fish, and if --  No one else

16   was going to remain in port.  Everyone was going to come

17   out.  And if the reduction from 500 pounds to 350, after

18   the full sub-quota of the restricted fishery was already

19   taken, it would have done nothing to protect the TAC.  The

20   average take per vessel per day in the landings in the

21   restricted fishery -- in the landing zone restricted

22   fishery were approximately 250 to 300 pounds a day.  So it

23   was meaningless.  Other tribes would have gone out and

24   fished out the rest of the quota in a few days anyway.

25           The majority of the tribes, after consultation,

1    including consultation with the S'Klallam, after the

2    S'Klallam refused to close their fishery, scheduled a

3    12-hour unrestricted opening, because the continuation of

4    the restricted fishery after their sub-quota was taken

5    threatened to preempt the rest of the fishery.  The tribes

6    were concerned that continuing to allow fishing along that

7    line would preempt the third sub-fishery completely.

8            The 2010 TAC was slow.  That made for a rough

9    year, a difficult year for the halibut tribes to manage.

10   But difficulty managing a fishery isn't contempt.

11           We have a minute order here that obviously

12   doesn't answer all the questions about how to interpret

13   the 2000 plan.  The tribes may need additional guidance.

14   The tribes may have to try to renegotiate a management

15   plan that is easier to manage with the help of a

16   settlement judge, as your Honor suggested in your last

17   order.  But these issues should be addressed in a

18   proceeding where all the tribes can participate fully and

19   not in a contempt proceeding like this.

20           We respectfully ask that the motion be denied.

21           THE COURT:  Thank you.  Ms. Rasmussen, anything

22   further?

23           MS. RASMUSSEN:  There is always wiggle room.

24   There is always going to be the opportunity to come to

25   this Court and say, well, gee whiz, your Honor, I couldn't

1    figure out how to comply, we were stuck, we did what we

2    thought was reasonable.  March 20th is not April 5th, 15

3    days is not 30.  The good faith interpretation of the plan

4    required the parties to sit down before the start of the

5    fishery, as the S'Klallam urged in their letter and their

6    e-mail, and try to figure out how to make it work.  Coming

7    in 14 days into the fishery and saying, oh, too bad, so

8    sad, you can't get your 30 days, is not compliance with

9    the plan.

10          If you look at all the years that the plan was in

11   place, you will see that never was the plan ever this

12   short.  Never did it close prior to the 30 days.  Never

13   was it interpreted the expected catch range for the

14   restricted fishery as a hard cap could be used to

15   frustrate the purposes of the plan.

16          And all the other things that the Makah argues

17   have to do with that difference of opinion:  Are you

18   allowed to do that?  Are you allowed to say that the

19   unrestricted fishery can fully and freely use the

20   management buffer, but the restricted fishery is not

21   allowed to do so, even though it is the unrestricted

22   fishery that has the language that says it shall be

23   managed to not exceed this amount?  Again, interpretation

24   with the goal -- the common purpose of the plan would

25   require no more attempts to game the system.

1    It is really hard to sit here and hear about how

2    the Makah tried to achieve consensus, when on a repeated

3    basis -- in 2009, you see it in black and white, seven out

4    of 13 tribes is good enough, has been the permeating

5    attitude in this fishery based on the entitlement.

6    Normally I would say a good faith proposal to

7    enter into settlement discussions would be a wonderful

8    thing.  But often what has been happening is it is the

9    party that wants to continue to do what it is doing, that

10   wants to propose further settlement discussion as a way to

11   avoiding the repercussions of their actions.  And any

12   wiggle room or equivocation on enforcing the terms of the

13   plan, even if you were to choose to enforce it against us,

14   your Honor, would be unacceptable.  The parties need to

15   get the clear message that just because a bunch of people

16   agree with you does not relieve you of your obligations.

17   We ask this Court to hold the Makah in contempt

18   and to enforce the provisions of the plan.

19   THE COURT:  Thank you, counsel.  The motion

20   before the Court is a request the Court hold the Makah in

21   contempt, order them to pay reasonable attorney fees

22   necessary to bring this action and any other just and

23   equitable relief.

24   After reading through all of this, there is no

25   doubt in my mind there is a serious disagreement with the

1    interpretation and implementation of this plan.  Whether

2    it does have built-in ambiguity or not, it is obvious that

3    nobody agrees exactly what it means.

4              There are only so many fish out there, there are

5    so many fishermen.  There are different parts to the

6    agreement, the restricted fishery, the unrestricted

7    fishery, the mop up, the 30-day plan.  All of those parts

8    are important, in my opinion.  But I do agree that the

9    only way to manage this is through the cooperation of all

10   the tribes.  That is why the Court has set up a process

11   for everyone to get together and, if necessary, with the

12   help of a judge, and iron out all of these issues.

13             In terms of the actual motion before the Court

14   today, the legal standard for contempt has not been met

15   here.  Procedurally there are severe hurdles in the way,

16   as pointed out by Mr. Raas's brief.  On the merits, there

17   are issues that prohibit the Court from reaching that

18   conclusion as well.

19             It is obvious that everyone is frustrated, and I

20   urge all of you to think about how we handle this before

21   the next season comes up.

22             For now, the motion holding the Makah in contempt

23   will be denied.  All parties will bear their own costs.

24   Thank you.  We will be at recess.

25                       (Adjourned.)

1                                    **CERTIFICATE**

2

3

4

5

6

7

8

            I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                                      S/Barry L. Fanning

12                                      _____

13                                      Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25