1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

Defendants.

CASE NO. C70-9213 RSM

Subproceeding No. 05-04

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT AND
MOTION FOR DECLARATORY
JUDGMENT

This matter is before the Court for consideration of three pending motions for summary judgment, partial summary judgment, and declaratory judgment. Dkt. ## 193, 195, 199. The Court heard oral argument on these motions on April 24, 2013, and took the matter under advisement. Having fully considered the record and the memoranda of the parties, the Court now rules as set forth below.

BACKGROUND

The initial Request for Determination ("Request") was filed by the Tulalip Tribes on August 8, 2005. Dkt. # 1. It was one of two such Requests filed by Treaty Tribes in 2005 concerning the extent of the usual and accustomed fishing grounds ("U&A") of the Suquamish Tribe ("Suquamish"), which was described in 1978 by the Honorable George Boldt as follows:

The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 1

and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington*, 459 F. Supp. 1020, 1049 (1978).

In June 2005, two months before this subproceeding was initiated, the Upper Skagit Indian Tribe ("Upper Skagit") filed a Request for Determination asking the Court to determine that certain defined areas to the east of Whidbey Island, namely Saratoga Passage and Skagit Bay, are not within the Suquamish U&A as defined by Judge Boldt. *U.S. v. Washington*, Cause No. 70-9213, Subproceeding 05-03. The Swinomish Indian Tribal Community ("Swinomish") filed a Cross-Request, essentially joining in the Upper Skagit's Request. This Court found in Subproceeding 05-03 that it retained jurisdiction under Paragraph 25 of the Permanent Injunction in this case, as modified August 23, 1993, to consider the Request of the Upper Skagit and Swinomish. Upon the parties' cross motions for summary judgment, the Court ruled that neither Saratoga Passage nor Skagit Bay lies within the Suquamish U&A. *U.S. v. Washington* , C70-9213, Subproceeding 05-03, Dkt. # 198. This ruling was affirmed by the Ninth Circuit Court of Appeals and is now the law of this case. *United States v. Washington* , 590 F. 3d 1020 (9th Cir. 2010).[1]

This Request for Determination, filed as Subproceeding 05-04 by the Tulalip, asks the Court to find that certain inland marine waters on the east side of Admiralty Inlet but west of Whidbey Island (specifically including Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay), as well as Saratoga Passage, Penn Cove, Holmes Harbor, Possession Sound (south to Point Wells), Port Susan, Tulalip Bay, and Port Gardner, do not lie within the Suquamish U&A as it was defined by Judge Boldt.[2] Amended Request for Determination, ¶ 1. The Tulalip assert that they do not seek to re-litigate the adjudicated U&A of the Suquamish Tribe, but rather seek to clarify the geographic scope of the area delineated by

---

[1] The United States Supreme Court denied a Suquamish petition for writ of certiorari on October 18, 2010. *Suquamish Indian Tribe v. Upper Skagit Indian Tribe*, 131 S.Ct. 414 (2010).

[2] The Tulalip assert that these named areas "approximate Washington Puget Sound Salmon Management and Catch Reporting Areas 8, 8A, 8D and eastern portions of 9." Amended Request, Dkt. # 81, p. 1 n. 1. They also "approximate Marine-Fish Shellfish Management and Catch Reporting Areas 24B, 24C, 24D, 26B, and 26A." *Id.* (citations omitted).

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 2

1   Judge Boldt.   Request for Determination, ¶ 4.   The Request invokes the jurisdiction of this Court

2   pursuant to Paragraphs 25(a)(1), (a)(3),  (a)(4), and (a)(7) of the Permanent Injunction dated March 22,

3   1974, as amended August 23, 1993.  C70-9213, Dkt. # 13599.

4        The Court earlier determined that it retains jurisdiction to consider this Request under Paragraph

5   25(a)(1), which empowers the Court to determine whether the actions of the Suquamish in fishing

6   certain areas are in conformity with Final Decision # 1 or the Permanent Injunction.  Order on Motion to

7   Dismiss, Dkt. # 105.   The Court rejected an argument by the Suquamish that a 1983 settlement

8   agreement between the parties precludes use of Paragraph 25(a)(1) as a basis for jurisdiction, stating that

9   "[t]he 1983 agreement may further define the rights of these two parties, but it does not deprive this

10   Court of Paragraph 25(a)(1) jurisdiction."  *Id.*, pp. 3-4.[3]  The Court accordingly denied a Suquamish

11   motion to dismiss, and directed the Suquamish to respond to the Request.  *Id.*

12        In answering the Request, the Suquamish asserted affirmative defenses of res judicata, judicial

13   estoppel, and laches.  The Suquamish also advanced a counter-claim for breach of the 1983 court-

14   approved settlement agreement between the Suquamish, Muckleshoot, and Tulalip Tribes ("MST

15   Agreement"). [4]  Suquamish Answer, Affirmative Defenses, and Counterclaims, Dkt. # 139.   The

16   Suquamish assert that jurisdiction to hear the counter-claim arises from the settlement agreement itself.

17   *Id.*, ¶ 2.  However, the MST Agreement itself provides that it "shall be enforceable pursuant to the

18   procedures established under the continuing jurisdiction of this case. . ."  *U.S. v. Washington*, 626

19   F.Supp. at 1477, ¶ 3.  Thus a claim of breach must be pursued through the procedures established in

20   Paragraph 25.

21        Under the jurisdictional provisions of Paragraph 25, a counter-request is allowed where it

22   "relates directly to the subject matter of the request for determination."  Paragraph 25(b)(4).  The subject

23   matter of this Request, as framed by the Tulalip, is the Suquamish U&A and whether it includes certain

24

25        [3] The Court also noted that the Suquamish have initiated a separate subproceeding based on the
    1983 settlement agreement.  *United States v. Washington*, C70-9213, Subproceeding 08-01RSM.

26        [4] The Court's approval of this MST Agreement is found at *U.S. v. Washington,* 626 F.Supp.
    1405, 1476-78 (W.D.Wash. 1985).

27

28    ORDER ON MOTIONS FOR SUMMARY
    JUDGMENT - 3

named bodies of water which, according to Tulalip, "approximate Washington Puget Sound Salmon Management and Catch Reporting Areas 8, 8A, 8D and eastern portions of 9." Amended Request for Determination, Dkt. # 81, p. 1, n. 1. Although Area 9 was covered in the MST Agreement, Areas 8, 8A, and 8D were not. *See*, Stipulation of Muckleshoot, Suquamish and Tulalip Tribes re Tulalip Usual and Accustomed Fishing Areas, Dkt. # 200, Exhibit G. Thus it cannot be said that the Suquamish counter-request relates directly to the subject matter of the Request, as required. Nor is there any indication that the Suquamish complied with the pre-filing requirements set forth at Paragraph 25(b) with respect to this counter-claim. They do not so state in the counter-claim statement. The Tulalip recitation of pre-filing negotiations includes no mention of the MST Agreement. *See*, Amended Request for Determination, Dkt. # 81, ¶¶ 37 - 41. The Court therefore declines to take jurisdiction of the Suquamish counter-claim for breach of the MST Agreement in this subproceeding.

The Tulalip have filed a motion for declaratory judgment, which is essentially a motion for summary judgment on the merits of their Request for Determination. Dkt. # 199. The Suquamish Tribe, as responding party, has filed a motion for summary judgment as to its affirmative defenses. Dkt. # 195. The Swinomish, appearing as an Interested Party under the procedures established for this case, have filed a motion for partial summary judgment with respect to certain aspects of the Tulalip Request. Dkt. # 193. The Court has jurisdiction to consider these matters pursuant to Paragraph 24(a)(1) of the Permanent Injunction. The three motions shall be addressed separately.

DISCUSSION

## I. Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 4

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defend against the motion, the nonmoving party must then establish a genuine issue for trial by pointing to specific evidence along with its location in the record. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774–75 (9th Cir. 2002). A moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an element essential to its case and with respect to which it bears the burden of proof. *Celotex*, 477 U.S at 322–23.

**II. Analysis**

A. <u>Suquamish Motion for Summary Judgment</u>

The Suquamish have moved for summary judgment on the affirmative defenses of res judicata, judicial estoppel, and laches asserted in their answer to the Request for Determination.  The judicial estoppel argument shall be addressed first.

Judicial estoppel is an equitable doctrine invoked at the discretion of the Court.  *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 601 (9th Cir. 1996).  The doctrine "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position."  *Id.* at 600.  The purpose is to protect the integrity of the courts, including "general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings . . .  [and] is intended to protect against a litigant playing fast and loose with the courts."  *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990), *cert. denied,* 501 U.S. 1260 (1991).  Accordingly, the doctrine is  designed to protect the interests of the Court, not of individual parties.  *In re Coastal Plains, Inc. v. Mims*, 179 F.3d 197, 205 (5th Cir. 1999) ( "Because the doctrine is intended to protect the judicial system, *rather than the litigants,* detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary.") (emphasis in original.)

The Court's determination to invoke it is "driven by the specific facts of the case."  *Johnson v. State of Oregon*, 141 F.3d 1361, 1368 (9th Cir.1998).   Because the rule is "intended to prevent 'improper use of judicial machinery.' "  the application of judicial estoppel is not reducible to a set formula.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

> Several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly" inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id*. at 750-51 (internal citations omitted). Relevant to the instant case, the Court emphasized that "in enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the application of judicial estoppel. Additional factual considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751.

The Suquamish assert that the Tulalip have taken inconsistent positions on Judge Boldt's use of the term "marine waters of Puget Sound," arguing in the past for a broader application for their own U&A than they now apply to the Suquamish U&A. They contend that the Tulalip attempt to mislead the Court by "trying to define the term 'marine waters of Puget Sound' more strictly against Suquamish than for itself in either 1975 or 1983." Suquamish Tribe's Motion for Summary Judgment, Dkt. # 195, p. 9. They point to the Court's language in an earlier Order in this subproceeding stating that the Tulalip "are now arguing for a limitation on the term 'Puget Sound' which is inconsistent with their 1975 claim [for their own U&A]." Order on Motion to Dismiss, Dkt. # 17, p. 4. The Court stated in that Order that the doctrine of judicial estoppel "may well apply to the inconsistent positions taken by the Tulalip Tribe on the extent of 'Puget Sound' here" but declined to apply it. *Id*., p. 4. What the Suquamish have failed to note, however, is that this Order was appealed by the Tulalip and the matter was remanded to this Court by the Ninth Circuit Court of Appeals, essentially vacating that Order of Dismissal. Moreover, as shown below, the Court's statement regarding inconsistent positions by the Tulalip was based upon incomplete development of the record and of the relevant principles which have come to guide the Court in deciding U&A issues. In other words, it was premature.

After remand to this Court, the Tulalip filed an Amended Request for Determination, asserting Paragraph 25(1)(a) as an additional basis for this Court's jurisdiction. The date of that filing, November 30, 2007, is significant in that it was ten months after this Court's decision in Subproceeding 05-03,

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 6

ruling that neither Saratoga Passage nor Skagit Bay lies within the Suquamish U&A.   On the way to that ruling, the Court found that Judge Boldt tended to use the term "Puget Sound" broadly, generally including all marine waters inward from the mouth of the Strait of Juan de Fuca.   In order to determine how he intended the term to apply to a Tribe's U&A, it was necessary to look to specific facts and the evidence that was before Judge Boldt when he described that U&A.   Examination of those facts led the Court to find that the two disputed areas (Saratoga Passage and Skagit Bay), although they were part of Puget Sound as Judge Boldt generally used the term, were not part of the Suquamish U&A.

The "fast and loose" branch of judicial estoppel requires more than a "threshold inconsistency." *General Signal Corp. v. MCI Telecom Corp*., 66 F.3d 1500, 1505 (9th Cir. 1995).   Here, the inconsistencies of which the Suquamish complain do not create a basis for the application of the doctrine of judicial estoppel.   Under the two-step procedure established in *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998) (*Muckleshoot I*"),   *Muckleshoot Tribe v. Lummi Indian Nation*, 234 F.3d 1099 (9th Cir.2000) (*Muckleshoot II*"), and *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir. 2000) (*Muckleshoot III*"*),* a Tribe may argue that a term used by Judge Boldt is ambiguous or that he intended something other than its apparent meaning.   Thus, Tulalip may take different positions on the meaning of the term "Puget Sound" when applied to its own U&A as opposed to the Suquamish U&A without running afoul of the doctrine of judicial estoppel, because the underlying factual considerations for the two U&A's are different.   As the Ninth Circuit Court of Appeals noted in affirming this Court's opinion in Subproceeding 05-03, "whether the language of one of Judge Boldt's findings is ambiguous is a factor in ascertaining the judge's intent, but not a dispositive one, because it is necessary to understand the findings 'in light of the facts of the case.' " *United States v. Washington (Upper Skagit Indian Tribe v. Suquamish Indian Tribe)*, 590 F. 3d at 1024 (quoting *Muckleshoot III,*  235 F.3d at 433.   Thus, in the specific context here, the Court declines to apply the doctrine of judicial estoppel.   *New Hampshire v. Maine*, 532 U.S. at 751.   The Suquamish motion for summary judgment on this basis shall be denied.

The Suquamish next contend that the Tulalip Request is barred by laches.   Laches is an equitable

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 7

1    defense that places a time limitation on a party's right to bring suit.  *Jarrow Formulas, Inc., v. Nutrition*

2    *Now, Inc.*, 304 F. 3d 829, 835 (9th Cir. 2002).   In order to establish this equitable defense, a party must

3    demonstrate that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and

4    (3)  the delay resulted in prejudice to the party asserting the defense.  *Petrella v. Metro-Goldyn-Mayer*,

5    695 F.3d 946, 951-52 (9th Cir. 2012).  This is a factual determination.  *Id*. [5]

6         The Suquamish laches argument rests on the Court's prior language in the now-vacated Order of

7    Dismissal (Dkt. # 17).  As noted above, that Order granting a Suquamish motion to dismiss was filed

8    very early in these proceedings and was based upon incomplete development of the record.   The

9    Suquamish may not rely upon the language in this vacated Order to support their summary judgment

10   motion.

11        Moreover, the prior Order was directed to the original Request for Determination, which did not

12   invoke this Court's jurisdiction under Paragraph 25(a)(1) as the Amended Request does.   That is a

13   crucial distinction.  Paragraph 25(a)(1) addresses actions by a party which are not "in conformity with

14   Final Decision # 1."  Some of the Suquamish actions which the Tulalip allege are not in conformity with

15   final Decision # 1 did not occur until 2003 and 2004.  *See,* Request for Determination, Dkt. # 1, ¶¶ 13,

16   14;  Amended Request for Determination, Dkt. # 81, ¶¶ 13, 14.  It cannot be said that the time between

17   these Suquamish actions and the filing of this subproceeding in 2005 constitutes a delay, much less an

18   unreasonable delay.

19        The Suquamish motion for summary judgment does not point to any facts, beyond the language

20   in the vacated Order, which would lead the Court to find laches here.   Instead, Suquamish "refers to and

21   incorporates here its previous memorandum supporting its assertion that Laches bars Tulalip, as a matter

22

23        [5] The Tulalip, Port Gamble and Jamestown  S'Klallam Tribes, and others have pointed to
     language in a prior Court Order ruling that equitable defenses such as laches are "not available in the
24   determination of U&A fishing places."  C70-9213, Dkt. ## 11596.  The Court earlier allowed the laches
     defense, reasoning that it is not determining the Suquamish U&A but rather examining what was already
25   determined by Judge Boldt.  Dkt. # 17.  As that Order was vacated by the remand, the Court's language
     with respect to the viability of a laches defense in this subproceeding is no longer valid.  In the interest
26   of resolving this matter on the merits, the Court will address the laches claim, but such action shall not
     be deemed a renewal of the court's prior determination that laches may be asserted in a subproceeding
27   brought to clarify a Tribe's U&A, and may not be cited as such.

28    ORDER ON MOTIONS FOR SUMMARY
     JUDGMENT - 8

of law, from further pursuing its suit." Suquamish Tribe's Motion for Summary Judgment, Dkt. # 195, p. 23. Such "incorporation by reference" violates the page limitations set forth in Local Rule LCR 7(e)(3). Nevertheless, in the interest of resolving the issue on the merits, the Court will briefly address the argument advanced by Suquamish in the earlier memorandum. Dkt. # 9.

The Suquamish argued in that earlier motion that

> [h]ere, Tulalip asserts in its Request that the Ninth Circuit Court in 1990, in *United States v. Suquamish Tribe*, "note" that Suquamish did not have fishing places on the eastern side of Puget Sound. RFD, 4: 8 - 13. Thus, for at least 15 years Tulalip has known about its potential cause of action.
>
> Tulalip further asserts that since the time of the 1990 ruling, Suquamish has "attempted to open various fisheries in sheltered marine waters on the east side of Puget Sound." *Id.* at 4: 18 - 20. Tulalip infers that Suquamish issued fishing regulations for the case area for many years and specifically points to Suquamish issuance of fishing regulations in September 2003, March 2004, April 2005 and June 2005. *Id.* at 4: 21 - 23, 27; 5: 1.

Suquamish Tribe's Motion to Dismiss, Dkt. # 9, p. 12.

The 1990 opinion of the Ninth Circuit Court of Appeals, to which the Suquamish refer, did not create a cause of action for Tulalip under Paragraph 25(a)(1) regarding Suquamish fishing in the areas at issue in this subproceeding. The Suquamish sought to expand their treaty fishing rights to certain freshwater lakes and rivers, based on the allegation that they were successors to the treaty-time Duwamish Tribe. The appellate court affirmed a district court ruling which denied the Suquamish Request for Determination regarding fishing places in Lake Washington, Lake Sammamish, the Duwamish River and the Lake Washington Ship Canal. Request for Determination, C70-9213, Dkt. # 10,054 (Subproceeding 85-1). These are freshwater areas which lie to the east of the marine waters of Puget Sound. In affirming the Court's ruling, the Ninth Circuit Court of Appeals stated that the Court "did not clearly err in finding and concluding that the Suquamish did not merge with the Duwamish and **were not entitled to exercise fishing rights on the east side of Puget Sound**." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 778 (9th Cir. 1990) (emphasis added). This reference to the "east side of Puget Sound" could not give rise to a Tulalip cause of action for Suquamish fishing within the marine waters of Puget Sound which are at issue in this subproceeding, as the Ninth Circuit's ruling did not concern those areas. Thus, as the Suquamish admit in the second paragraph set forth above, it

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 9

was their issuance of fishing regulations in certain areas in 2003 and subsequent years that triggered the Tulalip Request.  As to those actions by the Suquamish, there is no laches, and the Suquamish motion for summary judgment on the basis of laches shall be denied.

Finally, the Suquamish assert that the Tulalip is barred by the doctrine of res judicata.  Again, the motion refers to the Court's prior, now-vacated Order for support.   However, the limited analysis provided in that Order is not relevant to the Amended Request for Determination.  By invoking Paragraph 25(a)(1) as a jurisdictional basis for this subproceeding, the Tulalip are not attempting to re-litigate matters already decided, nor are they raising issues they could have brought to the Court earlier.  Rather, they ask for a declaration that the Suquamish fishing in certain areas since 2003 is "not in conformity with" their U&A as it was described by Judge Boldt.  The Suquamish U&A was actually and finally determined by Judge Boldt, and the Court's role in this subproceeding is not to alter or amend that determination but to clarify it.   Under the procedures established for this case, that will require an examination of the evidence that was before Judge Boldt to determine his intent.  Such examination is not barred by the doctrine of res judicata.   The Suquamish motion for summary judgment on the basis of res judicata shall be denied.

B. <u>Swinomish Indian Tribal Community Motion for Partial Summary Judgment</u> (Dkt. # 193)

The Swinomish have moved for summary judgment with respect to certain specific areas included in the Tulalip Request, asserting that this Court's ruling in Subproceeding 05-03 bars Suquamish claims to a U&A in Penn Cove and Saratoga Passage, and that the rule of issue preclusion bars their claim to any U&A in Holmes Harbor.   Penn Cove and Holmes Harbor are small narrow bays which open onto Saratoga Passage on the east side of Whidbey Island.  Saratoga Passage was itself determined to be outside the Suquamish U&A in Subproceeding 05-03, but the Court's Order did not specifically name either Penn Cove or Holmes Harbor.  Dkt. # 198.   Nevertheless, Penn Cove was included in that ruling because the parties and the Court equated the case area in Subproceeding 05-03 as "that portion of Saratoga passage within Catch Reporting Area 24C, plus Skagit Bay (Catch Reporting Area 24A)."   Order on Motions for Summary Judgment, Dkt. # 198, p. 1. n. 1.   Penn Cove

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 10

1   lies entirely within Catch Reporting Area 24C. [6]

2          With respect to Holmes Harbor, the Suquamish assert in response to the Swinomish motion that

3   the bay was not at issue in Subproceeding 05-03, and argue that the Court's ruling should not be read as

4   including Holmes Harbor.  Holmes Harbor is a separate catch reporting area (24D) and was not

5   specifically named in subproceeding 05-03.  However, the Court found after reviewing the evidence that

6   was before Judge Bolt that he did not intend to include Saratoga Passage in the Suquamish U&A.  As

7   noted there, he relied heavily on the reports and testimony of Dr. Barbara Lane.  She "reported and

8   testified that the Suquamish traveled by canoe from their territory (Port Madison) up through the San

9   Juan Islands, and Haro and Rosario Straits, as far as the Fraser River.  Order on Motions for Summary

10  Judgment, Subproceeding 05-03, Dk.t. # 198, p. 15.  However, "[n]othing in her testimony or her report

11  indicated a Suquamish presence in Saratoga Passage or Skagit Bay, neither as winter fishing grounds,

12  nor as a route for travel up to the San Juan Islands."  *Id*.  This language is determinative of the issue

13  here with respect to Holmes Harbor, because the Suquamish could not have reached Holmes Harbor

14  without traveling some distance up Saratoga Passage.  The Suquamish conceded this point at the oral

15  argument, but asserted that "in treaty times people did portage" and that at trial they could present

16  evidence of a Suquamish presence at Holmes Harbor in treaty times.  April 13, 2013 Transcript of

17  Proceedings, Dkt. # 239, p. 24.  However, they have not pointed to any such evidence that was before

18  Judge Boldt when he made his determination.  This proceeding is limited to that evidence.

19         The Court has previously determined that the Suquamish U&A does not include Saratoga

20  Passage.  Order on Motions for Summary Judgment, Subproceeding 05-03, Dkt. # 198, p. 15. The Court

21  also determined that evidence in the record demonstrated the Suquamish understanding, in 1975, of their

22  own U&A as it was described by Judge Boldt.  The Court found it significant that their 1975 fishing

23  regulations did not include any waters on the eastern side of Whidbey Island.  *Id*., p. 14.  Those

24

25         [6] Tribal U&A's were described by Judge Boldt in geographic terms, not by State of Washington
    Department of Fisheries catch reporting areas (which did not exist at treaty times).  However, the parties
26  have from time to time throughout these proceedings used catch reporting area boundaries as a
    convenient way to define a specific area at a given point in time.  The Court adopted that convention in
27  Subproceeding 05-03 and finds it appropriate in this subproceeding as well.

28   ORDER ON MOTIONS FOR SUMMARY
    JUDGMENT - 11

regulations appear to be comprehensive in that they addressed Suquamish fishing in the Strait of Juan de Fuca, the San Juan Islands, Admiralty Inlet, Hood Canal, certain freshwater lakes, and the waters of Puget Sound west of Whidbey island, but not east of Whidbey island. *See*, Declaration of David Hawkins, Subproceeding 05-03, Dkt. # 133, Exhibit C.  While these regulations are not evidence of Judge Boldt's intent, they do constitute evidence of the Suquamish contemporaneous understanding of Judge Boldt's ruling.

Thus the same analysis that the Court applied to Saratoga Passage in Subproceeding 05-03 applies as well to Penn Cove and Holmes Harbor, both small, enclosed bodies of water that extend off Saratoga Passage.  The Suquamish have not pointed to any evidence that was in the record before Judge Boldt that would indicate he intended to include these small bays, which can only be accessed by water from Saratoga Passage, in the Suquamish U&A.  Their offer to present evidence of portage across Whidbey Island is unavailing, as evidence that was not before Judge Boldt when he made his U&A determinations is inadmissible in a Paragraph 25(a)(1) proceeding.   Moreover, Holmes Harbor was specifically named in Dr. Lane's report titled "Identity, Treaty Status, and Fisheries of the Swinomish Indian Tribal Community," found in the record as Exhibit USA-74, which was before Judge Boldt when he made his determination on the U&A of the Swinomish in April, 1975.[7]  *U.S. v. Washington*, 459 U.S. at 1049.  Dr. Lane noted that Holmes Harbor was an important location for herring fishing "within territories used by the ancestors of the present Swinomish people."  USA-74 at 27.   She further identified Holmes Harbor as  one of the "constricted marine waters" which "were likely controlled by the resident groups in whose territory those waters were located."  USA-74 at 29.  Nowhere in this discussion of Holmes Harbor are the Suquamish mentioned.  Nor is Holmes Harbor or Penn Cove mentioned in Dr. Lane's report on the Suquamish, or the appendices attached thereto.  Exhibit USA-73.

As the Suquamish have failed to point to any evidence in the record that was before Judge Boldt that would support their claims of treaty-time fishing in Penn Cove or Holmes Harbor, the Swinomish

---

[7] Pursuant to Fed.R.Civ.P. 56(c)(3), the Court may consider materials in the record which are not cited by either party.

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 12

1    motion for partial summary judgment as to these areas shall be granted.

2          III.  Tulalip Motion for Declaratory Judgment (Dkt. # 199)

3          The Tulalip have moved for declaratory judgment, asking the Court to declare that (a) "the

4    Suquamish Tribe's adjudicated usual and accustomed fishing areas are limited to the west side of Puget

5    Sound as demonstrated by the evidence submitted to the District Court and as intended by the court in

6    its 1975 ruling," and that  (b) "the Suquamish Tribe does not have adjudicated usual and accustomed

7    fishing grounds and stations in the marine waters of Saratoga Pass[age], Holmes Harbor, Port Susan,

8    Possession Sound, or Port Gardner, and on the west side of Whidbey Island, including Useless Bay,

9    Mutiny Bay, and Admiralty Bay."  Tulalip Motion, Dkt. # 199, p. 25.  The motion further seeks a

10   declaration "that the Suquamish Tribe has impermissibly sought to expand its fishing areas by seeking

11   to fish on the east side of Puget Sound in the marine waters listed above" (citing to the list at (b)).  *Id.*

12   The motion is designated in the caption as a motion for declaratory judgment, and in the footers and on

13   the docket as a motion for summary judgment.   Because it asks for a judgment on the merits of the

14   Request for Determination, it will be treated as a motion for summary judgment.

15         The Court shall proceed with the two-step procedure set forth in *Muckleshoot I, II,* and *III,* as

16   approved by the Ninth Circuit Court of Appeals in *U.S. v. Washington (Upper Skagit Indian Tribe v.*

17   *Suquamish),* 590 F.3d at 1023.  The first step has already been completed in Subproceeding 05-03, with

18   the finding that Judge Boldt addressed a broad area in the term "Puget Sound," including the waters of

19   Saratoga Passage and Skagit Bay.  Subproceeding 05-03, Dkt. # 109; *U.S. v. Washington,* 2007 WL

20   30869 (W.D.Wash. Jan. 4 2007).   It would also encompass all the waters at issue here.  The second step

21   of the inquiry, determining whether Judge Boldt intended to include each specific area at issue in this

22   subproceeding within the Squamish U&A, requires examination of the evidence that was before him at

23   the time he made his determination.  *U.S. v. Washington (Upper Skagit Indian Tribe v. Suquamish),* 590

24   F.3d at 1023.  As to this determination, the Tulalip bear the burden of demonstrating that "there was no

25   evidence before Judge Boldt that the Squamish fished [in the disputed areas] or traveled there in route to

26   the San Juans and the Fraser River area."  *Id.*

27

28    ORDER ON MOTIONS FOR SUMMARY
      JUDGMENT - 13

As set forth above, the Court has already made this determination with respect to Skagit Bay and Saratoga Passage, and has explained that this ruling encompasses Penn Cove and Holmes Harbor as extensions of Saratoga Passage, as to which there is no evidence of Suquamish presence.   These areas lie outside the Suquamish U&A as it was determined by Judge Boldt.   As to the remaining areas named by the Tulalip, namely Possession Sound, Port Gardner, Port Susan, and bays on the west side of Whidbey Island, including Useless Bay, Mutiny Bay, and Admiralty Bay, the Court must proceed to an examination of the evidence that was before Judge Boldt to determine whether he intended to include them in the Suquamish U&A.

As an initial matter, the Court notes that the Tulalip Request is based in part on the theory that the Suquamish U&A does not include marine waters on the east side of Puget Sound.  This is apparent from the relief sought in the Request, namely that the Court declare that Suquamish "has impermissibly sought to expand its fishing areas by seeking to fish **on the east side of Puget Sound in the marine waters listed above**," citing to  Possession Sound, Port Gardner, Port Susan, bays on the west side of Whidbey Island, and other areas at issue in this Request (emphasis added).   The Tulalip  "eastern Puget Sound" argument has appeared on various occasions in this subproceeding, and formed the basis for the Suquamish laches argument:  the Suquamish contended that the "eastern Puget Sound" theory was spawned in 1990 by the language used by the Ninth Circuit Court of Appeals in a previous proceeding regarding the Suquamish U&A.  *United States v. Suquamish Indian Tribe*, 901 F.2d at 778. It appears that since that time the term has taken on a life of its own.   However, as this Court noted above, that language was used to affirm a district court ruling, in Subproceeding 85-1, that the Suquamish U&A does not include Lake Washington, Lake Sammamish, the Duwamish River, or the Lake Washington Ship Canal.   Those areas are indeed on the east side of Puget Sound, but they do not lie within the marine waters of Puget Sound.   They lie east of Puget Sound, beyond the shoreline.  The district court itself referred to these areas as "situated to the east of Puget Sound," not as "eastern Puget Sound" or "the east side of Puget Sound."  *See,* Finding of Fact 384, *U.S. v. Washington (In re Suquamish Tribe's Request for Determination of Additional Usual and Accustomed Fishing Places),* C70-9213, Dkt. #

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 14

11202 (February 25, 1989).

The Ninth Circuit's "east side of Puget Sound" references in *U.S. v. Squamish Indian Tribe* could only refer to what was actually at issue in the Request for Determination filed in the District Court in Subproceeding 85-1, specifically freshwater lakes and rivers situated to the east of Puget Sound.  This language should not and cannot be read as referring to some undefined "eastern side" of the marine waters of Puget Sound, and it does not in any way limit the Suquamish U&A to the western side of some imaginary line drawn down the middle of Puget Sound.   The Court accordingly rejects any and all Tulalip arguments based on the Ninth Circuit statement that the Suquamish "were not entitled to exercise fishing rights on the east side of Puget Sound." *U.S. v. Suquamish,* 901 F. 2d at 778.  Instead, the Tulalip must demonstrate, area by area, that there was no evidence before Judge Boldt from which he could have found that the contested area was included within the Suquamish U&A.

It is beyond dispute that Judge Boldt relied heavily on the reports and the testimony of anthropologist Dr. Barbara Lane in determining the U&A's of various Treaty Tribes. *Muckleshoot I,* 141 F.3d at 1359.  Often he quoted the language of her written reports verbatim when describing the extent of an individual Tribe's U&A.   Dr. Lane's report on the Suquamish is titled "Identity, Treaty Status and fisheries of the Suquamish Tribe of the Port Madison Indian Reservation."   Tulalip Tribe Motion for Summary Judgment, Dkt. # 200, Exhibit I.  It was admitted at the trial before Judge Boldt on April 9, 1975, as Exhibit USA-73.  Dr. Lane testified in that day's proceedings, and the transcript of her testimony appears in the record at Docket No. 7268 in C70-9213.   The Court has previously reviewed the evidence that was before Judge Boldt in Dr. Lane's report and testimony with respect to the marine waters on the east side of Whidbey Island, specifically Skagit Bay and Saratoga Passage, in Subproceeding 05-03.  The Court's findings in Subproceeding 05-03 are adopted and incorporated without further recitation here.

With respect to the other waters at issue in this subproceeding, the Court shall review the evidence Dr. Lane's report put before Judge Boldt.  As to these areas, her report states in relevant part,

In 1855 the Suquamish held the west side of Puget Sound from near the mouth of Hood

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 15

Canal south to Vashon island.  Their territory included the land around Port Madison, Liberty Bay, Port Orchard, Dye's Inlet, Sinclair Inlet and south to Olalla.  It also included Bainbridge Island, Blake island, and possibly also the west side of Whidbey Island.

It is difficult at this time to establish the precise nature of Suquamish use of the west coast of Whidbey island.  Achilles de Harley, who collected information on the Indian tribes of Oregon Territory before the separate existence of Washington Territory, reported in 1849

> The <u>Suquamish</u> are a warlike tribe of Indians, whose relations with the whites and with the Hudson's Bay Company are friendly.  They occupy the country about Port Orchard and neighbourhood, and the West side of Whidbey's Island.  Males, 150; females, 95; children under 12 years, 210; slaves, 64; total 519.  They live by labour.

George Gibbs, reporting on the Indians of western Washington in 1854 did not identify the Suquamish with Whidbey Island, although he did mention Snohomish and Skagit occupation of Whidbey Island.  Gibbs' failure to note Suquamish connection with Whidbey Island does not necessarily negate de Harley's report, as Gibbs gives very little space to the Suquamish in his report.  Gibbs also failed to mention Suquamish use of Bainbridge island, although this is clearly established by other sources.

So far as I have been able to determine, there appears to be no clear evidence of Suquamish winter villages on the west side of Whidbey Island.  It may be that de Harley had reference to seasonal use of the island by Suquamish for fishing, hunting, and collecting activities.

. . . .

The Suquamish often travelled to Hood Canal and to upper Puget Sound as well as in other directions to harvest natural resources or to visit with relatives in other areas.  The Suquamish, like all of the other Coast Salish peoples in western Washington and beyond, were related by marriage with most of the neighboring peoples.

. . . .

In the mid-nineteenth century the Suquamish resided in several villages:  one at the present site of Suquamish, one at the head of Libery Bay near the present town of Pouslbo, one at the mouth of Curley Creek where the present town of Colby is situtated, one at or near Point White on the southern shore of Bainbridge Island, one at Chico Creek on Dye's Inlet and one at Phinney Bay.  Possibly there were other winter villages for which we have not located documentation.  In addition to the winter villages, there were seasonal campsites.

Information on Suquamish villages and campsites is derived from nineteenth century accounts by early visitors and settlers and on twentieth century archeological and ethnographic investigation.  In addition, Indian testimony regarding Suquamish village locations was recorded in 1927.

The single most important source of information on Suquamish sites is contained in the unpublished nomograph of T.T. Waterman based on field investigations made about 1920.  Waterman's manuscript was unknown to the ethnographers who worked in Washington from 1926 until 1968.  It was not used by the anthropologists who offered expert testimony with regard to the Suquamish before the Indian Claims Commission.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 16

The Waterman manuscript can be used as an independent check on later ethnographic work. In the case of the Suquamish, the Waterman data corroborate the later work of Snyder and provide considerable site data not available elsewhere.  The Suquamish text portions and the map from Waterman's manuscript are included as Appendices 1 & 2 with this report. Snyder's material is included as Appendix 3.

. . . .

Like all of their neighbors, the Suquamish relied primarily on salmon for their food staple. There are no large rivers in Suquamish territory.  Small streams and creeks and lakes constitute the freshwater fisheries area.  These areas provided salmon and steelhead as well as trout.

The Suquamish territory is highly indented with bays and inlets which provide a large expanse of sheltered salt-water area abounding in shell-fish and other fish species.  In the salt water areas immediately adjacent to the Kitsap peninsula, the Suquamish were able to procure fresh fish on a year-round basis.

**For their store of smoke-dried salmon to serve as winter provision, the Suquamish resorted to fisheries more distant from their own shores.  They repaired to the mouth of the Duwamish and other large rivers to share in the harvest of fall salmon runs.**

The inability to secure sufficient supplies when confined to those fisheries on the west side of the Sound is attested to in correspondence from the agent at the Fort Kitsap reservation in 1856.  George A. Paige, the Indian Agent in charge of the Fort Kitsap reservation, wrote to Governor Isaac I. Stevens under date of October 31, 1856 in part as follows:

> *During the month the Suquamish Indians in my charge have been engaged in fishing in the different Bays and inlets on the west side of the Sound, but owing to the scarcity of salmon in this vicinity they did not succeed in laying in as large a supply as I could have wished; [if] they were obliged to subsist solely on the food procured by them the supply would all be consumed in less than a month.  . . .*

Paige's letter of October 31, 1856 states that salmon were so scarce on the west side of the Sound that the only way that the people at Port Madison would be able to obtain a sufficient supply of fish in those waters would be by seining.  If the use of the seine was not a traditional taking technique among the Suquamish, and [Dr. D. S.] Maynard's report clearly indicated that it was not, **the reliance on access to river fisheries or fisheries at the mouths of the large rivers seems to be underlined**.

Because of the continued hostilities during the winter of 1856, the Indians on the west side of the Sound were not permitted to visit the rivers to get their winter salmon and steelhead. In his report dated November 31, 1856, Paige again reported to Stevens on the impact of this prohibition on the ability of the Indians to secure provisions.

> *The Suquamish Indians during the month have been engaged mostly in repairing and building houses for the winter and collecting food in the different bays & inlets on the west side of the Sound; but for the same reasons mentioned in my last monthly report they have not succeeded in getting an extensive supply, though they have all the range they desire except the rivers.*

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 17

The following month Paige again reported to Stevens on the impossibility of the Suquamish Indians finding enough food while they were prevented from leaving the west side of the Sound.  Under date of December 31, 1856 he wrote

> *I send you by the express my monthly report for December 1856.  About the 10th of the month the Suquamish Indians commenced moving in to the Reservation from their fishing grounds in considerable numbers.  They continued to move in til the 20th since which time with the exception of a few families at Port Orchard, I have had the whole of the Tribe on my hands.  They reported that they could find no more food, and had to come in to keep from starving.  On proceeding to examine their stock of provisions, I found it very scant, so much so that if the whole amount collected was divided equally amongst them, they could not subsist on it above 3 or 4 weeks.*

It is my opinion that the foregoing reports written by Paige in the fall and winter months of 1856 **document the fact that the Suquamish were accustomed to harvest their fall and winter salmon supplies at the rivers on the east side of Puget Sound**.  Modern Suquamish, as well as neighboring Indians, have attested that **the Suquamish traditionally fished at the mouths of the Duwamish and Snohomish rivers as well as in the adjacent marine areas**.

In spring and summer the Suquamish undoubtedly made use of wider marine areas.  An 1827 report mentions the presence of Suquamish visitors as far north as Fort langley on the Fraser River.

. . . .

In my opinion, the evidence that the Suquamish travelled [sic] to the Fraser river in pre-treaty times documents their capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits.  According to oral tradition, the Suquamish regularly travelled through the San Juan Islands and to the Fraser river.  It does not appear feasible, on the basis of written records, to document the frequency of such trips.

The Fort Langley journal documents that the Suquamish did travel to the Fraser river.  It is my opinion that the Suquamish undoubtedly would have fished the marine waters along the way as they travelled.  It is likely that one of the reasons for travel was to harvest fish.  **The Suquamish travelled to Whidbey Island to fish** and undoubtedly used other marine areas as well.

Dr. Barbara Lane, "Identity, Treaty Status and fisheries of the Suquamish Tribe of the Port Madison Indian Reservation,"  Exhibit USA-73, pp. 1-2, 4-5, 11- 16 (emphasis added).

These passages from Dr. Lane's report demonstrate that there was competent and reliable evidence before Judge Boldt in 1975 that (1) the Suquamish fished in Admiralty Inlet and traveled as far as the western shores of Whidbey Island to do so (referencing the de Harley 1849 report); and (2) the mouth of the Snohomish River was an important fall and winter fishery for them.  Indeed, Dr. Lane emphasized the importance of this fall/winter fishery with the quotes from Agent George Paige's letters

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 18

to Governor Stevens, and the poignant reference to possible starvation resulting from their exclusion from this traditional fishery in 1856 by hostilities.  She also testified at the trial before Judge Boldt, on April 9, 1975, confirming that the Suquamish "did in fact go to the larger rivers on the mainland in order to harvest salmon because they had no rivers in their own country."  Transcript of Proceedings, April 9, 1975, p. 49; found at C70-9213, Dkt. # 7268.

As already noted, Judge Boldt paid close attention to, and relied heavily on, Dr. Lane's report when he described tribal U&A's.  He would have fully credited Dr. Lane's statement that the Suquamish traveled "to Whidbey Island to fish."  Thus it is very likely that he intended to include waters west of Whidbey Island as far as the island shoreline, including the bays on the west side, in the Suquamish U&A.  It is also highly likely, indeed a near certainty in light of Dr. Lane's emphasis on the importance of the winter fishery, that he intended to include the area at the mouth of the Snohomish River, specifically including Port Gardner Bay where the river meets the saltwater.  Further, he would have understood that the Suquamish could only have reached their fishing grounds at the mouth of the Snohomish River by traveling through Possession Sound, and they would have fished there as an "adjacent marine area" as reported by Dr. Lane.  Thus, it is highly likely that Judge Boldt intended to include Possession Sound in the Suquamish U&A, along with the bays on the west side of Whidbey island.  The Tulalip's motion for summary judgment and declaratory judgment (Dkt. # 199) shall accordingly be granted in part and denied in part.

CONCLUSION

The Court has considered the arguments of the parties and has reviewed the relevant evidence that was before Judge Boldt in the 1975 proceedings involving the Suquamish U&A.  The Court has also considered and incorporated its own Orders, together with previous Orders by the district court and by the Ninth Circuit Court of Appeals.  Upon review of the documents filed in the 1985 proceedings involving the Suquamish request to expand fishing into freshwater areas to the east of Puget Sound, the Court has rejected the Tulalip "eastern Puget Sound" arguments as based on an improper reading of the Ninth Circuit's language in *United States v. Suquamish Indian Tribe*, 901 F.2d at 778.  Instead, the

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 19

Court finds that Dr. Lane's report provided ample evidence from which Judge Boldt could have found that the Suquamish U&A included the mouths of certain rivers on the east side of Puget Sound.  Indeed, given the emphasis she placed on the importance of the fall and winter fishery at the mouth of the Snohomish River, it is nearly certain that Judge Boldt intended to include Possession Sound and the waters at the mouth of the Snohomish River in the Suquamish U&A.  On the other hand, there is an absence of evidence in her report regarding Suquamish fishing in the waters on the eastern side of Whidbey Island such as Skagit Bay, Saratoga Passage and its connecting bays Penn Cove and Holmes Harbor, and Port Susan.  Therefore the Court finds that Judge Boldt did not intend to include these areas in the Suquamish U&A.

Accordingly, it is hereby Ordered:

(1) The Suquamish motion for summary judgment of dismissal of the Tulalip Request for Determination on grounds of judicial estoppel, res judicata and/or laches (Dkt. # 195) is DENIED;

(2) The Suquamish Counter-Request for Determination is DISMISSED for failure to properly invoke this Court's jurisdiction under Paragraph 25 of the Permanent Injunction;

(3) The Swinomish motion for partial summary judgment (Dkt. #193) is GRANTED, and the Court finds that Saratoga Passage, Penn Cove, and Holmes Harbor (also described as Shellfish Management Catch and Reporting Areas 24C and 24D)  are not included within the U&A of the Suquamish as described by Judge Boldt in April, 1975; and

(4) the Tulalip motion for summary judgment and declaratory judgment (Dkt. # 199) is GRANTED IN PART and DENIED IN PART.   The motion is GRANTED as to Skagit Bay, Saratoga passage and its bays Penn Cove and Holmes Harbor, and as to Port Susan.  The  Court has found upon review of the evidence that was before Judge Boldt that there was none presented that would have led him to include these waters within the Suquamish U&A.  The motion is DENIED as to Possession

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 20

Sound,[8] Port Gardner Bay, and the bays on the west side of Whidbey Island, specifically Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay.  The Court has found that there was reliable evidence before Judge Boldt from which he could find, and most likely did find, that the Suquamish fished these areas in treaty times.  His description of the Suquamish U&A therefore included these areas.

The trial date in this matter was suspended pending the resolution of these issues in summary judgment proceedings.  Dkt. # 185.  As no issues remain to be determined, the Court directs the Clerk to enter judgment as set forth above, and close this Subproceeding.

Dated this 29 day of July 2013.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

---

[8] The Court is mindful that the geographic terms describing bodies of water are indefinite, in that they do not establish a precise dividing line between Possession Sound, which lies within the Suquamish U&A, and Port Susan and Saratoga Passage, which lie outside it.  The Court also notes that salmon catch reporting area boundaries do not coincide with the boundaries of these geographic areas.  However, the Marine-Fish Shellfish Management and Catch Reporting Areas come very close, in that all of the eastern fork of 26A lies within Possession Sound, and therefore is included in the Suquamish U&A.  However, in order to include the multiple channels that comprise the mouth of the Snohomish River, a portion of 24B should be included in the Suquamish U&A as well.  The actual dividing line would be north of the line that now separates 26A and 24B (Camano Head to Gedney Island to the City of Everett, *see* WAC 220-22-400(12)).   Instead, from Gedney Island the line should extend eastward or southeastward to a point somewhat north of the estuary at the mouth of the Snohomish River.  In the event the parties cannot agree on this line, the Court will entertain a brief motion and shall refer the matter for settlement.

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 21