1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON,
AT SEATTLE

UNITED STATES OF AMERICA, et al.,

                    Plaintiffs,

     v.

STATE OF WASHINGTON, et al.,

                    Defendants.

No. C70-9213RSM

Subproceeding No. 09-01

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF**

       This matter comes before the Court on Motion for Partial Summary Judgment by Petitioner Makah Indian Tribe (the "Makah") (Dkt. # 248), Motion for Summary Judgment by Respondents Quileute Indian Tribe (the "Quileute") and Quinault Indian Nation (the "Quinault") (Dkt. # 251), as well as Motion to Define the Burden of Proof by the Quileute and Quinault (Dkt. # 283). Both dispositive motions concern the application of equitable defenses in this subproceeding, specifically whether Makah's claims are barred by laches, judicial estoppel, and acquiescence. The Court deems oral argument unnecessary, having fully considered the extensive evidentiary record submitted by the parties, including the parties' moving papers, attached declarations and exhibits, briefs filed by the numerous participating Interested Parties, and the remainder of the record in this subproceeding. Being fully apprised,

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 1

the Court grants partial summary judgment on behalf of the Petitioner and denies Respondents'
summary judgment motion. The Court further denies in part and defers in part Respondents'
motion to define the burden of proof in this subproceeding.

## BACKGROUND

The Makah initiated this subproceeding by filing a Request for Determination on
December 4, 2009, seeking the Court's determination of the Quileute and Quinault's Pacific
Ocean usual and accustomed fishing grounds ("U&A"). Dkt. # 1, ¶ 4. In particular, the Makah
assert that the western boundary of the Quileute and Quinault U&A "appears to be
approximately 5 to 10 miles offshore." *Id.* at ¶ 3(c)(ix). If the Makah are correct, the Quileute
and Quinault have been conducting fisheries for salmon, halibut, and blackcod outside their
U&A, as well as asserting intentions to enter the Pacific Whiting fishery beyond their U&A's
western boundary. This subproceeding is brought under Paragraph 25(a)(6) of Final Decision
#1, pursuant to which the Court exercises jurisdiction to determine the location of any of a
tribe's U&A's not specifically determined by Judge Boldt in Final Decision # 1. *U.S. v.
Washington* , 384 F.Supp. 312, 419 (W.D. Wash. 1974) ("*Final Decision # 1*"). Bench trial in
this matter is scheduled to commence March 2, 2015.

While the procedural history of this subproceeding is well known to the parties and
shall not be repeated here, a rough recitation of the underlying events and prior related
subproceedings is necessary to set forth the factual predicate of the Court's rulings herein.
When this case was initiated over 40 years ago, the case area was limited to waters within the
jurisdiction of the State of Washington. *Final Decision # 1*, 384 F.Supp. at 400. The case area

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 2

has since expanded as, among other developments, the Makah requested an adjudication of

their own Pacific Ocean U&A, which the Court determined extends approximately 40 miles

offshore. *See U.S. v. Washington*, 626 F.Supp. 1405, 1467 (W.D. Wash. 1985), aff'd 730 F.2d

1314. While the Quileute and Quinault have moved in the past to limit the Makah's ocean

fisheries, they have not moved for a similar adjudication of their own asserted ocean U&A's.

*See id.* at 1471.

**(1) Federal Regulatory Boundaries**

The Pacific Ocean customary fishing grounds of the Quileute and Quinault have,

however, been implicated in prior federal regulation. The Magnuson Fishery Conservation

Management Act, 16 U.S.C. § 1801 *et seq.*, vests authority in federal regulatory agencies to

issue fishery management regulations consistent with the provisions of the Act and other

applicable law. *See* 16 U.S.C. §§ 1853 – 1855. Pursuant to the Act, in 1986, the National

Oceanic and Atmospheric Administration ("NOAA") adopted western boundaries for the

Quinault and Quileute ocean fishing areas for the purpose of describing Subarea 2A-1, the

tribal area for halibut fishing. 51 Fed. Reg. 16471 (May 2, 1986). The regulations provide that

Subarea 2A-1 "is not intended to describe precisely the historic off-reservation halibut fishing

places of all tribes, as the location of those places has [not] been determined" and that the

boundaries of a tribe's fishery within the Subarea "may be revised as ordered by a Federal

court." *Id.*; *see* Dkt. # 58, Ex. J, pp. 2, 4.

The Quileute and Hoh Tribes, joined by the Quinault, shortly thereafter submitted a

comment letter on the Halibut rule, in which they contested the legal basis for the western

boundaries of their ocean fishing areas delineated by NOAA, asserting that "[n]o court, and no

agreement, has ever established a western boundary for our treaty fishing areas." *See* Dkt. # 58, Ex. A, p. 2; *see also* Ex. B (letter from Quinault joining in the Quileute and Hoh Tribes' concerns). The Regional Director of the National Marine Fisheries Service ("NMFS") responded by inviting the Quileute, Quinault, and Hoh to submit information to justify a modification of the regulations. *Id.* at Ex. C.

The Quileute again contested the delineated western boundary for the tribes after the Halibut boundaries were incorporated into salmon fishing regulations in 1987. *See id.* at Ex. D (comment letter from Quileute to NMFS); 52 Fed. Reg. 17264 (May 6, 1987). The NMFS Assistant Administrator for Fisheries responded by noting that the Tribes had not answered NMFS's 1986 request for information concerning the tribes' historic boundaries and again solicited information. *Id.* at Ex. E.

NMFS included the same boundaries in its 1996 framework rule for the establishment of tribal groundwater fisheries. 61 Fed. Reg. 28786, 28789 (June 6, 1996); *see* Dkt. # 58, Ex. L. The rules' preamble explains the rationale behind it, as well as its limitations:

> Under this rule, NMFS recognizes the same U&A areas that have been implemented in Federal salmon and halibut regulations for a number of years. The States and the Quileute point out that the western boundary has only been adjudicated for the Makah tribe. NMFS agrees. NMFS, however, in establishing ocean management areas, has taken the adjudicated western boundary for the Makah tribe, and extended it south as the western boundary for the other three ocean tribes. NMFS believes this is a reasonable accommodation of the tribal fishing rights, absent more specific guidance from a court. NMFS regulations, including this regulation, contain the notation that the boundaries of the U&A may be revised by order of the court.

*Id.* In the response to comments, the agency agreed with the Quinault that "this rule is without prejudice to proceedings in United States v. Washington. As stated above, NMFS will modify the boundaries in the regulation consistent with orders of the federal court." *Id.* at p. 9.

**(2) The Halibut Litigation**

Subarea 2A-1 became the subject of further dispute when the Makah filed suit in 1985 against the Secretary of Commerce under the Administrative Procedure Act (the "APA") seeking judicial review of the Secretary's regulations setting harvestable fishing quotas for halibut between treaty and non-treaty fishermen. *See Makah Indian Tribe v. Mosbacher*, C85-1606. In 1992, the *Mosbacher* court ruled on cross motions for partial summary judgment that the threshold issues in the case concerning the nature and extent of the Makah's treaty right to take halibut had to be resolved in the context of the continuing jurisdiction of the *U.S. v. Washington* court, and accordingly transferred the proceeding into the instant case. *See* Dkt. # 248-2 – 248-5 ("Joner Decl."), Exs. K & L. The Makah then initiated Subproceeding 92-1, seeking confirmation of their previously adjudicated U&A and their treaty right to take halibut. *See id.* at Ex. M, pp. 1-2.

Makah subsequently moved for preliminary injunction in *Moshbacher*, seeking to prevent the Secretary from allocating less than 35% of the total allowable catch of halibut in the larger Area 2A to the Subarea 2A-1 Indian treaty fishery. The Makah argued that the Secretary's halibut regulations set forth the fishing areas of each of eleven tribes in addition to the Makah within Subarea 2A-1, and that these regulations had never been challenged by the States of Washington or Oregon. *See Id.* at Ex. Q, pp. 14-15 (citing 50 CFR 301.5(c), 301.19 (1992). The Makah further argued on reply, responding to opposition from the State intervenors, that because *Mosbacher* was an APA case, Washington had the burden to prove that the regulations were arbitrary, capricious, or an abuse of discretion, which it had not done.

The Makah also asserted that "substantial evidence" supported the Secretary's determination on tribal treaty rights in the Subarea. *Id.* at Ex. R, pp. 4-5.

Following consolidation of *Mosbacher* and Subproceeding 92-1, the Court entered an order on multiple pending motions, including the Makah's request for preliminary injunctive relief. Noting that several tribes had joined in the Makah's request for determination, Magistrate Judge Weinberg recommended that the Court find that only "[t]he issue of the Makah's treaty rights is properly before the Court." *Id.* at Ex. U, pp. 9-10 (explaining that "no tribe other than the Makah has filed a request for determination, or has specifically moved for a ruling seeking such relief. Nor has any other tribe made a timely and complete evidentiary showing comparable to that made by the Makahs."). As to tribes other than the Makah, Judge Weinberg recommended that "the determinations of the responsible agency are binding upon the parties unless and until there has been a timely application for review to a court with jurisdiction to hear it." *Id.* at p. 10.

Judge Rothstein adopted Judge Weinberg's recommendation regarding judicial confirmation of the Makah's treaty right to fish for halibut and its U&A for halibut, and reached a similar confirmation for four of the eleven Subareas 2A-1 tribes' treaty rights for halibut fishing purposes. *Id.* at Ex. U, pp. 2-5. The Court made no such ruling for the Quileute, Quinault, or Hoh. The Court also confirmed that, in formulating its allocation decisions, the Secretary is obligated to accord treaty fisherman the opportunity to take 50% of the harvestable surplus of halibut in their U&A's. *Id.* at p. 56.

**(3) Negotiated Management Plans**

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 6

Although the Makah supported the Quileute and Quinault's asserted customary ocean fishing grounds in *Mosbacher, see, e.g.*, Dkt. # 252 (King Decl.), Ex. G, the relations between the tribes regarding their respective ocean fisheries have not always been congenial. Previous to the instant dispute, however, the tribes were able to achieve negotiated ocean management plans with limited intervention by the Court. *See, e.g.*, Ocean Compact Subproceeding 81-2.

For instance, in 1996, the Quinault, Makah, and Hoh filed an RFD asserting that the Quileute's use of highly efficient pot gear threatened to preempt the Makah and Quinault's longline fisheries for blackcod. *See* Joiner Decl. at Ex. X. Previous to filing, the Makah had threatened the Quileute that failure to resolve the dispute would lead them to challenge Quileute's fishing beyond the western boundary of its previously adjudicated U&A. *Id.* at Ex. X, p. 3. The Quileute responded that a "Makah attack on the Quileute ocean U&A would result in irreparable damage to the relations between the costal tribes." *Id.* at Ex. Z, p. 1. The RFD ultimately filed asserted that the Quileute were fishing beyond their adjudicated north and south boundaries but did not specifically challenge Quileute's western boundary.

The parties entered into a 1997 settlement agreement, which memorialized the tribes' accord not to challenge any other tribe's right to fish in marine fishing areas during the term of the agreement. *Id.* at Ex. BB (Ex. A, p. 3). The agreement purported not to represent any parties' view with respect to usual and accustomed fishing areas and provided that it was "without prejudice to the parties' respective claims regarding usual and accustomed fishing places." *Id.* at pp. 3-4. The agreement terminated in 2001, upon which the tribes entered into a series of new agreements for management of the treaty blackcod fishery. The 2001, 2003, 2005, and 2006 agreements provided a similar limitation that they do not "necessarily represent the

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 7

view of any Party with respect to…the Parties' usual and accustomed fishing areas." *Id.* at Ex. DD – GG.

### (4) Whiting Dispute

The instant dispute arose following the Quileute and Quinault's assertions of intent to enter the Makah's valuable Pacific whiting fishery. The Makah have been fishing Pacific whiting in their adjudicated U&A since 1995 under allocations determined by NMFS. *See Midwater Trawlers Cooperative v. Dept. of Commerce*, 393 F.3d 994 (9th Cir. 2004). The Quinault and Quileute notified NMFS of their intent to enter the whiting fishery on January 10 and April 4, 2008, respectively. Dkt. # 126, Exs. A & D. The Quileute stated that one or more of its members would enter the fishery commencing in 2009 and that it was "not presently requesting an increase in the whiting allocation to all coastal tribes." *Id.* at Ex. A. The Quinault stated that its entry into the fishery "may occur as early as 2009" but did not make any allocation request. *Id.* at Ex. D.

In response, Makah's Chairman McCarty proposed that the Quinault and Quileute seek allocations from NMFS on top of the 17.5% allocation being requested by the Makah, which McCarty stipulated did not represent the full treaty entitlement in the whiting fishery. *Id.* at Ex. F. McCarty expressed concern with the proposal that the Quinault and Quileute fish under the Makah allocation, as it would disrupt the Makah's established treaty fishery and hinder its efforts to manage bycatch, in accordance with NMFS requirements. At the same time, McCarty informed the tribes that the Makah "will continue to support [] your requests for allocations to support your fisheries." *Id.*

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 8

Quileute Chairperson Hatch promptly rejected the proposal for separate allocations: "To be clear the Quileute Tribe rejects and will not accept any proposal which purports to limit its right to catch from the total 'tribal' whiting allocation announced annually by NMFS." *Id.* at Ex. G. Chairperson Hatch took the position that NMFS whiting allocations provided for harvest by all tribes collectively, and that NMFS lacked the authority to determine intertribal allocations. *Id.* Throughout meetings over the next several months with the Northwest Indian Fisheries Commission ("NWIFC"), the Makah continued to advocate for allocation of separate tribal shares, and the Quileute and Quinault continued to reject separate harvest guidelines.[1]

NMFS issued a proposed rule for 2009-1010 harvest specifications in the whiting fishery on December 31, 2008, in which it adopted the proposal of the Pacific Fisheries Management Council to create a total tribal allocation of 50,000mt, 42,000mt of which would be managed by the Makah and 8,000mt of which would be managed by the Quileute. The proposed regulation provided:

> These interim individual Tribal set-asides for 2009 only are not in any manner to be considered a determination of treaty rights to the harvest of Pacific whiting for use in future fishing seasons, nor do they set precedent for individual Tribal allocations of the Pacific whiting resource: the amounts being set aside for each tribe for 2009 are based on the timely requests from the tribes at the June Council meeting.

50 CFR § 660; Dkt. # 126, Ex. S. In its final March 2009 rulemaking, NMFS explained that the set-asides were driven by concerns that the absence of individual tribal allocations could lead to a race for fish with deleterious impacts on bycatch management:

---

[1] The Quinault ultimately decided not to participate in the 2009 fishery but informed the Quileute and the NWIFC that they intended to have five or six catcher boats in the 2010 fishery, with an anticipated harvest of around 7,000 mt per boat. Dkt. # 126, Ex. I, at pp. 50-51.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 9

> Without clear management targets for each tribe, a race for fish may occur as whiting migrate from south to north, reaching the Quileute [U&A] before they reach the Makah U&A. A race for fish could result in excessive bycatch of overfished species, and the closure of other groundfish fisheries.

*Id.* at Ex. U, p. 25. In acknowledgment that fishing rights of the treaty tribes are determined under *U.S. v. Washington*, NMFS emphasized that its set-asides do not represent "formal allocations, nor do they create precedent for future years." *Id.* The rule also provided that NOAA "does not intend to allocate the total tribal whiting allocation to the individual tribes" in the future, and that it would consider initiating litigation should the tribes fail to reach consensus amongst themselves as to intertribal allocation. *Id.* at p. 26. The Makah initiated the instant subproceeding following the tribes' failure to reach any such negotiated solution.

**(5) Instant Motions**

The Makah's motion for partial summary judgment, as well as the Quinault and Quileute's motion for summary judgment seek the Court's determination as to the availability of certain equitable defenses in this subproceeding. The Court previously rejected the Quinault and Quileute's laches argument as grounds for dismissal, noting that Respondents had at that stage failed to allege sufficient facts with respect to delay or injury for the Court to apply this equitable doctrine. Dkt. # 84, p. 4. The Court also noted that the tribes' laches defense is "incompatible" with their simultaneous defense that this dispute is not yet ripe for consideration. *Id.* In the parties' Joint Status Report filed October 1, 2013, the Quileute and Quinault reiterated their intention to pursue through discovery and dispositive motion "a defense that Makah's claims for relief are barred under the doctrines of laches and estoppel." Dkt. # 248, p. 3. The Quileute and Quinault clarify in their response to the Makah's motion and through their own dispositive motion that their asserted affirmative defenses include laches,

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 10

judicial estoppel, and acquiescence. *See* Dkt. # 274, p. 2 n.1; Dkt. # 251. The Quinault and

Quileute additionally invoke a sovereign immunity defense twice rejected by this Court and

currently on appeal before the Ninth Circuit. *See, e.g.*, Dkt. ## 86, 171, 183, 185.

Also before the Court is the Quinault and Quileute's motion to define the burden of

proof in this subproceeding. These tribes contend that the Makah must carry the burden of

proof as the petitioning party. As to the standard of proof, the Quileute and Quinault contend

that the APA arbitrary and capricious standard applies. If the Court finds that the Quileute and

Quinault bear the burden of proof, Respondents assert that they should be held to a lower

standard than the normal civil standard of preponderance of the evidence. The Makah and

Interested Parties oppose the Quinault and Quileute's suggestions, arguing that the burden of

proof rests with the tribes whose U&A is at issue and that these tribes should be held to the

ordinary preponderance of the evidence standard. The instant Order addresses all pending

motions.

**ANALYSIS**

**I.  Availability of Equitable Defenses**

As an initial matter, the Makah, joined by the Interested Parties the Tulalip, Swinomish,

and S'Klallam Tribes (*see* Dkt. # 275) contend that equitable defenses such as laches,

acquiescence, and equitable estoppel are unavailable for U&A adjudications under *U.S. v.*

*Washington.* These tribes draw this rule from then presiding Judge Coyle's February 15, 1990

decision on cross motions for summary judgment in Subproceeding 89-2, in which the court

was asked by several requesting tribes to determine the extent of the Lummi Tribe's

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 11

adjudicated U&A based on evidence before Judge Boldt. *See U.S. v. Washinton* 18 F.Supp.3d 1123, 1155 (W.D. Wash. 1990) ("*Coyle Order*") Asked to determine whether a tribe can be prevented from challenging a U&A by laches, waiver, or equitable estoppel, Judge Coyle held that "[t]here is no question that these equitable defenses may not be invoked by non-Indians to defeat Indian treaty rights." *Id.* at 1163 (citing *Swim v. Bergland*, 696 F.2d 712, 718 (9th Cir. 1983)); *see also U.S. v.* Washington, 157 F.3d 630, 649 (9th Cir. 1998) (reiterating the principle that equitable defenses cannot be used to defeat Indian treaty rights). Judge Coyle adopted the requesting tribes' concerns that allowing for equitable defenses would promote circumvention of the procedures set forth in Paragraph 25 for adjudicating U&A's and encourage tribes to expand their established fishing areas through the exercise of prescriptive rights:

> If equitable defenses are available to a tribe that engages in treaty fishing outside its established area, there will be a great incentive for tribes to issue regulations for areas outside their established usual and accustomed fishing grounds and to allow or encourage tribal members to engage in treaty fishing outside those areas in anticipation of being able to enlarge the tribe's treaty rights by 'prescription.'…There is neither enough time nor resources to prevent a potential dilution of a tribe's treaty right by these 'equitable means' for it would mean constant court filings – most on an emergency basis.

*Id.* at 1164.

The Court agrees with the S'Klallam that the concerns recognized by this Court two and a half decades ago are no less present in this subproceeding. It remains the case that  allowing for equitable defenses could very well have the unfortunate consequence of compelling treaty tribes to flood the Court with requests for immediate adjudication of disputes for fear of losing fishing rights through prescription. At the same time, the efforts of tribes to informally resolve intertribal grievances without Court intervention would be sorely undermined.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 12

The Quinault and Quileute nonetheless assert that Judge Coyle's holding is no longer the law of the case, having been unsettled by subsequent decisions within and without *U.S. v. Washington*. The Quinault and Quileute point out that the Ninth Circuit held that Judge Coyle's 1990 decision was not final because no separate judgment had been entered. *U.S. v. Lummi Indian Tribe*, 235 F.3d 443, 447-48 (9th Cir. 2000). They also point to a vacated decision in Subproceeding 05-04, in which the Court ruled that all applicable legal and equitable doctrines apply to proceedings under its continuing jurisdiction, and held that laches barred the Tulalip Tribe's request for clarification of the Suquamish U&A. 20 F.Supp.3d 777, 805-06 (W.D. Wash. 2004). On remand from the Ninth Circuit, the Court determined that equitable defenses including laches and estoppel "require a factual analysis which is not appropriate on a motion to dismiss," 20 F.Supp.3d 899, 937, a conclusion similar to that reached by the Court in this subproceeding on the Quileute and Quinault's earlier motion to dismiss. *See* Dkt. # 86. Finally, the Quileute and Quinault argue that Judge Coyle's legal analysis has been eroded by the Supreme Court's decision in *City of Sherrill, N.Y. v. Oneida Nation of N.Y.*, 544 U.S. 197 (2005), and the Ninth Circuit's decision in *Apache Survival Coalition v. U.S.*, 21 F.3d 895 (9th Cir. 1994), both of which found tribal land claims to be barred by laches.

Needless to say, the status of equitable defenses in U&A adjudications is in a fairly uncertain state. While this Court has reached equitable defenses in suproceedings since Judge Coyle's decision, it has done so without fully resolving their availability. For instance, although the Court resolved the laches claim on its merits on summary judgment in Suproceeding 05-04, it cautioned that in doing so its order should not be read as reviving its earlier vacated determination as to the availability of equitable defenses. *U.S. v. Washington*, 20 F.Supp. 3d

986, 1044 n. 5 (W.D. Wash. 2013); *see also* Suproceeding 01-02, 20 F.Supp.3d 899 (W.D. Wash. 2008) (ruling on "unclean hands" equitable defense to Rule 60(b) motion and declining to reach the question of estoppel).

The Court also does not find *Sherrill* and *Apache* to be controlling on this issue, as the former involved an assertion of tribal authority over land some 200 years after the state began exercising sovereign control and the latter was brought under the National Historical Preservation Act and involved no claim of tribal treaty rights. By contrast, the laches defense in the instant case at most raises a delay of some three and one-half decades. During this period, the Quileute and Quinault were fully aware of the Makah's contestation of their western boundary, but the tribes were generally able to keep their disputes out of court through informal means of negotiation. Furthermore, the unique nature of the *U.S. v. Washington* case places the burden foremost on each tribe to fully and finally resolve its usual and accustomed fishing places through the mechanism that Judge Boldt put in place. *See Coyle Order*, 18 F.Supp. 3d at 1165. As such, this matter raises neither the extraordinarily lengthy period of delay nor the disruption of settled, justifiable expectations at issue in *Sherrill. See Oneida Nation v. County of Oneida*, 617 F.3d 114, 127 (2d. Cir. 2010) (distinguishing *Sherrill* laches from traditional laches).

The Court notes that it has before it an unusual subproceeding, both in that it was initiated, like Subproceeding 89-2, by a tribe seeking adjudication of another tribe's U&A and in that it requires determination of a fishing grounds that was not finally adjudicated by Judge Boldt. Both of these features evoke concerns raised by Judge Coyle about the prospect that allowing for equitable defenses could lead to a system in which unadjudicated tribal U&A's are

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 14

determined through prescription rather than through the orderly judicial management

contemplated by Paragraph 25. While the Court declines to hold that equitable defenses are

never available in a Paragraph 25(a)(6) subproceeding, it reiterates the long-held understanding

that they do not apply in the typical fashion in this case. The Court further determines that the

Respondents' equitable defenses are unavailing on their merits.

## A. Judicial Estoppel

The doctrine of judicial estoppel codifies the rule that "where a party assumes a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position, especially if it be to the

prejudice of the party who has acquiesced in the position formerly taken by him." *New

Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation omitted). The *New

Hampshire* Court identified three factors that typically inform the decision whether to apply

judicial estoppel. First, "a party's later position must be 'clearly inconsistent' with its earlier

position." *Id.* at 750 (internal quotation omitted). Second, the party must have "succeeded in

persuading a court to accept that party's earlier position, so that judicial acceptance of an

inconsistent position in a later proceeding would create the perception that either the first or the

second court was misled." *Id.* (internal quotation omitted). Finally, the court considers whether

"the party seeking to assert an inconsistent position would derive an unfair advantage or impose

an unfair determinant on the opposing party if not estopped." *Id.* at 751.

The Court agrees with the Makah that none of these factors are present here. The

Quileute and Quinault fail to point to any positions advanced by the Makah that are clearly

inconsistent with those taken in this subproceeding. While Respondents point to the Makah's

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 15

expressions of support for their customary ocean fishing grounds in *Mosbacher* and Subproceeding 92-1, the Court does not find any obvious inconsistency with the Makah's positions in this subproceeding. In the former, a challenge brought under the APA, the Makah had argued that federal regulations recognizing tribal rights to take halibut were controlling where supported by substantial evidence and not properly challenged by the State of Washington. The Makah's position that federal regulations are binding until appropriately challenged or revised in accordance with a decision by this Court is not inconsistent with its request for adjudication of the Quileute and Quinault U&A's here based on a de novo determination on a full evidentiary record. Further, the Makah's statements that substantial evidence supported the Secretary's determination pertained to the rights of 12 tribes fishing in Subarea 2A-1, not the Quinault and Quileute specifically.

Even if there was an inconsistency in the Makah's assertion that "substantial evidence" supported the Secretary's determination, the Makah's position was never adopted by the Court. To the contrary, the Court only determined that federal regulatory boundaries governed the halibut fishery until properly challenged. The Court specifically declined to address the treaty rights of any tribe other than the Makah, the S'Klallam Tribes, and the Skokomish Tribe. *See* Joner Decl. Decl. at Exs. U & W. In declining to consider treaty fishing rights of tribes other than the Makah, Judge Weinberg explained:

> no tribe other than the Makahs has filed a request for determination, or has specifically moved for a ruling seeking such relief. Nor has any other tribe made a timely and complete evidentiary showing comparable that made that by the Makahs. In short, no other tribe has presented the issue to the court in a manner which might warrant the granting of relief on the pending motions.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 16

The Court's decision implicitly contemplated that those other tribes, including the Quileute and Quinault, would initiate proceedings under this case to seek clarification of their treaty fishing rights as had the Makah. *Id.* at Ex. U, pp. 9-10. The Quileute and Quinault accordingly fail to show that this or any other Court relied on any inconsistent statement by the Makah so as to pose a threat to judicial integrity. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) ("This Court has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position.").

Finally, the Quileute and Quinault fail to show that the Makah have received an unfair advantage as a result of any prior inconsistent position. As the Makah point out, any benefit they received from an increased total treaty allocation has always been offset by the need to share the increase with other tribes. This Court's determination as to Quileute and Quinault's western boundaries in this subproceeding does not dictate federal allocations of harvestable fish. Whichever side prevails before this Court, the total halibut allocations will be adjusted accordingly. The Court is not unsympathetic to the Quinault and Quileute's concerns as to the waste of resources that would attend a decision by this Court foreclosing their ocean fisheries. At the same time, it must be recognized that any prior support by the Makah of the Quileute and Quinault's customary ocean fishing grounds has primarily been to Respondents' benefit, allowing them to expand their fisheries in waters to which they may or may not have a right and to reap the resulting economic rewards. For all these reasons, the Court finds that judicial estoppel is not a defense available to the Quileute and Quinault in this subproceeding.

**B. Laches**

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 17

The Court finds Respondents' laches defense similarly unavailing. "Laches is an equitable defense that prevents a plaintiff, who, with full knowledge of the facts, acquiesces in a transaction and sleeps on his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (internal quotation omitted). A prima facie case for laches requires a two-fold showing of (1) unreasonable delay by the plaintiff in bringing suit and (2) prejudice to the defendant caused by the delay. *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010); *see also Kansas v. Colorado*, 514 U.S. 673, 687 (1995). The first prong of the test entails assessment of the length of the delay as well as the reasonableness of the delay. *Seller Agency Council*, 621 F.3d at 989.

The Court finds the Respondents' failure to make a showing under the first prong dispositive of their laches defense in this case. Far from sleeping on their rights, the Makah actively worked with the Quinault and Quileute since the 1980's to obtain amicably negotiated solutions to conflicts over their respective ocean fisheries, all the while preserving their right to seek adjudication in this Court should informal methods of dispute resolution reach an impasse. The express language in the blackcod agreements from 1997 onward supports the Makah's argument that the tribes preserved their right to asserts claims and defenses should formal adjudication become necessary. *See, e.g.*, Joner Decl. at Ex. BB (providing that the 1997 agreement was "without prejudice to the parties' respective claims regarding usual and accustomed fishing areas"). There was nothing unreasonable in the Makah's decision to decline to investigate the western boundary of the Quileute and Quinault U&A and to wait to bring the issue to the Court for resolution until negotiated pathways broke down with the whiting

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 18

dispute. The Court is unwilling to punish a tribe for attempting to solve intertribal issues inter-tribally and without judicial intervention, a pathway oft encouraged by the Court.

Indeed, as set forth above, Respondents' laches proposition would essentially turn the longstanding adjudication system established in this four-decade case on its head. As Judge Coyle explained, the onus is on each of the tribes to "finally resolve their usual and accustomed fishing places as soon as possible. This has nothing to do with equitable defenses. It has to do with the expeditious utilization of a mechanism that has been in place since the Boldt decision was issued." *Coyle Order*, 18 F.Supp.3d at 1165. Just as the Makah did decades ago, the Quileute and Quinault have had ample opportunity to submit evidence of their customary fishing grounds to the Court, seeking settlement of their ocean U&A's once and for all.  The Court is unwilling to reinforce a tribe's decision to evade Paragraph 25 mechanisms, only to assert a U&A entitlement without the requirement imposed on every other tribe in this case to show that it is supported by the evidence.

## C. Acquiescence

The Ninth Circuit's test for acquiescence is substantially similar to its test for laches, with the exception that it requires affirmative words or deeds by a party conveying implied consent to another. *See Seller Agency Council*, 621 F.3d at 988. The elements of a prima facie case for acquiescence are: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.* at 989.

The Quileute and Quinault have identified no actionable representations by the Makah sufficient to meet the first element. The sole affirmative representation pointed to by

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 19

Respondents is the Makah's assertion in *Mosbacher* that the federal regulations for Subarea 2A-1 were "not taken from whole cloth" but were instead supported by "substantial evidence." *See* Dkt. # 279, p. 14. These statements are insufficient to give rise to an acquiescence defense for several reasons. First, considered in their appropriate context, these statements were made as part of the Makah's argument that substantial evidence supported federal halibut regulations. The Makah did not thereby affirmatively represent that the Quileute and Quinault, or any other tribe fishing in the Subarea, had established their ocean U&A's, but only sought to counter the State of Washington's contention that the tribes bore the initial burden to prove that they had treaty rights and to prove that the federal regulations correctly depicted their U&A's.

These statements also do not imply that the Makah would not assert their right to seek adjudication of Quileute and Quinault U&A's through the proper channels in the future. To the contrary, in response to R&R objections by the State of Washington, the Makah stated that they "agree[d] fully with Washington that, in a proper judicial proceeding to determine the…usual and accustomed fishing grounds of any tribe…the Court must apply the treaty-right principles articulated in <u>United States v. Washington</u>." Joner Decl., Ex. V at pp. 7-8. The Makah further emphasized that if federal regulations were inconsistent with tribal rights, as adjudicated previously or "in further proceedings" in *U.S. v. Washington*, the regulations would be invalid under the APA. Given these and other such counterbalancing statements, any inference that the Makah affirmatively represented that they would not seek adjudication of the western boundary of Respondents' U&A is far too attenuated to support a viable acquiescence defense. Any such inference is further undermined by the Makah's express retention of the right to seek formal adjudication if negotiated management solutions reached an impasse and by their threat to put

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 20

the Quileute's western boundary before the Court during the blackcod dispute. *See* Joiner Decl. at Ex. X.

Even if these statements were actionable, the Court does not find that the Quileute and Quinault could reasonably have relied on them, knowing the purpose for which they were uttered during the halibut litigation and in light of the Makah's retention of their rights thereafter. *See Seller Agency Council*, 621 F.3d at 990 ("[P]rejudice in the context of acquiescence inherently must involve reliance on the senior user's affirmative act or deed, and such reliance must be reasonable."). Indeed, it appears that the tribes have not relied on them, as evidenced by the Quinault's letter to NMFS in February 2014 acknowledging that the "[b]oundaries of a tribe's fishing area may be revised as ordered by a federal court." Joner Decl. at Ex. G. As set forth above, the Court also declines to find that the Makah unreasonably delayed in waiting to initiate this subproceeding until the tribes reached an actual impasse in their ability to achieve negotiated fishery management solutions.

The Quileute and Quinault ask the Court to allow them to explore their equitable defenses further at trial should the Court decline to bar the Makah's request on summary judgment. The Court finds no reason to do so.[1] The Quileute and Quinault are unable to carry their burden to make a sufficient showing of multiple elements on each of these affirmative equitable defenses. With all inferences from underlying facts viewed in their favor, Respondents fail to identify any genuine issue of material fact that prevents the Court's resolution of their equitable defenses as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[1] The Court declines to reach the Quinault and Quileute's arguments as to sovereign immunity, as the Court has previously denied this defense and as the issue is currently on appeal before the Ninth Circuit.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 21

587 (1986). Accordingly, partial summary judgment as to the Quileute and Quinault's equitable

defenses shall be granted in the Makah's favor.

## II.  Burden and Standard of Proof

Also pending before the Court is the Quinault and Quileute's motion to define the

burden of proof in this subproceeding. Dkt. # 283. As an initial matter, the Court grants the

Makah's request through its surreply to strike arguments and exhibits in support thereof raised

for the first time by Respondents on reply. *See* Dkt. # 295. "As a general rule, a 'movant may

not raise new facts or arguments in his reply brief'" as doing so "essentially prevents [the non-

moving party] from providing any response." *Karpenski v. Am. Gen. Life Cos.*, 999 F.Supp.2d

1218, 1226-27 (W.D. Wash. 2014). In this instance, the Quinault and Quileute argue for the

first time in their reply brief that it is the law of the case that "non-fish species such as shellfish

and sea mammals are included in the Stevens Treaty fishing provision." Dkt. # 290 at p. 7. The

Court declines to address this important issue through its one-sided presentation and

accordingly strikes the following portions of the Quinault and Quileute's reply brief and

supporting exhibits: (1) the portion of the Reply from page 6, line 18 through page 7, line 22,

(2) Page 8 of Exhibit A of the third King Declaration (Dkt. # 291-1 at p. 9), and (3) Exhibits C

through E to the Third King Declaration (Dkt. # 291-1 at pp. 58-77; Dkt # 291-2; Dkt. # 291-

3).[1]

### A.  Burden of Proof

---

[1] Should this issue remain in controversy between the parties and require resolution within this subproceeding, the parties may bring it to the Court's attention at their pre-trial status conference and an appropriate briefing schedule will be established.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 22

The Responding Tribes' first argument that the Makah bear the burden of proof in this subproceeding has no merit. The Quileute and Quinault fail to identify any U&A subproceeding in the long history of this case where the Court has determined that any party but the tribe whose U&A was at issue carried the burden of proof. In the typical case, as the Quileute and Quinault point out, the burden is indeed "on the petitioning tribe to produce evidence that disputed waters were usual and accustomed fishing grounds." *U.S. v. Lummi Indian Tribe*, 841 F.2d 317, 318 (9th Cir. 1988). This is so because in the typical subproceeding, the petitioning tribe brings its own U&A before the Court for adjudication. In the unusual case where a tribe's U&A is involuntarily brought forward for adjudication, that tribe bears the burden of proof just as it would as if it had been the petitioning party.

Indeed, it is the settled law of this case that each tribe bears the burden to produce evidence to support its U&A claims. *See, e.g.*, *U.S. v. Washington*, 459 F.Supp. at 1059 ("[T]he Tulalips have the burden of producing evidence to support their broad [U&A] claims."); 459 F.Supp. at 1037 ("In order to be entitled to exercise its off-reservation treaty fishing rights, any tribe allowed to intervene in this case to asserts its claim of treaty fishing rights shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim…. ."). Any determination to the contrary would undermine the structure of this case, encouraging tribes to engage in gamesmanship with the mechanisms set up by Final Decision # 1 and wait for their U&A to be put at issue so as to shrug off the burden to prove their claimed territorial entitlements. As Judge Coyle wrote, it is incumbent on all "tribes which are parties to this action to finally resolve their usual and accustomed fishing places as soon as possible."

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 23

*Coyle Order*, 18 F.Supp.3d at 1165. When tribes fail to do so, they shoulder the burden to prove their customary fishing grounds all the same.

Lacking authority from within this case, the Quinault and Quileute contend that a request for determination is functionally equivalent to a complaint, and that the ordinary placement of the burden of proof in a civil proceeding should therefore apply. *See* Dkt. # 283, p. 4. While the party that seeks court action is ordinarily freighted with the initial burden of proving her claims, this "ordinary default rule" is not an inflexible one. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005). Indeed, the very case on which the Quileute and Quinault rely, *Schaffer ex. rel. Schaffer*, acknowledges that the general rule "admits of exceptions." *Id.* As the Supreme Court therein explained, "[u]nder some circumstances [the] Court has even placed the burden of persuasion over an entire claim on the defendant." *Id.* Among these exceptions are instances in which fairness counsel against placing "the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *Id.* at 60 (citing *United States v. New York N.H. & H.R. Co.*, 355 U.S. 253, 256 n. 5 (1957)).

The Court recently illustrated the limits of *Schaffer*'s default rule in *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S.Ct. 843 (2014), in which a patent licensee sought a declaratory judgment of non-infringement. The Court rejected the defendant-patentee's argument that the licensee, as the party seeking relief, has the burden to prove the absence of infringement in a declaratory judgment action. *Id.* at 846. The Court explained that the burden of proof is a "substantive aspect of a claim," *Id.* at 848, not to be confused with a "mere incident of a form of procedure." *Id.* (quoting *Garett v. Moore-McCormack Co.*, 317 U.S. 239, 249 (1942)). Just as the operation of the Declaratory Judgment Act is procedural in nature, so

are the Paragraph 25 avenues through which a tribe brings its U&A claim before the Court. As with the Declaratory Judgment Act, Paragraph 25(a)(6) does not alter substantive rights or shift the burden of proof away from the tribe asserting its usual and accustomed fishing grounds. Fairness also counsels in this case toward requiring the party with principal access to evidence about its own historic fishing practices to carry the burden to support its claim of entitlement. The burden of proof shall accordingly rest with the party asserting its U&A – here, the Quileute and the Quinault.

### B. Standard of Proof

As to the appropriate standard of proof, the Court rejects the Quileute and Quinault's assertion that anything other than the usual standard for a Paragraph 25(a)(6) subproceeding applies in this case. Respondents first contend that the Makah must carry the burden to prove that the Secretary's determination of their federal-water fishing areas is arbitrary and capricious. Respondents' attempt to import an APA standard of review into this Paragraph 25 subproceeding is without merit. This dispute does not involve the sort of challenge to federal regulations that was at issue in *Mosbacher*. Rather, it arises under this Court's continuing jurisdiction to determine, in the first instance, the boundaries of a tribe's customary fishing grounds.

The fact that the federal government has crafted placeholder boundaries for the tribes' ocean fishing grounds does not alter the standard of proof. As provided above, each time NMFS and NOAA issued a proposed or final rule, they did so with the express qualification that their regulations were neither intended to describe the tribes' historic U&A's nor to supplant the jurisdiction of this Court to adjudicate them. *See, e.g.* 51 Fed. Reg. 16471

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 25

(providing that the boundaries of a tribe's fishery within Subarea 2A-1 "may be revised as ordered by a Federal court"). The 1996 framework rule for tribal groundwater fisheries illustrates the point. The NMFS therein explained that the rule represented merely a "reasonable accommodation of the tribal fishing rights, absent more specific guidance from a court" and that its interim boundaries may be revised at any time under this Court's jurisdiction. *See* Dkt. # 58, Ex. L.

The United States has again emphasized the minimal impact that its regulations should have on U&A adjudications in its responsive brief. *See* Dkt. # 285, p. 5 (explaining that "NOAA's regulations addressing the Quinault and Quileute U&A's were not intended nor should be interpreted to be a conclusive boundary determination. Instead, the regulations are necessary for the agency's management of the ocean fisheries in the absence of a judicial determination of the boundaries of the Tribe's U&As."); *see also* Dkt. # 58 (brief by the United States explaining that NMFS "has consistently assumed that this Court would be the forum to adjudicate the western boundaries of the Quileute, Quinault, and Hoh usual and accustomed fishing grounds as it has done throughout the history of *United States v. Washington* in the context of other tribal U&A boundary disputes."). The Court is in accord. As it has stated before, it is this Court and not NMFS that determines tribal U&A's. As a consequence, federal regulations in this subproceeding have no bearing on the standard of proof that the Quileute and Quinault are required to carry.

Finally, in anticipation of the Court's decision to reject an APA standard and allocate the burden of proof to the Quileute and Quinault, Respondents move the Court to adopt a less stringent standard than the typical "preponderance of the evidence" standard employed in a

civil case. The tribes point to previous recognitions by this Court and by the Ninth Circuit that evidence of treaty-time fishing practices is particularly hard to come by, and that evidentiary standards in U&A subproceedings should reflect this reality. *See U.S. v. Washington*, 459 F.Supp. at 1059 ("In determining usual and accustomed fishing places the court cannot follow stringent proof standards because to do so would likely preclude a finding of any such fishing areas."); *Lummi*, 841 F.2d at 317 (Because of the fragmentary nature of treaty-time documentation, "the stringent standard of proof that operates in ordinary civil proceedings is relaxed."). As a consequence, the Quinault and Quileute move the Court to determine that they are only required to show, by direct evidence or reasonable inferences, the "probable location and extent of usual and accustomed treaty fishing areas." Dkt. # 283, p. 11 (citing *U.S. v. Washington*, 626 F.Supp. 1405, 1531 (W.D. Wash. 1985)).

For several reasons, the Court shall defer its determination as to the precise standard of proof. First, the Court is not persuaded that a relaxing of evidentiary standards is necessarily inconsistent with a preponderance of the evidence standard. For instance, while Judge Boldt observed that "stringent" standards of proof were inapplicable in U&A adjudications, he nonetheless applied the preponderance of the evidence standard in Final Decision # 1. *See Final Decision # 1*, 384 F.Supp. at 348 (basing findings of fact and conclusions of law "upon a preponderance of the evidence found credible and inferences reasonably drawn therefrom"). It stands to reason that a standard of proof identical to that used by Judge Boldt in Final Decision # 1 would apply when the Court is asked to adjudicate a U&A not specifically determined by Judge Boldt. In such an instance, the Court is merely standing in for what Judge Boldt would himself have done had the evidence been before him.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 27

In addition, it is unclear to the Court what exactly the proposed lesser standard of proof requires. Is the requirement to show "probable location" indeed less stringent than the requirement to show location on a "more likely than not" basis? If so, to what extent is the typical standard relaxed below a threshold 50% showing? The Court finds that these questions merit fuller discussion and hearing before a determination is reached on a matter that could carry a heavy precedential impact. Accordingly, the Court shall defer its decision on the precise standard of proof to be applied pending an opportunity for oral argument on this question at the opening of the upcoming bench trial.[1]

**CONCLUSION**

For the reasons stated herein, the Court hereby ORDERS that:

(1) The Makah Motion for Partial Summary Judgment Rejecting Equitable Defenses (Dkt. # 248) is GRANTED. The equitable defenses of laches, judicial estoppel, and acquiescence do not preclude a determination of the usual and accustomed fishing grounds and stations of the Quileute Indian Tribe and Quinault Indian Nation in the Pacific Ocean.

(2) The Quinault and Quileute Motion for Summary Judgment that Judicial Estoppel, Laches, Acquiescence, and Sovereign Immunity Bar the Makah Tribe's Request for Determination (Dkt. # 251) is DENIED.

---

[1] The Court also acknowledges the expressed grievances of Interested Parties that the instant Motion was filed with what the S'Klallam and Tulalip Tribes term "minimal compliance" with the filing deadlines set out in the Local Rules. While the Motion was filed in technical compliance with LCR 7(d)(3), the Court agrees that it contravenes the spirit and structure of this case. The Quinault and Quileute's decision to file their Motion so as to provide for the shortest possible response time has limited the ability of Interested Parties to respond to issues with potential ramifications for the case as a whole. The Court frowns on any appearance of gamesmanship in this or any other proceeding. The Court's decision to defer this issue until trial provides an opportunity for Interested Parties to be heard on the matter. No further briefing shall be submitted until invited by the Court.

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND MOTION TO DEFINE BURDEN OF PROOF – 28

(3) The Quileute and Quinault Motion to Define the Burden of Proof (Dkt. # 283) is

DENIED in part and DEFERRED in part. The Motion is denied to the extent that it

moves the Court to place the burden of proof at trial on the Makah Tribe. The

Motion is deferred pending hearing at bench trial to the extent that it seeks

clarification of the precise standard of proof to be borne by the Quinault and

Quileute Tribes at trial.


Dated this 18th day of February 2015.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT, SUMMARY JUDGMENT AND
MOTION TO DEFINE BURDEN OF PROOF – 29