UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF WASHINGTON, et al,,<br><br>Defendants. | CASE NO. C70-9213<br><br>Subproceeding No. 89-3-09 (Russ' Shellfish)<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

Pursuant to Section 9 of the Shellfish Implementation Plan (SIP), the Squaxin Island Tribe filed a request for dispute resolution regarding the Tribe's right to take shellfish and alleged interference with that right by Russell Norris d/b/a Russ' Shellfish. Dkt.1. The matter was referred to the undersigned pursuant to the terms of Section 9 of the SIP.

The parties fully briefed the issues and the Court heard oral argument on Tuesday, April 28, 2015. The Squaxin Island Tribe was represented by Sharon Haensly, the State of Washington, an interested party, was represented by Joseph Panesko and Russell Norris d/b/a Russ' Shellfish was represented by Dennis D. Reynolds.

**RELIEF REQUESTED BY THE SQUAXIN TRIBE**

The Squaxin Island Tribe's treaty right to harvest Manila clams from seven privately owned tidelands is at issue in this case.  The Squaxin Island Tribe asks this Court to find that Russell Norris d/b/a Russ' Shellfish violated Section 6.3 of the SIP when Russ' Shellfish failed to provide the Squaxin Island Tribe with a 6.3 Notice for the Beck, McNeal, Passmore and Durand tidelands.  The Tribe also seeks an order from this Court finding Russell Norris personally liable for Great Northwest Oyster's violation of Section 6.3 of the SIP when the limited liability corporation, owned by Russell Norris and Troy Morris, failed to provide 6.3 Notice for the Beck, McNeal and Passmore tidelands.  The Tribe seeks an order from this Court finding that Russell Norris d/b/a Russ' Shellfish violated the agreed upon Harvest Plans for the Moore, Verlinde, King and Durand tidelands.  Finally, the Tribe requests this Court to exercise its equitable powers and fashion a remedy for the asserted violations which would allow the Tribe to recover 30,850 pounds of naturally-occurring clams within the Tribe's U&A from any future tidelands leased by the Russell Norris, Russ' Shellfish, or any other business in which Russell Norris has any degree of direct or indirect involvement or privity.

For the reasons set forth below, the Court grants in part and denies in part the Tribe's Summary Judgment Motion.

**BACKGROUND**

Russ Norris has been involved in shellfish farming since 1982.  Mr. Norris started Russ Shellfish in 1992 (Dkt. 30-1, p. 16) and around that time he leased tidelands and started planting Manila Clams and a variety of oysters .  Dkt. 35, p. 3 (Declaration of Norris).  He also operated under the name Great Northwest Oyster Co. L.L.C. which was formed in 2005 (Dkt. 34-1, p. 7) and dissolved in 2011.

The current dispute revolves around seven different tidelands.  The McNeal, Beck and Passmore tidelands are located on Oakland Bay while the Moore, Verlinde, King and Durand tidelands are located on Hammersley Inlet.  There is approximately one mile of land between Oakland Bay and Hammersley Inlet.  *See* Dkt. 30-1, p. 7.  These tidelands are within the Squaxin Island Tribe's U&A which contains over 13,000 shoreline parcels and covers over 443 miles of shoreline.  Dkt. 43-1, Declaration of Eric Sparkman, Tribal Shellfish Biologist.

**1.  McNEAL, BECK AND PASSMORE TIDELANDS - OAKLAND BAY**

The Squaxin Island Tribe seeks recovery against Russ Norris for the McNeal, Beck and Passmore tidelands based on Mr. Norris' failure to comply with the 6.3 Notice requirement of the SIP.  The Tribe also seeks recovery against Russ Norris for his failure to provide 6.3 Notice for the Durand tidelands.

Mr. Norris' first contact with the McNeal, Beck and Passmore tidelands was through his limited liability corporation, Great Northwest Oyster Co. L.L.C., which he owned with Troy Morris.  Great Northwest Oyster entered into Tideland Harvest/Seed Agreements with the owners of the McNeal tidelands on December 15, 2007, the owners of the Beck tidelands on June 3, 2008, the owners of the Passmore tidelands on November 12, 2008.  Dkt. 30-1, p. 44-46. These agreements gave Great Northwest Oyster the exclusive rights to harvest and seed shellfish from the tidelands.

Great Northwest Oyster was formed by its owners to expand the sales of Russ Shellfish (owned by Russ Norris) and Calm Cove Shellfish (owned by Tony Morris).  Both Russ Norris and Tony Morris would sell their product, on occasion, to Great Northwest.  In addition, Great Northwest acquired a few harvest sites (Dkt. 30-1, p. 23, Declaration of Tony Morris), including the  McNeal, Beck and Passmore tidelands.  The bills for Great Northwest were paid through a separate checking account for Great Northwest.  Mr. Morris recalled two main employees who

1    worked for Great Northwest Oyster (Oscar Vasquez and Mick McKorr) but there were others he

2    could not recall.  Dkt. 34-1, p. ll.

3            Great Northwest Oyster dissolved in 2011.   Upon its dissolution, Tony Morris and Russ

4    Norris split a couple of tax liabilities fifty-fifty (Dkt. 30-1, p. 34) and divided up the assets of the

5    company between them.  According to Mr. Norris, the assets consisted of a couple of boats that

6    the LLC had purchased and each of them received one of those boats.  Dkt. 30-1, p. 33.

7            Both Russ Norris and Tony Morris continued to operate their separate businesses during

8    the time they had Great Northwest.  Dkt. 34-1, p. 11, 22 – 23.  Mr. Norris did not have any full-

9    time employees of Russ' Shellfish but he did have a contract employee, Mick McCord, who has

10   worked for Mr. Norris for quite awhile.  Dkt. 30-1, p. 37.

11           Following the dissolution of the limited liability corporation, Russell Norris signed, on

12   behalf of Russ' Shellfish, five year Tidelands Harvest/Seeding Agreements with the owners of

13   the McNeal tidelands on September 8, 2011, the owners of the Passmore tidelands on September

14   15, 2011 and the owner of the Beck tidelands on October 11, 2011.  Dkt. 30-2, p. 1-3.  These

15   three leases were cancelled by Russell Norris in August 2014.  Dkt. 30-2 p. 10 – 11.

16           Pursuant to R.C.W. 77.115.040 and WAC chapter 220-76, an individual desiring to

17   engage in shellfish cultivation or enhancement and harvest is required to apply for an Aquatic

18   Farm Registration (AFR).   An aquatic "farm" is defined as any "facility or tract of land" on

19   which the private, commercial culture of shellfish occurs, and "[e]ach geographically separate

20   facility or tract of land used for commercial culture shall constitute a separate farm site location."

21   WAC 220-765-015.  An AFR is nontransferable and any change in ownership invalidates the

22   prior AFR.  WAC 220-76-010(2).  It is undisputed that both Great Northwest Oyster and Russ'

23   Shellfish operated aquatic farms on these three tidelands.

24

According to the Paula Galivan, custodian of the Washington Department of Fish and Wildlife (WDFW) records and an employee of WDFW since March 2004, WDFW does not have any records showing that an Aquatic Farm Registration was ever issued for the McNeal, Passmore or Beck tidelands.  Dkt. 42.  Further, Mr. Norris presented no timely evidence that he ever obtained the required AFR's for these three tidelands either when he was farming under Great Northwest or under Russ' Shellfish.  Mr. Norris did testify that Great Northwest had an AFR (Dkt. 35-2, p. 10) but this AFR is for property identified as belonging to Darren Ogg and it was for Pacific Oysters.

However, the presence or absence of an AFR for these tidelands is not dispositive of this motion as the Squaxin Island Tribe seeks relief pursuant to the Shellfish Implementation Plan.  In that regard, it is undisputed that Russell Norris and Great Northwest Oyster never provided the Squaxin Island Tribe with a 6.3 Notice regarding these three tidelands.  Dkt. 30-1, Declaration of Eric Sparkman.

It was not until 2013 that the Squaxin Island Tribe first learned that these tidelands were being commercially farmed.  The Tribe mailed Section 7 notices to the McNeals, Passmores and Becks.  After these notices were sent out, Rana Brown, a Shellfish Biologist for the Squaxin Island Tribe, was informed by the McNeals and Becks that Russell Norris had been commercially cultivating and harvesting their tidelands for years and she heard from other sources about Mr. Norris' activities on the Passmore tidelands.  Dkt. 30-4.

Russ Norris stated in his Declaration (Dkt. 35) that he did not believe he was obligated to provide the Squaxin Island Tribe with notice regarding his aquaculture activities on the parcels for the following reasons:

The McNeal, Passmore, Beck and Durand beaches had all been farmed before leases were signed with Russ' Shellfish.  At the time I took over and inspected these beaches, no measurable quantities of wild stock Manila clams were present.  Based on the

1   information that I had from the involved landowners, the beaches had been cultivated for
    years.  Thus, because of these circumstances (and my general knowledge of aquaculture
2   and historical cultivation in the area), I did not believe we had any obligation to contact
    the Tribe that Russ' Shellfish was going to continue with established cultivation
3   practices on the beaches in question.  Again, there were no "natural beds" and the tracts
    or beaches had been previously cultivated and/or enhanced for many years."
4   Dkt. 35, p. 4 – 5.

5   Mr. Norris is of the opinion that there is no "natural bed" left after a beach has been farmed for at

6   least 15 years.  Dkt. 35, ¶ 6.

7       Russ' Shellfish cancelled the Tidelands Harvest/Seeding Agreements with the tideland

8   owners in August 2014.

9
    **2. SQUAXIN ISLAND TRIBE'S LOSS CALCULATION FOR THE McNEAL, BECK**
10  **AND PASSMORE TIDELANDS**

11      Eric Sparkman is employed by the Squaxin Island Tribe as a Shellfish Biologist and has

12  been so employed since 2005.  He holds a Bachelors of Science degree in Fisheries and Biology

13  and his position with the Squaxin Island Tribe involves managing shellfish harvesting.  Dkt. 30-

14  1, Declaration of Eric Sparkman.  Mr. Sparkman estimated the Squaxin Island Tribe's lost Treaty

15  share of Manila clams from the McNeal, Passmore and Beck tidelands.  In order to estimate the

16  Treaty share, he first located nearby beaches that had a representative local Manila clam

17  population free of recent harvest or enhancement activity.  The Sunset Beach tidelands owned by

18  the Royals and Campbells met these criteria.  The McNeal, Passmore and Beck tidelands are also

19  on the Sunset Beach.

20      The Squaxin Island Tribe's 2013 survey of the Royal tidelands indicated a density of 0.67

21  pounds per square foot, and a prior Grower's harvest on the Campbell tidelands indicated 1.0

22  pounds per square foot.  Mr. Sparkman averaged the baseline natural clam density of these tracts

23  for a clam density of 0.84 pounds per square foot.  Based on his knowledge of the size of the

24  tidelands for the three parcels he estimated the following annual loss for each parcel:

McNeal tidelands – 1,074 pounds per year

Passmore tidelands – 2,103 pounds per year

Beck tidelands – 1,010 pounds per year

As noted above, these three tidelands are all situated in Oakland Bay which is "one of the, if not the most productive Manila bays in all of Puget Sound and, in fact, the entire West Coast of the United States." Dkt. 43-1, p. 8. Mr. Sparkman also testified to the fact that "[w]e also have beaches in the area that we have surveyed regularly for wild populations of Manila clams, and so we know that there are many, many wild clams in that area." So Mr. Sparkman did the best he could do to "determine what our best estimate of what the ambient density would have been." *Id.*

Camille Speck, who has been a shellfish biologist for the Washington Department of Fish & Wildlife for sixteen years, also agrees with the approach taken by Mr. Sparkman to estimate the natural bed densities of the tidelands. As noted by Ms. Speck, she is "very familiar with their methodologies for determining natural bed density by surveying natural beds, and for back-calculating when the natural bed baseline is unavailable because cultivation and/or harvest has occurred. I have always had confidence and faith in their methodologies, and routinely incorporate their results into intergovernmental plans for Tribal-State sharing of the shellfish resource, which are reviewed and approved at the highest levels of WDFW." Dkt. 43-3, p. 1.

Russ' Shellfish filed a Declaration of Andrew Woolliscroft in which he concluded that the "particular 'baseline density' method used and the subsequent extrapolated results to be not only scientifically unsound, but also extremely unreliable and very inaccurate." Dkt. 38, p. 3. The Court is disregarding this declaration as there has been insufficient showing that Mr. Woolliscroft has the necessary expertise to make such a conclusion. Mr. Woolliscroft graduated from Evergreen State College last year with a Bachelor of Science degree with a concentration in

1   Environmental Studies and an emphasis on Landscape Ecology, and a Bachelor of Arts degree in

2   General Studies.  There is nothing set forth in his background which suggests that he has any

3   expertise in the area of a shellfish biology which would qualify him as an expert nor is there

4   anything in his declaration which suggests that he has the expertise necessary to render the

5   opinion he sets forth in his declaration.

6   **3.  DURAND, VERLINDE, KING and MOORE TIDELANDS – HAMMERSLEY INLET**

7          The Squaxin Island Tribe and Russell Norris agreed to Harvest Plans for the Durand,

8   Verlinde, King and Moore tidelands.  The Squaxin Island Tribe asserts, however, that Russell

9   Norris violated the Harvest Plans and they seek an equitable remedy from the Court for their lost

10  opportunity to harvest their Treaty share of the Manila clams on these tidelands.

11         **A.  Durand Tidelands**

12         On February 1, 2005 Russ' Shellfish entered into a five year lease with the tideland's

13  owner, Diane Durand (Dkt. 30-2, P. 27) which permitted Russ' Shellfish to harvest shellfish

14  from the tidelands.  Russ' Shellfish did not give the Squaxin Island Tribe a 6.3 Notice until May

15  16, 2011.  Dkt. 30-2.   The Tribe asserts that Mr. Norris violated the SIP by his failure to give the

16  required 6.3 Notice.  He did, however, provide 6.3 Notice on May 16, 2011.  Dkt. 35-1, p. 19.  A

17  Harvest Plan was subsequently agreed upon and became effective on October 10, 2011.  Dkt. 30-

18  2, p. 27.

19         Pursuant to the Durand Tideland Harvest Plan, the parties agreed that the Squaxin Island

20  Tribe's annual Tribal share was 450 pounds of Manila clams.  The Harvest Plan also addressed

21  the prior years during which Russ' Shellfish harvested clams from the property without giving

22  notice to the Tribe.

23         Upon signature of this Harvest Plan, Russ' Shellfish and the Squaxin Island Tribe
       ("Tribe") agree that Russ' Shellfish: 1) shall now be considered to be in
24     complete compliance with the 2002 Shellfish Implementation Plan as it

1    pertains to the creation of an artificial commercial bed of Manila clams.

2
     Dkt. 30-2, p. 27.
3
         The Harvest Plan addressed the issue of subsequent harvests:
4
         SUBSEQUENT HARVESTS:  Subsequent harvests of the artificial bed will
5        include the harvest of the naturally occurring Manila clam population on
         these tidelands.  To resolve any issues regarding the natural productivity
6        and/or the sustainable harvest of the leasehold, the parties agree that the
         Tribe shall be entitled to harvest **450 lbs. per year**, commencing in year
7        2011.  Harvests will occur on a three (calendar) year cycle unless otherwise
         requested by Russ' Shellfish, to which the Tribe will agree as long as it
8        the alternate cycle does not compromise its Treaty share.  The Tribe may
         agree to reserve any unharvested amount from the previous year(s) and harvest
9        that amount at a later date(s) that will not exceed three years from its last
         harvest, unless otherwise agreed to by Russ' Shellfish and the Tribe.
10       In order to accommodate subsequent harvests, Russ' Shellfish agrees to
         conduct harvests in a manner that will not prevent the Tribe from
11       harvesting its allocated share by coordinating harvest cycles with the
         Tribe, and communicating information that could affect the amount
12       and location of biomass available for Tribal harvest.  …
     Dkt. 30-2, p. 27-28.
13
         Following execution of the Harvest Plan, the Squaxin Island Tribe conducted a harvest on
14
     August 17, 2012 and harvested 396 pounds which left a shortage of 54 pounds.  The Tribe
15
     conducted a second harvest on November 19, 2013 and harvested 478 pounds of Manila clams
16
     which was 28 pounds over the Treaty share.  This resulted in a net deficit of 26 pounds based on
17
     the two harvests.  Dkt. 30-1, p. 3 and Dkt. 30-2, p. 29.  According to Eric Sparkman, because the
18
     Harvest Plan was signed late in the year the Tribe did not have time to schedule a harvest for its
19
     2011 Treaty share although its first harvest was targeted to represent the 2011 share.  In a letter
20
     dated November 25, 2013 Rana Brown notified Mr. Norris of a 472 pound shortfall in the
21
     Tribe's harvest and proposed "as a remedy that we roll this amount over to next years' allocation
22
     and harvest it during next years' harvest.  Please let us know if you have any questions regarding
23
     this matter."   Dkt. 30-2, p. 30.
24

1    During the time the Harvest Plan was in effect and between October 2011 through 2013,

2    Russ' Shellfish harvested 2,765 pounds of Manila clams from the Durand tidelands.  Dkt. 30-1,

3    p. 3.  It is undisputed that Mr. Norris did not provide the Squaxin Island Tribe with any

4    information regarding those harvests of Manila clams.  In addition, Mr. Norris provided no

5    explanation or reason why he failed to contact the Tribe regarding his anticipated harvests.  Mr.

6    Norris cancelled the Durand lease in August 2014 but the Squaxin Island Tribe did not learn of

7    Mr. Norris's cancellation of the Durand lease until September 16, 2014.  *Id.*

8    The Tribe is seeking to recover 450 pounds/year for the calendar years 2005 – 2010 for a

9    total of 2,700 pounds.  It is also seeking to recover 926 pounds for the calendar years 2011 –

10    2014.

11    **B.  Verlinde Tidelands**

12    Russ' Shellfish and the Squaxin Island Tribe entered into the Verlinde Tideland Harvest

13    Plan on June 28, 2011.  Dkt. 30-2, p. 31.  In the Harvest Plan the parties agreed that the Tribe's

14    initial share of Manila clams was 3,783 pounds and that the "subsequent (annual) Tribal Share"

15    was 1,261 pounds.  It appears that the Tribe did not conduct any "subsequent" harvests before

16    Mr. Norris cancelled the lease with Verlinde in August 2014.  No evidence was presented to the

17    Court as to why there were no Tribal harvests during the course of this Harvest Plan.

18    Mr. Norris conducted two harvests on the Verlinde tidelands in July 2014 and harvested

19    1,425 pounds of Manila clams.   Mr. Norris testified, in his Declaration, that he contacted the

20    Tribe before any work was started but he does not give any information as to what "work" he is

21    referencing, when he contacted the Tribe, who he spoke to or any other details.  He does not

22    specifically state that he had any contact with the Tribe regarding his anticipated harvests.  (Dkt.

23    35, p. 6)  This testimony is not sufficient to contradict the clear testimony from Mr. Sparkman

24

1    that Mr. Norris did not provide any information to the Squaxin Island Tribe prior to conducting

2    either of these harvests.

3        The Tribe seeks to recover, for its lost opportunity to harvest, a total of 3,783 pounds of

4    Manila clams.  This represents its annual share of 1,261 pounds of clams for three clam years –

5    June 2012 through June 2015.  The Tribe acknowledged, however, during oral argument that it

6    was not entitled to any recovery for any time after the leases were cancelled by Mr. Norris.  With

7    this concession, the Court concludes that the Tribe is seeking a recoupment amount of 2,522

8    pounds of Manila clams.

9     **C.  King Tidelands.**

10       Russ' Shellfish and the Squaxin Island Tribe entered into the King, J. Tideland Harvest

11    Plan on March 1, 2012.  Dkt. 30-3, p. 1.  The parties agreed that both parties had the right to an

12    initial share of 1,801 pounds of Manila clams each.  With regard to subsequent harvests, the

13    parties agreed as follows:

14       SUBSEQUENT HARVESTS:  Subsequent harvests of the bed will include the
         harvest of the naturally occurring Manila clam population on these tidelands.

15       The Tribe will conduct population assessments on the tideland every three
         years, unless otherwise agreed to by both parties, which will determine

16       the total harvestable biomass.  Both the Tribe and Russ' Shellfish shall
         then be entitled to harvest 50% of the harvestable biomass.

17

18       Russ' Shellfish agrees to only harvest shellfish only every three years
         (i.e., 2012, 2015 etc.) in coordination with the Tribe, and only after the
         Tribe has conducted a population assessment to determine the population

19       of naturally occurring shellfish on these tidelands.

20       In order to accommodate subsequent harvests, Russ' Shellfish agrees to
         conduct harvests in a manner that will not prevent the Tribe from

21       harvesting its share by coordinating potential harvest cycles with the
         Tribe, and by communicating information that could affect the amount

22       and location of biomass available for harvest.

23    Dkt. 30-3, p. 2.

24

1    Russell Norris admits that he violated the terms of this Harvest Plan when he harvested

2  850 pounds of Manila clams in mid-August 2014.  Mr. Norris' explanation for failing to comply

3  with the Harvest Plan was that he "thought the three-year period for Tribal harvest of the 'natural

4  set' was up; it was not."  Dkt. 35, p. 9.  The Court notes that this explanation does not track the

5  language of the Harvest Plan as Russ' Shellfish specifically agreed to only harvest shellfish

6  every three years, that such harvest would be done in coordination with the Tribe and that it

7  would be done only after the Tribe had done a population assessment.  Regardless of the strength

8  of his admission, there was a violation of the Harvest Plan.  Further, the Harvest Plan agreement

9  called for a fifty-fifty sharing.  There is no dispute that the Tribe was prevented from harvesting

10  its Tribal treaty share and that it is entitled to equitable relief in light of the fact that the King

11  lease was terminated in August 2014.

12  **D.  Moore Tidelands.**

13    The Squaxin Island Tribe is not seeking any additional relief regarding shellfish

14  harvesting activities of Russ' Shellfish on the Moore tidelands as the Tribe was able to reach a

15  separate agreement with the landowner and obtained the poundage it was due under that

16  agreement.

17    The history regarding the Moore tidelands is similar to those already discussed.  Russell

18  Norris leased the tidelands on March 6, 2011 for five years.  Dkt. 30-3.  The lease gave Russ'

19  Shellfish the right to seed and harvest shellfish.  On April 14, 2011 Rana Brown informed

20  Russell Norris' representative, Nicole Brown, that Russ Norris should contact Ms. Brown before

21  conducting commercial activities on the Moore tidelands as the Tribe needed to conduct a

22  baseline survey to determine the natural population.  Dkt. 30-4.

23

24

1       On May 3, 2011 Russ' Shellfish sent a 6.3 Notice to the Squaxin Island Tribe for the

2   Moore tidelands.  On the 6.3 Notice Russell Norris noted that he had harvested 1,772 pounds of

3   shellfish between April 22 through April 30, 2011.  Dkt. 35-1. P. 25.

4       The Squaxin Island Tribe, Russ' Shellfish and Randy Moore entered into the Moore

5   Tideland Harvest Plan May 18, 2011.  Dkt. 30-3, p. 9.  This is the only Harvest Plan in which the

6   property owner was also a party.  As part of the Harvest Plan, the parties agreed that Russ'

7   Shellfish "shall now be considered to be in compliance with the 2002 Shellfish Implementation

8   Plan as it pertains to the creation of an artificial commercial bed of Manila clams."  *Id.*

9   With regard to the terms of the Plan, the parties agreed that the Tribe's initial share was 7,131

10  pounds and that its subsequent annual share was 2,377 pounds commencing in 2012.

11      The Tribe attempted to harvest 2,377 pounds on August 17, 2012 but due to extreme

12  weather was only able to harvest 1,467 pounds.  The Tribe then scheduled a harvest on

13  November 2, 2012 to harvest the balance.  Dkt. 30-3, p. 12.  A dispute between the Tribe and Mr.

14  Norris arose during that harvest, and the Tribe harvested 559 pounds leaving a shortage of 351

15  pounds.[1]  The Court was provided with a copy of a March 6, 2013 letter purported to be signed

16  by Randal C. Moore and Ramona E. Moore in which they cancelled the lease of their tidelands

17  with Russ' Shellfish.

18      The Tribe and Randal and Ramona Moore then entered into an Agreement (Dkt. 30-3, p.

19  37) effective March 13, 2013 which permitted the Tribe to harvest 2,728 pounds of Manila clams

20  from the Moore tidelands.  This sum represented the 351 pound shortfall from its harvest in 2012

21  and the Tribe's share of 2,377 pounds for 2013.  The Tribe harvested its full share by July 2014.

22  ────────────────

23      [1] The Court notes that much of this factual information is contained in letters and not in a declaration under
    penalty of perjury.  However, for purpose of this motion the failure to present the evidence by declaration does not

24  affect the Court's conclusion as the Squaxin Tribe is not seeking any recovery based on activity on the Moore
    tidelands.

1    The Tribe learned through discovery that Mr. Norris harvested a total of 1,100 pounds of

2    Manila clams on the Moore tidelands  on March 25, 2013 (325 pounds) and again on May 13 and

3    20, 2013 (775 pounds).  Dkt. 30-3, p. 36.

4    Mr. Norris states that the Moore's allowed Russ' Shellfish to "recoup our seed, that is,

5    the lease contained a 'recoupment within 90 days' of cancellation clause.  Russ' Shellfish had 90

6    days to try and recover the planted seed and relocate it.  This was the second time we 'harvested'

7    the Moore beach.  The first was a scheduled harvest for mature product; the second was a

8    salvage of seed operation triggered by the cancelled lease."  Dkt. 35, p. 10.

9    While there may be many questions surrounding Mr. Norris' activities on the Moore

10   tidelands after the lease was cancelled, as noted above, the Tribe is not alleging harm with regard

11   to its lost opportunity to harvest its Treaty share as it was able to obtain its Treaty share through

12   its separate agreement with Randal and Ramona Moore.

13   **VIOLATION OF SIP 6.3 NOTICE REQUIREMENT**

14   Russ Norris asserts that there can be "no 'natural bed' left after a beach has been farmed

15   for at least 15 years."  Dkt. 35, p. 2.  "At the time I took over and inspected these beaches[2], no

16   measureable quantities of wild stock Manila clams were present.  Based on the information that I

17   had from the involved landowners, the beaches had been cultivated for years.  Thus, because of

18   these circumstances (and my general knowledge of aquaculture and historical cultivation in the

19   area), I did not believe we had any obligation to contact the Tribe and that Russ' Shellfish was

20   going to continue with established cultivation practices on the beaches in question.  Again, there

21   were no 'natural beds' and the tracts or beaches had been previously cultivated and/or enhanced

22   for many years."  Dkt. 35, p. 4 – 5.

23   _____

24   [2] The beaches referenced include the McNeal, Passmore, Beck and Durand beaches.

1   At oral argument, the Court inquired of counsel for Russ Norris how one was able to

2   differentiate between wild stock Manila clams and cultivated Manila clams and counsel agreed

3   that there is no difference in appearance between the two.  With this response, it is clear that

4   Russ Norris' conclusion that there was no wild stock Manila clams present was based solely on

5   his understanding that the tidelands had been previously cultivated by other Growers, which

6   included his own company Great Northwest Oyster, and not some type of skill that allowed him

7   to identify wild versus commercial Manila clams.  While this is a unique argument, it ignores

8   case law as well as the language and intent of the SIP.

9        We therefore apply the following analysis to Grower beds where the
     Growers, or their predecessors, began their enhancement efforts on a

10        natural bed.  For such natural beds, the Growers shall demonstrate what
     portion of their harvest is due to their labor, as opposed to what portion

11        would exist absent the Grower's enhancement.  *See Shellfish II.,* 898 F.
     Supp. At 1462.  For such enhanced natural beds, the Tribes shall be

12        entitled to fifty percent of the pre-enhanced sustainable shellfish
     production from those beds.  (footnote omitted).  Of course, this

13        allocation analysis does not apply to  artificial beds, that is, to Grower
     beds that did not support a sustainable commercial density of shellfish

14        prior to cultivation.  As the Tribes have acknowledged, the Tribes have
     no right to harvest such beds.  898 F.Supp. at 1460-61.

15        We place the burden of proving pre-enhancement harvest versus
     post-enhancement harvest on the Growers – for the Growers are best

16        able to prove such a calculation.  (footnote omitted).

17   *United States v. State of Washington*, 157 F.3d 630, 653 (9th Cir. 1998).

18   As a consequence of this 9th Circuit decision, on April 8, 2002 the Tribes, the Growers

19   and the State of Washington filed a Stipulation and Order Amending Shellfish Implementation

20   Plan (Dkt. 34-2), which is the current form of the Revised Shellfish Implementation Plan.

21   Section 6 applies to Commercial Shellfish Growers, which includes Russ Norris.

22   Section 6.3 requires a Grower to give notice to an affected Tribe if the Grower "plans to

23   enhance an existing natural bed or create a new artificial bed."

24   The notice shall be provided at least sixty days prior to the

> proposed enhancement or creation of the bed and shall include the
> following:  the location and species of the proposed bed and a summary
> of information known to the Grower regarding the history and
> enhancement of any species of shellfish listed in Exhibit A on the property.
> In addition, the notice shall explain the basis for the Grower's
> determination that the sustainable yield of shellfish is below the natural
> bed threshold in Exhibit A or if it is above the threshold, what the
> sustainable harvest yield is.

Dkt. 34-2, p. 17.

Mr. Norris asserts that Section 6.3 did not apply to him because of his conclusion that there was no "natural bed" left due to the prior cultivation of the beds which he understood had gone on for more than fifteen years.  Therefore, he was seeding an artificial bed but, also, because prior growers had cultivated the property, he was not creating a "new" artificial bed and therefore he did not have to give any notice to the Tribe.  However, based on Mr. Norris' testimony, the tidelands were "new" artificial beds as to him.  Reading the SIP in its entirety, as well as considering the case law upon which it was based, it is clear that Mr. Norris was required to give notice to the tribe both of his enhancement activities as well as his conclusion that there was no natural bed existing on the tidelands upon which he was operating.  Only by giving the required notice would the Tribe have had an opportunity to assess Mr. Norris' conclusion that there was no natural bed on these tidelands.

If the Court were to accept Mr. Norris' argument, then eventually the Treaty Tribes would be prohibited from harvesting shellfish on privately owned tidelands due to the passage of time (15 years as asserted by Mr. Norris) coupled with commercial activity by Growers.  This argument fails in light of the purpose and language of the SIP and its foundational case law.

The Court concludes that Mr. Norris violated the SIP when he failed to provide the required Section 6.3 Notice to the Squaxin Island Tribe prior to his commencing cultivation of

the McNeal, Passmore and Beck tidelands and that the Squaxin Island Tribe is entitled to relief because of that violation.

With regard to the Durand tidelands, the Court concludes that the Tribe relinquished its right to assert a 6.3 Notice violation when it entered into the Harvest Plan with Mr. Norris.  The Tribe agreed, in the Harvest Plan, that Russ Shellfish "shall now be considered to be in compliance with the 2002 Shellfish Implementation Plan as it pertains to the creation of an artificial commercial bed of Manila clams."  Dkt. 30-2, p. 27.  The Court therefore DENIES the Tribe any relief related to this allegation.

**VIOLATION OF HARVEST PLANS**

First, it should be noted that the Squaxin Island Tribe is not seeking any additional relief from Mr. Norris based on the alleged violation of the Harvest Plan for the Moore property.  It appears to the Court that this tideland was included in the litigation as additional evidence of Mr. Norris' failure to comply with the SIP and Harvest Plans.

Second, three of the Harvest Plans that were executed by the Squaxin Island Tribe and Mr. Norris forgave prior transgressions.  The Harvest Plans for the Durand, Verlinde and Moore tidelands agreed that Russ' Shellfish would be considered in compliance with the 2002 Shellfish Implementation Plan upon signing of the Plan.  *See* Dkt. 30-1, p. 27 (Durand); Dkt. 30-2, p. 31 (Verlinde); Dkt. 30-3, p. 9 (Moore).  Based on this language, the Court concludes that the Squaxin Island Tribe is not entitled to any equitable remedy for violations of the SIP for the time prior to the signing of the various Harvest Plans for Durand, Verlinde and Moore.

Third, Mr. Norris agrees that he violated the Harvest Plan for the King tidelands.  Dkt. 35, p. 9.  He admits to having harvested 850 pounds of Manila clams in mid-August 2014 in violation of the agreed upon Harvest Plan.  Based on the Harvest Plan, the parties agreed that Russ' Shellfish and The Squaxin Island Tribe were each entitled to "harvest 50% of the

harvestable biomass." Dkt. 30-3, p. 2. The Squaxin Island Tribe asserts that it is entitled to obtain 850 pounds of Manila clams and the Court agrees. The specific language with regard to this right will be determined at a later date.

Fourth, the Squaxin Island Tribe acknowledges that its claims against Russ Norris ended when the leases for the tidelands were terminated in August 2014.

There remain two Harvest Plans which the Tribe asserts were violated by Russ Norris – the Harvest Plans for Durand and Verlinde.

**Durand Harvest Plan.** The Harvest Plan requires Russ' Shellfish "to conduct harvests in a manner that will not prevent the Tribe from harvesting its allocated share by coordinating harvest cycles with the Tribe, and communicating information that could affect the amount and location of biomass available for Tribal harvest." Dkt. 30-2, p. 27-28. The Tribe was required to "coordinate its subsequent harvests with Russ' Shellfish and provide dates and times of the actual harvest at least 5 days in advance of the intended harvest date." *Id.* at p. 28.

During the time the Harvest Plan was in effect, Russ' Shellfish harvested 2,765 pounds of Manila clams from the Durand tidelands. Russ' Shellfish had no communication whatsoever with the Squaxin Island Tribe regarding coordination of harvest cycles nor did he communicate any information that could affect the amount and location of biomass available for Tribal harvest. Mr. Norris also did not provide this Court with any explanation as to why he failed to have any communication with the Tribe. The Court concludes that Russ Norris violated the terms of the Durand Harvest Plan.

**Verlinde Harvest Plan.** Mr. Norris made the same agreement in the Verlinde Harvest Plan (Dkt. 43-1, p. 13) as he made in the Durand Harvest Plan. He agreed to "conduct harvests in a manner that will not prevent the Tribe from harvesting its allocated share by coordinating

1   harvest cycles with the Tribe, and communicating information that could affect the amount and

2   location of biomass available for Tribal harvest." *Id.*

3       Mr. Norris conducted two harvests on the Verlinde tidelands in July 2014 for a total

4   harvest of 1,425 pounds of Manila clams.  Mr. Norris did not coordinate this harvest cycle with

5   the Squaxin Island Tribe nor did he communicate any additional information to the Tribe as

6   required under the Harvest Plan.  The Court concludes that Mr. Norris violated this Harvest Plan.

7         **TRIBAL CLAIMS RELATING TO GREAT NORTHWEST**

8       The Squaxin Island Tribe asserts that Russell Norris is personally liable for Great

9   Northwest's failure to provide Section 6.3 Notice to the Tribe for the McNeal, Beck and

10  Passmore tidelands.  As noted above, these tidelands were initially leased on various dates in

11  2008 by Great Northwest Oyster Co. L.L.C., a limited liability corporation owned by Russell

12  Norris and Troy Morris.  Great Northwest dissolved in 2011.

13      The Squaxin Island Tribe asserts personal liability against Russell Norris on two theories

14  – responsible corporate officer and successor liability.  Russ Norris denies that he has any

15  personal liability to the Tribe for the actions or inactions taken by Great Northwest.

16      **Responsible Corporate Officer.**  The undersigned concludes that this theory does not

17  apply to the facts of this case.  The theory of responsible corporate officer was first articulated in

18  *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) and then again in

19  *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).  In both of these

20  cases the Defendants were corporate officers who were found to be criminally responsible for

21  violations of the Federal Food, Drug and Cosmetic Act.  Subsequent to these cases, corporate

22  officers have been found to be personally liable for violations of other federal public health laws

23  as well as state environmental laws with regard to civil liability.

24

1      Included in that latter category is *Department of Ecology v. Lundgren,* 94 Wash. App.

2  236 (Div. II, 1999).  In this case the Department of Ecology sought to hold the defendant, who

3  was the sole owner and officer of Ketron Island Enterprises, personally liable for the

4  corporation's violation of the Washington Water Pollution Control Act. The Department's theory

5  was that it is appropriate to hold a corporate officer criminally liable where the officer stands in

6  responsible relation to a public danger.  The Washington Court of Appeals noted that this

7  doctrine has also been applied to violations of state environmental laws.

8      However, this Court has not been made aware of any case that imposes this type of

9  personal liability on an individual outside public health laws or state environmental laws.  The

10 facts of this case are not similar in any respect to the cases cited to the Court.

11     The Court concludes that the responsible corporate officer theory is inapplicable and that

12 the Tribe's summary judgment motion to hold Mr. Norris personally responsible as a corporate

13 officer is **DENIED**.

14     **Successor Liability.**  The Tribe also asserts, under the theory of successor liability, that

15 Russell Norris is personally liable for the failure of Great Northwest to provide 6.3 Notices to the

16 Tribe for the Passmore, McNeal and Beck properties.  In support of that position the Tribe cites

17 to the case of *Cambridge Townhomes v. Pacific Star Roofing,* 166 Wash.2d 475, 209 P.3d 863

18 (2009).

19     Washington adheres to the general rule that a corporation purchasing the assets of another

20 corporation does not become liable for the debts and liabilities of the selling corporation.  There

21 are, however, four exceptions to this rule of non-liability.  The one relied on by the Tribe is when

22 "the purchaser is a mere continuation of the seller."

23     In *Cambridge,* the Supreme Court concluded that a subsequent corporation may be liable

24 for a sole proprietorship's construction defects under a theory of successor liability.  Gerald

1   Utley was a sole proprietor doing business as P.J. Interprize.  He subsequently decided to

2   incorporate his business as P.J. Inc.  The Supreme Court concluded that this "merely represented

3   a new hat for the sole proprietorship."  *Id.* at p. 483.  While there was no "sale" of assets, there

4   clearly was an acquisition of assets in light of the fact that the only change was the sole

5   proprietorship becoming incorporated.  Nothing else of note changed with the change in the

6   business entity.

7       In the case before this Court, the Court cannot conclude that the theory of successor

8   liability applies as a matter of law.

9       First, it appears to this Court that Great Northwest simply stopped doing business and

10  that the debts and assets of the LLC were divided between Mr. Norris and Mr. Morris.  There is

11  nothing before the Court to suggest a sale of assets from Great Northwest to Russ' Shellfish nor

12  is there any evidence before the Court to suggest that Russ' Shellfish acquired the assets of Great

13  Northwest.

14      While Great Northwest, through the efforts of Russ Norris, did have contracts covering

15  various tidelands it appears that those contracts ended when Great Northwest stopped doing

16  business.  There is no evidence that the existing contracts were transferred to Russ' Shellfish.

17  Rather, new contracts were negotiated by Russ Norris for Russ' Shellfish.

18      In addition, it appears from the testimony that Great Northwest had a number of

19  employees who were employed to harvest the shellfish for which it had contracts.  These

20  employees were paid by Great Northwest.  It is also clear from Mr. Norris' testimony as well as

21  that of Troy Morris that there was no comingling of funds, bills etc. during the time Great

22  Northwest was active.

23      Finally, the testimony also shows that one aspect of the business of Great Northwest was

24  to purchase shellfish from the separate businesses of Russell Norris and Troy Morris which Great

1   Northwest then sold to others.  There is no evidence before the Court that Mr. Norris business,

2   Russ' Shellfish, followed this business model at any time – either before or after Great

3   Northwest.

4           For these various reasons, the Court cannot conclude, as a matter of law, that Russell

5   Norris is personally liable for the failure of Great Northwest to provide 6.3 Notices to the Tribe

6   for the Beck, Passmore or McNeal properties and the Tribe's motion of summary judgment in

7   that regard is DENIED.

8                                              **REMEDY**

9           The Court concludes that it does have the authority to fashion an equitable remedy

10  against Russell Norris for his violations of the 6.3 Notice requirements of the SIP as well as his

11  violations of the applicable harvest plans.  As noted by the State of Washington, "the Shellfish

12  Implementation Plan was fashioned out of equity to balance the rights of the Treaty Tribes,

13  shellfish growers, private landowners, and other citizens of the State of Washington when

14  implementing treaty harvesting rights.  *See United States v. Washington,* 898 F. Supp. 1453,

15  1458-59 (W.D. Wash. 1995), *aff'd in part, rev'd in part,* 157 F.3d 630 (9th Cir. 1998).  The Ninth

16  Circuit reaffirmed that equitable principles are at play in the Shellfish Implementation Plan.  157

17  F.3d at 651-53."  Dkt. 41 at p. 6-7.

18          It would clearly be unfair to the Tribe to allow a Grower to violate the SIP with impunity.

19  If there were no consequences, this could encourage Growers to sign a lease for tidelands,

20  harvest the shellfish and then cancel the lease without providing notice of any of the commercial

21  activities on the tidelands – all to the detriment of the affected tribes.  This clearly is not the

22  intent of the SIP.

23

24

ORDER ON MOTION FOR SUMMARY JUDGMENT   22

1       The next issue for determination, then, is what the remedy should be.  The Court agrees

2   with the proposal of the Squaxin Island Tribe that it should have the right to recover lost

3   poundage against Russell Norris in the future.

4       With regard to the three tidelands on Oakland Bay (McNeal, Beck and Passmore), Russ

5   Norris failed to provide the required 6.3 Notice.  These failures to provide the required notice

6   prevented the Squaxin Island Tribe, at that time, from ascertaining the sustainable yield of

7   shellfish and, where appropriate, develop a harvest plan as required by the SIP.   As noted in

8   Section 6.3 of the SIP, "[i]f the sustainable yield density exceeds the natural bed threshold from

9   Exhibit A for the species proposed to be enhanced, the Grower may enhance that natural bed,

10  however, a harvest plan **must be developed** to provide the tribes with fifty percent of the

11  sustainable harvest that would exist absent the Grower's proposed enhancement activities."  Dkt.

12  34-2, p. 17-18 (emphasis added).  It is clear that the failure to provide the required notice caused

13  a loss of opportunity for the Tribe.

14      While it is true that the Tribe did not send out a Section 7 Notice to the property owners

15  or 6.1.1 Notice to Russ' Shellfish prior to 2013, this lack of notice from the Tribe does not

16  relieve Mr. Norris of his obligation to give Section 6.3 Notice nor does it diminish the damage

17  sustained by the Tribe.  The notice requirements in the SIP are independent requirements and are

18  each triggered based on different events.

19      **Clam Density.**  This Court accepts the expert testimony of Mr. Sparkman and concludes

20  that the McNeal, Passmore and Beck tidelands had a sustainable yield of shellfish of 0.84 pounds

21  per square foot.

22       **McNeal Tidelands.  T**he Court notes that Russ Norris signed his lease with the McNeals

23  on September 8, 2011.  It is not clear to this Court when the Tribe would have first been entitled

24  to harvest the property in light of the steps that needed to be followed under the SIP.  The Court

1   does not know when a harvest plan would likely have been in effect or what factors are

2   considered when determining a start date for a harvest plan.  In addition, the Court has no

3   evidence regarding what, if any, impact the termination of the lease in August 2014 would have

4   had with regard to the Tribe's opportunity to obtain its treaty share of shellfish.  For these

5   reasons, the Court cannot make a final determination as to the pounds of shellfish the Tribe is

6   entitled to recover in the future.

7          **Passmore and Beck Tidelands.**  The Court has the similar concerns regarding the

8   Passmore and Beck tidelands as set forth above regarding the McNeal tidelands.

9          **DurandTidelands.**  According to the October 6, 2011 Harvest Plan (Dkt. 30-2, p. 27-28),

10  the Tribe was entitled to 450 pounds of Manila clams per year.  While there is testimony from

11  Mr. Sparkman as to the quantities of Manila clams that were harvested by the Tribe, there

12  remains the unanswered question as to why the Tribe did not conduct a harvest in 2014 prior to

13  August 2014 when the lease was terminated by Mr. Norris.

14         **Verlinde Tidelands.**  According to the June 28, 2011 Harvest Plan (Dkt. 30-2, p. 31-32)

15  the Tribe was entitled to 1,261 pounds of Manila clams per year commencing in 2012.  There is

16  no evidence before the Court as to why the Tribe did not conduct any harvests commencing in

17  2012.

18         **King Tidelands.**  According to the March 1, 2012 Harvest Plan (Dkt. 30-3, p. 1-2) the

19  Tribe and Russ Norris agreed that each party was entitled to harvest 50% of the harvestable

20  biomass.  The Tribe is, therefore, entitled to recover 850 pounds of Manila clams on terms to be

21  established.

22         **Moore Tidelands.**  As already noted, the Tribe is not seeking any remedy with regard to

23  this tideland.

24

1      **Conclusion.**  For the reasons set forth above, the Court is unable to determine the total

2 poundage to which the Tribe is entitled.  This needs to be resolved through testimony so the

3 Court may be certain all of its questions are addressed.  In addition, the Squaxin Island Tribe, in

4 its proposed order, requested a number of conditions, as part of its order.  Those conditions

5 should be addressed in argument following presentation of live testimony.

6                             **CONCLUSION**

7      Russell Norris violated the notice requirement of Section 6.3 of the SIP as well as

8 applicable Harvest Plans, as discussed above.  He is not, however, liable as a matter of law, for

9 the actions or inactions of Great Northwest.  The Squaxin Island Tribe is entitled to an equitable

10 remedy which will establish the pounds of Manila clams it is entitled, in the future, to recover

11 from Russ Norris.

12      As the Court could not determine the award based on the evidence presently before it, the

13 Court will coordinate with the parties for the purpose of presenting live testimony.

14      DATED this 29th day of May, 2015.

15

16                             _Karen L. Strombom_

17                             Karen L. Strombom
                             United States Magistrate Judge

18

19

20

21

22

23

24