**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | ) CAUSE NO. C70-9213 |
| Plaintiffs, | ) <br> ) Subproceeding 14-01 |
| v. | ) <br> ) ORDER ON CROSS-MOTIONS FOR |
| STATE OF WASHINGTON, et al., | ) SUMMARY JUDGMENT |
| Defendants. | ) <br> ) <br> ) <br> ) |

This matter comes before the Court on Cross-Motions for Summary Judgment by the Suquamish Indian Tribe (the "Suquamish") (Dkt. # 37) and the Upper Skagit Indian Tribe ("Upper Skagit") (Dkt. # 38), as well as the Upper Skagit's Motion to Strike Exhibits (Dkt. # 58). Having considered briefs and supporting exhibits by the Suquamish, Upper Skagit, and interested parties, the record of this and related subproceedings, and oral arguments, the Court grants summary judgment in favor of the Upper Skagit for the reasons stated herein.

## BACKGROUND

The Upper Skagit initiated this subproceeding by filing a Request for Determination ("RFD") on January 16, 2015, seeking a determination that the usual and accustomed fishing grounds ("U&A") for

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 1

the Suquamish Tribe do not include Samish Bay, Chuckanut Bay, and a portion of Padilla Bay (the "Disputed Areas"), where the Upper Skagit has its own Court-approved U&A.[1] Dkt. # 1; Dkt. # 4, p. 1 & Ex. A. All parties agree that the issues in dispute are to be resolved under Paragraph 25(a)(1) of the Permanent Injunction set forth in Final Decision # 1, *U.S. v. Washington*, 384 F.Supp. 312, 419 (W.D. Wash. 1974), as modified by *U.S. v. Washington*, Case No. C70-9213, Dkt. # 13599 (W. D. Wash. August. 23, 1993). Pursuant to this jurisdictional provision, the Court determines whether the Suquamish's current or intended tribal fisheries conform to Judge George Boldt's U&A determination for the tribe. In the language at the heart of this dispute, Judge Boldt described the Suquamish U&A as follows:

> The marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*U.S. v. Washington*, 459 F.Supp. 1020, 1049 (W.D. Wash. 1975) (Finding of Fact ("FF") 4). The instant proceeding is the third in a series of subproceedings through which this Court has been asked to determine the scope of the Suquamish U&A by examining evidence in the record before Judge Boldt in the spring of 1975.[2]

1) **Judge Boldt's 1975 Suquamish U&A Determination**

---

[1] According to the Upper Skagit, the Disputed Areas are more fully described as MFSF Catch Reporting Areas 21B and 22B: "Those waters, tideland and bedlands easterly of a line drawn from Clark Point to Governor Point across the mouth of Chuckanut Bay, and those waters, tidelands, and bedlands easterly of a line on the shore directly north of Whiskey Rock, thence southwesterly across Samish Bay to Point Williams, said line being the current line marking the boundary between Washington State Salmon Catch Reporting Areas 7B and 7C, thence westerly and southerly around Samish Island until a line can be drawn southerly to the westernmost point on Hat Island in Padilla Bay, thence westerly and southerly around Hat Island at extreme high tide until a line can be drawn southerly and easterly to a point on the shore of the mainland approximately one mile east of the eastern most point of the eastern mouth of the slough draining from Whitney to Padilla Bay, which point is almost directly south of Bay View…including all of the streams, beds and banks draining into these salt water areas." *See* Dkt. # 38, pp. 1-2.

[2] Suquamish claims to additional U&A in the freshwater bodies to the east of the Puget Sound were also considered, and rejected, in Subproceeding 85-1. *See U.S. v. Suquamish Indian* Tribe, 901 F.2d 772 (9th Cir. 1990); Dkt. # 38-2 (Order by Judge Coyle of February 25, 1989, rejecting Suquamish claim to the status of political successor-in-interest to the treaty-time Duwamish Tribe).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 2

As the Suquamish was not a party to the original *U.S. v. Washington* decision in February 1974, Judge Boldt did not specifically determine the Suquamish U&A in Final Decision # 1. Instead, the question of the Suquamish U&A arose when, along with several other tribes, the Suquamish filed a request for determination in March 1975 of its right to engage in a non-anadromous herring fishery. As evidence in support of its request, the Suquamish filed three reports by anthropologist Dr. Barbara Lane describing the tribe's treaty-time fisheries.[3] Dkt. # 16 (Answer to Upper Skagit RFD by the Suquamish Tribe), Ex. A.

On March 28, 1975, Judge Boldt determined that the Suquamish, along with six other tribes, had made a "prima facie showing[] of treaty entitlement" to participate in the herring fishery. Dkt. # 16 at Ex B, ¶ 3. He simultaneously noted that the Suquamish as well as the Swinomish Indian Tribal Community, for whom no U&A had thus far been determined by the Court, would be entitled to conduct herring fisheries at their claimed U&A's subject to the State's authority to contest any location. *Id.* The Court set a hearing for April 9, 1975 to receive anthropological and biological evidence regarding determinations announced in its Order. *Id.* at ¶ 6.

As directed by Judge Boldt, the Suquamish filed its proposed regulations for its herring fisheries on April 2, 1975, along with a map identifying the location of its claimed U&A. Dkt. # 16, Ex. C. This "claim map" was broken down into four zones roughly covering: (1) the Strait of Juan de Fuca through the San Juan Islands ("Area 1"), (2) the area north of the San Juan Islands to the Canadian border ("Area 2"), (3) the area east of Lummi Island, including Bellingham Bay and including the Disputed Areas ("Area 3"), and (4) the area stretching roughly southeast of the San Juans through Hood Canal and into

---

[3] These reports include: "The Indian Herring Fishery from the Earliest to Mid-Nineteenth Century," a supplemental report regarding Indian herring and herring roe fisheries, and an anthropological report entitled "Identity, Treaty Status and Fisheries of the Suquamish Tribe of the Port Madison Reservation." Dkt. # 16, Ex.'s D-F.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 3

the southern Puget Sound ("Area 4"). *See id.* at p. 3. These wide-ranging zones constituted the entirety of the Suquamish U&A claim.

Judge Boldt presided over hearings from April 9-11, 1975, during which the Court received evidence regarding its prior March 28th prima facie determinations. On the first day of the hearings, Alan Stay, counsel for the Suquamish, Nooksack, and Nisqually Tribes, called Dr. Lane to the stand to put on evidence for the Nooksack Tribe. As Mr. Stay concluded his questioning, counsel for the State, Paul Solomon, indicated that the State wished to cross-examine Dr. Lane regarding the northern portions of the U&A claimed by the Suquamish on its map. He asserted that the State has "some objections to note or inquiry to make as to the findings, possible inference, from the report that the [U&A] of the Suquamish Tribe reach as far north as they have claimed in their regulations that they filed with the Court." Dkt. # 37, Ex. A ("Tr."), at pp. 40-41. Mr. Stay responded by asserting that the State had filed no prior objections to the Suquamish claims and that he was unprepared to elicit evidence to support them.

The Court acknowledged the difficulty engendered by the need to make U&A determinations on an expedited basis, prior to the impending start of the herring fishery. Tr. at pp. 43:4-45:13. It nonetheless instructed Mr. Stay and Mr. Solomon to put evidence into the record in support of or in opposition to Suquamish claims through examination of Dr. Lane, with argumentation about the evidence to be made the following day. *Id.* at p. 45:11-21. Mr. Stay proceeded to examine Dr. Lane on the Suquamish's treaty-time fisheries in the northern Puget Sound, which formed part of Areas 1 and 2 on the Suquamish claim map, followed by cross-examination by Mr. Solomon. *Id.* at pp. 48-61. No testimony regarding Areas 3 or 4 was elicited, although Dr. Lane did testify to the Suquamish's travel from its home near Port Madison up north as far as the Fraser River, where the tribe had traditional ties through marriage. *Id.* at pp. 58 - 59. Later in the hearing in response to a question about Lummi

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 4

customary practices, Dr. Lane testified that the Suquamish had "herring places closer to their own place, where they lived." *Id.* at 84:10-11. Just as the Lummi would not take herring from Suquamish territory, Dr. Lane opined that "[i]n the same way Suquamish would not go all the way over into Bellingham Bay in order to get the herring that were spawning rights inside where the Lummi lived because they had their places." *Id.* at 84:10-15.

The following day, April 10, 1975, Judge Boldt began by requesting his law clerk to summarize for the record the matters discussed during the prior day's hearing. The law clerk described the discussion as follows: "The question of the usual and accustomed fishing locations for the Suquamish Tribe as to the northern areas that were called one and two yesterday, Mr. Stay's objections to those; and then the question of possible exclusive fishing rights of the Lummi Tribe vis-à-vis the Swimonish Tribe as to the Hale Passage locations." Dkt. # 37, Ex. B at p. 4:6-14. Later in the hearing, Judge Boldt ruled from the bench that "a prima facie showing has been made that travel and fishing of the Suquamish Tribe through the northern Sound areas; that is, areas one and two as designated by the state, was frequent and also regular, not merely occasional, and the application of the Suquamish for such a ruling is granted." *Id.* at pp. 51:22-52:3. The Court did not address Suquamish U&A as to any other portions of its claim map.

On April 18, 1975, the Court issued a written order, upon consideration of the "pleadings, testimony, evidence, memoranda and oral arguments," in which it found that the "usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal." *U.S. v. Washington*, 459 F.Supp. 1020, 1049 (W.D. Wash. 1975) (FF 4). The Court also acknowledged that the Lummi, Nooksack, and Suquamish Tribes had entered into an agreement over shared use of Hale Passage (which lies between

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 5

Bellingham Bay and Lummi Island), although it recognized that the Lummi had "exercised and was acknowledged by many others to have primary control as regards fishing or other resource gathering and occupancy" in that area. *Id.* at FF 7. Judge Boldt indicated that these findings of fact were made on the basis of a prima facie showing and would be subject to reconsideration upon a full evidentiary hearing if requested by a party on or before May 19, 1975. *Id.* at ¶ 8. Absent a request for reconsideration, the determinations would become final. *Id*. No such request for reconsideration was lodged.

### 2) Subproceeding 05-03

The Suquamish U&A delineated by Judge Boldt was first challenged in a Request for Determination brought by the Upper Skagit in Subproceeding 05-03. The Upper Skagit sought a determination that certain waters on the eastern side of Whidbey Island, known as Saratoga Passage and Skagit Bay, are not within the Suquamish Tribe's U&A. Applying the "*Muckleshoot* two-step" procedure, described below, this Court determined that while the term "the marine waters of Puget Sound" as used by Judge Boldt unambiguously included the waters of Saratoga Passage and Skagit Bay, based on the actual evidence before him, Judge Boldt must have intended not to include these disputed areas within the Suquamish U&A. *U.S. v. Washington*, 2007 WL 30869 (W.D. Wash. 2007). The Court noted that nothing in the record showed the Suquamish fished on the east side of Whidbey Island or traveled through there on their way to the San Juan Islands and the Fraser River area. *Id.* at \*\*7-10. Accordingly, the Court found that the Upper Skagit had met its burden to show that Judge Boldt did not intend to include the disputed waters in the Suquamish U&A and further found that the Suquamish failed to meet its burden to point to some evidence in the record demonstrating otherwise. The Ninth Circuit affirmed. *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1029 (9th Cir. 2010).

### 3) Subproceeding 05-04

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 6

Next, in Subproceeding 05-04, the Tulalip Tribe moved the Court to find that certain inland marine waters on the east side of Admiralty Inlet but west of Whidbey Island (including Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay), as well as Saratoga Passage, Penn Cove, Holmes Harbor, Possession Sound, Port Susan, Tulalip Bay, and Port Gardner, do not lie within the Suquamish U&A as determined by Judge Boldt. In addressing dispositive motions, the Court declined to apply res judicata, judicial estoppel, and laches to bar the Tulalip's RFD, as requested by the Suquamish. Subproceeding No. 05-04, Dkt. # 242 (W.D. Wash. July 29, 2012). On the merits, the Court determined that the same analysis undertaken in Subproceeding 05-03 applied to exclude Penn Cove and Holmes Harbor from the claimed Suquamish U&A. *Id.* at p. 12. Applying the *Muckleshoot* framework and citing to Dr. Lane's report on Suquamish fisheries, the Court also found that there was evidence before Judge Boldt in 1975 to support a finding that the Suquamish fished in Admiralty Inlet, traveling as far as the western shores of Whidbey Island to do so, and that the mouth of the Snohomish River was an important Suquamish fishery. From this evidence, the Court found it "highly likely" that Judge Boldt intended to include in the Suquamish U&A the bays on the west side of Whidbey Island (Admiralty, Mutiny, Useless, and Cultus Bays), along with Possession Sound and Port Gardner Bay. *Id.* at p. 19. The Court's determinations therein are currently on appeal.

**4) Instant Dispositive Motions**

Through its Motion for Summary Judgment, the Upper Skagit, with support from several interested parties, moves the Court to apply the standards through which it rejected Suquamish claims in Subproceedings 05-03 and 05-04 in order to determine that the Suquamish's U&A does not include the Disputed Areas at issue here. Specifically, the Upper Skagit point out that no testimony regarding Area 3 on the Suquamish claim map was elicited at the April 9, 1975 hearing, and Judge Boldt's findings the following day made no reference to Suquamish U&A outside Areas 1 and 2 in the northern Puget

Sound. In addition to contending that no record evidence before Judge Boldt in 1975 supports the Suquamish's claim to U&A in the Disputed Areas, the Upper Skagit argue that Suquamish should be barred from even asserting its claim by the doctrines of res judicata and collateral estoppel. *See* Dkt. # 38.

The Suquamish takes a different view of the role of the claim map in the proceedings leading up to the establishment of its U&A. According to the Suquamish, the claim map itself formed part of the record evidence that was before Judge Boldt in making the Suquamish U&A determination, along with the reports and testimony by Dr. Lane. The Suquamish further assert that by declining to challenge Areas 3 or 4 on the claim map, the State and the tribes implicitly conceded their place in the U&A. In support of this view, the Suquamish assert that the proceedings through which its U&A was determined were unique, taking place in an expedited fashion without a full evidentiary hearing and leading to a prima facie determination that became binding when no objection was lodged. According to the Suquamish, the Upper Skagit's RFD is in essence a request to reconsider Judge Boldt's prima facie finding of a broad Suquamish U&A, albeit one filed nearly forty years too late. The Suquamish also introduces evidence through its reply brief of Suquamish regulations covering fishing in and near the disputed waters since 1975 (Dkt. # 56 at Ex.'s 2-41), which the Upper Skagit moves to strike from the record. Dkt. # 58.

This Order resolves all three pending Motions.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A material fact is one that "might affect the outcome of the suit under governing law," and an issue is genuine when "the evidence is such that a

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 8

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. On summary judgment, the role of the court is not to weigh evidence to determine the truth of the matter, but rather to "determine whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994). In doing so, the court views all inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of production and the ultimate burden of persuasion. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party must initially identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-moving party to establish a genuine issue for trial by pointing to specific evidence, along with its location in the record. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774-75 (9th Cir. 2002); *Nissan Fire*, 969 F.2d at 1103. The moving party is entitled to judgment as a matter of law where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" at trial. *Celotex*, 477 U.S. at 322.

## DISCUSSION

### I. Claim and Issue Preclusion

As an initial matter, the Court considers application of the equitable doctrines of res judicata and collateral estoppel, or claim and issued preclusion, raised by the Upper Skagit's Motion. The Upper Skagit refers to Subproceeding 05-03 as the basis for its offensive assertion of these doctrines. According to the Upper Skagit, Subproceeding 05-03 involved adjudication of the same issues at play in this subproceeding, and the Court's prior rejection of Suquamish claims to U&A in the eastern Puget Sound should preclude it claims to U&A in the Disputed Areas at issue here. On response, the

Suquamish contends that these equitable doctrines should apply in the reverse, to bar the Upper Skagit from bringing claims that it could have brought in Subproceeding 05-03. The Court declines both invitations.

Claim and issue preclusion, which define the preclusive effect of a prior final judgment, are equitable doctrines employed to achieve finality, conserve judicial resources, and minimize the vexation and expense of successive litigation arising out of the same underlying events. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal citations omitted). Claim preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Issue preclusion analogously functions to "foreclos[e] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *Id.* at 748-49. Application of both doctrines depends on the party against whom they are asserted having had a "full and fair opportunity to litigate" the claims or issues settled in the prior suit. *Taylor*, 553 U.S. at 892.

The shortcoming in both parties' attempted applications of these doctrines is that the inclusion of the Disputed Areas in the Suquamish U&A has never been previously litigated, whether in a *U.S. v. Washington* subproceeding or in any related matter. As this Court explained in declining to apply res judicata in Subproceeding 05-03, the Suquamish U&A was actually determined in 1975 by Judge Boldt, not through any subsequent Paragraph 25(a)(1) subproceeding. *See* Subproceeding 05-03, Dkt. # 242 at p. 10. The Court's role now is not to alter or amend Judge Boldt's determination but to clarify it with respect to the disputed areas at issue. *See id.* It would be inequitable to preclude either party from litigating the inclusion of the three bays at issue in this subproceeding, when the Court was never previously asked to and never did make factual determinations on their place in the Suquamish U&A as

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 10

described by Judge Boldt. Paragraph 25(a)(1) jurisdiction contemplates successive lawsuits aimed at clarifying different portions of a tribe's U&A when a party's intended or effected actions raise the need for such clarification. While it would certainly be preferable to resolve the contours of a tribe's U&A as determined by Judge Boldt at once, in order to facilitate finality and achieve repose (as urged by counsel at oral argument), the Court's clarifications in any one subproceeding are necessarily limited to the issues raised in the request before it and should not be read to sweep more broadly.

For these reasons, the Upper Skagit's motion for summary judgment on the basis of res judicata and collateral estoppel shall be denied, and the Court proceeds to the merits of the Upper Skagit's claims asserted in its RFD.

**II. Application of Muckleshoot Two-Step Framework**

In an action to determine Judge Boldt's intent in delineating a tribal U&A, the Court applies the *Muckleshoot* two-step procedure established in *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998) ("*Muckleshoot I*"), *Muckleshoot Tribe v. Lummi Indian Nation*, 234 F.3d 1099 (9th Cir. 2000) ("*Muckleshoot II*"), and *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir. 2000). *See U.S. v. Washington*, 2007 WL 30869 at *1 (W.D. Wash. 2009); Subproceeding 05-04, Dkt. # 242 at pp. 7, 13. Under the first *Muckleshoot* step, the Upper Skagit, as the requesting party, bears the initial burden to show that a term used by Judge Boldt is ambiguous. If ambiguity is not demonstrated, the requesting party must show that Judge Boldt "intended something other than [the term's] apparent meaning." *Muckleshoot I*, 141 F.3d at 1359. The evidence that is relevant to discerning Judge Boldt's intent comprises "the entire record before the issuing court and the findings of fact [which] may be referenced in determining what was decided." *U.S. v.* Washington, 2007 WL 30869 at *2 (quoting *Muckleshoot I*, 141 F.3d at 1359).

Here, the parties are in agreement as to the first *Muckleshoot* step. In Subproceeding 05-03, this Court engaged in an extensive examination of the relevant evidence and determined that the term "Puget Sound" as used by Judge Boldt unambiguously encompassed "all the saltwater areas inward from the entrance to the Strait of Juan de Fuca," including the waters of Saratoga Passage and Skagit Bay. 2007 WL 30869 at \*\* 3-4. The Court applied this determination in Subproceeding 05-04, finding the first *Muckleshoot* step to have been completed and proceeding immediately to the second *Muckleshoot* step. Subproceeding 05-04, Dkt. # 242 at p. 13. The Court agrees with the parties that these prior determinations apply in this subproceeding as well, and that the term "Puget Sound" as used by Judge Boldt in describing the Suquamish U&A unambiguously encompasses the Disputed Areas at issue here. Accordingly, the Court proceeds directly to the second *Muckleshoot* step and looks to evidence in the record to discern Judge Boldt's intent.

Under the second *Muckleshoot* step, the burden is on the Upper Skagit to show that "there was no evidence before Judge Boldt that the Suquamish fished [in the Disputed Areas] or traveled there in route to the San Juans and the Fraser River area." *Upper Skagit*, 590 F.3d at 1023. The Court's determination is to be based on the record before Judge Boldt as of April 18, 1975, when he established the Suquamish U&A, as well as "additional evidence if it sheds light on the understanding that Judge Boldt had of the geography at that time." *Id.* at 1024-25 (quoting *Muckleshoot II*, 234 F.3d at 1100 (distinguishing latter-day interpretation of evidence before Judge Boldt, on which the district court may not rely, from evidence of geographic understandings in Judge Boldt's day)). The Court accordingly begins by examining each category of evidence in the record before Judge Boldt when he established the Suquamish U&A.

**1) Reports by Dr. Lane**

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 12

This Court has oft noted that Judge Boldt relied heavily on reports and testimony of anthropologist Dr. Barbara Lane in determining tribal U&As. *See U.S. v. Washington*, 2007 WL 30869 at *7; 590 F.3d at 1025. In her report on "Identity, Treaty Status and Fisheries of the Suquamish Tribe of the Port Madison Reservation," admitted as an exhibit at the April 9, 1975 hearing, Dr. Lane described the Suquamish, like their neighbors, as having "relied primarily on salmon for their staples." *See* Dkt. # 46, Ex. A at p. 11. While she noted that the Suquamish was able to procure fresh fish on a year-round basis in the salt waters immediately adjacent to their home on the Kitsap Peninsula, *id.* at p. 12, she reported that the tribe traveled widely by canoe, making use of areas as far north as Fort Langley on the Fraser River, *id.* at p. 46. Dr. Lane's report proceeded to delineate the waters between these far-ranging zones that were frequented by the Suquamish in its harvest of marine resources.

Although Dr. Lane characterized it as an impossible task to "present a complete account of Suquamish fisheries as of 1855," *id.* at p. 19, she provided an extensive list of specific geographic locations where the historical and anthropological evidence documented known customary, treaty-time Suquamish fisheries. Among locations where Suquamish took fish by trolling, clubbing, and spearing, Dr. Lane listed: Apple Cove Point, Hood Canal, Dye's Inlet, Liberty Bay, the head of Sinclair Inlet, Skunk Bay at the northern tip of Kitsap Peninsula, Ross Creek, Chico Creek, Blackjack Creek, Union River, Curley Creek, Blake Island, Jefferson Head, Point No Point, Rich's Passage between the southern end of Bainbridge Island and the peninsula, Indianola, Port Orchard, Ross Point, University Point, and Miller's Bay. *Id.* at 19-20. To this collection of locales, Dr. Lane added several others as places of traditional Suquamish shellfish harvest, including Agate Passage and the area between Chico and Erland's Point. *Id.* at p. 20.

In addition to these specific sites, Dr. Lane included more general geographic markers of Suquamish treaty-time fishing, including at "the mouths of the Duwamish and Snohomish rivers" and

adjacent marine areas," *id.* at pp. 12 & 15, "rivers on the east side of Puget Sound" for fall and winter salmon supplies, *id.* at p. 15, and Whidbey and Bainbridge Islands, *id.* at p. 16. She further described the general course of their travel and attendant fishing throughout wider marine areas, stating:

> In my opinion, the evidence that the Suquamish travelled to the Fraser river in pre-treaty times documents their capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits. According to oral tradition, the Suquamish regularly travelled through the San Juan Islands and to the Fraser River…. It is my opinion that the Suquamish undoubtedly would have fished the marine waters along the way as they travelled. It is likely that one of the reasons for travel was to harvest fish. The Suquamish travelled to Whidbey Island to fish and undoubtedly used other marine waters as well."

*Id.* at p. 16. Dr. Lane concluded by providing a list of Suquamish place names along the eastern side of Kitsap Peninsula and around Bainbridge Island. *Id.* at pp. 47-54.

Missing from Dr. Lane's report is any reference to Area 3 on the Suquamish claim map, or to the Disputed Areas in particular. Nearly all of the specifically denoted locations and place names are situated on the western side of the Puget Sound, nowhere near Bellingham Bay and the adjacent Disputed Areas. The only locations on the east side of the Puget Sound specifically identified in Dr. Lane's report are the mouths of the Duwamish and the Snohomish Rivers, which are located significantly south of Area 3.

The Suquamish nonetheless asserts that Dr. Lane's reference to Suquamish fishing in the course of travel toward Fraser River would have placed their route through the Disputed Areas. A similar such argument was considered, and rejected, by this Court in Subproceeding 05-03. This Court noted that while Dr. Lane "did testify that the Suquamish traveled up to the Fraser River, her reference to the Strait of Juan de Fuca, Haro and Rosario Strait places their route on the west side of Whidbey Island, from the Port Madison area and up through the San Juan Islands." 2007 WL 30869 at *9. These geographic anchors place the routes of Suquamish travel significantly west of the disputed waters at issue here. The easternmost of the denoted travel pathways, Rosario Strait, is bounded on the east by Whidbey, Fidalgo,

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 14

Cypress, Sinclair, and Lummi Islands. These islands separate the path of Suquamish travel from the protected waters of the Disputed Areas. In order to access Chuckanut, Samish, and Padilla Bays, the Suquamish would have had to depart Rosario Strait, navigating due east around these islands for at least eight miles from the nearest geographic anchor point. Yet nothing in Dr. Lane's report, whether by way of place names or specific or general geographic descriptors, suggests that the Suquamish customarily undertook this substantial detour.

### 2) Testimony in April 1975 Hearings

The Court also considers the testimony of Dr. Lane at the hearing on April 9, 1975 as evidence relevant to discerning Judge Boldt's intent. As detailed above, Dr. Lane's testimony on Suquamish U&A, as elicited by counsel for both the Suquamish and the State, focused exclusively on marine fisheries in the northern Puget Sound, from the San Juan Islands to the Fraser River, in Areas 1 and 2. *See* Tr. at p. 52 (eliciting testimony on Suquamish fishing in the San Juans Islands "and that area off of Birch Bay on the way up to the Fraser River"). Dr. Lane opined in response to a question from the State about Suquamish fishing in these zones that "it's entirely likely that [the Suquamish] fished for whatever was available as they traveled through those waters and that they visited those waters regularly as a usual and accustomed matter in order to fish and to do other things." *Id.* This testimony placed the routes of Suquamish travel and fishing both north and west of the Disputed Areas. While she acknowledged Suquamish travel from the tribe's home on the Kitsap Peninsula to visit people in the Fraser River area, with whom the Suquamish shared marital ties, she provided no geographic anchors for the path of Suquamish travel other than through the San Juan Islands in Areas 1 and 2. The absence of testimonial evidence pertaining to Area 3 was underscored at the April 10, 1975 proceeding, during which the law clerk's summary of the prior day's testimony and Judge Boldt's oral ruling on Suquamish fisheries referenced Suquamish fishing only in Areas 1 and 2. *See* Dkt. # 37, Ex. B at pp. 4, 51-52.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 15

Further, Dr. Lane's sole testimonial reference to Area 3 in relation to the Suquamish functioned to exclude the tribe from waters adjacent to those at issue in this subproceeding. Dr. Lane's opinion that the Suquamish "would not go all the way over into Bellingham Bay in order to get the herring" carved out waters immediately adjacent to the Disputed Areas from Suquamish U&A. *See Tr.* at 84:10-15. These are waters through which the Suquamish would have been required to pass in order to access much of the disputed territory.

Although the Suquamish is correct that Dr. Lane need not have mentioned specific marine waters by name, there must still be some evidence in the record before Judge Boldt indicating his intent to include them within a tribe's U&A. The evidence in this case points only to the opposite conclusion.

**3) Judge Boldt's Description of Suquamish U&A**

The Court looks now to the language of Judge Boldt's description of the Suquamish U&A in his written April 18, 1975 Order. The Ninth Circuit noted in the appeal of Subproceeding 05-03 that Judge Boldt tended to use "geographic anchor points" in describing a tribe's U&A. *Upper Skagit*, 590 F.3d at 1025. In Judge Boldt's description of the Suquamish U&A, "the only inclusive geographic anchor points for the term 'Puget Sound' are the 'Haro and Rosario Straits.'" *Id.* Just as these anchor points do not "include or delineate" Skagit Bay and Saratoga Passage, *id.*, they neither include nor delineate Chuckanut, Samish, and Padilla Bays. The Ninth Circuit has indicated that the fact that Judge Boldt neglected to mention Skagit Bay and Saratoga Passage in delineating the Suquamish U&A "supports [the] conclusion that he did not intend for them to be included." *Id.* This analysis applies with equal force here.

Contrary to the Suquamish's assertion, Judge Boldt's reference to the tribe's use in the 1970s of Hale Passage does not indicate that he intended to include this passage, or the disputed waters to the east, in the Suquamish U&A. Rather, Judge Boldt expressly found that the Lummi Tribe exercised

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 16

primary control over the passage, indicating that the Suquamish current day use of it was pursuant to agreement rather than to historic right. *See U.S. v. Washington*, 459 F.Supp. 1020, 1049 (W.D. Wash. 1975) (FF 7). Accordingly, Judge Boldt's written findings fail to support the Suquamish claims to U&A in the Disputed Areas.

### 4) Claim Map and Fishing Regulations

Finally, the Court finds the Suquamish's entreaty to expand the scope of evidence upon which the Court bases its U&A clarification to be misguided. The Suquamish's argument that Judge Boldt intended everything on the Suquamish's claim map to be included within the U&A runs contrary to the law of this case. This Court, in Subproceedings 05-03 and 05-04, has explicitly excluded waters within Area 4 from Suquamish U&A, basing its determination on a review of evidence encapsulated in Dr. Lane's report and testimony rather than the tribe's claim map. Its decision to do so in Subproceeding 05-03 has already been affirmed on appeal. *See Upper Skagit*, 590 F.3d 1020. The Court cannot now apply a different standard in assessing Area 3.[4]

The Suquamish's invitation to the Court to examine an expanded evidentiary record also runs contrary to the nature of a Paragraph 25(a)(1) proceeding. The Suquamish claim map represents just that – a delineation of the areas that the Suquamish *claimed* it fished at treaty-time and where it sought to fish during the 1975 herring season. Evidence in the form of a tribe's claim to fishing rights, including claims encapsulated in fishing regulations and contemporary fishing practices, is not probative of Judge Boldt's intent in delineating treaty-time fishing grounds and therefore is not evidence that the Court may

---

[4] Similarly, the law of the case as well as record evidence in the form of Judge Boldt's written description of the Suquamish U&A and the Dr. Lane's report undercut the Upper Skagit's argument that the Suquamish U&A should be limited to Areas 1 and 2. As conceded by counsel at oral argument, the reference to Vashon Island in Judge Boldt's description clearly places Suquamish U&A in part of Area 4, as does Dr. Lane's listing of geographic markers of Suquamish fishing in the southwest Puget Sound. In Subproceeding 05-04, this Court found evidence before Judge Boldt sufficient to show that he intended to include portions of Area 4 in Suquamish U&A. Still, none of these geographic anchor points comes close to placing Suquamish U&A in the disputed portions of Area 3.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 17

properly consider in a Paragraph 25(a)(1) proceeding.[5] *See Upper* Skagit, 590 F.3d at 1026 (finding no error in this Court's reference to Suquamish fishing regulations "as an aside to the Suquamish's understanding of its own U&A – not as evidence bearing on Judge Boldt's intent in determining that U&A."). In contrast to the sweeping delineations in the April 2nd claim map, Judge Boldt considered a narrower and more precise set of descriptions in the form of Dr. Lane's testimony and reports in determining the Suquamish U&A. It is this evidence – that relied on by Judge Boldt and probative of his intent – that the Court examines under Paragraph 25(a)(1).

For these reasons, the Suquamish's argument that the Upper Skagit's RFD constitutes an untimely motion for reconsideration must also fail. The Suquamish is correct that Judge Boldt's prima facie determinations of April 18, 1975 became final when no party lodged an objection to them. The Upper Skagit cannot now contest Judge Boldt's U&A determination by, for instance, introducing new evidence of Suquamish treaty-time fishing practices or seeking to impeach Dr. Lane's testimony. At the same time, Paragraph 25(a)(1) provides an avenue for the Upper Skagit to seek to clarify Judge Boldt's intent, as it could with respect to any other tribe's U&A. And in discerning Judge Boldt's intent, this Court looks to the evidence underlying his decision, not the capacious U&A claims made by the tribe.

For all of these reasons, the Court concludes that Judge Boldt did not intend to include Chuckanut, Samish, and the disputed portions of Padilla Bay within the U&A of the Suquamish Tribe. As the Court finds there to be no factual issues in dispute, summary judgment is appropriately entered in favor of the Upper Skagit Tribe.

---

[5] The Upper Skagit has moved the Court to strike the exhibits containing the Suquamish's fishing regulations as both improperly filed upon reply and as irrelevant to the Court's Paragraph 25(a)(1) determination. Dkt. # 58. The Court agrees with the Suquamish that the Upper Skagit's Motion to Strike is procedurally improper. LCR 7(g) provides that a motion to strike material from a reply brief must be included within a surreply of no more than three pages, which must be filed within five days of the filing of the reply brief and preceded by a notice of intent to file a surreply. As the Upper Skagit failed to comply with all of these requirements, its Motion to Strike shall be denied and the exhibits shall remain part of the record in this subproceeding. Nonetheless, for the reasons stated herein, the Court agrees with the Upper Skagit that Suquamish's fishing regulations are not part of the record before Judge Boldt. The Court thus disregards them as evidence upon which the Court bases its clarification of his intent.

**CONCLUSION**

Having considered the arguments of the parties and orders from prior related subproceedings, and having reviewed the relevant evidence before Judge Boldt in the 1975 proceedings that led to the determination of the Suquamish U&A, the Court hereby finds and ORDERS as follows:

1) The Suquamish Indian Tribe's Motion for Summary Judgment (Dkt. # 37) is DENIED.

2) The Upper Skagit Indian Tribe's Motion for Summary Judgment (Dkt. # 38) is GRANTED.

3) The Upper Skagit's Motion to Strike Exhibits (Dkt. # 58) is DENIED.

4) As the Suquamish Indian Tribe's usual and accustomed fishing grounds and stations do not include the Disputed Areas at issue here (Samish Bay, Chuckanut Bay, and the northern portion of Padilla Bay), the Suquamish Indian Tribe is permanently enjoined from issuing regulations for and/or fishing in the waters of the Disputed Areas.

5) Judgment shall be entered in favor of the Upper Skagit Indian Tribe, and this subproceeding shall be CLOSED.

DATED this 3 day of June 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE