UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, et al, | No. C70-9213 |
| Plaintiffs, | Subproceeding No. 09-01 |
| v. | |
| STATE OF WASHINGTON, et al., | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER |
| Defendants. | |

## I.  INTRODUCTION

This subproceeding is before the Court pursuant to the request of the Makah Indian Tribe (the "Makah") to determine the usual and accustomed fishing grounds ("U&A") of the Quileute Indian Tribe (the "Quileute") and the Quinault Indian Nation (the "Quinault"), to the extent not specifically determined by Judge Hugo Boldt in Final Decision # 1 of this case. The Court is specifically asked to determine the western boundaries of the U&As of the Quileute and Quinault in the Pacific Ocean, as well as the northern boundary of the Quileute's U&A. A 23-day bench trial was held to adjudicate these boundaries, after which the Court received extensive supplemental briefing by the Makah, Quileute, Quinault, and numerous Interested Parties and took the matter under advisement. The Court has considered the vast evidence presented at trial, the exhibits admitted into evidence, trial, post-trial,

and supplemental briefs, proposed Findings of Fact and Conclusions of Law, and the arguments of counsel at trial and attendant hearings. The Court, being fully advised, now makes the following Findings of Fact and Conclusions of Law. To the extent certain findings of fact may be deemed conclusions of law, or certain conclusions of law be deemed findings of fact, they shall each be considered conclusions or findings, respectively.

## I.   BACKGROUND

On February 12, 1974, Judge Hugo Boldt entered Final Decision # 1 in this case. The decision set forth usual and accustomed fishing grounds and stations ("U&As") for fourteen tribes of western Washington, wherein the tribes had a treaty-secured right to take up to 50% of the harvestable number of fish that could be taken by all fishermen. *See United States v. Washington*, 384 F.Supp. 312 (W.D. Wash. 1974) ("*Final Decision 1*"). The Court enforced its ruling through entry of a Permanent Injunction, whereby it provided for any party to the case to invoke the continuing jurisdiction of the Court on seven different grounds, the sixth of which permits adjudication of "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I." *Id.* at 419 (Permanent Injunction, ¶ 25(a)(6)), as modified by the Court's Order Modifying Paragraph 25, Dkt. # 13599.[1] After innumerable subproceedings and appeals and multiple decisions from this country's highest Court, this forty year-old injunction remains in place, safeguarding the rights reserved by these tribes in treating with the United States government to continue to fish as they had always done, beyond the boundaries of reservations to which they agreed to confine their homes.

It is under the jurisdiction set forth by the Permanent Injunction that the parties are again before this Court. The Makah Indian Tribe initiated this subproceeding on December 4, 2009 by filing

a request for this Court to determine the usual and accustomed fishing grounds and stations of the Quileute Indian Tribe and the Quinault Indian Nation, to the extent not specifically determined by Judge Boldt in Final Decision # 1. In particular, the Makah ask the Court to define the western and northern boundaries of the Quileute U&A and the western boundary of the Quinault's U&A in the Pacific Ocean – waters beyond the original case area considered by Judge Boldt.[2] After a series of pre-trial rulings, this subproceeding proceeded to trial under Paragraph 25(a)(6) of the Permanent Injunction. *See* No. 09-01, Order on Motions, Dkt. # 304.

This is only the second subproceeding in the long history of this case in which this Court has been asked to rule on the boundaries of a tribe's usual and accustomed fishing grounds in the Pacific Ocean. In the first such subproceeding, this Court in 1982 adjudicated the boundaries of the Makah Tribe's Pacific Ocean U&A, determining its western boundary to be located forty miles offshore and its southern boundary to be located at a line drawn westerly from Norwegian Memorial. *United States v. Washington*, 626 F.Supp. 1405, 1467 (W.D. Wash. 1982) ("*Makah*"), *aff'd* 730 F.2d 1314 (9th Cir. 1984). Since that time, the Quileute and Quinault have been fishing at locations up to forty miles offshore under regulations adopted by the federal government pending formal adjudication by this Court. *See* No 09-01, Dkt. # 304 at pp. 3-4.

The subproceeding was tried to the Court over the course of 23 days commencing March 2, 2015 and concluding April 22, 2015. The Court heard testimony from eleven witnesses and admitted 472 exhibits comprised of thousands of pages. The Court also heard argument and reviewed briefs by

---

[1] Citations to docket entries herein are to those under *United States v. Washington*, Case No. 70-9213, unless stated otherwise.

[2] The Makah, Quileute, and Quinault stipulated that these boundaries were not specifically determined in Final Decision # 1. *See* No. 09-01, Joint Status Report, Stipulation and Proposed Discovery Plan, Dkt. # 181 at p. 2.

the Makah, Quileute, Quinault, and a number of Interested Parties, including the State of Washington and the Hoh, Port Gamble S'Klallam, Jamestown S'Klallam, Tulalip, Swinomish, Upper Skagit, Nisqually, Squaxin Island, Muckleshoot, Puyallup, and Suquamish Tribes. The Court commends counsel for each of these parties – and for the Makah, Quinault, and Quileute in particular – for their exhaustive, thorough, and diligent efforts throughout the course of trial and the proceedings leading up to it. Indeed, trial on these three boundaries exceeded the length of the original trial before Judge Boldt leading to Final Decision # 1, a reflection of the great care and extensive research time and resources invested by all parties to this case. It is with the utmost respect for the impassioned efforts and the sincere professionalism demonstrated by all parties during this unusually extensive trial, as well as for the profound investment of diverse communities in the decision rendered herein, that the Court sets forth the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

The following findings of fact are based upon a preponderance of the evidence presented at trial. Where relevant, the Court also draws on findings of fact set forth by Judge Boldt in Final Decision # 1.

### A.  Treaty Background

As an initial matter, the Makah and Interested Party the State of Washington are at odds with the Quileute, Quinault, and a number of Interested Party tribes with respect to the scope of the treaty-secured "right of taking  fish." Specifically, the parties dispute whether evidence of a tribe's harvest of marine mammals, including fur seals and whales, may be the basis for establishing a tribe's U&A. The Makah and the State, joined by three Interested Parties, take the position that a tribe's U&A must be established on the basis of locations where it went at treaty time for the purpose of taking finfish. By

contrast, the Quileute and Quinault, with support from a number of Interested Parties, argue for a construction of their treaty that would allow for a U&A to be established based on a broader interpretation of "fish" inclusive of evidence of a tribe's treaty-time marine mammal harvest activities. The following findings of fact concerning the background of tribal treaty rights are made in answer to the question of treaty interpretation raised by the parties.

### 1. General Context of Treaty Negotiations

1.1.    On August 30, 1854, Isaac Stevens, the first Governor and Superintendent of Indian Affairs of the Washington Territory, was notified of his appointment to negotiate treaties with tribes west of the Cascade Range (hereinafter, the "Stevens Treaties"). The principal purposes of the Stevens Treaties were to extinguish Indian claims to the land in Washington Territory and to provide for peaceful and compatible coexistence of Indians and non-Indians in the area. Governor Stevens and the treaty commissioners who worked with him were not authorized to grant to the Indians or treat away on behalf of the United States any governmental authority of the United States. *Final Decision 1*, Findings of Fact ("FF") 17, 19.

1.2.    At the treaty negotiations, a primary concern of the Indians whose way of life was so heavily dependent upon harvesting fish, was that they have freedom to move about to gather food at their usual and accustomed fishing places. In 1856, it was felt that the development of the non-Indian fisheries in the case area would not interfere with the subsistence of the Indians, and Governor Stevens and the treaty commissioners assured the Indians that they would be allowed to continue their fishing activities. FF 20.

1.3.    It was the intention of the United States in negotiating the treaties to make at least non-coastal tribes agriculturists, to diversify Indian economy, and to otherwise facilitate the tribes' assimilation

into non-Indian culture. There was no intent, however to prevent the Indians from using the fisheries for economic gain. FF 21.

1.4.    There is nothing in the written records of the treaty councils or other accounts of discussions with the Indians to indicate that the Indians were told that their existing fishing activities or tribal control over them would in any way be restricted or impaired by their treaty. The most that could be implied from the treaty context is that the Indians may have been told or understood that non-Indians would be allowed to take fish at the Indian fishing locations along with the Indians. FF 26.

1.5.    Since the vast majority of the Indians at the treaty councils did not speak or understand English, the treaty provisions and the remarks of the treaty commissioners were interpreted by Colonel Benjamin F. Shaw, the treaty commission's official interpreter, to the Indians in Chinook jargon and then translated into native languages by Indian interpreters. Chinook jargon, a trade medium of limited grammar and a vocabulary of only 300 or so terms, was inadequate to express precisely the legal effects of the treaties, although the general meaning of treaty language could be explained. Even so, many of those present did not understand Chinook jargon. There is also no record of the Chinook jargon phrase that was actually used in the treaty negotiations to interpret the provision for the "right of taking fish." FF 22; *see also* Ex. 64.

### 2.    Treaties with the Makah, Quileute, and Quinault

2.1.    The Makah were a party to the Treaty of Neah Bay, signed on January 31, 1855. The Treaty of Neah Bay was negotiated with the Makah by Governor Stevens and members of his treaty commission, including George Gibbs (a lawyer and adviser to Stevens), Colonel Michael Simmons, and Colonel Shaw. Gibbs maintained a journal that includes a still extent record of the treaty negotiations with the Makah. It appears from Gibbs' journal that tribes to the south of the Makah,

likely including the Quileute, were invited to attend the treaty council, but Governor Stevens decided to proceed without them to avoid delaying the negotiations. The Treaty of Neah Bay was ratified by the United States Senate on March 8, 1859, and proclaimed by the President on April 18, 1859. A reserved fishing rights provision is found in Article 4 of the Treaty of Neah Bay, which provides as follows:

> The right of taking fish and of whaling or sealing at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States and of erecting temporary houses for the purposes of curing, together with the privilege of housing and gathering roots and berries on open and unclaimed lands: Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens.

Ex. 29 at pp. 1, 4; Ex. 65 at p. 19 (journal of George Gibbs, recording decision to send for the "other tribes" to meet at Grays Harbor); Ex. 298.

2.2.    Governor Stevens, along with Gibbs, Simmons, and Shaw, first attempted to negotiate a treaty with the Quinault and other tribes in southwest Washington in February 1855 at the Chehalis River Council. As with the Treaty of Neah Bay, Gibbs' journal provides a record, albeit a likely incomplete one, of the failed Chehalis River negotiations. The Quileute were not represented at the Council, although they sent two boys along with the Quinault to observe. The Chehalis River Council was intended to treat with the remaining tribes of Washington Territory west of the Cascade Range. However, it was accidentally discovered at the council, perhaps upon negotiators' overhearing the different language spoken by the two Quileute boys, that the Quinault did not occupy the entire area between the Chehalis River and Makah territory and that a distinct tribe – the Quileute – was situated between the two. Gibbs attributed the exclusion of the Quileute to their speaking a different language from the Quinault such that messengers sent up the coast to provide notice of the council had not communicated with the tribe. For these reasons, the Quileute were omitted from the negotiations. The

Chehalis River negotiations ultimately broke down when participating tribes refused to agree to Governor Stevens' proposal that a single reservation be established for all of the tribes. *See* Ex. 65 at pdf pp. 23-24; Ex. 68 at pp. 172-73.

2.3.    The Quileute and Quinault, together with the Hoh Tribe, were ultimately parties to the Treaty of Olympia, negotiated a few months later on July 1, 1855 at a village at the mouth of the Quinault River, now known as Taholah. Tr. 3/3 at 19:3-7 (Hoard). When the Treaty of Olympia was negotiated, only half of the four-member U.S. treaty commission was present: both Governor Stevens and George Gibbs were absent, and Stevens sent Colonel Simmons to negotiate in his stead, with Shaw serving as interpreter. Simmons utilized the draft treaty developed at the Chehalis River negotiations. As a result, the only substantive difference between the two is that the Treaty of Olympia provides that more than one reservation might be established for the Quileute and Quinault. There is no surviving journal of the negotiations conducted by Simmons. The Treaty of Olympia was signed by Governor Stevens in Olympia on January 25, 1856, ratified by the United States Senate on March 8, 1859 and proclaimed by the President on April 11, 1859. Article 3 of the Treaty of Olympia contains the following reservation of rights provision:

> The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands. Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens; and provided, also, that they shall alter all stallions not intended for breeding, and keep up and confine the stallions themselves.

Ex. 297.

2.4.    Not all of the differences between treaties can be attributed to differing degrees of importance that tribes attached to various resources. For instance, a provision for pasturing horses is absent from

the Treaty of Neah Bay but present in both the Treaty of Olympia and the draft Chehalis River Treaty. It is probable that Governor Stevens included this provision deliberately in the draft Chehalis River Treaty in response to specific concerns of the Chehalis and Cowlitz tribes for maintaining their horse traditions. By contrast, the fact that the draft Chehalis River Treaty was used as a template for the Treaty of Olympia most likely explains the inclusion of this provision in the treaty with the Quinault and Quileute. In particular, the limited use of horses by the Quileute Tribe makes the inclusion of this provision in the Treaty of Olympia anomalous. Stevens, unlike Simmons, was invested with authority to tailor treaty provisions in response to needs and concerns expressed by the tribes. As Governor Stevens was absent from the Treaty of Olympia negotiations, the ability of the Quileute and the Quinault to negotiate tailored treaty provisions was most likely limited. *See* Tr. 3/16 at 182:13 – 184:18; 192:3-10 (Boxburger).[3]

### 3. Scope of the Right of Taking Fish

3.1.    Although the treaty commission was primarily concerned with obtaining land, *see* Tr. 3/16 at p. 187:18-22 (Boxburger), the minutes that are available indicate a persistent concern among the Indians with preserving their entire subsistence cycle. For instance, when Che-lan-the-tat of the Skokomish Tribe expressed a concern at the negotiation of the Treaty of Point-No-Point with the ability of the tribes to feed themselves upon ceding so much land, Benjamin Shaw assured the tribes that they were "not called upon to give up their old modes of living and places of seeking food, but only to confine their houses to one spot." Ex. 65 at p. 11. Governor Stevens informed the tribes at that same council that the treaty "secures [their] fish." *Id.* at p. 14. Stevens similarly informed the tribes at the Chehalis

---

[3] Transcript citations herein are to the unofficial draft transcripts of trial proceedings produced by the Court Reporter.

River Council that the members of the treaty commission "want you to take fish where you have always done so and in common with the whites." *Id.* at p. 22.

3.2.    The minutes from the Chehalis River negotiations indicate that the participating tribes were specifically concerned with reserving the right to take sea mammals. During the Chehalis River negotiations, the assembled Indians raised the issue of whales at least twice. Tuleh-uk, the head chief of the Lower Chehalis, stated, "I want to take and dry salmon and not be driven off…I want the beach. Everything that comes ashore is mine (Whales and wrecks.) I want the privilege of the berries (Cranberry Marsh)." Governor Stevens responded, "He (Tuleh-uk) sees that we write down all that he says… That paper (the Treaty) was the heart of the Great Father which he thought good. It said he should have the right to fish in common with the whites, and get roots and berries." Ex. 65 at p. 24. Stevens' response to Tuleh-uk suggests that the term "fish" was used in a capacious sense, encompassing finfish as well as whales. *See* Tr. 3/3 at pp. 34:1-35:21 (Hoard). While Stevens elsewhere distinguished between "fish" and "whales" in responding to a demand from representatives of the Chinook Tribe for "one half of all that came ashore on the weather beach," he made no distinction between the tribes' right to take beached whales and to hunt for swimming whales. *See* Ex. 65 at p. 26 ("They of course were to fish etc. as usual. As to whales, they were theirs…."); TR 3/3 at pp. 36:5-39:1 (Hoard).

3.3.    Although the draft treaty was read to the assembled tribal representatives, no objection was made despite the lack of an express reference to the right to take sea mammals. *See* Ex. 65 at p. 32. It is reasonable to infer from the absence of any objection that the tribes understood the right to take whales to be provided for in the treaty. *See* 3/3 Tr. at pp. 45:13-25; 78:1-79:7 (Hoard).

---

3.4.    Nothing in the record of the negotiations of any of the treaties indicates that the U.S. treaty commission intended to exclude the harvest of sea mammals from the tribes' reserved fishing rights. By contrast, the intent to include the harvest of sea mammals is corroborated by James Swan's record of the treaty negotiations. Swan recounts that "[t]he Indians, however, were not to be restricted to the reservation, but were to be allowed to procure their food as they had always done, and were at liberty at any time to leave the reservation to trade with or work for the whites." Ex. 291 at p. 344. It is reasonable to infer from Swan's statement that Governor Stevens intended the treaties to reserve to tribes that had customarily harvested sea mammals the right to continue to do so "as they had always done."

3.5.    Dictionary definitions at the time also evidence a broad popular understanding of the word "fish." For instance, the 1828 Webster's American Dictionary of the English Language defined "fish" expansively as "[a]n animal that lives in the water." Ex. 334. While the dictionary recognized the Linnaean taxonomic classification of "fish," which limited the term to aquatic animals that "breathe by means of gills, swim by the aid of fins, and are oviparous," it nonetheless acknowledged its broader popular meaning: "Cetaceous animals, as the whale and dolphin, are, in popular language, called fishes, and have been so classified by some naturalists…. The term *fish* has also been extended to other aquatic animals, such as shell-fish, lobsters, etc." *Id.* (emphasis in original). Other dictionaries from the time corroborate the term's broad meaning in popular usage. *See, e.g.*, Ex. B222.6 (quoting Worcester's 1860 dictionary and Walker's 1831 dictionary, which both define fish as "an animal that inhabits the water"); 3/3 Tr. pp. 52:15, 56:4-57:25, 202:22-203:12 (Hoard). The common usage in legal opinions from the mid to late 1800s of the terms "fish" and "fisheries" in reference to both whales and seals suggests that the U.S. treaty negotiators may themselves have intended to use the

term "fish" in its broadest sense. *See, e.g.*, *In re Fossat*, 69 U.S. 649, 696 (1864) ("For all the purposes of common life the whale is called a fish, though natural history tells us that he belongs to another order of animals."); *Ex parte Cooper*, 143 U.S. 472, 499 (1892) (discussing "seal fisheries"); *The Coquitlam*, 77 F. 744, 747 (9th Cir. 1896) ("They all had the usual ships' supplies and stores and outfit for seal fishing.").

3.6.    There is no record of the Chinook phrase that was actually used to communicate the "right of taking fish." FF. 22. The severe limitations of Chinook jargon as a medium for communication, as well as the limited familiarity of negotiators on both sides with the language, inhibited the capacity to communicate treaty terms with precision. The negotiators most likely used the Chinook word "pish," translated by George Gibbs in his 1863 "Dictionary of the Chinook Jargon" as "English. Fish." Ex. 64 at p. 26. The negotiators may also have used the Chinook phrases "mamook pish" or "iskum pish," meaning "to take fish" or "to get fish." *See* Tr. 3/3 at pp. 66:6-67:24 (Hoard). While Chinook jargon did contain terms for some individual aquatic species, including whales, seals, and salmon, it lacked cover (i.e. high-level) terms that could differentiate between taxa or larger groupings of aquatic animals, such as finfish, shellfish, cetaceans, and sea mammals. *See* Ex. 64. It is reasonable to infer that the negotiators employed broad cover terms from Chinook jargon when negotiating the fishing rights provision and that these cover terms would not have been used in a restrictive sense. *See* Tr. 3/3 at p. 68:7 (Hoard).

3.7.    The sweep of the words for "fish" in the Quileute and Quinault languages is even broader than in Chinook jargon. The Quinault cover term for "fish," "Kémken," is defined alternatively as "salmon," "fish," and "food." *See* Ex. 76. Similarly, the Quileute cover term, "?aàlita?" is translated by multiple lexicographers as "fish, food, salmon." Exs. 225, 233. As with the Chinook jargon, neither

tribe's language possessed terms that could differentiate between groupings of aquatic species, such as sea mammals, shellfish, and finfish. It is reasonable to infer from the records of the Quileute and Quinault languages that members of these tribes would have understood that the treaty reserved to them the right to take aquatic animals, including shellfish and sea mammals, as they had customarily done.

3.8.    Post-treaty activities also suggest that all parties to the Treaty of Olympia understood its subsistence provision to secure to the Quinault and Quileute the right to take whales and seals at their usual and accustomed harvest grounds. During the post-treaty period, these tribes continued to harvest whales and seals from the Pacific Ocean without any protest from government agents. To the contrary, Indian agents actively encouraged these tribes to continue their sea mammal harvest. For instance, Indian Agent Charles Willoughby urged the Quileute to "continue your fisheries of salmon and seals and whales as usual" and assured them that if they wanted any blacksmith work done, such as "spear heads for seals or harpoons for whales, the blacksmith at the agency at Neah Bay will do the work." Ex. 281 at pp. 165, 167. These two tribes were also among those along the coast of the United States and Canada that were exempted from restrictions on fur sealing imposed through the 1893 Bering Sea Arbitration Award and 1894 Bering Sea Arbitration Act. *See* Ex. B85 at p. 53. Post-treaty activities are thus consistent with the reservation of the right to harvest sea mammals in the Treaty of Olympia and inconsistent with a restrictive reading of the treaty's fishing rights provision.

**A. Quinault Indian Nation's Western Boundary**

**1. Background on Traditional Quinault Economy**

4.1.    There is comparatively little documented information about aboriginal Quinault culture and subsistence fishing activity relative to information about other western Washington tribes. Evidence

regarding treaty-time activities of the Quinault is limited even in comparison to the similarly isolated Quileute and substantially more limited than for the Makah, whose location amidst the deep harbors at Neah Bay made this latter tribe unusually accessible to non-Indian traders, settlers, and visitors. Tr. 3/16 at 4:22-25 (Boxburger).

4.2.     Treaty-time governmental contacts with the Quinault were few. In 1854, just prior to the Treaty of Olympia negotiations, George Gibbs wrote, "Following up on the coast, there is another tribe upon the Kwinaitl [Quinault] River, which runs into the Pacific some twenty-five miles above the Chihalis, its headwaters interlocking with the streams running into Hood's canal and the inlets of Puget sound. Little is known of them except that they speak a different language from the last." Ex. B90 at p. 426. Federal Indian agent reports about the Quinault were all written post-treaty and focus on activities with the potential for commercial development to aid in the government's assimilation policy. These reports, narrow in their purview, are consequently of limited utility in discerning Quinault treaty-time practices. *See* Tr. 3/30 at p. 99 (Thompson); Tr. 4/2 at pp. 65-68 (Renker).

4.3.     There have been no archaeological excavations that have generated data associated with aboriginal Quinault occupancy. *See* Tr. 4/7 at pp. 101-103 (Wessen).  The only recorded pre-treaty historical accounts that mention the Quinault consist of records of a 1775 encounter with the Spanish vessel Sonora (an encounter that some scholars attribute to the Quileute rather than the Quinault, *see* Ex. 255 at p. 97 & n. 34), a 1788 encounter with English explorers on the Columbia expedition, and accounts by James Swan of his three-day trip to Quinault in 1854 as well as an encounter with several Quinault Indians while Swan was living 60 miles south of Quinault in Shoalwater Bay. One of nine accounts of the Wilkes Expedition also records an encounter with canoes carrying some men "from

southward about Grays Harbor" at the western end of the Strait of Juan de Fuca on August 3, 1841. Ex. B200 at pdf p. 5. These men may have been Quinault. TR 3/18 at pp. 175-178 (Boxburger).

4.4.    Most of what is known about Quinault culture and subsistence activities before and at treaty times comes from Dr. Ronald Olson's ethnology of the Quinault. Dr. Olson conducted anthropological fieldwork at Quinault for one month each in the spring of 1925 and the winters of 1925-26 and 1926-27 and published an ethnography on the Quinault in 1936. Ex. 213. Dr. Olson's ethnography intended to describe Quinault culture and society prior to contact with non-natives and drew from the memories and oral histories of informants, whom Dr. Olson described as "thoroughly reliable, reasonably intelligent" and "familiar with the old life." Ex. 213 at p. 3. Some of these informants, all of whom were over 60 years of age, had memories reaching back to the 1850's. Ex. 212 at p. 696. Dr. Olson's field notes are available in addition to his 1936 ethnography, though it is uncertain whether the remaining field notes are complete. Ex. 211. Dr. Olson also testified before the Indian Court of Claims ("ICC") on behalf of the Quinault in 1956. Ex. 212.

4.5.    The Quinault occupied the coast of Washington State for thousands of years. Tr. 3/16 at p. 2 (Boxburger). The current members of the Quinault Tribe are descendants of the treaty-time occupants of the villages situated in the territory extending roughly between the Queets River system to the north and the north shore of Gray's Harbor to the south. Ex. 141 at p. 1 (1973 Lane Report). Chief Tahola, Head Chief for the Quinault, expressed the important relationship of the tribe to these traditional lands in his remarks to Governor Stevens at the Chehalis River Council: "He wanted his country. His children live there and wanted food. He wanted them to get it there, did not want to leave it. The river he did not want to sell near the salt water, nor the sand beach mouth, but that part above the mountains and off the river he would sell." Ex. 65 at p. 23.

4.6.     Fishing constituted the principal economic activity of the Quinault at treaty time. Salmon and steelhead served as the principal food and as an important item of trade for the tribe. FF 122. Gibbs remarked that the Quinault Tribe is "celebrated for its salmon, which are considered to excel in quality even those of the Columbia." Ex. 68 at p. 172. The large, glacier-fed rivers in the Quinault region provided a rich source of salmon for the tribe. Reflecting the Quinault's adaptation to extracting resources from this environment, Judge Boldt included a number of rivers and streams in his determination of the Quinault U&A within the original case area: Clear water, Queets, Salmon, Quinault (including Lake Quinault and the Upper Quinault tributaries), Raft, Moclips, Copalis, and Joe Creek. FF 120.

4.7.     At the same time, the position of the Quinault on the Olympic Peninsula coast played an undeniable role in shaping and orienting the tribe's culture, trade, and economic activities. *See* Ex. 213 at p. 12 ("The location of the Quinault on the open coast had its influence on their life."). Comparing their Quinault to their northern neighbors, the anthropologist Jay Powell explained that, despite many Quileute families maintain settlements along inland river courses, "the Quileute, like their neighbors (the Quinaults, Ozettes, and Makahs), were primarily seafarers, deriving most of their livelihood from the oceans." Ex. 224, p. 105. Intermarriages between the Quinault and members of tribes to the north and south were common in traditional Quinault society, as was inter-tribal trade along the coast. Ex. 213 at p. 13; Ex. 277 at p. 81-84. Before and at treaty time, the Quinault, whom Dr. Olson described as "expert canoemen," possessed large ocean going canoes that they manufactured themselves or obtained in trade from the Makah and the Quileute. *Id.* at pp. 68, 73. The Quinault also manufactured sails out of cedar mats and used bailers and inflated sealskins to aid them in traveling on ocean voyages. *Id.* at p. 72. Before and at treaty time, the Quinault regularly traveled the Washington coast

between Cape Flattery and the Columbia River. *Id.* at p. 87; Ex. B200 at pdf p. 5 (1841 report documenting encounter with Indians from Grays Harbor near Cape Flattery). The important linkage between the Quinault's coastal location and the tribe's subsistence practices is reflected in Judge Boldt's determination that, in addition to inland fisheries, the Quinault utilized "[o]cean fisheries … in the waters adjacent to their territory." FF 120.

4.8.     In addition to salmon, the Quinault made use of a wide variety of aquatic coastal and oceanic resources for food as well as for materials such as clothing, bedding, ropes, containers, and tools. For instance, Captain Willoughby, who served as Indian agent at Neah Bay prior to serving as Indian agent on the Quinault Reservation, recorded a wide range of plants and animals harvested by the tribe for food, including "[m]any varieties of salmon," "tender shoots of rushes, young salmon-berry sprouts and other succulent growth of the spring-time," bulbous roots, a wide range of berries, whale, seal, otter, deer, bear, elk, sea-gulls, ducks, geese, seaweed, and a variety of shellfish. Ex. 351 at pp. 269-70. In addition to many of these species, Dr. Olson noted Quinault harvest of halibut, cod, rock cod, sea bass, and sole. Ex. 213 at p. 36. The Quinault traditionally hunted for sea mammals, including whales, fur and hair (harbor) seals, sea otters, and sea lions. The Quinault both ate the flesh of seals and whales and used them to extract oil. They also traditionally made use of seal skins, as well as the skins of elk, bear, and rabbit, for clothing. Ex. 351 at p. 3. Skins of hair seals were used as buoys on whaling expeditions. Ex. 213 at p. 44. Sarah Willoughby, Captain Willoughby's wife, included many of these products in her 1887 description of the possessions of a man named Riley, a Haida Indian and former slave who shared a lodge at Quinault with three other families. Among Riley's possessions, Sarah Willoughby noted: "[g]reat skins of seal and whale oil," "long festoons of whale blubber and dried clams," "baskets of dried halibut and salmon," "the skins of a beautiful sea otter," three large

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 17

bear skins, and other products obtained either locally or by trade. Ex. 355 at pdf pp. 2-4. The anthropologist Ram Raj Prasad Singh listed a similarly broad range of food resources traditionally used by the Quinault on a regular, seasonal basis. Among marine resources, Singh included: sea trout, night smelt, sea lion, blueback, candlefish, fur seal, salmon, whale, sea otter, smelt, and silver and king salmon. He also noted "some deep sea fishing" occurring from April through June. Ex. 277 at p. 67. Much of the salmon, halibut, rock cod, and bass caught by the Quinault were preserved for later consumption. Ex. 142 at p. 11.

4.9.     Traditional Quinault culture did not recognize the "idea of ownership of land beyond a 'use ownership' of the house site." Ex. 213 at p. 115. Individuals owned canoes and implements and could also own guardian spirits. *Id.* The concept of ownership did not extend to coastal and oceanic fishing grounds.

4.10.   The Quinault possessed the navigational skills, knowledge, and technologies to travel extensively on the open ocean out of sight of land. Reflective of their oceanic navigational skills, the Quinault recognized six directions, one of which was expressed alternatively as "ocean side" and "far out to the ocean." Ex. 213 at p. 178. The Quinault navigated chiefly by means of the sun but also watched the ocean swells when at sea, as they were said to always come from the west. *Id.* A few Quinault shamans were said to be able to control the weather. *Id.* at p. 150. The Quinault also had knowledge of the constellations, including of the Pole-star, which was known to be used by the Makah to navigate at night while whaling. *Id.* at pp. 177-78; Ex. 332 at p. 47. In consideration of this and other evidence, the noted anthropologist Dr. Barbara Lane wrote in a 1977 report on Quinault fisheries that "the record is clear that the Quinault possessed seaworthy canoes, navigational skills, and gear

and techniques designed to harvest a variety of offshore fisheries and that they customarily did so." Ex. 142 at p. 12.

### 2. Quinault Offshore Fishing

5.1.    At and before treaty time, the Quinault engaged in offshore fisheries on a regular, seasonal basis for salmon, halibut, cod, rock cod, sea bass, sole, smelt, candlefish, and herring. Ex. 213 at pp. 36-38. The Quinault harvested smelt and candlefish by means of a dip net, and caught halibut, cod, rock cod, and sea bass with hook and line. *Id.* Herring were harvested with a herring rake used from a canoe. *Id.* at p. 38. The Quinault also regularly harvested razor clams, mud clams, oysters, mussels, sea anemones, and crabs along the shore. *Id.* at pp. 38-39.  During the summer months, some Quinault migrated from their upland villages to sites along the coast to engage in these ocean fisheries. *Id.* at p. 38; Ex. 277 at p. 71.

5.2.    Dr. Olson recorded some of the usual locations and distances at which these offshore fish species were customarily harvested by the Quinault at and before treaty time. Smelt and candlefish were taken by the people of the lower villages at the river mouth and at the surf of the beach, and herring was taken within a mile of the beach. Ex. 213 at pp. 36-38. Halibut, cod, rock cod, sea bass, and sole "could be taken anywhere along the coast within six miles of shore." *Id.* One of Dr. Olson's informants reported that halibut, rock cod, and bass were fished in an identical manner between July and August at locations five to six miles offshore, in waters close to rocks and approximately twenty-five feet deep. Ex. 211 at pdf p. 28.

5.3.    Although the Quinault most likely harvested these fish within six miles, they may have fished at distances further offshore on at least an occasional basis. Dr. Lane, for instance, concluded in her 1977 report on Quinault ocean fisheries that, while "[i]t is not feasible to document the outer limits of

Quinault fishing, [] it appears that Quinault fishermen were familiar with offshore resources for at least thirty miles west of the Olympic peninsula." Ex. 142 at p. 1. Evidencing this familiarity, unidentified Indians informed the United States Fish Commission of a fishing bank at the continental shelf, approximately 30 miles offshore from Shoalwater Bay. Ex. 318 at p. 65. In 1895, Beriah Brown wrote an article on Quinault marine mammal hunting, in which he noted that the fur seal stop at this bank on their migration northward, where many of them fall victim to the Quinault. Brown described this bank as a "famous [] fishing ground." Ex. 18 at pdf p. 2. More likely than not, the Quinault Indians were the ones who informed the U.S. Commission of the location of the bank, given that they frequented Shoalwater Bay at treaty-time and ranged 30 miles offshore in their marine mammals hunts. The Quinault also manufactured fishing lines two to three hundred fathoms in length, which would be consistent with deep-sea fishing practices. Ex. 211 at pdf p. 675.

### 3. **Quinault Whaling**

6.1.    Whaling has been consistently recognized as an important cultural and economical tradition is pre-treaty Quinault society. While Quinault, like other coastal tribes, made use of drift whales that beached on their territorial coast, the historical and ethnographic evidence demonstrates that the active pursuit of whales was a deeply engrained practice in Quinault society. Dr. Olson, for instance, described the Quinault as the "most southern people who engaged in the pursuit of whales." Ex. 213 at p. 12. While Dr. Olson was of the opinion that the abundance of salmon in Quinault Territory mitigated the tribe's need and desire to engage in whaling to the extent of the Makah and Quileute to the north, he nonetheless recognized the importance of the practice in Quinault society, as manifested by traditional Quinault secret societies dedicated to whaling and of rituals associated with the hunt. *Id. See id.* at p. 44 (describing whaling as a "dangerous and spectacular pursuits [] hedged about with

ritual."). Dr. Olson recorded only two Quinault whalers – Nicagwa'ts and his brother – active around 1850, though he reported that there were as many as six Quinault whalers at any time in the pre-treaty era, when the population was larger. As each whaler would have needed to "call together seven other men to aid him," *id.*, the number of individuals engaged in whaling in 1850 would have been a substantial proportion of the population, which consisted of only 158 Quinault according to a treaty-time census. Tr. 3/16 at 60:2-18 (Boxburger). Edward Curtis, a Seattle photographer who visited Quinault in 1910, gave a similar account of the existence of two Quinault whalers at treaty-time, each captaining a canoe of eight men in total. Ex. 347 at pp. 9-10.

6.2.     Quinault whalers traditionally made use of large ocean canoes, sufficient to fit six paddlers, the steersman, and the harpoon thrower, who also served as the head whaler. The Quinault whalers made use of a harpoon similar to that used by the Makah as well as buoys made of whole skins of hair seal.

6.3.     A generations old myth describes how the Quinault learned to hunt whales. The "Story of the Dog Children," recorded by Livingston Farrand, tells of five children who could change from human to dog form. Cast away from society, the children learned to hunt whales from their mother using sealskin floats and harpoons. When their whaling prowess was discovered by the villagers, the children were welcomed back into society, becoming chiefs of the village and always keeping the people well supplied with whales. Ex. 52 at pp. 127-28. The myth expresses the substantial time depth of the Quinault whaling tradition as well as its important place in Quinault identity and culture.

6.4.     Quinault whaling was a specialized occupation. A Quinault whaler spent much of the year making and repairing the necessary equipment, which included a large ocean canoe and considerable other valuable gear. The head whaler had to possess the requisite guardian spirit, called sláo'ltcu,

which was acquired shortly after puberty. In addition, a whaler went through a month of training previous to the season of whaling. During this period, the whaler bathed in a ritualized fashion each night in the ocean or river, went out alone in his canoe to practice throwing his harpoon and to converse with his spirit, and refrained from sexual intercourse for ten days prior to the hunt. *Id.* at pp. 44-46.

6.5.    Whale products played an important role in the Quinault diet, economy, and ceremonial traditions. Whale meat was cured for later consumption and the blubber rendered into oil that was used as a condiment and in ceremonies and rituals. Dried foods were traditionally dipped into whale oil before they were eaten, and rendered whale fat was stored in the stomachs of seal or sea lion and in bags made from sections of whale intestines. Ex. 142 at p. 10.

6.6.    Treaty-time historical accounts are consistent with customary Quinault whaling practices. During the first recorded contact with the Sonora in 1775, Indians (likely Quinault though possibly Quileute) offered whale meat to the Spanish sailors. The second recorded contact between Quinault and non-natives occurred in 1788, when the English ship Columbia encountered two whaling canoes with whaling implements from the village of Quinault. Around treaty-time, James Swan also came to know a famous Quinault whaler named Neshwarts, who was most likely the same whaler, Nicagwa'ts, reported by Dr. Olson. Ex. 283 at pp. 85-86; Tr. 3/16 at 104:5-105:18. Swan's descriptions of Neshwarts indicate that Swan was familiar with the Quinault whaling tradition.

6.7.    The substantial number of words in the Quinault language associated with whaling practices is also indicative of the time depth of the Quinault whaling tradition. Quinault have separate words for whale, little whale, whale blubber, whale bone, whale oil, and whaling canoe. Ex 176 at p. 315. The

Quinault language also contains words indicative of ocean-going practices, including words meaning to "navigate on the ocean" and ocean canoe. *Id.* at p. 281.

6.8.     The historical and ethnographic evidence shows that before and at treaty time, whaling was a regular and customary subsistence practice exercised by the Quinault, taking place each year on a seasonal basis during the summer months when Quinault Indians would migrate from upland coastal villages to participate in the hunt. According to Dr. Olson, the Quinault whaled each year from May to August, when a Quinault whaler would spend much of his time on the open water, "cruising for the animals." Ex. 213 at p. 24. Singh too included whaling in his description of the Quinault's seasonal rounds, taking place during these summer months. Ex. 277 at p. 67.  One of Dr. Olson's Quinault informants related that his grandfather, who would have lived before treaty time, harpooned 77 whales in his lifetime, a feat that would have required hunting whales regularly during the summer season. Ex. 213 at p. 155; Tr. 3/16 at pp. 53-54 (Boxburger). The summer season of active whale hunts stands in contrast to the winter season, when the waters were typically too turbulent for the tribe to venture far offshore but a drift whale or two would often make its way to the Quinault coast. *See* Ex. 211 at pdf p. 308.

6.9.     The few ethnographic and historical accounts that exist of Quinault whaling show that the whaling voyages regularly required Quinault whalers to go up to 30 miles offshore on their hunts. Dr. Olson, for instance, records that "[w]hales were most often encountered 12 to 30 miles off shore." Ex. 213 at p. 44. Dr. Olson testified at the 1956 ICC hearing that Quinault hunted whale in the open ocean, "going as far out as 25 miles or even more to harpoon and capture whale." Ex. 212 at p. 514. When pressed about the western boundary of the Quinault territory, Dr. Olson testified that the Quinault "used to go out as much as 25 miles hunting whale." *Id.* at p. 503. Dr. Lane agreed with these

distances. *See* Ex. 142 at p. 4 ("In contrast to the herring which could be taken quite close to shore, whales and seals were harvested as far as twenty-five and thirty miles offshore.").

6.10.   Indian whaling canoes could also expect to be towed many miles out to sea as part of their hunt. *See* Ex. 260, pp. 18-19 (account by Dr. Lane of Makah whale hunt); Tr. 3/30 at p. 73:16-20 (Thompson). In his description of the traditional Quinault whale hunt, Dr. Olson noted that after a whale was struck by a harpoon, the whale "might run as much as ten to fifteen miles before being killed." *Id.* at p. 45. A whaler with particularly strong power, such as Nicagwa'ts, was able to spur the whale to run toward shore instead of out to sea. According to Dr. Olson, Nicagwa'ts was never forced to tow a whale more than five miles, which would be consistent with harpooning a whale up to twenty miles offshore. *Id.*

6.11.   The length of time needed for a single whale hunt is consistent with whaling practices taking place far offshore. Singh, for instance, noted that hunting a whale could require two or three days. Ex. 277 at p. 41. Among the various rituals and cultural taboos associated with whaling, Dr. Olson recorded the belief that should a whaler's wife be unfaithful while her husband was away on a hunt, "the whale would be wary and 'wild,' and the men would be unable to kill any." Ex. 213 at p. 46.

6.12.   Hunts taking place at distances 20 to 30 miles offshore would have placed Quinault whalers at the edge of the continental shelf, a location where whales would have been found in abundance during the summer months. *See* Tr. at 3/9, pp. 103:22-105:24 (Trites). The continental margin starts at 20 miles offshore at the Quinault canyon and runs, on average, 30 miles offshore adjacent to Quinault territory. *Id.* at 105:15-24. Biologist Dr. Andrew Trites described this margin as an ocean "Serengeti," through which large herds of marine animals, including whales and fur seals, would migrate on a seasonal basis. *Id.* at 104:8-23. The Court finds the testimony of Dr. Trites credible and consistent with

traditional Quinault whaling voyages taking place at the distances described by Dr. Olson and other anthropologists.

### 3. Quinault Fur Sealing

7.1.    The evidence also shows that fur sealing was traditionally practiced by the Quinault at and before treaty time. As with whaling, the Quinault language contains words specifically associated with fur sealing, including words for fur seal ("ma·a'i"), little seal, seal oil, and sealing canoe. Ex. 213 at p. 49, Ex. 176 at p. 295. Dr. Olson and Singh both described the hunting of fur seal as a seasonal Quinault activity, taking place regularly each year in the months of April and May when the animals could be encountered offshore on their annual migration to breeding grounds off the coast of Alaska. Ex. 213 at p. 49; Ex. 277 at p. 67. Dr. Lane was in accord. *See* Ex. 143.

7.2.    Quinault traditionally fur sealed in an ocean canoe holding three men. According to Dr. Olson, the sealers cruised around the open ocean until a seal was sighted asleep in the sun. The sealers paddled quietly to move within harpoon range of the seal, whereupon the animal was struck with a harpoon, hauled toward the canoe, killed with a club, and hoisted aboard. Quinault preserved the meat and fat of the fur seal for consumption and used the skins for blankets and ropes. Ex. 213 at p. 49. These uses are consistent with treaty time subsistence purposes, taking place prior to trade with non-Indians. Tr. 3/16 at 122:16-123:5 (Boxburger). The Quinault sealing tradition mirrors that practiced by the Quileute and the Makah.

7.3.    Beriah Brown's 1895 article on Quinault marine mammal hunts shows that Quinault fur sealing continued in its traditional form through the late 1800s. Brown described implements of fur sealing similar to those described by Dr. Olson, including the "bone harpoon" and a specialized ocean-going sealing canoe fifteen or sixteen feet in length, and noted that the Quinault hunt fur seals in the

open ocean, along with finback whales. Ex. 18 at pdf pp. 1-2. According to Brown, the Quinault "alone among the coast tribes…still follow the customs of their ancestors" in their pursuit of the seal, carrying out sealing voyages in canoes manned by three sealers and paddling as quietly as possible upon reaching the sealing grounds so as not to disturb the sleeping herds. *Id.* at p. 2. According to Brown, the sealers would regularly spend two days at sea during a hunt before returning to their village for several days' rest. *Id.* Though written post-treaty, Brown's account is indicative of both the important place of fur sealing in Quinault culture and the time depth of this customary practice.

7.4.    The Quinault more likely than not ventured up to thirty miles offshore in pursuit of fur seals on a regular, seasonal basis at and before treaty times. Dr. Olson recorded that it was necessary for the Quinault to go ten to twenty-five miles offshore to hunt fur seals. Ex. 213 at p. 49; Ex. 211 at pdf p. 31. Dr. Olson contrasted fur seal hunting, which took place at distances far offshore, with the hunting of hair seals, which could be found on rocks close to shore. *Id.* While it is likely that the Quinault ventured even further post-treaty prompted by the demands of the commercial fur seal industry, the context of Dr. Olson's descriptions makes clear that he was describing the Quinault's pre-contact, traditional fur sealing activities. *See* Tr. 4/2 at pp. 80:1-81:12 (Renker). Beriah Brown's article also places fur sealing thirty miles offshore, in the vicinity of the famous fishing bank off the coast from Shoalwater Bay. Ex. 18. Although Brown's report was likely influenced by observations of post-treaty commercial fur sealing practices, he believed these practices to be consistent with pre-contact Quinault traditions.

7.5.    These accounts of the distances at which the Quinault traditionally fur sealed place the sealers in the vicinity of optimal harvest. Fur seals are pelagic animals, spending their entire lives at sea other than their visit each year to their perennial breeding grounds. *See* Tr. 3/9 at 17:7-13. Current day

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 26

tracking records and scientific studies demonstrate that, consistent with Dr. Olson's ethnography, fur seals can be found in great abundance in April and May at the continental margin off the coast of Washington as they carry out their annual migration to breeding grounds, such as the Pribolof Islands in Alaska. *See id.* at 17-13, 44:10-22 (Trites). Consistent with Dr. Olson's description of the Quinault fur sealing tradition, Dr. Trites explained that fur seal sleep during the day off the continental margin, making them vulnerable to hunters traveling quietly by canoe. *Id.* at p. 37:20-25; 60:1-61:13. Dr. Trites' descriptions of current day fur seal behaviors were unrebutted, and the Court finds credible Dr. Trites' testimony about the continuity of fur seal biology and behavior. As described in greater detail below, the behavior of fur seals at and before treaty-time is more likely than not consistent with their observed behavioral patterns today. These patterns support an inference that the Quinault were harvesting fur seals up to thirty miles off the coast of their territory at and before treaty-time.

**B.  Quileute Indian Tribe's Western Boundary**

**1.  Background on Traditional Quileute Economy**

8.1.    As with the Quinault, the Quileute Tribe was isolated before and in the decades immediately following the signing of the Treaty of Olympia. Prior to 1855, there were only four recorded interactions between the Quileute and non-Indians, or five if the 1775 Spanish encounter with either Quileute or Quinault whalers is included. The four encounters definitely attributed to the Quileute and their Hoh relatives include: (1) a report of a British expedition led by Charles Barkely, which visited the Washington coast in 1787 and was attacked by the Hoh at Hoh River, (2) an account of the 1782 Columbia expedition, which traded skins with the Quileute on its way north to Nootka Sound, (3) an account of the 1808 wreck of the Russian ship, the Sv. Nikolai, which wrecked off the coast of Quileute territory, and (4) the testimony of Mr. James, who was at La Push in 1854 for nine weeks

assisting survivors of the wreck of the steamer Southerner and served as a witness in the Quileute's land dispute with the settler Dan Pullen. Little was written by any of these visitors about Quileute culture or economy.

8.2.    The United States government was almost entirely unaware of the presence of a tribe located between the Makah and the Quinault prior to the negotiation of the Treaty of Olympia. In 1854, George Gibbs wrote that "[s]till further north, and between the Kwinaitl [Quinault] and the Makahs, or Cape Flattery Indians, are other tribes whose names are still unknown, but who, by the vague rumors of those on the Sound, are both numerous and warlike." Ex. B090.39. As set forth above, the Quileute were included in neither the Neah Bay nor Chehalis River negotiations. It was only in the course of these latter negotiations that the treaty commission became aware of the presence of the Quileute, whose population they estimated to number around 300 people. Ex. 65 at pdf pp. 23-24.

8.3.    The Quileute remained isolated in the decades following the execution of the Treaty of Olympia, continuing to live in their traditional manner. *See* Tr. 3/12 at 50:17-51:4 (Boxburger). Annual reports of Indian agents evidence the difficulty in traveling to Quileute territory and the lack of non-Indian presence in the area. Superintendent C.H. Hale, for instance, reported to Washington on August 8, 1864 that the Quileute "know but little of the whites… Their advantage consists in the fact of their village being surrounded for many miles with an almost impenetrable forest of gigantic growth. It is believed that no white man has ever been permitted to visit their village and its locality is only approximately known." Ex 218 at p. 23. In 1877, an Indian agent similarly reported that the "Queets, Hohs and Quillehutes live at such a distance from the agency as to be entirely out of reach." Ex. 218 at p. 33. In 1878, after oversight of the Quileute was transferred to the Neah Bay agency, Indian agent Charles Willoughby wrote that the "Quillehutes were unanimous in stating that they have

only been once visited by an agent since the treaty was signed, and that visit they state was in the year 1862." Ex. 350 at pp. 2-3. By 1882, Willoughby too admitted to not being able to visit the Quileute: "The Quillehute Indians are 30 miles from the Agency by land and 40 miles by water and so difficult of access that I cannot make frequent visits to them." Ex. 218 at p. 33. The minimal familiarity of Indian agents with Quileute practices, coupled with the agency's economic development orientation, render Indian agent reports of little utility in reconstructing customary Quileute fishing practices at treaty time.

8.4.     During this post-treaty period, the U.S. government intended to move the Quileute together with the Quinault onto a new reservation established at the Quinault river. Several different Indian agents reported that the Quileute did not understand that by signing their treaty they would be forced to give up their homes. *See, e.g.*, Ex. 7 at p. 335, Ex. B049 at pp. 14-15; Ex. B226 at pp. 5-6. In an 1879 council with the Quileute, Chief Howeattle, Head Chief of the Quileute, recalled that Colonel Simmons "told us when he gave us our papers that we were always to live on our land, that we were not to be removed to another place." Ex. 281 at p. 161. The Quileute oral tradition likewise firmly roots the Quileute in their ancestral lands. Unlike neighboring tribes, the Quileute have no tradition of arriving on the Olympic Peninsula from other lands, instead asserting that they have always lived in this place. *See* Ex. 247 at p. 19. The Quileute remained on their land despite efforts to relocate them, and on February 19, 1889, the Quillayute Reservation was established by Executive Order at the Quileute coastal village, La Push. The first white settler to take up residency in Quileute territory was a schoolteacher, sent to oversee the Quileute when the first school was established at La Push in 1883 and who set about attempting to assimilate the Indians by assigning them colonial names. Ex. 218 at p. 25.

8.5.     Into the 1890s, the Quileute nonetheless remained unfamiliar with white culture and notions of property. Evidencing the tribe's indigenous worldview, the settler Karl Olof Erickson remarked on his meeting with the Quileute that "the leader of the group[] made an address and pointed to the woods, the ocean, and the sky." Ex. 145 at p. 85. Erickson presented the assembled Indians with his receipt for money paid at the U.S. Land Office in Seattle for his land claim, but this symbol of property ownership "did not mean anything" to the Quileute. *Id.* Tensions related to these differing notions of ownership arose when the settler Dan Pullen claimed land at La Push around 1883 and attempted to have the Quileute removed form the area. Several months after the Quillayute Reservation was established, Pullen burned the La Push village to the ground when its residents were away working in the Puget Sound hop fields. *See* Ex. B063.15. As a result, the Quileute suffered a devastating loss of most of their aboriginal artifacts, including their whaling and fur sealing implements and canoes. *See* Tr. 3/12 at pp. 26:15-28:8 (Boxburger); Ex. B63 at pdf. p. 15.

8.6.     Owing to their relative isolation and minimal contact with Indian agents and white settlers, the Quileute maintained their traditional practices through the early 1900s. The noted anthropologist Dr. Leo Frachtenberg, who studied the Quileute from 1915-16, reported that his "investigation was facilitated by the fact that the Quileute Indians, numbering approximately 300 individuals, live together in a single village and still cling tenaciously to their native language, and to their former customs and traditions…. [Their] condition seems to be due to their complete isolation from the other tribes and from the white people, and to their persistence in adhering to the former customs and beliefs." Ex. B096 at pp. 111, 113.

8.7.     Judge Boldt recognized that "[f]ishing is basic to the economic survival of the Quileute," FF 110, and it continues to be depended upon as a major source of income for the tribe. *See* Tr. 3/2 at

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 30

158:3-159:21. As it did for the Quinault, fishing constituted the principle economic and subsistence activity of the Quileute at and before treaty time. *See* FF 104, 105. Like the Quinault, the Quileute were favorably situated to harvest trout and steelhead, which were "taken in their long and extensive river systems." FF 104. The Quileute were also able to travel into the upland foothills to hunt by following their river system in canoes. *Id.* Individual Quileute families asserted ownership of river fishing grounds. FF 106; Ex. 58a at pdf p. 120. Pre-treaty Quileute villages were located where the conditions of the rivers were optimal for catching fish, with each village obtaining its principal supply of fish from a sophisticated fishtrap located nearby. FF at 109. Recognizing the tribe's customary use of rivers and lakes for their subsistence supply, Judge Boldt included a number of inland water bodies in his determination of the Quileute's case area U&A, including: "the Hoh River from the mouth to its uppermost reaches, its tributary creeks, the Quileute River and its tributary creeks, Dickey River, Soleduck River, Bogachiel River, Calawah River, Lake Dickey, Pleasant Lake, [and] Lake Ozette." FF 107.

8.8.    At the same time, ocean fishing undoubtedly played a significant role in the traditional Quileute economy, culture, and identity. Judge Boldt recognized the importance of oceanic resources to the Quileute in including "adjacent tidewater and saltwater areas" in their U&A. FF 108. In furtherance of this determination, Judge Boldt found that before and at treaty time, the Quileute harvested diverse resources in the Pacific Ocean, including "smelt, bass, puggy, codfish, halibut, flatfish, bullheads, devilfish, shark, herring, sardines, sturgeons, seal, sea lion, porpoise, and whale." *Id.* As they did with respect to their inland lakes, the Quileute viewed the waters of the ocean as common property. FF 106; Ex. 65(a) at pdf p. 120.

8.9.    Early settlers and visitors to Quileute territory make mention of Quileute use of ocean resources, as does every ethnographer to have done work among the Quileute. The anthropologist Ram Raj Prasad Singh, who did field work with the Quileute in the 1950s, noted the unusual diversity of the tribe's economic resource base. Singh noted that, unique among the three Olympic coast tribes, the Quileute exploited all three of the economic resource areas available on the Peninsula: the deep sea economy, the river and coastal economy, and the inland economy. Ex. 277 at p. 4 (noting that "the Makah had primarily a deep sea economy; the Quinault, river, coastal, and inland; the Quileute, all three"). Singh explained that the Quileute were situated in a unique geographic zone where none of the economic resource areas was sufficient on its own to provide for adequate subsistence. *Id.* at p. 127.

8.10.    The desire for dietary variety and the wide range of uses that the tribe found for the varied resources they exploited served as additional motivations for the Quileute to utilize a broad resource base. As one of Singh's Quileute informants related, "[t]he Indians did not want all fish or all whale but liked to get some of everything which they wanted to eat." Ex. 277 at p. 73. According to Singh, "[c]hoice in production gave the Indians a freedom unknown to most hunting tribes the world over." *Id.* Specialization in occupations and in the tools and technologies for extracting resources in their different environmental zones abetted the Quileute's exploitation of a diverse range of resources. *See* Tr. 3/12 at pp. 76:26-77:11 (Boxburger); Ex. 277 at p. 81. The Quileute, for instance, had specialized technology for seafaring and harvesting different ocean resources, including four different canoes and four specialized hooks for ocean hook and line fisheries. *See* Ex. B350.13; Ex. B310; Tr. 3/30 at pp. 47:21-48:5 (Thompson). Intra-tribal trade networks further spurred economic specialization. Members of both the Quileute and the Quinault tribes who lived on coastal settlements harvested aquatic

resources for intra-tribal trade with upriver tribal members in exchange for meats and furs. *See* Ex. 277 at p. 81.

8.11.   Anthropologists who studied the traditional Quileute economy noted a startling variety of ocean resources harvested by the tribe. These resources included a wide range of finfish (flounder, sole, rock fish, bullheads, suckers, skate, surgeon, smelt, sardines, herring, dog fish, sea bass, cod, salmon, halibut, and others), sea mammals (hair seal, sea lion, sea otter, porpoise, dolphin, fur seal, gray whale, humpback whale, killer whale, fin back whale, blue whale, and sperm whale), and shellfish (crab, clams, octopus, mussels, barnacles, squid, rock oysters, chiton, sea urchin, sea anemone, and goose neck barnacle). *See, e.g.*, Ex. 58(c) at pdf pp. 40-48, 61; Ex. 247 at pp. 14-16. According to Singh, marine resources were customarily harvested by the tribe during the months of April through August, when the tribe would harvest hair seal, fur seal, whale, sea lion, and smelt, and engage in "deep sea fishing." Ex. 277 at p. 65. Dr. Lane too reported that the Quileute "pursued whales, seals, sea-lion, porpoise and fished for halibut, cod, bass, salmon and other species in the marine waters off the west coast of the Olympic Peninsula." Ex. B349.2.

8.12.   Quileute Indians who addressed government officials in the post-treaty era consistently attested to the tribe's customary subsistence harvest of ocean resources. Stanley Gray, a Quileute born in 1864, emphasized the importance of ocean resources in traditional Quileute culture and economy in his testimony in *United States v. Moore*, a case concerning the intended scope of the Quillayute Reservation. Gray testified that the Quileute hunted whale and seal in the Pacific Ocean "in the early days." He further testified that the Quileute "fished for halibut, ling cod, and whale" in the Pacific Ocean "continuously" during his lifetime. Ex. 178 at pp. 346-49. Similarly, when Edward Swindell, an attorney for the Department of the Interior, visited various tribes to identify their subsistence activities,

several Quileute described the importance of ocean resources and intra-tribal trade between coastal and inland villages. Sextas Ward, a Quileute born in 1856, explained that "the Indians who lived in the villages along the various streams were able to catch much more salmon that those who lived along the ocean, whereas those along the ocean could obtain seal, whale and smelt; that as a result of this they were accustomed to trade amongst themselves so that they could have all kinds of fish and sea food for their daily subsistence." Ex. 293 at p. 221. Similarly, Benjamin Sailto, a Quileute born in 1853, told Mr. Swindell that the Indians living at the ocean would "catch whales and seals in the ocean" and that the people who lived upriver "would visit the Indians at other places or else come down to the main village at La Push for festivities and to obtain a supply of the different kinds of fish food which they could not obtain at their own fishing places." *Id.* at p. 225.

8.13.   Like the Quinault, the Quileute possessed navigational skills, knowledge, and technologies to travel extensively on the open ocean, reaching distances out of sight of land. Dr. Lane opined that the "Quileute and Hoh Indians at treaty times were known for their seamanship." Ex. B349.2. Like the Quinault, the Quileute propelled their ocean canoes by means of both paddles and sails. Ex. 58(a) at pdf p. 160. Frachtenberg specifically contrasted the traditional Quileute ocean-going equipment, including large paddles and a single sail set upon poles in the bow of the canoe, with the oars and canvass sails used in the early 1900s. *Id.* According to Frachtenberg, the Quileute traditionally used their canoes to travel 20-30 miles westward, as far south as Tahola (50 miles south of La Push), and as far north as Neah Bay (45 miles from La Push). *Id.*

8.14.   Various historical and anthropological accounts relate Quileute knowledge of weather forecasting and the sophisticated navigational techniques the Quileute employed when voyaging offshore. Chris Morgenroth, who settled on the Bogachiel River in the 1880s, described in his

autobiography his near deadly attempt to reach Neah Bay in a whaling canoe launched from La Push and crewed solely by him and other white settlers. Upon leaving La Push, Morgenroth was warned by Chief Howeattle to "Look out for the East wind!," a warning that Morgenroth and his crew regretfully ignored. Ex. 180 at pp. 62-65. Both the anthropologist Professor Jay Powell, who lived with the Quileute for four decades, and the anthropologist Richard Daugherty commented on the traditional weather forecasting techniques used by the Quileute. *See* Ex. 220 at pp. 9, 111 (discussing the ability to tell which way the wind is coming from by the roar of the ocean and to predict weather by the appearance of fog and clouds); Ex. B345.14 (noting "weather forecasting" by Quileute sealers). Various oral traditions reflect Quileute knowledge of the stars used for navigation, as well as Quileute use of the sun's position as a navigational tool while at sea. *See, e.g*, Ex. B333 at pp. 51-56 (myths about the origin of the stars and constellations), 71-74 (oral tradition that whaling season begins when the sun goes straight across the ocean to the west).

8.15.   The Quileute language reflects the tribe's oceanic orientation. Professor Powell's dictionary of the Quileute language records over ten distinct words for canoe, including separate words for "sealing canoe," "fur sealing canoe," "whaling canoe," and canoes of various sizes. Ex. 225 at pp. 44-45. Quileute words exist for a wide range of aquatic animals associated with the tribe's pre-treaty subsistence practices. The Quileute also possess distinct words associated with wide-ranging ocean traveling, including words meaning "to go out on the ocean," "at sea," "sea, blue water," and "sea, out in the ocean, west." *Id.* at p. 194; *see also* Ex. 233 at p. 159. Further words exist for a variety of sails used for traditional ocean travel and whaling purposes, as well as for stars associated with navigation. *See* Ex. 233 at pp. 154, 177.

### 2.  Quileute Offshore Fishing

9.1.     The archaeological and ethnographic evidence show that the Quileute engaged in offshore fisheries on a regular, seasonal basis for a range of oceanic finfish at and before treaty time.

9.2.     Fish bone data assemblages from middens associated with aboriginal Quileute occupancy evidence a community continuously engaged in harvesting finfish from the Pacific Ocean. Quantified faunal data is available for four sites associated with the Quileute: Cedar Creek (representing late prehistoric occupation), Cape Johnson (representing occupancy from 700 to 1100 years before present), La Push (dating 600 to roughly 900 years ago), and Strawberry Point (representing occupancy between 1650 and 1950). The species compositions of the bone assemblages at these sites are very similar to those found at the ten sites associated with Makah occupancy, for whom a forty mile offshore U&A has been determined by this Court. The three most prevalent fish at each of the Quileute sites are: (1) greenling, red Irish lord, and lingcod (Cedar Creek), (2) greenling, red Irish lord, and cabezon (Cape Johnson), (3) rockfish, salmon, and flatfish (La Push), and (4) perch, greenling, and lingcod (Strawberry Point). The top species compositions at Makah sites are analogous, with flatfish, rockfish, greenling, salmon, and lingcod typically found among the most prevalent three or four species. *See* Tr. 4/6, 163:11-165:11 (Wessen). Based on these comparisons, the archaeologist Dr. Wessen, whose testimony the Court finds credible, testified that "there are broad similarities among all of these sites in fish bones." *Id.* at 164:8-9.

9.3.     The types of species found at the Quileute sites suggest a strong oceanic orientation. Species like greenling, perch, lingcod, and sculpins (including red Irish lord and cabezon) would have been available to the tribe five to ten miles offshore, though they can also be found both nearer to shore and in deeper waters. *See* Tr. 3/11 at pp. 181-84 (Gunderson). Others, like rockfish, are most abundant in habitats deeper than 50 fathoms. *Id.* at 161:21-162:1.  Hake, representing 1.4% of fish bone specimens

at the Cape Johnson sites, and halibut, representing 2.5% of fish bone specimens at the La Push site, are strongly indicative of offshore harvest. Hake are a fish associated with deeper waters, *see* Tr. 3/11 at 15-16 (Schalk), though they too range from nearshore to distances beyond the 100-fathom line. *See* Tr. 4/3 at 109-109 (Joner). Dr. Gunderson, whose testimony the Court finds credible, testified that halibut are most common at depths from 30 to 230 fathoms, although they can be found in smaller quantities in nearshore waters as well. *See* Tr. 3/11 at 169:19-20 (Gunderson); *see also* Tr. 3/11 at 5:12-25 (Schalk).

9.4.     The low percentage of halibut at Quileute sites may not accurately reflect its importance in the Quileute economy. In particular, evidence suggests that halibut may be underrepresented at archaeological sites because it was often filleted on the beach rather than at village sites. *See* Tr. 4/6 at 174:2-23 (Wessen). Limited archaeological excavations at three additional Quileute sites – the Toleak Point site and two sites on Destruction Island (located 4 miles offshore) – provide further evidence of Quileute engagement in halibut fishing. Tentative identifications of fish bones at the Destruction Island sites indicate the probable presence of halibut, Ex. 267 at p. 3, and hooks and grooved stone sinkers associated with halibut fishing have been found at the Toleak Point site. *See* 3/10 at pp. 142:1-145:2 (Schalk). Halibut is also present at high frequencies (26% of fish bones) at an additional site at Sand Point located on the Washington Coast west of the northern portion of Lake Ozette and abandoned approximately 1,600 years ago. The Sand Point site may be reflective of either Makah, Ozette, or Quileute activity. *See* Tr 4/6 at pp. 42-43 (Wessen).

9.5.     The presence of offshore birds in the middens, accounting for 31% of bird bones at La Push, provides additional circumstantial evidence of offshore fishing activities. *See* Tr. 3/10 at 162:4-163:5

(Schalk). These birds were likely taken incidental to offshore fishing and marine mammal hunting. Ex. 338 at pp. 32-34.

9.6.      Ethnographic and historical evidence is broadly consistent with the archaeological evidence of regular and customary ocean finfish harvest by the Quileute at and before treaty time. James Swan, who traveled to La Push in 1861 on a trading vessel and remained for four days, later informed the U.S. Fish Commission that the Indians south of Cape Flattery subsisted principally on "rock cod, surf smelt, tomcod, salmon, etc." Ex. 318 at p. 66 (1888 U.S. Fish Commission Bulletin). The importance of salmon and smelt to the Quileute is corroborated by Swan's descriptions of first salmon and first smelt ceremonies. *See* Ex. 287 at p. 45. While Swan did not believe that the Quileute were harvesting halibut, the archaeological and ethnographic record proves him mistaken on this point. For instance, multiple sources document traditional Quileute fishing for halibut at halibut banks, where specialized U-shaped hooks similar to those used by the Makah were employed to catch the fish. *See* Ex. 248 at p. 447, Ex. B346.40. Frachtenberg too discussed specialized gear and fishing techniques used by the tribe for offshore harvest of halibut, cod, bass, and other species. Ex. 56(c) at pdf pp. 68-76. According to Frachtenberg, the Quileute caught fish in the ocean using five different types of hooks as well as lines made of dried kelp. *See* Ex. 58(a) at pdf p. 128. Women and men would go out together on fishing trips in the ocean, during which specialized ocean canoes somewhat smaller than sealing canoes were used. Ex. 56(c) at pdf p. 69. The Quileute also took salmon by trolling in the open ocean and took herring from their canoes by means of a herring rake. *See* Ex. 293 at p. 184; Ex. 37a at p. 143; Ex. 58(a) at pdf p. 131.

9.7.      While it is not possible to document the precise outer bounds of traditional Quileute finfish harvest in the Pacific Ocean, evidence suggests that the Quileute were more likely than not harvesting

finfish up to twenty miles offshore on a regular and customary basis. According to Frachtenberg, halibut was harvested within two miles of shore, cod taken along rock and reefs, and other fish caught under rocks in rough weather with a kelp line. Ex. 56(a) at pdf at pp. 129-133. Other reliable accounts, however, place Quileute fishing further offshore. Singh, for instance, reported that the coastal Indians, including the Quileute and Hoh, harvested bass six miles offshore and fished at halibut beds eight to twelve miles offshore. Ex. 277 at pp. 19, 32. Quileute tribal member Bill Hudson, born 1881, informed Richard Daugherty that the Quileute fished for halibut in depths of 50 to 60 fathoms using kelp lines in the traditional, pre-contact style. Ex. B346.40 at pdf p. 340; Tr. 3/2 at 116:18-119:9 (Boxburger). Fishing at a depth of 50-60 fathoms would place the Quileute approximately twenty miles offshore of La Push and at areas of peak abundance of halibut during the summer season. *Id.*; Tr. 3/11 at 171:5-9, 174:12-25 (Gunderson). This is a distance to which Frachtenberg reported that the Quileute were accustomed to travel westward in their ocean canoes. Ex. 56(a) at pdf pp. 162-63.

9.8.    One post-treaty historic reference places traditional Quileute fishing at distances even greater than twenty miles offshore. Quileute member Luke Hobucket, born 1873, drew a picture of "implements used in fishing" by the Quileute, which depicts specialized halibut hooks and sinkers and notes that halibut fishing occurred "700 feet deep." Ex. B310A.1.  Halibut fishing at 700 feet, or approximately 117 fathoms, would place the Quileute near the continental shelf break, about 40 miles offshore. Quileute finfish harvest 40 miles offshore at treaty time is not, however, corroborated by other sources and was unlikely to have been a regular practice at and before treaty time.

### 3. Quileute Whaling

10.1.   Like the Quinault and the Makah, the Quileute harvested whales on a regular and customary basis at and before treaty time. Judge Boldt recognized whaling as a customary Quileute practice in

setting forth the Quileute's case area U&A. FF 108. Evidence of Quileute whaling is present in the archaeological assemblages from Quileute middens and pervasive in the historical and ethnographic record.

10.2.   Whale bones have been recovered from three archaeological sites associated with prehistoric and historic Quileute occupancy: the La Push, Strawberry Point, and Toleak Point sites. *See, e.g.*, Ex. 338 at p. 28, Ex. 201 at p. 92. While it is possible that some of the whale bones present in the middens resulted from drift animals, Dr. Wessen concluded in a seminal report on the La Push excavation that the presence of marine mammal bones in the midden indicates that marine mammal hunting was a very important activity and that the archaeological data provide "clear evidence that Quileute People ventured into deeper offshore waters." Ex. 338 at p. 68. Dr. Schalk, whose testimony the  Court also finds credible, was in accord. *See* Tr. 3/10 at 182:9-185:12 (Schalk). The proportions of mammal bones found at La Push closely resemble the makeup of the midden at the Ozette village at Cape Alava, another site believed by experts to represent continuous whaling activity for hundreds of years up to and including treaty time. *See* Ex. 338 at p. 29; Tr. 4/7 at pp. 2-7 (Wessen). Excavations at Toleak Point also suggest that whale bones are present in substantial amounts at the site, though not yet identified to species or quantified. *See* Tr. 4/7 at 16:4-15 (Wessen).

10.3.   Albert Reagan also identified a diverse array of whale bones in the La Push middens, including "sperm whale, black fish, fin-back, sulphur bottom, California gray, and killer whale." Ex. 247 at p. 15. There are reasons to doubt the species identifications made by Reagan, who provided no indication of his methodology and attempted species identifications among salmonids thought impossible by Dr. Schalk and others. *See* Ex. B126 at p. 8. It is likely that Reagan's list reflected his observations of

Quileute whaling in the early 1900s, as well as his knowledge of available whale species and historic Quileute whaling practices. *See, e.g.*, Tr. 4/6 at p. 61 (Wessen).

10.4.   The significant presence of whale bones at Quileute sites is particularly telling because it is likely that whale bones would be underrepresented in the middens. Ethnographic information shows that whales were butchered on the beach, and it is likely that the only bones that ended up in the middens were those transported to the village for use in the manufacture of bone tools or in architectural elements. Tr. 4/6 at 107:9-108:3 (Wessen).  The presence of whale bone artifacts in the middens both evidences this theory and demonstrates the important role that whales played in the traditional Quileute economy. Ex. 338 at p. 42.

10.5.   The Quileute whaling tradition is deeply engrained in the tribe's identity, reaching as far back as the collective memory of the Quileute people. The Quileute Arthur Howeattle, for instance, informed Frachtenberg that "[w]haling was practiced since immemorial times and was an important industry, since the bone furnished them with material for their tools, the oil and meat their food." Ex. 58(c) at pdf p. 84. Albert Reagan's article on whaling practices of the Olympic Peninsula Indians similarly begins, "In this village from time immemorial have lived the Quileute Indians, a coastal people that engage in whaling." Ex. 252 at p. 25. Another oral history recorded by Reagan, "Why the People of Quillayute are Few in Numbers," teaches the importance of praying to mother earth to ensure that the meat of hunted whales will be good and details aboriginal whaling practices, including the use of hair sealskin buoys used in towing the whale. Ex B333.28. These and other oral traditions illustrate the centuries-long time depth associated with Quileute whaling.

10.6.   As with the Quinault, Quileute whaling is surrounded by rituals suggestive of its importance in the tribe's culture. The anthropologist George Pettit, stationed at La Push during World War II,

observed that aboriginal Quileute culture possessed a number of occupations associated with a specific guardian spirit and practiced only by a defined group of people sponsored by the proper spirit power. One such occupation was whaling. Fur sealing was another. Ex. 218 at p. 10. Edward Curtis, who described the Quileute as second only in whaling to the Makah, recorded an account of some of the rituals associated with whaling given by Yahatub, a Quileute born around 1835 who learned the trade from his uncle. Ex. 37(a) at pp. 145-47. Yahatub learned from his uncle to begin in the winter taking daily ritualized baths in the sea in an isolated location. While bathing, Yahatub would pray to the Universe, asking for help in taking a whale. Whalers were to keep away from women during the season for bathing and for whaling, which ended each year in October. Yahatub explained that "when summer approached, the Sun, some night as I slept, would show me that I would get whale the next day, and when the vision came I would start out." *Id.* at p. 146. Dr. Olson interviewed Quileute member Jerry Jones, born 1867, who informed him that his grandfather (born approximately 1815) was a whaler. Jones also described ceremonial whaling practices exercised by his relatives, which were wholly distinct from those practiced by the Makah, suggesting the substantial time depth of the Quileute whaling tradition. *See* Ex. 211 at pdf p. 286; Tr. 3/12 at 149:18-150:2 (Boxburger); Tr. 4/2 at 125:3-23 (noting differences between Quileute and Makah whaling rituals) (Renker).

10.7.   While rituals may have differed between tribal groups, Quileute whaling practices mirrored those employed by both the Makah and the Quinault. Traditional whaling implements were similar to those used by the Makah, consisting of harpoons, sinew and cedar lines, and floats. Ex. 323 at p. 44; Tr 3/25 at 20:19-22:2 (Boxburger). Frachtenberg provided a lengthy description of aboriginal Quileute whaling practices. Like the Quinault, the Quileute practiced whaling in specialized ocean-going canoes in parties of eight, each with specified duties. The whalers brought their own lunch and used

sails to voyage into the sea. Typically four of five canoes would go out together on a hunt, and after a whale was speared, the canoes would gather to assist in the fight. Frachtenberg characterized the Quileute as highly skilled whalers, better even than the celebrated Makah, and invested with "great skill, courage, and quickness on the part of spearman and steerman." Ex. 58(c) at pp. 84-97.

10.8.    Whale products played an important and diverse role in pre-treaty Quileute economy and culture. Dr. Frachtenberg reported on various uses of whales, among them: whale bones for tools and arrowheads; whale sinew for necklaces, threads, fish line and hooks; whale ribs to pry open mussels and barnacles; whale oil for dipping of food; and preserved whale meat serving as a valuable winter food supply. *See* Ex. 58(c); Tr. 3/12 at pp. 147:10-149:17 (Boxburger). The Quileute whaler Yahatub informed Edward Curtis that "[a]fter being rendered, the [whale] blubber was dried and smoked, and laid away for the winter. The flesh was cut into sheets like halibut steaks and dried in the sun or the smoke." Ex. 37(a) at p. 147. Harry Hobucket, born 1884, corroborated these uses of whale in his article, "Quillayute Indian Tradition," recounting aboriginal Quileute whaling practices. Ex. 94 at p. 41. The Quileute Robert Lee, in his testimony in *United States v. Moore*, likewise confirmed Quileute use of whale for subsistence purposes prior to the arrival of non-Indians. Ex. 178 at pp. 348-59.

10.9.    The limited historical accounts of pre-treaty contact with the Quileute corroborate the traditional nature of Quileute whaling practices. There were six recorded treaty-time Quileute villages associated with whaling. Ex. 119 at pp. 6-10. Members of the Quileute/Hoh Tribes offered whale oil to the Russians stranded in their territory following the 1808 wreck of the Sv. Nikolai. Ex. 214 at p. 53. Ultimately, one of the Russian survivors was traded to a whaler who departed for Destruction Island in Quileute/Hoh territory. *Id.* at p. 64. James Swan also recounted the Quileute offering him whale oil in trade when he visited La Push in 1861, several years after the signing of the Treaty of Olympia. Ex.

419 at pp. 5-6. Indians born around treaty-time recounted aboriginal whaling traditions to Edward Swindell, who visited the Quileute in 1942 to obtain information on their usual and accustomed activities. For instance, Benjamin Sailto, a Quileute born 1853, told Swindell that "in addition to smelt the Indians who lived at La Push would also catch whales and seals in the ocean." Ex. 293 at p. 225.

10.10.   The many Quileute words associated with extraction of ocean resources and with whaling in particular are indicative of the importance of whaling in Quileute culture. Among others associated with whaling, Quileute possess different words for whale, killer whale, expert whaler, summer whale, whale society song, drift whale, whalers who inflate floats and assist with line, whalers who paddle and help to steer, steersman whaler, whale sinew, and different sorts of whaling equipment. Ex. 225. The Quileute words associated with offshore ocean travel, including words for "blue water" and "way out at sea," indicate Quileute familiarity with distances far offshore. *Id.*

10.11.   The evidence shows that whaling was practiced by the Quileute at and before treaty time on a regular and customary basis, taking place habitually every summer. Singh noted that Quileute whaling traditionally took place each June and July, Ex. 277 at p. 65, while Powell recorded aboriginal Quileute whaling taking place each February, May, and June, Ex. 223 at pdf p. 14. According to Curtis, the tribe pursued the "winter whale" each June and July and the "summer whale" in August. Ex. 37(a) at p. 145. According to Frachtenberg, the Quileute hunted whale each spring and summer. Ex. 58(c) at pdf p. 90.

10.12.   Quileute whaling practices continued in the same manner after treaty-time. Upon hearing from a number of Quileute witnesses in the 1893 *United States v. Pullen* hearing, the court concluded that "the male portion of these Indians spent their time sealing during the months of March, April and May. They hunted up the river early in June and went whaling in the same month, and continued at

that during July." Ex. B242.21. The 1888 U.S. Commission of Fish and Fisheries Report similarly observed that the Quileute "engage in whaling during the summer; nine finback whales were captured in 1888; these were cut up and smoked for food. The catch is wholly for home consumption and has no commercial importance." Ex. 299 at p. 243.

10.13.  Accounts of the distances at which the Quileute customarily whaled at and before treaty time are contradictory. Dr. Frachtenberg reported that Quileute whalers "were not forced to go very far into the sea as some whales came as far to the beach as the edge of the breakers." Ex. 58(c) at pdf p. 90. Consistent with this observation, Albert Reagan recorded that the Quileute principally pursued the California gray whale, Ex. 252 at p. 25, a species that frequently traveled within six miles of shore on its northbound summer migration. Tr. 3/9 at 152 (Trites). The humpback whale too migrates in close proximity to the coastline and, like the gray whale, could often be spotted from shore. *See* Ex. 428 at p. 37. Reagan and Frachtenberg both described Quileute villagers watching the hunt from shore.

10.14.  Other ethnographic reports, however, describe customary whaling practices taking place at much greater offshore distances. Yahatub recounted that whalers "might spend several days in a fruitless search" and "usually found [their whale] out of sight of land." Ex. 37(a) at p. 146. Testimony and evidence submitted at trial show that the description "out of sight of land" is most likely associated with distances upward of 40 miles offshore. *See* Tr. 3/12 at pp. 132:10-133:24 (Boxburger); Ex. 348.2 (Quileute elder stating that land is no longer visible 50 to 60 miles offshore). Yahatub also detailed customs that the whalers would follow when forced to stay out over night in their search for whale. *Id.* ("When more than one day was spent at sea, the leader watched at night while his men slept."). Such customs are indicative of lengthy hunts. Dr. Pettit's description of aboriginal Quileute whaling practices placed them 25 to 50 miles offshore. Ex. 218 at pp. 8-9. Other reports suggest that

whales could sometimes be seen spouting several miles offshore but that once harpooned would regularly drag a canoe out of sight of land, for as long as two to three days at sea. *See, e.g.*, Ex. 277 at p. 41 (Singh). Olof Erickson, for instance, recounted a whale pursuit with the Quileute tribe, where the whale was "discovered spouting five miles off shore" but once harpooned towed the canoe "[m]ile after mile…until not a sign of the Indian village could be seen." Ex. 145 at pp. 150-56.

10.15.  Like the Makah, the Quileute likely employed more than one whaling strategy, engaging on a regular basis in both nearshore and offshore hunts. *See* Ex. 260 at p. 18; Tr. 3/12 at 151:10-21, 163:2-7 (Boxburger). Dr. Frachtenberg described both strategies, reporting both nearshore hunts taking place to the edge of the breakers and offshore hunts which required whalers to go "20 to 30 miles into the ocean attacking whales with their primitive weapons." Ex. 56(a) at pdf p. 3. Offshore hunts at these distances would allow Quileute whalers to access the most productive sites for whaling near the continental shelf break, which is generally located upward of 30 miles offshore adjacent to Quileute territory. Tr. 3/9 at 105:12-24 (Trites). While the gray whale and humpback whale migrate fairly close to shore, other whales associated with Quileute harvest are typically encountered 20 to 50 miles offshore. *See* Tr. 3/9 at pp. 113-121 (Trites). Synthesizing the various accounts, Dr. Lane opined that "whales were usually found out of sight of land, twenty-five to fifty miles offshore, and that whaling crews sometimes had to be at sea overnight. These accounts attest to the ability of the Quileute to navigate the offshore waters and to return home safely." Ex. B349.9-10. While it is not possible to place a precise outer bound on Quileute whaling, the evidence together indicates the Quileute whalers were more likely than not harvesting whales upwards of 30 miles offshore at treaty time on a customary basis.

### 4. Quileute Fur Sealing

11.1.   The evidence profoundly demonstrates that since prehistoric times, the Quileute have been a fur sealing people, harvesting fur seals in great quantities from the Pacific Ocean for their subsistence uses. Evidence of the great time depth of the Quileute fur sealing tradition and of its substantial entanglement in Quileute economy and culture is ubiquitous across the archaeological, historical, and ethnographic record in this case.

11.2.   First, archaeological data from middens associated with the Quileute people evidences over 1,000 years of consistent and continuous fur sealing by the Quileute people. Fur seal bones account for over 90% of the mammal bones recovered from the La Push midden, where mammal bones represent the most abundant class of recovered faunal remains. Ex. 338 at pp. 27-29 (accounting that the mammal bone assemblage represents 11% to 69% of the total specimens in the four strata represented in the La Push midden and concluding that the densities of mammal bones in the total archaeological assemblage are unusually high for regional standards); Tr. 4/6 at 111:22-23 (Wessen). Fur seal bones are dominant across the strata of the La Push midden, indicating a continuity in Quileute harvest of the animals stretching back 900 years before present. At the Cape Johnson site, whose archaeological remains reflect the time period from 1100 to 700 years before present, fur seals bones are similarly prevalent throughout the midden, accounting for roughly 70% of recovered mammal bone specimens. *Id.* at 111:23-24; Ex. 347, passim. The archaeological material recovered from the Strawberry Point site, located approximately 6 miles south of La Push and dating back 100 to 200 years, also shows the presence of fur seal bones in the midden, though in lower proportions than recovered at La Push and Cape Johnson. At the same time, there are reasons to believe that fur seal remains may be more prevalent in the Strawberry Push midden than accounted for in the available data. In particular, the relatively small overall sample size of the Strawberry Point excavation (four square meters in area,

representing only 10% of the remaining deposit) casts doubt as to whether the recovered samples are representative of the whole. *See id.* at pp. 49-50; Tr. 3/10 at 151:23-152:3, 3/11 at 72:9-73:11 (Schalk).

11.3.   The presence of large proportions of fur seal bones throughout prehistoric to historic strata refutes the hypothesis that fur sealing is a post-contact phenomenon. *See* Ex. A16 at p. 6; Ex. 338 at p. 68. Dr. Schalk credibly concluded from the midden evidence that Quileute use of offshore marine resources – and of fur seals particular – was persistent, taking place unabated over a period of many centuries up through treaty times. Tr. 3/10 at 182:13-22 (Schalk). Dr. Wessen, in his book chapter on "Prehistory of the Ocean Coast of Washington," similarly concluded that fur seal hunting has been ongoing on the Olympic Peninsula coast for the last 2,000 years. Ex. 344 at p. 421. The similarities between the La Push site and Makah sites like that at Ozette are indicative of the longstanding reliance on fur seal harvest by peoples spread across the Olympic Peninsula coast. *See* Ex. 338 at p. 29. Were archaeological data to be generated for sites associated with aboriginal Quinault occupancy, the data would more likely than not show a similar adaptation by the Quinault people to this feature of their coastal environment. *See* Tr. 190:8-191:5 (Schalk).

11.4.   While it is not possible to ascertain from the midden evidence alone the locations from which fur seal were obtained by the Quileute, it is reasonable to infer from the abundance of fur seal remains at La Push and Cape Johnson that the Quileute did not merely rely on the happenstance drift of a fur seal carcass onto their coast. Rather, the midden evidence demonstrates a sophisticated adaptation of the Quileute and other tribes of the Olympic Peninsula coast to harvesting available ocean resources through, among other offshore activities, the deliberate and customary hunt of fur seals. *See* Ex. 344 at p. 421. Moreover, current scientific knowledge of fur seal biology supports a strong inference that these hunts were regularly taking place at distances substantially offshore at and before treaty time.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 48

11.5.   Fur seal biology evidences a centuries-old migration path followed by the animals 30-60 miles offshore of the Washington coast. As Dr. Trites credibly testified, these pelagic animals are driven by their biology to follow the continental shelf in order to access their prey on their annual return migration to rookeries in northern Alaskan waters. Each year, adult female seals from the Pribolof Islands in Alaska migrate south to access the productive waters of the California current system, returning northward to their breeding grounds in the spring and coming onto land once a year to breed at their established offshore rookeries. Both while breeding and during their annual migration, the seals feed over the continental shelf break, where they spend their nights diving to meet their prey as it rises up from the deep. During the day, when their prey is too deep for the seals to access, the seals spend their time sleeping and resting on the surface where they could easily be taken by furtive hunters.

11.6.   Historical records and contemporary tracking data paint a robust picture of fur seal migratory behavior. Consistent with fur seal feeding patterns and expectations from the animals' physiology, these data document female fur seals following a settled migratory path along the continental shelf break roughly 30 to 60 miles off the coast of Washington as they return each spring to the Pribolof Islands to birth their young. Tr. 3/9 at 42-48 (Trites). In one recent study that tracked 81 migrating Alaskan seals, no fur seal came nearer than 15 or 20 miles from shore, and the majority of the seals remained 30 miles or more from the coast. *Id.* at 47:15-48:4. Historical data collected by sealing schooners between 1883 and 1897 corroborate these behaviors. *Id.* at 43:21-44:22. While errant fur seals occasionally wander closer to shore, it is highly unlikely that they leave the standard migratory path with sufficient frequency to account for the overwhelming abundance of fur seal remains in Olympic coast middens. *Id.* at 55:15-21.

11.7.    While a hypothesis exists in the literature that a prehistoric nearshore rookery off the coast of Washington may have accounted for the prevalence of fur seals in the middens, this hypothesis is not supported by evidence of fur seal biology and behavioral patterns. First, all known fur seal rookeries are located on remote islands, over 25 miles offshore and characterized by cool and foggy weather. These inhospitable and inaccessible environmental conditions are necessary to protect the seals, particularly the vulnerable pups, from predators during their annual mating cycle. *Id.* at 17-23. As of 1850, only four documented breeding sites for northern fur seals existed, with the Pribolof Islands off the coast of Alaska representing the sole North American site. *Id.* at 24. A breeding site has since been reestablished in the Farallon Islands off the coast of California, where historical records show that a productive rookery was extirpated by Russian sealers in 1841, and another rookery has been established on California's San Miguel Island at the likely location of a rookery extirpated by an indigenous population around 500 years ago.   *Id.* at 25-29; Tr. 3/10 at 5:3-7 (Trites). Even with protective regulations enabling the return of fur seal populations to prehistoric rookeries, no rookery has been established off the Washington coast, and no known site in the region exists that would offer the protection necessary for fur seals during the breeding season. Tr. 3/9 at 73:17- 94:19 (Trites). Dr. Trites' testimony that the hypothesized nearshore fur seal rookery would be a "biological impossibility" was not refuted by any qualified expert at trial. *Id.* at 91:21-23.

11.8.    Second, the migratory behaviors of Pribolof Island, San Miguel Island, and Farallon Island fur seal populations fully account for the presence of bones of both male and female seals of varying ages in the middens. Variability in the size of fur seals of the same age accounts for some of the diversity in the size of bones present in the middens. *Id.* at 86:1-10. The adult female fur seals were most likely harvested during their return migration to Alaska or during their northward migrations from breeding

grounds in California. Female fur seals returning to the breeding grounds carried fetuses in their last month of gestation, whose harvest likely accounts for the presence of pre-weaned pups in the middens. Historical accounts of fetal pups being extracted from pregnant mothers bound for the Pribolofs by crews aboard schooners and brought back to shore accords with the biological evidence. *See* Tr. 3/9 at 84:10-85:7. Dr. Trites further credibly testified that, more likely than not, the migration of prehistoric adult male fur seals and young pups northward from Californian rookeries to feed off the coast of Washington explains the presence of bull and weaned pup remains in the middens. *Id.* at 86:15-87:6; 102:20-103:15. These California-based breeding populations migrate along the same continental shelf pathway off the coast of Washington that is followed by the Alaskan fur seals leaving the California current system for breeding grounds in the Pribolofs. It is reasonable to infer from tracking data for adult females and weaned pups from California populations that these seals would have been available for harvest off the coast of Washington prior to the extirpation of the California rookeries, consistent with expectations from fur seal biology and physiology. *Id.* at 87:10-88:16.

11.9.   Third, genetic analyses of modern fur seals and fur seals remains from coastal middens indicate that modern fur seals are genetically identically to prehistoric ones. The continuity of fur seal DNA across the centuries undercuts the hypothesized existence of a now extinct non-migratory fur seal species capable of breeding in the nearshore environment. Tr. 3/9 at 82:24-83:17. As Dr. Trites explained, fur seals today are the same species as that taken by coastal Indians in prehistoric times. *Id.* at 90:10-11. Changes in ocean currents may have exercised some influence on fur seal migratory patterns, but fur seals are "ultimately driven by their physiology and basic principles of oceanography, physics and biology." *Id.* at 90:12-15. The known offshore migratory patterns of fur seals have remained constant across time and regardless of fluctuations in the fur seal population.

11.10.  In sum, the stable physiological and biological characteristics of fur seals strongly support an inference that coastal Indians were harvesting the species off the continental shelf adjacent to their territories at and before treaty times. By contrast, the alternative nearshore rookery theory is based on speculation rather than evidence and, in the opinion of Dr. Trites and this Court, lacks a sufficient scientific basis to reliably account for the abundance of fur seal remains in the Quileute middens.

11.11.  Ethnographic evidence corroborates the biological and archaeological evidence of the Quileute fur sealing tradition. Quileute accounts of pre-treaty sealing practices indicate that fur seals were harvested for the tribe's own subsistence use as well as for trade with neighboring tribes prior to the arrival of non-Indians in the area. Robert Lee, a Quileute Indian born 1879, attested to the time depth of the tradition, stating that the Quileute traded fur seal skins "regularly with the west coast (British Columbia) Indians…up until the time that a white man's trading post was established at Neah Bay. They then traded at this trading post until a store was established at La Push." Ex. B100.4. Based on information obtained from Mr. Lee, the authors of the Bureau of Indian Affairs article titled "Indians at Work" reported that the Quileute Indians had been engaged in pelagic sealing "[f]rom time immemorial. Before the advent of the white man these Indians used the skins so obtained for mats and bed coverings and for trading with the West coast and other Indians." Ex. 205, p. 12; Tr. 3/12 at pp. 181-83 (Boxburger). Lee likewise testified in *United States v. Moore* that the Quileute "used [fur seals] for themselves, before the white man come," "drying" the seal meat and "keeping it for winter use." Ex. 178 at p. 349. Recounting pre-contact Quileute history, Ruth Kirk wrote in a 1967 publication that the Quileute "lived by hunting whales and seals from dugout canoes when Great-Grandfather was a boy, and by gathering berries and digging roots in the forest. They knew nothing of white men's ways because white men had not yet settled along the west coast of Washington[.]" Ex. 135 at pdf p. 5.

11.12.  A Quileute oral history recounted by the anthropologist Manuel Andrade attests to the time depth of the Quileute fur sealing tradition, consistent with the midden data. The oral tradition tells that "long ago three men in a canoe drifted from the other side (from Vancouver Island) and landed at Ozette," where they taught the people to hunt fur seals in their canoes. "[N]ot long afterward people from the Quileute arrived at exactly the same time as those who had been hunting seals were returning home," where they too were taught the fur sealing practice. "Ever since that time the Quileute" continue to hunt fur seal. Ex. 4 at pp. 205-07. The framing of this story as having taken place "long ago" places the origin of Ozette and Quileute fur sealing traditions in aboriginal times, far before contact with non-Indians. *See* Tr. 3/3 155:12-19 (Hoard). This story is corroborated by the borrowing of the Quileute words for "fur seal" and "fur sealing" from the Makah language. The linguistic evidence, credibly attested to by Dr. Hoard, suggests that these words were adopted sufficiently long ago for any competing terms, or doublets, to fade out of collective memory. *See* 3/3 at pp. 142-43, 150-56 (Hoard).

11.13.  By contrast, the evidence does not support an inference that the Quileute began fur sealing only when trade with non-Indians made the practice commercially viable. The hypothesized introduction of fur sealing to the Quileute economy in the mid-1800s is based principally on a single account by the Quileute Arthur Howeattle given to Dr. Frachtenberg. Howeattle's account, as recorded by Frachtenberg, placed the origin of the Quileute fur sealing tradition only a decade prior to the Treaty of Olympia: "According to Arthur, fur sealing was introduced by the Ozettes at the time when Arthur's uncle (his father's immediate predecessor) was chief. This was about 70 years ago…. Since then the Quileutes developed fur-sealing as their most profitable industry." Ex. 58a at pdf p. 137. Contrary to Howeattle's report, evidence of a Quileute sealing tradition stretching back hundreds of

years is written across the archaeological and ethnographic record. Howeattle's report is also unreliable in other respects, including in his attestation that the Makah and the Ozette had given up fur sealing; these tribes in fact continued to practice sealing for years after 1916. *See* Tr. 3/13 at p. 22 (Boxburger).

11.14.  Traditional Quileute use of fur seals continued after the arrival of non-Indians on the Olympic Peninsula, resilient to the expansion of the commercial fur seal industry. A physician for the Neah Bay Agency, who visited La Push in the spring of 1891, observed that "It was [the Quileute's] sealing season, and seal flesh to them was a toothsome dish." Ex. 157 at p. 450. Albert Reagan similarly reported in 1922 that "fur seal is, of course, killed for its valuable fur, through the Indians are fond of its flesh and use its paunch to store whale oil and salmon-egg cheese." Ex. 248 at p. 447. Reagan's account mirrors Quileute practices recorded by survivors of the 1808 wreck of the Sv. Nikolai, who reported that the Quileute/Hoh offered "two sealskin bags of roe" and a "bladder full of whale oil" in up-river trade transactions. Ex. 214 at p. 53. In an 1887 publication, James Swan described Quileute sealing continuing in its traditional form despite the introduction of schooners to the area. He recorded that in 1880 the Quileute had caught 602 seals using 20 canoes crewed by 60 Indians. Ex. 288 at p. 399. The strength and resilience of the Quileute fur sealing tradition can reasonably be inferred from its continuity post-treaty, through the growth of the commercial fur seal industry.

11.15.  Historical and ethnographic accounts of Quileute fur sealing are consistent with the biological evidence of regular Quileute fur seal harvest at distances upward of 30 miles offshore during the seals' annual spring migration off the Washington coast. During a sealing trip with Quileute sealers in 1893, Chris Morgenroth observed that the seals' migratory route was 30-50 miles: "Seal hunting by coastal Indians take place during these two months [April and May] in the 100 miles stretch of open sea

between the mouth of the Queets River and Cape Flattery. Here the seals approach nearest to land, their line of northerly migration being about thirty to fifty miles offshore." Morgenroth further recounted leaving La Push "about 3:00 a.m. with fresh 'mokah' (east wind)" and reaching the "outskirts of the sealing grounds, some thirty miles from shore" after "six hours of strong paddling." Ex. 180 at pp. 58-60. Morgenroth's description is entirely consistent with Dr. Trites' testimony about the spring migration of fur seals and their density off the continental shelf 30 or more miles from shore. *See* Tr. 3/9 at 59:5-61:13 (Trites). In 1895, Captain C.L. Hooper related that Quileute fur sealer canoes crewed by three men were forced to go greater distances offshore than the Makah and were "often kept out over night." Ex B097.14. Hooper's account is also consistent with Dr. Trites' testimony that the fur seals would be available closer to shore off Makah territory given the nearer shore continental shelf break at the site of the Juan de Fuca Canyon off of Neah Bay. *See* Tr. 3/9 at 54:6-55:21 (Trites). So too is Dr. Singh's account that, during their spring migration northward, "Quinault and Quileute had to ge [sic] from twelve to thirty miles into the open sea, whereas near Cape Flattery the fur seal came near shore and was hunted by the Makah within a range of ten to fifteen miles." Ex. 277 at p. 21.

11.16. Numerous, remarkably similar reports of traditional Quileute sealing practices provide evidence that the Quileute were harvesting fur seals in substantial numbers each spring at the continental shelf break, 30 to forty miles from shore. Beatrice Black, born 1890, recalled that her brother "used to go out early as, as March, go out in the ocean, way out to get some seal…two or three months he'd go out…get as high as 100 seals each day hunting… They risk their lives going way out, forty miles out in the ocean in an open canoe. Three men in a canoe. Sometimes they'd be loaded with about five, six or ten seals." Ex. 017 at pdf p.1. Frachtenberg too reported that the "Quileute use

special canoes for [sealing]; these canoes are dug-outs, made of cedar, and are manned by three people. The sealing season lasts from March until July, and the hunters very often go 30 and 40 miles out into the sea." Ex. B096.119. After reviewing testimony from numerous Quileute elders in 1945, the Ninth Circuit in *United States v. Moore* concluded the Quileute, "[w]hen first visited by white men," were regularly hunting pelagic fur seal herds as they migrated along the 100 fathom line to and from the Pribolofs. Ex. B118.4.

11.17.   Robert Lee, who attested to having been out sealing to the "blue sea, reported to be forty miles," provided a description of traditional Quileute sealing practices that demonstrates a sophisticated adaptation to optimally exploiting fur seal physiology and behavior. According to Lee, Quileute sealers "leave the village before daylight, about 1:00 or 2:00 o'clock in the morning." The sealers take advantage of the prevailing "east wind….through sails, made of cedar bark," arriving at "the sealing grounds about daylight, when they speared the seal as they were sleeping on the water. Seals normally sleep in the daytime and the Indians say they can distinctly hear the seal snoring as they sleep on the surface. As the seals are speared they are dragged into the boat where they are taken ashore, when the hides are taken off for use or trading purposes and the meat used for food purposes." Ex. B100.5. Hal George, a Quileute born 1894, similarly recalled, "[Weather forecasters] would sit up after midnight to tell weather watching from up on the hill. Seal hunters sometimes took off at 2:00 AM. They wanted to get out to what was called xopasida (blue water) – the place where the ocean really gets deep." Ex. 220 at pdf p. 12. Jay Powell, in an article describing Quileute culture and "old ways," reported similar rituals and customs surrounding the Quileute whaling tradition. According to Powell,

> "Oldtime Quileutes used to go out in big sealing canoes called alotk [Ah-low-tk] and spear fur seals as they migrate north in great herds on their way to their 'pupping

grounds' in the Pribolof Islands.… Fur seal hunting was considered to be real t'axilitowaskʷa '*work that requires a strong spirit power*.' During the March moon, the old Weathermen would go up before dawn daily and sit on a bench located where the Senior Center is now. There, they would observe the dawn, clouds, wind, and waves…watching, listening, sniffing and chanting. It was their job to decide whether this would be a successful and safe day for the tribal sealers to go out. If so, several canoes would start out with four paddlers, one of whom was the harpooner. It took hours to go the 30-50 miles to the sealing grounds, pulling an empty canoe behind. If they were lucky, when they returned that two-canoe would be full, mounded up with fur seals. Fur seals are called kilados [KITH-ah-dos], but fur seal hunting is yashabal [yah-SHAH-bah-th]. That's the reason March is called yashabalktiyat.

Ex. 221 at pdf p. 175.

11.18.   It is not possible to document the precise outer bounds at which the Quileute regularly harvested fur seals before and at treaty time. At the same time, the evidence demonstrates that aboriginal Quileute sealers, like the Quinault, concentrated at the continental shelf break adjacent to their territory, where the density of fur seals was greatest during the animals' annual migrations. This shelf break occurs somewhat closer to shore in Quinault territory than in Quileute territory – as close as 20 miles to shore at the Quinault canyon and upwards of 30 miles offshore further north. Ex. 267, 277; Tr. 3/9 at 66:9-18; 105:15-24 (Trites). These geographic markers, coupled with the ethnographic accounts, support a reasonable inference that the Quileute were fur sealing on a regular and customary basis up to 40 miles offshore at and before treaty time.

### C.   Quileute Indian Tribe's Northern Boundary

### 1.   Tatoosh Island and Cape Flattery

12.1.   Although the Quileute do not claim to have occupied inland territory north of Cape Alava, they assert that the tribe was accustomed at treaty time to fish at the banks off of Tatoosh Island, offshore of Cape Flattery at the far northwest corner of the Olympic Peninsula. The evidence, and inferences drawn from it, do not support this claim.

12.2.   First, the Quileute's claim is inconsistent with Makah assertion of ownership of the fishing banks off of Cape Flattery. The Makah were the southernmost representatives of the Nootkan culture, which "carried the concept of ownership to an incredible extreme." Tr 3/25 at 142:24-143:6 (Renker); Ex. 44 at p. 247. Unlike the Quileute, who differentiated between private hereditary ownership of inland fishing sites and common ownership of ocean and coastal sites, Nootkan notions of property swept broadly. Philip Drucker, an authority on Nootkan ethnography, explained that "[n]ot only rivers and fishing places close at hand, but the waters of the sea for miles offshore, the land, houses, carvings on  house posts, the right to marry in a certain way or the right to omit part of an ordinary marriage ceremony, names, songs, dances, medicines, and rituals, all were privately owned property." *Id.*

12.3.   Historical records confirm that the Makah asserted exclusive ownership of waters off of Cape Flattery. In 1841, the Makah Chief George informed Captain Wilkes of the Wilkes expedition that he owned the area around Cape Flattery and that Wilkes did not have the right to be there. Ex. 14 at p. 262. Dr. Renker's testimony that Chief George "was the chief who would have owned Tatoosh Island at that time" was unrebutted at trial. Tr. 3/25 at 144:3-5 (Renker). Other historical records in the immediate post-treaty era show continued Makah assertions of exclusive ownership of the Cape Flattery fishing banks. Colonel Simmons, who was then Puget Sound Indian Agent, wrote in an 1858 report that the Makah "obtain[ed] an abundant livelihood by catching cod and halibut on the banks north and east of Cape Flattery." Ex. 275 at p. 231. According to Simmons, the Makah refused to allow four men who had established a nearby trading post to "fish on the banks," despite the men's congenial trading relationship with the tribe. *Id.* at p. 232. The Makah also objected to a new lighthouse on Tatoosh Island, asserting "that is on their land, and that [the Indian agents] have no right to put it there without their consent." *Id.*

12.4.    The historical evidence further shows that the Makah and their Nootkan relatives asserted ownership of the halibut banks against Indian tribes as well as non-Indians. Gilbert Sproat, who was living among the Nootkan Indians of Vancouver Island, wrote in 1868 that "fishing tribes on both sides of the Straits of Fuca would drive away any other tribes which had not been accustomed to fish on the halibut banks." Ex. 143 at p. 20. Agent McGlinn, who had jurisdiction over the Makah and the Quileute, similarly reported on the Makah's longstanding claims of ownership over the halibut banks off of Cape Flattery. McGlinn attested in an 1891 report that the Makah "view[ed] with jealousy the encroachment if the white men on what they have always regarded as their exclusive possessions, and find for the first time in their history that white competition has overstocked, and will I am afraid eventually take from them a market of which heretofore they have had almost a monopoly." Ex. 157 at pp. 448-49.

12.5.    Ethnographers of the Makah are in accord with the tribe's traditional assertion of exclusive ownership over these halibut banks. In the Makah Pacific Ocean U&A subproceeding, Dr. Lane attested to the existence of "specific halibut banks lying northwest of Tatoosh… Island, which were known to be Makah banks and which other groups didn't fish at." Ex. 323 at pdf p. 11. Dr. Lane reiterated this view in a 1991 report on Makah halibut fishing traditions, commenting that "[t]he Makah, like other Nootkan people, regarded the fishing banks as private property. One aspect of this proprietorship was the right to control use of the fisheries." Ex. 140 at p. 9. Joshua Reid, in his Ph.D. dissertation on the Makah, likewise explained that "'[o]utside resources'—called such because they were in marine spaces outside bays, inlets, and rivers—were the most important property rights, and only the highest-ranking chiefs owned them." Ex. 255 at pp. 13-14. Judge Boldt too found that "[a]

special feature of the Makah environment was a rich supply of halibut to which the Makah had access by virtue of ownership of lucrative fishing banks respected by competing tribes…." FF 61.

12.6.    Accounts of the history of conflict between the Makah and the Quileute are inconsistent with treaty-time use of the Cape Flattery halibut grounds by Quileute tribal members. Linguistic evidence, including mythic traditions, relates that the Quileute's ancestors once inhabited the entire northwest Olympic Peninsula before being displaced by the Makah, who moved south from what is now Vancouver Island around 1,000 years before present. *See* Ex. 134 at pp. 94-99; Ex. 259 at p. 422. An oral history recounted to Joshua Reid by a Makah elder places the exclusion of the Quileute from the waters around Cape Flattery and Tatoosh Island in the sixteenth century. The elder recounted that Quileute "warriors had once pushed Makahs north across the strait, claiming Cape Flattery, Tatoosh Island, and the surrounding waters." However, during the early sixteenth century, "the exiled Makahs…began encroaching upon the halibut banks stolen by Quilleutes." Violent raids ensued, and the Makah ultimately drove the Quileute "south and thereafter excluded them from the waters and marine resources around Cape Flattery and Tatoosh Island." Ex. 255 at pp. 89-90. Albert Regan recorded a similar oral history. *See* Ex. 251 at pp. 7-11.

12.7.    Later accounts show violent conflicts between the Makah and the Quileute extending closer to treaty time. Edward Curtis, for instance, recounted a Makah raid on Quileute fishermen near James Island around 1845 in the midst of a decade-long period of hostilities between the tribes. Ex. 37 at pp. 9, 11; Tr. 3/25 at 140-41, 152 (Renker); *see also* Ex. 58(a) at pdf p. 178 (account by Frachteberg of conflict around 1850). These hostilities appear to have continued for some years post-treaty. *See, e.g.* Ex. 284 at pdf pp. 28-29, 275-76 (account by Swan of killing of Makah whalers by Quileute when

they drifted into Quileute territory); Ex. 65 at p. 16 (account by Gibbs that hostilities between the tribes "have occurred within the memory of men born as late as 1863").

12.8.   Documented improvements in the relationship between the tribes in the late 1800s correspond with the first documentation of Quileute use of the fishing banks off of Tatoosh Island. According to Pettit and Swan, hostilities lessened with the arrival of non-Indian officials and the establishment of reservations. Ex. 218 at p. 15, Ex. 290 at p. 51. In 1879, Captain Willoughby attributed the improvement of the relationship between the tribes to various factors, including several intermarriages. Ex. 352 at pp. 144-45. Frachtenberg and Powell both recounted the exchange of "peace brides" in the post-treaty era, which brought hostilities to an end. *See* Ex. 58(a) at pdf p. 178; Ex. 220 at p. 27. Frachtenberg also recounted the first Quileute fishing trips to Neah Bay occurring in this period. For instance, Sally Black informed him that "Makah basketry was introduced amon[g] the Quileute's some 40 years ago [circa 1976], after the wars between the two tribes had stopped. Quilieute women used to accompany their husbands and fathers to Neah Bay on fishing trips and while there, they learned the Neah Bay basketry and introduced it among the Quilieute." Ex. 58(a) at pdf p. 21. Frachtenberg recounted Quileute fishing trips to Neah Bay continuing into the early 1900s, documenting that "[a]t the present time, the Quileutes leave for Neah Bay in the first part of July, fishing there with trolling hooks and purse-seins." *Id.* at pdf p. 126.

12.9.   Additional historical accounts show Quileute use of the Cape Flattery fishing grounds occurring on a seasonal basis from the late 1800s. Makah elder Harry McCarthy, born 1902, recalled Quileutes fishing at a camp called Midway on Tatoosh Island. Ex. 323 at p. 25. The Quileute Hal George also recalled being at Tatoosh Island as a child, helping to dry the Quileute halibut catch, around 1899 to 1901. Ex. 220 at pdf p. 72. Lillian Pullen, a Quileute born 1912, relayed that her first

husband's family would visit their annual halibut camp at Tatoosh Island during the period around WWI. Ex. 220 at pdf p. 125. By contrast, the comparatively voluminous historical record of Makah fishing off of Cape Flattery is absent any reference to Quileute use of the fishing banks prior to the late 1800s. Instead, the sole references to Quileute presence in the area are to occasional visits by tribal members to Neah Bay, not to fishing activities in surrounding waters. *See, e.g.*, Ex. 178 at p. 283 (1887 affidavit by Swan in the Pullen land dispute attesting that he "frequently saw these Indians at Neah Bay"). It cannot, for all these reasons, be reasonably inferred from accounts of post-treaty Quileute use of Cape Flattery fishing banks that the same pattern existed at and before treaty time.

12.10.  Indeed, the Quileute claim to treaty-time fishing at Tatoosh Island is based largely on an ambiguous 1879 statement by the Quileute Chief Tahahowtl. Chief Tahahowtl recounted that during the treaty negotiations in 1855, he informed Colonel Simmons that this land formerly extended "from the island of Upkowis opposite Kwedaitsatsit down the coast to the Hooh River." Ex. 281 at p. 162. The linguist Dr. Hoard opined at trial that the phrase translates to "island" or "promontory" across from "Makah place," which he located as Tatoosh Island. *See* Tr. 3/3 at 112-16, 119-20, 122-23 (Hoard); *see also* 3/25 at 176 (Renker) (explaining that "upkowis" is a Makah word meaning a promontory or piece of land projecting from a beach). For several reasons, Chief Tahahowtl's statement does not give rise to a reasonable inference that the Quileute were regularly fishing off of Cape Flattery at treaty times.

12.11.  First, a claim by Chief Tahahowtl to Tatoosh Island would be entirely inconsistent with Makah assertions of proprietary ownership of the island and surrounding waters, outlined above, as well as with exclusive habitation by the Makah people of the coast south of Tatoosh Island to Cape Alava in the centuries leading up to the treaties. It is not reasonable to infer that Chief Tahahowtl meant to

claim the entirety of Makah territory for the Quileute, from Cape Flattery across from Tatoosh Island down the coast to the Hoh River. Indeed, Col. Simmons himself did not appear to understand Chief Tahahowtl to be claiming lands all the way to Tatoosh Island and Cape Flattery during the treaty negotiations, because he did not adjust the cession boundary in the treaty to encompass such lands. *See* Tr. 3/25 at 179-80 (Renker). Second, assuming that Dr. Hoard's translation is accurate, "upkowis" could have referred to any number of islands or promontories, such as Ozette Island across from Cape Alava, that would be more in keeping with a Quileute territorial claim than Tatoosh Island. *See* Tr. 3/25 at pp. 176:20-23 (Renker). While Hal George identified "upkowis" as Tatoosh Island, Ex. 220 at pdf p. 47, this identification is not exclusive. According to Dr. Renker, the Makah themselves associated the term with two different sites – one about a mile north of Cape Johnson and another east of Cape Flattery. *See* 3/25 at 176:10-15 (Renker). Third, the language and context of Chief Tahahowtl's statement indicate that he was concerned with claiming lands for the purpose of treaty negotiations, which concerned land sales. *See* Tr. 3/25 at pp. 172-74 (Renker). Even if Chief Tahahowtl was referring to Tatoosh Island, his statement asserted a claim to land, not to uses of adjacent offshore waters for fishing purposes. *See* Tr. 3/4 at 40, 66 (Hoard).

**2. Cape Alava**

13.1.   Like the Quileute's western boundary, the northernmost extent of Quileute fishing cannot be ascertained with either precision or certainty. Nonetheless, the treaty-time, ethnographic, and place name evidence together support a reasonable inference that the Quileute were fishing on a regular basis as far north as Cape Alava at and before treaty time.

13.2.   First, it is reasonable to infer from the language of and statements attendant to the Treaties of Neah Bay and Olympia that the treaty negotiators on both sides understood aboriginal Quileute

territory to extend as far north as Cape Alava. The treaties for the Makah and Quileute together denote a shared boundary between the aboriginal territories of the tribes, running eastward from the coast. The Treaty of Neah Bay identifies the Makah's southern territorial boundary as beginning on the coast at "Osett, or the Lower Cape Flattery, thence eastwardly along the line of lands occupied by the Kwe-deAh-tut or Kwill-eh-yute tribe of Indians." Ex. 298 at p. 1. The Treaty of Olympia likewise identifies the Quileute's northern boundary as "the southwest corner of the lands lately ceded by the Makah tribe of Indians to the United States, and running easterly with and along the southern boundary of the said Makah tribe to the middle of the coast range of mountains." Ex. 297 at p. 1. Colonel Simmons, who negotiated the Treaty of Olympia, later clarified his understanding of aboriginal Quileute territory to correspond to the boundaries identified in the treaties. In his 1960 Puget Sound Agency report, Simmons wrote, "The treaty of Olympia with the Qui-nai-elt and the Quillehute tribes remains only to be considered. These tribes occupy the sea-coast between Oxelt or old Cape Flattery, on the north, and the Qui-nai-elt river on the south." Ex. 276 at p. 195. Governor Stevens also affirmed this understanding of Quileute territory when he stated, in submitting the Treaty of Olympia to the Commission of Indian Affairs: "I herewith enclose the treaty made with the Qui-nai-elt and Quil-leh-ute Tribes of Indians on the Coast between Gray's Harbor and Cape Flattery," where "Cape Flattery" may refer to "Old" or "Lower Cape Flattery." Tr. 3/13 at 66:18-67:4 (Boxburger).

13.3.   It is reasonable to infer that in placing this boundary at Ozette or old/lower Cape Flattery, the negotiators intended to locate the northernmost extent of aboriginal Quileute territory at or near Cape Alava. Tr. 3/13 at 66:12-14 (Boxburger). George Gibbs' 1855 map of the "Position of the Indian Tribes and the Lands Ceded by Treaty," illustrates the boundary between the Makah and the Quileute as beginning on the coast at "Osett," which it locates just north of Flattery Rocks in the vicinity of

Cape Alava. Ex B243.1. Arthur Howeattle expressed a similar understanding held by the Quileute, informing Dr. Frachtenberg that the Quileute's northern boundary was located at Ozette River, which spills into the Pacific just north of Cape Alava. Ex. 58(a) at pdf p. 53.

13.4.    Government officials continued to locate the Quileute/Makah boundary in the vicinity of Cape Alava in the decades following the signing of the treaties. In 1872, R.H. Milroy, the Indian Agent for Quinault and Quileute, wrote that the lands ceded by the tribes extended "from a few miles south of Cape Flattery to a few miles north of Gray's Harbor." Ex. 168 at p. 339. A map published in 1876 at the direction of the U.S. Coast Survey and intended to "illustrate a paper by the late Geo. Gibbs" places Makah's southern boundary at the Ozette River, slightly north of Cape Alava. Ex. B088. James Swan, in his book "The Indians of Cape Flattery" gave a similar expression to Makah territory, informed by his experience living among the Makah between 1859 and 1866. Swan wrote,

> At the time of making the treaty between the United States and the Makah Indians in 1855…the [Makah] tribe claimed as their land, all that portion of the extreme northwest part of Washington Territory lying between Cape Flattery Rocks on the Pacific coast, fifteen miles south from Cape Flattery, and the Hoko River, about the same distance eastward from the Cape on the Strait of Fuca.

Ex. 290 at p.1. Dr. Boxburger testified at trial that Swan's description accurately places Flattery Rocks fifteen miles south of Cape Flattery, indicative of Swan's keen understanding of the coastline. Tr. 3/13 at 69:23-70:22 (Boxburger).

13.5.    Ethnographers of the Quileute and the Makah have since located the boundary between the tribes in the vicinity of Cape Alava, consistent with these treaty-time understandings. In the 1990 *Handbook of North American Indians*, Dr. Renker and Dr. Erna Gunther published a map of Makah Territory that places its southern extent just south of Cape Alava. Ex. 249 at p. 423. Dr. Powell likewise reported that "aboriginal Quileute territory extended from south of Cape Alava to Destruction

Island." Ex. 226 at p. 431. Dr. Verne Ray and Dr. Nancy Lurie prepared a map of aboriginal territory for the ICC proceedings, based on their review of ethnographic accounts of the Quileute and their own field studies with the tribe. The map depicts Quileute ocean fishing activity extending northward along the coast to a location just south of Cape Alava and adjacent to the northernmost extent of Lake Ozette:



Ex. 120. Dr. Ray explained in his ICC testimony that "the shading over here on the ocean [to the west of Lake Ozette] indicates fishing activities. This would include bottom fishing for the various rock cod and flounders and so on." Ex. 243 at p. 240. Another ethnographer involved in the ICC proceedings likewise reported in a 1968 article that "Quileute informants insist that in aboriginal days their people fished and sealed almost to the mouth of the Ozette river." Tr. 3/25 at 14:22-17:2 (Boxburger).

13.6.   Second, aboriginal Quileute fishing in the vicinity of Cape Alava can be inferred from evidence that the Quileute were fishing at Lake Ozette at and before treaty time. Judge Boldt's inclusion of Lake Ozette in the Quileute case area U&A is consistent with evidence presented at trial. *See* FF 108. In contrast to the Makah's exclusion of other tribes from the Cape Flattery halibut banks, the evidence shows that the Quileute and the Makah engaged in an amicable, shared use of Lake Ozette. Sextas Ward, born 1853, recounted to Edward Swindell that:

> when he was a small boy and a young man that the Quileute Indians used to fish at the lower or southern end of Lake Ozette; that the other end of the lake was used by the Ozette Indians who were different people than the Quileute;….that the Ozette Indians

> were friendly to the Quileutes and they did not have any trouble over both of them using the lake to obtain fish;…that he understands that when the treaty was made with Governor Stevens the Quileute Indians were supposed to be given the right to continue to use their old fishing place at Ozette Lake.

Ex. 293 at pp. 221-22. Ray and Lurie likewise concluded from their research that this shared use of the lake was a traditional practice, extending back before treaty time. Ray explained their decision to draw a boundary-line across the center of the lake in his ICC testimony:

> You will see that the fishing symbol covers all of Ozette Lake, and there was not in the minds of these people the feeling that there is somehow a dividing line across the middle of the lake, that they didn't dare follow the fish north or south…. I finally convinced myself this was the actual state of affairs, and I was much interested to see that later on, when I discovered the Frachtenberg manuscript, that he did precisely the same thing.

Ex. 243 at pp. 202-03. While Ray believed that each tribe should be able to fairly claim half of the lake for compensation purposes, the ICC ultimately denied compensation for the area to both tribes because of its joint use. Ex. 123 at p. 168; Tr. 3/13 at 72:20-73:11 (Boxburger). Arthur Howeattle likewise told Frachtenberg that he understood the Quileute to have "ceded to the Government the northern half of Lake Ozette" in signing the Treaty of Olympia. Ex. 58(a) at pdf p. 47. Because Arthur Howeattle was married to an Ozette woman, it is reasonable to infer that he was particularly knowledgeable about the history of shared use of the lake. *See* Tr. 4/1 at 100:12-101:6 (Renker).

13.7.   The evidence shows that the Quileute did not constrain their fishing activities to Lake Ozette, but that they also fished along its adjacent coastline. Dr. Ray attested to this tradition before the ICC, explaining that the Quileute would fish up and down along the beach "covering a stretch of many miles" from their coastal village at Norwegian Memorial, located adjacent to the southern end of Lake Ozette. The Indians would travel back and forth along "the whole area in between Ozette Lake and the shores of the Pacific" for the purpose of hunting small game. "At other times, they would simply be

hurrying down to the beach [from Lake Ozette] to get to their whaling station or something of that sort." Ex. 243 at p. 239. Aboriginal Quileute fishing along the coastline west of Lake Ozette can also be inferred from Judge Boldt's inclusion in the Quileute case area U&A of the "tidewater and saltwater areas" "adjacent" to Lake Ozette and the other inland water bodies at which the Quileute traditionally fished. FF. 108.

13.8.    Third, evidence of Quileute place names is consistent with regular Quileute fishing as far north as Cape Alava. Dr. Ray provided a compilation of Quileute village sites to the ICC along with his maps, locating the northernmost of the sixteen identified Quileute coastal villages at Norwegian Memorial. Ex. 119.1. It is reasonable to infer, as this Court did in locating the southern boundary of the Makah's ocean U&A at Norwegian Memorial ten miles south of the southernmost Makah village at Ozette, that the Quileute villagers living at Norwegian Memorial were fishing in the waters north as well as south and west of their home. *See U.S. v. Washington*, 626 F.Supp. at 1467;  Tr. 4/1  at 172:17-19 (Renker). It is further apparent that Ray's compilation does not provide a full picture of Quileute use of the coastline. Ray himself testified that he is certain that his map does not include all of the "village or camp sites that were used in 1855." Ex. 243 at p. 130. While similarly acknowledging that "most of the Quileute names have been forgotten," Jay Powell and William Penn added several other Quileute place names to Ray's list. One such site, which translates as "hair seal-skin float," is located at White Rock between Cape Alava and Sand Point. Another Quileute site, translated as "Sea lion hunting place," is located north of Norwegian Memorial. Ex. 224, pp. 104, 108. These use-oriented place names associate the area in between Cape Alava and Norwegian Memorial with traditional Quileute sea mammal harvest activities. According to Powell and Penn, it is appropriate to assume that

many of these names "are of great age," reflecting a long history of Quileute seafaring traditions taking place along this coastline. *Id.* at p. 107.[4]

### III. CONCLUSIONS OF LAW

#### A. Legal Standards

1.1.    This case arises under the Court's continuing jurisdiction, retained under the Permanent Injunction set forth in Final Decision # 1, to consider "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # 1." *Final Decision 1*, 384 F.Supp. at 419. In making this determination, the Courts steps into the place occupied by Judge Boldt when he set forth U&As for fourteen tribes including the Quileute and Quinault within the original case area. The Court accordingly applies the same evidentiary standards applied by Judge Boldt in Final Decision # 1 and elaborated in the ensuing forty years of subproceedings.

1.2.    In accordance with these standards, the Court has found that the Quinault Indian Nation and the Quileute Indian Tribe bear the burden to establish the location of their usual and accustomed grounds and stations under the Treaty of Olympia. Order on Motions for Partial Summary Judgment, Dkt. # 304 at pp. 23-25. In determining whether these tribes have met their burden, the Court bases its findings "upon a preponderance of the evidence found credible and inferences reasonably drawn therefrom." *Id.* at 384 F.Supp. at 348.

1.3.    Available evidence of treaty-time fishing activities is "sketchy and less satisfactory than evidence available in the typical civil proceeding." *U.S. v. Lummi Indian Tribe*, 841 F.2d 317, 321 (9th Cir. 1988) ("*Lummi*"). What documentation does exist is "extremely fragmentary and just

---

[4] Two archaeological sites located in this area, one at Sand Point and the other at White Rock, may reflect either Makah or Quileute occupancy. *See 4/6 at 170:16-172:6 (Wessen); Tr. 4/7 at 8:4-11:6 (Wessen).* As such, it is not possible to infer from the archaeological record alone which tribe occupied this coastal area prior to treaty time.

happenstance." *Id.* at 318. As Judge Boldt observed, "[i]n determining usual and accustomed fishing places the court cannot follow stringent proof standards because to do so would likely preclude a finding of any such fishing areas." *U.S. v. Wash.*, 459 F.Supp. 1020, 1059 (W.D. Wash. 1975). "Accordingly, the stringent standard of proof that operates in ordinary civil proceedings in relaxed." *Lummi*, 841 F.2d at 318.

1.4.    In sum, the Quileute and Quinault may rely on both direct evidence and reasonable inferences drawn from documentary exhibits, expert testimony, and other relevant sources to show the probable location and extent of their U&As. *U.S. v. Wash.*, 626 F.Supp. 1404, 1531 (W.D. Wash. 1985). In evaluating whether or not the tribes have met their burden, the Court gives due consideration to the fragmentary nature and inherent limitations of the available evidence while making its findings on a more probable than not basis.

1.5.    Under the Treaty of Olympia, the Quinault and Quileute reserved the "right of taking fish," at all of their "usual and accustomed grounds and stations." The term "usual and accustomed" grounds and stations encompasses "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same water." *Final Decision 1*, 384 F.Supp. at 332. Excluded from a tribe's U&A are "unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions." *Id.* In other words, the term "usual and accustomed" was "probably used in [its] restrictive sense, not intending to include areas where use was occasional or incidental." *Id.* at 356.

1.6.    Evidence of the probable distances to which a tribe had the capability to travel at treaty-time is insufficient on its own to establish U&A. *Makah*, 730 F.2d at 1318 (affirming 40-mile offshore U&A

despite recognizing that the "Makahs probably were capable of traveling to 100 miles from shore in 1855"). So too is evidence that a tribe occasionally trolled incidental to traveling through an area. *See Final Decision 1*, 384 F.Supp. at 353 ("Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians."); *Upper Skagit Indian Tribe v. Wash.*, 590 F.3d 1020, 1022 (9th Cir. 2010) ("The term 'customarily' does not include 'occasional and incidental' fishing or trolling incidental to travel.").

1.7.    When it comes to determining a tribe's treaty-time offshore fishing grounds in the Pacific Ocean, this Court has recognized that it is not possible to document the precise outer limits of these areas with particularity. *Makah*, 626 F.Supp. at 1467. Rather than setting forth general "grounds" and specific "stations," the Court has found it appropriate to demarcate an offshore U&A based on the outermost distance to which the tribes customarily navigated their canoes for the purpose of "tak[ing] fish" at and before treaty time. *Id.* (delineating Makah offshore U&A as the entire area enclosed within the longitudinal line running forty miles offshore, from the State of Washington's boundary in the north to Norwegian Memorial in the south); *see also* Memorandum Opinion on Motion for Reconsideration, Dkt. # 8763, p. 2 (Jan. 27, 1983) (explaining that demarcating the extent of the Makah's U&A with certainty in this way is "appropriate for present day administration of the treaty right").

## B. Treaty Interpretation

2.1.    As set forth above, the parties to this subproceeding dispute the scope of evidence relevant to ascertain the Quileute and Quinault's Pacific Ocean U&As. At issue is whether evidence of a tribe's regular, treaty-time whaling and sealing practices can be the basis for establishing the tribe's offshore

U&A. The nature of this dispute requires the Court to address the scope of the "right of taking fish," as this term was used in the Treaty of Olympia.

2.2.     In interpreting the treaty fishing clause, the Court cannot simply look to the ordinary meaning of the words used in the Treaty of Olympia as they are understood today. That is, the Court's interpretation of the word "fish" neither begins nor ends with today's commonly accepted biological definitions. Rather, the Court's interpretation of this treaty fishing clause is constrained by a set of legal principles set forth in this and other cases involving adjudication of tribal treaty rights.

2.3.     First, the canons of construction for Indian treaties require that the Court give a "broad gloss" on the Indians' reserved fishing rights. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n* ("*Fishing Vessel*"), 443 U.S. 658, 679 (1979). In *Worcester v. State of Georgia*, the United States Supreme Court first set forth the fundamental principle that "[t]he language used in treaties with the Indians should never be construed to their prejudice….If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense….How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction." *Worcester v. State of Ga.*, 31 U.S. (6 Pet.) 515, 832 (1832). The principle that treaty terms are to be construed in favor of the tribes stems from the indubitable recognition that the parties to these treaties were "not on an equal footing." *Choctaw Nation v. U.S.*, 119 U.S. 1, 28 (1886). As the Supreme Court later set forth, "superior justice" requires that the inequality in bargaining power between the treaty parties "be made good by…look[ing] only to the substance of the right, without regard to technical rules[.]" *Id.*; *United States v. Winans*, 198 U.S. 371, 380-81 (1905).

2.4.     Where words used in a treaty may admit to more than one meaning, the canons of Indian treaty construction require that any such "ambiguities…be resolved from the standpoint of the Indians." *Winters v. U.S.*, 207 U.S. at 576-77 (1919); *see also Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334, 340 (9th Cir. 1996) ("Any ambiguities must be resolved in favor of the Indians."). The rule of liberal construction of treaties in favor of the tribes is "rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). In giving effect to the terms of the treaties, the Court must therefore endeavor to, as nearly as possible, construe the terms to have that meaning that would have been understood by the tribes represented at the treaty negotiations. *Tulee v. State of Wash.*, 315 U.S. 684, 684-85 (1942) ("It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.").

2.5.     These canons have guided the construction of the fishing rights provision in the Stevens Treaties from the very first decision in this case. In Final Decision # 1, Judge Boldt explained that "[e]ach of the basic fact and law issues in this case must be considered and decided in accordance with the treaty language reserving fishing rights to the plaintiff tribes, interpreted in the spirit and manner directed in the above quoted language of the United States Supreme Court." *Final Decision 1*, 384 F.Supp. at 331. These principles have continued to guide each of the many subsequent decisions in which this Court has been called upon to interpret specific terms within the fishing rights provision. *See, e.g., U.S. v. Wash.*, 774 F.2d 1470, 1481 (9th Cir. 1985) (drawing on the canons of Indian treaty construction in giving a "properly liberal construction" to the term "citizens of the Territory"); *U.S. v.*

*Wash.*, 20 F.Supp. 3d 828, 896 (W.D. Wash. 2007) ("*Culverts*") (emphasizing the importance of construing a Stevens Treaty "not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians" (quoting *Fishing Vessel*, 443 U.S. at 675-77)).

2.6.     Second, the Court's interpretation is guided by the "reserved rights doctrine," which requires the Court to view those rights that were possessed by the tribes prior to the treaties and not specifically granted away as being reserved to the tribes. The Supreme Court set forth this doctrine in *United States v. Winans*, in language quoted by Judge Boldt in Final Decision # 1, 384 F.Supp. at 331. Reviewing the circumstances under which one of the Stevens Treaties was negotiated, the Supreme Court determined that the vital rights encapsulated in the fishing rights provision preexisted the treaty and were reserved by the tribes in treating with the United States:

> The right to resort to the [usual and accustomed] fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed…. The treaty was not a grant of rights to the Indians but a grant of right from them – a reservation of those not granted.

198 U.S. at 381. In accordance with this doctrine, any subsistence right exercised by the tribes prior to the treaties is to be viewed as a right reserved by the tribes unless explicitly relinquished. *See U.S. v. Adair*, 723 F.2d 1394, 1413 (9th Cir. 1983) ("A corollary of these principles, also recognized by the Supreme Court, is that when a tribe and the government negotiate a treaty, the tribe retains all rights not expressly ceded to the Government in the treaty so long as the rights retained are consistent with the tribe's sovereign dependent status.").

2.7.     This Court has since continued to recognize the "right of taking fish" as a reserved right and declined to read restrictions into it absent an explicit grant of subsistence rights away to the United

States from the tribes during the treaty negotiations. *See, e.g.*, *U.S. v. Wash.*, 18 F.Supp.3d 1172, 1218 (W.D. Wash. 1991) ("[R]ights which were already possessed by the Indians and not granted to the United States were reserved by the Indians."); *Culverts*, 20 F.Supp.3d at 897-88 (recognizing that "Stevens specifically assured the Indians that they would have access to their normal food supplies now and in the future").

2.8.      Third, the reserved rights doctrine has produced the corollary principle that this Court is to interpret the "right of taking fish" without any limitation or differentiation as to species. Since Final Decision # 1, courts interpreting the Stevens Treaties have declined to require species-specific findings for usual and accustomed fishing grounds. *See U.S. v. Wash*, 157 F.3d 630, 631-32 (9th Cir. 1998) (*Shellfish*). Judge Boldt in 1978, for instance, held that the usual and accustomed grounds and stations for herring were co-extensive with those previously adjudicated for salmon. *U.S. v. Wash.*, 459 F.Supp. 1020, 1049 (W.D. Wash. 1978). In the *Shellfish* proceeding, this Court set forth the foundation for this principle: "Because the 'right of taking fish' must be read as a reservation of the Indians' pre-existing rights, and because the right to take *any* species, without limit, preexisted the Stevens Treaties, the Court must read the 'right of taking fish' without any species limitation." *U.S. v. Wash.*, 873 F.Supp. 1422, 1430 (W.D. Wash. 1994) (*Shellfish*) (emphasis in original). The Ninth Circuit affirmed in relevant part, rejecting the State's argument that the right of taking fish is limited to those species actually harvested by the tribes at treaty-time: "With all deference to the State, there is no language in the Treaties to support its position: the Treaties make no mention of any specifies-specific or technology-based restrictions on the Tribes' rights." *Shellfish*, 157 F.3d at 643. *See also U.S. v. Wash.*, 19 F.Supp. 3d 1126, 1130 (W.D. Wash. 1994) (concluding "as a matter of law that usual and accustomed grounds and stations do not vary with the species of fish, and that usual and accustomed

grounds and stations for non-anadromous fish are coextensive with those of anadromous fish"); *Midwater Trawlers Co-Op. v. U.S. Dep't of Commerce*, 282 F.3d 710, 716-17 (9th Cir. 2002) (affirming that "[t]he term 'fish' as used in the Stevens Treaties encompassed all species of fish, without exclusion and without requiring specific proof").

2.9.    Guided by these principles, this Court directly addressed the breadth of the term "fish" in the *Shellfish* proceeding. In declining to limit the "right of taking fish" to those species harvested by the tribes prior to signing the treaties, the Court explained that "had the parties to the Stevens Treaties intended to so limit the right, they would not have chosen the word 'fish,' a word which fairly encompasses every form of aquatic animal life. 'Fish' has perhaps the widest sweep of any words the drafters could have chosen, and the Court will not deviate from its plain meaning." *Shellfish*, 873 F.Supp. at 1430. The Ninth Circuit affirmed, agreeing with the district court's description of the broad sweep of the word "fish" as used in the treaties and noting that a more restrictive reading of the fishing rights provision would be contrary to the tribes' reservation of their pre-existing subsistence rights. *Shellfish*, 157 F.3d at 643-44.

2.10.    Applying these principles to the case at hand, the Court looks first to indicia of the meaning that the Quileute and Quinault attached to the word "fish" when their representatives negotiated the Treaty of Olympia in 1855. As set forth above, a capacious understanding of this word was in broad, popular circulation at the time that the treaty was negotiated, as evidenced by Webster's 1828 American Dictionary defining the word as "[a]n animal that lives in the water" and the numerous judicial decisions discussing "fish" and "fisheries" in ways that embraced sea mammals. *See, e.g.*, *In re Fossat*, 69 U.S. 649, 692 (1864) ("For all purposes of common life, the whale is called a fish, though natural history tells us that he belong to another order of animals."); *Ex parte Cooper*, 143 U.S.

472, 499 (1892) (discussing "seal fisheries"); *The Coquitlam*, 77 F. 744, 747 (9th Cir. 1986) (discussing "seal fishing"); *Knight v. Parsons*, 14 F. Cas. 776, 777 (D. Mass. 1855) (construing a contract to allow parties to "sell the fish" harvested in the "whale fisheries").

2.11.   More to the point, it is clear from the linguistic evidence that the tribal signatories to the treaty drew no distinctions between groups of aquatic species and would have understood the term "fish" to encompass at least those aquatic animals on which they relied for their subsistence purposes. The Quileute word "ʔaàlita?" and the Quinault word "Kémken" express this breadth, encompassing a spectrum of meanings from all "food" to all "fish" to "salmon" in particular. The negotiators could have used species-specific words, such as salmon, that were available in the common Chinook jargon negotiating medium and in all the parties' native languages. As this Court has previously explained, that the parties to the treaties chose instead to use the sweeping word "fish" in lieu of more tailored language indicates an intended breadth of the subsistence provision that should not be circumscribed on the basis of post hoc understandings and linguistic drift.

2.12.   A construction of the term "fish" to include sea mammals likewise follows from the context in which the treaties were set forth. As expressed in the reserved rights doctrine, the Quinault and Quileute, in agreeing to cede large swaths of their land, reserved the right to continue to fish as they had always done, in the locations where they were accustomed to harvest aquatic resources at and before entering into their treaty. The various promises and assurances made to them by the U.S. treaty negotiators underscore the mutually agreed purpose to restrict the tribes only as to the location of their homes: in the words of Governor Stevens, the U.S. treaty commission intended the tribes to continue "to take fish where you have always done so and in common with the whites." Apart from a proviso restricting the tribes' right to "take shell-fish from any beds staked or cultivated by citizens," there is

no indication anywhere in the language of the treaty or the evidence surrounding the negotiations of an intent to circumscribe this most important of usufructuary rights.

2.13.   It is likewise clear that prior to the Treaty of Olympia, the Quinault and the Quileute were harvesting marine mammals on a usual and accustomed basis from the Pacific Ocean. The several assurances given to the tribes during the Chehalis River negotiations of their continued ability to harvest drift whales evidence the U.S. negotiators' intent to draft the treaties to encompass the taking of whales. As these tribes did not explicitly relinquish the right to continue this traditional practice, it follows that they reserved the right to continue to harvest marine mammals as they had long done. That the tribes continued to harvest whales and seals in the decades following the Treaty of Olympia with active encouragement of federal officials and special dispensations on account of their tribal status shows that both sides believed the right to harvest sea mammals to have been reserved to the tribes.

2.14.   Together these findings lead inexorably to the conclusion that "fish" as used in the Treaty of Olympia encompasses sea mammals and that evidence of customary harvest of whales and seals at and before treaty time may be the basis for the determination of a tribe's U&A. That the tribes are not now permitted by conservation restrictions to carry out this marine mammal harvest is of no moment with respect to adjudication of their U&As. As this Court has oft explained, a tribe's U&A for the harvest of any one aquatic species is coextensive with its U&A for any other aquatic species. *See U.S. v. Wash.*, 19 F.Supp. 3d 1126, 1130 (W.D. Wash. 1994). This principle holds as true for marine mammals as it does for non-anadromous fish, for anadromous fish, and for shellfish.

2.15.   This Court's decision to so hold is unaffected by the differences in language between the Treaty of Olympia and the Treaty of Neah Bay. As set forth above, these treaties were negotiated by

different individuals and in different contexts. Colonel Simmons, who negotiated the Treaty of Olympia, lacked the authority to tailor provisions in the way that Governor Stevens was able to do when negotiating the Treaty of Neah Bay. The loss of the minutes for the Treaty of Olympia negotiations makes it impossible to discern what exactly was promised to the tribes and what specific assurances were requested or made. In the absence of such information, the Court must look to other evidence of the meaning understood by the tribal parties and the rights they reserved, guided by the canons requiring liberal construction in favor of the tribes.

2.16.  Finally, this Court's decision is likewise unaffected by the Makah's 1982 ocean U&A determination. Having carefully reviewed the orders by Judge Craig, the findings of Magistrate Judge Cooper on which the determinations were based, and the briefing and official transcripts from the Makah's ocean U&A subproceeding, the Court is persuaded that neither questions of treaty interpretation generally nor the scope of the "right of taking fish" in particular were raised. Rather, prior to the Court's ruling that U&As for non-anadromous fish were coextensive with those for anadromous fish, the parties had no reason to seek a judicial interpretation of the scope of "fish" because they were focused on evidence of salmon fishing. The representations by the parties, and the reactions by the Court, show that the scope of "fish" was not at issue. After Judge Cooper's initial ruling that the Makah's western boundary extended 100 miles offshore, the U.S. filed an objection in which it disputed "how far west the Makah Tribe's usual and accustomed salmon fishing grounds in the Pacific Ocean extended at the time of the treaty." Dkt. # 8698 at p. 2. After the district court issued an order limiting the Makah's western boundary to 40 miles offshore, the Makah moved for reconsideration. At a telephonic hearing, the Makah argued that it was sufficient for the Court to infer

from the tribe's capability to travel 100 miles offshore that it actually did so to fish for salmon. Dkt. # 8984 at pp. 5-6. The Court disagreed, stating:

> As to my conclusion, the evidence I believe [Judge Cooper] heard in reaching his conclusion the Makahs fished for salmon 100 miles out at treaty times, simply shows it was feasible to go 100 miles to fish for salmon, for anything out there, explore or whatever. That, to me, is not evidence of usual and accustomed fishing in a given area.

*Id.* at p. 7. It was not until the shellfish proceeding over a decade later that this Court addressed the scope of the word "fish," giving it the broad construction affirmed by the Ninth Circuit and reaffirmed herein.

2.17.   Moreover, Judge Craig's decision as to the Makah U&A ultimately turned on the sufficiency of the evidence proffered by the Makah to establish their U&A, not on a legal determination of what evidence would be deemed relevant. Judge Craig's Order cited solely to a 1977 report by Dr. Barbara Lane on "Makah Marine Navigation and Traditional Makah Offshore Fisheries." *Makah*, 626 F.Supp. at 1467; Ex. 143 (1977 Makah Report by Dr. Lane). While Dr. Lane's report contained evidence from which the Court could infer that the Makah fished 30 to 40 miles offshore at treaty time, *see id.*, the only evidence showing that the Makah fished distances greater than 40 miles came from post-treaty sources. *See* Ex. 143 at p. 10 ("It is known that the Makah fished at greater distances than thirty or forty miles offshore in post-treaty times."). Among this post-treaty evidence were reports that the Makah whaled and sealed at distances up to 100 miles in the late nineteenth century. *Id.* at p. 13 (citing reports from 1894 and 1897 of Makah offshore sealing); *Makah*, 626 F.Supp. at 1467 (citing same). This evidence, as Judge Craig determined, showed only that the Makah would have had the capability to travel distances up to 100 miles at treaty time—not that they customarily did so for their subsistence harvest. *Id.* (holding that "it is clearly erroneous to conclude that the Tribes customarily traveled such distances [up to 100 miles offshore] to fish" at treaty time). The Ninth Circuit agreed. Reviewing

evidence that the Makah traveled up to 100 miles around 1900 and probably fished up to 40 miles offshore in the 1850s, it concluded that "[t]hese facts do not show that their usual and accustomed fishing areas went out 100 miles in 1855. There is no basis for an inference that they customarily fished as far as 100 miles from shore at treaty time." *Makah*, 730 F.2d at 1318. Neither of these opinions excluded evidence of sea mammal harvest. Rather, they restricted the Makah's U&A to the distance that the tribe had demonstrated it *customarily* traveled to harvest aquatic resources at and before the time it signed its treaty.

2.18.   Indeed, it is clear from briefs later submitted by tribal parties to this case – including the Makah – that they did not view the Court's prior rulings as having excluded evidence of marine mammal harvest from U&A determinations. In a brief submitted in the *Shellfish* proceeding, the Makah and others argued:

> The type of fishing activities this Court has considered in determining the boundaries of usual and accustomed grounds and stations also shows that all fishing activities should be taken into account. This Court has frequently considered more than just salmon fishing in establishing usual and accustomed areas. For example, in adjudicating the Quileute Tribe's usual and accustomed areas, the Court noted that in portions of its area the Quileutes caught smelt, bass…seal, sea lion, porpoise, and whale. 384 F.Supp. at 372, FF 108….The Makah usual and accustomed areas were originally determined with reference to salmon, halibut, whale, and seal. 384 F.Supp. at 363, FF 61.

Dkt. # 13696, Joint Tribal Trial Brief (March 21, 1994), at p. 8; *see also* Dkt. # 12958 (March 31, 1993) (memorandum by Makah and other tribes, arguing that the common understanding of "fish" as an animal that lives in the water should control). Just as Judge Boldt saw no reason in Final Decision # 1 to distinguish marine mammal from finfish harvest in setting forth tribal U&As, the Court sees no reason today to restrict the usufructuary rights reserved by the tribes based on a modern taxonomic

distinction that they did not draw. The "superior justice" that guides the Court's enforcement of the treaties permits no such result. *Choctaw Nation*, 119 U.S. at 28.

2.19.    The Court accordingly determines that the Quinault and Quileute's usual and accustomed fishing locations encompass those grounds and stations where they customarily harvested marine mammals – including whales and fur seals – at and before treaty time.

### C.   Pacific Ocean U&A Boundaries at Issue

3.1.    On the basis of these legal standards and foregoing findings of fact, the Court concludes that the western boundary of the Quinault Indian Nation's usual and accustomed fishing ground in the Pacific Ocean is 30 miles from shore.

3.2.    The Court likewise concludes that the western boundary of the Quileute Tribe's usual and accustomed fishing ground in the Pacific Ocean is 40 miles offshore and the northern boundary of the Quileute Tribe's usual and accustomed fishing ground is a line drawn westerly from Cape Alava.

3.3.    The Court makes these determinations on the basis of the extensive evidence presented at trial showing the furthest distances to which the tribes customarily traveled to harvest aquatic resources including finfish, fur seals, and whales, at treaty time. While the Quinault and Quileute may have occasionally harvested these resources at distances upward of the boundaries set forth herein, the evidence presented at trial does not support a reasonable inference that they customarily did so at treaty-time.

3.4.    The Court did not receive evidence at trial specifying the longitudes associated with the U&A boundaries determined herein. Accordingly, and in order to delineate the boundaries with certainty, the Court directs counsel for the Quinault and the Quileute to file notice with the Court of the precise longitudinal coordinates associated with the boundaries set forth herein. Notice shall be filed within

ten (10) judicial days of the entry of this Order. The Makah and Interested Parties including the State of Washington may file a concise response within five (5) judicial days after the initial notices are filed if they so desire.

Dated this 9th day of July 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 83