UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, et al.,

                Plaintiffs,

    v.

STATE OF WASHINGTON, et al.,

                Defendants.

No. C70-9213RSM

Subproceeding No. 11-2

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This matter comes before the Court after remand from the Ninth Circuit Court of Appeals and upon the Jamestown S'Klallam Tribe's, Port Gamble S'Klallam Tribe's and Lower Elwha Klallam Indian Tribe's (collectively "the S'Klallam"), and Lummi Nation's ("the Lummi") motions for summary judgment.  Dkts. #164, #167 and #168.[1]  The S'Klallam request that the Court grant summary judgment on the issues presented in their Request for Determination ("RFD") filed November 8, 2011.  *See* Dkt. # 1.  The RFD asks the Court to find that the actions of the Lummi in fishing in the "case area" is not in conformity with Final Decision I.  The case area was originally defined in the RFD as the eastern end of the Strait of Juan de Fuca, specifically "the marine waters northeasterly of a line running from Trial Island

---

[1]  Dkts. #20,972, #20,976 and #20,977 in lead proceeding *USA v. State of Washington*, Case No. C70-9213RSM.

ORDER
PAGE - 1

near Victoria, British Columbia, to Point Wilson on the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait." Dkt. # 1 at ¶ 2.  As further discussed herein, since the RFD was filed, the Ninth Circuit Court of Appeals has remanded the matter to this Court to consider whether the waters immediately to the west of northern Whidbey Island are a part of the Lummi's usual and accustomed fishing grounds and stations ("U&A").  Dkt. #109.

The Lummi has opposed the S'Klallam motion and also moves for summary judgment in its favor.  Dkt. #167.   The Lummi moves first for a determination that there is no proof Judge Boldt expressly excluded the disputed waters from the Lummi's U&A.  *Id.*   It next moves for partial summary judgment that this Court has jurisdiction to hear evidence on the extent of the U&A in the disputed marine area, asserting that Judge Boldt did not specifically determine the western boundary of the Lummi's U&A, and therefore a genuine question of material fact exists on the boundary location.  *Id.*

The matter having now been fully briefed, and having determined that oral argument is not necessary in this matter, the Court now GRANTS S'Klallam's motions for summary judgment for the reasons set forth herein and DENIES Lummi's motion for summary judgment.

## II.   BACKGROUND

This case arises from an RFD brought by the S'Klallam to determine certain fishing rights of the Lummi under the 1855 Treaty of Point Elliott.  This dispute has more than 25 years of litigation history behind it.  Dkt. #1.

ORDER
PAGE - 2

On January 22, 1855, the Lummi entered into the Treaty of Point Elliott with the United States.  12 Stat. 927 (1855).  This treaty "secured" to the Lummi "[t]he right of taking fish at usual and accustomed grounds and stations" (hereinafter referred to as "U&A").  *Id.* at 928.

In 1970 the United States, as trustee for all the treaty tribes including the S'Klallam and the Lummi, filed suit in the Western District of Washington to obtain an interpretation of the Treaty of Point Elliott and an injunction protecting treaty fishing rights from interference by Washington State.  Both the S'Klallam and the Lummi intervened as plaintiffs.  In 1974, Judge Boldt issued extensive findings of fact, conclusions of law, and a permanent injunction.  *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) ("Boldt Decree").  The Boldt Decree defined the Treaty of Point Elliott's reference to "usual and accustomed grounds and stations" as meaning "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters[.]" *Id.* at 332.

The U&A of the Lummi Nation was described by Judge Boldt in Findings of Fact ("FF") 45 and 46 of his decision:

> 45. Prior to the Treaty of Point Elliott, the Lummi, Semiahmoo and Samish Indians had been engaged in trade in salmon, halibut and shellfish both with other Indians and with non-Indians. (FPTO § 3-42) This trade continued after the treaty. (Ex. USA-30, p. 6) At the time of the treaty they maintained prosperous communities by virtue of their ownership of lucrative saltwater fisheries. The single most valuable fish resource was undoubtedly the sockeye, which the Lummis were able to intercept in the Straits on the annual migration of the sockeye from the ocean to the Fraser River. (Ex. USA-30, p. 11) Lummi Indians developed a highly efficient technique, known as reef netting, for taking large quantities of salmon in salt water. (Ex. USA-30, p. 11) Aboriginal Indian 'reef netting' differs from present methods and techniques described by the same term. (FPTO § 3-40) The Lummis had reef net sites on Orcas Island, San Juan Island, Lummi Island and Fidalgo Island, and near Point Roberts and Sandy Point. (Ex. USA-30, p. 23; Exs. USA-62, USA-63; Tr. 1699, l. 2 to 1701, l. 21) When nature did not provide optimum reef conditions the Indians artificially created them.

(Ex. USA-30, p. 17) Reef netting was one of the two most important economic activities engaged in by these Indians, the other being the sale of dog fish oil. These Indians also took spring, silver and humpback salmon and steelhead by gill nets and harpoons near the mouth of the Nooksack River, and steelhead by harpoons and basketry traps on Whatcom Creek. They trolled the waters of the San Juan Islands for various species of salmon. (FPTO § 3-42; Ex. USA-30, pp. 6-25; Ex. G-21, pp. I-19-I-21)

46. In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay.  Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo Bay. (Exs. USA-20, p. 39; USA-30, pp. 23-26; Exs. PL-94a, b, c, d, e, t, u, v, w, x; Ex. G-26, pp. II-9 to II-13; Exs. USA-60, USA-61, USA-62, USA-63, USA-64; Tr. 1665, l. 4-11, l. 23-24).

*U.S. v. Washington*, 384 F. Supp. at 360.

**A.  Judge Coyle's Decision**

In 1989, the S'Klallam, along with the Skokomish Tribe, filed an RFD regarding the Lummi U&A, which was opened as Subproceeding 89-2 and assigned to United States District Judge Robert Coyle.  The Tribes asked for a ruling that Lummi fishing in the case area was "not in conformity with" the Findings of Fact in *Decision I*, which is one way by which a party may invoke the Court's jurisdiction under the Permanent Injunction.  The Request asserted that the Strait of Juan de Fuca, Admiralty Inlet, and the mouth of Hood Canal are all outside the Lummi U&A as it was described by Judge Boldt, and therefore, Lummi fishing in these areas is "not in conformity with" that decision.

The parties cross-moved for summary judgment.  On February 13, 1990, Judge Coyle granted summary judgment to the S'Klallam, stating with respect to the case area, "There is no question in the court's mind from the evidence presented to Judge Boldt that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca.  The

court is further persuaded that the mouth of the Hood Canal would not be an area which Judge Boldt would have intended to include in the Lummis' usual and accustomed fishing places." Case No. C70-9213RSM, Dkt. #11596 at 13-14.  Judge Coyle also concluded that "Judge Boldt did not intend Admiralty Inlet to be part of the Lummis' usual and accustomed fishing places." Case No. C70-9213, Dkt. # 11596 at 14.

However, no final judgment was entered by Judge Coyle.  *United States v. Lummi Indian Tribe*, 235 F.3d 443, 447-48 (9th Cir. 2000).  Instead, the Lummi filed a cross-request for determination, and both parties continued to litigate.  *Id.*  The Lummi's cross-request sought determination that:

> the [U&A] of the Lummi Indian tribe include the waters of the Strait of Juan de Fuca east from the Hoko River to the mouth of the Puget Sound, *the waters west of Whidbey Island*, Admiralty Inlet, the waters south of Whidbey Island to the present environs of Seattle, and the waters of Hood Canal south from Admiralty Inlet to a line drawn from Termination Point due East across Hood Canal.

(emphasis added).  The Lummi filed a motion to dismiss and a motion for summary judgment; the S'Klallam filed a cross motion to dismiss.

**B.  Judge Rothstein's Decision**

In 1993, the case was assigned to United States District Judge Barbara Rothstein.  After lengthy additional proceedings, on September 1, 1998, Judge Rothstein denied the Lummi motions, and granted the S'Klallam's  motion to dismiss.  She described in her Order the issues raised in Subproceeding 89-2 as whether the Lummi's U&A includes "the Strait of Juan de Fuca, Admiralty Inlet, or the mouth of Hood Canal."  *USA v. Washington*, Case No. 70-9213RSM, Dkt. # 16550 at 2.  She concluded that Judge Boldt did not intend to include the Strait of Juan de Fuca, Admiralty Inlet, or the mouth of Hood Canal in the Lummi U&A.  *Id*. at

ORDER
PAGE - 5

18.  The Clerk was directed to enter judgment in favor of the S'Klallam and Skokomish tribes, and dismiss the subproceeding.

The Lummi appealed.  *Lummi Indian Tribe*, 235 F.3d at 445.  The Ninth Circuit Court of Appeals held, first, that the Coyle Decision was not final because Judge Coyle never entered final judgment.  *Id.* at 448-49.  Because it was not final, the Court of Appeals continued, the Coyle Decision merged into the Rothstein Decision.  *Id.* at 449.  Therefore, the Court of Appeals concluded, both the Coyle and Rothstein decisions were before the court.  *Id.*

As the Court of Appeals framed the issue:

> The question before Judge Coyle was whether the Lummi's [U&A], as expressed in Finding of Fact 46 of *Decision I* [*i.e.* of the Boldt Decree] – "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle"—included the disputed areas [*i.e.* the Strait of Juan de Fuca, Hood Canal, and the Admiralty Inlet]. The phrase used by Judge Boldt is ambiguous because it does not delineate the western boundary of the Lummi's [U&A].

*Id.*  The Court of Appeals found that Judge Boldt's language in describing the Lummi U&A is ambiguous, "because it does not delineate the western boundary of the Lummi's usual and accustomed fishing grounds and stations."  *Lummi Indian Tribe*, 235 F.3d at 449.

The panel then analyzed the evidence that was before Judge Boldt and concluded that Judge Boldt had not intended to include either the Strait of Juan de Fuca or the Hood Canal in the Lummi's U&A, because Judge Boldt commonly distinguished between the Puget Sound, where the Lummi fished, and the Strait of Juan de Fuca and Hood Canal, where other tribes fished.  *Id.* at 450-52.  The panel held "[i]t is clear that Judge Boldt viewed Puget Sound and the Strait of Juan de Fuca as two distinct regions, with the Strait lying to the west of the Sound."  *Id.* at 451–52.  Thus, "had he intended to include the Strait of Juan de Fuca in the

ORDER
PAGE - 6

Lummi's usual and accustomed fishing grounds and stations, he would have used that specific term, as he did elsewhere in *Decision I*."   *Lummi Indian Tribe*, 235 F.3d. at 452.

The panel also concluded that Judge Boldt did intend for the Admiralty Inlet, *i.e.* "[t]he waters to the west of Whidbey Island, separating that island from the Olympic Peninsula[,]" to be included in the Lummi's U&A, because, "[g]eographically," the Admiralty Inlet

> would likely be a passage through which the Lummi would have traveled from the San Juan Islands in the north to the "present environs of Seattle." If one starts at the mouth of the Fraser River (a Lummi [U&A], see Findings of Fact 45 & 46) and travels past Orcas and San Juan Islands (also Lummi [U&A], see Finding of Fact 45), it is natural to proceed through Admiralty Inlet to reach the "environs of Seattle."

*Id.* at 452 (*quoting* the Boldt Decree, 384 F. Supp. at 360).  The panel thus affirmed in part and reversed in part, concluding:

> We are persuaded that Judge Boldt did not intend for either the Strait of Juan de Fuca or the mouth of the Hood Canal to be included within the Lummi's usual and accustomed grounds and stations.  Based on the geography of the area, however, we conclude that Judge Boldt did intend to include Admiralty Inlet.

*Lummi*, 235 F. 3d at 453.

After *Lummi Indian Tribe* was decided, the Lummi Natural Resources Commission, a tribal body, interpreted the decision as including in the Lummi U&A "Haro Strait and Admiralty Inlet and the waters between the two."  In April 2009, the S'Klallam moved for the district court in Subproceeding 89-2 to hold the Lummi in contempt for violating the court orders regarding the extent of the Lummi's U&A.  The Lummi moved to dismiss, arguing that Subproceeding 89-2 was closed, and the issue should be addressed in a new subproceeding. This Court, Judge Martinez (to whom the case had been reassigned), granted the Lummi's motion to dismiss and denied the S' Klallam's motion without prejudice so it could be renewed as a new subproceeding.

ORDER
PAGE - 7

## C.  Subproceeding 11-02

On November 11, 2011, the S'Klallam initiated the instant proceeding by filing a Request for Determination that the Lummi's U&A does not include "the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island (excepting Admiralty Inlet)."  In particular, the S'Klallam defined the "case area" at dispute as follows:

> Lummi is impermissibly fishing i[n] the marine waters northeasterly of a line running from Trial Island near Victoria, British Columbia, to Point Wilson on the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosaria Strait, the San Juan Islands, and Haro Strait.

Dkt. #1.  The S'Klallam then moved for summary judgment.

On October 11, 2012, this Court granted summary judgment in favor of the S'Klallam, finding that "[t]he law of the case holds that the Lummi U&A does not include the Strait of Juan de Fuca or the waters west of Whidbey Island that were named in the Lummi Cross-Request for Determination."  Dkt. #59 at 16.  In reaching that conclusion, this Court relied, in part, on Judge Rothstein's determination that there was no difference between "the Strait of Juan de Fuca, Hood Canal, and the Admiralty Inlet" and a list of locations that included "the waters west of Whidbey Island."  *See* Dkt. #59 at 8-9.  This Court also relied on a report on traditional U&As of Indian tribes, including the Lummi, by Dr. Barbara Lane, on which Judge Boldt had relied in making his findings of facts.  That report stated "Lummi fishermen were accustomed, at least in historic times, and probably earlier, to visit fisheries as distant as the Fraser River in the north and Puget Sound in the south."  *See* Dkt. #59 at 11-15.  This Court found that this statement does not compel the conclusion that the waters west of northern Whidbey Island should be included in the Lummi U&A because "the Lummi have pointed to

no facts before Judge Boldt which would support the conclusion that he intended to include all the marine waters in between." Dkt. #59 at 15.

The Lummi then moved for reconsideration on the ground that this Court's decision was overbroad because it interpreted the Lummi's U&A as not including waters off the southern coast of the San Juan Islands. This Court denied the motion, but did clarify that "the Lummi U&A should include nearshore waters immediately to the south of San Juan Island and Lopez Island." Dkt. #72. The Lummi then appealed both this Court's summary judgment decision and its denial of its motion for reconsideration.

**D. The Ninth Circuit Decision**

On August 19, 2014, in a 2-1 opinion, the Ninth Circuit Court of Appeals reversed this Court's summary judgment determination. Dkt. #109. The Court of Appeals concluded that because its own prior decision in the matter (under Subproceeding 89-2) was ambiguous, the "law of the case" doctrine did not control the outcome of this matter. The Court explained:

> The district court found that earlier decisions in Subproceeding 89-2 had already established that the Strait of Juan de Fuca's eastern boundary was the western shores of northern Whidbey Island. . . . To the district court, . . the Rothstein Decision held that "the Strait of Juan de Fuca" and "the waters west of Whidbey Island" were not different regions, but rather the "waters" were included in the "Strait." Moreover, the district court determined that, while it is true that the Ninth Circuit reversed the Rothstein Decision with regard to the Admiralty Inlet, finding that the Inlet was a part of the Lummi's U&A, it affirmed the rest of the Rothstein Decision. Therefore, the district court held, it is law of the case that the eastern boundary of the Strait of Juan de Fuca is the western shores of northern Whidbey Island.
>
> This reasoning suggests it has already been determined by necessary implication that the waters immediately west of northern Whidbey Island are part of the Strait of Juan de Fuca and hence not a part of the Lummi's U&A. The Rothstein Decision determined that "the Strait of Juan de Fuca, Admiralty Inlet, [and] the mouth of the Hood Canal" and the "waters west of Whidbey Island" were not different regions, but rather the latter was a subset of the former. The Rothstein Decision also determined that the Strait

ORDER
PAGE - 9

of Juan de Fuca was not included in the Lummi's U&A. *Lummi Indian Tribe* affirmed the second of these findings, namely that the Strait of Juan de Fuca was not included in the Lummi's U&A. 235 F.3d at 450–52. This finding at least suggests that it also affirmed the first finding that the "waters west of Whidbey Island" are a subset of the Strait of Juan de Fuca, and therefore are not included in the Lummi's U&A.

Other language in *Lummi Indian Tribe*, however, contains reasoning that would suggest just the opposite, namely that the waters immediately to the west of Whidbey Island *are* included in the Lummi's U&A. The reason the 2000 Ninth Circuit panel reversed the Rothstein Decision to find that the Admiralty Inlet *was* included in the Lummi's U&A was that the Admiralty Inlet "would likely be a passage through which the Lummi would have traveled" from the Fraser River, south through the San Juan Islands, to the present environs of Seattle. *Id.* at 452. Applying that reasoning here, the "passage through which the Lummi would have traveled" from the San Juan Islands to the Admiralty Inlet would have been the waters directly to the west of Whidbey Island. Thus, this reasoning suggests that the waters immediately to the west of northern Whidbey Island would be included within the Lummi's U&A.

. . .

Thus, each of *Lummi Indian Tribe*'s two holdings implies a different result. Therefore, we conclude that *Lummi Indian Tribe* is ambiguous regarding whether the waters immediately to the west of northern Whidbey Island are included within the Lummi U&A, and accordingly that this issue has not yet been decided explicitly or by necessary implication.

. . .

We hold that no prior decision in this case has yet explicitly or by necessary implication determined whether the waters immediately west of northern Whidbey Island are a part of the Lummi's U&A.

Dkt. #109 at 14-16. The matter was then remanded for further proceedings in this Court.

## E.  Current Proceedings

After remand, the Court raised the issue of whether there were jurisdictional questions brought about by the Ninth Circuit's remand and in dispute between the parties, which should be resolved prior to reaching the merits. *See* Dkt. # 156, Ex. A (Transcript). After hearing argument from the parties, the Court entered a briefing schedule for dispositive motions, with a motion noting date of June 30, 2015. *See id.* at 10:18-20, 14:22-24; Dkt. # 123.

ORDER
PAGE - 10

The Court subsequently granted the S'Klallam's request for a temporary restraining order and permanent injunction, enjoining the Lummi from issuing regulations or encouraging its members to fish in the disputed waters pending a decision on the merits. Dkts. #132 and #150. The parties' motions for summary judgment are now ripe for review.

## III.    JURISDICTION

This Court has already addressed potential jurisdictional issues in this case. Dkt. #174. As previously explained:

> The S'Klallam and Lower Elwha Tribes initiated this subproceeding through an RFD that invoked Paragraph 25(a)(1), (a)(4), and (a)(7) of Final Decision #1, 384 F.Supp. at 419, as modified by this Court's August 23, 1993 Order Modifying Paragraph 25 of Permanent Injunction (Case No. 70-9213, Dkt. # 13599). Dkt. # 1, Ex. 1 at ¶ 4. While the Court recognized that there is some jurisdictional ambiguity in this case following remand, the Court agreed with Petitioners at oral argument, and continues to agree, that it is appropriate to proceed first under the jurisdictional provisions invoked in the RFD before entertaining a request to proceed under Paragraph 25(a)(6).
>
> Paragraph 25(a)(1) provides the Court with jurisdiction to determine whether actions by a party are in conformity with Judge Boldt's findings in Final Decision # 1. While Paragraph 25(a)(1) jurisdiction comes into play where there is potential ambiguity in Judge Boldt's findings, Paragraph 25(a)(6) instead provides jurisdiction to resolve "the location of any of a tribe's usual and accustomed fishing grounds [("U&A")] not specifically determined by Final Decision # 1." Paragraph 25(a)(6) jurisdiction is thus contingent on the Court's finding, or the parties agreeing, that the disputed waters in question were not specifically determined by Judge Boldt.
>
> The Court accordingly finds it appropriate to proceed initially under Paragraph 25(a)(1) in order to determine whether the waters west of Whidbey Island are part of the Lummi's U&A, as described by Judge Boldt in findings of fact 45 and 46 in Final Decision # 1. Only if the issues cannot be resolved by looking at the record before Judge Boldt, and should the Court find that the Lummi's U&A in question was not specifically determined in Final Decision # 1, would it be appropriate to turn to Paragraph 25(a)(6) for further proceedings.

Dkt. #174 at 3-4. Accordingly, the Court shall proceed in that manner.

ORDER
PAGE - 11

# IV.    DISCUSSION

## A.  Motions to Strike

As an initial matter, the Court addresses a number of pending motions to strike filed by various parties.

### 1.  S'Klallam's Motion to Strike Lummi's Motion Under Paragraph 26(a)(6)

The S'Klallam have moved to strike the Lummi's Motion for Partial Summary Judgment to the extent that it has been brought under Paragraph 26(a)(6). Dkt. #183 at 16-19. The motion is DENIED AS MOOT. For the reasons discussed below, the Court does not reach any Paragraph 26(a)(6) analysis and denies that portion of Lummi's motion for summary judgment.

### 2.  S'Klallam's Motions to Strike Certain Exhibits

The S'Klallam have also moved to strike the Declarations of Philip Buri and Sharon Kinley and attachments thereto, along with Part IV of Lummi's motion which relies on those documents. Dkts. #186 at 2-4 and #193 at 9-11. The S'Klallam argue that these documents are inadmissible because they are post-Boldt and for other evidentiary deficiencies. The S'Klallam further move to strike an additional Declaration of Philip Buri and its attachments, Appendix A to the Lummi Reply brief, and references to certain materials in the Reply brief. Dkt. #199 and Dkt. #205. The motions are GRANTED. These materials were not before Judge Boldt at the time he rendered Final Decision I, and it appears they are actually being offered in support of the Lummi's summary judgment motion under Paragraph 25(a)(6). Further, Ms. Kinley's Declaration presents evidentiary issues as it merely purports to agree with the conclusions set forth by another person, and does not contain any specific factual bases for her own

concurrence with those conclusions.  *See* Dkt. #181.  Accordingly, the following materials are STRICKEN from the record:

- The Declaration of Philip Buri (Dkt. #180) and its attachments;

- The Declaration of Sharon Kinley (Dkt. #181) and its attachments;

- Those portions of Section IV of the Lummi Motion for Summary Judgment (Dkt. #167 at 11-19) that rely on Dkts. #180 and #181;

- The Declaration of Philip Buri (Dkt. #190) and its attachments;

- Appendix A to the Lummi Reply brief (Dkt. #189, Appendix A); and

- Those portions of the Lummi Reply brief that reference the stricken materials (Dkt. #189 at 6:10-13 and 9:3-7, 9:10-17, 9:18-20).

     *3.  Suquamish Indian Tribe's Motion to Strike Improper Reply Briefs*

     Interested party Suquamish Indian Tribe has moved to strike the Reply brief filed by Interested Party State of Washington and the Reply brief filed by Interested Party Tulalip Tribes, on the basis that the Court's rules do not allow non-moving parties to file such briefs. Dkt. #200. The Lummi join in that motion.  Dkt. #202.  The Court DENIES the motions.  This Court has previously clarified that Interested parties in all subproceedings may exercise the rights afforded to all parties.  *See* Case No. 09-sp-01, Dkt. #247 at 10-11.

   **B.  Paragraph 25(a)(1) Analysis**

     When conducting a Paragraph 25(a)(1) analysis, the Court engages in a two-step inquiry, first determining whether a particular finding of fact is ambiguous, and, if so, then examining the record in front of Judge Boldt to clarify his intent.  *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020 (9th Cir. Wash. 2010).

ORDER
PAGE - 13

### 1. Finding of Fact 46

There can be no genuine dispute that Finding of Fact 46 is ambiguous.  Indeed, the Ninth Circuit Court of Appeals has twice made that determination.  *United States v. Lummi Nation*, 763 F.3d 1180, 1187 (9th Cir. 2014); *Lummi Indian Tribe*, 235 F.3d at 449. Accordingly, the Court moves to the next step in the analysis.

### 2. Evidence Before Judge Boldt

The next step is to determine whether Judge Boldt intended to include the disputed area in the description of the Lummi's U&A in FF 46.  The burden is on the S'Klallam to provide evidence that will enable the Court to "interpret the decree in specific geographic terms." *Muckleshoot Indian Tribe v. Lummi Indian Nation,* 141 F. 3d 1355, 1360 (9th Cir. 1998) ("*Muckleshoot I*").  It is the evidence that was before Judge Boldt when he made his finding that is relevant to the inquiry.  *Id.* at 1359 ("The only relevant evidence is that which was considered by Judge Boldt when he made his finding"); *Puyallup Indian Tribe v. Muckleshoot Indian Tribe,* 235 F.3d 429, 434 (9th Cir.2000) ("*Muckleshoot III*") ("[The] most relevant evidence in determining what Judge Boldt intended by the [ambiguous] phrase consists of the [] documents referenced in the finding").

The S'Klallam argue that in looking at the evidence before Judge Boldt, there is both no specific reference to any of the disputed area and no evidence supporting any additional U&A than the areas described in FF 46.  As a result, the S'Klallam urge the conclusion that Judge Boldt did not intend the disputed waters to be included in the Lummi U&A.  In its motion for summary judgment, the Lummi advances several different arguments for its contention that the case area waters are not part of the Strait of Juan de Fuca, which has been excluded from the Lummi U&A.  For the reasons below, the Court agrees with the S'Klallam and rejects Lummi's

ORDER
PAGE - 14

arguments – an examination of the record before Judge Boldt in 1974 reveals that there is no factual evidence to establish that the Lummi customarily fished at any time in the disputed waters at issue here. Thus, there is no factual basis to support any claim by the Lummi to U&A rights in the disputed area. The absence of such specific evidence results in this Court's determination that Judge Boldt did not intend to include the disputed waters in the Lummi's U&A. *See Upper Skagit Indian Tribe v. Washington,* 590 F.3d 1020, 1025 (9th Cir. 2010).

Before even engaging in the two-step analysis, the Lummi argue that the waters west of Whidbey Island are not linguistically excluded from the Northern Puget Sound, and that the western waters of Whidbey Island fit geographically within the Sound as distinct from the Strait of Juan de Fuca, and conclude that the disputed waters must therefore be part of the Lummi U&A. Dkt. #167 at 8-11. However, that contention is not supported by case law or the record, as further discussed herein.

In *Lummi Indian Tribe*, the Ninth Circuit found that, unlike for the Strait of Juan de Fuca and Hood Canal, there were no linguistic clues in Decision No. 1 to compare for Admiralty Inlet. *Lummi Indian Tribe*, 235 F.3d at 452. Accordingly, linguistic clues could not be used to determine whether Admiralty Inlet was or was not intended to be included by Judge Boldt. *Id*. ("[I]t is just as likely that this area was intended to be included as that it was not"). In *Upper Skagit*, the Ninth Circuit held that "the inquiry properly focuses on individual U&As" and the "fact that Judge Boldt defined 'Puget Sound' in one instance as including" specifically named bodies of water "does not mean that references to 'Puget Sound' in other U&As always include those same areas." 590 F.3d 1026. "If anything," the Ninth Circuit concluded, Judge Boldt's "inclusion of reference points in one U&A but not in another indicates a lack of intent to include them generically." *Id*. As this Court recently held, the fact that a geographic term

ORDER
PAGE - 15

may include the waters at issue does not mean on the basis of the evidence that Judge Boldt intended to include them within a Tribe's U&A.  *See* Subproceeding 14-01, Case No. C70-9213, Dkt. No. 21017 at 6.

The Lummi then continue to contend that Dr. Lane's report supports its position.  Dkt. #167 at 13-19.  Specifically, they assert that the disputed waters are necessarily included in Judge Boldt's description of the U&A.  The Lummi rely on Dr. Lanes testimony that Lummi fishermen were "accustomed . . . to visit fisheries as distant as Fraser River in the north and Puget Sound in the South," *USA-30 at 25*, and that "other fisheries in the Straits and bays from the Fraser River south to the present environs of Seattle were utilized" by the Lummi.  *USA-30* at 26.  *See* Dkt. #167 at 13-19.  The Lummi has also relied on FF 13 in *Decision I* as support for its argument.  However, when FF 13 is read in its entirety, and together with the following FF 14, they lead to the opposite conclusion from what the Lummi argue.

These Findings of Fact, stated in full, read as follows:

> 13. Each of the Plaintiff tribes had usual and accustomed fishing places within the case area.  Although there are extensive records and oral history from which many specific fishing locations can be pinpointed, it would be impossible to compile a complete inventory of any tribe's usual and accustomed grounds and stations.  (FPTO § 3-34; Ex. USA-20, p. 21; Ex USA-52, p. 4, l. 7 to p. 5, l. 29)  Among the reasons for this are the following: 1) Indian fisheries existed at all feasible places along a given drainage system. Fishing stations which were the site of weirs or permanent villages are more easily documented than riffles where fish were speared; 2) Indian fishermen shifted to those locales which seemed most productive at any given time depending upon such factors as changes in river flow, turbidity or water course; 3) some important recorded fishing sites are no longer extant because of subsequent man-made alterations in watersheds and water systems; and, 4) use of some sites has been discontinued because appropriate Indian gear for those sites has been outlawed or because competing uses and users have made utilization of the sites by Indian fishermen unfeasible.  (Ex. USA-20, pp. 21-23; Ex. USA-27b, pp. 1-3) Documentation as to which Indians used specific fishing sites is incomplete. George Gibbs noted that:

ORDER
PAGE - 16

'As regards the fisheries, they are held in common, and no tribe pretends to claim from another, or from individuals, seignorage for the right of taking. In fact, such a claim would be inconvenient to all parties, as the Indians move about, on the sound particularly, from one to another locality, according to the season.' (Ex. USA-20, p. 18; Ex. USA-27b, p. 3; Ex. G-4, p. 186)

14. Although not all tribes fished to a considerable extent in marine areas, the Lummi reef net sites in Northern Puget Sound, the Makah halibut banks, Hood Canal and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fishing grounds and stations in marine waters. Marine waters were also used as thoroughfares for travel by Indians who trolled en route. (Ex. PL-75; Tr. 2847,l. 13 to 2850, l. 23) Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians. (Tr. 2177, l. 24 to 2180, l. 4).

*U.S. v. Washington*, 384 F. Supp. at 353.

Thus, FF 13, with its references to drainage systems, riffles, weirs, river flow, turbidity, and so on in Reasons 1 through 3, appears to address only fishing sites along rivers. It would be pure speculation to infer that the "impossible to compile a complete inventory" statement applies as well to fishing in the marine areas where none are mentioned; indeed logic and linguistics lead to the opposite inference. Judge Boldt used terms specific to riverine areas in FF 13 when he listed reasons why it was "impossible to compile a complete inventory" of any tribe's usual fishing areas. On the other hand, marine areas, and specifically the Lummi reef net sites, are addressed in FF 14, which is also the basis for the oft-quoted principle that transit through an area does not, without more specific evidence of fishing, lead to inclusion of an area in a tribe's U&A. Thus, FF 13 fails to support the conclusion that Judge Boldt intended to include the case area in the Lummi U&A, and FF 14 leads to the conclusion that the Lummi "natural pathway" argument must be rejected.

Nor does reference to Dr. Lane's language regarding the Lummi's "other fisheries in the Straits and bays from the Fraser River south" (quoted from Exhibit USA-30, p. 26) aid the

ORDER
PAGE - 17

Lummi position.  First, the case area is not a bay, and according to the Lummi argument it is not part of the Strait of Juan de Fuca either.  Therefore they have not shown how the case area could be included in the "other fisheries in the Straits and bays" referenced by Dr. Lane.  Second, this statement in her report is a summary conclusion, and must be read in context with the entire report, particularly the sections that were cited or quoted by Judge Boldt in FF 45 and 46.  Notably, Judge Boldt did not quote Dr. Lane's "Straits and bays" conclusion in either Finding of Fact.  Instead, he cited extensively and repeatedly to Dr. Lane's discussion of reefnetting, its uniqueness and importance to the Lummi, their system of individual ownership of reefnetting sites, and the location of those sites.  *See* FF 45 and citations therein to Exhibit USA-30 at 11 and 23.

Dr. Lane went into great detail on reefnetting by the Lummi in her report, describing the equipment and techniques, and the reasons for its success, which was attributed in part to specialized knowledge of topography and salmon behavior and migration patterns.  Exhibit USA-30 at 12.  "Usually the reefnet was located in a kelp-covered reef a short distance offshore.  Often it was opposite a headland that caused a backward sweep of tidal current.  The fish entered with the current."  Exhibit USA-30 at 17.  "The more important reefnet locations of the Semiahmoo-Lummi-Samish are noted in the section on usual and accustomed fishing sites and are plotted on the accompanying map."  Exhibit USA-30 at 11.  The map shows reefnet sites at various points from Point Roberts south to the southern shore of Lopez Island.  All appear to be associated with promontories and headlands, and none are located south of Lopez Island, where the case area begins.  The singular importance of reefnetting to the Lummi was acknowledged by Judge Boldt in FF 45, and the complete absence of any indicated sites from the case area is significant.

The section of Dr. Lane's report which was cited extensively, and sometimes quoted, by Judge Boldt states, in its entirety:

USUAL AND ACCUSTOMED FISHING AREAS

While it is not possible to pinpoint every fishing site used by the ancestors of the present Lummi Tribe of Indians prior to the Treaty of Point Elliot, **it is feasible to indicate the general area of their fishing operations and within the general area to designate certain sites as important or principle fishing locations**.

The pre-treaty Lummi, along with the Semiahmoo and Samish, both of whom were subsumed with the Lummi at the Treaty of Point Elliot, owned reefnet locations in the San Juan Islands, off Point Roberts, off Lummi Island, and Fidalgo Island.

The reefnetting grounds off Point Roberts were the largest in the entire area and were situated within the aboriginal territory of the Semiahmoo. They were used not only by the Semiahmoo but also by Saanich, Lummi, and other Indians.

The grounds off Village Point, Lummi Island[,] were second in size to the point Roberts grounds. At least two of the Lummi signers of the Point Elliot Treaty owned reefnet locations off Village Point.

The main Samish location was off Iceberg Point, Lopez Island[,] in the San Juans.  Other Samish and Lummi locations were located off the southern shores of Lopez.  The Samish also fished with reefnets off Langley Point on Fidalgo Island.

Other Lummi reefnet grounds were located off Shaw Island, Orcas Island, Waldron Island, and off Cherry Point on the mainland.

The Birch Point grounds off Birch Bay lay within the aboriginal territory of the Semiahmoo people.

In addition to using the reefnetting grounds noted above, the ancestors of the present Lummi Tribe of Indians also trolled for salmon in the contiguous salt waters of Haro and Rosario Straits and in the islands, speared them in the bays and streams of the mainland, and took them by means of weirs and traps in the rivers.  There were, in addition, other important fisheries, including halibut banks, but discussion here is limited to salmon (including steelhead) fisheries.

**The traditional fishing areas discussed thus far extended from what is now the Canadian border south to Anacortes.** This description included the traditional fishing areas of the Semiahmoo and the Samish. Some of the present Lummi Tribe are descendants of the pre-treaty Semiahmoo and Samish groups. Other descendants of these pre-treaty entities have not become members of the Lummi Tribe and those descendants would, of course, legitimately make claim to some of the same usual and accustomed fishing area included here.

**In addition to the home territory discussed to this point, Lummi fishermen were accustomed, at least in historic times, and probably earlier, to visit fisheries as distant as the Fraser River in the north and Puget Sound in the south.**

In the same manner, Saanich, Clallam, Skagit and other Indians fished in waters described above as within Semiahmoo, Lummi and Samish territory. The Straits and Sound were traditional highways used in common by all Indians of the region and most saltwater fisheries traditionally were free access areas. This point is discussed at some length in the Summary Anthropological Report,4 pages 15-19. While it is useful for certain purposes to speak of Lummi waters, or Samish territory, it is important to note that this by no means implies exclusive rights by one group. That these Indians travelled [sic] widely and frequently throughout the waters of the Sound and Straits is commented on by numerous early observers.

Exhibit USA-30 at 23-24 (emphasis added).

This Court previously found, and it continues to find, that several aspects of this section have significant implications for the Lummi "logic and linguistics" argument. See Dkt. #59 at 14-15. First, Dr. Lane stated that it was feasible to indicate a general area for the fishing operations of the Lummi, and within that general area to designate important sites, but not all of them. This is contrary to the sense in which the Lummi would have the Court read the "impossible to compile a complete inventory" language in FF 13. They use this language to invite consideration of unnamed locations well outside the designated area, but this section shows that was not Dr. Lane's intent. (And as shown above, Judge Boldt's "complete inventory" remark appears to be addressed to river fishing sites, not marine areas.) Second, the "traditional fishing areas" of the Lummi were designated as extending only as far south as

ORDER
PAGE - 20

Anacortes, well above the case area. Judge Boldt cited specifically to this section of the report and used the specific place names in FF 45, thus indicating his reliance upon this section.

Further, Dr. Lane named only two places, Fraser River in the north and Puget Sound to the south, as fisheries visited by Lummi fisherman; she did not report that they fished all the waters in between, or mention any intermediate fisheries. While Judge Boldt described the Lummi U&A in FF 46 as including marine areas from Fraser River south to the present environs of Seattle, "and particularly Bellingham Bay," the Lummi have pointed to no facts before Judge Boldt which would support the conclusion that he intended to include **all** the marine waters in between. Indeed, this Court has found in a previous subproceeding that Judge Boldt's "from" and "to" language in describing a U&A does not include all the waters in between. In a recent subproceeding addressing similar language by Judge Boldt in describing the Suquamish U&A ("the marine waters of Puget Sound **from** the northern tip of Vashon Island **to** the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal"), this Court found that Judge Boldt did not intend to include all of Puget Sound, and excluded certain area to the east of Whidbey Island. Subproceeding 05-03, *affirmed, U.S. v. Washington (Upper Skagit v. Suquamish)*, 590 F. 3d 1020 (9th Cir. 2010). This determination was made by examining the evidence that was before Judge Boldt, specifically Dr. Lane's report on Suquamish fishing areas. Here, the pointed reference to Bellingham Bay, far to the north of the case area, is significant. Likewise, the description of the Straits and Sound as "highways" used by all tribes reinforces the rule set forth by Judge Boldt in FF 14 that incidental trolling during travel does not "make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians." *U.S. v. Washington*, 384 F. Supp. at 353.

ORDER
PAGE - 21

The Lummi also point to a map that was before Judge Boldt, namely Exhibit USA-62, which is a reproduction of a U.S. coastal survey map from 1853.  Dkt. #167 at 15-16. The Lummi assert that the placement of the lettering for "Strait of Juan de Fuca" on this map would have led Judge Boldt to conclude that the eastern extent of the Strait was approximately Angeles Point.  Dkts. #167 at 15 and #43 at 18.[2]  This Court had previously found that the Lummi's argument is unavailing for many reasons, not the least of which is that it is purely speculative with respect to Judge Boldt's meaning or intent.  Dkt. #59.  While Judge Boldt did cite to USA-62 in FF 45, it was specifically in regard to the locations of Orcas Island, San Juan Island, Lummi Island, Fidalgo Island, Point Roberts, and Sandy Point.  *U.S. v. Washington*, 384 F. Supp. at 360.  Thus this map, while historically interesting, is of no import in the context of this subproceeding.

The Lummi argue that its U&A includes the case area because the Ninth Circuit expressly held that the Lummi's U&A includes Admiralty Inlet, which the Ninth Circuit defined as "consist[ing] of the waters to the west of Whidbey Island, separating that island from the Olympic Peninsula."  Dkts. #167 at 8 and 17 and #43 at 6 (quoting *Lummi*, 235 F.3d at 452).  This argument misreads the Ninth Circuit's definition of Admiralty Inlet and impermissibly expands its scope.  The correct reading of the Ninth Circuit language describes Admiralty Inlet as "(those) waters to the west of Whidbey Island (which) separate that island from the Olympic Peninsula;" in other words, only the southern portion of the waters west of Whidbey Island.  The fact that the Lummi understood the "waters west of Whidbey Island" to be distinct from Admiralty Inlet is evidenced from their own Cross-Request for Determination,

---

[2]  Because the Lummi has stated that it continues to rely on numerous prior pleadings in this case in support of its instant motion for summary judgment, *see* Dkt. #167 at 3-4, the Court cites to those prior filings where applicable in its discussion.

ORDER
PAGE - 22

filed in Subproceeding 89-2, which names them separately and disjunctively.  *See* C70-9213 at Dkt. #11690.

Based on the analysis of Dr. Lane's report and FF 45 and 46, the Court finds that neither logic nor linguistics would compel the conclusion that the waters to the west of northern Whidbey Island were intended by Judge Boldt to be included in the Lummi U&A. Accordingly, the Court need not reach any determination under Paragraph (a)(6) in this matter.

## V.    CONCLUSION

Having reviewed the parties' motions for summary judgment, the responses thereto and replies in support thereof, along with all supporting declarations and exhibits and the remainder of the record, the Court hereby FINDS and ORDERS:

1. S'Klallam's Motion to Strike (Dkt. #183 at 16-19) is DENIED AS MOOT.

2. S'Klallam's Motions to Strike Certain Declarations and Exhibits (Dkts. #186 at 2-4, #193 at 9-11, #199 and #205) are GRANTED.

3. Suquamish Indian Tribe's and Lummi Nations's Motions to Strike Reply Briefs (Dkts. #200 and #202)[3] are DENIED.

4. Lummi Nations's Motion for Summary Judgment (Dkt. #167)[4] is DENIED for the reasons set forth above.

5. S'Klallam's Motions for Summary Judgment (Dkts. #164 and #168)[5] are GRANTED:

   a. The Regulations issued by the Lummi Nation are actions in violation of Final Decision I.

---

[3]  Dkts. #21,056 and #21,058 in *USA v. Washington*, C70-9213RSM.

[4]  Dkt. #20,976 in *USA v. Washington*, C70-9213RSM.

[5]  Dkts. #20,972 and #20,977 in *USA v. Washington*, C70-9213RSM.

ORDER
PAGE - 23

b. The Lummi's U&A is specifically determined, and it does not contain the waters in dispute in this subproceeding.   The Lummi's U&A does not include the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, an area more specifically described as – the marine waters east of a line running from Trial Island near Victoria, British Columbia, to Point Wilson on the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait.

c. The Lummi Nation is permanently enjoined from issuing regulations or otherwise authorizing its fishers to exercise treaty fishing rights in the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, as described above, and permanently prohibited from exercising or purporting to authorize treaty fishing in these waters.

d. Any and all future Lummi fishing regulations that open for fishing any waters adjacent to the waters in the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, as described above, shall expressly and unambiguously acknowledge that the Lummi Nation has no authority to open, and that its fishers are not entitled to engage in, treaty fishing in the waters in the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, as described above.

//
//
//
//

ORDER
PAGE - 24

DATED this 17th day of July 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE