UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>                    Plaintiffs,<br><br>  v.<br><br>STATE OF WASHINGTON, et al.,<br><br>                    Defendants. | Case No. C70-9213RSM<br><br>Subproceeding No. 14-02<br><br>ORDER DENYING NISQUALLY'S MOTION FOR SUMMARY JUDGMENT AND GRANTING SQUAXIN'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Nisqually Indian Tribe's ("Nisqually") and Squaxin Indian Tribe's ("Squaxin") Cross-Motions for Summary Judgment. Dkts. #36 and #37.[1] Oral argument was held on June 14, 2016, before the Undersigned, and those arguments have been considered. Although interested parties have intervened in this matter, no other Tribes have submitted briefing in conjunction with the pending motions. The Nisqually and Squaxin now ask the Court to interpret the Usual and Accustomed fishing grounds and stations ("U&A") of the Squaxin pursuant to Paragraph 25(a)(1) of the permanent injunction. Specifically, Nisqually seeks a determination that Squaxin has no adjudicated U&A east of a line running from Johnson Point to Devils Head, including the waters of the Nisqually Reach

---

[1] Corresponding docket numbers in the main case, C70-9213, are Dkts. #21,234 and #21,235.

ORDER
PAGE - 1

and around Anderson Island ("Subproceeding Area" or "disputed waters"). Dkt. #37 at 2.[2] Nisqually also asks the Court to clarify the previous language of the Court concerning Squaxin's U&A, and enjoin Squaxin from future fishing or fisheries-management actions in the Subproceeding Area. *Id.* Squaxin argues that Judge Boldt did not intend to exclude the disputed waters, as demonstrated by the evidence before him at the time he made his decision, and seeks a determination that the Squaxin U&A includes those waters. Dkt. #36. For the reasons discussed below, the Court agrees with Squaxin, GRANTS its Motion for Summary Judgment and DENIES Nisqually's Motion for Summary Judgment.

## II. BACKGROUND

In 1974, the Honorable George H. Boldt, United States District Judge, issued an Order defining Squaxin's U&A as "the shallow bays, estuaries, inlets and open Sound of Southern Puget Sound." *United States v. Washington*, 384 F. Supp. 312, 378 (W.D. Wash. 1974) ("Final Decision #1"). Specifically, Judge Boldt found:

> 141. During treaty times the Squaxin Island Indians fished . . . at their usual and accustomed fishing places in the shallow bays, estuaries, inlets and open Sound of Southern Puget Sound and in the freshwater streams and creeks draining into those inlets. . . .

*United States v. Washington*, 384 F. Supp. 312, 378 (W.D.Wash. 1974) (emphasis added). In support of that finding, Judge Boldt cited the Final Pretrial Order ("FPTO") § 3-98, which provides:

> It is impossible to compile a complete inventory of the specific fishing places of those Indians who became known as the "Squaxin" following their relocation on the Squaxin Island Reservation. During treaty times they fished for coho, chum, chinook, and sockeye salmon in three water areas in southern Puget Sound: (1) freshwater streams and creeks draining into the various inlets, (2) shallow bays and estuaries, and (3) inlets and the open

---

[2] For ease of reference the Court will typically cite to only one brief in the record for each party, but recognizes and acknowledges that the same arguments and exhibits are also contained in the parties' opposing briefs on their cross-motions. By citing to only one brief, the Court does not suggest that it has not reviewed all of the parties' briefs and arguments on their motions.

> Sound. Customary use patterns varied according to the types of water areas being used; with freshwater fisheries being controlled by the residents while the deeper saltwater areas were open to anyone who traveled thereon. Their fishing techniques include trolling, stream weirs, spearing and tidal traps. These Indians continued to fish these areas following their relocation on the Squaxin Island Reservation and to rely in part on fishing for subsistence and monetary income. Salmon fishing and the fishing areas used by their predecessor bands continue to be important to members of the Squaxin Tribe.

Dkt. #36-1, Ex. 2 at ¶ 3-98. The instant matter involves the question of what Judge Boldt intended in Finding of Fact No. 141 when using the phrase "open Sound of Southern Puget Sound."

Nisqually's U&A includes the Nisqually River and certain marine areas in Puget Sound. *U.S. v. Washington*, 384 F. Supp. at 367–70; *U.S. v. Washington*, 626 F. Supp. 1405, 1441 (W.D. Wash. 1985). The area involved in this dispute, including the Nisqually Reach, is entirely within Nisqually's U&A.

On September 6, 2011, Squaxin issued an emergency regulation opening a salmon fishery in the Nisqually Reach. Dkt. #39 at ¶ 4 and Ex. A thereto. Nisqually learned of the planned fishery the next day, and immediately objected. *Id.* at ¶ 4 and Ex. B thereto. However, Squaxin opened its fishery on the evening of September 7, 2011. *Id.* at ¶ 5. When Squaxin boats entered the Nisqually Reach and the mouth of the Nisqually River, Nisqually fishermen repeatedly demanded that they leave the area. Dkt. #40 at ¶ ¶ 5-8. Those requests were ignored, so Nisqually fishers began hauling in the nets of the Squaxin fishers. *Id.* at ¶ ¶ 8-9. A community conservation officer from the Nisqually Tribal Police Department intervened, and the three Squaxin boats left the mouth of the Nisqually River. Dkt. #41 at ¶ ¶ 1-4. Squaxin fishers continued fishing throughout the night in the Nisqually Reach near the eastern green channel marker. *Id.* at ¶ 5.

At 9:00 a.m. on September 8, 2011, Squaxin closed its fishery. Dkt. #39 at ¶ 7 and Ex. C thereto. According to Nisqually, during the fishery, Squaxin fishers set 13,500 feet of gillnet, and caught 2,868 Endangered Species Act listed Fall Chinook salmon, 44 coho salmon, and 200 pink salmon from the Nisqually Reach and the mouth of the Nisqually River. *Id.* at ¶ 6 and Ex. D thereto.

The instant Request for Determination was filed by Nisqually on June 10, 2014. Dkt. #6.

### III.  DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Further, "[t]he mere existence of a scintilla of evidence in

ORDER
PAGE - 4

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

Here, the parties agree that it is appropriate to resolve the matter on cross-motions for summary judgment.

**B. Two-Step *Muckleshoot* Analysis**

This Court applies a two-step analysis to determine Judge Boldt's intent under Paragraph 25(a)(1) of Final Decision #1. This framework is referred to as the "*Muckleshoot* two-part procedure," as set out in *Muckleshoot Tribe v. Lummi Indian Nation*, 141 F.3d 1355 (9th Cir. 1998) ("*Muckleshoot I*"), *Muckleshoot Tribe v. Lummi Indian Nation*, 234 F.3d 1099 (9th Cir. 2000) ("*Muckleshoot II*"), and *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir. 2000) ("*Muckleshoot III*"). First, the moving party bears the burden of offering evidence that a U&A finding was "ambiguous, or that Judge Boldt intended something other than [the text's] apparent meaning." *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1023 (9th Cir. 2010) (citing *Muckleshoot I, Muckleshoot II*, and *Muckleshoot III*). Second, the moving party bears the burden of showing that "there was no evidence before Judge Boldt" that would indicate that the contested area was included or excluded in the U&A of the nonmoving tribe. *Id.; see also Tulalip Tribes v. Suquamish Indian Tribe, 794 F.3d 1129, 1133 (9th Cir. 2015)*.

*1. Ambiguity*

With respect to ambiguity, the parties disagree as to whether the term "open sound of Southern Puget Sound" unambiguously includes the contested waters. Squaxin argues that it is unambiguous, while Nisqually argues that Judge Boldt's description is ambiguous. *See* Dkts. #36 at 8-16 and #37 at 5. In this case, the Court finds that the phrase is ambiguous. Indeed,

Squaxin admits that "[t]he only ambiguous aspect of 'Southern' or 'South' Puget Sound' is the location of its northern boundary. . .". Dkt. #36 at 9 fn. 8. The Ninth Circuit Court of Appeals has found the failure to delineate a boundary creates ambiguity. *Lower Elwha Band of S'Klallams v. Lummi Indian Tribe*, 235 F.3d 443, 449 (9th Cir. 2000) ("The phrase used by Judge Boldt is ambiguous because it does not delineate the western boundary of the Lummi's usual and accustomed grounds and stations."). While Squaxin urges the Court to ignore that ambiguity, asserting that the northern boundary is not implicated because it does not include the contested waters, the Court is not persuaded, and will move to Step Two of the analysis. "When interpreting an ambiguous prior judgment, the reviewing court should 'construe a judgment so as to give effect to the intention of the issuing court.'" *Id.* (citations omitted).

    *2. Evidentiary Review*

The next step is to determine whether Judge Boldt intended to exclude the disputed area in the description of the Squaxin's U&A in FF 141. The burden is on the Nisqually to provide evidence that will enable the Court to "interpret the decree in specific geographic terms." *Muckleshoot I,* 141 F. 3d at 1360. It is the evidence that was before Judge Boldt when he made his finding that is relevant to the inquiry. *Id.* at 1359 ("The only relevant evidence is that which was considered by Judge Boldt when he made his finding"); *Muckleshoot III,* 235 F.3d at 434 ("[The] most relevant evidence in determining what Judge Boldt intended by the [ambiguous] phrase consists of the [] documents referenced in the finding"). As further discussed below, the Court now finds that there is no evidence in the record demonstrating that Judge Boldt intended to exclude the disputed area.

As noted above, Finding of Fact 141 specifically cites FPTO § 3-98, which provides:

    It is impossible to compile a complete inventory of the specific fishing
    places of those Indians who became known as the "Squaxin" following their

ORDER
PAGE - 6

>relocation on the Squaxin Island Reservation. During treaty times they fished for coho, chum, chinook, and sockeye salmon in three water areas in southern Puget Sound: (1) freshwater streams and creeks draining into the various inlets, (2) shallow bays and estuaries, and (3) inlets and the open Sound. Customary use patterns varied according to the types of water areas being used; with freshwater fisheries being controlled by the residents while the deeper saltwater areas were open to anyone who traveled thereon. Their fishing techniques include trolling, stream weirs, spearing and tidal traps. These Indians continued to fish these areas following their relocation on the Squaxin Island Reservation and to rely in part on fishing for subsistence and monetary income. Salmon fishing and the fishing areas used by their predecessor bands continue to be important to members of the Squaxin Tribe.

Dkt. #36-1, Ex. 2 at ¶ 3-98. This language comes from the reports of Dr. Barbara Lane, an anthropologist and witness during the 1973 trial, on whose opinion Judge Boldt placed great weight. *U.S. v. Washington*, 384 F. Supp. 312, 350 (W.D. Wash. 1974).

It is important to note that both Judge Boldt and Dr. Lane made clear that their descriptions of the usual and accustomed fishing places were not intended to be all-inclusive. Indeed, Judge Boldt stated that "[f]or each of the plaintiff tribes, the findings set forth information regarding the organization and membership of the tribe, **and some, but by no means all**, of their principal usual and accustomed fishing places." 384 F. Supp. at 333 (emphasis added). Likewise, Dr. Lane emphasized that "it is impossible to compile a complete inventory of 'Squaxin' fishing grounds and stations" and that "[t]he material on fishing grounds is intended to be illustrative and is no way to be considered a complete listing." Dkt. #37, Ex. B (USA-24) at 16-17. Thus, the evidence before Judge Boldt is examined in that context.

As noted above, Dr. Lane presented evidence that the Squaxin fished all the streams and creeks draining into the inlets at the head of Puget Sound, as well as the bays, inlets and the Sound itself. Dkt. #37, Ex. B (USA-24) at 12. In addition, she noted that certain species of salmon were available throughout the year in the Sound itself and the inlets, and the Squaxin

ORDER
PAGE - 7

took them by trolling in the salt water. *Id.* She also appended a map pinpointing certain usual and accustomed fishing sites in the Squaxin territory. *Id.* at 17 and 31 and the map attached thereto.

Significantly, Dr. Lane's Appendix contained excerpts from the "Waterman Transcript" entitled "Names of places in the so-called Nisqually and Squaxin areas on the 'upper' or southern portion of Puget Sound." *Id.* at 21. Professor T.T. Waterman defined that area as "[g]eographically, . . the part lying above [(south of)] The Narrows." *Id.* Mr. Waterman goes on to explain:

> This part of the sound is practically a large pond, the only outlet being the narrow passage between Point Defiance (near Tacoma) and Point Evans. This "pond," however, is broken up into a number of areas or "inlets" and its bosom is dotted with a number of islands. The inlets are extremely narrow and tortuous, so that the geography becomes somewhat complicated.

*Id.* Dr. Lane notes that the only detailed information about the Squaxin territory comes from Professor Waterman. She explains that she has noted on his list of villages and fishing sites, her own list of fishing sites, designated by "numbers in lighter circles. *Id.* at 17. She then concluded that the Squaxin fished "the entire area of upper Puget Sound." *Id.* at 19. Given her reliance on Professor Waterman's writings, it is logical to conclude that Dr. Lane was referring to the same geographic area defined by Professor Waterman – that is, the part lying south of The Narrows. Further, given Judge Boldt's reliance on Dr. Lane's research and reports, it is also logical that when Judge Boldt used the term "Southern Puget Sound," he was referring to the same area as Professor Waterman.

This analysis is bolstered by other evidence in the record. For example, in describing the Nisqually U&A, Judge Boldt specifically noted that Nisqually's saltwater fisheries were shared with other Tribes:

ORDER
PAGE - 8

> 85.  At the time of the Medicine Creek Treaty upriver fisheries in the Nisqually area were normally used by the locally resident group.  **Saltwater fisheries and fisheries at the mouth of the Nisqually River traditionally were used by visitors as well as the local residents**.  Visitors might use them because they held claims to them by virtue of kin ties with the local people or they might be accorded guest privileges by virtue of friendship.  Use of the lower Nisqually fisheries by non-Nisqually was with the permission of the local people and would have been accorded automatically to people claiming descent from someone who had come from the local village or who had married into it.  People with more distant kin ties to the local village or with none would be accorded fishing privileges on request if amicable relations obtained.
>
> 86.  The usual and accustomed fishing places of the Nisqually Indians included at least the saltwater areas at the mouth of the Nisqually River and the surrounding bay, and the freshwater courses of the Nisqually River and its tributaries, McAllister (Medicine or Shenahnam) Creek, Sequalitcu Creek, Chambers Creek and the lakes between Steilacoom and McAllister Creeks.  **The saltwater fisheries were shared with other Indians.**

384 F.Supp. at 368-369 (emphasis added).

That language mirrors Dr. Lane's descriptions of the Nisqually fishing sites.  Dr. Lane explained that visitors, such as the Squaxin, shared Nisqually's saltwater fisheries:

> Upriver fisheries were normally used by the locally resident group.  **Saltwater fisheries and fisheries at the mouth of the mouth [sic] of the Nisqually River traditionally were used by visitors as well as the local residents.**  Visitors might use these fisheries because they held claims to them by virtue of kin ties with the local people or they might be accorded guest privileges by virtue of friendship.  **The Nisqually intermarried with** Steilacoom, Puyallup and Duwamish to the north and east **and with people from the various inlets around the head of the Sound to the west. . . .**
>
> . . .
>
> 9.  **The fisheries on the lower reaches of the Nisqually River were undoubtedly used** not only by the locally resident villagers, but by people from other Nisqually villages and by members of other groups, **such as the people of the upper sound inlets**, the Steilacoom, Puyallup, and some Duwamish.

Dkt. #36-1, Ex. 14 (US-25) at 21a and 26 (emphasis added).  In the context of Dr. Lane's report regarding the Squaxin, her reference to "people from the various inlets around the head of the

ORDER
PAGE - 9

Sound to the west" and "people of the upper sound inlets" is logically a reference to the Squaxin tribes. That evidence was before Judge Boldt at the time he issued his findings of fact.

Nisqually's argument focuses primarily on Finding of Fact 140, wherein Judge Boldt set forth his findings as to where the Squaxin lived. Nisqually asserts that Judge Boldt intended to restrict the Squaxin U&A to the area of the western inlets "from South Bay on Henderson inlet [sic] around the head of the Sound to North Bay on Case Inlet." Dkts. #37 and #43 at 3. Nisqually argues that Dr. Lane defined this area as the boundaries of the "upper Puget sound" and therefore that is also what Judge Boldt intended. *Id.* The Court rejects that argument. Nisqually confuses Dr. Lane's descriptions of where the Squaxin lived with her descriptions of where the Squaxin fished. But Dr. Lane's own language differentiated the two. As noted by Squaxin, when describing where the Squaxin lived, Dr. Lane's language was more restrictive. For example, in describing where Squaxin people lived, Dr. Lane used the term "southwestern" to limit "Puget Sound." *See, e.g.*, Dkt. #36-1, Ex. 13 at 1, 2, 4, 5 and 6 (describing the pre-Treaty Squaxin as "one of a number of politically autonomous groups living along the various inlets and bays of southwestern Puget Sound"; explaining that pre-treaty, "all records relating to the southwestern Puget Sound groups mention them by individual name" and that certain census reports listed individually "the names of the various southwestern inlet groups." Similarly, Dr. Lane referred to the Squaxin people as inhabiting the "inlets" of the Sound. Dkt. 36-1, Ex. 13 at 6, 11 and 18. That language appears in Judge Boldt's Finding of Fact 140 and FPTO § 3-95, both of which described Squaxin's aboriginal living places.

In contrast, when describing where the Squaxin fished, Dr. Lane stated more broadly that they "fished all the streams and creeks draining into the inlets at the head of Puget Sound as well as the bays, inlets, and **the Sound itself**." *Id.* at 12 (emphasis added). She further

ORDER
PAGE - 10

explained that Squaxin fishing areas were "of three kinds: (1) freshwater streams and creeks draining into the various inlets; (2) shallow bays and estuaries; and (3) the inlets and the **open Sound**." *Id.* at 15 (emphasis added). Likewise, she noted that the "[d]eeper saltwater areas, the inlets and the **open Sound**" served as public thoroughfares that were used as fishing areas by anyone travelling through such waters. *Id.* at 16 (emphasis added). She concluded that the Squaxin people fished "**the entire area of upper Puget Sound** including all the creeks and streams draining into the head of the Sound as well as the saltwater estuaries and bays **and the open saltwater**." *Id.* at 19 (emphasis added).

Nisqually has also offered as evidence that Squaxin's U&A was not intended to include the disputed waters a colloquy between Plaintiffs' counsel and a witness, Calvin Peters (a Squaxin tribal member) regarding his reference to the portion of the Puget Sound where the Squaxin fished. Dkt. #37-2, Ex. C at 2505:22-2506:25. However, when read in context, this discussion refers to where the Squaxin people live, not where they fish. *Id.*

Additional evidence provided to Judge Boldt by Dr. Lane supports the conclusion that Judge Boldt did not intend to exclude the disputed waters from Squaxin's U&A. The Waterman excerpt attached to Dr. Lane's report includes 13 place names on the east and west shores of "Carr's Inlet," including a Squaxin village. Dkt. #36-1, Ex. 13 at 31-32. Significantly, traveling to and from Carr Inlet to the southwestern inlets occupied by other Squaxin people necessitated travel through the contested waters. *See* Dkt. #36-1, Ex. 1; *see also Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1136 (9th Cir. 2015) ("When traveling from Vashon Island to the Fraser River, the Suquamish would have passed through the waters west of Whidbey Island, and likely would have fished there while traveling. This general evidence, too, constitutes some evidence before Judge Boldt and supports the district

ORDER
PAGE - 11

court's determination that Judge Boldt did not intend to exclude these contested bay areas from Suquamish's U&A."). Nisqually's interpretation of Judge Boldt's decision would illogically give Squaxin two geographically separated U&As and exclude the body of saltwater that connects them.

Nisqually argues that the pinpoint location on Carr Island was simply a mistake and likely referred to the Hotlemamish of Carr Inlet. Dkt. #43 at 9. Nisqually asserts that:

> Dr. Lane could not determine with certainty where the Hotlemamish consolidated after the Treaty of Medicine Creek, noting that W.W. Elmendorf classified them as a "branch of the Puyallup." (Ex. USA-24, Aug. 24, 1973, 7.) Because Dr. Lane included no textual findings linking the Hotlemamish of Carr Inlet to Squaxin Island the pinpoint is likely erroneous.

*Id.* The Court is not persuaded by that argument. If the Court accepted Nisqually's argument, it would need to speculate that Dr. Lane made a mistake, and then essentially ignore the 12 additional Squaxin place names on Carr Inlet's eastern and western shores in Dr. Lane's T.T. Waterman excerpt, all of which Dr. Lane considered to be "'Squaxin' territory' of 'social and economic importance'". Dkt. #37-3 at 72. The Court would also have to ignore that the table in Dr. Lane's report entitled, "Upper Puget Sound Inlets and Peoples", included data on the Hotlemamish people of Carr Inlet, Dkt. #37-3 at 75, and the reference to Gibbs in Dr. Lane's Nisqually report that placed the Hotlemamish people with the Squaxins. Dkt. #36-1, Ex. 14 (USA-25) at 11. While Dr. Lane acknowledged that she could not place the Hotlemamish people with the Squaxin with certainty, she also did not rule that out. Thus, Nisqually fails to present any persuasive evidence that Dr. Lane made an "erroneous" pinpoint on Carr Inlet.

Finally, the Court considers the use of the term "open" as used by other witnesses when describing areas of the Puget Sound. For example, when clarifying the area he was discussing in his testimony, witness Calvin Peters stated that he was "talking about the salt water area, and

this is open." Dkt. #36-1, Ex. 25 at 2489:1-4. Likewise, a Washington State biologist (Mr. Lasater) testified that he had made provisions for an Indian fishery "on an area near the Tulalip [sic] reservation on the Puyallup River, the Nisqually River, and the area of Puget Sound that is open near Squaxin Island."). *Id.*, Ex. 29 at 3919:4-9.

Nisqually argues that Judge Boldt restricted the evidence he relied on by citing only three documents in his Findings of Fact regarding the Squaxin. Dkt. #46 at 3. Thus, Nisqually suggest that Judge Boldt relied on only three documents to define Squaxin's U&A. *Id.* Nisqually then appears to argue that this Court should restrict its own examination of the record to only those three documents. *See* Dkt. #46 at 3-7. But to do so would ignore Judge Boldt's own words:

> Counsel for all parties appeared and presented nearly 50 witnesses, whose testimony was reported in 4,600 pages of trial transcript, more than 350 exhibits, pretrial briefs, final oral argument 12/9-10/73 and post trial briefs. **In addition to consideration of the above evidence and material by the court, more than 500 proposed findings of fact and conclusions of law, submitted by counsel and annotated to the record, have been checked to determine the accuracy of every citation made by any counsel alleged to support a proposed finding or conclusion**. Many of the proposed findings and conclusions were modified and many of the supporting citations were corrected, and additional findings and conclusions not proposed by any party were developed. The court has also read and examined, individually and in relation to one another, every case cited by any party as possible authority concerning any issue in this case, as well as other cases not cited by the parties.
>
> **Based upon this exhaustive examination of the controlling law, the briefs and oral argument of counsel and upon a preponderance of the evidence found credible and inferences reasonably drawn therefrom, the court now makes the following Findings of Fact and Conclusions of Law**: . . .

384 F. Supp. at 348 (emphasis added). It is clear that Judge Boldt considered much more than the documents he specifically cited, and this Court will not ignore that evidence.

ORDER
PAGE - 13

While the discussion above is not intended to reflect the only evidence before Judge Boldt that supports the conclusion he did not intend to exclude the disputed waters from Squaxin's U&A, it is enough to lead the Court to such a conclusion. Accordingly, for all of the reasons discussed herein, the Court finds in favor of the Squaxin.

**C. Squaxin Motion to Strike**

Earlier in these proceedings, Squaxin moved to strike certain extra record evidence from the Court's consideration in this matter. Dkt. #25. The Court denied that motion, finding:

> There is no dispute among the parties that the documents may not be considered as evidence bearing on Judge Boldt's intent in determining Squaxin's U&A, and the Court will not consider them for that purpose.
>
> However, to the extent that the documents may be offered for some other purpose, the Court finds it premature to make a decision on how or if they should be considered. Without the context of legal arguments set forth in summary judgment motions or how the documents will be used, the Court cannot conclude that they should be stricken at this time. That does not imply, however, that the Court ultimately will consider the documents for any purpose. The Court simply finds it unnecessary and premature to strike them now.

Dkt. #33 at 2.

Squaxin has renewed its request that the Court decline to consider that extra-record in considering the instant motions. Dkt. #44 at 4-5. The Court DENIES that request as MOOT. It is unnecessary to consider those documents to reach the conclusions herein, and the Court has not considered or referenced them herein.

## IV.   CONCLUSION

Having considered the parties' Cross-Motions for Summary Judgment, the Oppositions thereto and Replies in support thereof, along with the Declarations and Exhibits and the remainder of the record, the Court hereby finds and ORDERS:

ORDER
PAGE - 14

1. Nisqually Indian Tribe's Motion for Summary Judgment (Dkt. #37)[3] is DENIED.

2. Squaxin Indian Tribe's Motion for Summary Judgment (Dkt. #36)[4] is GRANTED. This Court has determined that there is no evidence that Judge Boldt intended to exclude the disputed waters from the Squaxin U&A, and there is evidence in the record supporting that the Squaxin regularly fished in those waters.

3. This matter remains open to consider the remaining issue presented by Nisqually in its RFD.

DATED this 15 day of June, 2016.

                                          RICARDO S. MARTINEZ
                                          CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Case No. C70-9213, Dkt. #21,235.

[4] Case No. C70-9213, Dkt. #21,234.

ORDER
PAGE - 15