UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

Defendants.

CASE NO. C 70-9213

Subproceeding No. 89-3-06 (Shellfish)

ORDER REGARDING MOTIONS
TO INTERVENE

## I. INTRODUCTION

The Treaty Tribes requested dispute resolution arising under the Settlement Agreement (Dkt. 14476, sub-proceeding 89-03) approved by the Court on June 21, 2007. The Treaty Tribes, Puget Sound Shellfish Growers ("Growers"), United States Department of the Interior and State of Washington entered into the Settlement Agreement to resolve any and all disputes "regarding implementation of the Tribes' treaty right to take shellfish from lands owned or leased by the Growers." *Id.* at p. 10. The Settlement Agreement included specific requirements a Grower must meet in order to be covered by its terms. If a Grower meets the terms, then the "covered tidelands" are "deemed as of the date of this Settlement Agreement to be 'staked or cultivated by

1   citizens' for the purpose of implementing the Treaties" referenced in the Settlement Agreement.

2   *Id.* at p. 21.  A tideland that is considered "staked or cultivated by citizens" is exempt from the

3   Treaty Tribes' fishing rights.   The designation of a tideland as "staked and cultivated" brings

4   that tideland under the so-called Shellfish Proviso of the Stevens Treaties, which reserved to the

5   Tribes the right of taking fish in common with all citizens of the Territory, "*Provided, however,*

6   *That they shall not take shellfish from any beds staked or cultivated by citizens.*"  *United States v*

7   *Washington,* 157 F.3d 630, 638 (9th Cir. 1998).

8         Pursuant to the terms of the Settlement Agreement, shellfish growers not designated as

9   the original Intervenors, who meet the conditions set forth in the Settlement Agreement could

10   become Intervenors and be bound by the terms of the Settlement Agreement by filing a Notice

11   and Request for Intervention on or before March 1, 2008.  Such Notice must include

12   documentation which would establish that the requirements for Intervenor status set forth in the

13   Settlement Agreement had been met.  Settlement Agreement, ¶¶ 2(B), 2(C).

14         In the Treaty Tribes' Request for Dispute Resolution, the Tribes objected to certain

15   requests for intervention for a large number of parcels for which various Growers sought

16   Intervenor status.

17         At this Court's suggestion and upon agreement of the parties, the Growers and the Treaty

18   Tribes each selected ten representative parcels for initial dispute resolution by the undersigned.

19   Of the twenty parcels initially selected, six parcels were subsequently acknowledged by the

20   property owners to be excluded from coverage based on this Court's prior rulings.[1]

21

22   ────────────

23        [1] The six parcels withdrawn include Marrowstone Island Shellfish LLC - Parcel 316; Minterbrook Oyster
     Co. - Parcel 368;  Oakland Seafoods - Parcel 392;  Taylor United - Parcel 829;  G&R Quality Seafood - Parcel 112;
24   and Arcadia  - Parcel 10.

ORDER REGARDING MOTIONS TO INTERVENE- 2

1    The following fourteen parcels remain for dispute resolution:  Chelsea Farms (Parcels 70

2  and 92), G&R Quality Seafood (Parcel 110), Navy Yard Oyster (Parcel 390), Joe Leonard Oyster

3  Company (Parcels 231 and 234), Sunrise Marine (Parcel 563), Taylor Homestead Clams (Parcel

4  574), Eagle Rock Shellfish (Parcel 108), Topeeksin Shellfish (Parcel 855), Oliver Gray & Sons

5  (Parcel 401), Olympic Shellfish (Parcel 443), McDonald Mollusca (Parcel 341), and Girls Scouts

6  of Western Washington (Parcel 113).

7    The Court considered new briefing for the fourteen parcels and heard oral argument as to

8  each of the parcels over the course of several weeks.  Based on the briefing and oral argument,

9  there are several preliminary issues relating to some of the parcels regarding Department of

10  Health ("DOH") certification, Aquatic Farm Registrations ("AFR"), the definition of "sustained

11  commercial production" and the burden of proof.  These issues must be addressed first as their

12  resolution may impact the Court's decision regarding specific parcels.

13

14  **II. PRELIMINARY ISSUES**

15    **A.  DOH Certification**

16    Under RCW 69.30.050 (effective July 23, 1995), "[a]ny person desiring to remove

17  shellfish in a commercial quantity for sale for human consumption from a growing area in the

18  state of Washington shall first apply to the [Department of Health] for a certificate of approval of

19  the growing area."  As part of the Settlement Agreement, proposed Intervenors are required to

20  file, on or before March 1, 2008, copies of documents which establish the existence of a

21  "Washington Department of Health certification for those tidelands[.]"  *See* paragraph 2(B)(i),(ii)

22  and 2(C).

23    For a number of parcels the Growers argue that an after-acquired parcel is automatically

24  covered under a previously issued DOH certification because the DOH certification covered a

1  particular body of water.  In support of this position they rely on the Declaration of Frank Cox,

2  an employee of the Washington State Department of Health.  Dkt. 75.

3      The Treaty Tribes assert that DOH certification for one parcel in a growing area does not

4  establish DOH certification for any other parcel or all parcels in that growing area, whenever

5  acquired.  In addition, the terms of the Settlement Agreement require documentary evidence that

6  the DOH certification is for the specific tideland parcel at issue.

7      In his Declaration, Mr. Cox testified regarding the DOH certification process during the

8  1985 to 1995 time period.  *See* Dkt. 75.   It does not appear to this Court that Mr. Cox ever

9  asserted that after-acquired parcels are automatically covered under a previously issued DOH

10 certification.  In fact, his declaration is devoid of any comment regarding after-acquired parcels.

11 By way of contrast, Dianne Huff, who was an employee of the Washington Department of Fish

12 and Wildlife ("WDFW"),  testified in her declaration that this was the case for aquatic farm

13 registrations ("AFR").  Ms. Huff testified as follows in paragraph 5:

14          Growers were not required to re-register or update their AFR if they
            added tracts to their farm in any given aquaculture district after their
15          initial registration.  Because all tracts farmed in a single aquaculture
            district were considered part of one farm, it did not matter whether the
16          grower added or subtracted tracts from its farm.

17 Dkt. 230, p. 2.  This Court can only assume that had automatic coverage been the case with the

18 Department of Health that Frank Cox would have so testified.  He did not.  Instead, documents

19 have been filed that show parcels could be added to a DOH certification upon notification to the

20 Department of Health.  One such example is included in the Girl Scouts of Western Washington

21 documents, wherein Frank Cox authored a letter in which he granted Mr. Bean's request to have

22 Parcel 113 added to Lone Rock Oyster Company's 1992/93 DOH certification under WA-250-

23 SP.  Dkt. 216-1, p. 32, Exhibit H.

24

1     This Court concludes that the Department of Health only authorized DOH certification

2  for parcels for which it received notification and for which it specifically approved.  There was

3  no automatic coverage under a previously issued DOH certification for after-acquired parcels.

4  Instead, a parcel acquired by an owner who had a DOH certification could have that parcel

5  covered under a previously issued DOH certification upon notice and approval by the

6  Department of Health.

7     **B.  Aquatic Farm Registration**

8     As part of the Settlement Agreement, Growers are also required to file, on or before

9  March 1, 2008, copies of documents which establish the existence of an "active aquatic farm

10  registration for commercial shellfishing from those tidelands."  *See* paragraph 2(B)(i), (ii) and

11  2(C).  An AFR is a certification issued by the WDFW.

12     Counsel for the Growers filed declarations of Paula Galivan (Dkt. 76) and Dianne Huff

13  (Dkt. 230) who are or were employees of the WDFW.  In both of the declarations, Paula Galivan

14  and Dianne Huff testified that "[g]rowers were not required to re-register or update their AFR if

15  they added tracts to their farm in any given aquaculture district after initial registration.  Because

16  all tracts farmed in a single aquaculture district were considered part of one farm, it did not

17  matter whether the grower added or subtracted tracts from its farm."  Dkt. 76, p. 2, ¶ 6 (Dec. of

18  Paula Galivan); Dkt. 230, p. 2, ¶5 (Declaration of Dianne Huff).

19     In this Court's previous Order on Motion to Strike (Dkt. 284), the undersigned struck

20  paragraphs 5 and 6 from Paula Galivan's declaration based on a lack of personal knowledge.

21  The undersigned, however, did not strike any portion of Diane Huff's declaration and noted that

22  the Tribes' objections had to do with credibility and not admissibility.

23     The issue then before this Court is what weight, if any, should be given to Dianne Huff's

24  testimony.  Ms. Huff was an employee of the WDFW from 1985 through 1996.  During that time

1  she was a customer service representative and "between 1994 and 1996" she was directly

2  responsible for issuing and maintaining AFRs.  Dkt. 230, p. l.  Ms. Huff does not define her

3  responsibilities as a "customer service representative" and the Court does not know what her job

4  responsibilities were prior to her becoming "directly responsible for issuing and maintaining

5  AFRs."  Ms. Huff does assert that she has extensive knowledge regarding WDFW's policies and

6  practices for issuing AFRs and the information that WDFW required for the AFRs.

7         The following two paragraphs in Ms. Huff's declaration are at issue:

8         3.  Pursuant to the WDFW regulations in place at the time, the primary
          responsibility of WDFW concerning AFRs was developing and
9         maintaining a registration list of all aquaculture farms to determine production
          data for each farm.  The regulations at the time, and Department policy and
10        practice, did not require AFR applicants to establish proof of ownership
          or identify a particular parcel number.  Because WDFW was primarily
11        concerned with farm production, the AFR did not call for specific
          identification of which parcels of land within the aquaculture district
12        were being farmed, as that information was not needed for WDFW reporting.
          …
13
          5.  Growers were not required to re-register or update their AFR if they
14        added tracts to their farm in any given aquaculture district after their
          initial registration.  Because all tracts farmed in a singled aquaculture
15        district was considered part of one farm, it did not matter whether the
          grower added or subtracted tracts from its farm.
16
   Dkt. 230, p. 2.
17
          Exhibit A, attached to Ms. Huff's declaration, is a sample AFR form completed by
18
   Western Oyster Co. on October 23, 1995.  The instructions on that form state that "all Aquatic
19
   Farms belonging to one company in the same Aquaculture District may be registered as one farm
20
   on the same form."  This clearly contemplates the aquatic farm as it existed at the time of
21
   registration.
22
          The Court notes that in Exhibit A, Section 12, the applicant is "**REQUIRED**" to provide
23
   "Property Information" to include whether the property is owned or leased.  If it is owned, the
24

1    applicant is required to provide proof of ownership.  If it is leased, the applicant is required to

2    provide a copy of the lease agreement.  The "Property Information" required on the form

3    attached to Ms. Huff's declaration contradicts her testimony that applicants were not required to

4    establish proof of ownership.  In fact, WAC 220-76-010(10) was added in 1989 and required:

5    "Documentation of ownership or present right of possession of land comprising the aquatic farm

6    is required to be submitted together with the aquatic farm registration form."  This requirement

7    was part of the WACs during the time Ms. Huff said such proof was not required.

8        Applicants for an AFR were also required to provide the following information:   "[n]ame

9    of bay or inlet, county and aquaculture district for marine aquatic farms" and "[a] site drawing of

10   the aquatic farm and a brief narrative describing the facility and its operation."  WAC 220-76-

11   020, Aquatic farm registration form – Required information, Sections  (6) and (9).  The

12   requirements in sections 6 and 9 appear to contradict the testimony of Ms. Huff that the AFR did

13   not call for specific "identification of which parcels of land within the aquaculture district were

14   being farmed."  Rather, the WAC makes it clear that information regarding the identification of

15   each parcel was required and that such required information would establish the location of the

16   aquatic farm.

17       In addition, the requirement set forth in the AFR form in Exhibit A, Section 15 (Dkt. 230-

18   1, p. 2) also contradicts Ms. Huff's testimony.  Section 15 contains the following language:

19   "Required: Attach a site drawing of the aquatic farm and a brief description of the facility and its

20   operation.  Fresh water farms should identify the source of culture water, where the water is

21   discharged, and the watershed where the facility is located."   It appears to this Court that

22   applicants for an AFR were required to give information that would establish the location of an

23   approved aquatic farm.

24

1    While neither the WAC nor the AFR form required a tax ID or other specific

2  identification of the tracts making up the aquatic farm, they did require sufficient information

3  with which the location of the aquatic farm could be determined.

4    The undersigned concludes that the WAC and the specific requirements on the AFR form

5  contradict the testimony of Ms. Huff and rebut her assertion that she has extensive knowledge

6  regarding WDFW's policies and practices for issuing AFRs and the information that WDFW

7  required for the AFRs.  It is difficult to attribute any weight to Ms. Huff's testimony when so

8  much of it is contracted by the exhibit that is attached to her declaration.

9    Ms. Huff does not cite to any statute, WAC or written policy of the WDFW that supports

10  her conclusion that an aquatic farmer could, at any time - even years later - add parcels to a pre-

11  existing AFR merely by obtaining ownership or control over a new parcel, so long as the parcel

12  was in the same aquaculture district.  She has not provided any written instructions or directions

13  from WDFW that informed aquatic farmers they could enlarge their farm, at any time, under an

14  existing AFR without having to advise WDFW of such a change.  In addition, no Grower has

15  provided any testimony about being informed by Ms. Huff that the aquatic farmer could

16  automatically, without notice, add parcels to a previously issued AFR – so long as the additional

17  parcels were in the same aquaculture district covered by the pre-existing AFR.  Based on the

18  evidence before the Court, there is nothing in writing to support Ms. Huff's conclusions that an

19  existing AFR, which covered an aquatic farm that existed at the time it was registered, would

20  automatically be expanded to cover after-acquired parcels.  Clearly Ms. Huff was not in a

21  position to establish WDFW policy, she has not supported her testimony with any written

22  departmental procedure, and there is nothing in statute or the WACs to support her testimony.

23    Scott Gellatly, owner of McDonald Mollusca L.L.C., filed a declaration (Dkt. 77) to

24  which he attached Exhibit A (Dkt. 77, p. 4 - 9), which is a copy of a letter he received from

William R. Wilkerson, Director of the Washington Department of Fisheries, dated May 19, 1986 which had attached "Instructions for the Registration of Aquatic Farms".  He also attached Exhibit B (Dkt. 77, p. 11) which is a memorandum from Eric Hurlburt of the Washington Department of Fisheries, dated January 8, 1986.  The undersigned concludes that neither of these exhibits supports the proposition that an AFR for an existing aquatic farm would automatically be enlarged to cover after-acquired parcels – regardless of when the parcels were acquired.

The May 19, 1986 letter advised that (1) "the legislature eliminated aquaculture licenses and substituted the requirement that all aquatic farmers must register their aquatic farms with the Department" and (2) "all aquatic farms must be registered on the attached forms" which were due by June 15, 1986.  *Id.* at p. 4.

The instructions (Dkt. 77, p. 5 – 6) posed and answered several questions.  One such question was:  "What is an aquatic farm?"  The Instructions noted "[w]here one company owns or leases several separate marine facilities in the same Aquaculture District, all facilities within that district may be considered as one farm for the purposes of registration."

The instructions also made it clear that the aquatic farmer was required to register "prior to the commencement of culture activities," that an AFR is effective for one calendar year, and must be renewed annually.  However, the reporting of any production or commercial activity would constitute renewal for the following year.  The aquatic farmer was also advised that an AFR is not transferable and, upon sale, an Aquatic Farm must be re-registered.  Dkt. 77, p. 6.

The January 8, 1986 letter from Eric Hurlburt (Dkt. 77, p. 11) advised "Members of the Aquaculture Industry" that the Washington Department of Fisheries was preparing the registration procedures and that a registration information packet should be ready by the end of the month.  This letter reiterated the requirement that an aquaculture farm must be registered prior to the commencement of commercial activities.  It also notified members of the aquaculture

1  industry that "[t]he registration must be updated if significant changes are made in the farm or

2  species cultured."

3        The Growers assert, based on Diane Huff's testimony, that parcels acquired after receipt

4  of an AFR were automatically covered under that previously issued AFR.  They attempt to

5  support this assertion through reliance on the language in the documents in Dkt. 77 as well as

6  WAC 220-76-015 ("Aquatic farm – Definition")  that "tracts of land in the same marine

7  aquaculture district which are owned or operated by the same person shall be considered to be a

8  single farm for the purposes of this section."  However, the purpose of WAC 220-76 is to require

9  aquatic farms to be registered and to have an AFR for that aquatic farm.  In order to obtain an

10  AFR, the aquatic farmer was required to provide specific information to the applicable

11  Department (initially the Department of Fisheries and subsequently the WDFW), which included

12  a description of the aquatic farm as it then existed.  There is no provision either by statute, WAC

13  or written departmental policy which permits an after-acquired parcel to be automatically

14  covered, without notice to WDFW, under a previously issued AFR.  The language cited to the

15  Court in Dkt. 77 does not support the Growers' position and the Court has already discounted

16  Ms. Huff's testimony.

17        The Court also notes that the memo from Eric Hurlburt (Dkt. 77, p. 11) advises aquatic

18  farmers that their registration "must be updated if significant changes are made in the farm or

19  species cultured."  While this language does not appear in either a statute or WAC, including this

20  language in the memo adds additional support to the Court's conclusion that after-acquired

21  parcels are not, without more, automatically included in a pre-existing AFR.

22        The undersigned concludes that parcels acquired after receipt of an AFR by a Grower are

23  not, without more, automatically covered under a pre-existing AFR.  Growers are required to

24  show that the AFR is in fact for the tidelands for which the Grower seeks coverage.  The Court

1 understands that the AFR itself does not include a specific description of the tidelands.

2 However, the Growers must be able to provide some indicia that the AFR is, in fact, for

3 commercial shellfishing from those tidelands.

4 **C.  Sustained Commercial Production**

5 Certain Growers are required to file "documentary evidence establishing that those

6 tidelands were used for sustained commercial production of shellfish during some portion of the

7 time between January 1, 1985 and August 28, 1995" in order to be covered by the terms of the

8 Settlement Agreement and therefore not have their tidelands subject to Treaty Tribes' harvest

9 rights. *See* Section 2(B)(ii).

10 The terms of the Settlement Agreement require the Court to make its determination based

11 on consideration of timely filed "documents."   If documents were not timely filed or, for

12 whatever reason, there were no documents that could be filed, then the Grower has failed to

13 comply with the terms of the Settlement Agreement.

14 In addition, the documentary evidence that is required by the Settlement Agreement must

15 be for the tidelands for which coverage is sought.  If the documents are not for those specific

16 tidelands, then the Grower has failed to comply with the terms of the Settlement Agreement.

17 Finally, the Grower must timely file documentary evidence which establishes that the

18 tidelands were used for "sustained commercial production" during some portion of the specified

19 time period.  The phrase "sustained commercial production" is not one that has previously been

20 defined in any of the decisions cited at pages 1 and 2 of the Settlement Agreement.  Rather, this

21 phrase was agreed upon by the parties and now is before the Court for a more specific definition.

22 The undersigned concludes, however, that developing the definition of this phrase will be

23 dependent on the facts and circumstances of each parcel that is considered by the Court.

24

### D.  Burden Of Proof

In order to be covered under the terms of the Settlement Agreement, Growers were required to provide specified documents on or before a specific date.  The Court notes that the Settlement Agreement places the burden of proving coverage on the Growers.  The Settlement Agreement does not place any burden on the Treaty Tribes to disprove coverage.  In line with the need to strictly construe the language in the settlement agreement, when there is ambiguous or contradictory documentary evidence, the Court will not resolve the issue in favor of the Growers. *See* Order Denying Suquamish Tribe's Motion to Deny A&K Trust's Request for Intervenor Status, Subproceeding 89-03, Dkt. 14572, p. 5 ("any provision regarding that designation, including the Tribes' agreement in the Settlement Agreement, must be strictly construed").  The Settlement Agreement requires the filing of documents that establish compliance.  If the documents are ambiguous or contradictory such ambiguity or contradiction will not be resolved in favor of the Grower.

The Court also notes that the Settlement Agreement requires Growers to file documents that establish compliance with the terms of the Settlement Agreement.  Several Growers have indicated that they did not retain records which, if they were still in existence, would establish compliance with the terms of the Settlement Agreement.  Some Growers assert this is particularly problematic in light of the age of the required records, as they were for years prior to August 28, 1995.  While this may be a problem for Growers who did not maintain records, the terms of the Settlement Agreement are very specific and it is only when a Grower has complied with all of the terms of the terms that the Grower will receive the benefit of coverage offered by the Settlement Agreement.

1    In order to be covered by the Settlement Agreement, each Grower must comply with the

2    requirements of the Settlement Agreement.   If a Grower is not able to comply, that Grower will

3    not have the benefit of coverage under the Settlement Agreement.

4

5    **III. DISCUSSION**

6    **Chelsea Farms – Parcel 70**

7    **Coverage Request.**  Chelsea Farms seeks Intervenor status pursuant to Section 2(B)(i) or

8    2(B)(ii).  In order to qualify for Intervenor status under either Section 2(B)(i) or 2(B)(ii), Chelsea

9    Farms must show that on or before August 28, 1995, it owned, leased from a private party, or

10   otherwise had a right to commercial harvests of shellfish from tidelands in Washington State.  To

11   be covered under Section 2(B)(i), Chelsea Farms must also show that on or before August 28,

12   1995 it had an active AFR and DOH certification for commercial shellfishing from those

13   tidelands.  In order to qualify for coverage under Section 2(B)(ii), Chelsea Farms must also show

14   that (1) on or before the date it sought to intervene it had an active AFR and DOH certification

15   for those tidelands and (2) it must file documentary evidence establishing that those tidelands

16   were used for sustained commercial production of shellfish during some portion of the time

17   between January 1, 1985, and August 28, 1995.

18   **Disputed Issues.**  The Treaty Tribes dispute the assertion that Chelsea Farms had a lease

19   for Parcel 70 prior to August 28, 1995, that Chelsea Farms had an active AFR and DOH

20   certification prior to August 28, 1995 and assert that Chelsea Farms has not established that

21   Parcel 70 was used for sustained commercial production of shellfish during some portion of the

22   time between January 1, 1985 and August 28, 1995.

23   **Lease.**  Chelsea Farms, owned by John and Linda Lentz, entered into a written three year

24   "Tidelands Lease" with the owners of Parcel 70, Dean and Kathy Russell, on August 29, 1995.

Dkt. 210-1, pp. 1 – 2.  The Tidelands Lease is the only document that substantiates the right to plant, grow and harvest clams, oysters and other natural northwest shellfish and it specifically states that the lease "commences on August 29, 1995," (Dkt. 210-1, p. 1), which is one day late.

Chelsea Farms also relies on an October 4, 1996 letter by Linda Lentz to Rick Peters of the Squaxin Island Tribe (Dkt. 121, p. 9) in support of its assertion that it leased Parcel 70 in July 1995.  Ms. Lentz did not state that there was a "verbal" lease but rather she stated that the parcel was leased in July of 1995.  Her statement, however, is contradicted by the actual lease itself which was not effective until August 29, 1995.

As noted by the Treaty Tribes, the lease is one day late.  The terms of the Settlement Agreement require proof that Chelsea Farms had a lease for Parcel 70 on or before August 28, 1995.  The documents filed by Chelsea Farms fail to meet this requirement.  Unfortunately the failure is by one day, but the parties negotiated the terms of the Settlement Agreement and selected this particular date.

Because Chelsea Farms has not shown that it leased Parcel 70 on or before August 28, 1995, it is not entitled to Intervenor status for this parcel.  The Court will, however, address several other issues raised by the parties.

**Chelsea Farms' Active DOH Certification.**  Chelsea Farms was issued a DOH certification for Eld Inlet on September 21, 1994 (Dkt. 209-1, p. 19), eleven months before it entered into the lease for the Parcel 70.  In light of the fact that Chelsea Farms did not have control over Parcel 70, which is located in Eld Inlet, until August 29, 1995 it could not have had an active DOH certificate for those tidelands prior to August 28, 1995 as required by the Settlement Agreement.   This conclusion is also supported by the Harvest Site Certificate from the Department of Health which shows that Parcel 70 was certified on August 29, 1995 (Dkt. 209-1, p. 20), which is also the date of the tidelands lease.

1         Frank Cox testified in his declaration that he started creating Harvest Areas Records "to

2 identify with more particularity which beaches were being harvested by growers within a

3 certified growing area, like Totten Inlet." Dkt. 75, p. 2. It appears that the Harvest Areas Record

4 was a precursor to the Harvest Site Certificate filed by Chelsea Farms.

5         The Court understands that the Growers assert the dates on the Harvest Site Certificates

6 are not all accurate.   In fact, with regard to Parcel 70, Chelsea Farms asserts that the date shown

7 on the Harvest Site Certificate "only describes the date upon which DOH confirmed in its

8 database that it was included under the existing certification." Dkt. 297, p. 7, l. 2 – 3.  It is

9 unclear to the Court what testimony or evidence Chelsea Farms relies on to support this

10 assertion.   Regardless, the Court concludes that the certification date for Parcel 70, which

11 coincides with the date of the lease, is in fact the date when Chelsea Farms first had the right to

12 commercial harvests of shellfish from Parcel 70.

13         Chelsea Farms argues that it had DOH certification for Parcel 70 prior to the date of the

14 lease because of a "verbal agreement" which was subsequently memorialized in a written lease

15 agreement on August 29, 1995.  Dkt. 210, p. 2, l 11 – 13.  This argument is dependent on the

16 Court accepting the assertion that the Department of Health automatically included after-

17 acquired parcels under previously authorized DOH certificates for the same aquaculture district.

18 However, as discussed above, this Court has determined that there is no evidence to support the

19 assertion that an after-acquired parcel was automatically covered under a previously authorized

20 DOH certification.

21         The undersigned concludes that Chelsea Farms did not have an active DOH certificate for

22 Parcel 70 on or before August 28, 1995.

23         **Chelsea Farms' Active AFR.**  In light of the fact that the Court concludes Chelsea

24 Farms did not have an active DOH certificate on or before August 28, 1995 it need not address

the issues raised regarding an active AFR.  Failure to prove the existence of the DOH certificate, as required by the Settlement Agreement, is fatal to Chelsea Farms seeking intervention under Section 2(B)(i).

**Conclusion regarding Section 2(B)(i):**  The undersigned concludes that Chelsea Farms has failed to meet the requirements of Section 2(B)(i) and is not entitled to Intervenor status with regard to Parcel 70 pursuant to that section.

**Sustained Commercial Production under Section 2(B)(ii).**   In order to obtain Intervenor status under Section 2(B)(ii) a Grower must file documents which establish that the Grower "on or before August 28, 1995, owned, leased from a private party, or otherwise had a right to commercial harvests of shellfish from tidelands in Washington State."  As noted above, Chelsea Farms did not have such right prior to August 28, 1995.

A second issue with regard to Section 2(B)(ii) is the requirement that Chelsea Farms file "documentary evidence establishing that those tidelands were used for sustained commercial production of shellfish during some portion of the time between January 1, 1985, and August 28, 1995."

In order to show sustained commercial production, Chelsea Farms relies on two pages of a letter dated October 4, 1996 addressed to Rick Peters of the Squaxin Island Tribe and signed by Linda Lentz, owner of Chelsea Farms (Dkt. 209-1, p 3 – 4 (also filed under 89-sp-0003 RSM Dkt. 14504-9, pp. 19 – 20)) and a ledger sheet titled "Russells Beach" which was prepared by an unknown person and is dated March 21, 1998 (Dkt. 209-1, p. 23)("ledger").

The letter asserts that Parcel 70, which is listed as Property 4, is included in Chelsea Farms AFR and DOH certification, and that as of October 4, 1996 the tidelands had been under cultivation for over one year.  This conclusory statement, unsupported by any facts, that the parcel had been under cultivation for over one year is not specific enough for the Court to

conclude that there was sustained commercial production on Parcel 70 during some portion of the time between January 1, 1985, and August 28, 1995, as required by the Settlement Agreement.

Chelsea Farms asserts that "[t]he growing and cultivation of shellfish is a complex, multi-year process that includes, among other things, planting shellfish seed, installing equipment, predator exclusion, maintenance, harvesting, and selling shellfish, any of which may establish that a tideland is being used as a bona fide shellfish farm." Dkt. 209, p. 7. There are, however, no documents before the Court which establish that anything was done on Parcel 70 that could be considered sustained commercial production.

With regard to the ledger, one column of the ledger is titled "# bag" and below that "est. 523" in 1995. The next line documents a harvest but does not provide a date. Chelsea Farms concludes that the information on the ledger means that it planted oyster seed on Parcel 70 in July 1995 and that a harvest occurred in 1997. Dkt. 209, p. 9, l. 1 – 3. The Court cannot reach the same conclusion. There is no specific date associated with the "est. 523" bags to support a conclusion that anything was done prior to August 28, 1995.

The Treaty Tribes assert that the lack of a commercial harvest on Parcel 70 prior to August 28, 1995 is fatal to Chelsea Farms claim. However, the Court concludes that Chelsea Farms has failed to provide documentary evidence containing facts sufficient to support the conclusion that Parcel 70 was used for sustained commercial production of shellfish during some portion of the time between January 1, 1985 and August 28, 1995.

**Conclusion regarding Section 2(B)(ii):** The undersigned concludes that Chelsea Farms has failed to meet the requirements of Section 2(B)(ii) and is not entitled to Intervenor status with regard to Parcel 70 pursuant to that section.

1    **Conclusion:**  Chelsea Farms has failed to meet the requirements of the Settlement

2    Agreement and is not entitled to Intervenor status with regard to Parcel 70.

3                              **Chelsea Farms – Parcel 92**

4    **Coverage Request.**  Chelsea Farms seeks Intervenor status pursuant to Section 2(C)

5    because it is a successor to a person whose tidelands could have qualified under Section 2(B)(ii).

6    In order to qualify for Intervenor status Chelsea Farms must show the following:  (1) Chelsea

7    Farms acquired the right to harvest the tidelands between August 28, 1995 and March 1, 2008

8    from a person whose tidelands would have been eligible to become covered tidelands, (2) on or

9    before the date Chelsea Farms seeks to intervene it had an active AFR for commercial

10   shellfishing and a DOH certification for those tidelands, and (3) Chelsea Farms must file

11   documentary evidence establishing that those tidelands were used for sustained commercial

12   production of shellfish during some portion of the time between January 1, 1985 and August 28,

13   1995.

14       **Disputed Issues.**  The Treaty Tribes assert that Chelsea Farms did not have an active

15   AFR or DOH certification for Parcel 92 prior to March 1, 2008 and they argue that Chelsea

16   Farms has failed to establish that a prior shellfish grower used Parcel 92 for sustained

17   commercial production during some portion of the time between January 1, 1985, and August

18   28, 1995.

19       **Treaty Tribes' Motion to Strike.**  The Court reserved ruling (*See* Dkt. 290, p. 18)

20   regarding the Treaty Tribes' motion to strike Exhibits B through D and Exhibit F (as well as

21   associated paragraphs 12 – 16 and 18 – 20) of the Declaration of G. Pat Robinson (the General

22   Manager of the Manke Oyster Company from 1988 until 1995), found at Dkt. 116.  The Treaty

23   Tribes objected to the exhibits and related testimony on the grounds that they were not timely

24

1    filed by Chelsea Farms.   The parties were given an opportunity to present this issue during oral

2    argument which was held on May 19, 2016.

3        Chelsea Farms notes that the exhibits were all timely filed, that is they were filed on

4    March 1, 2008, but also admits that they were not filed by Chelsea Farms in support of their

5    request for Intervenor status for Parcel 92.  Rather, the exhibits were filed in C70-9213,

6    Subproceeding No. 89-3 under Dkt. 14518 which is the Motion of Dale Hall/Manke Lumber Co.,

7    Inc. to Participate in Shellfish Settlement.  The issue is whether the Court should consider

8    documents that were not timely filed in support of Chelsea Farms' motion for intervention, but

9    were instead timely filed by a different Grower, Dale Hall/Manke Lumber Co., who is also

10   seeking Intervenor status.

11       Chelsea Farms asserts that there is no prejudice to the Treaty Tribes by allowing cross-

12   references to such timely filed documents because the Treaty Tribes were notified, in Chelsea's

13   original filing,  that it was asserting intervenor status under Section 2(C).  It is clear that reliance

14   on this section means that Chelsea Farms would necessarily rely on documents created by an

15   entity other than Chelsea Farms.  Chelsea Farms also asserts that failure to consider such

16   documents would have the effect of invalidating a legitimate claim based on evidence that was

17   timely filed, but just not filed by the particular Grower.

18       The Treaty Tribes assert that Chelsea Farms' failure to file these documents in support of

19   its claim is in violation of the terms of the Settlement Agreement.  They also point out that the

20   Treaty Tribes should not have to wait for the dispute resolution process in order to be provided

21   the documents upon which Chelsea Farms relies.

22       As noted by Judge Martinez in his Order Denying Suquamish Tribe's Motion to Deny

23   A&K Trust's Request for Intervenor Status,

24       [p]ursuant to the Settlement Agreement and a subsequent stipulation regarding

its implementation, other shellfish growers who meet the conditions set forth in the Settlement Agreement could become Intervenors and be bound by the terms of the Settlement Agreement by filing a Notice and Request for Intervention on or before March 1, 2008.  Such Notice **must include documentation** which would establish that the requirements for Intervenor status set forth in the Settlement Agreement had been met.  Settlement Agreement, ¶¶ 2(B), 2(C).

Subproceeding 89-00003, Dkt. 14572, p. 2.  (emphasis added).

Judge Martinez went on to note that "[t]he designation of beds as 'staked and cultivated' within the language of the Shellfish Proviso is in derogation of the Tribes' treaty right to harvest shellfish at their usual and accustomed places.  Therefore, any provision regarding that designation, including the Tribes' agreement in the Settlement Agreement, must be strictly construed."  *Id.* at p. 5.

The Settlement Agreement requires any person who requests the right of intervention to file and serve copies of the documents which establish their compliance with the terms of the Settlement Agreement and this must be done on or before March 1, 2008.  This requirement also makes practical sense in light of the significant number of parcels for which intervention was sought.  The fact of giving "notice" that Chelsea Farms would be relying on the records of a different Grower for the purpose of establishing sustained commercial production does not meet the requirements of the Settlement Agreement.  This Court concludes that the documents upon which a Grower relies must have been timely filed by the Grower seeking Intervenor status – in this case, Chelsea Farms.  This construction is what is required by the Settlement Agreement and recognizes the requirement that the terms and conditions of Settlement Agreement be strictly construed.  The issue of prejudice, or lack thereof, was not a factor provided for in the Settlement Agreement and cannot be a consideration added by this Court.

Chelsea Farms did not timely file the documents at issue and therefore the Court GRANTS the Treaty Tribes' motion to strike Exhibits B through D and Exhibit F as well as the associated paragraphs 12 – 16 and 18 – 20 of the Declaration of G. Pat Robinson.  Dkt. 116.

The Treaty Tribes moved to strike Exhibit A attached to the Declaration of Joel Manke, Corporate Secretary for Manke Timber Company and Timber Operations Manager for Manke Lumber Company.  Dkt. 211-1, pp. 1 – 21.   Exhibit A contains portions of Manke Oyster Company's ledger from 1988 through 1992.  The Treaty Tribes assert that Exhibit A was not timely filed by Chelsea Farms and therefore should not be considered by the Court.

According to Joel Manke, Exhibit A "was previously submitted with Manke's Notice and Request for Intervention and Inclusion in Settlement Agreement, filed with the Court on March 1, 2008."  Dkt. 211, p. 2.  Chelsea Farms filed Exhibit A on May 23, 2014.  Exhibit A was not timely filed.  The Court GRANTS the Treaty Tribes' motion to strike Exhibit A as well as any testimony contained in Mr. Manke's Declaration that explains or relies on Exhibit A.  Specifically, the Court is striking all of paragraph 5 of Mr. Manke's Declaration.  Dkt. 211, p. 2.

**Facts:**  On June 4, 1996 Chelsea Farms entered into a ten year "Tidelands Lease" with Charles and Judi Manke for "[t]idelands adjacent to property at 6606 Young Road NW Olympia, Washington."  According to Joel Manke, "[t]here are three parcels owned by Manke that are leased by Chelsea Farms.  Those parcels, Parcels 92, 95 and 96, are known as the 'Manke Home' beach, and are located in Eld Inlet.  The Manke Home beach was our only active commercial shellfish beach in Eld Inlet."  Dkt. 211, p. 2.  Mr. Manke also confirmed that "Manke Oyster Company operated a shellfish farm on the Manke Home parcels including Parcel 92."  *Id.*  This testimony was confirmed based on the video taken by G. Pat Robinson, discussed below.

Mr. Lentz, owner of Chelsea Farms, testified that Parcel 96 is solely tidelands while two other parcels are mostly upland parcels with some tidelands.  Dkt. 121, p. 3, ¶9.  The Court

notes that there appears to be a typographical error in Mr. Lentz's declaration regarding which parcel is solely tidelands and which has some tidelands, but that is not a significant discrepancy with regard to the issue before the Court.  What is clear from this testimony is that the three parcels are adjacent to each other, were always considered to be one farm and were in fact all leased to Chelsea Farms under the same lease.

**Aquatic Farm Registration.**   Exhibit B-4 (Dkt. 209-2, pp. 10 – 14) contains the documents relied on by Chelsea Farms to show that it had an active AFR for commercial shellfishing for Parcel 92.  The AFR was issued to Chelsea Farms on February 17, 2005 under Registration #8517.  Dkt. 209-2, p. 10. The AFR does not identify the parcels which it covers. However, WDFW prepared a listing of parcels controlled by Chelsea Farms as of August 2, 2006.  This listing includes a registration number as well as name of the property owner.  A property listed as owned by Charles & Judith Manke has the registration number of 8517-18. Dkt. 209-2, p. 12.  This registration number is tied to the Manke Home beach through the February 22, 2005 AFR form filed by Chelsea Farms for 8517-18 which also identifies the aquatic farm as being owned by Manke and located in Eld Inlet.  Dkt. 209-2, p. 14.  According to the testimony of G. Pat Robinson, the Manke Home beach is the only beach Manke owned in Eld Inlet.  Dkt. 116, p. 3.  The undersigned concludes that the documents identified above along with the descriptive testimony sufficiently shows that Chelsea Farms had an active AFR for Parcel 92 on or before the date it sought to intervene.

**DOH Certificate.**  Chelsea Farms relies on its DOH Certificate (Dkt. 209-1, p. 22, Exhibit A-10) and a Harvest Site Certificate (Dkt. 209-2, p. 15) in support of its claim that it had an active DOH certificate for the tidelands on or before the date it sought to intervene.  The DOH Certificate was issued to Chelsea Farms on August 20, 2007 under Washington Cert. No. WA-0676-SS and was applicable to seven general locations, including Eld Inlet.  With regard to the

1  Manke Home beach, the Harvest Site Certificate identifies the "Harvest Site Owner/Address" as

2  6606 Young Road NW, which is the same address on the lease.  It also lists just one site number,

3  which is the site number for Parcel 95.  The Treaty Tribes assert that the reference to only one

4  site number is insufficient to show that the DOH certificate was for Parcel 92.  However, in light

5  of the fact that the Court accepted the testimony of both Joel Manke and John Lentz that the

6  lease covered the three parcels, that they were always treated as one farm and are adjacent to

7  each other, the undersigned concludes that the documents filed with the court and the

8  explanatory testimony accepted by the Court show that Chelsea Farms had an active DOH for

9  the tidelands on or before the date it sought to intervene.

10      **Sustained Commercial Production.**  In light of the Court's ruling above regarding

11  exclusion of the attachments to the declarations of Pat Robinson and Joel Manke, there are no

12  written documents before the Court which show sustained commercial production as required by

13  the Settlement Agreement.  However, there remains one "document" for consideration by the

14  Court and that is the video which was provided as part of Exhibit A, attached to the Declaration

15  of G. Pat Robinson.  Dkt. 116-1.  Having reviewed the video several times, the Court concludes

16  there was sustained commercial production on what has been referred to as the Manke Home

17  beach, adjacent to 6606 Young Road NW, Olympia, WA.

18      The 1994 video and narrative by G. Pat Robertson, which video was taken prior to this

19  litigation and without regard to this litigation, shows extensive shellfish farming activity as well

20  harvest on the tidelands adjacent to the Charles Manke home in 1994.  Accompanying the video

21  is a Declaration of G. Pat Robinson signed April 17, 2007.  Dkt. 116-1, p. 2 – 3.  Unfortunately,

22  the times shown on the declaration did not correlate to the time shown on the video when viewed

23  by the Court.  So, references to times will be based on what was viewed by the Court. Starting at

24  the 34:03 the video showed bags of oysters that were going to be placed out the next day and,

1  according to Mr. Robinson's narrative, the video showed "half of what is left on the ground" and

2  that it "will carry us through until we get more seed broken down and more bags filled up."

3  According to Mr. Robinson's narrative and as seen on the video, there were bags of oysters that

4  were knocked off the racks following a difficult winter and the plan was to start placing them

5  back on the racks the next day.  The video showed an extensive beach area and Mr. Robinson

6  commented that the beach continued another 800 feet past what could be seen on the video.  He

7  also noted that about half of the oyster bags were in deeper water and were covered up by the

8  water.  At 1:22:10, the video also shows harvesting that had occurred on the beach as there were

9  a number of buckets filled with oysters.    The undersigned concludes that the video sufficiently

10  documents sustained commercial production in this instance.

11      **Conclusion:** The Court concludes that Chelsea Farms has provided sufficient

12  documentary evidence, along with admissible explanation, to GRANT its request for Intervenor

13  status with regard to Parcel 92.

14                              **G&R Quality Seafood – Parcel 110**

15      **Coverage Request.**  G&R Quality Seafood seeks Intervenor status pursuant to Section

16  2(C) because it is a successor to a person whose tidelands could have qualified under  Section

17  2(B)(ii).  In order to qualify for Intervenor status, G&R Quality Seafood must show the

18  following:  (1) it acquired the right to harvest the tidelands between August 28, 1995 and March

19  1, 2008 from a person whose tidelands would have been eligible to become covered tidelands;

20  (2) on or before the date G&R Quality Seafood seeks to intervene it had an active AFR for

21  commercial shellfishing and a DOH certification for those tidelands; and (3) G&R Quality

22  Seafood must file documentary evidence establishing that those tidelands were used for sustained

23  commercial production of shellfish during some portion of the time between January 1, 1985,

24  and August 28, 1995.

**G&R Quality Seafood.**  On March 1, 2008, when G&R Quality Seafood filed its motion for intervention, it was represented by Perkins Coie LLP.  On May 11, 2012 the Treaty Tribes filed their "Motion for Order Denying Requests for Intervention and Coverage in Shellfish Settlement Agreement" with respect to a number of parcels, including Parcel 110.  Subsequently a new firm, Plauché & Stock LLP (now Plauché & Carr LLP) filed an Opening Brief (Dkt. 215) submitted on behalf of G&R Quality Seafood and Anne-Marie Nylund.

The Court notes, however, that G&R Quality Seafood is no longer in business and it has chosen not to pursue its motion for intervention.   Counsel for Anne-Marie Nylund has had no contact with G&R Quality Seafood, which, as of March 1, 2011, was an inactive corporation in Washington State.  *See* Dkt. 20209, Declaration of Dave Steele, and Dkt. 20210, Declaration of Terri A. Tyni.

It is unclear to the Court how an inactive corporate entity has any legal presence in this litigation as it no longer exists.  It is further unclear to the Court how counsel from Plauché & Carr, who represent Ann-Marie Nylund, has authority to represent a non-existent corporation with which it has had no contact.  The Court can only conclude that G&R Quality Seafood has abandoned its request for intervention and that it is not entitled to Intervenor status with regard to Parcel 110.

**Motion for Joinder by Anne-Marie Nylund.**  On November 7, 2012, the Puget Sound Shellfish Growers Legal Defense Fund, Inc. filed a motion requesting an order joining Anne-Marie Nylund as a party intervenor.   Dkt. 20208 in C70-9213.  Ms. Nylund requests joinder as a party pursuant to Fed. R. Civ. P. 19(a).  The Court notes that the request is to join as a party and not to substitute for G&R Quality Seafoods.  Ms. Nylund asserts that she meets the requirements of joinder as she owns Parcel 110 and disposing of the action in her absence may, as a practical

1   matter impair or impede her ability to protect her interests.  The Court GRANTS the request to

2   join this litigation as a party.

3          In light of the fact that Ms. Nylund is joining as a party, she is required to meet the terms

4   of the Settlement Agreement in order to be considered an Intervenor as she has no authority to

5   step into the shoes of an unrelated, separate and inactive corporate entity that has abandoned its

6   claim.

7          First, the Court notes that there is no evidence before it that Ms. Nylund is a member of

8   the Puget Sound Shellfish Growers Legal Defense Fund, Inc.  Membership in this defense fund

9   is a requirement for anyone who seeks coverage under the Settlement Agreement.

10         Ms. Nylund faces several additional obstacles in order to proceed along the same route

11  initially identified by G&R Quality Seafoods – that is, coverage requested under Section 2(C).

12  First, since she is requesting to join as a party, she has to meet the requirements of the Settlement

13  Agreement.  In order to proceed under Section 2(C), she had to file a motion to intervene on or

14  before March 1, 2008.  She did not do so.  The Court understands that as of March 1, 2008

15  circumstances were such that she did not need to intervene on her own.  However, there is no

16  exception in the terms of the Settlement Agreement in Section 2(C) for the circumstances faced

17  by Ms. Nylund with regard to the time to file.  Even if the March 1, 2008 deadline did not, for

18  some reason, apply to Ms. Nylund, the Settlement Agreement also required her to file her own

19  AFR for commercial shellfishing and her own DOH certification for those tidelands.  She did not

20  do so.  She cannot rely on a G&R Quality Seafoods AFR or DOH certificate as she is pursuing

21  coverage under Section 2(C) in her capacity as a separate party.  She has failed to meet the

22  requirements for intervention under Section 2(C).

23         It does appear that Section 2(E) of the Settlement Agreement comes close to recognizing

24  the circumstances faced by Ms. Nylund and could permit her intervention.  However, she has not

1   complied with the terms of Section 2(E) which require that she file a copy of her own AFR for

2   commercial shellfishing and her own DOH certification for those tidelands.  Ms. Nylund has not

3   filed either document.  She has failed to meet the requirements for intervention under Section

4   2(E).

5       **Conclusion Regarding Anne-Marie Nylund.**  The Court GRANTS Anne-Marie

6   Nyland's Motion to Intervene (Dkt. 20208 in C70-9213) but also concludes that Anne-Marie

7   Nylund has failed to comply with the terms of the Settlement Agreement and is not entitled to

8   Intervenor status with regard to Parcel 110.

9       **Conclusion Regarding G&R Quality Seafood.**  The Court concludes that G&R Quality

10  Seafood has abandoned its claim and is therefore not entitled to Intervenor status with regard to

11  Parcel 110.

<h3 style="text-align:center">Navy Yard Oyster – Parcel 390</h3>

13      **Coverage Request:**  Navy Yard Oyster seeks Intervenor status pursuant to Section 2(C)

14  because it is a successor to a person whose tidelands could have qualified under Section 2(B)(ii).

15  In order to qualify for Intervenor status, Navy Yard Oyster must show the following:  (1) it

16  acquired the right to harvest the tidelands between August 28, 1995 and March 1, 2008 from a

17  person whose tidelands would have been eligible to become covered tidelands; (2) on or before

18  the date Navy Yard Oyster seeks to intervene it had an active AFR for commercial shellfishing

19  and a DOH certification for those tidelands; and (3) Navy Yard Oyster must file documentary

20  evidence establishing that those tidelands were used for sustained commercial production of

21  shellfish during some portion of the time between January 1, 1985, and August 28, 1995.

22      **Disputed Issues.**  The Treaty Tribes assert that Navy Yard Oyster has failed to meet any

23  of the above requirements for intervention coverage with the exception of the DOH certification

24  requirement.

1    **Lease of Property:**  Navy Oyster Yard was founded in 2002 and is owned by Karen

2    Moran and her son, Joel Manke.  Dkt. 107, p. 1.  On June 12, 2002, George and Sharon

3    Kargianis leased property to Karen Kargianis Moran and Joel Manke for a period of five years.

4    Dkt. 107, p. 7 - 8.  The purpose of the lease was to allow Karen Moran and Joel Manke "to

5    conduct and operate a shellfish farming and harvesting operations on said tidelands and the doing

6    of any and all things necessary for the furtherance of said purpose, including but not limited to

7    having access and use up to the uplands as may be necessary for the conducting of said

8    business."  Dkt. 107, p. 7.  The lease referenced "Exhibit A attached hereto" as containing a

9    description of the land covered by the lease.  Unfortunately, no Exhibit A has been filed with the

10   Court.

11         Joel Manke testified that the lease was "for all of the tidelands owned by my

12   grandparents, Sharon and George Kargianis."  Dkt. 107, p. 2.

13         George Kargianis testified that the lease was for "Mason County tax parcel numbers

14   22222-22-90180 and 22219-50-00016."  Dkt. 108, p. 2.  Parcel 22222-22-90180 is Parcel 390,

15   which is the parcel currently under consideration by the Court.  Parcel 22219-50-00016 is Parcel

16   390.1, which is not currently before the Court.

17         According to George Kargianis, he and his wife purchased "the tideland property

18   identified as Mason County tax parcel number 22219-50-00016" (Parcel 390.1) on June 27,

19   2000.  Dkt. 108, p. 2.  The Statutory Warranty Deed attached to his declaration identifies "Parcel

20   2" as including parcel numbers 22219-50-00016, 22219-50-00017 and 22219-50-00018 (Parcel

21   390).  Dkt. 108, p. 6.

22         A Harvest Site Certificate dated September 30, 2008 (Dkt. 221-1, p. 15) shows that

23   George and Sharon Kargianis owned three tax parcels in Hood Canal #7 (22219-50-00016,

24   22219-500-00017 and 22219-50-00018 (Parcel 390)) – which are the same tax parcels identified

in the 2000 Statutory Warranty Deed just discussed above.  The Harvest Site Certificate also shows Parcel 390 owned by George and Sharon Kargianis, located in Hood Canal #8, with an address of 14771 E. SR 106.  The address on this Harvest Site Certificate is the same address shown for Parcel 390 on Dkt. 221-1, p. 2, which shows the location of the harvest site for which intervention is sought.  The address attached to this site is 14771 E. State Rt. 106, Belfair, WA 98528.

Having reviewed all the documents in detail, the Court concludes that there is no true conflict between the testimony of George Kargianis, that he leased two properties to his daughter and grandson, and Joel Manke, who testified that the lease covered all of his grandparents tidelands.  Both George Kargianis and Joel Manke agree that the lease in fact covered Parcel 390 and there is nothing before the Court that would reasonably lead to a different conclusion.

The Court concludes that the timely filed documents, along with the appropriate explanatory testimony, provide sufficient indicia to conclude that the 2002 lease did in fact include Parcel 390.

**Aquatic Farm Registration.**  Navy Yard Oyster's AFR is dated January 21, 2003 (Dkt. 221-1).  In addition, Navy Yard Oyster filed its AFR form dated May 7, 2004.  Dkt. 221-1, p. 12. In the section requesting "Property Information" George and Sharon Kargianis are shown as the property owners.  In light of the Court's conclusion regarding the lease, the Court also concludes that Navy Yard Oyster has provided documentary evidence to support the conclusion that it had an active AFR for Parcel 390.

**Sustained Commercial Production.**  Navy Yard Oyster is required, by the Settlement Agreement, to file "documentary evidence establishing that those tidelands were used for sustained commercial production of shellfish during some portion of the time between January 1, 1995 and August 28, 1995."  *See* Section (2)(B)(ii).

1        The only documentary evidence filed by Navy Yard Oyster, to show sustained

2   commercial production, is a ledger sheet with a date of August 17, 1995, which shows the

3   corporate seal for a separate and unrelated company, Taylor United, Inc.  Dkt. 221-1, p. 16.

4   George Kargianis testified in his declaration that this document is a "bill of sale for Manila clams

5   that Canal Fresh Seafood sold to Taylor United, Inc., on August 17, 1995."  Dkt. 108, p. 2.

6   While this document does not appear to this Court to be a "bill of sale," it does reflect a sale of

7   Manila clams by Canal Fresh Seafood to Taylor United.  Canal Fresh Seafood was owned by

8   George Kargianis and his wife, which they established around 1986.  Dkt. 108, p. 2.

9        Navy Yard Oyster asserts that this evidence of one sale of Manila clams is also evidence

10  of a harvest of Manila clams, which is "evidence of the final step of sustained commercial

11  shellfish production."  Dkt. 221, p. 5.  However, there is no documentary evidence before the

12  Court which supports the conclusion that Canal Fresh Seafood did anything other than harvest

13  Manila clams.

14       Navy Yard Oyster asserts that "[t]he growing and cultivation of shellfish is a complex,

15  multi-year process that includes, among other things, planting shellfish seed, installing

16  equipment, predator exclusion, maintenance, harvesting, and selling shellfish, any of which may

17  establish that a tideland is being used as a bona fide shellfish farm."  Dkt. 221, p. 5.  The Court

18  does not agree that one sale of shellfish is sufficient to establish "sustained commercial

19  production."  At this point, however, the Court does not decide what additional tasks are required

20  in order to show sustained commercial production as Navy Yard Oyster has presented no

21  evidence pertaining to "sustained commercial production" other than one sale of Manila clams.

22       As noted by Judge Rafeedie, the terms used in the Shellfish Proviso were "intended only

23  to exclude Indians from artificial, or planted, shellfish beds; they neither contemplated nor

24  desired that the Indians would be excluded from natural shellfish beds."  *United States v.*

*Washington,* 873 F. Supp. 1422, 1441 (W.D. Wash. 1994) (*Shellfish I*).  Navy Yard Oyster has not filed any documentary evidence regarding any other steps taken by Canal Fresh Seafood that would distinguish a harvest from a natural bed of clams, to which the Treaty Tribes have fishing rights, from an artificial bed of clams.   The Settlement Agreement did not change the distinction between artificial beds and natural beds.

The stated purpose of the Settlement Agreement was to resolve disputes "regarding implementation of the Tribes' treaty right to take shellfish from lands owned or leased by the Growers."  Sub-Proceeding 89-03, Dkt. 14476, p. 10.  To extinguish ancient fishing rights, Navy Yard Oyster must comply with each specific requirement of the Settlement Agreement – which it has failed to do.

**Conclusion:**  Navy Yard Oyster failed to timely file documentary evidence which established sustained commercial production on Parcel 390 for the relevant time period.  Navy Yard Oyster has, therefore, failed to comply with the terms of the Settlement Agreement and is not entitled to Intervenor status with regard to Parcel 390.

### Joe Leonard Oyster Company – Parcels 231 and 234

**Coverage Request.**  Joe Leonard Oyster Company seeks Intervenor status pursuant to Section 2(B)(i) or Section 2(B)(ii).  In order to qualify for Intervenor status under either Section 2(B)(i) or 2(B)(ii), Joe Leonard Oyster Company must show that on or before August 28, 1995, it owned, leased from a private party, or otherwise had a right to commercial harvests of shellfish from tidelands in Washington State.  To be covered under Section 2(B)(i), Joe Leonard Oyster Company must also show that on or before August 28, 1995 it had an active AFR and DOH certification for commercial shellfishing from those tidelands.  In order to qualify for coverage under Section 2(B)(ii), Joe Leonard Oyster Company must also show that (1) on or before the date it sought to intervene it had an active AFR and DOH certification for those tidelands and (2)

1  it must file documentary evidence establishing that those tidelands were used for sustained

2  commercial production of shellfish during some portion of the time between January 1, 1985,

3  and August 28, 1995.

4      **Disputed Issues.**  The Treaty Tribes assert that Joe Leonard Oyster Company has failed

5  to provide documentary evidence of an active AFR or DOH certification and that it has failed to

6  provide documents showing sustained commercial production during the relevant time.

7      **Facts.**  Joe Leonard Oyster Company was established in the late 1930's and is currently

8  being operated by the original founder's grandson, Gary L. Mazzoncini.  With regard to Parcel

9  231, Mr. Mazzoncini leased this parcel from its owner, Catherine Street, on January 5, 1994.

10  Pursuant to the lease, Joe Leonard Oyster Company was allowed to harvest marketable oysters

11  from the tidelands and was also allowed to do necessary work to keep the tidelands in condition

12  for raising and harvesting shellfish.  Dkt. 217-1, p. 1.

13      With regard to Parcel 234, Mr. Mazzoncini leased this parcel from its owner, Norman

14  Walter, on March 9, 1994.  Pursuant to the lease, Joe Leonard Oyster Company was allowed to

15  harvest marketable oysters from the tidelands as well as to do necessary work to keep the

16  tidelands in condition for raising and harvesting shellfish.  Dkt. 217-2, p. 1.

17      According to Mr. Mazzoncini, Parcels 231 and 234 are adjacent to each other and are in

18  the Hamma Hamma River Delta in central Hood Canal in Aquaculture District 42D.  All of the

19  aquatic farms operated by Joe Leonard Oyster Company are, in fact, located in Aquaculture

20  District 42D.

21      **DOH Certification under Section 2(B)(i).**  Joe Leonard Oyster Company's Application

22  for Shellfish Operation License and Certificate of Approval was approved by Frank Cox, a

23  Washington State employee with the Department of Health, on September 9, 1994 (Dkt. 81, p.

24  30), which is the same date shown on the Certificate (Dkt. 217-1, p. 36).  In section 8 of the

application, and in response to the requirement to provide the "Specific Harvest Area Location(s) and size: (include USCGS map or nautical chart showing each area – attach additional page if needed)", Mr. Mazzoncini identified two harvest areas, one of which was: "Area Name:  Hood Canal #5; Location: Hamma Hamma River Delta; and Size in Acres: 10".  Dkt. 81, p. 30. According to the Declaration of Frank Cox (Dkt. 75, p. 3), Joe Leonard Oyster Company was "cultivating approximately 10 acres in the Hamma Hamma River Delta **at that time**." (emphasis added).  It is unknown if a map or nautical chart was attached, as directed, as neither a map nor a nautical chart have been filed with the Court.

Joe Leonard Oyster Company had a lease with DNR for Parcel 20009956 for tidelands located in the Hamma Hamma River Delta since 1995.  The Harvest Site Certificate from the Department of Health identifies the area of the DNR lease for Parcel 20009956 as being 10 acres.  Dkt. 14509, p. 42 filed in subproceeding 89-00003.  These 10 acres appear to the Court to be the same 10 acres identified by Mr. Mazzoncini in the 1994 application.  The Court also notes that Mr. Mazzoncini did not testify that the application specifically covered either Parcel 231 or 234.  Rather, he testified only that when he submitted the application in July 1995 that he already had the lease for Parcel 231 from Catherine Street.  Dkt. 81, p. 3.

Even though Joe Leonard Oyster Company had a lease for the Parcels 231 and 234 prior to the company obtaining its DOH certificate, it appears to the Court that Joe Leonard Oyster Company did not include the two parcels on the September 9, 1994 Application for Shellfish Operation License and Certificate of Approval.  Further, the only other evidence before the Court as to when Parcel 231 was certified is found in the Harvest Site Certificate which shows a certification date of March 5, 2002 and the certification date for Parcel 234 is March 28, 2002. Dkt. 14509, p. 42 filed in subproceeding 89-00003.  The Court understands that Joe Leonard Oyster Company's attorney, Robert Smith, has raised questions regarding the accuracy of the

1   dates shown on the DOH certificates[2], but no documents have been filed for either Parcel 231or

2   234 which shows certification prior to August 28, 1995, as required by the Settlement

3   Agreement.

4        The Court notes that the Treaty Tribes have not objected to the DNR Parcel 20009956

5   and it has been given intervenor status by agreement.

6        **Aquatic Farm Registration:**  The Department of Fisheries issued an AFR (No. 8117) to

7   Joe Leonard Oyster Company on June 13, 1986 (Dkt. 217-1, p. 10) based on an AFR form dated

8   June 13, 1986 (Dkt. 217-1, p. 11) for property that was owned by Joe Leonard Oyster Company.

9   Joe Leonard Oyster Company did not have any interest in Parcels 231 and 234 until January and

10  March 1994, respectively, almost eight years after Joe Leonard Oyster Company obtained its

11  AFR.

12       Joe Leonard Oyster Company asserts that the tidelands first obtained in 1994 are

13  automatically covered under the 1986 AFR.  As noted above, this Court has concluded that there

14  is no automatic coverage for after-acquired tracts.  There must be some indicia that the pre-

15  existing AFR was for commercial shellfishing from those tidelands – in this case Parcels 231 and

16  234.  Joe Leonard Oyster Company has not provided any indicia that the 1986 AFR covered

17  these two parcels.

18       **Conclusion re: Section 2(B)(i).**  The Court concludes that Joe Leonard Oyster Company

19  has failed to provide sufficient documentary evidence to show that it had an active DOH

20  Certificate for either Parcel 231 or 234 on or before August 28, 1995 or that it had an active AFR

21  for either Parcel 231 or 234.  It has not complied with the terms of the Settlement Agreement and

22

23

24       [2] Joe Leonard Oyster Company asserts that the date shown in the Harvest Site Certificate "only describes
     the date upon which DOH confirmed in its database that it was included under the existing certification."  Dkt. 309,
     p. 5, Joe Leonard Oyster Company's Reply.

1   therefore is not entitled to Intervenor status under Section 2(B)(i) with regard to Parcel 231 or

2   234.

3      **Requested Coverage under Section 2(B)(ii):**  As noted above, in order to have

4   Intervenor status under Section 2(B)(ii), Joe Leonard Oyster Company must show that on or

5   before the date it sought to intervene that it had (1) an active AFR for commercial shellfishing

6   and a DOH certification for those tidelands by March 1, 2008 and (2) it must file documentary

7   evidence establishing that those tidelands were used for sustained commercial production of

8   shellfish during some portion of the time between January 1, 1985, and August 28, 1995.

9      **Parcel 231 - AFR.**  Joe Leonard Oyster Company filed, on January 21, 2009, an Aquatic

10  Farm Registration for Parcel 231 signed by Gary L. Mazzoncini on July 17, 2008.  *See* sub-

11  proceeding 89-03, Dkt. 14609, p. 9.  This document was not filed on or before March 1, 2008

12  and therefore was not timely filed.  Pursuant to this Court's prior ruling, documents that are not

13  timely filed will not be considered by the Court.  Even if it were to be considered, however, the

14  only thing that is certain is the date of the document – which is after the March 1, 2008 deadline.

15  The document itself states that it is both "[a]dding site to existing registration" and also that the

16  site had previously been registered with the WDFW.  As noted above, there is no evidence

17  before the Court as to when the site was previously registered.  If Joe Leonard Oyster is relying

18  on an automatic coverage once the tidelands were obtained, then that argument has already been

19  dismissed by the Court.

20     The Court concludes that there is no timely documentary evidence before the Court to

21  show that Joe Leonard Oyster Company had an active AFR for Parcel 231 on or before March 1,

22  2008.

23     **Parcel 234.**  Joe Leonard Oyster Company has not timely filed any documents which

24  show that on or before March 1, 2008 it had an active AFR for Parcel 234.

**Conclusion re: Section 2(B)(ii).**  The Court concludes that Joe Leonard Oyster Company has failed to provide sufficient documentary evidence to show that it had an active AFR for either Parcel 231 or 234 on or before the date it sought to intervene.   In light of the fact that Joe Leonard Oyster Company has not meet the condition of having an active AFR for the two parcels,  it is not necessary for the Court to address the issue of sustained commercial production. Joe Leonard Oyster Company  has not complied with the terms of the Settlement Agreement and therefore is not entitled to Intervenor status under Section 2(B)(ii) with regard to Parcels 231 and 234.

**Conclusion:** The Court concludes that Joe Leonard Oyster Company has failed to comply with the terms of the Settlement Agreement and is not entitled to Intervenor status with regard to Parcels 231 and 234.

### Sunrise Marine – Parcel 563

**Coverage Request.**  Initially Sunrise Marine sought Intervenor status under Section 2(C) because it is a successor to a person whose tidelands could have qualified under either Section 2(B)(i) or Section 2(B)(ii).  However, at oral argument on June 7, 2016, counsel advised the Court that Sunrise Marine was no longer pursuing Intervenor status through Section 2(B)(i) but rather was only seeking coverage under Section 2(C) and Section 2(B)(ii).  Therefore, in order to qualify for Intervenor status Sunrise Marine must show the following:  (1) it acquired the right to harvest the tidelands between August 28, 1995 and March 1, 2008 from a person whose tidelands would have been eligible to become covered tidelands; (2) on or before the date Sunrise Marine seeks to intervene it had an active AFR for commercial shellfishing and a DOH certification for those tidelands; and (3) Sunrise Marine must file documentary evidence establishing that those tidelands were used for sustained commercial production of shellfish during some portion of the time between January 1, 1985, and August 28, 1995.

**Disputed Issues.**  The Treaty Tribes assert that Sunrise Marine has failed to timely file documentary evidence of an active AFR or DOH certification for Parcel 563 or of sustained commercial production of shellfish from Parcel 563 for some portion of the time between January 1, 1985, and August 28, 1995.

**Motion to Strike (Dkt. 325).**  The Treaty Tribes ask this Court to strike the February 8, 2016 Declaration of David Steele (Dkt. 305) in its entirety.  In his Declaration, Mr. Steele, Treasurer of the Puget Sound Shellfish Growers Legal Defense Fund, attached a survey (Exhibit A, Dkt. 305-1, p. 2 – 3) for two parcels which he states are located immediately north of Parcel 563.  He testified that "[i]t demonstrates that the line of ordinary high water is above the government meander line; therefore, the upland parcels include tidelands that **could** be used for shellfish aquaculture."  Dkt. 305, p. 2, ¶3 (emphasis added).   According to Mr. Steele, Exhibit B (Dkt. 305-2, p. 2) is a survey of parcels owned by Shirley Wang, the owner of Sunrise Marine.  He identifies "Parcel E" as being Parcel 563 and he concludes that "the survey shows that the eastern boundary of Parcel 563 is the government meander line."  Finally, Exhibit E (Dkt. 305-3, p. 2), identified as a "composite map," was created by Mr. Steele.  Based on this "composite map" Mr. Steele concludes that Parcel 563 "includes tidelands that **can** be used for shellfish aquaculture."  Dkt. 305, p. 2, ¶ 5 (emphasis added).

The Treaty Tribes argue that the exhibits are new documents and that Mr. Steele's testimony is based on these new documents that were not timely filed.  Therefore, they should not be considered by the Court.

Sunrise Marine asserts that these new documents were filed in response to a new argument asserted by the Treaty Tribes.  Specifically, in their Response (Dkt. 257), the Treaty Tribes made this Court aware of the "Supplemental Filing of Shirley Wang/Sunrise Marine Incorporated to Participate in Shellfish Settlement" filed in subproceeding 89-0003, Dkt. 14597

filed on November 26, 2008.  In that supplemental filing, Shirley Wang admitted that Parcel 563 (identified as parcel 12917130600) is an upland parcel and was "not farmed."  The Court does not consider this to be a "new argument" by the Treaty Tribes.  Rather, the Treaty Tribes made this Court aware of an admission made by Shirley Wang/Sunrise Marine – something Sunrise Marine has known of for over seven years.  This is not a new fact or issue raised for the first time, but rather an old admission made by Sunrise Marine.  For this reason alone, the Court GRANTS the Treaty Tribes' motion to strike the declaration of Mr. Steele.

There are several additional reasons why Mr. Steele's declaration will not be considered by the Court.  First, there is no showing before the Court that Mr. Steele has special knowledge or training to interpret the Exhibits or to create the composite map that he included in Exhibit C. In addition, Mr. Steele's testimony does not contradict the admission made by Shirley Wang/Sunrise Marine.  He does not assert that Parcel 563 was in fact farmed but rather that it "could" or "can" be farmed.  The issue before this Court is not whether a parcel "could" or "can" be farmed but whether the tidelands were in fact used for sustained commercial production.

The Court GRANTS the Treaty Tribes' motion and it will not consider the Declaration of David Steele (Dkt. 305), its attachments or any references thereto.

**Conclusion.**  In spite of the arguments asserted by Sunrise Marine in its motion, the admission by Shirley Wang/Sunrise Marine that Parcel 563 was an upland parcel and not farmed prevents the undersigned from concluding that Sunrise Marine had an active AFR or DOH certification for Parcel 563.

Shirley Wang's statement that she "registered Parcels 563 through 567 with the Washington Department of Fish and Wildlife ("WDFW") in 2006" (Dkt. 135, p. 2, ¶6) creates, at the most, a contradiction with her prior admission regarding the fact that Parcel 563 was not farmed.  This contradiction results in a failure of proof by Sunrise Marine.

1   With regard to DOH certification, the Harvest Site Certificate filed by Sunrise Marine

2   (Dkt. 135, p. 19) does not specifically identify Parcel 563.  In light of Shirley Wang/Sunrise

3   Marine's admission that Parcel 563 was not farmed, the Harvest Site Certificate does not provide

4   documentary evidence to support a conclusion that the DOH certification was for Parcel 563.

5        For the above reasons, the Court concludes that Sunrise Marine has failed to comply with

6   the terms of the Settlement Agreement and is not entitled to Intervenor status with regard to

7   Parcel 563.

8                    **Taylor Homestead Clams – Parcel 574**

9        **Coverage Request.**  Taylor Homestead Clams seeks Intervenor status for Parcel 574

10   pursuant to Section 2(B)(ii).  In order to qualify for Intervenor status under Section 2(B)(ii),

11   Taylor Homestead Clams must show (1) that on or before August 28, 1995, it owned, leased

12   from a private party, or otherwise had a right to commercial harvests of shellfish from tidelands

13   in Washington State, (2) that on or before the date it sought to intervene Taylor Homestead

14   Clams had an active AFR and DOH certification for those tidelands and (3) Taylor Homestead

15   Clams must file documentary evidence establishing that those tidelands were used for sustained

16   commercial production of shellfish during some portion of the time between January 1, 1985,

17   and August 28, 1995.

18        **Disputed Issues.**  The Treaty Tribes dispute the claim by Taylor Homestead Clams that it

19   had the right to commercially harvest Parcel 574 prior to August 28, 1995 and they further assert

20   that Taylor Homestead Clams has not timely filed documents to show that Parcel 574 was used

21   for sustained commercial production of shellfish during the relevant time period.

22        **Motion to Strike.**  The Treaty Tribes filed a motion to strike the February 10, 2016

23   Supplemental Declaration of Juli Taylor (Dkt. 306) filed on February 12, 2016 and any reliance

24   thereon contained in Taylor Homestead Clams' Reply (Dkt. 306).

1    On September 16, 2013 this Court, in its oral ruling, noted that the "Court can envision

2    the need to explain how the timely filed documents established the claims of the proposed

3    intervenors." Dkt. 182, p. 63 (transcript of oral ruling).  In response to this, Juli Taylor filed a

4    Supplemental Declaration.  It does appear to the Court that paragraph 4 explains the issue raised

5    by the Treaty Tribes regarding other companies' rights to harvest on Parcel 574 and therefore the

6    Court will consider paragraph 4.  Dkt. 306.

7    However, the second sentence in paragraph 2 and paragraph 3 (Dkt. 306) do not explain

8    any timely filed documents and they will not be considered by the Court, nor will the Court

9    consider any reference thereto.

10   The Court GRANTS the Treaty Tribes' motion to strike the second sentence in paragraph

11   2 and all of paragraph 3 in the Supplemental Declaration of Juli Taylor (Dkt. 306) as well as any

12   reference thereto.

13   **Right to Harvest on or before August 28, 1995.**  Taylor Homestead Clams was

14   established by Mark and Juli Taylor in 1989.  Taylor Homestead Clams refers to Parcel 574 as

15   the "Charlene Hulse Lease" which Taylor Homestead Clams began leasing from the Hulses

16   "around 1990 under an oral contract."  Dkt. 94, p. 2, ¶ 8 of Declaration of Juli Taylor.  Parcel

17   574 was the only parcel leased from the Hulses for shellfish cultivation.  Clearly, with an oral

18   lease there can be no lease "document."   However, in support of this assertion Taylor

19   Homestead filed its 1990 "harvest log" (Dkt. 94, p. 6) which documents sales of clams to

20   Associated Seafoods.  According to Juli Taylor's testimony, the entries for sales made on April

21   27, May 4, May 11, May 18 and May 25, 1990 were for clams harvested from Parcel 574.

22   Exhibit F (Dkt. 94, p. 19 – 21) contains copies of invoices prepared by Juli Taylor for the 1990

23   sales of clams harvested "from Roger Hulse's Beach."  Juli Taylor testified that she created these

24   invoices "to document the stumpage fee paid to the tidelands owner."  Dkt. 94, p. 4, ¶14.

1    Exhibit C, a harvest log attached to Juli Taylor's declaration (Dkt. 574, p. 10), documents

2    an August 22, 1995 sale of clams from the Hulse property.  In addition, Juli Taylor provided

3    Taylor Homestead Clam's summary of 1995 clam sales which also documents the August 22,

4    1995 sale of clams.  Dkt. 94, p.17.

5    On January 9, 2008, Taylor Homestead Clams entered into a "Lease Agreement" with

6    Charlene Hulse which authorized Taylor Homestead Clams "[t]o dig and remove clams from the

7    owner's property" at the location identified in the lease.  Dkt. 226-1.

8    The Treaty Tribes assert that there is evidence that shows other shellfish companies – not

9    Taylor Homestead Clams – were certified by the Washington Department of Health to harvest

10   Parcel 574 prior to August 28, 1995.  In support of this statement, the Treaty Tribes' point to the

11   Harvest Site (Commercial) List, attached to the Declaration of Juli Taylor (Dkt. 94, p. 24) which

12   shows that Oy's by Us (owned by Charlene Hulse) had a DOH certification for the harvest of

13   Parcel 574 in 1994 and that Minterbrook Oyster Company had a DOH certification for harvest of

14   Parcel 574 in 2003.   Additional documents were attached to Juli Taylor's Declaration which

15   state that "responsibility for harvesting and shipping the product will be left to Taylor United."

16   Dkt. 94, p. 25.  *See also* Dkt. 94, p. 26 and 27.

17   Juli Taylor explained, in her supplemental declaration, that her agreement with Roger and

18   Charlene Hulse was only for the harvest of clams – which is what was authorized in the written

19   lease.  She also testified that the other shellfish companies contracted for harvest of oysters from

20   Parcel 574 and that such leases are not mutually exclusive.  Dkt. 307, p. 2, ¶4.

21   The Court concludes that the documentary evidence provided by Taylor Homestead

22   Clams, along with the permissible explanation, supports the conclusion that Taylor Homestead

23   Clams had the right to harvest from Parcel 574 before August 28, 1995.

24   **Sustained Commercial Production.**  To prove sustained commercial production, Taylor

1  Homestead Clams relies on the 1990 harvest log (Dkt. 94, p. 6), the 1995 harvest log (Dkt. 94, p.

2  10), the invoices (Dkt. 94, p. 19 – 21), and the Taylor Homestead Clam's summary of 1995 clam

3  sales which also documents the August 22, 1995 sale of clams (Dkt. 94, p.17) shown in the 1995

4  harvest log.

5       The Treaty Tribes assert that this documentation only supports the conclusion that Taylor

6  Homestead "exploited naturally-occurring clams twice in a five year period."  Taylor Homestead

7  Clams agreed at oral argument that it probably did not do anything to Parcel 574 before the first

8  harvest.

9       The Treaty Tribes assert that there is a complete absence of evidence of any type of

10  enhancement to the tidelands which would support the conclusion that Taylor Homestead Clams

11  conducted any cultivation activities showing management of Parcel 574 at any time.  This

12  position is supported by the language in the written lease as Taylor Homestead Clams was only

13  granted the authority to dig and remove wild clams.  This is the exact population – naturally-

14  occurring shellfish - that the Tribes have a treaty reserved right to harvest.  The Court concludes

15  that Taylor Homestead Clams has not shown through documentary evidence that Parcel 574 was

16  used for sustained commercial production of shellfish during some portion of the time between

17  January 1, 1985 and August 28, 1995.

18      **Conclusion:**  The Court concludes that Taylor Homestead Clams has failed to comply

19  with the terms of the Settlement Agreement and is not entitled to Intervenor status with regard to

20  Parcel 574.

21               **Eagle Rock Shellfish – Parcel 108**

22      **Coverage Request.**  Eagle Rock Shellfish seeks Intervenor status through Section 2(C)

23  because it is a successor to a person whose tidelands could have qualified under Section 2(B)(i).

24  In order to qualify for Intervenor status,  Eagle Rock Shellfish must show (1) that it acquired the

1   right to harvest Parcel 108 between August 28, 1995 and March 1, 2008 from a person whose

2   tidelands would have been eligible to become covered tidelands under section 2(B)(i), (2) that on

3   or before Eagle Rock Shellfish sought to intervene it had an active AFR and DOH certificate for

4   Parcel 108, and (3) that on or before August 28, 1995 there was an active AFR and DOH for

5   Parcel 108.

6       **Disputed Issues.**  The Treaty Tribes assert that Eagle Rock Shellfish has not

7   demonstrated through timely filed documentary evidence that it possessed an active AFR for

8   Parcel 108 prior to March 1, 2008, or that a prior shellfish grower possessed an active AFR and

9   DOH certification for Parcel 108 prior to August 28, 1995.

10       **Facts.**  Eagle Rock Shellfish, established in 1991, is owned by Gary T. Webb and Nancy

11   Gannon.  On November 10, 2006, Eagle Rock entered into a "Tidelands Lease Agreement" with

12   Clark Investments, the owner of Parcel 108, also identified as Tax Parcel No. 32423 50 02004.

13   The Court notes that the Tax Parcel No. on the Tidelands Lease is missing the number "3" in the

14   first series of numbers but there is no dispute that this Tidelands Lease Agreement applies to

15   Parcel 108.  Parcel 108 is located in the Hamma Hamma River Delta area of Hood Canal #5.

16       **Timely Filed Documentary Evidence.**  In order to be eligible for coverage under

17   2(B)(i), Eagle Rock Shellfish is required to show that a prior shellfish grower possessed an active

18   AFR prior to August 28, 1995 and it must show this through timely filed documents.  In order to

19   make this showing, Eagle Rock Shellfish relies on an AFR issued to Oliver Gray as well as two

20   AFR forms completed by Oliver Gray on June 10, 1986.  Dkt. 213-1, p. 17 – 20.

21       In their Response, the Treaty Tribes argued that Eagle Rock Shellfish did not timely file

22   and serve the two AFR forms completed by Oliver Gray and dated June 10, 1986.  Dkt. 253, p. 7,

23   l. 19 – p. 8, l. 2.  In their Surreply (Dkt. 322, p. 2, fn. 1), the Treaty Tribes note that they

24

moved to strike Eagle Rock's reliance on Oliver Gray & Son's 1986 Washington Department of Fish and Wildlife Aquatic Farm Registration because Eagle Rock did not submit that document in support of its request for Settlement coverage for Parcel 108 prior to March 1, 2008. *See* Dkt. 253 at 4-5, 7-8. The Court did not rule on this aspect of the Tribes' motion, and it is the Tribes' understanding that the Court is reserving ruling on whether an intervenor may rely on documents that it did not timely file, but that were timely filed by a different intervenor with respect to different tidelands. *See, e.g.,* Dkt. 290 at 12, 18 – 19.

The two AFR forms were timely filed in sub-proceeding 89-03 by Oliver Gray in support of its request for intervention for eight different parcels. *See* Dkt. 14528-2 at p. 60 – 62. The AFR forms were not, however, filed by Eagle Rock Shellfish on or before March 1, 2008.

Based on the Court's ruling regarding Chelsea Farms – Parcel 92, as it relates to documents not timely filed on behalf of Chelsea Farms, the analysis is the same with regard to the two AFR forms filed late by Eagle Rock Shellfish. The two documents, Dkt. 213-1, p. 18 – 20, will not be considered by the Court. The Court notes that the documents found at pages 19 and 20 are identical, so while three pages are referenced, only two documents are excluded.

**Prior Aquatic Farm Registration.**   As noted above, the Court has excluded the two AFR forms completed by Oliver Gray on June 10, 1986. (Dkts. 213-1, p. 18 – 20). However, even if the Court had not excluded these documents they lack any indicia that the AFR forms apply to Parcel 108.

Eagle Rock Shellfish argues that Parcel 108 is covered by the AFR issued to Oliver Gray (Dkt. 213-1, p. 17) because the AFR was for central Hood Canal, otherwise known as Aquaculture District 42D, that Oliver Gray operated all of its farms in Aquaculture District 42D, which includes the Hamma Hamma River Delta and therefore Parcel 108 was covered by a valid AFR on or before August 28, 1995. Dkt. 213, p. 5.

The Court notes that the AFR form found at Dkt. 213-1, p. 19 clearly does not cover Parcel 108 as it is for a freshwater farm for rainbow trout.

1    The AFR form found at Dkt. 213-1, p. 18, dated June 10, 1986, is specifically for

2   property owned by the Bill James Family.   There is no evidence before the Court that Parcel 108

3   was owned by the Bill James Family in 1986.   In the section of the AFR form which requests

4   information about the location of the farm, Oliver Gray did not list the Hamma Hamma River

5   Delta area (where Parcel 108 is located) when asked to identify the "bay or inlet."  He did,

6   however, identify Jorstad Creek, Eagle Creek and Lilliwaup Bay.  Clearly, Mr. Gray knew that

7   the Hamma Hamma River Delta area was a separate area as documented in his "Application for

8   Shellfish Operation License and Certificate of Approval" dated September 11, 1995.  Dkt. 213-1,

9   p. 25.  In that application, he separately listed the "Hamma Hamma River Delta" in his request

10  for certification.  The Court notes that when Oliver Gray filed this document with the

11  Department of Health, Parcel 108 was owned by Rhonda Clark.

12    Finally, there are no indicia whatsoever that Oliver Gray ever had the right to harvest

13  shellfish from Parcel 108.  There is nothing in the Oliver Gray AFR form that even remotely

14  connects it to Parcel 108 and there is no evidence before the Court that Oliver Gray ever

15  obtained the right to harvest shellfish from Parcel 108 at any time – either before or after he filed

16  his AFR application form.

17    The Court concludes that Eagle Rock Shellfish has failed to meet the requirement that it

18  show that on or before August 28, 1995 there was an "active aquatic farm registration for

19  commercial shellfishing from those tidelands."   For this reason, as well as for the reason that the

20  Court has excluded the two Oliver Gray AFR forms from consideration, the Court concludes that

21  Eagle Rock Shellfish has failed to comply with the terms of the Settlement Agreement and is not

22  entitled to Intervenor status.

23    **Prior Department of Health certificate.**  While the Court has already concluded that

24  Eagle Rock Shellfish is not entitled to Intervenor status, the Court will also address the

1   requirement that Eagle Rock Shellfish show that on or before August 28, 1995 there was an

2   active DOH certification for those tidelands.

3       In support of its assertion that Oliver Gray "cultivated shellfish on Parcel 108 pursuant to

4   DOH certification number WA-0115-SP, issued for cultivation in Hood Canal #5 and Hamma

5   Hamma River," Eagle Rock Shellfish relies on the following documents:

6       (1) "Shellfish Operation License and Certificate of Approval" issued to John E. Gray on

7   September 2, 1994.  Dkt. 213-1, p. 21.  The Court notes that Ronda Groves Clark obtained

8   ownership of Parcel 108 on May 8, 1990 (Dkt. 213-1, p. 3) from J. Earl Schoenberger.

9       (2) "Application for Shellfish Operation License and Certificate of Approval" approved

10  by Frank Cox of the Department of Health on September 2, 1994.  Dkt. 213-1, p. 22.  As noted

11  above, this Application was filed after Rhonda Groves Clark was the owner of Parcel 108.  There

12  have been no documents filed with this Court to support the necessary underlying requirement

13  that Oliver Gray ever had authority to harvest from Parcel 108 when it was owned by Ronda

14  Groves Clark.  Also, there is nothing on the application form itself that identifies the tidelands

15  for which coverage was sought.  The application simply refers to "see harvest record" and no

16  such harvest record has been provided to the Court.

17      (3) An undated "Certification Request for Commercial Shellfish Harvest Area" with

18  Oliver Gray being the applicant.   Dkt. 213-1, p. 23.  This Certification Request identifies Francis

19  P. Moake as the property owner with the property having an address of N. 36810 Hwy. 101,

20  Lilliwaup, WA.  It also included a legal description of the property as Parcel Number 32423, 50,

21  02006.  The Court notes that the Parcel Number in the Certification Request is not for Parcel

22  108, which has a tax parcel number of 324235002004.

23      In support of its position that this Certification Request covers Parcel 108, Eagle Rock

24  Shellfish relies very heavily on its reading of the last section of the Certification Request.  Under

1  the heading "Beach Location," Oliver Gray identified the beach location as: "Allie Ahl's

2  Summer Home Track, Block 2, Lot 6 and tidelands' Hood Canal – Hamma Hamma River Flats"

3  and  "Adj. Land owners – Thomas A. Sawby, Richard G. Frank – J.E. Schoenberger – Clair

4  Harter".   The Court notes that the beach location for the parcel identified in the Certification

5  Request is not the location for Parcel 108 as it is in Block 2, Lot 4, and not Lot 6.

6         Eagle Rock Shellfish argues that the last three lines in the Certification Request, which is

7  included under the heading "Beach Location," means that Oliver Gray was also requesting

8  certification for tidelands for property owned by four adjacent landowners, including J.E.

9  Schoenberger who owned Parcel 108.  When this Court first reviewed this document, it

10 understood that portion of the Certification Request to only serve the purpose of identifying

11 additional adjacent land owners and did not view the statement as seeking certification for

12 properties that were only identified by the landowner's name.   The Court reached this

13 conclusion in light of the specific information provided by Mr. Gray as to which parcel he was

14 seeking certification – he identified it by owner, address and legal description.  At the most,

15 Eagle Rock Shellfish has raised an ambiguity with regard to the interpretation of this document.

16 Since Eagle Rock Shellfish has the burden of proof, the Court cannot read this ambiguity in

17 favor of Eagle Rock Shellfish and in disregard of the Treaty Tribes' rights.

18        (4)  "Shellfish Operation License and Certificate of Approval" issued to Oliver Gray &

19 Sons on September 11, 1995 (Dkt. 213-1, p. 24) which is dated after the cut-off date of August

20 28, 1995, as required by the Settlement Agreement.  This document does not show that there was

21 DOH certification on or before August 28, 1995.  Even if the Court were to consider it as

22 circumstantial evidence, at the most it shows that Oliver Gray had certification for tidelands in

23 the Hamma Hamma River Delta, but it does not contain any indicia that it covered Parcel 108

24 owned by Ms. Clark.

(5)  Email from Cathy Barker, Public Health Advisor with DOH, to Eagle Rock Shellfish dated February 27, 2008.  Dkt. 213-1, p. 4.  Eagle Rock Shellfish asserts that in this email "DOH confirmed that prior to 1990 it had certified Oliver Gray to cultivate and harvest shellfish on the tidelands under Certification No. WA-0115-SP."

The email itself specifically states that "the documents Gary Webb has, listing Francis Moake as owner of the certified tidelands on the Hamma Hamma River Delta, is the only document on file here at DOH for that specific parcel."  Francis Moake was the owner identified by Oliver Gray in his undated "Certification Request for Commercial Shellfish Harvest Area", discussed above.  In fact, Oliver Gray had a five year lease with George W. and Frances Moake commencing on May 1, 1970 (Dkt. 14528-2, p. 17 in subproceeding 89-0003) and a second five year lease with Frances Moake commencing on May 1, 1989.  (Dkt. 14528-2, p. 18).  These leases were filed in support of the "Motion of John Gray/Oliver Gray & Sons to Participate in Shellfish Settlement" filed in subproceeding 89-0003 under Dkt. 14528.  According to the Treaty Tribes, this is Parcel 106 and they did not object to settlement coverage for this parcel.  The specific information in this email along with the existence of leases between Oliver Gray and Frances Moake do not support a conclusion that the DOH certification issued to Oliver Gray was intended to cover or covers Parcel 108.

For all the above reasons, the Court concludes that Eagle Rock Shellfish has not filed documents that show the existence of an active DOH certification for Parcel 108 on or before August 28, 1995.

**Conclusion.**  In light of the fact that Eagle Rock Shellfish has not met the requirements of showing an active AFR or DOH certification for Parcel 108 on or before August 28, 1995, it is not necessary for the Court to address the issue as to whether Eagle Rock Shellfish had an AFR for Parcel 108 on or before the date it sought to intervene.

1    The Court concludes that Eagle Rock Shellfish has failed to comply with the terms of the

2    Settlement Agreement and is not entitled to Intervenor status with regard to Parcel 108.

3                            **Topeeksin Shellfish – Parcel 855**

4    **Coverage Request.** Topeeksin Shellfish seeks Intervenor status through Section 2(C)

5    because it is a successor to a person whose tidelands could have qualified under either Section

6    2(B)(i) or Section 2(B)(ii).  In order to qualify for Intervenor status, Topeeksin Shellfish must

7    show (1) that between August 28, 1995 and March 1, 2008 it acquired "the right to harvest from

8    a person whose tidelands would have been eligible to become covered tidelands under section

9    2(B)(i) or (ii) and section 5, so long as the eligibility for including the tidelands under section

10   2(B)(i) or (ii) is documented as provided in those subsections" and (2) that on or before the date

11   Topeeksin Shellfish sought to intervene it had an active AFR and DOH certification for Parcel

12   855.  In addition, in order to qualify under Section 2(B)(i), Topeeksin Shellfish must file

13   documents establishing the existence of an active AFR and DOH certification for Parcel 855 on

14   or before August 28, 1995.  In order to qualify under Section 2(B)(ii), Topeeksin Shellfish must

15   file documentary evidence establishing that the tidelands (Parcel 855) were used for sustained

16   commercial production of shellfish during some portion of the time between January 1, 1985,

17   and August 28, 1995.

18   **Disputed Issues.**  The Treaty Tribes assert that Topeeksin has not demonstrated through

19   timely filed documentary evidence that a prior shellfish grower had an active AFR or DOH

20   certification for Parcel 855 prior to August 28, 1995 or that a prior shellfish grower used Parcel

21   855 for sustained commercial production between January 1, 1985 and August 28, 1995.

22   **Facts.**  Alan Moss established Topeeksin Shellfish in 2007.  On January 9, 2006, Alan

23   Moss entered into an open ended "Lease Agreement" for Parcel 855 with the owner, Candice

24   Greenwood.  Dkt. 229-1, p. 17.

Candice Greenwood became the owner of Parcel 855 in August 1989 when the property was conveyed to her by her grandparents, Maurel and Larry Oliver. Robin Greenwood Smith, Candice Greenwood's mother, owns Parcel 857 which is adjacent to Parcel 855. These two parcels were included in property initially purchased by John A. Sells in 1915. John A. Sells is Maurel Oliver's brother, Robin Greenwood Smith's uncle, and Candice Greenwood's great uncle.

Candice Greenwood leased Parcel 855 to Richard Berry on August 17, 1995. Dkt. 99, p. 4. According to Candice Greenwood, Mr. Berry leased the tidelands until she leased them to Alan Moss in 2006.

**Aquatic Farm Registration Prior to August 28, 1995.** Topeeksin Shellfish relies on a State of Washington, Department of Fisheries 1975 Handler's License, which, by its terms, expired on December 31, 1975, as evidence of a prior valid AFR for Parcel 855. Dkt. 229-1, p. 23. There are two obvious issues that prevent reliance on a Handler's License. First, a Handler's License is clearly not an AFR, which is specifically required by the terms of the Settlement Agreement. Second, no documents were filed which provide any indicia that the Handler's License was, in fact, for Parcel 855.

Also, as pointed out by the Treaty Tribes, the Washington State Legislature did not create the Aquatic Farm Registration program until 1985. *See* Dkt. 167-1, p. 2 (R.C.W. 75.58.040) and p. 13 (WAC 220-76-020). The Handler's License, issued 10 years before establishment of the aquatic farm registration, does not meet the requirement in the Settlement Agreement that Topeeksin show the existence of an active AFR for commercial shellfishing from Parcel 855 prior to August 28, 1995.

Topeeksin Shellfish asserts that "a strict construction of the Agreement's requirements fails to consider the purpose of the Agreement – to identify *bona fide* tidelands under cultivation

1   prior to August 28, 1995." Dkt. 310, p. 2 – 3.  The Treaty Tribes argue, in response, that the

2   Growers knew what documents they did or did not have and the agreement reached between the

3   parties required an AFR which, everyone agrees, could not be obtained until 1985.  The terms of

4   the Settlement Agreement are clear and specific and must be complied with in order to obtain

5   intervenor status.

6       Topeeksin Shellfish filed a copy of an undated AFR card (Dkt. 229-1, p. 24), but there

7   are no other documents filed with the Court that provide any indicia that this undated AFR card

8   was for Parcel 855.

9       The Court concludes that Topeeksin Shellfish has not shown the existence of an active

10  AFR for commercial shellfishing from Parcel 855 prior to August 28, 1995.

11  **Active DOH Certificate Prior to August 28, 1995.**  Topeeksin Shellfish filed the

12  following documents to show the existence of a prior active DOH Certificate issued to John A.

13  Sells:

14      (1)  DSHS Shellfish Operation License and Certificate of Approval issued to John A.

15  Sells for property he owned located at S.E. 4332 Lynch Road, Shelton on August 10, 1988,

16  which expired on September 30, 1989.  Dkt. 229-1, p. 30.  This certificate allowed harvesting of

17  shellfish in Totten Inlet. This document is also attached to the October 12, 2012 Declaration of

18  Pamela C. Patterson, who is Candice Greenwood's aunt.  Dkt. 101, p. 10.  The Court notes that it

19  had initially reserved ruling in its November 23, 2015 Order as to whether this document would

20  be considered in light of the fact that it had not been timely filed by Topeeksin Shellfish.  Rather,

21  this certificate was filed on March 1, 2008 by Gordon D. Martinen/Totten Rock Shellfish in

22  which it sought Intervenor status.  Dkt. 14512-2, p. 26, filed in subproceeding 89-03.  Based on

23  the Court's ruling regarding similarly untimely filed documents in Chelsea Farms – Parcel 92,

24  this document was not timely filed and will not be considered by the Court.

(2)  Department of Health Shellfish Operation License and Certificate of Approval dated August 15, 1995 issued to John A. Sells located at SE 402 Sells Drive, Shelton, Washington for Totten Inlet.  Dkt. 229-1, p. 31.  The Court notes, however, that Candice Greenwood leased Parcel 855 to Richard Berry on August 17, 1995.   In addition, the Court notes that in Candice Greenwood's stricken testimony (Dkt. 99, p. 2, ¶6) she testified that she leased Parcel 855 to Russell Norris sometime in 1992 or 1993.  While the Court struck that testimony, it will not ignore the fact that the testimony clearly disputes any assertion that the 1995 DOH certification to John A. Sells included Parcel 855.  The documents filed with the Court are ambiguous and, perhaps, even contradictory and therefore do not establish the existence of an active DOH certificate for Parcel 855 from on or before August 28, 1995.

(3)  Department of Health Shellfish Operation License and Certificate of Approval issued to John A. Sells located at SE 4332 Lynch Road, Shelton for Totten Inlet dated September 17, 1991.  Dkt. 229-1, p. 32.  This document is also attached to the October 31, 2012 Declaration of Pamela C. Patterson at Dkt. 101, p. 11.  The Court notes that it had initially reserved ruling in its November 23, 2015 Order as to whether this document would be considered in light of the fact that it had not been timely filed by Topeeksin Shellfish.  Rather, this certificate was filed on March 1, 2008 by Pamela C. Patterson, Trustee/John A. Sells (Living Trust)/John Sells Shellfish in which it sought intervenor status.  Dkt. 18994-2, p. 11, filed in subproceeding 70-9213.  Based on the Court's ruling regarding similarly untimely filed documents in Chelsea Farms – Parcel 92, this document was not timely filed and will not be considered by the Court.

(4)  A Harvest Area Record created by the Department of Health showing a Certification Year of 1995.  Dkt. 229-1, p. 33.  This document, however, does not support Topeeksin Shellfish's position as it is clear that Parcel 855 was not under the control of John A. Sells in 1995.  As noted above, Candice Greenwood leased Parcel 855 to Russell Norris in 1992 or 1993

1  and then to Richard Berry in August 1995.  This Harvest Area Record could not have included

2  Parcel 855.

3      Topeeksin Shellfish also initially relied on a September 30, 1996 letter written by John A.

4  Sells to Rick Peters of the Squaxin Island Tribe.  Dkt. 229-1, p. 12.  It was Topeeksin Shellfish's

5  position that this letter "identifies Parcel 855 as being covered under DOH Certificate WA-663-

6  SS."  Dkt. 310, p. 7.  However, at oral argument counsel for Topeeksin Shellfish admitted that

7  the letter did not apply to Parcel 855.

8      Topeeksin Shellfish also relied on a number of business records including a ledger and

9  invoices for the proposition that these documents "include a notation indicating that the

10 'Greenwood' property, or Parcel 855, was certified under WA-0663-SS."  Dkt. 310, p. 7.

11 However, as pointed out by the Treaty Tribes, the reference to "Greenwood" on the November

12 12, 1989 Invoice (Dkt. 229-1, p. 36) corresponds to a November 17, 1989 Check Register entry

13 which documents payment to Robin Greenwood – not Candice Greenwood. Dkt. 14559-5, p. 23,

14 filed in subproceeding 89-0003.  In fact, there are no entries in the Check Register which

15 document any payments to Candice Greenwood – all the payments are to Robin Greenwood.

16 These documents do not connect up John A. Sells' DOH certificate under WA-0663-SS with

17 Parcel 855 owned by Candice Greenwood. None of the documents contain any indicia that they

18 apply to Parcel 855.

19     The Court concludes that Topeeksin Shellfish has not shown the existence of an active

20 DOH certificate for Parcel 855 prior to August 28, 1995.

21     **Sustained commercial production of shellfish.**  Topeeksin Shellfish relies on the

22 business ledger and invoices (Dkt. 229-1, p. 34 – 48) for the proposition that payments made to

23 "Greenwood," which have not been clearly connected to Robin Greenwood, were made to

24 Candice Greenwood for the harvest of shellfish from Parcel 855 in 1989.  However, what is

1  lacking is any documentation which would support this assertion.  It is as plausible that the

2  invoices all relate to Robin Greenwood's Parcel 857.  The documents, taken in their entirety and

3  including the Check Register (Dkt. 14559-5, p. 23 in subproceeding 89-0003), the copies of

4  checks that were received by Robin Greenwood for harvest from Parcel 857 (Dkt. 100, p. 5 – 6),

5  and the map attached to the Declaration of Robin Greenwood Smith which shows that Larry

6  Oliver continued to own property after he conveyed Parcel 855 to Candice Greenwood, argue

7  against the Court drawing a conclusion that any payments were made to Candice Greenwood or

8  anyone else for harvest of shellfish from Parcel 855.

9       Topeeksin Shellfish asserts that the invoice found at Dkt. 229-1, p. 46, dated October 30,

10  1989, should be interpreted to mean that payments were made for a harvest from Parcel 855.

11  That invoice and the check register show a payment to Larry Oliver.  However, Topeeksin

12  Shellfish argues that the notation of "C and G" following the name "Oliver" on the invoice

13  means Candice Greenwood.  If that were the case, it is not clear why the word "and" is between

14  the initials.  Also, it is clear that, on the date of this invoice, Larry Oliver still owned property at

15  Barron Point.  *See* Dkt. 100, p. 8.  So, it is as logical to consider the payment to be to Larry

16  Oliver for shellfish harvested from his property.

17       Topeeksin Shellfish requested, in a footnote, that this Court reconsider its November 23,

18  2015 ruling which struck Paragraph 6 from the Declaration of Pamela C. Patterson.  Dkt. 310, p.

19  10, fn. 34.  First, the Court notes that the motion for reconsideration is extremely late as it was

20  included in the Reply brief filed approximately two and one-half months after this Court's Order

21  and for that reason alone, the motion should be denied.  However, the Court also notes that the

22  check register referenced in Ms. Patterson's Declaration was not timely filed and based on this

23  Court's prior ruling, that document and any testimony related thereto will not be considered.  So,

24  for that additional reason, the motion to reconsider is DENIED.

1   Topeeksin Shellfish also argues that the Treaty Tribes "present no evidence that the

2   remaining harvests were not associated with Parcel 855 or that stumpage fees were not also paid

3   to Mr. Oliver."  Dkt. 310.  The Settlement Agreement does not place a burden on the Treaty

4   Tribes to prove anything.  Rather, the Grower has the burden of proof and is the one who is

5   required to file documents that meet the terms of the Settlement Agreement.

6   In its Reply brief, Topeeksin Shellfish also relied on the September 30, 1996 letter to

7   Rick Peters of the Squaxin Island Tribe written by John A. Sells (Dkt. 229-1, p. 12 – 15, filed on

8   May 23, 2014) for documentary support that Mr. Sells planted and cultivated shellfish on Parcel

9   855, identified in the letter as "Parcel A".  Dkt. 310, p.10.  However, as noted above, counsel

10  concedes that "Parcel A" is not Parcel 855.  Clearly, at the time this letter was written, Parcel

11  855 had been previously leased to Russell Norris and then Richard Berry.  Dkt. 99, ¶6 and 7.  In

12  the Treaty Tribes' Surreply (Dkt. 323, p. 3, fn. 1) they object to consideration of the John A.

13  Sells' letter as it was not referenced or relied on by Topeeksin Shellfish in its opening brief with

14  regard to the issue of sustained commercial production.  Because it was first referenced in

15  Topeeksin Shellfish's Reply, the Treaty Tribes assert they were denied an opportunity to provide

16  a written response to that new argument.   The determinative fact, for this Court, is that the John

17  A. Sells letter was not timely filed by Topeeksin Shellfish.  It was, however, timely filed by

18  Gordon D. Martinen/Totten Rock Shellfish LLC in which it sought intervenor status.  Dkt.

19  14512-4, p. 21 – 24 filed in subproceeding 89-0003.  Based on the Court's ruling regarding

20  similarly untimely filed documents in Chelsea Farms – Parcel 92, this document was not timely

21  filed and will not be considered by the Court.

22  The Treaty Tribes also requested that the Court strike the Declaration of Robert Smith

23  (Dkt. 311) on the ground that it is new evidence not timely filed.  It is not clear to the Court what

24  information may be gleaned from a survey plat which is quite illegible.  It will not be considered.

1    Based on the above, the Court concludes that the documentary evidence does not show

2  that Parcel 855 was used for sustained commercial production of shellfish during some portion of

3  the time between January 1, 1985, and August 28, 1995.

4    **Conclusion.**  The Court finds that Topeeksin Shellfish has failed to comply with the

5  terms of the Settlement Agreement and is not entitled to Intervenor status with regard to Parcel

6  855.

7                     **Oliver Gray & Sons – Parcel 401**

8    **Coverage request:**  Oliver Gray & Sons seeks Intervenor status pursuant to Section

9  2(B)(i).  In order to qualify for Intervenor status, Oliver Gray & Sons must file documents

10  showing the following:  (1) that on or before August 28, 1995, Oliver Gray & Sons owned,

11  leased from a private party, or otherwise had a right to commercial harvests of shellfish from

12  Parcel 401 and (2) that on or before August 28, 1995 Oliver Gray & Sons had an active AFR for

13  commercial shellfishing from Parcel 401 and a DOH certification for Parcel 401.

14    **Disputed issues:**  The Treaty Tribes assert that Oliver Gray & Sons did not have an

15  active AFR for commercial shellfishing from the tidelands or an active DOH certification for the

16  tidelands prior to August 28, 1995.

17    **Facts:**  Oliver Gray & Sons is a family owned business established by Oliver Gray Sr. in

18  1956, and it is currently owned by Oliver Gray Jr. and John Gray.  Oliver Gray & Sons entered

19  into a written five year lease for Parcel 401 with Nicholas and Barbara Welsh on March 15,

20  1991.  This parcel is located on the Hood Canal at Jorstad Creek.  Dkt. 223-1, p. 1.

21    According to the "DFW Aquatic Farm Registration" certificate (Dkt. 223-1, p. 6) for

22  Oliver Gray Fish and Oyster Farm, it has been a registered aquatic farm since June 10, 1986.

23  The Court notes that the Registration certificate filed with the Court was signed by Paula Galivan

24  and that she first became employed with WDFW in March 2004.  Dkt. 76, p. 1 (Declaration of

1   Paula Galivan).  Ms. Galivan explained the date discrepancy in her declaration as follows:

2   "When a grower contacted me, I researched what records WDFW had as to that grower's

3   registered farm(s).  If my research revealed that the grower had registered with the agency, I

4   would reprint a WDFW Aquatic Farm Registration Certificate indicating the grower's license

5   number and the year the grower registered its first farm."  *Id.* at p. 2. It does not appear to the

6   Court that Ms. Galivan "reprinted" the certificate for if she had reprinted an original her name

7   would not have been on the certificate.  However, she does explain the certificate is based on her

8   research of the records.

9          Oliver Gray & Sons filed an AFR form signed by Oliver Gray (on behalf of Oliver Gray

10  Fish & Oyster Farm) on June 10, 1986 (Dkt. 223-1, p. 7) which has 8078-2 as its Aquatic Farm

11  Registration Number.  On June 10, 1986 Oliver Gray also filed an AFR form for a rainbow trout

12  farm (subp. 89-03, Dkt. 14528-2, p. 61), which has the number 8078-01 written on it.  Oliver

13  Gray attached to the trout farm form a drawing which, as requested by the AFR form in section

14  14, identified the "source of culture water, where the water is discharged, and the watershed

15  where the facility is located."  *Id.* at p. 63.  This drawing also contains the number "8078-1 pg

16  2."  Apparently Mr. Gray did not attach a similar "site drawing of the aquatic farm and a brief

17  narrative description of the facility and its operation" with his application for an AFR for his

18  marine aquatic farm although such a drawing was requested in section 14 of the form.

19         The AFR form 8078-2 (Dkt. 223-1, p. 7) was for pacific oyster farming on property

20  owned by the Bill James Family.  In the section of the form that requests the "Location of Farm"

21  Mr. Gray identified "Bay or Inlet" as "Jorsted," "Eagle Creek Fl" and "Lilliwaut Bay."  He also

22  said that there were four tracts within the district.

23         As noted above, this AFR form was dated June 10, 1986, which is also the first date that

24  Oliver Gray Fish & Oyster Farms was registered as an aquatic farm.  Oliver Gray, however, first

1  obtained a written lease for Parcel 401 on March 15, 1991, almost five years after he first

2  obtained his AFR on June 10, 1986.  Dkt. 213-1, p. 17.

3      Oliver Gray & Sons assert that Parcel 401, first obtained on March 15, 1991, is

4  automatically covered under the 1986 AFR.  As noted above, this Court has concluded that there

5  is no automatic coverage for after-acquired parcels and that there must be some indicia that the

6  pre-existing AFR was for commercial shellfishing from those tidelands – in this case Parcel 401.

7  Oliver Gray & Sons has not filed any documents which show that Parcel 401 was later added to

8  AFR 8078-2.

9      **Conclusion:**  Because the Court has concluded that Oliver Gray & Sons did not have an

10  AFR for Parcel 401, it is not necessary to address the issue of DOH certification as both an AFR

11  and DOH certification are required.  Oliver Gray & Sons did not have an AFR for Parcel 401, it

12  has not complied with the terms of the Settlement Agreement and therefore is not entitled to

13  Intervenor status with regard to Parcel 401.

14      **Olympic Shellfish – Parcel 443**

15      **Coverage Request:**  Olympic Shellfish seeks Intervenor status pursuant to Section

16  2(B)(i).  In order to qualify for Intervenor status, Olympic Shellfish must file documents showing

17  the following:  (1) that on or before August 28, 1995, Olympic Shellfish owned, leased from a

18  private party, or otherwise had a right to commercial harvests of shellfish from Parcel 443 and

19  (2) that on or before August 28, 1995 Olympic Shellfish had an active AFR for commercial

20  shellfishing from Parcel 443 and a DOH certification for Parcel 443.

21      **Disputed issues:**  The Treaty Tribes assert that Olympic Shellfish did not have an

22  active AFR for commercial shellfishing from the tidelands on or before August 28, 1995.

23      **Facts:**  The Department of Fisheries issued an AFR to Olympic Shellfish on March 16,

24  1993, under License No. 8745.  Dkt. 224-1, p. 6.  The AFR was based on the AFR form

1    completed by Olympic Shellfish on March 15, 1993 (Dkt. 224-1, p. 7) for Parcel 444 and Parcel

2    445.  Dkt. 86, p. 2, Declaration of Linda Ryan.  Olympic Shellfish did not own Parcel 443 until

3    September 28, 1994 (Dkt. 86, p. 2 and 11), a little more than one and one-half years after it

4    obtained its 1993 AFR.

5         Olympic Shellfish asserts that the tidelands first obtained in September 28, 1994 are

6    automatically covered under the AFR issued in 1993.  As noted above, this Court has concluded

7    that there is no automatic coverage for after-acquired parcels and that there must be some indicia

8    that the pre-existing AFR was for commercial shellfishing from those tidelands – in this case

9    Parcel 443.  Olympic Shellfish has not filed any documents which show that Parcel 443 was later

10   added to its March 16, 1993 AFR.

11       **Conclusion:**  Olympic Shellfish did not have an AFR for Parcel 443, has not complied

12   with the terms of the Settlement Agreement and therefore is not entitled to Intervenor status with

13   regard to Parcel 443.

14                              **McDonald Mollusca – Parcel 341**

15       **Coverage Request:**  McDonald Mollusca seeks Intervenor status pursuant to Section

16   2(B)(i).  In order to qualify for Intervenor status, McDonald Mollusca must file documents

17   showing the following:  (1) that on or before August 28, 1995, McDonald Mollusca owned,

18   leased from a private party, or otherwise had a right to commercial harvests of shellfish from

19   Parcel 341 and (2) that on or before August 28, 1995 McDonald Mollusca had an active AFR for

20   commercial shellfishing from Parcel 341 and a DOH certification for Parcel 341.

21       **Disputed issues:**  The Treaty Tribes assert that McDonald Mollusca did not have an

22   active AFR for commercial shellfishing from the tidelands on or before August 28, 1995.

23       **Facts:**  McDonald Mollusca timely filed a copy of AFR No. 8137-01 which is undated

24   but, on its face, is applicable to "Thurston – 41H, Totten."  Dkt. 228-1, p. 18.  Attached to the

1   Declaration of Scott Gellatly, owner of McDonald Mollusca, is an AFR form dated May 28,

2   1986 signed by Scott Gellatly.  Dkt. 96, p. 5.  While this form was not timely filed, this Court

3   ruled that it would be considered as explanatory of the AFR No. 8137-01 discussed in the

4   preceding sentence.  The form confirmed that the AFR was for Totten Inlet, Section 12,

5   Township 19, Range 3 in Thurston County.  Parcel 341 is not located in Totten Inlet.  It is

6   located in Little Skookum Inlet.  Parcel 341, identified as being in Section 11, Township 19,

7   Range 3, is not located in Thurston County.  It is located in Mason County.  *See* Dkt. 228-1, p. 2

8   and p. 10.  McDonald Mollusca does not dispute that Parcel 401 is located in Mason County.

9   Mr. Gellatly's testimony is not sufficient to change the clear terms of the documents.  There is no

10  indicia in the documents considered by the Court that support the conclusion the AFR was for a

11  tideland located in a different inlet and in a different county.  The terms of the settlement

12  agreement specifically require an AFR for commercial shellfishing "from those tidelands."  The

13  identifiers used by Mr. Gellatly when he completed the form limited the AFR application to

14  Totten Inlet in Thurston County.

15      **Conclusion:**  The Court concludes that McDonald Mollusca has failed to comply with

16  the terms of the Settlement Agreement and is not entitled to Intervenor status with regard to

17  Parcel 341.

18              **Girl Scouts of Western Washington – Parcel 113**

19      **Coverage Request.**  The Girl Scouts of Western Washington (GSWW) seeks Intervenor

20  status pursuant to Section 2(B)(i).  In order to qualify for Intervenor status, GSWW must file

21  documents showing the following:  (1) that on or before August 28, 1995, GSWW owned, leased

22  from a private party, or otherwise had a right to commercial harvests of shellfish from Parcel 113

23  and (2) that on or before August 28, 1995 GSWW had an active AFR for commercial

24  shellfishing from Parcel 113 and a DOH certification for Parcel 113.

**Disputed Issues.**  The Treaty Tribes assert that GSWW did not have an active AFR for commercial shellfishing from the tidelands or an active DOH certification for the tidelands.

**Facts.**  GSWW has never had an AFR for Parcel 113.  Instead, GSWW relies on a 1987 AFR issued to Lone Rock Oyster Co. which covered Parcel 113, property leased by Lone Rock Oyster Co. from GSWW.  Dkt. 216-1, p. 31, Exhibit G.   The parties do not dispute the fact that an AFR is not transferrable.

GSWW has never had a DOH certification for Parcel 113.  Instead, GSWW relies on a March 11, 1993 letter from Frank H. Cox, Public Health Advisor, Office of Shellfish Programs addressed to Jeffrey Bean, owner of Lone Rock Oyster Co.  In that letter Frank Cox granted Mr. Bean's request to have Parcel 113 added to Lone Rock Oyster Company's 1992/93 DOH certification under WA-250-SP.  Dkt. 216-1, p. 32, Exhibit H.  The parties do not dispute the fact that a DOH certification is not transferrable.

Jim Messmer, Property Director of Camp Robbinswold, testified by declaration that Parcel 113 is part of Camp Robbinswold and that he regularly entered into contracts which leased the tidelands to shellfish growers.  Dkt. 79, p. 2.  One of the growers who entered into such a lease was Lone Rock Oyster Company/Jeffrey Bean.  Lone Rock Oyster Company/Jeffrey Bean entered into a lease agreement in 1987 for a term commencing on March 9, 1987 and terminating on June 15, 1987.  (Dkt. 216-1, p. 15 – 16).  A second agreement, a "License to Harvest Oysters at Camp Robbinswold" ("License") between the Girls Scouts and Jeffrey Bean (Dkt. 216-1, p. 16 – 22) granted an easement for the purpose of harvesting oysters for a term commencing on March 1, 1993 and terminating on February 28, 1994.  The 1993 License required the Licensee to "use the license area in accordance with all applicable statutes, orders, rules, or regulations of any governmental authority having appropriate jurisdiction."  *Id.* at p. 18.  It also made clear in the terms of the License that the Girls Scouts Council "is not and shall not

1    be deemed to be a partner nor a joint venture with the Licensee in connection with the business

2    carried on under this license and shall have no obligation with respect to the Licensee's debts or

3    other liabilities." *Id.* at p. 19.

4    **Discussion.**  GSWW asserts that Lone Rock Oyster Company/Jeffrey Bean were agents

5    of GSWW and therefore GSWW "had" the required AFR and DOH for Parcel 113.  For proof of

6    an agency relationship, GSWW also relies solely on the fact that there was either a lease or a

7    license with Lone Rock Oyster Company/Jeffrey Bean.  However, there is no language in the

8    referenced documents that even suggests the creation of an agency relationship and GSWW cited

9    to no legal authority which would support such a conclusion.  The undersigned concludes that

10   GSWW has failed to prove the existence of an agency relationship and further concludes that the

11   documents provided to the Court show nothing more than the fact that Lone Rock Oyster

12   Company/Jeffrey Bean was an independent contractor.

13          The undersigned also rejects the assertion by GSWW that someone other than the

14   Intervenor under Section 2(B)(i) could have the required AFR and DOH certification in order to

15   comply with the requirements of that section of the Settlement Agreement.  To read Section

16   2(B)(i) in the way suggested by GSWW would strain the language of the Settlement Agreement.

17   In order to be an Intervenor under 2(B)(i) the Intervenor – here GSWW – must (1) be a member

18   of the Puget Sound Shellfish Growers Legal Defense Fund, Inc., and (2) on or before August 28,

19   1995 own or otherwise have a right to commercial harvests of shellfish from tidelands in

20   Washington State, and (3) on or before August 28, 1995 had an active AFR for commercial

21   shellfishing from those tidelands and a DOH certification for those tidelands, provided (4)

22   GSWW intervenes and files by March 1, 2008, copies of documents establishing compliance

23   with Section 2(B)(i).   The language of the Settlement Agreement clearly requires the **person**

24   who wishes to intervene to meet the specific requirements of 2(B)(i) and that includes the

1   requirement that the **person** who wishes to intervene have the required AFR and DOH

2   certification for the tidelands on or before August 28, 1995.  GSWW has failed to make this

3   showing.

4   **Conclusion:**   The Court concludes GSWW has failed to comply with the terms of the

5   settlement agreement and is not entitled to Intervenor status with regard to Parcel 113.

6

7   **SUMMARY REGARDING PRELIMINARY ISSUES**

8   As noted above in "II. Preliminary Issues," the Court made the following conclusions:

9   (1)  There is no automatic coverage under a DOH certificate for after-acquired parcels.

10   (2)  There is no automatic coverage under an AFR for after-acquired parcels.

11   (3)  The term "sustained commercial production" is dependent on the facts and

12   circumstances of each parcel and, at this point, is not susceptible to a specific definition.

13   (4)  The Growers have the burden of proof regarding compliance with the terms of the

14   Settlement Agreement.  The Treaty Tribes do not have a burden of proof.

15   **CONCLUSION REGARDING INDIVIDUAL PARCELS**

16   The Court has ruled with regard to the fourteen parcels as follows:

17   (1)  Intervenor status is GRANTED to Chelsea Farms – Parcel 92.

18   (2)  Intervenor status is DENIED to Chelsea Farms – Parcel 70; G&R Quality Seafood –

19   Parcel 110; Navy Yard Oyster – Parcel 390; Joe Leonard Oyster Company – Parcels 231 and

20   234; Sunrise Marine – Parcel 563; Taylor Homestead Clams – Parcel 574; Eagle Rock Shellfish

21   – Parcel 108; Topeeksin Shellfish – Parcel 855; Oliver Gary & Sons – Parcel 401; Olympic

22   Shellfish – Parcel 443; McDonald Mollusca – Parcel 341; and Girl Scouts of Western

23   Washington – Parcel 113.

24

1       (3)  The motion by the Puget Sound Shellfish Growers Legal Defense Fund, Inc. for an

2   order joining Anne-Marie Nylund as a party intervenor (Dkt. 20208 in C70-9213) is GRANTED.

3       (4)  Anne-Marie Nylunds' Motion to Intervene as to G&R Quality Seafood – Parcel 110

4   is DENIED.

5       DATED this 26th day of October, 2016.

6

7

8   Karen L. Strombom
    United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER REGARDING MOTIONS TO INTERVENE- 64