UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

Defendants.

CASE NO. 2:70-CV-09213-RSM

Subproceeding No. 89-3-12 (Shellfish)

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On May 8, 2015, Plaintiff Skokomish Indian Tribe ("Skokomish") filed a Request for Dispute Resolution under § 9 of the Revised Shellfish Implementation Plan ("Request for Dispute Resolution"). Dkt. 1. Currently before the Court is Defendants Dennis and Janis Dawsons' ("the Dawsons") Motion for Summary Judgment ("Motion"). Dkt. 43.

The Court concludes genuine issues of material fact exist regarding whether the Court has jurisdiction over the Dawsons pursuant to the Revised Shellfish Implementation Plan ("SIP").[1] The Court also concludes the Dawsons have failed to show disqualification of Attorney Earle Lees under Rule 3.7 of the Rule of Professional Conduct is appropriate. Therefore, the Motion is denied.

---

[1] Throughout this Order, when citing to the SIP, the Court is referring to Dkt. 14331 in Subproceeding 89-03.

**BACKGROUND**

A. <u>History of Shellfishing Rights</u>

In 1855, the United States negotiated five treaties ("Stevens Treaties") with the Tribes of western Washington, which at that time was a territory. *See United States v. State of Wash.*, 157 F.3d 630, 638 (9th Cir. 1998). The Tribes ceded aboriginal lands to the United States, but reserved the "right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens of the Territory...." *Id.*[2] The Shellfish Proviso of the Stevens Treaties, however, precluded the Tribes from harvesting shellfish on "any beds staked or cultivated by citizens." *United States v. State of Wash.*, 898 F.Supp. 1453, 1459-60 (W.D. Wash. 1995) ("*Shellfish II*").

In 1989, sixteen Tribes filed an action in the District Court seeking a declaration regarding the nature and extent of their shellfishing rights. *See id* at 1453. The District Court found, under the Stevens Treaties, the Tribes have the absolute right to fifty percent (50%) of the shellfish from "natural beds" in the Tribes' usual and accustomed grounds and stations in Washington waters. *Id.* at 1457, 1464. The District Court devised a plan for the implementation of the Tribes' shellfishing rights and entered the SIP on April 8, 2002. *See* SIP.

B. <u>Procedural History</u>

Skokomish filed the Request for Dispute Resolution, requesting the Court resolve ongoing disputes between Skokomish, Gold Coast Oyster, LLC ("Gold Coast"), and the Dawsons. *See* Dkt.

---

[2] In 1970, the United States of America and the Treaty Tribes sued the State of Washington seeking interpretation of the Stevens Treaties and an injunction to enforce the Treaty Tribes' fishing rights. *United States v. Washington*, 384 F.Supp. 312, 327 (W.D. Wash. 1974). In 1974, the District Court determined the Treaty Tribes were entitled to fifty percent of the harvestable fish from the Treaty Tribes' usual and accustomed grounds and stations. *Id.* The District Court reserved jurisdiction to hear future unresolved issues arising from the Stevens Treaties. *Id.*

1. Skokomish asserts the Dawsons are jointly and severally liable for the actions of Gold Coast and remain liable for their actions taken independently of Gold Coast. *See id*. at ¶ 4.40.

The Dawsons filed the Motion on December 23, 2016. Dkt. 43. Skokomish, Defendant Jamestown S'Klallam and Port Gamble S'Klallam Tribes ("S'Klallam"), and Interested Party Squaxin Island Tribe ("Squaxin Island") filed Responses on January 17, 2017. Dkt. 45, 47, 48. The Dawsons filed their Reply on January 20, 2017. Dkt. 49. The Court heard oral argument on February 13, 2017.[3]

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party asserting a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). All facts and reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (*citing Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

---

[3] During the hearing, the Court heard argument from Attorney Dennis Reynolds, on behalf of the Dawsons, Attorney Earle Lees, on behalf of Skokomish, Attorney Lauren Rasmussen, on behalf of S'Klallam, Attorney Sharon Haensly, on behalf of Squaxin Island, and Attorney Joe Panesko, on behalf of the State of Washington.

As the party moving for summary judgment, the Dawsons have the initial burden to demonstrate no genuine issue of material fact remains in this case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of the record, including pleadings, discovery materials, and affidavits, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has done this, the nonmoving party must show there are "genuine factual issues that properly can be resolved only by a finder of fact." *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The nonmoving party need not produce evidence in a form that would be admissible at trial to avoid summary judgment, but mere disagreement or the bald assertion stating a genuine issue of material fact exists does not preclude summary judgment. *Celotex*, 477 U.S. at 324; *California Architectural Building Products, Inc.*, 818 F.2d at 1468.

Regarding materiality, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Specifically, a "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id*.

Determining whether a "genuine" issue exists is often a close question. *Id.* The court must consider the substantive evidentiary burden the nonmoving party must meet at trial – e.g. a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 252. No genuine issue for trial exists where the record, taken as a whole, could not lead a rational trier of fact to find for the

non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat. Bank of Ariz. V. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient. *Id*. Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elect. Service Inc.*, 809 F.2d at 630 (*quoting Anderson*, 477 U.S. at 290); *see also California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment.").

In short, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3).

## DISCUSSION

In their Motion, the Dawsons assert: (1) the SIP does not apply to the Dawsons in this case and (2) Attorney Earle Lees should be disqualified from this proceeding under Rule 3.7 of the Rules of Professional Conduct. Dkt. 43.

### I. Proper Party under the Revised Shellfish Implementation Plan

First, the Dawsons argue the SIP does not apply to their activities in this subproceeding and, therefore, they are not subject to the SIP's dispute resolution provision and should be dismissed. *See* Dkt. 43.

A. <u>Applicable SIP Provisions</u>

Pursuant to § 2.5 of the SIP, "[e]ach Tribe may take, from natural beds, up to fifty percent of the sustainable harvest biomass of any shellfish species within the usual and accustomed areas for that Tribe." Section 6 of the SIP, titled Commercial Shellfish Growers, applies to shellfish "beds on property owned or leased by a Grower licensed in the State of Washington." Subproceeding 89-303, Dkt. 31, p. 7. Section 6 provides the procedures a Tribe and commercial grower ("Grower") must comply with when harvesting shellfish on Grower beds. *See* SIP § 6. In relevant part, § 6 requires a Grower who plans to enhance an existing natural bed or create a new artificial bed to provide written notice to the affected Tribe(s). *Id*. at § 6.3. The Tribes retain the right to 50% of the natural-occurring shellfish beds. *See State of Wash.*, 157 F.3d at 641. If the density of a "natural bed" on a Grower-controlled tideland is below the density requirements stipulated to by the parties, the Grower is entitled to 100% of the harvest.[4] However, if the "natural bed" density meets or exceeds the stipulated density requirements, a harvest plan must be created. *See* SIP § 6.

Section 7 of the SIP, titled Private Property Not Used for Commercial Shellfish Growing, covers "natural beds" on property not used for commercial growing. Tribes are entitled to 50% of the naturally-occurring shellfish. *See* SIP § 2.5. To exercise their rights, "Tribes shall survey privately owned tidelands to determine the existence of shellfish populations prior to commencing harvest[.]" SIP § 7.1. The Tribe(s) must provide notice to the property owner no less than one

---

[4] For example, as noted in the Consent Decree and Settlement Agreement Re Manila Clams, Native Littleneck Clams and Pacific Oysters, the minimum density for pacific oysters in Hood Canal is .33 mature, marketable pacific oysters per square foot. *See United States v. Washington*, Case No. 2:70-CV-9123, Dkt. 18848, p. 15; Dkt. 18859.

1  month prior to the survey. *Id*. at § 7.1.5. On the date the Tribe gives notice pursuant to § 7.1, "the

2  allocation [of shellfish] between tribal and non-tribal harvest shall commence[.]" SIP § 2.1.

3  "Any dispute arising under the implementation plan shall be brought before . . . [the]

4  Magistrate Judge appointed by the Court." SIP § 9.1.

5      B.  Evidence

6  The relevant evidence submitted by the parties is summarized as follows:[5]

7  The Dawsons own real property located at 13320 and 13330 E. Highway 106, Belfair,

8  Washington -- identified as tax parcel numbers 22220-41-00081 ("Parcel I") and 22220-41-00070

9  ("Parcel II"). Parcels I and II contain tidelands located in Hood Canal, Washington.[6] On May 1,

10 2014, the Dawsons entered into a License Agreement with Gold Coast, wherein the Dawsons

11 granted "Gold Coast an exclusive license to use the tidelands [of Parcels I and II] to harvest

12 commercial quantities of marketable shellfish." Dkt. 44, Dawson Dec., Exhibit 1. The License

13 Agreement stated the Dawsons retained title and ownership of the tidelands and Gold Coast could

14 not modify or change Parcel I or II without prior written approval from the Dawsons. *Id*. Gold

15 Coast also agreed to pay the Dawsons a royalty, which was twenty percent (20%) of the total sales

16 of each grade of oysters harvested from Parcels I and II. *Id*.

17 On June 6, 2014, Skokomish sent a letter to Gold Coast stating it intended to exercise its

18 Treaty rights under § 6 and § 7 of the SIP as to Parcel II. Dkt. 44, Dawson Dec., Exhibit 2.

19 Skokomish also sent a letter to the Dawsons on June 18, 2014, providing notice of its intent to

---

[5] The evidence before the Court is: Declaration of Dennis Dawson, with attached exhibits, Declaration of Leslie Mann, with attached exhibits, Declaration of Sharon Haensly, with an attached exhibit, Declaration of Jonathan Wolf, with attached exhibits, Declaration of Jessica Donovan, with attached exhibits. *See* Dkt. 2, 3, 44, 46, 48-1.

[6] The evidence is silent regarding the relationship of Parcel I to Parcel II. For example, it is unknown if Parcel I abuts Parcel II.

exercise its Treaty rights under § 6 and § 7 of the SIP as to Parcel II. *Id*. at Exhibit 3. After the Dawsons received the June 18 letter, Mr. Dawson contacted Gold Coast, expected Gold Coast to "handle the situation" with Skokomish, and required Gold Coast to sign an indemnity agreement. *Id*. at ¶ 10.

On June 25, 2014, Gold Coast began to harvest shellfish on the Dawsons' property. *Id*. at ¶ 18. Following the initial day of harvest by Gold Coast, which Mr. Dawson assumed was legal, Gold Coast arrived to continue harvesting on June 26, 2014. *Id*. at ¶¶ 18, 20. Representatives of Skokomish also arrived at Parcels I and II. *Id*. at ¶¶ 18-19. Representatives of Skokomish entered Parcel II and a confrontation ensued between representatives of Gold Coast, Skokomish, and Mr. Dawson regarding the harvest activities that were occurring. *Id*. at ¶¶ 18-20. Mr. Dawson told the Skokomish representatives his property was private and instructed the representatives to leave. *Id*. at ¶ 20. The harvest produced "twelve oyster bags and eight shell bags." *Id*. Mr. Dawson declined Skokomish's request to redistribute the harvested oysters. *Id*.

An unexecuted "Harvest Agreement" signed by Gold Coast on June 26, 2014 sought division of 5,000 dozen oysters between Gold Coast and Skokomish from oyster harvesting on Parcels I and II. Dkt. 2, Wolf Dec., Exhibit B. Also on June 26, 2014, Mr. Lees, an attorney for Skokomish, called Mr. Dawson and, according to Mr. Dawson, stated illegal activity occurred on the Dawsons' beach. Dkt. 44, Dawson Dec., ¶ 21.

On June 28, 2014, Mr. Dawson notified Gold Coast that Parcel II was removed from the License Agreement. *Id*. at ¶ 22. Parcel II was later added back to the License Agreement.[7] *Id*. Two days later, on June 30, 2014, Skokomish sent a letter to Mr. Dawson regarding Gold Coast's removal of Parcel II from its list of harvestable beaches and providing notice in accordance with §

---

[7] The date Parcel II was added back to the License Agreement is not included in the evidence.

7 of the SIP. *Id*. at Exhibit 4. On July 24, 2014, Skokomish sent a letter to Mrs. Dawson providing notice of intent to exercise its right to 50% of the shellfish provided under § 6 and § 7 of the SIP as to Parcel I. *Id*. at Exhibit 5. The next day, on July 25, 2014, Skokomish sent another letter to the Dawsons regarding notice of its intent to exercise its rights under § 6 and § 7 of the SIP as to Parcel II. *Id*. at Exhibit 6. Skokomish also provided, by certified mail, additional notices under § 6 and § 7 of the SIP to Gold Coast on July 22, 2014 (Parcels I and II) and August 19, 2014 (Parcel I). Dkt. 2, Donovan Dec., Exhibits B, D.

On March 18, 2015, Mr. Dawson sent an email to Gold Coast regarding seeding plans on Parcels I and II. *See* Dkt. 46, MacMillan Dec., Exhibit A. Mr. Dawson stated, "I expect fireworks when you file our plan with the state as the aboriginals obviously know the oysters have been removed since they conducted their illegal clam study." *Id*. On April 15, 2015, Gold Coast filed an "empty" § 6.3 notice stating Parcels I and II do not contain any densities as set forth by the SIP. Dkt. 3, Wolf Dec., Exhibit A.

To date, Skokomish has not completed density surveys of Parcel I or II. *See* Dkt. 44, Dawson Dec., ¶ 25.[8] Mr. Dawson stated Skokomish could conduct the survey after it makes proper arrangements and agrees with Mason County records regarding the widths of Parcels I and II. *Id*. Mr. Dawson also stated there is very little commercial production of oysters "on the ground" and "[t]here are few, if any, naturally occurring clams on Parcels I and II." *Id.* at ¶¶ 6, 7. While he is unsure if Parcels I and II would qualify as "enhanced," he does not waive the position. *Id.*

An investigation into the conduct on Parcels I and II showed the harvested shellfish were wild stock, not commercially grown. Dkt. 3, Wolf Dec., Exhibit D. There has also not been an

---

[8] The Court notes a density survey was not completed prior to the June 2014 harvest. *See* Dkt. 3, Wolf Dec., Exhibit B.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 9

aquatic farm registration for Parcel I or II. *Id*. As of November 28, 2016, Parcels I and II are completely controlled by the Dawsons. *See* Dkt. 46, MacMillan Dec., Exhibit B. A harvest agreement has not been executed between the Dawsons and any Tribe. Dkt. 44, Dawson Dec., ¶26.

C. <u>Analysis</u>

The Dawsons assert the SIP is not applicable to them because this matter is between Skokomish and Gold Coast, a Grower. Dkt. 43. The Court finds Skokomish has rebutted the Dawsons' assertions because there is evidence showing: (1) Parcels I and II were private property not used for commercial growing; (2) there is a dispute arising under § 2.5 of the SIP; and (3) there is an ongoing dispute between Skokomish and the Dawsons under § 7 of the SIP.

First, there is evidence showing Parcels I and II were, at all times, private property not used for commercial growing and therefore subject to § 7 of the SIP. The Dawsons entered into an agreement with Gold Coast to harvest wild stock shellfish on Parcels I and II. There is no evidence of enhancements to the shellfish beds and there was no aquatic farm registration for Parcel I or II. Additionally, there is evidence showing Parcels I and II were under the control of the Dawsons during the June 2014 harvest. The Dawsons allowed Gold Coast to harvest shellfish on the their property under a License Agreement, Gold Coast owed the Dawsons royalties, and Gold Coast could not make modifications to Parcels I or II without the Dawsons' permission. Mr. Dawson was present and involved in a confrontation between representatives of Skokomish and Gold Coast during the June 2014 harvest on Parcels I and II, which was after the Dawsons were on notice of Skokomish's rights to the natural, harvestable shellfish. *See* Dawson Dec., ¶¶10, 11. Further, nine months after the harvest, Mr. Dawson and Gold Coast were in communication regarding Gold Coast and the Dawsons' plan to enhance Parcels I and II. *See* Dkt. 46, MacMillan Dec., Exhibit A.

The evidence, viewed in the light most favorable to Skokomish, shows the Dawsons owned the tidelands and had control over the June 2014 harvest that occurred on their property. The Dawsons had notice of Skokomish's rights under § 6 and § 7 of the SIP prior to the harvest. Also, well after the harvest occurred, Mr. Dawson was in contact with Gold Coast regarding their plan for shellfish enhancements on Parcels I and II, showing the Dawsons had control over the harvest activities occurring on Parcels I and II.

There is evidence showing Parcels I and II were: (1) natural, not enhanced, shellfish beds; (2) owned and controlled by a private property owner during the June 2014 harvest; and (3) not harvested by a Grower. As such, there is evidence showing the dispute between Skokomish and the Dawsons arises under § 7 of the SIP. *See* SIP § 7 (Private Property Not Used for Commercial Shellfish Growing); Subproceeding 89-303, Dkt. 31, p. 7 ("§ 6 can only apply to beds on property owned or leased by a Grower licensed in the State of Washington").

Second, Tribes, including Skokomish, are entitled to 50% of all the sustainable harvest of the shellfish in "natural beds" under § 2.5 of the SIP. The evidence shows the shellfish beds on Parcels I and II were wild stock, or "natural." Prior to the harvest, on June 18, 2014, Skokomish provided the Dawsons with notice that it intended to exercise its Treaty rights under § 7 of the SIP. As such, there is evidence showing Skokomish exercised its Treaty rights under § 7 on June 18, 2014 and, from June 18, 2014 forward, Skokomish was entitled to and has not received 50% of the natural sustainable harvest on Parcels I and II. Therefore, there is a genuine issue of material fact regarding the Court's jurisdiction over the dispute between Skokomish and the Dawsons under § 2.5 of the SIP.

Third, regardless of the Dawsons' actions during the June 2014 harvest, the Court finds there is evidence of ongoing disputes between Skokomish and the Dawsons under § 7 of the SIP.

1  The evidence shows the parties have ongoing disputes regarding the property boundaries of Parcels
2  I and II, the methodologies of surveying, the shellfish densities, and the execution of a harvest
3  agreement. At this time, the Dawsons and Skokomish have been unable to agree on the beach
4  width of Parcels I and II. Further, there is a dispute over the methodology of the survey. For
5  example, it is unclear what survey methodology will be needed to determine shellfish densities
6  because the shellfish have not replenished following the June 2014 harvest. Additionally, there is
7  conflicting evidence regarding the shellfish densities on Parcels I and II. The evidence shows
8  Parcels I and II contained: (a) 5,000 dozen oysters, (b) 12 bags of oysters, (c) few naturally
9  occurring clams, and (d) very little commercial oyster product. The conflicting evidence in the
10 record shows there is evidence of a dispute over the densities on Parcels I and II. Without
11 agreement regarding the property boundaries and the densities on Parcels I and II, the parties have
12 been unable to enter into a harvest agreement. Therefore, the evidence shows there are several
13 ongoing disputes, which the parties appear to be unable to resolve, regarding provisions in § 7 of
14 the SIP.

15      As there is evidence to show § 2.5 and § 7 of the SIP are applicable to the dispute between
16 Skokomish and the Dawsons, there is a genuine issue of material fact as to whether the Court has
17 jurisdiction over the Dawsons pursuant to § 9.1 of the SIP. Therefore, the Court finds Skokomish
18 has sufficiently rebutted the Dawsons' assertion that they are not subject to the Court's jurisdiction
19 under the SIP. Accordingly, the Motion is denied as to the Dawsons' request to be dismissed with
20 prejudice from this action.

21      **II.     Disqualification of Counsel**

22      The Dawsons assert Skokomish's attorney, Mr. Lees, should be disqualified under Rule 3.7
23 of the Rules of Professional Conduct. Dkt. 43. The Dawsons argue, in full:

24

1        The Rules of Professional Conduct provide: "(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." (RPC, Rule 3.7, Lawyer as Witness). The Tribe's attorney's statement set out above (and his credibility) are at issue, and he must serve as a witnesses [sic], disqualifying him from further participation as an advocate for [Skokomish] in this proceeding.

Dkt. 43, p. 11.

      Here, the Dawsons provide a conclusory statement that Mr. Lees should be disqualified from this case. *See id*. The Dawsons have not adequately explained why Mr. Lees is "likely to be a necessary witness" at trial in this matter. Therefore, the Court finds the Dawsons have not shown disqualification of Mr. Lees is appropriate. Accordingly, the Motion is denied as to the Dawsons' request to have Mr. Lees disqualified.

## CONCLUSION

      The Court concludes the evidence shows a genuine issue of material fact exists regarding whether the Court has jurisdiction under the SIP over the dispute between Skokomish and the Dawsons. Therefore, the Dawsons have failed to show dismissal with prejudice is appropriate at this time. Further, the Dawsons have failed to show Mr. Lees is likely to be a necessary witness at trial in this case and, therefore, Mr. Lees should not be disqualified from this case. Accordingly, Plaintiff's Motion is denied.

      Dated this 2nd day of March, 2017.

                                                    David W. Christel
                                                    United States Magistrate Judge