1

2

3

4

5

6

7        UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
8               AT TACOMA

9   UNITED STATES OF AMERICA, et al.,

10              Plaintiff,              CASE NO. 2:70-CV-09213-RSM

11        v.                           Subproceeding No. 89-3-12 (Shellfish)

12   STATE OF WASHINGTON, et al.,       AMENDED ORDER ON REQUEST
                                       FOR DISPUTE RESOLUTION
13              Defendant.

14

15        On May 8, 2015, the Skokomish Indian Tribe ("Skokomish") filed a Request for Dispute

16   Resolution under § 9 of the Revised Shellfish Implementation Plan ("RFD"), requesting the

17   Court resolve ongoing disputes between Skokomish and Gold Coast Oyster, LLC ("Gold

     Coast"). Dkt. 1. A bench trial was held from September 16 - 18, 2019. *See* Dkt. 102, 104-105.
18
     The parties submitted post-trial briefs and, on November 20, 2019, the Court heard closing
19
     arguments. Dkt. 114-121. The court has jurisdiction to resolve this dispute under authority
20
     conferred by the Stipulation and Order Amending Shellfish Implementation Plan ¶ 9.1 (April 8,
21
     2002) ("SIP").[1]
22

23   _____

24   [1] Throughout this Order, when citing to the SIP, the Court is referring to Dkt. 14331 in Subproceeding 89-03.

## I. Background

A. *Revised Shellfish Implementation Plan*

This dispute arises over the application of the "Shellfish Proviso" in the Stevens Treaties. In 1855, the United States negotiated five Treaties with the Tribes of western Washington, at that time, a territory. These Treaties reserved to the Tribes the "right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens of the Territory." *United States, et al. v. Washington, et al.*, 157 F.3d 630, 638 (9th Cir. 1998). With respect to shellfish, however, this right was limited by the Shellfish Proviso, which stated, "*Provided, however,* [t]hat they shall not take shellfish from any beds staked or cultivated by citizens." *Id.* at 639 (emphasis in original).

This court addressed the Shellfish Proviso in a series of cases beginning in 1994. In *Shellfish I*, 873. F.Supp. 1422 (W.D. Wash. 1994), the court "interpreted the Treaties to award fifty percent of the shellfish harvest in Washington waters to the Tribes." *Washington*, 157 F.3d at 641. That award, however, was subject to the limitations of the Shellfish Proviso. First, the court concluded that the Shellfish Proviso did not apply to natural or native shellfish beds. *Shellfish I*, 873 F.Supp. at 1429. The court then interpreted the term "staked and cultivated by citizens" to describe "artificial shellfish beds created by private citizens," including "the intervenor growers' farms." *Id.* at 1441. The court found that such artificial beds are not subject to Tribal treaty fishing, "except to the extent that natural clam beds may be sub-adjacent to the staked or cultivated shellfish beds." *Id.* The court then held a six-day trial, the purpose of which was to receive evidence from which the parties could develop a plan to implement *Shellfish I*.

The implementation plan was incorporated into *Shellfish II*, 898 F.Supp. 1453 (W.D. Wash. 1995). The court defined a "natural shellfish bed" as "a bed which is capable of sustaining a yield of shellfish that will support a commercial livelihood." 898 F.Supp. at 1460–61. The

1   court noted that all parties agreed that "any shellfish beds created exclusively by the Growers'

2   efforts—'by scratch', as it were – are not subject to tribal harvesting, as such beds are clearly

3   'staked and cultivated' within the meaning of the Shellfish Proviso." *Id.* at 1462.

4          The district court in *Shellfish II* improperly broadened the definition of "cultivated"

5   shellfish beds to include so-called "de facto artificial beds," meaning natural shellfish beds that

6   have been enhanced by human means. *Washington*, 157 F.3d at 650. Ruling that the Tribes could

7   not be excluded from their ancient fisheries, but merely from taking an unfair share, the appeals

8   court devised the following allocation scheme: (1) a shellfish bed on Grower's property that

9   existed "solely by virtue of the natural propagation of the species"—a "natural bed"—is subject

10  to "a full fifty percent harvest allocation." *Id* at 652. (2) Where a Grower has enhanced the

11  natural production of a bed through cultivation efforts, the Tribal share is "fifty percent of the

12  pre-enhanced sustainable shellfish production." *Id.* at 653. For such enhanced natural beds, the

13  burden is on the Growers to "demonstrate what portion of their harvest is due to their labor, as

14  opposed to what portion would exist absent the Growers' enhancement." *Id.* Only the portion of

15  shellfish which is proven to be due to the Grower's efforts is excluded from Tribal harvest. *Id.* at

16  653. (3) Artificial beds, defined as "Grower beds that did not support a sustainable commercial

17  density of shellfish prior to cultivation," are not subject to Tribal harvest at all. *Id.* The Ninth

18  Circuit court remanded the matter for further proceedings consistent with the opinion. Pursuant

19  to that remand, the court, on April 8, 2002, approved the parties' stipulation which created the

20  SIP.

21      B. *Request for Dispute Resolution*

22          On May 8, 2015, Skokomish filed the RFD, requesting the Court resolve ongoing disputes

23  between Skokomish and Gold Coast regarding Gold Coast's shellfishing activities in Hood Canal.

24

1    *See* Dkt. 1.[2] Skokomish joined the Port Gamble S'Klallam Tribe, the Jamestown S'Klallam Tribe,

2    the Lower Elwha Klallam Tribe, and the Suquamish Tribe as parties to the RFD because these

3    Tribes have overlapping usual and accustomed fishing and shellfishing areas in Hood Canal. *See*

4    *id.* at ¶¶ 2.9-2.13. Skokomish contends that it has properly served notice on Gold Coast of its intent

5    to harvest approximately 50 tidelands under §§ 6 and 7 of the SIP. *See id.* at ¶¶ 4.3. Skokomish

6    requests declaratory relief, injunctive relief, and compensatory damages. *See id.* at ¶ 5.1.

7         Gold Coast filed a Response to the RFD on June 26, 2015. Dkt. 24. Skokomish filed a

8    Response to Gold Coast's Response on July 10, 2015. Dkt. 25. No other parties filed a response

9    to the RFD.

10        C.   *Partial Settlement Agreement*

11        On September 7, 2017, Skokomish, the Port Gamble S'Klallam Tribe, the Jamestown

12   S'Klallam Tribe (S'Klallam"), and Gold Coast entered into a Partial Settlement Agreement

13   ("PSA"). Dkt. 63.

14        D.   *Pre-trial and Trial*

15        In the Pretrial Order, filed on the eve of trial, S'Klallam raised separate claims against

16   Gold Coast. *See* Dkt. 100. During the September 2019 trial, Skokomish and S'Klallam ("the

17   Tribes") presented witnesses and evidence. The Squaxin Island Tribe and the State of

18   Washington, as interested parties, also briefly questioned select witnesses and provided brief

19   argument. Gold Coast did not present any witnesses. During the trial, Gold Coast moved to strike

20   any independent claims raised by S'Klallam in the Pretrial Order. The Court granted this

21

22   _____

23        [2] Skokomish named Dennis Dawson and Janis Dawson f/k/a Janis Chapman as Defendants in this case. *See*
     Dkt. 1. The Dawsons have been dismissed from this action and are not relevant to the Court's determination. *See*
24   Dkt. 77.

request.[3] The Tribes did not request bifurcation of the trial for the Court to consider liability and damages separately.

At trial, the parties and undersigned agreed to waive, under SIP § 9.2.5, the ten (10) day period within which a decision must be issued following the conclusion of a hearing.

E. *Scope*

The Court is limited to deciding the issues raised in the RFD. In the RFD, Skokomish asserts there is a dispute over (1) whether § 6 or § 7 of the SIP applies to the tidelands under Gold Coast's control, (2) Gold Coast's restrictions on Skokomish's access to tidelands, (3) Gold Coast's rejection of Skokomish's survey and population estimate methodology, and (4) the coordination, development, and execution of harvest plans. *See* Dkt. 1.[4] The following parcels are the only parcels identified in the RFD:

> Mason County parcel number(s) 22202-40-80221, 22202-51-00005, 22217-21-00060, 22218-13-00000, 22220-41-00070, 22220-41-00081, 22221-24-00360, 22221-24-00370, 22230-50-00009, 22230-50-00010, 22406-51-00012, 22406-51-00903, 32220-50-02008, 32220-50-02071, 32220-50-03068, 32224-51-02040, 32225-51-00033, 32225-51-00034, 32225-51-00036, 32225-51-00037, 32225-51-00053, 32233-50-00016, 32233-51-00023, 32236-50-00001, 32310-50-01001, 32310-50-01002, 32310-50-01900[, 22406-51-00014; 32235-32-00060; 32234-34-00150; and 32234-34-00170]; Kitsap County parcel number(s) 162501-4-016-1004, 192402-1-038-1001, 192402-1-039-1000, 192402-1-083-1005, 192402-1-086-1002, 4438-000-037-0001; and Jefferson County parcel number(s) 501032008, 602242010, 964600013, 964600502, 964600601.

*Id.* at ¶ 4.3 ("Disputed Tidelands"); *see also* SIP § 2.5 (sustainable harvest biomass shall be shared on a *bed by bed* basis).

At trial, the Tribes sought to expand the scope of the RFD, requesting the Court find, generally, that Gold Coast violated the SIP and PSA on every Hood Canal tideland on which

---

[3] S'Klallam filed a Motion for Clarification and/or Reconsideration of the Court's decision. Dkt. 106. A separate order will be entered regarding this Motion.
[4] Licensing matters regarding Gold Coast and the State of Washington are not before this Court.

Gold Coast is or was connected. *See* Dkt. 109, p. 24. Skokomish stated that "[a]ll of the tidelands in Hood Canal were pled as part of our prayer for relief in the original case. We identified a handful of cases as examples in our pleadings, but we asked for relief as to all Hood Canal tidelands." *Id*. at ll. 12-16. The Court does not find the RFD names the Disputed Tidelands as mere examples. Further, the Court does not interpret the prayer for relief to expand the scope of the allegations contained in the RFD; rather, it appears Skokomish is generally seeking relief as to the Disputed Tidelands. *See* Dkt. 1. The Court notes it allowed the Tribes great latitude in the presentation of evidence at trial. However, the Tribes never sought to amend the RFD to include additional claims or additional tidelands for dispute resolution in this case. Therefore, the Court has considered evidence unrelated to the Disputed Tidelands as contextual; however, this case is narrowed to the claims surrounding the Disputed Tidelands only. The Court declines to extend the scope of this case to any issue beyond the disputed issues raised in the RFD involving the Disputed Tidelands.[5]

**II.      Discussion**

A. *Violations of the SIP and PSA*

The Tribes request the Court find Gold Coast has violated both the SIP and the PSA.

1.   <u>SIP Violations</u>

The Court has reviewed the testimony and admitted exhibits. The Court finds there is sufficient evidence to show Gold Coast violated the SIP.

---

[5] Regardless of the scope of claims identified in the RFD, the Court finds the PSA expands the scope of any prospective relief granted in this case to all Hood Canal tidelands within Gold Coast's control. *See* Dkt. 63, ¶ (g).

a.   Deficient 6.3 Notices

Section 6.3 of the SIP requires a Grower to provide written notice ("6.3 Notice") to the affected Tribe(s) of the Grower's intention to enhance an existing natural bed or create a new artificial bed. A 6.3 Notice must include the location and species of the proposed bed and a summary of information known to the Grower. The 6.3 Notice must also "explain the basis for the Grower's determination that sustainable yield of shellfish is below the natural bed threshold in Exhibit A or if it is above the threshold, what the sustainable harvest yield is." SIP § 6.3.

On November 9, 2012, Gold Coast held itself out to be commercial Grower under § 6 of the SIP when it served 6.3 Notices on the Tribes stating it intend to create artificial shellfish beds or enhance natural shellfish beds on 150+ tidelands in Hood Canal. *See* Exhibit SK -154; Dkt. 109, Wolf Testimony, pp. 62-63; Dkt. 110, Hatch Testimony, p. 31. The 6.3 Notices stated that the sustainable yield of shellfish is below the natural bed threshold for the parcels in question. Dkt. 110, Hatch Testimony, pp. 31-32. However, Gold Coast's 6.3 Notices did not adequately explain the basis for Gold Coast's determination that the sustainable yield of shellfish was below the natural bed threshold or that there were no natural beds. *Id*. Gold Coast also provided an extensive species identification list that includes more species than probable for cultivation on one tideland. *See e.g.* SK-163, pp. 8-9. For example, Gold Coast provided the following 6.3 Notice for Mason County Parcel Nos. 22220-41-00081 & 22220-41-00070:

> Grower's Notice of Intent to Create a New Artificial Shellfish Bed or to Enhance an Existing Natural Shellfish Bed under Section 6.3 of the Revised Shellfish Implementation Plan. April 15th 2015. Gold Coast Oyster LLC (360) 426-0379 P.O. Box 276 Shelton WA 98584 Mason County 2222[0]-41-00081 & 22220-41-00070 All areas south of the Hood Canal Bridge. Dawson, Dennis. Cultivation to commence 61 days post tribal receipt. See attachment of species cultivation list. These parcels have been harvested previously by DD Denotta Seafood, Tom Farmer, and several other growers dating back many generations. This parcel has had extensive historical cultivation efforts over the decades. WADOH has listings

of previous approvals. This property does not contain any densities set forth by the SIP.

SK-163, Wolf Declaration, ¶ 6; Dkt. 108, Paul Testimony, pp. 149-50.

Based on the record, Gold Coast's 6.3 Notices did not comply with the requirements detailed in the SIP. While Gold Coast has withdrawn its claims to coverage under § 6, Dkt. 100 (Admitted Fact No. 8), the Court finds Gold Coast's decision to hold itself out as a commercial Grower for several years caused a loss of opportunity for the Tribes. As such, even if the Disputed Tidelands are currently governed by § 7, Gold Coast was not relieved of its obligations under § 6.3 to provide proper notice on the Disputed Tidelands on which it initially held itself out to be a Grower. Therefore, the Court finds Gold Coast violated the SIP when it served the deficient 6.3 Notices in November of 2012. *See* C70-9213, Dkt. 21232 (finding similar 6.3 Notices did not comply with the SIP).

   b.   Impeded Ability to Inspect Tidelands

There is also evidence Gold Coast placed unreasonable requirements on the Tribes when the Tribes attempted to inspect tidelands that were/are under Gold Coast's control in violation of the SIP. Under §6.3, if a Tribe contests the Grower's conclusion that there is no natural bed in the location of the proposed enhanced or artificial bed, "the Tribe shall be given the opportunity to inspect the location of the proposed bed upon fourteen days notice to the Grower." SIP § 6.3. Further, under § 7.1, the Tribes must conduct "a survey or population assessment . . . prior to any tribal harvest" on each particular privately-owned tideland. The following examples support the Court's conclusion that Gold Coast did not provide the Tribes adequate opportunities to inspect the location of proposed beds under § 6.3 or conduct survey or population assessments under § 7 for tidelands within its control:

- Gold Coast did not keep precise records regarding tideland activities on each specific tideland under its control. *See* SK-16 – SK-84, SK-86, SK-87, SK 100. The Tribes provided evidence that without more detailed records, such as harvest records, the Tribes were unable to meaningfully inspect the tidelands prior to harvesting as required under the SIP. *See* Dkt. 109, Wolf Testimony, pp. 78-79; Dkt. 108, Paul Testimony, pp. 155-57.

- Gold Coast informed the Tribes that if the Tribes did not complete surveys by specific dates, it would consider any survey conducted by the Tribes a trespass on the tideland and the survey would not be valid. *See* Dkt. 109, Gage Testimony, p. 160.

- Shannon Miller, the Intertidal Shellfish Manager at the Point No Point Treaty Council, testified it took three or four phone calls lasting a minimum of forty-five minutes each to schedule a survey on one tideland – the Huppert Tideland – controlled by Gold Coast. Dkt. 109, Miller Testimony, pp. 117-18. When coordinating other surveys with other persons, it would take Miller five minutes. *Id.*

- To conduct surveys, Gold Coast required the Tribes to have permits that the Tribes were not required to have. *See* Dkt. 109, Gage Testimony, p. 160; Dkt. 100, Hatch Testimony, pp. 37-38.

- Gold Coast did not want tribal employees to land boats on the tidelands. *See e.g.* Dkt. 109, Miller Testimony, pp. 117-18. To accommodate Gold Coast's requirement, Miller had to send additional staff members to tend to the boat while other staff members completed the survey. *Id.* at pp. 118-19. Miller testified that he never had to have a staff member stand in the water tending to the boat and did not find it reasonable to do so. *Id.* At trial, Gold Coast did not present evidence refuting the Tribes' evidence showing the additional requirements it placed on the Tribes when they were attempting to inspect and/or

1   survey tidelands were reasonable. On notice of the Tribes' treaty rights, Dkt. 100 (Admitted Fact

2   No. 4), Gold Coast took actions that caused a loss of opportunity for the Tribes. Thus, the Tribes

3   have shown, by a preponderance of the evidence, that Gold Coast did not provide the Tribes with

4   adequate opportunities to inspect and/or survey the Disputed Tidelands and, thus, impeded the

5   Tribes' abilities to exercise their Treaty Rights.

6          c.   Conclusion

7          For the above stated reasons, the Court finds Gold Coast sent deficient 6.3 Notices and

8   impeded the Tribes' ability to perfect their Treaty Rights, which caused a loss of opportunity for

9   the Tribes. Therefore, the Court concludes Gold Coast has engaged in conduct that violated the

10  SIP and frustrated the Tribes' abilities to comply with the SIP. The Tribes are entitled to relief

11  because of these violations.

12          2.   PSA Violations

13          a.   PSA

14          The Tribes and Gold Coast entered the PSA on September 17, 2017. Dkt. 63.[6] Under the

15  PSA:[7]

16   •   Gold Coast agreed to allow the Tribes access to tidelands to conduct inspections, surveys,

17       population estimates, and harvests and to not restrict the Tribes from accessing tidelands

18       or threaten, interfere, and/or intimidate any person on the tidelands during an inspection,

19       survey, harvest, or population estimate. *Id*. at ¶ (b)-(e).

20  ───────────────

21          [6] The RFD does not request dispute resolution for PSA violations. *See* Dkt. 1. Further, despite the ability to
     amend the pleadings on or before April 19, 2019, Skokomish did not amend the RFD to include PSA violations. *See*

22   Dkt. 74. However, Gold Coast did not object to the Court considering whether Gold Coast violated the PSA. Thus,
     the Court will consider the alleged PSA violations. The Court notes the consideration of the PSA has only expanded

23   the scope of the prospective relief to all Hood Canal tidelands in Gold Coast's control. *See* Section C, *infra*; *see also*
     Dkt. 63, ¶ (g).
             [7] The Court notes this is a summary of relevant portions of the PSA. The Court has reviewed the PSA and

24   does not find it necessary to restate the PSA in its entirety.

AMENDED ORDER ON REQUEST FOR
DISPUTE RESOLUTION - 10

- Gold Coast agreed to provide the Tribes with copies of its leases, licenses, or contracts or a memorandum demonstrating proof of control. *Id*. at ¶ (f).

- From the date of the PSA forward, Gold Coast agreed to provide the Tribes with complete records of all harvests for each tideland currently under its control within thirty days of each harvest. *Id*. at ¶ (g).

- The parties agreed to pay back the affected parties for the amount of shellfish it overharvested (if any) from the parties share of shellfish located on the tidelands controlled in whole or in part by Gold Coast. *Id*. at ¶ (l).

- The parties agreed to enter into harvest plans that contained agreed upon or judicially determined harvest amounts and any pay back amounts. *Id*. at ¶ (m).

- Gold Coast agreed to notify the Tribes within fourteen days when its control of a site terminated. *Id*. at ¶ (o).[8]

   b.   Violations

The Tribes assert Gold Coast violated the PSA. The Tribes appear to primarily assert Gold Coast has not provided documentation as agreed to in the PSA and has harvested without harvest plans. However, the Tribes have provided only speculation that Gold Coast violated the PSA. For example:

- The Tribes contend Gold Coast has not provided complete harvest records in violation of ¶ (g) of the PSA. *See* Dkt. 109, Wolf Testimony, pp. 78-79, 96; Dkt. 109, Miller Testimony, pp. 123-24.

---

[8] The Court also entered a minute entry on December 5, 2017 memorializing an agreement between the parties wherein Gold Coast agreed to provide additional information to the Tribes and the Tribes agreed to provide Gold Coast with a checklist of steps needed for 6.3 compliance. *See* Dkt. 67. The record does not indicate this minute entry amended the PSA. Therefore, the Court declines to consider whether Gold Coast's alleged failure to comply with the December 5, 2017 minute entry was a violation of the PSA.

1        o   First, to the extent the Tribes are asserting Gold Coast has failed to provide historical

2            harvest records following the PSA, this contention is belied by the language of the

3            PSA. The PSA states that "[f]rom the date of this agreement forward Gold Coast shall

4            provide each affected Indian Tribe with complete records of all harvests ... within

5            (30) days of each harvest[.]" Dkt. 63, ¶ (g). The PSA does not state Gold Coast

6            agreed to provide historical harvest records. Therefore, Gold Coast did not violate the

7            PSA by failing to provide records for any harvest that occurred prior September 7,

8            2017, the date the PSA was signed.

9        o   Second, there is no evidence, beyond speculation, that Gold Coast has provided

10           incomplete harvest records for any harvest occurring after the PSA was entered.

11           Rather, evidence shows Gold Coast has provided all the records in its possession. *See*

12           SK-156, Grout Depo., pp. 20, 34; *see also* GC-512. Further, it is unclear how the

13           Tribes have come to the conclusion that Gold Coast has not provided complete

14           harvest records. It appears the Tribes are relying on the sales logs, invoices, and

15           shellfish tickets produced by Gold Coast. *See* Dkt. 109, Wolf Testimony, pp. 103,

16           105; Dkt. 109 Miller Testimony, pp. 129-44. However, the sales logs are unclear; it is

17           difficult to discern if the sales logs show shellfish sales, shellfish purchases, or both.

18           Further, the records do not clearly indicate where or how Gold Coast obtained

19           shellfish. *See* SK-53, SK-54, SK-55. In fact, evidence shows Gold Coast purchased

20           shellfish from harvesters and sold to other individuals. For example, Gold Coast

21           purchased oysters from Vincente Torres, who harvested the oysters, and then Gold

22           Coast sold the oysters to "Dicarlo and other venders" for a profit. SK-156, Grout

23           Depo., pp. 35, 121-22; *see also* SK-68, p. 76 (tickets indicating shellfish was

24

1  purchased from Torres). Kevin Cagey, a shellfish technician for Skokomish, testified

2  he sold shellfish to Gold Coast and a cancelled check supports that testimony. *See*

3  Dkt. 108, Cagey Testimony, p. 63; SK-18, p. 17. The Tribes did not provide sufficient

4  evidence (for example, by live testimony or depositions) showing Gold Coast

5  harvested shellfish and did not report the harvests. There is also no evidence showing

6  Gold Coast failed to provide business records to the Tribes. The Court further notes

7  the Tribes did not submit a Rule 30(b)(6) deposition of Gold Coast that could confirm

8  the business records were complete, explain the business records, or confirm that an

9  unreported harvest occurred.

10  • The Tribes contend Gold Coast has not provided all leasing or licensing agreements.

11  However, there is no evidence showing Gold Coast failed to provide this information. *See*

12  GC-512. Rather, the evidence shows Gold Coast produced all documents within its

13  possession. *See* SK-156, Grout Depo., pp. 20, 34. While evidence shows Gold Coast does

14  not maintain detailed business records, the Tribes have failed to show a violation of the

15  PSA solely because of Gold Coast's record keeping.

16  • The Tribes assert Gold Coast is harvesting without harvest plans in violation of the PSA.

17  However, the PSA states that the parties will enter into harvest plans that contain agreed

18  upon or judicially determined harvest amounts. There is no evidence of any agreed upon

19  or judicially determined harvest amounts for any tidelands that are under Gold Coast's

20  control. The Tribes admit they have not conducted surveys of any Gold Coast controlled

21  tideland following the PSA. *See* Dkt. 109, Wolf Testimony, pp. 79, 98-99. Further, the

22  PSA contemplates harvests by Gold Coast absent harvest plans, in that, independent of

23  the provision regarding harvest plans, the PSA directs Gold Coast to provide harvest

24

records within thirty days of a harvest. *See* Dkt. 63, ¶ (h). The Court does not interpret the PSA to restrict Gold Coast from harvesting if the parties have not agreed on a harvest plan. *See* Dkt. 63.

- The Tribes argue Gold Coast has not conducted any surveys prior to harvesting in violation of the PSA. The language in the PSA contemplates that the Tribes, not Gold Coast, will conduct surveys. *See* Dkt. 63, ¶¶ (b), (i), (j). The PSA states that Gold Coast (1) shall allow affected Tribe(s) to access tidelands to conduct inspections, surveys, population estimates, and harvests and (2) shall not object to or dispute the survey and population estimate methodologies used by the Tribes that are consistent with or more precise than those used by the State of Washington. *Id*. at ¶¶ (b), (i). Gold Coast is free to conduct its own surveys and/or population estimates. *Id*. at ¶ (j). The language of the PSA appears to place the burden on the Tribes to conduct the surveys and population estimates and Gold Coast cannot interfere with the Tribes ability to conduct such surveys. *See e.g.* Dkt. 63, ¶¶ (b), (i). Therefore, the Tribes have not shown Gold Coast has violated the PSA by harvesting prior to conducting a survey.

- The Tribes argue they cannot conduct surveys because of Gold Coast's conduct following the PSA. However, the Tribes have not provided evidence sufficient to show Gold Coast impeded tideland inspections and surveys following the PSA. The evidence also shows Gold Coast provided all documentation it has in its control. *See* SK-156, Grout Depo., pp. 20, 34. Further, evidence shows the Tribes did not perform any surveys after the PSA was entered and intended to take this case to trial. Dkt. 109, Wolf Testimony, pp. 78-79, 98-99; *see also* Dkt. 108, Paul Testimony, p. 158 (attempted some surveys at the end of

2016). As such, the Tribes have not shown Gold Coast's conduct following the PSA violated the PSA or impeded the Tribes' abilities to exercise their Treaty Rights.

Overall, the Tribes maintain Gold Coast failed to provide agreed upon documents to the Tribes and harvested prior to entering harvest plans with the Tribes in violation of the PSA. The Tribes, however, failed to provide sufficient evidence to prove violations of the PSA. Accordingly, the Court finds the Tribes have not shown Gold Coast violated the PSA.

B. *Insufficient Evidence*

The Tribes argue Gold Coast's violations of the SIP and PSA are pervasive and have frustrated and impeded the Tribes' abilities to exercise their Treaty Rights. Further, the Tribes argue Gold Coast's violations necessitate compensatory damages and declaratory and injunctive relief. However, the Tribes' evidence is based primarily on witnesses' speculative interpretations of circumstantial evidence and Gold Coast's business records. In presenting their case, the Tribes ask the Court to sift through voluminous records and speculate as to Gold Coast's activities as to the poundage of the tribal share of shellfish that may have been harvested by Gold Coast. Despite the Tribes' failure to adequately explain the evidence and link the evidence to the alleged violations and damages, the Court has attempted to piece together the evidence and concludes the evidence is inconsistent and inconclusive.

While the Court has found Gold Coast violated the SIP, the evidence relied on by the Tribes to show additional violations of the SIP and the PSA is insufficient. Furthermore, there does not appear to be evidence, beyond speculation, that: (1) shows the amount of shellfish harvested by Gold Coast; (2) shows from what tidelands Gold Coast harvested those shellfish; (3) shows, if Gold Coast did harvest a tideland, Gold Coast took the Tribes' treaty share of

shellfish; or (4) differentiates the amount of shellfish Gold Coast allegedly harvested and the amount of shellfish Gold Coast purchased and resold.

While not exhaustive, the Court cites to the following examples to illustrate that the Tribes' evidence and arguments are insufficient to find further violations of the SIP, violations of the PSA, or to award compensatory damages:

- The limited surveys completed on Gold Coast controlled tidelands fail to show a basis for compensatory damages.
  - o The Rafn Tideland: Gold Coast visually estimated there were approximately 7,000 dozen oysters on the Rafn Tideland, a property identified in the Disputed Tidelands. Dkt. 110, Hatch Testimony, p. 46; *see also* Dkt. 1. A quantitative survey showed an estimate of over 20,000 dozen oysters. *Id*. The parties were unable to enter into a harvest plan. *Id*. at pp. 50-51. While there appears to be no evidence regarding the specific number of shellfish harvested from this tideland, Gold Coast's underestimate of oysters would indicate it did not harvest the Tribes' treaty share of oysters from the Rafn Tideland.
  - o The Bernstein Tideland: Randy Hatch, a retired senior shellfish biologist for the Point No Point Treaty Council, testified that, when a crew conducted a survey of the Bernstein Tideland, a tideland under Gold Coast's control, the survey crew found very little evidence of a natural shellfish bed. Dkt. 110, Hatch Testimony, p. 42. While Hatch found the results of the survey suspicious, Hatch speculates, and does not provide evidence, that Gold Coast harvested the Tribes' treaty share of shellfish on the Bernstein Tideland.

○ The Huppert Tideland: Miller testified that he conducted a survey on the Huppert Tideland on an unspecified date. Dkt. 109, Miller Testimony, pp. 117-21. Miller stated that, not including the shellfish in the cultivation bags, there was very little amount of resource on the tideland. *Id*. at pp. 119-21. Miller also testified that the natural populations of oysters are likely to be rather low in Seal Rock -- the area where the Huppert Tideland is located. *Id*. at p. 121. There is no indication Gold Coast harvested the Tribes' treaty share of shellfish on the Huppert Tideland.[9]

The survey data fails to show Gold Coast harvested the Tribes' treaty share of shellfish. Furthermore, the Tribes' have not adequately linked the limited number of surveys completed on Gold Coast controlled tidelands with evidence showing Gold Coast harvested shellfish, including the Tribes' treaty share, from a tideland.

- Relying on sales records, the Tribes appear to conclude the Tribes are entitled to half of Gold Coast's yearly sales. *See* Dkt. 109, Wolf Testimony, p. 94. The Court, however, cannot conclude Gold Coast violated the SIP or the PSA and that the Tribes are entitled to compensatory damages merely based on Gold Coast's sales records, cancelled checks, fish tickets, or other Gold Coast business records. The Court cannot discern which records show the purchase of harvested shellfish, the payment to a tideland owner for shellfish harvested by Gold Coast, the payment of the rights to harvest without harvesting, or some other unknown purpose. The Court also cannot reasonably discern which records show payment from a buyer to Gold Coast (i.e. for the purchase of shellfish) or payment from Gold Coast to a harvester or tideland owner (i.e. for the

---

[9] Neither the Bernstein Tideland nor the Huppert Tideland are identified in the list of Disputed Tidelands. *See* Dkt. 1; SK-99 (parcel numbers). The Court uses these tidelands for illustrative purposes.

purchase of shellfish or proceeds from a harvest). The Tribes did not subpoena a representative of Gold Coast to testify regarding Gold Coast's business records to clarify these issues. Further, no tideland owner testified at trial. Therefore, the Court cannot conclude Gold Coast violated the SIP or the PSA and that the Tribes are entitled to damages merely based on Gold Coast's sales records, cancelled checks, fish tickets, or business records. For example:

o   The Tribes presented evidence showing Gold Coast entered into a license agreement with Dmitri Vasin on May 19, 2014 for parcel number: 192402-1-083-1005. *See* SK-100, pp. 233-34. The Vasin Tideland was identified as a Disputed Tideland in the RFD. *See* Dkt. 1. The license agreement gave Gold Coast an exclusive license to use the tideland to harvest commercial quantities of marketable shellfish. *Id*. at p. 233. On July 3, 2014, Gold Coast was approved for a Washington State Department of Health ("DOH") harvest site certificate for this tideland. *See* SK-99, p. 22. A cancelled check indicates Gold Coast paid Vasin $5,000.00 for "Rental" on November 20, 2015. SK-21, p. 271. The sales records indicate the $5,000.00 payment was for property rental in July and August of 2015. SK-51, p. 9. Vasin did not testify at trial, nor was a deposition of Vasin submitted as evidence. The Tribes appear to assert that because Gold Coast paid Vasin $5,000.00 on November 20, 2015, Gold Coast harvested this tideland around that date. *See* Dkt. 114, p. 36. The Tribes then appear to estimate the number of shellfish (4,854 dozen oysters) that may have been harvested for $5,000.00. *See* Dkt. 114, p. 36; PGJ-21, p. 8. The Tribes have failed to adequately show how the cited records, which show payment for a tideland rental in July and August of 2015, show what activities occurred on the Vasin Tideland or that a harvest

occurred in November 2015, if at all. Importantly, there is no evidence showing Gold Coast's payment to Vasin resulted in a violation of the SIP or the PSA or resulted in a harvest of the Tribes' treaty share of shellfish.

- o Similar to the Vasin Tideland, Gold Coast entered into a license agreement with Paige Stockley on June 8, 2014 for parcel number: 192402-1-086-1002. *See* SK-100, pp. 215-16. The Stockley Tideland was identified as a Disputed Tideland in the RFD. *See* Dkt. 1. The license agreement gave Gold Coast an exclusive license to use the tideland to harvest commercial quantities of marketable shellfish. *Id*. at p. 215. On November 20, 2014, Gold Coast was approved for DOH harvest site certificate for this tideland. *See* SK-99, p. 23. A cancelled check indicates Gold Coast paid Stockley $2,500.00 for "Rental" on November 20, 2015. SK-21, p. 260. The sales records indicate the $2,500.00 payment was for an August 2015 property rental. SK-51, p. 10. Stockley did not testify at trial, nor was a deposition of Stockley admitted as evidence. As with the Vasin Tideland, the Tribes have failed to adequately show how the cited records explain what activities occurred on the Stockley Tideland or that a harvest occurred in November 2015 (as alleged), if at all. *See* Dkt. 114, p. 36. Importantly, there is no evidence showing the payment to Stockley resulted in a violation of the SIP or the PSA or resulted in a harvest of the Tribes' treaty share of shellfish.

- o The Tribes presented evidence showing a cancelled check for a payment from Gold Coast to Gary Sarver in the amount of $1,182.60 on March 27, 2015. SK-21, p. 116. Evidence also shows a cancelled check for a payment from Gold Coast to Gary Sarver in the amount of $895.50 on February 22, 2018 for "Tide Rent." SK-24, p. 51.

The Sarver Tideland was identified as a Disputed Tideland in the RFD. *See* Dkt. 1; SK-99, p. 23. Sarver did not testify at trial, nor was a deposition of Sarver admitted as evidence. The Tribes assert these payments were for harvests; however, there does not appear to be any evidence that Gold Coast harvested from the Sarver Tideland. Importantly, there is no evidence showing the payments to Sarver resulted in a violation of the SIP or the PSA or resulted in a harvest of the Tribes' treaty share of shellfish.

o   The Tribes presented evidence showing Gold Coast entered into a license agreement with James and Marlene Barber on January 1, 2012. *See* SK-100, p. 19.[10] The license agreement gave Gold Coast an exclusive license to use the tidelands to harvest commercial quantities of marketable shellfish. *Id.* On January 9, 2012, Gold Coast was approved for a DOH harvest site certificate for tideland owned by James and Marlene Barber in Hood Canal. *See* SK-99, p. 18. The sales record appears to indicate 325 dozen pacific oysters were sold to James or Marlene Barber on June 14, 2012. SK-56, p. 110; SK-48, p. 1. The sales record states the oysters were harvested on May 27, 2012, but there is no indication regarding who harvested the oysters or from which tidelands the oysters were harvested. SK-56, p. 110. On June 20, 2012, Gold Coast wrote a check to the Barbers for $284.38. SK-17, p. 137. Neither James nor Marlene Barber testified at trial, nor did the Tribes submit depositions of the Barbers as evidence. Based on this evidence, the Tribes are asking the Court to find Gold

---

[10] It does not appear the Barber Tideland was identified as a Disputed Tideland in the RFD. *See* Dkt. 1; SK-99, p. 18 (identifying Barber Tideland as parcel number: 44380000410104, which is not a parcel number listed in the RFD). The Court, however, provides this example as an illustration, especially in light of trial testimony that explained the Tribes' processes using the Barber Tideland. *See* Dkt. 109, Miller Testimony, pp. 129-37.

1   Coast paid the Barber's $284.38 for 325 dozen oysters that Gold Coast harvested

2   from the Barber Tideland. However, the discrepancies between the sales invoice and

3   the cancelled check to the Barbers require the Court to speculate as to what occurred

4   on this tideland and by whom any alleged actions were taken.

5   o   The evidence shows Gold Coast purchased shellfish from harvesters and sold it to

6   separate buyers. The Tribes appear to assert they are entitled to half the shellfish or

7   half the profits Gold Coast received even when Gold Coast purchased shellfish from a

8   harvester. The Tribes, however, fail to explain why an individual harvesting the

9   shellfish would not be responsible for ensuring the Tribes receive their treaty share.

10   Further, this position could result in the Tribes receiving more than their treaty share

11   if, for instance, the harvester is (1) a tribal member, (2) provided the Tribes with their

12   treaty share prior to selling to Gold Coast, or (3) only harvested a non-treaty share of

13   shellfish from a tideland. For instance, the evidence shows:

14   ▪   Kevin Cagey, a Skokomish member, testified that he never harvested from a

15   tideland controlled by Gold Coast, but sold oysters to Scott Grout, the owner of

16   Gold Coast, "a lot until all this court case stuff went about." *See* Dkt. 108, Cagey

17   Testimony, p. 63. The evidence contains a cancelled check showing Gold Coast

18   paid Cagey the amount of $200.26 on February 11, 2013. SK-18, p. 17. The

19   documents also contain at least one payment from Gold Coast to Skokomish. *See*

20   SK-17. This evidence shows that at least some of Gold Coast sales records are

21   payments for shellfish harvested from a tribal member, contradicting the Tribes'

22   assertion that it is reasonable to award the Tribes half of Gold Coast's yearly

23   sales.

24

- Gold Coast purchased oysters from harvesters, such as Vincente Torres, and then Gold Coast sold the oysters to "Dicarlo and other venders" for a profit. SK-156, Grout Depo., pp. 121-22. This is additional evidence supporting the conclusion that the sales logs, invoices, and fish tickets contain payments for the purchase and sale of shellfish that were not harvested by Gold Coast, contradicting the Tribes' assertion that the Court should award the Tribes half of Gold Coast's yearly sales.

- The record contains a memorandum that paraphrases a conversation between Grout and Marjorie Morningstar, the Commercial Harvest Data Team Manager for the Washington Department of Fish and Wildlife. SK-141, *see also* SK-142.[11] In the memorandum, Morningstar states:

> [Scott Grout] said he has changed over to using gardeners and buying directly from them.  The gardeners go to Taylor Shellfish to purchase the maximum number of eggs per day – 50,000 – until they have bought at least a million.  He then assists the gardeners by spreading out the seed.  I believe they harvest and he buys the harvest.  He has an agreement with the gardeners that isn't a lease, I think he used the term a sales agreement.

SK-141, p. 2. This memorandum shows Gold Coast may have assisted landowners in staking and cultivating shellfish, but does not show Gold Coast harvested the shellfish. Rather, Gold Coast appears to be buying shellfish from landowners who have independently cultivated and harvested shellfish. No landowner testified at trial. It is also unclear if Gold Coast entered into this type of

---

[11] The memorandum is not signed under penalty of perjury and Morningstar's statements regarding what Grout said is hearsay. However, the Court finds the information illustrative of the speculative evidence regarding Gold Coast's alleged harvesting activities.

arrangement with any of the tideland owners of the Disputed Tidelands, or even tidelands in Hood Canal. There is also no evidence Gold Coast has any control over these tidelands – i.e. no evidence Gold Coast entered license agreements with the tideland owners. Further, the Tribes have not sufficiently explained why Gold Coast, not the landowner, should be responsible for ensuring that tideland inspections and surveys occur and that any harvest plan be entered with the tideland owner in this situation.[12]

o Gold Coast's U.S. Return of Partnership Income for each year from 2013 through 2018 do not identify which tidelands were specifically harvested or where any seed or product had been placed during any of those years. *See* SK-2 –SK-7; Dkt. 108, Paul Testimony, p. 108.

o Gold Coast's business records do not provide complete and definitive information as to which tidelands were harvested, cultivated or enhanced. *See* SK-8 -- SK-84; SK-86 – SK-87; Dkt. 108, Paul Testimony, pp. 108 -12.

In sum, the evidence the Tribes provided to the Court is speculative regarding the number of shellfish harvested by Gold Coast on any particular tideland in Hood Canal. The sales records and fish tickets are insufficient to show the number of shellfish on particular tidelands and the number of shellfish harvested on each tideland. Thus, this evidence does not adequately allow the Court to determine if Gold Coast harvested the Tribes' treaty share of shellfish.

---

[12] The Court makes no decision regarding this type of activity and its relationship with the SIP; rather, the Court provides this hearsay evidence as an example that the Tribes' evidence is not clear regarding Gold Coast's activities on Hood Canal tidelands.

- The Tribes rely on Gold Coast's DOH certificates to prove Gold Coast harvested from Hood Canal tidelands. However, there is no evidence to show that, because Gold Coast obtained a DOH certificate, it necessarily means the specific tideland has been harvested. Thus, the DOH certificates fail to show Gold Coast violated the SIP or the PSA and the Tribes are entitled to compensatory damages.

- Testimony shows the Tribes believe that, based on invoices and other exhibits, the harvest records provided by Gold Coast after the PSA was signed do not contain all harvests completed by Gold Coast. Dkt. 109, Paul Testimony, p. 45. However, as stated above, evidence shows Gold Coast provided all the records it had in its possession. *See* SK-156, Grout Depo., pp. 20, 34; *see also* GC-512. Further, the Tribes have not adequately explained what evidence shows Gold Coast has failed to provide records, nor adequately shown how the perceived lack of records has impeded the Tribes' abilities to exercise their Treaty Rights.

- The Tribes state they cannot conduct surveys or develop harvest plans because the Tribes lack sufficient data from Gold Coast regarding each specific tideland in its control. *See* Dkt. 109, Wolf Testimony, pp. 78-79; Dkt. 108, Paul Testimony, pp. 155-57.

  o Evidence appears to show the Tribes conducted surveys and entered into harvest agreements with other landowners without historical harvest data. For example, the Tribes assert Gold Coast has not provided sufficient historical harvest records; yet, Skokomish was able to enter a harvest agreement with the Dawsons regarding tidelands that were previously under Gold Coast's control. *See* Dkt. 108, Paul Testimony, pp. 153-54. Miller also testified that he conducted a survey on a tideland that had evidence of cultivation activity. Dkt. 109, Miller Testimony, pp. 118-21.

Thus, the evidence indicates the Tribes have conducted surveys and entered harvest agreements without historical harvest and cultivation data.

o The record also belies the Tribes' global proposition that Gold Coast did not provide any tideland specific historical harvest data. The record contains information showing the Tribes had historical cultivation and harvest records for particular tidelands, yet did not attempt to conduct surveys. *See* SK-100, pp. 235-36 (letter from tideland owner Dmitir Vasin stating the cultivation and harvesting history on his tideland). The record also contains evidence that the tideland owners, not Gold Coast, were keeping tideland specific records of seeding, reseeding, and other cultivation done by the tideland owner, former tideland owners, and/or any other commercial operation. SK-162, Donovan Dec., p. 104. The Tribes, however, did not provide testimony from tideland owners or evidence, beyond what was produced by Gold Coast, regarding any tideland owner's records.

- The Tribes argue Gold Coast impeded their ability to conduct surveys due to Gold Coast's and Scott Grout's conduct. While there is evidence Gold Coast made surveys more difficult, there is also evidence that directly contradicts the Tribes' contention that it was unable to conduct surveys. For example, while the Tribes state there were safety concerns when surveying tidelands under Gold Coast's control, the evidence shows surveys were not impeded. On an unspecified date, the Huppert Tideland was surveyed by members of the Point No Point Treaty Council. *See* Dkt. 109, Miller Testimony, pp. 117-20. During the survey, the interactions between Scott Grout and the tribal members were cordial, but curt. *Id*. at p. 120. Evidence shows, in 2013, a survey was conducted on the Rafn Tideland without any interference from Gold Coast. Dkt. 109, Paul Testimony,

p. 25. Blair Paul, a Skokomish shellfish biologist, testified he had no direct confrontations with Gold Coast. Dkt. 108, Paul Testimony, pp. 72, 162. Hatch testified that the Point No Point Treaty Council would still send employees out to survey a tideland despite a landowner being of the impression that it is illegal for the Tribes to be on the tideland. Dkt. 110, Hatch Testimony, p. 48. This evidence belies the Tribes contention that they were unable to survey tidelands because of Gold Coast's behavior.

- Tribes argue Gold Coast violated the SIP and PSA by failing to enter into harvest plans prior to harvesting. As discussed above, the PSA does not state Gold Coast cannot harvest a tideland without a harvest plan. *See* Dkt. 63. Gold Coast has withdrawn its claim to any staked and cultivated shellfish by conceding the tidelands in question are governed by § 7 of the SIP. Skokomish admits § 7 does not require the parties to draft and execute harvest plans. *See* Dkt. 1, ¶ 4.24. Furthermore, if the tidelands were governed by § 6, § 6.2 - Harvest Plans does not indicate there is a harvesting moratorium while the Grower and affected Tribe(s) are negotiating a harvest plan. A Grower and affected Tribe(s) may submit the matter for dispute resolution if they are "unable to negotiate an acceptable harvest plan[.]"[13] Section 6.3 also states a Grower is permitted to continue with any enhancement or cultivation activities at his own risk pending the resolution of the matter by dispute resolution. The parties have not cited to a provision in the SIP that expressly prohibits harvesting prior to entering a harvest plan.

- Miller testified that, on an unspecified date, there was evidence of cultivation occurring on the Huppert Tideland. Dkt. 109, Miller Testimony, p. 119. While a 6.3 Notice had

---

[13] The Court notes that if a Grower and affected Tribe(s) submitted a harvest plan matter for dispute resolution, a party could seek a temporary injunction, if necessary, to cease harvesting on the tideland.

been filed, Miller assessed that, based on the appearance of the cultivation bags, cultivation occurred prior to the 6.3 Notice being sent. *Id*. at pp. 119-20. There is no clear evidence, however, showing Gold Coast placed the cultivation bags on the tidelands. Further, while failing to give a proper 6.3 Notice prior to cultivation warrants relief as a violation of the SIP, there is no evidence Gold Coast harvested the Tribes' share of shellfish from the Huppert Tideland. Thus, there is no evidence the Tribes are entitled to compensatory damages.

- Wolf believed Gold Coast was harvesting oysters from the Dawson Tideland without notification, without a harvest plan, and without a survey. Dkt. 109, Wolf Testimony, pp. 67-68. Wolf, however, does not explain how he came to this conclusion. Further, it is not clear that this conduct, without more, violates the SIP or the PSA. A January 27, 2015 incident report regarding the Dawson Tideland states, "Under the Stipulation and Order Amending Shellfish Implementation Plan [Gold Coast] is not required to notify tribes if [it is] not enhancing/farming the beach. In this case, Gold Coast is not enhancing or farming they are just harvesting." SK-163, Wolf Dec., p. 21. The incident report also stated D.D. Denotta (a shellfish company unrelated to this action) was issued a DOH harvest site certificate in 2008 for the Dawson Tideland. *Id*. Thus, it is not clear from the evidence if the Dawson Tideland was staked and cultivated and, if it was, whether D.D. Denotta – not Gold Coast – staked and cultivated and/or harvested the tideland prior to Gold Coast taking control. The incident report found that Gold Coast failed to report the sale of shellfish without a fish receiving ticket. *Id*.

- An unsigned incident report, dated July 8, 2012, shows Gold Coast harvested 20 to 25 bags of product from state land without a valid harvest site certificate. PGJ-5. The

evidence does not show the specific number of shellfish harvested, nor is there sufficient evidence showing the Tribes were denied their treaty shares because of this harvest. *See* Dkt. 109, Gage Testimony, pp. 177-79. Furthermore, this tideland is not identified in the RFD as a Disputed Tideland. *See* Dkt. 1.

The Court has provided examples wherein it finds the Tribes' arguments and evidence to be misleading, confusing, vague, and/or speculative. This list is not exhaustive. The Court also notes there are large amounts of evidence that appear completely unrelated and irrelevant to the disputes alleged in this case. For instance, the Tribes provided cancelled checks for payments Gold Coast made to Verizon wireless, medical providers, and employees. *See* SK-16 – SK-25. Without narrowly-tailored evidence and adequate explanations of specific evidence, the evidence presented by the Tribes is not persuasive. While the Court recognizes the Tribes assert Gold Coast has been less than forthcoming with records and information it has disclosed, the Tribes elected not to pursue remedies under the discovery rules to ensure Gold Coast produced all documents and adequately explained the evidence.

From the evidence the Court has reviewed, Gold Coast may have cultivated and harvested shellfish without giving proper notice to the Tribes under § 6.3. However, the evidence also shows Gold Coast bought shellfish from harvesters, such as Cagey and Torres, and sold the shellfish to separate buyers without harvesting. There does not appear to be evidence, beyond speculation, that shows: (1) the amounts of shellfish and from what tidelands Gold Coast may have harvested shellfish; (2) if Gold Coast did harvest a tideland, that Gold Coast took the Tribes' treaty share of shellfish; or (3) the amount of shellfish Gold Coast harvested as compared to the amount of shellfish Gold Coast merely purchased and resold.

1    Overall, the Tribes have not sufficiently connected Gold Coast's actions to evidence

2  showing Gold Coast denied the Tribes their treaty share of shellfish. The Tribes have not shown

3  Gold Coast harvested the Tribes' treaty share of shellfish. Further, even if Gold Coast only

4  denied the Tribes the opportunity to obtain their treaty share of shellfish, the Tribes have not

5  provided information showing the number or poundage of shellfish present on any tideland,

6  much less the Disputed Tidelands. The Tribes' global approach requires the Court to make

7  assumptions and speculate as to Gold Coast's activities and any alleged taking of tribal shares of

8  shellfish. The Court declines to do so. Thus, the Tribes have not shown they are entitled to

9  compensatory damages.

10    C.  *Remedy*

11    The Tribes seek declaratory and injunctive relief and compensatory damages. For the

12  above stated reasons, the Court is unable to determine the Tribes are entitled to a number or

13  poundage of shellfish. Therefore, the Court finds the Tribes have not shown they are entitled to

14  compensatory damages.

15    The Court finds Gold Coast has violated the SIP, as detailed above. While the SIP does

16  not dictate specific remedies, the Court has authority to fashion an equitable remedy against

17  Gold Coast for its violations of the SIP. *See U.S. v. Washington*, 2015 WL3451316, at *13 (W.D.

18  Wash. May 29, 2015). "[T]he Shellfish Implementation Plan was fashioned out of equity to

19  balance the rights of the Treaty Tribes, shellfish growers, private landowners, and other citizens

20  of the State of Washington when implementing treaty harvesting rights." *Id*.

21    It would clearly be unfair to the Tribe to allow a Grower to violate the SIP with
       impunity. If there were no consequences, this could encourage Growers to sign a
22     lease for tidelands, harvest the shellfish and then cancel the lease without providing
       notice of any of the commercial activities on the tidelands—all to the detriment of
23     the affected tribes. This clearly is not the intent of the SIP.

24

1   *Id.*

2          The Court has considered the law and the evidence, and finds that, based on the totality of

3   the evidence and the historical relationship between the Tribes and Gold Coast, a permanent

4   injunction is appropriate in this case. The Tribes have proposed a broad panoply of prospective

5   relief designed to apply to Gold Coast. *See* Dkt. 1, 115, 117-1.  The Court finds some of the

6   Tribes' proposed relief may be beyond the scope of this Order and may not be appropriate.

7          To ensure the Court orders injunctive relief that is predicated on the unique, particular

8   facts of this case, the Court directed the parties to provide a proposed order detailing the specific

9   conditions to which the parties must comply.[14] The parities have complied with the Court's

10  briefing schedule and the Court will file a permanent injunction in due course.

11         Gold Coast is temporarily enjoined from engaging in shellfish activities – including, but

12  not limited to, harvesting, transferring, removing, or cultivating shellfish – on every Hood Canal

13  tideland currently under its control. This injunction shall be lifted upon the date on which the

14  Court enters the order establishing the injunctive remedy in this case or May 1, 2020, whichever

15  occurs first.

16         The failure to comply with this Order may result in finding of contempt and imposition of

17  remedial sanctions of the purpose of coercing performance.

18         Dated this 20th day of April, 2020.

19

20                                                            David W. Christel
                                                              United States Magistrate Judge
21

22

23  _____

24  [14] Nothing in this Order should be interpreted to restrict the interested parties' involvement in the
    development of the stipulated proposed order.