UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF WASHINGTON, et al.,<br><br>Defendants. | CASE NO. C70-9213 RSM<br><br>SUBPROCEEDING NO. 17-03 RSM<br><br>SCHEDULING ORDER AND FOR POST-TRIAL BRIEFING |

This subproceeding proceeded to a bench trial, held before the Court on March 21–24, 28–29, and April 11, 2022. The parties have completed their evidentiary presentations and the Court issues this order to schedule the closing arguments, order post-trial briefing, and provide all parties the opportunity to respond to questions which may aid the Court in resolving this subproceeding within the larger context of the underlying case. Accordingly, the Court ORDERS as follows:

A. **Closing Arguments: The Court schedules closing arguments in this matter for May 9, 2022, at 9:00 a.m.**

B. **Findings of Fact and Conclusions of Law:** The parties shall submit proposed findings of fact and conclusions of law no later than the date and time set for closing arguments.

ORDER – 1

Interested parties are requested to submit proposed findings of fact and conclusions of law, if at all necessary, with any post-trial briefing they may submit.

C. **Post-Trial Briefing:** The parties, and each of the interested parties, may submit post-trial briefing, not to exceed 24 pages and preferably shorter, addressing the following questions posed by the Court and any additional legal issues they believe remain outstanding:

1. How, if at all, should the Court consider evidence of practices that were characteristic of all Coast Salish tribes in considering a specific tribe's U&A?
2. Does any tribe claim to be a successor tribe to the Quadsak people? Does it matter whether Quadsak was a treaty tribe?
3. Does any party contest that Quadsak, to the extent it was ever a separate tribe, ceased to be an organized tribe at some time?
4. What effect, if any, should the Court give the continual distinction drawn by various experts as to primary and secondary rights? Should any such distinction apply in the context of the underlying case? To the extent the distinction should and does apply, has the Court addressed the distinction consistently in the past?
5. Is there evidence in the record indicating that a primary-/secondary-right scheme was always operative (i.e., secondary user must obtain permission before use) or was such a scheme only relevant if two groups happened upon the same location at the same time (i.e., secondary user must yield to the primary user's superior right)?
6. Could a tribe ever have usual and accustomed fishing grounds or stations at locations it was permitted to use by another tribe?

ORDER – 2

7. Assuming that Quadsak peoples were not members of the Stillaguamish tribe and that they had primary use rights in Port Susan:

    a. How does Quadsak's presumably extinct primary right impact Stillaguamish's claims to U&A in Port Susan?

    b. Does the answer change if Stillaguamish had secondary rights to fish in Port Susan or permissive rights?

8. Should the Court draw any distinction between situations where:

    a. A tribe cannot present direct historical evidence of <u>fishing</u> in a marine water body but establishes its member's regular presence on the shores of the marine water body and its use of marine resources ; and

    b. A tribe cannot present direct historical evidence of <u>fishing</u> in a marine water body and is only able to establish its members' temporary or infrequent presence on the shores of a marine water body.

9. How should the Court treat situations where a tribe takes differing positions based on its particular interest in the subproceeding before the Court. Compare, e.g., Dkt. #14181 at (Swinomish, Tulalip, and Upper Skagit emphasizing relaxed standard of proof as to U&A claims and the generality of U&A in open marine areas and arguing that evidence of "regular visitation or travel to open marine areas is sufficiency to establish U&A, that absence of "hard" documentary data does not preclude U&A finding, and that "annual usage" is not required) with, e.g., Dkts. ##22494–96 (Swinomish, Upper Skagit, and Tulalip now arguing that Stillaguamish lacks direct evidence of fishing in contested waters).

10. Why was Stillaguamish included as a bound party in the Shellfish Implementation Plan if Stillaguamish did not have any interest in marine waters?

ORDER – 3

11. Hasn't the Court previously concluded, in earlier subproceedings, that tribes "took fish, including shellfish, from the marine and fresh waters, tidelands, and bedlands adjacent and subjacent" to their established sites/villages? *See United States v. Washington*, 873 F. Supp. 1422, 1448 (W.D. Wash. 1994), *aff'd in part, rev'd in part sub nom*, 157 F.3d 630 (9th Cir. 1998) (as amended).

   a. Are there any examples where:
      i. tribal members lived on a shoreline but did not have U&A extending into adjacent and subjacent waters; or
      ii. where U&A was found based on sustained and regular presence on the shoreline of a water body.
   b. Is it correct that, outside of specific grounds that may be some distance from a tribe's "home territory," most U&A determinations are premised primarily on a tribe's presence and access? Are any prior U&A determinations instructive?

12. Is it fair to say that the spotty historical record means that the Court is most often weighing the probability that a specific tribe fished in a specific water body on a limited evidentiary record?

   a. For instance, can the Court assume that no tribe believes that another tribe would be required to present evidence of fishing in every tributary where a main river is located mainly within that tribe's "home territory"? Similarly, can the Court assume that no tribe believes that another tribe would be required to present evidence of fishing in every bay, harbor, or passage adjacent to its "home territory"?

ORDER – 4

        **b.** Should presence, access, and ability, combined with the general presumption that tribes used the resources that were available to them, be sufficient in the absence of another tribe having a primary or superior claim to a specific area?

        **c.** Is proximity a reasonable measure of probability in the absence of contrary evidence?

        **d.** As the distance between a claimed water body and a tribe's "home territory" increases, should the measure of proof increase (specifically regarding frequency or regularity)?

**13.** Does professional baseball provide an apt analogy for thinking about a tribe's U&A?

        **a.** If the Mariners are playing baseball, the most likely location is at T-Mobile Field, in Seattle, where they play close to half of their regular season games (akin to a "home territory"). For spring training, approximately half of February and most of March, they primarily play at a home away from home in Peoria, Arizona (akin to an annually used "seasonal camp"), and occasionally travel to surrounding cities in Arizona to play preseason games against other teams (akin to "seasonal camps" which are not used every year). Outside of these most common locations, they visit the stadiums of their four American League West rivals three to four times a year for approximately half a week at a time. Less frequently, about once a year, they visit the ten teams in the American League's East and Central Divisions, again for approximately half a week at a time. Finally, the Mariners visit, in any given year, the stadiums of five of the fifteen National League teams.

ORDER – 5

      b. Where on this continuum do the Mariners switch from visiting usual and accustomed locations to visiting locations which are infrequent or occasional.

14. Do the parties contend that any other tribes—other than Quadsak or Stillaguamish—fished in the northern part of Port Susan?

15. Should any distinction be drawn between locations that can be reached quickly and with minimal travel and supplies (perhaps within a day of a tribal village/camp) and more distant locations requiring multiple days of travel and procurement of provisions in route?

16. Should the Court interpret the *Lummi* cases as establishing that travel alone can establish U&A? Why or why not? Are there alternative interpretations of the *Lummi* cases? Are the *Lummi* cases "tribe-specific" rulings? How is this case distinguishable from the *Lummi* cases?

17. Is there any distinction to be drawn, as regards establishing U&A, between traveling to a location (or locations) to engage in fishing and traveling to a location (or locations) for other purposes? Should this change with the length of the travel or other factors?

18. Are there any "true" evidentiary standards that must be satisfied in the underlying case to establish U&A? Is ethnographic or anthropological evidence *required*?

19. Is it fair to conclude from the expert testimony in this subproceeding, that, to a certain extent, shifting familial relationships had a larger bearing on access to shared resources than did tribal relationships? How should the Court attribute smaller shifts at the family level to tribes as a whole?

///

///

ORDER – 6

It is so ORDERED.

Dated this 20th day of April, 2022.

						_____
						RICARDO S. MARTINEZ
						CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 7